# DEPOSITION OF THOMAS LOUDAT, PH. D. VOL I TAKEN ON 06-22-05

*Page 1 to Page 195*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596



EXHIBIT "D"

Page 5

BY MR. LEVINSTEIN:

Q. Doctor Loudat, my name is Mark Levinstein, and I'm with the law firm of Williams & Connolly in Washington, D.C., and I am counsel for the defendants in this case.

When were you first contacted about this matter?

A. October 13 of last year via a phone call from Mr. Jones.

Q. What do you recall about that telephone call?

A. That he wanted to retain me to estimate the losses to Dae Sung Lee due to being withdrawn as the coach for the U.S. Olympics Taekwondo team for the 2004 Olympics.

Q. And did you agree to become an expert at that time?

A. Yes.

Q. And at that point in time what did you understand he wanted you to do?

A. Do exactly what I just said, review appropriate documents and measure as best as you can, given the information available, at the margin what would have happened to this business had Dae Sung Lee been the Olympic coach for the 2004 Olympics.

Page 6

Q. Do you have your CV with you?

A. I don't have a copy. Mr. Jones just asked me. He said he forgot to bring a copy. April may have a copy, because I have worked with, with her firm in the past. I don't know if you do.

I also have a copy on my laptop, and I can put a copy on my mass storage device, which is a USB device. And if you can plug it into a computer you can print out the CV, if you want to do that.

MR. LEVINSTEIN: Okay. Well, we don't have to do it right this second, I guess, but let me mark this as Exhibit A, or Exhibit 1, or whatever we're doing.

(Deposition Exhibit 1 marked.)

BY MR. LEVINSTEIN:

Q. I give you what's been marked as Exhibit 1. It's the notice of your deposition with documents to be produced. Have you seen this before?

A. Yes.

Q. And do you have any documents that you're bringing with you today to produce?

A. My entire file, which has every document related to this case that I reviewed, and what I've produced for the case.

Q. Okay. So I guess we'll get copies of that

Page 7

at some point.

A. Yes.

Q. And maybe next break I can sort of look through that. All right, since we don't have your CV let's, let me just ask you. What is your general area of expertise?

A. Economics.

Q. Anything particular within economics?

A. Well, in this regard it's forensic economics. I also do impact analysis related to economic impacts of certain policies or decisions, and agricultural and resource economic analysis as well.

Q. Agricultural and?

A. Resource economics.

Q. Now, the impact analysis, is that in the course of litigation or outside of litigation?

A. Outside litigation.

Q. And the forensic analysis, is that all in the course of litigation?

A. Pretty much. Sometimes there are administrative hearings where that expertise comes into play, but most of the time litigation.

Q. And do you do any work as a valuer of businesses or an appraiser of businesses?

Page 8

A. No, I don't do business appraisals.

Q. So you're not an expert in business appraisal?

A. No.

Q. And not an expert in valuing businesses?

A. Well, valuation insofar as if, if you talk about valuation insofar as the present value of cash flow, yes, and in looking at the change in that aspect of value of a business due to an event, yes. But in terms of doing an appraisal of a business for a sale purpose, I don't do that.

Q. But also not any expertise in determining what the effect of an event would be on a business?

A. Oh, absolutely. I can do that. It's just marginal analysis.

Q. What experience have you had with martial arts schools?

A. Well, I've never done martial arts so I have no personal experience with them. With respect to professional work, I don't recall ever doing an analysis of a martial arts school in the past, so this may be the first. I have no recollection of having done it before.

Q. Okay. So you don't know about the different types of martial arts, Karate, Judo, Kung

Page 13

(1) preliminary analysis, like setting up the model and,
(2) and looking to see what variables needed to be
(3) specified to go into the model, and, to the extent
(4) that I could, attach values to those variables.
(5) (09:23) Q. So, between the time you talked to Mr.
(6) Jones and this January 27th, 2005, you didn't talk
(7) to anyone else about this case?
(8) (09:23) A. Correct.
(9) (09:23) Q. And on January 27th did you speak to
(10) anyone about the case?
(11) (09:23) A. No.
(12) (09:23) Q. So you were provided some documents by Mr.
(13) Jones and you looked at those?
(14) (09:24) A. Yes.
(15) (09:24) Q. And the next time you worked on this case
(16) was when?
(17) (09:24) A. March 7th.
(18) (09:24) Q. Now, had you already started writing your
(19) report on January 27th?
(20) (09:24) A. Well, I would have drafted something just
(21) to outline, like I said, to outline variables that I
(22) felt needed to be specified and the variable values,
(23) and the vari -- if I couldn't specify a variable
(24) value, then that indicates to me I need more
(25) information, which I would then pursue?

Page 14

(1) (09:24) Q. On January 27th had you already come to
(2) the conclusion that Dae Sung Lee had suffered some
(3) damage by not being continued as the Olympic coach?
(4) (09:24) A. Well, concept -- or quan -- qualitatively,
(5) that was my opinion, otherwise, I would have never
(6) done any analysis. Quantitatively, I wouldn't have
(7) had a value at that point in time.
(8) (09:24) Q. Well, how did you form the opinion that he
(9) had been damaged?
(10) (09:24) A. Well, the, just -- I have some empirical
(11) information, but just the, the general concept or
(12) general knowledge that a market-differentiating
(13) characteristic such as an Olympics coaching
(14) experience can be publicized and generally leads to
(15) some income award or reward, which is typically the
(16) case in this society.
(17) (09:25) Q. And what analysis did you do or what
(18) documents did you look at to come to that conclusion
(19) about that being an Olympic coach would be
(20) market-differentiating in this market?
(21) (09:25) A. Generally, making professional and personal
(22) observations of what occurs in this society, and I
(23) would have had some documents of the statements of
(24) Han Won Lee and, and Master Cheon, who provided
(25) affidavits to the effect that it was their opinion

Page 15

(1) that their Olympic coaching experience had a positive
(2) impact on the business.
(3) (09:25) Q. And what is the relationship of those
(4) gentlemen to Mr. Lee, Mr. Han Won Lee --
(5) (09:26) A. -- well, they're --
(6) (09:26) Q. -- and Mr. Cheon?
(7) (09:26) A. They both operate do'jangs. I -- and
(8) there's some personal relationship between them, the
(9) extent to which I don't know other than I know
(10) generally there, there is a personal relationship.
(11) (09:26) Q. Did you speak to them as of January 27th?
(12) (09:26) A. No.
(13) (09:26) Q. Did you ever speak to them?
(14) (09:26) A. No.
(15) (09:26) Q. So the sole basis for what their view was
(16) is their declarations?
(17) (09:26) A. Is their declarations.
(18) (09:26) Q. Who drafted those declarations?
(19) (09:26) A. I don't know.
(20) (09:26) Q. And did you notice that they have identical
(21) language in their declarations?
(22) (09:26) A. I, I did notice in the first declaration
(23) that was the case.
(24) (09:26) Q. Did that affect your analysis at all?
(25) (09:26) A. No. They both signed it, so I'm assuming

Page 16

(1) that they reviewed and said this is applicable as
(2) stated to, to me.
(3) (09:26) Q. So, what work did you do in order to
(4) determine whether in the location where Mr. Dae Sung
(5) Lee's school is, whether his being the head coach at
(6) the Olympics in 2004 would have caused his business
(7) to do better?
(8) (09:27) A. Well, I'm not sure I understand the
(9) question. You say location of his business. I mean,
(10) see, I'm a little confused to what you're implying
(11) there that I'm supposed to respond to.
(12) (09:27) I mean, we have, the way I conceptualized
(13) it and measured it is we have the event of Olympic
(14) coaching experience. And so, qualitatively, based on
(15) what I've already stated, it would be my opinion that
(16) there would be a positive impact on his business due
(17) to that particular event.
(18) (09:27) The, the quantitative measure then comes
(19) into play via the approach that I used in my
(20) analysis.
(21) (09:27) Q. Is that because he would put in his
(22) advertising that he was the Olympic coach?
(23) (09:27) A. That he did?
(24) (09:27) Q. No, is that, is that -- the reason he would
(25) be benefitted, if he'd been the Olympic coach, was he

Page 57

BY MR. LEVINSTEIN:

Q. Okay.

A. But because of that, and I'll restate this, is why I didn't solely rely on that particular scenario.

Q. But are you saying that scenario is accurate to reasonable average economic certainty or it's not?

A. I, from a more-likely-than-not criterion, I would say no. But in terms of coming up with an overall opinion related to what is a more-likely-than-not scenario, it enters into the matrix of calculations.

Q. But it's the only way you attempted to measure lost profits of the business, correct?

A. No. Because then --

Q. The other calculation was to measure based on comparative salaries of coaches?

A. That incorrect. What, what I did is to take the net that he derived from the business, which includes his salary, as well as the net from the business.

And how I pegged that in terms of the profile was to use that total, which includes earnings and a net from the business, as a measure of

Page 58

his total net from the business to make him a comparable to an employee.

Then I used that profile to, as a measure of what would have happened to both his earnings from the business and his net that he would have derived from the business --

Q. -- to use --

A. -- for the low scenario --

Q. -- his value as the employee to try to estimate the lost profits from his business?

A. I used the, the valuation of a coach based on the profiles that I cited as a measure of what he nets from his efforts in that corporation.

Q. And the chart that you used of, of compensation that you used for the low-case scenario was based primarily on people who are on salary, not lost profits from business, correct?

A. It's -- regardless. It still --

Q. I'm asking a question. Is that true or not?

A. Well, it is true. That it's still --

Q. That's all I wanted to ask. So you used an estimate of what his salary would be, you average that with the lost profits calculation based on Han Won Lee to get your estimate of damage?

Page 59

A. Well, it's a misstatement. That's a misstatement. The, the, the measure of a profile of a coach is a proxy for the measure that he nets from his coaching at his center, what he nets from that, that labor market activity, that's what it is.

There is no profile in existence that I'm aware of, and if you can provide one I'll happily use it, as to what a Taekwondo business would be expected to net. Okay?

There's no benchmark statistics, published information, that I'm aware of, but there is for coaches, which can use as a benchmark as to what sort of return you would expect based on that particular labor market activity. That's what I did. It's a proxy for what you're saying I didn't measure.

Q. Okay, a labor market activity as determined by a negotiation of a salary?

A. It's a labor market value, whether it's negotiated or not. It's a labor, it's what the labor market is willing to pay for this particular occupational activity. That's what it is.

Q. Isn't running a small business more comparable to being a Taekwondo coach than being hired to be a gym coach at a school?

MR. JONES: Objection. Vague and

Page 60

ambiguous.

A. Yeah, I don't know what you're purporting to say there.

BY MR. LEVINSTEIN:

Q. So you don't know, focusing back on Han Won Lee, you don't know anything about what competition he faced in that marketplace?

A. Han Won Lee in, in Colorado?

Q. Yes.

A. No.

Q. Don't know how many competitors there are who coach Taekwondo?

A. No. I mean, I'm looking at, like I said, I'm looking at his business. And there's an assumption that's typically made when do you this type of analysis by economists, it's called certeris parabus: All things the same but for this particular event.

So I'm not aware of any significant change in his marketplace or his competitive environment. The most significant -- that that is dramatic enough to cause a measurable impact.

Q. Except that he was a three-year-old business and still may have been on the increase from that alone, right?

Page 61

(1) A. I, that I don't know. I mean, that's
(2) possible, that's possible.
(3) Q. Okay. And we don't know if athletes from
(4) the National Training Center working at his school
(5) helped his business?
(6) A. I don't know.
(7) Q. And we don't know about the quality of his
(8) facility and how it compared to Dae Sung Lee's
(9) facility?
(10) A. Yeah, I, I haven't observed either of the
(11) facilities. And I, I will state that it's very
(12) atypical to do that.
(13) Q. Well, let's suppose we're going to take two
(14) businesses and compare them in order to determine if
(15) the experience of one is a good yardstick for the
(16) experience of the other. Are you familiar with that
(17) analysis?
(18) A. Well, you're talking comparables for a
(19) valuation estimate, or I assume that's what you, what
(20) you would be using it for.
(21) Q. Yes. And you're not an expert on that?
(22) A. I'm not doing a business valuation.
(23) Q. So you're not attempting to assess lost
(24) profits based on a business valuation?
(25) A. No. I'm measuring the consequence of an

Page 62

(1) event on a business activity at the margin, what can
(2) reasonably be estimated to have happened --
(3) Q. -- and don't you --
(4) A. -- based on --
(5) Q. -- understand --
(6) A. -- based on, based on the best information
(7) I can bring to bear.
(8) Q. And don't you understand that in order to
(9) make that assessment you need to know that the two
(10) businesses you're comparing are comparable?
(11) A. The only reason that would come into play
(12) is if there's a significant change in the operating
(13) environment of one business relative to the other,
(14) because we're talking an event at the margin, or an
(15) incremental event that changes something. Unless you
(16) have some dynamic change in one versus the other,
(17) then the comparable falls apart.
(18) Q. Let's suppose I have two businesses, one in
(19) a mature market where there's lots of competition,
(20) okay? Where there's other people competing all the
(21) time. Other place you have a new business, all by
(22) itself in a wide open market, okay?
(23) Same event happens in two places. This guy
(24) gets a credential and that guy gets a credential and
(25) they both go out to advertise it. Are you telling me

Page 63

(1) that there's no reason to think the guy with no
(2) competition in a wide open market is going to have a
(3) lot more success than the guy in a mature market?
(4) A. I have no idea what you mean by a wide open
(5) market.
(6) Q. The only --
(7) A. -- everybody's dealing in a marketplace,
(8) attempting to get consumer dollars to come to their
(9) business. Whether it's a new customer you're taking
(10) from somebody else, it's the same event. You're
(11) still competing in a marketplace and you're doing
(12) something to garner more business to your, more
(13) customers to your business.
(14) Q. And you believe business valuation and
(15) assessing the effect of an event on a business has
(16) nothing to do with your market share or the
(17) competitive conditions in the market where you're
(18) operating?
(19) MR. JONES: Objection. Vague and
(20) ambiguous, and also compound.
(21) A. If you can say that over the time period of
(22) the specific analysis that the assumption of
(23) everything else being the same but for the event
(24) changes dramatically, then there, there are things
(25) that you just, you just don't assess.

Page 64

(1) BY MR. LEVINSTEIN:
(2) Q. But we're not assuming that everything's
(3) the same. We're assuming that everything's
(4) completely different in Hawaii and Colorado Springs,
(5) aren't they?
(6) A. Is that your opinion?
(7) Q. Well, what's the same? Why don't you tell
(8) me what's the same about Colorado Springs and Hawaii?
(9) What's the same in 2000 in Colorado Springs for Han
(10) Won Lee's business and Dae Sung Lee's business in
(11) 2004 in Hawaii?
(12) MR. JONES: Excuse me, counsel. Just
(13) one question. Are we assuming Castle Rock and
(14) Colorado Springs are one and the same?
(15) MR. LEVINSTEIN: Well, it's outside
(16) of Castle Rock we'll use where Han Won Lee's business
(17) is.
(18) A. Well, wait a minute. So the -- you want me
(19) to state what's the same in each of these markets.
(20) Why don't you be more specific rather than leaving it
(21) as an open-ended question, because I, I don't know
(22) how to answer it unless --
(23) BY MR. LEVINSTEIN:
(24) Q. I don't think you know anything about these
(25) businesses in order to tell me anything that's the

Page 65

(1) same.
(2) MR. JONES: Objection. Argumentative.
(3) BY MR. LEVINSTEIN:
(4) Q. That's why you can start anywhere you want.
(5) A. Well, that remains --
(6) MR. JONES: -- argumentative --
(7) A. -- to be seen. And you're, you're welcome
(8) to whatever opinion and whatever you want to say.
(9) Whether it has any relevance to what I've done or
(10) what's going to be perceived by the triers of fact or
(11) a jury is another question, but you can say whatever
(12) you want.
(13) BY MR. LEVINSTEIN:
(14) Q. But I asked you a question. What's the
(15) same about Han Won Lee's business in 2000 and Dae
(16) Sung Lee's business in 2004 besides they both teach
(17) Taekwondo, that you know to be true?
(18) A. Okay, I'll just go through a laundry list
(19) of similarities that I'm aware of, and there may be
(20) more. And they can testify to this themselves and
(21) people can make their own assessment, but this is
(22) based on what I know at this point in time.
(23) They're both of Korean ancestry, they're
(24) both of approximately the same age, they're both
(25) educated at American university.

Page 66

(1) Dae Sung Lee, I think, is, is degreed. Han
(2) Won Lee, I believe, is not degreed. Both emigrated
(3) to the U.S. at approximately the same age and time.
(4) Based on what Dae Sung Lee indicated to me,
(5) they both are more Westernized than, than, and speak
(6) better English in contrast to Master Cheon. That was
(7) a distinguishing characteristic he mentioned to me.
(8) They're both Taekwondo masters in terms of
(9) professional activities. They both coached, have
(10) coaching experience at the Olympic level, and you've
(11) mentioned that, although, again, Dae Sung Lee was not
(12) a credentialed coach. In fact, they coached
(13) together, according to Dae Sung Lee.
(14) Both have been associated with the U.S.
(15) Olympic Team and related associations.
(16) Business-wise, they both own and operated do'jangs.
(17) They, well, they both advertised in their business.
(18) Dae Sung Lee cannot advertise that he was a
(19) credentialed Olympic coach, which is a
(20) differentiating characteristic between the two.
(21) In 2002, when they both had approximately
(22) equal revenues, their cost structure was
(23) approximately the same. They both netted 19 percent
(24) Sub Chapter S net income from the corporations,
(25) suggesting some similar cost structures.

Page 67

(1) In terms of, there's been some opinions in
(2) John Candon's report that they had different,
(3) allegations that they have different management
(4) styles. I don't know. We can discuss the relevance
(5) of that and whether his comments are correct or not.
(6) So I don't, I can't make any comment about management
(7) styles.
(8) The terms of market demographics, median
(9) age, Castle Rock/Colorado Springs relative to
(10) Honolulu is approximately the same, and that's in
(11) contrast to John Candon's opinion, and I'll show you
(12) the definitive information to show that.
(13) There is a cost of living differential.
(14) Honolulu, relative to both of those communities, it's
(15) more expensive to live here. Mr. Candon makes -- one
(16) of the reasons is the cost of housing here.
(17) However, what you can't lose sight of in
(18) this local market is what's called ohana housing,
(19) large extended families, to mitigate that particular
(20) cost so that people have, still have discretionary
(21) income for activities such as martial arts.
(22) With respect to job growth, yeah, I would
(23) say there's probably greater job growth in Colorado
(24) Springs, at least in percentage terms. Absolute
(25) terms, Honolulu job growth is going to dwarf whatever

Page 68

(1) happens there.
(2) So, you know, that's, again, that's a
(3) comment that Candon made, and I'm, I'm unclear as to
(4) what the relevance of it is, but I assume it's
(5) relevant to you because your expert stated it.
(6) There is greater job growth. I'm not sure
(7) what the implication of that is. And also his
(8) statistics are wrong for that area, that I can see.
(9) I can't substantiate them. If he provides a source,
(10) I can check his source.
(11) So, those are the similarities that I'm
(12) aware of, or there may be more, but that's what I'm
(13) aware of at this particular point in time.
(14) Q. This list of things you generated you just
(15) read from, that's been generated since you read
(16) Mr. Candon's report, correct?
(17) A. That's right.
(18) Q. You mentioned they're both of Korean
(19) ancestry. What are the demographics here versus
(20) Colorado Springs or Castle Rock in terms of the
(21) extent to which there's an Asian or Korean
(22) population?
(23) A. There's a much larger percentage of Asians
(24) in, in this population as opposed to Colorado
(25) Springs.

Page 85

A. What numbers?

Q. You said there weren't any data points in order to do a regression analysis, right?

A. For establishing probabilities for specific outcomes, right. I, I'm not aware of any data that would allow you to do that, and I don't know it would be a regression, it'd be a probe it or load analysis, I believe.

Q. And if you had enough information, that's the sort of analysis you'd want to do?

A. Yeah. The information doesn't exist.

Q. And so if you attempted to do the analysis with the information we have, what would happen?

A. Well, the, the basis for taking the mid point of the two scenarios that I formulated is a rule-of-thumb benchmark in operations research. You just equate your outcomes equally in terms of probabilities, and then that becomes, so it's a simple mean, and that's what I did.

Q. And where, with two outcomes, weighing them equally, where is the literature that supports this?

A. Oh, it's, it's in a textbook, operations research textbook that I used to teach from. So you just, if you have outcomes that you cannot attach probabilities to, the rule of thumb is to give them

Page 86

equal weights or just do a simple mean of them.

Q. And you can't attach probabilities to these outcomes is what you're telling me?

A. No, not, not without doing additional analysis. You could establish subjective probabilities based on whomever's doing the subjective determination.

Q. Could we have produced the pages of this textbook?

A. Well, if you want them.

Q. That's the basis for your applying this analysis, I'd like to see the textbook that explains it. And the textbook is called what?

A. Operations Research. I forgot the author.

Q. Now, if I told you I had two gentlemen, each had a business, and they were going to be given the benefit, something they could put on their resume or some other event, is it your analysis that, in general, they'd be equally able to capitalize on that?

A. Not necessarily. They may, but not necessarily.

Q. And what would you look at, if they were business people, in order to assess whether they'd be equally able to capitalize on it?

Page 87

A. Well, if you have -- you would do a more detailed analysis of the management characteristics of the individuals. I suspect the changes in the market over the time period which you're talking about. Any other factors that could potentially change simultaneous with the benefit.

Q. Well, even static factors would affect the extent to which one's going to get the benefit versus the other, right?

A. Correct.

Q. So if I've got a McDonald's that's in the middle of nowhere and a McDonald's that's sitting in a high population center, and some good event happens to both McDonald's, the one in the better center may be able to capitalize a lot more than the guy who's in the middle of nowhere?

A. All other things the same, that may be the case.

Q. Right. That's just an extreme example. And two McDonald's having the same event, you wouldn't necessarily expect them to have the same impact on their net income?

A. Not necessarily, but it could.

Q. But you'd need to look at all the issues that go into the business situation each faces?

Page 88

A. Yeah. If you're going to split the hair, you're going to split the hair and you have infinite resources to do it, then that's, that's what you could do.

Q. That's what you'd need to do in order to get an accurate prediction of what was going to happen?

A. Well, I don't know what you mean by "accurate". You could give a range of possibilities, given the information that you do have, and give, that gives you the range of outcomes or the range of values that could occur.

Q. Well, if you were going to advise someone about whether they should invest in business one or business two, knowing only that they are situated where they are and they've each got this event that might be important, you'd want to do more research than give them two possibilities, right?

A. Maybe, maybe. Again, if you have no resource constraints to doing the analysis and you want to make a dissertation of it, then, yeah, you have no resource constraints.

The more information that you can bring to bear, obviously, in the end, the better the decision; typically, as long as it's good information.

Page 129

(1) Q. Okay. You relied on Young In Cheon's declaration in preparing your report, right?
(3) A. I looked at it, yes.
(4) Q. Did you rely on it or not?
(5) A. I did cite it, but I didn't rely on it for any of my forecasts, because there were some mitigation circumstances in his situation that suggested to me not to use the data.
(9) Q. And, and what were those?
(10) A. Well, he had all these other business complications that occurred totally unrelated to Olympic coaching experience that didn't occur for Han Won Lee and, as far as I know, don't exist for Dae Sung Lee.
(15) Q. And what were those?
(16) A. Well, he was in bankruptcy. He was having a big legal conflict with a partner.
(18) Q. When did you find that out?
(19) A. In a conversation with, with, with Mr. Jones.
(21) Q. Before or after your report was done?
(22) A. I don't recall. I don't recall.
(23) Q. So it may have been after your report was done?
(25) A. It may have been after the report was done.

Page 130

(1) Q. So your report may not have taken into account anything about Young In Cheon's problems?
(3) A. Yeah, I mean, it's -- well, obviously, my report does not take into account his problems.
(5) Q. Well, but it takes into account you relied in part on his declaration?
(7) A. I, I noted his declaration, that's correct. But in terms of doing the forecasts that I did, I relied exclusively on the financials of Han Won Lee.
(10) Q. Well, Young In Cheon in his declaration said his business did better, significantly better, because he was Olympic coach?
(13) A. That's right, he did state that.
(14) Q. And you may have relied on that in doing your analysis?
(16) A. Yeah. And I think in, in terms of students that, that was correct, but there were other complicating factors in his situation.
(19) Q. But you don't know in terms of students whether it was correct or not because you don't have any base case to compare it to?
(22) A. I'm relying on his, on his signed affidavit.
(24) Q. But his first signed affidavit said his business did great and didn't mention he went

Page 131

(1) bankrupt, right?
(2) A. It didn't mention that he went bankrupt, and I think it stated that with respect to his students, not, not necessarily with respect to his business financials.
(6) (Deposition Exhibit 3 marked.)
(7) Q. Well, let's look at what he said. If you'll look at -- oh, sorry -- what's been marked as Exhibit 3. You can look at your copy if you want. Because, see, now I'm going to want you to leave that to be copied, all those pages, including what's highlighted and noted and so on.
(13) It says: Following the 2000 Sydney Olympic Games, declarant did receive measurable financial benefits and enhanced professional reputation. Right, paragraph 7, page 2?
(17) A. That's, that's what it says.
(18) Q. Okay. And he attributed that to having been a coach at the Olympic Games?
(20) A. That's correct.
(21) Q. And that's one of the declarations you relied upon in doing your expert opinion?
(23) A. That's correct.
(24) Q. Okay, thanks. Let's talk about the second part of your two cases, your -- I'm sorry, where's

Page 132

(1) the page with the chart about coaches? Is there a chart?
(3) A. Yeah. It's --
(4) Q. No, maybe it's not. Maybe you just assert the numbers.
(6) A. On, on pages 5 and 6, starts on page 5 --
(7) Q. -- oh --
(8) A. -- and then continues on page 6.
(9) Q. I apologize. Okay. What, what is that chart?
(11) A. The chart you're referring to is the chart at the bottom of page 5.
(13) Q. Apparently. Can you describe what this chart is?
(15) A. This chart is a reporting of the occupational employment and wage statistics for a coach in Honolulu.
(18) Q. Coach or a scout?
(19) A. Well, it's, it's, okay, for coaches and scouts.
(21) Q. Do we have this document, do you have this in your --
(23) A. You see the web site. You can go there yourself.
(25) Q. It's a paid web site, I believe?

### Page 133

(1) A. No, it's not. It's public.
(2) Q. Did you print it out?
(3) A. You see it printed out right there.
(4) Q. The address of the web site I see. Did you
(5) print for us, did you ever print the pages that you
(6) relied on from the web site?
(7) A. That's what I just said. You're looking at
(8) what is, appears in the web site.
(9) Q. Okay. Well, what is the, what's the source
(10) of the data?
(11) A. The source of the data? It's the Bureau of
(12) Labor statistics. It's from their occupational wage
(13) and, and employment estimates.
(14) Q. And what's the definition of a coach or a
(15) scout?
(16) A. The -- I would tell you generally. If you
(17) want the exact definition that they're using I'd have
(18) to go to the web site and pull it out.
(19) Q. Okay. So you don't know as you sit here
(20) today what is the definition?
(21) A. No. All I know is it's the closest
(22) occupational category I could find in this data base
(23) to correspond to what Dae Sung Lee's occupation is.
(24) Q. What percentage of people whose annual wage
(25) is used there are salaried employees?

### Page 134

(1) A. Oh, I don't know. They don't report it
(2) that way. Just an average annual wage.
(3) Q. Well, do we know if it includes both what
(4) their wage was and profits from businesses they own?
(5) Because Dae Sung Lee, for example, reports a wage,
(6) and separate from that he has Sub-Chapter S income?
(7) A. Correct.
(8) Q. So it could be that his wage is $12,000,
(9) for purposes of this survey?
(10) A. Well, that's your opinion, and it's, I
(11) would --
(12) Q. No, I'm asking. Do you know?
(13) A. Do I know? Well, this is, this is from
(14) their survey. So this would be surveying employees
(15) or establishments as to what the earnings salary are
(16) of coaches and scouts.
(17) Q. Says annual wage.
(18) A. That's right.
(19) Q. Does that include profits from a business
(20) they own?
(21) A. No, it wouldn't include profits from a
(22) business.
(23) Q. It wouldn't?
(24) A. No.
(25) Q. Okay. So, do we know if these people own

### Page 135

(1) businesses or don't?
(2) MR. JONES: Objection. Calls for
(3) speculation.
(4) A. Yeah, I, I, it's hard to say, because, see,
(5) I could, I could have a business and be paying myself
(6) a wage, and then when I was surveyed I could say this
(7) is the wage I'm paying myself and my occupation is
(8) this. So it, it could include business owners.
(9) BY MR. LEVINSTEIN:
(10) Q. But we don't know?
(11) A. No, they don't, they won't disclose
(12) individual observations.
(13) Q. Does it include volleyball coaches?
(14) A. It probably does.
(15) Q. Does it include gym teachers?
(16) A. Yeah, I'm certain it does. Well, I don't
(17) know about gym teachers. They may be classified
(18) under teaching as opposed to coach.
(19) Q. But if in the afternoon they coach a team,
(20) would they be included, like they're the football
(21) coach but they're paid to be a phys ed teacher during
(22) the day and they coach the football team?
(23) A. If you don't --
(24) MR. JONES: Objection. Calls for
(25) speculation.

### Page 136

(1) WITNESS: Yeah.
(2) MR. LEVINSTEIN: He's relying on the
(3) study. I want to know what, what the data is that
(4) he's relying upon.
(5) A. You don't --
(6) MR. JONES: But he didn't take the
(7) study, so.
(8) WITNESS: Yeah.
(9) MR. LEVINSTEIN: He's using it as a
(10) basis, so I want to know if he can tell me if it's
(11) reliable or what it means. If he doesn't know, it's
(12) okay.
(13) A. It all depends on how the reporting entity
(14) reports the occupation of the individual. They
(15) reported him as a teacher, it'd come up as teacher.
(16) If they reported him as a coach, his salary would
(17) come up as coach.
(18) BY MR. LEVINSTEIN:
(19) Q. If they reported him where?
(20) A. To the interviewing entity, which would be
(21) Bureau of Labor Statistics surveyors.
(22) Q. Do we know if there are any Taekwondo
(23) coaches included in this survey?
(24) A. You're, you're never going to know for
(25) certain, because then you would be disclosing

BSA   DEPOSITION OF THOMAS LOUDAT, PH. D. VOL I TAKEN ON 06-22-05   XMAX(35/35)

Page 137

(1) individual observation data, and they just don't do
(2) that. Because if you did that, nobody would provide
(3) information for the survey because you're disclosing
(4) private information.
(5) Q. Well, you could say football coach is X,
(6) volleyball coach is Y, La Crosse coach is Z. But is
(7) there any information that tells us what's included
(8) in the numbers.
(9) A. No, not that I'm aware of. Not the kind of
(10) breakdown that you're suggesting.
(11) Q. Okay. Do you know whether generally
(12) football coaches are higher paid or lower paid than
(13) Taekwondo coaches?
(14) A. I don't know.
(15) Q. Do you know if there is a distinction
(16) between what sport you coach and how much you're
(17) likely to make?
(18) A. Depends on the level.
(19) Q. Well, just in general. At whatever level
(20) you are for a soccer coach versus whatever level you
(21) are for a football coach, are football coaches
(22) generally paid more or less than soccer coaches?
(23) A. I don't know.
(24) Q. Is it possible that football coaches as a
(25) group are paid more than soccer coaches?

Page 138

(1) A. If you include June Jones and, and his
(2) equivalents in the survey, yeah, I would say so.
(3) Q. Do you know if that generally would be
(4) included?
(5) A. In, in this? If he was included in the
(6) survey, yeah.
(7) Q. But, but should he have been included in
(8) the survey, given the title of coaches and scouts?
(9) A. If University of Hawaii was surveyed and
(10) they classified him as coach, then he would be
(11) included in the survey.
(12) Q. And that would skew the numbers high
(13) because he probably makes over half million dollars a
(14) year?
(15) A. Without him in there the mean would be
(16) less.
(17) Q. Right. And the 90th percentile would be
(18) less?
(19) A. That's right.
(20) Q. And yet your analysis assumes that by being
(21) an Olympic Taekwondo coach one should be in the
(22) highest category of coaches?
(23) A. No.
(24) Q. Okay, what does it assume?
(25) A. It's, again, just so, to be real clear so

Page 139

(1) you understand, I'm measuring the marginal impact of
(2) this event. I know what this individual Dae Sung Lee
(3) derives from this particular occupational activity
(4) based on his tax returns.
(5) Q. All right.
(6) A. So, in the profile of earnings for coaches
(7) I can place him in that profile, okay. And, and the,
(8) given that I'm measuring at the margin what happens
(9) to this particular event, I just moved him from one
(10) profile to the next, from the mean profile to the
(11) 90th percentile profile, to say that this would be
(12) the marginal impact of this particular event.
(13) Q. On what basis?
(14) A. Well, on the basis that, A, I'm, as I've
(15) said, it seems reasonable to conclude to me that
(16) Olympic coaching experience would have a positive
(17) financial impact on his business, given that I'm
(18) looking at a way to measure what that impact is,
(19) given that there's no benchmarks to measure that.
(20) This would be one.
(21) Given that experience, you would expect one
(22) to move, 90th percentile, the highest earners, only
(23) 10 percent of earners in that particular profile earn
(24) more than whatever that value is.
(25) So that if you posit that, yeah, some

Page 140

(1) positive financial results would happen to the
(2) Olympic coaching experience, this would be a measure
(3) of that.
(4) Q. But if you go to the Aina Haina Shopping
(5) Center web site and you call up Dae Sung Lee's
(6) business, it describes him as a two-time Olympic
(7) coach. If you look at the book he participated in
(8) writing, it describes him as an Olympic coach. It
(9) already says he's an Olympic coach.
(10) So why can you conclude that by the fact
(11) that he was Olympic coach one more time this would
(12) catapult him into a new category when it hasn't
(13) gotten to that category in the last 10 years?
(14) A. Well, it seems to me that being an Olympic
(15) coach for a medaled Olympics and being credentialed
(16) as such, and garnering the publicity that would have
(17) been garnered by virtue of the publicity we've
(18) already covered, and then whatever publicity he would
(19) get in the local press, et cetera, that this would be
(20) a little bit different than whatever was stated
(21) before. It's a little differentiated from previous
(22) experience.
(23) Q. Well, it was announced he was going to be
(24) the Olympic coach in the spring of 2003, and there
(25) was a lot of publicity associated with that and he

Page 141

(1) put it in his newsletter, and yet we didn't see any
(2) increase from 2003, when he was announced, for a
(3) year. And during that year no one knew that his
(4) position had been withdrawn. So, why didn't he get
(5) the bump then?
(6) (12:01)    A.   Well, maybe he did. I mean, if you look at
(7) 2003 relative to 2002 in his actual financials, you
(8) see a bump. And then when 2004 comes along and he's
(9) been withdrawn, you see a decline.
(10) (12:01)         So, I mean, you can just as easily say,
(11) aside from other factors, that that is the cause, the
(12) two events that you just described.
(13) (12:01)    Q.   Well, then that's the first year's cause,
(14) the first year it bumped. So, why does he get it
(15) again? Why does he get it again like Han Won Lee
(16) gets, or why doesn't that take the first one out of
(17) it, if that is the increase already happened?
(18) (12:02)    A.   Well, I mean --
(19) (12:02)    Q.   It wasn't as big as Han Won Lee's increase,
(20) was it?
(21) (12:02)    A.   Well, he didn't have the Olympic coaching
(22) experience. It's all, it's all hypothetical at that
(23) point in time, and it didn't occur. So, I mean, you
(24) could also say, well, we're just starting to get the
(25) buildup of the publicity and the return on it, and

Page 142

(1) the bigger return's going to come somewhere down the
(2) pike.
(3) (12:02)    Q.   And where --
(4) (12:02)    A.   So that's just an alternative explanation.
(5) (12:02)    Q.   And where do you get the theory that he had
(6) this plan to get all this publicity? We've already
(7) said there is no -- are we talking about the fact
(8) that he's published in the Olympic record somewhere
(9) as being the coach?
(10) (12:02)    A.   Well, that, that does occur. That does
(11) occur.
(12) (12:02)    Q.   And, and that was going to cause his
(13) revenues to go up how?
(14) (12:02)    A.   That's one of --
(15) (12:02)    Q.   Who's going to know that?
(16) (12:02)    A.   Well, well, first of all, there's an
(17) assumption of rational expectation and rational
(18) response. If I, if I -- in this instance, and I'm
(19) applying that to, to Dae Sung Lee, that, given this
(20) experience, the rational expectation would be he
(21) would take maximum advantage of it to maximize the
(22) financial result.
(23) (12:03)         And what I'm saying for the high scenario
(24) is, as I've said multiple times, that is one measure
(25) of what that could have looked like, and this low

Page 143

(1) scenario's another measure.
(2) (12:03)    Q.   And what plan -- you've now talked to Dae
(3) Sung Lee. Did you discuss what he was going to do to
(4) capitalize on this occurrence?
(5) (12:03)    A.   No, I haven't, I haven't discussed any
(6) detail with him. Again, I said it's based on
(7) rational expectation.
(8) (12:03)    Q.   Didn't even ask him whether he was going to
(9) do stuff to capitalize on this Olympic experience or
(10) whether he could have? You never asked the man who
(11) owned the business that you assumed was going to make
(12) all this money because he was going to do something,
(13) you never asked him whether he was going to do it?
(14) (12:03)    A.   I think to assume otherwise would assume
(15) that, would be making a statement that the man is an
(16) idiot. And if you want to make that statement,
(17) that's fine. It's not what I'm assuming. Like I
(18) said --
(19) (12:03)    Q.   -- you --
(20) (12:03)    A.   -- let me finish, okay? Keep interrupting
(21) me. I'd appreciate if you didn't do that. If you
(22) assume rational expectation, what do you do? I come
(23) up with a distinguishing characteristic about myself,
(24) I want to enhance my market position. What am I
(25) doing to do?

Page 144

(1) (12:03)         Now, an Olympian wins a gold medal and they
(2) want to maximize their economic benefit by virtue of
(3) that event. What are they going to do? They're
(4) going to publicize it. In my mind, as an expert,
(5) that's a reasonable expectation and assumption to
(6) make in this case.
(7) (12:04)    Q.   Well, he was named the Olympic coach.
(8) Didn't increase his advertising, did he?
(9) (12:04)    A.   Not at that time.
(10) (12:04)    Q.   Not for a year, the whole year after that,
(11) he didn't increase his advertising at all, did he?
(12) (12:04)    A.   Why would he? He didn't have the
(13) experience. Is he going to publicize in 2004 that I,
(14) my name was withdrawn, and, and get all the benefit
(15) of the notoriety of that, is that what you're
(16) suggesting?
(17) (12:04)    Q.   It's just that, once he was named the
(18) Olympic coach, he talked to all the media and got his
(19) student to place articles in the paper about the fact
(20) that he'd been named the coach, why didn't he spend
(21) money to advertise?
(22) (12:04)         MR. JONES:   Objection. Calls for
(23) speculation and lacks foundation, assumes facts not
(24) in evidence.
(25) (12:04)    A.   Yeah, yeah. It's, at that point -- I don't

Page 145

(1) know, you'd have to ask him. But he did not have the
(2) Olympic coaching experience at that time. He did not
(3) go to the Olympics, he did not coach the Olympians.
(4) (12:05) BY MR. LEVINSTEIN:
(5) (12:05) Q. Well, maybe he'd been advertising for 11
(6) years and realized that he didn't get much benefit
(7) from advertising because he was a two-time Olympic
(8) coach and he puts that in whatever he advertises, and
(9) yet whatever effort he'd made to publicize that
(10) hadn't yielded any significant benefit in his
(11) marketplace, so maybe he determined that it wasn't
(12) worth spending a ton of money on advertising, given
(13) his business experience and his market?
(14) (12:05) A. Maybe so, and that's one -- you can say
(15) that. It may be that once this more significantly
(16) differentiating event occurred that's exactly what
(17) would have happened.
(18) (12:05) Q. But who says it's more differentiating?
(19) (12:05) A. So you're, okay --
(20) (12:05) Q. -- a two-time Olympic coach. Now he's a
(21) three-time Olympic coach. What makes this one more
(22) differentiating than the other one?
(23) (12:05) MR. JONES: Objection. Vague and
(24) ambiguous.
(25) (12:05) A. Well, you're the one that noted information

Page 146

(1) that I wasn't aware of: He was Olympic coach in
(2) Korea. Okay, he wasn't Olympic coach in the U.S.
(3) This is the market in which his business is. So if
(4) you --
(5) (12:06) Q. No, no. He was the U.S. Olympic coach in
(6) the Korean Olympics in Seoul, Korea.
(7) (12:06) A. Okay, in the Korean Olympics. Okay, but it
(8) was a non-medaled event. You're, you're the one that
(9) made the distinctions before.
(10) (12:06) Q. But knows -- but do you think that the
(11) average consumer knows that? Does the average
(12) consumer know whether Taekwondo is in the Olympics or
(13) not?
(14) (12:06) A. The average consumer knows a market
(15) differentiating characteristic from one that doesn't
(16) exist, and that's, that's what would have occurred in
(17) this instance. At least that's what I'm saying.
(18) (12:06) Q. But he could have said two-time Olympic
(19) coach, he's been saying it for 11 years. How would
(20) they know when they read the advertisement whether it
(21) was in 2000, 2004 or '88 and '92?
(22) (12:06) A. He could have also said, hey, coached gold
(23) medal winners in the 2004 Olympics. Can he make that
(24) statement for previous Olympics? No, because they
(25) were non-medaled events.

Page 147

(1) (12:06) Q. No, they got gold medals. They got gold
(2) medals in '98 and 92.
(3) (12:06) A. I --
(4) (12:06) Q. -- they just were a demonstration sport.
(5) Sure, you win a gold medal just like you do in any
(6) other Olympics.
(7) (12:07) A. Oh, okay. So your, from your point of
(8) view, just so we're real clear, you're saying that
(9) that's the same as the second Olympic experience --
(10) (12:07) Q. -- to the consumer, yes.
(11) (12:07) A. Well, that's your opinion. See, I would
(12) say differently. I'd say it's a distinguishing
(13) event. And you, you saw --
(14) (12:07) Q. -- well, Han Won Lee --
(15) (12:07) REPORTER: Just a moment. You're both
(16) cutting in to one another. Go ahead.
(17) (12:07) A. Yeah. The, I -- it seems to me that Han
(18) Won Lee also had previous Olympic coaching
(19) appearance.
(20) (12:07) BY MR. LEVINSTEIN:
(21) (12:07) Q. No.
(22) (12:07) A. He has no previous -- he has some previous
(23) coaching experience similar to, to what Dae Sung Lee
(24) did.
(25) (12:07) Q. Not in the Olympics.

Page 148

(1) (12:07) A. Okay, I don't know that for a fact. I
(2) don't know that for a fact.
(3) (12:07) Q. You don't. And the question is, what
(4) expertise from economics do you have that backs up
(5) your assessment? What scientific economic analysis
(6) have you done to assess whether this is a defining
(7) event, other than reading Han Won Lee's declaration?
(8) (12:07) A. Well, what I've already testified to, which
(9) I'll state again. Celebrity is exploited in this, in
(10) this economy and culture.
(11) (12:08) Celebrity, when it can be exploited,
(12) particularly when it's something that differentiates
(13) you from the competition, is something that leads to
(14) financial benefit, reward. That's it. And I cited a
(15) specific example for that one individual.
(16) (12:08) Q. Okay, that's good. What discount rate did
(17) you use?
(18) (12:08) A. The nominal interest rate that I used for
(19) discounting is 4.49 percent. And since I'm
(20) projecting in real terms, I back out a wage inflation
(21) rate and I also take out taxes.
(22) (12:08) Q. So you're assuming that the certainty of
(23) the increased gains is the same certainty as a no
(24) risk instrument?
(25) (12:08) A. Yeah, for this analysis, that's right.

Page 149

(1) Q. Even though this is a business that you're assessing the likelihood of future profits for?
(3) A. Well, it's a business that's not a start-up. It's an operating entity with a track record.
(6) Q. But the, the, what you're discounting is dramatic profit increases different than this business has ever experienced?
(9) A. That's right, for the high scenario, which is not the one that I'm opining to. So, in a sense, the discount factor that I'm applying is incorporated in to the base-case scenario.
(13) Q. But even the 50 percent rate that is the base-case is dramatically a higher rate of increase than his business has ever experienced?
(16) A. It's, it is higher, yeah, and it --
(17) Q. Dramatically. 50 percent a year for a couple of years?
(19) A. Well, that's what we've seen in a, what I'm saying is an equivalent situation and equivalent event for one that's reasonably comparable.
(22) Q. For one business for one unique 3-year period?
(24) A. That's right. And if there was more data we could use that, too.

Page 150

(1) Q. Has your testimony ever been excluded in response to a Daubert motion?
(3) A. Never.
(4) Q. How about a motion pursuant to Rule 702 of the Federal Rules?
(6) A. I don't know what Rule 702 is.
(7) Q. Have there been Daubert motions submitted against testimony that you've submitted?
(9) A. Yes.
(10) Q. And are there cases where the case is settled before any ruling was made on the Daubert motion?
(13) A. A ruling was made and it was, the Daubert motion failed.
(15) Q. How many times was that?
(16) A. One time.
(17) Q. Only one time has there been a Daubert motion in response to your testimony?
(19) A. Right.
(20) Q. Do you have a list for me of all the cases in which you've testified in the last, whatever the time period required by the rule is?
(23) A. I --
(24) WITNESS: Did you?
(25) MR. JONES: I don't think I have it.

Page 151

(1) WITNESS: You don't have it?
(2) A. I, I can provide it. I, I thought I did provide it.
(4) BY MR. LEVINSTEIN:
(5) Q. No.
(6) A. I can e-mail it to you if you give me an e-mail address.
(8) Q. I'll do that.
(9) A. And I'll e-mail you the CV as well.
(10) Q. What about all publications? What publications have you authored in the last 10 years; a lot?
(13) A. I don't know what a lot is but, you know, I've been fairly active.
(15) Q. We need copies of all.
(16) A. Copies of all my publications?
(17) Q. In the last 10 years, yes. That's what the subpoena called for.
(19) A. Yeah. I mean, to me, that's an unreasonable demand, which I've never responded to. And I would, I would refuse to do that unless forced to by the court. I've never been requested to provide those publications in 20-plus years of doing this.
(25) Q. What about a list of what all those

Page 152

(1) publications are?
(2) A. You'll have the list in the CV.
(3) MR. LEVINSTEIN: Okay. We'll see if they're available as easy to us as to you, we'll be, we'll get them, but if they're not we'll ask you to provide them, because some things aren't available generally to us. It doesn't help us to have a title of a publication if we can't read what it said.
(9) I need to take a look through some of those documents, so, give me five minutes. Take a break and I'll --
(12) VIDEOGRAPHER: The time is 12:12 p.m. and we're off the record.
(14) (Break taken from 12:12 p.m. to 12:19 p.m.)
(15) VIDEOGRAPHER: The time is 12:19 p.m. We're back on the record.
(17) BY MR. LEVINSTEIN:
(18) Q. There's an article in your materials that talks about Nasti Lyukin. Just to be -- we'll attach it, we'll -- once we get copies we can do some things with this. But in fairness, the, the gym that was opened in Dallas was opened by two families, correct, the Leukins and, and Marchenka?
(24) A. I thought it was just the, Lyukins. Well, Marchenko is the wife. I think Lyukin, where is it,

Page 177

(1) Q. And you have his declaration and you have
(2) his tax returns?
(3) A. That's right.
(4) Q. And that's all you know about his business?
(5) A. That's right. But, again, I will
(6) reiterate, because I don't know that it's sunk in
(7) yet, there, unless there's the assumption of what the
(8) economists call ceteris parabus, or all things
(9) constant, if that changes dramatically, then you have
(10) other factors that mitigate the impact of the event
(11) that I'm, I'm doing a measurement for. And I don't
(12) see that being the case, given everything that I
(13) know.
(14) Q. But you don't know enough to know whether
(15) there are differences?
(16) A. Nothing has been pointed out to me and I
(17) haven't seen anything in the record. If you point
(18) something out, I'll happily tell you what impact I
(19) think that would have.
(20) Q. But you didn't even go, you didn't even
(21) talk to Han Won Lee to ask him what's different about
(22) his school versus Dae Sung Lee's school?
(23) A. It's not necessary, unless you have some
(24) basis to say that there's going to be other factors
(25) that are going to change that are going to mask or,

Page 178

(1) or impede my ability to measure based on the factor
(2) that I'm measuring, or for the factor that I'm
(3) measuring.
(4) Q. Until you know, other than his declaration
(5) sentence, what all the causes were that caused his
(6) income to go up, you can't assess what would happen
(7) in Dae Sung Lee's business?
(8) MR. JONES: Objection. Argumentative.
(9) A. Yeah, I disagree. In, in my profession as
(10) an economist, now, accountants are different, the
(11) assumption of what they call all other things
(12) constant, cetera parabus -- ceteris parabus, is what
(13) allows you to do an analysis and isolate on one
(14) particular factor to see what, what impact a change
(15) in that factor does to the bottom line, in this case
(16) the profits.
(17) And in a regression analysis, that's
(18) exactly what happens in multiple regression. If you
(19) look at the, the, a variable or coefficient that's
(20) estimated, when you look at that change caused by
(21) that particular variable, all the other ones are held
(22) constant. So it's implicit in the analysis that we
(23) do, conceptually and empirically.
(24) Q. But the regression analysis is done to
(25) eliminate the effects of all the other factors?

Page 179

(1) A. No.
(2) Q. In this case you've assumed that the other
(3) factors had no effect?
(4) A. No. I've assumed that they don't change
(5) from the pre versus post situation, okay.
(6) Q. They had no role in the numbers going up?
(7) A. Correct. There's no change. If there is a
(8) change, then it could cause, it could mitigate the
(9) measure or, or distort the measure of what would
(10) happen to the Olympic coaching experience. I'll
(11) acknowledge that.
(12) Q. Okay. Why don't you tell me other things
(13) if any that you disagree with in Candon's report?
(14) A. On page 14 of Mr. Candon's report he
(15) alleges that Loudat does not consider that Dae Sung
(16) Lee's business had already begun declining, according
(17) to a study of his bank deposits since 1998 when the
(18) do'jang banked 266,000. And he cites his Exhibit
(19) C-2.
(20) And, and that's just an erroneous
(21) statement. I, I can't substantiate that based on
(22) what's occurred since 2001, as I've already indicated
(23) that we, there has been a significant up-trend in his
(24) revenues, in nominal terms, since 2001. Plus if you
(25) look at Candon's own analysis of gross receipts you

Page 180

(1) don't see a declining trend, you see a flat trend
(2) (Indicating). So I, it's just an erroneous
(3) statement.
(4) Q. Unless you take into account inflation.
(5) That would be a declining trend?
(6) A. Yeah, I, I don't think it would make any
(7) difference, but it might. I'm pretty certain it
(8) wouldn't make any difference because inflation has
(9) been very tame over this period.
(10) Yeah, number 6 it goes: It may be
(11) beneficial to point out -- excuse me, this is
(12) page 14, Mr. Candon's comments about Young In Cheon.
(13) He notes: It may be beneficial to point
(14) out that earlier in the course of, course of this
(15) dispute Master Young In Cheon had signed a
(16) declaration to the effect that being a coach of the
(17) U.S. Taekwondo team at the 2000 Olympics had improved
(18) the financial results of his business. Our analysis
(19) indicates otherwise.
(20) Yeah, and he may be unaware of contextual
(21) factors that impacted that that aren't the same for
(22) Han Won Lee or Dae Sung Lee. So, again, I think this
(23) statement has to be taken in a broader context to see
(24) why this occurred and it didn't occur for Han Won
(25) Lee.

### Page 193

(1) during this deposition.
(2) Q. Okay, go ahead. What else is, that you
(3) disagree with in Mr. Candon's report?
(4) A. Yeah, that's, that's basically it. That's
(5) basically it.
(6) MR. LEVINSTEIN: Okay. You've got to
(7) go now. We'll let you go now. I don't want to keep
(8) you from something else. I have more questions, but
(9) we'll --
(10) VIDEOGRAPHER: The time is 1:05 p.m.
(11) We're off the record. This concludes tape number 3.
(12) {cln}
(13) **(Proceedings recessed at 1:05 p.m.)**

### Page 194

(1) WITNESS CERTIFICATE
(3) I, THOMAS A. LOUDAT, PH.D., hereby certify that I
(4) have read the foregoing typewritten pages 1 through
(5) 194, inclusive, and corrections, if any, were noted
(6) by me, and the same is a true and correct transcript
(7) of my testimony.

(10) Dated this _____ day of _____, 2005.

(13) _____
(14) THOMAS A. LOUDAT, Ph.D.

(17) Signed before me this _____ day of _____,
(18) 2005.

(21) _____

(24) LEE VS. UNITED STATES TAEKWONDO UNION - CIVIL NO.
(25) 04-00461 SOM LEK - June 22, 2005 D. Yankee

### Page 195

(1) CERTIFICATE
(2) STATE OF HAWAII          )
(3)                          ) SS.
(4) CITY AND COUNTY OF HONOLULU )

(6) I, DENNIS J. YANKEE, do hereby certify;
(7) That on June 22, 2005, at 9:11 a.m.
(8) appeared before me THOMAS A. LOUDAT, PH.D., the
(9) witness whose deposition is contained herein; that
(10) prior to being examined he was by me duly sworn;
(11) That the deposition was taken down by me in
(12) machine shorthand and was thereafter reduced to
(13) typewritten form under my supervision; that the
(14) foregoing represents to the best of my ability, a
(15) true and correct transcript of the proceedings had in
(16) the foregoing matter.
(17) I further certify that I am not an attorney
(18) for any of the parties hereto, nor in any way
(19) concerned with the cause.
(20) DATED this 29th day of June, 2005, in
(21) Honolulu, Hawaii.

(25) DENNIS J. YANKEE, CSR 285