6/30/2005 Skinner, Kelly

```
0001
1              IN THE UNITED STATES DISTRICT COURT
2                      DISTRICT OF HAWAII
3     DAE SUNG LEE,            )
                              )
4          Plaintiff,          ) Civil No. 04-00461
                              ) Som Tek
5     UNITED STATES TAEKWONDO  )
      UNION, a Colorado nonprofit )
6     corporation, UNITED STATES )
      OLYMPIC COMMITTEE, a      )
7     federally chartered       )
      nonprofit corporation; JOHN )
8     DOES 1-10; JANE DOES 1-10; )
      DOE PARTNERSHIPS 1-10; DOE )
9     CORPORATIONS 1-10,        )
                              )
10         Defendants.         )
                              )
11
12
13
14
15
16            DEPOSITION OF KELLY SKINNER
17                   JUNE 30, 2005
18
19    PURSUANT TO NOTICE, the deposition of KELLY SKINNER
20    was taken on behalf of the Plaintiff pursuant to the
21    Federal Rules of Civil Procedure, at 90 South Cascade
22    Avenue, Suite 1300, Colorado Springs, Colorado, this
23    date at 1:10 p.m., before Janice L. Doyle, a
24    Certified Court Reporter and a Notary Public.
25
```

1

6/30/2005 Skinner, Kelly

```
1                       APPEARANCES
2          MR. WARD D. JONES, Attorney at Law, from the
3     law firm of Bervar & Jones, 1400 Pauahi Tower, 1001
4     Bishop Street, Honolulu, Hawaii, 96813, (808)
5     550-4990, appeared on behalf of the Plaintiff.
6          MR. MARK S. LEVINSTEIN, Attorney at Law, from
7     the law firm of Williams & Connolly, LLP, 725 Twelfth
8     Street, N.W., Washington, D.C., 20005, (202)
9     434-5012, and MR. GARY JOHANSEN, Attorney at Law,
10    United States Olympic Committee, 1 Olympic Plaza,
11    Colorado Springs, Colorado, 80909, (719) 866-4526,
12    appeared on behalf of the Defendants.
13         Also Present:  Mr. Dae Sung Lee
14
15
16
17
18
19
20
21
22
23
24
25
```

2

6/30/2005 Skinner, Kelly

```
1                        I N D E X
2
3     DEPOSITION WITNESS:                          PAGE
4     KELLY SKINNER
5     Examination by Mr. Jones                      7
6
7
8
9           EXHIBITS PREVIOUSLY MARKED
10    EXHIBIT    DESCRIPTION                        PAGE
11    4     Letter to Bruce Harris From Thomas      58
12          L. Satrom Dated August 4, 2003
13    5     Letter to Bruce Harris From Thomas      68
14          L. Satrom Dated September 5, 2003
15    45    Governance and Management Committee     90
16          Minutes of Meeting, February 5,
17          2004, Numbered USTU00004
18    57    Minutes of USTU Governance and          98
19          Management Committee Meeting,
20          February 26, 2004, Numbered
21          USTU00002 Through USTU00003
22    58    Memorandum to USOC Executive           102
23          Committee From Bob Gambardella
24          and Steve Locke Dated March 8,
25          2004, Numbered USTU00001
```

3

6/30/2005 Skinner, Kelly

```
1     EXHIBIT    DESCRIPTION                        PAGE
2     63    USTU Governance and Management         127
3           Committee Minutes, July 1, 2004,
4           Numbered USTU00008 Through
5           USTU00009
6     73    Various E-mails                        136
7     83    Memorandum to Kelly Skinner From        57
8           Bruce Harris Dated July 24, 2003
9     85    Letter to Bruce Harris From James E.    77
10          Scherr Dated October 30, 2003
11    87    Selection Procedures for Coaches        36
12          Dated January 20, 2003
13    120   Letter to Bruce Harris From Kelly       71
14          Skinner Dated October 24, 2003,
15          Numbered HRO 138 Through HRO 141
16    141   Letter to Bruce Harris From Thomas      67
17          L. Satrom Dated August 26, 2003,
18          Various Fax Cover Sheets, Numbered
19          HRO 214 Through HRO 217
20
21
22
23
24
25
```

4

EXHIBIT ___"A"___

```
1                 EXHIBITS MARKED
2  EXHIBIT      DESCRIPTION               PAGE
3  147    Memorandum to Gary Johansen, Jennifer    49
4         Gabrius, Bob Foth From Kelly Skinner,
5         Michelle Farrell Dated June 3, 2003
6  148    Taekwondo Review                  79
7  149    Declaration of Kelly Skinner Dated    137
8         August 6, 2004
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                 EXAMINATION
2  BY MR. JONES:
3       Q.   Sir, if you could please state your name
4  and home address for the record.
5       A.   Sure.  Kelly Skinner, 1608 Yuma,
6  Colorado Springs, Colorado, 80909.
7       Q.   Have you ever had your deposition taken
8  before?
9       A.   No.
10       Q.   I'm sure your counsel explained to you a
11  little bit about what a deposition is.
12       MR. LEVINSTEIN:  Should have, but I'm
13  not sure if he --
14       Q.  BY MR. JONES:  Well, I'll quickly run
15  through the ground rules to avoid any problems.  A
16  deposition is an interview.
17       A.   Uh-huh.
18       Q.   Question and answer.  However, it's
19  under oath and generally for use in court.  Should
20  this matter go to court, it can be used in lieu of
21  your live evidence if you're unable to appear in
22  Hawaii for the trial.  Therefore, it's important to
23  try and answer as completely and truthfully as you
24  can so that we get it right the first time around.
25       If I don't make my questions clear,
```

```
1       WHEREUPON, the following proceedings were
2  had:
3       IT WAS STIPULATED AND AGREED that the within
4  proceedings were taken pursuant to the Federal Rules
5  of Civil Procedure.
6
7       WHEREUPON,
8                 KELLY SKINNER,
9  the witness herein, having been first duly sworn by
10  the notary public, was examined and testified as
11  follows:
12
13       MR. LEVINSTEIN:  For the record, I gave
14  counsel two documents, and I've hand-numbered them
15  20001, and the back of the first page is 20002
16  through 20005.  And it's just documents that we
17  didn't know about previously that --
18       MR. JONES:  These are the USTU
19  documents?
20       MR. LEVINSTEIN:  I think these would be
21  USOC documents.
22       MR. JONES:  Okay.
23       MR. LEVINSTEIN:  I think these are Mr.
24  Skinner's documents that he produced.
25       MR. JONES:  All right.
```

```
1  please say, "Mr. Jones, I don't understand the
2  question."
3       A.   Okay.
4       Q.   "Can you rephrase it or reask it?" or
5  "What do you mean?"  I'd be happy to do that.  If you
6  go ahead and respond, we'll all assume you're
7  responding -- number one, that you understand the
8  question; number two, that you're responding
9  truthfully and fully.
10       If your counsel makes objections, in
11  those situations, pause so we don't have two people
12  talking at the same time and let him get out his
13  objection and then continue with your response unless
14  he instructs you not to answer, then we can address
15  that.
16       I'll try and take breaks at least every
17  hour to give the court reporter and you a rest.  And
18  if you need to take a break for any reason, just say
19  so, and we'll take a break before that.
20       Because everything will be transcribed
21  in kind of script form, question and answers, after
22  it's all said and done, which you'll have the
23  opportunity to look at, it's very important to
24  respond with words.  We all use "uh-huh," "huh-uh,"
25  nods of the head in everyday language, but it sounds
```

1    very ambiguous when you write that out as to whether
2    you mean a yes or a no or something else.  So try to
3    use words, and we'll remind you if you forget.
4              Any other -- any reason why we can't
5    proceed?
6         A.   None.
7         Q.   Your -- let's see.  Have you ever been a
8    party to a lawsuit?
9         A.   No.
10        Q.   Can you just briefly describe your
11   education after high school, formal education?
12        A.   I have a bachelor's degree in marketing
13   from Western Michigan University.  Got that in 1991.
14   Graduate degree from Central Michigan University in
15   sport administration.  Received that in 2002.
16        Q.   That would be a master's or a Ph.D.?
17        A.   It's a master's degree.
18        Q.   That was in sports --
19        A.   Sport administration.
20        Q.   Now, if you could briefly run through
21   your full-time employment history from whenever you
22   started working full-time for anybody.
23        A.   If it's okay, can I focus on the sports
24   side or do you want everything?
25        Q.   Well, I guess everything just in case.

1    You never know.
2         A.   Okay.  Out of -- after I received my
3    bachelor's degree, I started working for a copier and
4    fax sales company.  Went from there to work for a
5    consultant doing program administration.  Went --
6    left him to go to graduate school.
7              During my master's degree, I had to get
8    an internship.  Did that with USA Weightlifting in
9    marketing.  Was formally hired on as a director of
10   marketing for USA Weightlifting.  Left USA
11   Weightlifting to be a coordinator in grants and
12   planning at the U.S. Olympic Committee.  Left the
13   USOC to become the vice president of marketing and
14   administration with the North American Hockey League,
15   which is in Michigan.
16             Left there to come back to the Olympic
17   Committee as a manager in grants and planning and was
18   then promoted to director.  I'm sorry.  That manager
19   position morphed into a manager of Sport Partnerships
20   and was then promoted to director of Sport
21   Partnerships.
22        Q.   When you say "morphed," did the
23   organization change its name or restructure or
24   something?
25        A.   The organization eliminated divisions

1    called athlete support, grants and planning, and I
2    believe there may have been one other.  I don't
3    recall fully.  And people that were in those
4    positions were offered a chance to apply for
5    positions within the newly created Sport Partnership
6    division.
7         Q.   Back before it changed to sports
8    partnership --
9         A.   Uh-huh.
10        Q.   -- were the tasks you had different from
11   what you're doing now?
12        A.   They were different in that they weren't
13   as encompassing.  My focus at grants and planning was
14   to strictly manage a -- what we call a marker
15   program, which was the evaluation of governing bodies
16   on how they did performance-wise and maybe on
17   coaching clinics, other types of things that we would
18   call task markers.
19             We also administered funds.  Now I have
20   greater responsibility.
21        Q.   What sports are you now responsible for,
22   if I could use that term?
23        A.   Okay.
24        Q.   Sports Partnerships.
25        A.   There are 12.  The winter sports are ice

1    hockey and speed skating.  The Pan American only
2    sports are roller sports and squash.  My Olympic
3    sports that I work with are archery, badminton,
4    basketball, field hockey, tennis, taekwondo,
5    shooting, weightlifting.
6         MR. LEVINSTEIN:  And alphabetically.
7         Q.   BY MR. JONES:  At times has the sports
8    you've been responsible for changed been
9    reassigned to someone else or has that been kind of
10   constant as far as that group of sports you're
11   handling right now?
12        A.   Since being in Sport Partnerships, the
13   sports that have been added I have not had any
14   removed.  The sports that have been added to my group
15   or my responsibility are taekwondo, basketball, field
16   hockey, and speed skating.
17        Q.   Have you ever been involved with
18   taekwondo as a participant?
19        A.   No.
20        Q.   Is it correct then you've not competed
21   in taekwondo competition?
22        A.   Correct.
23        Q.   And is it also correct that you've not
24   coached anyone in taekwondo competition?
25        A.   Correct.

6/30/2005 Skinner, Kelly

**Page 13**

1    Q.   And is it correct that other than your
2    professional responsibilities with respect to these
3    various sports that you're responsible for that
4    you've not personally been involved as a participant
5    in any of those sports at a -- call it a competitive
6    level?
7           MR. LEVINSTEIN:  An elite level.
8           MR. JONES:  An elite level.
9           THE WITNESS:  At an elite level, no.
10          MR. LEVINSTEIN:  Certainly wouldn't want
11   to say played competitive basketball.
12          MR. JONES:  Yeah.  I'm not talking about
13   pickup basketball.
14          THE WITNESS:  High school basketball,
15   but that's not elite basketball.
16          Q.  BY MR. JONES:  What year and month, if
17   you can remember, did you become responsible for
18   taekwondo?
19          A.  May of 2003.
20          Q.  Do you know who was handling taekwondo
21   before you?
22          A.  I do.  The original Sport Partnership
23   concept had five teams, and Terry Kent was the
24   director that had taekwondo within its mix.  Terry
25   left.  Jill Savory, one of the managers, ended up

**Page 14**

6/30/2005 Skinner, Kelly

1    overseeing that entire group of sports.  So Jill
2    Savory.  And then when Jay Warwick and I were hired,
3    taekwondo was removed from that portfolio and moved
4    into my group.
5           Q.  Was that by any chance because Jay came
6    from taekwondo?
7           A.  Absolutely.
8           Q.  Would that be considered some sort of
9    a -- would it be considered inappropriate or some
10   sort of a conflict?
11          A.  No, it would not be that because I came
12   from the sport of weightlifting, and weightlifting is
13   in my mix of sports.  It always has been.  It was
14   simply a function of giving Jay an opportunity to
15   move away from taekwondo because he had been involved
16   with that sport for quite a long time, which was his
17   expertise.
18          Q.  Did he request to be removed, to have
19   taekwondo removed?
20          A.  I have no idea.  I just went into a
21   meeting with Jay and the other directors, and they
22   said, "Here's the way the break-out of the sports
23   will be now."
24          Q.  Who was your boss, using the term
25   loosely, in 2003 at Sports Partnership?

**Page 15**

6/30/2005 Skinner, Kelly

1           A.  Jim Shear.
2           Q.  Is he still your boss?
3           A.  He's the -- he's the ultimate boss.
4    He's the CEO.
5           Q.  So he's moved up?
6           A.  Yes, but my direct report is to Steve
7    Rousch, chief of sport performance.
8           Q.  And when did Mr. Rousch become your
9    boss?
10          A.  He officially became my boss sometime
11   towards the end of 2004.
12          Q.  Did that correspond with Mr. Shear
13   moving up?
14          A.  Mr. Shear was asked to assume the role
15   of acting CEO.  Without that title, he was still the
16   chief of sport performance.  Upon the departure of
17   Lloyd Ward, who had left the USOC sometime in 2003,
18   early 2003, so Mr. Shear had been in that role since
19   that time.  He was officially named the end of April
20   2005.
21          Q.  Are you a salaried employee of the USOC
22   in your current job?
23          A.  Yes, I am.
24          Q.  And in your job, have you ever had
25   reason to review the budget of the whole USOC?

**Page 16**

6/30/2005 Skinner, Kelly

1           A.  Not the entire USOC, no.
2           Q.  So you have -- do you have any idea what
3    the annual budget of USOC is in millions of dollars?
4           A.  I have a rough idea of the budget.
5           Q.  What would that amount be?
6           A.  About 116 million.
7           Q.  1-1-6?
8           A.  1-1-6.
9           Q.  How did you -- how did that information
10   become known to you?
11          A.  The board made it public that they had
12   approved the budget around that number for the year.
13          Q.  Focusing on your duties with Sports
14   Partnership -- and again, your formal title today is
15   Sport Partnerships?
16          A.  Director of Sport Partnerships.
17          Q.  Just describe briefly what the duties of
18   the director are.
19          A.  Briefly.
20          Q.  Maybe it's a long list.  I don't know.
21          A.  We -- our division is responsible for
22   planning with the governing bodies, allocating
23   resources against high performance plans, sport
24   plans.  We work with the governing bodies on
25   selection procedures.  We work with them on joint

1 marketing. We have some involvement there. Value in
2 kind that they may get.
3        It seems to run training center access,
4 the approval of resident training programs. We have
5 a incredible amount of involvement with the governing
6 bodies. What we have become is a first phone call
7 for the sports that we work with to say, "How do I
8 get this done?" And if I -- if my team cannot do it,
9 we direct them to who can do it.
10    Q.  Would it be fair to say -- and I don't
11 want to put words in your mouth. But currently,
12 Sports Partnerships touches on all aspects of NGB
13 day-to-day business.
14        MR. LEVINSTEIN:  Objection.
15        THE WITNESS:  We have involvement in
16 several areas, but I would not know to say all
17 aspects of their business.
18    Q.  BY MR. JONES:  Your duties are broad?
19    A.  Yes.
20    Q.  Other than taekwondo --
21    A.  Uh-huh.
22    Q.  -- among the various sports that you've
23 handled, have any of those other sports you've been
24 involved with ever had financial difficulties?  By
25 that, I mean in situations where the budgets are

1 operating at a deficit.
2    A.  Not that I recall.  And -- no, not that
3 I recall at a budget deficit, no.
4    Q.  Defining budget is having higher
5 expenses than incomes for a given year at the time
6 the accounting is done.
7    A.  That is actually a very -- if I look at
8 the sports that I work with on a four-year move,
9 moving number, that would not be the case.  And the
10 reason I say it that way is this:  Several of their
11 marketing deals are structured to whether they're
12 front-end loaded or back-end loaded.  So you may have
13 years in the middle where you operate at a deficit,
14 however, at the end it is all covered.  So they're on
15 a four-year budget.  They at least break even or
16 hopefully yielding a little bit of money.
17    Q.  I take it NGB's, they're not
18 corporations for profit; their primary goal is not to
19 make money.  Is that true?
20    A.  Correct.
21    Q.  And as you've just pointed out, they're
22 looking at a minimum to break even.
23    A.  Uh-huh.  Yes.
24    Q.  And if they can do better than that,
25 that's great.  Right?

1        MR. LEVINSTEIN:  Objection.  They're
2 not-for-profit entities, but they want to make money
3 to accomplish their goals.  So I'm not sure what you
4 mean by all of what you just said.  But you can
5 answer the question.
6        THE WITNESS:  What -- what they would do
7 is if they were in a position that had some extra
8 money at the end of the year, they would bulk up
9 their foundations because down the road the
10 foundations will help them further their business.
11 But it's a rare case, very rare case.
12    Q.  BY MR. JONES:  But ultimately, they have
13 to use all of their surpluses on NGB programs.  Isn't
14 that correct?
15        MR. LEVINSTEIN:  Objection.
16        MR. JONES:  And/or expenses.
17        MR. LEVINSTEIN:  Calls for a legal
18 conclusion about multiple different entities and
19 they're very differently situated, but you can
20 answer.
21        THE WITNESS:  Again, not being an expert
22 in 501(C)(3) law, I would not want to provide an
23 answer.
24    Q.  BY MR. JONES:  But as you mentioned, it
25 would not be unusual to see some NGB's in mid-year

1 taking a snapshot mid-year of going into the red.  Is
2 that correct?
3        MR. LEVINSTEIN:  Objection.
4        MR. JONES:  That happens.
5        MR. LEVINSTEIN:  Objection.
6        THE WITNESS:  If you could just clarify
7 that.  I'm sorry.  If you could clarify that for me.
8    Q.  BY MR. JONES:  You mentioned there were
9 situations you had seen where NGB's operated at a
10 deficit mid-year because of the way they've
11 structured their planning as being front-end or
12 back-end loaded?
13    A.  Actually, I was addressing over a
14 four-year span of time, but --
15    Q.  Okay.  Well, use a four-year plan then.
16 Is the -- at some point in time during that four
17 years there might be a point where the expenses
18 exceed the incomes?
19        MR. LEVINSTEIN:  Objection because,
20 again, they're contracted for revenues when they come
21 in.  Doesn't mean their revenues are less than
22 expenses, but you can answer.  I don't know what the
23 point of any of this is, but go ahead.
24        THE WITNESS:  That's possible.
25    Q.  BY MR. JONES:  Have you ever had any of

1   your sports being, shall I say, watched closely by
2   the USOC auditing department because of what the
3   auditing department perceives as a poor fiscal
4   situation for that individual NGB other than USTU?
5            A.   None.
6            Q.   Have any of the sports that you've been
7   responsible for ever been the subject of a
8   decertification action other than USTU?
9            A.   No.
10           Q.   Have any of the sports you've been
11  responsible for ever been subject to any sort of
12  discipline by USOC other than USTU?
13           MR. LEVINSTEIN:   Objection.
14           THE WITNESS:   That's -- to the best of
15  my recollection, I don't recall.  And discipline is a
16  pretty broad --
17           Q.   BY MR. JONES:   Okay.  Turning now to the
18  subject of just coach selection generally, is it
19  correct that one of the functions of a NGB is to
20  create criteria for selection of coaches and athletes
21  for the Olympics?
22           A.   Yes.
23           Q.   And are there definite procedures or
24  rules NGB's are supposed to follow with respect to
25  the timing of submission of such criteria to the

1   USOC?
2            A.   There's guidelines.
3            Q.   With respect to the timing, what's your
4   understanding of the guidelines?
5            A.   We ask that we have procedures at least
6   12 months in advance.
7            Q.   And is it correct that those procedures
8   must at some point be approved by the USOC before
9   they can be used by the NGB in actual selection?
10           A.   Correct.
11           MR. LEVINSTEIN:   Again, we're talking
12  about Olympic coaches.
13           MR. JONES:   Olympic coaches.
14           Q.   BY MR. JONES:   And for those of us who
15  don't know, what -- what department in particular,
16  what committee in particular is the one that would
17  use the coach selection criteria or committees?
18           A.   The coach selection criteria for the
19  Olympic games would be reviewed by the Team Selection
20  Working Group.
21           (A discussion was held off the record
22  between Mr. Levinstein and Mr. Johansen.)
23           MR. JONES:   And then --
24           MR. LEVINSTEIN:   For the record --
25           MR. JONES:   Oh.

1            MR. LEVINSTEIN:   -- time.
2            MR. JONES:   Oh, okay.
3            Q.   BY MR. JONES:   If the procedures have
4   changed, what was the situation in 2003?
5            A.   If the --
6            Q.   Did that Team Selection Working Group
7   was that first stage of review by the USOC during
8   calendar 2003?
9            A.   There was, and I do not recall when the
10  transition happened.  There's been a great deal of
11  change.  There was a time when it transferred from a
12  group called the Delegation Review Committee to a
13  Team Selection Working Group.  When that piece
14  happened, I do not recall, but that was the group.
15           Q.   So at some point in the past a committee
16  called the Delegation Review Committee would see it
17  first?
18           A.   Correct.
19           Q.   And then it would go to the Team
20  Selection Working Group?
21           A.   No.  They -- they were -- it was
22  previously called the Delegation Review Committee,
23  which then the name changed --
24           Q.   Okay.
25           A.   -- is all that it was.

1            Q.   All right.
2            A.   To Team Selection Working Group.
3            Q.   All right.  And then let's take the past
4   first.
5            A.   Okay.
6            Q.   Where -- where would it go, if anywhere,
7   after Team Selection Working Group or was that it?
8            MR. LEVINSTEIN:   You said the past.  Now
9   you're using Team Selection Group.  The past would be
10  the Delegation Committee.
11           MR. JONES:   Okay.
12           Q.   BY MR. JONES:   Where would it go after
13  the Delegation Review Committee in the past, if
14  anywhere?
15           A.   It would go to the Executive Committee
16  of the board for final approval.
17           Q.   All right.  And in 2003, do you know who
18  was on the Delegation Review Committee?
19           A.   I do not know.  I did not work closely
20  with that group.
21           Q.   Do you have any idea how big it was?
22           A.   I do not.
23           Q.   And same question for the Executive
24  Committee of the board in 2003, do you know who was
25  on there or how many people?

1      A.   I -- to give you a 100 percent assured,
2  do not know.
3      Q.   Okay.  Now, just moving forward to the
4  time that the name changed to Team Selection Working
5  Group --
6           MR. LEVINSTEIN:  For the record, despite
7  the testimony, it was more than a name change.
8           MR. JONES:  Oh, okay.
9           MR. LEVINSTEIN:  One was a governance
10 committee of the USOC and USOC restructured.  It's
11 not --
12          MR. JONES:  All right.
13          MR. LEVINSTEIN:  -- the same thing.
14 That's why it's called a working group instead of a
15 committee.  I just don't want to leave the record
16 unclear.
17     Q.   BY MR. JONES:  After the name change,
18 what is your understanding of who, if anyone, would
19 review the coach selection criteria after the Team
20 Selection Working Group?
21     A.   After the Team Selection Working Group
22 would be -- once the Team Selection Working Group was
23 comfortable and approved a set of procedures, they
24 would go to the board of directors.
25     Q.   Not the Executive Committee of the

1  board?
2      A.   To the best of my knowledge, we do not
3  have an Executive Committee within our board
4  structure currently.
5      Q.   So that's one of the changes then?
6      A.   Part of the whole restructure --
7      Q.   Okay.
8      A.   -- of the USOC.
9      Q.   And as you sit here today, we don't
10 know -- you don't know what month or year that change
11 came about?
12     A.   The restructure was an evolving process,
13 so to give you a definitive date, I could not tell
14 you.
15     Q.   Thank you.  You called it the one-year
16 guideline?
17     A.   Uh-huh.  Correct.
18     Q.   Do you know where that guideline is in
19 writing?  Do you know where it comes from?
20     A.   Comes from our desire to get better
21 information out to the athletes earlier.  I don't
22 know of it being in writing anywhere except in our
23 selection procedures manual that is put out.
24     Q.   Are there also guidelines for when the
25 coach -- actual coach selection of the candidate, the

1  person, should take place?
2      A.   We ask for all procedures to be
3  submitted at the same time, but it rarely happens.
4      Q.   So --
5           MR. LEVINSTEIN:  He didn't answer your
6  question, just for the record.  You asked him when
7  the coach decision was made.
8           MR. JONES:  Yes.
9           MR. LEVINSTEIN:  You answered sort of
10 about when the procedure would be submitted.
11          MR. JONES:  I guess I was interpreting
12 it as he was saying one in the same.
13     Q.   BY MR. JONES:  But did you understand
14 the difference?
15     A.   The question was:  When do we ask for
16 coach procedures?
17     Q.   No.  The person.  When do you ask for
18 the actual name of the candidate to look at for USOC
19 approval?
20     A.   We don't have a set date as to when we
21 ask for a name.
22     Q.   There's no guideline on that?
23     A.   Not -- I don't have a manual here with
24 me and I haven't committed it to memory, but I do not
25 know of a guideline on we would like to see a coach

1  named by.
2      Q.   In the capacity as a director now --
3      A.   Uh-huh.
4      Q.   -- have you at times had to consult
5  either the past USOC bylaws or any revisions to the
6  USOC bylaws that have come afterwards?
7      A.   Consult them?
8      Q.   Read them and use them.
9      A.   Yes.
10     Q.   Have you read the bylaws front to back?
11     A.   Once.
12     Q.   You'd agree with me that those are not
13 guidelines.
14     A.   I would agree.
15     Q.   Those are rules, procedures which
16 everybody is supposed to abide by, if they apply.  Is
17 that fair?
18          MR. LEVINSTEIN:  Objection.  They're the
19 bylaws.  Go ahead.
20          THE WITNESS:  That's it.  They're our
21 governing documents.
22     Q.   BY MR. JONES:  You try to follow them if
23 you can?
24     A.   I try to follow them so I can keep a
25 job.

```
 1        Q.   Any other rules in your department that
 2   you follow to keep your job other than the USOC
 3   bylaws?
 4        A.   No.
 5             (A discussion was held off the record
 6   between Mr. Levinstein and Mr. Johansen.)
 7        Q.   BY MR. JONES:  Is it correct that it's
 8   the individual NGB's job to determine particular
 9   selection criteria for Olympic coaches?
10             MR. LEVINSTEIN:  Objection.
11        Q.   BY MR. JONES:  With USOC approval, I
12   understand that.  But it's -- it's the NGB's function
13   to come up with the criteria.
14        A.   The NGB's function to develop criteria,
15   but often in consultation with the Olympic Committee.
16        Q.   And that's because it's assumed that
17   they know their sport very well, totally familiar
18   with it?
19             MR. LEVINSTEIN:  Objection.
20             THE WITNESS:  It is assumed that they
21   know their sport very well, yes.
22        Q.   BY MR. JONES:  When -- and when a
23   criteria has been approved by the USOC and then the
24   individual NGB, does its actual coach selection of
25   the person -- but let's pick 2003, first of all,
```

```
 1        Q.   And let's take the --
 2             MR. LEVINSTEIN:  Just for clarification,
 3   we're not sure, but it's possible that they both
 4   existed at one point in time.  They went from the
 5   Team Selection Working Group to the Delegation Review
 6   Committee and then to -- Gary's told me this and I'm
 7   not positive and I just don't want to --
 8             MR. JONES:  Okay.
 9             MR. LEVINSTEIN:  I'm not sure.  If I'm
10   wrong, I'm wrong.
11             MR. JONES:  That's fine.
12             MR. LEVINSTEIN:  I just don't want to
13   mislead you here.
14             MR. JONES:  Let's go with what the
15   witness knows then.
16             MR. LEVINSTEIN:  Right.
17        Q.   BY MR. JONES:  Just give me your best
18   response.  If we're wrong, we're wrong.
19             After the Delegation Review Committee --
20   well, your department looks at it first, the name,
21   makes sure it complies with the approved procedure.
22   And, what, you look at the name of the person and his
23   qualifications?
24        A.   Qualifications.
25        Q.   Is a resume or something from the person
```

```
 1   because I don't know if the procedures has changed.
 2             MR. LEVINSTEIN:  Objection.  Start over.
 3   NGB's in general?  Let's get the question clear.
 4             MR. JONES:  I think it is clear.
 5        Q.   BY MR. JONES:  2003, an NGB submits its
 6   individual coach selection candidate and the person's
 7   identified.  Who is that submitted to and what's the
 8   process for getting that person approved at the USOC
 9   stage?
10        A.   So just to clarify, once procedures for
11   selecting a coach have been approved?
12        Q.   Right.  That's done.
13        A.   And now the governing body is coming
14   forward with a name.
15        Q.   Right.
16        A.   The name is given to the appropriate
17   Sport Partnership team, whoever it is that works with
18   that sport.  That person makes sure that the
19   candidate matches up with the approved procedures,
20   and then that name, if that is all in order, is
21   brought forward to the Team Selection Working Group.
22        Q.   And before the Team Selection Working
23   Group came into vogue, would that be the Delegation
24   Review Committee?
25        A.   Correct.
```

```
 1   usually submitted along with the name?
 2        A.   Typically.  It is within the procedures
 3   that a biographical sketch or some type of
 4   biographical information is provided.
 5        Q.   And then assuming Sports Partnership
 6   gives its okay, it goes to the -- possibly the
 7   Delegation Review Committee first back when that
 8   existed?
 9        A.   Possibly it could have to the point that
10   was made about the evolving restructure.  It could
11   have gone to the partnership team to the Team
12   Selection Working Group to the Delegation Review
13   Committee to the board.  Or the way it is now, it
14   goes Sport Partnership, Team Selection Working Group
15   to the board.
16        Q.   In the -- in the past --
17             MR. LEVINSTEIN:  For the record, when
18   you said board the first time, he probably meant
19   selection committee.
20        Q.   BY MR. JONES:  Is your counsel probably
21   right?
22        A.   Probably.
23        Q.   Yeah.  I was going to ask about the
24   Executive Committee.  So it's not --
25             MR. LEVINSTEIN:  One thing I can make
```

1  easier.  The Executive Committee, Delegation Review
2  Committee ran the business simultaneously.
3        THE WITNESS:  Right.
4        MR. LEVINSTEIN:  So if one existed, the
5  other did.
6        MR. JONES:  I can see why a
7  restructuring was required.
8        THE WITNESS:  Yeah, definitely.
9        (A discussion was held off the record
10 between Mr. Levinstein and Mr. Johansen.)
11    Q.  BY MR. JONES:  The individual person
12 could theoretically be rejected at any one of these
13 USOC stages that you just described?
14    A.  Correct.
15    Q.  Or something noted and sent back for
16 further study?
17    A.  Correct.
18    Q.  And once -- back when the Executive
19 Committee was in the loop, once they approved the
20 candidate, was that it, or would that then go to the
21 board, the whole board?
22    A.  I was not involved at that point in time
23 to tell you what the next steps would be in terms of
24 the next aspect.
25    Q.  Just testify to what you know now then.

1  What -- where would it go?
2        A.  Right now it would go from the Team
3  Selection Working Group to the board.
4        Q.  The board is a lot smaller now than it
5  was?
6        A.  Correct.
7        Q.  But that body would have the opportunity
8  to approve of every single Olympic coach then?
9        MR. LEVINSTEIN:  That body?
10       MR. JONES:  The board.
11       MR. LEVINSTEIN:  Okay.
12       THE WITNESS:  Correct.
13    Q.  BY MR. JONES:  And once that happens,
14 the person is then formally the coach.  Is that
15 right?
16    A.  They are formally nominated to be the
17 coach at that point in time.
18    Q.  So nobody that has to look at it any
19 further?
20    A.  Correct.
21       (A discussion was held off the record
22 between Mr. Levinstein and Mr. Johansen.)
23    Q.  BY MR. JONES:  Are you aware of any
24 basis for removing an Olympic coach once that process
25 that you've just described is completed at the USOC,

1  removing the coach other than for cause, not doing
2  his job or illness?  Are you aware of any other
3  reason for doing that?
4        A.  So code of conduct violation?  Anything
5  in there?  You would -- code of conduct violation
6  definitely would be a removal, but not to the best of
7  my knowledge do I recall anything along those lines.
8        Q.  A coach being removed for other than
9  cause, code of conduct?
10       MR. LEVINSTEIN:  Objection.
11    Q.  BY MR. JONES:  Or perhaps illness?
12    A.  Understood.  Not that I've personally
13 been involved with, but there's been hundreds of
14 coaches nominated to the Olympic Committee.  I do not
15 know the fate of all of them.
16    Q.  Turning to Dae Sung Lee, have you ever
17 met Dae Sung Lee, the plaintiff in this case?
18    A.  I have met him maybe once, twice.
19    Q.  What was the situation?
20    A.  I wouldn't -- I would not be telling you
21 the truth if I gave you an idea.  There was several
22 events that I was at and several different meetings
23 that I was involved in.
24    Q.  Could it have been some competition or
25 something you attended?

1        A.  Could have been.  Could have been a
2  meeting.
3        Q.  Were you involved in reviewing any part
4  of, first of all, the -- I'll call it the old coach
5  selection criteria at USTU?
6        A.  No.
7        Q.  Just to show you something, Exhibit 87,
8  I think it's -- if you look in that book here.  I
9  hope it's in here.
10       A.  Okay.
11       Q.  Have you ever seen Exhibit 87 before?
12       A.  Possibly when the transfer of documents
13 from the previous team to our team, but I don't
14 recall ever seeing it, but it's possible.
15       Q.  I'm showing you a document entitled
16 "Selection Procedures For Coaches, U.S. Taekwondo."
17 It's signed by Bruce Harris and dated January 20,
18 2003.  Is that correct?
19       A.  That's correct.
20       Q.  So you might have seen it, but nothing
21 jumps out at you as to when exactly or if?
22       A.  No.  When exactly, definitely not.
23       Q.  So you don't know what stage this
24 document might have been at in the various USOC
25 review procedures as of May 2003 when you took over

1  taekwondo?
2      A.  I do not know.  No, I don't.
3      Q.  Was it your impression as of May 2003
4  that USTU had a set of coaching criteria in effect
5  when you came on board?
6      A.  Yes.
7      Q.  So is it also correct then that you had
8  no opportunity to reject or comment on whatever was
9  contained in the old criteria during 2003?
10     A.  That would be correct.  I was not a
11  member of the group that worked on these, so did not
12  have that opportunity.
13     Q.  Looking at them just for a moment since
14  you've handled so many NGB's, would you -- just
15  looking at the criteria that are contained there,
16  would you consider that the criteria contained in
17  that document to be objective, subjective, or none of
18  the above?
19     A.  Subjective.
20     Q.  And just if you just read in the record
21  what the document states.
22     A.  The entire document?
23     Q.  Just the answer to number one.
24     A.  Okay.  The question number one is:
25  "What are your NGB and/or PSO prerequisites for

37

1  coaching positions?"
2      The answer is:  "Previous coaching
3  experience at the Olympic Games, Pan American Games,
4  World Championships, World Cup, or Pan Am
5  Championships for taekwondo."
6     MR. LEVINSTEIN:  That's not the whole
7  thing.  There's a 2 and a 3.
8     MR. JONES:  I know that.
9     MR. LEVINSTEIN:  Okay.  Just for the
10  record, you asked him to do one thing, and then you
11  told him to do something else.
12     MR. JONES:  I don't think that that
13  correctly characterizes what I'm doing.
14     Q.  BY MR. JONES:  But let me ask you this:
15  Contrasting that with or comparing it with any other
16  coaching selection criteria you've seen at the other
17  NGB's you've handled, have you ever seen coaching
18  selecting criteria that looked like this?
19     A.  No.  This may be one minor part of it,
20  but typically what I've seen is things that are much
21  more -- criteria that is much more objective.
22     Q.  Now, taekwondo is a individual sport.
23  Is that correct?
24     A.  Correct.
25     Q.  Do you -- are you in charge of any other

38

1  individual sports?
2      A.  Yes, several.
3      Q.  Which ones would you term individual?
4      A.  Archery, badminton, weightlifting,
5  shooting, speed skating, squash, roller sports.
6      Q.  Okay.
7      A.  That should be nine.  I have --
8     MR. LEVINSTEIN:  tennis.
9     THE WITNESS:  Tennis.  Thank you.
10     MR. JONES:  Okay.
11     MR. LEVINSTEIN:  That was not in
12  alphabetical order.
13     THE WITNESS:  I know.  If it's not
14  alphabetical, I don't do it right.
15     MR. LEVINSTEIN:  Although doubles
16  tennis.
17     THE WITNESS:  There are team components
18  to some of those sports.
19     Q.  BY MR. JONES:  And you've seen the
20  coaching selection criteria for all of those?
21     A.  I have.
22     Q.  When you say that some of these other
23  individual sports have criteria that contain more
24  or -- excuse me.
25     MR. LEVINSTEIN:  Here you go.

39

1     MR. JONES:  Thanks.  I'm sorry.  Why
2  don't you restate what your --
3     MR. LEVINSTEIN:  I think he said, "I
4  have seen much more objective criteria."  That's what
5  I have written down.
6     THE WITNESS:  Right.
7     Q.  BY MR. JONES:  Why don't you explain
8  your answer when you say "much more objective."
9      A.  Okay.  Typically what I see in these
10  procedures, whether it be for coach or team leader or
11  any other staff member, is a performance focus,
12  meaning actively coaching athletes that could be on
13  the Olympic games team or whatever team it is, we are
14  approving athletes for or whatever procedures -- I'm
15  sorry -- that we're approving.  Number of athletes on
16  a team, if you are the current national team coach,
17  performances of athletes when you've coached them at
18  high-level international events.  That's typically
19  the way it's broken up.  The procedures here are very
20  appropriate for a team leader.
21     Q.  "Here" meaning in Exhibit 8?
22     A.  Correct.  Previous experience at an
23  event is good indicator of maybe there would be some
24  success of that person in an event as a team leader.
25     Q.  But you would not consider previous

40

1  coaching experience at the Olympic games, for
2  example, to be appropriate for determining an Olympic
3  coach?
4       A.   Depending on when the Olympic games are
5  that they coached, it may play a role.  But if it was
6  quite awhile ago, maybe there is somebody that has
7  athletes that are going to be participating on an
8  Olympic team and have an opportunity to make the
9  Olympic team that would be better suited for the
10  position.
11       Q.   But you'd agree, though, that if the
12  coach candidate in question had recent Olympic coach
13  experience, it would be a relevant trait to require?
14       A.   I don't know that it's necessary.  I've
15  seen coaches, because it's the coach of the athlete
16  that's performing, be tremendously successful at one
17  of the games and that could be the absolute wrong
18  coach for the next Olympic games.  So I would not use
19  that as a rule of thumb.
20       Q.   When you say performance -- use the term
21  performance as being an objective in coach selection?
22       A.   I say that we focus on performance.
23       Q.   So it's more of -- it's a goal then.  Is
24  that fair when you say --
25       A.   It's an absolute -- within my position,

41

1  it's an absolute demanded outcome.
2       Q.   And how does one measure performance?
3       A.   Success at the games.
4       Q.   And how does one measure success at the
5  games?
6       A.   Medals.
7       Q.   And is more medals better than less?
8       A.   Absolutely, without a doubt.
9       Q.   So if you have a lot of medals, you've
10  performed.
11       MR. LEVINSTEIN:  Objection.
12       THE WITNESS:  If a national governing
13  body has won a large number of medals, that could be
14  seen as an indicator of success.
15       Q.   BY MR. JONES:  Okay.  Looking at Exhibit
16  87 for a moment and assuming that was the selection
17  procedures in effect --
18       A.   Uh-huh.
19       Q.   -- at least through calendar 2003, do
20  you know how many medals the USTU had won in the
21  Olympic competition using these criteria to select
22  their coaches?
23       MR. LEVINSTEIN:  Objection.
24       THE WITNESS:  Using these criteria?
25       MR. JONES:  Yeah.  That -- the answer is

42

1  no?
2       MR. LEVINSTEIN:  Objection.  These are
3  criteria for 2004.
4       MR. JONES:  Let's assume that the same
5  criteria were used in the past.  If you assume that.
6       MR. LEVINSTEIN:  For what events?
7       Q.   BY MR. JONES:  Why don't you answer a
8  simpler question.  Do you know how many medals the
9  USTU had won in those Olympics that it had
10  participated in prior to 2004?
11       A.   Off the top of my head, only one medal
12  comes to mind in 2000.  That's it.
13       Q.   Jay Warwick gave an interview that he
14  counted 22 in the 3 Olympics that USTU had
15  participated in before 2004.  Do you have any
16  evidence that refutes that?
17       MR. LEVINSTEIN:  Objection.  It is what
18  it is.
19       Q.   BY MR. JONES:  Do you have any evidence
20  that refutes it?
21       A.   I have nothing to refute that.
22       Q.   And you -- you only know of the one
23  medal you just mentioned in 2000?
24       A.   I said I'm not looking at results.
25  Please understand I work with 12 sports.  I have a

43

1  great deal of information in my head about 12 sports.
2  So to recall what any one of my sports that I work
3  with did in 2000 or in 2002 would potentially provide
4  you with a false answer.
5       MR. LEVINSTEIN:  For the record, the
6  other two games were in '92 and '88.  We're talking a
7  long, long time ago.
8       Q.   BY MR. JONES:  Is it your testimony that
9  none of your other sports have coaching selection
10  criteria that looks like number one in Exhibit 87?
11       MR. LEVINSTEIN:  Objection.  Vague and
12  ambiguous.  We're talking about individual sports
13  versus team sports?
14       MR. JONES:  Individual sports.
15       THE WITNESS:  Without having all of
16  their procedures in front of me, to the best of my
17  recollection, this -- we would look for more to a
18  coach selection process than what is indicated here.
19       Q.   BY MR. JONES:  Okay.  Were you
20  responsible for U.S. Taekwondo when Dae Sung Lee's
21  name was submitted as a coach candidate for the
22  position of U.S. Olympic coach?
23       MR. LEVINSTEIN:  Objection.
24       MR. JONES:  To USOC.
25       MR. LEVINSTEIN:  Objection.

44

1      THE WITNESS:  I do not recall when his
2  name was submitted.  If it was after May of 2003,
3  then I was a director of that team, but I do not
4  recall when his name was submitted.
5      Q.  BY MR. JONES:  Did you have any
6  involvement at all in his selection process during
7  2003?
8      A.  None.
9      Q.  Do you know if Olympic coaches or coach
10 candidates were being sent by individual NGB's to the
11 Athens Olympic site at USOC expense in the month of
12 April 2003?
13     A.  April 2003?
14     Q.  I realize there's a conversion in there
15 for you.
16     A.  Not that I -- not that I recall were
17 coaches sent to Athens in April of 2003, but I wasn't
18 a part of that if it did happen.
19     Q.  You weren't involved with sending --
20 having anything to do with the process of arranging
21 for coaches to go to visit the site in April 2003 in
22 any of your NGB's?
23     A.  I was not involved at all, no, not that
24 I recall.
25     Q.  All right.

45

1      (A discussion was held off the record
2  between Mr. Levinstein and Mr. Johansen.)
3      Q.  BY MR. JONES:  Do you have any
4  understanding of what the job description is for a
5  U.S. Olympic coach?
6      A.  It varies from sport to sport.
7      Q.  Do you know what the USCO bylaws say?
8      A.  About the Olympic coach?
9      Q.  Yeah, his job description.
10     A.  I would not want to go out of USOC
11 bylaws on that issue.  I have a -- I have a
12 familiarity, but I do not -- I would not want to be
13 citing verse from the bylaws.
14     Q.  What is your understanding of what a
15 U.S. Olympic coach is supposed to do?
16     A.  I can only --
17         MR. LEVINSTEIN:  Objection.  Go ahead.
18         THE WITNESS:  I can only answer that
19 based on what I've seen from my experience with
20 governing bodies and what appears to be successful,
21 but I cannot answer it based on what it is USOC has
22 outlined without looking at the bylaws.
23     Q.  BY MR. JONES:  Okay.  Do you know
24 whether Dae Sung Lee attended the world championship
25 for taekwondo in 2003?

46

1      A.  I do not know.
2      Q.  Do you recall testifying in federal
3  court that yes, he did?
4      A.  (No oral response.)
5      Q.  You don't recall?
6      A.  I do not recall that.
7      Q.  You were under oath at that time.
8      A.  Understood.  You asked if I recall right
9  now today that he was at the 2003 world
10 championships.  That testimony was during the Olympic
11 games nearly a year ago.  What I said a year ago, I
12 do not recall.
13     Q.  Were you at that championship?
14     A.  No, I was not at that championship.
15     Q.  Do you know whether he attended, Dae
16 Sung Lee attended the Pan Am games in the Dominican
17 Republic in 2003?
18     A.  I do not know if he did.  It's quite
19 possible.
20     Q.  You earlier testified that yes, he did.
21 Do you know --
22     A.  Can I just make a point?
23     Q.  Sure.
24     A.  I did not take it upon myself to, for
25 coming here today, understand the complete history of

47

1  Mr. Lee.  So where he has been, I do not know at this
2  point in time.  So you can continue to ask me those
3  questions.  I will continue to tell you I do not
4  know.
5      Q.  That's all we're asking for is your
6  current knowledge.
7      A.  That's what you're getting.
8      Q.  Do you know whether Dae Sung Lee
9  attended the regional -- I'm sorry.  You already
10 answered that one.  I think -- I'm sorry.
11         Do you know whether he attended the
12 regional Pan Am qualifications in Mexico?
13     A.  I do not recall.
14     Q.  Do you know whether he attended the
15 world qualifications in France?
16     A.  I do not recall.
17     Q.  How about the first Olympic qualifiers
18 in Colorado?
19     A.  I do not recall.
20         MR. JONES:  Let's take a break.  It's
21 been an hour.
22         MR. LEVINSTEIN:  We're okay.  It's up to
23 you.
24         (Recess taken from 2:08 p.m. to
25 2:13 p.m.)

48

1    Q.   BY MR. JONES:  With respect to the coach
2    selection of Dae Sung Lee, did you ever write any
3    correspondence to Mr. Johansen regarding the
4    circumstances surrounding Dae Sung Lee's approval as
5    coach?
6        A.   Utilizing him by name?  Mentioning Mr.
7    Lee by name?
8        Q.   Not mentioning him by name, no.
9        A.   If you're referring to the June 3rd
10   memo, I had sent a memo to three people within the
11   Olympic Committee to make them aware of what I
12   observed at a May -- end of May 2003 board of
13   governors meeting of U.S. Taekwondo, one item of
14   which was that the coach selection process was
15   challenged on the floor of that meeting.
16       Q.   Let's mark --
17           MR. LEVINSTEIN:  It's not identical
18   because my handwriting is a little different.  Other
19   than that, they're identical because I have the right
20   Bates number.
21           (Exhibit No. 147 was marked for
22   identification by the court reporter.)
23       Q.   BY MR. JONES:  Do you need to review it
24   again before I ask questions about it?  Go ahead, if
25   you need.

1        A.   The entire document or you just want me
2    to focus on the paragraph concerning the coach?
3        Q.   Just focus on the --
4        A.   Okay.
5        Q.   -- back page.
6        A.   Okay.
7        Q.   What is that document?
8        A.   This document is a memo from me to -- me
9    and Michelle Farrell, a member of my team, because we
10   both attended the board of governors meeting to Gary
11   Johansen, Jennifer Gabrius, and Bob Foth of the U.S.
12   Olympic Committee outlining things that we had
13   observed at the taekwondo board of governors meeting
14   and Executive Committee meeting.
15       Q.   That meeting you observed was May 23,
16   2003?
17       A.   The meeting, yes.
18       Q.   In New Orleans?
19       A.   In New Orleans, Louisiana, yes.
20       Q.   And the purpose was to keep the
21   recipients advised of what the status of things
22   happening with USTU?
23       A.   Correct.
24       Q.   The back page, first paragraph refers to
25   what you just said, matters discussed at the meeting

1    regarding the circumstances of selection of the
2    Olympic coach at USTU.  Is that right?
3        A.   This -- you're asking for me to
4    summarize what this paragraph says or what?
5        Q.   Well, generally, the topic of the
6    paragraph is selection of the coach at USTU?
7        A.   It's the involvement of the athletes in
8    the selection of the Olympic coach.
9        Q.   First of all, this memo is not signed.
10   Is there a reason it wasn't signed?  Is that your
11   normal practice?
12       A.   That's my normal practice.  I do not
13   sign them.
14       Q.   And other than sending this memorandum
15   to the recipients, was any follow-up of any kind done
16   to see when happened at USTU with respect to
17   selection of the coach and athlete participation in
18   that decision process?
19       A.   Any follow-up by which parties?
20       Q.   By you.
21       A.   Those athletes that we could talk to we
22   talked to.
23       Q.   And who was that?
24       A.   We talked to several athletes at that
25   point in time.  I don't recall all the athletes that

1    I spoke with.
2        Q.   That was after the meeting or at the
3    same time or --
4        A.   After.
5        Q.   Do you know if there were any further
6    meetings or communications between members of the
7    Coaching Sciences Committee at USTU after this
8    meeting?
9        A.   I do not have any information on that.
10   That would have been a USTU issue, and I would not
11   have been involved in those types of communications.
12   So none that I'm aware of at this time.
13       Q.   Other than the meeting you observed
14   which touched on the coach selection process at USTU
15   and Athens representation in that process and your
16   follow-up with a letter to Mr. Johansen on June 3rd,
17   2003, can you think of any other correspondence you
18   sent or received, correspondence you received from
19   other parties regarding coach selection in 2003 at
20   USTU?
21       A.   Not off the top of my head.  I do not
22   recall any at this point in time.
23       Q.   And other than the conversations with
24   athletes that you just mentioned, were there any
25   other conversations, for example, with the chair of

**Page 53**

1  the Coaching Science Committee as to follow-up?
2      A.  I did not speak with the chair of the
3  Coaching Science Committee personally.  If there was
4  other follow-up, I am not sure.
5      Q.  So you don't know what his position was
6  on what actually happened?
7      A.  What I do know is at that particular
8  point in time there were two things that were very
9  apparent to us within Sport Partnerships.  Number
10  one, nobody was really sure who was on which
11  committee, and the second thing was defining the
12  chair of those committees was equally challenging.
13      Q.  You -- so you weren't -- you weren't
14  even sure who the chair was --
15      A.  Correct.
16      Q.  -- of Coaching Science --
17      A.  Correct.
18      Q.  And your -- you had a perception that
19  other people didn't know who the chair was or the
20  members were?
21      A.  I definitely from sitting through a May
22  2nd or May 3rd membership and credentials meeting,
23  open forum meeting in Denver, had strong belief that
24  there were several people that were not sure who was
25  on which committees, particularly within the ranks of

**Page 54**

1  the athletes.
2      Q.  You already mentioned that as you sit
3  here today you can't recall names of any athletes you
4  talked to, but you've got some recollection of
5  talking to athletes --
6      A.  Correct.
7      Q.  -- at some time after this meeting.
8      A.  Correct.
9      Q.  But as you sit here today, you can't
10  tell us how many conversations, for example?
11      A.  No, not at all.  I had access to
12  athletes or I would talk to athletes at events.
13  Athletes would stop by my office and see me.  You
14  have resident program in place.  There were athletes
15  on campus.  Part of what I was doing at that point in
16  time was learning about the sport through talking to
17  the athletes.  So I spoke to a great number of
18  athletes within the sport.
19      Q.  Any -- understanding you don't know any
20  names, any recollection of any specific
21  conversations, the substance of what was said to you?
22          MR. LEVINSTEIN:  About coach selection
23  in 2003?
24          MR. JONES:  Yes, about the substance of
25  this paragraph that we're talking about.

**Page 55**

1          THE WITNESS:  The substance of this
2  paragraph was on the floor of the board of governors
3  meeting.
4      Q.  BY MR. JONES:  I understand, but you
5  talked with athletes afterwards, I assume, about the
6  same topic.  Am I wrong?
7      A.  I did not make it my personal mission to
8  go out to talk to every athlete about the coach
9  selection process.
10      Q.  Okay.
11      A.  I talked to them about a variety of
12  items.
13      Q.  Turning now to another topic, you're
14  aware, of course, that at some point in time a
15  decertification action was brought against USTU in
16  2003.
17          MR. LEVINSTEIN:  Objection, but you know
18  what he's referring to.
19          THE WITNESS:  Yes.
20          MR. LEVINSTEIN:  He calls it that, but I
21  don't know if that's the proper term for it, but --
22      Q.  BY MR. JONES:  You know what I'm talking
23  about?
24      A.  I know that in 2003 the organizations
25  were trying to find some resolution to some

**Page 56**

1  challenges within the sport of taekwondo.
2      Q.  Did you get involved with that process?
3      A.  Involved meaning -- clearly, I wrote a
4  memo.  I attended meetings.  So there was some level
5  of involvement, yes.
6      Q.  I notice a lot of the correspondence
7  flying back and forth would courtesy copy you.
8      A.  Yes.
9      Q.  Was that typical procedure?
10      A.  Typical procedure within the Olympic
11  movement is that if there's correspondence between
12  the U.S. Olympic Committee and a national governing
13  body that happens to be a sport that falls within my
14  group of sports, I tend to get a courtesy copy.  Not
15  always, but I tend to.
16      Q.  Okay.  Because one of your duties you
17  try to at least monitor and know what's happening
18  with your NGB's.  Is that right?
19      A.  Correct.  Yes.
20      Q.  Did you ever have any discussions with
21  Jay Warwick about what was happening with USTU as far
22  as decertification and trying to resolve that during
23  2003?
24      A.  I did not have any conversations of
25  substance with Mr. Warwick at all, and that was

1  intentional.
2        Q.   Did he ask?
3        A.   He honored the situation that I was
4  trying to keep everything away from him and not have
5  him get involved, at least to the best of my
6  knowledge.  Jay works three doors down from me, so if
7  I don't recall any substantive conversations with
8  him.
9        Q.   I want to show you some documents
10 that -- do you have Exhibit 83 in the book there?  Do
11 you recall seeing that document before?
12       A.   I recall seeing this document.
13       Q.   What is it?
14       A.   It's a request from Mr. Bruce Harris,
15 the executive director of the USTU, to myself
16 regarding funding, some funding that had been awarded
17 to the USTU and the movement of some of the dollars
18 within that funding.
19       Q.   These were several reallocation
20 requests?
21       A.   Correct.
22       Q.   Movement being the same thing as
23 reallocation?
24       A.   Correct.
25       Q.   What was your response to this letter,

1  if any?
2        A.   Well, I definitely responded.  Without
3  having the letter in front of me, my recollection is
4  at that time we were working very aggressively to
5  help Mr. Harris through some funding challenges the
6  NGB was having.  So we looked at all these, but what
7  our ultimate decision was -- and I know there's a
8  response.  I just off the top of my head do not
9  recall what I said.
10       Q.   Do you know if you refused?
11       A.   I don't recall.  I don't recall.
12       Q.   Okay.  If you could take a look at
13 Exhibit 4.
14            MR. JONES:  You got one?
15            MR. LEVINSTEIN:  I gave it back.
16            MR. JONES:  Be that way.  I thought you
17 didn't want to see it anymore.
18            MR. LEVINSTEIN:  It depends.  If you
19 want me to take it home with me, I'm not going to
20 take this one home with me either.  I'm giving it
21 back to you after you're done asking.
22            MR. JONES:  It's a multipage document.
23 Why don't you take your time.
24            THE WITNESS:  Okay.  Is part of this
25 missing?  "The following are examples of some of

1  these problems."  And there's no 1, but there's a 2.
2  And does it really start with "a governance system"?
3            MR. JONES:  I don't think so.
4            MR. LEVINSTEIN:  It might have been a
5  copying problem.
6            THE WITNESS:  Okay.
7            MR. LEVINSTEIN:  That's what yours says,
8  too.
9            MR. JONES:  Yeah.
10           MR. LEVINSTEIN:  You can see it's been
11 maybe shrunk and distorted.  It looks like it was
12 folded a little because some letters are missing in
13 the middle.  But I know there are better copies than
14 this, but this is what we've got.
15           MR. JONES:  Is this his?
16           MR. LEVINSTEIN:  Yes.  If you want to
17 write the numbers on -- she's going to want that.
18       Q.   BY MR. JONES:  Have you had a chance to
19 look at that one, Exhibit 4?
20       A.   I looked it over, yes.
21       Q.   I'm asking you about it because it's one
22 of those documents that was apparently courtesy
23 copied to you.
24       A.   Correct.
25       Q.   Do you remember seeing it before?

1        A.   I remember seeing this document, yes.
2        Q.   Did you have any input at all into the
3  contents of it before it went out?
4        A.   None.  None that I recall.
5        Q.   Did anyone discuss with you before
6  August 4, 2003, the possibility that the Membership
7  and Credentials Committee might write a letter like
8  this involving compliance review?
9            MR. LEVINSTEIN:  Objection.
10           THE WITNESS:  I don't recall every
11 meeting I sat in that discussed potential outcomes
12 with the U.S. Taekwondo Union, but it's quite
13 possible that it was discuss at some meeting that I
14 attended.
15       Q.   BY MR. JONES:  This is a serious letter,
16 is it not, as far as an NGB is concerned?
17           MR. LEVINSTEIN:  Objection.
18           THE WITNESS:  I considered it to be a
19 very serious letter when I read it.
20           MR. JONES:  I mean, NGB's don't get
21 letters like this every day.
22           THE WITNESS:  Thankfully not.
23       Q.   BY MR. JONES:  And as you sit here
24 today, you can't recall if there were any discussions
25 about compliance review before August 4 with you?

6/30/2005 Skinner, Kelly

1    MR. LEVINSTEIN:  That's not what he
2  said.  You asked him about the letter before.  Now
3  you've asked him about compliance review.  That's a
4  different question.
5    THE WITNESS:  As mentioned, I sat in a
6  series, more than -- more meetings than I'd ever want
7  to remember about this particular issue.  So what was
8  discussed in all those meetings --
9    MR. JONES:  Okay.
10    THE WITNESS:  -- there was always a
11  number of scenarios that could play itself out.
12    Q.  BY MR. JONES:  When you say "these
13  meetings," about when did these meetings begin?
14    A.  May 2nd, 2003, my first membership and
15  credentials meeting in Denver.
16    Q.  And after that, did you attend regular
17  meetings, like monthly meetings or weekly meetings
18  involving USTU?
19    A.  I want to make sure I answered your
20  first question clearly.  I'll get to this one.  That
21  was the first meeting I was involved with regarding
22  taekwondo, that May 2nd meeting.  There could have
23  been other meetings before that.  I don't know.
24    There was not a regularly scheduled
25  taekwondo meeting that I was aware of or was a part

61

6/30/2005 Skinner, Kelly

1  of.
2    Q.  When we say "meetings," were these
3  meetings by only USTU people and you or joint
4  meetings between USTU and USOC people?
5    A.  I attended meetings with both USTU staff
6  and with USOC.  The only time I attended a
7  meeting with both groups in the room would be
8  membership and credential meetings, like the May 2nd
9  meeting and other meetings.
10    Q.  Okay.  Is this letter --
11    A.  There may have been a meeting with
12  Mr. Lee at one point.  I know there was a
13  meeting -- I just don't recall when it all
14  happened -- and some USOC staff.  Mr. Sang Lee.
15    Q.  Sang Lee.
16    A.  Yeah.
17    Q.  All right.  This letter of August 4
18  states on page 2 that has placed USTU
19  on its meeting agenda for September 12th, 13, 2003,
20  in Denver, Colorado.  Do you recall attending such a
21  meeting in Denver, Colorado, in September?
22    A.  I did attend, yes.
23    Q.  And what -- what did you observe at that
24  meeting?  First of all, who was there generally?
25    A.  Generally, you had the various members

62

6/30/2005 Skinner, Kelly

1  of the Membership and Credentials Committee, people
2  from the United States Olympic Committee staff as
3  well as people within the membership of the U.S.
4  Taekwondo Union, athletes from the U.S. Taekwondo
5  Union, which, obviously, are going to be within the
6  membership, as well as some U.S. Taekwondo Union
7  staff and volunteers.
8    Q.  Did some lawyers show up for the USTU at
9  that meeting?
10    A.  Yes, there were lawyers there for the
11  USTU at that meeting.
12    Q.  Now, we've had some testimony by other
13  attendees of that meeting in May of -- kind of
14  taking place in two stages, the first stage being, I
15  guess, everybody invited and say what they will.  And
16  then the second stage was more closed doors with just
17  the lawyers and, I believe, USOC people.
18    A.  I recall the first open forum or however
19  it is you characterize it.  Everybody can come on in
20  and have their opportunity.  And there was a
21  follow-on after that of the Membership and
22  Credentials Committee as well as some USOC staff.
23    Q.  Were you allowed to attend the second
24  stage of the meeting that was closed doors?
25    A.  I was allowed to attend that meeting,

63

6/30/2005 Skinner, Kelly

1  yes.
2    Q.  What happened in that meeting, if you
3  know?
4    MR. LEVINSTEIN:  For the record, the
5  first was sort of three stages the lawyers weren't
6  in.  I think you heard testimony that they met to
7  deliberate or discuss what they had heard in the
8  meeting, and then at some point they were joined by
9  the lawyers.  I may be wrong, but I don't think that
10  Steve Smith and Jill Chalmers were present for the
11  whole thing.
12    THE WITNESS:  That is correct.  There
13  was -- there was the open general meeting.  There
14  was Membership and Credentials Committee with USOC staff,
15  as I said.  And then later the -- the legal team for
16  the USTU was brought in.  So --
17    Q.  BY MR. JONES:  In the closed door
18  session, whether we call it the second or the third
19  stage, do you know who Jeannie Picarriello is?
20    A.  I do know who Jeannie is.
21    MR. LEVINSTEIN:  I'm just going to
22  advise on the second stage when the lawyers from USTU
23  were not there, the meeting with the lawyers about
24  what had happened, I'll instruct him not to answer
25  about what happened in that membership and

64

6/30/2005 Skinner, Kelly

1   credentials session with the lawyers. So it's
2   important for you to distinguish -- if you ask him
3   who Jeannie Picarriello is, you can ask about that at
4   any stage of the meeting.
5            But if you ask questions about what was
6   said in connection with the Membership and
7   Credentials Committee with USOC staff and its lawyers
8   and the USTU lawyers were not present, I'm going to
9   instruct him not to answer questions about that
10   session.
11       Q.   BY MR. JONES:  Okay.  I'm talking about
12   the stage behind closed doors when USTU lawyers from
13   this firm, Holmes and Robert or whatever or -- yeah,
14   Holmes and Robert are talking with Membership and
15   Credential Committee members, you've testified you
16   were there.  Is that right?
17       A.   Yes.
18       Q.   And you've also testified that you know
19   who Jeannie Picarriello is?
20       A.   Yes.
21       Q.   She's a member of the Membership and
22   Credentials Committee.  Is she not?
23       MR. LEVINSTEIN:  Objection.
24       Q.   BY MR. JONES:  Or was at that time?
25       A.   At that time, she was, yes.

65

6/30/2005 Skinner, Kelly

1       Q.   Did you ever hear during that meeting
2   Ms. Picarriello refer to the management at the USTU
3   as Korean mafia?
4       A.   No.
5       Q.   Did you ever hear her tell the lawyers
6   for USTU that USTU needs to cut out the bowing crap?
7       A.   No, I don't recall that language.
8       Q.   Do you recall any language at all that
9   referred to the use of the word Korean?
10       A.   Not that -- no, not at all.  The only
11   time I ever heard reference to Korean was in regards
12   where the Kukkiwan was located.  So at that point in
13   time, we would have been talking about the Kukkiwan
14   and where their headquarters were.  So no, not that I
15   recall.
16       Q.   Did you take notes at that meeting?
17       A.   No, I did not.
18       Q.   Was anyone else from your -- from Sports
19   Partnerships with you at the meeting during that
20   stage?
21       A.   I'm trying to recall if Michelle
22   Farrell -- she had attended the meeting with me, but
23   she had to leave early, so I do not believe that she
24   was there, but I do not recall because she had to get
25   back for some family obligation.  She wanted to be at

66

6/30/2005 Skinner, Kelly

1   the open forum, but I do not recall if she was there
2   or not.
3       Q.   You have Exhibit 141.
4       MR. LEVINSTEIN:  What about number 5?
5       MR. JONES:  What?
6       MR. LEVINSTEIN:  What about number 5?
7   Did you skip that one?
8       MR. JONES:  For some reason, they didn't
9   CC him on that.
10       MR. LEVINSTEIN:  People get asked when
11   they never even seen it before, so I figured --
12       THE WITNESS:  141?  From August 26th?
13       MR. JONES:  Yes.
14       THE WITNESS:  Okay.
15       Q.   BY MR. JONES:  That's just a one-pager.
16   Right?
17       A.   Yes.  All of this behind it is three
18   pages of fax --
19       Q.   Okay.
20       A.   -- cover sheets.
21       Q.   I guess I removed the rest of it.  For
22   the record, I'm just using page 1 of 141.
23       A.   Okay.
24       Q.   This is another courtesy copy that you
25   received from Mr. Satrom regarding the September 13

67

6/30/2005 Skinner, Kelly

1   meeting.  Is that --
2       A.   Yes.
3       Q.   -- correct?
4       A.   Yes, it's correct.
5       Q.   And you did attend the meeting that you
6   just testified to.  Correct?
7       A.   Right.
8       Q.   I guess we do have to look at Exhibit 5.
9       MR. JONES:  We don't have to.  Just
10   didn't think you would think a deposition was
11   complete if we didn't look at document 5.
12       THE WITNESS:  Okay.
13       Q.   BY MR. JONES:  I'm sorry I didn't show
14   this to you earlier.  This one actually predates the
15   September 13 meeting that you attended.  Does it not?
16       A.   It does.
17       Q.   It's a letter that is courtesy copied to
18   you dated September 5?
19       A.   Yes.
20       Q.   From Bruce Harris -- I mean to Bruce
21   Harris from Mr. Satrom?
22       A.   Correct.
23       Q.   And you received it and read it?
24       A.   I did.
25       Q.   And were the points of inquiry in

68

```
1   Exhibits 4 and 5 discussed at the September 13
2   meeting that you attended?
3        MR. LEVINSTEIN:  Objection.  Compound
4   question.
5        MR. JONES:  Or some of the points.
6        THE WITNESS:  The -- the meeting of
7   everybody, is that the meeting --
8        MR. JONES:  Yes.
9        THE WITNESS:  -- that you're talking
10  about right now?
11       MR. JONES:  Yes.
12       THE WITNESS:  Some of these issues -- to
13  the best of my recollection, this was the focus of
14  the meeting.  What all was discussed there, I do not
15  recall, but this is what they were -- what USTU was
16  asked to respond to at that meeting.
17       MR. JONES:  Okay.
18       THE WITNESS:  I don't recall everything
19  that we went through.  It was rather lengthy.
20       Q.   BY MR. JONES:  Did you have any dealings
21  with members of the Membership and Credentials
22  Committee before the September 13 meeting one on one
23  or you or with small groups?
24       A.   Me personally?
25       Q.   Yes.
```

69

```
1        A.   No.  And no one-on-one.  I do not recall
2   any of that -- any types of meetings like that.
3        Q.   How about after the September 13
4   meeting?
5        MR. LEVINSTEIN:  For the record, the May
6   2nd meeting he attended was a Membership and
7   Credentials Committee meeting of the whole as long as
8   we're clear on that.
9        MR. JONES:  Yes.
10       MR. LEVINSTEIN:  Okay.
11       THE WITNESS:  The only time that I was
12  with a member or members of the Membership and
13  Credentials Committee when taekwondo was a topic of
14  discussion was at one of these meetings.
15       MR. JONES:  Okay.
16       THE WITNESS:  Or if there happened to be
17  a conference call of a subgroup, I might be looped
18  into that conference call.  But never one on one.
19  There are members of that committee that I do know
20  that I work with on other issues, but I did not talk
21  to them about taekwondo unless it was with the entire
22  group.
23       Q.   BY MR. JONES:  Have you ever heard
24  anyone from Membership and Credentials Committee at
25  anytime say something racially insensitive about
```

70

```
1   Korean-Americans?
2        A.   Never.
3        MR. LEVINSTEIN:  Are you done with that
4   one?
5        MR. JONES:  Yes.  Thank you.
6        MR. LEVINSTEIN:  Thank you.
7        MR. JONES:  Exhibit 120, please.
8        THE WITNESS:  120.  Okay.
9        Q.   BY MR. JONES:  Can you please identify
10  the document?
11       A.   This is a letter written by me on
12  October 24th of 2003 to Bruce Harris.
13       Q.   And in what capacity were you writing
14  that letter?
15       A.   I was writing the letter as the director
16  of Sport Partnerships notifying the sport that I work
17  with of the next steps in the process.
18       Q.   The process of decertification?
19       A.   Decertification.
20       Q.   Second sentence states that the USOC had
21  hoped that president Lee in his meeting with Jim
22  Scherr last evening would have seen the wisdom of
23  endorsing a remediation plan that would have allowed
24  USTU to reorganize and to continue serving at the NGB
25  for taekwondo under the guidance and with the
```

71

```
1   assistance of the USOC.
2        Just to understand the dynamics here, it
3   was the Membership and Credentials Committee that was
4   bringing the decertification action, not Sports
5   Partnerships.  Am I right?
6        A.   That is correct.
7        Q.   Why is Sports Partnership writing a
8   letter like this to USTU --
9        MR. LEVINSTEIN:  Objection.
10       Q.   BY MR. JONES:  -- on behalf of USOC?
11       MR. LEVINSTEIN:  Objection.  As of this
12  date, that status had changed.  There was a complaint
13  that had already been issued by USOC board, I
14  believe, by October 24th, but I may be wrong.  I
15  think that might have changed the --
16       THE WITNESS:  It had.  Actually, at a
17  board meeting --
18       MR. JONES:  Let me just state something.
19  I don't think it's appropriate for counsel to, in
20  essence, coach the witness with those kinds of
21  comments unless the witness knows.  I prefer to know
22  what the witness knows first and you can make your
23  objection, but --
24       MR. LEVINSTEIN:  You've asked questions
25  that assumes facts that are false, therefore, it's
```

72

1  important so that the testimony doesn't become
2  misleading or meaningless, for the record.
3       MR. JONES:  Okay.  Well, I prefer just
4  an objection that says assumes facts not in evidence
5  rather than stating what your recollection of the
6  facts are without any other testimony that's been
7  given.  But let's move on.
8       Q.  BY MR. JONES:  The -- what was the role
9  of Sports Partnerships at this point in time, being
10  October 24th, 2003?
11       A.  The role that it is today, to work the
12  governing body.
13       Q.  Were you speaking for the Membership and
14  Credentials Committee?
15       A.  I was speaking in an effort to try to
16  help the USTU not go through a decertification
17  process, which nobody wanted to endure.
18       Q.  You were not -- were you writing as an
19  adversary?
20       MR. LEVINSTEIN:  Objection.
21       THE WITNESS:  Not at all.  I'm trying to
22  help Bruce Harris get out of a bad situation.
23       Q.  BY MR. JONES:  Okay.  Can you -- can you
24  explain what is referred to when you talked about a
25  meeting with Jim Scherr last evening?  First of all,

73

1  who attended the meeting, if you know?
2       A.  I do not know.  I was not there.
3       Q.  At least, apparently, president Lee and
4  Jim Scherr were there, though.  Is that your
5  understanding?
6       A.  Based on the letter, that would be my
7  understanding.
8       Q.  Did you talk with Jim Scherr about the
9  contents of this letter before sending it out?
10       A.  Whether or not Jim Scherr saw this
11  letter before it went out, I do not know.
12       Q.  Someone must have come to you and given
13  you the information that a --
14       A.  I was --
15       Q.  -- meeting had occurred.
16       A.  I was definitely asked to write this
17  letter.  What -- the words are my words, but I was
18  asked to write the letter.
19       Q.  And it says at the bottom courtesy copy
20  to "Jim Scherr, USOC Chief, Sport Performance."  He
21  was still your direct boss at that time or no?
22       A.  Yes.
23       Q.  Do you know -- then it goes on to state
24  that "as you're aware, the primary stumbling block to
25  the remediation plan was President Lee's refusal to

74

1  resign his duties as president of USTU."
2       So at that stage of the negotiations he
3  was, meaning president Lee was refusing to step down?
4       A.  Correct.
5       Q.  I mean, as part of a --
6       A.  Plan to -- right.
7       Q.  -- overall plan?
8       A.  Correct.  To remediate the NGB versus
9  decertify.
10       Q.  Did you continue to have a role in the
11  negotiations going back and forth to resolve it short
12  of actual decertification?
13       A.  It was not my role to resolve it.  My
14  role was to work with the governing body to help
15  hopefully bring a good conclusion to this.  So I did
16  not negotiate it.
17       Q.  This is the only letter I have come
18  across written by you to Bruce Harris or anyone else
19  on the USTU side specifically about, you know,
20  resolving -- resolving the decertification action
21  through mediation.  Do you recall any other letters
22  going out from you?
23       A.  I do not recall.  This is what you're
24  seeing here is a last ditch effort of, "Hey, Bruce.
25  We've been working together.  We've got to correct

75

1  this."
2       Q.  Were you in favor of giving more time to
3  the negotiation process?
4       A.  I was in favor of the most efficient
5  resolution possible.  We had -- at this time, we had
6  Olympic games in less than ten months away, so we
7  needed an efficient resolution to a problem that we
8  had.
9       Q.  Do you know if at some point in
10  time -- well, obviously, at some point in time
11  president Lee did agree to resign his duties.
12       A.  Correct.
13       Q.  Do you know if there were other sticking
14  points or stumbling blocks as the negotiations
15  progressed even after president Lee agreed to resign?
16       A.  Other sticking points after he agreed to
17  resign?
18       Q.  Let me be more specific.
19       A.  Okay.
20       Q.  Are you aware of a plan that was on the
21  table in which president Lee and the financial
22  officers would agree to step down and be replaced by
23  a USOC installed person to oversee all the financial
24  duties?  Did you ever hear of that plan?
25       A.  My understanding was that they would

76

6/30/2005 Skinner, Kelly

```
1    step down, but the Governance and Management
2    Committee would be formed of members that would come
3    in and assume those duties.  They would not be
4    recognized as the president of the governing body,
5    but they would come in and assume those
6    responsibilities.
7         Q.   Was it always your understanding
8    that -- that the -- well, withdraw that question.
9              Showing you Exhibit 85.
10        (Mr. Jones gives Exhibit 85 to Mr.
11   Levinstein.)
12             MR. LEVINSTEIN:  Thank you.
13             THE WITNESS:  Okay.
14        Q.   BY MR. JONES:  Have you seen that
15   document before?
16        A.   Yes, I have.
17        Q.   It's a letter dated October 30, 2003, to
18   Bruce Harris from Jim Scherr, chief of sports
19   performance, courtesy copy to you.  Is it not?
20        A.   That's correct.
21        Q.   Do you recall any discussions with
22   Mr. Scherr about this letter either before or after
23   it was dated?
24        A.   I recall a discussion regarding that
25   taekwondo had two individuals going to the team
```

77

6/30/2005 Skinner, Kelly

```
1    Love and Mr. Lee know they were no longer going to be
2    traveling to Athens for the team leadership meeting.
3         Q.   Was that because of the possibility that
4    if decertification went through USTU would no longer
5    be the NGB?
6         A.   That's exactly it.  We had no idea what
7    the future was of the sport.
8         Q.   And if USTU was no longer the NGB, then
9    its appointees would no longer be a member -- members
10   of the U.S. team.  Correct?
11        A.   If USTU was decertified as a member
12   organization, that's correct.  We would then have to
13   handle -- the U.S. Olympic Committee would have to
14   handle all the nominations, selection, everything.
15   Getting athletes there, everything we would have to
16   do;
17             MR. JONES:  Okay.  Might as well go
18   through this document.  Mark it next in order.
19             (Exhibit No. 148 was marked for
20   identification by the court reporter.)
21             MR. JONES:  Go ahead and review it if
22   you need.
23             THE WITNESS:  We can go ahead and talk
24   about it, if you'd like to.
25        Q.   BY MR. JONES:  All right.  First of all,
```

79

6/30/2005 Skinner, Kelly

```
1    leadership meeting in Athens.  And based on what was
2    happening, is that the right course of action?
3    Clearly, the USOC then took an action, but I don't
4    recall being involved on the final decision on that
5    would be the action that we take.  I may have been
6    there.  I just don't recall.  Again, it was one of
7    those times where we were regularly communicating
8    with each other, so there's a lot of conversation.
9         Q.   This is -- may be one of the first
10   letters, but based on Lee's name on it, is that when
11   you first became aware that he and Ms. Lynette Love
12   were appointees?
13        A.   I probably knew at some point previous
14   to this.  I just don't know when because we had to
15   have had a discussion about who the -- we had to have
16   had a discussion about had U.S. Taekwondo had
17   approved procedures, had they submitted names, where
18   are we at with that process, where are the people on
19   the -- where are the people had been named on the
20   roster to travel to Athens.  So there had to have
21   been a discussion that took place.
22        Q.   And do you know why this letter was
23   written?
24        A.   This letter was written in an effort to
25   let Mr. Harris know that we would ask him to let Ms.
```

78

6/30/2005 Skinner, Kelly

```
1    what is that three-page document before you?
2         A.   This is the typed version of a meeting
3    that I had with Bob Gambardella, and I believe it was
4    in early November of 2003 when at the point it looked
5    like we would hopefully have a remediation plan which
6    would call for the USOC to insert a staff employee --
7    an employee on loan.  So it was my effort to walk
8    through with him over the course of four or five
9    hours what I knew at the time as we were doing this.
10        Q.   Okay.  So this was done well before any
11   remediation agreement was signed.  Is that true?
12        A.   Well, clearly as you -- as was noticed
13   in my October -- I believe the date was October 23rd
14   letter, there's a mention that we tried to do
15   remediation, but that looks like it's off the table.
16   So the hope continued to be in my mind that we would
17   find a way to remediate this versus having to
18   recertify.  So this is before the remediation
19   agreement, but not before the concept of remediation.
20        Q.   This is before Mr. Gambardella had
21   formally been appointed by USOC?
22        A.   Correct.
23        Q.   A top ten list.
24        A.   Yep.
25        Q.   Page 1.
```

80

**Page 81**

1  A.  Yes.
2  Q.  "Review, recreate team leader and coach
3  selection for Athens."  Whose -- where did that come
4  from?
5  A.  Well, the USOC had taken an action and
6  not had Ms. Love and Mr. Lee travel to Athens.  As
7  the status of the membership of taekwondo within the
8  USOC was in jeopardy, there may be a need -- that's
9  all this is.  Things that may need to be looked at.
10  There may be a need to review or recreate the
11  selection process.
12  Q.  What was -- at that point in time, what
13  was wrong with the selection process, if anything,
14  from your perspective?
15  A.  I was not sure.  Just like I was not
16  sure the expenses that HRO had in the Q, item number
17  2.  I was not sure of the event status of upcoming
18  events.  Item number 1, I was not sure of the
19  direction of the staffing plan.  I was not sure of
20  the status of the oversight committee.  I was not
21  sure.
22  Q.  Okay.  These items, though, they came
23  from somewhere.  Was it the September 13 meeting
24  or --
25  A.  I have no idea how many hours you've put

**Page 82**

1  in on taekwondo since you've been involved.  I can
2  tell you that from May 1st until this point in time,
3  a significant portion of my life had been put into
4  taekwondo.  It came from all those meetings.
5  Q.  Under "athletes," this was various
6  upcoming possible expenditures for the athletes and
7  the Olympic games?
8  A.  Athletes -- what it was was it was a
9  listing of money that was being paid by the Olympic
10  Committee, the Athlete Support Performance Pool is
11  what the ASPP stands for.  There were four athletes
12  that we were supporting at that time, the amount that
13  they were being supported for.  There were 12 other
14  athletes within the taekwondo system that were being
15  supported at $1,000 a month.  It details that for Mr.
16  Gambardella.
17  It lets them know their elite athlete
18  health insurance slots, their basic grant slots, and
19  that we are all set with those.  It gives him basic
20  information, such as how many men and how many women
21  of the weight classes would be funded as well as how
22  many men and how many women can actually go per
23  country.
24  And then the NBD process is actually --
25  it's a perform directing process, and we were looking

**Page 83**

1  at hiring somebody.  We were working with taekwondo
2  to hire somebody to oversee their national team
3  development program.  And it's just that there was a
4  targeted 11/19 hire date.  Obviously, that was put on
5  hold based on what was happening.
6  So, again, every area within here was a
7  summary of things I had heard, what was happening,
8  things he needs to look at if tomorrow -- because we
9  were on a day-by-day basis.  If tomorrow there had
10  been a signed remediation plan and we needed to go in
11  and take control of the NGB, we would at least have
12  something.  He could have walked in there the next
13  day wet and said, "Okay.  I've got to figure out for
14  myself, but at least here's some things I should be
15  looking at instead of walking in cold."  That's all
16  this was.
17  Q.  This was to help him.
18  A.  That's exactly right.  With the
19  transition.  Whenever that transition may be, if it
20  was to ever be.  At this point, I had no idea if that
21  would even happen.
22  Q.  Okay.  Under "financials," what was
23  the -- I'm sorry -- Dan account?
24  A.  That's how much money was in that
25  account, at least to the best of my understanding.

**Page 84**

1  This would have been information I would have
2  received from our audit division.  Just so he had an
3  accurate picture of the financial situation within
4  taekwondo.
5  Q.  I'm sorry.  Above that "Base PPF," what
6  is that?
7  A.  Base funding and performance pool
8  funding.  So far, about $188,000 had been allocated.
9  Also remains $188,000 to be distributed.  We
10  had -- obviously, if this was written in November, we
11  were sitting on their October -- on their August 15th
12  check because the NGB was not in compliance and we
13  would have an upcoming November 15th.  So what that
14  let him know was that of the $366,000 that we had
15  allocated for taekwondo in 2003, $188,000 had been
16  spent; $188,000 had not.  Because the best we knew
17  based on the financial situation of the organization,
18  that may be the only money he had walking in the door
19  to run an organization.
20  Q.  188?
21  A.  Yep.  So I wanted him to know yes.  I
22  wanted him to know what was potentially there.  I did
23  not know the status of all the accounts.
24  Q.  Page 2, second bullet, Kukkiwan
25  equals --

1      A.   Yep.   Our -- this is -- the Kukkiwan, we
2  had been told, was about a $300,000 line item a year
3  for U.S. Taekwondo of which 150,000 of it would go to
4  pay certifications within -- it would be sent to the
5  Kukkiwan group in Korea.   150,000 of it would stay in
6  the United States.   Again, just a picture.   Here's
7  what's happening within the sport.
8      Q.   That would be an income item?
9      A.   An income item, potential, depending on
10 what was in there at that time.   Just like salary
11 structure run rate, he had to cut some salary to make
12 it work.   Just to look at the whole picture.
13     Q.   Under "programs," there are several --
14     A.   Yes.
15     Q.   -- things, types of programs listed.   Do
16 you know if any of these programs were running at a
17 loss?   By that, I mean costing more than --
18     A.   Right.
19     Q.   -- they were bringing in.
20     A.   I understand.   The -- the -- actually,
21 my understanding would be that I did not know the
22 financials of the U.S. Open, but it was an upcoming
23 event coming up in February of '04.   None of these
24 would be programs that should be running at a loss,
25 frankly.   The resident program should be a

1  break-even.   And the elite training camps, as we were
2  getting to know what they were because we were
3  getting calls from people saying, "I'm coming to a
4  camp.   Is it still on?" were revenue-generating camps
5  for U.S. Taekwondo.
6           Coaching is just who are your coaches.
7  We weren't sure if Sammy was going to be a coach or
8  not going to be a coach.   We didn't know what his
9  role was within the organization.   We knew Chul Ho
10 Kim was a coach.   So that would not be a loss item.
11 That would just be a status.
12     Q.   I'm sorry.   You didn't know what about
13 Chul Ho Kim?
14     A.   We knew he was a resident coach at that
15 time.
16     Q.   Qualification lists a number of
17 competitions upcoming?
18     A.   Yes, or what's already happened.
19     Q.   And that's to help Mr. Gambardella get
20 an idea of what the calendar looked like ahead for
21 events?
22     A.   Yes, that's correct.
23     Q.   Because those would involve expense, I
24 take it?
25     A.   Expense and opportunities.

1      Q.   Bottom, "questions."   "Holloway as team
2  leader," question mark.   What was that about?
3      A.   We were -- in assessing overall, you
4  look -- we looked at, obviously, or talked about.   I
5  shouldn't say looked at.   It would be much more
6  definite than it was.   I talked about the OTC
7  coaches, who the resident coaches were.   One name
8  that had been mentioned to us as somebody that would
9  be good team leader for an upcoming event, whether it
10 be the world qualifier, the event that went on in the
11 Pan Am regional, if we needed a team leader, if we
12 were running the sport, the one person that would be
13 a good team leader would be John Holloway.
14     Q.   And then "people to check" on the last
15 page.
16     A.   Uh-huh.
17     Q.   "AAU" paren "Mike Friello," end paren,
18 and then "MBSH."   What is -- oh, membership?   What is
19 MBSH?
20     A.   Correct.   AAU, Mike wanted to talk to
21 whoever it was going to be running taekwondo, if we
22 were to get in that situation.   These are all people
23 that had been very vocal, very active.   They're
24 people I talked to.   It was not at all to mean an
25 exhaustive list.   It was a few names and a few

1  groups.
2      Q.   These were people to talk to about what?
3      A.   The sport, learn about the sport, find
4  out what's going on.
5      Q.   I note that there are no Korean names on
6  there.   Is there a reason why no Korean people were
7  to be checked or consulted?
8      A.   Well, a reason, no, but my understanding
9  is that within the Ohio and Pennsylvania contingent
10 there are people that are of Korean heritage that
11 could be consulted there, but it was not an
12 intentional or an oversight.   It was just a list.
13     Q.   Elite team, Lopez Amani, Lopez meaning
14 Rich Lopez?
15     A.   Well, all of them.   I mean, what I
16 thought at that point in time coming out of the Pan
17 American games and a world championships you had Jean
18 Lopez, who was establishing himself as a solid coach,
19 Steven Lopez, Mark Lopez, Diana Lopez, Peter Lopez.
20 Manny Maroon is down there.   You have a cadre of
21 athletes that are worthwhile to talk to and go see.
22     Q.   Mr. Amani.   You've worked with
23 Mr. Lopez?
24     A.   Correct.
25     Q.   And they were people who you said were

1 vocal early on?

2    A.  No, they were not overly vocal.  In

3 fact, they -- there was times that every one of these

4 groups that are listed here at some point or another,

5 whether it be at a board of governor's meeting or a

6 Membership and Credentials meeting or by way of

7 e-mail or phone call may have reached out to me.

8 That's all that they were.  So these are folks you

9 should talk to.  But not -- no one of these groups

10 was in talking to me every single day.

11    Q.  Is it correct that people from elite

12 team may have reached out to you at some point before

13 this memo was generated in November?

14    A.  It would be correct to assume that.  I

15 think I had talked to members of the elite team

16 before that, yes.

17    Q.  And I'm sorry.  Would this be like -- do

18 you have a feel for what -- what part of the month of

19 November this was generated?  Before Thanksgiving?

20    A.  Yeah, I would imagine before

21 Thanksgiving.

22    (Brief interruption in the proceedings.)

23    (Recess taken from 3:15 p.m. to

24 3:20 p.m.)

25    Q.  BY MR. JONES:  Other than what we've

1 covered on document 148, were any names for possible

2 coach selections discussed between you and

3 Mr. Gambardella in that November meeting leading up

4 to this document?

5    MR. LEVINSTEIN:  Objection.  There was

6 never any mention of names at all before, so I don't

7 know what other than part --

8    MR. JONES:  No.  I just meant other than

9 what we've discussed already.

10    THE WITNESS:  There was never a

11 discussion even of existing names.  There was never a

12 discussion of names.

13    MR. JONES:  Okay.

14    THE WITNESS:  Are you done with this?

15    MR. JONES:  Yes.  Now, I'd like to move

16 to another area.  Don't worry.  We're not going to go

17 through all these.

18    MR. LEVINSTEIN:  Not worried.

19    Q.  BY MR. JONES:  Exhibit 45, I think, I

20 gave you.  I'm sorry.  I don't have more copies.

21 Comes from the deposition this morning.

22    MR. LEVINSTEIN:  Hold on.  I have it

23 here.

24    MR. JONES:  Please go ahead and review

25 that.

1    THE WITNESS:  Okay.

2    Q.  BY MR. JONES:  Have you seen this

3 document before?

4    A.  Yes, I have.

5    Q.  What is it?

6    A.  It is minutes of a February 5th, 2004,

7 meeting of the USOC Governance and Management

8 Committee.

9    Q.  Did you attend the -- I'll call it GMC

10 meeting on February 5, 2004, as it represents?

11    A.  I did.

12    Q.  Was there any practice established

13 whereby that whoever took the minutes would provide

14 you with a copy at some point after for your records?

15    A.  I don't recall a process being

16 established.  I just recall I would receive them, but

17 I don't recall a process being established.

18    Q.  Looking at these, as best as you can

19 recall, do they appear accurate as to what took place

20 during that meeting on February 5, 2004, at the GMC?

21    MR. LEVINSTEIN:  Objection.

22    THE WITNESS:  To the best of what I can

23 recall, these were items that we would have been

24 talking about when this group started to get

25 together.

1    Q.  BY MR. JONES:  It's been awhile, but

2 would you -- is there anything that you would add or

3 change as you sit here today that would make these

4 more accurate?

5    MR. LEVINSTEIN:  Objection.  Compound

6 question.  Improper as to the entire document asking

7 him to do that.

8    THE WITNESS:  That is a very challenging

9 question for me to answer.

10    Q.  BY MR. JONES:  Were there any other

11 subjects discussed -- as you sit here today, can you

12 recall any other subjects that were discussed at this

13 particular meeting that aren't listed in here?

14    A.  As I sit here today well over a year

15 later, I do not recall everything we discussed at

16 that meeting.

17    Q.  Okay.  Was it your practice to take

18 notes at these GMC committee meetings?

19    A.  My practice to take notes?  No.  There

20 was somebody assigned to take minutes of the meeting.

21    Q.  Would you take them for your own -- take

22 notes for your own purposes?

23    A.  No, not that I recall.

24    Q.  Ms. Witte allegedly gave a progress

25 report on USTU financial condition and mentioned that