4/6/2005 Warwick, Jay

```
0001
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF HAWAII
                CIVIL ACTION NO. 04-00461-SOM-LEK
    _____

    DEPOSITION OF RICHARD JAY WARWICK
    EXAMINATION DATE:  Wednesday, April 6, 2005
    _____

    DAE SUNG LEE,

    Plaintiff,

    v.

    UNITED STATES TAEKWONDO UNION,
    a Colorado nonprofit corporation, et al.,
    Defendants.
    _____

         PURSUANT TO SUBPOENA, the deposition of
    RICHARD JAY WARWICK was taken at 2:20 p.m. on
    Wednesday, April 6, 2005, at the Double Tree Hotel at
    1775 E. Cheyenne Mountain Boulevard, Colorado Springs,
    Colorado, before Valorie S. Mueller, Registered
    Professional Reporter and Notary Public in and for the
    State of Colorado, said deposition being taken pursuant
    to the Federal Rules of Civil Procedure.



                    Valorie S. Mueller
              Registered Professional Reporter
```

1

4/6/2005 Warwick, Jay

```
              A P P E A R A N C E S

For the Plaintiff:

     WARD D. JONES, ESQ.
     Bervar & Jones
     1400 Pauahi Tower
     1001 Bishop Street
     Honolulu, Hawaii 96813
     (808) 550-4990

For the Defendants:

     MARK LEVINSTEIN, ESQ.
     TODD BRAUNSTEIN, ESQ.
     Williams & Connolly, LLP
     725 Twelfth Street, N.W.
     Washington, D.C. 20005
     (202) 44-5171
Also present:  Dae Sung Lee
               Gary Johansen, Deputy General Counsel,
               United States Olympic Committee

                      I N D E X

EXAMINATION BY:                               PAGE

Mr. Jones ........................................ 4

          I N D E X   O F   E X H I B I T S
DEPOSITION                                PAGE FIRST
EXHIBIT NO.    DESCRIPTION                    APPEARS

   4*   August 4, 2003 letter from Thomas Satrom
        to Bruce Harris ........................ 22
   5*   9/5/2003 letter from Thomas Satrom to
        Bruce Harris ........................... 24

  32*   Excerpt from the United States Olympic
        Committee Selection Procedures Manual ..... 48
```

2

4/6/2005 Warwick, Jay

```
  35*   1/31/00 letter from Salena DiMatteo to R.
        Jay Warwick ............................ 37

  36*   11/29/01 letter from Virginia Witte to R.
        Jay Warwick, with attached audit report ... 40
  77**  Richard Jay Warwick's CV .................. 9
  78    Article entitled "USTU Executive Director
        Jay Warwick Leads a New Generation of
        Taekwondo Champions into the 21st Century" . 9
*Exhibits previously marked.
**Exhibit to be marked.



                   I N D E X   O F
            I N F O R M A T I O N   R E Q U E S T E D
     DESCRIPTION                              PAGE
     OF ITEM REQUESTED                     REQUESTED

Mr. Warwick's CV to be marked as Exhibit 77 ...... 9
```

3

4/6/2005 Warwick, Jay

```
                   P R O C E E D I N G S
                   RICHARD JAY WARWICK
         The deponent herein, having first duly
affirmed to testify to the truth in the above cause,
was examined and testified on his oath as follows:
                    E X A M I N A T I O N
BY MR. JONES:
     Q    Good afternoon, Mr. Warwick.
     A    Hello.
     Q    If you could please give us your full name
and home address for the record.
     A    Richard Jay Warwick, 1615 Ridgeview
Circle, Monument, Colorado. I'm just going to turn
this off so it doesn't ring.
     Q    Have you ever had your deposition taken
before?
     A    Yes. Not with a recorder, however, just
two attorneys.
     Q    I'll just go through some ground rules to
hopefully prevent problems later on down the line.
         As your attorneys may have told you, a
deposition is an interview, questions and answers; but
it is different in the sense that it's under oath and
it's generally to be used in court.
         If for some reason, for example, this case
```

4

EXHIBIT "A"

4/6/2005 Warwick, Jay

1  goes to trial and you are not present at trial, your
2  deposition might be used in place of your live
3  testimony. Do you understand that?
4      A    Yes.
5      Q    So it's important that we get a clean
6  transcript. Everything we're saying today is going to
7  be written out into paper form, reading kind of like a
8  movie script. And you will have the opportunity to
9  take a look at it after to make corrections.
10          However, if you change responses to questions
11 substantively, we have the right to bring that forward
12 and address the fact that you changed responses after
13 the fact.
14          Please respond in using words, yes, no, I
15 don't know, whatever the appropriate response is,
16 instead of huh-uh, uh-huh, waves of the head. We all
17 do that in everyday communication, but it becomes
18 ambiguous when you do that in a deposition as to what
19 is intended.
20          I will try to take breaks every 45 minutes or
21 so, so everybody does not become fatigued.
22     A    Great.
23          MR. LEVINSTEIN: But if you need to go to
24 the restroom, and it doesn't match the 45-minute
25 cycle --

5

4/6/2005 Warwick, Jay

1      Q    (BY MR. JONES) Feel free to say so.
2  Also, if my questions aren't clear, just say,
3  Mr. Jones, I don't understand the question; please
4  rephrase it or re-ask it, and I'll be happy to do so,
5  because if you go ahead and respond, everyone will
6  assume you understand the question and are responding
7  truthfully and correctly.
8          Okay. If you could just tell us your age,
9  sir?
10     A    My age?
11     Q    (Counsel nodded.)
12     A    I'm 47.
13     Q    Briefly, do you have any formal education
14 after high school?
15     A    Yes.
16     Q    Can you summarize that?
17     A    I have a bachelor's degree in education,
18 and I have a master's degree in sport business
19 management.
20     Q    What institution were those two degrees
21 from?
22     A    Montana State University on the four-year
23 and a master's from the University of Northern
24 Colorado.
25     Q    Where were you born and raised?

6

4/6/2005 Warwick, Jay

1      A    I was born in Los Angeles, California, and
2  I was raised in the Bay area in California. In the San
3  Francisco area.
4          MR. LEVINSTEIN: For us non-Californians.
5      Q    (BY MR. JONES) Do you have a background
6  in the martial art of Taekwondo?
7      A    Yes.
8      Q    Can you tell us about that? Just
9  summarize briefly when you got into Taekwondo and how
10 and your involvement over the years.
11     A    I started martial arts when I was 7 and
12 continued through school. I began competing in
13 national Taekwondo tournaments in 1975. I made the
14 national team in 1977. Competed on the national team
15 through 1988.
16          After that, I coached -- I coached
17 international teams through 1997. And then in March of
18 1998, I became the Executive Director of the USTU and
19 served in that capacity until the summer of 2002.
20     Q    When you started Taekwondo, what state was
21 that in, as a child?
22     A    Montana.
23     Q    As a competitor in Taekwondo, can you
24 briefly summarize notable accomplishments, awards,
25 medals?

7

4/6/2005 Warwick, Jay

1      A    This is great. Let's see. I won a bronze
2  medal in the World Championships in 1983, 1985, and
3  1987, and I won a bronze medal in the Olympic Games in
4  1988.
5      Q    And as a coach, have you had notable
6  successes? By that, I mean your athletes achieving
7  medals at an international level or national level?
8      A    Yes. I -- when I was competing,
9  simultaneously I coached a number of athletes. And in
10 1987, we had seven of our athletes make the Pan Am --
11 or the Pan Am trials, qualify for the Pan Am trials,
12 and two make the team. And we had the same number
13 qualify for the Olympic trials in 1988 and three made
14 the finals. And then I'm pleased to say that we have
15 had numerous national team members throughout the years
16 and many of them won international ones.
17     Q    Do you have a resume that covers your
18 Taekwondo accomplishments that you use for any purpose?
19     A    You know, not on me.
20     Q    I mean, do you have one at your office?
21     A    I had one. You know, it hasn't been
22 current probably since I -- I used it to get a job at
23 the USTU in 1998. And since then, I really haven't had
24 a need for that specific type of resume. But I
25 probably still have that one hanging around somewhere.

8

4/6/2005 Warwick, Jay

1  Q   If we could mark it as exhibit next in
2  order and save a spot for that, and you can give it to
3  your counsel, I'd appreciate it.
4          MR. LEVINSTEIN: 77?
5  A   Taekwondo resume?
6  Q   (BY MR. JONES)  Yes.
7          (Deposition Exhibit No. 78 was marked
8           for identification.)
9  A   Can I take a minute?
10 Q   (BY MR. JONES)  Sure.  We can go off the
11 record and take a look at it.  I know it's ancient
12 history.
13         (Whereupon, Mr. Johansen left the
14          deposition proceedings.)
15         (Discussion off the record.)
16         MR. JONES:  Back on the record.
17 Q   (BY MR. JONES)  Mr. Warwick, you've had a
18 chance to look at that Exhibit 78?
19 A   Yes.
20 Q   And I ask you, do you recall giving an
21 interview to a publication of this type?
22 A   Yes.
23 Q   It is abbreviated "MA Success."  Is that
24 the name of the publication, or is it something else
25 like Martial Art Success?

9

4/6/2005 Warwick, Jay

1  A   I think that's what the abbreviation is,
2  Martial Art Success.  It was an article -- or the
3  magazine, I think, was produced by Century Martial
4  Arts.
5  Q   Do you recall the year when you gave this
6  interview?  It sounds like you were talking in the
7  present tense when they were talking about your role
8  with USTU as Executive Director, but I can't be sure.
9  A   I am thinking it was in the winter or
10 spring of 2002 seems right.
11 Q   And without holding you to every single
12 word in there, are the statements in there, as you read
13 them, generally true?
14 A   Yes.
15         MR. LEVINSTEIN:  I'm going to object.
16 It's eight pages long, and I'm not even sure he had
17 time to read it, but for whatever it's worth.  That's a
18 giant compound question.  But okay.  It is what it is.
19         (Whereupon, Mr. Johansen rejoined the
20          deposition proceedings.)
21 Q   (BY MR. JONES)  If there's anything that
22 jumps out at you, you know, please say so.  I'm not
23 even sure we'll have to quote from it directly, but I
24 did use it as a source for some of my questions.
25 A   Okay.

10

4/6/2005 Warwick, Jay

1  Q   Focusing in on the years that you were
2  with the USTU, I'm sorry, you told us you were there
3  for several years as the Executive Director?
4  A   Yes.
5  Q   And you left in summer of 2002?
6  A   Yes.
7  Q   And you began when?
8  A   March of 1998.
9  Q   And before being appointed Executive
10 Director, did you have any other positions with USTU?
11 A   Yes.
12 Q   What positions?
13 A   Again, I was -- had served for a number of
14 events as a national coach.  I had served as the chair
15 of the athlete committee.  I was currently at that time
16 the chair of the Junior Olympic Committee.  And by
17 virtue of being the chair of the athlete committee, I
18 was in and out of several other standing committees,
19 just to address and represent athlete -- the athlete
20 side.
21         So at that time, I think they used to have
22 about 26 standing committees, so it's difficult to
23 list.
24 Q   What were your duties as national coach --
25 coach of the national team, rather?

11

4/6/2005 Warwick, Jay

1  A   If there was a camp that preceded the
2  competition, it was to help plan and operate the camp,
3  preparing the athletes for the competition.  And then
4  it was to travel with the athletes to the competition
5  and monitor, you know, their preparation, and on-floor
6  coaching.
7  Q   Did you coach the team at the
8  international level in any international competitions?
9  A   Yes.
10 Q   Which competitions do you recall?
11 A   Let me see some of the notable . . . the
12 1991 Pan Am Games, the 1995 World Championships, and
13 there were a number of international exchange programs
14 that I served as a coach on.
15 Q   As team coach in those days, was that a
16 salaried position or a volunteer position?
17 A   Volunteer.
18 Q   Now, briefly, what were your duties as
19 Executive Director from '98 to summer 2002 at USTU?
20 A   Well, essentially to oversee the
21 management of the national office.
22 Q   That would be the day-to-day management?
23 A   Yes.
24 Q   And would that include the financial
25 operations --

12

4/6/2005 Warwick, Jay

1  A  Yes.
2  Q  -- of USTU as a business?
3  A  Yes.
4  Q  Any other duties come to mind as part of
5  that role?
6  A  Yeah. Yes. I -- let's see. The primary
7  duties were, of course, monitoring the approved budget,
8  overseeing all aspects of event management, from site
9  location to sponsorship to operations of the events,
10 working with the appropriate committees in developing
11 and executing whatever their relative plans were,
12 things from overseeing the Olympic -- the permanent
13 resident program and drafting a Junior Olympic
14 grassroots program. And, you know, other programming
15 as they relate to our pipeline, developing our
16 pipeline.
17 Q  Was the Executive Director position a
18 salaried position?
19 A  Yes.
20 Q  So you were an employee, an actual
21 employee of USTU during those years?
22 A  Yes.
23 Q  Since that time, you have gone on where?
24 A  I currently work for the United States
25 Olympic Committee.

13

4/6/2005 Warwick, Jay

1  Q  What is your current title?
2  A  I am a director in the Sports Partnership
3  Division.
4  Q  And can you describe for us what your
5  duties are as director of the Sports Partnership
6  Division?
7  A  We are the primary interface for National
8  Governing Bodies, and we help coordinate distribution
9  of USOC resources to their programs, to support their
10 programs.
11 Q  Now, we heard some prior testimony that
12 sometimes the various NGBs are kind of divided up
13 amongst --
14 A  Yes.
15 Q  -- people within your department?
16 A  Uh-huh.
17 Q  Is that a true statement?
18 A  Yes.
19 Q  Just generally, what sports have you
20 handled in this position as director of Sports
21 Partnership?
22 A  I have 11 sports in my portfolio. They
23 are boxing, judo, gymnastics, soccer, softball,
24 wrestling, track and field, team handball, bobsled, and
25 luge. Whoops. And one more really important sport.

14

4/6/2005 Warwick, Jay

1  Whoever I left out is going to be really mad.
2  Oh, karate, which is not an Olympic sport.
3  It's a Pan Am sport, but it's still in my portfolio,
4  you bet.
5  Q  And have you had that position
6  continuously from 2002 to now?
7  A  No.
8  Q  What other titles have you had?
9  A  Oh, I accepted this job in April of 2003
10 until now.
11 Q  And what were you doing between summer of
12 2002 and April 2003, if anything?
13 A  Playing with my kids.
14 Q  Fair enough.
15 A  That's nine months of my life. That's on
16 the record.
17    MR. LEVINSTEIN: Can I sign up for that?
18 I want those nine months.
19 Q  (BY MR. JONES) During this period with
20 the USOC, did you ever handle Taekwondo --
21 A  No.
22 Q  -- as one of the NGBs?
23 A  I'm sorry. I should have let you finish.
24 Q  Did you ever handle Taekwondo as one of
25 the NGBs you were responsible for?

15

4/6/2005 Warwick, Jay

1  A  No.
2  Q  Would that be considered some sort of
3  conflict or --
4  A  Yes, I think so.
5  Q  Turning to another area, after you left
6  USTU, were you aware that the USOC brought an action
7  against USTU to decertify it sometime in 2003?
8  A  Yes.
9  Q  How did you find out about that?
10 A  Some friends called and told me.
11 Q  Did you try to monitor what was going on
12 with USTU during 2003 to keep up on current events with
13 the NGB?
14 A  No.
15 Q  Did friends contact you on occasion to
16 tell you anyway what was going on?
17 A  They did.
18 Q  Please describe, if you could, what your
19 understanding of the reasons for USOC bringing an
20 action to decertify USTU in 2003 were.
21    MR. LEVINSTEIN: Objection; you can
22 answer.
23    THE DEPONENT: Answer?
24    MR. LEVINSTEIN: (Counsel nodded.)
25 A  Well, like I said, I didn't monitor those

16

4/6/2005 Warwick, Jay

activities very closely. And it would -- I mean, I guess I remember that there was some financial problems, and I think there were some internal complaints. But I didn't keep up on any specifics.

Q    (BY MR. JONES) Did you maintain your membership with USTU during 2003, 2004?

A    I stopped being a current member of USTU when I became a staff member.

Q    For USOC?

A    No. For USTU.

Q    Is that part of what usually happens when you become a staff member?

A    Well, I just -- I mean, I don't know. For me, it was. It seemed right.

Q    Did anyone send you materials, correspondence about the decertification action during 2003?

A    2003?

Q    Yes. By that, I mean correspondence maybe that was sent out by the USOC, correspondence going back and forth?

A    You know, not that I recollect.

Q    Which friends, if you can recall, advised you about the decertification action that you just referred to now?

17

4/6/2005 Warwick, Jay

A    Specifically, John Holloway.

Q    And what title, if any, did he have with USTU during 2003?

A    2003, I'm not aware he had any.

Q    Subsequent to finding out that there was an attempt to decertify USTU in the beginning of 2003 from John Holloway, did you ever speak with anyone on the USOC, either staff or voluntary executive personnel, about the decertification action that was pending?

A    It's possible that there were some conversations, but, you know, my -- I really at that point was not interested in what was happening to the USTU.

Q    Why weren't you interested in what was happening to the USTU?

A    I had a new full-time job that was very comprehensive, overseeing portfolio sports that I had very little background in. The learning curve was very steep and just consumed my full attention.

I also have four kids that are very active. And most waking moments that I don't spend on professional endeavors, I'm chasing them around.

Q    Did that degree of interest in what was going on with USTU, quote, not interested in what was

18

4/6/2005 Warwick, Jay

going on with the decertification action, did that degree of interest continue through 2003 and to 2004, or did it change?

A    And to now, it's the same.

MR. LEVINSTEIN:  So can he leave now?

MR. JONES:  Pardon?

MR. LEVINSTEIN:  So can he leave now?

MR. JONES:  Nope.

Q    (BY MR. JONES) You said there may have been conversations. Specifically, did you have any conversations with Mr. Thomas Satrom, S-a-t-r-o-m?

A    Tom Satrom?

Q    Yes, of the USOC about the decertification action?

A    No. He never contacted me, and I never contacted him.

Q    How about Mr. Jim Scherr; did you have any specific conversations with him about the decertification action against USTU?

A    Jim Scherr kept me out of that entire business item, I think for the same reason that I didn't have any involvement with the sport after I took a staff position with the USOC. I think it just felt better that I remove myself, and Jim, there was no reason to ask me anything. He was working with Bob at

19

4/6/2005 Warwick, Jay

that time.

Q    So the response is no, there were no conversations, or --

A    Yes, there were no conversations.

Q    So would it be correct that you never asked Jim Scherr if the USOC was really going to decertify the USTU?

A    Earlier, when you asked if I had any specific conversations, and I said no, I said there may have been some -- there very well could have been some things in the hallway where Kelly Skinner, who oversees -- or Taekwondo is in his portfolio, I mean, it's very common for us -- track and field is in my portfolio. They have 120 athletes on their Olympic team.

Every once in a while, we have a few problems, and he'll know that I'm struggling with some things, and he'll say, how's track and field? And I'll go (gesturing). And I might do the same thing to him, how's Taekwondo? You know, to that kind of, how is your day and how is this, you know, yes. As far as specifically diving in and, you know, no.

Q    So the people at USOC that you might have had discussions with in passing would more likely be Kelly Skinner?

20

4/6/2005 Warwick, Jay

1  A    Yes.
2  Q    Even in these passing conversations, did
3  he let you know where the decertification action was at
4  at any given time?
5       MR. LEVINSTEIN: One second. I think
6  Mr. Harris may be in the hallway. I think he just
7  stuck his head in.
8       (Whereupon, Mr. Lee left the deposition
9        proceedings.)
10 A    Passing conversations?
11 Q    (BY MR. JONES) Yes. For example, with
12 respect to Kelly Skinner, did he ever say one way or
13 the other whether the USOC was really going to go
14 through with decertification?
15 A    I don't recall our conversations getting
16 that in depth. Again, it was more casual than anything
17 else. I think just out of professional respect, you
18 know, I mean, he -- that was a sport that he worked
19 with and I was kind of trying to stay away from his
20 responsibilities and let him do his job.
21      (Whereupon, Mr. Lee rejoined the
22       deposition proceedings.)
23 Q    (BY MR. JONES) I was going to show you
24 what's previously been marked as Exhibit 4.
25      (Deposition Exhibit No. 4 was re-marked

21

4/6/2005 Warwick, Jay

1        for identification.)
2        MR. LEVINSTEIN: Would it help you to
3  keep -- I got the one from the last deposition.
4        MR. JONES: Oh, thanks.
5  Q    (BY MR. JONES) Have you had a chance to
6  read that?
7  A    Yes.
8  Q    The first question is, have you ever seen
9  that document before?
10 A    No.
11      MR. JONES: For the record, it's the
12 letter dated August 4th, 2003 from Thomas Satrom to
13 Bruce Harris, Mr. Satrom identifying himself as the
14 chairman of the USOC Membership and Credentials
15 Committee.
16 Q    (BY MR. JONES) Focusing in a moment to
17 Page 2, the Item No. 5, there's a carryover from Page 1
18 which says that "The following are examples of some of
19 these problems" with USTU, No. 5 reading, "An
20 Allegiance to Korea to the detriment of U.S. programs
21 and the interests of U.S. athletes."
22      First of all, do you, just as an individual
23 person, find that statement to be racially insensitive
24 towards people of Korean heritage, specifically
25 Korean -- American citizens of Korean heritage?

22

4/6/2005 Warwick, Jay

1       MR. LEVINSTEIN: Objection.
2  A    Do I find it --
3  Q    (BY MR. JONES) Racially insensitive
4  towards U.S. citizens of Korean heritage?
5       MR. LEVINSTEIN: Objection.
6       THE DEPONENT: Do I answer?
7       MR. LEVINSTEIN: (Counsel nodded.)
8  A    No.
9  Q    (BY MR. JONES) You don't feel that
10 individuals with USTU who are American citizens and
11 happen to be of Korean heritage would find that
12 offensive?
13      MR. LEVINSTEIN: Objection.
14 A    I don't know if they would.
15 Q    (BY MR. JONES) In your years at USTU, did
16 you ever question the allegiance to this country of
17 people associated with USTU who were American citizens
18 and of Korean heritage?
19      MR. LEVINSTEIN: Objection.
20 A    I guess could you rephrase that?
21 Q    (BY MR. JONES) In your years while you
22 were with USTU --
23 A    Right.
24 Q    And let me settle a foundation here.
25      It's true, is it not, that there are many

23

4/6/2005 Warwick, Jay

1  people of Korean heritage associated with USTU?
2  A    During my tenure, yes. I don't know what
3  it looks like now.
4  Q    In your associations with those people,
5  did you ever question their allegiance or support for
6  this country?
7       MR. LEVINSTEIN: Objection.
8  A    No, I didn't.
9  Q    (BY MR. JONES) I'd like to now show you
10 Exhibit 5 -- what's been previously marked as Exhibit
11 5.
12      (Deposition Exhibit No. 5 was re-marked
13       for identification.)
14 A    They're getting longer.
15 Q    (BY MR. JONES) Feel free to read the
16 whole thing, but I'm just going to focus in on the
17 first paragraph, Page 1.
18 A    First paragraph, Page 1? Okay.
19 Q    And Page 3, Paragraph No. 8.
20 A    You're not going to ask any questions
21 beyond Item No. 8?
22 Q    No.
23 A    Okay.
24 Q    You've had a chance to look at that
25 document?

24

4/6/2005 Warwick, Jay

1  MR. JONES: For the record, it's a letter
2  dated September 5, 2003, again from Thomas Satrom to
3  Bruce Harris of the USTU.
4      Q   (BY MR. JONES) Have you ever seen this
5  letter before?
6      A   You know, I don't recall seeing this
7  letter.
8      Q   You have had a chance to read Paragraph
9  No. 8 on Page 3?
10     A   Yes.
11     Q   Do you, as an individual, find that
12 paragraph to contain allegations which would seem
13 racially insensitive towards U.S. citizens of Korean
14 heritage?
15         MR. LEVINSTEIN: Objection.
16     A   Insensitive? Do I find it to be --
17     Q   (BY MR. JONES) Racially insensitive.
18     A   To those --
19     Q   People of Korean heritage who are U.S.
20 citizens.
21     A   I don't know. I'm not of Korean heritage.
22     Q   Pardon?
23     A   I'm not one of those people.
24         MR. LEVINSTEIN: In case you didn't hear,
25 he said I'm not of Korean heritage.

25

4/6/2005 Warwick, Jay

1           MR. JONES: I understand.
2       Q   (BY MR. JONES) But as an individual, do
3  you think they might find it offensive?
4           MR. LEVINSTEIN: Objection.
5       A   I suppose all things are possible,
6  Mr. Ward -- or Jones, excuse me.
7       Q   (BY MR. JONES) It's all right. If I
8  might ask, sir, what heritage are you?
9       A   Chinese Hawaiian.
10      Q   If someone were to make these same
11 allegations toward you, but substitute China for all of
12 the words where Korea is stated, how would you feel
13 about that?
14          MR. LEVINSTEIN: Objection.
15      A   When it's happened in the past, it wasn't
16 a big deal to me. And I shared with you I lived in
17 Montana for awhile. And there's not a lot of Asians in
18 Montana. And I mean, it wasn't a big deal.
19      Q   (BY MR. JONES) When you say it wasn't a
20 big deal, though, is that in the spirit of getting
21 along with other cultures?
22          MR. LEVINSTEIN: Objection.
23      A   No. It just wasn't a big deal.
24      Q   (BY MR. JONES) Do you think it's
25 appropriate for someone in Mr. Satrom's position to be

26

4/6/2005 Warwick, Jay

1  making or repeating allegations like this of a racial
2  nature and then using them as at least a partial basis
3  for possible decertification of an NGB?
4           MR. LEVINSTEIN: Objection. There's
5  nothing racial in this document. It's national
6  heritage.
7       A   I don't know. I haven't served in that
8  capacity or on that committee.
9       Q   (BY MR. JONES) Do you know what happened
10 to USTU after this decertification action was brought?
11 Do you know anything about what happened to it?
12      A   The USOC put an executive on loan in -- or
13 assigned a USOC executive to be the acting CEO. And
14 there was a five person management panel assigned to
15 address governance issues, and I think that's how it
16 operates today.
17      Q   Prior to that, there were some meetings,
18 one of which I think was set up by the USOC Membership
19 and Credentials Committee -- Membership and Credentials
20 Committee. Do you know anything about that, or had you
21 heard anything about meetings set up by the Membership
22 and Credentials Committee to address some of the things
23 in these letters?
24      A   I may have been aware of the meetings,
25 just because it makes sense that they would have been

27

4/6/2005 Warwick, Jay

1  meeting and talking about this stuff. But I couldn't
2  tell you when or where or the agendas.
3       Q   You did not attend any of them?
4       A   No.
5       Q   There are allegations that USOC committee
6  persons may have --
7           (Whereupon, there was an interruption
8           in the deposition proceedings.)
9           MR. LEVINSTEIN: Could we break for one
10 second?
11          MR. JONES: Sure. We're going to take a
12 short break I guess.
13          (Recess taken from 3:14 p.m. to 3:22
14          p.m.)
15          MR. LEVINSTEIN: Sorry about the
16 interruption.
17          MR. JONES: It's all right.
18      Q   (BY MR. JONES) We were done with
19 Exhibit --
20      A   5.
21      Q   -- 5. And we were discussing your
22 knowledge, if any, of any of meetings that the USOC
23 were holding.
24      A   Yes.
25      Q   And I just want to ask you if you ever

28

```
 1   heard any allegations that members of the USOC
 2   Membership and Credentials Committee during that 2003
 3   inquiry were heard to have referred to USTU management
 4   as "Korean Mafia" or words to that effect?
 5              MR. LEVINSTEIN:  Objection.
 6        A     I do recall hearing some rumors or
 7   speculation that there was something said that was in
 8   bad taste.  Again, I can't -- I just was so uninvolved
 9   that it's very hard to make a definitive statement.
10   That might have been it.
11        Q     (BY MR. JONES)  As you sit here today,
12   though, do you recall ever hearing anybody at the USOC,
13   whether it be a staff member or an executive level
14   person, volunteer, refer to USTU management as being
15   Korean Mafia or controlled by the Korean Mafia, or
16   words to that effect?
17        A     No.
18        Q     Okay.  Have you ever heard any USOC staff
19   persons or volunteer executive persons say anything
20   that sounded racially insensitive about persons with
21   Korean heritage?
22        A     No.  When I worked for the USTU, and when
23   I worked for the USOC, in my meetings, the conduct at
24   the USOC is very professional, and nobody was ever
25   derogatory, as far as I know.  And it could have been
```

```
 1   that I was very familiar with everybody in the USTU,
 2   so . . .  But no.
 3        Q     Before I forget, who is Jim Scherr, do you
 4   know?
 5        A     Who is Jim Scherr?
 6        Q     Yeah.
 7        A     He is the interim CEO for the United
 8   States Olympic Committee.
 9        Q     And how long have you known him, if you
10   know him?
11        A     I've known Jim since probably around 1988.
12   We might have met casually.  And then we served on the
13   Athletes Advisory Council together from '89 through
14   '92.  And while he was the Executive Director of
15   wrestling, I was the Executive Director of Taekwondo.
16   So I knew him professionally.
17        Q     Would you characterize your relationship
18   as purely professional, or are you also social friends?
19        A     We were friends up to the date that he
20   hired me.  And I'd like to say that we are still
21   friends; however, it is -- that relation is absolutely
22   subservient to our professional relationship.
23        Q     And I think you said that when this
24   decertification thing happened, he protected you from
25   it or --
```

```
 1        A     He didn't protect me from it.  What
 2   happened was when I began working at Sports
 3   Partnership, there were just instances where I suppose
 4   I could have been conflicted or ineffective because of
 5   my relationship with the Taekwondo community.  And so I
 6   was not charged with any communication or business
 7   dealings with Taekwondo.
 8        Q     In your capacities at USOC, did you have
 9   any reason to interface with Bob Gambardella?
10        A     No.
11        Q     Do you know who he is?
12        A     Yes.
13        Q     Have you ever spoken with him?
14        A     Yes.
15        Q     In what situations have you spoken with
16   him?
17        A     When he first became the acting or CEO of
18   Taekwondo, I called, and I told him that if he needed
19   any help and any information on particularly the
20   technical side of Taekwondo, I told him I'd be glad to
21   lend a hand, if I could remember any of it.  It had
22   been a little while.
23        Q     Did he take you up on your offer?
24        A     You know, we had lunch once, and we talked
25   generally about what it took to make a good athlete and
```

```
 1   what I thought the components were.  Bob has done -- he
 2   used to work in Sports Partnership, so he is very
 3   familiar with developing pipeline models to develop
 4   athletes, and we kind of had those discussions.
 5        Q     Do you recall the substance of your
 6   statements to him about developing ideal athletes, for
 7   example, in Taekwondo?
 8        A     Do I remember any of the --
 9        Q     Discussions, advice, whatever you want to
10   call it.
11        A     No.  I mean, he was pretty new, so I'm
12   hoping that I didn't get too detailed with him.  I was
13   probably pretty general, as far as trying to get
14   younger kids in the pipeline, in the international
15   pipeline, as early as they could, developing strength
16   and speed and things like that, I would imagine is what
17   we talked about.  I can't -- I mean, it was kind of
18   casual.  It wasn't a formal meeting.  That was kind of
19   it.
20        Q     Other than the lunch that you had together
21   discussing those points, were there any other times
22   when you and Mr. Gambardella spoke about Taekwondo or
23   the USTU?
24        A     Yes.  You know, we both work in the
25   complex, on the USOC complex here in Colorado Springs.
```

4/6/2005 Warwick, Jay

1  And from time to time, I would see him on various
2  things or just in passing. Once again, you ask, how's
3  it going. And having been in his chair before, I knew
4  how difficult it was. And he said, you know, it's not
5  easy. He's working hard. But, again, Bob really
6  didn't seek me out for that much help or counsel or
7  whatever. Smart.
8      Q    Do you recall ever touching on the topic
9  of coach selection with Bob Gambardella?
10     A    No.
11     Q    Did you know any of the other people who
12 were installed as a New Governing Body for USTU in
13 early 2004?
14     A    You mean --
15          MR. LEVINSTEIN: Objection. Any other
16 you said? But Bob wasn't one.
17     Q    (BY MR. JONES) Did you know the GMC that
18 was installed in 2004?
19     A    GMC?
20     Q    Yeah, Governing --
21          MR. LEVINSTEIN: Governance.
22     Q    (BY MR. JONES) -- and Management?
23     A    Oh. Do I know them?
24     Q    Yes. Do you know the individuals?
25     A    Yes, I do.

33

4/6/2005 Warwick, Jay

1  came to work at the USOC, Rich was promoted to the
2  Executive Director job for USA Wrestling.
3      Q    Would that be a purely professional
4  relationship that you had with Rich Bender?
5      A    You know, more so, yeah. I don't think
6  we've ever gotten together and had dinner or anything.
7      Q    How about Tony Baggiano?
8      A    I believe it's waterskiing. He's maybe
9  the volunteer president or something for waterskiing.
10 And I know Tony from his working at the USTU. And he
11 was a Pan Am only sport, waterskiing is. It's not on
12 the Olympic program.
13          And just through the course of, I guess,
14 regular business meetings, whether it was going to a
15 Pan Am Games team leadership meeting or going to the
16 Pan Am Games, or regular USOC board meetings. He sat
17 on the NGB council representing his sport.
18          And we would have some conversation. Again,
19 I wouldn't call it a very extensive relationship, but
20 saw him at meetings.
21     Q    And lastly, Steve Locke?
22     A    Steve was the Executive Director of USA
23 Triathlon at the same time that I was the Executive
24 Director of Taekwondo. So we were professional
25 colleagues.

35

4/6/2005 Warwick, Jay

1      Q    Do you know all of them?
2      A    I know all of them.
3      Q    I guess taking them one at a time, how do
4  you know Ms. Virginia Witte?
5      A    She is the auditor for the United States
6  Olympic Committee, and when I was working for the USTU,
7  we would have to conduct standard business together as
8  a result of USOC audits. Additionally, we both served
9  on the USOC's audit committee.
10     Q    Did you have a good relation --
11 professional relationship with her during your years at
12 USTU as Executive Director?
13     A    I'd like to think so.
14     Q    And Juan Moreno, how do you know him?
15     A    Juan Moreno was an athlete in the late
16 '80s, and we were actually Olympic teammates in 1988.
17 And after that, I had worked with Juan from time to
18 time as a coach. And since then, we were on the USTU's
19 tournament committee together. And he -- actually,
20 we're friends. Since then, we just became friends. We
21 keep in touch.
22     Q    And how about Rich Bender?
23     A    Rich Bender, when I came to Colorado
24 Springs, he was the event manager for USA Wrestling.
25 And I met him in that capacity. And then after Jim

34

4/6/2005 Warwick, Jay

1      Q    When these individuals were appointed to
2  the GMC for USTU in February 2004, or thereabouts,
3  after that selection of them, did you have
4  conversations with any of them about USTU?
5      A    I had a conversation with Steve Locke, and
6  he asked me about the governance structure, and we also
7  talked a little bit about programming, about pipeline
8  developing.
9      Q    Was coach selection ever discussed with
10 any members of the GMC after they were appointed in
11 early 2004?
12     A    No. Well, I mean, between me and them?
13     Q    Yeah.
14     A    No. I mean, it was just kind of -- Steve
15 was not working for a triathlon, I believe at that
16 point, and he wasn't around very often. And those
17 other gentlemen or folks aren't at the USOC, with the
18 exception of Virginia. And I don't see her very often,
19 so . . .
20     Q    I'm going to turn topics for a second here
21 to the years when you were Executive Director of USTU.
22 I show you what has previously been marked as Exhibit
23 35. Why don't you show it to counsel first?
24          MR. LEVINSTEIN: You only have one?
25          MR. JONES: Yeah. Sorry. It's a short

36

4/6/2005 Warwick, Jay

1 one.
2         (Deposition Exhibit No. 35 was
3         re-marked for identification.)
4     A    Great.  Got anymore of these?
5     Q    (BY MR. JONES)  A few.
6     A    That's more like it.
7     Q    All right.  Showing you Exhibit 35, have
8  you ever seen that document before, sir?
9     A    I would imagine I have.  I mean,
10 obviously, five years ago, I can't remember.  But it's
11 addressed to me.  It's from Salena.  I would imagine I
12 saw it.
13    Q    It is a letter dated January 31, 2000,
14 addressed to you from Salena DiMatteo.  And who is
15 Salena DiMatteo, if you recall?
16    A    She is one of the staff auditors.  She
17 works for Virginia Witte.
18    Q    It expresses appreciation for USTU's
19 commitment to improvement; is that not correct?
20    A    That's what it says.
21    Q    And it also states that cooperation by you
22 and your staff have made the review process smooth --
23    A    Yes.
24    Q    -- or more smoothly?  Just explain for us
25 briefly what process she was referring to.

37

4/6/2005 Warwick, Jay

1     A    When the USOC conducts an audit, we have
2  to provide certain documentation and backup for them to
3  conduct their diligence.  And we had prepared those
4  documents in advance, so that when she came over here
5  and started digging and feeling around for it, we had
6  it all prepared and organized, and I imagine that's
7  what she's referencing.
8     Q    And she is referring specifically to an
9  audit report dated December 2, 1999; is that correct?
10    A    Yes.
11    Q    Would that be an annual audit, if you
12 know?
13    A    At this . . .  I can't recall exactly, but
14 when I first took over, we were being audited annually,
15 because we had a task force assigned to us.  And at
16 this point, I think we may have still been receiving
17 annual audits.
18    Q    And what's the purpose of these annual
19 audits, if you know?
20    A    To ensure that the USOC's resources were
21 appropriately spent for the activities that they were
22 approved for.
23    Q    If you know, were there other NGBs
24 experiencing annual audits like USTU?
25    A    If I know.  At this point?  I served on

38

4/6/2005 Warwick, Jay

1  the audit committee, so I got to see all the audits for
2  all the NGBs.  So I can tell you that there were
3  certain NGBs that were audited annually.  It was the
4  exception and not the rule.  For the most case, I think
5  it was every other year, was the practice.
6     Q    During this period, you said it was the
7  exception, and not the rule?
8     A    Yeah, it's not good if they're auditing
9  you every year.
10    Q    It means what?
11    A    It means we had some problems.
12    Q    And what was the upshot of the audit
13 report for 1999 that was commented on at January 31,
14 2000, if you recall?
15         MR. LEVINSTEIN:  Objection.
16    A    Do you have the audit?
17    Q    (BY MR. JONES)  No.
18    A    Okay.  If this audit report was December
19 2nd, 1999, we probably started organizing that stuff in
20 October.  And I -- I can't say what the upshot was.
21 Hopefully it was all-around good.
22    Q    There was no decertification action
23 brought in 2000, was there?
24    A    Not as of the 31st of January.
25    Q    Showing you the next exhibit previously

39

4/6/2005 Warwick, Jay

1  marked as 36.
2         (Deposition Exhibit No. 36 was
3         re-marked for identification.)
4     Q    (BY MR. JONES)  I'm not going to ask you
5  anything specific about the report --
6     A    Oh.
7     Q    -- in case you were trying to analyze all
8  those numbers all of a sudden.
9          First of all, have you seen this document
10 before?
11    A    I believe so.
12    Q    It's another one addressed to you, a cover
13 letter dated November 29, 2001.  This one is from
14 Virginia Witte; is that correct?
15    A    Yes.
16    Q    And is it fair to state you probably
17 received this?
18    A    Yes.
19    Q    This one does have an audit summary
20 attached to it for 2000 -- no, it says '99 slash 2000?
21    A    Yeah.
22    Q    So that's both?
23    A    Right.
24    Q    It's a two-year?
25    A    Uh-huh.

40

4/6/2005 Warwick, Jay

1  Q   And if you could just tell us what the
2  purpose of this letter was, if you know.
3  A   Of the cover letter?
4  Q   Yes.
5  A   It's standard operating procedure that
6  once an audit is conducted, whoever conducted the audit
7  drafts a cover letter, and it includes the audit. They
8  send that to the National Governing Body for a
9  response. This is Salena. She conducted the audit
10 this year. Virginia conducted this audit, so she wrote
11 the cover letter.
12 Q   The letter congratulates you on the
13 improvements shown in the reporting of USOC support to
14 USTU; is that correct?
15 A   Yes.
16 Q   And I note that there are five
17 recommendations in the report --
18 A   Uh-huh.
19 Q   -- that they were encouraging you to
20 adopt --
21 A   Yes.
22 Q   -- with respect to reporting procedures,
23 is that fair?
24 A   Yes.
25 Q   How was USTU doing financially in '99 and

41

4/6/2005 Warwick, Jay

1  2000?
2  A   We were doing well.
3  Q   Was the business solvent?
4  A   Yes.
5  Q   I don't have financial information for you
6  to look at for years after this period, but generally
7  you've testified that you left in mid-2002; is that
8  right?
9  A   Yes.
10 Q   From this period we just looked at, in '99
11 and 2000, forward to the time you left, did the
12 financial picture of USTU remain the same, get worse,
13 get better, if you remember?
14 A   I believe it remained on a positive trend.
15 I think we finished on -- in fact, I'm almost certain
16 we finished positive, revenues over expenses, exceeds
17 expenses for 2001. For two thousand -- beyond that, I
18 don't know.
19 Q   This letter, for example, recommends five
20 areas be --
21 A   Yeah.
22 Q   -- addressed?
23 A   Yeah.
24 Q   And it says we would appreciate your
25 response within 30 days from the date of this letter?

42

4/6/2005 Warwick, Jay

1  A   Right.
2  Q   Generally, when you got requests like
3  this, did you respond in a timely fashion to say what
4  the status was?
5  A   Yeah. The appropriate response to that
6  letter is that we received their audit. We either
7  agree or disagree. Sometimes it could be that we
8  simply didn't agree with one of their recommendations
9  or we didn't agree that we had not satisfied one of the
10 previous recommendations or whatever.
11     But it was more -- I think more of a protocol
12 thing that within 30 days, fix everything and get back
13 to us, that's not the intent of the audit. It's more
14 to recognize that we're in agreement with the results,
15 the conclusions of the audit.
16 Q   During your time as Executive Director of
17 USTU, right up until the time you left, were there any
18 signs that USOC was contemplating decertification of
19 your organization because of its financial situation or
20 for financial reasons?
21 A   I don't -- I mean, I don't know at that
22 point what the USOC was saying, but I wasn't aware of
23 any.
24 Q   You didn't get any negative correspondence
25 or threats or demands that made you panic?

43

4/6/2005 Warwick, Jay

1  A   No.
2  Q   USTU was subject to these audits during
3  your term as Executive Director? I'm talking about the
4  USOC audits.
5  A   Yes.
6  Q   You are in charge of several sports,
7  several NGBs. You testified 11?
8  A   Yes.
9  Q   Do you know if any of them are subject to
10 annual audits now?
11 A   Karate, I believe is -- or not karate.
12 Excuse me. Boxing. Just one.
13 Q   Would that be annual or biannual audits?
14 A   For boxing, annual.
15 Q   Are any of those NGBs for which you are
16 responsible subject to biannual audits, that some have
17 to do it every other year?
18 A   The rest of them.
19 Q   The rest of them are subject to biannual
20 audits?
21 A   (Deponent nodded in the affirmative.)
22 Q   Would the biannual audits be the usual
23 rule, or is that something that they're just doing with
24 respect to yours? I'm not sure I understand the
25 protocol.

44

1   A   The standard was having an audit every
2   other year unless there were some problems.
3   Q   I see.
4   A   And they could speed that up to an annual
5   audits.
6   Q   Okay. All right. I'd like to turn to
7   another area. Do you know my client, Dae Sung Lee?
8   A   Yes, I do.
9   Q   And how long have you known him?
10  A   Over 25 years.
11  Q   When did you first meet?
12  A   We were on the national team together in
13  1980.
14  Q   Both as competitors?
15  A   Uh-huh.
16  Q   Would that be a yes?
17  A   Yes.
18  Q   You have been doing fine, by the way.
19      And what was the result of -- well, let me
20  ask it this way: What competitions did you go to
21  together as teammates?
22  A   All of them. In 1980, we went to the Pan
23  Am Taekwondo Championships in Houston. That was the
24  first one. Actually, that event, it was a 1980 team,
25  but the event didn't occur until early spring of 1981.

45

1       Since that time, I mean, from that point
2   through 1987, we were on the national team together and
3   attended all the events.
4   Q   During that period, did you develop more
5   of a relationship besides just being colleagues in
6   Taekwondo? Did you become friends?
7   A   We're very good friends.
8   Q   At some point, Dae Sung Lee retired from
9   competition?
10  A   Yes.
11  Q   About when?
12  A   It was about 12 o'clock, right after he
13  fought Juan in 1989.
14  Q   Were you with him when he made that
15  decision?
16  A   I was.
17  Q   And did you continue on in competition
18  after he retired?
19  A   No. I retired before him. He is younger
20  than I am.
21  Q   Did he ever coach you when you were
22  competing?
23  A   Yes, he did.
24  Q   During what years?
25  A   At the -- you know, it's hard. I would

46

1   say during the later years, maybe '85, -6, -7, and -8,
2   and beyond, from time to time, we would coach each
3   other at the national championships, team selection,
4   stuff like that.
5   Q   Did you find him to be a competent coach?
6   A   Yes.
7   Q   Did you ever have any financial
8   relationships with him?
9   A   Hmmm.
10  Q   I'm not talking about lending him 20 bucks
11  or something like that.
12  A   Yeah.
13  Q   I'm talking about going into some sort of
14  a contract together.
15  A   No $5.00 nassaus, huh? No, I did not.
16  Q   Now, I want to turn to another area,
17  Olympic coach selection. In your interview that I
18  showed you earlier, you were asked about whether and
19  how you took your competitive experience into coaching,
20  and you said more or less that one of the most valuable
21  things that a coach can bring to any team is their
22  experience?
23  A   Uh-huh.
24  Q   Is that a yes?
25  A   Yes. That's true.

47

1   Q   Is that still a true statement?
2   A   Yes, yes. For me.
3   Q   For you. Now, was one of USTU's
4   functions, at least while you were associated with it,
5   to select an Olympic coach for the United States team
6   for upcoming Olympic Games?
7   A   Yes.
8   Q   That's what all NGBs are supposed to do;
9   is that correct?
10  A   Correct.
11      MR. LEVINSTEIN: Except for the ones that
12  don't go to the Olympics.
13      MR. JONES: Yeah, except for those.
14  Q   (BY MR. JONES) I want to show you an
15  exhibit that was -- it's part of Exhibit 32, previously
16  marked.
17          (Deposition Exhibit No. 32 was
18          re-marked for identification.)
19  Q   (BY MR. JONES) I have the whole document,
20  if you wish to look at it, but I just pulled out the
21  part on coach selection.
22  A   Uh-huh.
23      MR. LEVINSTEIN: This is 32 previously?
24      MR. JONES: Yes.
25  A   Hmmm. Okay.

48

4/6/2005 Warwick, Jay

1  Q    (BY MR. JONES)  Like I say, I have the
2  thicker document if you want to look at it.
3  A    If there's no questions pertaining to it,
4  that's okay.
5  Q    I'm just going to focus on coach
6  selection.
7  A    Yeah, that's fine.
8  Q    First of all, have you ever seen this
9  portion of the document that I've shown you marked as
10 Exhibit 32 before?
11 A    I probably have.  It's dated December '01,
12 and if this was submitted during any point in '01, I
13 may have seen it.  If that's just the date that the
14 document was created, and if it was submitted beyond my
15 tenure, then I probably haven't seen it.  But if it was
16 prior to then, yeah, I would imagine.
17 Q    All right.  And it purports to be a
18 portion of the selection procedures manual submitted by
19 USTU to the USOC specifically for Olympic coach
20 selection; is that fair?
21 A    Yes.
22 Q    Did you get involved in the writing of
23 coach selection criteria in your years at USTU?
24 A    In selecting the 2000 coaches, yes.
25 Q    You have a recollection of USTU writing a

49

4/6/2005 Warwick, Jay

1  criteria to be used for the 2000 Olympic games?
2  A    What I remember was there was a criteria.
3  I can't remember specifics, and it was probably early
4  1999, I think is when we started working.
5  Q    And as you look at this coach selection
6  criteria, does it look similar, different than the '99
7  criteria that you were involved in?
8  A    It looks incomplete.
9  Q    In what way?
10 A    It's not filled out.
11       MR. LEVINSTEIN:  I think he is talking
12 about Page 29.
13 A    28 and 29.  And there's a lot of missing
14 information.
15 Q    (BY MR. JONES)  Okay.
16 A    So I -- I'm hopeful that the one we filled
17 out for 2000 was complete.
18 Q    Looking at Page 29 --
19 A    Okay.
20 Q    -- does the substance of the responses to
21 these three questions look like the ones that you
22 helped write in 1999 or were involved in in 1999?
23 A    This seems to be missing some elements.  I
24 remember for 2000 we wanted to consider if somebody
25 hadn't coached an athlete to this level, that they had

50

4/6/2005 Warwick, Jay

1  some experience as an athlete also, I think was
2  mentioned in the criteria.  And I don't -- I apologize.
3  I can't remember.  It was a long time ago.
4  Q    Well, from memory, what do you recall of
5  the coaching selection criteria that were in effect in
6  '99 when you were involved?  For example, this one says
7  previous coaching experience at the Olympic Games, et
8  cetera.  Was that a criteria in 1999?
9  A    These look like they were probably similar
10 to the ones in '99.  Like I said, I recall there being
11 something regarding -- we should just look it up, but
12 something regarding and/or having personal experience
13 as an international athlete success.
14 Q    I see.
15 A    And also I think coaching somebody to a
16 certain amount of success domestically and so forth.
17 So to take into account here your full credentials.
18 Q    Okay.  Do you know if any of the criteria
19 that were in effect in 1999 required that a coach place
20 a person on the U.S. Olympic team as a prerequisite to
21 being considered?
22 A    No, I don't recall.  I mean, the . . . up
23 to that point, the criteria wasn't very good.  And I
24 think that was really kind of a first go of it, of
25 trying to formalize the process.  And also it was

51

4/6/2005 Warwick, Jay

1  possible for members of the committee that were
2  building the slate of candidates to recommend each
3  other.
4       And at that point, you know, that rule was
5  changed, where if you were on the committee making the
6  selections, you could no longer serve or be a candidate
7  for one of the coaching jobs.
8  Q    That would be a conflict of interest, or
9  at least be perceived as one?
10 A    Yeah.  I mean, it wasn't uncommon for the
11 same people that run the Coaching Science Committee to
12 serve in some team coaching management leadership
13 positions.
14 Q    But you said that rule seemed to have been
15 changed in '99?
16 A    We changed it in '99.
17 Q    And removed that as a possibility?
18 A    Yes.
19 Q    And as you sit here today, the
20 considerations that stick in your mind as to what it
21 took to be an Olympic coach appointed by USTU would be
22 previous coaching experience at the international
23 level?
24 A    Uh-huh.
25 Q    Yes?

52

4/6/2005 Warwick, Jay

1  A  Yes.
2  Q  And there were possibly additional or more
3  explanations as to what that meant in the version that
4  you recall?
5     MR. LEVINSTEIN: Objection.
6  A  I want to say yes, but I'm not sure I
7  understand the question.
8  Q  (BY MR. JONES) Okay. Then let me
9  rephrase it. You were talking about some additional
10 factors --
11 A  Yeah.
12 Q  -- that you were thinking were in the '99
13 rules --
14 A  Yes.
15 Q  -- or procedures, coaching selection
16 procedures --
17 A  Uh-huh.
18 Q  -- dealing with competition.
19 A  Uh-huh.
20 Q  That's a yes?
21 A  Yes.
22 Q  By the applicant?
23 A  Yes.
24 Q  Any other factors that you can recall --
25    MR. LEVINSTEIN: Objection.

53

4/6/2005 Warwick, Jay

1  Q  (BY MR. JONES) -- in the '99 selection
2  criteria that you worked on?
3     MR. LEVINSTEIN: Objection.
4  A  No.
5  Q  (BY MR. JONES) Your criteria were
6  submitted to and approved by the USOC before actual
7  names were submitted to the USOC for --
8  A  For 2000?
9  Q  -- for the 2000 Olympics?
10 A  Yes.
11 Q  And who were the coaches, if you can
12 recall, who were selected pursuant to that process for
13 the 2000 Olympic games?
14 A  Young In Cheon and Han Lee.
15 Q  And did these coaches and their team
16 experience any success in the 2000 Olympics?
17    MR. LEVINSTEIN: Objection.
18 A  Yes. Success being defined medal success,
19 yes. Steven Lopez won a gold medal.
20 Q  (BY MR. JONES) And his head coach was
21 whom?
22 A  Young In Cheon was the head coach.
23 Q  And who was sitting with Steven in the
24 final match?
25 A  Yungin Chun.

54

4/6/2005 Warwick, Jay

1  Q  Did any of the other athletes get medals
2  in that 2000 Olympics?
3  A  No.
4  Q  You were with USTU during the 1992
5  Olympics?
6  A  As a volunteer, yes.
7  Q  Do you know anything about how those
8  coaches were selected for the '92 Olympics?
9  A  I did. And it would have been the same
10 process. The Coaching Science Committee would have
11 recommended a slate of coaches to the executive
12 committee, and they would have taken that forward.
13 Q  And what kind of success, if any, did the
14 '92 U.S. Taekwondo team experience in the '92 Olympics?
15 A  One gold medal for the men, a silver medal
16 for the women, and I think maybe two or three bronze
17 medals.
18 Q  And how about '88?
19 A  That is the best team ever.
20 Q  Pardon?
21 A  The best team ever.
22 Q  Of course. Do you know how the coaches
23 for that team were selected?
24 A  Coaching Science Committee, executive
25 committee.

55

4/6/2005 Warwick, Jay

1  Q  Same process?
2  A  Yes.
3  Q  And, again, who were those individuals?
4  A  That coached the team? The head coach was
5  Sang Lee, and the assistant coach was Yeon Hwan Park.
6  Q  And you told us you got a medal at that
7  Olympics?
8  A  Uh-huh.
9  Q  That's a yes?
10 A  Yes, I did.
11 Q  And who sat with you during your final
12 match?
13 A  Sang Lee.
14 Q  Now, would you agree that under the prior
15 coach selection criteria -- and by prior, I'm talking
16 about the 2000, '92, and '88 Olympics, the selection
17 processes that were in force then and that you have
18 testified to -- that the results obtained under that
19 coaching selection criteria were pretty good?
20    MR. LEVINSTEIN: Objection.
21 Q  (BY MR. JONES) If medals is any
22 indicator?
23    MR. LEVINSTEIN: Objection.
24 A  Yes.
25 Q  (BY MR. JONES) And I think in your

56

4/6/2005 Warwick, Jay

1  interview with the publication that I showed you, you
2  took it upon yourself to even count the number of
3  medals in those three Olympics and made the statement
4  that you counted 18 medals being awarded to the U.S.
5  team during those three Olympics; isn't that true?
6      A    That's true. Yes, I'm sure it is.
7      Q    Given that, would you say that the Olympic
8  coach selection process that was in effect during those
9  years was performance-oriented?
10         MR. LEVINSTEIN: Objection.
11     A    No.
12     Q    (BY MR. JONES) Why not?
13     A    I didn't think we picked a very good slate
14  of coaches for the '92 games.
15     Q    And who was that again?
16     A    Dong Gun Park and Hong Kong Kim.
17     Q    And what is your criticism of those two
18  individuals?
19     A    I'm not aware that Mr. Hong Kong Kim had
20  very much experience as a coach during that time
21  period, maybe many years before. Dong Gun Park, who
22  was the head coach, his coaching philosophy and his
23  technical methodology, if you will, I thought was very
24  outdated.
25     Q    That's your personal view as both a coach

57

4/6/2005 Warwick, Jay

1  and former competitor?
2      A    Yes.
3      Q    Do you think that the former criteria were
4  objective?
5      A    No.
6      Q    In what way were they not objective?
7      A    You know, there was so much subjectivity
8  involved, I think, in the discussions. It wasn't
9  objective in the way that anything was quantified. If
10  you created an athlete that made a national team, you
11  get two points. If you -- you know, if that athlete
12  went on to be successful internationally, that would
13  receive a greater value, so forth and so on.
14         It was more of a, as long as you've
15  accommodated the bullet, it was sufficient. And so in
16  that way, I don't think it was very objective at all.
17     Q    Why, then, as a person participating in
18  the writing of these criteria, did you write them in
19  that fashion?
20     A    Got outvoted.
21     Q    By whom?
22     A    The rest of the committee.
23     Q    And who else was on the committee?
24     A    I can't recall, but --
25     Q    What adjustments would you have made to

58

4/6/2005 Warwick, Jay

1  the selection criteria to satisfy your concerns about
2  objectivity or subjectively?
3      A    I would have quantified things.
4      Q    Can you be more specific?
5      A    I would have placed a value on certain
6  accomplishments, whether it be how an individual had
7  performed themselves at an international competition;
8  what their history was; their success in developing
9  national team members, people that could get to that
10  level; and then their success coaching international
11  teams. And I would have placed a value on those
12  things.
13     Q    When you say you got outvoted, it sounds
14  like you had specific criteria, either written out or
15  in mind that you were pushing for?
16     A    Yes.
17     Q    Did you retain any of those?
18     A    No, it was -- I felt at the philosophical
19  level, we never got to the point where a motion got to
20  the floor.
21     Q    What was the name of this committee that
22  was --
23     A    The Coaching Science.
24     Q    Coaching Science. And how many people
25  were on the committee, if you can recall?

59

4/6/2005 Warwick, Jay

1      A    I can't recall.
2      Q    But your recollection is you got outvoted
3  with respect to your suggestions for modifications,
4  changes to the coach selection criteria?
5      A    Yeah. I mean, maybe outvoted might not be
6  accurate. Just those -- my opinions weren't received
7  well.
8      Q    How did you feel about that?
9      A    Probably not great, but, I mean, sometimes
10  you don't win. Business. Business items.
11     Q    Is there anything -- did you find that the
12  description of using prior coach experience in and of
13  itself to be subjective? Was that a subjective
14  criteria in your mind?
15     A    Prior coach experience?
16     Q    Prior coaching experience in the Olympics,
17  Pan Am Games, the exact same language I have shown you.
18     A    Do I find that to be subjective? No.
19     Q    Do you find the subjectivity to be more in
20  the application? Is that the problem you saw?
21     A    You know, I mean, again, it's more of a
22  qualifying something versus quantifying something.
23     Q    I see. So you would have wanted more
24  detail as to what experience means?
25     A    Yes.

60

4/6/2005 Warwick, Jay

1  Q   It sounded like in '99 they did add more
2  detail?
3  A   Yes.  We were moving in a good direction.
4  Q   It was not enough, though, in your mind to
5  be optimal?
6  A   Well, at that point, I was talking about
7  the '92 selection when I said I would have preferred
8  things to be different for qualification.  In 1999, at
9  that time, I was staff.  So my involvement on those
10 committees was from a staff position, more of recording
11 and executing the policy that was determined by those
12 committees.
13 Q   I see.  So in 1999, you didn't feel like
14 you really had authorship --
15 A   No, no.
16 Q   -- input?
17 A   No.
18 Q   But by 1999, in your words, they were
19 moving in the right direction, as far as taking some of
20 the subjectivity out of it?
21 A   It made some advances, yes.  We had made
22 some advances at that time, I guess.
23     MR. LEE:  May I request a break?
24     MR. JONES:  Sure.  We'll take a brief
25 one.  I'm about done.

61

4/6/2005 Warwick, Jay

1     (Recess taken from 4:21 p.m. to 4:26
2     p.m.)
3     MR. LEVINSTEIN:  Just for the record,
4  Exhibit 32, we don't believe in its entirety is the
5  United States Olympic Committee Selections Procedures
6  Manual, but I'm not positive.  But I do think there is
7  a document like this that existed, but that Pages 29,
8  at least, and 32 -- sorry, 33 -- no, once again, Page
9  29 and 34 would have been blank.  They would have been
10 sample pages without any particular sport filled in or
11 any particular criteria for a particular sport.  They
12 would have been the format.
13    And Gary Johansen used the example, it
14 would be like the Form 1040 from the IRS, but it
15 wouldn't have anybody's name and their tax information.
16    And someone has created a Page 29 and
17 filled in some criteria for Taekwondo.  That's all.
18 I'll just represent we will go look more for what
19 exists for selection criteria from prior to February of
20 2003 that was used for the selection.
21    MR. JONES:  I'd appreciate that, Counsel.
22    Also, for the record, the way we got this
23 document was Samuel Pejo did a declaration and
24 testified that he downloaded it from the USOC, filled
25 it in, which was, I suppose, the normal procedure, and

62

4/6/2005 Warwick, Jay

1  then submitted it, but wasn't sure whether this was the
2  exact one, but he felt it was very close to the exact
3  one.  He did not have any copies of the exact one that
4  was submitted with signatures on it and so forth.
5     MR. LEVINSTEIN:  Okay.
6     MR. JONES:  Okay.
7     MR. LEVINSTEIN:  Did he think he
8  submitted Page 29, or did he think he submitted the
9  whole book?
10    MR. JONES:  The whole book.
11 Q   (BY MR. JONES)  Before I forget to ask,
12 under the criteria that existed when you left the USTU
13 in mid-2002 --
14    MR. LEVINSTEIN:  Objection just because I
15 don't know if -- criteria for what?
16    MR. JONES:  Criteria for Olympic coaches,
17 the selection of Olympic coaches.
18    MR. LEVINSTEIN:  For 2004?
19    MR. JONES:  No.  Under the criteria that
20 existed when he left.
21    MR. LEVINSTEIN:  He left in 2002.
22    MR. JONES:  Right, that's what I asked.
23 Using those criteria --
24    MR. LEVINSTEIN:  The ones that existed
25 for 2004.

63

4/6/2005 Warwick, Jay

1     MR. JONES:  I don't know if he can
2  respond to 2004.
3     MR. LEVINSTEIN:  The '91 criteria didn't
4  exist anymore because the Olympics were over.
5     MR. JONES:  Right.
6     MR. LEVINSTEIN:  So just tell me which
7  criteria are we talking about?  The '99 criteria?
8  Q   (BY MR. JONES)  Yes.  Whatever criteria
9  you were familiar with.  And I thought you were
10 familiar with the -- I guess it would be the 2000
11 criteria, which was still around in 2002.
12    MR. LEVINSTEIN:  Objection.  They
13 terminated as of 2000.
14 A   Yeah, I guess . . .
15    MR. LEVINSTEIN:  I don't mean to testify.
16 You answer.
17 Q   (BY MR. JONES)  Let's use the 2000
18 criteria to see if counsel is right.  Assuming they do
19 terminate in 2000 --
20 A   Yeah.
21 Q   -- and assuming those are the only written
22 criteria in existence when you leave in mid-2002, and
23 applying them to Dae Sung Lee --
24 A   The 2000 criteria?
25 Q   Yes.

64

4/6/2005 Warwick, Jay

1       MR. LEVINSTEIN:  Objection.  He doesn't
2  remember exactly what they all were.  He had some vague
3  recollections.  I don't know how he can apply criteria
4  we don't have.
5       Q    (BY MR. JONES)  Do you believe Dae Sung
6  Lee would have been a qualified coach to serve as the
7  U.S. Olympic team head coach?
8       A    Under the qualifications for 2000?
9       Q    Yes.
10           MR. LEVINSTEIN:  Are we saying assuming
11 those applied for 2004?
12           MR. JONES:  Yes.
13      A    2000 Olympic coach or 2004 Olympic coach?
14      Q    (BY MR. JONES)  2004 Olympic coach --
15      A    Ah.
16      Q    -- but applying the same criteria.
17           MR. LEVINSTEIN:  Applying them with?
18      A    Applying the 2000 standards to 2004?
19      Q    (BY MR. JONES)  Yes.
20           MR. LEVINSTEIN:  Applying with?
21      A    You mean, Young In Cheon and Han Lee were
22 selected as the coaches in 2000.
23      Q    (BY MR. JONES)  Understood.
24      A    And if the procedures that selected those
25 two gentlemen were in place in 2004 -- so I guess

65

4/6/2005 Warwick, Jay

1  you're asking if they could have selected him in 2000
2  also?
3       Q    Let me make it a lot simpler.
4       A    Good.
5       Q    Based solely on his experience in
6  international competition --
7       A    Uh-huh.
8       Q    -- in your opinion, was Dae Sung Lee a
9  qualified candidate to serve as U.S. Olympic team coach
10 in the 2004 Olympics?
11           MR. LEVINSTEIN:  Objection.  Applying
12 what criteria?
13      A    Just his international experience?
14      Q    (BY MR. JONES)  International experience.
15           MR. LEVINSTEIN:  So we're not applying
16 any particular coaching criteria?
17           MR. JONES:  Right.
18      A    Yes.
19      Q    (BY MR. JONES)  Why do you think so?
20      A    Dae has extensive experience.
21      Q    As both a competitor and a coach?
22      A    Yes.
23      Q    At the highest levels?
24      A    Yes.
25      Q    And is it correct that he's also had high

66

4/6/2005 Warwick, Jay

1  achievements at those high levels?
2       A    Yes.
3       Q    I just want to touch a moment on Sang Lee,
4  the subject of Sang Lee.  Sang Lee was your former
5  coach?
6       A    Yes.
7       Q    You worked with him for many years as a
8  competitor?
9       A    Yes.
10      Q    At least in your interview, you had high
11 praise for his skills and experience as a coach?
12      A    Yes.
13      Q    In fact, you said in your interview that
14 you adopted approximately 80 percent of his methods
15 into your own teaching, something like that?
16      A    I'm going to say that that interview was
17 specifically to promote the USTU and our Junior
18 program, and I was well aware that Sang Lee would be
19 reading it.
20           But, yes, he did coach me for many years, and
21 he was very influential in forming my own methodology
22 for the technical side of Taekwondo, yes.
23      Q    I think that's all the questions I have.
24 Thank you.
25      A    Thank you very much.

67

4/6/2005 Warwick, Jay

1            MR. LEVINSTEIN:  No questions.
2       (The deposition concluded at 4:35 p.m.)

68

4/6/2005 Warwick, Jay

```
1                     A F F I D A V I T
2       STATE OF COLORADO    )
                             ) ss.
3       COUNTY OF            )
4              I have read my deposition, and the same is
5       true and accurate, save and except for changes and/or
6       corrections, if any, as indicated by me on the
7       amendment sheet(s) attached hereto as indicated.
8
9       Amendment sheet(s) attached [ ]
10      No changes; no amendment sheet attached [ ]
11
12
               _____
13                      RICHARD JAY WARWICK
14
15         SUBSCRIBED AND SWORN TO before me on this
16      _____ day of _____, 2005.
17      My commission expires:  _____
18
19             _____
                         NOTARY PUBLIC
20
            in and for the State of _____
21
22
23
24
25
```

69

4/6/2005 Warwick, Jay

```
1                     C E R T I F I C A T E
2
        STATE OF COLORADO    )
3                            ) ss.
        COUNTY OF DENVER     )
4
5
               I, VALORIE S. MUELLER, Registered
6       Professional Reporter and Notary Public in and for the
        State of Colorado, duly appointed to take the
7       deposition of RICHARD JAY WARWICK, certify that prior
        to the examination the deponent was duly sworn to
8       testify to the truth in the matters in controversy
        between the parties herein; that the deposition was
9       taken in shorthand by me at the time and place
        aforesaid and was thereafter reduced to typewritten
10      form by me and processed under my supervision, the same
        consisting of 69 pages, and that the same is a full,
11      true and complete transcription of my shorthand notes.
        I further certify that I am not related to, employed
12      by, or counsel to any of the parties herein, or
        otherwise interested in the events of the within cause.
13
14         A transcript review of this deposition was
        requested and is available to the deponent as notified
15      by me.
16
           IN WITNESS WHEREOF, I have affixed my notarial
17      seal this 25th day of April, 2005.  My commission
        expires December 11, 2006.
18
19             _____
                      VALORIE S. MUELLER
20                Registered Professional Reporter
21
22
23
24
25
```

70