4/5/2005 Gambardella, Robert

0001
```
 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF HAWAII
 2           CIVIL ACTION NO. 04-00461-SOM-LEK

 3       _____
 4   DEPOSITION OF:  ROBERT GAMBARDELLA
     EXAMINATION DATE:  April 5, 2005
 5       _____
 6   DAE SUNG LEE,

 7        Plaintiff,

 8        v.

 9   UNITED STATES TAEKWONDO UNION, a Colorado
     nonprofit Corporation, et al.,
10
          Defendants.
11       _____
12           PURSUANT TO SUBPOENA, the deposition of
     ROBERT GAMBARDELLA, was taken at 8:19 a.m. on
13   April 5, 2005 at the Double Tree Hotel at 1775 E.
     Cheyenne Mountain Boulevard, Colorado Springs,
14   Colorado, before Susan L. Sims, Registered
     Professional Reporter and Notary Public in and
15   for the State of Colorado, said deposition being
     taken pursuant to the Federal Rules of Civil
16   Procedure.
17
18                    Susan L. Sims
              Registered Professional Reporter
19
20
21
22
23
24
25
```

4/5/2005 Gambardella, Robert

```
 1              A P P E A R A N C E
 2   For the Plaintiff:
 3       GLENN UESUGI, ESQ.
         WARD D. JONES, ESQ.
 4       Bervar & Jones
         1400 Pauahi Tower
 5       1001 Bishop Street
         Honolulu, Hawaii 96813
 6       (808) 550-4990
 7   For the Defendants:
 8       MARK LEVINSTEIN, ESQ.
         TODD BRAUNSTEIN, ESQ.
 9       Williams & Connolly, LLP
         725 Twelfth Street, N.W.
10       Washington, D.C. 20005
         (202) 434-5171
11
12   Also present:  Dae Sung Lee, Plaintiff
                    Gary Johansen, Deputy General
13                  Counsel, United States Olympic
                    Committee
14
15
16
17
18
19
20
21
22
23
24
25
```

4/5/2005 Gambardella, Robert

```
 1                  I N D E X
 2   EXAMINATION BY:                         PAGE
 3   Mr. Uesugi                                 5
 4
 5           I N D E X  O F  E X H I B I T S
 6
 7   DEPOSITION                          PAGE FIRST
     EXHIBIT NO.       DESCRIPTION         APPEARS
 8
 9    9   3-18-04 Letter from Dae Sung Lee to
          Bob Gambardella                      200
10   10   4-8-04 letter to Mr. Dae Sung Lee from
          Mr. Bob Gambardella                  202
11
12   42   1-27-04 USOC Remediation Plan for USTU  40
13   43   2-4-04 USOC Press Release             60
14   44   2-5-04 USTU Webpage                   77
15   45   2-5-04 USTU Governance & Management
          Committee Minutes of Meeting          98
16   46   2-6-04 USOC Press Release            110
17   47   2-13-04 USOC Press Release           112
18   48   2-18-04 USTU Webpage                 114
19   49   2-13-04 USTU Webpage                 116
20   50   2-17-04 USTU Webpage                 120
21   51   2-27-04 USTU Press Release           124
22   52   3-11-04 USTU Webpage                 130
23   53   3-22-04 USTU Webpage                 135
24   54   4-29-04 USTU Webpage                 143
25   55   4-5-04 USTU Webpage                  145
```

4/5/2005 Gambardella, Robert

```
 1   56   4-29-04 USTU Webpage                 166
 2   57   2-26-04 Minutes of USTU Governance and
          Management Committee Meeting         185
 3
 4   58   3-8-04 Memo from Bob Gambardella and
          and Steve Locke to USOC
          Executive Committee                  189
 5
 6   59   3-25-04 Minutes of the Governance and
          Management Committee                 223
 7   60   6-9-04 Memo from Bob Gambardella to
          Members Governance & Management
 8        Committee USTU                       231
 9   61   June 2004 E-mails from Steven Lock to
          Bob Gambardella                      233
10
11   62   7-19-04 Letter to Mr. Gambardella from
          Mr. Lee                              238
12   63   7-1-04 USTU Governance and Management
          Committee Minutes                    247
13
14   64   7-27-04 USTU Webpage                 251
15   65   9-1-04 Open Letter, USTU Webpage     274
16   66   6-24-04 Letter to Mr. Gambardella from
          Chul Ho Kim                          283
17   67   6-25-04 E-mail to Coach Kim from Bob
          Gambardella                          283
18
19   68   7-19-04 Letter for Coach Chul Ho Kim 284
20   69   9-8-04 Letter to Mr. Kim from Bob
          Gambardella                          285
21   70   12-9-04 Letter to Mr. Scherr from
          Chul Ho Kim                          292
22
23   71   11-26-04 E-mail                      300
24
25
```

EXHIBIT "A"

1

2

3

4

```
 1            P R O C E E D I N G S
 2            ROBERT GAMBARDELLA
 3       The deponent herein, being first duly
 4   sworn to testify to the truth in the above cause,
 5   was examined and testified on his oath as
 6   follows:
 7            E X A M I N A T I O N
 8   BY MR. UESUGI:
 9       Q    Will you please state your name.
10       A    My name is Robert Peter
11   Gambardella, G-a-m-b-a-r-d-e-l-l-a.
12       Q    And your address?
13       A    My address, work or home?
14       Q    Work is fine.
15       A    One Olympic Plaza, Colorado
16   Springs, Colorado 80909.
17       Q    And your telephone number?
18       A    At work or home?
19       MR. LEVINSTEIN:  Just work.
20       A    My work, (719) 866-4632.
21       Q    (BY MR. UESUGI)  And your date of
22   birth?
23       A    6-3-54.
24       Q    Have you ever had your deposition
25   taken before?
```

```
 1       A    No, I haven't.
 2       Q    Have you ever testified in court
 3   before?
 4       A    Yes, I have, once before.
 5       Q    And when was that?
 6       A    It was via telephone in the
 7   Athens Olympic Games.
 8       Q    With respect to this case?
 9       A    Yes.
10       Q    Any other times you testified in
11   court before?
12       A    No.
13       Q    Before we start, let me go over a
14   few ground rules.  When we started, the court
15   reporter gave you an oath to tell the truth, the
16   whole truth and nothing but the truth.  Did you
17   understand that oath?
18       A    Yes, I did.
19       Q    I will be asking questions and I
20   ask that you please listen to my questions
21   carefully and answer truthfully to the best of
22   your knowledge.  Can you do that for me?
23       A    I will.
24       Q    The court reporter is taking down
25   your testimony, so we need you to answer orally.
```

```
 1   That means you can't shake or nod your head in
 2   response to a question.  Do you understand that?
 3       A    Yes, I do.
 4       Q    Also, uh-huhs or huh-uhs don't
 5   pick up very well on the record, so I ask that
 6   you please don't use that in response to a
 7   question from me.  If a question calls for a yes
 8   or no answer, I'd ask that you please state yes
 9   or no.  Do you understand?
10       A    Yes.
11       Q    Do you understand?
12       A    Yes.
13       Q    Also, please don't guess.  If you
14   don't understand a question or what I'm asking,
15   please tell me and I'll rephrase my question for
16   you.  Do you understand that?
17       A    Yes, I do.
18       Q    If you don't ask for a rephrase
19   or if you don't ask for a clarification, I will
20   assume that you understand what my question was.
21   Is that fair?
22       MR. LEVINSTEIN:  No.  Don't ask him
23   what's fair or not fair.  You can ask questions,
24   he'll answer them.  We're not entering into prior
25   agreements.  The transcript will speak for
```

```
 1   itself.
 2       Q    (BY MR. UESUGI)  Okay.  You can
 3   answer the question.
 4       MR. LEVINSTEIN:  No, I instruct him not
 5   to answer that question.
 6       Q    (BY MR. UESUGI)  Do you consider
 7   Mr. Levinstein your personal attorney?
 8       A    He is my attorney, yes.
 9       Q    And you understand that at some
10   point a situation might arise where your
11   interests and the interests of the USTU or the
12   USOC may come in conflict.  Do you understand
13   that?
14       MR. LEVINSTEIN:  That's a legal
15   question.  That's not a proper question.  I don't
16   know how his interests would differ from those of
17   the USOC.  You're asking for his legal opinion
18   about something.  He's not a lawyer.
19       Q    (BY MR. UESUGI)  And at some point
20   when your interest and the USOC/USTU interests
21   conflict, he is representing the USTU?
22       MR. LEVINSTEIN:  I'm Mr. Gambardella's
23   lawyer in this deposition.
24       Q    (BY MR. UESUGI)  All right.  Okay.
25   Please don't guess.  All right.  I asked that
```

1  already.
2        If you don't know an answer to a
3  question, please state "I don't know."  "I don't
4  know" is a perfectly fine answer.  Do you
5  understand that?
6        A    Yes, I do.
7        Q    Okay.  Also, if you don't
8  remember, please state that you don't remember.
9  "I don't remember" is a perfectly fine answer
10  also.
11        A    Yes, I understand.
12        Q    Okay.  Any time that you wish to
13  take a break, use the rest room or you just want
14  to stop, please tell me and I'll be happy to
15  accommodate you.  This isn't the Spanish
16  Inquisition, and I want you to be comfortable and
17  I want you to give the best answers that you
18  possibly can.
19        A    Thank you.
20        Q    Also, for the sake of the court
21  reporter so we have a clean record, I'd ask
22  that you please wait until I finish my question
23  before you start your answer.  And I will try to
24  extend you the same courtesy.  Do you understand
25  that?

9

1        A    Yes, I do.
2        Q    After your depo is concluded, the
3  court reporter will transcribe your testimony
4  into a little booklet which you'll have the
5  opportunity to read and make any changes to the
6  transcript.
7        A    That sounds fair and reasonable.
8        Q    But if you do make any changes,
9  we have the right to ask you about the changes
10  that you made and the reason why you made those
11  changes.
12        A    I understand.
13        Q    Is that fair?
14        A    Yes.
15        Q    Did you take any sort of
16  medication, drugs or alcohol today?
17        A    No.
18        Q    Before you came?
19        A    No.
20        Q    Is there any reason we can't go
21  forward with your deposition?
22        A    I don't see why not.
23        Q    You were served with a notice of
24  a deposition and you were also asked to bring
25  down documents with you?

10

1        A    Yes.
2        Q    Did you bring those documents
3  with you?
4        MR. LEVINSTEIN:  For the record, I am
5  turning over documents numbered USTU 21 -- well,
6  USTU 00021 through USTU 00052.
7        Q    (BY MR. UESUGI)  These are
8  previously produced documents?
9        MR. LEVINSTEIN:  I don't know.  I don't
10  think so.  I don't think all of them were
11  previously produced.
12        MR. UESUGI:  I'm asking the witness.
13        A    I don't know.
14        MR. LEVINSTEIN:  I don't think he would
15  know what was produced.
16        Q    (BY MR. UESUGI)  Is there anything
17  that you didn't produce?
18        A    I don't know.
19        Q    There was objections filed and
20  you made certain objections.  Was there anything
21  that you withheld?
22        MR. LEVINSTEIN:  I'll respond on his
23  behalf, since we handled the document production.
24        MR. UESUGI:  All right.
25        MR. LEVINSTEIN:  There were no

11

1  documents that were responsive that were withheld
2  other than privileged documents were withheld
3  previously in response to the other document
4  request.  But no responsive documents that we
5  know of.  Other than we did not reproduce --
6  well, there were some documents that may have
7  been responsive that have already been produced
8  that we didn't reproduce.  It's possible some of
9  these have been produced before or some slightly
10  different form.
11        Q    (BY MR. UESUGI)  Okay.  Let's get
12  into a little background information.  Where were
13  you born?
14        A    I was born in Staten Island, New
15  York.
16        Q    Is that where you grew up?
17        A    Yes.
18        Q    Is that where you went to high
19  school?
20        A    That's where I went to high
21  school.
22        Q    Where did you graduate high
23  school?
24        A    Where I did graduate from high
25  school?  At St. Peter's High School for Boys.

12

**Page 13**

```
1        Q   What year was that?
2        A   1972.
3        Q   Did you go to college?
4        A   Yes, I did.
5        Q   Where did you go to college?
6        A   I went to George Williams
7    College.
8        Q   Where is that?
9        A   It's in Downers Grove, Illinois.
10       Q   And your major?
11       A   Was in health education.
12       Q   And that's what you got your
13   degree in?
14       A   Yes, it is.
15       Q   Did you pursue your education
16   past college?
17       A   Yes, I did.
18       Q   Where did you go and what was
19   your degree?
20       A   My second degree was at the
21   University of Northern Colorado in sport
22   management.
23       Q   That was a master's degree?
24       A   Yes, sir.
25       Q   When did you receive that degree?
```

**Page 15**

```
1    Illinois.
2        Q   Your alumni?
3        A   Yes.
4        Q   Volleyball?
5        A   Yes.
6        Q   How long did you do that?
7        A   A year and a half.
8        Q   Were you the head coach?
9        A   Yes, I was.
10       Q   After you left there, what did
11   you do?
12       A   I was the head volleyball coach
13   and an instructor of physical education at the
14   United States Military Academy at West Point, New
15   York.
16       Q   How long?
17       A   Thirteen years.
18       Q   What years?
19       A   1983 to 1996.
20       MR. LEVINSTEIN:  Slow down.  You're
21   going too fast.  Take your time.
22       Q   (BY MR. UESUGI)  What was your
23   record while you were coaching at West Point?
24       A   Well, I was the third most
25   winning coach at West Point.  And I believe my
```

**Page 14**

```
1        A   1997, I believe.
2        Q   Okay.  Any other degrees?
3        A   Yes, I just completed another
4    degree in conjunction with the International
5    Olympic Committee and the University of Lyon,
6    France in sport management.
7        Q   That was a master's degree?
8        A   Yes, in October of 2004.
9        Q   Congratulations.  After you
10   graduated college, did you go to work?
11       A   Yes.
12       Q   Where did you work?
13       A   At the YMCA.
14       Q   Doing what?
15       A   I was a director of physical
16   education.
17       Q   How long did you do that?
18       A   It was just about a year,
19   perhaps.
20       Q   Okay.  And you left for what
21   reason?
22       A   To coach at George Williams
23   College.
24       Q   Where is that?  The same place?
25       A   Yes, it's in Downers Grove,
```

**Page 16**

```
1    record was somewhere in upwards of 470 wins and
2    230 losses, perhaps.  I can't quite remember.
3        Q   Did you win any national
4    championships?
5        A   No, I haven't.
6        Q   Did you win any regional
7    championships?  Is there such a thing?
8        A   No, there isn't.  Division I
9    Volleyball, I was conference coach --
10   conference -- we won our conference, I believe,
11   three years.
12       Q   After you left West Point, what
13   did you do?
14       A   I was hired on as the director of
15   youth in junior high performance programs at USA
16   Volleyball.
17       Q   What does that job entail?
18       A   It entails building a seamless
19   athlete pipeline for world class athlete
20   development.
21       Q   What does that mean?
22       A   What does that mean, is that you
23   want to prepare athletes for high level
24   competitions, such as Olympics, Pan Am Games,
25   world championships.
```

1    Q    What does a seamless athlete
2    pipeline mean?
3    A    What that means is that an
4    athlete can start at the age of, let's say, nine
5    years old and work all the way through an entire
6    system all the way to the National Team programs.
7    Q    How would such a person do that?
8    A    Excuse me?
9    Q    How would such a person do that?
10   A    How would a person --
11   Q    Yes.  Take a person, a
12   nine-year-old boy.  I want to be on the US
13   Olympic team.  How would I progress through the
14   seamless athletic pipeline?
15   A    They would go through different
16   camps and different programs.
17   Q    Such as?
18   A    Such as a high performance camp,
19   a youth national team, a junior national team, a
20   world university team, so on and so forth.
21   Q    I'm trying to understand the term
22   seamless.  What does that mean?
23   A    Seamless means that a person can
24   go through a pipeline, okay, right from, as I
25   say, from nine, ten years old all the way through

1    A    Prior to me?
2    Q    Yes.
3    A    Basically, it was really a
4    glorified all-star team.
5    Q    What do you mean by that?
6    A    What do I mean, is that I would
7    pick athletes and then bring them together for
8    camp and they'd go on to a competition.
9    Q    Who would pick the athletes?
10   A    Basically, again, before my time.
11   Could have been the coaching staff.
12   Q    So you weren't involved in USA
13   Volleyball before being hired as a staff member?
14   A    Oh, yes, I was.
15   Q    But you don't know the athlete
16   selection process?
17   A    I do know the athlete selection
18   process in some other programs that were being
19   sponsored that I was involved with, yes.
20   Q    Prior to starting at USA
21   Volleyball, how did they choose the USA
22   Volleyball National Team?
23   A    National Team, I don't remember.
24   And I don't have that information with me to
25   provide to you.

1    the National Team level, so without interruption.
2    Q    Through the volleyball NGB?
3    A    Yes.
4    Q    And you designed that program for
5    USA Volleyball?
6    A    I, along with some other
7    colleagues, yes.
8    Q    Prior you to starting at USA
9    Volleyball, what was the athlete development
10   program in place?
11   A    The athlete development program
12   was just a couple of programs that they hosted in
13   the summer months.
14   Q    What were those couple of
15   programs?
16   A    It would have been the Junior
17   National Team, the Youth National Team, depending
18   on the year and the resources available.
19   Q    So it was just two camps during
20   the summer?
21   A    Could have been.
22   MR. LEVINSTEIN:  Programs, not camps.
23   Q    (BY MR. UESUGI)  What did those
24   two programs entail?  Start with the first that
25   you mentioned.

1    Q    Were you involved in the
2    selection of the USA Volleyball National Team
3    during your tenure there from 1996 to 1999?
4    A    With the women's team partially,
5    yes.
6    Q    What was your involvement?
7    A    Well, my move from the director
8    of the youth and junior program to the director
9    of the National Team programs.
10   Q    What does that mean?
11   A    That means that I was directly
12   involved with the administration of the national
13   teams of USA Volleyball.
14   Q    Did you select the National Team
15   for USA Volleyball?
16   A    Did I select the team, no.
17   Q    Who did?
18   A    Other head coach, with input from
19   others.
20   Q    Who selected the head coach?
21   A    Who selected -- the
22   administration selected the head coach.
23   Q    When you say administration, who
24   do you mean?
25   A    The executive director.  And they

1   had input from others in the organization.
2        Q    Such as?
3        A    I don't know.
4        Q    Did you have input into the
5   selection of the National Team?
6        A    No, I didn't.
7        Q    Okay.  I'm trying to compare the
8   USA Volleyball program which you participated in
9   and the USA Taekwondo USTU program.  That's why
10  I'm asking these questions.  Do you understand?
11       A    Yes, I do.
12       Q    After you left USA Volleyball,
13  what did you do?
14       A    I went to the United States
15  Olympic Committee Sport Partnerships Division.
16       Q    This was in October of 2002?
17       A    Yes, after the Olympic Games.
18       Q    How did you come to work for the
19  USOC?
20       A    I was asked if I was interested
21  in the position.
22       Q    By who?
23       A    By the United States Olympic
24  Committee.
25            MR. LEVINSTEIN:  Hold on one second.  I

1        Q    And you were hired in
2   October 2000; is that correct?
3        A    My date of hire, I believe, was
4   October, in the middle of October when I got back
5   from the Olympic Games.
6        Q    Is that the same position that
7   Kelly Skinner was in?
8        A    Yes.
9        Q    So you were the same rank, so to
10  speak?
11       A    Yes, I was.
12       Q    Did you know Kelly Skinner back
13  then?
14       A    When I first came to work there,
15  I knew who he was but I didn't know him.
16       Q    Which sports were you in charge
17  of?
18       A    Figure skating, team -- excuse
19  me, volleyball, water polo, team handball, and
20  softball, I believe.  And we worked with other
21  sports within our portfolio, but those are the
22  ones that I focused on.
23       Q    What do you mean by that, other
24  sports in your portfolio?
25       A    Well, there were ten sports in

1   think you said 2002.
2            MR. UESUGI:  No, October 2000.
3            THE DEPONENT:  Right after the Olympic
4   Games.
5            MR. LEVINSTEIN:  I thought I heard
6   2002.  I just wanted to clarify.
7        Q    (BY MR. UESUGI)  Was there a
8   specific person that asked you?
9        A    There were a couple people.
10       Q    Who were they?
11       A    Rebecca Crawford.  And I had some
12  conversation with Scott Blackman.
13       Q    Who is Rebecca?
14       A    Rebecca Crawford.  She's a
15  director of sport partnerships.  She's one of the
16  four directors of sport partnerships.
17       Q    And Scott Blackman was the old
18  general counsel?
19       A    Yes, and then CEO.
20       Q    Did you have to submit an
21  application for this position?
22       A    A resume, and a letter of
23  application.
24       Q    Was there an interview?
25       A    Yes, there was.

1   the portfolio at that time.  So basically what we
2   did is in order to facilitate, you know, good
3   customer service with those sports, we broke it
4   down individually.  However, we all did have a
5   hand in working with the ten sports.
6        Q    Who's we?
7        A    Myself, Lynn Wetland and Steve
8   Roush.
9        Q    Who are they, part of your team?
10       A    Yes.
11       Q    What were their job titles?
12       A    Steve was the director of that
13  sport partnership portfolio and Lynn was a
14  manager.
15       Q    Okay.  So there were ten, you got
16  five, Lynn got five?
17       A    Yes.  Well, it was it changed.
18  But yeah, that's basically it, yes.
19       Q    What were your responsibilities
20  as manager of the sports partnership division?
21       A    Oh, basically to help sports
22  build an infrastructure.
23       Q    What do you mean by that?
24       A    Well, to build a good foundation
25  for the notion of sustained competitive

1   excellence.

2       Q     How would you do that?

3       A     You work with people

4   individually. You see what their needs are

5   through a SWOT analysis, through high performance

6   planning. Then we try to partner up with them in

7   terms of developing programs that will help them

8   develop this notion of sustained competitive

9   excellence.

10      Q     You said SWOT analysis?

11      A     Yes, SWOT analysis. It's just a

12  basic tool that administrators use in terms of

13  looking at what the strengths, weaknesses,

14  opportunities and threats are of an organization.

15      Q     What does SWOT stand for?

16      A     Okay, strength, weakness,

17  opportunity and -- S-W-O-T. Strengths,

18  weaknesses, opportunities and threats. So they

19  name it as an acronym, SWOT.

20      Q     Forgive me if I sound ignorant,

21  because I'm not versed in USOC. So I need to

22  understand this kind of stuff.

23      A     No. I'm willing to share it, for

24  the record.

25      Q     Thank you for that. And how long

1   did you work there?

2       MR. LEVINSTEIN: Work where?

3       Q     (BY MR. UESUGI) As the manager of

4   the sport partnership division?

5       A     Two and a half years.

6       Q     And then in 2002 you became the

7   associate director of international programs?

8       A     Yes.

9       Q     In the USOC's international

10  affairs division?

11      A     Yes.

12      Q     How did you come to go to that

13  position?

14      A     Well, they were looking for

15  someone and they knew that I had some experience

16  in the area of, you know, just international

17  programming. And so they had asked me if I was

18  interested. And at that point, I looked at it

19  and I thought it would be something that I would

20  like to do.

21      Q     Who is they? Who approached you?

22      A     Hernando Madronero, managing

23  director of international affairs.

24      Q     Is Hernando still there?

25      A     No, he's not.

1       Q     What is Hernando doing now, do

2   you know?

3       A     I don't know. I haven't talked

4   to him.

5       Q     What was your duties as associate

6   director of international programs?

7       A     Basically an interface with

8   United States Olympic Committee and the

9   International Olympic Committee Olympic

10  Solidarity Program.

11      Q     What is the Olympic Solidarity

12  Program?

13      A     It's a program that is one out of

14  Lausanne, Switzerland, which they take revenues

15  from TV from Olympic Games and they put together

16  programs for other countries, Third World

17  countries, let's say, or athletes who don't have

18  the means/resources available to prepare for

19  world class athletics, world class sport.

20      Q     Can you give an example?

21      A     An example would be Abhinav

22  Bindra from India. He's a shooter who came to

23  the United States Olympic Committee. And we put

24  together a two-year program for him to train for

25  the Olympic Games.

1       Q     So you help other country's

2   athletes prepare for the Olympics?

3       A     Yes, as part of the philosophy of

4   the Olympic movement, yes.

5       Q     What philosophy are you talking

6   about?

7       A     Extending the wreath, the olive

8   branch to other countries, fellow family members.

9       Q     Anything else you did? What else

10  did you do?

11      A     We worked in conjunction with

12  PASO, Pan American Sports Organization, in

13  hosting clinics at the US Olympic Committee in

14  different sports and then sending coaches and

15  other subject matter experts to other countries

16  who were hosting different clinics.

17      Q     Was this US coaches or coaches

18  from other countries also?

19      A     US coaches going to other

20  countries, and then other countries coming to the

21  US.

22      Q     Can you give an example?

23      A     An example would be we had a PASO

24  badminton course and I believe we had probably

25  over 20 coaches from all over the PASO region who

1  came and learned about different programs and
2  ideas through a best practices approach in
3  development of badminton, the infrastructure and
4  actually of the sport development side of it,
5  too.
6      Q    Okay.  Anything else?  What else
7  did you do as the associate director of
8  international programs?
9      A    I had some travel
10  responsibilities.
11     Q    Such as?
12     A    The most notable one was I went
13  to Iraq.
14     Q    For?
15     A    As a special representative of
16  the International Olympic Committee to watch the
17  first democratic election in 35 years of that
18  country.
19     Q    Of the president?
20     A    Of the Olympic Committee
21  president and his cabinet.
22     Q    When was that?
23     A    That was January, a couple days
24  into February of 2004.
25     Q    Did you have any responsibilities

29

1  with respect to the election?
2      A    No.  As official observer, that
3  was my role.
4      Q    And after you observed, you wrote
5  a report?
6      A    I believe I had, yeah.
7      Q    And who did you give that report
8  to?
9      A    To my boss.
10     Q    Which was?
11     A    At that time, it was Greg Harney.
12     Q    Okay.  Is that report still
13  available?
14     A    I don't know.
15     Q    Did you write other reports as
16  the associate director of international programs?
17     A    Depends on the situation, but I
18  couldn't tell you for sure.
19     Q    You don't remember?
20     A    No.
21     Q    Okay.  What else did you do as
22  the associate director of international programs?
23     A    Let's see here.  Helped them with
24  just any support in the area of games
25  preparation, depending on the time of the year.

30

1      Q    What do you mean by that?
2      A    Well, giving our support to other
3  divisions as they're preparing for the Olympic
4  Games, if they needed some help in terms of
5  protocol maybe, or what have you.
6      Q    Did you participate at the 2003
7  Pan American Games?
8      A    Yes, I did.
9      Q    In what capacity?
10     A    I was in charge of the housing
11  for the Pan American Games, the American
12  delegation.
13     Q    What did your responsibilities
14  include?
15     A    Putting people into beds, 700
16  people over a 14-day time span.  And getting
17  people in and out of the village.  And most
18  importantly, just to help the security folks in
19  keeping a safe environment for our coaches and
20  athletes.
21     Q    Did you have an opportunity to
22  interface with Taekwondo athletes during the Pan
23  American Games?
24     A    With the team leader.
25     Q    Which was who?

31

1      A    Mr. Lee, Eui Ben Lee, I believe
2  his name is.
3      Q    Eui Ben Lee?
4      A    I guess.
5      Q    Anybody else from Taekwondo?
6      A    Let's see.  One day when I was
7  running around the athlete village, I ran into
8  Kevin Padilla.  I saw Mr. Lee at one point doing
9  a Poomse in the courtyard.  But I'm just too busy
10  to be running around to try to shake hands with
11  people, but -- so I did see people at the Pan Am
12  Games.
13     Q    Did you watch any of the
14  Taekwondo competition while you were at the Pan
15  Am Games?
16     A    I believe I didn't, no.
17     Q    In your capacity at the USOC as
18  associate director of international programs, did
19  you have the opportunity to watch any Taekwondo
20  competition?
21     A    No, I hadn't.  Basically it's a
22  24/7 --
23     Q    Job?
24     A    Yeah.
25     Q    How about as a manager in the

32

4/5/2005 Gambardella, Robert

**Page 33**

```
1   sports partnership division, did you have an
2   opportunity to watch any Taekwondo competition?
3       A    No, it wasn't in my portfolio --
4   wasn't in our portfolio, excuse me.
5       Q    How did you happen to become
6   employed as the USTU executive director?
7       A    Oh, I was asked if I was
8   interested in taking on a challenge.
9       Q    Who were you asked by?
10      A    United States Olympic Committee.
11      Q    Was there anybody specific in the
12  United States Olympic Committee that asked you?
13      A    Kelly Skinner.
14      Q    When was this?  When did he ask
15  you?
16      A    We had a conversation November of
17  2003.
18      Q    What did Kelly Skinner tell you
19  during that conversation?
20      A    I can't remember.  Basically, are
21  you interested in doing something along this
22  line?  And I said, seems like a good challenge
23  and, you know, I would consider it.
24      Q    Did you have to fill out an
25  application?
```

**Page 34**

```
1       A    No, I hadn't.
2       Q    So what was the process, just
3   Kelly Skinner asking you?
4       A    Well, that was just one part of
5   it, yeah.
6       Q    What were the other parts?
7       A    Well, basically, I don't know
8   what was going on prior to my being hired, I was
9   doing other things.  But what happened was that I
10  think as things started to escalate, whatever
11  that may be, because I don't know what was going
12  on then, there was more of a conversation that,
13  would you consider this.
14      Q    Prior to you being hired as the
15  USTU executive director, what was your
16  understanding of the certification process, I
17  guess, of the USTU?
18      A    Don't know, because I didn't
19  bother with it.  It wasn't part of my job.  I
20  just felt that it was something that I shouldn't
21  spend time on.
22      Q    Even after you were approached by
23  Kelly Skinner?
24      A    Yes.
25      Q    You weren't interested in the
```

**Page 35**

```
1   certification process with the USTU?
2       A    No.
3       Q    Why not?
4       A    I have no reason.
5       Q    You didn't think that knowledge
6   of the certification process would be helpful if
7   and when you accepted the position of the
8   executive director for the USTU?
9       A    I don't know.
10      Q    Excuse me?
11      A    I don't know.  As I said earlier,
12  we would do a SWOT analysis, that would tell us
13  everything we need to know.
14      Q    Did you look for the SWOT
15  analysis for Taekwondo prior to being hired as
16  the USTU executive director?
17      A    No.
18      Q    Did anyone recommend you for the
19  position to Kelly Skinner, do you know?
20      A    Couldn't tell you.
21      Q    Do you know if Herb Perez
22  recommended you?
23      A    I don't remember, but he could
24  have, but I don't know.
25      Q    And when were you hired?
```

**Page 36**

```
1       A    Oh, I would say sometime after
2   February 5th or 6th, somewhere right around there
3   I got back from my trip from Iraq.  And then it
4   was probably that Tuesday, I don't know.  It was
5   right around then.
6       Q    When was the election in Iraq?
7       A    I believe it was January 29th.
8       Q    Then you came back the end of
9   January?
10      A    No, I came back a day or two
11  after, in February.
12      Q    An that's when you were
13  approached with the offer to be USTU executive
14  director?
15      A    Well, I received correspondence,
16  a phone call.
17      Q    From who?
18      A    Mr. Jeff Benz.
19      Q    What did Jeff Benz tell you
20  during that telephone conversation?
21      A    Basically, I don't know, but are
22  you interested in a job?  That's all I can
23  remember.
24      Q    Didn't you already have a job?
25      A    Yes, he knew that.  I was working
```

```
1   in international affairs.
2        Q    And did he explain the situation
3   in the USTU to you?
4        A    Yeah.  Just really quickly, it
5   wasn't anything in depth.
6        Q    What did he say about the
7   situation in the USTU?
8        A    It seemed that the remediation
9   plan was going to be signed by the president.
10  And that the USOC was going to install a CEO or
11  an executive director in that position and would
12  I be interested.
13       Q    Did you ask him any questions?
14       A    Well --
15       Q    With respect to the situation in
16  the USTU?
17       A    I don't think we had -- we got
18  into it at that point, no.
19       Q    Did he speak about specifics or
20  starting salary, benefits?
21       A    Not in that conversation, no.
22       Q    Did you accept the position
23  during that conversation with Mr. Benz?
24       A    Well, I told him when I'd get
25  back and then we'll meet and go from there.
```

```
1        Q    This telephone conversation, was
2   it in Iraq; you were in Iraq, he was calling you?
3        A    No, it wasn't.  I believe it was
4   when I was in Kuwait City on my way back.  But
5   I'm not sure.  There's no phone in Iraq.  Didn't
6   work for obvious reasons.
7        Q    When you got back, did you meet
8   with Mr. Benz?
9        A    Yes, I did.
10       Q    Anybody else present at the
11  meeting?
12       A    I think in the beginning, I
13  believe maybe Jim Scherr was there and then
14  he left.
15       Q    When was this meeting?
16       A    I don't know.  Upon my return.
17       Q    Okay.  And what was said at that
18  meeting by Mr. Benz?
19       A    Well, here's a situation and
20  would you like the position.  And there's going
21  to be lots of challenges in rebuilding an
22  organization.  And I said, in a nutshell at this
23  part of my career, I think I'm ready for this
24  type of a challenge.  So I looked at it as a very
25  positive type of challenge for me.
```

```
1        Q    How long was the meeting with
2   Mr. Benz and Mr. Scherr?
3        A    Well, it was just a couple
4   minutes with Mr. Scherr, but it was, I would say,
5   venture to guess, I don't even really know, but
6   maybe half hour.
7        Q    Was this in Mr. Benz's office?
8        A    I can't remember.
9        Q    Did he give you more information
10  about the USTU remediation situation?
11       A    Well, he gave me a remediation
12  document and I looked at that.  However, in the
13  beginning when I started, it was all about, you
14  know, trying to stabilize an environment, an
15  organization.
16       Q    What do you mean by that?
17       A    Well, just try to, you know,
18  figure out where we're at, what we need to do,
19  and take it from there.
20       Q    Was this the remediation plan
21  that Mr. Benz showed you?
22       A    This looks like it, yes.  I would
23  have to read the whole thing but, yeah, that's
24  what it looks like, yeah.
25            MR. LEVINSTEIN:  One second.
```

```
1            MR. UESUGI:  Why don't we mark this as
2   Exhibit 42.
3            (Exhibit 42 was marked.)
4        Q    (BY MR. UESUGI)  Can you please
5   not mark this.  That's the exhibit to the
6   deposition.
7            MR. LEVINSTEIN:  Don't write on it.
8        A    Okay.
9        Q    (BY MR. UESUGI)  Can you please
10  review the document?
11           MR. LEVINSTEIN:  Exhibit 42?
12           MR. UESUGI:  Yes.
13           MR. JONES:  Yeah.  For the record,
14  Counsel, we're just using the same numbering we
15  used in the hearing.
16           MR. LEVINSTEIN:  You went to 41 in the
17  hearing?
18           MR. JONES:  Doesn't seem like it.
19           MR. LEVINSTEIN:  I was on the phone, so
20  I wasn't as clear.
21       Q    (BY MR. UESUGI)  I'd ask that you
22  please review the document marked as Exhibit 42.
23       A    What part?
24       Q    The entire document.
25       A    The entire document?  You want to
```

1  take a recess and I can go through it then.
2        Q    If you feel comfortable, if
3  that's what you want to do?
4        A    Sure.
5        MR. UESUGI:  Go off the record.
6        (A recess was taken from 8:54 a.m. to
7           9:00 a.m.)
8        MR. UESUGI:  Back on the record.
9        Q    (BY MR. UESUGI)  Is Exhibit 42
10 what Mr. Benz showed you?
11       A    Yes, it is.
12       Q    Did he explain the remediation
13 plan to you?
14       A    Yeah.
15       Q    What did he tell you?
16       A    I can't remember.  It was over a
17 year ago.
18       Q    All right.  What did -- what was
19 Mr. Jim Scherr's role in the meeting?
20       A    Initially, as I said, he was
21 there for, you know, a brief time just to say,
22 you know, that he has the confidence in me to be
23 able to, you know, help the organization.
24       Q    Did you have any dealings with
25 Mr. Scherr prior to this meeting with Mr. Benz?

1        A    Regarding?
2        Q    Anything?
3        A    Well --
4        Q    Did you know Mr. Scherr before
5  that meeting with Mr. Benz?
6        A    Yes.  Mr. Scherr prior to being
7  the interim was the chief of sport performance
8  for the US Olympic Committee.
9        Q    Was that a position that you
10 reported to?  Is it part of the sport
11 partnerships division?
12       A    Yeah, that was.  Yeah, he oversaw
13 the sport partnership division and other
14 divisions at that time.
15       Q    So you worked for him, basically.
16       A    Yes.
17       Q    During that meeting with Mr. Benz
18 and Mr. Scherr, did Mr. Scherr mention anything
19 about the USTU being run by a Korean mafia?
20       A    No.
21       Q    Did Mr. Scherr tell you to get
22 rid of all the Koreans in the USTU?
23       A    No, he didn't.
24       Q    How about Mr. Benz; did Mr. Benz
25 mention anything about the Korean mafia?

1        A    No, he didn't.
2        Q    Did Mr. Benz tell you or instruct
3  you to get rid of all the Koreans during that
4  meeting?
5        A    No, he didn't.
6        Q    Was this a promotion for you?
7        A    Sure, it was.
8        Q    Okay.  When you were manager of
9  the sports partnership division, how much did you
10 start off at, your salary?
11       MR. LEVINSTEIN:  What's the relevance
12 of this?  I mean, it's kind of personal
13 information.  Unless we get some kind of
14 confidentiality in place, I don't think there's
15 any reason to get his prior salaries.
16       MR. UESUGI:  It relates in the sense
17 that the financial situation of the USTU is at
18 issue.
19       MR. LEVINSTEIN:  If you want to ask
20 what he got paid by the USTU when he got hired,
21 that's one thing.  But what he was paid back in
22 his other jobs is not relevant.
23       MR. UESUGI:  My understanding is that
24 he still works for the USOC.
25       MR. LEVINSTEIN:  He does.

1        MR. UESUGI:  Right.
2        MR. LEVINSTEIN:  But the issue is
3  USTU's finances.  You can ask him about what he's
4  paid by the USTU.
5        Q    (BY MR. UESUGI)  Are you getting
6  more as the -- without getting specific, are you
7  getting more as the interim director of the USTU
8  than you were as the manager of the sports
9  partnership division?
10       MR. LEVINSTEIN:  Objection.  I don't
11 think that's his title.
12       MR. UESUGI:  Excuse me?
13       MR. LEVINSTEIN:  I don't think he's the
14 interim director.
15       A    Can I make a statement?  I have
16 issue with this, just because of the fact that
17 this gentleman that's asking me the questions has
18 a public Internet website.  And I'm a little bit
19 concerned about the fact that he's a lawyer for
20 Mr. Lee and at the same time he publicly blasts,
21 not only me, but other people throughout the
22 United States.  So I have a strong objection to
23 some of that questioning.
24       Q    (BY MR. UESUGI)  Okay.  Are you
25 making more as the USTU executive director than

1   you were as the manager of sport partnerships
2   division with the USOC?
3        A    Can you restate that one more
4   time, please?
5        Q    Are you making more money in
6   terms of salary as the USTU executive director
7   than you were as the manager of the sports
8   partnership division?
9        A    When you say that, are you asking
10  about specifically cash or VIK or other perks
11  that one may get?
12       Q    You stated that you consider this
13  a promotion.  So I'm just exploring that.  One of
14  the things one receives when you get a promotion
15  is an increase in salary?
16       MR. LEVINSTEIN:  His prior position was
17  not the position you indicated.
18       Q    (BY MR. UESUGI)  Right.  So I'm
19  just starting at the beginning, the first USOC
20  position that you had?
21       A    My first position as the manager
22  of sport partnerships?
23       Q    Yes.  Did you make more money --
24  are you making more money as the manager -- it's
25  a yes or no question.  Are you making more money

1   as the manager of the sports partnerships
2   division than you are as the USTU executive?
3        A    Yes, I am, Glenn.
4        MR. LEVINSTEIN:  That's backwards.  You
5   asked that backwards.  You asked whether he's
6   making more as a manager than he was with the
7   USTU.
8        Q    (BY MR. UESUGI)  And you are?
9        A    Yes.
10       Q    Is that incorrect?
11       A    Okay.  How about we start again?
12       Q    Okay.  Why don't you explain it
13  in your own words?
14       A    Okay.  When I came to the United
15  States Olympic Committee, I -- and then through
16  my movement within the organization, and when I
17  came to the USA Taekwondo, I do make more money
18  at this moment.
19       Q    Okay.  Are you making more money
20  as the USTU executive director than you were as
21  the associate director of international programs?
22       A    I think I just answered your
23  question.  And again, I strongly object to what
24  you're asking because of the fact of your
25  involvement with a Internet site that puts

1   everything on there.
2        MR. UESUGI:  Okay.  We'll go off the
3   record.
4        (Discussion held off the record.)
5        MR. UESUGI:  Back on the record.
6        Q    (BY MR. UESUGI)  So you make more
7   money as -- just to start where we were.  You
8   make more money as the USTU executive director
9   than you did as the associate director of
10  international programs?
11       MR. LEVINSTEIN:  What Mr. Gambardella
12  has testified to is throughout his career, his
13  salary has increased.  So any prior positions had
14  less money than subsequent positions.  So simply
15  by looking at the chronology, you can tell that
16  his salary was higher at the more recent
17  positions than it was in the previous positions.
18       MR. UESUGI:  Great.  Now we all
19  understand.
20       THE DEPONENT:  Thank you.
21       Q    (BY MR. UESUGI)  At this meeting
22  with Mr. Benz, was salary discussed?
23       A    Yes.
24       Q    What else was asked?
25       A    Basically the task that I have in

1   front of me.
2        Q    Were your benefits increased
3   also?  Did you get the same benefits as the
4   associate director of international programs?
5        A    The same benefits, yes.
6        Q    What were those benefits?
7        A    Tell you the truth, my wife
8   handles all the health benefits and issues like
9   that, so you'd have to depose her.  But I don't
10  know, they were the same.  Gold plan, 403
11  retirement.  But you'd have to ask her.  She
12  handles that part of our family.
13       Q    At the time of your hire, was
14  your salary increased from the associate director
15  position?
16       A    Yes.
17       Q    Did you receive any subsequent
18  salary increases as the USTU executive director?
19       A    No.
20       Q    Are you making the same what you
21  are today as you did when you started?
22       A    Affirmative.
23       Q    Did you ask for a raise?
24       A    No, I haven't.
25       Q    And at this meeting with Mr.

1  Benz, did you accept the position of USTU

2  executive director?

3       A    Yes.

4       Q    Do you know the date of this

5  meeting?

6       A    No, but I know it was before the

7  6th of February.

8       Q    Okay.  How many days after that

9  meeting with Mr. Benz did you start your

10  employment with the USTU?

11       A    It might have been the next day.

12       Q    You didn't have to give notice to

13  the international programs division?

14       A    I talked to them.

15       Q    And he let you go, you didn't

16  have to give notice?

17       A    Well, that's neither here nor

18  there.  He didn't want to see an employee go, but

19  he knew it was something that he had to do.

20       Q    Do you consider yourself a USOC

21  employee?

22       A    I consider myself an USTU on-loan

23  employee, yeah.  So I'm a US Taekwondo employee

24  on loan from the US Olympic Committee.

25       Q    And your paycheck comes from the

1  USOC?

2       A    Well, my paycheck, I actually get

3  direct deposit into the bank, so it's a direct

4  deposit from the US Olympic Committee into my

5  bank account, yes.

6       Q    Can I ask you your salary?

7       MR. LEVINSTEIN:  Hold on one sec.

8       (Discussion held off the record.)

9       A    Yeah, I make $90,000 per annum.

10       Q    (BY MR. UESUGI)  And in addition

11  to the USOC health benefits, 401(k) gold plan, is

12  that yes?

13       A    In addition, yes, those things,

14  those benefits that we prior talked about,

15  previously talked about.

16       Q    Do you receive any other benefits

17  in addition to what we've already discussed?

18       A    Do I presently receive any

19  benefits from where?  From who?

20       Q    From the USOC as a temporary

21  on-loan employee USTU executive director?

22       A    No benefits, no.  No other

23  benefits, no.

24       Q    Do you get a car?

25       A    No, I don't get a car.

1       Q    How about your cell phone bill?

2       A    My cell phone bill, yes.

3       Q    Gets paid for by the USOC?

4       A    It is actually paid for by the

5  USA Taekwondo.

6       Q    Anything else you receive?

7       A    No.

8       MR. LEVINSTEIN:  For the record, I

9  don't think we consider paying your cell phone a

10  benefit.  Business expense that is covered by the

11  employer.

12       MR. UESUGI:  Okay.

13       Q    (BY MR. LEVINSTEIN)  Prior to your

14  employment as the USTU executive director, did

15  you have any martial art experience?

16       A    No.  The only type of combative

17  experience I had was I was trained at the United

18  States Military Academy in the area of boxing,

19  which was part of the self-defense curriculum.

20       Q    You took a course at West Point?

21       A    Constant ongoing staff training.

22       Q    And part of that training was in

23  boxing?

24       A    It was in boxing, yes.

25       Q    When was this?

1       A    I taught boxing for nine years,

2  so from 1983 and nine years later.

3       Q    How often would you train in

4  boxing?

5       A    Well, we would train every -- you

6  know, before each term, more or less, it would be

7  a, just train the trainer.  You get in there.

8  You would learn some of the sport boxing and how

9  to teach it.  The pedagogical, not only the

10  sport, but the pedagogical, use a lot of motor

11  learning techniques to try to enhance the

12  learner's experience.

13       Q    Was this a short course every

14  year?

15       A    Twenty lessons.  And there were

16  three terms.  And then there was one in between

17  Christmas and then there was a summer term.  But

18  I was never involved in the summer term.  So

19  basically I was involved with -- depending on my

20  season what I was in, you know, I'd be involved

21  with three terms of it.

22       Q    So 60 lessons per year?

23       A    I guess if you do the math, yeah.

24       Q    How long were the lessons?

25       A    The lessons lasted for an hour,

1  right around an hour.
2       Q    What did the lessons consist of?
3       A    Let's see here.  Basic offense,
4  defense, transitional moves.
5       Q    Punch the bag, speed bag?
6       A    Oh, yeah sure.
7       Q    Jump rope?
8       A    Live sparring.  Not so much jump
9  rope, but really actually engage in an activity
10  to lower one's level of fear if ever in that type
11  of situation.
12       Q    What situation, self-defense?
13       A    Yes.
14       Q    So it was more a self-defense
15  training rather than the sport of boxing?
16       A    It was using boxing as a way in
17  which to lower one's level of fear if confronted
18  in a real live situation.  However, boxing
19  techniques were taught.  Everything from a jab to
20  combinations to power right-hands, defensive
21  moves, so on, so forth.
22       Q    So you put on the gloves and you
23  sparred also?  That was part of the training?
24       A    No, there was not any sparring
25  between instructors and students.  However, the

1  instructors did put on bags and they would work
2  through different routines.
3       Q    Hand mitts?
4       A    The hand mitts, the big bag, just
5  all different types of things.  In addition to
6  that I was -- worked with the intramural program,
7  which we led up to kind of a boxing finals which
8  one year was on ESPN.
9       Q    Oh, really?
10       A    Yeah.
11       Q    Did you participate as a
12  competitor?
13       A    No, Glenn, I didn't participate
14  as a competitor.  I ran the whole thing.
15       Q    Oh, you ran the whole thing?
16       A    Yes, I did.
17       Q    Okay.  Was there a Taekwondo
18  program at West Point?
19       A    I believe there was, yes.
20       Q    Did you happen to observe any
21  practices?
22       A    You know, in my 13-year tenure, I
23  observed lots of different things and so I could
24  have.
25       Q    You don't remember?

1       A    No, I don't remember.  I don't
2  remember what I had for lunch yesterday, no less
3  13 years ago.
4       Q    So you basically have zero
5  martial arts experience, other than the boxing
6  for self-defense that you took at West Point?
7       A    What you said is exactly true.
8       Q    Do you have kids?
9       A    I have two children.
10       Q    How old are they?
11       A    One is 23 and the other is 14.
12       Q    Did you ever sign them up for
13  martial art lessons?
14       A    I signed my children up for the
15  things in which they want to do.
16       Q    And martial art lessons wasn't a
17  part of that?
18       A    Martial arts lessons were not
19  part of that.
20       Q    How about your wife, did she ever
21  take any martial art?  I'm skipping ahead.  Are
22  you married?
23       A    Yeah, I'm married, yeah.
24       Q    And your wife, did she ever take
25  any martial art courses?

1       A    No.
2       Q    So I take it that because you
3  have no martial art experience, you never
4  competed in any Taekwondo events?
5       A    You are correct.
6       Q    And you never coached at any
7  Taekwondo events?
8       A    You are correct.
9       Q    And you never participated as a
10  volunteer at any Taekwondo events, prior to your
11  hiring?
12       A    Oh, okay.  Prior to my hiring,
13  yeah, no, I hadn't.
14       Q    Just so we have a clear record,
15  prior to your hiring as the USTU executive
16  director, you never volunteered at a Taekwondo
17  event?
18       A    No, I hadn't.
19       Q    Do you have any interest in the
20  martial arts?
21       A    Well, now that I've been involved
22  and engaged in the sport for, what is it, over a
23  year now, 12 months, 13 months, I think it's
24  really opened my eyes to see the art form and the
25  sport portion of it.  So yeah, I am.  It's been

1  very interesting.

2      Q    Prior to your hire as the USTU

3  executive director, did you have any interest in

4  martial arts?

5      A    I had interest in sport in

6  general.

7      Q    But not martial arts

8  specifically?

9      A    No.

10     Q    You didn't like to go watch Kung

11 Fu movies or nothing like that?

12     A    Actually, when I grew up in New

13 York City, we would go to Chinatown and we would

14 see some Bruce Lees and things like that.  It was

15 just part of the whole experience of going to New

16 York City and seeing different things.

17     Q    But you never had any interest in

18 training?

19     A    No, no, I don't.

20     MR. LEVINSTEIN:  By that you mean

21 martial arts training and Taekwondo?

22     MR. UESUGI:  Yes.

23     MR. LEVINSTEIN:  Just to be clear.

24     Q    (BY MR. UESUGI)  When did you

25 become interested?  As your capacity as executive

1  director, that's when your interest came about in

2  martial arts?

3      A    Yeah, as executive director.  And

4  then as things have kind of stabilized a little

5  bit and you can kind of see the sport, and at the

6  Olympic Games, just watching it has been a great

7  appreciation.

8      Q    Do you feel that having no

9  martial art experience prior to your hire as the

10 USTU executive director, is that a detriment?

11     MR. LEVINSTEIN:  Objection to form.

12 It's contrary to the record, because we're

13 talking about boxing and so on.

14     Q    (BY MR. UESUGI)  You can answer

15 the question.

16     A    I believe sport is sport.  And

17 how it's managed, I think that there are some

18 clear-cut generalities that I think one could

19 bring, especially with a background in world

20 class sport development.

21     Q    So being involved in sport has

22 some advantages and crossover?

23     A    I believe so.

24     Q    Is there any disadvantages to not

25 having practiced Taekwondo?

1      A    Well, you know, when you first

2  get there, I mean, one would not know what a

3  padduh chagi is or an axe kick or things of that

4  sort.  But one who's inquisitive would find out

5  these things and learns pretty quickly about

6  again the moves in the sports.

7      Q    So you now know what a padduh

8  chagi is?

9      A    Yeah.  You move back and then you

10 come back and kick, and things like that.  So I'm

11 learning.  I'm learning, slowly but surely.

12     Q    Actually, padduh chagi is -- the

13 translation is receiving kick, so it doesn't

14 necessarily mean what you just said.  But in any

15 event --

16     A    Okay.  Thank you for the

17 clarification.

18     Q    So you don't feel there's any

19 disadvantage to not having any Taekwondo training

20 in your job?

21     A    Depends if you have an open mind.

22     Q    So if you have an open mind,

23 there's no disadvantage to not having a Taekwondo

24 background?

25     A    I think that's a huge part of it,

1  yes.  If you're willing to learn.  I mean, that's

2  a very important thing, I guess, for all of us.

3      Q    Okay.  When did you start at the

4  USTU?

5      A    Well, earlier I told you I

6  believe maybe around February 6th perhaps, but I

7  can't quite remember.  But February 6th I think

8  is a safe date to --

9      Q    Okay.  I'm going to hand you

10 which would be marked the exhibit next in order.

11     (Exhibit 43 was marked.)

12     Q    (BY MR. UESUGI)  This is a press

13 release that was placed on the USOC web page.  Do

14 you recognize it?

15     A    I have to read it.  But yeah, it

16 looks like something that was on the website.

17     Q    Why don't you take a couple

18 minutes and we'll go off the record and you can

19 read it?

20     A    All right.  Thank you.

21     (A recess was taken from 9:23 a.m. to

22     9:25 a.m.)

23     MR. UESUGI:  Back on the record.

24     Q    (BY MR. UESUGI)  Did you have a

25 chance to review --

1    A    43?

2    Q    Yes.

3    A    Yes, I did.

4    Q    Does that refresh your

5    recollection as to when you started at the USTU?

6    A    Yeah.  I guess it says that they

7    started, you know, February 4th.

8    Q    Did you meet with Bill Martin

9    prior to your hire?

10    A    No, I didn't.

11    Q    In the second paragraph, can you

12    please read for me the last sentence?

13    A    The second paragraph of page 1 or

14    page 2?

15    Q    Page 1, please.

16    A    Page 1, okay.  So it says, I

17    quote, We are pleased, that one?

18    Q    The last sentence.

19    A    Oh, the last sentence?  Okay.

20    Q    Yes.

21    A    His solid background in sport

22    performance and international relations makes him

23    the ideal person to lead the USTU in critical

24    time for final preparations in the 2004 Olympic

25    Games in Athens, Greece, unquote.

1    Q    We've already discussed some of

2    your activities in sport performance.  Is there

3    anything else that we didn't discuss that would

4    make you the ideal person to lead the USTU in

5    this critical time of final preparation for the

6    2000 Olympic Games?

7    MR. LEVINSTEIN:  Objection.  You can

8    answer.  If you're asking what was thought of by

9    Jim Scherr when he said that sentence?

10    MR. UESUGI:  No, no, no.  I'm not

11    asking about Jim Scherr.  I'm asking for his

12    personal knowledge of his experiences and

13    background in sport performance that makes him

14    the ideal --

15    MR. LEVINSTEIN:  That's kind of vague

16    and ambiguous as to all the things in his life

17    that might prepare him for a job.  So I don't

18    know what that question's asking for.

19    A    I wouldn't even know what else to

20    tell you based on this last sentence.  It seems

21    to be someone else's opinion.

22    Q    (BY MR. UESUGI)  Is that your

23    opinion?  Do you feel that you have a solid

24    background in sports performance and

25    international relations which makes you the ideal

1    person to lead the USTU in this critical time?

2    A    I have a knowledge, skill and

3    experience of world class sport.

4    Q    Do you agree with this sentence

5    with respect to yourself?

6    MR. LEVINSTEIN:  Ideal person, compared

7    to whom?  It's a nice sentence.  I don't know

8    what the question means.

9    A    You know --

10    Q    (BY MR. UESUGI)  Do you agree?

11    It's a simple question.  Do you agree with that

12    sentence?

13    A    It's idealized, yeah.  I mean, I

14    think that, again, you as a lawyer, me as a sport

15    manager, people around the room here, you know, I

16    don't think that we're ever the ideal, because

17    ideal means the top.  I think we're always

18    working towards that.  The process of moving

19    towards an idealized type, I think, is critical.

20    Q    So you don't feel you're the

21    ideal person to lead, because there's only one

22    and that's the top person?

23    MR. LEVINSTEIN:  Objection, that's not

24    what he said.

25    THE DEPONENT:  I feel I'm getting

1    harassed.

2    MR. LEVINSTEIN:  That's okay.  Why

3    don't you ask another question?

4    Q    (BY MR. UESUGI)  Why don't you

5    answer that question?  So you don't feel -- so

6    you disagree with this statement?  You don't feel

7    you're the ideal person?

8    MR. LEVINSTEIN:  That's not what he

9    said.

10    A    That's not what I'm saying.

11    MR. UESUGI:  Why don't we read back his

12    response to that last part?

13    MR. LEVINSTEIN:  For the record, what

14    he said was that the ideal person doesn't exist,

15    that he was striving to be as good as he can be

16    toward an ideal.

17    THE DEPONENT:  I mean, you know, you

18    want to read it back?

19    MR. LEVINSTEIN:  Let him do what he

20    wants.  There's no question pending.

21    MR. UESUGI:  Yes.  Can you please read

22    back the statement by the witness.

23    (The record was read.)

24    Q    (BY MR. UESUGI)  So once again,

25    you don't feel you're the ideal candidate?

1    MR. LEVINSTEIN:  Objection.  That's not
2 what he said.
3        A    That's not what I said.
4        Q    (BY MR. UESUGI)  What did you say?
5        A    Read it for the record.  Would
6 you please read it again?
7        MR. LEVINSTEIN:  That's what he said.
8        A    That's what I said.
9        Q    (BY MR. UESUGI)  Okay.  What would
10 make you -- what would make someone the ideal
11 person?
12        MR. LEVINSTEIN:  Are we talking about
13 what would make the ideal person in 2004
14 February?
15        Q    (BY MR. UESUGI)  In your opinion,
16 what would make someone the ideal person to lead
17 the USTU in this critical time of final
18 preparations for the 2000 Olympic Games?
19        MR. LEVINSTEIN:  2004?
20        Q    (BY MR. UESUGI)  2004 Olympic
21 Games.  I'm sorry, my mistake.
22        A    We're talking in generalities
23 here?  Is that what you're saying, generally
24 speaking?
25        Q    Yes.

65

1        A    I think the person who comes to
2 the table with knowledge, skill and experience in
3 the area of sport and sport management.
4        Q    Would a background in Taekwondo
5 help make a person an ideal person to lead the
6 USTU in the critical time of final preparation?
7        A    It depends on the situation.
8        Q    What do you mean by that?
9        A    Depends on what level the
10 organization is at in their development.  It
11 could play a key role.  And then again, depending
12 on where an organization is in their whole life
13 cycle, it doesn't really matter.
14        Q    How about where the USTU was in
15 the beginning of 2004 when you came on board as
16 the executive director?
17        A    I believe when I came on board as
18 the executive director, there were other areas of
19 concern, grave concern, such as a $1.1 million
20 debt with a $650,000 accounts payable that was
21 owed.  So it was looking at trying to, again, as
22 I said earlier in this deposition, a
23 stabilization of an organization.
24        Q    So in the beginning of 2004, in
25 your opinion, you don't feel that a Taekwondo

66

1 background was necessary to be the executive
2 director?
3        A    At that point of the organization
4 where it was at, no, I don't feel it was
5 important to have a vast understanding of the
6 sport of Taekwondo.
7        Q    Because you were concerned about
8 the financial situation?
9        A    That is correct.
10        Q    But weren't there other areas of
11 the organization that you were also entrusted
12 with responsibilities?
13        A    Yes, there were.
14        Q    What were those other areas
15 besides financial?
16        A    Well, like as you see on that
17 last document, we had to hire, you know, a CFO,
18 you know, things of that sort of trying to put
19 together a stable work environment.
20        Q    Outside of the financial area,
21 what other areas of responsibilities did you
22 have?
23        A    At what point, Counsel?
24        Q    In the beginning when you first
25 started?

67

1        A    In the beginning?  In the
2 beginning was just trying, as I said, stabilize
3 and learn about where we're currently at in the
4 organization, thus putting together a SWOT
5 analysis list and things of that sort.
6        Q    Did you do that?
7        A    Yes, I did.
8        Q    Was that a written document?
9        A    Yes, it is.
10        Q    Has that document been produced;
11 do you know?
12        A    I don't know.
13        Q    When did you prepare this
14 document?
15        A    Beginning of February.
16        Q    And when you prepared that
17 document, what was your analysis or what did you
18 do in preparation of drafting that SWOT analysis?
19        A    Well, any basic course in the
20 area of organizational development would say that
21 you need to know what your strengths, weaknesses,
22 opportunities and threats are.  And then you can
23 start to do some planning from that perspective.
24        Q    When you first started, what were
25 some of the strengths of the USTU?

68

1      A      Well, there were very few, if
2  any.
3      Q      What were they?
4      A      I would have to look at the SWOT
5  analysis.  I can't remember, so I don't want to
6  guess at this moment.
7      Q      Okay.  How about the weaknesses?
8      A      As I just mentioned, I think that
9  we were financially, you know, had some
10 challenges there, which was a huge weakness in
11 terms of, you know, whether or not you're going
12 to keep the doors open.
13     Q      Any other weaknesses?
14     A      Not that I can remember at this
15 moment.
16     Q      What were some of the
17 opportunities that were present when you first
18 start as executive director?
19     A      I just think, you know, at the
20 end of the day, I think that there were a lot of
21 people who, you know, have commented on the fact
22 that the sport had so much potential, you know,
23 in terms of not at the Olympic level, but just
24 other levels.  And so I think that was an
25 opportunity.  What that specifically meant at

1  that time was just generally speaking, you know,
2  looking at how we can rally around, you know, to
3  promote, you know, our future programs.
4      Q      Are you talking about grass-roots
5  development?
6      A      I think it runs the gamut.
7      Q      Of what?
8      A      Of grass-root, high performance,
9  world class.
10     Q      Grass-roots, high performance,
11 world class.  What is your understanding of the
12 grass-roots development?
13     A      Well, let's start even the one
14 before that is a sport-for-all entity, which
15 allows people just to participate in sport.  And
16 there's really -- it's just for the appreciation
17 of it.  A grass-root type of a program could be
18 one, depending on how it's designed, that gives
19 people an opportunity to participate in sport
20 and, you know, basically, you know, get involved
21 with it at a certain point.
22            High performance level is one at which
23 the athletes have been identified to possess, you
24 know, potential, world class potential.  And the
25 world class one is really as it is.  It's

1  athletes who have that ability to compete at the
2  highest level.
3      Q      So the term sport-for-all, that
4  comes from the Olympic charter; is that correct?
5      A      I believe it does, yes.
6      Q      Have you read the Olympic
7  charter?
8      A      Not in a very long time, no.
9      Q      Have you read the USOC bylaws,
10 prior to you starting as the executive director
11 of the USTU in February 2004?
12     A      I read the bylaws when I was
13 first hired by the US Olympic Committee.
14     Q      In their entirety?
15     A      Certain sections of it.
16     Q      But the bylaws has changed since
17 then, right?  It's different bylaws since 2000?
18     A      Of course you do read certain
19 sections of the new bylaws.  But I just wanted to
20 give you a history that I did, yes, at some point
21 at the beginning when I started, yeah.
22     Q      Is it your understanding that the
23 USOC bylaws were completely reworked?
24     A      Yes.
25     Q      When were the bylaws completely

1  reworked?
2      A      I can't tell you.  I don't know.
3      Q      Was it before or after you were
4  hired as the USTU executive director?
5      A      Could have been during.  I don't
6  know.
7      Q      Did you read those new bylaws?
8      A      I've read the bylaws, yes.  As I
9  said, parts that pertain to some of the things
10 that we were dealing with.
11     Q      So you never read the USOC bylaws
12 in their entirety?
13     A      The newest edition, not in their
14 entirety.
15     Q      What sections have you read?
16     A      I can't tell you.  I don't know.
17 I don't remember.
18     Q      Did you read the section with
19 respect to national governing bodies?
20     A      Probably.
21     Q      Probably?  You don't know?
22     A      I don't remember.
23     Q      Going back to that last sentence,
24 it says you have a solid background in
25 international relations.  And you also previously

```
1    testified that you did have an international
2    background and that was one of the reasons or
3    that was the primary reason that you were hired
4    as the USTU executive director; is that correct?
5         A    Yeah.
6         Q    What was your international
7    experience prior to being hired as the USTU
8    executive director?
9         A    Well, well traveled.
10        Q    What does that mean?
11        A    Been to many countries, have
12   worked with different Olympic committees, have
13   established relationships with, you know,
14   individuals and groups throughout the world.
15        Q    Was this personal travel,
16   vacations or --
17        A    No, it was --
18        Q    -- work related?
19        A    -- business, yeah, work related
20   mostly, yeah, 99 percent of it, perhaps.
21        Q    In what capacity?  What job are
22   you talking about?
23        A    Well, in several functional
24   areas.  I mean, being a team leader on
25   competitions.  You know, as I mentioned before
```

```
1    for the record, you know, being at the 2003
2    Olympic -- excuse me, Pan American Games.  Going
3    on a trip to, like, to, say, Guatemala to help
4    them in certain areas of programming, help the
5    Olympic Committee out with the certain of their
6    programs.  So it's a myriad of different
7    experiences.
8         Q    When did you go to Guatemala?
9         A    I don't remember.
10        Q    Prior to being hired as the USTU
11   executive director?
12        A    Yes.
13        Q    Were all these experiences
14   internationally, did it come as a result of your
15   hire as the associate director for international
16   programs?
17        A    State that again, please.
18        Q    Your international experience
19   that you just discussed, were they all related to
20   your position as associate director of
21   international programs with the USOC?
22        A    Some were.
23        Q    Some weren't?
24        A    No.  In that position, there
25   was -- I gave you kind of a global look at what
```

```
1    I've done.  And some were under during that
2    position and some were when I was at volleyball.
3         Q    What international experiences
4    did you gain when you were with volleyball?
5         A    As I said, team leader, went to
6    regionalized -- regional meetings, such as, you
7    know, meetings in Santo Domingo.
8         Q    Where's that?
9         A    Santo Domingo in the Dominican
10   Republic.
11        Q    Okay.  With respect to the Pan Am
12   Games, no?
13        A    No.  Basically it was just
14   focusing on volleyball in terms of looking at
15   developing new programs in this part of the
16   hemisphere.
17        Q    PASO?
18        A    Well, yeah, PASO.
19        Q    Any other international?
20        A    In volleyball, it was an acronym
21   called NORCECA.  So NORCECA region specific to
22   volleyball, which was pretty much almost PASO
23   regional.
24        Q    So it would was sort of like the
25   PATU, Pan American Taekwondo Union, except for
```

```
1    you were working for volleyball?
2         A    Exactly, exactly.
3         Q    This was when you were working
4    for USA Volleyball?
5         A    Uh-huh.
6         Q    That's a yes?
7         A    Excuse me, yes.
8         Q    What was the first thing that you
9    did when you was hired at the USTU executive
10   director?
11        MR. LEVINSTEIN:  Objection.
12        A    I don't even remember.
13        MR. LEVINSTEIN:  First thing?
14        Q    (BY MR. UESUGI)  Okay.  What were
15   some of the -- we went through the SWOT analysis.
16   What were some of the threats that you identified
17   with respect to the USTU?
18        A    I cannot remember.
19        Q    What would be a threat?  What
20   does that constitute?
21        A    Well, a threat could be like
22   another organization that's trying to take
23   membership away or things of that sort.  So that
24   could be a common threat.
25        Q    Like the AAU Taekwondo program?
```

4/5/2005 Gambardella, Robert

```
1        A    Other organizations.  I'm not
2   going to name any specific organization.
3        Q    When you first started as the
4   USTU executive director, did you consider the AAU
5   Taekwondo program a threat for SWOT analysis
6   purposes?
7        A    I cannot remember.  I cannot
8   remember.
9        Q    It would be in your document?
10       A    I believe so.
11       Q    I'd like to hand you another
12  document from the USTU web page, which we'll mark
13  as the exhibit next in order.
14       (Exhibit 44 was marked.)
15       Q    (BY MR. UESUGI)  Do you recognize
16  that document?
17       A    Yes, I do.
18       Q    What is this?
19       A    It's a letter just to the
20  membership.
21       Q    Which you wrote?
22       A    For the record, yeah.  It's
23  clearly signed by Bob Gambardella, chief
24  executive officer, yes.
25       Q    Is this a true and correct copy
```

77

4/5/2005 Gambardella, Robert

```
1   of what you wrote?
2        A    Say again.  I'm sorry.
3        Q    Is this a true and correct copy
4   of what you wrote?
5        A    Yeah, yeah.
6        MR. LEVINSTEIN:  It's tough for him to
7   know.  You represented to him that it came off
8   the website, so we have no way of knowing if it's
9   the exact document.
10       Q    (BY MR. UESUGI)  Do you have a
11  hard copy of this document?
12       A    In my person, no.
13       Q    In the office?
14       A    I would imagine so.
15       Q    Do you have any reason to believe
16  this isn't what you wrote?
17       A    Can we then take a break and let
18  me read it and then I can tell you whether or
19  not?  How's that?
20       Q    Why don't we do that.  Whenever I
21  go through any of these documents, we'll take a
22  break and you can review the document in its
23  entirety and then go back on the record.
24       A    Sounds good.
25       MR. UESUGI:  Off the record.
```

78

4/5/2005 Gambardella, Robert

```
1        (A recess was taken from 9:44 a.m. to
2        9:48 a.m.)
3        MR. UESUGI:  Back on the record.
4        Q    (BY MR. UESUGI)  Did you have a
5   chance to review the Exhibit 44?
6        A    Yes, I did.
7        Q    Did you write this letter?
8        A    Yes, it seems to be
9   philosophically in line with what I believe.  So
10  yes, I did read it -- write it.
11       Q    What was your purpose in writing
12  this letter?
13       A    Just to say hello, Taekwondo
14  World, how are you doing?  Here's who I am and
15  here's what we're going to be, you know, focusing
16  on in the short term.
17       Q    Let's go into it.  You list three
18  things here that you intend to focus your time
19  and efforts?
20       A    Right.
21       Q    Athletes, Athens and
22  infrastructure?
23       A    Right.
24       Q    Let's go into the athlete
25  section.
```

79

4/5/2005 Gambardella, Robert

```
1        A    Sure.
2        Q    Can you read me that paragraph?
3        A    Athletes - As we all know,
4   athletes are the core and key components to any
5   NSB.  We would become an organization that values
6   the concept of athletes first.  We are fortunate
7   that we have several outstanding athletes who are
8   part of our sport and the potential for growth is
9   tremendous.  It is our job to make sure that
10  these athletes, present and future, have the
11  resources necessary to achieve sustained
12  competitive excellence.
13       Q    What does the concept athletes
14  first mean to you?
15       A    Basically, it really comes from
16  the fact that as an organization, we really are
17  athlete centered.  So the athlete is the central
18  point of everything that we do.
19       Q    So every decision that you make
20  you consider athletes first?
21       A    I don't think it's every
22  decision, because there may be some decisions
23  that it just doesn't deal with that.  But in the
24  majority of decisions, yes.
25       Q    Which athletes wouldn't be
```

80

1  athletes-first-consideration-type decisions?
2        A    You may want to ask that again.
3        Q    You stated that certain decisions
4  that you make do not involve the concept of
5  athletes first; is that correct?
6        A    There could be some situations
7  where it's not a purely programmatic process or
8  thing that we're working on and it doesn't have
9  to deal with, you know, athletes.  And some
10 decisions are made based on just best business
11 practices.
12       Q    Can you give an example of what
13 would be a decision that you have made that
14 didn't involve the concept of athletes first?
15       A    Well, how you go to work and try
16 to figure out how to pay the $1.1 million deficit
17 down.
18       Q    Anything other than financial?
19       A    At this point, that was the --
20 you know, that would be a prime example of that.
21       Q    So are you saying that the
22 financial situation of the USTU is not an
23 athletes-first type of decision?
24       A    At that point, Counselor,
25 basically we were trying to keep the doors open.

1        Q    What do you mean by that?
2        A    Well, keep the lights on, the
3  doors open that people can transact business.
4  And so that was really, you know, something that
5  we focused on.
6        Q    In what ways did you focus on the
7  concept of athletes first when you first started
8  as the USTU executive director?
9        A    Just trying to gain information
10 about, you know, what athletes are out there, who
11 are -- you know, I knew who some of the
12 performers were but, you know, what is the
13 overall environment in terms of what athletes,
14 how they -- how they're progressing, so on, so
15 forth.
16       Q    You state here that we're
17 fortunate to have several outstanding athletes
18 who are part of our sport; is that correct?
19       A    Yeah.
20       Q    Who were those outstanding
21 athletes that you were referring to in your
22 February 5 letter?
23       A    Yeah, initially the first one
24 would come to mind would be Steven Lopez, you
25 know, Mark Lopez, you know, a Diana Lopez.  Maybe

1  a Mandy Meloon.  You know, so those are the ones
2  that come to my mind and were probably the ones
3  that I most notably knew about in the beginning.
4        Q    So Steven Lopez, Mark Lopez,
5  Diana Lopez and Mandy Meloon were athletes that
6  you had in mind when you wrote this letter?
7        A    I would say so.
8        Q    How did you learn of Steven Lopez
9  being an outstanding athlete?
10       A    Well, he was a 2000 Sydney games
11 gold medalist.
12       Q    How did you learn about him?
13       A    How did I learn about him?
14       Q    Yes.  You previously stated that
15 you had no knowledge of Taekwondo when you first
16 started.
17       MR. LEVINSTEIN:  Objection.
18       A    Taekwondo, the sport, but not the
19 personalities.  I think we need to differentiate
20 that.
21       Q    (BY MR. UESUGI)  Okay.
22       A    As two.
23       Q    When did you first learn about
24 Steven Lopez?  Did you know about him before you
25 were hired as the executive director?

1        A    Yeah, right around the 2000
2  Olympic Games.  You get press releases and things
3  like that.  You read about all the athletes.
4        Q    You remember him from the 2000
5  Sydney games?
6        A    Yes, yes.
7        Q    How about Mark Lopez, when did
8  you first learn about Mark Lopez being an
9  outstanding athlete in Taekwondo?
10       A    Probably right around when I was
11 hired.  I know that I read something about the
12 family affair of the Lopezes and just read of his
13 name, as I did Diana, how the father kind of got
14 his children into the sport.  So I read a story
15 somewhere about the story part of it.
16       Q    Where did you read the story?
17       A    I don't remember.
18       Q    Was it online?
19       A    I don't remember.
20       Q    Okay.  How about Diana Lopez,
21 same thing?
22       A    Same thing, yes.
23       Q    How about Mandy Meloon, where did
24 you learn about her?
25       A    Just a name that from someone --

1 I don't know who it was -- in passing a
2 conversation, but seemed the kid, this athlete,
3 had some potential also. But I don't remember
4 who told me that. But those are the names that,
5 you know, come forward.
6          Q     When did you hear of Mandy
7 Meloon's name in passing?
8          A     I cannot remember. I cannot
9 remember.
10         Q     It was before you were hired?
11         A     Yeah, yes.
12         Q     Any other athletes that you had
13 in mind when you were --
14         A     Not to my recollection, no.
15         Q     Can you please wait until I -- I
16 have to finish my sentence.
17         A     Okay. Yes, Counselor.
18         Q     You have to finish your answer
19 and then it's my turn to ask a question.
20         A     All right.
21         Q     So just to be clear, Steven
22 Lopez, Mark Lopez, Diana Lopez and Mandy Meloon
23 were the athletes that you had in mind when you
24 wrote this letter?
25         A     Those are athletes that, yes,

85

1 came to my mind, yes.
2          Q     As outstanding athletes who are
3 part of our sport?
4          A     Yes.
5          Q     And there are no others?
6          A     Back then, there could be others,
7 but I just don't remember.
8          Q     It says here that your job or our
9 job is to make sure that these athletes have the
10 resources necessary to achieve sustained
11 competitive excellence. What did you mean by
12 that?
13         MR. LEVINSTEIN: For the record, could
14 you read the whole sentence?
15         Q     (BY MR. UESUGI)  It is our job to
16 make sure that these athletes, present and future
17 athletes, have the resources necessary to achieve
18 sustained competitive excellence. What did you
19 mean by that?
20         MR. LEVINSTEIN: Objection, the
21 document speaks for itself, but you can answer.
22         A     Yeah, basically, you know, at the
23 end of, you know, every program, you want to be
24 able to be measured in terms of being able to
25 develop a program with this notion of sustained

86

1 competitive excellence. And that you're at the
2 top of the world from one quadrennium to the
3 next. Not only -- let me answer.
4          Q     (BY MR. UESUGI)  Go ahead.
5          A     Not only just in terms of medals
6 but, you know, a program that is, you know, is
7 all encompassing, that has, you know, just all
8 different components to it that will lend itself
9 to the end.
10         Q     When you mentioned resources,
11 what did you mean?
12         A     Financial and otherwise. You
13 know, support staff, you know.
14         Q     Support staff, what does that
15 mean?
16         A     That means that just people who
17 are interested in helping, you know, grow a sport
18 in all areas of programming.
19         Q     I don't understand what you're
20 trying to say.
21         A     Well, basically --
22         MR. LEVINSTEIN: Stop. Ask a question.
23         A     Well, basically --
24         Q     (BY MR. UESUGI)  Can you rephrase
25 your answer?

87

1          MR. LEVINSTEIN: Can you ask a new
2 question? You asked a question, but I don't
3 think he knows what you're asking. You're a long
4 way from the last question. So if you want to
5 state a question so the record's clear, fine.
6          MR. UESUGI: Can you read back the
7 question?
8          MR. LEVINSTEIN: For the record, the
9 question she reads, he already answered. So if
10 you want to ask another one, you can, but --
11         (The record was read.)
12         Q     (BY MR. UESUGI)  Support staff,
13 what does that mean?
14         A     What it means is that you're
15 building a team around a team. That means that
16 you're putting together resources of people and
17 subject matter experts to help you, you know,
18 guide a program in a certain direction.
19         Q     Who would be an example of a
20 resource, one of your support staff resources?
21         A     Sport science people.
22         Q     At OTC?
23         A     Anywhere. Anyone who has, you
24 know, knowledge in the area of sport science,
25 different disciplines.

88

1    Q    Who would be an example of that?
2    A    An example would be a person
3  who's concerned with, you know, performance
4  enhancement.
5    Q    Do you have -- did you retain any
6  specific support staff in order to develop the
7  resources necessary to achieve sustained
8  competitive excellence?
9    MR. LEVINSTEIN:  Objection.
10    Q    (BY MR. UESUGI)  Did you hire
11  anybody -- I'm using your terminology.  You said
12  that one of the resources necessary was support
13  staff?
14    A    It's all pro bono.
15    Q    It's all pro bono?
16    A    Yeah, yeah.
17    Q    Who would be an example?
18    A    An example would be Peter Haberl,
19  who's a sport psychologist who works for the
20  United States Olympic Committee.
21    Q    At OTC?
22    A    Yes, at the United States Olympic
23  Committee Olympic Training Center in Colorado
24  Springs, yeah.
25    Q    And what did you do to make sure

89

1  that Peter was available to Taekwondo athletes so
2  that they could achieve sustained competitive
3  excellence?
4    A    Well, it's not that easy.  I
5  mean, that's just one of the parts of it.  But we
6  are -- you know, have been in meetings and
7  planning meetings and moving forward in terms of
8  developing that, as I said, that team around the
9  team.  Things don't just happen overnight.
10    Q    Did you inform the USTU athletes
11  or membership that a sports psychologist at the
12  Olympic Training Center was available as a
13  resource so that they could sustain competitive
14  excellence?
15    A    You may want to rephrase that a
16  little bit.
17    Q    Did you tell people that, hey, we
18  have Peter, the sports psychologist, at OTC and
19  he's available as a resource support staff so
20  that you, the athlete, present and future, have
21  the resources necessary to achieve sustained
22  competitive excellence?
23    A    I don't quite remember any
24  specific instance.  But yes, generally that is
25  part of our overall plan in terms of trying to

90

1  integrate a team around a team concept.
2    Q    What I'm asking is did you inform
3  the membership that Peter was available for the
4  athletes?
5    A    The membership?
6    Q    Yes.
7    A    No.
8    Q    Why not?
9    A    This is a high performance
10  program.
11    Q    What does that mean?
12    A    That means it was targeted
13  towards, you know, the highest or the higher
14  level of athletes.
15    Q    Did you inform our higher level
16  athletes, the one in which you refer?
17    A    As I said earlier, yes.  I can't
18  give you a specific date.  But yes, I mean, I
19  remember it was part of our conversations with
20  athletes, you know, and that if that came up or
21  came up, we would explain to them that there are
22  services available.
23    Q    Okay.  Who did you tell?  Which
24  athletes?
25    A    I cannot remember, Counselor.

91

1    Q    Okay.  That's a perfectly fine
2  answer.
3    MR. LEVINSTEIN:  I'm glad you approve.
4    MR. UESUGI:  And I'm glad that you're
5  acknowledging that.
6    Q    (BY MR. UESUGI)  Okay.  Let's turn
7  to Athens.
8    A    Uh-huh.
9    Q    Can you please read that
10  paragraph?
11    A    That paragraph.  Okay, Athens --
12  the Olympic Games are only 191 days away.  What
13  we know is that we will be sending two
14  athletes -- one man, one woman -- to Athens to
15  represent the USA.  It is our job to make sure
16  that the athlete who ends up qualifying to
17  represent us will have all our support in order
18  to maximize their performance in the Olympic
19  Games, period.
20    Q    When you stated all our support
21  in order to maximize their performance in the
22  Olympic Games, what did you mean by that?
23    A    Again, Counselor, building a team
24  around a team, having a support infrastructure to
25  help maximize potential.

92

1        Q     So you're talking about
2   resources?
3        A     Everything, yes, a team around a
4   team.
5        Q     How about infrastructure, can you
6   please read the first sentence?
7        A     We will ensure our transparency
8   to the membership in our business dealings and we
9   will work diligently to bring about fiscal and
10  ethical responsibility.
11       Q     Stop.  Just the first sentence.
12  When you stated transparency, what did you mean?
13       A     What did I mean, is the fact that
14  our philosophy at USA Taekwondo, and even at the
15  US Olympic Committee, is one that we want to try
16  to provide information to its members.
17       Q     So if something's going on, you
18  tell the membership?
19       A     If there's a need to know.  Like
20  take, for instance, you know, just most recently
21  about our membership cards, we put something out
22  on the web that they're going to be held up.  So
23  that's just a simple example.  But that's an
24  example of that.
25       Q     Are there things that you

1   wouldn't tell the membership?  Need to know, what
2   do you mean by that?
3        A     Just basically give them
4   information that they would need to know about,
5   you know, what could be happening, you know,
6   like, you know, governance proposals.  We put
7   that it's on a separate bar so people can kind of
8   see where we're at in terms of handing over the
9   new governance structure, the new governance to
10  the membership and so forth.
11       Q     So the membership needs to know
12  about the governance proposal, so that's why you
13  put it out there?
14       A     Yes.
15       Q     What is something that you
16  wouldn't put out, for example?
17       A     I can't tell you.  I don't know.
18  Nothing comes to mind at this moment.
19       Q     How about the Olympic coaching
20  selection criteria, is that something the
21  membership needs to know?
22       A     I would think so.
23       Q     What steps did you take to inform
24  the membership about the Olympic coach selection
25  criteria?

1        A     I cannot remember.
2        Q     Do you remember doing anything
3   about that, informing the membership?
4        A     I don't remember specifically.
5        Q     Okay.
6        A     Again, it was at a different
7   time, you know, a different time of then and
8   where we're at now.
9        Q     Was that something that the
10  membership would need to know?
11       A     They could, by the Amateur Sports
12  Act, yes, it should be something that's
13  communicated.
14       Q     Did you put it on the USTU web
15  page?
16       A     I cannot remember.
17       Q     You also in your letter
18  introduced the governance and management
19  committee, Steve Locke, Tony Baggiano, Rich
20  Bender, Juan Moreno and Virginia Witte?
21       A     Correct.
22       Q     Prior to your employment as USTU
23  director, did you know Steve Locke?
24       A     I knew him just in passing he
25  being in triathlon and me being in volleyball.

1        Q     You see him in the hall?
2        A     Yeah, I see him or different
3   meetings or what have you, yes.
4        Q     You didn't have any sort of a
5   social relationship with him?
6        A     No, none whatsoever.
7        Q     How about Tony Baggiano?
8        A     No, just knew the name.
9        Q     You never met him prior to
10  your --
11       A     No.
12       Q     -- employment as executive
13  director?
14       A     No, I never have.
15       Q     How about Rich Bender?
16       A     Knew who he was.  Again, in the
17  same light as Steve Locke.  You know, knew who he
18  was and met him once before.
19       Q     Who was he, the executive
20  director of?
21       A     Of USA Wrestling.
22       Q     That was the capacity you saw him
23  at One Olympic Plaza?
24       A     Yeah.
25       Q     But no social relationship?

1    A    No.
2    Q    How about Juan Moreno?
3    A    Basically met him when I came to
4  work for the US Taekwondo.
5    Q    Did you know his name?
6    A    As I started to hear more, you
7  know, like in the beginning of my tenure that I
8  heard that he was going to be, you know, possibly
9  named to the governance management, so, yeah.
10    Q    But prior to that you had never
11  met Juan Moreno?
12    A    No, I hadn't.
13    Q    And you never heard his name?
14    A    No, I hadn't.
15    Q    How about Virginia Witte?
16    A    Oh, yeah, we worked together and
17  she was -- she's in auditing and I was in sport
18  parthership.  And so there was, you know, an
19  ongoing working relationship with the auditing
20  division.
21    Q    So you had a direct working
22  relationship with Virginia Witte?
23    A    I don't know if it was a direct,
24  but we would be in meetings together, yeah.
25    Q    With respect to the five sports

1  that you were supervising?
2    A    Within our portfolio, yes.
3    Q    Did you ever know her socially?
4    A    No.
5    Q    On February 5, there was a USTU
6  governance and management committee meeting; is
7  that correct?
8    A    Don't know.  But maybe you have
9  something that will tell us the date.
10    Q    Yes, let's mark this as the
11  exhibit next in order, 45.
12        (Exhibit 45 was marked.)
13    Q    (BY MR. UESUGI)  You want to take
14  a minute to just quickly review that?
15    A    Thank you.
16        (Discussion held off the record.)
17    Q    (BY MR. UESUGI)  Have you reviewed
18  the document that I just handed to you?
19    Q    Are we back on record again?
20    Q    Yes.
21    A    Yes, I did.
22    Q    What is this?
23    A    These, as you can see, are
24  minutes of a meeting, February 5th, 2004,
25  governance and management committee meeting.

1    Q    This was the first meeting of the
2  USTU GMC?
3    A    I believe so.
4    Q    How often would the GMC meet?
5    A    Well, it was based on, you
6  know -- the time was weekly.  It might have been
7  biweekly.  And depending on, you know, what was
8  happening, you know, so there wasn't a set time
9  frame.  It was, you know, really as needed.  And
10  it's still pretty much as needed.  But generally
11  every two weeks.
12    Q    And every time the GMC meets,
13  minutes would be produced?
14    A    Yes.
15    Q    Who would produce the minutes?
16    A    Virginia Witte.
17    Q    I notice on the bottom it says
18  minutes approved February 12th, 2004?
19    A    Right.
20    Q    What does that mean?  What was
21  that for?
22    A    That means that the governance
23  and management committee would have an
24  opportunity to go over the minutes to see if
25  everything was correct.  And then they would send

1  back any corrections to Virginia for, I think,
2  inclusion.  And then at that point it would be
3  voted on to move that the minutes be approved.
4    Q    So you were following Roberts
5  Rules of Order?
6        MR. LEVINSTEIN:  Objection.
7    A    I don't know.
8    Q    (BY MR. UESUGI)  Were Roberts
9  Rules of Order used at the meeting?
10    A    I don't know.
11    Q    The second paragraph talks about
12  the financial situation.  Was that the major
13  concern at the time?
14    A    I believe, yeah, it was.  I mean,
15  it seemed to be a huge problem.
16    Q    Okay.  It states here in the
17  third paragraph, and I'm going to just read it,
18  it says that, quote, Mr. Locke reported that he
19  and Mr. Gambardella and Mr. Skinner met with the
20  USOC marketing division.  He was able to
21  negotiate incremental funding for USTU through
22  the USOC joint marketing agreement.  Did I read
23  that correctly?
24    A    You read what was on here
25  correctly, yes, sir.

1      Q    What does that mean, you
2  negotiated incremental funding for the USTU
3  through the USOC?
4          MR. LEVINSTEIN:  Okay.  For the record,
5  we've been here two hours.  This has absolutely
6  nothing to do with this case.  This is not a case
7  about everything going in the USTU and its
8  funding and so on.  I understand you're curious,
9  but let's try to at least have something to do
10 with the case in the questions.
11         MR. UESUGI:  We're coming up to it.
12         MR. LEVINSTEIN:  It would be nice if
13 after two hours we got somewhere close.  Go ahead
14 and answer that question.
15         A    Can you restate that question
16 again, Counsel?
17         Q    (BY MR. UESUGI)  What does that
18 sentence mean?
19         A    What does that mean?  That means
20 that three people collectively went to a division
21 of the US Olympic Committee, namely the marketing
22 division, and then Mr. Locke was able to
23 negotiate some incremental funding for the USTU
24 through its joint marketing agreement.
25         Q    What types of funding are you

101

1  talking about?
2          A    Incremental marketing dollars.
3          Q    Which you're entitled to -- which
4  the USTU was entitled to?
5          A    Yes, could be.  Eligible for, I
6  should say.
7          Q    Is this for athlete development?
8          A    Excuse me.  Excuse me.  Eligible
9  for.
10         Q    Eligible for?
11         A    Yes.
12         Q    Is this for athlete development
13 purposes?
14         A    This money is not earmarked
15 specifically towards one particular project.
16         Q    The next sentence is, in addition
17 the office will loan the USTU a USOC staff member
18 to develop a marketing package and videotape.
19 Was that ever developed?
20         MR. LEVINSTEIN:  For the record, I'm
21 going to, at this point, say he's not going to
22 answer that question.  It's got nothing to do
23 with this case.
24         MR. UESUGI:  It has to do with the
25 finances.  If you're saying that the financial

102

1  situation of the USTU is not at issue, then okay,
2  I won't be asking these questions about finances.
3          MR. LEVINSTEIN:  The financial
4  condition is at issue.  Of course, it had a
5  terrible financial situation.  Whether they
6  eventually made a video about marketing has
7  nothing to do with this lawsuit.
8          MR. UESUGI:  In your opinion.  Okay.
9  Are you instructing him not to answer?
10         MR. LEVINSTEIN:  Yes.
11         Q    (BY MR. UESUGI)  You do realize
12 that your Counsel has objected and he's
13 instructed you not to answer.  We can file a
14 motion to compel, seeking costs and attorneys'
15 fees, and if we prevail, which there's
16 substantial likelihood which we will, you will
17 have to come back here and you have to answer
18 these questions at your expense?
19         MR. LEVINSTEIN:  Don't answer.  You can
20 say what you want.  Continue.
21         Q    (BY MR. UESUGI)  Do you understand
22 that?
23         MR. LEVINSTEIN:  It's not for him to
24 answer that question.  Go ahead.
25         Q    (BY MR. UESUGI)  Okay.  All right

103

1  it talks about the resignation of Eui Ben Lee as
2  the referee chair; is that correct?
3          A    That's what I read, Counselor.
4          Q    Did any other committee chairs
5  resign?
6          A    Can you be a little bit more
7  specific, Counselor?
8          Q    Any time during 2004?
9          A    I don't know.  This one here came
10 forward because there was a letter that was sent
11 in to the USTU.  So this is the only one that I'm
12 aware of.  But before my time, I don't know what
13 happened or what could have happened, who
14 resigned, whatever.
15         Q    Okay.  From the time you were
16 hired February 4, 2004 until December 31, 2004
17 did any other committee chairs resign?
18         A    I don't remember.
19         Q    It says here, a letter will be
20 written thanking him for his service to the
21 organization.  Did you write letters to everyone
22 who resigned from the USTU?
23         A    I don't remember.
24         Q    Here's the last paragraph on page
25 1, Discussion ensued concerning the team leader

104

1   and coach appointments for the Athens games.

2   Eligibility requirements are being rewritten by

3   the USOC and the earlier appointments may have to

4   be rescinded as soon as those new requirements

5   are clarified by the USOC. Further discussion

6   will wait until the new information is available.

7   Did I read that correctly?

8       A   Word by word, it seems like what

9   you articulated verbally is what is on paper,

10   yes, Counselor.

11       Q   What eligibility requirements

12   were being rewritten by the USOC?

13       A   The team leader and coach

14   appointments, coaching selection procedures.

15       Q   Who in the USOC was rewriting

16   these eligibility requirements?

17       A   The members of the United States

18   Olympic Committee sport partnership division.

19       Q   Do you know who specifically?

20       A   I would imagine it would be Kelly

21   Skinner and/or his staff.

22       Q   Prior to this meeting did you

23   speak with Kelly Skinner about this issue?

24       A   About which issue?

25       Q   The eligibility requirements

1   being rewritten by the USOC?

2       A   This had this came up about at

3   this meeting.

4       Q   But it states here that the

5   eligibility requirements are being rewritten. So

6   was it a process that had already been set in

7   motion?

8       A   I can't remember. It might have

9   been. But again, it might be before my time.

10       Q   Who raised this issue?

11       A   I do not remember.

12       Q   What was your input with respect

13   to this issue at this meeting?

14       A   There were other things that I

15   was trying to get my arms around that -- I was

16   maybe a day or two on the job, so there were just

17   a myriad of issues that were being thrown at me,

18   you know, by people.

19       Q   Is that the fact that the eligibility

20   requirements being rewritten by the USOC for team

21   leader and coach appointments for the Athens

22   games, is that something that the membership

23   needs to know?

24       A   Perhaps.

25       Q   You're not sure?

1       A   Not sure.

2       Q   Okay. Was the membership

3   informed that the eligibility requirements are

4   being rewritten by the USOC on or about

5   February 5, 2004?

6       A   I don't remember.

7       Q   At the top of the second page --

8       A   Yes, sir.

9       Q   -- it says that there was a

10   discussion about the secretary general position

11   and a consensus was reached to name you as the

12   secretary general for the USTU; is that correct?

13       A   That is correct, Counselor.

14       Q   Are you aware that the USOC

15   remediation plan which was signed on January 27,

16   2004 states that the governance and management

17   committee shall assume the duties and authorities

18   of secretary general?

19       A   If that's in there, then I guess

20   that's what it says.

21       Q   Is there any mention in the USOC

22   remediation plan for USTU dated January 27, 2004

23   with regard to the executive director assuming

24   the secretary general position?

25       A   One more time, please.

1       Q   Is there any mention about the

2   executive director assuming the secretary general

3   position in the USOC remediation plan dated

4   January 27, 2004?

5       A   I don't believe so.

6       Q   Can you please quickly review

7   that?

8       A   I will, thank you. Okay. Again,

9   your question?

10       MR. UESUGI: Can you read back the

11   question, please?

12       (The record was read.)

13       A   No, there isn't.

14       Q   (BY MR. UESUGI) Would you

15   consider this a deviation from the remediation

16   plan?

17       MR. LEVINSTEIN: Objection.

18       Q   (BY MR. UESUGI) In your opinion?

19       A   What are you describing when you

20   say a deviation? What exactly do you mean by

21   that?

22       Q   What I mean by that is that the

23   remediation plan calls for the governance and

24   management committee to assume the duties and

25   authority of secretary general. The remediation

1  plan also makes no mention of the executive

2  director assuming the duties, authority and title

3  of the secretary general for the USTU.

4      MR. LEVINSTEIN:  Objection.  Again,

5  what does it matter whether they did or did not?

6      Q     (BY MR. UESUGI)  I'm just asking

7  for his opinion.  He's the executive director.

8  Is it your understanding that you are allowed to

9  assume the secretary general title and position

10 of the USTU?

11     A     It seems --

12     Q     According to the USOC

13 remediation?

14     A     It seems to me that the

15 governance and management committee has broad

16 oversight powers and they can perhaps do whatever

17 they need to do based on the situation as it

18 exists.

19     Q     So they're not bound by the words

20 of the remediation plan?

21     MR. LEVINSTEIN:  Objection.

22     A     You have to talk to the people

23 who drafted this document.  I cannot answer that,

24 Counselor.

25     Q     (BY MR. UESUGI)  Who drafted the

1  remediation plan?

2      A     I do not know, Counselor.

3      Q     All right.  I'm going to hand you

4  which we'll mark as the exhibit next in order.

5      (Exhibit 46 was marked.)

6      Q     (BY MR. UESUGI)  Can you please

7  review that?

8      MR. UESUGI:  Off the record.

9      (A recess was taken from 10:26 a.m. to

10     10:32 a.m.)

11     MR. UESUGI:  Back on the record.

12     Q     (BY MR. UESUGI)  Did you have a

13 chance to review Exhibit 46?

14     A     Yes, I have.

15     Q     And what is this?

16     A     It appears to me to be a US

17 Olympic Committee press release dated February 6,

18 2004 entitled US Taekwondo Union governance and

19 management committee meets with USTU CEO Bob

20 Gambardella.

21     Q     Is this the first time you're

22 seeing this?

23     A     No, I believe it was on their

24 website.

25     Q     So you have seen this before?

1      A     I believe so.

2      Q     Who drafted this?

3      A     I couldn't tell you.

4      Q     What was the purpose of this

5  press release?  Was it to document the meeting of

6  February 5, 2004?

7      A     One can only speculate.  I don't

8  know.

9      Q     Well, you're the executive

10 director?

11     MR. LEVINSTEIN:  This is a USOC press

12 release.

13     Q     (BY MR. UESUGI)  Okay.  Do you see

14 any mention about the eligibility requirements

15 being rewritten by the USOC?

16     A     As I go over it again, no.

17     Q     Do you know why there's no

18 mention of that?

19     A     No, I don't know why.

20     Q     If you were drafting this, would

21 you have included it?

22     MR. LEVINSTEIN:  Objection, calls for

23 speculation.

24     A     I don't know what my frame -- our

25 frame of reference or my frame of reference of

1  mind was back then, so it's very difficult to

2  answer anything.  So I don't know.

3      Q     (BY MR. UESUGI)  Was there --

4  okay.  Okay.  You're objecting to the financial.

5  I guess we won't to this one.  We'll just do this

6  short one.

7      MR. UESUGI:  We'll mark this as the

8  next one.

9      (Exhibit 47 was marked.)

10     Q     (BY MR. UESUGI)  Could you quickly

11 review that?  I'm not going to spend a lot of

12 time to this.

13     MR. LEVINSTEIN:  Rather than read the

14 whole thing, if you want to point him to a

15 specific paragraph, he'll read that paragraph.

16     Q     (BY MR. UESUGI)  Okay.  Do you

17 know what this is, this document?

18     A     Yes, it's a US Olympic Committee

19 press release dated February 13th and entitled US

20 Taekwondo Union financial situation improving

21 thanks to a donation from the Colorado Springs

22 Sports Corporation.

23     Q     And there was a $25,000 donation

24 from that organization; is that correct?

25     A     Yes, there was.

1          Q     There is a quote there in the
2    second paragraph, the last sentence says, the
3    timing of the USTU restructuring was such that it
4    allowed the Sports Corp. to donate money we
5    already had earmarked for an international
6    Taekwondo tournament that was canceled.  Do you
7    know what tournament they're talking about?
8          A     No, I don't.  You'd have to ask
9    Mr. Osborne.
10         Q     Was there other donation that
11   came in?
12         A     No.
13         Q     This was the only one?
14         A     Yes, it was.
15         Q     At least in this dollar amount?
16         A     Yes, anything significant, right.
17         Q     Or higher?
18         A     Yes.
19         Q     Did you look for any donations?
20   Was that part of your --
21         A     Well, I mean, we tried to.  There
22   was only so many sympathetic ears.  And these
23   folks from the Sports Corporation came through
24   for us.
25         MR. UESUGI:  Okay.  Let's mark the next

1    exhibit in order.
2          (Exhibit 48 was marked.)
3          Q     (BY MR. UESUGI)  Do you recognize
4    this document?
5          A     No.  But I see what it reads, but
6    I don't actually remember it.
7          Q     It's dated February 18, 2004 and
8    it announces that the 2004 Junior Olympic and
9    Senior Nationals will be open events.  Do you
10   remember that decision being made on or about
11   that time?
12         A     Yeah, I believe it was done
13   before that time.
14         Q     Okay.  Who made the decision?
15         A     It was a collective decision, I
16   believe, with the governance and management group
17   committee.
18         Q     Did you get involved in that
19   decision making process?
20         A     No.  I mean, basically I might
21   have had some input, but other than that it was
22   really the group's decision as a board.
23         Q     The GMC?
24         A     Governance and management group,
25   exactly, committee.

1          Q     Do you know why they made Junior
2    Olympic and Senior Nationals as open events?
3          A     You would have to ask them for
4    their opinion as they made that decision.
5          Q     Were you in favor of making JOs
6    and nationals open events?
7          A     Based on what I knew that for as
8    a temporary situation, I thought it was probably
9    a remedy that would at least stabilize some of
10   the existing problems that may have happened in
11   the past.
12         Q     In what way?
13         A     Basically, as I've heard, is that
14   there's just some states that the money wasn't
15   getting funneled at the end of the day to the
16   athletes.
17         Q     And your solution was to make JOs
18   and Nationals open events?
19         A     Yes.
20         MR. LEVINSTEIN:  Objection, that wasn't
21   his solution.  The solution --
22         THE DEPONENT:  The solution of the US
23   governance, right, was --
24         MR. UESUGI:  The solution of the USTU.
25         MR. LEVINSTEIN:  Again, he didn't say

1    that was why they did it.  He didn't know why
2    they did it.
3          Q     (BY MR. UESUGI)  Did you ever
4    receive any comments to the fact that if you make
5    JOs and Nationals open events it would destroy
6    the infrastructure of Taekwondo in the United
7    States?
8          A     I don't remember.
9          Q     You don't remember receiving any
10   comments?
11         A     I could have, but I don't
12   remember.
13         MR. UESUGI:  Okay.  Next exhibit in
14   order.
15         (Exhibit 49 was marked.)
16         (Discussion held off the record.)
17         Q     (BY MR. UESUGI)  Do you recognize
18   this document?
19         A     Yes, I do.
20         Q     It's a document from the USTU web
21   page dated February 13, 2004 in which it's
22   announced that the OTC camps are canceled; is
23   that correct?
24         A     That is correct.
25         Q     Do you remember this decision

1 being made on or about this time?

2     A    Somewhere around then, yes.

3     MR. LEVINSTEIN:  Hold on one second.  I

4 think you gave me your copy with the highlighting

5 on it.

6     MR. UESUGI:  That's okay.

7     MR. LEVINSTEIN:  I apologize.  I didn't

8 want to interrupt.

9     Q    (BY MR. UESUGI)  Who made this

10 decision?

11     A    It was a staff decision.

12     Q    Which means you?

13     A    Ultimately, yes, me.

14     Q    Why did you make this decision?

15     A    Basically, it seemed to me that

16 the camps weren't doing what they needed to do.

17 It was just a way, as I understood in talking to

18 some staff that were working there, that it was

19 just a money maker and had no impact on

20 performance, which is what we're all about.

21     Q    Okay.  Any other reasons?

22     A    That's the only reason,

23 performance, impact on performance.

24     Q    In previous years, did the OTC

25 camps make money for their organization?

1     A    I can't tell you.  You'd have to

2 look at their financials.

3     Q    Wasn't that one of your concerns

4 about the financial state of the USTU?

5     A    Moving forward.

6     Q    Moving forward, yes?

7     A    Trying to stabilize something and

8 moving forward to have a positive cash flow.

9     Q    Did you investigate whether the

10 camps in the past had made money?

11     A    I don't remember.

12     Q    Would that have been a factor in

13 your decision making?

14     A    Probably not, because of the fact

15 that, again, it didn't have impact on

16 performance.

17     Q    But it did have impact on the

18 financial situation of the USTU?

19     A    You might know better than I do

20 whether it did.

21     Q    Well, if it made money, it would

22 be good for the USTU's situation?

23     A    I don't know if it made money, so

24 I can't answer that yes.

25     Q    If the camps did make money,

1 would you agree that it would be good for the

2 financial situation of the USTU?

3     A    I don't know.

4     Q    You don't know?

5     A    No.  Basically, here's the deal.

6     Q    All right.

7     A    It's cash in.  The bottom line is

8 that it doesn't impact performance.  So when I

9 have to answer to certain people about certain

10 programs and it doesn't have a connection in some

11 way, shape or form to performance, then it's, in

12 my opinion, not a valuable program.

13     Q    These OTC camps, who would be

14 invited or who would be allowed to come?

15     A    Your question is -- I don't know.

16     Q    You don't know?

17     A    I don't know.

18     Q    Who would lead the camp?

19     A    I don't know.

20     Q    The OTC coach, resident coach?

21     A    Perhaps.

22     Q    So you don't know anything about

23 the OTC camps?

24     A    No, I'd have to go back and look

25 at it.

1     Q    And yet you canceled it?

2     A    Yes, Counselor, I did.

3     Q    Okay.

4     MR. UESUGI:  The exhibit next in order.

5     (Exhibit 50 was marked.)

6     Q    (BY MR. UESUGI)  Do you recognize

7 this.

8     A    Yes.

9     Q    This is a document from the USTU

10 web page date February 17th, 2004 announcing that

11 the USTU black belt certification program has

12 been suspended until further notice; is that

13 correct?

14     A    That's what it says, yes.

15     Q    Do you remember this decision

16 being made on or about this time?

17     A    I don't remember it, no.

18     Q    What is the state of the USTU

19 black belt certification program?

20     A    My understanding is there was a

21 paper that was developed in putting together a US

22 version of a Kukkiwon.  And basically when this

23 was, you know, happening, we just didn't have the

24 staff to put towards trying to develop something

25 at this point.  Again, we were in this trying to

1  stabilize rather than to grow at this point.

2      Q    You didn't have staff in the

3  office to handle this USTU certification program?

4      A    Our staff was overburdened in

5  terms of just trying to get membership cards out,

6  that adding another factor, another program could

7  have just not put out a quality program that our

8  members would expect.

9      Q    Didn't you have USTU Dan office

10 at this time?

11     A    Yes, we do.

12     Q    That handled Kukkiwon

13 certification?

14     A    Right.

15     Q    Who was in charge of that

16 certification?

17     A    Dedra McClay.

18     Q    Anybody else working that?

19     A    No.

20     Q    Did you have any conversations

21 about the USTU black belt certification program

22 with her on or about this time?

23     A    We probably talked about it, but

24 no, I don't remember.

25     Q    She didn't tell you that she

1  could handle it, no problem?

2      A    I don't remember.

3      Q    Who made the decision to cancel

4  the black belt course or suspend the program

5  until further notice?

6      A    Ultimately it was my decision.

7      Q    But you don't remember making it?

8      A    No, I'd have to go back and start

9  digging out files, but no.

10     Q    Were you aware that one of the

11 concerns of the USOC was the allegiance to Korea

12 or alleged allegiance to Korea through the

13 Kukkiwon Dan certification program?

14     MR. LEVINSTEIN:  Objection.

15     Q    (BY MR. UESUGI)  Were you aware of

16 that?

17     A    No.  At this point,

18 February 17th?

19     Q    Yes.

20     A    No.

21     Q    Did you subsequently become aware

22 that there was a concern?

23     A    No.

24     MR. LEVINSTEIN:  Objection to these

25 questions.

1      MR. UESUGI:  Are you answering for him?

2      MR. LEVINSTEIN:  No.

3      MR. UESUGI:  Just asking.

4      Q    (BY MR. UESUGI)  What is the state

5  of it at this point?  You never answered that.

6      MR. LEVINSTEIN:  The state of what?

7      Q    (BY MR. UESUGI)  The USTU black

8  belt certification program which you suspended

9  until further notice?

10     A    What we've had is, I had before

11 Dedra McClay left the organization, we were

12 working on developing a program in this USTU

13 black belt certification.  So it's in the

14 process.

15     Q    And who was developing it?

16     A    Dedra McClay has been talking to

17 certain individuals.  I believe Leon Preston was

18 one that she contacted.  I believe Jay Warwick.

19 But I can't remember the other folks that were

20 involved in it.

21     Q    And she subsequently left the

22 organization?

23     A    Yes.

24     Q    And so now what is the status of

25 the program?

1      A    The program is suspended until

2  further notice.

3      Q    Are you working on it actively?

4      A    Not actively, but we're working

5  on it.  We're working towards that end.

6      Q    What are you doing, you

7  specifically?

8      A    Me specifically at this point,

9  I'm not doing anything with it.

10     MR. UESUGI:  Exhibit next in order.

11     (Exhibit 51 was marked.)

12     Q    (BY MR. UESUGI)  Can you just

13 please review the first paragraph?  I'm just

14 going to ask about that so we can speed things

15 along.

16     A    Yes.

17     Q    Do you remember this?

18     A    Yes, I do.

19     Q    This is a USTU press release

20 dated February 27, 2004 which announces that the

21 USTU inks new sponsors for 2004; is that correct?

22     A    Yes.

23     Q    And it says that, with the

24 assistance of the United States Olympic

25 Committee's marketing division, the USTU has