8/12/2004 TRO Proceeding

1  were. And at this stage of the game, I think we were not
2  giving them any more money; we had frozen their grants.
3  Q.  You stated, I think, somewhere in that report, that their
4  financial management -- their financial condition was
5  worsening; do you recall something like that?
6  A.  Worsening.
7  Q.  Do you know if they were still solvent as of that point?
8  A.  Well, it depends on what you mean by "solvent." If you
9  can define that, I'll tell you.
10 Q.  Did their revenues exceed their expenses?
11 A.  I have no idea, at this stage of the game. I don't think
12 so, because I think the issue was, we weren't giving them any
13 money.
14 Q.  Okay. And this one was --
15 A.  There's no -- and there's no audit for '03. Their
16 external auditor resigned, so there really -- there is no
17 audit. There really is no way to tell.
18        MR. JONES:  At this time, Your Honor, I'd like to
19 offer 35 through 40 -- Exhibit Numbers 35 through 40 of the
20 plaintiff's exhibits into evidence.
21        MR. ROECA:  No objection, Your Honor.
22        THE COURT:  Okay, then Exhibits 35 through 40 are
23 received in evidence .
24        (Exhibits 35 through 40 received in evidence.)
25 BY MR. JONES:

121

8/12/2004 TRO Proceeding

1  Q.  You make the statement in your declaration that you, in
2  your capacity as auditor, have to keep track of something like
3  44?
4  A.  There's 45 NGB's.
5  Q.  45 NGB's. And that you had to audit -- or chose to audit
6  USTU a total of 11 times over the -- what was it, nine years?
7  A.  12 years.
8  Q.  12 years that you had them.
9       And that -- but you also made a statement that other
10 NGB's usually average four to five audits?
11 A.  That's right.
12 Q.  Would that be all of them on an average, an average four
13 to five audits?
14 A.  That's what "average" is. Yeah, four to five. If you
15 take all of them into consideration. Not counting Taekwondo.
16 Q.  Is --
17 A.  Our policy is to audit each NGB once every two to three
18 years, if there are no issues.
19 Q.  So that's a standard thing, then?
20 A.  That's our policy.
21 Q.  And that's to ensure that those funds that USOC is
22 providing to them are spent properly?
23 A.  That's right.
24 Q.  NGB's rely heavily on USOC funding, do they not?
25 A.  Well, it depends on the NGB. Some NGB's, we give them

122

8/12/2004 TRO Proceeding

1  less than one percent; some -- of their total funding; some,
2  we give them 80 percent. I think Taekwondo is in the 15 to 16
3  percent range.
4  Q.  Could you explain that? So, 15 to 16 percent of their
5  funding came from USOC?
6  A.  Right.
7  Q.  In your capacity as auditor, prior to joining the
8  governance committee for USTU, did the membership and
9  credentials committee ever call upon you to attend their
10 meetings?
11 A.  If they were looking at a sport that they wanted some
12 financial information on, they would ask me for a report. And
13 if it was necessary, then they would ask me to go. I didn't
14 go to all of them, but I went to many of them.
15 Q.  Did you attend any of the USTU meetings when USTU was
16 discussed by the membership --
17 A.  Yes, yes.
18 Q.  Which ones do you recall?
19 A.  Well, let's see... we were in San Diego, we were in
20 Florida, we were in Chicago, several in Denver.
21 Q.  So they would have these meetings at other -- in other
22 cities other than Colorado Springs?
23 A.  Right. The membership and credentials committee was a
24 group of volunteers from all over the country, so they moved
25 the meetings around to make it easier for attendance.

123

8/12/2004 TRO Proceeding

1  Q.  Were you familiar with all of the members of the
2  credentials and -- membership and credentials committee, I'm
3  sorry?
4  A.  Yes.
5  Q.  Thank you.
6        MR. JONES:  No further questions.
7        THE COURT:  Okay.
8        Mr. Roeca?
9        MR. ROECA:  Thank you, Your Honor. Just a few
10 questions.
11       REDIRECT EXAMINATION
12 BY MR. ROECA:
13 Q.  You made a comment, in response to one of counsel's
14 questions, that funds were frozen; do you recall that?
15 A.  Uh-huh.
16 Q.  Can you explain that to us? Why were funds frozen; and
17 to whom were they frozen?
18 A.  Well, it's USOC policy that if a sport is either not
19 performing -- not spending the money the way they should be,
20 or if they owe us money, or -- there's several reasons that
21 they're not performing, then we will suspend their funds.
22       The funds are actually an annual grant, but they are
23 paid quarterly.
24 Q.  And, in this particular instance, were funds being frozen
25 from USOC to the United States Taekwondo Union?

124

8/12/2004 TRO Proceeding

```
1   A.  Right.
2   Q.  And what was the reason, as you understood it, for that
3   decision, to freeze funds?
4   A.  The sport partnership group that Kelly Skinner is part
5   of, and Taekwondo is assigned to him, they had asked for
6   certain things like a business plan, a high performance plan,
7   planning documents like that that they hadn't turned in.  And
8   so they asked -- and they are actually the ones that trigger
9   the payments, so they asked that they be frozen.
10  Q.  Now, when did that occur?
11  A.  That's something I haven't thought about in a while.  I
12  think it was in the fall of '03.  I think their August 15th
13  and their November 15th payment were held up.
14  Q.  And you had been an auditor of the national governing
15  bodies on behalf of the United States Olympic Committee for a
16  number of years prior to that time, true?
17  A.  Since '92.
18  Q.  Had there been a freezing of funds of any national
19  governing board prior to that time?
20  A.  Occasionally it happened, but usually it would only be,
21  like, one payment.  And -- because it's really a drastic step.
22  Q.  Now, the 11 times in conducting audits of this particular
23  national governing body during the period in question you
24  indicated is not the average and not the norm, true?
25  A.  Right.  We're actually going in quarterly now.
```

126

8/12/2004 TRO Proceeding

```
1   something that had been an ongoing problem for years?
2   A.  Well, it actually had been an ongoing problem ever since
3   I had been there, and I think the first time I was there was
4   in '93.  But it was like a moving target.  This year they'd do
5   something right, and then the next year, they'd do it, the
6   same thing, wrong.  So the over-arching issues -- one of the
7   over-arching issues, which -- I don't know whether it has
8   anything to do with what we're doing here, but -- was that
9   they didn't hire really -- except for in one instance -- they
10  didn't hire qualified people, because they didn't want to
11  spend the money to hire good people.  So they had people who
12  didn't know bookkeeping trying to do the bookkeeping.
13          Part of the issue is that they didn't want the
14  office, the national office, to be in control.
15  Q.  And who is the national office?
16  A.  Well, the national office was the executive director and
17  the staff, the paid staff.  That's essentially what led to
18  the remediation plan.
19          THE COURT:  I'm sorry.  I am not certain I know --
20  national office of what?
21  A.  Taekwondo.
22  BY MR. ROECA:
23  Q.  The national office of Taekwondo?
24  A.  Right.  The fortunate -- or unfortunate thing is that the
25  national office of Taekwondo is on the Olympic training center
```

127

8/12/2004 TRO Proceeding

```
1   Q.  Okay.
2           And there was an Exhibit Number 38 that was shown to
3   you and is in evidence, and it refers to -- it's an August 29,
4   2003, letter which you wrote, and which had an attachment to
5   it, but the second paragraph starts off, "There are 19
6   recommendations in the report."  Do you see that?
7   A.  Right.
8   Q.  And if you turn to the executive summary, Pages 1 and 2
9   of that have 19 recommendations.  How would you characterize
10  the number and kind of recommendations that were being made in
11  this particular document to the United States Taekwondo Union?
12  A.  Well, I'd never issued a report with 19 recommendations
13  before, that's for sure.  This is the most recommendations
14  that we had made in a -- typically, you don't have to do that,
15  but the situation there was so bad that we had to spell
16  everything out.
17  Q.  What do you mean, the situation was so bad?
18  A.  Well, they didn't have appropriate records.  They had
19  changed their financial people -- they had fired their
20  -- they had fired their financial person.  Then they got
21  three temps in to do the accounting.  And they didn't know the
22  organization.  We went in -- they couldn't find documentation.
23  Things were just missing.  It was like operating out of a shoe
24  box.
25  Q.  Was this something that occurred in 2003, or was this
```

126

8/12/2004 TRO Proceeding

```
1   in Colorado Springs.  So they were in the next building over
2   from where we were, so we could keep an eye on them.
3   Q.  Were you involved in the discussions that led to the
4   agreement and remediation?
5   A.  On the financial side.  But that was really not the
6   sports side.
7   Q.  Okay.
8           On the financial side, based upon your recollection
9   of discussions, were financial issues significant to that
10  agreement and remediation?
11  A.  Yes, to the point of -- they did not have the capability
12  of administering the organization.  In the sports act, it says
13  that the NGBs have to demonstrate managerial and financial
14  capability.  And they didn't have either one.
15          THE COURT:  I'm still kind of confused.  Mr. Roeca,
16  you can ask her questions that will help clarify this.
17          When she says, they didn't want the national office
18  to be in control, who is "they"?
19          MR. ROECA:  Okay, why don't we clarify that for the
20  court.
21  BY MR. ROECA:
22  Q.  When you say, they didn't want the national office to be
23  in control, who is the "they"?
24  A.  The volunteer side.  The executive committee.  The
25  executive board of the USTU.  It's much like any
```

128

1  not-for-profit. There's a volunteer group, and then there's a
2  staff group. And the volunteer group typically should be
3  making the policy and telling the staff, which is the national
4  office, how to implement that. And
5  Q. And where, from your perspective, was there a breakdown?
6  A. The breakdown was that the volunteer side of this
7  organization had tried to micro-manage the administration in
8  the financial and managerial capability. That's what the
9  membership and credentials committee, I believe, was saying.
10 Q. Now, when the monies would come into the organization,
11 was the direction of the flow of the money to go to the
12 administrative side and then to fund the various activities --
13 in theory -- that the United States Taekwondo Union was
14 organized for?
15 A. Right.
16 Q. And was the audit that you had conducted over the course
17 of time, the various audits, did it find that those monies
18 were being filtered in directions that were not intended by
19 the organization?
20 A. Yes. We found inappropriate use of -- over the years, we
21 probably asked back $400- to $500,000.
22 Q. And, from your knowledge, currently being on the
23 governance and management committee, has that been one of the
24 focuses of your attention since assuming your current position
25 with that organization, the restructuring of that to prevent

129

1  that in the future?
2  A. Right. The governance committee is, you know, just a
3  volunteer position. Because I still am the managing director
4  of the audit at the USOC, and that is one of our focuses. And
5  they've -- I sent my staff in, and my staff spent three months
6  full-time Monday through Friday, re-creating their accounting
7  records.
8       MR. ROECA: That's all I have. Thank you,
9  Your Honor.
10      MR. JONES: Briefly, Your Honor?
11      THE COURT: Anything more?
12      MR. JONES: Thank you.
13           RECROSS-EXAMINATION
14 BY MR. JONES:
15 Q. Ms. Witte, you said you participated in the -- some of
16 the membership and credential meetings where the actual
17 remediation plan was discussed?
18 A. No, I didn't say that. I said I went to some of the
19 membership and credential meetings when they asked me to be
20 there. But I was not involved in the remediation plan.
21 Q. So you don't know what steps led up to the plan that went
22 into effect?
23 A. Not really. All I know is that it appeared that
24 decertification was imminent, and that the U.S. Taekwondo
25 Union and the USOC came up with this plan. But I was not

130

1  involved in concocting it.
2  Q. Were you asked what sort of personnel needed to be
3  substituted in order to set things right financially?
4  A. Yes. I said they needed a CFO.
5  Q. A CFO?
6  A. Right.
7  Q. Were you a part of any discussions where a plan was
8  looked at that would involve getting rid of less than the
9  entire board, all the officers and the president?
10 A. I wasn't involved in any of those discussions.
11      MR. JONES: Thank you.
12      THE COURT: All the officers and the what? I didn't
13 catch your question. Getting red of less than the entire
14 board, all the officers and --
15      MR. JONES: And the president.
16      THE COURT: The president? Thank you.
17      Anything more?
18      MR. JONES: No, Your Honor.
19      THE COURT: Okay. Then the witness is excused and
20 may step down.
21      I think we're done with all the evidence. At least
22 the testimony.
23      MR. JONES: Yes, Your Honor.
24      THE COURT: Okay, any other evidence from either
25 side?

131

1       MR. JONES: I would like to put a stipulation on the
2  record, as far as the exhibit list?
3       THE COURT: Okay. What's that?
4       MR. JONES: As I understand it, we've agreed on the
5  admissibility of Plaintiff's Exhibits 1 through 5. Also, 7
6  through 19. Also, 21. Also, 24 through 26. Also, 28 through
7  30. And 32. In addition to those that are already in.
8       THE COURT: Okay, 35 to 40 are in.
9       Okay, is that your position, too, Mr. Roeca?
10      MR. ROECA: Yes, Your Honor, we've agreed to that.
11      THE COURT: Okay, then I will admit those.
12      MR. JONES: I've also agreed to the admission of
13 Defendant's Exhibits A, B, C and D.
14      THE COURT: What are those? I have D-1, D-2, D-3,
15 D-4, D-5, D-6, so --
16      MR. JONES: D-1, D-2, D-3, D-4 and D-5 are agreed
17 on.
18      THE COURT: Is D-1 the same as Plaintiff's Exhibit
19 29?
20      MR. JONES: Yes, Your Honor.
21      MR. ROECA: If it is, we'll withdraw it, Your Honor.
22      THE COURT: Okay, then I will put on the record that
23 I am admitting Plaintiff's Exhibits 1, 2, 3, 4 and 5; and 7
24 and 8; 9, 10 and 11 have been previously admitted; I'll admit
25 12, 13, 14, 15, 16, 17, 18 and 19; Exhibit 21; Exhibits 24, 25

132

```
 1   and 26; 28, 29, 30 and 32; Exhibits 35 to 40 have been
 2   previously admitted.  I'm also admitting D-2, D-3, D-4 and
 3   D-5.
 4            Is that right?
 5            MR. JONES:  Yes, Your Honor.
 6            THE COURT:  Okay.  Then is that all the evidence?
 7            MR. JONES:  I would like to offer a few more.
 8            THE COURT:  I'm sorry?
 9            MR. JONES:  I would like to offer a few more.
10            THE COURT:  Okay, which ones?
11            MR. JONES:  Plaintiff's Exhibit 6; and Plaintiff's
12   Exhibit 22; Plaintiff's Exhibit 23 and 27; 31; and, lastly,
13   41.
14            THE COURT:  22 and 23 are the ones we were looking
15   at earlier, right?
16            MR. JONES:  Yes, Your Honor.
17            THE COURT:  Okay.  So I think we've discussed
18   those -- or did you want to say more?
19            MR. ROECA:  No, Your Honor.
20            THE COURT:  Okay, then I'm going to receive
21   Exhibits 22 and 23 -- that's over objection, right?
22            MR. ROECA:  Thank you.
23            THE COURT:  Okay.
24            And, then, looking at Exhibit 6, any objection?
25            MR. ROECA:  Yes.  We have already stated our
```

133

```
 1   objections for the record, Your Honor.
 2            THE COURT:  Did we look at this already?  Would you
 3   remind me what the objection was?
 4            MR. ROECA:  Hearsay, Your Honor.  We objected on the
 5   grounds that it was hearsay.  It was during the prior dispute.
 6   And, at that time, they were adversaries, and at the current
 7   time we have a different group.  And I understand the court's
 8   position, but that is our objection.  And it's double hearsay.
 9            THE COURT:  Okay, but this is an internal
10   communication, as opposed to the other...
11            MR. ROECA:  Your Honor, what we're objecting to is
12   the statement that is being referred to in the body of the
13   document, which is being referred to someone else.  And,
14   again, it's hearsay within hearsay.
15            MR. JONES:  Your Honor, we've also laid some
16   foundation, I think, through the witnesses that several
17   witnesses have heard the same exact statement, sat in on the
18   same meeting.
19            THE COURT:  Okay.
20            Well, I'm going to overrule the objection, and
21   receive Exhibit 6.
22            And you also asked for Exhibit 27?
23            MR. JONES:  Yes, Your Honor.  We have several
24   newspaper articles.
25            MR. ROECA:  Objection.  They are not
```

134

```
 1   self-authenticating.  A newspaper article is hearsay.
 2            THE COURT:  Yeah.  What is the purpose you are
 3   offering Exhibit 27 for?
 4            MR. JONES:  To show that USOC was having problems of
 5   its own regarding fairness, conflict of interest, picking
 6   favorites, all those sorts of things.
 7            THE COURT:  Okay, objection sustained.
 8            Exhibit 31 is another newspaper article.  And what
 9   is the -- why is this being offered?
10            MR. JONES:  Exhibit 31 is to show, actually,
11   irreparable harm to Dae Sung Lee, Your Honor.  April 15 is
12   when the media started letting the public and the State of
13   Hawaii know that he had been nominated.  And that is also what
14   triggered damage to his reputation after that point by the
15   USTU, with USOC then saying that they were going to pull the
16   nomination back a year later.
17            THE COURT:  Okay, this may go to your damage claim,
18   possibly, but I don't see how it goes to this injunctive
19   relief --
20            MR. JONES:  Irreparable harm is what we are saying,
21   Your Honor.  If -- the only way you can correct these kinds of
22   media releases at this point is to do equity.
23            THE COURT:  Is to what ?
24            MR. JONES:  Issue equitable relief, injunction.
25            THE COURT:  I am going to sustain the objection to
```

135

```
 1   Exhibit 31 for purposes of this hearing.  And whether it
 2   should come in on some other proceeding in this case can be
 3   resolved later.
 4            You also --
 5            MR. JONES:  Exhibit 41.
 6            THE COURT:  Yes.  For what purpose is this being
 7   offered?
 8            MR. JONES:  That is the one that covers the
 9   so-called interim remediation plan in which something less
10   drastic was agreed to by both sides and vetoed by the USOC
11   membership and credentials committee.  It goes to actions of a
12   racial nature.  That is our contention.
13            THE COURT:  Okay, sounds to me like it's being
14   offered for the truth, so it's hearsay; I am going to sustain
15   the objection to Exhibit 41.
16            Okay, any other evidence being offered by either
17   side?
18            MR. JONES:  No, Your Honor.
19            MR. ROECA:  No, Your Honor.
20            THE COURT:  Okay, then the evidence is closed.
21            Now, I do have the proposed findings of fact and
22   conclusions of law, but -- my intent is to rule by tomorrow.
23   So I guess what I want to do now -- and I know it's late,
24   and -- are the people on the phone still awake?
25            MR. LEVINSTEIN:  Yes, Your Honor.
```

136

8/12/2004 TRO Proceeding

1      MR. BENZ: Yes, Your Honor.
2      THE COURT: Okay, I just wanted to check, because
3  you have been silent for a while.
4      I want to give the attorneys a few minutes to argue
5  the impact of any facts that may have come up in this hearing
6  that were not anticipated, and so were not addressed in the
7  proposed findings of fact and conclusions of law, or the memos
8  that were submitted. So, we don't have a whole lot of time,
9  but to the extent there were things that you think were either
10 very helpful to your case that you didn't know would come up,
11 and you want to highlight those for me, or were very hurtful
12 to your case, and you want to tell me why I shouldn't consider
13 them, and you didn't anticipate them so didn't address them in
14 your submissions, I'll let you talk about those since you're
15 not going to have a chance to do revised proposed findings.
16     So, Mr. Jones, do you want to start? If there is
17 anything. There may not be. Things may have gone as you
18 anticipated. So, you don't need to repeat the things in your
19 papers already.
20     MR. JONES: No, Your Honor, I think the only thing
21 that came up which is -- I'll call it an equitable
22 consideration when issuing an injunction because it concerns
23 other parties, and that was the statements made by the two
24 athletes that Master Lee might be a source of distraction.
25     ==I think that the situation here is one where coaches==

137

8/12/2004 TRO Proceeding

1  ==have rights equal to the athletes. And I am not aware of any==
2  ==bylaw provisions, or anything in the sports act, or anywhere==
3  ==else, that put the interests of the athletes above coaches.==
4  However, it's obvious that the court is put in a position here
5  of trying to do the best thing for the team, do the best thing
6  for the coaches, do the best thing for the cause, and promote
7  the mission statement. And I feel strongly that the court can
8  still do that by issuing two credentials instead of the one
9  that was issued, but ordering that a second credential be
10 issued.
11     THE COURT: I want to tell you now that if you do
12 get any relief through the present proceeding, it will not be
13 in the form of my issuing Olympic coaching credentials. I
14 mean, I am not a credential issuing authority. So I want to
15 make sure that that's clear, that I don't think that I am in a
16 position to require that a particular individual be named as
17 the coach, you know, for some United States Olympic team.
18     Any relief that you were to get, assuming you were
19 to get any in this hearing, would not be in that form, okay?
20     MR. JONES: Thank you, Your Honor.
21     THE COURT: Okay.
22     Mr. Roeca?
23     MR. ROECA: Just a couple things.
24     First, Your Honor, the statement from one of the
25 witnesses that was called by plaintiff was to the effect that

138

8/12/2004 TRO Proceeding

1  the criteria were applied correctly in the selection of the
2  coach, and I think the court heard that.
3      The second thing is that, if one reads the -- I will
4  take some exception to what counsel just said regarding the
5  Amateur Athletic Act. The athletes come first. Coaches are
6  accorded equal rights, but this is about the athletes, not the
7  coaches. Today's proceedings is about the coach, but the
8  Olympics are about athletic performances.
9      And the other thing that has come through, I
10 believe, as I had hoped -- and I'm glad to hear from
11 everybody -- is that despite the background that was discussed
12 concerning the interplay between the United States Olympic
13 Committee and the United States Taekwondo Union and problems,
14 and the various pieces of information there, there's been not
15 a single piece of evidence by way of document or testimony
16 that the criteria for selection of coaches that was
17 established and communicated in April of 2004 was motivated by
18 anyone by reason of any prohibited discriminatory view. It is
19 neutral. It is objective. And the objective nature of it
20 was followed.
21     And so there's no connection through the testimony
22 that there has been any discrimination towards anyone in the
23 selection of athletes or coaches or the coach who happens to
24 be in Athens representing the United States today.
25     And I want to commend the plaintiff; he has an

139

8/12/2004 TRO Proceeding

1  exemplary background and qualifications. But that's not what
2  was set forth in the criteria. And I understand his feelings,
3  but I believe that the spirit of the Olympics have been set
4  forth and followed by the national governing board, and I ask
5  that the court find accordingly.
6      Thank you.
7      THE COURT: Okay.
8      MR. LEVINSTEIN: Your Honor, this is Mark Levinstein
9  in Washington. May I speak just very briefly?
10     THE COURT: Okay.
11     MR. LEVINSTEIN: One, if Your Honor does decide that
12 the only claim left is discrimination claim, then all the
13 contract claims and so on, that they have to be decided in
14 arbitration, then it's clear that what has to be shown is the
15 decision made to terminate his -- sorry, to rescind his
16 position as the coach and a new criteria were motivated by
17 discrimination against Korean-Americans.
18     So, if that's the case, then it would be necessary
19 to show that the executive committee -- not the membership and
20 credentials committee -- but the executive committee which
21 rescinded it did so not because of the reasons they stated,
22 which was they were reconsidering the management, there was
23 only one credential available so they had to reconsider
24 everything, was not true; that it was really because they
25 wanted to get rid of Dae Sung Lee, which there's no evidence,

140

1  at all, to that effect.
2  In addition, the -- I'm sorry, it's late here, and I
3  am trying to keep track here. The other issue is, as the
4  letters from Mr. Dae Sung Lee and his testimony indicate, he
5  liked Mr. Gambardella; Mr. Gambardella had always been nice to
6  him; he had confidence that Mr. Gambardella was going to do
7  the right thing; Mr. Gambardella told him that he was going to
8  try to come up with criteria and pick coaches who would best
9  serve the athletes. And Mr. Lee testified he believed that,
10 and he thought he would be fair, and he wrote to him saying he
11 wanted to still be considered.
12 It's clear he was still considered in the sense that
13 if an athlete he had coached had successfully competed, he
14 would have been selected.
15 Now, the criteria are neutral, and it's also clear
16 that at the time they were promulgated, no one knew who would
17 be selected, because the selection was totally contingent on
18 what happened to the athletes in the trials. So there
19 certainly was a possibility that both coaches that were
20 selected eventually would be -- (incomprehensible) --
21 Next, what is clear from the facts is that, really,
22 two coaches were selected. The problem is, at present we only
23 have one credential. So we selected a coach and a backup
24 coach who we want to get a credential for, who is the second
25 coach, and we are just waiting to see if we can accommodate

1  him because of the concern about having a -- both athletes
2  having a coach at ring-side who they are most comfortable
3  with.
4  And, lastly, the new evidence that we got in
5  Mr. Lee's declaration and in the hearing was that he was a
6  member of the board and the executive committee or the
7  executive board -- whatever they called it -- of the USTU when
8  the January 27th, 2004, agreement was signed. And it
9  explicitly includes, in paragraph 3-A on Page 4, a waiver of
10 rights that includes the directors and officers; it includes
11 Mr. Lee. And it says that no claims that were the subject of
12 the complaint and answer, which includes all these claims
13 about what the membership and credentials committee did, could
14 be -- it goes on to say that it won't be in any hearing having
15 to do with the Ted Stevens Olympic and Amateur Sports Act, and
16 so on.
17 So, all these claims were waived specifically by
18 him, and he agreed -- he testified that he voted in favor of
19 the agreement and the mediation plan after having seen it. So
20 it's fair to consider him bound.
21 And so, in our view, the same claims which are being
22 made about unfairness and what was going on in the fall of
23 2003, which we have confidence we can prove at a hearing were
24 anything but unfair, but they agree it cannot be a subject of
25 this proceeding.

1  So I think that's an important thing to add, as
2  well, and given that the only suggestion, whatsoever, the only
3  glimmer of evidence of any discrimination, is two letters and
4  an alleged statement by members of the membership and
5  credentials committee in connection with settlement
6  discussions, and reviewing of the allegations made by people
7  in the Taekwondo community about the USTU. Those have nothing
8  to do with the conduct of Mr. Gambardella or the USTU
9  committee, and they are trying to avoid exactly what the
10 settlement agreement was designed to do, which was put these
11 issues to rest.
12 THE COURT: Okay.
13 This hearing, with much coming in by telephone, is
14 probably a court reporter's nightmare. So I did notice that
15 the court reporter had some difficulty in understanding some
16 of the things heard, and one thing that was probably fairly
17 important in what Mr. -- well, important to the defense in
18 what was just said didn't come out totally on the transcript.
19 So, what I heard counsel just say was a reference
20 to, certainly, there having been the possibility that both
21 coaches that would be selected eventually would be
22 Korean-Americans, and that Korean-Americans part got -- you
23 got an "incomprehensible" in what the court reporter
24 transcribed, and that was probably an important part of what
25 you were saying in that particular sentence.

1  Okay, I'm going to try and issue a ruling by
2  tomorrow. Sometimes, on these preliminary injunction
3  hearings, I bring everybody in, and I recite findings orally.
4  I might do that tomorrow, but maybe not. If I do a written
5  ruling, which is probably what I'll do, then probably I'll
6  e-mail it to Mr. Jones and Mr. Roeca, and you can then
7  disseminate it as you like.
8  And I'll call you if I'm going to do that, so that
9  you can sit by your e-mail and see it and read it before you
10 read about it in the news.
11 So, that's probably how I am going to do it. I
12 can't promise you exactly that, but I think that's probably
13 how I'll do it. And it probably will come out in the
14 afternoon, not in the morning. So, for whatever help that
15 gives you folks in planning your day, that's my present
16 thought of how this will go.
17 Okay, I thank everybody for the work that they did.
18 I know everybody on both sides had to work really hard on
19 short notice. And I know that the people in Greece are ready
20 to collapse, and the sun is rising, and so forth. So I thank
21 all of you for the help that you've given to me, and I hope to
22 get you a ruling by tomorrow.
23 Thank you.
24 MR. ROECA: Thank you.
25 MR. JONES: Thank you, Your Honor.

```
1    THE CLERK: All rise.
2         This court now stands in recess.
3         (The hearing in the above-entitled
4    cause was concluded at 4:14 p.m.)
5                   - - -
```

8/12/2004 TRO Proceeding

```
7                        -ooOoo-
8         I, Stephen B. Platt, Official Court Reporter,
9    United States District Court, District of Hawaii, do hereby
10   certify that the foregoing is a true and correct partial
11   transcript of proceedings before the Honorable Susan Oki
12   Mollway, United States District Judge.


20                        -------------------------------
21   TUESDAY, MARCH 1, 2005    STEPHEN B. PLATT, CSR NO. 248
```