DEPOSITION OF JILL J. CHALMERS, ESQUIRE                              4/8/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
CIVIL ACTION NO. 04-00461-SOM-LEK

---

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
EXAMINATION DATE: Friday, April 8, 2005

---

DAE SUNG LEE,

Plaintiff,

v.

UNITED STATES TAEKWONDO UNION,
a Colorado nonprofit corporation, et al.,

Defendants.

---

PURSUANT TO SUBPOENA, the deposition of JILL J. CHALMERS, ESQUIRE, was taken at 8:11 a.m. on Friday, April 8, 2005, at the Double Tree Hotel at 1775 E. Cheyenne Mountain Boulevard, Colorado Springs, Colorado, before Valorie S. Mueller, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.


Valorie S. Mueller
Registered Professional Reporter


**EXHIBIT 3**

---

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/8/2005

Page 13

1    to a reincorporation in Colorado.
2         Q    Did that happen recently?
3         A    Yes.  That happened in November of last
4    year.
5         Q    What is the new name, which I assume is
6    public record?
7         A    The new name is USA Taekwondo.
8         Q    Is it correct that the decertification
9    action brought by the USOC against USTU during 2003 was
10   settled at some point?
11        A    To my knowledge, it was settled.
12        Q    When the settlement took place, was --
13   well, was your representation terminated before the
14   actual final settlement was agreed upon?
15        A    Yes.
16        Q    Did other counsel take over in your place?
17        A    Yes.
18        Q    What was the name of that counsel?
19        A    I believe his name is Richard Tagmeyer.
20        Q    I'd like to show you an exhibit, if I
21   could, marked as exhibit -- previously marked as
22   Exhibit 4.
23             MR. LEVINSTEIN:  Thanks again.
24        Q    **(BY MR. JONES)  Have you had a chance to**
25   **skim through Exhibit 4?**

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/8/2005

Page 14

```
 1      A    Yes, I've skimmed it.
 2      Q    Have you seen that document before?
 3      A    Yes, I have.
 4      Q    Is that a letter from Thomas Satrom,
 5 Chairman of the USOC Membership and Credentials
 6 Committee, to Bruce Harris, Executive Director of the
 7 U.S. Taekwondo Union, dated August 4, 2003?
 8      A    That's what it appears to be.
 9      Q    When did you first see this document?
10      A    I don't know an exact date, but generally
11 in early fall of 2003.
12      Q    Would it be roughly around the time it was
13 sent out to Bruce Harris, if you know?
14      A    I don't know.  I don't think we were
15 retained immediately upon its sending.
16      Q    The letter contains a list of problems,
17 does it not, that the USOC apparently perceived that
18 the USTU had?
19           MR. LEVINSTEIN:  Objection.  Contrary to
20 the document.  Speaking on behalf of the Membership and
21 Credentials Committee, not the USOC.
22      A    The letter appears to list a number of
23 problems or concerns.
24      Q    (BY MR. JONES)  Concerns of the Membership
25 and Credentials Committee of the USOC?
```

Page 15

1    A    That's my understanding, yes.

2    Q    And correct me if I'm wrong, but one of
3 the listed problems, they state, is an allegiance to
4 Korea to the detriment of U.S. programs and the
5 interest of U.S. athletes?

6    A    Yes, that's listed as No. 5.

7    Q    Did you understand about the time your
8 firm was retained to handle the decertification action
9 against USTU that a substantial number of Korean
10 Americans held management positions with USTU?

11   A    Can you repeat the question again?  Sorry.

12   Q    Did you understand or learn that at the
13 time you were retained and began work for USTU that a
14 substantial number of Korean Americans were in
15 management or appointed positions for USTU?

16   A    My understanding was that there were a
17 number of Korean Americans in governance positions,
18 which are different, in my mind, than management
19 positions.

20   Q    Fair enough.  And was it a substantial
21 number?

22        MR. LEVINSTEIN:  Objection.

23   A    That was my understanding.  I guess,
24 substantial, I'm not sure.  But in a regular
25 organization that I deal with, yes, it seemed to be

Case 1:04-cv-00461-SOM-LEK    Document 189-5    Filed 03/14/2006    Page 5 of 13

DEPOSITION OF JILL J. CHALMERS, ESQUIRE                              4/8/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 16

1   substantial in comparison to organizations that I
2   normally deal with.
3           Q   (BY MR. JONES)  Given that knowledge, did
4   you personally feel, when you read this letter, that
5   No. 5 listed on Page 2 appeared to be racially
6   insensitive --
7                MR. LEVINSTEIN:  Objection.
8           Q   (BY MR. JONES)  -- to Korean-born
9   Americans?
10               MR. LEVINSTEIN:  Objection.  Calls for
11  attorney work product.  It's privileged information.
12               MR. JONES:  I'm just asking for her
13  individual feelings when she saw that.
14               MR. LEVINSTEIN:  She was in a position as
15  an attorney at the time representing a client.  There's
16  no way to separate out those views from advice given on
17  other issues, so I think it's work product.
18               MR. RYCHENER:  And I think if the entity
19  is asserting the work-product privilege and
20  attorney-client, then I'll instruct her not to answer.
21               MR. JONES:  Fair enough.
22          Q   (BY MR. JONES)  This letter, Exhibit 4,
23  gave notice that the USOC Membership and Credentials
24  Committee was intending to have a meeting on September
25  12th, 2003 in which decertification would be discussed.

Case 1:04-cv-00461-SOM-LEK   Document 189-5   Filed 03/14/2006   Page 6 of 13

DEPOSITION OF JILL J. CHALMERS, ESQUIRE                            4/8/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 17

1   Do you recall that?
2        A    Yes.
3        Q    Did you ultimately attend that meeting
4   whenever it occurred?
5        A    Yes.
6        Q    Where was that meeting held?
7        A    The meeting was held in Denver.
8        Q    And you attended on behalf of USTU?
9        A    That's correct.
10       Q    Did any other attorneys from your firm
11  attend that meeting on behalf of USTU?
12       A    Yes.  Steve Smith, a partner of our firm,
13  attended as well.
14       Q    Showing you Exhibit 5 previously marked.
15            MR. LEVINSTEIN:  Thank you.
16       Q    (BY MR. JONES)  You've had a chance to
17  skim Exhibit 5?
18       A    Yes.
19       Q    And is that another letter from Mr. Satrom
20  of the USOC Membership and Credentials Committee
21  directed to Bruce Harris of the USTU dated September 5,
22  2003?
23       A    That's what it appears to be.
24       Q    And did you see this letter before
25  sometime in 2003?

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/8/2005

Page 18

```
 1        A      Yes, I've seen this letter before.
 2        Q      What was the purpose of this letter, if
 3   you know?
 4               MR. LEVINSTEIN:  Objection.
 5        A      My understanding was this letter was from
 6   the Membership and Credentials Committee to raise
 7   additional concerns that they expected USTU to respond
 8   to prior to or during the September meeting.
 9        Q      (BY MR. JONES)  So you understood that
10   items 1 through -- I guess numbered items 1 through 15
11   needed to be responded to by USTU before or during the
12   upcoming meeting in Denver?
13               MR. LEVINSTEIN:  Objection.
14        A      That was my understanding.
15        Q      (BY MR. JONES)  And did you have an
16   understanding as to what would happen if USTU did not
17   respond appropriately or fully to these points listed
18   in the September 5 letter?
19               MR. LEVINSTEIN:  Objection.  Calls for
20   legal advice given to the client.  It's work-product
21   privilege and it's probably attorney-client as well.
22               MR. RYCHENER:  I also object, lack of
23   foundation to the extent you are asking about her
24   understanding of what the USOC committee intended.  But
25   to the extent they raised the attorney-client
```

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/8/2005

Page 19

```
 1    privilege, I'll instruct her not to answer.
 2              MR. JONES:  Fair enough.
 3         Q    (BY MR. JONES)  Focusing on Item No. 8, if
 4    you'd read that one.
 5         A    Okay.
 6         Q    When you read that, did you believe it to
 7    be racially insensitive toward Korean Americans?
 8              MR. LEVINSTEIN:  Objection.  It's calling
 9    for attorney work product and privilege.
10              MR. RYCHENER:  I'll instruct her not to
11    answer.
12         Q    (BY MR. JONES)  You told us, that you did
13    attend the meeting held in Denver by the USOC
14    Membership and Credentials Committee, along with
15    Mr. Smith; is that correct?
16         A    That's correct.
17         Q    About how long was that meeting?  Just a
18    rough estimate.
19         A    I guess half a day.
20         Q    Did it take place on September 13?
21         A    That's my recollection.
22         Q    Who else was in attendance at the meeting,
23    if you remember?
24         A    There were a large number of people
25    attending the meeting; many members of USTU attended,
```

DEPOSITION OF JILL J. CHALMERS, ESQUIRE                                  4/8/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 26

1     A     During an attorney-client meeting
2  following the hearing.
3     Q     So just to understand, your testimony
4  today is that during all parts of the Denver meeting
5  arranged by USOC Membership and Credentials Committee,
6  you never heard anyone on the USOC side or the
7  Membership and Credentials side refer to USTU
8  governance as a Korea Mafia-run organization, or words
9  to that effect?
10    A     Never the words Korean or Korea Mafia.
11    Q     Did you ever hear words or terms used by
12 the USOC Membership and Credentials Committee that
13 sounded racially insensitive to Korean Americans?
14          MR. LEVINSTEIN:  Objection; vague and
15 ambiguous.  But she can answer that.
16          MR. RYCHENER:  And this question is not
17 limited to the Denver meeting, or is it about the
18 Denver meeting?
19    Q     (BY MR. JONES)  I'm just focusing on the
20 Denver meeting for now.
21    A     And can I clarify if your question refers
22 to the Denver meeting or the meeting of the Membership
23 and Credentials Committee that Steve and I were invited
24 to attend afterward?
25    Q     Either.

```
 1      A      Can you repeat your question, something
 2   about racially insensitive?
 3      Q      Let me break it up.
 4      A      Yeah, thanks.
 5      Q      During the open -- there were two parts --
 6      A      Yes.
 7      Q            the open session and I'll call it the
 8   closed session; is that correct?
 9      A      Yes.
10      Q      There were just two parts?  During the
11   first session, did you hear anyone on the Membership
12   and Credentials side or the USOC side use terms or
13   words that sounded racially insensitive to Korean
14   American people?
15             MR. LEVINSTEIN:  Objection.  You may
16   answer.
17      A      I don't recall hearing words that I
18   thought people would feel are racially insensitive
19   during the open meeting.
20      Q      (BY MR. JONES)  Same question now for the
21   closed session.  Did you hear anyone on the USOC side
22   or the Membership and Credentials side use words,
23   phrases that sounded racially insensitive to Korean
24   Americans?
25      A      It's a hard question for me to answer
```

1  because I'm not a Korean American, so I can't tell you
2  how Korean Americans might have felt after hearing some
3  comments made during the closed hearing.  But I can
4  tell you that I recall some comments that were -- I'm
5  not sure if insensitive would be the word, but
6  inflammatory would be a word I would use.
7       Q    What words did you hear that you would
8  consider inflammatory?
9            MR. LEVINSTEIN:  Objection.
10      A    I specifically remember hearing words such
11 as, the athletes need to get their heads out of their
12 asses; they need to cut the deferential bowing crap and
13 think for themselves, and words to that effect.
14      Q    (BY MR. JONES)  Any other inflammatory
15 words that you heard at that closed session meeting in
16 Denver?
17      A    Those were the -- are the only specific
18 words I recall.
19      Q    Were any minutes taken at that meeting
20 by -- did it appear to you that minutes were being
21 taken at that meeting by staff or volunteers on the
22 USOC side?  And I'm focusing on the closed session
23 portion.
24      A    I don't recall minutes being taken.
25      Q    Were you provided with minutes after the

DEPOSITION OF JILL J. CHALMERS, ESQUIRE  
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.  
4/8/2005

Page 89

```
 1        Q     Among the things you handled, would it
 2   have included the merger?
 3        A     That's correct.
 4        Q     Does your firm currently do work for USOC,
 5   if you know?
 6        A     I don't know if we are representing USOC
 7   in any matters.
 8        Q     I believe I am done.
 9              And forgive me if I have asked this before; I
10   better ask it one more time.  During your tenure as
11   counsel for USOC -- I mean, pardon me -- USTU, have you
12   ever heard/observed statements or conduct by any staff
13   or volunteers of USOC that the average person may take
14   to be racially insensitive?
15              MR. LEVINSTEIN:  Objection.
16        A     I can't answer what an average person --
17        Q     (BY MR. JONES)  How about you as an
18   average person?
19              MR. LEVINSTEIN:  Objection.
20        Q     (BY MR. JONES)  You would interpret as
21   racially insensitive?
22              MR. RYCHENER:  I'm going to object to the
23   extent that you have asked and she has answered that
24   question before, but --
25        Q     (BY MR. JONES)  If you could just answer
```

Page 90

1  it one more time, whatever the answer was.
2       A    I have no other additional information
3  than I have provided.  I know that the Membership and
4  Credentials Committee posed questions to the USTU that
5  I can't tell you how other people might interpret.  And
6  I told you about a statement made by Jeannie
7  Picariello.  And that's all I've heard or seen from the
8  USOC.
9       Q    Did any of the questioning by members of
10 the Membership and Credentials Committee during the
11 Denver meeting ever sound racially insensitive to you?
12      A    During all parts of the meeting?
13      Q    All parts, yeah.
14      A    Did it sound racially insensitive to me?
15      Q    You covered the statement that was made.
16 I'm just asking now about the types of questioning.
17      A    I don't recall any questioning that would
18 have appeared to be racially insensitive.
19      Q    Okay.  No further questions.  Thank you.
20      A    Thank you.
21           (The deposition concluded at 11:40 a.m.)
22
23
24
25

Valorie S. Mueller, RPR                                                303-681-9939
VSM REPORTING, LLC    P.O. BOX 186    LARKSPUR, CO 80118-0186          vsmreporting.com