0001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
CIVIL ACTION NO. 04-00461-SOM-LEK

---

DEPOSITION OF JILL J. CHALMERS, ESQUIRE
EXAMINATION DATE: Friday, April 8, 2005

---

DAE SUNG LEE,

Plaintiff,

v.

UNITED STATES TAEKWONDO UNION, a Colorado nonprofit corporation, et al.,
Defendants.

---

PURSUANT TO SUBPOENA, the deposition of JILL J. CHALMERS, ESQUIRE, was taken at 8:11 a.m. on Friday, April 8, 2005, at the Double Tree Hotel at 1775 E. Cheyenne Mountain Boulevard, Colorado Springs, Colorado, before Valorie S. Mueller, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.

Valorie S. Mueller
Registered Professional Reporter

A P P E A R A N C E S

For the Plaintiff:

WARD D. JONES, ESQ.
GLENN UESUGI, ESQ.
Bervar & Jones
1400 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813
(808) 550-4990

For the Defendants:
MARK LEVINSTEIN, ESQ.
TODD BRAUNSTEIN, ESQ.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 44-5171

For the Deponent:

BRENT RYCHENER, ESQ.
Holme Roberts & Owen, LLP
90 South Cascade, Suite 1300
Colorado Springs, CO 80903
(719) 473-3800

Also present: Dae Sung Lee
Gary Johansen, Deputy General Counsel, United States Olympic Committee

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Jones ...................................... | 8 |

I N D E X O F E X H I B I T S

| DEPOSITION EXHIBIT NO. | DESCRIPTION | PAGE FIRST APPEARS |
|---|---|---|
| 4* | August 4, 2003 letter from Thomas Satrom to Bruce Harris .......................... | 13 |
| 5* | 9/5/2003 letter from Thomas Satrom to Bruce Harris ............................. | 17 |
| 6* | 10/9/03 memo from Bruce Harris to Sang Lee | 23 |
| 22* | 10/27/03 one-page, unsigned letter from Steven Smith to President Sang Lee ........ | 82 |
| 23* | 11/17/03 fax cover sheet with attached 11/12/03 letter from Sang Lee, Barb Kunkel, Sammy Pejo, and others, to Hon. Ben Nighthorse Campbell ................... | 82 |
| 102 | 9/12/03 memo from Steve Smith and Jill Chalmers to USOC Membership and Credentials Committee, Bates HRO001 ....... | 39 |
| 103 | Responses to 12 Problems Outlined by Tom Satrom in August 4, 2003 Letter, Bates HRO002-HRO017 ............................ | 40 |
| 104 | Responses to 16 Questions Submitted by Tom Satrom in September 5, 2003 Letter, with attachments A-G, Bates HRO018-HRO059 ...... | 41 |
| 105 | 9/12/03 letter from Jill Goodwin to Virginia Witte, with attached audit report, Bates HRO060-HRO065 ............... | 44 |
| 106 | United States Taekwondo Union Financial Policies and Procedures, Bates HRO066-HRO077 ............................ | 45 |
| 107 | 2/13/04 fax cover sheet from Steve Smith to Gary Johansen, with attached USTU Board of Governors as of September 11, 2003, Bates HRO078-HRO084 ...................... | 46 |

| DEPOSITION EXHIBIT NO. | DESCRIPTION | PAGE FIRST APPEARS |
|---|---|---|
| 108 | 11/22/03 e-mail from Steven Smith to Judi Cope, forwarding 10/22/03 exchange of e-mail between Judi Cope and Gary Johansen, Bates HRO085-HRO086 ............ | 47 |
| 109 | 10/22/03 exchange of e-mail between Judi Cope and Gary Johansen, with attached remediation plan, Bates HRO145-HRO149 ..... | 48 |
| 110 | 11/20/03 e-mail correspondence between Steve Smith and Gary Johansen, with attached 11/20/03 letter from Stephen Bull to The Honorable Ben Campbell, and attached press release, Bates HRO087-HRO098 ............................ | 50 |
| 111 | 10/31/03 and 10/30/03 exchange of e-mail between Steven Smith and Gary Johansen, Bates HRO099 ............................. | 53 |
| 112 | 10/30/03 letter from Kenneth Waugh to Sang Lee, Bates HRO100-HRO101 .................. | 53 |
| 113 | 10/30/03 and 10/29/03 exchange of e-mail between Gary Johansen and Steven Smith, with attachments, Bates HRO102-HRO111 ..... | 54 |
| 114 | 10/29/03 letter from Steven Smith to Gary Johansen, Bates HRO112-HRO114 ............. | 54 |
| 115 | 10/28/03, 10/13/03 and 10/12/03 exchange of e-mail among Steven Smith, Gary Johansen, and Jim Cahn, with attached Implementation of a Remediation Plan for the United States Taekwondo Union, Bates HRO115-HRO120 ............................ | 56 |
| 116 | 10/28/03 e-mail from Steven Smith to Jeff Benz and Gary Johansen, Bates HRO121 ...... | 57 |
| 117 | Printout of PowerPoint presentation prepared for USOC Membership and Credentials Committee September 13, 2003, Bates HRO122-HRO130 ...................... | 58 |
| 118 | 10/27/03 letter from Steven Smith to Jeffrey Benz, Bates HRO131-HRO134 ......... | 61 |

EXHIBIT "A"

119 10/27/03 e-mail from Steven Smith to Jeff Benz and Gary Johansen, with attached 10/27/03 letter from same, Bates HRO135-HRO137 ............................ 61

120 10/24/03 letter from Kelly Skinner to Bruce Harris, with attached Draft Press Release, Bates HRO138-HRO141 ............. 61

121 10/24/03 e-mail correspondence among Steven Smith, Gary Johansen and Jill Chalmers, Bates HRO142 ................... 62

122 10/24/03 letter from Mark Bryant to Sang Lee and Bruce Harris, Bates HRO143-HRO144 . 63

123 10/22/03 e-mail from Gary Johansen to Judi Cope, with attached Remediation Plan for USTU, Bates HRO150-HRO154 ................ 63

124 10/22/03 e-mail from Gary Johansen to Judi Cope, with attached Remediation Plan for USTU, Bates HRO155-HRO159 ................ 63

125 10/22/03 exchange of e-mail between Gary Johansen and Judi Cope, Bates HRO160-HRO162 ............................ 64

126 10/22/03 exchange of e-mail between Gary Johansen and Judi Cope, with attached Summary of USOC's Position and Proposed Plan to Remedy USOC's Concerns, Bates HRO163-HRO168 ............................ 64

127 10/7/03 letter from Kelly Skinner to Bruce Harris, Bates HRO169 ..................... 65

128 10/7/03 e-mail from Gary Johansen to Steven Smith and Jill Chalmers, with attached e-mail correspondence between Dedra McClay and Ronda Sweet, Bates HRO170-HRO171 ............................ 65

129 10/3/03 exchange of e-mail between Steven Smith and Gary Johansen, Bates HRO172 ..... 66

130 9/26/03 and 9/25/03 exchange of e-mail between Steven Smith and Gary Johansen, Bates HRO173 ............................. 66

131 9/22/03 e-mail from Jill Chalmers to Kay Burton, Bates HRO174 ..................... 67

132 9/19/03 and 9/18/03 exchange of e-mail between Jill Chalmers and Gary Johansen, Bates HRO175-HRO176 ...................... 67

133 9/19/03 e-mail from Gary Johansen to Steven Smith and Jill Chalmers, with attached 9/16/03 letter from Bruce Harris to Member USTU School and sample letter to Honorable Ben Campbell, Bates HRO177-HRO179 ............................ 67

134 9/12/03 exchange of e-mail between Steven Smith and Gary Johansen, with attached Proposed Remediation for USTU, Bates HRO180-HRO189 ............................ 68

135 9/12/03 exchange of e-mail between Steven Smith and Jeff Benz, et al., Bates HRO190-HRO191 ............................ 68

136 9/11/03 exchange of e-mail between Jill Chalmers and Jeff Benz, et al., Bates HRO192-HRO195 ............................ 69

137 9/11/03 letter from Thomas Satrom to Steven Smith, Bates HRO196-HRO198 ......... 70

138 9/9/03 letter from Steven Smith to Gary Johansen, Bates HRO204-HRO207 ............ 71

139 9/11/03 e-mail from Steven Smith to Gary Johansen, et al., with draft Proposed Remediation for USTU, Bates HRO199-HRO203 . 75

140 9/9/03 e-mail from Steven Smith to Gary Johansen, et al., Bates HRO208 ............ 75

141 8/26/03 letter from Thomas Satrom to Bruce Harris, Bates HRO214-HRO217 ............... 75

142 8/26/03 and 8/21/03 exchange of e-mail between Gary Johansen and Steven Smith, Bates HRO218-HRO220 ...................... 76

143 8/21/03 e-mail from Steven Smith to Gary Johansen, Bates HRO221 ................... 76

144 9/12/03 resignation letter from Bruce Harris, Bates HRO232-HRO233 ............... 77

*Exhibits previously marked.

P R O C E E D I N G S

JILL J. CHALMERS, ESQUIRE

The deponent herein, being first duly sworn to testify to the truth in the above cause, was examined and testified on her oath as follows:

E X A M I N A T I O N

BY MR. JONES:

Q Would you please state your name and business address for the record, please?

A Jill J. Chalmers. I'm at Holme Roberts & Owen, 90 South Cascade, Suite 1300, Colorado Springs, 80913.

MR. RYCHENER: And if I could just state, now that we're on the record, that Holme Roberts & Owen has produced, in response to your subpoena, documents this morning which we've Bates stamped HRO-1 through HRO-251.

MR. JONES: And are those documents responsive to the subpoena?

MR. RYCHENER: Yes.

Q (BY MR. JONES) Ms. Chalmers, what is your occupation?

A I'm an attorney.

Q Are you licensed in the state of Colorado?

A Yes.

Q Have you ever taken a deposition before?
A Never.
MR. LEVINSTEIN: Taken or given?
MR. JONES: Taken.
Q (BY MR. JONES) Given the fact that you haven't taken one before, I'll briefly run through the ground rules to avoid problems as we proceed along.

As your attorney might have told you, a deposition is basically an interview. It is an under-oath interview, so it is important that we get a clear record. The purpose of the deposition is primarily for use in court.

If this matter goes to trial and you are not able to testify in Hawaii where the action is pending, the deposition could be read directly to the jury in place of your live testimony. You understand that?
A Yes.
Q I will try and make myself clear, but if I do not in my questioning, please say, I don't understand the question, could you please rephrase it or re-ask it, and I'll be happy to do so.

Nobody wants you to guess. We're just asking for your best answers based upon personal knowledge today.
A Okay.

Q If you do go ahead and respond to questions, we'll all assume that you understand the question and are responding fully and truthfully. Is that fair?
A That's fine.
Q We will take breaks every 45 minutes or so, but if for any reason you want to take a break, just ask for one, and we'll go off the record.
A Okay.
MR. LEVINSTEIN: For the record, I just want to say that taking the deposition of a lawyer of the defendant is a very unusual thing. It raises all sorts of concerns about attorney work product and privilege. We are going to go very slowly so we can make sure we identify those issues. Ms. Chalmers has her own counsel here.

And, in general, our view is if there are events at which there are other people available to testify, in general it is not appropriate to take the deposition of Ms. Chalmers about things that counsel has special knowledge.

In fact, the questions you're going to ask, we have the view are all privileged, given the limited allowance the judge made at the hearing on that document to come in. We have not challenged that she

will be questioned about certain limited subjects. But we're making no waiver by allowing her to be here today.
MR. JONES: Understood.
Q (BY MR. JONES) Where are you employed, Ms. Chalmers?
A At Holme Roberts & Owen.
Q That is a law firm?
A That's correct.
Q And where is it located?
A We have many offices, but I work in Colorado Springs.
Q How long have you been with that firm?
A Since 2000.
Q Do you have an area that you specialize in?
A I have a few areas I specialize in. They include representation of nonprofit organizations. I also have a subspecialty in intellectual property.
Q In your position at Holme Roberts, has your firm ever represented the United States Taekwondo Union?
A Yes, we did represent the United States Taekwondo Union.
Q Roughly during what period has it or did

it represent United States Taekwondo Union?
A To my knowledge, I know that we represented USTU at least from 2002. And I know we withdrew representation at some time and continued representation recently again.
Q I saw some documentation in the documents that were just furnished that suggests you might have withdrawn around October 2003, something like that. Does that sound about right?
A That sounds correct.
Q I'm not going to hold you to that date, but I just noticed one letter.

What was the scope of your representation during 2002 through 2003, if you can recall, of USTU?
MR. LEVINSTEIN: Objection; calls for privilege.
Q (BY MR. JONES) During 2002 and 2003, did you represent USTU in a decertification action brought by the United States Olympic Committee against it?
MR. LEVINSTEIN: Objection. You can answer.
A Yes.
Q (BY MR. JONES) Just to clarify, does the USTU still exist under that name?
A No. USTU was merged out of existence due

to a reincorporation in Colorado.

Q Did that happen recently?

A Yes. That happened in November of last year.

Q What is the new name, which I assume is public record?

A The new name is USA Taekwondo.

Q Is it correct that the decertification action brought by the USOC against USTU during 2003 was settled at some point?

A To my knowledge, it was settled.

Q When the settlement took place, was -- well, was your representation terminated before the actual final settlement was agreed upon?

A Yes.

Q Did other counsel take over in your place?

A Yes.

Q What was the name of that counsel?

A I believe his name is Richard Tagmeyer.

Q I'd like to show you an exhibit, if I could, marked as exhibit -- previously marked as Exhibit 4.

MR. LEVINSTEIN: Thanks again.

Q (BY MR. JONES) Have you had a chance to skim through Exhibit 4?

A Yes, I've skimmed it.

Q Have you seen that document before?

A Yes, I have.

Q Is that a letter from Thomas Satrom, Chairman of the USOC Membership and Credentials Committee, to Bruce Harris, Executive Director of the U.S. Taekwondo Union, dated August 4, 2003?

A That's what it appears to be.

Q When did you first see this document?

A I don't know an exact date, but generally in early fall of 2003.

Q Would it be roughly around the time it was sent out to Bruce Harris, if you know?

A I don't know. I don't think we were retained immediately upon its sending.

Q The letter contains a list of problems, does it not, that the USOC apparently perceived that the USTU had?

MR. LEVINSTEIN: Objection. Contrary to the document. Speaking on behalf of the Membership and Credentials Committee, not the USOC.

A The letter appears to list a number of problems or concerns.

Q (BY MR. JONES) Concerns of the Membership and Credentials Committee of the USOC?

A That's my understanding, yes.

Q And correct me if I'm wrong, but one of the listed problems, they state, is an allegiance to Korea to the detriment of U.S. programs and the interest of U.S. athletes?

A Yes, that's listed as No. 5.

Q Did you understand about the time your firm was retained to handle the decertification action against USTU that a substantial number of Korean Americans held management positions with USTU?

A Can you repeat the question again? Sorry.

Q Did you understand or learn that at the time you were retained and began work for USTU that a substantial number of Korean Americans were in management or appointed positions for USTU?

A My understanding was that there were a number of Korean Americans in governance positions, which are different, in my mind, than management positions.

Q Fair enough. And was it a substantial number?

MR. LEVINSTEIN: Objection.

A That was my understanding. I guess, substantial, I'm not sure. But in a regular organization that I deal with, yes, it seemed to be

substantial in comparison to organizations that I normally deal with.

Q (BY MR. JONES) Given that knowledge, did you personally feel, when you read this letter, that No. 5 listed on Page 2 appeared to be racially insensitive --

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) -- to Korean-born Americans?

MR. LEVINSTEIN: Objection. Calls for attorney work product. It's privileged information.

MR. JONES: I'm just asking for her individual feelings when she saw that.

MR. LEVINSTEIN: She was in a position as an attorney at the time representing a client. There's no way to separate out those views from advice given on other issues, so I think it's work product.

MR. RYCHENER: And I think if the entity is asserting the work-product privilege and attorney-client, then I'll instruct her not to answer.

MR. JONES: Fair enough.

Q (BY MR. JONES) This letter, Exhibit 4, gave notice that the USOC Membership and Credentials Committee was intending to have a meeting on September 12th, 2003 in which decertification would be discussed.

Do you recall that?

A Yes.

Q Did you ultimately attend that meeting whenever it occurred?

A Yes.

Q Where was that meeting held?

A The meeting was held in Denver.

Q And you attended on behalf of USTU?

A That's correct.

Q Did any other attorneys from your firm attend that meeting on behalf of USTU?

A Yes. Steve Smith, a partner of our firm, attended as well.

Q Showing you Exhibit 5 previously marked.

MR. LEVINSTEIN: Thank you.

Q (BY MR. JONES) You've had a chance to skim Exhibit 5?

A Yes.

Q And is that another letter from Mr. Satrom of the USOC Membership and Credentials Committee directed to Bruce Harris of the USTU dated September 5, 2003?

A That's what it appears to be.

Q And did you see this letter before sometime in 2003?

A Yes, I've seen this letter before.

Q What was the purpose of this letter, if you know?

MR. LEVINSTEIN: Objection.

A My understanding was this letter was from the Membership and Credentials Committee to raise additional concerns that they expected USTU to respond to prior to or during the September meeting.

Q (BY MR. JONES) So you understood that items 1 through -- I guess numbered items 1 through 15 needed to be responded to by USTU before or during the upcoming meeting in Denver?

MR. LEVINSTEIN: Objection.

A That was my understanding.

Q (BY MR. JONES) And did you have an understanding as to what would happen if USTU did not respond appropriately or fully to these points listed in the September 5 letter?

MR. LEVINSTEIN: Objection. Calls for legal advice given to the client. It's work-product privilege and it's probably attorney-client as well.

MR. RYCHENER: I also object, lack of foundation to the extent you are asking about her understanding of what the USOC committee intended. But to the extent they raised the attorney-client

privilege, I'll instruct her not to answer.

MR. JONES: Fair enough.

Q (BY MR. JONES) Focusing on Item No. 8, if you'd read that one.

A Okay.

Q When you read that, did you believe it to be racially insensitive toward Korean Americans?

MR. LEVINSTEIN: Objection. It's calling for attorney work product and privilege.

MR. RYCHENER: I'll instruct her not to answer.

Q (BY MR. JONES) You told us that you did attend the meeting held in Denver by the USOC Membership and Credentials Committee, along with Mr. Smith; is that correct?

A That's correct.

Q About how long was that meeting? Just a rough estimate.

A I guess half a day.

Q Did it take place on September 13?

A That's my recollection.

Q Who else was in attendance at the meeting, if you remember?

A There were a large number of people attending the meeting; many members of USTU attended,

as well as management and some members of the governance of USTU.

Q Were the USTU members who were present at the meeting invited or allowed to stay through the whole meeting, or did the meeting kind of go in two stages where they were invited to leave or asked to leave and then the meeting continued?

A My understanding is it was one meeting that was open to all of the membership or any interested person, and that was the only meeting of the Membership and Credentials Committee. I understood that the Membership and Credentials Committee met separately, but that was an internal meeting, not part of the meeting to discuss USTU and compliance issues.

Q Were you allowed to sit in on the closed-door session of the USOC Membership and Credentials Committee for all or part of it?

A Steve Smith and I were asked to join a meeting that had been in session for some time near the end of their meeting.

Q Can you tell us what areas were discussed in the open forum portion of the meeting, if you can remember anything about it?

A What areas were discussed?

Q (Counsel nodded.)

A There were a number of areas that were discussed. Primarily issues raised by the Membership and Credentials Committee, many of them that were listed in the two letters that we have just discussed, as well as a number of additional issues that were raised by USTU members during the meeting, mainly relating to the compliance or noncompliance of USTU with the USOC bylaws and articles of incorporation in the Ted Stevens Olympic and Amateur Sports Act.

Q Did the members of the U.S. Olympic Committee ask questions during the open forum portion?

A Members of the USOC's Membership and Credentials Committee did ask a number of questions.

Q And did people speaking on behalf of the USTU or appearing to be speaking on behalf of the USTU attempt to respond to those questions?

A Yes. And in addition, other members from the USTU who attended on their own behalf also responded and asked additional questions.

Q Did there appear to be groups of USTU members at the meeting who opposed each other based upon the kinds of things they were saying?

MR. LEVINSTEIN: Objection.

A Yes. There were many individual groups of members whom I perceived to have different agendas and

disputes among each other and with the USTU.

Q (BY MR. JONES) So this meeting, the whole meeting, was as much as a half day, you said?

A It may have even been a bit longer than a half day.

Q Were you asked to speak or did you ask to speak during the open session on behalf of USTU?

A I believe I spoke briefly during the open session on behalf of USTU.

Q Were you -- or did you go in expecting to have to give a formal presentation?

A It was our hope to give a formal presentation, although it had been planned that Steve Smith would primarily lead the presentation.

Q Was it your intention to try and respond to all these points in Exhibits 4 and 5 as best you could?

A That wasn't our plan.

Q It was not?

A No.

Q Was there any intention to present witnesses at any portion of the USOC Membership and Credentials Committee meeting in Denver?

A Yes.

Q What witnesses were at least planned?

MR. RYCHENER: Again, I think that's going into attorney work product. I think you can ask her what witnesses they put on; but in terms of what their strategy was, again, I think that gets too far into attorney-client work product.

MR. JONES: That's fair.

Q (BY MR. JONES) What witnesses did you put on, if any?

A I don't recall specifically who we were able to put on. I know generally we asked athletes to speak, I believe some state association presidents we asked to speak.

I recall asking Jill Goodwin, USTU's independent auditor at that time, to speak on behalf of the organization. I believe we asked Bruce Harris to speak, but he may have spoken without our prompting.

I can explain our intent was a lot.

MR. RYCHENER: Again, I instruct you not to get into attorney-client and work-product issues in terms of strategy.

MR. JONES: All right.

Q (BY MR. JONES) I'm showing you what's previously been marked as Exhibit 6.

A Okay.

Q Have you had a chance to read Exhibit 6?

A Yes.

Q Have you seen that document before?

A No, I have not.

Q It appears to be a memo written by Bruce Harris directed to Sang Lee dated October 9, 2003, which summarizes a meeting between you and various USTU individuals and governance; is that correct?

A I don't know if it's a memo or a letter.

MR. LEVINSTEIN: And for the record, again, this document came into evidence that certain issues can be discussed, but we don't consider it a waiver of privilege. We also have severe doubts that whoever produced it had the right to waive privilege, to the extent there's a limited waiver of certain things -- actually, it's not a waiver, but there's information here that should have been preserved by the entity.

That's it. Go ahead.

Q (BY MR. JONES) In it, Mr. Harris says that you mentioned that several members of the M&C Committee during that Denver meeting had referred to the USTU as a Korea Mafia-run organization; that you specified that Jeannie Picariello, a member of the committee, was one of the more vocal persons using the racially derogatory language; and further that you

expressed your feeling that the Membership and Credentials Committee was running amuck. Did --

MR. LEVINSTEIN: Let's take them one at a time and separate them out because they present different issues.

Q (BY MR. JONES) Did you hear Jeannie Picariello state that she felt USTU -- or refer to USTU as a Korea Mafia-run organization during any portion of the meeting in Denver?

A No.

Q Did you hear anyone on the USOC side use language similar in reference to the USTU -- language similar, I mean, "Korea Mafia" or words to that effect?

A No one from the USOC Membership and Credentials Committee or from the USOC.

Q Who, if anyone, did you hear use that kind of language?

A Sammy Pejo.

Q Your best memory of what Sammy Pejo said at the Denver meeting?

A I didn't hear Sammy use that term during the Denver meeting.

Q It was at a different time?

A Yes.

Q When, if you can say?

A During an attorney-client meeting following the hearing.

Q So just to understand, your testimony today is that during all parts of the Denver meeting arranged by USOC Membership and Credentials Committee, you never heard anyone on the USOC side or the Membership and Credentials side refer to USTU governance as a Korea Mafia-run organization, or words to that effect?

A Never the words Korean or Korea Mafia.

Q Did you ever hear words or terms used by the USOC Membership and Credentials Committee that sounded racially insensitive to Korean Americans?

MR. LEVINSTEIN: Objection; vague and ambiguous. But she can answer that.

MR. RYCHENER: And this question is not limited to the Denver meeting, or is it about the Denver meeting?

Q (BY MR. JONES) I'm just focusing on the Denver meeting for now.

A And can I clarify if your question refers to the Denver meeting or the meeting of the Membership and Credentials Committee that Steve and I were invited to attend afterward?

Q Either.

A Can you repeat your question, something about racially insensitive?

Q Let me break it up.

A Yeah, thanks.

Q During the open -- there were two parts --

A Yes.

Q -- the open session and I'll call it the closed session; is that correct?

A Yes.

Q There were just two parts? During the first session, did you hear anyone on the Membership and Credentials side or the USOC side use terms or words that sounded racially insensitive to Korean American people?

MR. LEVINSTEIN: Objection. You may answer.

A I don't recall hearing words that I thought people would feel are racially insensitive during the open meeting.

Q (BY MR. JONES) Same question now for the closed session. Did you hear anyone on the USOC side or the Membership and Credentials side use words, phrases that sounded racially insensitive to Korean Americans?

A It's a hard question for me to answer

because I'm not a Korean American, so I can't tell you how Korean Americans might have felt after hearing some comments made during the closed hearing. But I can tell you that I recall some comments that were -- I'm not sure if insensitive would be the word, but inflammatory would be a word I would use.

Q What words did you hear that you would consider inflammatory?

MR. LEVINSTEIN: Objection.

A I specifically remember hearing words such as, the athletes need to get their heads out of their asses; they need to cut the deferential bowing crap and think for themselves, and words to that effect.

Q (BY MR. JONES) Any other inflammatory words that you heard at that closed session meeting in Denver?

A Those were the -- are the only specific words I recall.

Q Were any minutes taken at that meeting by -- did it appear to you that minutes were being taken at that meeting by staff or volunteers on the USOC side? And I'm focusing on the closed session portion.

A I don't recall minutes being taken.

Q Were you provided with minutes after the

meeting?

A No.

Q Did you take notes regarding things that were said during the closed session meeting?

A No.

Q Do you know if Mr. Smith did?

A I don't know if he did.

Q So should we assume that notes were not produced today pursuant to the subpoena duces tecum?

A I did not produce any notes, and I'm not aware of any notes.

Q Who was the person that stated that the athletes should quit bowing during the closed session meeting, if you remember?

A Jeannie Picariello said the statement to that effect. And I recall, I think it was cut the bowing crap.

Q Did she explain why she thought that was an inappropriate habit by the athletes?

A My understanding was Jeannie was very frustrated by the athletes who testified at the hearing that they were members of committees but didn't know who the chair of the committees were or what their roles were.

And I know the athletes made statements that

they just tried to focus on training, rather than getting involved in the politics. And I understood her comments were out of frustration of the athletes' lack of ability or desire to govern the organization, despite their election to governance positions.

Q She understood, though, that that was a requirement that athletes participate and have a voice in governance of USTU?

MR. LEVINSTEIN: Objection.

MR. RYCHENER: Objection; lack of foundation.

Q (BY MR. JONES) Did it appear she understood that to you?

MR. RYCHENER: Same objection.

A It appeared to me that she understood.

Q (BY MR. JONES) Were there any other actions on the part of USTU governance that the Membership and Credentials Committee, during the closed-door session, was critical of that concerned Korean cultural --

A I don't --

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) -- Korean culture.

MR. LEVINSTEIN: Other actions? I don't know what other actions we're talking about. But go

ahead.

A I don't recall any other -- I don't recall any person making any statement of their frustration with the USTU resulting from any Korean issue.

Q (BY MR. JONES) During the closed-door session, was the point made in Mr. Satrom's first letter about members of the USTU having more allegiance to Korea discussed in any way, shape, or form during the closed-door session?

A I don't recall that issue being discussed.

Q How about Item 8 in his second letter?

MR. RYCHENER: Referring to Exhibit 5?

Q (BY MR. JONES) Yes. Was any part of that discussed during the closed-door session?

MR. RYCHENER: Any part of Item 8?

MR. JONES: Yes.

A Item 8 wasn't specifically discussed, but I suppose you might make a connection between Jeannie Picariello's statements to Item 8. But we didn't look down at any letters during that meeting and say focus on Item 8, let's discuss it.

Q (BY MR. JONES) Did fairness of officiating during competitions come up in discussion during the closed-door session?

A I really don't recall.

Q Did accountability of the USTU leadership come up during the closed door discussion at the Denver meeting?

A Yes.

Q And what was said about that, if you can recall?

A I don't recall exact words, but generally I recall members discussing their belief that the leadership of USTU had to go for accountability reasons.

Q Had to go -- in other words, had to be replaced?

A Resign, I think would be the best characterization.

Q And did they say --

MR. LEVINSTEIN: Is this about the closed door meeting or the open meeting as well?

MR. JONES: Closed door meeting.

A That was my understanding, closed door meeting.

MR. LEVINSTEIN: Okay. I apologize.

Q (BY MR. JONES) Is that how it was tied into accountability; that they weren't accountable, and that's why they had to go, or was it something else?

A We were trying to negotiate a remediation

plan where the leadership would be retained, although the Executive Director would resign. And it was clear during the closed door meeting that members, and I can't remember individually which members, but certain members felt that the leaders of the organization should be held accountable for noncompliance with the USOC directives.

Q So did it sound to you like the committee had already made up its mind by the Denver meeting that that's what they wanted to do?

MR. LEVINSTEIN: Objection.

A During the meeting, it was my belief that certain members had made up their mind about noncompliance and that the leadership and management of the organization was insufficient.

Q (BY MR. JONES) Bruce Harris stated that you told the USTU management after the meeting that you thought the committee was running amuck. Was that a fair characterization of what was going on in there?

MR. LEVINSTEIN: Objection.

MR. RYCHENER: And I also object, I think that does ask for attorney work product, thought processes. I mean, if you want to ask, did she say that, I think that's where to start.

Q (BY MR. JONES) Did you say that?

A Those are not my words.

Q Did the committee appear to be running amuck --

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) -- during the closed-door session?

MR. LEVINSTEIN: I think that's tied in with legal advice and work product. I don't even know what it means.

A And I'm not sure what running amuck means. I can tell you that I thought that USTU, during the open meeting, did not have proper opportunity to fully explore the remediation plan that they were proposing and to show the USOC the efforts they were taking to try to comply with the requirements, because during the meeting, much of the time was taken by members of the USTU who spoke against the governance and management during that meeting.

So from a time standpoint, it was very difficult for us to represent and defend the USTU when they were being questioned not only from the Membership and Credentials Committee but from members and factions of the organization itself. And for that reason, it did not seem to me that USTU had a fair opportunity to be heard.

Q (BY MR. JONES) Were you ever provided with written correspondence, e-mails, letters from these various factions that were critical of USTU governance?

A Were we ever given the materials?

Q Yes.

MR. LEVINSTEIN: Objection.

A I know we were provided with some materials showing concerns of the members from our client. And independently I reviewed websites relating to Taekwondo, so I was aware of some concerns that certain factions or portions of USTU membership had with the organization.

Q (BY MR. JONES) Did either the Membership and Credentials Committee or staff working for that committee independently provide you with individual complaints --

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) -- from USTU members critical of the current governance at that time?

MR. LEVINSTEIN: Objection.

A I don't know who provided our firm with documentation. I know I -- I know there was an open hearing which our firm did not attend. I know -- I understood from discussions with our client --

MR. RYCHENER: I would instruct you not to reveal attorney-client communications.

Q (BY MR. JONES) The meeting that you did not attend, was that the first portion, the open forum portion, or are you talking about a separate meeting before that?

A A separate meeting before we were retained to assist USTU with this.

Q Your best estimate as to when that occurred, if you know?

A I don't know, but I'm guessing July.

Q Of 2003?

A That would be correct.

MR. LEVINSTEIN: We ought to not leave her with a misimpression, since you know when it was. Why don't you tell her? You don't have to, but I don't want to get confused testimony based on a misunderstanding.

MR. JONES: Fair enough.

Q (BY MR. JONES) Did the subject of a Taekwondo student's loyalty to his instructor being all important come up during that meeting behind closed doors in Denver?

A Not specifically, but I would tie Jeannie Picariello's frustration to deference given by athletes

to instructors, managers, or organizers.

Q Was discussion about Korean culture placing a higher value on loyalty to one's family, friends, school than on honesty and fair play discussed during the closed-door session?

A Not specifically.

Q How about indirectly?

A I guess I could tie Jeannie's statements to that, but my understanding was Jeannie was very angry and frustrated by the athletes who were in attendance at the meeting; their inability to think for themselves was my understanding of her frustration.

Q What happened after the meeting in Denver? By that, I mean just chronologically, how did the decertification action proceed?

MR. LEVINSTEIN: Objection. I don't see how she could possibly do that without mixing in discussions with the client, advice given, meetings held. So I don't know how she can answer that question.

MR. RYCHENER: Yeah, I agree that that would necessarily include attorney-client communications.

Q (BY MR. JONES) You mentioned that attempts were made at coming up with a mutually

agreeable remediation plan; is that correct?

A Yes.

Q Did those efforts continue up until the time Holme Roberts withdrew?

A Yes.

Q During your representation of USTU, was there ever a plan on the table which involved removing only the chief executive officer and the financial officers involved with handling day-to-day financial issues for USTU?

MR. LEVINSTEIN: Objection. First, I don't know what on the table means. Is it who presented it, didn't present it? There are documents that show specifically what proposals were made and so on. And I see no basis for getting into her recollection or thought processes when she may be incorrect and may be influenced by communications with the client. And there are documents which would show exactly those issues.

MR. RYCHENER: And I object, as well, to the extent a plan may refer to internal strategy that was never developed into a plan that was provided to the other side.

Q (BY MR. JONES) Since you have provided a stack of documents, why don't we go through them, since

there doesn't seem to be any problem with using those.

MR. JONES: Let me go ahead and mark HRO-001 as next exhibit in order.

(Deposition Exhibit No. 102 was marked for identification.)

MR. LEVINSTEIN: For the record, the mere fact that they have produced nonprivileged documents does not mean that it's okay to ask questions about them, just for the record. So you can do what you want to do.

Q (BY MR. JONES) Can you tell me what that exhibit is, 102?

A It appears to be a memo from Steve Smith and myself to the Membership and Credentials Committee to which our written responses to sets of questions that were raised by the Membership and Credentials Committee responded to.

Q And this was after the Denver meeting?

A I believe it was before -- immediately before the Denver meeting.

Q Oh, that's right. The meeting was on the 13th. So this was given to them the day before?

A Yes.

Q And we've had testimony by Mr. Bruce Harris testifying to two sets of responses -- at least

two sets of responses that he prepared specifically to Exhibits 4 and 5, which we already looked at.

Were those the items that were turned over to Mr. Satrom?

MR. LEVINSTEIN: Objection.

A Attached to this letter?

MR. LEVINSTEIN: You can look at what follows. She wouldn't know what Bruce Harris said or what documents that he produced.

MR. JONES: She might.

Exhibit next in order.

(Deposition Exhibit No. 103 was marked for identification.)

Q (BY MR. JONES) What is that document?

A This is USTU's responses to the initial 12 problems that were outlined in the letter from Tom Satrom on behalf of the Membership and Credentials Committee, this dated August 4th of 2003.

Q So that was USTU's response to Exhibit 4; is that correct?

A I can't recall if Exhibit 4 --

Q August 4 --

A Yes.

Q -- 2003 letter?

A That's correct.

Q And did you believe that Bruce Harris prepared this document?
A Bruce Harris had assisted with the preparation of this document.
Q And in it, Page 3, Item 5, it states that USTU categorically denies the assertion that USTU has an allegiance to Korea to the detriment of U.S. programs and the interests of U.S. athletes?
A Yes, that's what it says.
(Deposition Exhibit No. 104 was marked for identification.)
Q (BY MR. JONES) Showing you Exhibit 104. What is that document?
A These are the written responses of USTU to additional questions that were raised by the Membership and Credentials Committee in a letter that was dated September 5th of 2003.
Q And, again, was this document prepared with input from Bruce Harris?
A That's correct, yes.
Q And it attaches Exhibits A through G in further support of the answers?
A Yes.
Q And Item 9 at Page 8 states that USTU disagrees with the perception of the -- the perceptions

listed in Item 9?
A Yes.
Q Was the substance contained in the response in Item 9 discussed during the closed session meeting in Denver, other than the bowing remark that you have already gone over?
A I don't recall any specific other discussions.
Q After the Denver meeting and before your firm withdrew, were there any face-to-face discussions with either members of the USOC volunteers or staff regarding the decertification action?
MR. LEVINSTEIN: Objection.
MR. JONES: I'm not talking about their attorneys now. I'm talking about the actual volunteers or staff of the USOC.
MR. LEVINSTEIN: Meetings by whom with those people?
MR. JONES: With Ms. Chalmers.
A I don't recall any.
Q (BY MR. JONES) Was all discussion done between attorneys when it came to dealing with the other side?
A That's my recollection.
Q And who was the attorney on the other

side, or attorneys?
A We had conversations with Gary Johansen following the October -- or sorry -- the November -- or September meetings and prior to our withdrawal.
Q Was he the spokesperson -- did you believe him to be the spokesperson for the Membership and Credentials Committee and/or the USOC?
MR. LEVINSTEIN: Objection.
A I didn't understand his role to be the spokesperson for the Membership and Credentials Committee. That, to my understanding, was Tom Satrom.
Q (BY MR. JONES) Did you understand Gary Johansen to be the attorney for the USOC and/or the Membership and Credentials Committee?
A It was my understanding that he was the attorney for the USOC.
Q And, again, you had no direct conversations with Mr. Satrom after the Denver meeting regarding the decertification action?
A I remember we had telephone conversations with Mr. Satrom, but I don't believe they were after the meeting.
Q You had discussions with him before?
A Yes.
Q What was the nature of the discussions?

A I don't recall the specific discussions, but generally relating to our proposed remediation plan.
Q Did Mr. Satrom ever use language or terms with you that one could interpret as racially insensitive toward Korean Americans?
A No.
(Deposition Exhibit No. 105 was marked for identification.)
Q (BY MR. JONES) What is that document?
A It is a letter from Jill Goodwin of Waugh & Associates, USTU's outside auditor, responding -- containing responses to questions that were raised by Virginia Witte of the Audit Division of the USOC relating to USTU's finances.
Q This was provided the day before the Denver meeting, as well, to the Membership and Credentials Committee?
A Yes, that's correct.
Q And the purpose, again, was what?
MR. RYCHENER: Object to lack of foundation.
Q (BY MR. JONES) Why was it passed on to the Membership and Credentials Committee?
MR. LEVINSTEIN: Objection.

A To respond to questions that they had raised or that the USOC had raised concerning the finances and accounting at USTU.

(Deposition Exhibit No. 106 was marked for identification.)

Q (BY MR. JONES) Exhibit 106. What is that document, do you know?

A I believe it was an attachment to the letter sent by Jill Goodwin. And if it wasn't an attachment, I think it was referred to either in Jill's letter or during the USOC Membership and Credentials Committee meeting.

Q It's a multiple-page document entitled the "United States Taekwondo Union Financial Policies and Procedures"?

A That's correct.

Q Did you believe it to be just that, a statement of United States Taekwondo Union's Financial Policies and Procedures?

MR. LEVINSTEIN: Objection.

A I believe this was policies and procedures that Jill Goodwin was working with USTU management to draft and implement in an effort to bring USTU -- or with the goal of bringing the USTU into compliance with their requirements under the Act and USOC bylaws and

constitution.

Q (BY MR. JONES) Was this discussed at the closed-door session in Denver?

A I don't recall it being discussed in the closed-door session.

(Deposition Exhibit No. 107 was marked for identification.)

MR. LEVINSTEIN: To help move this along a little, the attachment to the cover page of Exhibit 107 is already an attachment to a previous document you've marked. It's one of the exhibits to a prior response.

MR. JONES: Yeah.

Q (BY MR. JONES) What is this document?

A It is a categorized listing of members of the USTU Board of Governors, including Executive Committee members and other categorizations of the members of the Board of Governors.

Q And this is the same document as one of the exhibits in 104 --

A I believe so, yes.

Q -- that we looked at earlier?

A Yes, I believe it is. Exhibit D.

Q And this breaks down the structure and people on the governance as it existed in 2003 for

USTU?

A That's correct.

(Deposition Exhibit No. 108 was marked for identification.)

A Okay.

Q (BY MR. JONES) Have you had a chance to look at Exhibit 108?

A Yes.

Q What is that?

A It appears to be an e-mail string to and from Steve Smith, via his secretary, Judi Cope, to Gary Johansen, attaching our proposed draft of a remediation plan.

Q Just to speed things up, in the pile you provided, is the remediation plan that's being referred to in this e-mail contained?

A In the e-mail?

Q I'm sorry. In the stack of documents you're bringing today.

A I believe so.

Q Could you take a look at the pile and tell us which page number to look at, and I might put it with it.

A I believe HRO-145. I believe it's the same plan attached to HRO-145, starting at -146.

Q So the date of the e-mail on 108 to Mr. Johansen was what?

A On the initial e-mail or the e-mail --

Q The one attaching the actual remediation plan for his consideration.

A Wednesday, October 22nd -- or October -- October 22.

(Deposition Exhibit No. 109 was marked for identification.)

Q (BY MR. JONES) And what that is document?

A It's also an e-mail string from Judi Cope, a secretary of our firm, and Gary Johansen.

Q And what are the remaining pages of that document?

A It is a draft proposed remediation plan for USTU.

Q Pardon me?

A A draft proposed remediation plan for the USTU.

Q And was this plan accepted by the other side?

MR. LEVINSTEIN: Objection.

A I don't believe this is the plan that was ultimately accepted.

Q (BY MR. JONES) Do you recall the reasons

given by the other side, the USOC Membership and Credentials Committee, as to why this one was unacceptable?

MR. LEVINSTEIN: Objection; assumes facts not in evidence.

A I don't recall specifically the reasons that were given, and I don't know if this is -- I haven't compared this to the plan that we finally proposed before the Membership and Credentials Committee. I don't know if it's the same or a subsequent draft.

Q (BY MR. JONES) This plan we're looking at calls for the replacement of Bruce Harris?

A Yes, it does call for the replacement of Bruce Harris.

Q It also calls for the replacement of whoever was functioning as chief financial officer? I'm sorry. It calls for the hiring of a competent financial manager or outside contractor to serve as chief financial officer?

A Yes, that's what it calls for.

Q It also calls for a new governance and management committee comprised of five persons and describes the type of people or type of qualifications?

A Yes. It includes the provision that the

USOC would select those five people, with input from USTU or recommendations.

Q It calls for the immediate resignation of the president, who was Sang Lee? Page 3?

A Yes. And putting him in a new capacity.

Q With the chair of the Governance and Management Committee assuming the duties of the president?

MR. LEVINSTEIN: I just object to her being asked to sit and read the document. I don't know what the point of it is. The document says what it says.

A That's what the document says, yes. It's part of this plan.

(Deposition Exhibit No. 110 was marked for identification.)

Q (BY MR. JONES) Had chance to look at Exhibit 110?

A Yes.

Q What is that?

A It's an e-mail message from Gary Johansen to Steve Smith of our office in response to an e-mail message that Steve sent to Gary asking about a separate matter for a different client and about news that the USTU had filed a discrimination claim against the USOC.

Q And what are the attachments?

MR. RYCHENER: I'll object to the lack of foundation. There's no indication that she was copied on this or anything.

Q (BY MR. JONES) Are the documents attached to this -- stapled to this e-mail, do they go along with the e-mail?

MR. RYCHENER: Same objection.

Q (BY MR. JONES) Do you know?

A I believe they were attached to the e-mail.

Q The first attachment is a letter addressed to Senator Campbell dated November 20, 2003, signed by Stephen Bull? Who is Stephen Bull, do you know?

A I don't know.

Q Senator Campbell was the senator from Colorado at the time?

A That's correct.

Q Do you know if this letter was some sort of response to a letter sent out by USTU to Senator Campbell?

MR. LEVINSTEIN: Objection. To have her read the document to answer things not from her personal knowledge is just inappropriate.

A Yeah. I don't know. I could read and

tell you.

Q (BY MR. JONES) The second attachment is a press release?

MR. RYCHENER: I would also note -- I would object on lack of foundation. I would also note that all of these attachments are dated after Holme Roberts & Owen withdrew from representation.

A It looks to me like a press release.

Q (BY MR. JONES) Given the date on the third -- well, on all of these exhibits, do you happen to know why they're in your file?

A We keep correspondence relating to clients in our files.

MR. LEVINSTEIN: Her file or Steven Smith's files? These were all together, so . . .

Q (BY MR. JONES) Just to understand, Steven Smith's and your files have been merged?

A That's correct. We keep one set of client files.

Q Okay. So he might have gotten this after you were no longer involved with the case?

A That's my best understanding.

MR. LEVINSTEIN: For the record, he got it after both of them were no longer involved in the case.

MR. JONES: Right. Understood.
MR. UESUGI: Should we take a break? We've been going about an hour and a half.
MR. JONES: Good idea.
(Recess taken from 9:43 a.m. to 9:52 a.m.)
(Deposition Exhibit No. 111 was marked for identification.)
Q (BY MR. JONES) What is Exhibit 111?
A This looks like an e-mail from Steve Smith to Gary Johansen in response to an e-mail from Gary to Steve.
Q Gary was apparently advising of the resignations of Mark Bryant, Juan Moreno, and Waugh & Associates?
A That's correct.
(Deposition Exhibit No. 112 was marked for identification.)
Q (BY MR. JONES) Exhibit 112, what is that?
A It is a letter that was sent by fax to us from Waugh & Associates, and the letter is to the president of USTU, Sang Lee, at the time from Ken Waugh informing USTU of Waugh & Associates resignation as their accountant.
Q Do you happen to know why Waugh &

Associates resigned?
A No.
(Deposition Exhibit No. 113 was marked for identification.)
Q (BY MR. JONES) What is that document, Exhibit 113?
A It's an e-mail from Gary Johansen to Steve Smith containing a draft press release from the USOC, a draft letter to Bruce Harris from Kelly Skinner, a draft letter to Bruce Harris from Jim Scherr, and a draft remediation plan.
Q This one is dated October 30, 2003?
A That's correct.
Q Were you still representing USTU on October 30th, 2003?
MR. LEVINSTEIN: Why don't you look at the next document?
MR. JONES: I know.
A I believe so. I can't recall the date of our resignation.
MR. JONES: Let me mark the next one.
(Deposition Exhibit No. 114 was marked for identification.)
A No. At that time, we were no longer representing USTU.

Q (BY MR. JONES) Just like a day after, right?
A That's correct.
Q Why did Holme and Roberts withdraw from representation on October 29, 2003, if you know?
MR. LEVINSTEIN: Objection; calls for attorney-client privileged communication.
MR. RYCHENER: Same objection.
MR. JONES: Instructing her not to answer?
MR. RYCHENER: That's correct, to the extent it calls for attorney-client communications. I think the letter indicates, to some extent. But beyond the letter, I think I will instruct her not to answer.
Q (BY MR. JONES) Was Holme Roberts also representing USOC in any matters during this period, if you know?
A I don't believe so, but I don't know for certain.
Q Do you know if it had in the past?
A I believe it had in the past.
Q It had represented USOC in the past?
A I believe so, but I don't know for certain.
Q Going back to Exhibit 113, these

attachments were received by Steve Smith?
A Yes.
Q Did you read them after he received them?
A Yes.
Q For what purpose?
A Curiosity.
Q The last exhibit attached to 113 is a remediation plan. When you read it, did you understand it to be a counterplan proposed by USOC, if you had any understanding of what it was?
A Yeah, that was my understanding of what it was.
Q And did you understand it to be a counterproposal to the plan we looked at earlier?
MR. LEVINSTEIN: Objection.
A That was my understanding.
Q (BY MR. JONES) Do you know if the plan received on October 30 was the plan that was ultimately approved?
MR. LEVINSTEIN: Objection.
A I don't know, but I could guess.
Q (BY MR. JONES) It's all right.
(Deposition Exhibit No. 115 was marked for identification.)
Q (BY MR. JONES) What is that document,

Exhibit 114 (sic)?

A Exhibit 115?

Q I'm sorry. Exhibit 115.

A It looks like an e-mail message from Gary Johansen forwarding suggestions for revisions to a suggested remediation proposal proposed by the Ohio Taekwondo Association.

Q Was the Ohio Taekwondo Association one of those groups that were critical of current management -- pardon me -- current governance at USTU in 2003?

A That's my recollection, yes.

Q And is this an alternate remediation plan that they were proposing or changes to the existing plan to serve their interests?

A It appears that's what it is.

Q We heard testimony yesterday that the Ohio Group was actually planning substitution of its own people into governance as a remediation solution.

A That's my understanding of a portion of the plan, yes.

MR. JONES: Okay. Next exhibit.

(Deposition Exhibit No. 116 was marked for identification.)

Q (BY MR. JONES) That one is dated October

28, 2003. And what is that?

A It looks like an e-mail message from Steve Smith to Gary Johansen and Jeff Benz, counsel of USOC regarding a USTU Executive Committee conference call.

Q Did you participate in that Executive Committee conference call?

A No.

(Deposition Exhibit No. 117 was marked for identification.)

Q (BY MR. JONES) 117. What is that document?

A This is a printout of a PowerPoint presentation that was prepared for the Membership and Credentials Committee meeting in September, and it was actually used during that meeting. It outlines the USTU's proposed remediation plan to the USOC.

Q That was the Denver meeting?

A That's correct.

Q Was this proposed on a screen?

A Yes. And also, I think, distributed hard copy as well.

Q Was it shown during the open session?

A Yes.

Q And did anyone walk through the points verbally?

A Yeah, Steve Smith did.

Q Did Steve Smith prepare this?

A Steve and I jointly prepared this.

Q What was the Membership and Credentials Committee's response, at least verbally, during that meeting to this, if there was one?

MR. LEVINSTEIN: There's all sorts of nonlawyers who can testify about that meeting, but --

A I don't recall a specific response. I know it was not accepted.

Q (BY MR. JONES) Turning to the, I guess, third-to-the-last page?

A Page 6 or Page 5?

Q Pardon me. Page 7.

A Okay. Yes.

Q Looking at the composition of the new proposed Government and Management Committee, were there any aspects to your proposal as to the content of that meeting that the USOC criticized verbally at the Denver meeting?

A I don't recall any specifics or objections raised during the meeting. There might have been some, but I don't recall.

Q Was it criticized after the meeting and before October 30 when you withdrew by USOC?

A Yes.

Q What aspects did they criticize, if you can recall? Was it --

A I believe -- my recollection is not great on the specifics, but I believe they were dissatisfied with the second and third proposed composition being the USTU member who was satisfied and a USTU member who was not satisfied.

Q They didn't want any USTU members on the board?

MR. LEVINSTEIN: Objection.

A I don't know if that's what they wanted. My general sense is they were not interested in hearing more from the detractors, I guess I would characterize them, or dissatisfied members. I think they had heard quite a bit from them and didn't necessarily think that members from those factions should serve on the Governance and Management Committee.

And I believe -- again, my recollection is fuzzy, but I believe they wanted clarification about reasonably satisfied -- who that reasonably satisfied member, what that category could be filled by. So I think they had issues with both of those.

Q Okay. Thank you.

MR. JONES: Next exhibit.

(Deposition Exhibit No. 118 was marked for identification.)

Q (BY MR. JONES) What is Exhibit 118?

A This is a letter from Steve Smith to Jeff Benz, general counsel for USOC, relating to matters that President Lee would like -- wanted to have the ability to address if he resigned.

Q Those matters were the Regional Olympic Qualifier and the 2006 World Cup Championship, the Kukkiwon Dan Certification, and the Cup/Trophy for Dr. Un Yong Kim?

A Yes, aspects of each of those issues.

Q This letter was dated a couple of days before your firm withdrew. Was there any response from Mr. Benz to this letter before you withdrew?

A I don't recall.

(Deposition Exhibit No. 119 was marked for identification.)

Q (BY MR. JONES) 119. 119 appears to be the same thing as 118, without an e-mail; is that correct?

A That's correct.

(Deposition Exhibit No. 120 was marked for identification.)

Q (BY MR. JONES) 120 appears to be a

document we've looked at already?

A Yeah, I think these are the signed versions of those draft documents that we looked at earlier.

Q The first page is the October 24 letter to Bruce Harris from Kelly Skinner?

A That's correct.

Q This letter refers to a meeting between Sang Lee and Jim Scherr previous to October 24, 2003. You didn't attend that meeting?

A No.

(Deposition Exhibit No. 121 was marked for identification.)

Q (BY MR. JONES) This is Document 121. What is this?

A This is e-mail correspondence from Gary Johansen to Steve Smith and myself informing us of the USOC's plans with respect to USTU.

Q And this was dated October 24th, 2003, about five days before your firm withdrew?

A That is correct.

Q Gary Johansen was advising that they were going to move forward with a complaint, a formal complaint for decertification?

A That's correct. And advised that the USOC

wanted also to protect --

Q Assets?

A -- assets. They also withdrew their offer to suspend the decertification pursuant to any remediation plan.

(Deposition Exhibit No. 122 was marked for identification.)

Q (BY MR. JONES) Next exhibit?

A Yes.

Q What is that?

A This looks like a letter from Mark Bryant to USTU president, Executive Committee, and Executive Director at the time, informing them of his resignation as the chair of the Law and Legislation Committee and as one of their counselors.

(Deposition Exhibit No. 123 was marked for identification.)

Q (BY MR. JONES) And have we seen this document before?

A I believe so.

Q And what is it?

A One of the draft remediation plans forwarded by Gary Johansen.

(Deposition Exhibit No. 124 was marked for identification.)

MR. LEVINSTEIN: Sixteen minutes earlier.

Q (BY MR. JONES) We've seen this one before as well?

A I'm not sure if we've seen this one before.

MR. LEVINSTEIN: No. It's a 16 minutes earlier e-mail. Couldn't have made many changes in 16 minutes.

A I think the previous e-mail says there's a couple of minor changes. But, again, another draft remediation plan.

Q (BY MR. JONES) Okay.

(Deposition Exhibit No. 125 was marked for identification.)

Q (BY MR. JONES) What is that document?

A I believe it's an e-mail string from Gary Johansen to and from Judi Cope, a secretary of our firm, with respect to a draft remediation plan.

(Deposition Exhibit No. 126 was marked for identification.)

Q (BY MR. JONES) 126?

A I believe it's the same correspondence as Exhibit 125, except for containing the attachment.

Q Is the attachment -- it says "Summary of USOC's Position." This was --

A This was our draft.

MR. JONES: Next exhibit.

(Deposition Exhibit No. 127 was marked for identification.)

Q (BY MR. JONES) What is Exhibit 127?

A It looks like a draft letter from Kelly Skinner to Bruce Harris relating to questions about USTU's tax exempt status. I'm not even sure that this document is responsive to the production request.

(Deposition Exhibit No. 128 was marked for identification.)

Q (BY MR. JONES) Have you had a chance to look at that one?

A Yeah.

Q What is it?

A It's an e-mail message from Gary Johansen to Steve Smith and myself asking specific questions about the USTU and it's, in particular, questions regarding Dan fees and questioning why USTU doesn't disclose the fees and forwarding proposals -- or asking us to review proposals.

Q Were these the Dan fees under the Korean certification system or the proposed U.S. certification system?

A My understanding, it's the U.S.





certification system.

(Deposition Exhibit No. 129 was marked for identification.)

Q (BY MR. JONES) What is Exhibit 129?

A It looks like it's e-mail correspondence to and from Gary Johansen and Steve Smith with respect to an alternate remediation plan.

Q Was this an ultimate remediation plan, other than the Ohio Group, or is it the same?

A I believe it's the Ohio Group's remediation plan.

Q The name at the bottom of the -- bottom of the page, Exhibit 129, is Melissa Nelke?

A Yes.

Q Did you understand her to be with the Ohio Group?

A Yes, in addition to some of the other persons mentioned in the text of the e-mail immediately above.

(Deposition Exhibit No. 130 was marked for identification.)

Q (BY MR. JONES) What is 130?

A It appears to be correspondence from Steve Smith to Gary Johansen in response to e-mail correspondence that he forwarded with a question from





Ronda Sweet regarding notice of a Board of Governors meeting.

(Deposition Exhibit No. 131 was marked for identification.)

Q (BY MR. JONES) What is that?

A It's an e-mail from myself to Kay Burton, Gary Johansen's prior assistant, explaining changes to a list of USTU officers that Gary either had prepared or had.

Q Were these like structural changes?

A These are explanations, bylaw explanations.

(Deposition Exhibit No. 132 was marked for identification.)

Q (BY MR. JONES) What is 132?

A It's an e-mail message from me to Gary Johansen forwarding information about some of the officers of USTU at that time.

MR. JONES: 133.

(Deposition Exhibit No. 133 was marked for identification.)

Q (BY MR. JONES) What is 133?

A It's an e-mail message from Gary Johansen to Steve Smith and myself forwarding a letter prepared by Bruce Harris, and a draft letter attachment to that





to Senator Nighthorse Campbell. Bruce was asking USTU members to sign and forward the draft letter attached to Senator Campbell.

Q And what was the nature of the letter they wanted to send to Senator Campbell, if you know?

A If you read the letter, it tells the nature of it. But asking the senator to step in to try to support the remediation plan.

Q USTU's remediation plan?

A That's my understanding, yes.

Q And Gary Johansen says in his e-mail that he suspects that this is not going to make the Membership Committee very happy?

A That's what it says, yes.

(Deposition Exhibit No. 134 was marked for identification.)

Q (BY MR. JONES) What is 134?

A It is an e-mail message from Gary Johansen to Steve Smith responding to an e-mail that Steve Smith had sent Gary with one of our draft remediation plans to which he responded with suggested revisions.

(Deposition Exhibit No. 135 was marked for identification.)

Q (BY MR. JONES) Exhibit 135?

A Uh-huh.

Q What is 135?

A It's e-mail correspondence to and from Jeff Benz and Steve Smith with respect to draft remediation plans.

(Deposition Exhibit No. 136 was marked for identification.)

Q (BY MR. JONES) What is Exhibit 136?

A It's an e-mail message from me to Jeff Benz explaining a provision of the Ohio Revised Code.

Q That was applicable to USTU because it was an Ohio nonprofit?

A That's correct.

Q And that was in response to Jeff Benz's question at the bottom --

A That's correct.

Q -- "Where is the legal authority for the proposition that a committee has to consist of all board members if it does board functions that the board, in the exercise of its fiduciary obligations, has chosen to delegate to a committee of non board members?"

A That's correct.

Q There were communications going back and forth with Mr. Benz over the propriety of having an oversight committee over USTU?

A That's correct.

Q Just to understand, was an oversight committee different from a new governing board, or were they the same, in the context of these discussions?

MR. LEVINSTEIN: New Governance and Management Committee?

MR. JONES: Yes.

MR. LEVINSTEIN: You said the governing board. I don't know what that meant.

Q (BY MR. JONES) I'm sorry. The five-person new governing body that was set forth in the remediation plan, was the oversight committee the same thing or something different?

A I can't recall if oversight committee was something different. But what eventuated was a Governance and Management Committee suggestion.

(Deposition Exhibit No. 137 was marked for identification.)

Q (BY MR. JONES) What is Exhibit 137?

A It's a letter from Tom Satrom to Steve Smith in response to correspondence from Steve Smith outlining some of our concerns or ground rules for the Membership and Credentials Committee meeting.

Q If you can look through your own file for a moment, just two documents down, there's another

letter dated September 9, 2003.

MR. RYCHENER: What number?

Q (BY MR. JONES) The Bates stamp is HRO-204. My question is whether 137 responds to that September 9 letter?

A Yes, that's my understanding, that that's what the letter is responsive to.

Q Okay. Did you assist Steve Smith in writing the September 9 letter, or was that his work?

A I don't recall assisting Steve drafting a letter, but I remember discussing these concerns.

Q And looking at -- well, let's go ahead and mark Steve Smith's earlier letter.

(Deposition Exhibit No. 138 was marked for identification.)

Q (BY MR. JONES) 138. Exhibit 138 is the September 9, 2003 letter to Gary Johansen from Steve Smith --

A Yes.

Q -- that you said you had some knowledge of?

A Yeah.

Q What were the concerns that caused or triggered the writing of this letter to Gary Johansen?

MR. RYCHENER: I'm going to object. I

think other than what's stated in the letter, I think you are asking for work-product privilege, and I will instruct the witness not to answer with respect to discussions among counsel beyond what is stated in the letter.

Q (BY MR. JONES) Were you concerned that the format of the meeting was to allow critics of USTU governance to bring in even more issues than were already being addressed by you as their attorneys?

MR. RYCHENER: Same objection.

MR. LEVINSTEIN: Objection.

MR. RYCHENER: You can ask her what's stated in the letter, but I'll instruct her not to answer with respect to conversations, other than what are stated in the letter.

Q (BY MR. JONES) What is stated in the letter with regard to your concerns about the format of the upcoming Denver meeting?

MR. LEVINSTEIN: Objection. I object to asking her to interpret or go beyond. The letter speaks for itself. I don't know how she can summarize it.

Q (BY MR. JONES) Go ahead and summarize it.

MR. LEVINSTEIN: I don't see how she can without -- she can read it to you.

A Would you like me to read it to you?
Q (BY MR. JONES) That's fine. Read it into the record.
A I'll start with the first paragraph. "Dear Gary: We understand that the U.S. Taekwondo Union's ('USTU') Compliance Meeting with the United States Olympic Committee's ('USOC') Membership and Credentials Committee occurring on September 13, 2003 at 1:00 p.m. will be an open meeting. Although we appreciate the need for those associated with USTU and the sport of Taekwondo to be able to hear the proceedings, we are concerned about the possibility of critics of USTU using this meeting as an avenue to raise additional issues in an attempt to undermine USTU. It is our firm belief that the critics of USTU have had ample opportunity to raise their concerns about USTU with the USOC during the May 2, 2003 open forum and through their various communications with you and your staff. We plan to spend a fair amount of time during the hearing regarding those issues. However, to allow opponents of the current USTU management and administration the opportunity to raise additional new issues with the USTU during the September 13, 2003 meeting would be unfair for USTU since USTU would not have adequate time to properly respond."

Next paragraph. "As you are aware, USTU is in the process of preparing responses to (i) the 12 issues [raised] in the USOC Membership and Credentials Committee's August 4, 2003 letter, (ii) the 19 recommendations raised in the USOC's Audit Division's August 29, 2003 letter, (iii) the 10 issues regarding 'questionable expenses' you raised in an email on August 26, 2003, and (iv) the 16 issues raised in the USOC Membership and Credentials Committee's September 5, 2003 letter, as well as preparing for the September 13, 2003 meeting. Although we believe we will have adequate responses to those issues, we feel it is justified to expect that any new issues of critics be raised before the hearing. Therefore, on behalf of the USTU, we respectfully request that the USOC Membership and Credentials Committee require that any additional issues be raised with the USTU prior to September 13."
Q And in Mr. Satrom's response, was he going to require that new issues be brought up by complainants before the meeting?
MR. LEVINSTEIN: Objection; the letter speaks for itself.
A No. He says the committee is not of a mind to preclude anyone from raising an issue that he or she feels are important.

(Deposition Exhibit No. 139 was marked for identification.)
Q (BY MR. JONES) What is 139?
A It's an e-mail message from Steve Smith to various persons at the USOC with a draft of our proposed remediation plan.
Q That was the plan as of September 11, 2003?
A Yes, that's correct.
(Deposition Exhibit No. 140 was marked for identification.)
Q (BY MR. JONES) What is 140?
A It's an e-mail message from Steve Smith to Gary Johansen and Jennifer Gabrius asking a question in response to an e-mail that they had sent informing Steve of interviews or telephone conferences with the USTU athlete representative, Juan Moreno.
Q Steve Smith was asking if you and he were allowed to participate?
A That's correct.
(Whereupon, Mr. Uesugi left the deposition proceedings.)
MR. JONES: 141.
(Deposition Exhibit No. 141 was marked for identification.)

Q (BY MR. JONES) What is 141?
A It's a letter from Tom Satrom to Bruce Harris informing Bruce that the USOC Membership and Credentials Committee would place Taekwondo on their agenda for their September 13th meeting at one o'clock. And it was faxed from Steve to Jill Goodwin at Waugh & Associates.
MR. JONES: 142.
(Deposition Exhibit No. 142 was marked for identification.)
Q (BY MR. JONES) What is 142?
A It's an e-mail correspondence from Gary Johansen to Steve Smith in response to a question in a previous e-mail that Steve asked to Gary with respect to inappropriate volunteer expenses that were noted by the Membership and Credentials Committee and contains a list of some of the questionable volunteer expenses that the Membership and Credentials Committee had concerns.
(Deposition Exhibit No. 143 was marked for identification.)
MR. LEVINSTEIN: This is just the e-mail in the last one.
MR. JONES: Yeah, apparently. There's nothing attached to it.

A Sometimes our files have duplicate copies of e-mails.

Q (BY MR. JONES) Is this the same?

A Yes.

Q Okay. Sorry.

MR. LEVINSTEIN: I think there's only one new one left.

(Deposition Exhibit No. 144 was marked for identification.)

Q (BY MR. JONES) What is 144?

A It's a letter from Bruce Harris tendering his resignation as the Executive Director.

Q And he tendered that September 12, 2003 or thereabouts?

A He wrote the letter on September 12th, 2003, but I don't know that that's the exact date that he tendered his resignation.

Q Okay. Do you know if he continued on at USTU after that date?

A Yes, I believe he did.

Q Did you ever meet Dae Sung Lee?

A I don't believe I met him. I might have met him during the last November Board of Governors meeting, but I can't recall.

Q You never met him after the Denver meeting

when you summarized what happened in the meeting?

A I don't believe so.

Q During your representation of USTU up until, I guess it was, October 29, was U.S. Olympic coach selection ever discussed with representatives of the United States Olympic Committee directly?

A I don't recall specific discussions with the USOC, but I believe there was a question about the process, which was responded to in written answers. But I don't recall specific discussions with members of the USOC.

Q So other than Bruce Harris' response or input into responding into the area of how Olympic coaches are selected, you cannot recall any specific discussions that occurred, for example, during the Denver meeting hosted by the USOC Membership and Credentials Committee?

(Whereupon, Mr. Uesugi rejoined the deposition proceedings.)

A There may have been questions, but I don't recall a specific discussion.

Q (BY MR. JONES) Was his name, Dae Sung Lee's name, discussed during the Denver meeting?

A I don't believe so.

Q You mentioned that you thought there was

insufficient time and opportunity provided for USTU to present its side of things during the -- at least the period that you were representing them in the decertification action. Do you recall that?

MR. LEVINSTEIN: Objection.

MR. RYCHENER: Yeah. I'm not sure that's what she said. I think it was only directed in the September meeting.

Q (BY MR. JONES) Do you recall saying that with respect to the September meeting?

A Yes.

Q If you had your way, how would you have changed things?

MR. LEVINSTEIN: Objection; calls for thought processes and representation of a client.

Q (BY MR. JONES) Requested more time perhaps?

MR. RYCHENER: I'll object and instruct you not to answer, to the extent it's calling for privileged information.

Q (BY MR. JONES) Did the proceedings at the Denver open forum seem very one-sided in favor of the critics of USTU's existing governing body?

MR. LEVINSTEIN: Objection; calls for mental impressions. I don't know what one-sided means.

MR. RYCHENER: I'll object as well. I mean, if you want to ask her how much time was given or something like that. But I think if you're asking for mental impressions, I'll instruct her not to answer.

Q (BY MR. JONES) Are you going to follow your counsel's instruction?

A Yes.

Q Just to make sure I understood who was at the meeting, do you know if Thomas Satrom was at any portion -- attended any portion of the Denver meeting?

A Yes, I believe he even served as chair during the meeting.

Q Was Robert Gambardella present?

A I don't recall.

Q Steve Locke?

A I don't believe so.

Q Rich Bender?

A I don't believe so.

Q Juan Moreno?

A I believe Juan was present, but I'm not entirely sure.

Q Virginia Witte?

A I believe Virginia was present.

Q Tony Baggiano?

A Tony was present.

Q William Martin?
A I don't know.
Q Jeff Benz?
A I believe Jeff was present.
Q Jim Scherr?
A I don't recall with specificity that he was there.
Q Gary Johansen?
A I know Gary was there.
Q Jeannie Picariello, who we already said, was there?
A Jeannie was there.
Q Bob Foth?
A I don't know Bob Foth by recognition.
Q Tim Wiley?
A I wouldn't recognize Tim Wiley.
Q Steven Sobel?
A I believe he was present, but I can't specifically recall seeing him.
Q Perry Toles?
A I know Perry was present.
Q Paul DePace?
A I don't know him by recognition.
Q Nancy Whiteman?
A I also don't know Nancy by recognition.

Q William Maxin?
A I don't know William Maxin.
Q Mary McCagg?
A I know Mary was present.
Q Geraldine Andrews?
A I don't recall if Geraldine was present.
Q And last, Barbara Smith?
A I believe Barbara was present.
Q And is your testimony about minutes not being taken true for the open portion of the meeting as well?
A That's my understanding.
MR. LEVINSTEIN: Testimony about minutes not being taken?
MR. JONES: Yes. At least she didn't see anybody who looked like they were taking minutes.
A I didn't take minutes. Steve didn't take minutes. And I don't recall anyone in particular taking minutes.
Q (BY MR. JONES) To your knowledge, did anyone record the proceeding?
A Not to my knowledge.
MR. JONES: Let's take another break, if we can.
(Deposition Exhibit Nos. 22 and 23 were

re-marked for identification.)
Q (BY MR. JONES) I'm showing you Exhibits 22 and 23 together.
A Yes.
Q First of all, Exhibit 23, have you ever seen that one before?
A Yes.
Q Do you know who wrote that letter?
A I believe either Bruce Harris or Sang Lee.
Q It is signed by Sang Lee and others, correct?
MR. RYCHENER: Object to the extent you're asking her to identify signatures or whether you just want her to read the names that are on there.
A It looks like it appears that it was signed by Sang Lee, Barb Kunkel, Sammy Pejo, and Dae Sung Lee; I can't recognize the signature above it or below it; and Lynnette Love.
Q (BY MR. JONES) And it is directed to Honorable Ben Nighthorse Campbell, U.S. Senator?
A That's correct.
Q Dated November 12, 2003?
A That's correct.
Q Have you ever seen this letter?
A Yes.

Q About when did you see it? It was before your firm withdrew as counsel for USTU?
A That's correct.
Q Looking at Exhibit --
A Well, I saw a letter that was similar to this. I don't know if it's the exact letter.
Q It could have been a draft?
A It could have been a draft.
Q Exhibit 22, have you seen that partial letter before?
MR. RYCHENER: I'll let her answer if she's seen the letter, but it appears to be the first page of a multipage letter, but it appears clear to me that it is an attorney-client communication that would be privileged, and I would instruct her not to answer questions about it because of the attorney-client privilege.
Q (BY MR. JONES) The letter has Steve Smith's name at the bottom; is that correct?
A That's correct.
Q And it is directed to President Sang Lee; is that right?
A That's correct.
Q And it is dated October 27, 2003, two days before your firm withdrew?

A That's correct.

Q And it does state in the middle that the -- excuse me. At the top, it says regarding "Draft Letter to Senator Campbell"; is that correct?

MR. RYCHENER: I'm going to instruct her not to answer questions about this unless I'm told that the USTU has waived the privilege.

MR. LEVINSTEIN: We have not.

Q (BY MR. JONES) Okay. Did you have any direct contact with Jeff Benz during the period of the decertification up until the time your firm withdrew?

MR. RYCHENER: You mean in person as opposed to correspondence?

Q (BY MR. JONES) In person, yeah.

A I -- we had a few in-person meetings with representatives from the USOC, but I cannot specifically recall if Jeff was present. I really can't recall if he was present. Sorry.

Q Did you ever hear or see in written form any threats by Mr. Benz threatening to take punitive action against USTU if any letters were sent to Senator Ben Nighthorse Campbell by USTU?

A Can you ask -- sorry. Can you ask that question again?

Q Did you ever hear Mr. Benz or

Mr. Johansen, for that matter, or see any written communications threatening punitive action against USTU if it wrote any correspondence to Senator Ben Nighthorse Campbell?

A No, I did not personally hear or see anything from Jeff Benz.

Q And the same goes for Mr. Johansen?

A That's correct.

Q Do you recall attending a November membership meeting in 2004 for USTU or USA Taekwondo?

A Yes.

Q At that meeting, did you give a presentation on the subject of a proposed merger in which USA Taekwondo and USTU would merge into a new entity?

MR. RYCHENER: I'm sorry. I didn't hear what meeting this was, but I assume if it was client representatives, it would be attorney-client privilege, and I would instruct her not to answer; but I may have missed the question in terms of what the meeting was.

Q (BY MR. JONES) At this meeting, were members of the old USTU present?

MR. LEVINSTEIN: Objection; I don't know what that means.

Q (BY MR. JONES) If you know.

A Yes, members from USTU were present.

Q At that meeting, were there persons who were involved in former governance of USTU?

A Yes.

Q And there were people involved in current governance of USTU as well; is that correct?

A If you're referring to membership -- or the Governance and Management Committee --

Q Yes.

A -- yes, they were in attendance.

Q With that, did you give a presentation of a proposed merger between USA Taekwondo and USTU?

A Yes.

Q And according to your presentation, would USTU cease to exist --

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) -- after the merger?

MR. LEVINSTEIN: Objection.

A It would cease to exist as a result of a merger with and into a new corporation. So, yes, it would cease to exist.

Q (BY MR. JONES) There's only one survivor in a merger; is that correct?

A That's correct.

Q And the survivor would be a new company

called USA Taekwondo?

A That's correct.

Q And that's a Colorado corporation?

A That's correct.

Q And it would be the new NGB for Taekwondo?

MR. LEVINSTEIN: Objection. Continue to be the NGB for Taekwondo.

Q (BY MR. JONES) Continue to be the NGB for Taekwondo?

A That's correct.

Q And do you know if that action was approved by the persons present?

A Yes. It's my understanding that it was approved by the persons present.

Q A requisite vote was obtained?

A There was a specific resolution that was passed by the requisite required vote.

Q And so is that now a fate accompli? Has it been completed and does the old USTU now cease to exist?

A That's correct.

Q And you mentioned that your firm withdrew as counsel for USTU on October 29, 2003 and then came back onboard as counsel for USTU sometime in 2004?

A Yes, we were rehired as counsel.

Q Among the things you handled, would it have included the merger?

A That's correct.

Q Does your firm currently do work for USOC, if you know?

A I don't know if we are representing USOC in any matters.

Q I believe I am done.

And forgive me if I have asked this before; I better ask it one more time. During your tenure as counsel for USOC -- I mean, pardon me -- USTU, have you ever heard/observed statements or conduct by any staff or volunteers of USOC that the average person may take to be racially insensitive?

MR. LEVINSTEIN: Objection.

A I can't answer what an average person --

Q (BY MR. JONES) How about you as an average person?

MR. LEVINSTEIN: Objection.

Q (BY MR. JONES) You would interpret as racially insensitive?

MR. RYCHENER: I'm going to object to the extent that you have asked and she has answered that question before, but --

Q (BY MR. JONES) If you could just answer

it one more time, whatever the answer was.

A I have no other additional information than I have provided. I know that the Membership and Credentials Committee posed questions to the USTU that I can't tell you how other people might interpret. And I told you about a statement made by Jeannie Picariello. And that's all I've heard or seen from the USOC.

Q Did any of the questioning by members of the Membership and Credentials Committee during the Denver meeting ever sound racially insensitive to you?

A During all parts of the meeting?

Q All parts, yeah.

A Did it sound racially insensitive to me?

Q You covered the statement that was made. I'm just asking now about the types of questioning.

A I don't recall any questioning that would have appeared to be racially insensitive.

Q Okay. No further questions. Thank you.

A Thank you.

(The deposition concluded at 11:40 a.m.)

A F F I D A V I T

STATE OF COLORADO )
) ss.
COUNTY OF )

I have read my deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the amendment sheet(s) attached hereto as indicated.

Amendment sheet(s) attached [ ]
No changes; no amendment sheet attached [ ]

______________________________
JILL J. CHALMERS, ESQUIRE

SUBSCRIBED AND SWORN TO before me on this __________ day of ______________, 2005.
My commission expires: _______________

______________________________
NOTARY PUBLIC

in and for the State of __________________

C E R T I F I C A T E

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

I, VALORIE S. MUELLER, Registered Professional Reporter and Notary Public in and for the State of Colorado, duly appointed to take the deposition of JILL J. CHALMERS, ESQUIRE, certify that prior to the examination the deponent was duly sworn to testify to the truth in the matters in controversy between the parties herein; that the deposition was taken in shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form by me and processed under my supervision, the same consisting of 90 pages, and that the same is a full, true and complete transcription of my shorthand notes. I further certify that I am not related to, employed by, or counsel to any of the parties herein, or otherwise interested in the events of the within cause.

A transcript review of this deposition was requested and is available to the deponent as notified by me.

IN WITNESS WHEREOF, I have affixed my notarial seal this 25th day of April, 2005. My commission expires December 11, 2006.

______________________________
VALORIE S. MUELLER
Registered Professional Reporter