IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DAE SUNG LEE, Plaintiff,

vs.

UNITED STATES TAEKWONDO UNION, etc., et al., Defendants.

) CIVIL NO.04-00461SOM

PARTIAL TRANSCRIPT OF PROCEEDINGS

The above-entitled matter came on for hearing on Thursday, August 12, 2004, at 11:30 a.m., at Honolulu, Hawaii,

BEFORE: THE HONORABLE SUSAN OKI MOLLWAY
United States District Judge

REPORTED BY: STEPHEN B. PLATT, RMR, CRR
Official U.S. District Court Reporter

APPEARANCES: WARD D. JONES, ESQ.
Bervar & Jones
1001 Bishop Street, Suite 1400
Honolulu, Hawaii 96813

Attorney for the Plaintiff

ARTHUR F. ROECA, ESQ.
APRIL LURIA, ESQ.
Roeca Louie & Hiraoka
841 Bishop Street, Suite 900
Honolulu, Hawaii 96813

Attorneys for the Defendants

I N D E X

STEVEN LOPEZ
CROSS-EXAMINATION.......................................... 4

NIA NICOLE ABDALLAH
CROSS-EXAMINATION BY MR. JONES............................. 11

ROBERT PETER GAMBARDELLA
CROSS-EXAMINATION BY MR JONES.............................. 18
REDIRECT EXAMINATION BY MR. ROECA.......................... 35

KELLY SKINNER
CROSS-EXAMINATION BY MR. JONES............................. 44
REDIRECT EXAMINATION BY MR. ROECA.......................... 51

HAN WAN LEE
CROSS-EXAMINATION BY MR. ROECA............................. 57
REDIRECT EXAMINATION BY MR. JONES.......................... 58
RECROSS-EXAMINATION BY MR. ROECA........................... 60

AFTERNOON SESSION.......................................... 64

DAE SUNG LEE
CROSS-EXAMINATION BY MR. ROECA............................. 87

VIRGINIA WITTE
CROSS-EXAMINATION BY MR. JONES............................ 112
REDIRECT EXAMINATION BY MR. ROECA......................... 124
RECROSS-EXAMINATION BY MR. JONES.......................... 130

THURSDAY, AUGUST 12, 2004 11:30 A.M.

* * *

THE CLERK: Mr. Lopez, would you please raise your right hand.

Do you solemnly affirm the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Would you please state your name for the record, and spell your last name?

THE WITNESS: Steven Lopez, L-O-P-E-Z.

THE COURT: Okay.

Now, Mr. Jones, can you come to the lectern? And you may go ahead and cross-examine Mr. Lopez within the scope of his declaration.

And let me first make sure that, Mr. Lopez, the statements in the declaration that you signed on August 6th, 2004 were true and correct and being submitted the same as if you testified to all of these matters live in the courtroom; is that right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Go ahead.

STEVEN LOPEZ,

called as a witness on behalf of the Defendants, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JONES:

Q. Steven, this is Ward Jones; I am Master Lee's attorney.
First of all, I want to congratulate you on making the team.
A. Thank you.
Q. Master Lee -- you know Master Lee; isn't that correct?
A. Correct.
Q. He coached you in the capacity as head coach at the world qualifications tournament in Croatia; isn't that correct?
A. (No response.)
Q. He was head coach?
A. Let me think about it... Croatia? Yeah, I think he did coach me there. I have difficulties remembering now, but, yeah, I think he did.
Q. Master Lee also coached you at the Pan American games in 2003?
A. Yes, sir.
Q. You won a gold medal there, did you not?
A. Yes.
Q. In your statement, you mentioned pushing a coach out of the way at the Sydney Olympic games in 2000, do you recall that?
A. Yes.
Q. Would that be Coach Yan In Chon?

EXHIBIT "1"

A. Yeah, that was Coach Yan In Chon.

Q. Could you describe how that occurred?

A. Well, my -- Coach Yan In Chon, he gets very emotional when he coaches. His English isn't very good to begin with, much less when it's a high-pressured situation like the finals of the Olympic games, and so he was basically -- I was down a point, and he was yelling a bunch of things, and at that moment, that's the last thing I needed, and I really couldn't understand everything he was saying. And at that moment I just needed someone to really calm me down and just -- if you can just imagine being at the finals and you are down a point, you need someone to calm you down. So I did physically push him to the side. And I was looking for my brother, and I was looking up to my brother.

Q. Your brother was in the spectator area?

A. Correct.

Q. As far as the layout of the sparring area at the Sydney Olympics, isn't it correct that the fighting area was elevated several feet, like a boxing rink?

A. Correct.

Q. And, so -- and isn't it also correct that the coaches were not allowed to sit up in the fighting area, they were down below, below you?

A. Correct.

Q. How is it, then, that you were able to physically move

Coach Chan?

A. Because I would go down the stairs, down the steps --

Q. I see.

A. -- and then sometimes Coach Chon would get really excited, and either he would go up the steps or I would go down the steps, I'm not sure which one, just because, like I said, Coach Chon doesn't speak -- his English is pretty broken up, and so I can't really understand anything he was saying, so I would go down. Either -- like I said, I can't remember, it's four years ago. Either I went down the steps or he was up the steps.

Q. I see. And that was so you could get a look at your brother?

A. Right. I mean throughout the match, anytime I was in the chair, actually Coach Chon actually encouraged me to look up at my brother.

THE COURT: Just so you make the record, your brother is your coach; is that right, Mr. Lopez?

A. Yes, ma'am.

THE COURT: Okay.

MR. JONES: I'm sorry, Your Honor.

BY MR. JONES:

Q. When I say your brother, you are talking about Gene Lopez; is that correct?

A. Correct.

Q. And Gene Lopez, at the 2000 Olympics, did not have any title; isn't that correct?

A. He was my training partner.

Q. Okay. Did he have a credential?

A. Yes. To get into the high performance center where all the U.S.A. delegation trained at, he had to have some kind of accreditation to get in there to train with me.

Q. But he could not sit next to you where Coach Chon was; isn't that right?

A. No, he was not -- he was not given Olympic coach credentials.

Q. Okay.

Turning to another topic, which is your brother Gene Lopez, you're close to him, are you not?

A. We're brothers.

Q. Do you love your brother?

A. Sir?

Q. Do you love your brother?

A. Yes, I love my brother.

Q. Your brother has a Taekwondo school which specializes in sparring and competition?

A. No. He has a Taekwondo school that has -- is very successful as far as placing people on the national team, but he has 300 other students, where I would say 99 percent are for people are there because they want to lose weight, or they

want to learn self discipline or whatnot, the tenets that martial arts teaches you.

Q. You are a member of his school and came from his school?

A. Excuse me?

Q. Are you a member of his school or come from his school?

A. We trained -- I train at his school.

Q. Would you like to see his school grow and become more successful?

A. I would love for my brother to be successful.

Q. Pardon?

A. I would love to see my brother be successful in life.

Q. Thank you.

Now, you were very happy, were you not, when he was selected for Olympic coach in June of this year?

A. Yes.

Q. Did you try to help him get that nomination?

A. There was nothing I could have done to help him.

Q. Do you like having your --

A. As far as -- if you're asking, like, voting, or nominating, or anything like that, as an athlete, I don't think I -- uh, I didn't know the procedures, as far as an athlete, what athletes could or could not do.

Q. You didn't put in the good word to anybody you thought might be able to help him?

A. No. I didn't know who are the people assigned to that

Q. Fair enough.

Anyhow, you were very happy when he got selected as Olympic coach in June of this year?

A. Yes.

Q. And you'd like to have your brother there with you at the Olympic games in Athens for the duration, wouldn't you?

A. Yes.

Q. Will it hurt you to have Dae Sung Lee there present as an extra coach at the Athens Olympic games if your brother sits ring-side with you during the competition?

A. Coach Dae Sung Lee would just be a distraction.

Q. Even if he doesn't sit near you at ring-side?

A. Excuse me?

Q. Even if he's not sitting with you ring-side?

A. Well, I mean, I -- you're breaking up when you speak to us here, when we get it through here. We didn't hear what the question was, actually.

Q. The question is -- let me repeat it:

Will it hurt you to have Dae Sung there as an extra coach, as long as Gene Lopez sits with you ring-side and is your primary coach?

A. If Dae Sung Lee has any involvement, as far as coaching me in any way, shape or form, it would be a distraction to me, at this point -- especially when we're only about two weeks until I compete.

Q. Thank you very much?

THE COURT: Okay.

Redirect?

MR. ROECA: I have nothing further.

Thank you very much.

THE COURT: Okay.

Then I'll ask Mr. Lopez to leave the room, and -- are we going to take Ms. Abdallah next?

MR. JONES: Yes, Your Honor.

THE COURT: Okay.

So, could Ms. Abdallah come into the room, and we'll have her sworn.

MR. BENZ: Okay, Your Honor, I'll do that. It's going to take me a minute or two.

THE COURT: Okay.

While we are getting her, let me ask Mr. Jones: Are there any objections to Ms. Abdallah's declaration?

MR. JONES: No, Your Honor.

THE COURT: Okay.

MR. BENZ: Okay, Your Honor, we have Ms. Abdallah here.

THE COURT: Okay, then I am going to have my courtroom manager administer the oath or affirmation to Ms. Abdallah.

THE CLERK: Would you please raise your right hand.

Do you solemnly affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Would you please state your name for the record and spell your last name?

THE WITNESS: Nia Nicole Abdallah. The last name is spelled A-B-D-A-L-L-A-H.

THE COURT: All right.

And let me start by asking you, first, whether the declaration that you signed on August 6, 2004, is true and correct and states what you would say if you were asked questions on these subjects and were appearing live in a courtroom?

THE WITNESS: Oh, yes, that's correct.

THE COURT: Okay.

Then, Mr. Jones, you may cross-examine.

MR. JONES: Thank you, Your Honor.

NIA NICOLE ABDALLAH,

called as a witness on behalf of the Defendants, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JONES:

Q. Nia -- if I could call you that -- my name is Ward Jones; I am the attorney for Coach Dae Sung Lee. I want to

congratulate you on making the team.

A. Thank you.

Q. First of all, is it correct that you came originally from a Houston Taekwondo school before going to Colorado Springs?

A. That's true.

Q. Who were your teachers there?

A. My teachers there was Coach Kim, in Houston named So Wu Kim.

Q. Who is different from Chul Ho Kim; correct?

A. Correct.

Q. Do you know a Coach Han Wan Lee?

A. Yes.

Q. Who is he?

A. He was head coach of the Olympic Training Center when I originally moved there.

Q. That was in 2002; correct?

THE COURT: I'm sorry, I couldn't quite hear it. He was head coach where?

A. At the Olympic Training Center in Colorado Springs when I first moved there in 2002.

THE COURT: Thank you.

BY MR. JONES:

Q. Wasn't it Coach Han Wan Lee who first discovered you and invited you there?

A. It was probably along with Coach Chul Ho Kim.

Q. Coach Han Wan, though, was the head coach, and Coach Chul Ho worked for him?

A. True.

Q. Coach Han Wan then resigned April of last year, do you recall that?

A. Yes.

Q. And, at that time, Coach Chul Ho Kim took over your training?

A. Well, he was training -- he was running practices beforehand, but he just took the title as head coach after Coach Lee left.

Q. Okay. So then you worked with Chul Ho Kim --

THE COURT: Did she say after Coach Lee left?

MR. JONES: Yes.

THE COURT: Okay.

BY MR. JONES:

Q. And, at that point, did you just work with Coach Chul Ho Kim after Coach Lee left?

A. Yes.

Q. Do you know Master Dae Sung Lee?

A. Yes.

Q. He was the head coach who went with you and Coach Chul Ho Kim to the Pan American qualifying events in January of this year, isn't he?

A. Yes.

Q. He was able to observe you at that event, wasn't he?

A. Yes.

Q. Will having Dae Sung Lee present as an extra coach hurt you if Coach Chul Ho Kim is allowed to sit with you ring-side?

A. I think that him being there would be kind of a distraction, because we -- we've been, as a team, a unit here for a while, we've been together, and just having an extra person -- everybody has their opinions and stuff, and it could just throw off everything that I have been working on right now. I don't think it's the time to change anything.

Q. If he were not to instruct you or suggest any of your training regimen or techniques, would that be a distraction?

A. Well, if that happens, then I don't see a reason for him to be here. I mean, if he's not going to help me, then I don't see why he should be there. That extra person being there is not needed.

Q. I see.

MR. JONES: Thank you.

THE COURT: Any redirect?

MR. ROECA: No, Your Honor.

THE COURT: Okay. Then the witness is excused.

Are any of the other witnesses in Athens? Where is Kelly Skinner?

MR. BENZ: Kelly Skinner is present. I can get Kelly Skinner, Your Honor.

THE COURT: It can be either Kelly Skinner or Mr. Gambardella; who do you want to take first?

MR. JONES: Mr. Gambardella, Your Honor.

THE COURT: Can we have Mr. Gambardella first?

MR. BENZ: All right, Your Honor.

THE COURT: Mr. Jones, while they are getting Mr. Gambardella, can you tell me if you have any objections to the declaration of Robert Gambardella?

MR. JONES: I'm afraid I do have objections to expert opinions contained therein, Your Honor.

THE COURT: Okay. I need you to give me the paragraph number you are objecting to.

MR. BENZ: Okay, Your Honor, you have Bob Gambardella present in the room.

THE COURT: Okay, hold on, now, we have some objections to his declaration, and I am going to deal with those first.

MR. JONES: Paragraph number seven.

THE COURT: Quote me the language you're objecting to.

MR. JONES: All of it, Your Honor, as well as paragraph number eight.

MR. LEVINSTEIN: Your Honor, this may not be -- I may not be the most important person to hear this, but I can't hear anything right now, and I just want to make sure we

haven't lost the line --

THE COURT: Oh, you can't hear anything because we are all reading paragraphs seven and eight.

MR. LEVINSTEIN: Sorry.

THE COURT: Okay. And who was that who just spoke?

(No response.)

THE COURT: The person who just said you couldn't hear anything, give me your name.

MR. BENZ: I'm sorry, this is Jeff Benz.

THE COURT: Thank you. There are a lot of voices, so it will help us if people told us who is speaking...

Okay, who wants to respond to the evidentiary objection to paragraphs -- it's to paragraphs seven and eight; is that right?

MR. JONES: Yes, Your Honor, and also 12.

THE COURT: Seven, 8 and 12.

MR. BENZ: Could the objections please be restated? This is Jeff Benz.

MR. JONES: Yes, Your Honor.

They call for expert opinions, and this witness has absolutely no expertise in the field of Taekwondo coaching in national or international competition.

THE COURT: Okay, well, paragraph seven, it seems to me, doesn't really call for an expert opinion. Paragraph seven has a little historical discussion.

MR. JONES: It --
MR. ROECA: Your Honor, if I might?
THE COURT: Okay.
MR. ROECA: I agree with the court's observation. Secondly, the opinions are those of Mr. Gambardella, who was on the committee that was establishing the criteria and revisiting them. And, going to paragraph eight, part of that is simply a recitation of what the new criteria were.
THE COURT: Okay, I am going to overrule the objections to paragraphs seven and eight.
Can we all look at paragraph 12 now. And state the objection. You think this is an expert opinion, and you think he's not qualified; is that what it is?
MR. JONES: Yes, Your Honor.
THE COURT: Okay. I'm not sure that this is an opinion. Isn't this a statement of the position of the Taekwondo Union and then of the status of what's happening with appointing coaches? I don't think this is an expert opinion, so I'm going to overrule that.
Okay, anything else?
MR. JONES: No, Your Honor.
THE COURT: Okay.
Then let's have Mr. Gambardella given the oath or affirmation.
THE CLERK: Would you please raise your right hand.

Do you solemnly affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THE CLERK: Will you please state your name for the record, and spell your last name, please.
THE WITNESS: Yes. My name is Robert Peter Gambardella. My last name is spelled G-A-M-B-A-R-D-E-L-L-A.
THE COURT: Okay, let me ask you, Mr. Gambardella, looking at your declaration, which says it was signed on August 6, 2004, I ask you if the statements in this document are true and correct and represent what you would testify to if you were asked questions in court and were appearing live -- and the questions concern the matters raised in the declaration.
THE WITNESS: Yes, Your Honor.
THE COURT: Okay.
Then, Mr. Jones, go ahead with cross-examination.
MR. JONES: Thank you, Your Honor.

ROBERT PETER GAMBARDELLA,

called as a witness on behalf of the Defendants, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JONES:
Q. Mr. Gambardella, this is the attorney for Dae Sung Lee.

Is it correct that you have never competed in Taekwondo?
A. Yes, sir, that is correct.
Q. And that you have never coached athletes in competitive Taekwondo at any level, have you?
A. Yes, sir, that is correct.
Q. What you know about Taekwondo you have sort of picked up in the last six months?
A. Uh... no, sir.
Q. What else did you know about Taekwondo, just generally, before becoming CEO of USTU?
A. Well, I worked with the United States Olympic Committee in the Sport Partnership Division, and throughout that time period, I had opportunity to observe Taekwondo in different functions throughout the past four years. I'm not saying I am an expert, but I have had an opportunity to kind of take a look at it and analyze it.
Q. You do not hold yourself out as an expert in Taekwondo competition based upon that experience, though?
A. That is correct.
Q. Is it correct that you recommended Gene Lopez to the governing board?
A. Yes, sir.
Q. How did you get his name?
A. Can you say that again? I'm sorry.
Q. I'm sorry. How did you get his name?

A. How did I get his name? How did I get his name for what?
Q. To -- to be considered by you.
A. Basically, the name came forward as a result of performance of athletes.
Q. Nobody submitted the name to you?
A. Uh, no, sir.
Q. You were aware that Dae Sung Lee had been selected by USTU in March 2003, were you not?
A. Yes, sir.
Q. You were also aware that USOC had approved his nomination around October -- early October 2003?
A. Yes, sir.
Q. You were aware that Dae Sung Lee had some coaching success with Steven Lopez at the 2003 Pan Am games?
A. Uh, I'm unaware of that, sir.
Q. Were you aware that Coach Dae Sung Lee coached Steven Lopez at the Pan Am games?
A. Yes.
Q. And that --
A. I knew that.
Q. And, at that tournament, Steven Lopez won a gold medal?
A. Yes, sir.
Q. Isn't it also correct that at the world championships, Dae Sung Lee was the head coach for that team?
A. I know he was on the coaching staff, but I don't know in

what exact position, to be honest with you.

Q. Steven Lopez won a gold medal at that tournament, as well; you're aware of that?

A. Yes, sir.

Q. Were you aware at the time you were doing the screening that you refer to in your statement, the screening for head coach, that Gene Lopez coached his sister, Diana Lopez, against Nia Abdallah at the Olympic qualifications?

A. I'm aware of that, yes.

Q. Were you aware of it at the time you were doing the screening?

A. Yes, sir.

Q. Were you aware that Nia Abdallah won and beat out Diana for that position?

A. Yes, that happened in June.

Q. And, as a result, Diana is now first alternate to Nia Abdallah?

A. Yes, sir.

Q. In other words, if something should happen to Nia, Diana would get to take her place at the Olympics?

A. Uh, yes.

Q. How do you think that makes Nia feel, to have Gene Lopez sitting with her ring-side in Olympic competition?

A. Uh, I don't know. I really haven't talked to him specifically about that.

Q. I'm sorry. The question is, how do you think it makes Nia feel?

A. Well, I had a conversation with Nia about that, and I think that we have come to a resolve, you know, in our conversations that we have had over the several weeks prior to us coming to our training in Malta and now in Athens.

Q. And that resolution is to have someone other than Gene Lopez sit with her?

A. I'm sorry, could you say that again?

Q. Would the resolution be that you have decided to have someone other than Gene Lopez sit with her in competition?

A. Gene Lopez is the head coach of the Olympic teams.

Q. Right. But why don't you explain what the resolution is for Nia.

A. Well, we had a meeting, I believe, around July 2nd or 3rd -- I can't remember the exact date -- and with our governance and management committee, and it was decided that, in the best interests of the program, that we would have Chul Ho Kim come and help us in our efforts leading up to Malta and to Athens.

Q. And how is he going to help you?

A. Basically, he's helping us in our training, and basically, just -- uh, in meetings that we have, uh, amongst the coaching staff.

Q. He does not have the title of "coach"; isn't that

correct?

A. Actually, the title is, he's on our staff.

Q. Okay. But, to answer the question, Chul Ho Kim does not have the title --

MR. BENZ: Wait, wait, wait, wait, wait. He hasn't finished his answer. I'd like to let him continue.

A. Because, basically, within the rules and regulations that's set forth right now by the United States Olympic Committee, in terms of number of --

THE COURT: Can I stop you? I don't know who grumbled that the witness hadn't finished his answer. And the court reporter needs to know who is speaking, and cannot tell. So, if counsel wants to say anything from the telephone, counsel needs to start whatever comment is being made by telephone with counsel's name. So, who said that?

MR. BENZ: That was Mr. Benz, Your Honor. Your point is well taken. I apologize.

THE COURT: Okay, thank you.

I'm sorry, whoever was then speaking -- I think it was the witness -- you can go ahead and continue.

A. Yes, can you restate your question again?

THE COURT: Sure.

Mr. Jones, can you repeat the question?

MR. JONES: I forgot what it was...

THE COURT: Well, hold on, we have to go back a

little. The record is all messed up right now, because we can't tell who is talking, but hold on, and I'll see if I can figure this out.

Have you got it, Mr. Jones?

MR. JONES: Yes.

THE COURT: Okay.

BY MR. JONES:

Q. Is it correct that Chul Ho Kim is not a credentialed coach?

A. Yes, sir. And, basically, even myself, as being a team leader of this team, I am not credentialed to get an ATHOC credential; therefore, I cannot get into the Olympic Village, nor can I get into the venue. So, yes, indeed -- and the same thing has occurred with Chul Ho Kim as he's come to our Malta trip, and our pre-games training, and to the Athens trip, the Athens Olympics here as just a staff member, who is helping us in our training efforts in preparation for our competition.

Q. Thank you.

Do you know if it is a conflict of interest for Gene Lopez to be Nia Abdallah's coach during Olympic competition?

A. Uh... I don't think -- I don't believe so, but it can be looked at by different -- you know, different people can look at it different ways.

Q. Did you recognize a conflict of interest when you were

screening Gene Lopez, as far as his relation with -- his prior relation and record with Nia Abdallah?
A. Uh, no, sir.
Q. You did not see the conflict?
A. No, sir, because, you know what? If we were trying to figure out everything that could have happened in the series of all the athletes involved in the trials, trying to write every situation down would probably be -- the text would be larger than "War and Peace," so we just can't account for everything.
Q. Did the possibility that there was a conflict of interest arise after Gene Lopez's name was sent by you to the governing body?
A. Yes, sir.
Q. What did you do in reaction to that when the possibility of conflict was brought to your attention?
A. Well, it wasn't a reaction -- rather than a way to try to develop solutions so that we come to Athens with a team that is ready to compete for medals at the Athens Olympic games.
Q. Did you ever consider pulling back Gene Lopez's name when you discovered the conflict of interest?
A. Well, as I said, I didn't see it as being a conflict of interest, so at that point, with that being said, we weren't considering pulling his name back.
Q. And about when are we talking about when the issue of --

or the discussion of conflict came up?
A. Please state your question again, I didn't hear you.
Q. I'm sorry.
About what time period are we talking about when the issue of conflict came up after Gene Lopez's initial selection?
A. It was approximately around, I believe, June 29th, because I was on my way to Indianapolis for an executive director's meeting, at which time I had several conversations with the parents of Nia Abdallah, and the conversations -- several conversations after that I had with the parents and with members of the governance and management committee. And, as I stated earlier, it was probably about July 2nd or 3rd that we had a meeting of our governance and management committee.
Q. Okay.
According to your statement, Gene Lopez was confirmed by USOC approximately June 22nd of this year?
A. Yes, sir. I don't know the exact date, but that sounds somewhere -- probably right around the time. I would say maybe somewhere between the 21st, 22nd, or even the 20th.
Q. Thank you.
Turning for a moment to Nia Abdallah 's history, do you know when she was first discovered by the U.S. Olympic people?

A. You may want to be a little bit more specific, sir, because I don't think that the USOC "discovers" anyone, but rather, maybe the United States Taekwondo Union?
Q. Yes, let me rephrase that. When was she discovered by USTU?
A. Yeah, I think probably about two years ago. And, just -- I want to state for the record, just so we don't have a misunderstanding, my tenure at U.S. Taekwondo started February 4th of 2004, so some of this institutional history, which is not documented, is just from what I have been trying to piece together for the past several months.
Q. Were you aware whether -- were you aware that Han Wan Lee was the person who discovered her at USTU?
A. I could not say one way or the other. I don't know.
Q. When you were applying the new criteria for coach selection, would you research the first criteria, which is whether the applicant had placed the athlete?
A. Had I researched that?
Q. Yes.
A. Yes, we did. We did take a look at that. And I do have a file up in my room with all the results. And even I have results of what athletes participated in what qualifiers. So we did look at that.
Q. My question is whether you researched Nia Abdallah's history to determine who placed her for purposes of criteria

number one.
A. No, we hadn't.
Q. So, criteria number one was applied without the benefit of research to either determine who placed Nia Abdallah?
A. Well, sir, it's my understanding that Chul Ho Kim was her coach, and that she was training with him, and she was the one who was asking for Chul Ho Kim -- and no one else -- as -- to be her coach.
Q. Is what the athlete asks for one of the criteria?
A. No, basically, this is a conversation that we had several times. So, basically, in terms of the historical perspective, you know, it has been Chul Ho Kim who has been the resident coach of the program.
Q. If it turned out that someone else and not Chul Ho Kim -- rather, Han Wan Lee -- placed her, then that would mean that the first criteria was applied erroneously with respect to Nia Abdallah, would it not?
A. I guess that's a matter of opinion.
Q. You can't have more than one coach placing an athlete, can you?
A. I don't believe so.
Q. Now, you called the system of coach selection under the old system at USTU an "award", is that right?
A. Yes, sir. That's basically -- and that's the opinion of many people inside and outside the U.S. Taekwondo Union.

Q. It's correct, is it not, that you were not there in 2003 when USTU went through the coach selection process that led up to Dae Sung Lee's nomination? Isn't that true?

A. Yes, sir. As I stated a little bit ago, I started with Taekwondo February 4th of 2004.

Q. You don't know who was considered or what factors were weighed in that selection, do you?

A. Uh, no, sir; however, I -- I talked to some of the former board members, especially some of the AAC reps, and I think that the process that was set forth probably wasn't proper, because there wasn't -- what I understood -- understand is that there wasn't enough athlete representation when it was voted upon.

Q. You're aware, though, that the process by which Dae Sung Lee was selected required AAC representation and voting prior to a nomination being approved?

A. No.

Q. You weren't aware that AAC people were on the committee that approved Dae Sung Lee?

A. I was aware of the fact. Again, this was before my time. And, again, I can only go on what I have been told by other AAC members.

Q. Assume that the bylaws require a certain number of AAC people to approve -- number one, compose the selection committee, and, number two, that it's got to be majority rule,

that would mean the AAC was represented in that selection process, would it not?

A. Perhaps, yes. But, again, I really don't know.

Q. Now, you stated in your declaration that --

THE COURT: What is AAC?

A. Athletes' Advisory Council.

THE COURT: And is that a council that is part of the U.S. Olympic Committee?

A. Well, NGB's, National Governing Bodies, have their own AAC's, or AAC reps.

THE COURT: Okay.

A. It may be structured differently according to different NGB's.

THE COURT: Okay, thank you.

A. But the USOC also has an AAC body that works with the U.S. Olympic Committee.

THE COURT: All right.

BY MR. JONES:

Q. Next question, sir:

You stated that you have been unable to get an additional credential for Chul Ho Kim, is that correct?

A. Yes. And, as I stated earlier, I was unable to get a credential for myself.

Q. Who issues those credentials?

A. The United States Olympic Committee in cooperation with

the athletes' organizers.

Q. And has the U.S. Olympic Committee agreed to issue you one?

A. No. As I stated a moment ago, I don't have a credential to get into, number one, into the Olympic village or the venue. I do have a USOC credential, which gets me into our training site, which is outside the purview of the ATHOC facilities.

Q. But it's correct, is it not --

THE COURT: Of the what facilities?

A. The American College of Greece.

MR. BENZ: Your Honor, this is Jeff Benz.

THE COURT: Yes?

MR. BENZ: ATHOC is an acronym that stands for the organizing committee for the Olympic games in Athens. I think it actually stands for the Athens Organizing Committee.

THE COURT: What was it --

MR. BENZ: They administer the games, they run the games on site in accordance with IOC -- International Olympic Committee -- policies and procedures.

THE COURT: What did you say was the acronym?

MR. BENZ: I'm sorry, A, T as in Tom, H as in Harold, O-C.

THE COURT: Thank you.

Okay.

BY MR. JONES:

Q. So, just to understand this credentialing process, USOC is one of the parties that issues one; is that right?

A. Yes -- yes, the USOC is in charge of X number of credentials, which is based on -- the formula-driven equation based on the numbers of athletes who qualify, as I understand it.

Q. You also -- turning to another topic, you said in your statement that a coach at the Sydney Olympics was pushed aside by Steven Lopez; is that right?

A. Uh -- yes. My understanding from conversations with Steven that he wasn't getting the correct information in his finals, and so he was seeking information from his brother, who was in the stands.

Q. I see. So you got that secondhand, you didn't see it?

A. Uh, no, sir. I got it from the athlete, yes.

Q. Thank you.

Now, you wrote a letter to me, you might recall, in response to a query by me as to Dae Sung Lee's status back in July, do you recall that?

A. Yes, I do.

Q. You wrote in that letter that the USOC approved of Gene Lopez as coach on July 21, do you recall that?

A. Uh, I would have to look at it. It says, U.S. Team nominated Mr. Gene Lopez from Houston, Texas, as the 2004

Olympic coach for Taekwondo. His nomination was approved by the United States Olympic Committee on July 19, 2004.

Q. I believe, in your statement, though, your declaration, you told us that it was June 22nd that that process occurred?

A. If that was the case -- and I'm trying to find it right now -- that's an error on my part, I guess.

MR. BENZ: This is Jeff Benz. Do you have a part of the declaration he can refer to?

THE COURT: Paragraph 11, at the bottom of paragraph 11.

A. That, Your Honor, is a mistake, and it is -- the letter here, July 19th, is correct, and this is a typographical error that I didn't catch.

BY MR. JONES:

Q. Thank you.

THE COURT: So what is the correct date when the recommendation was approved by the USOC?

A. Yes, ma'am, it was July 19th, 2004.

THE COURT: Okay.

MR. LEVINSTEIN: Your Honor, this is Mark Levinstein. Just for clarification, I'm not sure the question matched the answer. It was a question about the USTU recommendation versus the USOC approval. I'm just not sure that the record's clear on what he was answered.

THE COURT: Okay.

MR. LEVINSTEIN: I think he's saying that the USOC approval was the 19th of July --

THE COURT: Right.

MR. LEVINSTEIN: But the USTU recommendation, I think, was in your question as well.

THE COURT: Well, Mr. Jones, from what I can tell, had asked whether the USOC had approved Gene Lopez's coach July 21. And the witness said, well, I don't know. Where is it in the declaration?

So, when was Gene Lopez approved by the United States Olympic Committee as the coach for the Taekwondo team?

A. Your Honor, again, it was July 19th I received an e-mail from a USOC staff member approving Gene Lopez and other coaches and staff for the 2004 Olympic games.

THE COURT: Okay. So you're saying that it was July 19, 2004, that the United States Olympic Committee approved Mr. Gene Lopez as the coach for the 2004 Olympic games; is that right?

A. Yes, Your Honor.

THE COURT: Thank you.

BY MR. JONES:

Q. And is it correct that -- just to understand, that approximately a month before that is when the USTU approved his name?

A. Uh, I don't believe it was a month before. I believe it

was, perhaps -- probably late June -- perhaps? Maybe the 26th. I don't have the exact date.

Q. So a little less than a month, you're thinking?

A. Well, first of all, we -- in order for us to do this correctly, we had to wait and see who would win the Olympic trials in San Jose, in order for us to try and keep the process moving in the correct manner. So our Olympic trials were in June, and, basically, we had to wait until after that and then, you know, send in a recommendation to the United States Olympic Committee after that.

MR. JONES: Thank you, I have no further questions.

THE COURT: Okay.

Redirect?

MR. ROECA: Okay, Your Honor.

THE COURT: Okay, hold on.

(Discussion off the record.)

REDIRECT EXAMINATION

BY MR. ROECA:

Q. Mr. Gambardella, Arthur Roeca. I just have a few follow-up questions.

One of the questions that was earlier put to you had to do with the composition of the team with Nia and Mr. Lopez being the competitors and Mr. Lopez's brother being the coach.

And my question for you is, have you observed the team since you arrived in Athens, in terms of its cohesive

nature or lack of cohesive nature?

A. Yes, Mr. Roeca. As a matter of fact, our team --

MR. JONES: Objection, Your Honor, outside the scope.

A. -- and Steven and Mark Lopez came to the U.S. Olympic Committee prior to -- a week prior to our trip in Malta --

THE COURT: Can I stop you? There's an objection to the question. And the objection is, it's outside the scope. Okay, well, I'm going to let it go.

Go ahead; overruled. You can complete your answer.

A. I just wanted to give you a little bit of the chronology. The Lopez family came to Colorado Springs a week prior to us departing for our Malta trip. At that point, I had opportunities to spend time watching, observing practice. When we left for Malta -- we spent eight days in Malta. We were hosted by the Malta Olympic Committee. I observed every practice that they had, and the same here now in Athens, every practice. We have had two practices a day, 9:00 in the morning, and then another one at 5:00 in the evening, and I have been at those. And I have seen, basically, a group of individuals forming into what I think is a cohesive team -- which is really critical, especially when you're at games of this magnitude.

BY MR. ROECA:

Q. Mr. Gambardella, during one of the questions that was

8/12/2004 TRO Proceeding

[Page 37 - text redacted]

8/12/2004 TRO Proceeding

[Page 38 - text redacted]

---

8/12/2004 TRO Proceeding

```
 1  could have won, whether it be in the female or male area, and
 2  you know, basically, we had to look at it and see how all
 3  things settled out.
 4           MR. ROECA:  That's all I have; thank you.
 5           THE COURT:  Okay.
 6           Did you have any more cross?
 7           MR. JONES:  No, Your Honor.
 8           THE COURT:  Okay.
 9           Then the witness is excused.
10           We are going to take about a ten-minute break.  I
11  know it's really, really late over there in Greece, so we
12  won't take more than ten minutes.  I know we still have
13  Ms. Skinner to get back to by phone, so, ten minutes, then
14  we'll be right back.
15           Thank you.
16           THE CLERK:  All rise.
17           This court will stand in recess for ten minutes.
18           (A recess was taken from 11:55 to 12:05 p.m.)
19           THE COURT:  Okay, we're going to go back now to the
20  telephone witnesses.  And I think Kelly Skinner is the last
21  witness we have from Greece, right?
22           MR. JONES:  Yes.
23           THE COURT:  Is she there in the room?
24           MS. LURIA:  It's a man.
25           THE COURT:  I'm sorry, I couldn't hear.  Hello?  Are
```

39

8/12/2004 TRO Proceeding

```
 1  we connected okay?
 2           THE CLERK:  Your Honor, they were supposed to remain
 3  on...
 4           MR. LEVINSTEIN:  You are connected with me,
 5  Your Honor.  This is Mark Levinstein in Washington.  I think
 6  they are there.  Kelly Skinner is a man, though, not a woman.
 7           THE COURT:  I'm so sorry.  That's why I was waiting
 8  for the voice.
 9           MR. LEVINSTEIN:  But I don't hear anyone yet from
10  Athens.
11           Jeff Benz, are you there?
12           THE COURT:  Mr. Benz, are you there?
13           MR. LEVINSTEIN:  No, I'm not hearing him either.
14  But my phone shows that they are still conferenced in.  I do
15  have a cell number, so we can also try to call that to make
16  sure they are there.
17           THE COURT:  Okay, who is speaking now?
18           MR. LEVINSTEIN:  This is Mark Levinstein in
19  Washington, Your Honor.  I'm the one who is patching them in.
20  I'm not with them.  But let me try to get him on the cell
21  phone.
22           THE COURT:  Okay, hold on, we'll wait a little
23  while.
24           MR. JONES:  Your Honor, if I can make a statement,
25  just to answer the court's inquiry.  I've got the cite for
```

40

that one provision.

THE COURT: Yes, thank you.

MR. JONES: It's provision 19.1(f) of the USOC bylaws. It talks about the Olympic Committee's obligations, as far as paying for athletes's and teams' expenses. Transportation, equipment, housing --

THE COURT: Does it include the coach?

MR. JONES: Let's see, it says --

THE COURT: What exhibit number are you looking at?

MR. JONES: 29.

THE COURT: Exhibit to what?

MR. JONES: Plaintiff's Exhibit 29; it's the bylaws of the USOC.

THE COURT: Okay.

I think Mr. Skinner and Mr. Benz are just not back yet from their break.

MR. LEVINSTEIN: We are calling his cell number now, Your Honor. This is Mark Levinstein in Washington.

THE COURT: Okay, I am still not clear, even though Mr. Jones has referred to 19.1(f)...

MR. JONES: What's unclear on that provision is the meaning of "team," I understand, Your Honor, whether that includes staff, as well as athletes or not.

THE COURT: Well, I'm looking at it. It says the corporation shall assume responsibility for transportation,

equipment, housing and living expenses of the Olympic, Pan American, or Paralympic Games team from the time the athletes depart for the team processing site until they are officially disbanded on their return to the United States.

So what happens if, for example, the coach decides to stay two days later in Greece? Isn't his return plane fare still covered, even though that is after the team has departed?

MR. BENZ: Your Honor, this is Jeff Benz from the USOC. I'm sorry, we're back. We're in a facility that is not the same kind of facility we would be using in the states, so --

THE COURT: Okay, well, let's go back for now to the witnesses.

Okay, so --

MR. BENZ: The answer to that question is that the -- the coaches generally travel with the team and --

THE COURT: Okay --

MR. BENZ: -- do not allow tourism to occur during the Olympic games, as a general rule --

THE COURT: I am going to stop you, Mr. Benz. I want to go back to the witnesses right now.

So let's get Kelly Skinner on the line.

THE WITNESS: Yes, I am.

THE COURT: Okay, I will have the oath or

affirmation administered.

THE CLERK: Would you please raise your right hand. Do you solemnly affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Would you please state your name for the record and spell your last name?

THE WITNESS: Kelly Skinner, S-K-I-N-N-E-R.

THE COURT: Mr. Skinner, could you tell me whether the -- I'm looking for your declaration. Hold on... I've got it. Okay.

Could you tell me whether the declaration that you executed on August 6, 2004, is true and correct and represents what your answers would be if you were appearing live in a courtroom and being questioned about the subject matters set forth in your declaration?

THE WITNESS: It does.

THE COURT: Okay.

Then, Mr. Jones, you may go ahead with cross-examination.

MR. JONES: Thank you, Your Honor.

KELLY SKINNER,

called as a witness on behalf of the Defendants, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JONES:

Q. Hello, Mr. Skinner, this is Ward Jones, attorney for Dae Sung Lee.

A. Hello.

Q. Your background is mainly marketing; is that correct?

A. No. My background is some marketing with a great deal of sports administration.

Q. Thank you.

You are a salaried employee of the USOC?

A. Yes.

Q. You've never competed in Taekwondo; is that true?

A. That is correct.

THE COURT: Mr. Jones, you didn't have any -- I forgot to ask you -- any objections to the declaration?

MR. JONES: No, Your Honor.

THE COURT: Okay, then go ahead.

BY MR. JONES:

Q. You've never coached athletes in competitive Taekwondo at any level; is that true?

A. That is correct.

Q. What you know about Taekwondo you've picked up on the job?

A. Correct.

Q. You stated in your declaration that USTU was not willing

to pay expenses for coaches whose sole role would be to show up at the Olympic competition; is that correct?
A. That is correct.
Q. Were you referring to plaintiff Dae Sung Lee, in particular, when you made that statement?
A. I was referring to coaching practices of the USTU coaches.
Q. But not Dae Sung Lee in particular?
A. Anybody who has been a coach at an international event for the USTU in the past two years.
Q. And were you thinking of anybody in particular when you made that statement?
A. No. All of their appointed coaches were people that that statement was targeted at.
Q. Okay.
When you say USTU was not willing, were you referring to Robert Gambardella in particular?
A. I'm sorry, I missed part of that question.
Q. Sorry.
When you said that USTU was not willing to cover these expenses any longer, were you referring to Robert Gambardella?
A. No.
Q. Were you referring to the board?
A. I was referring to the administration in place at that

time.
Q. And who was your understanding of who that is?
A. The board of USTU, as well as the salaried staff.
Q. Okay.
Now, do you know how the USOC bylaws describe the Olympic coaches' function?
A. I cannot cite it by verse, but I have the basic understanding, yes.
Q. State, in your own words, what you think a U.S. Olympic coach is supposed to do under the bylaws.
A. To prepare and coach athletes leading up to and during major international events, including the Olympic games.
Q. Do you know whether plaintiff Dae Sung Lee was attempting to do those things?
A. I do not see any record of him coaching any athletes that were in the competitive pool that were attempting to make the Olympic team in 2004.
Q. And what kind of record are you referring to?
A. Athletes who entered into -- (incomprehensible) -- that occurred in January, March, April, May or June of 2004 --
THE COURT: Did you say --
A. -- as well as those athletes who were members of the 2003 world championship team.
THE COURT: Okay, did you say athletes that had entered into -- what?

A. What they had was a series of fightoffs to try to make the Olympic team. I did not see any athletes that registered Mr. Lee as a coach that participated in any of those events.
THE COURT: In the "playoffs"?
A. In the "fightoffs," yes, ma'am -- yes, Your Honor.
THE COURT: Okay, thank you.
BY MR. JONES:
Q. Uh --
THE COURT: The "fightoffs," did you say, or the "playoffs"? The "fightoffs"?
A. F-I-G-H-T, "fight."
THE COURT: Thank you.
BY MR. JONES:
Q. Tell me, Mr. Skinner, do you know whether plaintiff, Dae Sung Lee, attended a site visit in Greece in April at USTU's request?
A. I do not know.
Q. Do you know whether he attended the world championship in 2003?
A. Yes.
Q. He did?
A. Yes.
Q. Do you know whether he attempted -- or, pardon me, attended the Pan Am games in the Dominican Republic?
A. Yes.

Q. That was six weeks long, wasn't it?
A. You faded out during part of that.
Q. That was six weeks long, wasn't it?
A. That event was three weeks long.
Q. You believe it to be three weeks?
A. That event -- I don't have the dates in front of me, but I wasn't gone for six weeks, and I was there before the games started and after they ended.
Q. Do you know whether Dae Sung Lee attended the regional Olympic Pan American qualifications in Mexico?
A. Yes, he did.
Q. Do you know whether he attended the world qualifications in France?
A. Yes, he did.
Q. Do you know whether he attended the Asian qualifications in Thailand?
A. I am not aware, because as far as I know, there were no U.S. athletes in that event.
Q. Do you know whether he attended the first U.S. Olympic trials in Colorado?
A. The first Olympic trials?
Q. Yes, the U.S. Olympic trials in Colorado?
A. In which year?
Q. That would be 2004.
A. There was one Olympic trial; that was in June in San

Jose, California.

THE COURT: Well, did he attend?

A. I did not see him there.

BY MR. JONES:

Q. Are you aware of any other Olympic trials? You're only aware of one Olympic trial; is that correct?

A. There is one official Olympic trial. Everything else was a fight-off to try to get to that trial.

Q. Do you know whether he attempted to go on a second Greece site visit at USTU's request?

A. I was not aware of that.

Q. Do you know if he attended the U.S. Pan American Games team trial in Colorado?

A. I cannot recall.

Q. It's common, is it not, for Olympic coaches to attend lots of these competitions in order to size up the foreign competition?

A. Those competitions -- everything except for the Pan American Games and the world championships that you mentioned were competitions that featured U.S. athletes -- I'm sorry, you also mentioned an Asian event. Those are the only three events where you would be looking at anybody else; every other event was totally full of American athletes.

Q. And, as part of a U.S. Olympic coach's duties, shouldn't he be at the United States' events, as well?

A. Should he be at the United States' events, as well? Yes. Any coach who is preparing athletes should be at the events that are relevant to that athlete making an Olympic team.

Q. And we've just gone over the ones that Dae Sung Lee attended that you were aware of. Is that right?

A. I indicated which ones I was aware that he attended, yes.

Q. And you are aware of that how, by attending them with him or by looking at receipts that are turned in?

A. Some of those events I was at. Some of those events I know he was at because of looking at delegation member names on final rosters. One thing I want to make sure that was caught in the -- phone is that he attended many events, but I do not recall him having any athletes that were competing at any of those events.

Q. I see. So you're distinguishing between attending events for preparation versus bringing athletes there from his school to compete; is that fair?

A. That is very fair.

Q. Now, let me ask you your understanding of the process for issuing coaching credentials. We heard testimony that the USOC, along with a Greek committee, are the ones that must okay the issuance of additional credentials; is that your understanding?

A. Generally, yes.

Q. And what committee would that be in Greece?

A. What -- what I mean by that is, it's not that simple. The U.S. Olympic Committee plays a very minor role. International federations play a bigger role. The International Olympic Committee plays a role, as well as ATHOC, the Athens Organizing Committee, plays a role in these particular games.

Q. Okay, we've heard about that association.

To your knowledge, the USOC has not issued a credential for Chul Ho Kim; correct?

A. Correct.

Q. Thank you.

MR. JONES: No further questions.

THE COURT: Okay.

Any redirect?

MR. ROECA: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. ROECA:

Q. Good evening, Mr. Skinner. Arthur Roeca. Just a couple of follow-up questions.

You were asked a series of questions concerning Mr. Lee's attendance at a number of competitions over the course of time. Are you aware of the qualification events that occurred for the U.S. Olympic team, Taekwondo team, in June of 2004?

A. Yes.

Q. To your knowledge, did Mr. Lee coach any athlete who was a competitor for a position on the United States Olympic team for the 2004 Olympics in June of 2004?

A. No.

Q. Now, to your knowledge, was the selection of the coach based upon the criteria that had been established prior to the qualification tournament that occurred in June of 2004?

A. Yes.

Q. And were the criteria followed in the selection of the coach, Mr. John Lopez -- Gene Lopez, who has been --

A. Yes.

MR. ROECA: That's all I have; thank you.

THE COURT: Okay.

Anything more?

MR. JONES: No, Your Honor; thank you.

THE COURT: Okay.

Then we are going to excuse Mr. Skinner. And, at this point, I think we are done with the witnesses in Greece, and we'll go back to the live witnesses.

Did you want to -- Mr. Jones, did you want to do Mr. Han Wan Lee, who is a non-party first, so that then we would be left with the parties only, and then the non-party witnesses would be excused?

MR. JONES: That would be fine, Your Honor.

THE COURT: Okay.

My suggestion is this: That we take Mr. Han Wan Lee, and then take a lunch break. And then come back to do the witnesses who are parties anyway, so they are going to be here, okay?

MR. JONES: Yes. Thank you, Your Honor.

THE COURT: Okay, so let's call Mr. Han Wan Lee.

MR. LEVINSTEIN: Your Honor, are we first going to do objections to his declaration or not?

THE COURT: Yes, we are, but I am just bringing him in, and then I'll take objections, and so forth.

Who is going to be examining -- cross-examining Mr. Han Wan Lee?

MR. ROECA: I will be, Your Honor.

THE COURT: Okay. So, are there any objections?

MR. ROECA: If you'd give me one minute, Your Honor?

THE COURT: All right.

(Mr. Lee approached the witness stand.)

(Discussion off the record.)

MR. ROECA: Your Honor, we object to the -- paragraph eight, concerning -- well, on the grounds that it's not relevant.

THE COURT: Okay, just a minute.

MR. ROECA: And paragraph nine, on the grounds of relevance.

Number ten, on the grounds of relevance.

(Perusing documents.) Number ten on the grounds of relevance.

11 on the grounds of relevance.

And 12 on the grounds of relevance, Your Honor.

MR. LEVINSTEIN: Your Honor, Mark Levinstein in Washington. Since I can't confer with my co-counsel, I just have the end of 12 -- also on the basis of he's testifying about the mental state of someone else, which I don't know how he testifies about whether Nia Abdallah would be uncomfortable or not.

THE COURT: Okay. Well, I'll let Mr. Jones respond. Paragraph eight, it seems to me, goes to the damage claim. And so -- I mean, it's fine that it's in here, but you might want to explain to me why I have to consider this evidence on the preliminary injunction motion.

MR. JONES: You're correct, Your Honor, it does go to future damages.

THE COURT: Okay.

So, for purposes of this hearing, I am sustaining the objection to paragraph eight, but it's in the record if it later gets referred to on the damage discussion.

Okay, then, looking at paragraph nine, Mr. Jones?

MR. JONES: Again, this goes to the effects of having one of these appointments, Your Honor. Primarily, we are talking about irreparable harm to the plaintiff --

THE COURT: Okay, but what about the last sentence, for example? The last sentence probably goes to your damage claim, it seems to me. I can see your argument that the first two sentences about getting the acclaim of going around and speaking in public might be some non-monetary damage.

MR. JONES: Yes, Your Honor.

THE COURT: Okay.

So I'm going to sustain the objection to the last sentence of paragraph nine, and I won't consider that for purposes of this preliminary injunction motion.

Paragraph ten, it seems to me, does go to what they are claiming as irreparable harm, so I am going to overrule the objection to paragraph ten.

Paragraph 11 -- I'll overrule the objection to paragraph 11.

Paragraph 12, I think the objection with respect to Nia Abdallah conceivably being uncomfortable is well taken, so I'm going to sustain the objection to the last sentence. In paragraph 12, I think, also -- can this witness really talk about whether or not something is or is not a conflict of interest?

MR. JONES: Yes, Your Honor. Coaches are held to a standard of their own ethics, and I think he's -- being an expert, he's qualified to talk about what's ethical and what isn't.

THE COURT: Okay, well, this subject has actually been raised with another witness, so I'm going to allow it; but, the last sentence of paragraph 12, it does seem to me, is speculative, and I'm going to not consider that. So the objection is sustained to -- to summarize, paragraph 8; the last sentence of paragraph 9; and the last sentence of paragraph 12; and, in other respects, the objections are overruled.

Now, I'll have the witness sworn.

THE CLERK: Would you please rise and raise your right hand.

Do you solemnly affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Please be seated.

State your name for the record and spell your last name, please.

THE WITNESS: Han Wan Lee. L-E-E.

THE COURT: Okay.

Mr. Lee, do you have a copy in front of you, of your declaration?

THE WITNESS: I do not.

THE COURT: You do not?

THE WITNESS: I have it in my bag.