THE COURT: Okay, you might want to go and get that so you have it in front of you.

THE WITNESS: Okay.

(The witness stepped down from the stand, retrieved briefcase, then returned to the witness stand.)

THE WITNESS: (Perusing documents.)

THE COURT: Okay.

Now, looking at that declaration, tell me whether everything in it is true and correct, and if you were asked questions while you were sitting here in this courtroom about subjects in this declaration, would you provide the answers that are written in this declaration?

THE WITNESS: Yes, I would.

THE COURT: Okay.

Then let me invite cross-examination.

MR. ROECA: Thank you, Your Honor.

HAN WAN LEE,

called as a witness on behalf of the Plaintiffs, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. ROECA:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Are you familiar with the coaching criteria that were established by the United States Taekwondo Union in April of

2004?

A. Yes, I read that, yes.

Q. Okay.

And, are you aware of the factors that they took into consideration in selecting Gene Lopez as coach of the 2004 Olympic team?

A. Yes.

Q. And, do you know whether or not those factors were appropriately applied in selecting Gene Lopez?

A. With the new criteria, yes.

Q. They were appropriately applied, correct?

A. Yes.

MR. ROECA: That's all I have.

Thank you.

THE COURT: Okay.

Then, redirect?

REDIRECT EXAMINATION

BY MR. JONES:

Q. Can you just comment on the applicability of the new criteria to Gene Lopez, why you feel he was appropriately selected?

A. Well, because the 2004 USTU's selection criteria said -- in my belief -- that, has to produce an athlete, or have to put athlete on the team. And so, in that criteria, it is. But, my personal opinion is that Dae Sung Lee, Coach Dae Sung

Lee, did not coach anybody, because he was to believe that he was a coach for Olympic team, and therefore, he didn't have a chance to put anybody on the team.

Q. Would you agree that Coach Dae Sung Lee had some positive record for purposes of factor two of the new coaching criteria?

MR. ROECA: Objection; calls for speculation, Your Honor.

THE COURT: I'm going to let him go ahead.

Go ahead and answer.

A. Okay. Coach Dae Sung Lee has experience in international competitions, coaching, and he has coached Steven Lopez in 2003 Pan Am Games to a gold medal. And he was -- believed that he was coach for 2004. I believe he spend a lot of his money, as well, to go to international competitions to study international competitors, as well. And he has coached many of the elite athletes, or national team members, at world championships and world cups and made them winners in international competition.

BY MR. JONES:

Q. But if one is constrained by these new coaching selection criteria because he can't meet the first factor, is what points to Gene Lopez?

A. Right. To me, 2004 election -- coaches' selection criteria is not really, you know, fair, in my opinion, because

of -- you know, first criteria is, you have to put the athlete on the Olympic team to be eligible or be considered as Olympic coach. So...

Q. Thank you, sir.

A. Thank you.

THE COURT: Anything more?

MR. ROECA: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. ROECA:

Q. So you don't agree with the criteria that were adopted and that were used to select Gene Lopez; is that what you're saying?

A. Yes. I mean, I do understand the 2004 USTU has set a criteria.

Q. Did Mr. Dae Sung Lee tell you that in April of 2004, he had been told that he was no longer the coach of the U.S. Olympic Taekwondo team?

A. No, he did not.

Q. Did he tell you that he understood in April of 2004 that the position that had been created previously, because of the remediation plan, that all the positions had changed, and his position as coach had been rescinded? Did he tell you that?

A. I don't think so. I don't recall that.

Q. Was it your understanding that he thought in April and May and June of 2004 that he was still a coach?

A. No. My understanding was, he was still running for the position.

Q. In other words, he knew he wasn't the coach, he was hoping to be the coach; right?

A. Well -- maybe, yes. Maybe.

MR. ROECA: Thank you.

THE COURT: Anything more?

MR. JONES: Nothing further, Your Honor.

THE COURT: Okay.

Thank you very much, Mr. Lee; you can step down, and you are excused.

And let me talk to counsel about the schedule here. We still have Ms. Witte and the plaintiff. And I was thinking we should take about an hour break and come back.

MR. ROECA: That's fine, Your Honor.

MR. JONES: That's fine, Your Honor.

THE COURT: Okay.

MR. ROECA: Shall we leave them on the telephone?

THE COURT: On the telephone, are you okay with that, whoever is still going to be with us on the telephone? I realize we are much earlier than you are, so I'm not sure who on the telephone is -- Mr. Benz, are you still going to be with us?

MR. GAMBARDELLA: Your Honor, Mr. Benz is out of the office right now. This is Mr. Gambardella. And I will stick

around. I'll go back to my room and then come back. But -- here is Mr. Benz, he's coming back right now.

MR. BENZ: I'm sorry about that.

THE COURT: I was just checking. We are going to take a one-hour lunch break, and I wasn't sure whether you folks in Athens still wanted to be hooked in when we come --

MR. BENZ: Yes, Your Honor, this is an important issue for us, so --

THE COURT: Okay, so when we come back you still want to participate.

And, in Washington, D.C., are we still going to have that?

MR. LEVINSTEIN: Absolutely, Your Honor.

THE COURT: Okay. Okay, well, you folks are --

MR. LEVINSTEIN: Should we hang up and reconnect in an hour? It doesn't matter to us.

THE COURT: No, I think --

MR. BENZ: It matters to me simply because I am going to try to get closer to my bed than I am now, during this hour.

THE COURT: We are going to --

MR. LEVINSTEIN: Well, it doesn't matter for you, Jeff, because you called me. So the question is: I'm the connection to the court, Your Honor. Should I leave the phone line on?

THE COURT: No, you can hang up. And we'll call you back. So, it's about 20 to 1:00 for us, so we'll call you back about 20 till 2:00. So, about 1:40 our time, I guess that's 2:40 in the morning your time. I think you all ought to get Olympic medals just for participating in this hearing. And I'll talk to you all again in an hour.

Thank you.

MR. BENZ: Thank you.

MR. LEVINSTEIN: Thank you, Your Honor.

THE CLERK: All rise.

This court will be in recess for one hour.

(The lunch recess was taken at 12:40 p.m.)

- - -

AFTERNOON SESSION 1:50 P.M.

- - -

THE COURT: We are going back on the record, and one of the first things we need to know is whether you have any intention of calling Han Wan Lee as a further witness in these proceedings? If you do not, then he'll be allowed to sit in the audience, as he is now doing.

MR. JONES: No, Your Honor, we don't have any more questions for him.

THE COURT: And, Mr. Gambardella apparently has been doing that, also, on the Greece side, although he's representing a party -- representative of a party, in any event.

Okay, so, let's first look at the Sammy Pejo matter and take care of that, and then we'll call the plaintiff. So what, if any, objections are there to the declaration?

MR. ROECA: Yes, Your Honor.

What I can do is go through paragraph by paragraph?

THE COURT: Yes.

MR. ROECA: We object to the last sentence of paragraph six as being hearsay. Paragraph nine, lacking in foundation. Number ten, lacking in foundation. Number 13 as being hearsay -- undocumented hearsay. Number 15, no foundation as to how -- it's speculation, because the witness is being asked to interpret how Nia would feel. The entire

paragraph is speculative. And she also had an opportunity to be examined by counsel during the proceedings. 16, hearsay.

That's all, Your Honor.

MR. LEVINSTEIN: Paragraph seven, the last sentence, testifying as to what everyone at USTU believed, lacks foundation.

THE COURT: Okay.

Okay, let's start with paragraph six.

MR. JONES: Your Honor, we're not offering it for the truth of the matter, we're offering it for the fact that the words were stated; therefore, it's nonhearsay.

THE COURT: Well, this is the kind of statement where, if it was stated, that's the whole ball game for that particular statement. One such meeting with the legal counsel...

MR. LEVINSTEIN: Your Honor, Mark Levinstein. It's technically double hearsay, and one of the statements is for the truth of the fact that it was said.

THE COURT: Why isn't this a party admission, though, so it's not hearsay?

MR. LEVINSTEIN: The statement is that a counsel for the USTU --

THE COURT: Right, but I'm taking counsel as being an agent of USTU --

MR. LEVINSTEIN: Well, this was at a time -- this

was a counsel for the -- the management of USTU who is no longer with USTU.

THE COURT: Okay, I'm going to overrule this hearsay objection, on paragraph six, for the sentence, "At one such meeting with legal counsel, declarant was told that members of the USOC membership and credentials committee referred to USTU management as the Korean Mafia."

Okay, paragraph seven, the last sentence is objected to. It says, "Everyone at USTU respected his qualifications and ability and was happy for him" -- "him" being the plaintiff. I am going to sustain that objection, so that will not be considered.

Looking, then, at paragraph nine, give me a minute here to look at it...

Okay, I don't know how Mr. Pejo knows these things. Presumably he knows them from Mr. Lee. If he knows them from Mr. Lee, then that's hearsay, and Mr. Lee is offering somebody else's statement about what Mr. Lee said. If there's some other personal knowledge foundation, it's not apparent from the declaration.

MR. JONES: I'm sorry, Your Honor. In the example of the Pan Am game, Mr. Pejo was with Mr. Lee, so he saw it with his own eyes.

THE COURT: Okay, but this is all preceded by "he did all the things expected of an Olympic coach."

MR. JONES: I think Mr. Pejo is qualified to talk about those things. He is the AAC chair; he is on the committee that actually selected Mr. Lee, under the old regime.

THE COURT: How does he know the other things? That he was sent to Athens for an Olympic games site. He was also asked to and did attend all these relevant national and international Taekwondo competitions, and these Olympic trials, and the Asian -- how does he know those?

MR. JONES: As AAC chair, he would have to be on top of all those things.

THE COURT: Okay, can I tell that from his declaration, that he had some way other than from Mr. Lee, the plaintiff, to know that?

MR. JONES: No. One would have to look at the bylaws.

THE COURT: Well, I am going to sustain the objection to paragraph nine.

Okay, paragraph ten, I don't know how the declarant is aware that Mr. Lee's nomination was approved in October 2003, and then the sentence that says, quote, "At that point, it is considered final," close quote, I don't know the basis for that. It's not apparent, anyway, from the declaration, so I'm going to sustain the objection to paragraph ten.

Okay, paragraph 13, there's something wrong with the

grammar here. It says, "Declarant only heard from Master Dae Sung Lee's nomination was withdrawn." I don't know what this is supposed to say. Only heard "that" Master Dae Sung Lee's nomination was withdrawn?

MR. JONES: That's what it was supposed to state, Your Honor.

THE COURT: But we can't tell from whom he heard it. I mean, I don't mind saying, declarant does not know the reasons or who suggested the withdrawal of Master Dae Sung Lee's name in the first place, but I don't know that you want that sentence by itself in.

MR. JONES: We'll withdraw that one, Your Honor.

THE COURT: Okay. Okay.

And then I'm looking at paragraph 15. Hold on... and, again, I'm going to take out the sentence, "Because of the family relationship, and so forth, Nia would now conceivably be very uncomfortable."

So, for the same reasons that I sustained the objection to such a statement in an earlier declaration, the objection is sustained to the last sentence in paragraph 15, but the rest of paragraph 15 will stay.

Paragraph 16, give me a moment... okay, I cannot tell from whom declarant heard this, and so I am going to sustain the objection to paragraph 16 on hearsay grounds.

Okay, I think that takes care of the objections to

the Sammy Pejo declaration, and there's no cross-examination, so -- is that right?

MR. ROECA: That's correct, Your Honor.

THE COURT: Okay.

So we're going to look, now, to the declaration of the plaintiff, and we'll have the plaintiff come to the stand.

(Mr. Dae Sung Lee approached the witness stand.)

THE CLERK: Would you please raise your right hand.

Do you solemnly affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE CLERK: Please be seated.

State your name for the record and spell your last name, please.

THE WITNESS: Dae Sung Lee, L-E-E.

THE COURT: Okay, let me first begin by asking Mr. Lee if the declaration that was filed on -- do you have a copy of it?

THE WITNESS: Yes, ma'am.

THE COURT: Okay.

-- that was filed on August 11, 2004, are the statements in this document true and correct?

THE WITNESS: Yes, ma'am.

THE COURT: These would be -- this would be your

testimony if you were asked, while sitting live in this courtroom, questions on the subject matter set forth in the declaration; is that right?

THE WITNESS: Yes, ma'am.

THE COURT: Okay.

Then, cross-examination may proceed.

Mr. Roeca?

MR. ROECA: Your Honor, might we address some of the statements in --

THE COURT: Oh, yes. Do you have objections? Certainly, go ahead.

MR. ROECA: Your Honor, directing the court's attention to paragraph 18, there are statements in that paragraph that are objected to as being hearsay.

THE COURT: Which statements?

MR. ROECA: Well, there's a letter that's attached as an exhibit, which is hearsay, dated August 14, 2003. And then there are a series of characterizations in the paragraph, as you can see, which are referencing hearsay statements.

THE COURT: Do you think that they are inaccurate?

MR. ROECA: I have no way of verifying them one way or the other.

And the letter, itself, is not a self-authenticating document.

THE COURT: Wait. When you say you have no way of

knowing one way or the other, are you disagreeing -- starting with the second sentence, isn't it a description of what the letter says? So I'm asking you whether you think that the description of the letter is incorrect? Putting aside for the moment your hearsay objection to the letter.

MR. ROECA: I think it's out of context, Your Honor.

THE COURT: Is there an exhibit number to the letter? Or is the letter, itself, attached? Is there an exhibit number?

MR. ROECA: It's referred to as Exhibit 4.

THE COURT: Exhibit 4? Hold on --

MR. ROECA: Plaintiff's Exhibit 4.

THE COURT: Okay.

MR. ROECA: Your Honor, I will withdraw. We have agreed to that exhibit, so I will withdraw my objection to that paragraph.

THE COURT: Okay.

MR. ROECA: Moving to the next one, on Page 21 -- or, rather, paragraph 21, we do disagree on the grounds of hearsay, and we have not agreed to the exhibit which is referenced.

And, do you want me to go through the whole declaration --

THE COURT: Hold on, I'll stop here. Okay, well, I don't know that it's hearsay, since we have one of the

Taekwondo Union lawyers allegedly advising declarant of this fact directly. So I think that's an admission.

MR. ROECA: Your Honor, with all due respect, I don't believe that that's an admission, because the current board is in position, in place, due to a settlement -- a remediation agreement, and there was an adversary relationship between the USOC and the USTU at the time of this.

THE COURT: That may be, but the USTU is here, itself, and, presumably, there was not an adversarial relationship between the USTU and the USTU. So, you know, you're representing the USTU, also, not just the USOC, as I understand it, so I'm having some problems saying why it's not a party admission, just because it's not a USOC document or a USOC lawyer.

MR. ROECA: It's -- I don't believe that the statements that were made -- well, I understand that -- if one takes a step back and looks at the relationship, there was an adversary proceeding, and whether a lawyer was characterizing something in a certain way pertaining to a matter that resulted in a resolution, we object to it as being hearsay, and that's the basis of our objection.

THE COURT: Okay. The hearsay objection is overruled, because at the time the statement was made, the lawyer for the Taekwondo Union presumably was acting as an agent for the Taekwondo Union, which is a party in front of

me. So the hearsay objection --

MR. LEVINSTEIN: Your Honor?

THE COURT: Yes?

MR. LEVINSTEIN: I think that if -- just to give you an analogy, if there's a group that's running a company, and they make statements to themselves, and then they are ousted and they sue the company, they can't claim that because at the time they were running the company, that everything they said to each other, in my view, is -- is an admission of the party, because they controlled the entity at that time.

Mr. Dae Sung Lee was a member of the old management, and Mr. Han Wan Lee -- these are the people who were -- as they said -- unhappy about the people being forced to resign, and these were their lawyers, who are no longer the lawyers for the USTU, and this case, according to them, is about a dispute about who should run the organization. So I don't think you can turn around and say that everything they said to each other now becomes an admission because at the time, they had those positions.

So, that's just our view, for the record.

THE COURT: Okay, it's overruled on that issue.

And, as far as -- I mean, I -- I guess I'm having some difficulty understanding this. As I understand it, you are objecting to my considering this letter, Exhibit 6 -- or, this memo, Exhibit 6. My suggestion is that we go through the

declarations. Now, as my trial procedures memo makes explicit, referring to an exhibit is not the same as my receiving the exhibit into evidence. So anybody who's referred to an exhibit in any declaration and wants me to look at and consider the exhibit itself has to move for the admission of that exhibit.

This is the same as if you had -- without this declaration procedure, if we had a witness on the stand who referred to -- who, in testimony, said, there was a memo by Bruce Harris about this, that wouldn't put the memo into evidence.

Well, by the same token, simply referring to a document in a declaration doesn't put it into evidence. So it may be that you folks want to bring these seriatim motions for admission of exhibits, or maybe you have a stip or something, but in any event, I mean, I wasn't going to consider Exhibit 6 at the moment, unless I had to, and I was only going to stick to the declaration statements, themselves.

MR. ROECA: Fine.

THE COURT: Okay.

MR. ROECA: Shall we move on, or do you want to stick with the same paragraph?

THE COURT: Yes.

MR. ROECA: Paragraph 30, we object on the grounds of lack of foundation and relevance.

THE COURT: I'll overrule that.

MR. ROECA: Number 31, objection on the grounds of relevance.

THE COURT: Okay, overruled.

MR. ROECA: Number 36, objection on the ground of relevance.

THE COURT: Okay, overruled.

MR. ROECA: Number 41, objection on the ground of hearsay.

THE COURT: Okay, I guess I'm not really certain about how Mr. Pejo fits in as a party, but, in any event, what difference does it make what Mr. Pejo told Mr. Lee that Mr. Pejo believed since -- I mean, can't we look at some set of rules to figure out who actually had a right to nominate whom?

MR. ROECA: Your Honor, I am just making my objection.

THE COURT: Okay. So, I think I am helping you out here.

MR. ROECA: Okay.

THE COURT: Anyone want to say anything about it?

MR. JONES: Your Honor, we are just offering it to show chronology of events, the communications and notice that he got throughout the process, to show that he was not delaying. And it goes to irreparable harm.

THE COURT: Okay.

Okay, as I said, I don't really know if this is hearsay or not, since I don't fully understand whether Mr. Pejo could be said to be speaking for the Taekwondo Union.

Mr. Roeca's objection was a hearsay objection, and I'm not going to sustain that objection. I suggested that there might be a relevance objection, but I take it from Mr. Roeca saying he was just stating his objection that he didn't want to adopt a relevance objection and is sticking to his hearsay objection, which is what he offered.

Am I correct?

MR. ROECA: I will amend my objection to incorporate relevance.

THE COURT: Okay. On relevance grounds, I'll sustain that.

MR. ROECA: Thank you, Your Honor.

And then, paragraphs 50 and 51, we object on the grounds of hearsay.

THE COURT: Okay, I guess I don't know how to do this without looking at the actual exhibits, so -- hold on... is it a one-page exhibit?

MR. JONES: Yes, Your Honor.

THE COURT: Okay.

I can't tell from this what the writer's relationship is to the addressee. I can't tell who Keith

Smith is.

MR. JONES: He's one of the counsel for USTU, Your Honor. All we have is the letterhead to identify the firm.

THE COURT: And where's the attachment? Is that a different exhibit?

MR. JONES: Yes, Your Honor, I think it's the next one.

THE COURT: The next one?

MR. JONES: Yes.

THE COURT: Okay.

Okay, so, sticking just to Exhibit 22, I'll overrule that, the hearsay objection to paragraph 50, which then brings us to the next exhibit I see. Paragraph 51 is Exhibit 23... hold on...

The objection is hearsay. I'm not certain it's hearsay, since --

MR. JONES: Your Honor, it's hard to read, but the very last page, the declarant signed the letter, so, in essence, he's one of the writers of the letter.

THE COURT: Oh, that I realize, but I hadn't thought it was being -- I thought this was being offered as notice to the Olympic committee of the concern of the writers. And so -- this did not go to the Olympic committee or it did?

MR. JONES: We're not sure. But the exhibit right

before it seems to leave that inference, that their counsel, Mr. Benz, saw this letter, and then made these threats of taking immediate action against USTU if they sent the letter.

THE COURT: Okay.

So, then, Mr. Roeca, let me turn this back over to you. If this were only being offered for the truth of it, then I could see your hearsay concern, but why wouldn't I consider it for purposes of notice?

MR. LEVINSTEIN: Your Honor, this is --

MR. ROECA: Your Honor --

MR. LEVINSTEIN: -- Mark Levinstein. Just briefly? Could we also add relevance?

MR. ROECA: I would add relevance -- I'm not sure -- the letter that you're looking at on Exhibit 23 is dated November the 12th. Exhibit 22 is dated October the 27th. And I don't believe there's been any showing that the two are connected. And, while one may have been signed by the plaintiff, the one that's signed by the plaintiff is addressed to a state (sic) senator.

THE COURT: "United States --"

MR. ROECA: I mean a United States Senator, from the State of Colorado.

THE COURT: Right. Because it looks like Exhibit 22 attached a draft of what turned out to be Exhibit 23, so maybe the attachment, in fact, is different from Exhibit 23. But,

in any event, Exhibit 23 -- I can't tell to whom Exhibit 23 went. I mean -- even if we assume it did get mailed out to Senator Campbell --

MR. JONES: I think it's also relevant for another purpose, Your Honor: It tends to show that the entire management of USTU felt that they were being victimized in a racially impermissible way through this remediation plan.

THE COURT: Going back a little bit... I'm starting to get concerned about a lot of these things. Okay, I'll stick with Exhibit 23 for now. That was paragraph 51?

MR. ROECA: Yes, Your Honor.

THE COURT: Okay.

I think it's true that a letter dated November 17, 2003, probably wasn't precisely the attachment to the transmittal of October 27, 2003; but, the October 27, 2003, transmittal, which is Exhibit 22, seems to be referring to something that was either identical to or a precursor to what is Exhibit 23. And I think Exhibit 23 will help us understand what's going on with Exhibit 22.

So, in any event, I'm going to overrule the objection to Exhibit -- I'm sorry, to paragraph 51, because I don't think it's only a hearsay issue, I think it's a notice issue, also.

But that does raise something else, which I hadn't thought about previously. You know those earlier references

to things that counsel for the Taekwondo Union told the plaintiff, could the attorneys here help me understand how the attorney-client privilege factors into that. Does Mr. Dae Sung Lee have the right to waive the privilege that the Taekwondo Union had with its counsel at the time?

I understand that you're saying the plaintiff was involved here, but I don't know that one person who's involved can waive the union's attorney-client privilege.

MR. LEVINSTEIN: Your Honor, could I address that?

THE COURT: Yes.

MR. LEVINSTEIN: It's our view that those people who were doing that, their statements can't be attributed to the Taekwondo Union. But if they can be, then you're right, they can't waive the privilege. So if they were the lawyers to the USTU, he cannot waive that as a board member. If these were statements of the group that's no longer in, then they are hearsay and not admissible. So I think either way, those should not come in.

MR. JONES: I don't see it as legal advice that we're talking about here, Your Honor. It's statements made in a public hearing by the USOC membership and credentials committee.

THE COURT: Okay. Well, let me look --

MR. LEVINSTEIN: No, Your Honor, it was -- for the record, it was statements made in settlement conferences. It

was statements made in settlement discussions with the USOC.

THE COURT: Remind me -- maybe, Mr. Roeca, you can help me with this: What paragraph was I looking at before?

MR. ROECA: You were looking at paragraph 41, Your Honor.

THE COURT: Paragraph 41?

MR. ROECA: I think.

THE COURT: Okay, hold on.

MR. LEVINSTEIN: Your Honor, to help you, the reason that counsel's sending the memo is, only counsel were in the meeting, because it was not an open meeting, it was a settlement discussion.

THE COURT: Okay, who is speaking, now?

MR. LEVINSTEIN: This is Mark Levinstein in Washington.

THE COURT: Okay, hold on for one second. I'm trying to find the paragraph number where the issue of what counsel was saying came -- was that in Mr. Pejo's declaration?

MR. LEVINSTEIN: It's in both, but I think it's paragraph 21 of Mr. Lee's declaration.

THE COURT: Hold on... you're right. Thank you very much. Okay.

Okay, well, I'm not too concerned about the first sentence being privileged, because the first sentence of paragraph 21 refers to what several Olympic committee members

allegedly called the Taekwondo Union, and so that, it seems to me --

MR. LEVINSTEIN: Your Honor, may I interrupt one second and refer you to paragraph six of Mr. Pejo, which explains the context.

THE COURT: I couldn't hear you.

MR. LEVINSTEIN: This is Mark Levinstein again.

If you look at paragraph six in Mr. Pejo's declaration, it makes it clear what was happening. It says, it was a meeting regarding the status of settlement, and it's what the legal counsel for USTU said in settlement discussions in conferring with client, USTU, about what was said in settlement discussions with the USOC. And that's clear from paragraph six of Mr. Pejo's declaration.

THE COURT: Okay. But, in any event, the "Korean Mafia" statement does not seem to me to be covered by either a hearsay problem or an attorney-client privilege problem, so my ruling is unchanged on those matters.

Hold on, now...

Because even though the lawyer was telling that to the Taekwondo Union people, he was reporting something that someone else had said, and so I think that that is not a --

MR. LEVINSTEIN: So it's either privileged or it's hearsay?

THE COURT: No, it's not privileged, because the

Taekwondo Union lawyers were telling the Taekwondo union people what the Olympic Committee people had allegedly said.

MR. LEVINSTEIN: In settlement discussions as part of giving them advice about settlements.

THE COURT: I don't think that this is the kind of 408 exclusionary type of evidence that the makers of the rules of evidence had in mind.

Okay, I take it back. I'm not too worried about that, if that's all we were talking about on the counsel's side.

Okay, I kind of led us astray. We were at paragraph 51. Mr. Roeca, let me invite you to continue with your objections.

MR. ROECA: Well, I had objected to 51 on the grounds that its hearsay.

THE COURT: Right.

MR. ROECA: And I would make an observation, also, Your Honor, on the grounds of relevance, in that if -- keeping in mind the context which has been set forth in the various pieces of paper that have been submitted to this court, there was a settlement and a remediation agreement, and all of the issues that preceded that merged, were released and waived. So we raise the relevance issue, again, to these sorts of preceding out-of-court statements.

THE COURT: I'll overrule that.

MR. ROECA: Paragraph --

THE COURT: I don't think that a letter to a United States senator is something that merged and can never be referred to again. And, as I understand it, it's offered, at least in part, as notice of a concern about alleged racial discrimination, and that notice occurred, you know, half a year or more before what is alleged to be discrimination violating Section 1981. So, overruled.

MR. ROECA: And I would also reiterate an argument made earlier to the effect that the statute, Chapter 2205, contemplates exclusive jurisdiction for such matters, including discrimination based upon any factor, whether it be national origin or otherwise, be subject to that chapter, which is one of the reasons that it's irrelevant to today's proceeding.

Paragraph 57, objection on the grounds of hearsay.

THE COURT: Okay, sustained. Chapter (sic) 57 is stricken.

MR. ROECA: That's "Paragraph 57," I'm sorry.

THE COURT: Yeah, 57, right?

MR. ROECA: Yeah, "Paragraph 57."

THE COURT: Yeah.

MR. ROECA: The --

THE COURT: Actually -- wait, now... okay, I don't know what's wrong with "I found out after I went to Athens

that only Olympic coaches were present."

What's wrong with that, in Paragraph 57?

MR. ROECA: I have no problem with that, Your Honor.

THE COURT: Okay. So that's still in. I guess --

MR. ROECA: Paragraph 61 --

THE COURT: Hold on.

Just to make this understandable, I think it should say, I found out after I went to Athens in April... is that when his visit was?

MR. JONES: Yes, Your Honor.

THE COURT: Okay.

So, after I went to Athens in April 2003 -- "I found out after I went to Athens in April 2003 that only Olympic coaches were present" -- we have to put something in -- at the site I was visiting, or something like that.

MR. JONES: That's fine, Your Honor.

THE COURT: Okay. So that sentence will remain.

Okay, Mr. Roeca.

MR. ROECA: Paragraph 61 on Page 19, the last two sentences are objected to as being hearsay.

THE COURT: Okay. I don't think the fact that the press covered it is hearsay -- which is all this is. And since we just had this discussion, that doesn't mean I'm admitting Exhibit 41, but I don't see the problem with hearsay with the statement that the press covered a particular

event, so I'll overrule the objection. But that's not saying I'll admit Exhibit 41.

MR. ROECA: Are you overruling my objection as to the last sentence or as to both sentences?

THE COURT: Well, I hope I'm looking at the same sentences. Paragraph 61, the last two sentences are, "This was covered by the press in Colorado. A true and correct copy of the article is marked as Plaintiff's Exhibit 41."

Is that what you're looking at, too?

MR. ROECA: Yes.

THE COURT: Okay, yes, your objection is overruled --

MR. ROECA: Thank you.

THE COURT: Thank you.

MR. LEVINSTEIN: Your Honor, this is Mark Levinstein in Washington.

We also have an objection to the two sentences that preceded that, both of those sentences.

THE COURT: Okay, I think the only part that is objectionable --

MR. LEVINSTEIN: First, if he's going to testify about what was acceptable to you, to you and his lawyers, he's purporting to testify about what the legal advice was from the USTU lawyers to USTU about settlement.

THE COURT: Okay, that's what I was going to say.

MR. LEVINSTEIN: I also don't think he has any basis for knowing what legal advice the USOC gave to its -- a foundation for him testifying about whether the USOC's lawyers recommended a settlement.

THE COURT: Okay.

MR. LEVINSTEIN: And the sentence that follows it about what furthered his belief is one opinion that's inadmissible, furthered another.

THE COURT: I will strike the words "even though it was reasonable and recommended by their own lawyers and acceptable to USTU and its lawyers." The rest of the objection is overruled.

Mr. Roeca, is there anything further?

MR. ROECA: No, Your Honor.

THE COURT: Okay.

Then let me invite cross-examination of Mr. Lee.

DAE SUNG LEE,

called as a witness on his own behalf, having been produced and duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. ROECA:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Mr. Lee, in 2002, approximately how many students were involved in taking Taekwondo in the United States?

A. As a school or are you talking about athletes?

Q. Athletes.

A. Athletes. Including juniors, or seniors, or all of them?

Q. All of them.

A. Okay. Juniors would be about 5,000.

Q. Okay.

A. And adults, maybe -- including -- (incomprehensible) -- about 700, because I was involved with the tournament committee members, so I know that.

Q. And in the year 2002-2003, how many Taekwondo coaches were teaching Taekwondo to students in the United States?

A. I think all the coaches was teaching Taekwondo.

Q. How many?

A. National?

Q. National.

A. Let me clarify that. I don't know what your question is, but there's a national coaching level -- see, we have like three different levels, okay: national level, state level, and international levels. So you can maybe address for me which level you are talking about?

Q. All levels.

A. All levels. I think everybody's teaching Taekwondo, sir.

Q. How much is everybody?

A. I believe there are -- uh... I don't know, about -- maybe -- I don't know -- 5,000.

THE COURT: I'm sorry --

MR. ROECA: About 5,000.

THE COURT: Wait, now. 5,000 students?

MR. ROECA: Teachers.

A. Coach.

MR. ROECA: Coaches.

THE COURT: 5,000 coaches?

A. Yes, there are more than 12,000 Taekwondo instructors in the United States.

BY MR. ROECA:

Q. Thank you.

Now, as I understand it, you moved to the United States when you were quite young?

A. Yes, 1971, when I was 12 years old, sir.

Q. And what is the extent of your formal education?

A. Korean.

Q. Pardon me?

A. Korean.

Q. No, no, no.

A. I'm sorry --

Q. Let me rephrase the question. If you don't understand one of my questions, just tell me, and I'll try to make sure that you do. Okay?

A. Yes, sir.

Q. You went to school when you got to Hawaii?

A. Yes, sir.

Q. And how many -- when did you finish your formal education in school?

A. I went to Kalakaua Intermediate, Moanalua High School, and I graduated from the University of Hawaii in 1987.

Q. And what was your degree in?

A. I was political science and physical education.

Q. And I take it that although English is your second language, that was the language you used as a student in Hawaii all the way through the University of Hawaii?

A. Yes, sir.

Q. And all of the papers you wrote as a college student were written in English when you were taking a course other than a foreign language?

A. Yes, sir.

Q. Now, do you recall that in late 2003 there were disputes between the United States Taekwondo Union and the United States Olympic Committee that involved people at the highest level; true?

A. Yes.

Q. Okay.

And the -- you had conversations from time to time, as we've seen from your affidavit, or your declaration, people told you bits and pieces of what was taking place?

A. No, that's not true, because I'm one of the executive

committee members; therefore, I have a right to know all the answers, all the questions that our officers have, and just our, you know, administration.

Q. Okay. And you knew that when that dispute was resolved it was resolved by a board of directors meeting that agreed to the terms of the settlement agreement; correct?

A. For taking of remediation plan?

Q. Correct.

A. Yes, on, I believe, January 25, that's when President Lee signed, and all the officers, and all the -- what is it? -- nominated executive members, and all appointed state president --

THE COURT: Did you say "nominated executive"?

A. No, no, no, all the appointed executive members.

THE COURT: Thank you.

BY MR. ROECA:

Q. And you were one of the individuals who deliberated and voted; true?

A. I don't remember that. Executive unit, yes. Executive board member, we had a vote, and then we accept the remediation plan, as junior committee chair.

Q. Now --

A. Sir, can I say one more?

Q. Certainly.

A. If we don't take the remediation plan, we will get

decertified. And, then, as an executive board member, we don't want to decertify our union, because the union has been established in 1984; therefore, all the executive board unanimously decide to follow USOC remediation plan, because we do not want to get decertified by USOC.

Q. You understood, through your experience with the Olympic movement, that the United States Taekwondo Union was a national governing body that had been certified by the United States Olympic Committee; correct?

A. Yes, sir.

Q. And the United States Olympic Committee existed because of a statute that was enacted in 1978 by the United States Congress; correct?

A. Yes, sir.

Q. And you were familiar with parts of that as a result of your involvement in the Olympic movement for a number of years; true?

A. Yes, sir.

Q. And you understood that the United States Olympic Committee had an obligation to audit, periodically, the activities of each of the national governing bodies which were beneath it; true?

A. Yes, sir.

Q. Now, you understood that the problem between the national governing body and the United States Olympic Committee that

```
 1  was occurring in 2003 was something that was in arbitration;
 2  do you recall that?
 3  A.   That, I'm not too sure, sir.
 4  Q.   Well, do you recall that there was going to be an
 5  arbitration -- it wasn't going to be in a courtroom, it was
 6  going to be an arbitration between the United States Taekwondo
 7  Union and the United States Olympic Committee?
 8  A.   Well, I don't know it's going to be arbitration, but I
 9  understand that there was going to be hearing, okay, by, I
10  believe, the credential committee, USOC credential committee,
11  yes.
```

[Lines 12–25 of page 93 are redacted/blacked out.]

93

[Lines 1–25 of page 94 are redacted/blacked out.]

94

[Lines 1–25 of page 95 are redacted/blacked out.]

95

```
 1  [redacted]
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  Q.   Okay.
 6            Just so that we can assist the court in following
 7  along, what I'd like to do is, I would like to direct the
 8  court's attention -- and you have your declaration, or --
 9            MR. ROECA:   Does the witness have the exhibits with
10  him?
11            THE CLERK:   Yes.
12            THE COURT:   The books?
13            MR. ROECA:   Yes.
14            THE COURT:   Does he have the witness books?
15            THE CLERK:   Yes.
16            MR. ROECA:   May I approach the witness for just a
17  second?
18            THE COURT:   Yes.  Are you going to point him to a
19  particular --
20            MR. ROECA:   Yes.  I am going to direct his attention
21  and the court's attention to three exhibits, and those are
22  Plaintiff's Exhibits 9, 10 and 11.
23            THE COURT:   Okay, go ahead.
24            MR. ROECA:   May I approach, Your Honor?
25            MR. JONES:   Your Honor, for the record, we are
```

96

showing the witness exhibits that aren't in evidence yet.

THE COURT: Okay.

MR. ROECA: I am laying a foundation.

THE COURT: Don't worry, he's going to take care of it.

BY MR. ROECA:

Q. First of all, directing Mr. Lee's attention to Exhibit Number 9, is this a letter that you recognize, Mr. Lee?

A. Yes, this is my first letter that I sent to Mr. -- uh, first e-mail, and then write a letter to Mr. Gambardella.

Q. So this two-page letter, dated March 18, 2004, to Mr. Bob Gambardella, is, in fact, a true and correct copy of the original letter you wrote to him on that date?

A. Yes, sir.

MR. ROECA: I would offer this into evidence at this time, Your Honor.

THE COURT: Any objection?

MR. JONES: No, Your Honor.

THE COURT: Okay, then Plaintiff's Exhibit 9 is received in evidence.

(Plaintiff's Exhibit 9 received in evidence.)

BY MR. ROECA:

Q. Okay, Mr. Lee, could you kindly turn to Exhibit 10, the very next exhibit?

A. (Perusing exhibit.)

Q. And what I would like you to do is just look at this; it's a three-page document, it's dated April the 8th, 2004, and there is a one-page attachment to the two-page letter.

And my question is, did you receive a copy of this -- is this a true and correct copy of what you received on April the 14th or the 18th of 2004?

A. Yes.

Q. Okay.

MR. ROECA: I would offer this document into evidence, as well, Your Honor.

THE COURT: Okay.

Any objection?

MR. JONES: No objection.

THE COURT: All right.

Then, Exhibit 10, Plaintiff's Exhibit 10, is received in evidence.

(Plaintiff's Exhibit 10 received in evidence.)

BY MR. ROECA:

Q. And, directing your attention, Mr. Lee, to Plaintiff's Exhibit 11, which is the very next one, please take a look at that. It is a two-page document bearing a date of June 2, 2004, to Mr. Bob Gambardella, signed by you, which -- with no signature on it. Is this a true and correct copy of the original that you prepared and mailed to Mr. Gambardella?

A. Yes, I do not believe I signed it, but I guess not.

Q. Well, all we have is an unsigned copy?

A. Oh, I'm sorry. Yes. Yes, I e-mailed to him, too, first.

MR. ROECA: I would offer that into evidence at this time, Your Honor.

THE COURT: Mr. Jones?

MR. JONES: No objection, Your Honor.

THE COURT: Okay.

Exhibit 11 is received in evidence.

(Plaintiff's Exhibit 11 received in evidence.)

BY MR. ROECA:

Q. Now, Mr. Lee, just so that we are all on the same document, I'd like to go back for just a second to Exhibit Number 9, and Page 2 of that document. Do you see the last sentence of the top paragraph, which states, "The 2004 games are fast approaching, and I respectfully request an update with regard to my position as head coach..." and then it goes on.

Did I read that portion correctly?

A. Which paragraph?

Q. I'm talking about Exhibit 9.

A. Yes, sir.

Q. On the second page.

A. Oh, second page?

Q. The last sentence of the top paragraph?

THE COURT: Do you see it, Mr. Lee --

A. Yes, yes.

THE COURT: -- it starts with "2004 games"?

A. Yes.

THE COURT: Okay, go ahead, Mr. Roeca.

MR. ROECA: Okay.

BY MR. ROECA:

Q. And I will reread it: "The 2004 games are fast approaching, and I respectfully request an update with regard to my position as head coach..." and then it goes on. But that portion, did I read that correctly?

A. Yes, sir.

Q. Mr. Lee, isn't it true that you wrote this letter to Mr. Gambardella because you knew that following the settlement agreement and the remediation plan, that many positions at the USTU, including that of coach, were being reconsidered, and new people were being named, or new criteria were being established?

A. Okay, uh -- yes and no. Yes, there is a lot of our governance -- (incomprehensible) -- but the coaching, no. But --

THE COURT: I'm sorry, can you go back a little bit? You said, yes, there's a lot of your governance --

A. Would be changed, the structure-wise, such as, there's no state president, there's no -- what is that? -- state championship. So there's going to be a lot of things going to

be changed that I know. However, on the coaching area, I do not want to mention somebody's name, however, I have various friends that I have in USOC that -- the very first -- this is what they told me. If the President Lee sign remediation plan, then your job as a coach will be secure. That's what somebody told me. So why he doesn't sign? I say, I have no -- I cannot tell my president because of my coaching positions to sign. So I told him, no.

Then, afterward, when he signed -- and then, one month later -- I think after one month later, the governance body came in, and then the same person said, I wish I could help you, but I can't. You know, they might change your new criteria. But you have a very good chance because of your -- all your experience, and then, you know, what you done for USTU.

Okay, that's the --

BY MR. ROECA:

Q. And because you still felt you had a very good chance, that was one of the reasons you told Mr. Gambardella, in paragraph two of Exhibit 9, and paragraph three and four, of your accomplishments in the area of Taekwondo, correct?

A. Yes, sir.

Q. You wanted to introduce yourself to Mr. Gambardella because you didn't know whether he was familiar with your background, true?

A. Yes, sir, that's true.

Q. And you also asked him to give you an update with regard to your position as head coach?

A. Yes, sir.

Q. And Mr. Gambardella wrote back to you on the letter which is in evidence, Exhibit 10; true?

A. Yes, sir.

Q. Would you take a look at that exhibit, please.

A. Yes.

Q. The first page of the letter, Mr. Gambardella describes general discussions about the reorganization of the United States Taekwondo Union; correct?

A. Yes.

Q. And the last sentence of the first full paragraph states, "As you might expect, with the change in management and governance at the USTU, there has been a change in view about the head coach position for the Athens games."

Did I read that correctly?

A. Yes.

Q. And you read this when you got it; correct?

A. Yes, but --

Q. And, if you would go to the next page, Mr. Gambardella informed you, quote, "The USOC executive committee also vacated its prior approval of the coach and team leader nominations for Taekwondo; thus, your selection as coach for

Taekwondo has been vacated."

Did I read that correctly, sir?

A. On the second page? Yes.

Q. Yes.

And, when you received this letter on April the 14th or the 18th of 2004, you read that portion of the letter, correct?

A. Yes.

Q. And wouldn't you, at that point in time, have concluded that you were no longer the coach of the United States 2004 Olympic Taekwondo team?

A. Yes and no.

Q. Well --

A. The reason why, before I received this letter I met Mr. Bob Gambardella, prior to our first team Olympic trial. I introduce myself, and then I could not say that I was chosen by U.S. Olympic Committee to be 2004 Olympic coach because I did not have the letter that -- which is all the coaches should receive. So, on that first time when I spoke with him, I could not say that I was representing 2004. However, when I spoke with him, he told me this. He said -- because, somehow, we met him at 2003, when Pan Am Games was occurred. I think he was a house -- I think he was one of the -- supervising all the housing, and we then we had problems in Dominican Republic.

So I was very comfortable with him. And when I spoke with him, I ask him if -- if there's going to be any change. And then, because that was before April, he told me, yes, there was going be several change, but, however, I am new in this sports, therefore I will look every way to find the best coach for 2004.

So I asked, is it my name is off the list? And he said, no, your name is not off the list. I will do the best for the athletes. And then I will find best coach for them. I said, thank you.

Then I went to the first Olympic trial, which is, I think -- I believe March 24. When I came back, that's when I received this letter.

Q. Okay.

And, in fact, the very next sentence of the letter that I have been focusing on, the paragraph, do you see it says, further -- this is on Page 2 of the -- of Exhibit 10, the top paragraph.

"Further, the USOC executive committee approved revised staff selection procedures for Taekwondo. I am enclosing those revised procedures with this letter."

A. Yes.

Q. And the attachment -- and you read that, did you not?

A. Yes.

Q. And it says, selection procedures for coaches; do you see

that?

A. Yes.

Q. And you saw that when you received Mr. Gambardella's letter on April the 18th, 2004?

A. Yes.

Q. And that selection procedure for coaches contains a provision -- it says, position of head coach will be selected based on the following criteria and priority order. And then it identifies them; do you see that?

A. Yes.

Q. Now, Mr. Lee, isn't it true that if you had read that in April of 2004 and had asked yourself the questions that are set forth below the sentence that I just read, you would have concluded that you would not be selected as the United States Olympic coach for the U.S. Olympic Taekwondo team for 2004? Isn't that true?

A. No. Because, it says criteria. Maybe I don't -- uh... I don't follow first criteria, such as number of athlete that coach has placed on 2000 Olympic team. I can explain to that. Because reason why I did not participating any athletes in 2004 Olympic trial is that once you are announced as an Olympic coach, you are not allowed to coach any preliminary or final Olympic team trial because it's conflict of interest.

If I have my own student who is going to Olympic game, I cannot even coach them; it's a conflict of interest

because they already announced you as a coach. And how can I sit down in the preliminary? And it's conflict of interest. And it's been done from 1988, 1992, year 2000. And so maybe I don't meet the first requirement. But the second requirement, yes, I do. I went to 2003 world championship. My athlete won. And I was head coach. I assign them to coach the athletes so that we can bring the best result in world championship. 2003 Pan Am Games, I went, too. And I was the head coach for the men. And this is the first time we ever brought two gold medal international -- I mean Pan Am regional, ever since 1987.

And, so, in my understanding -- maybe I don't follow the first criteria, but I do follow the second criteria as a coach, that I brought. Steven Lopez, gold medal, and Tim has a gold medal. So I do.

And then I think maybe I, like you say, yes, my name stay on the list.

(Discussion off the record between defense counsel.)

BY MR. ROECA:

Q. From what I understand, Mr. Lee, it's your opinion that you are qualified and competent to be a coach at any level; true?

A. No. Because my dear past executive director, Bruce Harris, because he mentioned that I was officially chosen by U.S. Olympic Committee -- executive committee board member as

Olympic coach, the nomination. And then I cannot prove that part, but, however, when I met him at the first Olympic team trial, I asked Mr. Harris to have -- do you have the letter? And then, yes, he said that it's in my Internet; however, I will send it to you.

I think he sent it to me, that e-mail, about four days later, when I came back from -- (incomprehensible). And then the letter say exactly, the following nomination that approved from USTU, will be approved by U.S. Olympic Committee, follow as, head of team -- (incomprehensible) -- coach: Dae Sung Lee. And I have the letter. Then I had more confidence that I would be -- I was the -- I would be next Olympic coach in 2004.

Wouldn't you, sir, if you received a letter saying the USOC approved? And then now, because the new governance came in and they want to change that -- but that time, they didn't knew that I had that letter.

Q. Now, you understood when you received Mr. Gambardella's --

A. Yes, sir --

Q. -- letter --

A. Yes, you asking me --

Q. -- that your position as coach had been rescinded; true? Vacated?

A. Yes, yes, yes. I read the letter, and I already told

you. But I believe, because Mr. Gambardella was new, and that he doesn't know that I have approve letter from USOC, therefore he could say yes or no.

Q. And when -- the next time you wrote to Mr. Gambardella, or -- there was a letter that you wrote on March the 18th. He wrote his letter to you, which is Exhibit 10. And the next letter that was written is Exhibit 11; true?

A. Yes, sir. I'm sorry that I didn't sign it. Sorry...

Q. I'm sure that it was signed, but what we have here is an unsigned copy.

A. Yes, sir.

Q. And you knew, from the time that you received Mr. Gambardella's letter up until June the 2nd, that your position as coach, in your own words, was "up in the air"; right?

A. No, because they did not send official letter as a USTU saying that I am not 2004 Olympic coach. Therefore, I was still wondering, so that I want to make sure, that I wrote a second letter to respond saying that I am.

Q. Would you please take a look at the second page of Exhibit 11?

A. Yes.

Q. I will read a portion of this. And make sure I read it correctly. This is a letter you wrote; true?

A. Yes.

Q. Second paragraph states, "The 2004 games are fast approaching. Even though my position as the USTU coach has been up in the air, I have continued to support our athletes, and have attended all Olympic qualifying events at my personal expense to do this."

Did I read that correctly?

A. Yes, sir.

Q. And in the first paragraph of that same letter, it states in the second sentence, in part, "Although I am disappointed to learn that my selection as the coach of the 2004 U.S. Olympic Taekwondo team has been rescinded, I am hopeful that I will be considered as the coach by the remediation committee."

Correct? Did I read that correctly?

A. Yes.

Q. And, after that, isn't it true that the balance of that particular page of Exhibit 11, you summarize your accomplishments --

A. Yes.

Q. And -- and I, sir --

A. Yes, sir.

Q. -- I will represent to you that you have accomplished a great deal, and I respect you for that.

A. Yes.

Q. I mean, what you've summarized here is very, very impressive.

A. Yes.

Q. However, you recognized, isn't it true, that the decision as to who would be the coach was something for the United States Taekwondo Union, and that's one of the reasons you wrote this letter?

A. Yes.

MR. ROECA: One moment, please.

(Discussion off the record between defense counsel.)

MR. ROECA: Thank you very much.

THE COURT: Mr. Jones, do you have any redirect?

MR. JONES: No, Your Honor.

THE COURT: Okay, then the witness can step down and is excused.

Is the only other witness Ms. Virginia Witte? Is that the only other witness?

MR. JONES: Yes, Your Honor.

THE COURT: Okay, then, please come to the stand.

THE COURT: Mr. Jones, any objections to the declaration of Virginia Witte?

MR. JONES: No, Your Honor.

THE COURT: Okay.

This might be kind of a convenient time -- even though I just made the witness walk up here -- to take a ten-minute break.

MR. JONES: Fine, Your Honor. Thank you.

THE COURT: Okay.

THE CLERK: All rise.

This court will be in recess for ten minutes.

(A recess was taken from 3:05 to 3:15 p.m.)

THE CLERK: Would you please raise your right hand?

Do you solemnly affirm the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: State your name for the record and spell your last name, please.

THE WITNESS: Virginia Witte, W-I-T-T-E.

THE COURT: Mr. Jones, any objections to the declarations submitted by Ms. Witte?

MR. JONES: No, Your Honor.

THE COURT: Okay.

Ms. Witte, can you tell me whether your declaration, which was executed on August 6, 2004, is true and correct and represents what you would say if you were testifying live in answer to questions here in this courtroom concerning the matters set forth in your declaration?

THE WITNESS: Yes.

THE COURT: Okay.

Then, go ahead, Mr. Jones.

MR. JONES: Thank you, Your Honor.

VIRGINIA WITTE,

called as a witness on behalf of the Defendants, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JONES:

Q. Ms. Witte, you are a CPA?

A. Yes.

Q. You are a salaried employee of USOC?

A. Yes.

Q. And you also serve on the board of governance of USTU presently?

A. Right.

Q. I take it you would agree with me that you are not an expert on coaching competitive Taekwondo?

A. No, I agree.

Q. I'd like to show you an exhibit -- do you have the exhibits in front of you? Turning to 35, please...

A. Right.

Q. Do you know a Salena DiMatteo?

A. She is one of my staff members.

Q. Do you know who R.J. Warwick is?

A. At that time he was the executive director of USTU.

Q. Did you have occasion to work with him regarding USTU financial issues?

A. Over the three years, yes.

Q. And about when did he leave the USTU organization?
A. End of '02, maybe .
Q. Could it have been '03?
A. No, I don't think it could have been the end of '03, because Bruce Harris was the executive director in the summer, and then he was gone, and then Tim Connally became the executive director in '03. So it had to be '02.
Q. Can you please look at the three-sentence letter, Exhibit 35?
A. Yeah, this is an acknowledgment letter.
Q. Were you aware of this letter going out to Mr. Warwick?
A. Yeah, this is a standard boiler plate letter that we send out.
Q. It states -- if I'm not incorrect, that "USTU's commitment to improvement is appreciated. The efforts and complete cooperation of your staff made the review process go very smoothly."
Are those true statements, as far as you know?
A. Yeah. Like I say, it's a thank you letter that we send out.
Q. I take it you wouldn't send out a letter like that if people weren't cooperating with you?
A. That's true. We try and find something good to say in every situation. That's -- nobody likes auditors, anyway.
Q. I guess that's one of the hazards of the job, huh?

A. Like lawyers, yeah.
THE COURT: Hey...
(Laughter in the courtroom.)
BY MR. JONES:
Q. That's January 31, 2000, and that was covering an audit report dated December 2nd, 1999. Would that be an annual audit report for the whole '99 period?
A. If it was dated '99, it was probably over '98.
Q. And then, if you would look at Exhibit 36, a letter dated November 29, 2001, I would ask that you briefly review that.
A. It's a transmittal letter for audit report.
Q. And that one was written by you personally?
A. I wrote the transmittal letters.
Q. And that's your signature at the bottom?
A. Yep.
Q. Again, that's directed to Mr. Warwick who was still executive director on that date?
A. Right.
Q. And it, again, expresses appreciation to him and his staff for the time spent answering questions, providing information, locating records, etc., and congratulates USTU on the improvement shown in the reporting of USOC support to the organization; is that correct?
A. Right.
Q. And is it correct that that -- the period that that

letter is covering, and the report that's attached, would be 2000 and '99?
A. '99 and 2000.
Q. All of calendar '99 and 2000?
A. Right.
Q. And are the statements made in the cover letter correct? Were they cooperating, and were they improving?
A. Always.
Q. Turning to Exhibit 37, please. That is a memorandum from you to the membership and credentials committee of the USOC?
A. Right.
Q. Dated September 25, 2002; is that correct?
A. Uh-huh.
Q. Did you in the scope of your duties have occasion to periodically report or send financial reports to the membership and credentials committee?
A. Yeah, when they requested it.
Q. So that was by request only?
A. Right.
Q. Feel free to look through the entire document there, but is it correct that USTU was solvent and liquid as of the writing of this letter?
A. I think I said, in paragraph three, as of September 10th, 2002, that they were solvent and liquid.
Q. So, 15 days earlier, they were --

A. Right.
Q. Turning to Exhibit 38, another letter signed by you and directed to, this time, Bruce Harris of USTU; is that right?
A. Yeah, he was the executive director by then.
Q. So, sometime in between those two letters is when the transition between Mr. Warwick and Mr. Harris took place?
A. Yeah. I think Jay left at the end of '02.
Q. Where did Mr. Warwick go, if you know?
A. He was unemployed for a year, and then he went to work for the USOC.
Q. So the USOC thought enough of him to hire him?
A. Apparently.
Q. And what is his title now, if you know?
A. He's a sports partnership director.
Q. Is that someone in management?
A. Sure.
Q. Is that someone above Mr. Gambardella?
A. No.
Q. Just a different position?
A. It's a whole different area, yeah.
Q. Focusing on Exhibit 38, that letter, again, expresses appreciation to Mr. Harris for cooperation in answering Chris' questions, discussing procedures, locating records; isn't that true?pla
A. Yeah, that's another staff member, Christopher Telli.