Q. But it goes on to talk about some recommendations that you felt were appropriate?
A. Yes.
Q. Is that true?
A. Yeah.
Q. And this letter attaches an executive summary listing the recommendations once again. And, correct me if I am wrong, but as of the time of this executive summary, the USTU was still solvent?
A. No.
Q. It was not?
A. No, if you read the second paragraph.
Q. What was their position?
A. Well, you have to understand, and this -- we're not auditing the organization as an external auditor; we're auditing USOC funds and their financial and managerial capability.
So what we're looking at is, can they pay their bills? Did they use the money that we gave them appropriately? And, in this particular instance, I believe that we asked back $132,000.
Q. And these were funds that were not appropriately spent?
A. Yep. They either were not appropriately spent, or they couldn't tell us what they did with them.
Q. I recall one reference in the document -- and you may

recall it -- to certain programs being cancelled because of the September 11th disaster.
A. They had, I think, a competition, a trip overseas, that was cancelled. But we rolled -- as a typical policy at the USOC, we rolled over any of those funds that -- to the next year, so that there -- Taekwondo was not the only sport that couldn't spend the money because of September 11th.
Q. Were some of those funds that were earmarked for programs that got cancelled because of September 11th rolled over into this year?
A. I believe that you'll find -- I think in '02, this was -- this was -- we were looking at, I believe, '02, and that we did not take that into consideration; we just rolled it over. So we didn't ask for it back, or whatever. It just would be handled the next year in the '03 reports.
Q. Thank you.
Turning to Exhibit 39, what is that?
A. This is an audit report at the end of '02 -- another one. This was -- well, let's see... (perusing documents). This is -- it's out of -- out of chronological order, but it's an audit report from '02.
Q. Was that prepared by your --
A. Uh-huh.
Q. -- office?
And, according to this, was USTU -- were its

revenues exceeding expenses?
A. I have no idea whether its revenues were exceeding expenses. I know that we asked back $35,000 --
Q. Okay --
A. -- in unsupported expenditures. If you need to know that, I've got a list of their revenues and expenses at the table.
Q. If you could just turn to Page 2 for a moment, second paragraph...
A. Page 2?
Q. Page 2, second paragraph --
A. Uh-huh.
Q. -- it would be the first statement in that paragraph.
A. Okay, so it says in that year that revenues had exceeded expenses in the last -- in each of the last four years, reversing the trend of the prior five years.
Q. So, looking at a nine-year segment of USTU, leading up to the date of this report, the first five years, they were insolvent; the second four years, they were solvent?
A. As of -- what are we looking at? '02? That was two years ago.
Q. You also, I think, mentioned that -- in that exhibit that USTU suffered turnover in financial management personnel?
A. Yeah, immediately prior to this audit. Every time they changed executive directors, they changed financial people.

Q. And the person that they lost was Jay Warwick?
A. If it was the end of '02, it probably was, but...
Q. And did him moving on coincide with some problems for USTU financially?
A. No, not -- well, not any more than they'd had in the past.
Q. Well, whom were you talking about, then, when you said suffered financial -- suffered turnover in financial management personnel?
A. Well, as I said, every time they changed executive directors, they changed financial people.
Q. Would it be fair to state, then, at least from the standpoint of solvency, there had been an improvement in the four years leading up to that period?
A. Yeah, the three years that Jay was there, it got a lot better.
Q. Finally, showing you Exhibit 40, a letter from you to Tim Connally dated January 6, 2004, did you sign that one?
A. Yes.
Q. And the purpose of that letter?
A. Was to send this -- the report. We were trying to figure out what they owed us back, if they could afford to pay it. We were trying to quantify, because the funds had been rolled over twice, and they didn't seem to be able to spend it, and sport partnerships was -- we were trying to quantify where we

were. And at this stage of the game, I think we were not giving them any more money; we had frozen their grants.

Q. You stated, I think, somewhere in that report, that their financial management -- their financial condition was worsening; do you recall something like that?

A. Worsening.

Q. Do you know if they were still solvent as of that point?

A. Well, it depends on what you mean by "solvent." If you can define that, I'll tell you.

Q. Did their revenues exceed their expenses?

A. I have no idea, at this stage of the game. I don't think so, because I think the issue was, we weren't giving them any money.

Q. Okay. And this one was --

A. There's no -- and there's no audit for '03. Their external auditor resigned, so there really -- there is no audit. There really is no way to tell.

MR. JONES: At this time, Your Honor, I'd like to offer 35 through 40 -- Exhibit Numbers 35 through 40 of the plaintiff's exhibits into evidence.

MR. ROECA: No objection, Your Honor.

THE COURT: Okay, then Exhibits 35 through 40 are received in evidence .

(Exhibits 35 through 40 received in evidence.)

BY MR. JONES:

Q. You make the statement in your declaration that you, in your capacity as auditor, have to keep track of something like 44 --

A. There's 45 NGB's.

Q. 45 NGB's. And that you had to audit -- or chose to audit USTU a total of 11 times over the -- what was it, nine years?

A. 12 years.

Q. 12 years that you had them.

And that -- but you also made a statement that other NGB's usually average four to five audits?

A. That's right.

Q. Would that be all of them on an average, an average four to five audits?

A. That's what "average" is, yeah, four to five -- if you take all of them into consideration. Not counting Taekwondo.

Q. Is --

A. Our policy is to audit each NGB once every two to three years, if there are no issues.

Q. So that's a standard thing, then?

A. That's our policy.

Q. And that's to ensure that those funds that USOC is providing to them are spent properly?

A. That's right.

Q. NGB's rely heavily on USOC funding, do they not?

A. Well, it depends on the NGB. Some NGB's, we give them

less than one percent; some -- of their total funding; some, we give them 80 percent. I think Taekwondo is in the 15 to 16 percent range.

Q. Could you explain that? So, 15 to 16 percent of their funding came from USOC?

A. Right.

Q. In your capacity as auditor, prior to joining the governance committee for USTU, did the membership and credentials committee ever call upon you to attend their meetings?

A. If they were looking at a sport that they wanted some financial information on, they would ask me for a report. And if it was necessary, then they would ask me to go. I didn't go to all of them, but I went to many of them.

Q. Did you attend any of the USTU meetings when USTU was discussed by the membership --

A. Yes, yes.

Q. Which ones do you recall?

A. Well, let's see... we were in San Diego, we were in Florida, we were in Chicago, several in Denver.

Q. So they would have these meetings at other -- in other cities other than Colorado Springs?

A. Right. The membership and credentials committee was a group of volunteers from all over the country, so they moved the meetings around to make it easier for attendance.

Q. Were you familiar with all of the members of the credentials and -- membership and credentials committee, I'm sorry?

A. Yes.

Q. Thank you.

MR. JONES: No further questions.

THE COURT: Okay.

Mr. Roeca?

MR. ROECA: Thank you, Your Honor. Just a few questions.

REDIRECT EXAMINATION

BY MR. ROECA:

Q. You made a comment, in response to one of counsel's questions, that funds were frozen; do you recall that?

A. Uh-huh.

Q. Can you explain that to us? Why were funds frozen, and to whom were they frozen?

A. Well, it's USOC policy that if a sport is either not performing -- not spending the money the way they should be, or if they owe us money, or -- there's several reasons that they're not performing, then we will suspend their funds.

The funds are actually an annual grant, but they are paid quarterly.

Q. And, in this particular instance, were funds being frozen from USOC to the United States Taekwondo Union?

A. Right.

Q. And what was the reason, as you understood it, for that decision, to freeze funds?

A. The sport partnership group that Kelly Skinner is part of, and Taekwondo is assigned to him, they had asked for certain things like a business plan, a high performance plan, planning documents like that that they hadn't turned in. And, so, they asked -- and they are actually the ones that trigger the payments, so they asked that they be frozen.

Q. Now, when did that occur?

A. That's something I haven't thought about in a while. I think it was in the fall of '03. I think their August 15th and their November 15th payment were held up.

Q. And you had been an auditor of the national governing bodies on behalf of the United States Olympic Committee for a number of years prior to that time, true?

A. Since '92.

Q. Had there been a freezing of funds of any national governing board prior to that time?

A. Occasionally it happened, but usually it would only be, like, one payment. And -- because it's really a drastic step.

Q. Now, the 11 times in conducting audits of this particular national governing body during the period in question you indicated is not the average and not the norm, true?

A. Right. We're actually going in quarterly now.

something that had been an ongoing problem for years?

A. Well, it actually had been an ongoing problem ever since I had been there, and I think the first time I was there was in '93. But it was like a moving target. This year they'd do something right, and then the next year, they'd do it, the same thing, wrong. So the over-arching issues -- one of the over-arching issues, which -- I don't know whether it has anything to do with what we're doing here, but -- was that they didn't hire really -- except for in one instance -- they didn't hire qualified people, because they didn't want to spend the money to hire good people. So they had people who didn't know bookkeeping trying to do the bookkeeping.

Part of the issue is that they didn't want the office, the national office, to be in control.

Q. And who is the national office?

A. Well, the national office was the executive director and the staff, the paid staff. That's, essentially, what led to the remediation plan.

THE COURT: I'm sorry, I am not certain I know -- national office of what?

A. Taekwondo.

BY MR. ROECA:

Q. The national office of Taekwondo?

A. Right. The fortunate -- or unfortunate thing is that the national office of Taekwondo is on the Olympic training center

Q. Okay.

And there was an Exhibit Number 38 that was shown to you and is in evidence, and it refers to -- it's an August 29, 2003, letter which you wrote, and which had an attachment to it, but the second paragraph starts off, "There are 19 recommendations in the report." Do you see that?

A. Right.

Q. And if you turn to the executive summary, Pages 1 and 2 of that have 19 recommendations. How would you characterize the number and kind of recommendations that were being made in this particular document to the United States Taekwondo Union?

A. Well, I'd never issued a report with 19 recommendations before, that's for sure. This is the most recommendations that we had made in a -- typically, you don't have to do that, but the situation there was so bad that we had to spell everything out.

Q. What do you mean, the situation was so bad?

A. Well, they didn't have appropriate records. They had changed their financial people -- they had fired their -- or -- they had fired their financial person. Then they got three temps in to do the accounting. And they didn't know the organization. We went in -- they couldn't find documentation. Things were just missing. It was like operating out of a shoe box.

Q. Was this something that occurred in 2003, or was this

in Colorado Springs. So they were in the next building over from where we were, so we could keep an eye on them.

Q. Were you involved in the discussions that led to the agreement and remediation?

A. On the financial side. But that was really not the sports side.

Q. Okay.

On the financial side, based upon your recollection of discussions, were financial issues significant to that agreement and remediation?

A. Yes, to the point of -- they did not have the capability of administering the organization. In the sports act, it says that the NGB's have to demonstrate managerial and financial capability. And they didn't have either one.

THE COURT: I'm still kind of confused. Mr. Roeca, you can ask her questions that will help clarify this.

When she says, they didn't want the national office to be in control, who is "they"?

MR. ROECA: Okay, why don't we clarify that for the court.

BY MR. ROECA:

Q. When you say, they didn't want the national office to be in control, who is the "they"?

A. The volunteer side. The executive committee. The executive board at the USTU. It's much like any

not-for-profit. There's a volunteer group, and then there's a staff group. And the volunteer group typically should be making the policy and telling the staff, which is the national office, how to implement that. And...

Q. And where, from your perspective, was there a breakdown?

A. The breakdown was that the volunteer side of this organization had tried to micro-manage the administration in the financial and managerial capability. That's what the membership and credentials committee, I believe, was saying.

Q. Now, when the monies would come into the organization, was the direction of the flow of the money to go to the administrative side and then to fund the various activities -- in theory -- that the United States Taekwondo Union was organized for?

A. Right.

Q. And was the audit that you had conducted over the course of time, the various audits, did it find that those monies were being filtered in directions that were not intended by the organization?

A. Yes. We found inappropriate use of -- over the years, we probably asked back $400- to $500,000.

Q. And, from your knowledge, currently being on the governance and management committee, has that been one of the focuses of your attention since assuming your current position with that organization, the restructuring of that to prevent





that in the future?

A. Right. The governance committee is, you know, just a volunteer position. Because I still am the managing director of the audit at the USOC, and that is one of our focuses. And they've -- I sent my staff in, and my staff spent three months full-time, Monday through Friday, re-creating their accounting records.

MR. ROECA: That's all I have. Thank you, Your Honor.

MR. JONES: Briefly, Your Honor?

THE COURT: Anything more?

MR. JONES: Thank you.

RECROSS-EXAMINATION

BY MR. JONES:

Q. Ms. Witte, you said you participated in the -- some of the membership and credential meetings where the actual remediation plan was discussed?

A. No, I didn't say that. I said I went to some of the membership and credential meetings when they asked me to be there. But I was not involved in the remediation plan.

Q. So you don't know what steps led up to the plan that went into effect?

A. Not really. All I know is that it appeared that decertification was imminent, and that the U.S. Taekwondo Union and the USOC came up with this plan. But I was not





involved in concocting it.

Q. Were you asked what sort of personnel needed to be substituted in order to set things right financially?

A. Yes. I said they needed a CFO.

Q. A CFO?

A. Right.

Q. Were you a part of any discussions where a plan was looked at that would involve getting rid of less than the entire board, all the officers and the president?

A. I wasn't involved in any of those discussions.

MR. JONES: Thank you.

THE COURT: All the officers and the what? I didn't catch your question. Getting red of less than the entire board, all the officers and --

MR. JONES: And the president.

THE COURT: The president? Thank you.

Anything more?

MR. JONES: No, Your Honor.

THE COURT: Okay. Then the witness is excused and may step down.

I think we're done with all the evidence. At least the testimony.

MR. JONES: Yes, Your Honor.

THE COURT: Okay, any other evidence from either side?





MR. JONES: I would like to put a stipulation on the record, as far as the exhibit list?

THE COURT: Okay. What's that?

MR. JONES: As I understand it, we've agreed on the admissibility of Plaintiff's Exhibits 1 through 5. Also, 7 through 19. Also, 21. Also, 24 through 26. Also, 28 through 30. And 32. In addition to those that are already in.

THE COURT: Okay, 35 to 40 are in.

Okay, is that your position, too, Mr. Roeca?

MR. ROECA: Yes, Your Honor, we've agreed to that.

THE COURT: Okay, then I will admit those.

MR. JONES: I've also agreed to the admission of Defendant's Exhibits A, B, C and D.

THE COURT: What are those? I have D-1, D-2, D-3, D-4, D-5, D-6, so --

MR. JONES: D-1, D-2, D-3, D-4 and D-5 are agreed on.

THE COURT: Is D-1 the same as Plaintiff's Exhibit 29?

MR. JONES: Yes, Your Honor.

MR. ROECA: If it is, we'll withdraw it, Your Honor.

THE COURT: Okay, then I will put on the record that I am admitting Plaintiff's Exhibits 1, 2, 3, 4 and 5; and 7 and 8; 9, 10 and 11 have been previously admitted; I'll admit 12, 13, 14, 15, 16, 17, 18 and 19; Exhibit 21; Exhibits 24, 25

and 26; 28, 29, 30 and 32; Exhibits 35 to 40 have been previously admitted. I'm also admitting D-2, D-3, D-4 and D-5.

Is that right?

MR. JONES: Yes, Your Honor.

THE COURT: Okay. Then is that all the evidence?

MR. JONES: I would like to offer a few more.

THE COURT: I'm sorry?

MR. JONES: I would like to offer a few more.

THE COURT: Okay, which ones?

MR. JONES: Plaintiff's Exhibit 6; and Plaintiff's Exhibit 22; Plaintiff's Exhibit 23 and 27; 31; and, lastly, 41.

THE COURT: 22 and 23 are the ones we were looking at earlier, right?

MR. JONES: Yes, Your Honor.

THE COURT: Okay. So I think we've discussed those -- or did you want to say more?

MR. ROECA: No, Your Honor.

THE COURT: Okay, then I'm going to receive Exhibits 22 and 23 -- that's over objection, right?

MR. ROECA: Thank you.

THE COURT: Okay.

And, then, looking at Exhibit 6, any objection?

MR. ROECA: Yes. We have already stated our

objections for the record, Your Honor.

THE COURT: Did we look at this already? Would you remind me what the objection was?

MR. ROECA: Hearsay, Your Honor. We objected on the grounds that it was hearsay. It was during the prior dispute. And, at that time, they were adversaries, and at the current time we have a different group. And I understand the court's position, but that is our objection. And it's double hearsay.

THE COURT: Okay, but this is an internal communication, as opposed to the other...

MR. ROECA: Your Honor, what we're objecting to is the statement that is being referred to in the body of the document, which is being referred to someone else. And, again, it's hearsay within hearsay.

MR. JONES: Your Honor, we've also laid some foundation, I think, through the witnesses that several witnesses have heard the same exact statement, sat in on the same meeting.

THE COURT: Okay.

Well, I'm going to overrule the objection, and receive Exhibit 6.

And you also asked for Exhibit 27?

MR. JONES: Yes, Your Honor. We have several newspaper articles.

MR. ROECA: Objection. They are not

self-authenticating. A newspaper article is hearsay.

THE COURT: Yeah. What is the purpose you are offering Exhibit 27 for?

MR. JONES: To show that USOC was having problems of its own regarding fairness, conflict of interest, picking favorites, all those sorts of things.

THE COURT: Okay, objection sustained.

Exhibit 31 is another newspaper article. And what is the -- why is this being offered?

MR. JONES: Exhibit 31 is to show, actually, irreparable harm to Dae Sung Lee, Your Honor. April 15 is when the media started letting the public and the State of Hawaii know that he had been nominated. And that is also what triggered damage to his reputation after that point by the USTU, with USOC then saying that they were going to pull the nomination back a year later.

THE COURT: Okay, this may go to your damage claim, possibly, but I don't see how it goes to this injunctive relief --

MR. JONES: Irreparable harm is what we are saying, Your Honor. If -- the only way you can correct these kinds of media releases at this point is to do equity.

THE COURT: Is to what ?

MR. JONES: Issue equitable relief, injunction.

THE COURT: I am going to sustain the objection to

Exhibit 31 for purposes of this hearing. And whether it should come in on some other proceeding in this case can be resolved later.

You also --

MR. JONES: Exhibit 41.

THE COURT: Yes. For what purpose is this being offered?

MR. JONES: That is the one that covers the so-called interim remediation plan in which something less drastic was agreed to by both sides and vetoed by the USOC membership and credentials committee. It goes to actions of a racial nature. That is our contention.

THE COURT: Okay, sounds to me like it's being offered for the truth, so it's hearsay; I am going to sustain the objection to Exhibit 41.

Okay, any other evidence being offered by either side?

MR. JONES: No, Your Honor.

MR. ROECA: No, Your Honor.

THE COURT: Okay, then the evidence is closed.

Now, I do have the proposed findings of fact and conclusions of law, but -- my intent is to rule by tomorrow. So I guess what I want to do now -- and I know it's late, and -- are the people on the phone still awake?

MR. LEVINSTEIN: Yes, Your Honor.

MR. BENZ: Yes, Your Honor.

THE COURT: Okay, I just wanted to check, because you have been silent for a while.

I want to give the attorneys a few minutes to argue the impact of any facts that may have come up in this hearing that were not anticipated, and so were not addressed in the proposed findings of fact and conclusions of law, or the memos that were submitted. So, we don't have a whole lot of time, but to the extent there were things that you think were either very helpful to your case that you didn't know would come up, and you want to highlight those for me, or were very hurtful to your case, and you want to tell me why I shouldn't consider them, and you didn't anticipate them so didn't address them in your submissions, I'll let you talk about those since you're not going to have a chance to do revised proposed findings.

So, Mr. Jones, do you want to start? If there is anything. There may not be. Things may have gone as you anticipated. So, you don't need to repeat the things in your papers already.

MR. JONES: No, Your Honor, I think the only thing that came up which is -- I'll call it an equitable consideration when issuing an injunction because it concerns other parties, and that was the statements made by the two athletes that Master Lee might be a source of distraction.

I think that the situation here is one where coaches

have rights equal to the athletes. And I am not aware of any bylaw provisions, or anything in the sports act, or anywhere else, that put the interests of the athletes above coaches. However, it's obvious that the court is put in a position here of trying to do the best thing for the team, do the best thing for the coaches, do the best thing for the cause, and promote the mission statement. And I feel strongly that the court can still do that by issuing two credentials instead of the one that was issued, but ordering that a second credential be issued.

THE COURT: I want to tell you now that if you do get any relief through the present proceeding, it will not be in the form of my issuing Olympic coaching credentials. I mean, I am not a credential issuing authority. So I want to make sure that that's clear, that I don't think that I am in a position to require that a particular individual be named as the coach, you know, for some United States Olympic team.

Any relief that you were to get, assuming you were to get any in this hearing, would not be in that form, okay?

MR. JONES: Thank you, Your Honor.

THE COURT: Okay.

Mr. Roeca?

MR. ROECA: Just a couple things.

First, Your Honor, the statement from one of the witnesses that was called by plaintiff was to the effect that

the criteria were applied correctly in the selection of the coach, and I think the court heard that.

The second thing is that, if one reads the -- I will take some exception to what counsel just said regarding the Amateur Athletic Act. The athletes come first. Coaches are accorded equal rights, but this is about the athletes, not the coaches. Today's proceedings is about the coach, but the Olympics are about athletic performances.

And the other thing that has come through, I believe, as I had hoped -- and I'm glad to hear from everybody -- is that despite the background that was discussed concerning the interplay between the United States Olympic Committee and the United States Taekwondo Union and problems, and the various pieces of information there, there's been not a single piece of evidence by way of document or testimony that the criteria for selection of coaches that was established and communicated in April of 2004 was motivated by anyone by reason of any prohibited discriminatory view. It is neutral. It is objective. And the objective nature of it was followed.

And so there's no connection through the testimony that there has been any discrimination towards anyone in the selection of athletes or coaches or the coach who happens to be in Athens representing the United States today.

And I want to commend the plaintiff; he has an

exemplary background and qualifications. But that's not what was set forth in the criteria. And I understand his feelings, but I believe that the spirit of the Olympics have been set forth and followed by the national governing board, and I ask that the court find accordingly.

Thank you.

THE COURT: Okay.

MR. LEVINSTEIN: Your Honor, this is Mark Levinstein in Washington. May I speak just very briefly?

THE COURT: Okay.

MR. LEVINSTEIN: One, if Your Honor does decide that the only claim left is discrimination claim, then all the contract claims and so on, that they have to be decided in arbitration, then it's clear that what has to be shown is the decision made to terminate his -- sorry, to rescind his position as the coach and a new criteria were motivated by discrimination against Korean-Americans.

So, if that's the case, then it would be necessary to show that the executive committee -- not the membership and credentials committee -- but the executive committee which rescinded it did so not because of the reasons they stated, which was they were reconsidering the management, there was only one credential available so they had to reconsider everything, was not true; that it was really because they wanted to get rid of Dae Sung Lee, which there's no evidence,

at all, to that effect.

In addition, the -- I'm sorry, it's late here, and I am trying to keep track here. The other issue is, as the letters from Mr. Dae Sung Lee and his testimony indicate, he liked Mr. Gambardella; Mr. Gambardella had always been nice to him; he had confidence that Mr. Gambardella was going to do the right thing; Mr. Gambardella told him that he was going to try to come up with criteria and pick coaches who would best serve the athletes. And Mr. Lee testified he believed that, and he thought he would be fair, and he wrote to him saying he wanted to still be considered.

It's clear he was still considered in the sense that if an athlete he had coached had successfully competed, he would have been selected.

Now, the criteria are neutral, and it's also clear that at the time they were promulgated, no one knew who would be selected, because the selection was totally contingent on what happened to the athletes in the trials. So there certainly was a possibility that both coaches that were selected eventually would be -- (incomprehensible) --

Next, what is clear from the facts is that, really, two coaches were selected. The problem is, at present we only have one credential. So we selected a coach and a backup coach who we want to get a credential for, who is the second coach, and we are just waiting to see if we can accommodate

him because of the concern about having a -- both athletes having a coach at ring-side who they are most comfortable with.

And, lastly, the new evidence that we got in Mr. Lee's declaration and in the hearing was that he was a member of the board and the executive committee or the executive board -- whatever they called it -- of the USTU when the January 27th, 2004, agreement was signed. And it explicitly includes, in paragraph 3-A on Page 4, a waiver of rights that includes the directors and officers; it includes Mr. Lee. And it says that no claims that were the subject of the complaint and answer, which includes all these claims about what the membership and credentials committee did, could be -- it goes on to say that it won't be in any hearing having to do with the Ted Stevens Olympic and Amateur Sports Act, and so on.

So, all these claims were waived specifically by him, and he agreed -- he testified that he voted in favor of the agreement and the mediation plan after having seen it. So it's fair to consider him bound.

And so, in our view, the same claims which are being made about unfairness and what was going on in the fall of 2003, which we have confidence we can prove at a hearing were anything but unfair, but they agree it cannot be a subject of this proceeding.

So I think that's an important thing to add, as well, and given that the only suggestion, whatsoever, the only glimmer of evidence of any discrimination, is two letters and an alleged statement by members of the membership and credentials committee in connection with settlement discussions, and reviewing of the allegations made by people in the Taekwondo community about the USTU. Those have nothing to do with the conduct of Mr. Gambardella or the USTU committee, and they are trying to avoid exactly what the settlement agreement was designed to do, which was put these issues to rest.

THE COURT: Okay.

This hearing, with much coming in by telephone, is probably a court reporter's nightmare. So I did notice that the court reporter had some difficulty in understanding some of the things heard, and one thing that was probably fairly important in what Mr. -- well, important to the defense in what was just said didn't come out totally on the transcript.

So, what I heard counsel just say was a reference to, certainly, there having been the possibility that both coaches that would be selected eventually would be Korean-Americans, and that Korean-Americans part got -- you got an "incomprehensible" in what the court reporter transcribed, and that was probably an important part of what you were saying in that particular sentence.

Okay, I'm going to try and issue a ruling by tomorrow. Sometimes, on these preliminary injunction hearings, I bring everybody in, and I recite findings orally. I might do that tomorrow, but maybe not. If I do a written ruling, which is probably what I'll do, then probably I'll e-mail it to Mr. Jones and Mr. Roeca, and you can then disseminate it as you like.

And I'll call you if I'm going to do that, so that you can sit by your e-mail and see it and read it before you read about it in the news.

So, that's probably how I am going to do it. I can't promise you exactly that, but I think that's probably how I'll do it. And it probably will come out in the afternoon, not in the morning. So, for whatever help that gives you folks in planning your day, that's my present thought of how this will go.

Okay, I thank everybody for the work that they did. I know everybody on both sides had to work really hard on short notice. And I know that the people in Greece are ready to collapse, and the sun is rising, and so forth. So I thank all of you for the help that you've given to me, and I hope to get you a ruling by tomorrow.

Thank you.

MR. ROECA: Thank you.

MR. JONES: Thank you, Your Honor.

THE CLERK: All rise.

This court now stands in recess.

(The hearing in the above-entitled cause was concluded at 4:14 p.m.)

- - -

-ooOoo-

I, Stephen B. Platt, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that the foregoing is a true and correct partial transcript of proceedings before the Honorable Susan Oki Mollway, United States District Judge.

-------------------------------

TUESDAY, MARCH 1, 2005 STEPHEN B. PLATT, CSR NO. 248