6/28/2005 Brunner, Mary

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF HAWAII
 3   DAE SUNG LEE,                )
                                  )
 4        Plaintiff,              )
                                  )
 5   vs.                         )  CV 04 00461 SOM TEK
                                  )
 6   UNITED STATES TAE KWON DO    )
     UNION, a Colorado nonprofit  )
 7   corporation, UNITED STATES   )
     OLYMPIC COMMITTEE, a         )
 8   federally chartered nonprofit)
     corporation, JOHN DOES 1-10, )
 9   JANE DOES 1-10, DOE          )
     PARTNERSHIPS 1-10, DOE       )
10   CORPORATIONS 1-10,           )
                                  )
11        Defendants.             )
12
13        Videotaped deposition of MARY M. BRUNNER taken
14   before CAROL CONNOLLY, CSR, CRR, and Notary Public,
15   pursuant to the Federal Rules of Civil Procedure for the
16   United States District Courts pertaining to the taking
17   of depositions, at 3400 West Euclid Avenue, Arlington
18   Heights, Illinois, commencing at 9:12 a.m. on the 28th
19   day of June, 2005.
20
21
22
```

1

6/28/2005 Brunner, Mary

```
 1        There were present at the taking of this
 2   deposition the following counsel:
 3        BERVAR & JONES by
          MR. WARD D. JONES, ESQUIRE
 4        1001 Bishop Street
          Pauahi Tower, Suite 1400
 5        Honolulu, Hawaii 96813
          (808) 550-4990
 6
          Appeared on behalf of the Plaintiff;
 7
 8        WILLIAMS & CONNOLLY, LLP, by
          MR. MARK S. LEVINSTEIN, ESQUIRE
 9        725 Twelfth Street, Northwest
          Washington, D.C. 20005
10        (202) 434-5000
11        Appeared on behalf of the Defendants.
12
13   ALSO PRESENT:
14        Mr. Dae Sung Lee
15        Mr. Donald Peterson, Videographer
16
17
18
19
20
21
22
```

2

6/28/2005 Brunner, Mary

```
 1                    I N D E X
 2   VIDEOTAPED DEPOSITION OF MARY M. BRUNNER
 3            TAKEN June 28, 2005
 4
 5   EXAMINATION BY                    PAGE
 6   Mr. Levinstein                    5, 216
 7   Mr. Jones                         180, 234
 8
 9
10            - - - - - - -
11            EXHIBITS MARKED
12        (Attached to the transcript.)
13                                     PAGE
14   Deposition Exhibit No. 1          8
15   Deposition Exhibit No. 2          10
16   Deposition Exhibit No. 3          80
17   Deposition Exhibit No. 4          125
18   Deposition Exhibit No. 5          138
19   Deposition Exhibit No. 6          156
20   Deposition Exhibit No. 7          160
21
22
```

3

6/28/2005 Brunner, Mary

```
 1        THE VIDEOGRAPHER:  We're going on the video record
 2   at 9:12 a.m.  Today's date is June 28th, 2005.  My name
 3   is Donald Peterson, and I'm a legal videographer in
 4   association with LAD Reporting, Washington, D.C..
 5        The court reporter today is Carol Connolly.
 6   Here begins the videotaped deposition of Mary M. Brunner
 7   taken in the matter of Lee versus U.S. Tae Kwon Do
 8   Union, et al. bearing case number CV 04 00461 SOM LEK in
 9   the U.S. District Court for the District of Hawaii.
10        This deposition is being held at 3400 West
11   Euclid in Arlington Heights, Illinois and is being taken
12   on behalf of the defendant.
13        Will counsel, please, identify themselves for
14   the record and state whom you represent starting with
15   the noticing party.
16        MR. LEVINSTEIN:  Mark Levinstein of the law firm of
17   Williams and Connolly representing the defendant.
18        MR. JONES:  Good morning.  Ward Jones on behalf of
19   plaintiff, Dae Sung Lee, who is present in the
20   deposition today.
21        THE VIDEOGRAPHER:  Will the court reporter please
22   swear the witness.
```

EXHIBIT "A"

4

1                    MARY M. BRUNNER,
2    called as a witness herein, having been first duly
3    sworn, was examined upon oral interrogatories and
4    testified as follows:
5                    EXAMINATION
6         By Mr. Levinstein:
7         Q.   Would you please state your full name and spell
8    your last name.
9         A.   Am I supposed to speak into the camera or to
10   the person that's addressing me, or does it matter?
11        Mary M. Brunner.
12        Q    Could you spell your last name?
13        A    B like boy; R like Robert; U like under; N,
14   Nelly; N, Nelly; E, Edward; R, Robert.
15        Q    Ms. Brunner, do you understand that you're here
16   because you've been identified as a witness on his
17   behalf?
18        A    Yes.
19        Q    Are you here to testify for Dae Sung Lee in his
20   lawsuit?
21        A    I'm assuming I'm just swearing or testifying to
22   facts.  As far as I'm concerned not to either party.

1         Q    When was that?
2         A    Last night.
3         Q    And what time was that?
4         A    Late evening, between 9:00 and 10:00, something
5    like that.
6         Q    Where did you meet?
7         A    In Arlington Heights.
8         Q    At what location?
9         A    I don't remember the address.  At a restaurant.
10        Q    Did you have dinner together?
11        A    Yes.
12        Q    Was that with Mr. Jones?
13        A    Yes, he was there, yes.
14        Q    Who else was present?
15        A    Mr. Lee.
16        Q    How long were you at that restaurant with
17   Mr. Jones and Mr. Lee?
18        A    Approximately an hour.
19        Q    In that time you spent together did Mr. Jones
20   talk to you about what questions I was likely to be
21   asking you?
22        A    Basically we went over the document that I

1         Q    Did Mr. Lee call you at some point in time and
2    ask you if you would testify for him in this lawsuit?
3         A    Yes, he did.
4         Q    When did that happen?
5         A    I don't remember.  Some weeks back.
6         Q    Can you give me an idea of what month it was?
7         A    Couple of months ago.
8         Q    Best estimate May?
9         A    Sure.  I don't remember.
10        Q    But it was during 2005?
11        A    Yes.
12        Q    Did you speak to Mr. Lee about his lawsuit?
13        A    He asked me some questions about his lawsuit,
14   yes.
15        Q    Did you speak to his lawyers?
16        A    Yes.
17        Q    Did you submit a declaration in support of
18   Mr. Lee's position in this lawsuit?
19        A    As I said I just stated facts as I knew them.
20        Q    Did you meet with any lawyer representing
21   Mr. Lee?
22        A    Yes.

1    received from you.  I asked questions concerning some of
2    the items that were requested and we also discussed my
3    declaration.
4         Q    Let me show you what's been marked as
5    Brunner 1 --
6         A    Is this the same document you served?
7         Q    I believe it is.
8              (Document marked as Exhibit 1)
9         Q    When did you receive what's been marked as
10   Brunner Exhibit 1?
11        A    Late afternoon on Friday.
12        Q    That would mean Friday, June 24th?
13        A    According to the document the -- whatever the
14   date was on Friday.
15        Q    If Monday was the 27th, Friday the 24th of
16   June?
17        A    I would guess.
18        Q    And did you understand that document asked you
19   to produce documents at this deposition?
20        A    Yes.
21        Q    And do you have any documents to produce?
22        A    Absolutely not.

1    Q    Is that because it would take longer to produce
2  those documents?
3    A    Well, the -- this document asked for records
4  dating back to 1996.  That's approximately 10 years of
5  records.  That's a massive request.
6    Q    But you didn't produce any documents in
7  response?
8    A    Absolutely not.  In 2 hours of business when my
9  classes start in the late afternoon at the same time
10  that I received this request, impossible.
11    Q    But you are willing to produce documents at
12  some point in the future?
13    A    Some documents, yes.
14    MR. LEVINSTEIN:  We'll reserve the right to continue
15  this deposition after we receive those documents at some
16  point in the future.
17    MR. JONES:  We will also reserve the right to object
18  to a continuance of the deposition if it is to ask
19  questions about documents.  I think this witness -- her
20  identity has certainly been disclosed for a number of
21  months and contents of her declaration has been in the
22  hands of defense counsel for 4 to 6 weeks.  A -- a

1  documents request could have been submitted quite a
2  while ago so that we would not be forced to go to the
3  expense to having a second deposition.
4    I also point out that counsel with respect to a
5  motion to quash reminded us that 45 days notice was
6  needed prior to a subpoena duces tecum, and if that's
7  the case, same rule applies to defense.  So we do
8  reserve the right to contest the right to a second
9  deposition if it's solely to go over documents.
10    MR. LEVINSTEIN:  Q  Let me show you what's been
11  marked as Brunner Exhibit 2 and ask you if you recognize
12  that document.
13    (Document marked as Exhibit 2)
14    A    Yes.
15    Q    Is that the declaration that you submitted in
16  this lawsuit?
17    A    Yes.
18    Q    And was that document signed on or about
19  May 6th, 2005?
20    A    It's dated May 6th, yes.
21    Q    Was that the date that you signed it?
22    A    Yes.

1    Q    Who drafted this document?
2    A    Counsel for Mr. Lee.  I edited the document.
3    Q    Do you have in your possession any drafts of
4  the document?
5    A    No.
6    Q    Not here today?
7    A    No.
8    Q    What happened to the document you edited?
9    A    Garbage.
10    Q    Why did you throw away the draft?
11    A    It's not my lawsuit.
12    Q    Have you been in lawsuits before?
13    A    Yes.
14    Q    What did they concern?
15    A    The Ford family that I had forcibly removed
16  from my property.
17    Q    Any other lawsuits?
18    A    The one over a lease.
19    Q    Any other lawsuits?
20    A    Several years back during my professional
21  business years.
22    Q    About what?

1    A    Money owed the company, unfairness of the
2  company, et cetera.
3    Q    Let's take those one at a time.
4    Q    The lawsuit by the Ford family was a lawsuit
5  against you?
6    A    They filed a complaint with the USTU.  The USTU
7  Council advised them that he would not entertain the
8  complaint until they had gone through civil court, which
9  they did, and it was dismissed with prejudice as a
10  frivolous lawsuit.
11    Q    What were the allegations of the Ford family in
12  their lawsuit?
13    A    Basically that I was denying their child the
14  right to learn.  They wanted to come to my school.  His
15  father came at me over my desk, which is when I called
16  the police and had him removed.
17    Q    Did the lawsuit concern your refereeing of
18  events?
19    A    No.  They didn't want me to referee their son.
20  That wasn't what the lawsuit was about.
21    Q    Did the lawsuit seek an order that you wouldn't
22  be allowed to referee their son --

1    A    No.  It said that we mutually agreed that I
2  would not be in the ring with their son.  However, I am
3  not mutually in the ring with any of my students.
4  That's ethically done by any referee.
5    Q    But did they bring a lawsuit that included a
6  request for an order that you not be allowed to be
7  involved --
8    A    As I said, yes.  As my counter indicated I
9  didn't want to be in the ring.
10    Q    Was an order entered by a court saying that you
11  couldn't referee at those matches?
12    A    No, there was no order.  We agreed that that
13  would not happen.
14    Q    Did you sign an agreement to that effect?
15    A    Yes.
16    Q    Was that filed with the court?
17    A    I suppose it was.  I don't know.
18    Q    Was it entered as an agreed order?
19    A    I really don't know.  I signed it.  I don't
20  know what they did with it.  I'm not legally trained.  I
21  don't know.  I'm answering as best I know.
22    Q    Then there was a lawsuit over a lease.

13

1  ordered to pay backpay.
2    Q    Was it just an issue of salary they hadn't
3  paid?
4    A    And commissions.
5    Q    Is there any allegations of discrimination in
6  that?
7    A    No.
8    Q    So you didn't allege that they discriminated
9  against you?
10    A    No.  They owed me money.  I asked for them to
11  pay me what was due, I showed up at the place of the
12  meeting with documents proving what they owed and they
13  were ordered to pay me.
14    Q    Have you been deposed before?
15    A    Yes.
16    Q    In which case?
17    A    The lease thing.
18    Q    Was your deposition taken in the Ford case?
19    A    I don't recall that it was.
20    Q    How long have you been involved in the U.S. Tae
21  Kwon Do Union?
22    A    Since its inception probably.

15

1    A    Yes.
2    Q    Were you the plaintiff or the defendant?
3    A    Plaintiff.
4    Q    Who did you sue?
5    A    I'm sorry.  They sued me.
6    Q    So were you the defendant?
7    A    Yes.
8    Q    Who sued you?
9    A    The landlord.
10    Q    Was the claim that you hadn't paid your rent?
11    A    Yes.
12    Q    And then several years back in your
13  professional life there was a lawsuit about money owed
14  the company.  Is that what you said?
15    A    The company owed me money.
16    Q    So did you sue your prior employer?
17    A    I didn't sue.  I went to the Labor Relations
18  Board and asked for money to be paid.  You asked if
19  there were any cases.  Is that correct?
20    Q    Doesn't matter.
21    A    Then that's my mistake.  It went a lawsuit.  I
22  went to the Labor Relations Board.  The company was

14

1    Involved means what?
2    Q    In any capacity.  Since its inception you
3  think?
4    A    I think you need to clarify the question.
5    Q    Were you a member of the AAU that had
6  responsibility for tae kwon do before the United States
7  Tae Kwon Do Union?
8    A    I was not a member.
9    Q    But were you involved back with tae kwon do
10  back when the AAU was in charge of tae kwon do?
11    A    Yes.
12    Q    After the USTU was formed, did you become a
13  member of the USTU?
14    A    At some point, yes.
15    Q    Any idea how long ago that was?
16    A    10 years approximately, but I'm sure the USTU
17  would have records.
18    Q    I hope so.  I don't think so.  They don't go
19  back that far.
20    A    Not my job, man.
21    Q    Before you became a member were you involved in
22  USTU events?

16

6/28/2005 Brunner, Mary

1    A    Yes.

2    Q    In what ways were you involved?  Were you a

3  competitor ever?

4    A    Yes.

5    Q    When were you a tae kwon do competitor?

6    A    '70s, late '70s.

7    Q    What level of competition did you participate

8  in?

9    A    I don't understand that question.  It needs

10  explanation.

11    Q    Did you go to State tournaments?

12    A    Yes.

13    Q    Did you go National tournaments?

14    A    Yes.

15    Q    As a competitor?

16    A    Yes.

17    Q    What's the most success you had as a

18  competitor?

19    A    Not getting killed.

20    Q    That's a success?

21    A    Walking off the ring.  Also competed

22  internationally.

17

6/28/2005 Brunner, Mary

1    Q    Where did you compete international?

2    A    In Korea.

3    Q    In what events?

4    A    I don't remember.  I think it was called the

5  World Championships at that time.  It was the late '70s.

6    Q    Were you there representing the United States?

7    A    No.  I was there representing myself.

8    Q    So you competed at the Tae Kwon Do World

9  Championships?

10    A    I don't remember what the name of the

11  tournament, but it was in Korea, and it was an

12  international tournament.

13    Q    Did you have a ranking in the United States as

14  a tae kwon do competitor?

15    A    A ranking?  I don't understand that question.

16    Q    Did you win any major competitions in the

17  United States?

18    A    At that time there was no such thing as those

19  types of records being kept.  They were still very

20  quiet, very informal.

21    Q    Did you win any competitions --

22    A    State tournaments, local tournaments,

18

6/28/2005 Brunner, Mary

1  Invitationals, opens, whatever it was that I went to.  I

2  was generally a pretty successful competitor.

3        MR. JONES:  Excuse me.  I don't mean to interrupt

4  the deposition.

5        If I could just advise the witness to pause a

6  little bit after counsel asked the question.  I'm

7  concerned that the record is going to be pretty broken

8  up.

9        THE WITNESS:  All right.

10        MR. LEVINSTEIN:  Q  Did you compete in forms?

11    A    No.

12    Q    Did you compete in breaking boards?

13    A    Well, actually I did compete in forms.  They

14  were just different forms back then.

15    Q    Did you compete in breaking boards?

16    A    No.

17    Q    Did you compete in sparring?

18    A    Yes.

19    Q    Was it in sparring you won State tournaments

20  and local tournaments?

21    A    It was in both.

22    Q    It was in sparring and forms that you won State

19

6/28/2005 Brunner, Mary

1  tournaments and local tournaments?

2    A    Yes.

3    Q    And this was in the late '70s?

4    A    Yes.

5    Q    Did you participate in any national tournaments

6  in the United States?

7    A    I don't remember.  If they were there, I

8  probably went to them.  I don't remember the names of

9  them.  That was 30 years ago.

10    Q    What state did you live in the late '70s?

11    A    Illinois.

12    Q    Did you compete in tournaments outside the

13  State of Illinois?

14    A    No, but that doesn't necessarily mean they were

15  just state tournaments.

16    Q    I understand.  So if you competed in any

17  National tournaments though they would have been

18  National tournaments held in Illinois?

19    A    Probably.  People didn't travel as much for tae

20  kwon do.

21    Q    But you specifically said did you not compete

22  in any tournaments outside State of Illinois other than

20

1   the events you mentioned in Korea?

2       A    Yes.

3       Q    So if you did compete in a National tournament,

4   it had to be a National tournament held in Illinois?

5       A    What did I just answer?

6       Q    You said probably I think.

7       A    That's probably true.

8       Q    Did there come a time when you -- why did you

9   become a member of the USTU?

10      A    Probably on the request of one of the referee

11  trainers.

12      Q    Were you already a referee at the time you

13  joined the USTU?

14      A    In order for you to become a referee with the

15  USTU you have to be a member first.

16      Q    When did you first apply to be a referee?

17      A    I can't remember.  Approximately 15 years ago.

18           With the USTU is that your question?

19      Q    No.  Just when did you become a referee.

20      A    Late '70s.

21      Q    You became a tae kwon do referee in the late

22  '70s?

1       Q    Taken to the present, have you become a member

2   of any tae kwon do organization other than the USTU?

3       A    WTF.

4       Q    Any other organizations?

5       A    AAU.

6       Q    Any others?

7       A    USTW.

8       Q    What's the USTW?

9       A    United States Tae Kwon Won.

10      Q    Is that W-O-N?

11      A    Yes.

12      Q    Any other tae kwon do organizations?

13      A    Modern Arnis and Jujitsu.

14      Q    Modern?

15      A    Arnis and Jujitsu Federation.

16      Q    Does that involve tae kwon do?

17      A    No.

18      Q    Any other martial arts organizations you're a

19  member of?

20      A    Hapkido.

21      Q    That's a style of martial arts.  Is there a

22  Hapkido organization?

1       A    Yes.

2       Q    That was not about the USTU?

3       A    There was no USTU then.

4       Q    Was it with another organization?

5       A    It was with whomever asked me to referee.

6       Q    Were you a member in the late '70s of any other

7   tae kwon do organization?

8       A    I don't understand that question.

9       Q    Well, at some point you became a member of the

10  USTU.

11      A    Exactly.

12      Q    I'm just asking before you became a member of

13  the USTU, were you the member of any other tae kwon do

14  organizations?

15      A    Again I don't understand.  My instructor was.

16      Q    What organization was your instructor a member

17  of?

18      A    I don't know.  It was not my business at that

19  time.

20      Q    When you refereed in the late '70s, you did it

21  without being a member of any organization?

22      A    As far as I recall that's correct.

1       A    Several hundred probably.

2       Q    Which ones are you a member of?

3       A    I don't remember the exact name.  I don't have

4   the documents in front of me.

5       Q    Do you referee at Modern Arnis events?

6       A    No.

7       Q    Do you referee at jujitsu events?

8       A    No.

9       Q    What involvement do you have in the modern

10  Arnis and jujitsu Federation?

11      A    More specific question.

12      Q    Do you referee events related to the modern

13  Arnis and Jujitsu Federation?

14      A    No.

15      Q    Do you teach Modern Arnis or Jujitsu?

16      A    I did.  I have now removed it from my

17  curriculum.

18      Q    Do you teach Hapkido?

19      A    Yes.

20      Q    Do you referee Hapkido events?

21      A    No.

22      Q    Are there Hapkido events?

```
1    A    I'm sure there are.
2    Q    Are there any other martial arts organizations
3  you're a member of or have been a member of?
4    A    Those are the ones I recall.  In 30 years I may
5  have belonged to several others.  I don't remember.
6    Q    Does your school belong to any tae kwon do
7  organizations?
8    A    Can you clarify the question?
9    Q    Are you aware that schools are sometimes
10 members of organizations?
11   A    I don't think that's the way it's done.  I
12 don't understand your question.
13   Q    You weren't aware that schools -- there's such
14 a thing as a school member of --
15   A    To pay a school fee, but they aren't members.
16   Q    And to what organizations can you pay a school
17 fee?
18   A    Probably whoever creates an organization can
19 ask for school fee.
20   Q    Does your school pay fees to any martial arts
21 organizations?
22   A    USTW currently.
```

25

```
1    Q    Does your school pay a fee to the USTU?
2    A    No.
3    Q    Did your school used to pay a fee to the USTU?
4    A    Yes.
5    Q    When was that?
6    A    Several years back before this new regime came
7  in.
8    Q    Why did your school pay a fee to the USTU
9  before the new regime came in?
10   A    At that time they provided some materials that
11 were helpful to business.  They no longer do that.
12   Q    What materials did they provide?
13   A    Collateral pieces.
14   Q    Give me an example.
15   A    Advertising pieces.
16   Q    I don't understand.  They gave you an
17 advertising piece.  What does that mean?
18   A    Mockups for a potential ad.
19   Q    So they gave you some artwork that you could
20 use to turn into an ad?
21   A    It wasn't really art work.  It was just ideas.
22   Q    As a school member did your school have the
```

26

```
1  right to vote on selection of people involved in
2  governance?
3    A    More specific question, please.
4    Q    When your school was a member of the USTU, did
5  the school get to vote on certain matters?
6    A    Concerning -- again --
7    Q    Concerning anything.  If schools --
8    A    At the city level, at the state level?  I don't
9  understand what you're asking.
10   Q    Well, I don't understand the answer.  I'm
11 trying to get an understanding from you.  The school
12 became a member of the USTU.
13   A    Yes.
14   Q    Then were there levels, whatever levels, at
15 which the school cast votes on certain things as a
16 member?
17   A    Sometimes there were.
18   Q    Do you remember an example of what school the
19 voted on?
20   A    No, I don't.
21   Q    You've been a referee for 30 years?
22   A    No.  Approximately the late '70s.
```

27

```
1    Q    For 25 years plus?
2    A    Correct.
3    Q    Have you held referee positions beyond being
4  just a referee to refereed events, did you hold any
5  referee titles?
6    A    Yes.  I was briefly assigned referee chair for
7  the USTW.
8    Q    Did you have any state association positions as
9  a referee?
10   A    Referee chair, referee vice chair.
11   Q    In what organization?
12   A    USTU.
13   Q    Did you hold any state referee positions in the
14 USTW?
15   A    No.  There's no such thing.
16   Q    When were you the referee vice chair?
17   A    I don't remember.  Several years back.
18   Q    When were you the referee chair?
19   A    This year.  For the state --
20   Q    I'm sorry.  I thought you were saying this was
21 a state position.
22   A    Yes.
```

28

6/28/2005 Brunner, Mary

```
 1      Q   Okay.  So I was going to say for the State of
 2   Illinois, but you cut me off.
 3      A   I briefly answered which is why I cut you off
 4   because you repeated the question.
 5      Q   I just want to be clear on what I was asking.
 6          So you were the referee chair for the State of
 7   Illinois for the --
 8      A   Vice chair.  Referee chair and vice chair.
 9      Q   I understand.  Several years ago you were the
10   referee vice chair?
11      A   Yes.
12      Q   And at what point in time did you become the
13   referee chair for the State of Illinois?
14      A   I don't remember.  It's been several years.
15      Q   But you were the referee chair last year?
16      A   No.  I said I was briefly the referee chair for
17   the USTW this year.
18      Q   I see.  You said the referee chair for the
19   USTW.  That wasn't for the entire USTW, that was for the
20   State of Illinois?
21      A   Referee chair for the USTW.
22      Q   For the entire country?
```

29

6/28/2005 Brunner, Mary

```
 1      A   Yes.  Third time.  USTW.
 2      Q   But in response to another question you said
 3   you said you were referee chair and referee vice chair
 4   for the USTU.
 5      A   State of Illinois, two different organizations.
 6   You're asking two different questions.  I'm trying to
 7   keep it straight and keep going back which makes me
 8   answer that question and then you confuse that with the
 9   USTW group.  It's two groups.
10      Q   Let's stick with the USTU.
11      A   That's what I was trying to do.
12      Q   Let's talk about the State of Illinois.
13      A   Yes.
14      Q   Let's talk about the position as referee chair.
15      A   Yes.
16      Q   When did you hold --
17      A   As I said, I don't remember.  It was several
18   years back.
19      Q   Prior to the January -- Strike that.
20          Are you familiar with the 2004 Remediation
21   plan?
22      A   I don't know what you're talking about.
```

30

6/28/2005 Brunner, Mary

```
 1      Q   Are you aware that there was an agreement
 2   signed by the USTU in January of 2004 called the
 3   Remediation Plan?
 4      A   I don't know the specifics of it.  I heard
 5   there was turmoil.  I didn't get involved.
 6      Q   Did you become aware that certain officers of
 7   the USTU resigned in January of 2004?
 8      A   I became aware that certain officers were no
 9   longer with the Tae Kwon Do Union.
10      Q   Do you have any knowledge about the process in
11   2003 that led to change in who the officers were in
12   2004?
13      A   By knowledge you mean what?
14      Q   What do you know about that process?
15      A   The process itself, nothing.
16      Q   Do you know that there were meetings held by
17   the USOC Membership and Credentials Committee concerning
18   the USTU?
19      A   First person knowledge, no.  As I said before,
20   I did not get involved.  That was not my business.
21      Q   In 2003 were you a member of the USTU?
22      A   I'm a lifetime member.
```

31

6/28/2005 Brunner, Mary

```
 1      Q   In 2003 did you hold any positions with the
 2   USTU?
 3      A   No.  That I recall, no.
 4      Q   In 2003 were you actively involved in
 5   refereeing USTU events?
 6      A   Yes.
 7      Q   Have you held any positions with the WTF?
 8      A   Yes.
 9      Q   What positions?
10      A   International referee.
11      Q   Are you held any administrative positions with
12   the WTF?
13      A   No.
14      Q   So you have worked for the WTF as a referee at
15   international events?
16      A   Yes.
17      Q   Is there anything else that you mean by the
18   position of international referee?
19      A   I don't understand the question.
20      Q   Are you on any WTF committees?
21      A   No.
22      Q   Have you served as a trainer of referees for
```

32

1  the WTF?

2      A    No.

3      Q    Have you served as a trainer of referees for

4  the USTU?

5      A    I don't believe there ever was a position like

6  that so I don't understand the question.

7      Q    Have you been involved in running events for

8  the USTU?

9      A    Events like what?

10     Q    Any events.

11     A    Yes.

12     Q    What events have you been involved in running

13 for the USTU?

14     A    I don't know what you mean by running.  As a

15 referee?

16     Q    In any capacity.  Have you been involved in

17 running events for the USTU?

18     A    Yes.  You mean managing them, directing them,

19 in control of or being in attendance at?  I don't

20 understand the question.  It's not nebulous.

21     Q    Having some position involved in management or

22 operation of the event.

33

1      A    Yes.

2      Q    What events are those?

3      A    The first Pan Am Tae Kwon Do Union Open in

4  1993, I was executive director.  I've assisted in

5  several state tournaments.  And I was the executive

6  director for the 1994 Junior Olympics.

7      Q    Prior to January of 2004 did you observe

8  problems in how the USTU was run?

9      A    Yes.

10     Q    Can you tell us what some of those problems

11 were?

12     A    Administrative, management, operational.

13     Q    What administrative problems did you observe?

14     A    What the term indicates, anything to do with

15 paperwork.

16     Q    What problems were there?

17     A    Well, I wasn't privy to their intermachinations

18 so I can't give specifics.

19     Q    You said you observed problems in their

20 administration.

21     A    Yes.

22     Q    What did you observe?

34

1      A    Late paperwork, not -- correspondence not being

2  returned, documentation not being forwarded,

3  documentation being incorrect.

4      Q    In your opinion were these serious problems?

5      A    When they affected me they had to be serious.

6      Q    Did you try to do something to correct the

7  problems?

8      A    Other than corresponding, no.

9      Q    With whom did you correspond?

10     A    Whomever happened to be in charge of that

11 particular area at that particular point in time.

12     Q    Did you send letters to the USTU complaining

13 about their administration?

14     A    I don't recall that.

15     Q    But you corresponded about the administrative

16 problems?

17     A    About the core -- I corresponded about issues

18 that related to me.

19     Q    So when there were problems with late paperwork

20 or documentation not being forwarded or documentation

21 being incorrect, you sent letters to the appropriate

22 people at the USTU about those problems?

35

1      A    No.  As I said, I sent correspondence about

2  those issues relating to me.

3      Q    And you sent the correspondence to whom?

4      A    Whomever was in charge of that particular

5  department at that particular point in time.

6      Q    These were people in the USTU?

7      A    Yes.

8      Q    And in your judgment were the problems all

9  handled quickly and efficiently by the USTU?

10     A    As I said, no, that's why it was a problem.

11     Q    What management problems did you observe with

12 the USTU?

13     A    Lack of management.

14     Q    In particular what management was lacking?

15     A    Lack of experience, lack of background, lack of

16 education in the field with which they were connected.

17 Management by crisis rather than management by planning.

18     Q    Was this in connection with running of events?

19     A    Connection with anything.

20     Q    You observed these problems in all aspects of

21 the USTU's management?

22     A    Pretty much.

36

6/28/2005 Brunner, Mary

1    Q    Were there people in particular that you blamed
2    for these problems?
3    A    No.  The whole organization was and still is
4    run the same way.
5    Q    And did you correspond about these problems as
6    well?
7    A    I don't recall.  Again, that wasn't my
8    business.
9    Q    When it affected you it was your business?
10    A    Exactly.
11    Q    And a lot of times you knew about it because it
12    affected you?
13    A    Only if it affected me did I get involved, the
14    rest was not my business.
15    Q    When it did affect, did you correspond with the
16    US --
17    A    As I stated before several times, yes, I did.
18    If it related to me, I wrote about that particular
19    issue.
20    Q    I apologize.  You said that about the
21    administrative problems.  I wasn't sure if the same was
22    true of the management problems.

37

6/28/2005 Brunner, Mary

1    A    In all aspects, if there were an issue relating
2    to me in particular, I sent correspondence if I felt it
3    necessary concerning my issue.
4    Q    What operational problems did you perceive with
5    the USTU?
6    A    I don't understand that question.
7    Q    Well, I had asked you what kind of problems you
8    perceived with the USTU, and you said administrative,
9    management and operational.
10    A    Yes.
11    Q    And so if those were different then --
12    A    Can you be a little more specific?
13    Q    Since I don't want to put words in your mouth,
14    I don't know what you meant by operational problems.
15    So, can you tell me what you meant by operational
16    problems?
17    A    Nothing in particular, just that it didn't
18    operate well.
19    Q    Did you observe people in the USTU who were
20    involved in misuse of funds?
21    A    Did I observe it?  Meaning was I at the USTU
22    headquarters?

38

6/28/2005 Brunner, Mary

1    Q    No.  But did you believe there had been misuse
2    of funds by people involved with the USTU?
3    MR. JONES:  Objection, vague and ambiguous as to
4    believe.
5    MR. LEVINSTEIN:  Q  You can answer the question.
6    A    Well, my perception was that the funds weren't
7    always channeled where they should have been.
8    Q    Were there particular people who you believe
9    were involved in misuse of funds?
10    A    It would be perception only.
11    Q    Did you correspond and assert that people had
12    been involved in misuse of funds?
13    A    No.  It was not my business.
14    Q    Did you observe decisions that were made that,
15    in your opinion, were made based on favoritism rather
16    than merit?
17    MR. JONES:  Objection, vague and ambiguous.
18    THE WITNESS:  I don't understand the question.  Can
19    you be a little more specific?
20    MR. LEVINSTEIN:  Q  You were involved in the USTU?
21    A    Yes.
22    Q    And you saw decisions being made by USTU

39

6/28/2005 Brunner, Mary

1    personnel?
2    A    In the ring?
3    Q    Okay.  That's one place where you saw decisions
4    being made.  You also saw decisions being made about
5    management, administration, things like that, correct?
6    A    In the ring, when it affected me in my
7    environment, yes.
8    Q    Did you see decisions about people being
9    selected for certain positions?
10    MR. JONES:  Objection, vague.
11    THE WITNESS:  Again I have to say do you mean in the
12    ring?
13    MR. LEVINSTEIN:  Q  No.
14    A    Do you mean refereeing?
15    Q    I mean refereeing but not in the ring.  People
16    were picked for referee positions but they weren't
17    selected in the ring they were selected outside the ring
18    to serve as referees or hold referee positions.
19    A    Yes, several times.
20    Q    I'm not sure what I asked and what you answered
21    so let's be clear.
22    A    Because you asked, like, five questions all in

40

6/28/2005 Brunner, Mary

1  a row.

2      Q    I apologize.  I'm trying to be clear.  So any

3  problem, just tell me.

4           So leaving aside the ring, we'll get to that in

5  a second.

6           Let's talk about there were referee positions

7  that people were selected to hold.

8      A    Yes.

9      Q    And did you -- withdrawn.

10          Did you observe situations in which people were

11 selected for referee positions that you believed were

12 based on favoritism and not on merit?

13     A    Yes.

14     Q    Can you give me some examples?

15     A    Barbara Wakefield.

16     Q    For what positions was Barbara Wakefield

17 selected based on favoritism?

18     A    Referee chair interim.

19     Q    Any other positions?

20     MR. JONES:  Objection, now vague.

21     THE WITNESS:  I don't know if she was chosen as a

22 favor -- in a favoritism manner for her referee vice

41

6/28/2005 Brunner, Mary

1  chair position, but I do believe that interim referee

2  chair was a matter of favoritism.

3      MR. LEVINSTEIN:  Q  Because of a personal

4  relationship?

5      A    With me?

6      Q    No, no, no.  She was picked because of

7  favoritism.  By that do you mean she was picked because

8  of who she knew?

9      A    Yes.  That was direction -- that information

10 was given to me by Bob Gambardella.

11     Q    We'll get to that.

12          Were there situations in which the conduct of

13 certain people in authority in the USTU led to others

14 not wanting to be involved in the organization?

15     A    In what aspect?

16     Q    In any aspect.

17     A    I don't have firsthand knowledge.  I'm sure

18 there were.  It's a big organization.

19     Q    Did you tell people that people were leaving

20 the organization because of conduct of certain

21 individuals?

22     A    That's a fact.  I'm one of them.

42

6/28/2005 Brunner, Mary

1      Q    Okay.  Prior to 2004 were you aware of

2  situations in which people in authority led to others

3  not wanting to be involved in the organization?

4      A    Yes.

5      Q    Can you give me some examples?

6      A    Kim Davis.

7      Q    Who is Kim Davis?

8      A    Referee out of Dallas, Texas.

9      Q    And did Mr. Davis -- is a Mister?

10     A    Miss Davis.

11     Q    I can't tell with the word Kim in this group

12 whether it's a man or woman.

13          So Ms. Davis -- did Ms. Davis stop being

14 involved with refereeing?

15     A    Yes.

16     Q    And whose conduct in authority led Ms. Davis

17 not to be involved?

18     A    Barbara Wakefield.

19     Q    When was that?

20     A    Several years ago.

21     Q    And were you friends with Ms. Davis?

22     A    Yes.

43

6/28/2005 Brunner, Mary

1      Q    Are you still friends with Ms. Davis?

2      A    I'm friends with any referee.

3      Q    What did Barbara Wakefield do that led

4  Ms. Davis to stop being involved?

5      A    Basically she torpedoed her at a tournament.

6      Q    I'm sorry.  I don't know what that means.  She

7  torpedoed her at a tournament, what did she do?

8      A    She could have stood up in her defense.  And

9  what was apparent to the referees sitting in the stands

10 when that event happened, she didn't do that.  Steven

11 Dripp and Bill Sullivan witnessed it and stood up in kim

12 Davis' defense against Barbara.

13     Q    Okay.  Any idea what year this was?

14     A    Several years back.  I'm sure it's on record

15 with the USTU.

16     Q    Okay.  That's not really available to me, but I

17 understand.

18          There's a tournament several years ago.  Where

19 was the tournament?

20     A    Colorado Springs, U.S. Open.

21     Q    And what was Barbara Wakefield's position at

22 the time?

44

1    A   Vice chair.
2    Q   And Ms. Davis was refereeing a match?
3    A   Was supposed to be there, had been invited and
4    Barbara uninvited her. That was my perception at the
5    tournament after she had paid. -- Ms. Davis had paid for
6    her ticket to be there.
7    Q   Ms. Davis had paid for her ticket to fly to
8    Colorado Springs to be at the U.S. Open?
9    A   Because she had been invited.
10    Q   And Ms. Wakefield didn't assign her to referee
11    any matches?
12    A   Actually they told her to leave the tournament.
13    Q   What reason did they give for telling her to
14    leave the tournament?
15    A   That she wasn't needed.
16    Q   And do you have a reason why -- why do you
17    think they -- they didn't need her?
18    A   My personal perception was that it was strictly
19    a personal decision. That was my perception.
20    Q   So Barbara Wakefield didn't like Kim Davis?
21    A   That would be my guess.
22    Q   Is there anything else I'm missing that you're

1    referring to?
2    A   That would be my guess.
3    Q   Steven Dring and Bill Sullivan believed that
4    Ms. Davis should not be told to leave the tournament?
5    A   Absolutely. Everyone there did. They in
6    particular stood up and were very forcefully -- voice
7    their opinion as did some of the referees from Canada,
8    as did the referee from England who stood up and said
9    that we should all walk out in protest. That's how
10    wrong that situation was and how it was perceived by all
11    the international referees. It was so wrong they were
12    all willing to walk out of the U.S. Open and shut the
13    tournament down rather than have one of the referees
14    treated in that manner by Barbara Wakefield.
15    Q   Did Barbara Wakefield do anything besides say
16    we don't need you to referee?
17    A   That's all that was needed.
18    Q   I'm just trying to get an understanding of what
19    got everybody so upset.
20    A   When you are selected to referee at an
21    international event and you pay your own way to get
22    there, and then you show up and they say go home, sorry

1    about that, you can't leave until you return ticket is
2    useful. You have to pay your own meals and your own
3    room and board while you're there to be told you're not
4    needed. For that reason every single referee there,
5    except maybe two of Barbara's friends, stood up in
6    unison and said, this is wrong, we should leave rather
7    than have someone from the referee ranks treated in this
8    manner. The most voiceful about it and forceful were
9    the Canadians referees, and, as I said, the gentleman
10    from England and Bill Sullivan and Steven Dring.
11    Q   Were you vocal about the problem?
12    A   No.
13    Q   Why not?
14    A   It wasn't my place to be at that point in time.
15    Q   Who were the friends of Barbara Wakefield that
16    you referred who supported her side?
17    A   I'm assuming Valerie Long was there.
18    Q   You said friends, plural. Is there anyone else
19    you're referring to?
20    A   Not that I remember.
21    Q   Valerie Long is a friend of Barbara
22    Wakefield's?

1    A   Yes.
2    Q   And supports Barbara Wakefield?
3    A   Well -- yes.
4    Q   Is it fair to say that you've not liked Barbara
5    Wakefield for a long time?
6    MR. JONES: Objection, vague and ambiguous.
7    THE WITNESS: Ask the question again, please.
8    MR. LEVINSTEIN: Q Is it fair to say that you have
9    not liked Barbara Wakefield for a long time?
10    A   As I stated at the outset, when I see
11    injustices done, I will stand up for them no matter who
12    it is that's involved. In the case of Barbara Wakefield
13    where I have seen her perform items or situations or
14    handle anything that is lacking in integrity, I will not
15    like that, but that would apply to anyone that has no
16    integrity. Tae kwon do teaches integrity.
17    Q   But it's your view that Barbara Wakefield has
18    no integrity?
19    A   That on some of the instance that she's been
20    involved that I have observed, that would be the case.
21    Q   There have been a number of those instances?
22    A   There have been some instances. That situation

1    with Ms. Davis was one of them. And since every
2    international referee had the same opinion that I did, I
3    could only assume that that was a worldwide opinion.
4        Q    It was your understanding it was a worldwide
5    opinion?
6        A    There were worldwide referees at that U.S. Open
7    from different countries.
8        Q    This is a worldwide opinion Ms. Wakefield was
9    not doing a good job?
10       A    As I said there were referees in attendance
11   from several countries at the U.S. Open, therefore, it
12   is an international event.
13       Q    I understand. It's an international event.
14       A    So people being from other countries would be
15   giving their international opinion.
16       Q    Fine. But your view was there was some of a
17   consensus among these international referees that
18   Miss Wakefield was doing things that were improper?
19       A    That was unethical.
20       Q    I just want to understand was there more to it
21   in your understanding than she didn't like Kim Davis?
22   Had there been some prior dispute between Ms. Wakefield

1    and Ms. Davis?
2        A    I don't understand that question. I don't
3    think you understand refereeing.
4        Q    Well, that's very possible, I don't understand
5    refereeing. I'm not a referee. You've described
6    someone who flew all the way to Colorado Springs and was
7    going to referee and was told she wasn't needed. And
8    you seem to think it was more than an administrative
9    decision that we don't need you. I'm just wondering if
10   you think there was some discriminatory motivation or
11   something beyond Ms. Wakefield didn't like Ms. Davis. I
12   just want to know if there's something more I'm missing.
13       A    There could be. I don't know.
14       Q    Let's go to the ring. In your years as a
15   referee, besides refereeing events you attended lots of
16   matches?
17       A    Lots of tournaments.
18       Q    And -- what do you call the individual bouts
19   within a tournament?
20       A    A match.
21       Q    So you watched a lot of matches in which you
22   weren't the referee?

1        A    Yes.
2        Q    Prior to January of 2004 did you have the view
3    that there was often discrimination in the refereeing or
4    judging of matches?
5        MR. JONES:  Objection, vague.
6        THE WITNESS:  Ask the question again.
7        MR. LEVINSTEIN:  Q  I'm focusing on the time period
8    before the new regime, before January of 2004.
9        A    Yes.
10       Q    I'm just asking in that time period before
11   January of 2004, based on the matches you watched or the
12   matches that you were one of the referees during the
13   match, was it your view that there was often
14   discrimination in the refereeing or judging of matches?
15       A    At what level?
16       Q    At any level.
17       MR. JONES:  Same objection, vague.
18       THE WITNESS:  That is -- that's an impossible
19   question to answer. I mean at what level?
20       MR. LEVINSTEIN:  Q  What levels did you watch? I
21   don't know how to identify levels of matches.
22       A    Then maybe I can't answer the question. I

1    don't understand the question. That's really an
2    open-ended, nebulous, out there question.
3        Q    You'd remember there if there was a match you
4    watched in which you thought the outcome was not based
5    on who was the best competitor but was based on improper
6    factors?
7        A    Well, there again it's a question that almost
8    can't be answered.
9        Q    I just want to know your opinion.
10       MR. JONES:  Objection, vague.
11       THE WITNESS:  My -- the reason I'm trying to clarify
12   here is because it's an impossible question. I mean
13   that's like saying what created infinity. There has to
14   be -- draw some parameters in a little bit then I'd be
15   happy to answer it. It's not that I'm avoiding
16   answering it. I don't know how to answer you because
17   it's so open.
18       MR. LEVINSTEIN:  Q  Have you told people over the
19   years that you believe the outcome of matches is
20   affected by the national origin of the competitors?
21       A    National origin?
22       Q    Whether they're Korean-Americans or they're

6/28/2005 Brunner, Mary

1  Hispanic or they're some other national origin.
2      A    I do not recall ever making that specific
3  statement.
4      Q    Do you recall making statements similar to
5  that?
6      A    I don't recall making statements similar to
7  that.
8      Q    Do you recall telling people that you thought
9  that Korean-American referees favor Korean-American
10  competitors?
11     A    I don't recall making that statement.
12     Q    Do you believe that that happened?
13     A    I believe that it could have happened in some
14  instances as could have happened that Americans did the
15  same thing.
16     Q    Non-Korean American referees favored
17  non-Korean-American competitors?
18     A    Yes.
19     Q    You believe that both of those things happened?
20     A    Yes.
21     Q    Do you have specific matches in mind where you
22  believe that happened?

53

6/28/2005 Brunner, Mary

1      A    No.
2      Q    But has it happened a number of times over the
3  years?
4      MR. JONES:  Objection, vague.
5      THE WITNESS:  For that reason -- again you're asking
6  questions that are almost impossible to answer.  There
7  have been literally thousands of matches at which I have
8  been around.  So answer a question like that, it's too
9  open a question.
10     MR. LEVINSTEIN:  Q  But have there been many matches
11  in those thousands in which you believed that whether
12  the competitor or referee was Korean-American or not
13  affected the outcome of the match?
14     A    Generally my opinion wasn't based on race.  My
15  opinion was based on facts of the match.
16     Q    You just think you saw a match and you thought
17  the person declared the winner wasn't the winner?
18     A    Yes.
19     Q    Did that happen a lot?
20     MR. JONES:  Objection, vague.
21     THE WITNESS:  Yes.
22     MR. JONES:  Move to strike.

54

6/28/2005 Brunner, Mary

1      MR. LEVINSTEIN:  Q  In your opinion you saw a
2  significant number of matches in which you felt that the
3  winner of the match was -- person declared the winner of
4  the match had not won the match on merit?
5      MR. JONES:  Misstates the testimony.
6      THE WITNESS:  Sorry.
7      MR. JONES:  Misstates the testimony.
8      MR. SNAO:  Q  You can answer.  He's just got to make
9  those objections for the record.  They don't affect your
10  answering the questions.
11     A    When you have referees that are not properly
12  trained, or you select referees to officiate at a match
13  who are not of the proper experience to handle the level
14  of the competition to which they have been invited to
15  officiate, you stand the chance repeatedly of having the
16  incorrect competitor declared the winner.
17     Q    That happened a lot of times in your
18  experience?
19     A    It's happening especially in the last year.
20     Q    Prior to 2004 did it happen?
21     A    Not as much.
22     Q    But did it happen?

55

6/28/2005 Brunner, Mary

1      A    Of course it happened because there were
2  occasions when once in a while we would get a D3 level
3  referee.  Now it's happening all the time.
4      Q    Is that because of conduct by Barbara
5  Wakefield?
6      A    Could be, but generally it's happening because
7  of the way this regime is running the USTU.
8      Q    You don't believe this regime is running the
9  USTU properly?
10     A    When the membership has decreased in the
11  numbers that it has, the number of competitors having
12  decreased in the numbers that they have, specifically in
13  2003 there were about 5,000 competitors at the juniors,
14  about -- those were approximate figures -- 1500
15  competitors at the seniors, then in 2004 the same
16  tournaments are approximately half, U.S. Open was 1500
17  approximately in the year 2003 and about half of that in
18  2004, and I understand that this year at the U.S. Open
19  there were even less.  So those figures are available
20  readily through the USTU they're not my perception,
21  those are facts.
22     Q    I understand the numbers are less.  But you

56

1  believe this regime is not running the USTU properly?

2      A   Well, I'm going say that if they were running

3  it better than the regime before those numbers would

4  have increased.  At least that's what my perception

5  would be on the data.  But that's not the case.  So my

6  perception and my conclusion would be that apparently

7  they're doing half the job the previous this regime was

8  doing because we have half of the numbers and we have

9  less qualified referees.

10     Q   Okay.  Prior to January of 2004 was it your

11 view that the national origin of competitors and

12 referees at high level matches affected who was declared

13 the winner of the matches?

14     A   Repeat the question.

15     Q   Prior to January of 2004 was it your view that

16 the national origin of competitors and referees affected

17 who was declared the winner of high level matches?

18     MR. JONES:  Objection, vague.

19     THE WITNESS:  As I stated before, my perception was

20 based on the facts of the individual match that I was

21 observing, not particularly who was refereeing, who was

22 judging or who the competitors were.  My perceptions

1  were drawn on what I saw going on in the ring.

2      MR. LEVINSTEIN:  Q  But didn't you tell people that

3  you believed that Korean-American referees were favoring

4  Korean-American --

5      MR. JONES:  Objection, misstates the testimony.

6      THE WITNESS:  I believe I stated before that I

7  didn't recall making that statement.  I still don't

8  recall making that statement.

9      MR. LEVINSTEIN:  Q  Was there discrimination in your

10 opinion in who was selected to hold volunteer leadership

11 positions in the USTU?

12     A   I don't know what a volunteer position is.

13     Q   Do you understand that referee positions are

14 volunteer positions?

15     A   Well, they're really not.  There's a selection

16 process for that.  You can't just show up and referee.

17     Q   I know.  By I mean volunteer not paid.

18     A   They are paid.

19     Q   They're paid to referee?

20     A   Yes.

21     Q   Are they paid to hold the positions of chair

22 and vice chair?

1      A   When you're -- I don't know that.  They might

2  be.  I'm not aware of that.  I don't have firsthand

3  knowledge.

4      Q   I didn't think they were, and I was just using

5  the word volunteer to talk about not whether they were

6  hired to be employees of the USTU, but these category of

7  leadership positions, whether it's members of the board,

8  members of the executive committee, referee positions,

9  those sorts of positions.

10     A   I don't have firsthand knowledge of who is paid

11 what or in how they are compensated.

12     Q   Okay.  But you understand that category of

13 positions that people held, management positions --

14     A   I can answer you only to the best of what I

15 know.

16     Q   Was it your understanding there was

17 discrimination, in your opinion, in who was selected to

18 hold those types of positions?

19     MR. JONES:  Objection, vague and ambiguous.

20     MR. LEVINSTEIN:  Q  Prior to January of 2004.

21     A   I don't recall thinking of that, thinking that

22 way.

1      Q   Did you believe prior to January of 2004 that

2  who would get those positions, the referee positions,

3  the board positions, the executive committee positions

4  in the USTU was affected by friendships and who people

5  knew rather than based on merit?

6      A   You're talking about the vice chair referee

7  chair and the vice chair positions, is that what you're

8  asking?

9      Q   Those kind of positions that you were aware of.

10     A   They had to be.  The referee chair selected his

11 own group so it had to be.

12     Q   Did he make those selections based on merit and

13 based on friendships?

14     A   I can't tell you how anybody was thinking.  I

15 know how I would think had I been in that position, but

16 those were selected positions, appointed positions.

17     Q   But did you believe that they were appointed

18 unfairly some of those people?

19     A   I can't tell you that.  I wasn't in the

20 position to appoint them.

21     Q   Did you observe problems, in your view, about

22 how these people were selected?

1   A   They were appointed positions so how could
2   there be a problem because the person who appointed them
3   was making the selection.
4   Q   Prior to the Remediation Agreement in January
5   of 2004, did you believe that there had been
6   discrimination against you by individuals of
7   Korean-American descent?
8   A   I don't believe I ever stated that.
9   Q   I didn't ask whether you stated it.  I asked
10  whether you believed that.
11  A   I don't believe I ever voiced that opinion, nor
12  did I have that opinion.
13  Q   You don't believe you were discriminated
14  against because you were a woman prior to January of
15  2004?
16  A   That's a different question.
17  Q   Okay.  Prior to the remediation agreement in
18  January of 2004, had there been discrimination against
19  you because you were a woman in the USTU?
20  A   I don't have firsthand knowledge of that.
21  Q   Did you believe that?
22  A   I don't think I ever made an opinion of that.

1   Q   Never expressed that view?
2   A   I don't recall it.
3   Q   And never held that view?
4   A   I might have held that view.  Worldwide, it's a
5   big world.
6   Q   I'm not focusing on worldwide.  I'm focusing on
7   the USTU.
8   A   But I referee worldwide.
9   Q   I'm talking about the USTU.  Did you have an
10  opinion that the people within the USTU discriminated
11  against you because you were a woman?
12  A   I don't believe because of my gender.  I don't
13  believe that I had that opinion, I don't believe so.
14  Q   Do you believe --
15  MR. JONES:  Excuse me, Counsel.  Can we take a
16  break?  We've been going an hour.
17  MR. LEVINSTEIN:  Sure.  By the way, anytime you want
18  to take a break, we'll take a break.
19  THE VIDEOGRAPHER:  We're going off the record at
20  10:15 a.m.
21  (Off the record)
22  THE VIDEOGRAPHER:  We're back on the record.  The

1   time is 10:20 a.m.
2   MR. LEVINSTEIN:  Q  Ms. Brunner, when you met with
3   Mr. Jones and Mr. Lee yesterday, did you look at any
4   documents besides your declaration and the subpoena?
5   A   The document that you sent me.
6   Q   Did you discuss or talk about any other
7   documents?
8   A   No, not that I recall.
9   Q   Did you show him or bring any other documents
10  that you had?
11  A   No.
12  Q   Prior to January of 2004, was it your view that
13  there had been discrimination against you in connection
14  with your refereeing because you were Hispanic?
15  A   Prior to, no.
16  Q   Since January of 2004 do you believe you have
17  been discriminated against because you are Hispanic?
18  A   Yes.
19  Q   By whom?
20  A   By the people that make the decisions for
21  referees.
22  Q   Is that Barbara Wakefield?

1   A   It's my understanding it's Bob Gambardella and
2   I don't know who else he chose to take counsel from.
3   Q   Prior to January of 2004, in your capacity as a
4   referee, was any improper or abusive conduct directed at
5   you?
6   MR. JONES:  Objection, vague.
7   THE WITNESS:  Abusive.  What does that mean,
8   somebody hit me?
9   MR. LEVINSTEIN:  Q  I don't know.  When you were
10  refereeing was it your view that there had been
11  situations in which people had been improper and abusive
12  towards you?
13  A   Which people?
14  Q   Anyone in your capacity when you were a
15  referee.
16  A   Somebody threw a chair in our ring once.  I saw
17  bottles flying into the rings, several rings, some in my
18  proximity.  I don't believe that they were directed at
19  me.  I saw tables flipped at the tournaments where I
20  officiated it.  I saw several coaches throw chairs.  I
21  saw Mark Williams get in a -- try to stop a tussle in
22  San Antonio several years ago which somebody pushed him

6/28/2005 Brunner, Mary

```
1    backwards, he grabbed one of the people who was in the
2    stands and ripped her dress off, that was on camera.
3    And we had several people that were injured and passed
4    out at tournaments.  One person died at San Antonio.
5    Those types of things, I don't know.  That's why I said
6    your question is a little vague.
7        Q    The question is directed at you.  That was in
8    every question.  Was there any abusive or improper
9    conduct directed at you at tournaments besides these
10   random things that were thrown in the ring?
11       A    I don't know because if someone threw something
12   in the ring, there's no way to tell if it was directed
13   toward me or towards the match or towards the judges or
14   towards what had happened in the match up to that point.
15   That's impossible to know.
16       Q    Did you believe that any group of people, for
17   example, Korean-American instructors had directed
18   improper or abusive conduct at you?
19       A    When was this?
20       Q    Prior to January of 2004.
21       A    I don't recall that.  Not to say it didn't
22   happen.  I personally don't recall it.  So if there were
```

65

6/28/2005 Brunner, Mary

```
1    abuses behind the scenes there would be no way for me to
2    know that.
3        Q    But you're not aware of any improper abusive
4    conduct by Korean-American instructors directed at you
5    openly in front of you?
6        A    I don't recall that.  Other than in the course
7    of questioning decisions in the ring which is normal
8    procedure, but then I don't -- I don't know if that's
9    what your question is.  It's hard to answer.
10       Q    You didn't think that was improper or abusive?
11       A    That's very generally what happens in the
12   course of a tournament, even though the verbiage used
13   might not be acceptable on the street or in everyday
14   business language, it is generally accepted behavior in
15   a tournament environment.
16       Q    So you never complained that Korean-American
17   instructors directed improper abusive conduct toward
18   you?
19       MR. JONES:  Objection, vague.
20            You mean Korean-American instructors?
21       MR. LEVINSTEIN:  Q  Yes.  Or coaches or whatever you
22   call the people who were with the athlete.
```

66

6/28/2005 Brunner, Mary

```
1        A    I don't remember that being the case.
2        Q    Prior to the Remediation Plan in January of
3    2004, focusing on referee positions, was it your view
4    that certain people were in line for positions?
5        A    I want to restate.  I don't know what the
6    remediation plan was.  I don't know the details of it.
7    I wasn't privy to it.
8        Q    I just gave a date --
9        A    So I don't want to go record to say I have any
10   knowledge about that document or that procedure or that
11   process because I didn't, I don't, and I don't intend to
12   have any knowledge about it.  It's not my business.
13       MR. JONES:  Also could I pose an objection to the
14   vague and ambiguous as to in line to certain positions.
15       MR. LEVINSTEIN:  Q  Prior to January of 2004 was it
16   your view that certain people in the referee ranks were
17   in line for certain positions?
18       A    My general perception had always been that the
19   most qualified, the people with the most seniority for
20   the appropriate positions would be the ones selected.
21   That's the way as I understand tae kwon do has been run
22   for thousands of years.  I could have expected no
```

67

6/28/2005 Brunner, Mary

```
1    different or nothing to change in the last ten years
2    that would change that perception, that's martial arts,
3    specifically tae kwon do.  Seniority and rank have a lot
4    it say in how things are done.
5        Q    So it was your view that by virtue of their
6    rank or seniority certain people are supposed to be
7    selected --
8        A    Should have been and experience I said.
9        Q    Even if someone thought they weren't the best?
10       MR. JONES:  Objection.
11       MR. LEVINSTEIN:  Q  Rank and seniority should be
12   taken into position?
13       A    Sorry.
14       Q    Even if someone's view was they were not the
15   best people for the job because of their rank or
16   seniority and their experience, your view was they were
17   supposed to be selected for those positions?
18       MR. JONES:  Objection, vague and ambiguous.
19       THE WITNESS:  I don't believe that's what I said.
20       MR. LEVINSTEIN:  Q  How did people view's peoples on
21   their merit come into this rank and seniority of
22   experience formula?
```

68

1    A    How did people's view, I don't know other

2    people's views.

3    Q    If someone is making the decision on who to

4    select, and they believe one person has a lot of merit,

5    personal skills, management skills, whatever skills, was

6    it your view they were supposed to select the people

7    they thought were the best for the position or take into

8    account rank, seniority and experience?

9    A    I can't tell you what went in their mind. I

10    wasn't privy to that selection process.

11    Q    But what was your view about the way it should

12    run?

13    A    The way I would have done it would be -- would

14    have been based on experience, on rank, on seniority,

15    management skills, business skills, people skills,

16    that's how I would have based my decision.

17    Q    As of the end of 2003 was someone in particular

18    in line to be the referee chair?

19    A    I don't know. I wasn't privy to that

20    information. I wasn't part of that process.

21    Q    Did you have a view based on your involvement

22    in refereeing that there was a person who was in line at

1    the end of 2003 to be the referee chair?

2    A    As I just stated I was not part of that

3    process, it was an appointed position. There would be

4    no way I would have knowledge of that.

5    Q    What was your view of Mr. Sang Lee and his

6    leadership of the USTU prior to January of 2004?

7    A    Can you be more specific?

8    Q    No. Did you have a view about whether he had

9    done a good job as the person running the USTU?

10    A    Good job, in respect to what?

11    Q    You identified the problems, administrative,

12    problems, management problems, operational problems. He

13    was the head of the USTU?

14    A    He was the president.

15    Q    He had been the president for a long time?

16    A    Several years.

17    Q    12 years?

18    A    I don't know.

19    Q    Okay. Was it your view that he was responsible

20    for a lot of the problems the organization had?

21    A    He was the president and I would assume the

22    buck stopped there.

1    Q    Did you support him in his leadership?

2    A    There was no reason for me to support or not

3    support him. I would assume that those people who were

4    members were supporting by actions -- by their action of

5    being a member.

6    Q    And you were a member.

7    A    Yes.

8    Q    What is your view of Gene Lopez and his

9    performance and success as a coach?

10    A    He's awesome.

11    Q    Did you believe prior to 2004 gene Lopez had

12    not been given fair consideration for USTU coaching

13    positions?

14    A    Yes.

15    Q    And why do you think he was not given fair

16    consideration?

17    A    He was -- I believe part of it had to do with

18    him being Hispanic and part of it had to do that he was

19    not liked by certain people.

20    Q    Who in particular?

21    A    Well, I know Barbara did not like him. She

22    started a petition to get him ousted.

1    Q    Did Barbara Wakefield have any role in deciding

2    who would be the national coaches?

3    A    I don't know that. I was not part of that

4    process. I have no information firsthand of any of

5    that.

6    Q    Besides Barbara Wakefield were there others

7    that you thought didn't like Gene Lopez?

8    A    Don't have firsthand knowledge.

9    Q    You said you thought one of the reasons Gene

10    Lopez had not been first given fair consideration for a

11    USTU coaching position was because he was Hispanic?

12    A    I did not say that. I said that was my

13    impression.

14    Q    Was it because he was Hispanic or because he

15    was not Korean-American in your impression?

16    A    I believe I said Hispanic.

17    Q    But was it your view that anyone who was not

18    Korean-American had a difficulty getting fair treatment

19    for USTU coaching positions?

20    MR. JONES: Objection, misstating the testimony.

21    THE WITNESS: I did not say that. I repeated it I

22    believe three times. You asked me a specific about Gene

1  Lopez and I replied about Gene Lopez.
2      MR. LEVINSTEIN:  Q  I understand.
3      A    Thank you.
4      Q    I understand he was Hispanic.
5      A    Yes.  Is.
6      Q    Is Hispanic.
7      Did you view that it would be a problem for
8  Korean-American referees to work for or report to a
9  woman referee chair?
10     A    Probably.  You mean if they were selected?
11     Q    If a woman was selected to be the woman --
12  Strike that.
13     If a woman was selected to be the referee
14  chair, was it your view that there would be unhappiness
15  among Korean-American referees to have a woman as the
16  chair?
17     MR. JONES:  Objection, vague.
18     THE WITNESS:  I can only answer it as vaguely as
19  you're asking it, and, that is, that generally there
20  were no women in the United States qualified -- with the
21  referee credentials qualified to hold that position.
22     MR. LEVINSTEIN:  Q  Well, let's change it then just

1  to a non-Korean-American.  In your view would it be a
2  problem for Korean-American referees to work for or
3  report to a non-Korean-American referee chair?
4      A    I don't believe that would be the case.
5      Q    In January of 2004 did you believe that having
6  a non-Korean-American referee chair might cause
7  Korean-American referees to stop refereeing?
8      A    As I just stated, we had no one, have no one
9  that is female that is at the level required to hold
10  that kind of respect from the other referees.
11     Q    Did my question have the word female it?
12     A    You said woman.
13     Q    Did I say woman in this question?
14     MR. JONES:  I don't think.
15     MR. LEVINSTEIN:  I don't think I did.  Let me try it
16  again.  I said non-Korean-American.
17     Q    So let's -- was it your view in January of 2004
18  that if a non-Korean-American was chosen to be the
19  referee chair that that was likely to cause
20  Korean-American referees not to want to continue to be
21  referees?
22     MR. JONES:  Objection, vague.

1      THE WITNESS:  I believe I answered that.
2      MR. LEVINSTEIN:  Q  Could you indulge me, answer
3  again.
4      A    I said I did not believe that would be the
5  case.
6      Can you have her read back if I did answer that
7  previous?
8      Q    It's okay.
9      A    For my own knowledge, I would like --
10     Q    That is a different question.  It was a little
11  different.  I just asked it a second time.
12     A    Because you seem to take offense at that, and
13  if I misunderstood, I'd like to know that to make sure I
14  am listening properly.
15     Q    If you want you can read the question back
16  for --
17     A    Both questions, the one previous and the last
18  one.
19     Q    If you would make her feel better I think you
20  should do that.
21     (Question read)
22     Q    Your answer was about women and my question

1  wasn't about women.
2      A    The second time, not the first time.
3      Q    Prior to January of 2004 are you aware of any
4  situation involving referee education or referee
5  training at which there was segregation of instructors
6  or referees of Korean-American heritage?
7      A    Yes.
8      Q    Can you tell me about that situation?
9      A    Several situations.
10     Q    Why was that done?
11     A    I don't know.  I was not part of that process
12  or decision making.
13     Q    Were you present when that happened?
14     A    When the decision was made?
15     Q    When they were segregated?
16     A    I was present at the event at which segregation
17  occurred, yes.
18     Q    And did you have a view that that was improper?
19     A    Yes.
20     Q    And can you tell me was it one time this
21  happened or did it happen a number of times?
22     A    Number of times.

1    Q   Who was in charge who caused that to occur?

2    A   Whoever happened to be in charge at that

3  particular point in time for that particular event for

4  that particular association and/or organization.

5    Q   Did you believe it appropriate when that

6  occurred?

7    A   I just stated, no.

8    Q   Did you try to do something about it?

9    A   Nothing I could do.  That was not my position

10  to do that.

11    Q   Are you aware of any situation which

12  Korean-Americans were treated differently concerning

13  referee certification than referees who were not

14  Korean-American?

15    A   Yes, I just stated that.

16    Q   That was segregation of the people, I'm --

17    A   You said treated differently.

18    Q   Concerning their certification.

19    A   Then it probably would be an easier process if

20  you were a little more specific on your questions.

21    Q   I'm trying.  I'm trying.

22    A   I'm trying to answer but you're taking offense

77

1    A   Generally.

2    Q   So the certification, you mean the actual

3  receiving of the certificate?

4    A   No.  Certification means actually getting

5  certified and/or promoted and/or upgraded in your

6  referee status.

7    Q   And did you have to attend the seminars in

8  order to get upgraded in status?

9    A   That was part of the process, yes.

10    Q   And were there situations in which in your

11  experience prior to 2004 certain people who were

12  Korean-Americans were promoted more quickly than the

13  rules allowed?

14    MR. JONES:  Objection, vague.

15    THE WITNESS:  That situation occurred without race

16  being taken into consideration.

17    MR. LEVINSTEIN:  Q  Well, were you aware of a -- of

18  any situation in which there was discrimination in an

19  effort to artificially increase the number of

20  Korean-American referees?

21    MR. JONES:  Objection, vague.

22    THE WITNESS:  That is an impossible question to

79

1  or exception with my answers, and I can only answer a

2  vague question with maybe nebulous answers.  That's why

3  I keep asking for more clarification on the questions so

4  that there is no nebulous answer.

5    Q   Focusing on referee certification.

6    A   Yes, sir.

7    Q   Prior to 2004.

8    A   What level of referee certification?

9    Q   Well, were there referee certification programs

10  in Illinois?

11    A   Yes.

12    Q   Were you involved in those?

13    A   How do you mean?

14    Q   Did you attend meetings at which referees were

15  trained and received certification based on their

16  performance at training sessions?

17    A   It wasn't done that way.  The certification

18  followed the seminar.

19    Q   Was there a test given?

20    A   Sometimes.

21    Q   But in general by attending the seminar you

22  later received a certificate?

78

1  answer.  You need to be a little more specific, please.

2    MR. LEVINSTEIN:  Q  Are you aware of any referee

3  seminars to which only Korean-Americans were invited

4  prior to January of 2004?

5    MR. JONES:  Objection, calls for speculation.

6    THE WITNESS:  I was not in attendance of -- at any

7  of those, and I was not part of the process or decision

8  making in allowing those to occur, if they did occur.

9    MR. LEVINSTEIN:  Q  Is it your understanding they

10  did or did not occur?

11    A   I do not know.  I was not part of that process.

12    Q   I'm going to give you what's been marked as

13  brunner Exhibit 3, and I apologize because the second

14  page -- it's the best copy I had when I got ready --

15  it's hard to read some of the language on the second

16  page.  I ask if you've seen that document before.

17    (Document marked as Exhibit 3)

18    A   Yes, I've seen maybe not this document, but

19  something similar.

20    Q   Can you tell me who signed it?  Do you know who

21  this letter was written by?

22    A   I can't read that.  Somebody Williams.

80

1  Millmer. I can't read --

2      Q    Lori Millmer. Is that a Lori. I'm guessing?

3      A    I don't know. I can't read it. I can't read

4  half the page.

5      Q    Let's focus on the first page.

6           In March of 2004 was there an Illinois referee

7  seminar held at the school of Day-Inn Kim in Palatine,

8  Illinois?

9      A    Palatine, yes.

10     Q    Did you teach at that seminar?

11     A    I was assisting someone that was teaching.

12     Q    Let me speed this up. I'll read you what the

13  letter says as I read it, you can tell me if that's

14  correct or not correct.

15     A    I can read it.

16     Q    But for the record so we know what you're being

17  asked about. The letter from this person says,

18  concerning race discrimination, and it's a letter to Jim

19  Scherr.

20          Do you know who Jim Scherr is?

21     A    No.

22     Q    Were you aware that Jim Scherr was the acting

1  upgraded one level, but let's move on.

2           Was this a seminar in 2003?

3      A    Are we still reading from the letter?

4      Q    Before we read from it -- it says March. Was

5  this held in 2003 or 2004, do you know?

6      A    I would assume since the letter is written in

7  April that it was probably in reference to the seminar

8  held in March.

9      Q    My only concern is the paragraph says my

10  upgrade and certification arrived in January.

11     A    Probably 2005. I don't know.

12     Q    This letter is dated April 12th of 2004.

13     A    I didn't write the letter, sir.

14     Q    So I'm -- you don't remember if the seminar was

15  in 2003 or 2004?

16     A    All right. Maybe we can call Ms. Williams.

17     Q    Maybe you can tell me.

18     A    I did not write this letter.

19     Q    I know. But you went to the seminar at the

20  Day-Inn Kim school at Palatine in Illinois?

21     A    Yes, I did.

22     Q    Do you remember if that was 2004 or 2003?

1  chief executive officer of the United States Olympic

2  Committee?

3      A    I just stated I don't know who he is. Don't

4  get involved at that level.

5      Q    First sentence says, the following instance of

6  racial discrimination should be immediately rectified.

7  Next paragraph says, I attended the March, Illinois

8  referee seminar held at the school of Day-Inn Kim in

9  Palatine, Illinois. This seminar was taught by Mary

10  brunner and also attended by Chang Kil Kim the senior

11  vice chair for the USTU Referee Committee.

12          Is that consistent with your recollection?

13     A    Yes. But I was not the assigned instructor.

14  That's what I tried to clarify to you before. The

15  assigned instructor was Chang Kil Kim. I was assisting

16  him.

17     Q    Okay.

18     A    The perception is their perception.

19     Q    So you did teach at the seminar but --

20     A    I assisted Chang Kil Kim in teaching.

21     Q    The person writing the letter says her upgrade

22  and certification arrived in January and she was only

1      A    Actually I don't. The last one that I attended

2  was in the same timeframe as Chang Kil Kim, the senior

3  vice chair for the USTU Referee Committee. Again those

4  documents have to be on file with the USTU.

5      Q    But you don't remember whether it was in 2003

6  or 2004?

7      A    I don't recall at this time.

8      Q    Okay. It says during the seminar all of the

9  Caucasian referees, coaches and parents were directed to

10  one room of the school and all of the instructors of

11  Korean descent were directed to another room, is that

12  true?

13     A    Yes.

14     Q    It says, none of the Korean attendees have ever

15  refereed any sanctioned USTU tournament as a certified

16  USTU referee and had never before attended an official

17  USTU certification seminar, nor did they have any

18  referee rating prior to this seminar.

19          Do you know if that was correct?

20     A    I do not know. That information came from who

21  was writing this letter.

22     Q    Then it says Bill Cho, the Illinois Tae Kwon Do

1   Association President, gave a brief address to us prior
2   to the start of this seminar.
3       Q   Do you recall that?  Is that correct?
4       A   Yes.
5       Q   And then it says, when we asked Bill Cho, the
6   Illinois State Tae Kwon Do President, why there were
7   separate rooms for the same seminar, we were told that
8   they had a language problem.
9       Did you hear Mr. Cho say that?
10      A   Yes.
11      Q   It then says, when one of the referees pointed
12  out that the seminars were supposed to be conducted in
13  English and all attendees should speak or understand
14  English, the referee was told to be quiet by Bill Cho.
15      Do you recall that exchange?
16      A   I believe that occurred, maybe not in that
17  exact verbiage, but I believe the situation occurred.
18      Q   Do you agree that the seminars were supposed to
19  be conducted in English?
20      A   That's by stipulation in the bylaws.
21      Q   So that is a requirement?
22      A   Yes.

1       A   Top.
2       Q   It's the highest level of referee
3   certification?
4       A   For what?
5       Q   I don't know.  Is there anything above A-1
6   level?
7       A   I don't know what the question refers to.
8       Q   I asked about A-1 level.  You said it's the
9   top.
10      A   Sir, there are hundreds, maybe thousands of
11  organizations within the world.  You need to be a little
12  more specific.
13      Q   Then you tell me what is A-1 level?
14      A   Within what parameters?
15      Q   I'm not trying to mislead you or confuse.
16  You're the one who knows about all these terms.  It's a
17  term that you are familiar with.  I'm asking you -- if
18  you can't tell me what it means, that's okay.  I'm just
19  trying to ask you to explain to me what an A-1 level
20  means.
21      A   I can tell you what it means in several
22  different aspects, but you're asking a very nebulous

1       Q   And along with that it was basically a
2   requirement that in order to attend the seminar you had
3   to speak or understand English since the seminar was
4   going to be conducted in English?
5       A   I thought I just answered that.
6       Q   I'm just taking it one line at a time making
7   sure we're on the same page.
8       It says, at the conclusion of the seminar Mary
9   Brunner attempted to log the Korean applications on the
10  log sheets.
11      Is that correct?
12      A   Yes.
13      Q   Then it says, Bill Cho literally grabbed the
14  applications out of her hand and stated loud enough for
15  us to hear that he would be handling the Korean
16  applications personally.
17      Did that occur?
18      A   Yes.
19      Q   It then says, it is my understanding that all
20  of the Korean attendees were upgraded right away to A-1
21  level.
22      First, what is A-1 level?

1   question.  So I am trying to get you to ask me a
2   specific question so I can give you a specific answer.
3   I am also not trying to be evasive, except that I can
4   answer this question for three hours.  I don't think you
5   want that.
6       Q   Do you know what A-1 level meant in the context
7   of this seminar in Illinois?
8       A   Yes.  It's the highest level rank for the USTU
9   certification process for the referee committee.
10      Q   Is that what you meant?
11      A   Yes.
12      Q   Thank you.
13      Q   It says in the letter again, it is my
14  understanding that all of the Korean attendees were
15  upgraded right away to A-1 level.
16      Is that your understanding?
17      A   This is coming from this person.
18      Q   I know.
19      A   All right.  You need to ask her.
20      Q   You don't know the answer to that, whether that
21  happened or not?
22      A   I don't know whether that actually happened or

```
 1    not.  I know that Bill Cho told me that he was going to
 2    upgrade them to a higher level.
 3       Q.  I know.  Was that contrary to the rules?
 4       A.  Yes.
 5       Q   It then says, several of us have talked with
 6    and complained to Mary Brunner, the Illinois referee
 7    chair.  So let me just ask.  At the time of this seminar
 8    were you the Illinois referee chair?
 9       A.  No.
10       Q   So she's mistaken when she describes you as
11    that?
12       A.  Yes.
13       Q   But did several of the people in attendance at
14    the seminar talk with and complain to you about what had
15    happened?
16       A.  Yes.
17       Q   Did you tell them that you had been told by
18    Bill Cho several weeks prior to the seminar that Bill
19    Cho would provide all of the referees for the tournament
20    from his organization and that they would be A-1
21    certified from the State of Illinois?
22       A.  Yes.  I didn't tell them.
```

```
 1       Q   Had Bill Cho said that to you?
 2       A.  Yes.
 3       Q   Did you tell the people who complained to you
 4    that Bill Cho had said that?
 5       A.  Some of them, yes.
 6       Q   It then says, Mary Brunner further advised Bill
 7    Cho that the referees needed to be from any and all
 8    schools or organizations and USTU certified in order to
 9    conduct a fair state tournament.
10           Is that correct?
11       A.  Yes.
12       Q   It says Ms. Brunner also told him --
13       A.  I believe I said that to him at the seminar.
14       Q   Okay.  It says, Ms. Brunner also told him,
15    referring to Mr. Cho, that since she had been Illinois
16    referee chair for several years, she was aware of all of
17    the A-1 certified referees in the State and that there
18    were only about five, and none of them was active.
19           So you had not been Illinois referee chair for
20    several years, is that correct?
21       A.  No.
22       Q   So let's take that part out of what she
```

```
 1    thought.
 2       A   I don't know what she thought, sir.
 3       Q   I understand.
 4       A   I cannot speak for someone that wrote this
 5    letter.  I cannot speak for someone that is not here.
 6       Q   I'm not asking you to speak for her.  I'm
 7    asking did you tell Mr. Cho that you were aware of all
 8    of the A-1 certified referees in the State of Illinois?
 9       A.  Yes.
10       Q   And did you tell him that there were only about
11    five and none of them were active referees?
12       A.  I don't recall the number.  I don't believe I
13    stated a number.
14       Q   Do you recall that there weren't enough to
15    staff the tournament?
16       A.  Absolutely.
17       Q   Did you tell him that?
18       A.  Yes.
19       Q   Did Mr. Cho tell you that the referees were
20    certified in Korea?
21       A.  Yes.
22       Q   Did you tell Mr. Cho this did not qualify them
```

```
 1    to referee in USTU events?
 2       A.  Yes.
 3       Q   Did you tell Mr. Cho they would have to go
 4    through the USTU referee certification process just like
 5    everyone else?
 6       A.  I believe I would have said they should go
 7    through the process like everyone else.
 8       Q   Do you believe that was done?
 9       A   I don't know what the final result was of the
10    upgrades.  I only know what he told me.  I cannot state
11    what the final upgrades were.  I am not part of that
12    process.
13       Q   It says, Bill Cho scheduled another referee
14    seminar in June or July and invited only Koreans, once
15    again and with the intention of upgrading still another
16    group of Koreans above the level of the Caucasians.
17           Do you think that's correct?  Is that your
18    understanding?
19       MR. JONES:  Objection, calls for speculation.
20       THE WITNESS:  I don't know what Bill Cho did or
21    didn't do.  I wasn't privy to his thinking process, nor
22    was I a part of the process that involved anything to do
```

1  with the Illinois State Association.

2      MR. LEVINSTEIN:  Q  Okay.  It then says, this

3  referee seminar was scheduled when it was announced that

4  Sang Chul Lee would be ousted from the USTU and they

5  needed to hurry to get this done while his regime was

6  still in power.

7      Did you hear discussions about a hurry to get

8  referees certified before Mr. Sang Lee's regime was out

9  of power?

10     A   No.

11     Q   It says, Ms. Brunner had previously attempted

12  to get some of our Illinois referees double upgraded to

13  rectify previous upgrade errors.

14     Had that occurred?

15     A   Yes.

16     Q   It says, she, meaning you, were told by Eui Bin

17  Lee that he would never authorize more than a one level

18  upgrade and only once per year.

19     Is that correct?

20     A   That's what he said to me, however, he

21  apparently had exceptions for people -- other people

22  because he did it for others, just not for me.

93

1      Q   And was it your view that it had to do with

2  whether they were Korean-Americans, whether they got the

3  double upgrade?

4      MR. JONES:  Objection, calls for speculation.

5      THE WITNESS:  In fact, the knowledge that I have it

6  was -- no, that's not the case.

7      MR. LEVINSTEIN:  Q  Okay.  But in your view

8  different people were treated differently as far as the

9  upgrading process?

10     MR. JONES:  Objection, vague.

11     THE WITNESS:  I don't know.  I wasn't part of the

12  process there.

13     MR. LEVINSTEIN:  Q  Okay.  He told you that you

14  couldn't do double upgrades?

15     A   That's exactly right.

16     Q   But your understanding is he did it for other

17  people?

18     A   Speculation.  I don't know, in fact, if it

19  happened.  I wasn't part of the process or the

20  management group.

21     Q   But you -- it's your understanding that it

22  happened, you were told that?

94

1      A   I was not a part of that process, sir.  I was

2  not part of the management group.  You would probably

3  need to speak to Mr. Lee.

4      Q   Eui Bin Lee?

5      A   Yes.

6      Q   Do you know who the members are of the USTU

7  governance --

8      A   Can you read the last three paragraphs or four

9  paragraphs?

10     Q   I would if I could, but I'm not sure what they

11  say.

12     A   Then how is that done for Bill Cho and his

13  group.  The rest of that I cannot read.

14     Q   I'll do my best job.  It says, then how is it

15  this was done for Bill Cho and his group.  Then I

16  believe it says, the Korean attendees should be upgraded

17  like we have been only one level, dash between, have

18  been and only one level.

19     And then if there are -- if there is any,

20  something, attendee who attended either of the two

21  referee seminars that I outlined above, March or

22  June/July that is now higher than a D-3 they need to be

95

1  immediately downgraded to D-3 level prior to the

2  Illinois State Championship scheduled for April.

3      A   So apparently this person also didn't know if,

4  in fact, that had been done.

5      Q   They understood it happened and they were

6  asking that if it had happened to reverse it, yes,

7  that's my understanding?

8      A   If it had, yes.

9      Q   Well, all he said was that there was the

10  intention of upgrading them, that it had been scheduled

11  in June or July if you read that paragraph?

12     A   As I believe you asked me if in fact it

13  happened.

14     Q   I just wanted to know if you knew whether it

15  happened, yes.  Then it says, not only is this

16  discriminatory, but it is against the law and something,

17  something class action suit if not immediately

18  rectified, but I would prefer to solve this immediately

19  and amicably through you.  And then please provide me a

20  list of the names of Korean attendees in referee

21  seminars held in Illinois in March and in June and

22  please indicate what their current referee rank is,

96