1    sincerely, a name of someone I'm not sure what the name

2    is 921 Wildwood Court, St. Charles, Illinois, 60174, and

3    it's addressed to Mr. Scheer with copies to Bob

4    Gambardella, Gary Johansen and Bill Wood.

5        A    Were those copies provided by the USTU?

6        Q    I don't know whether they were sought.  I don't

7    if this they were responsive to any question.

8            Do you know who the members are of the USTU

9    Members Governance Committee?

10       A    I don't know what the committee is.  I don't

11   know get involved at that level, don't intend to, not my

12   job.

13       Q    Simple no is okay.

14       A    It's just you asked several times.  The answer

15   is still the same.

16       Q    Have you ever met or spoken with Virginia

17   Witty?

18       A    Virginia who?

19       Q    Virginia Witty.  Let me speed this up.  Let me

20   just give you some names and ask if you know any of

21   these people.

22           Virginia Witty, Rich Bender, Tony Bangiano,

1    Steven Lock, do you know any of those people?

2        A    I may know their faces having been in a

3    tournament, but I don't recognize any of those names.

4        Q    You did not attend any United States Olympic

5    Committee Membership and Credential Committee Meetings

6    about the USTU during 2003?

7        A    I don't believe so.  Where were they held?

8        Q    You would have known if you attended it.  They

9    were opening meetings to discuss whether the USTU was in

10   compliance with its obligations of the National

11   Governing Body?

12       A    Don't know anything about compliance, don't

13   know anything about remediation, doesn't know anything

14   about that process, nor do I wish to know.

15       Q    Have you ever been terminated or dismissed from

16   any position with the tae kwon do organization?

17       A    Yes.  I stated to you before USTW, briefly I

18   was assigned as the referee chair.

19       Q    How did you end being the referee chair?

20       A    I refused to give them permission to print my

21   referee manual.

22       Q    Did they terminate you as a result of that?

1        A    Yes.

2        Q    Prior to 2004 are you aware of any situation in

3    which someone held the position as referee chair and was

4    forced out of the position by President Sang Lee?

5        A    I don't remember anything like that.

6        Q    Have you ever been present at any meetings or a

7    referee business situation in which Korean was spoken

8    and you thought that was inappropriate, the meeting was

9    conducted in Korean or people were --

10       A    There's about five questions there.

11       Q    Let's start again.

12           Have you been present at meetings or referee

13   business situations in which Korean was spoken?

14       A    Yes.

15       Q    Have you been present in those situations where

16   you believed Korean was being spoken in order that the

17   non-Korean-Americans present wouldn't understand what

18   was being said?

19       A    I can't speak for why they did that.

20       Q    Were you in any meeting like that where you

21   objected to discussions being held in Korean when you

22   couldn't understand Korean?

1        A    Yes.

2        Q    And did it happen a lot or can you remember

3    specific instances?

4        MR. JONES:  Objection, vague.

5        THE WITNESS:  Can you be more specific, please?

6        MR. LEVINSTEIN:  Q  You have a recollection of

7    meetings in which Korean was spoken and you objected.

8        A    Meeting, singular.

9        Q    Meeting, okay.  That's what I wanted to know.

10   It happened one time.  You objected one time?

11       A    Rephrase your question.

12       Q    Meeting.

13       A    Yes.

14       Q    There was a meeting only once where Korean was

15   spoken and you objected?

16       A    That wasn't your first question.

17       Q    I'm sorry.  Let me try again.  I'm not trying

18   to be difficult.

19       A    Neither am I, but I want to be sure I'm

20   answering correctly.

21       Q    You said you were present at meetings, plural,

22   in which Korean was spoken.

1     A     Correct.

2     Q     How many meetings were you at in which Korean

3     was spoken and you objected?

4     A     One.

5     Q     Okay.  When was that meeting?

6     A     Several years ago.

7     Q     What was the -- where was the meeting?

8     A     I don't recall.

9     Q     What was the subject of the meeting?

10    A     Refereeing, credentials, certification,

11    seminar, upgrade, refreshing.

12    Q     Was it the meeting referred to by the letter we

13    just looked at?

14    A     No.

15    Q     Okay.  But it was a meeting about referee

16    certification?

17    A     Referee seminars are about all of those things

18    I just mentioned by nature of the beast.

19    Q     Okay.  And who was it who was speaking Korean,

20    if you recall?

21    A     All of the Koreans.

22    Q     Was there someone running that meeting who

1     was --

2     A     Yes.

3     Q     Do you remember who that was?

4     A     Whoever the referee chair happened to be at

5     that particular point in time for that particular

6     tournament for that particular organization.  It was an

7     international tournament.

8     Q     You don't remember who the person was?

9     A     Whoever the referee chair was from the WTF.

10    Q     You said there was a situation in which Barbara

11    Wakefield had treated Gene Lopez unfairly?

12    MR. JONES:  Objection, misstates the testimony.

13    MR. LEVINSTEIN:  Q  Was there a situation in which

14    you thought Barbara Wakefield was taking some action

15    versus Gene Lopez that was inappropriate?

16    A     Yes.

17    Q     When did that happen?

18    A     One situation was at the team trials a couple

19    of years ago.

20    Q     Do you remember what year that was?

21    A     No, I don't.

22    Q     What happened?

1     A     Barbara Wakefield approached me while I was

2     corner judging during a match while the tournament was

3     in process and asked me to sign a petition requesting

4     that Gene Lopez be sanctioned as a coach.

5     Q     What was the reason she gave for either in the

6     petition or orally as to why Gene Lopez should be

7     sanctioned?

8     A     She referred to an instance where a bottle was

9     thrown, bounced off the floor while she was in the ring.

10    Q     Thrown by whom?

11    A     Gene Lopez.

12    Q     And did you sign the petition?

13    A     No.

14    Q     Did you think the petition was inappropriate?

15    A     Absolutely.

16    Q     And did you complain to anyone about the

17    petition?

18    A     To her.

19    Q     To anyone else?

20    A     Could be.  I don't recall exactly who.

21    Q     Did you send any letter to anyone about that?

22    A     Yes.

1     Q     And to whom did you write?

2     A     Sang Chu Lee.

3     Q     What did you want Mr. Lee to do?

4     A     I don't recall.  I asked for definition of

5     function and/or decision.  I don't recall exactly what

6     it was in the letter, but basically it was inappropriate

7     behavior, it was unethical during the course of a

8     tournament that would determine Olympic participants,

9     and it was absolutely out of line in character, moral

10    and otherwise.

11    Q     What other complaints did you have over the

12    years about Barbara Wakefield?

13    A     I would call that being about the only one.  I

14    didn't like her not defending Kim Davis.

15    Q     Did you believe she was improperly influenced

16    by other people?

17    MR. JONES:  Objection, vague.

18    THE WITNESS:  When she approached me with the

19    petition to sign I would assume that she had been given

20    directive.

21    MR. LEVINSTEIN:  Q  And did you have someone in

22    particular in mind that --

6/28/2005 Brunner, Mary

```
1        A    No, I did not.
2        Q    Was there someone that you thought that Barbara
3   Wakefield looked to for direction?
4        A    Traditionally a lot of people refer -- give
5   deference to their instructors.
6        Q    Is that person sometimes referred to as their
7   master?
8        A    Yes.
9        Q    Was it your view that Barbara Wakefield gave
10  deference in her position as a referee to her master?
11       A    That's not what I said.  I said traditionally
12  that is what is done.  I cannot speak for her.
13       Q    Did you tell people that you thought her master
14  influenced her?
15       A    I don't recall that, but, as I said, I cannot
16  speak for her.
17       Q    Was her master Korean-American?
18       A    Yes.
19       Q    Who was her master?
20       A    Somebody from Minnesota.  Park.  I don't
21  remember his full name.
22       Q    Was it your view that Ms. Wakefield's actions
```

105

6/28/2005 Brunner, Mary

```
1   against Mr. Lopez or the -- trying to get the petition
2   signed was motivated by someone who had animosity
3   against Mr. Lopez because he was Hispanic?
4        A    I cannot say or speak for her.
5        Q    Was it your view in general that some of the
6   discrimination against Mr. Lopez because he was Hispanic
7   came from the Korean-American tae kwon do community?
8        A    We were speaking about Barbara Wakefield.
9        Q    This is a different question.
10       A    That I don't know.  You have to speak with the
11  Korean-American individuals.
12       THE VIDEOGRAPHER:  Mr. Levinstein, we'll have to
13  change the tape in about 5 minutes.
14       MR. LEVINSTEIN:  Want to wait 5 minutes, take a
15  break now?
16       MR. JONES:  Take a break now.  It's been about an
17  hour.
18       MR. LEVINSTEIN:  Is it okay to change the tape
19  early?
20       THE VIDEOGRAPHER:  This is the end of tape 1 of
21  the deposition of Mary M. Brunner.  The time is 11:06
22  a.m.
```

106

6/28/2005 Brunner, Mary

```
1        (Off the record)
2        THE VIDEOGRAPHER:  This is the beginning of tape
3   number 2 of the deposition of Mary M. Brunner.  The time
4   is 11:15 a.m.
5        MR. LEVINSTEIN:  Q  Did you learn in 2004 that
6   Barbara Wakefield had been appointed the interim referee
7   chair?
8        A    Yes.
9        Q    And how did you learn that?
10       A    Bob Gambardella told me.
11       Q    Was this at the meeting referred to in your
12  declaration?
13       A    Yes.
14       Q    So before the meeting started you didn't know
15  that she had been appointed?
16       A    Not specifically, no.
17       Q    Let me refer to your declaration.  You have one
18  in front of you so let me find my copy.
19            It says on paragraph 4, on or about February 4,
20  2004, while declarant was -- you okay?  I thought you
21  said something.
22       A    No.
```

107

6/28/2005 Brunner, Mary

```
1        Q    Paragraph 4 it says, on or about February 4,
2   2004 while declarant was attending the U.S. Open
3   competition for tae kwon do in Orlando, Florida she did
4   speak with Bob Gambardella the newly appointed chief
5   executive officer for the USTU for approximately 2
6   hours.
7            Was this a meeting that had been set up in
8   advance?
9        A    No.
10       Q    Where did the meeting take place?  I understand
11  it was in Orlando, Florida, but where did you meet with
12  Mr. Gambardella?
13       A    On the floor.
14       Q    What were you doing at that event?
15       A    Refereeing.
16       Q    Were you sitting with him in the stands?
17       A    On the floor.
18       Q    You were standing on the floor where the
19  competition is taking place?
20       A    Sitting on the floor where the tournament was
21  taking place.
22       Q    Sitting on the floor you mean --
```

108

1    A    I was sitting in a chair which was placed on
2    the floor during the course of where the tournament was
3    taking place during for the U.S. Open in Florida.
4    Q    Was anyone else with you and Mr. Gambardella
5    when you spoke with him for 2 hours?
6    A    No.
7    Q    Just the two of you were together for 2 hours
8    with no one else around?
9    A    Approximately 2 hours.  We were alone.  Two or
10   three people came up asked him questions, conversation
11   paused while those people were asked, answered or taken
12   care of and dismissed by Mr. Gambardella and then
13   conversation continued.
14   Q    Do you know any of the other people who came up
15   while you were talking with Mr. Gambardella?
16   A    No.
17   Q    Do you remember them or you just can't remember
18   who they are?
19   A    I didn't know them, nor did I care to know.  It
20   wasn't my business.
21   Q    What was the reason that Mr. Gambardella gave
22   you that Ms. Wakefield had been selected?

1    A    He said she's the only referee that he had come
2    into contact with the USTU and she had been present at a
3    tournament that he was there also in attendance at.  And
4    since he knew her from that tournament he selected her
5    on that basis.  My question to him was why wasn't due
6    diligence followed in selecting somebody who was
7    absolutely qualified for the position.
8    Q    At the U.S. Open did certain referees not want
9    to referee for Ms. Wakefield as the interim chair?
10   A    You'd have to ask the referees.
11   Q    Did someone have to speak to the
12   Korean-American referees at the U.S. Open to convince
13   them not to walk up?
14   A    You'd have to speak to the referees.  I'm not
15   going to speak for anyone else.
16   Q    Do you know about any such meeting taking
17   place?
18   A    I'm not privy to what took place in their
19   conversations.  You would have to ask them.
20   Q    As we heard earlier you previously had disputes
21   or disagreements with Barbara Wakefield.
22   A    I had a concern about the integrity in which

1    she handled the situation with Gene Lopez, and I had a
2    concern with the -- with which -- with the integrity
3    with which she handled the situation with Kim Davis.
4    They were not disputes.  I had no verbal contact with
5    her concerning them.
6    Q    But you complained to Mr. Sang Lee about her?
7    A    In -- in regard to the integrity of the
8    situation.  Had it been anyone else in that position, my
9    issue would have been the same.  So the issue was not
10   with Barbara Wakefield.  The issue was with the
11   situation and with the lack of integrity that occurred
12   in those two specific instances concerning Juan Gene
13   Lopez and, two, Kim Davis.
14   Q    Were there situations in which you believe
15   Ms. Wakefield had caused disputes or problems besides
16   the two you mentioned?
17        MR. JONES:  Objection, vague and ambiguous.
18        THE WITNESS:  How can I answer something so
19   nebulous?  That's impossible to answer.
20        MR. LEVINSTEIN:  Q    Had you told anyone that Barbara
21   Wakefield had caused disputes and problems?
22   A    Caused disputes and problems, I don't recall

1    that verbiage ever coming out of my mouth.
2    Q    Was there a disagreement you had with
3    Ms. Wakefield about conducting inspection of athletes?
4    A    Disagreement, I don't recall a disagreement.
5    Q    First, what is inspection of athletes?
6    A    Meaning inspection desk?
7    Q    Is there a process where referees have to
8    inspect athletes before matches?
9    A    Well, that can either be done in the ring or at
10   an inspection desk.
11   Q    Okay.  Was there a situation in which
12   Ms. Wakefield assigned you to inspect athletes and you
13   didn't think that was appropriate?
14   A    She didn't assign me.  She asked if I would do
15   inspections.  That position had normally been given to
16   the less senior attendees, of which I was not.
17   Q    And were you upset that it had been -- that
18   assignment was being asked of you instead of someone who
19   was less senior?
20   A    I did not say I was upset.  I asked her why she
21   had asked me.
22   Q    And were you unhappy that she asked you?

```
1        A    Not necessarily.  I asked why she had asked me.
2   As I said that -- that position had normally been given
3   to the least senior people.  In fact, at the U.S. Open
4   two years before the Canadian, Guy -- his name was
5   Guy -- was asked to do inspection and he asked the same
6   question that I did.  That was a common question.  He
7   was a sixth degree black belt.  That position was
8   normally assigned to less senior attendees.
9        Q    What degree black belt are you?
10       A    Now I'm a sixth degree.
11       Q    Did you believe Ms. Wakefield was
12  discriminating against you?
13       A    I felt that she had selected me when there were
14  other people she could have selected.
15       Q    Did you think there was some improper
16  motivation behind it?
17       A    I don't know her motivation.  You'd have to ask
18  her.
19       Q    Did you think it was because you were Hispanic?
20       A    You'd have to ask her why her decision was
21  made.
22       Q    Did you tell her you thought it was because you
```

113

```
1   in 2004.
2        A    I don't recall who was the --
3        Q    Had there been referee chairs prior to Ms.
4   Wakefield that you thought had performed badly?
5        MR. JONES:  Objection, vague and ambiguous.
6        THE WITNESS:  At the dinner table?  I mean -- please
7   -- can you be a little more specific?  That's a very
8   open question.
9        MR. LEVINSTEIN:  Q  Have there been prior referee
10  chairs that you thought have been involved in improper
11  conduct?
12       A    I don't know what their conduct was before or
13  after drink.  I didn't spend time with referee chairs.
14       Q    Had the prior referee chairs increased the
15  number and quality of the referees?
16       A    Yes.
17       Q    Had they retained the best referees?
18       A    Retained?
19       Q    Caused the best referees to stay refereeing.
20       A    Yes.  You mean the most qualified, the most
21  well trained?
22       Q    Ones you thought were the best.
```

115

```
1   were Hispanic?
2        A    No, I did not.
3        Q    Did you tell her it was because you thought --
4   that you were a woman?
5        A    No, I did not.
6        Q    Did you tell her it was because you were not
7   Korean-American?
8        A    No, I did not.
9        Q    Did you accuse Ms. Wakefield of being a racist?
10       A    No, I did not.
11       Q    Prior to Miss Wakefield's selection as the
12  interim chair, who had been the previous referee chairs?
13       A    Eui Bin Lee.
14            Chairs, is that a plural?
15       Q    Yes.
16       A    Eui Bin Lee that I recall.  Hong Kong Kim that
17  I recall.  Leo -- I don't remember his first name out of
18  Texas.  Koang Woong Kim.  I don't recall the others if
19  in fact there were others.
20       Q    Focusing on the two prior to Ms. Wakefield.
21       A    Who were they?
22       Q    I don't know.  People who were referee chairs
```

114

```
1        A    No.  That's not the same thing.
2        Q    What makes a referee the best isn't that
3   whether they are the best trained and most experienced
4   and best qualified?
5        A    Not necessarily.  They could be best trained
6   and most experienced and make bad judgments in the ring.
7        Q    And it was your view that it was a mistake for
8   Bob Gambardella to select Barbara Wakefield as the
9   referee chair?
10       A    I felt that there were many more -- much more
11  qualified people that could have been selected.
12       Q    Was it your view -- again you've asked this but
13  I want to make sure -- I've asked this before.
14            But was it your view that selecting a referee
15  chair who was not Korean-American would be a mistake?
16       A    My answer would probably be the same as I gave
17  before.  Whatever that was I would state that again.
18       Q    Which is it was your view that it mattered
19  whether it was Korean-American or not?
20       A    If that's what I said previously then yes.
21       Q    You said previously that selecting a
22  non-Korean-American referee chair would not, in your
```

116

1   view, cause the USTU to loss Korean-American referees?

2       A    To explain again.  The tradition of tae kwon do

3   is held on rank and seniority.  Along with that comes

4   respect.  When you have the first two, you generally

5   also have the respect of the individuals with whom you

6   are dealing.  If you do not have the respect, regardless

7   of if they're pink, yellow, gold, whatever, that won't

8   happen in the tae kwon do community.  It is very

9   difficult for me to take direction from one of my own

10  students.  Why?  Because I have more knowledge than they

11  did, which is why I am the master instructor at my

12  facilities.  Make sense?  And that follows with

13  referees.

14          So it would be horrible and unspeakable to

15  request that a D-3 level referee be assigned as any form

16  of position and expect others to follow.  It's not done.

17      Q    Did you have a view if the person who the USTU

18  selected to be the referee chair needed to have respect

19  in the Korean-American community and in the

20  non-Korean-American referee community?

21      A    Absolutely.

22      Q    Did you view that these were two separate

1   communities of the referees?

2       A    They were two separate races being addressed,

3   yes.

4       Q    And they needed to both be addressed,

5   separately?

6       A    They need -- state your question again.

7       Q    They both needed to be addressed?

8       A    That wasn't your initial question.

9       Q    They both needed to be addressed separately,

10  that was my initial question.

11      A    No.  The respect needed to come from both

12  factions.

13      Q    And was it your view that the only people who

14  had the likelihood of being respected by those groups

15  were Korean-Americans?

16  MR. JONES:  Objection, vague and ambiguous, and also

17  misstates the testimony.

18  THE WITNESS:  Fourth time.  I will state it again.

19  Respect came from seniority, from experience, from rank.

20  I believe I've already answered that three times.  The

21  answer is the same.  It would not have made a difference

22  to people of rank and experience within the tae kwon do

1   community who it was as long as those credentials were

2   there.

3       MR. LEVINSTEIN:  Q  Were there any

4   non-Korean-Americans who in your view had seniority,

5   experience and rank sufficient to hold that referee

6   chair position?

7       A    I believe I also answered that before.

8       Q    No, you didn't.

9       A    Yes, I did.  At the beginning you asked that,

10  and I said yes, there were.

11      Q    Were there particular people that you believed

12  should have been the key candidates to be the referee

13  chair?

14      A    Anyone that had the experience, the credentials

15  and held the respect of most of the referees could have

16  qualified as that, and there were several people in that

17  category.

18      Q    Were there two particular ones that you

19  recommended?

20      A    To whom?

21      Q    To Bob Gambardella.

22      A    One of them I believe was Chang Kil Kim.

1       Q    Is there another that you recommended as well?

2       A    There was.  I don't remember who.

3       Q    How about Koang Wong Kim?

4       A    Koang Woong Kim.  He had been a previous

5   referee chair.  Very highly respected, ninth degree --

6   tenth degree back belt, special class international

7   referee status.

8       Q    How had he stopped being the referee chair?

9       A    I don't know.  I believe that was an appointed

10  position so whomever was in charge of the USTU at that

11  point would appoint on who they wished to have as

12  referee chair.

13      Q    Had he been forced out?

14      A    I have no knowledge of that.

15      Q    Was there a situation at the U.S. Open in 2003

16  or 2004 in which there was almost a walkout by referees?

17      MR. JONES:  Objection, vague.

18      THE WITNESS:  You'd have to ask all the other

19  referees.

20      MR. LEVINSTEIN:  Q  You don't know of such a thing?

21      A    I was not involved in anything like that.

22      Q    You weren't aware of anything like that?

1    A    I was not involved in anything like that.

2    Q    Were you aware of anything like that?

3    A    As I said, you have to ask the other referees.

4    I don't get in anyone else's mind.  I only deal with me.

5    Q    Was there a walkout of referees at the 1999

6    Junior Olympics?

7    A    Where was that held?

8    Q    I don't know.

9    A    You have to give me a location.  I don't go by

10    dates.  Referees walked out of one of the tournaments

11    that I was at.

12    Q    Why did they walk out?

13    A    I don't know.  They shut down the tournament,

14    we sat there and watched for two hours.  I wasn't

15    officiating.  So I don't know.  I have personally never

16    been involved in a walkout.

17    Q    So your meeting with Bob Gambardella was on the

18    floor, not at lunch?

19    A    I believe it was both.  I believe we had two

20    separate meetings at that -- at that tournament.  I

21    believe we talked briefly on the floor and then I

22    believe during lunch we sat at a table for a little

1    while.

2    Q    Well, but there was a 2-hour meeting on the

3    floor you said?

4    A    Between the two, the floor is wherever the

5    referees are.

6    Q    Okay.  There's two hours on the floor then

7    there was a meeting at lunch?

8    A    Together I spoke with him for approximately 2

9    hours.

10    Q    Okay.  And you were meeting with him in what

11    capacity?

12    A    I just wanted to discuss some of the questions

13    that came to my mind concerning the USTU and its

14    direction.

15    Q    Besides Barbara Wakefield's appointment what

16    other issues were you concerned that you wanted to

17    discuss with Bob?

18    A    I was not concerned with Barbara Wakefield's

19    "appointment".  I had an issue with the most qualified

20    referee chair.  Those are your words.  I also asked

21    about the direction of the USTU, I asked about future

22    plans, I asked about why some of the things had been

1    done the way they had been done, what were his plans for

2    the future, how was he going to clear up some of the

3    situations that had existed in the past.  Basically how

4    it was going to affect my business.

5    Q    You introduced yourself to him?

6    A    Yes.

7    Q    He knew who you were?

8    A    I gave him my name.  At that point I assumed he

9    remembered the name.

10    Q    You spent a very long time discussing all these

11    issues with him?

12    A    Is a very long time approximately 2 hours?

13    That's how long I spent.

14    Q    We've only been going two-and-a-half.

15    A    Approximately.  I didn't time it.  I didn't

16    think I had to.

17    Q    But you had no doubt that he knew who you were

18    and knew what you were meeting about?

19    A    No.  I introduced myself.  He didn't know who I

20    was before then.  I didn't know who he was.  I didn't

21    even know what his last name was.  I had to introduce

22    myself to him.

1    Q    You knew he was the CEO of the USTU?

2    A    No.  I knew he was supposedly in charge.  I did

3    not know what his title was, didn't care.

4    Q    According to your declaration --

5    A    Which item number?

6    Q    Paragraph 5.  It says, declarant inquired of

7    Mr. Gambardella to the reason why Ms. Barbara Wakefield

8    was appointed by him as the interim referee chairperson

9    of the USTU.

10    He told you because she was the only person

11    that he knew?

12    A    Whatever I stated before.

13    Q    And did you ask him why a particular person --

14    it says, specifically declarant asked why someone who .

15    had more support in the tae kwon do referee community

16    including racial minorities such as Korean-Americans had

17    not been selected.

18    Was it your view that racial minorities such as

19    Korean-Americans had more support in the tae kwon do

20    referee community?

21    A    Restate the question.

22    Q    It says, you asked him why someone who had more

1  support in the tae kwon do referee community, including
2  racial minorities such as Korean-Americans had none
3  selected, is that correct?
4      A    As I stated before, anyone with the proper
5  seniority, with the proper rank, which follows that you
6  get the respect of the referees, would have been
7  acceptable.
8      Q    Let me first give you Exhibit 4.
9           (Document marked as Exhibit 4)
10     Q    I ask you if you've seen that letter before.
11     A    Do you purposely reduce all of these so people
12  can't read them.  This is reduced, right?
13     Q    I don't think so.
14     A    70 percent, yes.  Yes, I wrote this document.
15     Q    And for the record, this is a 3 page letter
16  dated June 22nd, 2000 from you to Sang Lee, the USTU
17  president, Sang Chul Lee, is that correct?
18     A    Yes.  It's dated June 22nd, date to Sang Chul
19  Lee, USTU President, from me, copied Gary Johansen,
20  Jerome Reitenbach, Mark Bryant, Kim Dotson-Peck, Rhoda
21  Sweet.
22     Q    This is the letter you referred to earlier

1      Q    And on the second page you talk about --
2      A    We're skipping over the rest of the first page?
3      Q    You want to read it, you're certainly welcome
4  to.
5      A    I know what it says.
6      Q    But you were complaining about conduct that we
7  talked about earlier about Barbara Wakefield?
8      A    I was complaining about -- I believe this is
9  the fifth time that I've stated this, the situation that
10  appeared that -- that occurred at that tournament
11  expressing lack of integrity on the part of what
12  happened in that particular situation.  Had it been
13  anybody else in that position other than Barbara
14  Wakefield, my response would have been exactly the same.
15  The situation is what was bad as it states in the first
16  paragraph, to bring a negative issue.
17     Q    Okay.  And on page 2 you indicate that Gene
18  Lopez should not be sanctioned and that he --
19     A    Which paragraph are you referring to?
20     Q    Says two important thoughts on top of third
21  paragraph of page 2.
22     A    Third paragraph, yes.

1  about the incident involving Gene Lopez and Barbara
2  Wakefield?
3      A    Yes.
4      Q    It says in the first paragraph that you're
5  writing to bring a negative issue to Mr. Sang Chul Lee's
6  attention, is that correct?
7      A    Yes.
8      Q    And it says that you believe that both Barbara
9  Wakefield and Ji Ho Choi took actions you found to be
10  improper in the next paragraph?
11     A    Yes.
12     Q    In the second paragraph it says, I repeat what
13  I have always said in the past.  I believe strongly in
14  your leadership, the USTU and the ideals which we as an
15  organization compositively project to the rest of the
16  world.
17          Was that correct?  Was that your view?
18     A    Yes, that's why I wrote it.
19     Q    You believe strongly in Sang Chul Lee's
20  leadership?
21     A    Yes.  As I would believe strongly in the
22  leadership of any person.

1      Q    Why were you even thinking about sanctioning
2  the one and only coach who trained and coached 6 out of
3  20 competitors who competed at the Olympic team trials.
4  No one else in the USA or in the world for this matter
5  can claim such as accomplishment.  He is obviously doing
6  something right.
7           Those were your views about Gene Lopez?
8      A    Those are facts.
9      Q    It says we should be petitioning to have Gene
10  Lopez nominated to act as USTU national coach, not
11  threatening to sanction him over a plastic water bottle
12  thrown at the floor.
13          That was your view as well?
14     A    That's also fact.
15     Q    And again you said earlier you thought that
16  Mr. Lopez had not been treated fairly for positions in
17  the USTU at the coaching level because he was Hispanic?
18     A    Is that what I said?
19     Q    Yes.
20     A    Yes.
21     Q    Okay.  The next paragraph refers to a Las Vegas
22  incident that Barbara Wakefield and Ji Ho Choi evidently

6/28/2005 Brunner, Mary

1  had been instigators at.
2      What was that referring to?
3  A    The next paragraph.
4  Q    If you look at the bottom of paragraph 2 it
5  says, the whole scenario with the petition seemed like a
6  repeat of the Las Vegas incident with Barbara Wakefield
7  and Ji Ho Choi as instigator once again.
8  A    I believe there was a tournament at which they
9  had requested a walkout.
10 Q    Who is they?
11 A    Those two individuals, I believe. As I said, I
12 wasn't officiating when that walkout took place. I was
13 there with my team and we waited for several hours until
14 it was resolved. And I believe that it was that
15 incident for which Ji Ho Choi ended up being sanctioned
16 as a referee. The only way you can get sanctioned is if
17 you did something really, really wrong. Otherwise, you
18 can't get sanctioned. So obviously whoever it was that
19 sanctioned him and initiated that action was in
20 consensus of opinion with me because he wouldn't have
21 been sanctioned otherwise, nor would it have stood if it
22 wasn't correct. So someone in the USTU agreed and had

129

6/28/2005 Brunner, Mary

1  anything derogatory by that individual to the judges
2  that are then judging that individual on merit and on
3  performance, which is exactly what happened. That was
4  my objection.
5      If there was some sanctioning to be done, if in
6  fact it was legitimate, if in fact it was called for, it
7  should have been either prior to the tournament or after
8  the tournament, but not during. All of us there in
9  attendance as referees were in a position that we had to
10 judge and comment via our scores on those individuals.
11 That was improper to do during the course of a
12 tournament while the judging was taking place. Do it
13 after. That was my contention, that's why I didn't want
14 to get involved with it. I thought it was improper.
15     Had I been involved with a walkout that Ji Ho
16 Choi and Barbara initiated during some other tournament,
17 I would have said the same thing, it's improper. If you
18 want to handle it, handle it another way. I won't walk
19 out on a tournament, which is why I personally have
20 never been involved in a walkout. It's not ethical to
21 do that. We are there as officials for the benefit of
22 the competitors, and if you can't do that job, you

131

6/28/2005 Brunner, Mary

1  him sanctioned. I don't know who they were, but he was
2  sanctioned.
3  Q    And how was this incident of Mr. -- with
4  Mr. Lopez related to or how did it seem like a repeat of
5  the Las Vegas incident?
6  A    Let me read the whole paragraph. On reflection
7  it seems that Ji Ho Choi attended this tournament for
8  only reason, to cause another problem for the USTU in
9  retaliation for his so-called punishment, that
10 sanctioning. The whole scenario with the petition
11 seemed like the repeat of the Las Vegas incident, with
12 Barbara Wakefield and Ji Ho Choi as instigators once
13 again, which is exactly what happened when he got
14 sanctioned. So it's very clear.
15 Q    This was a case where they are circulating a
16 petition to ask for Gene Lopez to be sanctioned?
17 A    Yes, to cause a problem for the USTU and the
18 tournament and the whole process.
19     To circulate a document asking that someone be
20 sanctioned who is actively participating in the
21 tournament is unethical. That is like saying in the
22 middle of a track run during the Olympics somebody says,

130

6/28/2005 Brunner, Mary

1  shouldn't be there in the first place. That's how I
2  felt about this situation.
3      Had it been Barbara or anyone else, my feeling
4  would have been the same. This memo was written, not
5  contrary to Barbara or anyone else, but contrary to the
6  situation that took place.
7  Q    But in this Las Vegas incident you were very
8  disturbed that Barbara Wakefield as a referee would be
9  involved in a walkout?
10 A    I will have been, would have been, will be in
11 the future, disturbed that anyone would do it, not
12 specifically Barbara, not specifically Ji Ho. If you
13 were the referee that initiated a walkout, I would feel
14 just as strongly about you personally, because it
15 affects me, it affects my income and my school. It
16 affects the impression that my parents and my
17 competitors that are sitting at that tournament
18 observing what is happening in a very negative manner.
19     I don't teach that way at my school. I
20 personally don't follow those principles. So when lack
21 of integrity rears its ugly head, it will have a
22 negative response for me regardless of who is involved.

132

1    Q    What was the problem in Las Vegas --

2    A    I don't know.

3    Q    Let me finish my question.

4    A    Sorry.

5    Q    What was the problem in Las Vegas that lead

6   Barbara Wakefield and Ji Ho Choi to be involved in a

7   referee walkout?

8    A    I don't know.

9    Q    So you can't imagine anything whatsoever that

10   might have occurred that might have justified referees

11   considering walking out of a tournament?

12   A    As I just said, had someone asked me to walk

13   out I would not have done that, as I didn't do when

14   those occasions were presented to me.  My personal

15   decision is and will always be referees are there for

16   the benefit of the competitors, not self-serving their

17   own ambitions, whoever those might be, whatever those

18   might be.  I personally would not think positively about

19   someone staging a walkout when there are 4,000 people

20   waiting for a tournament to continue.  It's unethical to

21   do that.

22   Q    Moving down the page.  There's a sentence in

1   the middle of the long paragraph under the fourth bullet

2   that says, also since only one coach who is Hispanic was

3   singled out, there's potential for a case of racial

4   discrimination.

5        Do you see that?

6    A    Yes.

7    Q    Was that your view about what was going on here

8   with Mr. Lopez?

9    A    Any time someone of ethnicity is targeted

10   there's potential for legal action.

11   Q    Whether it's because of their race or not?

12   A    Any time that someone that is targeted because

13   of ethnicity --

14   Q    Well, you said anyone who is targeted who is of

15   an ethnic background.

16   A    Of a specific ethnic background is -- is

17   putting themself liable.

18   Q    But -- slow down.  Did you know that the reason

19   Barbara Wakefield was targeting Gene Lopez was because

20   he was Hispanic?

21   A    Since only one coach who is Hispanic was

22   singled out, there is potential for a case of racial

1   discrimination.

2    Q    I know what it says.  I'm trying clear that up.

3    A    I'm repeating that.

4    Q    You didn't know the reason or had any reason to

5   know what Ms. Wakefield's motivation toward Mr. Lopez

6   was, but you were saying because he is Hispanic someone

7   might claim that it was because of racial

8   discrimination?

9    A    I'll repeat -- I'll read what I wrote because

10   it's very clear.  It doesn't need clarification.  Only

11   one coach was singled out in that petition, he was

12   Hispanic.  There is potential for a case of race

13   discrimination by law.  That's not my decision that's

14   law, Article VII.

15   Q    But he was singled out, according to the

16   petition, because he threw a bottle, correct?

17   A    I don't know why.  I didn't read the whole

18   thing.  I didn't sign it.  I refused to sign it.  You

19   need to speak with whomever wrote the document.  And I

20   don't know who that was.

21   Q    But if you look at the first page of this

22   document, at the bottom of the fourth paragraph, it

1   says, for some reason a plastic water bottle thrown at

2   the floor was considered worthy of a petition.  So it's

3   the throwing of the water bottle that led to the

4   petition?

5    A    I don't know that.  I didn't write the

6   petition.

7    Q    But whether it was or wasn't a plastic water

8   bottle that was involved, because only one coach who is

9   Hispanic was singled out, it was your understanding

10   there was a potential for a lawsuit claiming race

11   discrimination?

12   A    That's what I stated in the letter.

13   Q    On the last page there's a sentence that says,

14   twice now I have seen this sort of support initiated.

15   The other one involved Barbara Wakefield and a Korean

16   referee at the Louisville Junior Olympics.

17   A    Where are you reading?

18   Q    The second bullet on the last page.

19        Twice now I have seen there sort of support

20   initiated.  The other one involved Barbara Wakefield and

21   a Korean referee at the Louisville Junior Olympics.

22   Does this mean that all referees should openly rebel

1    only if Ms. Wakefield is mistreated?

2            Do you recall what that refers to?

3    A    Yes.  Again I was not officiating at that

4    tournament.  I was there with my team.  You want my

5    hearsay evidence?

6    Q    I want to know what you're referring to when

7    you wrote that?

8    A    It's all hearsay.  You want me to tell you what

9    I heard?  I wasn't officiating.

10   Q    You said you saw something that happened.

11   A    This sort of action --

12   Q    I want to know what you saw in Louisville.

13   A    I wasn't officiating.  We were told in the

14   audience that she had had an altercation with a Korean

15   referee and she was demanding that the Korean referees

16   apologize to her, otherwise, all of the referees should

17   walk out if that did not occur.  That's what we were

18   told.

19   Q    And it says this sort of support initiated.

20   A    Let's walk out if I don't get my apology.

21   Q    Was there something about a walkout involved in

22   the Gene Lopez petition?

1    A    I don't know.  I didn't read the petition as I

2    stated three times before.  I just refused to sign it

3    when she gave me the general gist of it.

4    Q    And focusing on the last sentence, you

5    believed -- it says my final comment at the referee

6    meeting was that I have enough integrity that I will not

7    "railroad" without due diligence and due process.

8            Did you believe that Ms. Wakefield and Mr. Choi

9    were railroading Gene Lopez without due diligence and

10   due process?

11   A    When you're asked to sign a document in the

12   middle of a match while you're sitting in the ring not

13   allowed to read and/or discuss and/or give objections to

14   or rewrite a document that everyone is asked to sign,

15   yes.

16           If a document is going to be signed by a group

17   of people, it should be reviewed, voted on and composed

18   by that group of people, not by one or two individuals

19   and then pretty much strongarmed into signing it.

20   Q    Let me show you what's been marked as Brunner

21   Exhibit 5.

22           (Document marked as Exhibit 5)

1    Q    Do you recognize this letter?

2    A    Yes, I wrote the document.  It's dated

3    February 26th to Bob Gambardella from me.

4    Q    It's four pages long.  And did you write and

5    send it around February 26th, 2004?

6    A    If that's when I dated it, I would assume that.

7    Q    And beginning it says, thank you for your

8    letter thanking for se donating my time to referee at

9    the U.S. Open.

10   Q    Did you get a letter from Bob Gambardella that

11   thanked you for refereeing?

12   A    I would assume that.

13   Q    Do you remember receiving such a letter?

14   A    No.

15   Q    It says, that is a first for me and greatly

16   appreciated.

17           Is that true it was a first time someone had

18   sent you a letter thanking you for refereeing?

19   A    No.

20   Q    What was the first for you?

21   A    I don't know.  I don't remember.  This was a

22   year plus ago.

1    Q    It says, I also thank you for taking the time

2    to visit with me at the U.S. Open.  I was the lady you

3    talked to at lunch.

4    A    Yes.

5    Q    Did you put that to make sure he remembered who

6    you were?

7    A    I don't remember.

8    Q    If you look down close to the bottom of the

9    page, the next to last paragraph, it says, it was

10   announced at our referee meeting that you appointed an

11   interim referee chairman based solely on the fact that

12   you had some personal contact prior to the U.S. Open.

13           What referee meeting was that?

14   A    Probably the referee meeting.

15   Q    Okay.  At the U.S. Open?

16   A    Yes.

17   Q    Before you met with Mr. Gambardella?

18   A    I would assume Gambardella is the one that gave

19   the information at the referee meeting.

20   Q    Okay.  It then says, you also confirmed that

21   Barbara was the only person you interacted with prior to

22   your appointment and therefore selected her.

```
 1        So was that at the referee meeting?
 2    A   No.  That was probably in my conversation with
 3   him because he would have confirmed it to me.
 4    Q   If look at the last paragraph on the page, you
 5   had testified earlier that the previous referee chairs
 6   had increased the number and quality of referees, but
 7   the last sentence says, we have lost approximately 100
 8   very good and qualified referees during the tenure of
 9   the last two referee chairs.
10        What does that refer to?
11    A   That we have lost approximately qualified
12   referees during the tenure of the last two referee
13   chairs.
14    Q   Turn to the next page, it says, of course, some
15   attrition is also always expected but neither of the
16   last two referee chairs did much to cultivate, motivate
17   nor recruit and train additional replacement referees.
18   Rather they were involved in misusing funds and open
19   favoritism which resulted in so many of our good
20   referees quitting, never to return.
21        Is that your view on that date?
22    A   On that day, yes.
```

```
 1    Q   That your view today?
 2    A   Probably.
 3    Q   If you look at the bottom of the next
 4   paragraph, it says -- leaving out the and so, the last
 5   line, it is very important how our positions as referees
 6   are perceived and accepted, most especially at the state
 7   level.  I have endured being cursed, shouted at and
 8   physically pushed by Korean-American instructors.
 9        Is that the case?
10    A   Yes.
11    Q   Why earlier when I asked you if you had any
12   kind of abusive or similar conduct by Korean-American
13   instructors you answered none that you were aware of?
14    A   Not that I remembered.  Probably didn't
15   remember it, and yes, I do.
16    Q   You said earlier that there were a number of
17   people who were qualified to be referee chair, but if
18   you look down about four more paragraphs, this paragraph
19   starts, in my opinion -- in my opinion there are only
20   two people who satisfy these requirements Koang Woong
21   Kim from Kenosha, Wisconsin and Chang Kil Kim from
22   California.
```

```
 1    Q   So contrary to what you said earlier it was
 2   your view in 2004 that only two Korean-American referees
 3   met the requirements to be the referee chair?
 4    A   The position -- the previous paragraph says,
 5   requires a strong leader, several years of business
 6   management experience and strong administrative and
 7   organizational skills.  The referee chair should also
 8   have seniority, both in age and rank.  It is common
 9   respect from the tae kwon do --
10    Q   To command respect?
11    A   To command respect.  From both the American and
12   Korean-American referees, and most importantly have some
13   degree of influence with the world of Tae Kwon Do
14   Federation, whose technical rules and regulations the
15   USTU follows.
16        Yes, that is true in those statements.  There
17   are, however, many referees who have the seniority and
18   the experience to fill the position of referee chair.
19   However, I was specifically referring to the influence
20   in the World Tae Kwon Do Federation, which is the mother
21   organization for the USTU.  So the statement is true
22   with reference to the WTF involvement.
```

```
 1    Q   So because you thought WTF involvement was
 2   important as well, it was your view that only two
 3   Korean-Americans were qualified to satisfy the
 4   requirements to be the referee chair?
 5    A   I believe Mr. Gambardella agrees with me in
 6   that regard because now he has actively sought and
 7   received a position with the international community
 8   understanding he -- he understands clearly that that's
 9   necessary in tae kwon do and has, therefore, sought and
10   accepted a position with the world organizations.
11    Q   But back to my question.  It was your view at
12   this time that the only two people who met the
13   requirement to be referee chair when you took into
14   account the involvement with the World Tae Kwon Do
15   Federation were two Korean-Americans?
16    A   No.  This states that they had influence with
17   the world tae kwon do community at that point in time.
18   That does not say there were not other people qualified
19   to hold that position.  That does not say that there
20   were other people who did not have the proper seniority
21   and/or credentials and/or influence in the nation to
22   hold that position.
```

1    It merely states these two individuals had a
2  great deal of influence with the WTF, the mother
3  organization, the World International Federation, and
4  Mr. Gambarella agrees with that summation because he has
5  now sought a position with the PATU group, understanding
6  that he needs the world involvement.
7       Q    But back to what you said.  Given that
8  requirement that you have some degree of influence with
9  the WTF in your opinion there were only two people who
10  satisfied those requirements?
11       A    At that point in time they had influence with
12  the World Tae Kwon Do Federation, that was necessary and
13  I feel it still is, but that does not preclude that
14  there are not other individuals who do not have the
15  proper credentials, rank, seniority and following within
16  the U.S. that can hold a referee chair position.  There
17  are several people like that.
18       Q    I asked you earlier if you thought that an
19  American referee chair would cause the USTU to lose
20  Korean-American referees, and you said no, you hadn't
21  held that view, you never expressed that view.  Do you
22  recall that?

1       A    I said not necessarily so.
2       Q    Can you read the next paragraph where it says
3  "An American referee chair will most certainly cause us
4  to lose the Korean-American referees."
5       A    As it has.  That was my opinion at that time.
6       Q    So you did express that view?
7       A    Apparently.
8       Q    And your view it is that having an American
9  referee chair is what caused those people to leave?
10       A    It has caused a great deal of people to leave,
11  not just Korean-Americans.
12       Q    Okay.  The next paragraph, I had asked you
13  whether anyone had been forced out of referee chair
14  position, and you said you had no knowledge of such
15  things.
16       A    I believe I said I didn't recall.
17       Q    You said you had no knowledge of such things.
18  I think the record will speak for itself.
19  It now says, Koang Woong Kim was forced out of
20  the referee chair position by Sang Lee and continues to
21  be an excellent candidate.  Since he was forced out of
22  office, it goes without saying that this men's integrity

1  lies with the responsibility of the job and not personal
2  relationships.
3       What did you mean by saying that -- by being
4  forced out it shows that he had integrity?
5       A    I don't recall.  Whatever it was that I was
6  thinking at the time.  This was a long time ago.
7       Q    Next paragraph down it says, Chan Kil Kim
8  continues to a leading candidate for the position,
9  and it is very unclear to me and to many others as to
10  why he was not assigned to oversee the U.S. Open.
11       By that you mean why he wasn't picked to be the
12  interim referee chair?
13       A    No.  Why he was not assigned to oversee the
14  U.S. Open.
15       Q    Who was assigned to oversee the U.S. Open?
16       A    Barbara Wakefield.
17       Q    Then the next paragraph you say in the middle,
18  senior referee chair Chan Kil Kim was next in line for
19  that position, the position of chair of the referee
20  committee.
21       Do you see that?
22       A    Yes.

1       Q    That was your view that he was in line for that
2  position?
3       A    Senior referee denotes he's senior.
4       Q    Your view was people moved up through the ranks
5  and based on rank and seniority they were in line to get
6  the higher positions as those positions came open?
7       A    Tae kwon do is generally dealt with in rank and
8  seniority through thousands of years.  I don't believe
9  that has changed in the last year.
10       Q    That's fine.  Did you think that was right?
11       A    Martial arts, the word martial means military,
12  and it's the always been taught very much in the fashion
13  of the military that has rank.  That's what martial arts
14  is about.
15       Q    But the United States military, people often
16  are promoted above others if their merit exceeds the
17  people above them.  So --
18       A    But in proper sequence.  They don't go from
19  someone who is enlisted to general.
20       Q    But just because someone has got a higher rank
21  doesn't mean he is in line to get a promotion?
22       A    Is that a question?

1    Q    Isn't that correct?

2    A    No.

3    Q    So it was your view that it was traditional or

4    it was the way it had always been done in tae kwon do

5    that you moved up by rank and, therefore, the most

6    senior people should get positions when they became

7    open?

8    A    By rank, by seniority, those are the people

9    with the most experience period.

10    Q    But focusing on the USTU, through 2004 you said

11    with those people having those positions there had been

12    administrative problems, management problems and

13    operational problems at the USTU. Isn't it possible

14    that the people with the rank and seniority didn't have

15    good administrative, management and operational skills?

16    A    Yes, that's possible, and probable and probably

17    is continuing to this day in the general -- in the

18    present organization.

19    Q    If you go three paragraphs down on the next

20    page, it talks about the U.S. Open and it says Mr. Kim

21    stood up, and in Korean, dressed down all those who

22    spoke Korean telling them they should support and

1    respect the acting referee chair.

2         Do you see that?

3    A    Yes.

4    Q    You previously told me you didn't know anything

5    about any of these conversations that happened in

6    Korean?

7    A    I probably said I didn't recall it.

8    Q    Okay. Why did he need to make those

9    statements?

10    A    You need to ask him. I don't know why he did

11    it.

12    Q    Actually it says, next sentence, he did not

13    need to make that statement.

14         What were you referring to?

15    A    He stood up and dressed down those who spoke

16    Korean telling them they should not support --

17    Q    They should support?

18    A    That they should support and respect the acting

19    referee chair.

20    Q    So are you saying that the Korean-American

21    referees, because that's who he was speaking to in

22    Korean, were saying they were very angry that Barbara

1    Wakefield had been picked as the acting referee chair?

2    A    I don't know what they were saying. I don't

3    speak Korean.

4    Q    Well, you knew what he said to them?

5    A    No. I heard people behind me describing. I

6    didn't know because I don't speak Korean.

7    Q    You know that you were told that he spoke

8    Korean to tell them they should support and respect the

9    acting --

10    A    The body language is an indicator. Everyone

11    dropped their head which means respect and listen to

12    whoever is speaking.

13    Q    But someone had to tell you what he said in

14    order for you to know that he was talking about the

15    acting referee chair?

16    A    I just said I heard the conversations from

17    people behind me.

18    Q    In English?

19    A    I don't speak Korean, exactly.

20    Q    So they told you that there was some sort of

21    problem with the referees not respecting the acting

22    referee chair and Mr. Kim stood up and told them that

1    they should?

2    A    Not necessarily did they say there was a

3    problem. They said he was dressing them down.

4    Q    Why would he be dressing them down if there

5    wasn't a problem?

6    A    You need to ask him.

7    Q    But you were writing about this to

8    Mr. Gambardella?

9    A    Correct.

10    Q    The next -- you said you didn't know who

11    influenced Barbara Wakefield but --

12    A    Which paragraph are you on?

13    Q    Next sentence says while Barbara Wakefield is a

14    good referee, she has always been strongly influenced by

15    her personal instructors and others in position of

16    power. This was confirmed when her instructor Mr. Park

17    from Minnesota remained at the referee area for the

18    entire tournament. Ms. Wakefield had to consult with

19    him several times during breakfast, lunch and dinner

20    consultations.

21         What did that they discuss during breakfast,

22    lunch and dinner?

1    A    I wasn't there.

2    Q    How do you know she was consulting him and not

3    just having meals with him?

4    A    Because you don't necessarily talk to other

5    individuals when you're refereeing, not that are sitting

6    with the referee group, and he was sitting with the

7    referee group.

8    Q    So you thought it was inappropriate that she

9    had meals with her instructor?

10    A    During the tournament.  And he shouldn't have

11    been sitting there.  He's not a referee.

12    Q    Sitting in the --

13    A    With the referee area.

14    Q    I see.

15    A    He should not have been there.  She, had she

16    been following proper course, should have asked him to

17    leave.

18    Q    The next paragraph, you said you didn't know of

19    anything else about Ms. Wakefield and causing problems,

20    but, it says, in addition, Ms. Wakefield has been

21    involved in many other controversial and potentially

22    litigious situations in including one which ended up

1    costing USTU several thousands of dollars and a lengthy

2    court battle.  If Ms. Wakefield had responded other than

3    she did, litigation, time and wasted USTU moneys would

4    have been avoided.

5         What's that referring to?

6    A    Ms. Kim Davis.  We talked about that earlier.

7    Q    There was a lawsuit by Ms. Davis because she

8    wasn't allowed to referee?

9    A    Yes, there was.

10    Q    I see.  It says many other controversial

11    potential litigious situations.  You have mentioned Gene

12    Lopez's, you've mentioned Kim Davis, I guess the Las

13    Vegas issue about Mr. Choi.

14    A    You mentioned Las Vegas, you mentioned

15    Louisville, Kentucky.

16    Q    Those are in your letters.

17    A    Because you brought them up.

18    Q    I mentioned them because you referred to them

19    in prior letters.

20    A    But you mentioned them here.  So I mentioned

21    two, you mentioned two.

22    Q    What other -- is there any others that are the

1    many that you're referring to?

2    A    Four is quite a few when you're talking about

3    dollars spent.  And I'm sure that if I sit down I can

4    probably recall others, but off the top of my head at

5    this point in time I don't.

6    Q    But you view that you're right there were many

7    situations in which Ms. Wakefield did things that were

8    controversial and potentially litigious?

9    A    Well, I mentioned two, you mentioned two and as

10    I said I could probably recall others.

11    Q    Two paragraphs down, you say, to make matters

12    worse, the following year also at team trials

13    Ms. Wakefield was again assigned to center referee a

14    finals for a Lopez family competitor which once again

15    ended in a questionable outcome.  Integrity and common

16    sense indicated to all of us who watched that she should

17    have excused herself to avoid potential controversy or

18    the appearance of impropriety, but she didn't.

19         So it's your view that in light of the prior

20    problem with Gene Lopez, Ms. Wakefield shouldn't referee

21    any match involving a Lopez family competitor, is that

22    correct?

1    A    We previously discussed the Ford family, and

2    you asked if there had been some sort of decision made

3    with refereeing.  That situation because there was a

4    question with that individual's father and myself, I

5    would never step into the ring with that individual.

6    The same should have been held with her.  She should

7    have excused herself from refereeing someone with whom

8    she had had a dispute.

9         (Document marked as Exhibit 6)

10    Q    Let me show you what's been marked as Brunner

11    Exhibit No. 6 and ask you if you recognize that

12    document.

13    A    Yes.

14    Q    That's the lawsuit that was filed by Edward

15    Ford and his wife Rhonda Ford on behalf of their son?

16    A    There is the Amended Complaint.

17    Q    And attached to it is the complaint as well?

18    A    I don't remember as I stated to you before.

19    But you don't have the final.  Where is the final?

20    Q    Let's just deal with this one to start.

21    A    So even if it's incorrect, we're going to deal

22    with it?

1    Q    I don't think I have anything beyond the
2  Complaint and the Amended Complaint.
3    A    Because it was dismissed with prejudice which
4  meant it was frivolous.  All of this was made up.
5  That's why it was dismissed with prejudice.
6    Q    If you want to produce that document, I will be
7  happy to see it.
8    A    The USTU has it on file I'm sure.
9         As I stated before, the legal counsel for the
10 USTU did not entertain their complaint because he felt
11 it was frivolous, and told these people that they should
12 first file in civil court, and if, in fact, there was an
13 out come then he would accept the complaint at the USTU
14 level, none of which took place because the case was
15 dismissed as frivolous with prejudice.
16   Q    Focus on the Amended Complaint.  What Mr. Ford
17 and his wife --
18   A    Which page?
19   Q    -- on behalf of their son -- on page 4?
20   A    Of the first section?
21   Q    Yes.  The Amended Complaint was seeking, if you
22 look at paragraph 7B, that the respondent or anyone

1  under influence or direct control shall not be allowed
2  to referee, judge or technically assist in any ring.
3         So by the Amended Complaint it still hadn't
4  been determined that you wouldn't referee in his
5  matches?
6    A    Well, where is that on the Amended Complaint?
7    Q    Paragraph 7B.
8    A    Okay.  First of all, anyone that I would have
9  influence or affecting within the tae kwon do
10 environment would probably include all of the State of
11 Illinois, most of the State of Missouri, most of the
12 State of Wisconsin, the State of Indiana and any other
13 seminar at which I had participated in which would
14 involve about 80 percent of the referees in the United
15 States, and a good percentage of those internationally,
16 which means that nobody could have been able to
17 officiate at all because that's a ludicrous statement to
18 make one of the reasons why it was thrown out as
19 frivolous.  It's too nebulous.  Which is why I will
20 state again, I would not have ever stepped in the ring,
21 nor will I in the future as a referee where Luke is
22 competing.  It wouldn't be fair to him, but more

1  important, it wouldn't be fair to the competitor that's
2  in the ring with him because if they file a complaint,
3  and that competitor that he was fighting legitimately
4  won, that could be overturned.  And that would be unfair
5  to the competitor that he was with, not to Luke.
6    Q    Luke was 11 years old?
7    A    I don't remember.  He was young.
8    Q    They first went to the USTU and then went to
9  court in order to try to get protection from their son
10 against you refereeing in his matches, is that correct?
11   A    No, sir.  They when to the USTU to complain
12 about having been kicked out of my school.
13   Q    Would you show me in this document that talks
14 about --
15   A    You need to talk to the USTU, sir.  Those
16 documents are within the USTU.  You need to talk to
17 legal counsel that dealt with them at that point in
18 time.  And he told them, I will not entertain your
19 complaint within the USTU until you have resolved this
20 civilly.  This is a civil situation.  When they went to
21 civil court it was dismissed with prejudice because all
22 of the statements they were making were equally as

1  ludicrous as this number 7.
2    Q    Just for the record there's nothing in this
3  complaint whatsoever that him wanting to be in your
4  school and that he had been thrown out of your school.
5  It was that after he left your school you threatened him
6  and took actions adverse to him?  That's what they
7  allege.
8    A    Absolutely not.  Whatever they alleged it was
9  dismissed with prejudice, sir.  That means that it was a
10 frivolous complaint, that means that the information
11 that is in this document is made up, is incorrect which
12 is why he couldn't prove it up in court.  That's why
13 it was dismissed.  These allegations in this document
14 are incorrect, inaccurate.
15   Q    After the Fords filed complaints against you,
16 did you file with the Illinois Department of Children
17 and Family Services that they were guilty of child abuse
18 or neglect?
19   A    No, I did not.
20        (Document marked as Exhibit 7)
21   Q    Let me show you what's been marked as
22 Exhibit 7.  Have you seen that document before?

1    A    No, I have not.

2    Q    It refers to the fact that a report of

3    suspected child abuse or neglect was filed against

4    Mr. Ford with the Department of Children and Family

5    Services.

6         Are you saying it wasn't you who reported that?

7    A    Absolutely I'm saying it.

8    Q    Okay.

9    A    Did he say it was?

10   Q    I'm not here to answer questions.

11   A    By implication are you saying it?  Because it's

12   not true.

13   Q    Let's go back to Exhibit 6 -- 5.  The letter

14   you sent to Bob Gambardella or the memo, whatever, dated

15   February 26th.

16   A    Which page are we on?

17   Q    They're not numbered, but it's the third page.

18   Three paragraphs from the bottom you write, these two

19   examples alone clearly indicate that she, referring to

20   Ms. Wakefield, cannot be impartial and that

21   Ms. Wakefield is still bound to follow the direction

22   influence of other martial artists due to rank and

1    Q    So you thought Ms. Wakefield was an unethical

2    referee?

3    A    I told you that I thought the situations in

4    which she was involved were unethical.  The situations

5    were unethical.

6    Q    Based on those she shouldn't have been selected

7    to be the referee chair, among other things?

8    A    Those are two good reasons that anyone, not

9    just Ms. Wakefield, that had been involved in situations

10   that involve ethics regarding referees should not be

11   there, which is I will state again, have I occasion to

12   step in the ring where Luke Ford would be competing I

13   would not do so.  Not because of Luke Ford but because

14   of the competitor that is fighting him.  It wouldn't be

15   fair to the other person.

16   Q    Okay.  Now the purpose of this letter that you

17   were sending to Bob Gambardella was to set forth the

18   positive reasons why he should have picked Chang Kil

19   Kim?

20   A    It was just to state opinions or impressions.

21   Q    If you read the next paragraph it says, I can

22   provide side examples if you wish, but my purpose is to

1    personal affiliation with her personally and her own

2    allegiance to her instructor, Mr. Park.

3    Q    So it was your view that --

4    A    Let me read the two previous paragraphs because

5    it had been so long since we went on this page that I

6    forgot what it was we were referring to when we left

7    that document.

8         The two examples to which you are referring are

9    in the previous -- are from the previous paragraphs,

10   and, that is, the Gene Lopez instance that apparently he

11   didn't file a lawsuit over but could have, and the

12   second Gene Lopez and Steven Lopez incident when she

13   should have excused herself from being in the ring as a

14   result of her having other altercations with the Lopezes

15   and didn't.  Those clearly are unethical decisions.

16   Q    Based on those you thought Ms. Wakefield

17   clearly could not be impartial and was bound to follow

18   the direction, influence of other martial artists?

19   A    It says that it indicates that she cannot be

20   impartial because she was told, I'm assuming, by others

21   to do what she did and did it.  Referees aren't supposed

22   to do that.

1    set forth the positive reasons as to why Mr. Chan Kil

2    Kim should have been considered.

3    A    Okay.

4    Q    Is that correct, that's what the purpose of the

5    letter was?

6    A    Part of impressions.  A lot of this is

7    impressions, sir.

8    Q    You said before that you weren't aware of and

9    didn't recall having been discriminated against by

10   Korean Americans?

11   A    Didn't recall.

12   Q    But it says in the next paragraph, as I told

13   you when we spoke, yes, it is true that many of us

14   have -- I think the word been is missing -- but it says

15   have discriminated against.  So I assume it means have

16   been discriminated against, is that correct?

17   A    We talked about discrimination Gambardella and

18   myself.

19   Q    Okay.  Let me read it again.  With the word

20   been should have been in there, is that correct?

21   A    I'm assuming so.

22   Q    Okay.  So you wrote to Mr. Gambardella, as I

1    told you when we spoke, yes, it is true that many of us
2    have been discriminated against for many years by those
3    of Korean-American descent.
4              So even though you're writing to Bob
5    Gambardella one year ago that you and others have been
6    discriminated against for many years by those of
7    Korean-American descent, as you sat there just a few
8    minutes ago you couldn't recall any such incident?
9         A    You were asking me about the referee
10   environment.  You were asking me about officials in
11   tournament environment.  Koreans exist far beyond just
12   the tournament environment.  Korean-American instructors
13   exist all over the world.  They exist in great numbers
14   at state level and at regional level, many of whom who
15   are involved not involved all with the USTU and/or the
16   WTF and/or other organizations.  Discrimination could
17   occur at any level.  It can occur on the street or it
18   can occur at a restaurant, not necessarily in the
19   tournaments about which we have been speaking today.
20        Q    So this discrimination against you for many
21   years by those of Korean-American descent, did it have
22   something to do with tae kwon do or not?

1         A    Could be, could not be.  That's --
2         Q    You were writing it --
3         A    That's why --
4         Q    What are you talking about in this sentence?
5         A    That's why I kept asking you to be more
6    specific in all the questions that you were asking.
7    They were so broad they encompassed everything in the
8    world, and I said that to you several times, that you
9    needed to be more specific.  Discrimination can occur
10   anywhere.
11        Q    Okay.  Why don't you tell me as you sit here
12   today what you recall about situations in which you were
13   discriminated against --
14        A    I don't recall any at this point.
15        Q    Even though as of one year ago you said it was
16   true that many of us, meaning you and many other people,
17   have been discriminated against for many years but those
18   Korean-American descent you can't recall any instances
19   as you sit here today?
20        A    Let me give you a nebulous answer.  By the
21   Sports Act, I believe that all of the positions within
22   the organization should reflect the competitors involved

1    in that sport.  With that in mind we have approximately
2    40 to 50 percent of all competitors in tae kwon do
3    within the USTU structure being of Hispanic and Latino
4    background, approximately 20 percent of Korean
5    descendency, approximately 20 percent black.  These are
6    approximations.  I don't have any basis of fact, but
7    approximations.
8              The state level does not reflect those numbers
9    for almost any state that I am aware of, and neither do
10   the national organizations, either on the board previous
11   or currently.  Mr. Gambardella also hasn't reflected
12   those numbers, and in the referee channel most
13   especially.
14             Being the only Latin American female that I'm
15   aware of at this level of rank, we don't reflect 40
16   percent of the entire referee community being of Latin
17   origin or 20 percent being of black origin that I'm
18   aware of.  That's my idea in presenting this document
19   for discrimination.
20        Q    It says, I am not only female but also Hispanic
21   and I have personally felt discrimination firsthand all
22   my life.

1              Is that correct?
2         A    Would you like me to explain that?
3         Q    If you'd like to.
4         A    I grew up in the State of Utah where there is
5    discrimination against religion and race and ethnicity.
6    So yes, I have been exposed to discrimination my entire
7    life.
8         Q    Let me turn back to your declaration.  By the
9    way -- the purpose of this letter you were saying to
10   Mr. Gambardella?
11        MR. JONES:  Excuse me, Counsel.  We've been going
12   over an hour this past one.
13        MR. LEVINSTEIN:  We can take a break.
14        THE VIDEOGRAPHER:  We're going off the record.  The
15   time is 12:21 p.m.
16             (Off the record)
17        THE VIDEOGRAPHER:  We're back on the record.  Time
18   is 1:05 p.m.
19        MR. LEVINSTEIN:  Q  In February of 2004 when you met
20   with Bob Gambardella, Ms. Wakefield had been appointed
21   interim referee chair, is that her title?
22        A    I guess if you say so.  I don't --

1    Q    You don't recall?

2    A    I don't recall.

3    Q    You were still writing to Mr. Gambardella on

4    February 26th in the hope that he would select Koang

5    Woong Kim or Chan Kil Kim to replace her as the

6    permanent referee chair?

7    A    Interim to me did not mean permanent.

8    Q    You were writing to Mr. Gambardella to

9    recommend, in particular, Chan Kil Kim for the position?

10    A    Or someone with more stringent qualifications

11    like Koang Woong Kim, Or someone with more stringent

12    qualifications, yes.

13    Q    Those were the only two people you mentioned --

14    A    By name.

15    Q    -- in your February 26 letter?

16    A    By name. But as I stated before there were

17    countless others who have higher credentials, higher

18    ranks, higher seniority, et cetera, et cetera.

19    Q    Than Barbara Wakefield?

20    A    Yes.

21    Q    And you wrote this letter with the hopes that

22    Mr. Gambardella would consider it and select one of

1    issues over who had been selected interim chair.

2    Q    Well, it had to do with why he picked Barbara

3    Wakefield instead of somebody else, didn't it?

4    A    No, he had already told me he picked because

5    her because he saw her at a tournament.

6    Q    And nowhere in your letter dated February 26th

7    do you mention his statement about crooks?

8    A    There was no need to, crooks didn't have

9    anything to do with the interim chair position and the

10    issue that I had. Was that a question?

11    Q    You didn't discuss with Bob Gambardella

12    anything about Olympic coach selection, did you?

13    A    I didn't never got involved with the coaching

14    process. Wasn't my job function, didn't care about it,

15    don't care about it.

16    Q    You don't know what the Olympic coach selection

17    criteria were in 2003 or 2004?

18    A    Did not get involved with that end of

19    tournament functions, not my job, don't care about it,

20    didn't care about it.

21    Q    And don't know what the criteria?

22    A    Don't care about it, didn't care it, don't want

1    those people to replace Barbara Wakefield as the referee

2    chair?

3    A    My aim was to keep the referee group strong and

4    it didn't appear as that was happening.

5    Q    You took all the time to write this letter

6    because you were hopeful you could persuade

7    Mr. Gambardella to pick Mr. Kim?

8    A    I took the time to write the letter because I

9    had an opinion about an issue that had happened with the

10    changes in hierarchy.

11    Q    Okay. Your declaration says in paragraph 6

12    that when you talked to Mr. Gambardella he said he

13    didn't want anymore Koreans involved at all, they are

14    crooks?

15    A    Yes.

16    Q    Yet on February 26th you thought he might

17    select a Korean-American to be the referee chair?

18    A    No. I did not say that. It was my hope that

19    someone with higher qualifications and a greater

20    following would be selected. His statement to me that

21    he did not want anymore Koreans involved and stating

22    that they are all crooks had nothing to do with my

1    to know, never did know.

2    Q    And don't know whether Dae Sung Lee or anyone

3    else qualified under those criteria?

4    A    Don't care, don't know, don't want to know.

5    Q    In 2004 --

6    A    Which document are we on now?

7    We are on no document.

8    In 2004 did various people complain about Bob

9    Gambardella about you?

10    A    I have no information about that.

11    Q    Did Mr. Ford approach Mr. Gambardella and talk

12    to him about what happened in the Illinois court and

13    the dispute involving his son?

14    MR. JONES:  Calls for speculation.

15    THE WITNESS:  Exactly. I have no firsthand

16    knowledge of it. You need to ask the Fords.

17    MR. LEVINSTEIN:  Q  Did John -- who is John Seiber?

18    A    John Seiber?

19    Q    S-E-I-B-E-R.  I don't know how to pronounce it.

20    A    Yes. He's the referee.

21    Q    Did he complain to you the USTU about you?

22    A    I have no knowledge of that. Did you ask

1    Mr. Seiber?

2    Q    I have.

3         Do you know who Stewart Koch is, K-O-C-H?

4    A    Yes.

5    Q    Who is he?

6    A    He's an individual who is now teaching here in

7    the State of Illinois.

8    Q    Did you ever have any dealings with Mr. Koch?

9    A    Koch.

10   Q    Koch?

11   A    Yes.

12   Q    Was there a dispute between you and Mr. Koch?

13   A    Yes.  He stole money.

14   Q    In what context did he steal money?

15   A    He was supposed to be paying out at the 1994

16   Junior Olympics as a vendor, he never paid that, and he

17   and I had a venture for equipment at that same

18   tournament.  He stole all the money out of the account.

19   I believe it's called embezzlement.

20   Q    Were you aware that he alleges that you had

21   done things that were improper?

22   A    So who ended up with the money?

1    Q    I don't know.

2    A    He did.

3    Q    But are you -- did you ever sue Mr. Koch?

4    A    No.  Should have.

5    Q    But you're aware that he had a dispute with

6    you?

7    A    He stole money from me and from KH Kim the

8    tournament director.

9    Q    Are you aware that he contacted the USTU to

10   complain about you?

11   A    No, I'm not aware.

12   Q    Who is Dr. Randy Chambliss?

13   A    Randy Chambliss is a referee or a tae kwon

14   doist out of California.

15   Q    Have you had disputes with Mr. Chambliss?

16   A    He wanted me to send my referee manual and I

17   refused to do so.

18   Q    Is that the thing you testified about earlier

19   about your being removed from your position with the

20   USTW?

21   A    Yes.  That was my document and they had to have

22   my permission to use it and I did not give it.

1    Q    Was there an event at which -- have you ever

2    been referring and there been a situation in which there

3    were threats to call the police to come and escort you

4    from --

5    A    Randy Chambliss just did that.

6    Q    Did you leave the event?

7    A    Absolutely not.  The event was over.

8    Q    But were you aware that police had been called

9    and you left before they got there?

10   A    He did not call police.  He stood there right

11   there with us, and the event was already over and he did

12   it in front of 30 other people.

13   Q    You're aware though there had been complaints

14   registered by people whether they have merit or not

15   about you with the USTU?

16   A    No, I was not.

17   Q    Was there an event in 2004 that Bob Gambardella

18   did not select you to referee?

19   A    I believe there was several events in 2004.

20   Q    What events were those?

21   A    I don't remember.  I don't know what they call

22   them anymore since he's changed everything.

1    Q    Were they events that you wanted to referee?

2    A    They are events at which I sent in an

3    application to referee.  They acknowledged they had

4    received my applications and did not select me to

5    referee.

6    Q    Did that anger you?

7    A    Neither here nor there.

8    Q    Did you send in your application because you

9    wanted to referee those matches?

10   A    That's normally why people send in

11   applications.

12   Q    You weren't selected by Mr. Gambardella?

13   A    Bob Gambardella.

14   Q    Did you inquire as to why you weren't selected?

15   A    Actually, yes.  I inquired at a table of

16   individuals at the San Jose regional, and the people

17   that were present there were MC Kim, Chang Kil Kim,

18   Jerome Reitenbach, Barbara Wakefield and Bruce Harris.

19   And Barbara Wakefield replied to me that the reason that

20   she assumed that I had not been selected because I asked

21   her --

22   Q    I haven't asked you what she said.  You can --

1    A.  You did -- yes, you did.  I'd like to finish
2    the answer.  Was that there was a restraining order
3    issued by the Ford family and that that's the reason Bob
4    had not selected me.
5    Q.  So you were told by Barbara Wakefield that the
6    restraining order issued by a court in the Ford family
7    case was the reason Bob Gambardella had not selected
8    you?
9    A.  That's not what I said.  I said she told the
10    group of us that the reason I had not been selected by
11    Bob Gambardella was some issue over a restraining order
12    concerning the Ford family.  In fact, there was never
13    any such restraining order ever issued.
14    Q.  But you said there was an agreement that might
15    have been filed about the court that restrained you from
16    refereeing his matches?
17    A.  I don't know where it was filed.  The agreement
18    was, as I stated to you before, that I would not be
19    officiating at any event at which Luke -- at the match
20    in which he was competing.  But I would have done that
21    regardless.
22    Q.  Subsequent to February of 2004, did you have

177

1    any conversations with Bob Gambardella, telephone
2    conversations, otherwise?
3    A.  I believe I called him again to ask why I had
4    been uninvited, unselected to a Olympic qualifier.  I
5    received a request to officiate and the following week
6    was told I was unselected, whatever that meant.
7    Q.  In the conversation with Mr. Gambardella, did
8    he tell you that if you were so unhappy or had so many
9    complaints that perhaps you should retire from
10    refereeing?
11    A.  He did not say that to me.
12    Q.  Did he satisfy your concerns in the call?
13    A.  No.  Actually he said that decision was just
14    made, don't know why, didn't answer at all.  At least
15    didn't give me a reason.  He did answer, but didn't give
16    me a reason.
17    Q.  Did you complain to Mr. Gambardella about other
18    relation issues related to the USTU?
19    A.  I told him that I felt at that point he needed
20    to do some due diligence as to why certain people were
21    being selected and some weren't.  And he said he didn't
22    want to hear me complain about that anymore since I had

178

1    mentioned that to him at our previous meeting.  I
2    suppose two comments constitutes complaints in his mind.
3    Q.  In 2005 have there been events you have applied
4    for you have not been selected to referee?
5    A.  Yes.
6    Q.  What other events?
7    A.  Whatever events that are out there supported by
8    the USTU.
9    Q.  Do you think that's unfair?
10    A.  Yes.
11    Q.  Do you think it's because you are Hispanic?
12    A.  I don't know why it is, but it is unfair.  I
13    have higher credentials than a lot of the referees that
14    are there so that the people that are competing are not
15    getting the best officiating.  I personally wouldn't
16    want my kids to be competing at an Olympic level by a
17    first time referee, which is what's happening.
18    Which kind of goes back to what I said of
19    having lost 100 referees over attrition, that's
20    acceptable and common, but to then replace those people
21    with first time referees is not acceptable, and that's
22    what's happening.  And that hadn't been occurring prior

179

1    to Gambardella and this new regime taking over.
2    Q.  But there had been a lot of attrition over the
3    prior two chairs?
4    A.  We have thousands of registered referees,
5    that's going to happen as a matter of course.
6    Q.  But you're also of the view because there was
7    an American referee chair that that was going to lead to
8    a lot of Korean-Americans --
9    A.  It has lead to the fact we have had less
10    qualified referees, less credentialed referees, and I
11    don't know of very many referees seminars we have had by
12    comparison to previous years.  I believe just one at
13    each of the regionals as an instructional, but not as a
14    training seminar.
15    MR. LEVINSTEIN:  Subject to receiving documents and
16    cross-examination, I'm done.
17    EXAMINATION
18    By Mr. Jones:
19    Q.  Okay.  Ms. Brunner, you're aware that the
20    testimony you give today could be used in lieu of live
21    evidence if you don't appear at trial in Hawaii when
22    this matter goes to trial?

180

1     A   Yes.

2     Q   What is your current occupation?

3     A   Well, I'm a martial arts instructor, but I'm

4 also involved in other business ventures.

5     Q   Do you have your own school?

6     A   Yes, I do.

7     Q   What is it called?

8     A   McHenry Tae Kwon Do Academy and Fitness, Inc.

9     Q   And roughly how many students do you have?

10     A   Several hundred.

11     Q   You've been refereeing since approximately 1979

12 I believe was your testimony?

13     A   Yes.

14     MR. LEVINSTEIN: I think it was late '70s.

15     MR. JONES: Q  Late '70s.

16     A   Approximately in late I'm assuming is pretty

17 much the same thing.

18     Q   What are the qualifications or requirements for

19 becoming a A-1 rated USTU rated referee?

20     A   There's a process, or at least there used to

21 be, I have not seen if there have been any changes since

22 Gambardella came on board, but it used to be there were

181

1 approximately 16 levels of certification and rank

2 promotion within the referee committee.

3     Q   And, generally speaking, what's required to

4 move from level to level?

5     A   Attending seminars, passing the criteria set by

6 the instructor that happened to be at that event at that

7 seminar, getting the appropriate upgrade which may or

8 may not have happened, upgrade certificate. Basically

9 that was it.

10     Q   Same question for WTF ratings, what are the

11 requirements for that?

12     A   For the ratings?

13     Q   To move from level to level with the WTF.

14     A   That's more stringent. In order to become an

15 international referee I believe the current requirements

16 are at least a fourth degree black belt, the proper

17 certification level for the country whom you are

18 representing, and the recommendation from the nation's

19 organizing group, in our case the USTU, and then once

20 you are through the initial seminar and training and

21 certification process then there is waiting periods of,

22 I believe, five and ten years to be upgraded with a

182

1 certain number of international events that you have

2 certified officially refereed in as an official before

3 you can be upgraded. So the process is very long and

4 very involved.

5     Q   For those of us who have not much familiarity

6 with what a referee does, can you just tell us generally

7 what a referee does at a tae kwon do competition?

8     A   Once the tournament starts the function of the

9 tournament resides with the tournament committee and the

10 tournament committee chair and the referee committee and

11 the referee chair. Those two groups then run the

12 tournament.

13     Specifically for officials or referees in the

14 ring, the principal purpose of the referees and judges

15 in a particular ring is for the safety of the

16 competitors, but also to implement that the rules are

17 being properly followed, observed by both competitors

18 and their coaches and that they are followed within and

19 properly administered by the referee in that ring. That

20 happens when you have more experienced referees on the

21 floor as opposed to inexperienced ones.

22     So the likelihood then of having a fair

183

1 tournament really depends on the expertise of the

2 referees that are at the tournament.

3     Q   Does the referee -- as match progresses

4 does a given referee's role change? In other words, do

5 they move from one location to another and the roles

6 change?

7     A   The ring sometimes rotate position on the

8 floor, but within each ring, generally speaking, the

9 referees will rotate positions. For example, the first

10 person starting out as center referee will rotate out

11 with the judge -- corner judge in position chair one.

12 When that position -- the corner judge 1 takes his place

13 as center referee, when he finishes one or two matches,

14 he will then rotate out with chair two, and chair two

15 acts as center and then he rotates out, or she, with

16 chair three and so on. That's continuous throughout the

17 tournament.

18     Q   What do the referees do who sit in the chairs?

19     A   They actually score the points for the

20 competitors that are in that match, and should something

21 be missed by the center referee, they will call

22 attention to it. However, they have no say in the

184

6/28/2005 Brunner, Mary

1   actual running of that particular match.  That's the job
2   of the center referee.
3      Q    So it would be fair then that the referees then
4   become judges when they're sitting in the chairs?
5      A    Yes.  Center referee is called the center
6   referee.  When you're sitting in the corner even though
7   you are a certified referee, you are acting in the
8   position of a judge.  Corner judge it's called.
9      Q    Now, turning to another area, that being the
10  United States Tae Kwon Do Union or what used to be
11  called the United States Tae Kwon Do Union, what we'll
12  call USTU for short, you mentioned that you have been a
13  member since its inception or thereabouts?
14     A    No.  I've been involved in and around the USTU
15  probably since its inception.  Only because the schools
16  I was associated with were, but I believe I didn't
17  become a member until I was active in the USTU referee
18  channel.
19     Q    Thank you.  Has the USTU undergone management
20  changes in the past 2 years, if you know?
21     MR. LEVINSTEIN:  Objection, lacks foundation.
22     THE WITNESS:  I'm assuming that the new regime that

185

6/28/2005 Brunner, Mary

1   Gambardella is now heading up is constitute a changing
2   in management and et cetera, along with the reformation
3   meeting that was held or whatever that was called
4   before.
5     MR. LEVINSTEIN:  Objection.  Move to strike based on
6   what she heard here and not her own knowledge.
7     MR. JONES:  Q Again, for the record, who is
8   Mr. Gambardella or Robert Gambardella?
9     A    I don't know what his exact title is.  I'm
10  assuming he's in charge of the USTU.
11     Q    Roughly when did you first meet him?
12     A    I first met him at the tournament U.S. Open in
13  February of 2004.
14     Q    What kind of a competition is the U.S. Open?
15     A    It's an international event.  It was started by
16  Sang Chul Lee several years ago.  It was turned over to
17  management by the USTU several years ago.  It is
18  attended by teams from all over the world.  Generally 47
19  to 60 different countries attend that -- used to attend
20  that tournament.
21     Q    Is it an important competition for tae kwon do
22  competitors?

186

6/28/2005 Brunner, Mary

1     A    It's considered I believe at this point in time
2   a prestigious event.  One that you would want to have a
3   competitor medal at.
4     Q    You were at the U.S. Open in 2004 for what
5   purpose?
6     A    As an official.
7     Q    How did you come to meet Mr. Gambardella?
8     A    I introduced myself to him and asked if he
9   could take some time to speak.  I believe I called him
10  ahead of that tournament and asked if I could speak to
11  with him, and I believe he suggested that we speak on
12  the floor at the tournament somewhere.  That's my
13  recollection.  I'm not 100 percent sure.  It's been a
14  while.
15     Q    You used the phrase the floor.  That's the area
16  where the competition is going on?
17     A    And all the encompassing area where we sit and
18  rest.  There's a place generally for the referees to
19  sit, there's a place generally for them to eat, to go to
20  the restroom, but generally it's the entire floor at
21  which the tournament is taking place.  But it
22  encompasses staging area, setup.  The tournament

187

6/28/2005 Brunner, Mary

1   committee have their own area, referees of course have
2   their own, medical has its own area.  It is a big place.
3   It isn't just the tournament.
4     Q    Did he consent to speak with you?
5     A    Yes, he did.
6     Q    Before going into detail on the substance of
7   the discussion, what general topics were covered in that
8   hour to two-hour conversation?
9     A    We talked --
10     MR. LEVINSTEIN:  Objection to the hour, two hour.
11  You can continue.
12     THE WITNESS:  It was approximately a one-hour to
13  two-hour conversation that took place and we discussed
14  refereeing, discussed officials within the referee
15  committee, direction of the USTU, his perspective on
16  what he had planned to do.  How he planned to make
17  changes, what had happened in the past, what had
18  transpired in the past, almost every aspect that I could
19  think of to ask questions about.
20     MR. JONES:  Q Focusing on the area of refereeing,
21  what in particular was covered with him?  What did you
22  say to him about refereeing?

188

1    A    I believe I asked why in particular he had
2    picked Barbara as an interim, and he responded that he
3    had met her at a tournament and she's the only one he
4    really knew.
5        I asked him if due diligence had taken place in
6    the selection process, he said no, he just knew her,
7    which was really not probably a good management decision
8    to make especially since he was new to that position.
9    It would seem to me that more due diligence would have
10   taken place rather than less because he was new and he
11   had no background in tae kwon do.  So I voiced those
12   opinions to him, and he said that's the reason he had
13   for selecting her.
14   Q    I'm sorry.  Barbara's last name?
15   A    Wakefield.
16   Q    She was selected in your understanding to what
17   position?
18   A    Interim referee chair.  When he spoke to the
19   referees I believe it was his statement that said that
20   she would be officiating or running -- managing the U.S.
21   Open and that he would then select someone later, but I
22   don't know if he really understood what he was saying to

1    us.
2    Q    What was -- was it your understanding then that
3    she was -- that the interim referee chair position was
4    appointed by Mr. Gambardella?
5    A    It was -- he was the one appointing, yes.
6    Q    And what was your understanding of the function
7    of the referee chairperson at USTU at that time?
8    A    Up until that time the referee chair was
9    responsible for processing and taking recommendations
10   for referee certification and upgrades and for selecting
11   referees that were at any given USTU event and/or the
12   U.S. Open and/or making recommendations to the WTF for
13   international tournaments and resided as the manager in
14   place over the tournaments that were sponsored by the
15   USTU.
16   Q    So the referee chair actually picked referees
17   at several USTU tournaments?
18   A    Up until that time, yes.
19   Q    What concerns, if any, did you voice with
20   Mr. Gambardella about selection of Wakefield as the
21   interim referee chair?
22   A    Her qualifications, her unbiased or biased

1    opinions and the fact that I had complained or written a
2    letter about the issues involving her situation with Kim
3    Davis and Lopez led me to believe that she probably
4    wouldn't be so positive about me.
5    Q    Focusing a moment on what you phrase as bias
6    being one of your concerns about Ms. Wakefield, what
7    bias were you -- did you voice to Mr. Gambardella?
8    A    I'm sorry.  Can you ask the question --
9    Q    You said you voiced concern about
10   Ms. Wakefield's selection because of bias.
11   A    Well, she had lacked in my opinion integrity in
12   the situation with the Lopezes and did not stand by a
13   referee when she could have, and those were really
14   contrary to what I had seen other referee chair people
15   do both of those.
16   Q    In your opinion did she have the support of all
17   of the various racial minorities within the referee
18   environment?
19   MR. LEVINSTEIN:  Objection.
20   THE WITNESS:  I do not believe so.
21   MR. JONES:  Q  Did you voice that to Mr. Gambardella
22   during that conversation?

1    A    I believe I expressed to him that her seniority
2    and rank were not of the level that would command as
3    much following and respect from the referee pool, et al.
4    as would have been with another individual.
5    Q    Exactly what races were mentioned, if any, to
6    Mr. Gambardella in that conversation with respect to
7    commanding respect?
8    MR. LEVINSTEIN:  Objection.
9    MR. JONES:  Q  Were there -- were there any races
10   mentioned that -- that in your opinion did not -- would
11   not support Ms. Wakefield?
12   MR. LEVINSTEIN:  Objection.
13   THE WITNESS:  The tae kwon do world operates on rank
14   and seniority.  It would be like a general in command of
15   an Army being contacted by the President of the United
16   States and said well, for the next war you follow the
17   direction of the enlistee that just started yesterday.
18   Because he didn't have the rank that soldier wouldn't
19   have the rank and/or the seniority or the experience it
20   would be less likely there would be a positive outcome
21   had the President of the United States requested of that
22   general why don't you talk to another general.

```
 1       Rank and seniority mean a lot in the tae kwon
 2  do world and there were many, many and are many, many
 3  other people with higher rank and higher qualifications
 4  that would command a higher following.
 5       MR. JONES:  Q  Did you voice any concern that
 6  Korean-Americans in particular would be less likely to
 7  participate as referees when Ms. Wakefield was selected?
 8       A    Well, I think I remember asking why there
 9  weren't more Koreans on the floor since there were only
10  like four or five and that hadn't been the case in the
11  past.  And that's when he said to me he wanted to get
12  rid of them, he didn't want any of them, they were all
13  crooks, didn't want to have any participation at all,
14  wanted to clean house so to speak.
15       Q    This is important.  Can you use as best you can
16  the words he used to you with respect to his description
17  of why Korean-American refs weren't on the floor?
18       A    He said they're all crooks.  I want to get rid
19  of all of them.  I don't want to have them here anymore,
20  I don't want them involved with us anymore, USTU.
21  Something -- I'm paraphrasing.  I'm not quoting.
22       Q    What did you say in response to that, if
```

```
 1  anything?
 2       A    I said isn't that against the law, isn't that
 3  called discrimination?  I said, I have been subject to
 4  discrimination in the course of my lifetime as I said
 5  probably you have with the last name of Gambardella.
 6  And he said yes.  And I said it didn't feel good to me
 7  then.  Did it feel good to you?  No.
 8            I said, well, then that's the way it's going
 9  feel to these other people also, myself included.  Just
10  because some people with any group, not just Korean, not
11  just Hispanic, but within any group, because some are
12  out of line or dishonest or are caught with whatever
13  situation doesn't mean that the whole group is bad, and,
14  therefore, that the whole group should not be castigated
15  as a result of that.
16       Q    What, if anything, did he say when you brought
17  up those points?
18       A    Don't care.  I don't want them here.
19       Q    You took the word them to mean whom?
20       A    Korean-American background referees, and I
21  don't know if he threw in Latins in there too.  I don't
22  know that, but I certainly haven't been selected since
```

```
 1  then.
 2       Q    Your best estimate as to the number of
 3  Korean-American refs -- referees that were on the floor
 4  at the U.S. Open in Florida in 2004 when you were there.
 5       A    I believe 4 to 6, something like that.  Not too
 6  many.  About 10 percent.
 7       Q    In your experience was that less than what you
 8  would have expected?
 9       A    I believe the previous year and the years in
10  the previous years -- the previous year and previous
11  years before that it was more like 40 percent as there
12  were more Latin referees in previous years.
13       Q    Did anyone witness this conversation -- witness
14  or to your knowledge overhear this conversation that
15  you've just described with Mr. Gambardella at the U.S.
16  Open on the floor there at the U.S. Open Championship?
17       A    There were two or three individuals that came
18  up and asked questions of him, somebody that was working
19  with him.  I don't know who they were.  Conversation was
20  paused while he and -- while he took care of whatever it
21  was they did, and I did not resume conversation until
22  they had left because I felt that was my business with
```

```
 1  him one-on-one.  No one else sat down with us nor was
 2  witness to any of the conversation that I had with him.
 3       Q    Did Ms. Wakefield come anywhere near the
 4  conversation that you just described?
 5       A    She might have been one of the individuals that
 6  walked up to him, I don't recall, but she certainly was
 7  not a witness to any of my conversation with him.  Only
 8  because I would not want her to misconstrue anything
 9  that I was saying.
10       Q    You were, in fact, talking about her?
11       A    Exactly.  So why would I invite her to sit
12  there?
13       Q    Based upon this verbal exchange, this
14  conversation you had with Mr. Gambardella on the floor
15  in February of 2004 at the U.S. Open, did you come away
16  with any impressions about how Mr. Gambardella felt
17  about Koreans or Korean-Americans?
18       MR. LEVINSTEIN:  Objection.
19       THE WITNESS:  My impression was that he didn't like
20  them, that he was a racist and that he was very open
21  about expressing his feelings about being a racist and
22  treating the Korean-Americans especially in a
```

1    discriminatory manner.

2        MR. JONES:  Q  As a result of your conversation with

3    Mr. Gambardella in February of 2004, did he, to your

4    knowledge, change his decision to select or appoint

5    Ms. Wakefield as interim chair referee?

6        A   I'm sorry.  Can you ask the question again?

7        Q   As a result of that conversation which you just

8    described, did Mr. Gambardella reconsider or change his

9    appointment of Ms. Wakefield?

10       A   I believe she is still interim referee chair.

11       Q   And earlier we went over a letter that you

12   wrote to Mr. Gambardella later in the month of February.

13       A   After the tournament, yes.

14       Q   Seeking reconsideration again?

15       A   He had asked me to put my suggestions down,

16   which is what I did.  That was why I wrote him.

17       Q   And even after that letter he did not --

18       A   In fact, he didn't even respond to my letter.

19   That I recall.  It's been a long time.  I don't think he

20   did.

21       Q   A few minutes ago you gave us some estimates of

22   what you'd expect to see as far as participation

1    percentage-wise by Korean referees as a group at the

2    U.S. Open.  Let me ask you this.  Before the U.S. Open

3    in early 2004 at this more elite tournaments, the higher

4    level tournaments generally was it your impression that

5    the more elite referees would be selected?

6        MR. LEVINSTEIN:  Objection, vague and ambiguous.

7    Don't know what tournaments.

8        THE WITNESS:  They would have to be the more

9    qualified referees.  Most people vying for the Olympic

10   team and their coaches and representing organizations

11   would not want a beginning referee to be officiating.

12   The possibility of their competitor at a Steven Lopez

13   level to whether or not they would be a winner or not.

14   You'd want the most qualified, most experienced referees

15   on the floor.

16       MR. JONES:  Q  Over the past 10 or 15 years, what do

17   you think was the largest national tournament that you

18   have been to as a referee prior to February of 2004?

19       MR. LEVINSTEIN:  Objection.

20       THE WITNESS:  Been to as a referee?  I don't

21   understand the question.

22       MR. JONES:  Q  Participated in as a referee.

1        MR. LEVINSTEIN:  Objection.

2        MR. JONES:  Q  I'm talking about in terms of

3    numerosity --

4        A   As a referee?

5        Q   Yes.  In terms of number of competitors who

6    have attended.

7        A   As a referee was probably one of the Junior

8    Olympics, 2003 or 4, I don't remember the exact figures.

9    I'm assuming there were around 5,000.  But the largest

10   attendance was at the '94 Junior Olympics at which I was

11   the executive director at which there were over 5200

12   competitors.

13       Q   You were a referee and executive director?

14       A   No.  I was executive director and did not act

15   as referee at that tournament.

16       Q   And about how many participants did you say?

17       A   Over 5200 at that tournament.

18       Q   So how many referees participated in a

19   tournament of that size?

20       A   We invited approximately 200 referees to that

21   tournament.

22       Q   Your best estimate as to the percentage of

1    those 200 referees who were Korean-American?

2        MR. LEVINSTEIN:  Objection.

3        THE WITNESS:  The percentages were divided and I

4    tried to be very ethical in the way that we were

5    handling that tournament.  I tried to make sure that

6    ethnicities -- all ethnicities were represented.  I was

7    trying to follow the Sports Act.

8        So the -- one of the speeches I invited a black

9    to give one of the speeches.  I invited a Latino boy to

10   do the Pledge of Allegiance.  When we did some of the

11   demonstrations in opening ceremonies, I tried to make

12   sure that we had a representative ethnicity division

13   amongst the participants because I wanted no one to feel

14   left out.

15       As far as referees were concerned, I didn't

16   select those.  That was part of the referee chair.  But

17   I do believe that we had approximately 40 percent Korean

18   background or Korean born, Korean ethnicity;

19   approximately maybe 15 percent Latins.  We had about 15

20   percent blacks, maybe 20 percent blacks, and the rest

21   were mixed races and/or Caucasian, Vietnamese, blah,

22   blah, et cetera, et cetera.

1    THE VIDEOGRAPHER:  Five minutes on the tape.

2    MR. JONES:  Q  That was a national tournament you

3    were executive director of, is that right?

4    A    Yes.

5    Q    In your recollection what was the largest

6    international tournament in the United States that you

7    were either executive director of or referee at prior to

8    February of 2004 in terms of number of attendees?

9    A    Prior to it would be probably another U.S.

10   Open.  They were averaging around I'm guessing 2,000

11   competitors up until 2004 when the numbers dropped

12   dramatically.

13   Q    Can you give us a specific one that you recall

14   was the biggest?

15   A    2003, 2002 would probably be the two highest.

16   Q    And why -- again your best estimate of the

17   percentage of Korean-American referees who participated?

18   MR. LEVINSTEIN:  Objection.

19   THE WITNESS:  My guess would be pretty close to that

20   40 percent mark at both of those.

21   MR. JONES:  Q  Is that an estimate?

22   A    That's a best estimate because again I'm not --

1    part of the process, but generally we have a center

2    referee, three corners, and we may or may not have TA,

3    technical assistant, and you multiply that figure by the

4    number of rings that's generally the number of referees

5    you have on the floor.

6    Q    Have you observed any other tournaments in any

7    capacity where you were able to visually estimate the

8    number of -- estimate the number of Korean-American

9    referees present?

10   A    Any tournament you multiply five by the number

11   of rings you generally get a pretty good idea of the

12   number of referees that are on the floor.

13   Q    Have you attended any after the U.S. Open in

14   2004 where you were able to see and do that?

15   A    For the USTU?

16   Q    Yes.

17   A    No.  I wasn't invited anywhere.

18   Q    To what would you attribute the decrease in

19   percentage of Korean-American referees after February --

20   as of February 4th, 2004?

21   MR. LEVINSTEIN:  Objection.

22   THE WITNESS:  As I stated before referees for any

1    I wasn't on the referee committee.  I wasn't in the part

2    of anything to do with management, wasn't my job.  I

3    wasn't privy to all of that, but in looking around the

4    rings that would be my guess.

5    Q    Based on a visual estimate?

6    A    Yes.

7    MR. LEVINSTEIN:  Objection, move to strike.

8    MR. JONES:  Q  Now comparing that to what you

9    observed in February of 2004 during the U.S. Open in

10   Florida, your best estimate of the percentage of

11   Korean-American referees at that tournament in which you

12   participated in?

13   A    I believe there were about four or six on the

14   floor.  The number of participants was also dramatically

15   decreased.

16   Q    Your best estimate of the total number of

17   referees at that tournament.

18   A    Wasn't part of that process, but I believe we

19   were running four, six rings which would mean four to a

20   group, probably 24 people refereeing approximately.

21   Q    So 4 to 6 out of 24?

22   A    Yes, sir.  Again visual assumption.  I wasn't

1    given event are selected and invited by the person in

2    charge of that function.  In this case is Bob

3    Gambardella.  I can only assume that he has for some

4    reason decided not to select Koreans and/or Latins to

5    referee at his events.

6    MR. JONES:  Q  Just to acquaints us a little bit

7    with the referee selection process, how does that work?

8    Do referees who want to participate apply?

9    A    When a tournament is announced they

10   generally -- at least they used to -- they're not doing

11   that now, but they used to send out a tournament

12   information packet.  Included in that packet were

13   applications for the competitors and/or the coaches

14   and/or VIPs and instructors and/or masters.  And along

15   with that is an invitation or an application for

16   referees.  You fill out the application and you sent it

17   in.  That's been the normal procedure.

18   Q    What is on the application with respect to --

19   so is there any information on the application with

20   respect to individual tournament participation or are

21   tournaments listed on there that the respective referee

22   may want to participate in?

1    A    Currently -- they didn't used to be, but
2    currently the one that I had someone pull off the
3    Internet and give me showed the regional tournaments on
4    there and indicated which ones you wanted to or would be
5    available to assist in refereeing and the number of days
6    that you could participate at each particular
7    tournament.  And then you filled that out and then you
8    sent it back in along with your referee rank and other
9    personal information.
10    THE VIDEOGRAPHER:  Mr. Jones, we have to change the
11    videotape.
12    MR. JONES:  That's fine.
13    THE VIDEOGRAPHER:  This is the end of tape number 2
14    of the deposition of Mary M. Brunner.  The time is 1:52
15    p.m.
16        (Off the record)
17    THE VIDEOGRAPHER:  This is the beginning of tape
18    number 3 of the deposition of Mary M. Brunner.  The time
19    is 1:58 p.m.
20    MR. JONES:  Q  Ms. Brunner, before we broke we were
21    talking about the procedures for referee selection and
22    you explained to us your understanding of the content of

1    A    By Barbara and Bob.
2    Q    So what happens next, if you know?  As a given
3    tournament approaches do people get calls or letters or
4    what, if you know?
5    A    In the past I had been sent letters telling me
6    that I had been appointed, and in some cases also
7    received a phone call, and in some cases received a
8    phone call in lieu of a letter.
9    Q    Other than the impact of new management on the
10    percentage of attendance by Korean-American referees at
11    USTU sponsored tournaments, are you aware of any other
12    impacts that new management has had on the tournaments?
13    MR. LEVINSTEIN:  Objection.
14    THE WITNESS:  By observation the number of
15    participants at the national level of competitors has
16    decreased substantial by approximately half of the
17    juniors -- actually by approximately half at almost all
18    of the tournaments, which would subsequently lead to the
19    conclusion that the U.S. team membership has also
20    dropped significantly.  We have, of course, eliminated
21    50 state tournaments which reflects on the number of
22    competitors that have USTU tournaments availability to

1    the referee application.
2    A    Yes.
3    Q    And that the applicant has the ability to check
4    off what events they wish to participate in or are
5    available for, is that correct?
6    A    Yes.
7    Q    What happens, if you know, to those
8    applications?
9    MR. LEVINSTEIN:  Objection.
10    THE WITNESS:  It's my understanding they're sent to
11    the person that is then going to make the selection of
12    the referees for any particular tournament.  I don't
13    know who that is.  I'm assuming that it's Gambardella
14    since he's the one that uninvited me.
15    MR. JONES:  Q  And would -- if you know would
16    Ms. Wakefield have a role or function in that selection
17    process as well?
18    A    The documentation that is sent out on the
19    referee application that I saw said it was done as a
20    joint effort in writing on their applications.  It's on
21    the website.  It was on the website.
22    Q    Joint effort --

1    them, those that can't travel, that means that's gone
2    which, in turn, affects the number of referees and
3    coaching staff that is properly trained to go onto the
4    national level.
5        Doing away with the state presidents also
6    greatly affected the number of sanctioned tournament
7    fees that go to the USTU because they are no longer
8    required.
9        Is that what you meant?
10    Q    I think you've answered it.
11        So you mentioned several points.  One is
12    participation by athletes has dropped, is that correct,
13    at the tournaments?
14    A    Absolutely.
15    MR. LEVINSTEIN:  Objection.
16    THE WITNESS:  And, unfortunately, one of the views
17    -- the issues that I presented to Mr. Gambardella at
18    that meeting or meetings that I had with him in February
19    were that when we eliminate the state presidents and we
20    eliminate the state organizations, we are also
21    eliminating by attrition, by -- in the same hand the
22    grass roots efforts to develop competitors, the grass

1   roots efforts to develop referees and coaching staff.
2   So, in fact, his reply to me was, well, we still got
3   competitors. Sure we do for now and for next year and
4   the next maybe.
5        But what happens in five years when we haven't
6   developed any new ones? And it's happening with
7   referees. We haven't developed any new ones. So what's
8   happening is I was at the San Jose regional and almost
9   every -- well, maybe 90 percent of those referees were
10  first time referees. What does that do to the caliber
11  of the tournament? What does that do the caliber of the
12  competitors that we are now selecting because the -- it
13  logically follows we're not selecting the best of the
14  competitors because we have not the best of the
15  officials on the floor.
16      MR. LEVINSTEIN: Objection. Move to strike,
17  nonresponsive.
18      THE WITNESS: The un -- unexperienced referees have
19  the greater likelihood of making errors in judgment,
20  errors in scoring and errors in applying the rules.
21      MR. JONES: Q So you're talking about the quality
22  of competition then when you talk about the quality of

1   the referees or the officiating?
2       MR. LEVINSTEIN: Objection.
3       THE WITNESS: Not only the quality of the
4   competitions, it is also the quality of the people that
5   we select as competitors. We may or may not get the
6   best, and more than likely we won't because there's --
7   the possibility with inexperienced officials is much
8   higher of as I say misapplying rules, not calling proper
9   penalties, et cetera, and missing points.
10      MR. JONES: Q Just understanding the relationship
11  between revenue and participation at these tournaments,
12  do participant athletes who are competing pay a fee?
13      A   The applicants pay a -- are required to pay an
14  application fee, and if they're late, they pay a late
15  fee. And in order to participate they have to be a U.S.
16  team member. If they are taking a parent with them to
17  sit in the back, especially if the juniors, those have
18  to pay a fee to become a parent coach/coach. Coaches
19  going with them to help them at the tournament also pay
20  a fee, and any member of the family attending the
21  tournament must pay a fee to enter the tournament.
22      Q   In the past do you know if these tournaments

1   like the U.S. Open were profitable for USTU?
2       MR. LEVINSTEIN: Objection.
3       THE WITNESS: I don't have direct knowledge of the
4   U.S. Open since I was not involved in that process. But
5   I was executive director for the '94 Junior Olympics,
6   and for the PATU 1993 -- first PATU cup and I have
7   direct knowledge there.
8       Q   Were those two events profitable?
9       MR. LEVINSTEIN: Objection.
10      THE WITNESS: The 1994 Junior Olympics was not
11  profitable. The PATU tournament I believe broke even.
12  I need to explain that at that time the tournaments
13  weren't run by the USTU. The tournaments were run by
14  whoever bid on the tournament. So I believe until about
15  4 years ago, maybe 5 years ago, I'm not sure when that
16  change happened, the tournaments were runs strictly by
17  individuals which had nothing to do with the U.S. They simply
18  paid a sanction fee to the USTU which, in effect, made
19  it profitable for the USTU because they got the sanction
20  fee free and clear. They were not responsible for any
21  expenses.
22      In addition, because it was a USTU sanctioned

1   tournament, all the participants had to apply for USTU
2   membership, therefore, multiplying 5200 by USTU
3   membership, at that time was $28 in 1994, that would be
4   very profitable to the USTU.
5       MR. JONES: Q Backing up a moment to your opinions
6   about the Korean-American referees. In your opinion are
7   they better or more experienced referees than the ones
8   you've seen lately at USTU sponsored events?
9       MR. LEVINSTEIN: Objection.
10      THE WITNESS: That's a question that can't really be
11  answered objectively. In every ethnicity you have
12  experienced people. You have credentialed people.
13  Because you are Korean or because you are Latino does
14  not necessarily make you a more qualified referee. What
15  makes you more qualified and more apt to be a
16  professional is how much experience you have had, how
17  much training you have had, and, more importantly, how
18  you apply the rules when you are in the ring. Has
19  nothing to do with ethnicity.
20      What bothered me with Mr. Gambardella is that
21  he exclusively said, pointedly said, that they're all
22  crooks, meaning the Koreans, and, therefore, I don't

1  want them here.  That's not -- it's not ethical to me,
2  and I believe it's discriminatory.
3      MR. JONES:  Q  Let me --
4      MR. LEVINSTEIN:  Objection, move to strike,
5  nonresponsive.
6      THE WITNESS:  What does nonresponsive mean?
7      MR. JONES:  Q  Didn't answer the question.  Let me
8  rephrase the question.
9          Within the total group of Korean-American
10  referees out there, are there a significant number of
11  highly-qualified referees for international and national
12  competitions?
13      MR. LEVINSTEIN:  Objection.
14      THE WITNESS:  Yes.
15      MR. JONES:  Q  Why -- what makes them highly
16  qualified?
17      MR. LEVINSTEIN:  Objection.
18      THE WITNESS:  As I just stated the more experience
19  you have, the more training you receive, the more
20  training you seek will make you better at your
21  profession as in any profession.  A doctorate generally
22  has more training than a bachelor, Bachelor of Arts.

1      MR. JONES:  Q  Is it correct then within the
2  Korean-American community there are a number of referees
3  who have the highest certification, for example, A-1?
4      MR. LEVINSTEIN:  Objection.
5      THE WITNESS:  I don't know.  I'm not involved with
6  that process, but from my personal acquaintances there
7  are a higher number of Korean background or ethnic
8  referees with the higher ratings, and I believe the
9  highest ranking, highest two or three ranking referees
10  within the United States are all Korean.  One of them is
11  Koang Woong Kim.
12      MR. JONES:  Q  If one were to assume that the new
13  management at USTU wanted to remove all of the
14  Korean-Americans from their activities, would you say
15  that they have been successful?
16      MR. LEVINSTEIN:  Objection.
17      THE WITNESS:  The best way to eliminate a group of
18  people from the referee environment is to simply not
19  invite them, and I believe that's been done.
20      MR. JONES:  Q  Are you acquainted with the plaintiff
21  Dae Sung Lee?
22      A    Acquainted, yes.

1      Q    Would you consider him a friend?
2      A    I would not have said -- I won't -- can't say
3  that he would be in my group of friends.
4      Q    Are you aware that prior to the 2004 Olympics
5  in Athens that he was appointed to be a coach of the
6  U.S. Olympic Team?
7      MR. LEVINSTEIN:  Objection.
8      THE WITNESS:  Ask the question again, please.
9      MR. JONES:  Q  Were you aware prior to the 2004
10  Olympics he was appointed to be the U.S. Olympic coach?
11      MR. LEVINSTEIN:  Objection, asked and answered.
12      THE WITNESS:  Excuse me.  I'm missing here.
13      MR. JONES:  Not been asked by me.
14      MR. LEVINSTEIN:  Asked and answered.
15      MR. JONES:  Q  Go ahead and answer the question.
16      A    I became aware that he had been appointed
17  approximately at the same time that I became aware that
18  he was not going.  Again referees and coaching
19  environment do not really have anything to do with each
20  other.  That's why I say I am acquainted with Dae Sung
21  Lee but not considered friend because once a tournament
22  starts, tournament committee is over there, they do

1  their own thing, referee committee is over there, they
2  do their own thing, and they're really not together.
3  They're different functions within the tournament group,
4  within the tournament.
5      Q    When you became aware that he had been
6  appointed and then removed, what did you think of that?
7      MR. LEVINSTEIN:  Objection, lacks foundation, no
8  basis for her to answer that question.
9          Go ahead.
10      MR. JONES:  Q  What did you think?
11      A    What was my opinion?  They did it again.
12      Q    Meaning USTU?
13      MR. LEVINSTEIN:  Objection.
14      THE WITNESS:  Yes.
15      MR. JONES:  Thank you.  No further questions.
16          FURTHER EXAMINATION
17          by Mr. Levinstein:
18      Q    I've got a few.
19      Q    But you don't know what the criteria were to be
20  the Olympic coach?
21      A    Didn't know, don't care, don't want to know,
22  not involved, not my job.

1    Q    Don't know whether he met the criteria or did
2    not?
3    A    Don't care, don't know, don't want to know.
4    Not my job.
5    Q    And since February of 2004 you don't know which
6    referees have applied to be referees?
7    A    That would be that I would be the referee chair
8    and subject to receiving all documentation nationwide,
9    which I don't believe Bob Gambardella has forwarded to
10   me.
11   Q    So you don't know if Korean -- Korean-Americans
12   have applied and not been accepted?
13   A    Yes, I do.  There are some that I have spoken
14   to that have applied and not been accepted.
15   Q    Based on them telling you?
16   A    Correct.
17   Q    You've never seen their application or any
18   documents saying they weren't selected?
19   A    As I said Mr. Gambardella has not forwarded me
20   -- forwarded to me that documentation.
21   Q    Do you know when Mr. Gambardella took his
22   position with the USTU?

1    A    I have no idea, not my job.
2    Q    The event which you talked to him was in
3    February of 2004, correct?
4    A    Yes.
5    Q    No indication, suggestion or discussion had
6    even taken place as of then about the elimination of
7    state presidents or state organizations, had it?
8    A    I talked to him at great length about it during
9    that conversation.
10   Q    That's your testimony, one week after he took
11   his job there had already been discussion about
12   eliminating state presidents --
13   A    I believe they had already been eliminated.  I
14   believe they had already contacted the state presidents.
15   We talked -- there had been several rumors going about
16   for many months prior to because of all the
17   machinations, et cetera.  I believe that we had talked
18   about state involvement, et cetera, et cetera, but I may
19   be wrong.  It was a long time ago, I didn't write it
20   down and I didn't record the conversation.
21   Q    So it's --
22   A    It could be incorrect, it may be correct.  I

1    don't recall exactly.
2    Q    It's possible you never discussed elimination
3    of state presidents and state organizations --
4    A    Oh, I did discuss that with him.  It may or may
5    not have been at this tournament, but I did discuss it
6    with him, and I do remember discussing the grass roots.
7    It may have been at a subsequent conversation, but I did
8    have that conversation with him, he and I one-on-one.
9    Q    Is it your understanding -- you were a referee
10   in the February of 2004 U.S. Open, correct?
11   A    Yes.
12   Q    When was your application accepted?
13   A    I have no idea.
14   Q    Would it have been a day before?
15   A    I have no idea.
16   Q    In general, for an event like that, how far in
17   advance do you know you're going to have to travel to be
18   a referee in an event?
19   A    There was no in general.  They were all
20   different.  I was uninvited to the Olympic qualifier
21   three or four days before the event.
22   Q    I understand.  But in order to have an event

1    like the U.S. Open, how far in advance does the event
2    have to have referees lined up to referee the events?
3    A    As I just said, they're all different.
4    Q    But for an event that took place -- what does
5    your declaration say -- February 4th you met with
6    Mr. Gambardella?
7    A    Yes.
8    Q    How far in advance of that would invitations
9    have to have been made or accepted?
10   A    There is no general timeframe, there is no set
11   timeframe.  It depends on the manager that's handling
12   that particular event, and the director I'm assuming at
13   this point it was Gambardella and how organized he is.
14   There is no set amount of time.
15   Q    What's the shortest time you can imagine that
16   you could accept applications and still have referees in
17   time for an event like that?
18   A    The morning of the event.
19   Q    The morning of the event you could select
20   people to travel to -- where was this event -- Orlando,
21   Florida and gets referees there between the morning and
22   the afternoon of the event?

6/28/2005 Brunner, Mary

1    A    There are several referees in Florida, several
2    in Orlando.
3        Q    But of the 24 people you said probably refereed
4    that event, were they coming from all around the
5    country?
6        A    I don't know.  You'd have to ask Bob
7    Gambardella that.  I know I came from Illinois.
8        Q    And when was your application accepted for that
9    event?
10       A    As I said before I don't know.
11       Q    Are you aware of any referee who applied for
12   the U.S. Open in February of 2004 who was not accepted?
13       A    Didn't care, didn't know, wasn't my job.
14       Q    You have no basis for saying that the USTU
15   turned down any Korean-American or Latin who applied to
16   the February, 2004 event?
17       A    Observation.  They weren't on the floor.
18       Q    But you don't know if they applied?
19       A    I have no idea of what and who, but I know
20   based on previous tournaments that that tournament was
21   highly attended by qualified, international referees.
22       Q    But didn't it affect the people's decision to

221

6/28/2005 Brunner, Mary

1    apply the fact that there was a new regime?
2        A    Is that hearsay?  You'd have to ask those
3    individuals.
4        Q    Well, you're the one who is telling me about
5    hearsay about why people didn't show up for the event.
6        A    No, I'm not.  You have to ask each individual
7    referee if they applied.
8        Q    But you have no knowledge of anyone who applied
9    and was turned down?
10       A    Well, why would I?  That wasn't my job.
11       Q    You have no idea whether Bob Gambardella turned
12   anyone down or didn't?
13       A    All I know is when he turned me down.
14       Q    Correct.  When you talked to Bob Gambardella,
15   you were concerned about Barbara Wakefield because you
16   were concerned that she wouldn't be positive about you,
17   isn't that correct?
18       A    That was one issue that I had.
19       Q    Why did you believe Barbara Wakefield would not
20   be positive about you?
21       A    I believe I've already answered that.
22       Q    I'd like to hear it again.

222

6/28/2005 Brunner, Mary

1        Q    Can we reread back the question?
2        Q    She will never be able to find the question.
3    MR. JONES:  Objection, asked and answered.
4    THE WITNESS:  I believe I've already answered it.
5    MR. JONES:  Objection, asked and answered.
6    MR. LEVINSTEIN:  Q  You're under oath.  I'd like to
7    know why did you believe Barbara Wakefield would not be
8    positive.
9        A    It would be the same answer I gave before.
10       Q    This is a deposition.  I'm asking you a
11   question.  There's an objection.
12       A    I don't understand when before I answered it
13   you objected, now it's okay.
14       Q    That's not correct.  There was never such a
15   question.
16       A    Yes, there was.  I answered it before.
17       Q    Why were you concerned Barbara Wakefield would
18   not be positive about you?
19       A    I already stated that.  I had had issue and
20   stated the issues when she was caught having a petition
21   circulated without integrity at a tournament at which
22   she was officiating.  That's absolutely not ethical.

223

6/28/2005 Brunner, Mary

1        Q    Did you --
2        A    Would you let me finish?
3        Q    Sure.
4        A    And she was not standing behind the referees,
5    for example, Ms. Kim Davis, when it was clearly her job
6    as referee -- a position of referee chair, vice chair to
7    do so.
8        Q    And did your complaints about that get back to
9    her?
10       A    Did you see the letter that I wrote?
11       Q    It wasn't copied to her, was it?
12       A    She has a copy of it given to her by Bob
13   Gambardella.
14       Q    Which letter?
15       A    The letter that I wrote to Sang Chu Lee.
16       Q    But not as of February of 2004 she didn't?
17       A    Yes, she did.
18       Q    Given to her by Bob Gambardella?
19       A    Apparently he gave it to her because I saw it
20   in San Jose.  This year she showed it to me.  She told
21   me she had it.
22       Q    But you didn't send it to him until

224

```
1   February 26th?
2       A    No, sir.  I sent the letter to Sang Chu Lee the
3   year before whenever that event happened with --
4       Q    In 2000.
5       A    Let me finish.  Whenever that event happened
6   involving her and the Lopezes.  Between then apparently
7   Bob Gambardella got a copy of it from somewhere because
8   when I met with Barbara Wakefield --
9       Q    Go ahead.  You attached it to your
10  February 26th letter to Bob Gambardella?
11      A    Yes.  And she had a copy on -- no, he works for
12  the USTU.  He has copies of everything that's there,
13  doesn't he?
14      Q    So you think he went back through the files and
15  found your June 22, 2000 letter?
16      A    If I attached it then he had it with that, but
17  she was given a copy by him.
18      Q    But you talked to him before you sent this
19  letter?
20      A    Yes.
21      Q    So you talked to him before February 26th?
22      A    Yes.
```

```
1       A    To Sang Chu Lee concerning her involvement in
2   circulating a petition trying to sanction Gene Lopez
3   when, in fact, he was probably the most qualified coach
4   that we had.  And my issue with that instance was that
5   she did it during the middle of an Olympic qualifier --
6   an Olympic qualifying tournament, and it should have
7   been done either before or after, but not during the
8   tournament.  And I believe I have answered and stated in
9   the past.  That's my concern.  That isn't the ethical.
10  I would have objected had it been Barbara or anybody
11  else that did it.
12      Q    You objected directly to her?
13      A    Yes, and I objected to others.
14      Q    She knew you objected to others?
15      A    I don't know.  Didn't follow her around.
16      Q    You said you called Bob Gambardella head of the
17  tournament to arrange to meet with him?
18  MR. JONES:  Objection, misstates the testimony.
19  MR. LEVINSTEIN:  Q  In February.
20      A    I don't know what his title was is what I
21  believe I said.  And I called to ask if he could speak
22  with me.  He suggested we meet at the tournament.
```

```
1       Q    And on the day you talked to him, you had
2   concern about Barbara Wakefield wouldn't be positive
3   about you?
4       A    Yes.
5       Q    And on that date you hadn't yet sent Bob
6   Gambardella your previous letter?
7       A    But I had discussed my issues.
8       Q    But on February 4th or 15th when you talked to
9   Bob Gambardella, there was no reason to believe that
10  Barbara Wakefield had seen your June 22 letter, 2000 to
11  Sang Chu Lee, correct?
12      A    Is that a question?
13      Q    Did you have any reason to believe she had seen
14  that letter?
15  MR. JONES:  Objection, calls for speculation.
16  THE WITNESS:  Why would I care?  I wouldn't ask.
17  Wasn't my issue.  I didn't care what she had done or
18  hadn't done.  My concerns were her being ethical in a
19  position that would influence me.
20  MR. LEVINSTEIN:  Q  You said you were concerned she
21  wouldn't be positive about you because you had sent the
22  letter.
```

```
1       Q    You called him where?
2       A    I'm assuming at the USTU.
3       Q    Where did you get his name to call him?
4       A    I called the USTU and asked who was in charge
5   and they gave me to him.  I still didn't know his name.
6   He's got a very complicated last name.
7       Q    When did you call him?
8       A    I don't remember.  You could check the USTU
9   records I'm sure.  Incoming phone calls would have that
10  on record.
11      Q    And what was it that you wanted to talk to him
12  about?
13      A    Same as I stated before, hasn't changed.
14      Q    Did you want to talk to him about the
15  appointment of the interim referee chair?
16      A    At that time I just wanted to have a
17  conversation with him.  I didn't indicate to him the
18  topics that I wished to cover, nor the length of time of
19  each topic.
20      Q    Did you know when you called him ahead of the
21  tournament that Barbara Wakefield had been appointed the
22  interim referee chair?
```

1   A   I don't believe I did when I called him.

2   Q   And when you called did you identify who you

3   were and that you wanted to speak with him?

4   A   I gave him my name.

5   Q   Did you speak to him on the telephone?

6   A   He said he was busy, could we talk at the

7   tournament on the floor of the tournament.

8   Q   Were there Korean-American referees at the U.S.

9   Open?

10   A   I believe I've answered that at least ten

11   times.

12   Q   There were four to six?

13   A   It hasn't changed.

14   Q   Was there something about them that made them

15   different as to why they were allowed to referee and

16   others were not?

17   A   You'd have to ask the person who selected them.

18   Q   Were they unqualified?

19   A   I think I've already stated what the

20   qualifications are to become an international referee.

21   Q   So those four to six people who were there you

22   believe were qualified?

1   A   I believe I've already stated what the

2   qualifications are to become an international referee.

3   Q   I understand that.  That wasn't what I asked.

4   I asked you -- you said there were 24 people who

5   refereed the event?

6   A   Approximately.  I said multiply the number of

7   rings by the number of people required per ring and you

8   pretty well had a good idea of how many officials were

9   on the floor.

10   Q   Were some of those official not qualified to be

11   there?

12   A   If they were international referees they had

13   met the criteria required by the WTF, I would assume.

14   You'd have to check with the WTF.  I don't have access

15   to credentials or certification or documents that were

16   handled by the WTF.

17   Q   So you're not aware of anyone who was at that

18   U.S. Open who refereed who was not qualified to be a

19   referee?

20   A   I'm not aware of credentials of anybody that

21   was on that floor.

22   Q   And, as far as you know, all 24 people who

1   refereed at that event were qualified to referee the

2   U.S. Open in 2004?

3   A   At international tournaments you must be an

4   international referee to be selected to be there.  I

5   stated that before also.

6   Q   You mentioned when you ran an event you tried

7   to make sure that the ethnicity of the participants

8   matched certain percentages, is that correct?

9   A   Tried to be fair to all ethnic backgrounds that

10   were at our tournament, yes.

11   Q   You took into account ethnic backgrounds in

12   deciding which people to invite or to accept to

13   participate?

14   A   No.  I didn't say that.

15   Q   How could you make sure that all ethnicities

16   were represented?

17   A   In the open ceremony, sir, I believe I stated I

18   had a black give a speech as the MC, and I believe I had

19   a Latino little boy give the Pledge of Allegiance.  I

20   believe that's what I said.

21   Q   You specifically selected them because of their

22   ethnicity?

1   A   Yes -- no, not because of their ethnicity

2   because I wanted to have a percentage represented in the

3   opening ceremonies.

4   Q   But in the referee core you also wanted to

5   maintain certain percentages of ethnicity?

6   A   I had nothing to do with the referee selection

7   process.  I was the executive director.  Referees are

8   selected by the referee chair.  At that time that was

9   the case.  Now that person I believe is Mr. Gambardella.

10   I believe I stated before that that was done by Koang

11   Woong Kim because he was the acting referee chair.  As

12   the tournament executive director I had no input, no

13   say, nothing to do with the referees except to feed them

14   and to house them.  That's it.

15   Q   And you checked though to see what

16   percentage --

17   A   No, I did not.

18   Q   Then where did you get these numbers,

19   approximately 40 percent Korean born, 15 percent

20   Latinos, 15 to 20 percent blacks, and the rest a mixed

21   races or Caucasians?

22   A   Because I was the executive director of that

6/28/2005 Brunner, Mary

1  tournament and I have eyes.

2      Q    And you --

3      A    Can see --

4      Q    You went around and computed the percentages of

5  the various races?

6      A    We had rings running and I could look out from

7  one position and see the entire floor as could Mr. Dae

8  Sung Lee as I believe he was involved in the tournament

9  committee at that time, and at any given point in time

10  anyone involved in running the tournament could you do

11  exactly what I did, and, that is, observe.

12      Q    So with 200 referees, by observing from where

13  you were sitting you could see they were about 80 Korean

14  born, 30 Latinos, 30 to 40 black referees, and the rest

15  were mixed races or Caucasian?

16      A    Approximately, yes.  I'm not a stupid person.

17      MR. LEVINSTEIN:  That that's all I have.

18      MR. JONES:  One quick question.

19      MR. LEVINSTEIN:  Subject to cross.

20

21

22

233

---

6/28/2005 Brunner, Mary

1  tournament and I have eyes.

1  Q    Would those 100 very good and qualified

2  referees being referees of all various races?

3      A    Probably be pretty much across the board.

4      Q    When counsel was asking you about examples of

5  persons that had sent in applications for tournaments

6  and then not gotten selected, that happened to you in

7  one instance, did it not in 2004?  Let me rephrase it

8  this way.

9      Was there a situation in 2004 where you

10  submitted an application, you got accepted then you got

11  deselected?

12      A    Yes.

13      Q    When was that?

14      A    It was an Olympic qualifier after the U.S. Open

15  that that happened.  I believe I also sent in

16  applications for the juniors and seniors that year and I

17  have sent in several applications for this year.

18      Q    And in all of those instances you have not been

19  selected?

20      A    No, I have not.  In fact, I asked for

21  confirmation of receipt of my applications.  I asked for

22  them to send them to me in writing, and they did on a

235

---

6/28/2005 Brunner, Mary

1          FURTHER EXAMINATION

2          By Mr. Jones:

3      Q    One quick question about Exhibit 5.

4      A    What's that?

5      Q    Your letter to Bob Gambardella dated

6  February 26th, 2004, last sentence on page 1.

7      A    Are these the ones that were being given to me,

8  this collection of documents here?

9      MR. LEVINSTEIN:  They're not being given to you.

10  They'll be attached to the transcript.

11      MR. JONES:  They're for the court reporter.

12      THE WITNESS:  So what's mine on here?

13      MR. LEVINSTEIN:  Just yours --

14      THE WITNESS:  This is mine.

15      MR. LEVINSTEIN:  If it doesn't have an exhibit

16  sticker on it.

17      THE WITNESS:  I brought that with me.  Okay.

18      MR. JONES:  Q  With respect to your statement on

19  February 26th of the USTU having lost approximately 100

20  very good and qualified referees during the tenure of

21  the last two referee chairs.

22      A    Yes.

234

---

6/28/2005 Brunner, Mary

1  few of the occasions, not all of them.

2      MR. JONES:  Thank you.  I don't think I have any

3  other questions.

4      MR. LEVINSTEIN:  That's it.

5      THE VIDEOGRAPHER:  This is the end of the deposition

6  of Mary M. Brunner.  The time is 2:33 p.m.

7          (Off the record)

8              - - - - - -

9

10          ACKNOWLEDGMENT OF DEPONENT

11

12      I, Mary M. Brunner, acknowledge that I have read

13  and examined the foregoing testimony, and the same is a

14  true, correct, and complete transcription of the

15  testimony given by me, and any corrections appear on the

16  attached errata sheet signed by me.

17

18

19  _____    _____

20      DATE                      SIGNATURE

21

22

236

6/28/2005 Brunner, Mary

```
 1    STATE OF ILLINOIS  )
                         )  SS:
 2    COUNTY OF C O O K  )

 3

 4          The within and foregoing deposition of the

 5    aforementioned witness was taken before CAROL CONNOLLY,

 6    CSR, CRR and Notary Public, at the place, date and time

 7    aforementioned.

 8          There were present during the taking of the

 9    deposition the previously named counsel.

10       .  The said witness was first duly sworn and was

11    then examined upon oral interrogatories; the questions

12    and answers were taken down in shorthand by the

13    undersigned, acting as stenographer and Notary Public;

14    and the within and foregoing is a true, accurate and

15    complete record of all of the questions asked of and

16    answers made by the forementioned witness, at the time

17    and place hereinabove referred to.

18          The signature of the witness was not waived,

19    and the deposition was submitted, pursuant to Rule 30

20    (e) and 32 (d) 4 of the Rules of Civil Procedure for the

21    United States District Courts, to the deponent per copy

22    of the attached letter.
```

237

6/28/2005 Brunner, Mary

```
 1          The undersigned is not interested in the within

 2    case, nor of kin or counsel to any of the parties.

 3          Witness my official signature and seal as

 4    Notary Public in and for Cook County, Illinois on this

 5    _____ day of _____, A.D. 2005.

 6

 7

                        _____
 8                      CAROL CONNOLLY, CSR, CRR

                        CSR No. 084-003113
 9                      Notary Public

10

11

12

13

14

15

16

17

18

19

20

21

22
```

238