8/12/2004 TRO Proceeding

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF HAWAII
 3
 4   DAE SUNG LEE,              ) CIVIL NO.04-00461SOM
                                )
 5             Plaintiff,       )
                                )
 6      vs.                     )
                                )
 7   UNITED STATES TAEKWONDO UNION, )
     etc., et al.,              )
 8                              )
               Defendants.      )
 9   _____)
10
11            PARTIAL TRANSCRIPT OF PROCEEDINGS
12         The above-entitled matter came on for hearing on
13   Thursday, August 12, 2004, at 11:30 a.m., at Honolulu, Hawaii,
14   BEFORE:    THE HONORABLE SUSAN OKI MOLLWAY
                United States District Judge
15
     REPORTED BY:  STEPHEN B. PLATT, RMR, CRR
16                 Official U.S. District Court Reporter
17   APPEARANCES:  WARD D. JONES, ESQ.
                   Bervar & Jones
18                 1001 Bishop Street, Suite 1400
                   Honolulu, Hawaii 96813
19
20                             Attorney for the Plaintiff
21                 ARTHUR F. ROECA, ESQ.
                   APRIL LURIA, ESQ.
22                 Roeca Louie & Hiraoka
                   841 Bishop Street, Suite 900
23                 Honolulu, Hawaii 96813
24                             Attorneys for the Defendants
25
```

1

8/12/2004 TRO Proceeding

```
 1                I N D E X
 2
 3
 4   STEVEN LOPEZ
        CROSS-EXAMINATION.................................. 4
 5
     NIA NICOLE ABDALLAH
 6      CROSS-EXAMINATION BY MR. JONES..................... 11
 7   ROBERT PETER GAMBARDELLA
        CROSS-EXAMINATION BY MR JONES..................... 18
 8      REDIRECT EXAMINATION BY MR. ROECA................. 35
 9   KELLY SKINNER
        CROSS-EXAMINATION BY MR. JONES.................... 44
10      REDIRECT EXAMINATION BY MR. ROECA................. 51
11   HAN WAN LEE
        CROSS-EXAMINATION BY MR. ROECA.................... 57
12      REDIRECT EXAMINATION BY MR. JONES................. 58
        RECROSS-EXAMINATION BY MR. ROECA.................. 60
13
        AFTERNOON SESSION................................. 64
14
     DAE SUNG LEE
15      CROSS-EXAMINATION BY MR. ROECA.................... 87
16   VIRGINIA WITTE
        CROSS-EXAMINATION BY MR. JONES................... 112
17      REDIRECT EXAMINATION BY MR. ROECA................ 124
        RECROSS-EXAMINATION BY MR. JONES................. 130
18
19
20
21
22
23
24
25
```

2

8/12/2004 TRO Proceeding

```
 1   THURSDAY, AUGUST 12, 2004                 11:30 A.M.
 2                       * * *
 3          THE CLERK:  Mr. Lopez, would you please raise your
 4   right hand.
 5          Do you solemnly affirm the testimony you are about
 6   to give before this court shall be the truth, the whole truth,
 7   and nothing but the truth?
 8          THE WITNESS:  I do.
 9          THE CLERK:  Would you please state your name for the
10   record, and spell your last name?
11          THE WITNESS:  Steven Lopez, L-O-P-E-Z.
12          THE COURT:  Okay.
13          Now, Mr. Jones, can you come to the lectern?  And
14   you may go ahead and cross-examine Mr. Lopez within the scope
15   of his declaration.
16          And let me first make sure that, Mr. Lopez, the
17   statements in the declaration that you signed on August 6th,
18   2004, are true and correct and being submitted the same as if
19   you testified to all of these matters live in the courtroom;
20   is that right?
21          THE WITNESS:  Yes, ma'am.
22          THE COURT:  Okay.  Go ahead.
23                       STEVEN LOPEZ,
24   called as a witness on behalf of the Defendants, having been
25   duly sworn, was examined and testified as follows:
```

3

8/12/2004 TRO Proceeding

```
 1                    CROSS-EXAMINATION
 2   BY MR. JONES:
 3   Q.  Steven, this is Ward Jones; I am Master Lee's attorney.
 4       First of all, I want to congratulate you on making
 5   the team.
 6   A.  Thank you.
 7   Q.  Master Lee -- you know Master Lee; isn't that correct?
 8   A.  Correct.
 9   Q.  He coached you in the capacity as head coach at the world
10   qualifications tournament in Croatia; isn't that correct?
11   A.  (No response.)
12   Q.  He was head coach?
13   A.  Let me think about it... Croatia?  Yeah, I think he did
14   coach me there.  I have difficulties remembering now, but,
15   yeah, I think he did.
16   Q.  Master Lee also coached you at the Pan American games in
17   2003?
18   A.  Yes, sir.
19   Q.  You won a gold medal there, did you not?
20   A.  Yes.
21   Q.  In your statement, you mentioned pushing a coach out of
22   the way at the Sydney Olympic games in 2000; do you recall
23   that?
24   A.  Yes.
25   Q.  Would that be Coach Yan In Chon?
```

4

EXHIBIT ___"A"___

1   A.   Yeah, that was Coach Yan In Chon.

2   Q.   Could you describe how that occurred?

3   A.   Well, my -- Coach Yan In Chon, he gets very emotional

4   when he coaches.   His English isn't very good to begin with,

5   much less when it's a high-pressured situation like the finals

6   of the Olympic games, and so he was basically -- I was down a

7   point, and he was yelling a bunch of things, and at that

8   moment, that's the last thing I needed, and I really couldn't

9   understand everything he was saying.   And at that moment I

10  just needed someone to really calm me down and just -- if you

11  can just imagine being at the finals and you are down a point,

12  you need someone to calm you down.   So I did physically push

13  him to the side.   I was looking for my brother, and I was

14  looking up to my brother.

15  Q.   Your brother was in the spectator area?

16  A.   Correct.

17  Q.   As far as the layout of the sparring area at the Sydney

18  Olympics, isn't it correct that the fighting area was elevated

19  several feet, like a boxing rink?

20  A.   Correct.

21  Q.   And, so -- and isn't it also correct that the coaches

22  were not allowed to sit up in the fighting area, they were

23  down below, below you?

24  A.   Correct.

25  Q.   How is it, then, that you were able to physically move

1   Coach Chon?

2   A.   Because I would go down the stairs, down the steps --

3   Q.   I see.

4   A.   -- and then sometimes Coach Chon would get really

5   excited, and either he would go up the steps or I would go

6   down the steps, I'm not sure which one, just because, like I

7   said, Coach Chon doesn't speak -- his English is pretty broken

8   up, and so I can't really understand anything he was saying,

9   so I would go down.   Either -- like I said, I can't remember,

10  it's four years ago.   Either I went down the steps or he was

11  up the steps.

12  Q.   I see.   And that was so you could get a look at your

13  brother?

14  A.   Right.   I mean throughout the match, anytime I was in the

15  chair, actually Coach Chon actually encouraged me to look up

16  at my brother.

17       THE COURT:   Just so you make the record, your

18  brother is your coach; is that right, Mr. Lopez?

19  A.   Yes, ma'am.

20       THE COURT:   Okay.

21       MR. JONES:   I'm sorry, Your Honor.

22  BY MR. JONES:

23  Q.   When I say your brother, you are talking about Gene

24  Lopez; is that correct?

25  A.   Correct.

1   Q.   And Gene Lopez, at the 2000 Olympics, did not have any

2   title; isn't that correct?

3   A.   He was my training partner.

4   Q.   Okay.   Did he have a credential?

5   A.   Yes.   To get into the high performance center where all

6   the U.S.A. delegation trained at, he had to have some kind of

7   accreditation to get in there to train with me.

8   Q.   But he could not sit next to you where Coach Chon was;

9   isn't that right?

10  A.   No, he was not -- he was not given Olympic coach

11  credentials.

12  Q.   Okay.

13       Turning to another topic, which is your brother

14  Gene Lopez, you're close to him, are you not?

15  A.   We're brothers.

16  Q.   Do you love your brother?

17  A.   Sir?

18  Q.   Do you love your brother?

19  A.   Yes, I love my brother.

20  Q.   Your brother has a Taekwondo school which specializes in

21  sparring and competition?

22  A.   No.   He has a Taekwondo school that has -- is very

23  successful as far as placing people on the national team, but

24  he has 300 other students, where I would say 99 percent are

25  for people are there because they want to lose weight, or they

1   want to learn self discipline or whatnot, the tenets that

2   martial arts teaches you.

3   Q.   You are a member of his school and came from his school?

4   A.   Excuse me?

5   Q.   Are you a member of his school or come from his school?

6   A.   We trained -- I train at his school.

7   Q.   Would you like to see his school grow and become more

8   successful?

9   A.   I would love for my brother to be successful.

10  Q.   Pardon?

11  A.   I would love to see my brother be successful in life.

12  Q.   Thank you.

13       Now, you were very happy, were you not, when he was

14  selected for Olympic coach in June of this year?

15  A.   Yes.

16  Q.   Did you try to help him get that nomination?

17  A.   There was nothing I could have done to help him.

18  Q.   Do you like having your --

19  A.   As far as -- if you're asking, like, voting, or

20  nominating, or anything like that, as an athlete, I don't

21  think I -- uh, I didn't know the procedures, as far as an

22  athlete, what athletes could or could not do.

23  Q.   You didn't put in the good word to anybody you thought

24  might be able to help him?

25  A.   No.   I didn't know who are the people assigned to that.

1    Q.   Fair enough.
2    Anyhow, you were very happy when he got selected as
3    Olympic coach in June of this year?
4    A.   Yes.
5    Q.   And you'd like to have your brother there with you at the
6    Olympic games in Athens for the duration, wouldn't you?
7    A.   Yes.
8    Q.   Will it hurt you to have Dae Sung Lee there present as an
9    extra coach at the Athens Olympic games if your brother sits
10   ring-side with you during the competition?
11   A.   Coach Dae Sung Lee would just be a distraction.
12   Q.   Even if he doesn't sit near you at ring-side?
13   A.   Excuse me?
14   Q.   Even if he's not sitting with you ring-side?
15   A.   Well, I mean, I -- you're breaking up when you speak to
16   us here, when we get it through here.  We didn't hear what the
17   question was, actually.
18   Q.   The question is -- let me repeat it:
19   Will it hurt you to have Dae Sung there as an extra
20   coach, as long as Gene Lopez sits with you ring-side and is
21   your primary coach?
22   A.   If Dae Sung Lee has any involvement, as far as coaching
23   me in any way, shape or form, it would be a distraction to me,
24   at this point -- especially when we're only about two weeks
25   until I compete.

9

1    Q.   Thank you very much?
2         THE COURT:  Okay.
3         Redirect?
4         MR. ROECA:  I have nothing further.
5         Thank you very much.
6         THE COURT:  Okay.
7         Then I'll ask Mr. Lopez to leave the room, and --
8    are we going to take Ms. Abdallah next?
9         MR. JONES:  Yes, Your Honor.
10        THE COURT:  Okay.
11        So, could Ms. Abdallah come into the room, and we'll
12   have her sworn.
13        MR. BENZ:  Okay, Your Honor, I'll do that.  It's
14   going to take me a minute or two.
15        THE COURT:  Okay.
16        While we are getting her, let me ask Mr. Jones:  Are
17   there any objections to Ms. Abdallah's declaration?
18        MR. JONES:  No, Your Honor.
19        THE COURT:  Okay.
20        MR. BENZ:  Okay, Your Honor, we have Ms. Abdallah
21   here.
22        THE COURT:  Okay, then I am going to have my
23   courtroom manager administer the oath or affirmation to
24   Ms. Abdallah.
25        THE CLERK:  Would you please raise your right hand.

10

1         Do you solemnly affirm that the testimony you are
2    about to give before this court shall be the truth, the whole
3    truth, and nothing but the truth?
4         THE WITNESS:  I do.
5         THE CLERK:  Would you please state your name for the
6    record and spell your last name?
7         THE WITNESS:  Nia Nicole Abdallah.  The last name is
8    spelled A-B-D-A-L-L-A-H.
9         THE COURT:  All right.
10        And let me start by asking you, first, whether the
11   declaration that you signed on August 6, 2004, is true and
12   correct and states what you would say if you were asked
13   questions on these subjects and were appearing live in a
14   courtroom?
15        THE WITNESS:  Uh, yes, that's correct.
16        THE COURT:  Okay.
17        Then, Mr. Jones, you may cross-examine.
18        MR. JONES:  Thank you, Your Honor.
19        NIA NICOLE ABDALLAH,
20   called as a witness on behalf of the Defendants, having been
21   duly sworn, was examined and testified as follows:
22        CROSS-EXAMINATION
23   BY MR. JONES:
24   Q.   Nia -- if I could call you that -- my name is Ward Jones;
25   I am the attorney for Coach Dae Sung Lee.  I want to

11

1    congratulate you on making the team.
2    A.   Thank you.
3    Q.   First of all, is it correct that you came originally from
4    a Houston Taekwondo school before going to Colorado Springs?
5    A.   That's true.
6    Q.   Who were your teachers there?
7    A.   My teachers there was Coach Kim, in Houston named So Wu
8    Kim.
9    Q.   Who is different from Chul Ho Kim, correct?
10   A.   Correct.
11   Q.   Do you know a Coach Han Wan Lee?
12   A.   Yes.
13   Q.   Who is he?
14   A.   He was head coach of the Olympic Training Center when I
15   originally moved there.
16   Q.   That was in 2002, correct?
17        THE COURT:  I'm sorry, I couldn't quite hear it.  He
18   was head coach where?
19   A.   At the Olympic Training Center in Colorado Springs when I
20   first moved there in 2002.
21        THE COURT:  Thank you.
22   BY MR. JONES:
23   Q.   Wasn't it Coach Han Wan Lee who first discovered you and
24   invited you there?
25   A.   It was probably along with Coach Chul Ho Kim.

12

8/12/2004 TRO Proceeding

1  Q.   Coach Han Wan, though, was the head coach, and Coach Chul
2  Ho worked for him?
3  A.   True.
4  Q.   Coach Han Wan then resigned April of last year; do you
5  recall that?
6  A.   Yes.
7  Q.   And, at that time, Coach Chul Ho Kim took over your
8  training?
9  A.   Well, he was training -- he was running practices
10 beforehand, but he just took the title as head coach after
11 Coach Lee left.
12 Q.   Okay.  So then you worked with Chul Ho Kim --
13      THE COURT:  Did she say after Coach Lee left?
14      MR. JONES:  Yes.
15      THE COURT:  Okay.
16 BY MR. JONES:
17 Q.   And, at that point, did you just work with Coach Chul Ho
18 Kim after Coach Lee left?
19 A.   Yes.
20 Q.   Do you know Master Dae Sung Lee?
21 A.   Yes.
22 Q.   He was the head coach who went with you and Coach Chul Ho
23 Kim to the Pan American qualifying events in January of this
24 year, isn't he?
25 A.   Yes.

13

8/12/2004 TRO Proceeding

1  Q.   He was able to observe you at that event, wasn't he?
2  A.   Yes.
3  Q.   Will having Dae Sung Lee present as an extra coach hurt
4  you if Coach Chul Ho Kim is allowed to sit with you ring-side?
5  A.   I think that him being there would be kind of a
6  distraction, because we -- we've been, as a team, a unit here
7  for a while, we've been together, and just having an extra
8  person -- everybody has their opinions and stuff, and it could
9  just throw off everything that I have been working on right
10 now.  I don't think it's the time to change anything.
11 Q.   If he were not to instruct you or suggest any of your
12 training regimen or techniques, would that be a distraction?
13 A.   Well, if that happens, then I don't see a reason for him
14 to be here.  I mean, if he's not going to help me, then I
15 don't see why he should be there.  That extra person being
16 there is not needed.
17 Q.   I see.
18      MR. JONES:  Thank you.
19      THE COURT:  Any redirect?
20      MR. ROECA:  No, Your Honor.
21      THE COURT:  Okay.  Then the witness is excused.
22      Are any of the other witnesses in Athens?  Where is
23 Kelly Skinner?
24      MR. BENZ:  Kelly Skinner is present.  I can get
25 Kelly Skinner, Your Honor.

14

8/12/2004 TRO Proceeding

1       THE COURT:  It can be either Kelly Skinner or
2  Mr. Gambardella; who do you want to take first?
3       MR. JONES:  Mr. Gambardella, Your Honor.
4       THE COURT:  Can we have Mr. Gambardella first?
5       MR. BENZ:  All right, Your Honor.
6       THE COURT:  Mr. Jones, while they are getting
7  Mr. Gambardella, can you tell me if you have any objections to
8  the declaration of Robert Gambardella?
9       MR. JONES:  I'm afraid I do have objections to
10 expert opinions contained therein, Your Honor.
11      THE COURT:  Okay.  I need you to give me the
12 paragraph number you are objecting to.
13      MR. BENZ:  Okay, Your Honor, you have Bob
14 Gambardella present in the room.
15      THE COURT:  Okay, hold on, now, we have some
16 objections to his declaration, and I am going to deal with
17 those first.
18      MR. JONES:  Paragraph number seven.
19      THE COURT:  Quote me the language you're objecting
20 to.
21      MR. JONES:  All of it, Your Honor, as well as
22 paragraph number eight.
23      MR. LEVINSTEIN:  Your Honor, this may not be -- I
24 may not be the most important person to hear this, but I can't
25 hear anything right now, and I just want to make sure we

15

8/12/2004 TRO Proceeding

1  haven't lost the line --
2       THE COURT:  Oh, you can't hear anything because we
3  are all reading paragraphs seven and eight.
4       MR. LEVINSTEIN:  Sorry.
5       THE COURT:  Okay.  And who was that who just spoke?
6       (No response.)
7       THE COURT:  The person who just said you couldn't
8  hear anything, give me your name.
9       MR. BENZ:  I'm sorry, this is Jeff Benz.
10      THE COURT:  Thank you.  There are a lot of voices,
11 so it will help us if people told us who is speaking...
12      Okay, who wants to respond to the evidentiary
13 objection to paragraphs -- it's to paragraphs seven and eight;
14 is that right?
15      MR. JONES:  Yes, Your Honor, and also 12.
16      THE COURT:  Seven, 8 and 12.
17      MR. BENZ:  Could the objections please be restated?
18 This is Jeff Benz.
19      MR. JONES:  Yes, Your Honor.
20      They call for expert opinions, and this witness has
21 absolutely no expertise in the field of Taekwondo coaching in
22 national or international competition.
23      THE COURT:  Okay, well, paragraph seven, it seems to
24 me, doesn't really call for an expert opinion.  Paragraph
25 seven has a little historical discussion.

16

8/12/2004 TRO Proceeding

1    MR. JONES:  It --
2    MR. ROECA:  Your Honor, if I might?
3    THE COURT:  Okay.
4    MR. ROECA:  I agree with the court's observation.
5  Secondly, the opinions are those of Mr. Gambardella, who was
6  on the committee that was establishing the criteria and
7  revisiting them.  And, going to paragraph eight, part of that
8  is simply a recitation of what the new criteria were.
9    THE COURT:  Okay, I am going to overrule the
10  objections to paragraphs seven and eight.
11    Can we all look at paragraph 12 now.  And state the
12  objection.  You think this is an expert opinion, and you think
13  he's not qualified; is that what it is?
14    MR. JONES:  Yes, Your Honor.
15    THE COURT:  Okay.  I'm not sure that this is an
16  opinion.  Isn't this a statement of the position of the
17  Taekwondo Union and then of the status of what's happening
18  with appointing coaches?  I don't think this is an expert
19  opinion, so I'm going to overrule that.
20    Okay, anything else?
21    MR. JONES:  No, Your Honor.
22    THE COURT:  Okay.
23    Then let's have Mr. Gambardella given the oath or
24  affirmation.
25    THE CLERK:  Would you please raise your right hand.

17

8/12/2004 TRO Proceeding

1    Do you solemnly affirm that the testimony you are
2  about to give before this court shall be the truth, the whole
3  truth, and nothing but the truth?
4    THE WITNESS:  I do.
5    THE CLERK:  Will you please state your name for the
6  record, and spell your last name, please.
7    THE WITNESS:  Yes.  My name is Robert Peter
8  Gambardella.  My last name is spelled G-A-M-B-A-R-D-E-L-L-A.
9    THE COURT:  Okay, let me ask you, Mr. Gambardella,
10  looking at your declaration, which says it was signed on
11  August 6, 2004, I ask you if the statements in this document
12  are true and correct and represent what you would testify to
13  if you were asked questions in court and were appearing
14  live -- and the questions concern the matters raised in the
15  declaration.
16    THE WITNESS:  Yes, Your Honor.
17    THE COURT:  Okay.
18    Then, Mr. Jones, go ahead with cross-examination.
19    MR. JONES:  Thank you, Your Honor.
20    ROBERT PETER GAMBARDELLA,
21  called as a witness on behalf of the Defendants, having been
22  duly sworn, was examined and testified as follows:
23    CROSS-EXAMINATION
24  BY MR. JONES:
25  Q.   Mr. Gambardella, this is the attorney for Dae Sung Lee.

18

8/12/2004 TRO Proceeding

1  Is it correct that you have never competed in Taekwondo?
2  A.   Yes, sir, that is correct.
3  Q.   And that you have never coached athletes in competitive
4  Taekwondo at any level, have you?
5  A.   Yes, sir, that is correct.
6  Q.   What you know about Taekwondo you have sort of picked up
7  in the last six months?
8  A.   Uh... no, sir.
9  Q.   What else did you know about Taekwondo, just generally,
10  before becoming CEO of USTU?
11  A.   Well, I worked with the United States Olympic Committee
12  in the Sport Partnership Division, and throughout that time
13  period, I had opportunity to observe Taekwondo in different
14  functions throughout the past four years.  I'm not saying I am
15  an expert, but I have had an opportunity to kind of take a
16  look at it and analyze it.
17  Q.   You do not hold yourself out as an expert in Taekwondo
18  competition based upon that experience, though?
19  A.   That is correct.
20  Q.   Is it correct that you recommended Gene Lopez to the
21  governing board?
22  A.   Yes, sir.
23  Q.   How did you get his name?
24  A.   Can you say that again?  I'm sorry...
25  Q.   I'm sorry.  How did you get his name?

19

8/12/2004 TRO Proceeding

1  A.   How did I get his name?  How did I get his name for what?
2  Q.   To -- to be considered by you.
3  A.   Basically, the name came forward as a result of
4  performance of athletes.
5  Q.   Nobody submitted the name to you?
6  A.   Uh, no, sir.
7  Q.   You were aware that Dae Sung Lee had been selected by
8  USTU in March 2003, were you not?
9  A.   Yes, sir.
10  Q.   You were also aware that USOC had approved his nomination
11  around October -- early October 2003?
12  A.   Yes, sir.
13  Q.   You were aware that Dae Sung Lee had some coaching
14  success with Steven Lopez at the 2003 Pan Am games?
15  A.   Uh, I'm unaware of that, sir.
16  Q.   Were you aware that Coach Dae Sung Lee coached Steven
17  Lopez at the Pan Am games?
18  A.   Yes.
19  Q.   And that --
20  A.   I knew that.
21  Q.   And, at that tournament, Steven Lopez won a gold medal?
22  A.   Yes, sir.
23  Q.   Isn't it also correct that at the world championships,
24  Dae Sung Lee was the head coach for that team?
25  A.   I know he was on the coaching staff, but I don't know in

20

1    what exact position, to be honest with you.

2    Q.    Steven Lopez won a gold medal at that tournament, as

3    well; you're aware of that?

4    A.    Yes, sir.

5    Q.    Were you aware at the time you were doing the screening

6    that you refer to in your statement, the screening for head

7    coach, that Gene Lopez coached his sister, Diana Lopez,

8    against Nia Abdallah at the Olympic qualifications?

9    A.    I'm aware of that, yes.

10    Q.    Were you aware of it at the time you were doing the

11    screening?

12    A.    Yes, sir.

13    Q.    Were you aware that Nia Abdallah won and beat out Diana

14    for that position?

15    A.    Yes, that happened in June.

16    Q.    And, as a result, Diana is now first alternate to Nia

17    Abdallah?

18    A.    Yes, sir.

19    Q.    In other words, if something should happen to Nia, Diana

20    would get to take her place at the Olympics?

21    A.    Uh, yes.

22    Q.    How do you think that makes Nia feel, to have Gene Lopez

23    sitting with her ring-side in Olympic competition?

24    A.    Uh, I don't know.  I really haven't talked to him

25    specifically about that.

21

1    Q.    I'm sorry.  The question is, how do you think it makes

2    Nia feel?

3    A.    Well, I had a conversation with Nia about that, and I

4    think that we have come to a resolve, you know, in our

5    conversations that we have had over the several weeks prior to

6    us coming to our training in Malta and now in Athens.

7    Q.    And that resolution is to have someone other than Gene

8    Lopez sit with her?

9    A.    I'm sorry, could you say that again?

10    Q.    Would the resolution be that you have decided to have

11    someone other than Gene Lopez sit with her in competition?

12    A.    Gene Lopez is the head coach of the Olympic teams.

13    Q.    Right.  But why don't you explain what the resolution is

14    for Nia.

15    A.    Well, we had a meeting, I believe, around July 2nd or

16    3rd -- I can't remember the exact date -- and with our

17    governance and management committe, and it was decided that,

18    in the best interests of the program, that we would have Chul

19    Ho Kim come and help us in our efforts leading up to Malta and

20    to Athens.

21    Q.    And how is he going to help you?

22    A.    Basically, he's helping us in our training, and

23    basically, just -- uh, in meetings that we have, uh, amongst

24    the coaching staff.

25    Q.    He does not have the title of "coach"; isn't that

22

1    correct?

2    A.    Actually, the title is, he's on our staff.

3    Q.    Okay.  But, to answer the question, Chul Ho Kim does not

4    have the title --

5          MR. BENZ:    Wait, wait, wait, wait, wait.  He hasn't

6    finished his answer.  I'd like to let him continue.

7    A.    Because, basically, within the rules and regulations

8    that's set forth right now by the United States Olympic

9    Committee, in terms of number of --

10          THE COURT:    Can I stop you?  I don't know who

11    grumbled that the witness hadn't finished his answer.  And the

12    court reporter needs to know who is speaking, and cannot tell.

13    So, if counsel wants to say anything from the telephone,

14    counsel needs to start whatever comment is being made by

15    telephone with counsel's name.  So, who said that?

16          MR. BENZ:    That was Mr. Benz, Your Honor.  Your

17    point is well taken.  I apologize.

18          THE COURT:    Okay, thank you.

19          I'm sorry, whoever was then speaking -- I think it

20    was the witness -- you can go ahead and continue.

21    A.    Yes, can you restate your question again?

22          THE COURT:    Sure.

23          Mr. Jones, can you repeat the question?

24          MR. JONES:    I forgot what it was...

25          THE COURT:    Well, hold on, we have to go back a

23

1    little.  The record is all messed up right now, because we

2    can't tell who is talking, but hold on, and I'll see if I can

3    figure this out.

4          Have you got it, Mr. Jones?

5          MR. JONES:    Yes.

6          THE COURT:    Okay.

7    BY MR. JONES:

8    Q.    Is it correct that Chul Ho Kim is not a credentialed

9    coach?

10    A.    Yes, sir.  And, basically, even myself, as being a team

11    leader of this team, I am not credentialed to get an ATHOC

12    credential; therefore, I cannot get into the Olympic Village,

13    nor can I get into the venue.  So, yes, indeed -- and the same

14    thing has occurred with Chul Ho Kim as he's come to our Malta

15    trip, and our pre-games training, and to the Athens trip, the

16    Athens Olympics here as just a staff member, who is helping us

17    in our training efforts in preparation for our competition.

18    Q.    Thank you.

19          Do you know if it is a conflict of interest for

20    Gene Lopez to be Nia Abdallah's coach during Olympic

21    competition?

22    A.    Uh...  I don't think -- I don't believe so, but it can be

23    looked at by different -- you know, different people can look

24    at it different ways.

25    Q.    Did you recognize a conflict of interest when you were

24

1  screening Gene Lopez, as far as his relation with -- his prior
2  relation and record with Nia Abdallah?
3  A.   Uh, no, sir.
4  Q.   You did not see the conflict?
5  A.   No, sir, because, you know what?  If we were trying to
6  figure out everything that could have happened in the series
7  of all the athletes involved in the trials, trying to write
8  every situation down would probably be -- the text would be
9  larger than "War and Peace," so we just can't account for
10  everything.
11  Q.   Did the possibility that there was a conflict of interest
12  arise after Gene Lopez's name was sent by you to the governing
13  body?
14  A.   Yes, sir.
15  Q.   What did you do in reaction to that when the possibility
16  of conflict was brought to your attention?
17  A.   Well, it wasn't a reaction -- rather than a way to try to
18  develop solutions so that we come to Athens with a team that
19  is ready to compete for medals at the Athens Olympic games.
20  Q.   Did you ever consider pulling back Gene Lopez's name when
21  you discovered the conflict of interest?
22  A.   Well, as I said, I didn't see it as being a conflict of
23  interest, so at that point, with that being said, we weren't
24  considering pulling his name back.
25  Q.   And about when are we talking about when the issue of --

1  or the discussion of conflict came up?
2  A.   Please state your question again, I didn't hear you.
3  Q.   I'm sorry.
4        About what time period are we talking about when the
5  issue of conflict came up after Gene Lopez's initial
6  selection?
7  A.   It was approximately around, I believe, June 29th,
8  because I was on my way to Indianapolis for an executive
9  director's meeting, at which time I had several conversations
10  with the parents of Nia Abdallah, and the conversations --
11  several conversations after that I had with the parents and
12  with members of the governance and management committee.  And,
13  as I stated earlier, it was probably about July 2nd or 3rd
14  that we had a meeting of our governance and management
15  committee.
16  Q.   Okay.
17        According to your statement, Gene Lopez was
18  confirmed by USOC approximately June 22nd of this year?
19  A.   Yes, sir.  I don't know the exact date, but that sounds
20  somewhere -- probably right around the time.  I would say
21  maybe somewhere between the 21st, 22nd, or even the 20th.
22  Q.   Thank you.
23        Turning for a moment to Nia Abdallah 's history, do
24  you know when she was first discovered by the U.S. Olympic
25  people?

1  A.   You may want to be a little bit more specific, sir,
2  because I don't think that the USOC "discovers" anyone, but
3  rather, maybe the United States Taekwondo Union?
4  Q.   Yes, let me rephrase that.  When was she discovered by
5  USTU?
6  A.   Yeah, I think probably about two years ago.  And, just --
7  I want to state for the record, just so we don't have a
8  misunderstanding, my tenure at U.S. Taekwondo started February
9  4th of 2004, so some of this institutional history, which is
10  not documented, is just from what I have been trying to piece
11  together for the past several months.
12  Q.   Were you aware whether -- were you aware that Han Wan Lee
13  was the person who discovered her at USTU?
14  A.   I could not say one way or the other.  I don't know.
15  Q.   When you were applying the new criteria for coach
16  selection, would you research the first criteria, which is
17  whether the applicant had placed the athlete?
18  A.   Had I researched that?
19  Q.   Yes.
20  A.   Yes, we did.  We did take a look at that.  And I do have
21  a file up in my room with all the results.  And even I have
22  results of what athletes participated in what qualifiers.  So
23  we did look at that.
24  Q.   My question is whether you researched Nia Abdallah's
25  history to determine who placed her for purposes of criteria

1  number one.
2  A.   No, we hadn't.
3  Q.   So, criteria number one was applied without the benefit
4  of research to either determine who placed Nia Abdallah?
5  A.   Well, sir, it's my understanding that Chul Ho Kim was her
6  coach, and that she was training with him, and she was the one
7  who was asking for Chul Ho Kim -- and no one else -- as -- to
8  be her coach.
9  Q.   Is that what the athlete asks for one of the criteria?
10  A.   No, basically, this is a conversation that we had several
11  times.  So, basically, in terms of the historical perspective,
12  you know, it has been Chul Ho Kim who has been the resident
13  coach of the program.
14  Q.   If it turned out that someone else and not Chul Ho Kim --
15  rather, Han Wan Lee -- placed her, then that would mean that
16  the first criteria was applied erroneously with respect to Nia
17  Abdallah, would it not?
18  A.   I guess that's a matter of opinion.
19  Q.   You can't have more than one coach placing an athlete,
20  can you?
21  A.   I don't believe so.
22  Q.   Now, you called the system of coach selection under the
23  old system at USTU an "award," is that right?
24  A.   Yes, sir.  That's basically -- and that's the opinion of
25  many people inside and outside the U.S. Taekwondo Union.

1    Q.  It's correct, is it not, that you were not there in 2003
2    when USTU went through the coach selection process that led up
3    to Dae Sung Lee's nomination?  Isn't that true?
4    A.  Yes, sir.  As I stated a little bit ago, I started with
5    Taekwondo February 4th of 2004.
6    Q.  You don't know who was considered or what factors were
7    weighed in that selection, do you?
8    A.  Uh, no, sir; however, I -- I talked to some of the former
9    board members, especially some of the AAC reps, and I think
10   that the process that was set forth probably wasn't proper,
11   because there wasn't -- what I understood -- understand is
12   that there wasn't enough athlete representation when it was
13   voted upon.
14   Q.  You're aware, though, that the process by which Dae Sung
15   Lee was selected required AAC representation and voting prior
16   to a nomination being approved?
17   A.  No.
18   Q.  You weren't aware that AAC people were on the committee
19   that approved Dae Sung Lee?
20   A.  I was aware of the fact.  Again, this was before my time.
21   And, again, I can only go on what I have been told by other
22   AAC members.
23   Q.  Assume that the bylaws require a certain number of AAC
24   people to approve -- number one, compose the selection
25   committee, and, number two, that it's got to be majority rule,

1    that would mean the AAC was represented in that selection
2    process, would it not?
3    A.  Perhaps, yes.  But, again, I really don't know.
4    Q.  Now, you stated in your declaration that --
5        THE COURT:  What is AAC?
6    A.  Athletes' Advisory Council.
7        THE COURT:  And is that a council that is part of
8    the U.S. Olympic Committee?
9    A.  Well, NGB's, National Governing Bodies, have their own
10   AAC's, or AAC reps.
11       THE COURT:  Okay.
12   A.  It may be structured differently according to different
13   NGB's.
14       THE COURT:  Okay, thank you.
15   A.  But the USOC also has an AAC body that works with
16   the U.S. Olympic Committee.
17       THE COURT:  All right.
18   BY MR. JONES:
19   Q.  Next question, sir:
20       You stated that you have been unable to get an
21   additional credential for Chul Ho Kim; is that correct?
22   A.  Yes.  And, as I stated earlier, I was unable to get a
23   credential for myself.
24   Q.  Who issues those credentials?
25   A.  The United States Olympic Committee in cooperation with

1    the athletes' organizers.
2    Q.  And has the U.S. Olympic Committee agreed to issue you
3    one?
4    A.  No.  As I stated a moment ago, I don't have a credential
5    to get into, number one, into the Olympic village or the
6    venue.  I do have a USOC credential, which gets me into our
7    training site, which is outside the purview of the ATHOC
8    facilities.
9    Q.  But it's correct, is it not --
10       THE COURT:  Of the what facilities?
11   A.  The American College of Greece.
12       MR. BENZ:  Your Honor, this is Jeff Benz.
13       THE COURT:  Yes?
14       MR. BENZ:  ATHOC is an acronym that stands for the
15   organizing committee for the Olympic games in Athens.  I think
16   it actually stands for the Athens Organizing Committee.
17       THE COURT:  What was it --
18       MR. BENZ:  They administer the games, they run the
19   games on site in accordance with IOC -- International Olympic
20   Committee -- policies and procedures.
21       THE COURT:  What did you say was the acronym?
22       MR. BENZ:  I'm sorry, A, T as in Tom, H as in
23   Harold, O-C.
24       THE COURT:  Thank you.
25       Okay.

1    BY MR. JONES:
2    Q.  So, just to understand this credentialing process, USOC
3    is one of the parties that issues one; is that right?
4    A.  Yes -- yes, the USOC is in charge of X number of
5    credentials, which is based on -- the formula-driven equation
6    based on the numbers of athletes who qualify, as I understand
7    it.
8    Q.  You also -- turning to another topic, you said in your
9    statement that a coach at the Sydney Olympics was pushed aside
10   by Steven Lopez; is that right?
11   A.  Uh -- yes.  My understanding from conversations with
12   Steven that he wasn't getting the correct information in his
13   finals, and so he was seeking information from his brother,
14   who was in the stands.
15   Q.  I see.  So you got that secondhand, you didn't see it?
16   A.  Uh, no, sir.  I got it from the athlete, yes.
17   Q.  Thank you.
18       Now, you wrote a letter to me, you might recall, in
19   response to a query by me as to Dae Sung Lee's status back in
20   July; do you recall that?
21   A.  Yes, I do.
22   Q.  You wrote in that letter that the USOC approved of Gene
23   Lopez as coach on July 21; do you recall that?
24   A.  Uh, I would have to look at it.  It says, U.S. team
25   nominated Mr. Gene Lopez from Houston, Texas, as the 2004

1    Olympic coach for Taekwondo.  His nomination was approved by
2    the United States Olympic Committee on July 19, 2004.
3    Q.    I believe, in your statement, though, your declaration,
4    you told us that it was June 22nd that that process occurred.
5    A.    If that was the case -- and I'm trying to find it right
6    now -- that's an error on my part, I guess.
7          MR. BENZ:  This is Jeff Benz.  Do you have a part of
8    the declaration he can refer to?
9          THE COURT:  Paragraph 11, at the bottom of paragraph
10   11.
11   A.    That, Your Honor, is a mistake, and it is -- the letter
12   here, July 19th, is correct, and this is a typographical error
13   that I didn't catch.
14   BY MR. JONES:
15   Q.    Thank you?
16         THE COURT:  So what is the correct date when the
17   recommendation was approved by the USOC?
18   A.    Yes, ma'am, it was July 19th, 2004.
19         THE COURT:  Okay.
20         MR. LEVINSTEIN:  Your Honor, this is Mark
21   Levinstein.  Just for clarification, I'm not sure the question
22   matched the answer.  It was a question about the USTU
23   recommendation versus the USOC approval.  I'm just not sure
24   that the record's clear on what he was answered.
25         THE COURT:  Okay.

1          MR. LEVINSTEIN:  I think he's saying that the USOC
2    approval was the 19th of July --
3          THE COURT:  Right.
4          MR. LEVINSTEIN:  But the USTU recommendation, I
5    think, was in your question as well.
6          Well, Mr. Jones, from what I can tell,
7    had asked whether the USOC had approved Gene Lopez's coach
8    July 21.  And the witness said, well, I don't know.  Where is
9    it in the declaration?
10         So, when was Gene Lopez approved by the United
11   States Olympic Committee as the coach for the Taekwondo team?
12   A.    Your Honor, again, it was July 19th I received an e-mail
13   from a USOC staff member approving Gene Lopez and other
14   coaches and staff for the 2004 Olympic games.
15         THE COURT:  Okay.  So you're saying that it was July
16   19, 2004, that the United States Olympic Committee approved
17   Mr. Gene Lopez as the coach for the 2004 Olympic games; is
18   that right?
19   A.    Yes, Your Honor.
20         THE COURT:  Thank you.
21   BY MR. JONES:
22   Q.    And is it correct that -- just to understand, that
23   approximately a month before that is when the USTU approved
24   his name?
25   A.    Uh, I don't believe it was a month before.  I believe it

1    was, perhaps -- probably late June -- perhaps?  Maybe the
2    26th.  I don't have the exact date.
3    Q.    So a little less than a month, you're thinking?
4    A.    Well, first of all, we -- in order for us to do this
5    correctly, we had to wait and see who would win the Olympic
6    trials in San Jose, in order for us to try and keep the
7    process moving in the correct manner.  So our Olympic trials
8    were in June, and, basically, we had to wait until after that
9    and then, you know, send in a recommendation to the United
10   States Olympic Committee after that.
11         MR. JONES:  Thank you, I have no further questions.
12         THE COURT:  Okay.
13         Redirect?
14         MR. ROECA:  Okay, Your Honor.
15         THE COURT:  Okay, hold on.
16         (Discussion off the record.)
17                   REDIRECT EXAMINATION
18   BY MR. ROECA:
19   Q.    Mr. Gambardella, Arthur Roeca.  I just have a few
20   follow-up questions.
21         One of the questions that was earlier put to you had
22   to do with the composition of the team with Nia and Mr. Lopez
23   being the competitors and Mr. Lopez's brother being the coach.
24         And my question for you is, have you observed the
25   team since you arrived in Athens, in terms of its cohesive

1    nature or lack of cohesive nature?
2    A.    Yes, Mr. Roeca.  As a matter of fact, our team --
3          MR. JONES:  Objection, Your Honor, outside the
4    scope.
5    A.    -- and Steven and Mark Lopez came to the U.S. Olympic
6    Committee prior to -- a week prior to our trip in Malta --
7          THE COURT:  Can I stop you?  There's an objection to
8    the question.  And the objection is, it's outside the scope.
9    Okay, well, I'm going to let it go.
10         Go ahead; overruled.  You can complete your answer.
11   A.    I just wanted to give you a little bit of the chronology.
12   The Lopez family came to Colorado Springs a week prior to us
13   departing for our Malta trip.  At that point, I had
14   opportunities to spend time watching, observing practice.
15   When we left for Malta -- we spent eight days in Malta.  We
16   were hosted by the Malta Olympic Committee.  I observed every
17   practice that they had, and the same here now in Athens, every
18   practice.  We have had two practices a day, 9:00 in the
19   morning, and then another one at 5:00 in the evening, and I
20   have been at those.  And I have seen, basically, a group of
21   individuals forming into what I think is a cohesive team --
22   which is really critical, especially when you're at games of
23   this magnitude.
24   BY MR. ROECA:
25   Q.    Mr. Gambardella, during one of the questions that was

1 asked earlier, that there was a suggestion raised as to
2 possible conflict of interest, my question is, during the time
3 you have had an opportunity to observe the U.S. Taekwondo
4 Olympic team, have you observed anything that would suggest to
5 you that there has been any conflict of interest that created
6 a negative atmosphere in the training or in the interaction of
7 any of the athletes or coaches?
8 A.   No, sir.
9 Q.   Based upon what you observed, have you reached a
10 conclusion as to whether you have been able to pull together
11 the team so that it has a best chance to compete as an Olympic
12 team in the 2004 Olympics?
13 A.   Based on everything that I know, in terms of what I've
14 read and researched, in terms of preparation for Olympic
15 games, two studies by Dan Gould of the University of North
16 Carolina, Greensboro -- presently my master's degree work that
17 I am doing is on athlete development through the University of
18 Lyon in France -- and all the research I have read through
19 that, I think that our team is ready to take on the world.
20 Q.   Now, one of the other questions had to do with who
21 coached whom as it related to who was selected to be coach of
22 the Olympic team; do you recall those general questions?
23 A.   Yes, sir.
24 Q.   And, the selection of coaches -- or of the coach, Gene
25 Lopez, this year, for the U.S. Olympic teams, based upon your

1 involvement in this, was that selection based upon criteria
2 that were established by the United States Taekwondo Union
3 and approved by the United States Olympic Committee?
4 A.   Can you repeat it once again?  We just lost you a little
5 bit, I'm sorry.
6 Q.   Yes.
7        You were responding to questions about whether Nia
8 had a coach, and whether she had coached -- then coached for
9 certain activities.  And my question for you is:  The coach,
10 Gene Lopez, was the one selected in July of 2004, as you've
11 testified in response to questions; true?
12 A.   Yes, sir.
13 Q.   To your knowledge, was his selection based upon criteria
14 that had been established prior to the date of his selection?
15 A.   The criteria was developed prior to his selection, yes,
16 sir.  Actually, I had an opportunity, when we first came on
17 board, I had an opportunity to talk and work with our sport
18 partnership division to try to help us develop selection
19 procedures.
20 Q.   And when the criteria were established, did you have any
21 idea, one way or another, as to who the coach would ultimately
22 be on the date that the criteria were established?
23 A.   No, sir.  Because, basically, as I stated a little bit
24 earlier, I had to wait until our Olympic trials were over,
25 because there could have been, you know, other coaches that

1 could have won, whether it be in the female or male area, and,
2 you know, basically, we had to look at it and see how all
3 things settled out.
4        MR. ROECA:  That's all I have; thank you.
5        THE COURT:  Okay.
6        Did you have any more cross?
7        MR. JONES:  No, Your Honor.
8        THE COURT:  Okay.
9        Then the witness is excused.
10        We are going to take about a ten-minute break.  I
11 know it's really, really late over there in Greece, so we
12 won't take more than ten minutes.  I know we still have
13 Ms. Skinner to get back to by phone, so, ten minutes, then
14 we'll be right back.
15        Thank you.
16        THE CLERK:  All rise.
17        This court will stand in recess for ten minutes.
18        (A recess was taken from 11:55 to 12:05 p.m.)
19        THE COURT:  Okay, we're going to go back now to the
20 telephone witnesses.  And I think Kelly Skinner is the last
21 witness we have from Greece, right?
22        MR. JONES:  Yes.
23        THE COURT:  Is she there in the room?
24        MS. LURIA:  It's a man.
25        THE COURT:  I'm sorry, I couldn't hear.  Hello?  Are

1 we connected okay?
2        THE CLERK:  Your Honor, they were supposed to remain
3 on...
4        MR. LEVINSTEIN:  You are connected with me,
5 Your Honor.  This is Mark Levinstein in Washington.  I think
6 they are there.  Kelly Skinner is a man, though, not a woman.
7        THE COURT:  I'm so sorry.  That's why I was waiting
8 for the voice.
9        MR. LEVINSTEIN:  But I don't hear anyone yet from
10 Athens.
11        Jeff Benz, are you there?
12        THE COURT:  Mr. Benz, are you there?
13        MR. LEVINSTEIN:  No, I'm not hearing him either.
14 But my phone shows that they are still conferenced in.  I do
15 have a cell number, so we can also try to call that to make
16 sure they are there.
17        THE COURT:  Okay, who is speaking now?
18        MR. LEVINSTEIN:  This is Mark Levinstein in
19 Washington, Your Honor.  I'm the one who is patching them in.
20 I'm not with them.  But let me try to get him on the cell
21 phone.
22        THE COURT:  Okay, hold on, we'll wait a little
23 while.
24        MR. JONES:  Your Honor, if I can make a statement,
25 just to answer the court's inquiry.  I've got the cite for

1  that one provision.

2      THE COURT:  Yes, thank you.

3      MR. JONES:  It's provision 19.1(f) of the USOC

4  bylaws.  It talks about the Olympic Committee's obligations,

5  as far as paying for athletes's and teams' expenses.

6  Transportation, equipment, housing --

7      THE COURT:  Does it include the coach?

8      MR. JONES:  Let's see, it says --

9      THE COURT:  What exhibit number are you looking at?

10     MR. JONES:  29.

11     THE COURT:  Exhibit to what?

12     MR. JONES:  Plaintiff's Exhibit 29; it's the bylaws

13  of the USOC.

14     THE COURT:  Okay.

15     I think Mr. Skinner and Mr. Benz are just not back

16  yet from their break.

17     MR. LEVINSTEIN:  We are calling his cell number now,

18  Your Honor.  This is Mark Levinstein in Washington.

19     THE COURT:  Okay, I am still not clear, even though

20  Mr. Jones has referred to 19.1(f)...

21     MR. JONES:  What's unclear on that provision is the

22  meaning of "team," I understand, Your Honor, whether that

23  includes staff, as well as athletes or not.

24     THE COURT:  Well, I'm looking at it.  It says the

25  corporation shall assume responsibility for transportation,

1  equipment, housing and living expenses of the Olympic, Pan

2  American, or Paralympic Games team from the time the athletes

3  depart for the team processing site until they are officially

4  disbanded on their return to the United States.

5      So what happens if, for example, the coach decides

6  to stay two days later in Greece?  Isn't his return plane fare

7  still covered, even though that is after the team has

8  departed?

9      MR. BENZ:  Your Honor, this is Jeff Benz from the

10  USOC.  I'm sorry, we're back.  We're in a facility that is not

11  the same kind of facility we would be using in the states,

12  so --

13     THE COURT:  Okay, well, let's go back for now to the

14  witnesses.

15     Okay, so --

16     MR. BENZ:  The answer to that question is that

17  the -- the coaches generally travel with the team and --

18     THE COURT:  Okay --

19     MR. BENZ:  -- do not allow tourism to occur during

20  the Olympic games, as a general rule --

21     THE COURT:  I am going to stop you, Mr. Benz.  I

22  want to go back to the witnesses right now.

23     So let's get Kelly Skinner on the line.

24     THE WITNESS:  Yes, I am.

25     THE COURT:  Okay, I will have the oath or

1  affirmation administered.

2      THE CLERK:  Would you please raise your right hand.

3  Do you solemnly affirm that the testimony you are

4  about to give before this court shall be the truth, the whole

5  truth, and nothing but the truth?

6      THE WITNESS:  I do.

7      THE CLERK:  Would you please state your name for the

8  record and spell your last name?

9      THE WITNESS:  Kelly Skinner, S-K-I-N-N-E-R.

10     THE COURT:  Mr. Skinner, could you tell me whether

11  the -- I'm looking for your declaration.  Hold on... I've got

12  it.  Okay.

13  Could you tell me whether the declaration that you

14  executed on August 6, 2004, is true and correct and represents

15  what your answers would be if you were appearing live in a

16  courtroom and being questioned about the subject matters set

17  forth in your declaration?

18     THE WITNESS:  It does.

19     THE COURT:  Okay.

20     Then, Mr. Jones, you may go ahead with

21  cross-examination.

22     MR. JONES:  Thank you, Your Honor.

23     KELLY SKINNER,

24  called as a witness on behalf of the Defendants, having been

25  duly sworn, was examined and testified as follows:

1      CROSS-EXAMINATION

2  BY MR. JONES:

3  Q.  Hello, Mr. Skinner, this is Ward Jones, attorney for Dae

4  Sung Lee.

5  A.  Hello.

6  Q.  Your background is mainly marketing; is that correct?

7  A.  No.  My background is some marketing with a great deal

8  of sports administration.

9  Q.  Thank you.

10  You are a salaried employee of the USOC?

11  A.  Yes.

12  Q.  You've never competed in Taekwondo; is that true?

13  A.  That is correct.

14     THE COURT:  Mr. Jones, you didn't have any -- I

15  forgot to ask you -- any objections to the declaration?

16     MR. JONES:  No, Your Honor.

17     THE COURT:  Okay, then go ahead.

18  BY MR. JONES:

19  Q.  You've never coached athletes in competitive Taekwondo at

20  any level; is that true?

21  A.  That is correct.

22  Q.  What you know about Taekwondo you've picked up on the

23  job?

24  A.  Correct.

25  Q.  You stated in your declaration that USTU was not willing

```
1   to pay expenses for coaches whose sole role would be to show
2   up at the Olympic competition; is that correct?
3   A.   That is correct.
4   Q.   Were you referring to plaintiff Dae Sung Lee, in
5   particular, when you made that statement?
6   A.   I was referring to coaching practices of the USTU
7   coaches.
8   Q.   But not Dae Sung Lee in particular?
9   A.   Anybody who has been a coach at an international event
10  for the USTU in the past two years.
11  Q.   And were you thinking of anybody in particular when you
12  made that statement?
13  A.   No. All of their appointed coaches were people that that
14  statement was targeted at.
15  Q.   Okay.
16       When you say USTU was not willing, were you
17  referring to Robert Gambardella in particular?
18  A.   I'm sorry, I missed part of that question.
19  Q.   Sorry.
20       When you said that USTU was not willing to cover
21  these expenses any longer, were you referring to Robert
22  Gambardella?
23  A.   No.
24  Q.   Were you referring to the board?
25  A.   I was referring to the administration in place at that
```

```
1   time.
2   Q.   And who was your understanding of who that is?
3   A.   The board of USTU, as well as the salaried staff.
4   Q.   Okay.
5        Now, do you know how the USOC bylaws describe the
6   Olympic coaches' function?
7   A.   I cannot cite it by verse, but I have the basic
8   understanding, yes.
9   Q.   State, in your own words, what you think a U.S. Olympic
10  coach is supposed to do under the bylaws.
11  A.   To prepare and coach athletes leading up to and during
12  major international events, including the Olympic games.
13  Q.   Do you know whether plaintiff Dae Sung Lee was attempting
14  to do those things?
15  A.   I do not see any record of him coaching any athletes that
16  were in the competitive pool that were attempting to make the
17  Olympic team in 2004.
18  Q.   And what kind of record are you referring to?
19  A.   Athletes who entered into -- (incomprehensible) -- that
20  occurred in January, March, April, May or June of 2004 --
21       THE COURT: Did you say --
22  A.   -- as well as those athletes who were members of the 2003
23  world championship team.
24       THE COURT: Okay, did you say athletes that had
25  entered into -- what?
```

```
1   A.   What they had was a series of fightoffs to try to make
2   the Olympic team. I did not see any athletes that registered
3   Mr. Lee as a coach that participated in any of those events.
4        THE COURT: In the "playoffs"?
5   A.   In the "fightoffs," yes, ma'am -- yes, Your Honor.
6        THE COURT: Okay, thank you.
7   BY MR. JONES:
8   Q.   Uh --
9        THE COURT: The "fightoffs," did you say, or the
10  "playoffs"? The "fightoffs"?
11  A.   F-I-G-H-T, "fight."
12       THE COURT: Thank you.
13  BY MR. JONES:
14  Q.   Tell me, Mr. Skinner, do you know whether plaintiff, Dae
15  Sung Lee, attended a site visit in Greece in April at USTU's
16  request?
17  A.   I do not know.
18  Q.   Do you know whether he attended the world championship in
19  2003?
20  A.   Yes.
21  Q.   He did?
22  A.   Yes.
23  Q.   Do you know whether he attempted -- or, pardon me,
24  attended the Pan Am games in the Dominican Republic?
25  A.   Yes.
```

```
1   Q.   That was six weeks long, wasn't it?
2   A.   You faded out during part of that.
3   Q.   That was six weeks long, wasn't it?
4   A.   That event was three weeks long.
5   Q.   You believe it to be three weeks?
6   A.   That event -- I don't have the dates in front of me, but
7   I wasn't gone for six weeks, and I was there before the games
8   started and after they ended.
9   Q.   Do you know whether Dae Sung Lee attended the regional
10  Olympic Pan American qualifications in Mexico?
11  A.   Yes, he did.
12  Q.   Do you know whether he attended the world qualifications
13  in France?
14  A.   Yes, he did.
15  Q.   Do you know whether he attended the Asian qualifications
16  in Thailand?
17  A.   I am not aware, because as far as I know, there were
18  no U.S. athletes in that event.
19  Q.   Do you know whether he attended the first U.S. Olympic
20  trials in Colorado?
21  A.   The first Olympic trials?
22  Q.   Yes, the U.S. Olympic trials in Colorado?
23  A.   In which year?
24  Q.   That would be 2004.
25  A.   There was one Olympic trial; that was in June in San
```

1    Jose, California.

2            THE COURT:  Well, did he attend?

3    A.  I did not see him there.

4    BY MR. JONES:

5    Q.  Are you aware of any other Olympic trials?  You're only

6    aware of one Olympic trial; is that correct?

7    A.  There is one official Olympic trial.  Everything else was

8    a fight-off to try to get to that trial.

9    Q.  Do you know whether he attempted to go on a second Greece

10   site visit at USTU's request?

11   A.  I was not aware of that.

12   Q.  Do you know if he attended the U.S. Pan American Games

13   team trial in Colorado?

14   A.  I cannot recall.

15   Q.  It's common, is it not, for Olympic coaches to attend

16   lots of these competitions in order to size up the foreign

17   competition?

18   A.  Those competitions -- everything except for the Pan

19   American Games and the world championships that you mentioned

20   were competitions that featured U.S. athletes -- I'm sorry,

21   you also mentioned an Asian event.  Those are the only three

22   events where you would be looking at anybody else; every other

23   event was totally full of American athletes.

24   Q.  And, as part of a U.S. Olympic coach's duties, shouldn't

25   he be at the United States' events, as well?

49

1    A.  Should he be at the United States' events, as well?  Yes.

2    Any coach who is preparing athletes should be at the events

3    that are relevant to that athlete making an Olympic team.

4    Q.  And we've just gone over the ones that Dae Sung Lee

5    attended that you were aware of.  Is that right?

6    A.  I indicated which ones I was aware that he attended, yes.

7    Q.  And you are aware of that how, by attending them with him

8    or by looking at receipts that are turned in?

9    A.  Some of those events I was at.  Some of those events I

10   know he was at because of looking at delegation member names

11   on final rosters.  One thing I want to make sure that was

12   caught in the -- phone is that he attended many events, but I

13   do not recall him having any athletes that were competing at

14   any of those events.

15   Q.  I see.  So you're distinguishing between attending events

16   for preparation versus bringing athletes there from his school

17   to compete; is that fair?

18   A.  That is very fair.

19   Q.  Now, let me ask you your understanding of the process for

20   issuing coaching credentials.  We heard testimony that the

21   USOC, along with a Greek committee, are the ones that must

22   okay the issuance of additional credentials; is that your

23   understanding?

24   A.  Generally, yes.

25   Q.  And what committee would that be in Greece.

50

1    A.  What -- what I mean by that is, it's not that simple.

2    The U.S. Olympic Committee plays a very minor role.

3    International federations play a bigger role.  The

4    International Olympic Committee plays a role, as well as

5    ATHOC, the Athens Organizing Committee, plays a role in these

6    particular games.

7    Q.  Okay, we've heard about that association.

8            To your knowledge, the USOC has not issued a

9    credential for Chui Ho Kim; correct?

10   A.  Correct.

11   Q.  Thank you.

12           MR. JONES:  No further questions.

13           THE COURT:  Okay.

14           Any redirect?

15           MR. ROECA:  Yes, Your Honor.

16           REDIRECT EXAMINATION

17   BY MR. ROECA:

18   Q.  Good evening, Mr. Skinner.  Arthur Roeca.  Just a couple

19   of follow-up questions.

20           You were asked a series of questions concerning

21   Mr. Lee's attendance at a number of competitions over the

22   course of time.  Are you aware of the qualification events

23   that occurred for the U.S. Olympic team, Taekwondo team, in

24   June of 2004?

25   A.  Yes.

51

1    Q.  To your knowledge, did Mr. Lee coach any athlete who was

2    a competitor for a position on the United States Olympic team

3    for the 2004 Olympics in June of 2004?

4    A.  No.

5    Q.  Now, to your knowledge, was the selection of the coach

6    based upon the criteria that had been established prior to the

7    qualification tournament that occurred in June of 2004?

8    A.  Yes.

9    Q.  And were the criteria followed in the selection of the

10   coach, Mr. John Lopez -- Gene Lopez, who has been --

11   A.  Yes.

12           MR. ROECA:  That's all I have; thank you.

13           THE COURT:  Okay.

14           Anything more?

15           MR. JONES:  No, Your Honor; thank you.

16           THE COURT:  Okay.

17           Then we are going to excuse Mr. Skinner.  And, at

18   this point, I think we are done with the witnesses in Greece,

19   and we'll go back to the live witnesses.

20           Did you want to -- Mr. Jones, did you want to do

21   Mr. Han Wan Lee, who is a non-party first, so that then we

22   would be left with the parties only, and then the non-party

23   witnesses would be excused?

24           MR. JONES:  That would be fine, Your Honor.

25           THE COURT:  Okay.

52

1      My suggestion is this:  That we take Mr. Han Wan
2  Lee, and then take a lunch break.  And then come back to do
3  the witnesses who are parties anyway, so they are going to be
4  here, okay?
5      MR. JONES:  Yes.  Thank you, Your Honor.
6      THE COURT:  Okay, so let's call Mr. Han Wan Lee.
7      MR. LEVINSTEIN:  Your Honor, are we first going to
8  do objections to his declaration or not?
9      THE COURT:  Yes, we are, but I am just bringing him
10  in, and then I'll take objections, and so forth.
11      Who is going to be examining -- cross-examining
12  Mr. Han Wan Lee?
13      MR. ROECA:  I will be, Your Honor.
14      THE COURT:  Okay.  So, are there any objections?
15      MR. ROECA:  If you'd give me one minute, Your Honor?
16      THE COURT:  All right.
17      (Mr. Lee approached the witness stand.)
18      (Discussion off the record.)
19      MR. ROECA:  Your Honor, we object to the --
20  paragraph eight, concerning -- well, on the grounds that it's
21  not relevant.
22      THE COURT:  Okay, just a minute.
23      MR. ROECA:  And paragraph nine, on the grounds of
24  relevance.
25      Number ten, on the grounds of relevance.

1      (Perusing documents.)  Number ten on the grounds of
2  relevance.
3      11 on the grounds of relevance.
4      And 12 on the grounds of relevance, Your Honor.
5      MR. LEVINSTEIN:  Your Honor, Mark Levinstein in
6  Washington.  Since I can't confer with my co-counsel, I just
7  have the end of 12 -- also on the basis of he's testifying
8  about the mental state of someone else, which I don't know how
9  he testifies about whether Nia Abdallah would be uncomfortable
10  or not.
11      THE COURT:  Okay.  Well, I'll let Mr. Jones respond.
12  Paragraph eight, it seems to me, goes to the damage claim.
13  And so -- I mean, it's fine that it's in here, but you might
14  want to explain to me why I have to consider this evidence on
15  the preliminary injunction motion.
16      MR. JONES:  You're correct, Your Honor, it does go
17  to future damages.
18      THE COURT:  Okay.
19      So, for purposes of this hearing, I am sustaining
20  the objection to paragraph eight, but it's in the record if it
21  later gets referred to on the damage discussion.
22      Okay, then, looking at paragraph nine, Mr. Jones?
23      MR. JONES:  Again, this goes to the effects of
24  having one of these appointments, Your Honor.  Primarily, we
25  are talking about irreparable harm to the plaintiff --

1      THE COURT:  Okay, but what about the last sentence,
2  for example?  The last sentence probably goes to your damage
3  claim, it seems to me.  I can see your argument that the first
4  two sentences about getting the acclaim of going around and
5  speaking in public might be some non-monetary damage.
6      MR. JONES:  Yes, Your Honor.
7      THE COURT:  Okay.
8      So I'm going to sustain the objection to the last
9  sentence of paragraph nine, and I won't consider that for
10  purposes of this preliminary injunction motion.
11      Paragraph ten, it seems to me, does go to what they
12  are claiming as irreparable harm, so I am going to overrule
13  the objection to paragraph ten.
14      Paragraph 11 -- I'll overrule the objection to
15  paragraph 11.
16      Paragraph 12, I think the objection with respect to
17  Nia Abdallah conceivably being uncomfortable is well taken, so
18  I'm going to sustain the objection to the last sentence.  In
19  paragraph 12, I think, also -- can this witness really talk
20  about whether or not something is or is not a conflict of
21  interest?
22      MR. JONES:  Yes, Your Honor.  Coaches are held to a
23  standard of their own ethics, and I think he's -- being an
24  expert, he's qualified to talk about what's ethical and what
25  isn't.

1      THE COURT:  Okay, well, this subject has actually
2  been raised with another witness, so I'm going to allow it;
3  but, the last sentence of paragraph 12, it does seem to me, is
4  speculative, and I'm going to not consider that.  So the
5  objection is sustained to -- to summarize, paragraph 8; the
6  last sentence of paragraph 9; and the last sentence of
7  paragraph 12; and, in other respects, the objections are
8  overruled.
9      Now, I'll have the witness sworn.
10      THE CLERK:  Would you please rise and raise your
11  right hand.
12      Do you solemnly affirm that the testimony you are
13  about to give before this court shall be the truth, the whole
14  truth, and nothing but the truth?
15      THE WITNESS:  I do.
16      THE CLERK:  Please be seated.
17      State your name for the record and spell your last
18  name, please.
19      THE WITNESS:  Han Wan Lee, L-E-E.
20      THE COURT:  Okay.
21      Mr. Lee, do you have a copy in front of you, of your
22  declaration?
23      THE WITNESS:  I do not.
24      THE COURT:  You do not?
25      THE WITNESS:  I have it in my bag.

1    THE COURT:  Okay, you might want to go and get that
2  so you have it in front of you.
3    THE WITNESS:  Okay.
4    (The witness stepped down from the stand, retrieved
5    briefcase, then returned to the witness stand.)
6    THE WITNESS:  (Perusing documents.)
7    THE COURT:  Okay.
8    Now, looking at that declaration, tell me whether
9  everything in it is true and correct, and if you were asked
10  questions while you were sitting here in this courtroom about
11  subjects in this declaration, would you provide the answers
12  that are written in this declaration?
13    THE WITNESS:  Yes, I would.
14    THE COURT:  Okay.
15    Then let me invite cross-examination.
16    MR. ROECA:  Thank you, Your Honor.
17    HAN WAN LEE,
18  called as a witness on behalf of the Plaintiffs, having been
19  duly sworn, was examined and testified as follows:
20    CROSS-EXAMINATION
21  BY MR. ROECA:
22  Q.   Good afternoon, sir.
23  A.   Good afternoon.
24  Q.   Are you familiar with the coaching criteria that were
25  established by the United States Taekwondo Union in April of

1  2004?
2  A.   Yes, I read that, yes.
3  Q.   Okay.
4    And, are you aware of the factors that they took
5  into consideration in selecting Gene Lopez as coach of the
6  2004 Olympic team?
7  A.   Yes.
8  Q.   And, do you know whether or not those factors were
9  appropriately applied in selecting Gene Lopez?
10  A.   With the new criteria, yes.
11  Q.   They were appropriately applied; correct?
12  A.   Yes.
13    MR. ROECA:  That's all I have.
14    Thank you.
15    THE COURT:  Okay.
16    Then, redirect?
17    REDIRECT EXAMINATION
18  BY MR. JONES:
19  Q.   Can you just comment on the applicability of the new
20  criteria to Gene Lopez, why you feel he was appropriately
21  selected?
22  A.   Well, because the 2004 USTU's selection criteria said --
23  in my belief -- that, has to produce an athlete, or have to
24  put athlete on the team.  And so, in that criteria, it is.
25  But, my personal opinion is that Dae Sung Lee, Coach Dae Sung

1  Lee, did not coach anybody, because he was to believe that he
2  was a coach for Olympic team, and therefore, he didn't have a
3  chance to put anybody on the team.
4  Q.   Would you agree that Coach Dae Sung Lee had some positive
5  record for purposes of factor two of the new coaching
6  criteria?
7    MR. ROECA:  Objection; calls for speculation,
8  Your Honor.
9    THE COURT:  I'm going to let him go ahead.
10    Go ahead and answer.
11  A.   Okay.  Coach Dae Sung Lee has experience in international
12  competitions, coaching, and he has coached Steven Lopez in
13  2003 Pan Am Games to a gold medal.  And he was -- believed
14  that he was coach for 2004.  I believe he spend a lot of his
15  money, as well, to go to international competitions to study
16  international competitors, as well.  And he has coached many
17  of the elite athletes, or national team members, at world
18  championships and world cups and made them winners in
19  international competition.
20  BY MR. JONES:
21  Q.   But if one is constrained by these new coaching selection
22  criteria because he can't meet the first factor, is what
23  points to Gene Lopez?
24  A.   Right.  To me, 2004 election -- coaches' selection
25  criteria is not really, you know, fair, in my opinion, because

1  of -- you know, first criteria is, you have to put the athlete
2  on the Olympic team to be eligible or be considered as Olympic
3  coach.  So...
4  Q.   Thank you, sir.
5  A.   Thank you.
6    THE COURT:  Anything more?
7    MR. ROECA:  Yes, Your Honor.
8    RECROSS-EXAMINATION
9  BY MR. ROECA:
10  Q.   So you don't agree with the criteria that were adopted
11  and that were used to select Gene Lopez; is that what you're
12  saying?
13  A.   Yes.  I mean, I do understand the 2004 USTU has set a
14  criteria.
15  Q.   Did Mr. Dae Sung Lee tell you that in April of 2004, he
16  had been told that he was no longer the coach of the U.S.
17  Olympic Taekwondo team?
18  A.   No, he did not.
19  Q.   Did he tell you that he understood in April of 2004 that
20  the position that had been created previously, because of the
21  remediation plan, that all the positions had changed, and his
22  position as coach had been rescinded?  Did he tell you that?
23  A.   I don't think so.  I don't recall that.
24  Q.   Was it your understanding that he thought in April and
25  May and June of 2004 that he was still a coach?

8/12/2004 TRO Proceeding

```
1    A.    No.  My understanding was, he was still running for the
2    position.
3    Q.    In other words, he knew he wasn't the coach, he was
4    hoping to be the coach; right?
5    A.    Well -- maybe, yes.  Maybe.
6          MR. ROECA:  Thank you.
7          THE COURT:  Anything more?
8          MR. JONES:  Nothing further, Your Honor.
9          THE COURT:  Okay.
10         Thank you very much, Mr. Lee; you can step down, and
11   you are excused.
12         And let me talk to counsel about the schedule here.
13   We still have Ms. Witte and the plaintiff.  And I was thinking
14   we should take about an hour break and come back.
15         MR. ROECA:  That's fine, Your Honor.
16         MR. JONES:  That's fine, Your Honor.
17         THE COURT:  Okay.
18         MR. ROECA:  Shall we leave them on the telephone?
19         THE COURT:  On the telephone, are you okay with
20   that, whoever is still going to be with us on the telephone?
21   I realize we are much earlier than you are, so I'm not sure
22   who on the telephone is -- Mr. Benz, are you still going to be
23   with us?
24         MR. GAMBARDELLA:  Your Honor, Mr. Benz is out of the
25   office right now.  This is Mr. Gambardella.  And I will stick
```

8/12/2004 TRO Proceeding

```
1    around.  I'll go back to my room and then come back.  But --
2    here is Mr. Benz, he's coming back right now.
3          MR. BENZ:  I'm sorry about that.
4          THE COURT:  I was just checking.  We are going to
5    take a one-hour lunch break, and I wasn't sure whether you
6    folks in Athens still wanted to be hooked in when we come --
7          MR. BENZ:  Yes, Your Honor, this is an important
8    issue for us, so --
9          THE COURT:  Okay, so when we come back you still
10   want to participate.
11         And, in Washington, D.C., are we still going to have
12   that?
13         MR. LEVINSTEIN:  Absolutely, Your Honor.
14         THE COURT:  Okay.  Okay, well, you folks are --
15         MR. LEVINSTEIN:  Should we hang up and reconnect in
16   an hour?  It doesn't matter to us.
17         THE COURT:  No, I think --
18         MR. BENZ:  It matters to me simply because I am
19   going to try to get closer to my bed than I am now, during
20   this hour.
21         THE COURT:  We are going to --
22         MR. LEVINSTEIN:  Well, it doesn't matter for you,
23   Jeff, because you called me.  So the question is:  I'm the
24   connection to the court, Your Honor.  Should I leave the phone
25   line on?
```

8/12/2004 TRO Proceeding

```
1          THE COURT:  No, you can hang up.  And we'll call you
2    back.  So, it's about 20 to 1:00 for us, so we'll call you
3    back about 20 till 2:00.  So, about 1:40 our time, I guess
4    that's 2:40 in the morning your time.  I think you all ought
5    to get Olympic medals just for participating in this hearing.
6    And I'll talk to you all again in an hour.
7          Thank you.
8          MR. BENZ:  Thank you.
9          MR. LEVINSTEIN:  Thank you, Your Honor.
10         THE CLERK:  All rise.
11         This court will be in recess for one hour.
12         (The lunch recess was taken at 12:40 p.m.)
13              - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

8/12/2004 TRO Proceeding

```
1    AFTERNOON SESSION                          1:50 P.M.
2              - - -
3          THE COURT:  We are going back on the record, and one
4    of the first things we need to know is whether you have any
5    intention of calling Han Wan Lee as a further witness in these
6    proceedings?  If you do not, then he'll be allowed to sit in
7    the audience, as he is now doing.
8          MR. JONES:  No, Your Honor, we don't have any more
9    questions for him.
10         THE COURT:  And, Mr. Gambardella apparently has been
11   doing that, also, on the Greece side, although he's
12   representing a party -- representative of a party, in any
13   event.
14         Okay, so, let's first look at the Sammy Pejo matter
15   and take care of that, and then we'll call the plaintiff.  So
16   what, if any, objections are there to the declaration?
17         MR. ROECA:  Yes, Your Honor.
18         What I can do is go through paragraph by paragraph?
19         THE COURT:  Yes.
20         MR. ROECA:  We object to the last sentence of
21   paragraph six as being hearsay.  Paragraph nine, lacking in
22   foundation.  Number ten, lacking in foundation.  Number 13 as
23   being hearsay -- undocumented hearsay.  Number 15, no
24   foundation as to how -- it's speculation, because the witness
25   is being asked to interpret how Nia would feel.  The entire
```

1  paragraph is speculative.  And she also had an opportunity to
2  be examined by counsel during the proceedings.  16, hearsay.
3      That's all, Your Honor.
4      MR. LEVINSTEIN:  Paragraph seven, the last sentence,
5  testifying as to what everyone at USTU believed, lacks
6  foundation.
7      THE COURT:  Okay.
8      Okay, let's start with paragraph six.
9      MR. JONES:  Your Honor, we're not offering it for
10 the truth of the matter, we're offering it for the fact that
11 the words were stated; therefore, it's nonhearsay.
12     THE COURT:  Well, this is the kind of statement
13 where, if it was stated, that's the whole ball game for that
14 particular statement.  One such meeting with the legal
15 counsel...
16     MR. LEVINSTEIN:  Your Honor, Mark Levinstein.  It's
17 technically double hearsay, and one of the statements is for
18 the truth of the fact that it was said.
19     THE COURT:  Why isn't this a party admission,
20 though, so it's not hearsay?
21     MR. LEVINSTEIN:  The statement is that a counsel for
22 the USTU --
23     THE COURT:  Right, but I'm taking counsel as being
24 an agent of USTU --
25     MR. LEVINSTEIN:  Well, this was at a time -- this

1  was a counsel for the -- the management of USTU who is no
2  longer with USTU.
3      THE COURT:  Okay, I'm going to overrule this hearsay
4  objection, on paragraph six, for the sentence, "At one such
5  meeting with legal counsel, declarant was told that members of
6  the USOC membership and credentials committee referred to USTU
7  management as the Korean Mafia."
8      Okay, paragraph seven, the last sentence is objected
9  to.  It says, "Everyone at USTU respected his qualifications
10 and ability and was happy for him" -- "him" being the
11 plaintiff.  I am going to sustain that objection, so that will
12 not be considered.
13     Looking, then, at paragraph nine, give me a minute
14 here to look at it...
15     Okay, I don't know how Mr. Pejo knows these things.
16 Presumably he knows them from Mr. Lee.  If he knows them from
17 Mr. Lee, then that's hearsay, and Mr. Lee is offering somebody
18 else's statement about what Mr. Lee said.  If there's some
19 other personal knowledge foundation, it's not apparent from
20 the declaration.
21     MR. JONES:  I'm sorry, Your Honor.  In the example
22 of the Pan Am game, Mr. Pejo was with Mr. Lee, so he saw it
23 with his own eyes.
24     THE COURT:  Okay, but this is all preceded by "he
25 did all the things expected of an Olympic coach."

1      MR. JONES:  I think Mr. Pejo is qualified to talk
2  about those things.  He is the AAC chair; he is on the
3  committee that actually selected Mr. Lee, under the old
4  regime.
5      THE COURT:  How does he know the other things?  That
6  he was sent to Athens for an Olympic games site.  He was also
7  asked to and did attend all these relevant national and
8  international Taekwondo competitions, and these Olympic
9  trials, and the Asian -- how does he know those?
10     MR. JONES:  As AAC chair, he would have to be on top
11 of all those things.
12     THE COURT:  Okay, can I tell that from his
13 declaration, that he had some way other than from Mr. Lee, the
14 plaintiff, to know that?
15     MR. JONES:  No.  One would have to look at the
16 bylaws.
17     THE COURT:  Well, I am going to sustain the
18 objection to paragraph nine.
19     Okay, paragraph ten, I don't know how the declarant
20 is aware that Mr. Lee's nomination was approved in October
21 2003, and then the sentence that says, quote, "At that point,
22 it is considered final," close quote, I don't know the basis
23 for that.  It's not apparent, anyway, from the declaration, so
24 I'm going to sustain the objection to paragraph ten.
25     Okay, paragraph 13, there's something wrong with the

1  grammar here.  It says, "Declarant only heard from Master Dae
2  Sung Lee's nomination was withdrawn."  I don't know what this
3  is supposed to say.  Only heard "that" Master Dae Sung Lee's
4  nomination was withdrawn?
5      MR. JONES:  That's what it was supposed to state,
6  Your Honor.
7      THE COURT:  But we can't tell from whom he heard it.
8  I mean, I don't mind saying, declarant does not know the
9  reasons or who suggested the withdrawal of Master Dae Sung
10 Lee's name in the first place, but I don't know that you want
11 that sentence by itself in.
12     MR. JONES:  We'll withdraw that one, Your Honor.
13     THE COURT:  Okay.  Okay.
14     And then I'm looking at paragraph 15.  Hold on...
15 and, again, I'm going to take out the sentence, "Because of
16 the family relationship, and so forth, Nia would now
17 conceivably be very uncomfortable."
18     So, for the same reasons that I sustained the
19 objection to such a statement in an earlier declaration, the
20 objection is sustained to the last sentence in paragraph 15,
21 but the rest of paragraph 15 will stay.
22     Paragraph 16, give me a moment... okay, I cannot
23 tell from whom declarant heard this, and so I am going to
24 sustain the objection to paragraph 16 on hearsay grounds.
25     Okay, I think that takes care of the objections to

8/12/2004 TRO Proceeding

1  the Sammy Pejo declaration, and there's no cross-examination,
2  so -- is that right?
3          MR. ROECA:  That's correct, Your Honor.
4          THE COURT:  Okay.
5          So we're going to look, now, to the declaration of
6  the plaintiff, and we'll have the plaintiff come to the stand.
7          (Mr. Dae Sung Lee approached the witness stand.)
8          THE CLERK:  Would you please raise your right hand.
9          Do you solemnly affirm that the testimony you are
10 about to give before this court shall be the truth, the whole
11 truth, and nothing but the truth?
12         THE WITNESS:  Yes, I do.
13         THE CLERK:  Please be seated.
14         State your name for the record and spell your last
15 name, please.
16         THE WITNESS:  Dae Sung Lee, L-E-E.
17         THE COURT:  Okay, let me first begin by asking
18 Mr. Lee if the declaration that was filed on -- do you have a
19 copy of it?
20         THE WITNESS:  Yes, ma'am.
21         THE COURT:  Okay.
22         -- that was filed on August 11, 2004, are the
23 statements in this document true and correct?
24         THE WITNESS:  Yes, ma'am.
25         THE COURT:  These would be -- this would be your

69

8/12/2004 TRO Proceeding

1  testimony if you were asked, while sitting live in this
2  courtroom, questions on the subject matter set forth in the
3  declaration; is that right?
4          THE WITNESS:  Yes, ma'am.
5          THE COURT:  Okay.
6          Then, cross-examination may proceed.
7          Mr. Roeca?
8          MR. ROECA:  Your Honor, might we address some of the
9  statements in --
10         THE COURT:  Oh, yes.  Do you have objections?
11 Certainly, go ahead.
12         MR. ROECA:  Your Honor, directing the court's
13 attention to paragraph 18, there are statements in that
14 paragraph that are objected to as being hearsay.
15         THE COURT:  Which statements?
16         MR. ROECA:  Well, there's a letter that's attached
17 as an exhibit, which is hearsay, dated August 14, 2003.  And
18 then there are a series of characterizations in the paragraph,
19 as you can see, which are referencing hearsay statements.
20         THE COURT:  Do you think that they are inaccurate?
21         MR. ROECA:  I have no way of verifying them one way
22 or the other.
23         And the letter, itself, is not a self-authenticating
24 document.
25         THE COURT:  Wait.  When you say you have no way of

70

8/12/2004 TRO Proceeding

1  knowing one way or the other, are you disagreeing -- starting
2  with the second sentence, isn't it a description of what the
3  letter says?  So I'm asking you whether you think that the
4  description of the letter is incorrect?  Putting aside for the
5  moment your hearsay objection to the letter.
6          MR. ROECA:  I think it's out of context, Your Honor.
7          THE COURT:  Is there an exhibit number to the
8  letter?  Or is the letter, itself, attached?  Is there an
9  exhibit number?
10         MR. ROECA:  It's referred to as Exhibit 4.
11         THE COURT:  Exhibit 4?  Hold on --
12         MR. ROECA:  Plaintiff's Exhibit 4.
13         THE COURT:  Okay.
14         MR. ROECA:  Your Honor, I will withdraw.  We have
15 agreed to that exhibit, so I will withdraw my objection to
16 that paragraph.
17         THE COURT:  Okay.
18         MR. ROECA:  Moving to the next one, on Page 21 --
19 or, rather, paragraph 21, we do disagree on the grounds of
20 hearsay, and we have not agreed to the exhibit which is
21 referenced.
22         And, do you want me to go through the whole
23 declaration --
24         THE COURT:  Hold on, I'll stop here.  Okay, well, I
25 don't know that it's hearsay, since we have one of the

71

8/12/2004 TRO Proceeding

1  Taekwondo Union lawyers allegedly advising declarant of this
2  fact directly.  So I think that's an admission.
3          MR. ROECA:  Your Honor, with all due respect, I
4  don't believe that that's an admission, because the current
5  board is in position, in place, due to a settlement -- a
6  remediation agreement, and there was an adversary relationship
7  between the USOC and the USTU at the time of this.
8          THE COURT:  That may be, but the USTU is here,
9  itself, and, presumably, there was not an adversarial
10 relationship between the USTU and the USTU.  So, you know,
11 you're representing the USTU, also, not just the USOC, as I
12 understand it, so I'm having some problems saying why it's not
13 a party admission, just because it's not a USOC document or a
14 USOC lawyer.
15         MR. ROECA:  It's -- I don't believe that the
16 statements that were made -- well, I understand that -- if one
17 takes a step back and looks at the relationship, there was an
18 adversary proceeding, and whether a lawyer was characterizing
19 something in a certain way pertaining to a matter that
20 resulted in a resolution, we object to it as being hearsay,
21 and that's the basis of our objection.
22         THE COURT:  Okay.  The hearsay objection is
23 overruled, because at the time the statement was made, the
24 lawyer for the Taekwondo Union presumably was acting as an
25 agent for the Taekwondo Union, which is a party in front of

72

1    me.  So the hearsay objection --

2              MR. LEVINSTEIN:  Your Honor?

3              THE COURT:  Yes?

4              MR. LEVINSTEIN:  I think that if -- just to give you

5    an analogy, if there's a group that's running a company, and

6    they make statements to themselves, and then they are ousted

7    and they sue the company, they can't claim that because at the

8    time they were running the company, that everything they said

9    to each other, in my view, is -- is an admission of the party,

10   because they controlled the entity at that time.

11             Mr. Dae Sung Lee was a member of the old management,

12   and Mr. Han Wan Lee -- these are the people who were -- as

13   they said -- unhappy about the people being forced to resign,

14   and these were their lawyers, who are no longer the lawyers

15   for the USTU, and this case, according to them, is about a

16   dispute about who should run the organization.  So I don't

17   think you can turn around and say that everything they said to

18   each other now becomes an admission because at the time, they

19   had those positions.

20             So, that's just our view, for the record.

21             THE COURT:  Okay, it's overruled on that issue.

22             And, as far as -- I mean, I -- I guess I'm having

23   some difficulty understanding this.  As I understand it, you

24   are objecting to my considering this letter, Exhibit 6 -- or,

25   this memo, Exhibit 6.  My suggestion is that we go through the

1    declarations.  Now, as my trial procedures memo makes

2    explicit, referring to an exhibit is not the same as my

3    receiving the exhibit into evidence.  So anybody who's

4    referred to an exhibit in any declaration and wants me to look

5    at and consider the exhibit itself has to move for the

6    admission of that exhibit.

7              This is the same as if you had -- without this

8    declaration procedure, if we had a witness on the stand who

9    referred to -- who, in testimony, said, there was a memo by

10   Bruce Harris about this, that wouldn't put the memo into

11   evidence.

12             Well, by the same token, simply referring to a

13   document in a declaration doesn't put it into evidence.  So it

14   may be that you folks want to bring these seriatim motions for

15   admission of exhibits, or maybe you have a stip or something,

16   but in any event, I mean, I wasn't going to consider Exhibit 6

17   at the moment, unless I had to, and I was only going to stick

18   to the declaration statements, themselves.

19             MR. ROECA:  Fine.

20             THE COURT:  Okay.

21             MR. ROECA:  Shall we move on, or do you want to

22   stick with the same paragraph?

23             THE COURT:  Yes.

24             MR. ROECA:  Paragraph 30, we object on the grounds

25   of lack of foundation and relevance.

1              THE COURT:  I'll overrule that.

2              MR. ROECA:  Number 31, objection on the grounds of

3    relevance.

4              THE COURT:  Okay, overruled.

5              MR. ROECA:  Number 36, objection on the ground of

6    relevance.

7              THE COURT:  Okay, overruled.

8              MR. ROECA:  Number 41, objection on the ground of

9    hearsay.

10             THE COURT:  Okay, I guess I'm not really certain

11   about how Mr. Pejo fits in as a party, but, in any event, what

12   difference does it make what Mr. Pejo told Mr. Lee that

13   Mr. Pejo believed since -- I mean, can't we look at some set

14   of rules to figure out who actually had a right to nominate

15   whom?

16             MR. ROECA:  Your Honor, I am just making my

17   objection.

18             THE COURT:  Okay.  So, I think I am helping you out

19   here.

20             MR. ROECA:  Okay.

21             THE COURT:  Anyone want to say anything about it?

22             MR. JONES:  Your Honor, we are just offering it to

23   show chronology of events, the communications and notice that

24   he got throughout the process, to show that he was not

25   delaying.  And it goes to irreparable harm.

1              THE COURT:  Okay.

2              Okay, as I said, I don't really know if this is

3    hearsay or not, since I don't fully understand whether

4    Mr. Pejo could be said to be speaking for the Taekwondo Union.

5              Mr. Roeca's objection was a hearsay objection, and

6    I'm not going to sustain that objection.  I suggested that

7    there might be a relevance objection, but I take it from

8    Mr. Roeca saying he was just stating his objection that he

9    didn't want to adopt a relevance objection and is sticking to

10   his hearsay objection, which is what he offered.

11             Am I correct?

12             MR. ROECA:  I will amend my objection to incorporate

13   relevance.

14             THE COURT:  Okay.  On relevance grounds, I'll

15   sustain that.

16             MR. ROECA:  Thank you, Your Honor.

17             And then, paragraphs 50 and 51, we object on the

18   grounds of hearsay.

19             THE COURT:  Okay, I guess I don't know how to do

20   this without looking at the actual exhibits, so -- hold on...

21   is it a one-page exhibit?

22             MR. JONES:  Yes, Your Honor.

23             THE COURT:  Okay.

24             I can't tell from this what the writer's

25   relationship is to the addressee.  I can't tell who Keith

1  Smith is.

2         MR. JONES:  He's one of the counsel for USTU,

3  Your Honor.  All we have is the letterhead to identify the

4  firm.

5         THE COURT:  And where's the attachment?  Is that a

6  different exhibit?

7         MR. JONES:  Yes, Your Honor, I think it's the next

8  one.

9         THE COURT:  The next one?

10         MR. JONES:  Yes.

11         THE COURT:  Okay.

12         Okay, so, sticking just to Exhibit 22, I'll overrule

13  that, the hearsay objection to paragraph 50, which then brings

14  us to the next exhibit I see.  Paragraph 51 is

15  Exhibit 23... hold on...

16         The objection is hearsay.  I'm not certain it's

17  hearsay, since --

18         MR. JONES:  Your Honor, it's hard to read, but the

19  very last page, the declarant signed the letter, so, in

20  essence, he's one of the writers of the letter.

21         THE COURT:  Oh, that I realize, but I hadn't thought

22  it was being -- I thought this was being offered as notice to

23  the Olympic committee of the concern of the writers.  And

24  so -- this did not go to the Olympic committee or it did?

25         MR. JONES:  We're not sure.  But the exhibit right

1  before it seems to leave that inference, that their counsel,

2  Mr. Benz, saw this letter, and then made these threats of

3  taking immediate action against USTU if they sent the letter.

4         THE COURT:  Okay.

5         So, then, Mr. Roeca, let me turn this back over to

6  you.  If this were only being offered for the truth of it,

7  then I could see your hearsay concern, but why wouldn't I

8  consider it for purposes of notice?

9         MR. LEVINSTEIN:  Your Honor, this is --

10         MR. ROECA:  Your Honor --

11         MR. LEVINSTEIN:  -- Mark Levinstein.  Just briefly?

12  Could we also add relevance?

13         MR. ROECA:  I would add relevance -- I'm not sure --

14  the letter that you're looking at on Exhibit 23 is dated

15  November the 12th.  Exhibit 22 is dated October the 27th.  And

16  I don't believe there's been any showing that the two are

17  connected.  And, while one may have been signed by the

18  plaintiff, the one that's signed by the plaintiff is addressed

19  to a state (sic) senator.

20         THE COURT:  "United States --"

21         MR. ROECA:  I mean a United States Senator, from the

22  State of Colorado.

23         THE COURT:  Right.  Because it looks like Exhibit 22

24  attached a draft of what turned out to be Exhibit 23, so maybe

25  the attachment, in fact, is different from Exhibit 23.  But,

1  in any event, Exhibit 23 -- I can't tell to whom Exhibit 23

2  went.  I mean -- even if we assume it did get mailed out to

3  Senator Campbell --

4         MR. JONES:  I think it's also relevant for another

5  purpose, Your Honor:  It tends to show that the entire

6  management of USTU felt that they were being victimized in a

7  racially impermissible way through this remediation plan.

8         THE COURT:  Going back a little bit... I'm starting

9  to get concerned about a lot of these things.  Okay, I'll

10  stick with Exhibit 23 for now.  That was paragraph 51?

11         MR. ROECA:  Yes, Your Honor.

12         THE COURT:  Okay.

13         I think it's true that a letter dated November 17,

14  2003, probably wasn't precisely the attachment to the

15  transmittal of October 27, 2003; but, the October 27, 2003,

16  transmittal, which is Exhibit 22, seems to be referring to

17  something that was either identical to or a precursor to what

18  is Exhibit 23.  And I think Exhibit 23 will help us understand

19  what's going on with Exhibit 22.

20         So, in any event, I'm going to overrule the

21  objection to Exhibit -- I'm sorry, to paragraph 51, because I

22  don't think it's only a hearsay issue, I think it's a notice

23  issue, also.

24         But that does raise something else, which I hadn't

25  thought about previously.  You know those earlier references

1  to things that counsel for the Taekwondo Union told the

2  plaintiff, could the attorneys here help me understand how the

3  attorney-client privilege factors into that.  Does Mr. Dae

4  Sung Lee have the right to waive the privilege that the

5  Taekwondo Union had with its counsel at the time?

6         I understand that you're saying the plaintiff was

7  involved here, but I don't know that one person who's involved

8  can waive the union's attorney-client privilege.

9         MR. LEVINSTEIN:  Your Honor, could I address that?

10         THE COURT:  Yes.

11         MR. LEVINSTEIN:  It's our view that those people who

12  were doing that, their statements can't be attributed to the

13  Taekwondo Union.  But if they can be, then you're right, they

14  can't waive the privilege.  So if they were the lawyers to the

15  USTU, he cannot waive that as a board member.  If these were

16  statements of the group that's no longer in, then they are

17  hearsay and not admissible.  So I think either way, those

18  should not come in.

19         MR. JONES:  I don't see it as legal advice that

20  we're talking about here, Your Honor.  It's statements made in

21  a public hearing by the USOC membership and credentials

22  committee.

23         THE COURT:  Okay.  Well, let me look --

24         MR. LEVINSTEIN:  No, Your Honor, it was -- for the

25  record, it was statements made in settlement conferences.  It

1  was statements made in settlement discussions with the USOC.
2      THE COURT:  Remind me -- maybe, Mr. Roeca, you can
3  help me with this:  What paragraph was I looking at before?
4      MR. ROECA:  You were looking at paragraph 41,
5  Your Honor.
6      THE COURT:  Paragraph 41?
7      MR. ROECA:  I think.
8      THE COURT:  Okay, hold on.
9      MR. LEVINSTEIN:  Your Honor, to help you, the reason
10  that counsel's sending the memo is, only counsel were in the
11  meeting, because it was not an open meeting, it was a
12  settlement discussion.
13      THE COURT:  Okay, who is speaking, now?
14      MR. LEVINSTEIN:  This is Mark Levinstein in
15  Washington.
16      THE COURT:  Okay, hold on for one second.  I'm
17  trying to find the paragraph number where the issue of what
18  counsel was saying came -- was that in Mr. Pejo's declaration?
19      MR. LEVINSTEIN:  It's in both, but I think it's
20  paragraph 21 of Mr. Lee's declaration.
21      THE COURT:  Hold on... you're right.  Thank you very
22  much.  Okay.
23      Okay, well, I'm not too concerned about the first
24  sentence being privileged, because the first sentence of
25  paragraph 21 refers to what several Olympic committee members

81

1  allegedly called the Taekwondo Union, and so that, it seems to
2  me --
3      MR. LEVINSTEIN:  Your Honor, may I interrupt one
4  second and refer you to paragraph six of Mr. Pejo, which
5  explains the context.
6      THE COURT:  I couldn't hear you.
7      MR. LEVINSTEIN:  This is Mark Levinstein again.
8      If you look at paragraph six in Mr. Pejo's
9  declaration, it makes it clear what was happening.  It says,
10  it was a meeting regarding the status of settlement, and it's
11  what the legal counsel for USTU said in settlement discussions
12  in conferring with client, USTU, about what was said in
13  settlement discussions with the USOC.  And that's clear from
14  paragraph six of Mr. Pejo's declaration.
15      THE COURT:  Okay.  But, in any event, the "Korean
16  Mafia" statement does not seem to me to be covered by either a
17  hearsay problem or an attorney-client privilege problem, so my
18  ruling is unchanged on those matters.
19      Hold on, now...
20      Because even though the lawyer was telling that to
21  the Taekwondo Union people, he was reporting something that
22  someone else had said, and so I think that that is not a --
23      MR. LEVINSTEIN:  So it's either privileged or it's
24  hearsay?
25      THE COURT:  No, it's not privileged, because the

82

1  Taekwondo Union lawyers were telling the Taekwondo union
2  people what the Olympic Committee people had allegedly said.
3      MR. LEVINSTEIN:  In settlement discussions as part
4  of giving them advice about settlements.
5      THE COURT:  I don't think that this is the kind of
6  408 exclusionary type of evidence that the makers of the rules
7  of evidence had in mind.
8      Okay, I take it back.  I'm not too worried about
9  that, if that's all we were talking about on the counsel's
10  side.
11      Okay, I kind of led us astray.  We were at paragraph
12  51.  Mr. Roeca, let me invite you to continue with your
13  objections.
14      MR. ROECA:  Well, I had objected to 51 on the
15  grounds that its hearsay.
16      THE COURT:  Right.
17      MR. ROECA:  And I would make an observation, also,
18  Your Honor, on the grounds of relevance, in that if -- keeping
19  in mind the context which has been set forth in the various
20  pieces of paper that have been submitted to this court, there
21  was a settlement and a remediation agreement, and all of the
22  issues that preceded that merged, were released and waived.
23  So we raise the relevance issue, again, to these sorts of
24  preceding out-of-court statements.
25      THE COURT:  I'll overrule that.

83

1      MR. ROECA:  Paragraph --
2      THE COURT:  I don't think that a letter to a United
3  States senator is something that merged and can never be
4  referred to again.  And, as I understand it, it's offered, at
5  least in part, as notice of a concern about alleged racial
6  discrimination, and that notice occurred, you know, half a
7  year or more before what is alleged to be discrimination
8  violating Section 1981.  So, overruled.
9      MR. ROECA:  And I would also reiterate an argument
10  made earlier to the effect that the statute, Chapter 2205,
11  contemplates exclusive jurisdiction for such matters,
12  including discrimination based upon any factor, whether it be
13  national origin or otherwise, be subject to that chapter,
14  which is one of the reasons that it's irrelevant to today's
15  proceeding.
16      Paragraph 57, objection on the grounds of hearsay.
17      THE COURT:  Okay, sustained.  Chapter (sic) 57 is
18  stricken.
19      MR. ROECA:  That's "Paragraph 57," I'm sorry.
20      THE COURT:  Yeah, 57, right?
21      MR. ROECA:  Yeah, "Paragraph 57."
22      THE COURT:  Yeah.
23      MR. ROECA:  The --
24      THE COURT:  Actually -- wait, now... okay, I don't
25  know what's wrong with "I found out after I went to Athens

84

1  that only Olympic coaches were present."
2          What's wrong with that, in Paragraph 57?
3          MR. ROECA:  I have no problem with that, Your Honor.
4          THE COURT:  Okay.  So that's still in.  I guess --
5          MR. ROECA:  Paragraph 61 --
6          THE COURT:  Hold on.
7          Just to make this understandable, I think it should
8  say, I found out after I went to Athens in April... is that
9  when his visit was?
10         MR. JONES:  Yes, Your Honor.
11         THE COURT:  Okay.
12         So, after I went to Athens in April 2003 -- "I found
13 out after I went to Athens in April 2003 that only Olympic
14 coaches were present" -- we have to put something in -- at the
15 site I was visiting, or something like that.
16         MR. JONES:  That's fine, Your Honor.
17         THE COURT:  Okay.  So that sentence will remain.
18         Okay, Mr. Roeca.
19         MR. ROECA:  Paragraph 61 on Page 19, the last two
20 sentences are objected to as being hearsay.
21         THE COURT:  Okay.  I don't think the fact that the
22 press covered it is hearsay -- which is all this is.  And
23 since we just had this discussion, that doesn't mean I'm
24 admitting Exhibit 41, but I don't see the problem with
25 hearsay with the statement that the press covered a particular

1  event, so I'll overrule the objection.  But that's not saying
2  I'll admit Exhibit 41.
3          MR. ROECA:  Are you overruling my objection as to
4  the last sentence or as to both sentences?
5          THE COURT:  Well, I hope I'm looking at the same
6  sentences.  Paragraph 61, the last two sentences are, "This
7  was covered by the press in Colorado.  A true and correct copy
8  of the article is marked as Plaintiff's Exhibit 41."
9          Is that what you're looking at, too?
10         MR. ROECA:  Yes.
11         THE COURT:  Okay, yes, your objection is
12 overruled --
13         MR. ROECA:  Thank you.
14         THE COURT:  Thank you.
15         MR. LEVINSTEIN:  Your Honor, this is Mark Levinstein
16 in Washington.
17         We also have an objection to the two sentences that
18 preceded that, both of those sentences.
19         THE COURT:  Okay, I think the only part that is
20 objectionable --
21         MR. LEVINSTEIN:  First, if he's going to testify
22 about what was acceptable to you, to you and his lawyers, he's
23 purporting to testify about what the legal advice was from the
24 USTU lawyers to USTU about settlement.
25         THE COURT:  Okay, that's what I was going to say.

1          MR. LEVINSTEIN:  I also don't think he has any basis
2  for knowing what legal advice the USOC gave to its -- a
3  foundation for him testifying about whether the USOC's lawyers
4  recommended a settlement.
5          THE COURT:  Okay.
6          MR. LEVINSTEIN:  And the sentence that follows it
7  about what furthered his belief is one opinion that's
8  inadmissible, furthered another.
9          THE COURT:  I will strike the words "even though it
10 was reasonable and recommended by their own lawyers and
11 acceptable to USTU and its lawyers."  The rest of the
12 objection is overruled.
13         Mr. Roeca, is there anything further?
14         MR. ROECA:  No, Your Honor.
15         THE COURT:  Okay.
16         Then let me invite cross-examination of Mr. Lee.
17                     DAE SUNG LEE,
18 called as a witness on his own behalf, having been produced
19 and duly sworn, was examined and testified as follows:
20                   CROSS-EXAMINATION
21 BY MR. ROECA:
22 Q.  Good afternoon, sir.
23 A.  Good afternoon.
24 Q.  Mr. Lee, in 2002, approximately how many students were
25 involved in taking Taekwondo in the United States?

1  A.  As a school or are you talking about athletes?
2  Q.  Athletes.
3  A.  Athletes.  Including juniors, or seniors, or all of them?
4  Q.  All of them.
5  A.  Okay.  Juniors would be about 5,000.
6  Q.  Okay.
7  A.  And adults, maybe -- including -- (incomprehensible) --
8  about 700, because I was involved with the tournament
9  committee members, so I know that.
10 Q.  And in the year 2002-2003, how many Taekwondo coaches
11 were teaching Taekwondo to students in the United States?
12 A.  I think all the coaches was teaching Taekwondo.
13 Q.  How many?
14 A.  National?
15 Q.  National.
16 A.  Let me clarify that.  I don't know what your question is,
17 but there's a national coaching level -- see, we have like
18 three different levels, okay:  national level, state level,
19 and international levels.  So you can maybe address for me
20 which level you are talking about?
21 Q.  All levels.
22 A.  All levels.  I think everybody's teaching Taekwondo, sir.
23 Q.  How much is everybody?
24 A.  I believe there are -- uh... I don't know, about --
25 maybe -- I don't know -- 5,000.