1    THE COURT:  I'm sorry --

2    MR. ROECA:  About 5,000.

3    THE COURT:  Wait, now.  5,000 students?

4    MR. ROECA:  Teachers.

5  A.    Coach.

6    MR. ROECA:  Coaches.

7    THE COURT:  5,000 coaches?

8  A.  Yes, there are more than 12,000 Taekwondo instructors in

9  the United States.

10  BY MR. ROECA:

11  Q.  Thank you.

12    Now, as I understand it, you moved to the United

13  States when you were quite young?

14  A.  Yes, 1971, when I was 12 years old, sir.

15  Q.  And what is the extent of your formal education?

16  A.  Korean.

17  Q.  Pardon me?

18  A.  Korean.

19  Q.  No, no, no.

20  A.  I'm sorry --

21  Q.  Let me rephrase the question.  If you don't understand

22  one of my questions, just tell me, and I'll try to make sure

23  that you do.  Okay?

24  A.  Yes, sir.

25  Q.  You went to school when you got to Hawaii?

89

1  A.  Yes, sir.

2  Q.  And how many -- when did you finish your formal education

3  in school?

4  A.  I went to Kalakaua Intermediate, Moanalua High School,

5  and I graduated from the University of Hawaii in 1987.

6  Q.  And what was your degree in?

7  A.  I was political science and physical education.

8  Q.  And I take it that although English is your second

9  language, that was the language you used as a student in

10  Hawaii all the way through the University of Hawaii?

11  A.  Yes, sir.

12  Q.  And all of the papers you wrote as a college student were

13  written in English when you were taking a course other than a

14  foreign language?

15  A.  Yes, sir.

16  Q.  Now, do you recall that in late 2003 there were disputes

17  between the United States Taekwondo Union and the United

18  States Olympic Committee that involved people at the highest

19  level; true?

20  A.  Yes.

21  Q.  Okay.

22    And the -- you had conversations from time to time,

23  as we've seen from your affidavit, or your declaration, people

24  told you bits and pieces of what was taking place?

25  A.  No, that's not true, because I'm one of the executive

90

1  committee members; therefore, I have a right to know all the

2  answers, all the questions that our officers have, and just

3  our, you know, administration.

4  Q.  Okay.  And you knew that when that dispute was resolved

5  it was resolved by a board of directors meeting that agreed to

6  the terms of the settlement agreement; correct?

7  A.  For taking of remediation plan?

8  Q.  Correct.

9  A.  Yes, on, I believe, January 26, that's when President Lee

10  signed, and all the officers, and all the -- what is it? --

11  nominated executive members, and all appointed state

12  president --

13    THE COURT:  Did you say "nominated executive"?

14  A.  No, no, no, all the appointed executive members.

15    THE COURT:  Thank you.

16  BY MR. ROECA:

17  Q.  And you were one of the individuals who deliberated and

18  voted; true?

19  A.  I don't remember that.  Executive unit, yes.  Executive

20  board member, we had a vote, and then we accept the

21  remediation plan, as junior committee chair.

22  Q.  Now --

23  A.  Sir, can I say one more?

24  Q.  Certainly.

25  A.  If we don't take the remediation plan, we will get

91

1  decertified.  And, then, as an executive board member, we

2  don't want to decertify our union, because the union has been

3  established in 1984; therefore, all the executive board

4  unanimously decide to follow USOC remediation plan, because we

5  do not want to get decertified by USOC.

6  Q.  You understood, through your experience with the Olympic

7  movement, that the United States Taekwondo Union was a

8  national governing body that had been certified by the United

9  States Olympic Committee; correct?

10  A.  Yes, sir.

11  Q.  And the United States Olympic Committee existed because

12  of a statute that was enacted in 1978 by the United States

13  Congress; correct?

14  A.  Yes, sir.

15  Q.  And you were familiar with parts of that as a result of

16  your involvement in the Olympic movement for a number of

17  years; true?

18  A.  Yes, sir.

19  Q.  And you understood that the United States Olympic

20  Committee had an obligation to audit, periodically, the

21  activities of each of the national governing bodies which were

22  beneath it; true?

23  A.  Yes, sir.

24  Q.  Now, you understood that the problem between the national

25  governing body and the United States Olympic Committee that

92

1    was occurring in 2003 was something that was in arbitration;
2    do you recall that?
3    A.   That, I'm not too sure, sir.
4    Q.   Well, do you recall that there was going to be an
5    arbitration -- it wasn't going to be in a courtroom, it was
6    going to be an arbitration between the United States Taekwondo
7    Union and the United States Olympic Committee?
8    A.   Well, I don't know it's going to be arbitration, but I
9    understand that there was going to be hearing, okay, by, I
10   believe, the credential committee, USOC credential committee,
11   yes.
12   Q.   Now, the -- it was -- it was known -- you -- you knew on
13   January the 26th or January 27th, when the agreement and the
14   remediation plan was signed, you were made aware of that,
15   correct?
16   A.   Yes, because the President Lee personally called me, yes,
17   and then, also, Sammy -- Mr. Pejo is a very important role,
18   because he is one of the AAC chair.   That is very important.
19   So he called me that President Lee signed the remediation
20   plan.
21   Q.   And would you agree that once the settlement agreement
22   and the remediation plan went into effect, that within a
23   matter of days and weeks new individuals began to assume
24   positions within the administration of the United States
25   Taekwondo Union?

1    A.   Yes, because we read the letter, so, therefore, as soon
2    as we -- President Lee resigned and officer resigned.   And
3    then we sign -- we sign afterward.   The first thing was that
4    President Lee and all the officer resign.
5    Q.   Okay.
6         And would you agree that the people who took those
7    new administrative positions were going to try to improve the
8    administration of the United States Taekwondo Union?
9    A.   Yes.
10   Q.   And that they would then put the United States Taekwondo
11   Union on the sustained competitive excellence path?
12   A.   Yes and no.
13   Q.   Well, have you ever told anyone that?
14   A.   Such as?
15   Q.   Have you ever told anyone that you hoped that the new
16   administration that went into place after the remediation
17   agreement would place the United States Taekwondo Union on a
18   path to sustained competitive excellence?
19   A.   Yes, I did.   I tell the truth.   Yes, I did.   There's a
20   way that, maybe, we have a new -- uh, new Taekwondo role in
21   the United States.
22   Q.   Uh, --
23   A.   The reason why, because I believe USOC would put
24   excellent number of covenants to improve our union, and
25   therefore I do understand that.

1    Q.   Now, the -- you realized that the -- once the United
2    States Taekwondo Union entered into the remediation plan, that
3    every position within the organization was subject to being
4    reviewed and replaced?
5    A.   No.
6    Q.   Well --
7    A.   Only some.   Yes, like I said, that -- because what I read
8    is, any appointed executive members, appointed state
9    president, and officers are, yes, resign.   I -- I know that.
10   I would have said so before.
11   Q.   If somebody told you that your position as coach was
12   rescinded, would you understand what that means?
13   A.   Could you repeat, "rescinded"?
14   Q.   Rescinded?
15   A.   Yes.
16   Q.   What would that mean?
17   A.   Can you tell me?   I don't understand, so I just ask --
18   Q.   That's not a word that you would use, "rescind"?
19   A.   Can you explain a simple language, so that --
20   Q.   Do you understand what the word "rescind" means?   Yes or
21   no?
22   A.   No.
23   Q.   Vacate.   Do you know what it means to vacate?
24   A.   Vacate?   Yes, I do.
25   Q.   Did anyone tell you that your position as coach was

1    vacated after the remediation plan went into effect because
2    they were revising the coaching criteria?
3    A.   I received a letter from Mr. Gambardella on April 18th --
4    no, a fax.   And then he sent it by mail.
5    Q.   Okay.
6         Just so that we can assist the court in following
7    along, what I'd like to do is, I would like to direct the
8    court's attention -- and you have your declaration, or --
9         MR. ROECA:   Does the witness have the exhibits with
10   him?
11         THE CLERK:   Yes.
12         THE COURT:   The books?
13         MR. ROECA:   Yes.
14         THE COURT:   Does he have the witness books?
15         THE CLERK:   Yes.
16         MR. ROECA:   May I approach the witness for just a
17   second?
18         THE COURT:   Yes.   Are you going to point him to a
19   particular --
20         MR. ROECA:   Yes.   I am going to direct his attention
21   and the court's attention to three exhibits, and those are
22   Plaintiff's Exhibits 9, 10 and 11.
23         THE COURT:   Okay, go ahead.
24         MR. ROECA:   May I approach, Your Honor?
25         MR. JONES:   Your Honor, for the record, we are

```
1    showing the witness exhibits that aren't in evidence yet.
2              THE COURT:  Okay.
3              MR. ROECA:  I am laying a foundation.
4              THE COURT:  Don't worry, he's going to take care of
5    it.
6    BY MR. ROECA:
7         Q.   First of all, directing Mr. Lee's attention to Exhibit
8    Number 9, is this a letter that you recognize, Mr. Lee?
9         A.   Yes, this is my first letter that I sent to Mr. -- uh,
10   first e-mail, and then write a letter to Mr. Gambardella.
11        Q.   So this two-page letter, dated March 18, 2004, to Mr. Bob
12   Gambardella, is, in fact, a true and correct copy of the
13   original letter you wrote to him on that date?
14        A.   Yes, sir.
15             MR. ROECA:  I would offer this into evidence at this
16   time, Your Honor.
17             THE COURT:  Any objection?
18             MR. JONES:  No, Your Honor.
19             THE COURT:  Okay, then Plaintiff's Exhibit 9 is
20   received in evidence.
21             (Plaintiff's Exhibit 9 received in evidence.)
22   BY MR. ROECA:
23        Q.   Okay, Mr. Lee, could you kindly turn to Exhibit 10, the
24   very next exhibit?
25        A.   (Perusing exhibit.)
```

```
1         Q.   And what I would like you to do is just look at this,
2    it's a three-page document, it's dated April the 8th, 2004,
3    and there is a one-page attachment to the two-page letter.
4              And my question is, did you receive a copy of
5    this -- is this a true and correct copy of what you received
6    on April the 14th or the 18th of 2004?
7         A.   Yes.
8         Q.   Okay.
9              MR. ROECA:  I would offer this document into
10   evidence, as well, Your Honor.
11             THE COURT:  Okay.
12             Any objection?
13             MR. JONES:  No objection.
14             THE COURT:  All right.
15             Then, Exhibit 10, Plaintiff's Exhibit 10, is
16   received in evidence.
17             (Plaintiff's Exhibit 10 received in evidence.)
18   BY MR. ROECA:
19        Q.   And, directing your attention, Mr. Lee, to Plaintiff's
20   Exhibit 11, which is the very next one, please take a look at
21   that.  It is a two-page document bearing a date of June 2,
22   2004, to Mr. Bob Gambardella, signed by you, which -- with no
23   signature on it.  Is this a true and correct copy of the
24   original that you prepared and mailed to Mr. Gambardella?
25        A.   Yes, I do not believe I signed it, but I guess not.
```

```
1         Q.   Well, all we have is an unsigned copy?
2         A.   Oh, I'm sorry.  Yes.  Yes, I e-mailed to him, too, first.
3              MR. ROECA:  I would offer that into evidence at this
4    time, Your Honor.
5              THE COURT:  Mr. Jones?
6              MR. JONES:  No objection, Your Honor.
7              THE COURT:  Okay.
8              Exhibit 11 is received in evidence.
9              (Plaintiff's Exhibit 11 received in evidence.)
10   BY MR. ROECA:
11        Q.   Now, Mr. Lee, just so that we are all on the same
12   document, I'd like to go back for just a second to Exhibit
13   Number 9, and Page 2 of that document.  Do you see the last
14   sentence of the top paragraph, which states, "The 2004 games
15   are fast approaching, and I respectfully request an update
16   with regard to my position as head coach..." and then it goes
17   on.
18             Did I read that portion correctly?
19        A.   Which paragraph?
20        Q.   I'm talking about Exhibit 9.
21        A.   Yes, sir.
22        Q.   On the second page.
23        A.   Oh, second page?
24        Q.   The last sentence of the top paragraph?
25             THE COURT:  Do you see it, Mr. Lee --
```

```
1         A.   Yes, yes.
2              THE COURT:  -- it starts with "2004 games"?
3         A.   Yes.
4              THE COURT:  Okay, go ahead, Mr. Roeca.
5              MR. ROECA:  Okay.
6    BY MR. ROECA:
7         Q.   And I will reread it:  "The 2004 games are fast
8    approaching, and I respectfully request an update with regard
9    to my position as head coach..." and then it goes on.  But
10   that portion, did I read that correctly?
11        A.   Yes, sir.
12        Q.   Mr. Lee, isn't it true that you wrote this letter to
13   Mr. Gambardella because you knew that following the settlement
14   agreement and the remediation plan, that many positions at the
15   USTU, including that of coach, were being reconsidered, and
16   new people were being named, or new criteria were being
17   established?
18        A.   Okay, uh... yes and no.  Yes, there is a lot of our
19   governance -- [incomprehensible]. -- but the coaching, no.
20   But --
21             THE COURT:  I'm sorry, can you go back a little bit?
22   You said, yes, there's a lot of your governance --
23        A.   Would be changed, the structure-wise, such as, there's no
24   state president, there's no -- what is that? -- state
25   championship.  So there's going to be a lot of things going to
```

1  be changed; that I know. However, on the coaching area, I do
2  not want to mention somebody's name, however, I have various
3  friends that I have in USOC that -- the very first -- this is
4  what they told me: If the President Lee sign remediation
5  plan, then your job as a coach will be secure. That's
6  what somebody told me. So why he doesn't sign? I say, I have
7  no -- I cannot tell my president because of my coaching
8  positions to sign. So I told him, no.
9          Then, afterward, when he signed -- and then, one
10  month later -- I think after one month later, the governance
11  body came in, and then the same person said, I wish I could
12  help you, but I can't. You know, they might change your new
13  criteria. But you have a very good chance because of your --
14  all your experience, and then, you know, what you done for
15  USTU.
16          Okay, that's the...
17  BY MR. ROECA:
18  Q.  And because you still felt you had a very good chance,
19  that was one of the reasons you told Mr. Gambardella, in
20  paragraph two of Exhibit 9, and paragraph three and four, of
21  your accomplishments in the area of Taekwondo; correct?
22  A.  Yes, sir.
23  Q.  You wanted to introduce yourself to Mr. Gambardella
24  because you didn't know whether he was familiar with your
25  background; true?

1  A.  Yes, sir, that's true.
2  Q.  And you also asked him to give you an update with regard
3  to your position as head coach?
4  A.  Yes, sir.
5  Q.  And Mr. Gambardella wrote back to you on the letter which
6  is in evidence, Exhibit 10; true?
7  A.  Yes, sir.
8  Q.  Would you take a look at that exhibit, please.
9  A.  Yes?
10  Q.  The first page of the letter, Mr. Gambardella describes
11  general discussions about the reorganization of the United
12  States Taekwondo Union; correct?
13  A.  Yes.
14  Q.  And the last sentence of the first full paragraph states,
15  "As you might expect, with the change in management and
16  governance at the USTU, there has been a change in view about
17  the head coach position for the Athens games."
18          Did I read that correctly?
19  A.  Yes.
20  Q.  And you read this when you got it; correct?
21  A.  Yes, but --
22  Q.  And, if you would go to the next page, Mr. Gambardella
23  informed you, quote, "The USOC executive committee also
24  vacated its prior approval of the coach and team leader
25  nominations for Taekwondo; thus, your selection as coach for

1  Taekwondo has been vacated."
2          Did I read that correctly, sir?
3  A.  On the second page? Yes.
4  Q.  Yes.
5          And, when you received this letter on April the 14th
6  or the 18th of 2004, you read that portion of the letter,
7  correct?
8  A.  Yes.
9  Q.  And wouldn't you, at that point in time, have concluded
10  that you were no longer the coach of the United States 2004
11  Olympic Taekwondo team?
12  A.  Yes and no.
13  Q.  Well --
14  A.  The reason why, before I received this letter I met
15  Mr. Bob Gambardella, prior to our first team Olympic trial. I
16  introduce myself, and then I could not say that I was chosen
17  by U.S. Olympic Committee to be 2004 Olympic coach because I
18  did not have the letter that -- which is all the coaches
19  should receive. So, on that first time when I spoke with him,
20  I could not say I was representing 2004. However, when I
21  spoke with him, he told me this. He said -- because, somehow,
22  we met him at 2003, when Pan Am Games was occurred. I think
23  he was a house -- I think he was one of the -- supervising all
24  the housing, and we then we had problems in Dominican
25  Republic.

1          So I was very comfortable with him. And when I
2  spoke with him, I ask him if -- if there's going to be any
3  change. And then; because that was before April, he told me,
4  yes, there was going be several change, but, however, I am new
5  in this sports, therefore I will look every way to find the
6  best coach for 2004.
7          So I asked, is it my name is off the list? And he
8  said, no, your name is not off the list. I will do the best
9  for the athletes. And then I will find best coach for them,
10  I said, thank you.
11          Then I went to the first Olympic trial, which is, I
12  think -- I believe March 24. When I came back, that's when I
13  received this letter.
14  Q.  Okay.
15          And, in fact, the very next sentence of the letter
16  that I have been focusing on, the paragraph, do you see it
17  says, further -- this is on Page 2 of the -- of Exhibit 10,
18  the top paragraph:
19  "Further, the USOC executive committee approved
20  revised staff selection procedures for Taekwondo. I am
21  enclosing those revised procedures with this letter."
22  A.  Yes.
23  Q.  And the attachment -- and you read that, did you not?
24  A.  Yes.
25  Q.  And it says, selection procedures for coaches; do you see

1    that?

2    A.    Yes.

3    Q.    And you saw that when you received Mr. Gambardella's

4    letter on April the 18th, 2004?

5    A.    Yes.

6    Q.    And that selection procedure for coaches contains a

7    provision -- it says, position of head coach will be selected

8    based on the following criteria and priority order.  And then

9    it identifies them; do you see that?

10   A.    Yes.

11   Q.    Now, Mr. Lee, isn't it true that if you had read that in

12   April of 2004 and had asked yourself the questions that are

13   set forth below the sentence that I just read, you would have

14   concluded that you would not be selected as the United States

15   Olympic coach for the U.S. Olympic Taekwondo team for 2004?

16   Isn't that true?

17   A.    No.  Because, it says criteria.  Maybe I don't -- uh... I

18   don't follow first criteria, such as number of athlete that

19   coach has placed on 2000 Olympic team.  I can explain to that.

20   Because reason why I did not participating any athletes in

21   2004 Olympic trial is that once you are announced as an

22   Olympic coach, you are not allowed to coach any preliminary or

23   final Olympic team trial because it's conflict of interest.

24        If I have my own student who is going to Olympic

25   game, I cannot even coach them; it's a conflict of interest

105

1    because they already announced you as a coach.  And how can I

2    sit down in the preliminary?  And it's conflict of interest.

3    And it's been done from 1988, 1992, year 2000.  So maybe I

4    don't meet the first requirement.  But the second requirement,

5    yes, I do.  I went to 2003 world championship.  My athlete

6    won.  And I was head coach.  I assign them to coach the

7    athletes so that we can bring the best result in world

8    championship.  2003 Pan Am Games, I went, too.  And I was the

9    head coach for the men.  And this is the first time we ever

10   brought two gold medal international -- I mean Pan Am

11   regional, ever since 1987.

12        And, so, in my understanding -- maybe I don't follow

13   the first criteria, but I do follow the second criteria as a

14   coach, that I brought.  Steven Lopez, gold medal, and Tim has

15   a gold medal.  So I do.

16        And then I think maybe I, like you say, yes, my name

17   stay on the list.

18        (Discussion off the record between defense counsel.)

19   BY MR. ROECA:

20   Q.    From what I understand, Mr. Lee, it's your opinion that

21   you are qualified and competent to be a coach at any level;

22   true?

23   A.    No.  Because my dear past executive director, Bruce

24   Harris, because he mentioned that I was officially chosen by

25   U.S. Olympic Committee -- executive committee board member as

106

1    Olympic coach, the nomination.  And then I cannot prove that

2    part, but, however, when I met him at the first Olympic team

3    trial, I asked Mr. Harris to have -- do you have the letter?

4    And then, yes, he said that it's in my Internet; however, I

5    will send it to you.

6         I think he sent it to me, that e-mail, about four

7    days later, when I came back from -- (incomprehensible).  And

8    then the letter say exactly, the following nomination that

9    approved from USTU, will be approved by U.S. Olympic

10   Committee, follow as, head of team -- (incomprehensible) --

11   coach:  Dae Sung Lee.  And I have the letter.  Then I had more

12   confidence that I would be -- I was the -- I would be next

13   Olympic coach in 2004.

14        Wouldn't you, sir, if you received a letter saying

15   the USOC approved?  And then now, because the new governance

16   came in and they want to change that -- but that time, they

17   didn't knew that I had that letter.

18   Q.    Now, you understood when you received

19   Mr. Gambardella's --

20   A.    Yes, sir --

21   Q.    -- letter --

22   A.    Yes, you asking me --

23   Q.    -- that your position as coach had been rescinded; true?

24   Vacated?

25   A.    Yes, yes, yes.  I read the letter, and I already told

107

1    you.  But I believe, because Mr. Gambardella was new, and that

2    he doesn't know that I have approve letter from USOC,

3    therefore he could say yes or no.

4    Q.    And when -- the next time you wrote to Mr. Gambardella,

5    or -- there was a letter that you wrote on March the 18th.  He

6    wrote his letter to you, which is Exhibit 10.  And the next

7    letter that was written is Exhibit 11; true?

8    A.    Yes, sir.  I'm sorry that I didn't sign it.  Sorry...

9    Q.    I'm sure that it was signed, but what we have here is an

10   unsigned copy.

11   A.    Yes, sir.

12   Q.    And you knew, from the time that you received

13   Mr. Gambardella's letter up until June the 2nd, that your

14   position as coach, in your own words, was "up in the air";

15   right?

16   A.    No, because they did not send official letter as a USTU

17   saying that I am not 2004 Olympic coach.  Therefore, I was

18   still wondering, so that I want to make sure, that I wrote a

19   second letter to respond saying that I am.

20   Q.    Would you please take a look at the second page of

21   Exhibit 11?

22   A.    Yes.

23   Q.    I will read a portion of this.  And make sure I read it

24   correctly.  This is a letter you wrote, true?

25   A.    Yes.

108

8/12/2004 TRO Proceeding

1  Q.  Second paragraph states, "The 2004 games are fast
2  approaching.  Even though my position as the USTU coach has
3  been up in the air, I continued to support our athletes,
4  and have attended all Olympic qualifying events at my personal
5  expense to do this."
6  Did I read that correctly?
7  A.  Yes, sir.
8  Q.  And in the first paragraph of that same letter, it states
9  in the second sentence, in part, "Although I am disappointed
10  to learn that my selection as the coach of the 2004 U.S.
11  Olympic Taekwondo team has been rescinded, I am hopeful that I
12  will be considered as the coach by the remediation committee."
13  Correct?  Did I read that correctly?
14  A.  Yes.
15  Q.  And, after that, isn't it true that the balance of that
16  particular page of Exhibit 11, you summarize your
17  accomplishments --
18  A.  Yes.
19  Q.  And -- and I, sir --
20  A.  Yes, sir.
21  Q.  -- I will represent to you that you have accomplished a
22  great deal, and I respect you for that.
23  A.  Yes.
24  Q.  I mean, what you've summarized here is very, very
25  impressive.

8/12/2004 TRO Proceeding

1  A.  Yes.
2  Q.  However, you recognized, isn't it true, that the decision
3  as to who would be the coach was something for the United
4  States Taekwondo Union, and that's one of the reasons you
5  wrote this letter?
6  A.  Yes.
7  MR. ROECA:  One moment, please.
8  (Discussion off the record between defense counsel.)
9  MR. ROECA:  Thank you very much.
10  THE COURT:  Mr. Jones, do you have any redirect?
11  MR. JONES:  No, Your Honor.
12  THE COURT:  Okay, then the witness can step down and
13  is excused.
14  Is the only other witness Ms. Virginia Witte?  Is
15  that the only other witness?
16  MR. JONES:  Yes, Your Honor.
17  THE COURT:  Okay, then, please come to the stand.
18  THE COURT:  Mr. Jones, any objections to the
19  declaration of Virginia Witte?
20  MR. JONES:  No, Your Honor.
21  THE COURT:  Okay.
22  This might be kind of a convenient time -- even
23  though I just made the witness walk up here -- to take a
24  ten-minute break.
25  MR. JONES:  Fine, Your Honor.  Thank you.

8/12/2004 TRO Proceeding

1  THE COURT:  Okay.
2  THE CLERK:  All rise.
3  This court will be in recess for ten minutes.
4  (A recess was taken from 3:05 to 3:15 p.m.)
5  THE CLERK:  Would you please raise your right hand?
6  Do you solemnly affirm the testimony you are about
7  to give before this court shall be the truth, the whole truth,
8  and nothing but the truth?
9  THE WITNESS:  I do.
10  THE CLERK:  State your name for the record and spell
11  your last name, please.
12  THE WITNESS:  Virginia Witte, W-I-T-T-E.
13  THE COURT:  Mr. Jones, any objections to the
14  declarations submitted by Ms. Witte?
15  MR. JONES:  No, Your Honor.
16  THE COURT:  Okay.
17  Ms. Witte, can you tell me whether your declaration,
18  which was executed on August 6, 2004, is true and correct and
19  represents what you would say if you were testifying live in
20  answer to questions here in this courtroom concerning the
21  matters set forth in your declaration?
22  THE WITNESS:  Yes.
23  THE COURT:  Okay.
24  Then, go ahead, Mr. Jones.
25  MR. JONES:  Thank you, Your Honor.

8/12/2004 TRO Proceeding

1  VIRGINIA WITTE,
2  called as a witness on behalf of the Defendants, having been
3  duly sworn, was examined and testified as follows:
4  CROSS-EXAMINATION
5  BY MR. JONES:
6  Q.  Ms. Witte, you are a CPA?
7  A.  Yes.
8  Q.  You are a salaried employee of USOC?
9  A.  Yes.
10  Q.  And you also serve on the board of governance of USTU
11  presently?
12  A.  Right.
13  Q.  I take it you would agree with me that you are not an
14  expert on coaching competitive Taekwondo?
15  A.  No, I agree.
16  Q.  I'd like to show you an exhibit -- do you have the
17  exhibits in front of you?  Turning to 35, please...
18  A.  Right.
19  Q.  Do you know a Salena DiMatteo?
20  A.  She is one of my staff members.
21  Q.  Do you know who R.J. Warwick is?
22  A.  At that time he was the executive director of USTU.
23  Q.  Did you have occasion to work with him regarding USTU
24  financial issues?
25  A.  Over the three years, yes.

8/12/2004 TRO Proceeding

1   Q.   And about when did he leave the USTU organization?
2   A.   End of '02, maybe .
3   Q.   Could it have been '03?
4   A.   No, I don't think it could have been the end of '03,
5   because Bruce Harris was the executive director in the summer,
6   and then he was gone, and then Tim Connally became the
7   executive director in '03.  So it had to be '02.
8   Q.   Can you please look at the three-sentence letter,
9   Exhibit 35?
10  A.   Yeah, this is an acknowledgment letter.
11  Q.   Were you aware of this letter going out to Mr. Warwick?
12  A.   Yeah, this is a standard boiler plate letter that we send
13  out.
14  Q.   It states -- if I'm not incorrect, that "USTU's
15  commitment to improvement is appreciated.  The efforts and
16  complete cooperation of your staff made the review process go
17  very smoothly."
18       Are those true statements, as far as you know?
19  A.   Yeah.  Like I say, it's a thank you letter that we send
20  out.
21  Q.   I take it you wouldn't send out a letter like that if
22  people weren't cooperating with you?
23  A.   That's true.  We try and find something good to say in
24  every situation.  That's -- nobody likes auditors, anyway.
25  Q.   I guess that's one of the hazards of the job, huh?

113

8/12/2004 TRO Proceeding

1   A.   Like lawyers, yeah.
2        THE COURT:  Hey...
3        (Laughter in the courtroom.)
4   BY MR. JONES:
5   Q.   That's January 31, 2000, and that was covering an audit
6   report dated December 2nd, 1999.  Would that be an annual
7   audit report for the whole '99 period?
8   A.   If it was dated '99, it was probably over '98.
9   Q.   And then, if you would look at Exhibit 36, a letter dated
10  November 29, 2001, I would ask that you briefly review that.
11  A.   It's a transmittal letter for audit report.
12  Q.   And that one was written by you personally?
13  A.   I wrote the transmittal letters.
14  Q.   And that's your signature at the bottom?
15  A.   Yep.
16  Q.   Again, that's directed to Mr. Warwick who was still
17  executive director on that date?
18  A.   Right.
19  Q.   And it, again, expresses appreciation to him and his
20  staff for the time spent answering questions, providing
21  information, locating records, etc., and congratulates USTU on
22  the improvement shown in the reporting of USOC support to the
23  organization; is that correct?
24  A.   Right.
25  Q.   And is it correct that that -- the period that that

114

8/12/2004 TRO Proceeding

1   letter is covering, and the report that's attached, would be
2   2000 and '99?
3   A.   '99 and 2000.
4   Q.   All of calendar '99 and 2000?
5   A.   Right.
6   Q.   And are the statements made in the cover letter correct?
7   Were they cooperating, and were they improving?
8   A.   Always.
9   Q.   Turning to Exhibit 37, please.  That is a memorandum from
10  you to the membership and credentials committee of the USOC?
11  A.   Right.
12  Q.   Dated September 25, 2002; is that correct?
13  A.   Uh-huh.
14  Q.   Did you in the scope of your duties have occasion to
15  periodically report or send financial reports to the
16  membership and credentials committee?
17  A.   Yeah, when they requested it.
18  Q.   So that was by request only?
19  A.   Right.
20  Q.   Feel free to look through the entire document there, but
21  is it correct that USTU was solvent and liquid as of the
22  writing of this letter?
23  A.   I think I said, in paragraph three, as of September 10th,
24  2002, that they were solvent and liquid.
25  Q.   So, 15 days earlier, they were --

115

8/12/2004 TRO Proceeding

1   A.   Right.
2   Q.   Turning to Exhibit 38, another letter signed by you and
3   directed to, this time, Bruce Harris of USTU; is that right?
4   A.   Yeah, he was the executive director by then.
5   Q.   So, sometime in between those two letters is when the
6   transition between Mr. Warwick and Mr. Harris took place?
7   A.   Yeah.  I think Jay left at the end of '02.
8   Q.   Where did Mr. Warwick go, if you know?
9   A.   He was unemployed for a year, and then he went to work
10  for the USOC.
11  Q.   So the USOC thought enough of him to hire him?
12  A.   Apparently.
13  Q.   And what is his title now, if you know?
14  A.   He's a sports partnership director.
15  Q.   Is that someone in management?
16  A.   Sure.
17  Q.   Is that someone above Mr. Gambardella?
18  A.   No.
19  Q.   Just a different position?
20  A.   It's a whole different area, yeah.
21  Q.   Focusing on Exhibit 38, that letter, again, expresses
22  appreciation to Mr. Harris for cooperation in answering Chris'
23  questions, discussing procedures, locating records; isn't that
24  true?pla
25  A.   Yeah, that's another staff member, Christopher Telli.

116

1  Q.  But it goes on to talk about some recommendations that
2  you felt were appropriate?
3  A.  Yes.
4  Q.  Is that true?
5  A.  Yeah.
6  Q.  And this letter attaches an executive summary listing the
7  recommendations once again.  And, correct me if I am wrong,
8  but as of the time of this executive summary, the USTU was
9  still solvent?
10  A.  No.
11  Q.  It was not?
12  A.  No, if you read the second paragraph.
13  Q.  What was their position?
14  A.  Well, you have to understand, and this -- we're not
15  auditing the organization as an external auditor; we're
16  auditing USOC funds and their financial and managerial
17  capability.
18       So what we're looking at is, can they pay their
19  bills?  Did they use the money that we gave them
20  appropriately?  And, in this particular instance, I believe
21  that we asked back $132,000.
22  Q.  And these were funds that were not appropriately spent?
23  A.  Yep.  They either were not appropriately spent, or they
24  couldn't tell us what they did with them.
25  Q.  I recall one reference in the document -- and you may

1  recall it -- to certain programs being cancelled because of
2  the September 11th disaster.
3  A.  They had, I think, a competition, a trip overseas, that
4  was cancelled.  But we rolled -- as a typical policy at the
5  USOC, we rolled over any of those funds that -- to the next
6  year, so that there -- Taekwondo was not the only sport that
7  couldn't spend the money because of September 11th.
8  Q.  Were some of those funds that were earmarked for programs
9  that got cancelled because of September 11th rolled over into
10  this year?
11  A.  I believe that you'll find -- I think in '02, this was --
12  this was -- we were looking at, I believe, '02, and that we
13  did not take that into consideration; we just rolled it over.
14  So we didn't ask for it back, or whatever.  It just would be
15  handled the next year in the '03 reports.
16  Q.  Thank you.
17       Turning to Exhibit 39, what is that?
18  A.  This is an audit report at the end of '02 -- another one.
19  This was -- well, let's see... (perusing documents).  This
20  is -- it's out of -- out of chronological order, but it's an
21  audit report from '02.
22  Q.  Was that prepared by your --
23  A.  Uh-huh.
24  Q.  -- office?
25       And, according to this, was USTU -- were its

1  revenues exceeding expenses?
2  A.  I have no idea whether its revenues were exceeding
3  expenses.  I know that we asked back $35,000 --
4  Q.  Okay --
5  A.  -- in unsupported expenditures.  If you need to know
6  that, I've got a list of their revenues and expenses at the
7  table.
8  Q.  If you could just turn to Page 2 for a moment, second
9  paragraph...
10  A.  Page 2?
11  Q.  Page 2, second paragraph --
12  A.  Uh-huh.
13  Q.  -- it would be the first statement in that paragraph.
14  A.  Okay, so it says in that year that revenues had exceeded
15  expenses in the last -- in each of the last four years,
16  reversing the trend of the prior five years.
17  Q.  So, looking at a nine-year segment of USTU, leading up to
18  the date of this report, the first five years, they were
19  insolvent; the second four years, they were solvent?
20  A.  As of -- what are we looking at?  '02?  That was two
21  years ago.
22  Q.  You also, I think, mentioned that -- in that exhibit that
23  USTU suffered turnover in financial management personnel?
24  A.  Yeah, immediately prior to this audit.  Every time they
25  changed executive directors, they changed financial people.

1  Q.  And the person that they lost was Jay Warwick?
2  A.  If it was the end of '02, it probably was, but...
3  Q.  And did him moving on coincide with some problems for
4  USTU financially?
5  A.  No, not -- well, not any more than they'd had in the
6  past.
7  Q.  Well, whom were you talking about, then, when you said
8  suffered financial -- suffered turnover in financial
9  management personnel?
10  A.  Well, as I said, every time they changed executive
11  directors, they changed financial people.
12  Q.  Would it be fair to state, then, at least from the
13  standpoint of solvency, there had been an improvement in the
14  four years leading up to that period?
15  A.  Yeah, the three years that Jay was there, it got a lot
16  better.
17  Q.  Finally, showing you Exhibit 40, a letter from you to
18  Tim Connally dated January 6, 2004, did you sign that one?
19  A.  Yes.
20  Q.  And the purpose of that letter?
21  A.  Was to send this -- the report.  We were trying to figure
22  out what they owed us back, if they could afford to pay it.
23  We were trying to quantify, because the funds had been rolled
24  over twice, and they didn't seem to be able to spend it, and
25  sport partnerships was -- we were trying to quantify where we

1  were. And at this stage of the game, I think we were not
2  giving them any more money; we had frozen their grants.
3  Q.   You stated, I think, somewhere in that report, that their
4  financial management -- their financial condition was
5  worsening; do you recall something like that?
6  A.   Worsening.
7  Q.   Do you know if they were still solvent as of that point?
8  A.   Well, it depends on what you mean by "solvent." If you
9  can define that, I'll tell you.
10 Q.   Did their revenues exceed their expenses?
11 A.   I have no idea, at this stage of the game. I don't think
12 so, because I think the issue was, we weren't giving them any
13 money.
14 Q.   Okay. And this one was --
15 A.   There's no -- and there's no audit for '03. Their
16 external auditor resigned, so there really -- there is no
17 audit. There really is no way to tell.
18       MR. JONES: At this time, Your Honor, I'd like to
19 offer 35 through 40 -- Exhibit Numbers 35 through 40 of the
20 plaintiff's exhibits into evidence.
21       MR. ROECA: No objection, Your Honor.
22       THE COURT: Okay, then Exhibits 35 through 40 are
23 received in evidence .
24       (Exhibits 35 through 40 received in evidence.)
25 BY MR. JONES:

1  Q.   You make the statement in your declaration that you, in
2  your capacity as auditor, have to keep track of something like
3  44 --
4  A.   There's 45 NGB's.
5  Q.   45 NGB's. And that you had to audit -- or chose to audit
6  USTU a total of 11 times over the -- what was it, nine years?
7  A.   12 years.
8  Q.   12 years that you had them.
9        And that -- but you also made a statement that other
10 NGB's usually average four to five audits?
11 A.   That's right.
12 Q.   Would that be all of them on an average, an average four
13 to five audits?
14 A.   That's what "average" is, yeah, four to five -- if you
15 take all of them into consideration. Not counting Taekwondo.
16 Q.   Is --
17 A.   Our policy is to audit each NGB once every two to three
18 years, if there are no issues.
19 Q.   So that's a standard thing, then?
20 A.   That's our policy.
21 Q.   And that's to ensure that those funds that USOC is
22 providing to them are spent properly?
23 A.   That's right.
24 Q.   NGB's rely heavily on USOC funding, do they not?
25 A.   Well, it depends on the NGB. Some NGB's, we give them

1  less than one percent; some -- of their total funding; some,
2  we give them 80 percent. I think Taekwondo is in the 15 to 16
3  percent range.
4  Q.   Could you explain that? So, 15 to 16 percent of their
5  funding came from USOC?
6  A.   Right.
7  Q.   In your capacity as auditor, prior to joining the
8  governance committee for USTU, did the membership and
9  credentials committee ever call upon you to attend their
10 meetings?
11 A.   If they were looking at a sport that they wanted some
12 financial information on, they would ask me for a report. And
13 if it was necessary, then they would ask me to go. I didn't
14 go to all of them, but I went to many of them.
15 Q.   Did you attend any of the USTU meetings when USTU was
16 discussed by the membership --
17 A.   Yes, yes.
18 Q.   Which ones do you recall?
19 A.   Well, let's see... we were in San Diego, we were in
20 Florida, we were in Chicago, several in Denver.
21 Q.   So they would have these meetings at other -- in other
22 cities other than Colorado Springs?
23 A.   Right. The membership and credentials committee was a
24 group of volunteers from all over the country, so they moved
25 the meetings around to make it easier for attendance.

1  Q.   Were you familiar with all of the members of the
2  credentials and -- membership and credentials committee, I'm
3  sorry?
4  A.   Yes.
5  Q.   Thank you.
6        MR. JONES: No further questions.
7        THE COURT: Okay.
8        Mr. Roeca?
9        MR. ROECA: Thank you, Your Honor. Just a few
10 questions.
11            REDIRECT EXAMINATION
12 BY MR. ROECA:
13 Q.   You made a comment, in response to one of counsel's
14 questions, that funds were frozen; do you recall that?
15 A.   Uh-huh.
16 Q.   Can you explain that to us? Why were funds frozen, and
17 to whom were they frozen?
18 A.   Well, it's USOC policy that if a sport is either not
19 performing -- not spending the money the way they should be,
20 or if they owe us money, or -- there's several reasons that
21 they're not performing, then we will suspend their funds.
22        The funds are actually an annual grant, but they are
23 paid quarterly.
24 Q.   And, in this particular instance, were funds being frozen
25 from USOC to the United States Taekwondo Union?

1  A. Right.
2  Q. And what was the reason, as you understood it, for that
3  decision, to freeze funds?
4  A. The sport partnership group that Kelly Skinner is part
5  of, and Taekwondo is assigned to him, they had asked for
6  certain things like a business plan, a high performance plan,
7  planning documents like that that they hadn't turned in. And,
8  so, they asked -- and they are actually the ones that trigger
9  the payments, so they asked that they be frozen.
10 Q. Now, when did that occur?
11 A. That's something I haven't thought about in a while. I
12 think it was in the fall of '03. I think their August 15th
13 and their November 15th payment were held up.
14 Q. And you had been an auditor of the national governing
15 bodies on behalf of the United States Olympic Committee for a
16 number of years prior to that time; true?
17 A. Since '92.
18 Q. Had there been a freezing of funds of any national
19 governing board prior to that time?
20 A. Occasionally it happened, but usually it would only be,
21 like, one payment. And -- because it's really a drastic step.
22 Q. Now, the 11 times in conducting audits of this particular
23 national governing body during the period in question you
24 indicated is not the average and not the norm; true?
25 A. Right. We're actually going in quarterly now.

1  something that had been an ongoing problem for years?
2  A. Well, it actually had been an ongoing problem ever since
3  I had been there, and I think the first time I was there was
4  in '93. But it was like a moving target. This year they'd do
5  something right, and then the next year, they'd do it, the
6  same thing, wrong. So the over-arching issues -- one of the
7  over-arching issues, which -- I don't know whether it has
8  anything to do with what we're doing here, but -- was that
9  they didn't hire really -- except for in one instance -- they
10 didn't hire qualified people, because they didn't want to
11 spend the money to hire good people. So they had people who
12 didn't know bookkeeping trying to do the bookkeeping.
13 Part of the issue is that they didn't want the
14 office, the national office, to be in control.
15 Q. And who is the national office?
16 A. Well, the national office was the executive director and
17 the staff, the paid staff. That's, essentially, what led to
18 the remediation plan.
19 THE COURT: I'm sorry, I am not certain I know --
20 national office of what?
21 A. Taekwondo.
22 BY MR. ROECA:
23 Q. The national office of Taekwondo?
24 A. Right. The fortunate -- or unfortunate thing is that the
25 national office of Taekwondo is on the Olympic training center

1  Q. Okay.
2  And there was an Exhibit Number 38 that was shown to
3  you and is in evidence, and it refers to -- it's an August 29,
4  2003, letter which you wrote, and which had an attachment to
5  it, but the second paragraph starts off, "There are 19
6  recommendations in the report." Do you see that?
7  A. Right.
8  Q. And if you turn to the executive summary, Pages 1 and 2
9  of that have 19 recommendations. How would you characterize
10 the number and kind of recommendations that were being made in
11 this particular document to the United States Taekwondo Union?
12 A. Well, I'd never issued a report with 19 recommendations
13 before, that's for sure. This is the most recommendations
14 that we had made in a -- typically, you don't have to do that,
15 but the situation there was so bad that we had to spell
16 everything out.
17 Q. What do you mean, the situation was so bad?
18 A. Well, they didn't have appropriate records. They had
19 changed their financial people -- they had fired their --
20 or -- they had fired their financial person. Then they got
21 three temps in to do the accounting. And they didn't know the
22 organization. We went in -- they couldn't find documentation.
23 Things were just missing. It was like operating out of a shoe
24 box.
25 Q. Was this something that occurred in 2003, or was this

1  in Colorado Springs. So they were in the next building over
2  from where we were, so we could keep an eye on them.
3  Q. Were you involved in the discussions that led to the
4  agreement and remediation?
5  A. On the financial side. But that was really not the
6  sports side.
7  Q. Okay.
8  On the financial side, based upon your recollection
9  of discussions, were financial issues significant to that
10 agreement and remediation?
11 A. Yes, to the point of -- they did not have the capability
12 of administering the organization. In the sports act, it says
13 that the NGB's have to demonstrate managerial and financial
14 capability. And they didn't have either one.
15 THE COURT: I'm still kind of confused, Mr. Roeca,
16 you can ask her questions that will help clarify this;
17 When she says, they didn't want the national office
18 to be in control, who is "they"?
19 MR. ROECA: Okay, why don't we clarify that for the
20 court.
21 BY MR. ROECA:
22 Q. When you say, they didn't want the national office to be
23 in control, who is the "they"?
24 A. The volunteer side. The executive committee. The
25 executive board at the USTU. It's much like any

1    not-for-profit. There's a volunteer group, and then there's a
2    staff group. And the volunteer group typically should be
3    making the policy and telling the staff, which is the national
4    office, how to implement that. And...
5    Q. And where, from your perspective, was there a breakdown?
6    A. The breakdown was that the volunteer side of this
7    organization had tried to micro-manage the administration in
8    the financial and managerial capability. That's what the
9    membership and credentials committee, I believe, was saying.
10   Q. Now, when the monies would come into the organization,
11   was the direction of the flow of the money to go to the
12   administrative side and then to fund the various activities --
13   in theory -- that the United States Taekwondo Union was
14   organized for?
15   A. Right.
16   Q. And was the audit that you had conducted over the course
17   of time, the various audits, did it find that those monies
18   were being filtered in directions that were not intended by
19   the organization?
20   A. Yes. We found inappropriate use of -- over the years, we
21   probably asked back $400- to $500,000.
22   Q. And, from your knowledge, currently being on the
23   governance and management committee, has that been one of the
24   focuses of your attention since assuming your current position
25   with that organization, the restructuring of that to prevent

129

1    involved in concocting it.
2    Q. Were you asked what sort of personnel needed to be
3    substituted in order to set things right financially?
4    A. Yes. I said they needed a CFO.
5    Q. A CFO?
6    A. Right.
7    Q. Were you a part of any discussions where a plan was
8    looked at that would involve getting rid of less than the
9    entire board, all the officers and the president?
10   A. I wasn't involved in any of those discussions.
11            MR. JONES: Thank you.
12            THE COURT: All the officers and the what? I didn't
13   catch your question. Getting red of less than the entire
14   board, all the officers and --
15            MR. JONES: And the president.
16            THE COURT: The president? Thank you.
17   Anything more?
18            MR. JONES: No, Your Honor.
19            THE COURT: Okay. Then the witness is excused and
20   may step down.
21            I think we're done with all the evidence. At least
22   the testimony.
23            MR. JONES: Yes, Your Honor.
24            THE COURT: Okay, any other evidence from either
25   side?

131

1    that in the future?
2    A. Right. The governance committee is, you know, just a
3    volunteer position. Because I still am the managing director
4    of the audit at the USOC, and that is one of our focuses. And
5    they've -- I sent my staff in, and my staff spent three months
6    Full-time, Monday through Friday, re-creating their accounting
7    records.
8            MR. ROECA: That's all I have. Thank you,
9    Your Honor.
10           MR. JONES: Briefly, Your Honor?
11           THE COURT: Anything more?
12           MR. JONES: Thank you.
13                    RECROSS-EXAMINATION
14   BY MR. JONES:
15   Q. Ms. Witte, you said you participated in the -- some of
16   the membership and credential meetings where the actual
17   remediation plan was discussed?
18   A. No, I didn't say that. I said I went to some of the
19   membership and credential meetings when they asked me to be
20   there. But I was not involved in the remediation plan.
21   Q. So you don't know what steps led up to the plan that went
22   into effect?
23   A. Not really. All I know is that it appeared that
24   decertification was imminent, and that the U.S. Taekwondo
25   Union and the USOC came up with this plan. But I was not

130

1            MR. JONES: I would like to put a stipulation on the
2    record, as far as the exhibit list?
3            THE COURT: Okay. What's that?
4            MR. JONES: As I understand it, we've agreed on the
5    admissibility of Plaintiff's Exhibits 1 through 5. Also, 7
6    through 19. Also, 21. Also, 24 through 26. Also, 28 through
7    30. And 32. In addition to those that are already in.
8            THE COURT: Okay, 35 to 40 are in.
9            Okay, is that your position, too, Mr. Roeca?
10           MR. ROECA: Yes, Your Honor, we've agreed to that.
11           THE COURT: Okay, then I will admit those.
12           MR. JONES: I've also agreed to the admission of
13   Defendant's Exhibits A, B, C and D.
14           THE COURT: What are those? I have D-1, D-2, D-3,
15   D-4, D-5, D-6, so --
16           MR. JONES: D-1, D-2, D-3, D-4 and D-5 are agreed
17   on.
18           THE COURT: Is D-1 the same as Plaintiff's Exhibit
19   29?
20           MR. JONES: Yes, Your Honor.
21           MR. ROECA: If it is, we'll withdraw it, Your Honor.
22           THE COURT: Okay, then I will put on the record that
23   I am admitting Plaintiff's Exhibits 1, 2, 3, 4 and 5; and 7
24   and 8; 9, 10 and 11 have been previously admitted; I'll admit
25   12, 13, 14, 15, 16, 17, 18 and 19; Exhibit 21; Exhibits 24, 25

132

1  and 26; 28, 29, 30 and 32; Exhibits 35 to 40 have been
2  previously admitted.  I'm also admitting D-2, D-3, D-4 and
3  D-5.
4            Is that right?
5       MR. JONES:  Yes, Your Honor.
6       THE COURT:  Okay.  Then is that all the evidence?
7       MR. JONES:  I would like to offer a few more.
8       THE COURT:  I'm sorry?
9       MR. JONES:  I would like to offer a few more.
10      THE COURT:  Okay, which ones?
11      MR. JONES:  Plaintiff's Exhibit 6; and Plaintiff's
12 Exhibit 22; Plaintiff's Exhibit 23 and 27; 31; and, lastly,
13 41.
14      THE COURT:  22 and 23 are the ones we were looking
15 at earlier, right?
16      MR. JONES:  Yes, Your Honor.
17      THE COURT:  Okay.  So I think we've discussed
18 those -- or did you want to say more?
19      MR. ROECA:  No, Your Honor.
20      THE COURT:  Okay, then I'm going to receive
21 Exhibits 22 and 23 -- that's over objection, right?
22      MR. ROECA:  Thank you.
23      THE COURT:  Okay.
24           And, then, looking at Exhibit 6, any objection?
25      MR. ROECA:  Yes.  We have already stated our

1  objections for the record, Your Honor.
2       THE COURT:  Did we look at this already?  Would you
3  remind me what the objection was?
4       MR. ROECA:  Hearsay, Your Honor.  We objected on the
5  grounds that it was hearsay.  It was during the prior dispute.
6  And, at that time, they were adversaries, and at the current
7  time we have a different group.  And I understand the court's
8  position, but that is our objection.  And it's double hearsay.
9       THE COURT:  Okay, but this is an internal
10 communication, as opposed to the other...
11      MR. ROECA:  Your Honor, what we're objecting to is
12 the statement that is being referred to in the body of the
13 document, which is being referred to someone else.  And,
14 again, it's hearsay within hearsay.
15      MR. JONES:  Your Honor, we've also laid some
16 foundation, I think, through the witnesses that several
17 witnesses have heard the same exact statement, sat in on the
18 same meeting.
19      THE COURT:  Okay.
20           Well, I'm going to overrule the objection, and
21 receive Exhibit 6.
22           And you also asked for Exhibit 27?
23      MR. JONES:  Yes, Your Honor.  We have several
24 newspaper articles.
25      MR. ROECA:  Objection.  They are not

1  self-authenticating.  A newspaper article is hearsay.
2       THE COURT:  Yeah.  What is the purpose you are
3  offering Exhibit 27 for?
4       MR. JONES:  To show that USOC was having problems of
5  its own regarding fairness, conflict of interest, picking
6  favorites, all those sorts of things.
7       THE COURT:  Okay, objection sustained.
8            Exhibit 31 is another newspaper article.  And what
9  is the -- why is this being offered?
10      MR. JONES:  Exhibit 31 is to show, actually,
11 irreparable harm to Dae Sung Lee, Your Honor.  April 15 is
12 when the media started letting the public and the State of
13 Hawaii know that he had been nominated.  And that is also what
14 triggered damage to his reputation after that point by the
15 USTU, with USOC then saying that they were going to pull the
16 nomination back a year later.
17      THE COURT:  Okay, this may go to your damage claim,
18 possibly, but I don't see how it goes to this injunctive
19 relief --
20      MR. JONES:  Irreparable harm is what we are saying,
21 Your Honor.  If -- the only way you can correct these kinds of
22 media releases at this point is to do equity.
23      THE COURT:  Is to what ?
24      MR. JONES:  Issue equitable relief, injunction.
25      THE COURT:  I am going to sustain the objection to

1  Exhibit 31 for purposes of this hearing.  And whether it
2  should come in on some other proceeding in this case can be
3  resolved later.
4            You also --
5       MR. JONES:  Exhibit 41.
6       THE COURT:  Yes.  For what purpose is this being
7  offered?
8       MR. JONES:  That is the one that covers the
9  so-called interim remediation plan in which something less
10 drastic was agreed to by both sides and vetoed by the USOC
11 membership and credentials committee.  It goes to actions of a
12 racial nature.  That is our contention.
13      THE COURT:  Okay, sounds to me like it's being
14 offered for the truth, so it's hearsay; I am going to sustain
15 the objection to Exhibit 41.
16           Okay, any other evidence being offered by either
17 side?
18      MR. JONES:  No, Your Honor.
19      MR. ROECA:  No, Your Honor.
20      THE COURT:  Okay, then the evidence is closed.
21           Now, I do have the proposed findings of fact and
22 conclusions of law, but -- my intent is to rule by tomorrow.
23 So I guess what I want to do now -- and I know it's late,
24 and -- are the people on the phone still awake?
25      MR. LEVINSTEIN:  Yes, Your Honor.

1  MR. BENZ: Yes, Your Honor.
2  THE COURT: Okay, I just wanted to check, because
3  you have been silent for a while.
4  I want to give the attorneys a few minutes to argue
5  the impact of any facts that may have come up in this hearing
6  that were not anticipated, and so were not addressed in the
7  proposed findings of fact and conclusions of law, or the memos
8  that were submitted. So, we don't have a whole lot of time,
9  but to the extent there were things that you think were either
10  very helpful to your case that you didn't know would come up,
11  and you want to highlight those for me, or were very hurtful
12  to your case, and you want to tell me why I shouldn't consider
13  them, and you didn't anticipate them so didn't address them in
14  your submissions, I'll let you talk about those since you're
15  not going to have a chance to do revised proposed findings.
16  So, Mr. Jones, do you want to start? If there is
17  anything. There may not be. Things may have gone as you
18  anticipated. So, you don't need to repeat the things in your
19  papers already.
20  MR. JONES: No, Your Honor, I think the only thing
21  that came up which is -- I'll call it an equitable
22  consideration when issuing an injunction because it concerns
23  other parties, and that was the statements made by the two
24  athletes that Master Lee might be a source of distraction.
25  I think that the situation here is one where coaches

137

1  have rights equal to the athletes. And I am not aware of any
2  bylaw provisions, or anything in the sports act, or anywhere
3  else, that put the interests of the athletes above coaches.
4  However, it's obvious that the court is put in a position here
5  of trying to do the best thing for the team, do the best thing
6  for the coaches, do the best thing for the cause, and promote
7  the mission statement. And I feel strongly that the court can
8  still do that by issuing two credentials instead of the one
9  that was issued, but ordering that a second credential be
10  issued.
11  THE COURT: I want to tell you now that if you do
12  get any relief through the present proceeding, it will not be
13  in the form of my issuing Olympic coaching credentials. I
14  mean, I am not a credential issuing authority. So I want to
15  make sure that that's clear, that I don't think that I am in a
16  position to require that a particular individual be named as
17  the coach, you know, for some United States Olympic team.
18  Any relief that you were to get, assuming you were
19  to get any in this hearing, would not be in that form, okay?
20  MR. JONES: Thank you, Your Honor.
21  THE COURT: Okay.
22  Mr. Roeca?
23  MR. ROECA: Just a couple things.
24  First, Your Honor, the statement from one of the
25  witnesses that was called by plaintiff was to the effect that

138

1  the criteria were applied correctly in the selection of the
2  coach, and I think the court heard that.
3  The second thing is that, if one reads the -- I will
4  take some exception to what counsel just said regarding the
5  Amateur Athletic Act. The athletes come first. Coaches are
6  accorded equal rights, but this is about the athletes, not the
7  coaches. Today's proceedings is about the coach, but the
8  Olympics are about athletic performances.
9  And the other thing that has come through, I
10  believe, as I had hoped -- and I'm glad to hear from
11  everybody -- is that despite the background that was discussed
12  concerning the interplay between the United States Olympic
13  Committee and the United States Taekwondo Union and problems,
14  and the various pieces of information there, there's been not
15  a single piece of evidence by way of document or testimony
16  that the criteria for selection of coaches that was
17  established and communicated in April of 2004 was motivated by
18  anyone by reason of any prohibited discriminatory view. It is
19  neutral. It is objective. And the objective nature of it
20  was followed.
21  And so there's no connection through the testimony
22  that there has been any discrimination towards anyone in the
23  selection of athletes or coaches or the coach who happens to
24  be in Athens representing the United States today.
25  And I want to commend the plaintiff; he has an

139

1  exemplary background and qualifications. But that's not what
2  was set forth in the criteria. And I understand his feelings,
3  but I believe that the spirit of the Olympics have been set
4  forth and followed by the national governing board, and I ask
5  that the court find accordingly.
6  Thank you.
7  THE COURT: Okay.
8  MR. LEVINSTEIN: Your Honor, this is Mark Levinstein
9  in Washington. May I speak just very briefly?
10  THE COURT: Okay.
11  MR. LEVINSTEIN: One, if Your Honor does decide that
12  the only claim left is discrimination claim, then all the
13  contract claims and so on, that they have to be decided in
14  arbitration, then it's clear that what has to be shown is the
15  decision made to terminate his -- sorry, to rescind his
16  position as the coach and a new criteria were motivated by
17  discrimination against Korean-Americans.
18  So, if that's the case, then it would be necessary
19  to show that the executive committee -- not the membership and
20  credentials committee -- but the executive committee which
21  rescinded it did so not because of the reasons they stated,
22  which was they were reconsidering the management, there was
23  only one credential available so they had to reconsider
24  everything, was not true; that it was really because they
25  wanted to get rid of Dae Sung Lee, which there's no evidence,

140

1    at all, to that effect.

2         In addition, the -- I'm sorry, it's late here, and I

3    am trying to keep track here.  The other issue is, as the

4    letters from Mr. Dae Sung Lee and his testimony indicate, he

5    liked Mr. Gambardella; Mr. Gambardella had always been nice to

6    him; he had confidence that Mr. Gambardella was going to do

7    the right thing; Mr. Gambardella told him that he was going to

8    try to come up with criteria and pick coaches who would best

9    serve the athletes.  And Mr. Lee testified he believed that,

10   and he thought he would be fair, and he wrote to him saying he

11   wanted to still be considered.

12        It's clear he was still considered in the sense that

13   if an athlete he had coached had successfully competed, he

14   would have been selected.

15        Now, the criteria are neutral, and it's also clear

16   that at the time they were promulgated, no one knew who would

17   be selected, because the selection was totally contingent on

18   what happened to the athletes in the trials.  So there

19   certainly was a possibility that both coaches that were

20   selected eventually would be -- (incomprehensible) --

21        Next, what is clear from the facts is that, really,

22   two coaches were selected.  The problem is, at present we only

23   have one credential.  So we selected a coach and a backup

24   coach who we want to get a credential for, who is the second

25   coach, and we are just waiting to see if we can accommodate

1    him because of the concern about having a -- both athletes

2    having a coach at ring-side who they are most comfortable

3    with.

4         And, lastly, the new evidence that we got in

5    Mr. Lee's declaration and in the hearing was that he was a

6    member of the board and the executive committee or the

7    executive board -- whatever they called it -- of the USTU when

8    the January 27th, 2004, agreement was signed.  And it

9    explicitly includes, in paragraph 3-A on Page 4, a waiver of

10   rights that includes the directors and officers; it includes

11   Mr. Lee.  And it says that no claims that were the subject of

12   the complaint and answer, which includes all these claims

13   about what the membership and credentials committee did, could

14   be -- it goes on to say that it won't be in any hearing having

15   to do with the Ted Stevens Olympic and Amateur Sports Act, and

16   so on.

17        So, all these claims were waived specifically by

18   him, and he agreed -- he testified that he voted in favor of

19   the agreement and the mediation plan after having seen it.  So

20   it's fair to consider him bound.

21        And so, in our view, the same claims which are being

22   made about unfairness and what was going on in the fall of

23   2003, which we have confidence we can prove at a hearing were

24   anything but unfair, but they agree it cannot be a subject of

25   this proceeding.

1         So I think that's an important thing to add, as

2    well, and given that the only suggestion, whatsoever, the only

3    glimmer of evidence of any discrimination, is two letters and

4    an alleged statement by members of the membership and

5    credentials committee in connection with settlement

6    discussions, and reviewing of the allegations made by people

7    in the Taekwondo community about the USTU.  Those have nothing

8    to do with the conduct of Mr. Gambardella or the USTU

9    committee, and they are trying to avoid exactly what the

10   settlement agreement was designed to do, which was put these

11   issues to rest.

12        THE COURT:  Okay.

13        This hearing, with much coming in by telephone, is

14   probably a court reporter's nightmare.  So I did notice that

15   the court reporter had some difficulty in understanding some

16   of the things heard, and one thing that was probably fairly

17   important in what Mr. -- well, important to the defense in

18   what was just said didn't come out totally on the transcript.

19        So, what I heard counsel just say was a reference

20   to, certainly, there having been the possibility that both

21   coaches that would be selected eventually would be

22   Korean-Americans, and that Korean-Americans part got -- you

23   got an "incomprehensible" in what the court reporter

24   transcribed, and that was probably an important part of what

25   you were saying in that particular sentence.

1         Okay, I'm going to try and issue a ruling by

2    tomorrow.  Sometimes, on these preliminary injunction

3    hearings, I bring everybody in, and I recite findings orally.

4    I might do that tomorrow, but maybe not.  If I do a written

5    ruling, which is probably what I'll do, then probably I'll

6    e-mail it to Mr. Jones and Mr. Roeca, and you can then

7    disseminate it as you like.

8         And I'll call you if I'm going to do that, so that

9    you can sit by your e-mail and see it and read it before you

10   read about it in the news.

11        So, that's probably how I am going to do it.  I

12   can't promise you exactly that, but I think that's probably

13   how I'll do it.  And it probably will come out in the

14   afternoon, not in the morning.  So, for whatever help that

15   gives you folks in planning your day, that's my present

16   thought of how this will go.

17        Okay, I thank everybody for the work that they did.

18   I know everybody on both sides had to work really hard on

19   short notice.  And I know that the people in Greece are ready

20   to collapse, and the sun is rising, and so forth.  So I thank

21   all of you for the help that you've given to me, and I hope to

22   get you a ruling by tomorrow.

23        Thank you.

24        MR. ROECA:  Thank you.

25        MR. JONES:  Thank you, Your Honor.

8/12/2004 TRO Proceeding

```
1        THE CLERK:  All rise.
2        This court now stands in recess.
3        (The hearing in the above-entitled
4        cause was concluded at 4:14 p.m.)
5                 - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

8/12/2004 TRO Proceeding

```
1
2
3
4
5
6
7                 -ooOoo-
8        I, Stephen B. Platt, Official Court Reporter,
9   United States District Court, District of Hawaii, do hereby
10  certify that the foregoing is a true and correct partial
11  transcript of proceedings before the Honorable Susan Oki
12  Mollway, United States District Judge.
13
14
15
16
17
18
19
20                --------------------------------
21  TUESDAY, MARCH 1, 2005        STEPHEN B. PLATT, CSR NO. 248
22
23
24
25
```