0001

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                     DISTRICT OF HAWAII
 3     DAE SUNG LEE,               )
                                   )
 4          Plaintiff,            ) Civil No. 04-00461
                                   ) Som Tek
 5     UNITED STATES TAEKWONDO     )
       UNION, a Colorado nonprofit )
 6     corporation, UNITED STATES  )
       Olympic COMMITTEE, a        )
 7     federally chartered         )
       nonprofit corporation; JOHN )
 8     DOES 1-10; JANE DOES 1-10;  )
       DOE PARTNERSHIPS 1-10; DOE  )
 9     CORPORATIONS 1-10,          )
                                   )
10          Defendants.            )
                                   )
11
12
13
14
15          DEPOSITION OF STEVEN MICHAEL LOCKE
16                   JUNE 30, 2005
17
18     PURSUANT TO NOTICE, the deposition of STEVEN MICHAEL
19     LOCKE was taken on behalf of the Plaintiff pursuant
20     to the Federal Rules of Civil Procedure, at 90 South
21     Cascade Avenue, Suite 1300, Colorado Springs,
22     Colorado, this date at 9:03 a.m., before Janice L.
23     Doyle, a Certified Court Reporter and a Notary
24     Public.
25
```

1

```
 1                      APPEARANCES
 2          MR. WARD D. JONES, Attorney at Law, from the
 3     law firm of Bervar & Jones, 1400 Pauahi Tower, 1001
 4     Bishop Street, Honolulu, Hawaii, 96813, (808)
 5     550-4990, appeared on behalf of the Plaintiff.
 6          MR. MARK S. LEVINSTEIN, Attorney at Law, from
 7     the law firm of Williams & Connolly, LLP, 725 Twelfth
 8     Street, N.W., Washington, D.C., 20005, (202)
 9     434-5012, and MR. GARY JOHANSEN, Attorney at Law,
10     United States Olympic Committee, 1 Olympic Plaza,
11     Colorado Springs, Colorado, 80909, (719) 866-4526,
12     appeared on behalf of the Defendants.
13          Also Present:  Mr. Dae Sung Lee
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1                      I N D E X
 2
       DEPOSITION WITNESS:                         PAGE
 3
       STEVEN MICHAEL LOCKE
 4
       Examination by Mr. Jones                      6
 5
 6
 7
 8
 9
10
11
12          EXHIBITS PREVIOUSLY MARKED
13     EXHIBIT    DESCRIPTION                      PAGE
14     4     Letter to Bruce Harris From Thomas     99
15           L. Satrom Dated August 4, 2003
16     5     Letter to Bruce Harris From Thomas     99
17           L. Satrom Dated September 5, 2003
18     10    Letter to Dae Sung Lee From Bob        70
19           Gambardella Dated April 8, 2004;
20           Selection Procedures for Coaches
21     11    Letter to Bob Gambardella From         74
22           Dae Sung Lee Dated June 2, 2004
23     13    Fax Cover Sheet and Letter to Ward     88
24           D. Jones From Bob Gambardella
25           Dated July 21, 2004 (Not Retained)
```

3

```
 1     EXHIBIT    DESCRIPTION                      PAGE
 2     45    Governance and Management Committee    27
 3           Minutes of Meeting, February 5,
 4           2004, Numbered USTU00004
 5     57    Minutes of USTU Governance and         38
 6           Management Committee Meeting,
 7           February 26, 2004, Numbered
 8           USTU00002 Through USTU00003
 9     58    Memorandum to USOC Executive           58
10           Committee From Bob Gambardella
11           and Steve Locke Dated March 8,
12           2004, Numbered USTU00001
13     59    Governance and Management Committee    57
14           Minutes, March 25, 2004, Numbered
15           USTU00005 Through USTU00007
16     61    Various E-mails, Numbered USTU00016    76
17           Through USTU00012
18     62    Letter to Bob Gambardella From Ward
19           D. Jones Dated July 19, 2004
20     63    USTU Governance and Management         79
21           Committee Minutes, July 1, 2004,
22           Numbered USTU00008 Through
23           USTU00009
24     69    Letter to Chul Ho Kim From Bob        100
25           Gambardella Dated September 8, 2004
```

4

EXHIBIT "A"

```
1    EXHIBIT        DESCRIPTION              PAGE
2    73             Various E-mails          84
3
4
5
6
7                      EXHIBITS MARKED
8    EXHIBIT        DESCRIPTION              PAGE
9    145            Various E-Mails, Numbered USTU00100    63
10   146            E-Mail to Mr. Lee From Bob Gambardella  66
11                  Dated April 9, 2004, Numbered
12                  USTU00116
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
1    the executive director of USA Triathlon.
2         Q.   About how many would you estimate if you
3    had to estimate?
4              MR. LEVINSTEIN:  How many cases --
5              MR. JONES:  Deposed in.
6              THE WITNESS:  Several hundred times.
7         Q.   BY MR. JONES:  Well, as an experienced
8    witness then, I don't have to go through all the
9    ground rules.  The same rules apply as in those other
10   cases, and that is to answer orally with words as
11   you've been doing so that we have a clear record and
12   not to use gestures, "uh-huh, "huh-uh," those sorts
13   of things that we use in everyday language, but
14   become ambiguous when you try and write them out as
15   to what the witness means -- intends.
16             Secondly, please go ahead and let me get
17   out my whole question before you start responding so
18   we have a clear transcript as well.  I don't always
19   take breaks at the right time, but I will try to do
20   so at least every hour so that nobody becomes too
21   fatigued --
22             MR. LEVINSTEIN:  But if at anytime --
23        Q.   BY MR. LEVINSTEIN:  -- as well as the
24   court reporter.
25             MR. LEVINSTEIN:  If at anytime you want
```

---

```
1              WHEREUPON, the following proceedings were
2    had:
3              IT WAS STIPULATED AND AGREED that the within
4    proceedings were taken pursuant to the Federal Rules
5    of Civil Procedure.
6
7              WHEREUPON,
8              STEVEN MICHAEL LOCKE,
9    the witness herein, having been first duly sworn by
10   the notary public, was examined and testified as
11   follows:
12
13                  EXAMINATION
14   BY MR. JONES:
15        Q.   Can you please state your name and home
16   address for the record?
17        A.   Yes.  Steven Michael Locke, 19 East
18   Columbia Street, Colorado Springs, Colorado, 80907.
19        Q.   Have you ever had your deposition taken
20   before, Mr. Locke?
21        A.   Yes.
22        Q.   In what kinds of cases or case?
23        A.   Accident cases, cases dealing
24   with -- I was a director of the state park
25   system in Indiana, and I had various cases when I was
```

---

```
1    to go to the bathroom or you want to take a break for
2    any reason, just say, "Can we take a break?"
3              THE WITNESS:  Thanks.
4         Q.   BY MR. JONES:  Have you been deposed as
5    a representative of United States Taekwondo Union
6    before?
7         A.   No.
8         Q.   Have you ever been named as a party
9    personally in any litigation?
10        A.   Personally?
11        Q.   Either as a plaintiff or a defendant.
12        A.   Yes.
13        Q.   What kinds of cases would that be?  The
14   accident cases you were talking about?
15        A.   Most typically, accident cases, yes.
16        Q.   Any other types of cases?  Commercial
17   actions?
18        A.   Employment cases.
19        Q.   Were you a plaintiff or a defendant?
20        A.   Defendant --
21        Q.   Was the --
22        A.   -- and plaintiff.
23        Q.   So it was -- were they like wrongful
24   termination-type claims?
25        A.   Yes.
```

6/30/2005  Locke, Steven

1    Q.    Do you remember the names of any of the
2    cases for the record?
3    A.    Offhand, no.
4    Q.    Were they Colorado cases or some other
5    state?
6    A.    Both Indiana and Colorado.
7    Q.    Turning now to a little bit of your
8    background, could you just briefly summarize your
9    occupational history, I guess, from earliest up to
10   now, say, after you went to work full-time after
11   getting out of college or whatever?
12   A.    Okay.  Left college, graduated from
13   college in 1969.  Became employed by the
14   Indiana -- well, became employed as a school teacher
15   at Edinburgh, Indiana, and Franklin, Indiana,
16   teaching physics, physiology, biology, and chemistry.
17   After that one-year horrendous experience, went to
18   the Department of Natural Resources in Indiana and
19   began work within the Indiana state park system.
20   Stayed there through 19 -- 1971 through 1991.
21          In the interim, I had several small
22   businesses I operated at the same time.  Businesses
23   in Indianapolis, there were three of those.  One was
24   an Indy car racing operation.  One was an endurance
25   management company for races like marathons and

6/30/2005  Locke, Steven

1    A.    Taught, unbelievably, in both elementary
2    and high school.
3    Q.    Okay.
4    A.    Elementary in Edinburgh and then high
5    school at Franklin, Indiana.
6    Q.    Do you have any experience in Olympic
7    athletes either as a competitor athlete or a coach?
8    A.    I'm not that level of athlete.  I'm a
9    recreational athlete.
10   Q.    You do triathlon for recreation?
11   A.    Yes.
12   Q.    Do you have any background in taekwondo
13   before 2003?
14   A.    I had none.
15   Q.    You mentioned that you were executive
16   director with the Olympic national governing body for
17   triathlon?
18   A.    Yes.
19   Q.    I'm sorry.  That's called --
20   A.    It's called USA Triathlon.
21   Q.    USA Triathlon.  You did that for 12
22   years up through 2003 or '4?
23   A.    January 12th, 2004, I think, was the
24   date I resigned.
25   Q.    Did you -- did you leave Triathlon?

6/30/2005  Locke, Steven

1    triathlons and that sort of thing.  And another was a
2    restaurant in Indianapolis.
3          And then I migrated to Colorado Springs
4    in 19 -- in the late part of 1991 after being
5    selected as executive director of USA Triathlon.  Was
6    in that role for 12 years and in the interim also had
7    a small business in Louisville, Colorado.  It was a
8    restaurant.
9          Currently after having resigned from my
10   position as executive director of USA Triathlon, I
11   owned a small business in Colorado Springs.
12   Q.    Another restaurant business?
13   A.    No.  It's completely different.  This is
14   a franchise operation.  It's a junk collection
15   business called 1-800-Got-Junk.
16   Q.    And so you maintain that business
17   and -- as a full-time vocation?
18   A.    Yes.
19   Q.    And briefly, what formal education did
20   you have after high school?
21   A.    I have an undergraduate degree from Ball
22   State University with a major in biology and
23   chemistry minors and physics minors.
24   Q.    I'm sorry.  You said you did some
25   teaching.  What level were you teaching at?

6/30/2005  Locke, Steven

1    A.    On my own accord, yes.
2    Q.    What were the reasons for deciding to
3    leave?
4    A.    I had two reasons.  One I had prostate
5    cancer and was dealing with prostate cancer at that
6    point.  And then secondly was we had a board of
7    directors that was conducting an election in an
8    illegal fashion that was determined to be illegal
9    after an investigation by USOC.
10   Q.    Did you say a board of directors?
11   A.    Yes.
12   Q.    How many people are on the board of
13   directors or were on the board of directors during
14   that inquiry?
15   A.    There are -- there were and there are 11
16   members.
17   Q.    Was there some sort of a arbitration or
18   hearing that determined what you just said?
19   A.    There was a hearing conducted by the
20   United States Olympic Committee hearings panel that
21   determined the election was improperly conducted.
22   Q.    And who was the one being elected that
23   you referred to?
24   A.    There were several being elected, and so
25   the election was overturned and was rerun.

1  Q.  Was it -- was it because of that finding
2  the reason that you decided to go your separate way?
3  A.  No.  The finding was subsequent to my
4  resignation.
5  Q.  So you discovered the deficiencies with
6  the election process and decided you didn't want to
7  be affiliated any longer?
8  A.  I found them to be unacceptable, and
9  then also dealing with prostate cancer was creating
10  some time issues for me.
11  Q.  Did -- did U.S.A Triathlon ever have any
12  financial problems?  By that, I mean, getting into
13  situations where the expenses were greater than the
14  incomes?
15  A.  Well, I wouldn't call them financial
16  problems.  I would call them at first when I first
17  arrived financial constraints.  We had very limited
18  revenue streams.
19  Q.  And like taekwondo is only a part of
20  triathlon's budget subsidized by the USOC?
21  A.  At that time when I arrived, we were not
22  an Olympic sport, and we were an affiliated sport
23  organization.  So we had very little income coming in
24  for the United States Olympic Committee.
25  Q.  Over time was USA Triathlon able to get

1  its certification to become an Olympic sport?
2  A.  Yes.  We first became an American -- a
3  Pan Am sport, then we became an Olympic sport.
4  MR. LEVINSTEIN:  Just for the record, it
5  was not in the games, so it wasn't that USA Triathlon
6  didn't qualify while other countries had a triathlon.
7  THE WITNESS:  Right.
8  MR. LEVINSTEIN:  We had to wait until
9  the Olympics said triathlon was in.  So your question
10  sort of suggested they hadn't been certified, but
11  they could be certified in as an Olympic sport --
12  Q.  BY MR. JONES:  Do you agree with your
13  counsel?
14  A.  I do.  And just so you know, I think you
15  know this.  Triathlon became an Olympic sport when
16  taekwondo became an Olympic sport officially on the
17  program.
18  Q.  What year was that?
19  A.  I think we were accepted as an NGB -- we
20  went through the compliance issues in 1996.
21  Q.  Once USA Triathlon started getting money
22  from USOC, did it have to submit to the same audit
23  procedures that all NGB's have to submit to?
24  A.  Yes, we did.
25  Q.  Did USOC ever find fault with or ever

1  criticize USA Triathlon regarding any of its
2  accounting practices?
3  A.  We had no deficiencies.
4  Q.  So the answer is no?
5  A.  The answer is no.
6  Q.  Was USA Triathlon's various
7  certifications ever in jeopardy or -- as far as USOC
8  was concerned as far as you know?
9  MR. LEVINSTEIN:  Objection.  Vague and
10  ambiguous what certifications you're talking about.
11  THE WITNESS:  No.
12  Q.  BY MR. JONES:  As an executive director
13  of USA Triathlon, did you ever participate in the
14  process of determining coach selection criteria for
15  any of the events that USA Triathlon participated in?
16  A.  No.
17  Q.  Did it -- did it have a coach selection
18  criteria?
19  A.  We had a coaching selection criteria,
20  yes.
21  Q.  Do you know anything about -- can you
22  describe to me what the coach selection criteria was
23  that was in effect as of the last years you were with
24  USA Triathlon?
25  MR. LEVINSTEIN:  Objection.

1  THE WITNESS:  I honestly do not recall
2  what that criteria was.
3  Q.  BY MR. JONES:  And is it -- is it
4  correct that triathlon and taekwondo are the only
5  Olympic sports that you've been directly involved
6  with?
7  MR. LEVINSTEIN:  Objection.
8  THE WITNESS:  Directly, yes.
9  Q.  BY MR. JONES:  Have you ever been
10  associated in any capacity with the United States
11  Olympic Committee?
12  A.  I was a board member and a member of
13  various committees.
14  Q.  During what years were you a board
15  member, if it was in the past?
16  A.  1998 through the term -- through my
17  resignation.  Well, actually, would be on my
18  resignation.  Until the board was suspended as it was
19  constituted at that time.
20  Q.  Have any idea what year we're talking
21  about?
22  A.  The board was reconstituted in 2004, the
23  USOC board was.
24  Q.  Was reconstituted.  Does that mean cut
25  down in size?

1     A.   Yes.

2     Q.   Do you know what the size was from '98

3 to 2004, if it was one size?

4     A.   Approximately 123 at that time when I

5 was serving.  Currently now, I think it is 11.

6     Q.   And what was your understanding of

7 functions of the board during '98 to 2004?

8          MR. LEVINSTEIN:  Objection.

9          MR. JONES:  If you know.

10          THE WITNESS:  Development in --

11 development of policy, voting of officers.

12     Q.  BY MR. JONES:  Not unlike the board of

13 directors of a corporation?

14          MR. LEVINSTEIN:  Objection.

15          THE WITNESS:  I don't know.  I don't

16 know the -- what the equivalencies would be.

17     Q.  BY MR. JONES:  Turning to the committees

18 that you recall serving on, what committees were you

19 on or subcommittees of the USOC?

20     A.   I was on a committee called the Training

21 Centers Committee, which dealt with all four training

22 centers under the auspices of the USOC, and I was on

23 the Budget Committee.

24     Q.   During what years were you on the

25 Training Centers Committee?

17

1     A.   The Training Centers Committee I was on

2 from 1998 to approximately 2000.  I think in 2000 it

3 was suspended and no longer existed.  I was on the

4 Budget Committee from 2000 until the suspension of

5 the board as it was constituted.

6     Q.   2004.  Is that correct?

7     A.   Yes.

8     Q.   The training centers -- I'm sorry.  The

9 Training Centers Committee was responsible for what?

10 Training centers as it says or --

11     A.   Provided overview for the operation of

12 Olympic Training Centers, providing guidance on

13 preventive maintenance, rehab, rehabilitation,

14 capital expenses.

15     Q.   Would that be training centers for all

16 sports?

17     A.   No.  Training centers for the Olympic

18 Training Centers of which there are four.

19     Q.   Colorado Springs would be one?

20     A.   Yes.  San Diego is the other; Marquette

21 is another, and Lake Placid is the fourth.

22     Q.   Are the positions you have held with the

23 USOC, first as a board member, is that a voluntary

24 position?

25     A.   All positions I have held with USOC are

18

1 voluntary positions.

2          MR. LEVINSTEIN:  Objection.  Just

3 volunteer positions?

4          MR. JONES:  Volunteer, yes.

5          MR. LEVINSTEIN:  As opposed to not paid.

6          THE WITNESS:  Nonpaid positions.

7          MR. LEVINSTEIN:  I assume all positions

8 are voluntary in some sense paid-wise.

9     Q.  BY MR. JONES:  Is it correct you have

10 never been on salary with the USOC?

11     A.   That is correct.

12     Q.   As a former member of the Budget

13 Committee, did you review the budget of the USOC

14 during the years you served?

15     A.   Yes.

16     Q.   Roughly, what was the gross operating

17 budget of the USOC during 2004, if you remember?

18          MR. LEVINSTEIN:  Objection.

19          THE WITNESS:  I do not remember.  I

20 don't remember that number.

21     Q.  BY MR. JONES:  It's in the tens of

22 millions of dollars?

23          MR. LEVINSTEIN:  Objection.

24          THE WITNESS:  Is it in the tens of

25 millions of dollars?

19

1          MR. JONES:  Tens of millions.

2          THE WITNESS:  Sure.

3     Q.  BY MR. JONES:  Is it --

4     A.   Yes.

5     Q.   Is it over a hundred million?

6          MR. LEVINSTEIN:  Objection.

7          THE WITNESS:  You know, I don't recall.

8 I don't think so.

9     Q.  BY MR. JONES:  Is the USOC budget public

10 record, if you know?

11     A.   I believe it is.

12     Q.   Where would one go to see the USOC's

13 budget, if it's public record?

14     A.   You know, I -- I take that back.  I'll

15 have to say I don't know if it is public record.

16     Q.   Did you keep any of your annual

17 statements from the USOC given to you as a member of

18 the Budget Committee from 2004?

19     A.   I did not.

20     Q.   In your capacity as a board member of

21 the USOC up through 2004 or whenever it was exactly

22 that you resigned, did you ever attend any USOC

23 committee meetings which specifically concerned the

24 United States Taekwondo Union?

25     A.   I did not.

20

1    MR. LEVINSTEIN:  For the record, I don't
2    know that he resigned from the USOC board or just
3    automatically stopped being on the board when a new
4    board took over.
5        MR. JONES:  Okay.  I'll use whatever
6    term you're comfortable with.  Call it ending the
7    relationship.
8        MR. LEVINSTEIN:  His term ended.
9        MR. JONES:  Term ended.
10       Q.  BY MR. JONES:  Outside of a meeting
11   context with the USOC, did you as a board member
12   ever -- were you ever called upon just to discuss any
13   issues concerning USTU?
14       A.  I was not.
15       Q.  Do you now hold any titles with United
16   States Taekwondo Union, which I'll continue to call
17   USTU?
18       MR. LEVINSTEIN:  It's now USA Taekwondo,
19   but --
20       MR. JONES:  Aka USA Taekwondo.
21       THE WITNESS:  Well, it's not aka.  It is
22   USA Taekwondo.  And the chair of the Governance and
23   Management Committee.
24       Q.  BY MR. JONES:  When did you become
25   chair?

1    other relationship you have with him?
2        A.  I have no relationship other than a
3    business relationship with Jim.
4        Q.  Can you describe for us that business
5    relationship?
6        A.  The essence of the business relationship
7    is the appointment to the Governance and Management
8    Committee.
9        Q.  Did he personally ask you to serve?
10       A.  He asked through Jeff Benz, counsel,
11   USOC.
12       Q.  Was this before or after you had already
13   ended your relationship with USA Triathlon?
14       A.  It was after.
15       Q.  And what, if anything, was said by
16   Mr. Benz to you when the offer was made?
17       A.  Other than asking me if I would be
18   willing to accept the position, there was little
19   said.
20       Q.  No one described to you the tasks that
21   lay ahead or the problems that USTU faced?
22       MR. LEVINSTEIN:  Objection.
23       THE WITNESS:  In very vague terms.
24   Mostly financial were -- was my view; really, my
25   expertise.

1        A.  Approximately February of 2004.
2    February, March time frame.
3        Q.  I'll refer to that Governance and
4    Management Committee as GMC at times, if I could.
5        A.  Okay.
6        Q.  What -- what do you see as your duties
7    as chair of GMC?
8        A.  To provide oversight, to provide policy
9    direction.
10       Q.  I'm sorry.  Policy direction?
11       A.  Yes.
12       Q.  Do you know a Mr. Jim Scherr?
13       A.  I do.
14       Q.  How -- well, first of all, who is he as
15   far as the USOC is concerned?
16       A.  Jim is the CEO of the USOC.
17       Q.  Have you worked with him?
18       A.  Have I worked with Jim before?
19       Q.  Yes.
20       A.  In --
21       Q.  In any capacity.
22       A.  No official capacity.
23       Q.  You've met him?
24       A.  Yes.
25       Q.  Other than having met him, is there any

1        Q.  BY MR. JONES:  Do you know a Mr. Tom
2    Satrom?
3        A.  I do.
4        Q.  How do you know him?
5        A.  Satrom was on the board of directors at
6    the same time I was, and he was chair of the
7    Membership Credentials Committee for the United
8    States Olympic Committee.
9        Q.  Have you ever had cause -- well, you
10   worked with him then as board members on the same
11   board?
12       A.  Remembering that this board was a big
13   board, no, I didn't work with Tom.
14       Q.  How does one conduct a meeting with 120
15   board members?
16       MR. LEVINSTEIN:  Object.
17       Q.  BY MR. JONES:  I mean, is it conference
18   call or --
19       A.  Typically, we met two times a year en
20   masse.
21       Q.  Did you meet him at those mass meetings?
22       A.  I would see him at those meetings.
23       Q.  Any other context or business dealings
24   with Mr. Satrom as far as USOC work?
25       A.  I've never been involved with Tom on a

```
1   committee or any other capacity.
2        Q.   Same question for Ms. Jeannie
3   Picarriello.  Do you know her?
4        A.   I do.
5        Q.   And how do you know her?
6        A.   Jeannie served on the board of directors
7   during the same time frame I did.
8        Q.   Would the response be the same as far as
9   how you -- how often you saw her?
10       A.   Precisely the same as Tom.
11       Q.   And before joining the GMC, did you know
12  Mr. Robert Gambardella in any capacity?
13       A.   I did.
14       Q.   And how did you know him?
15       A.   I knew Bob when he was in volleyball and
16  knew when he migrated from volleyball into USOC
17  Sports Partnerships and then after that migrating
18  into International Relations.
19       Q.   Did you ever work with him on any
20  particular projects?
21       A.   No.
22       Q.   I'd like to turn now to another area.
23  I'm sorry.  Before I -- before I jump into
24  the -- this other area, I just had one question.  Did
25  you ever serve as a member of a hearing panel for the
```

25

```
1   equestrian NGB?
2        A.   I did.
3        Q.   As a hearing panel member, what did that
4   mean?  Were you serving as an arbitrator or a judge?
5        A.   We were serving as an arbitrator
6   arbitrating an issue between the two organizations
7   within equestrian.
8        Q.   "Two organizations," meaning was one of
9   them the NGB for equestrian?
10       A.   It was a coshared responsibility.
11       Q.   What was the nature of the dispute that
12  you were called upon to help decide?
13       A.   The nature of the dispute was complex,
14  so complex it's lost upon me now exactly what took
15  place.
16       Q.   Was -- was one of the group's
17  certification as the NGB in jeopardy in that
18  proceeding?
19            MR. LEVINSTEIN:  Object.
20            THE WITNESS:  I don't recall.
21       Q.   BY MR. JONES:  How long ago are we
22  talking about as far as that hearing?
23       A.   I think approximately two, two and a
24  half years ago.
25            MR. LEVINSTEIN:  For the record, I think
```

26

```
1   it was three or more.
2            THE WITNESS:  Was it three?  How time
3   slips away.  Was it three?
4            MR. LEVINSTEIN:  It was in 2002 or
5   earlier, I think.
6            THE WITNESS:  Okay.
7            MR. LEVINSTEIN:  Fairly sure, but he's
8   got a document.  He may know.
9            MR. JONES:  I will be referring at times
10  in the deposition to documents that have already been
11  marked and identified in previous depositions.  I
12  will try to give counsel copies if I have them.
13  First one is the -- has been marked as Exhibit 45.
14            (Mr. Jones gives Exhibit 45 to Mr.
15  Levinstein.)
16            MR. LEVINSTEIN:  Thank you, sir.
17       Q.   BY MR. JONES:  Why don't you take a
18  minute to go ahead and review that, please.
19            Have you had a chance to review Exhibit
20  45?
21       A.   Yes.
22       Q.   What is Exhibit 45?
23       A.   It is -- it consists of the minutes of
24  the first meeting that we had as a Governance and
25  Management Committee.
```

27

```
1        Q.   The second page of the document says
2   that it was approved on February 12, 2004.  Does it
3   not?
4        A.   It does say that.
5        Q.   Was it approved on February 12th, 2004,
6   as far as you know?
7        A.   As far as I know.
8        Q.   Is the document a true and -- true and
9   accurate as to what went on at the meeting on
10  February 5th, 2004, as far as you know?
11            MR. LEVINSTEIN:  Objection.
12            THE WITNESS:  As far as I know.
13       Q.   BY MR. JONES:  You were given the
14  opportunity to change the contents of the document if
15  you saw inaccuracies, I assume, at the next meeting?
16       A.   Sure.
17       Q.   And were any done by you?
18            MR. LEVINSTEIN:  Objection.
19            THE WITNESS:  I do not recall.
20       Q.   BY MR. JONES:  The second paragraph, if
21  you'll focus on that one for a second.
22       A.   Of which page?
23       Q.   I'm sorry.  Page 1.  Talks about a
24  financial progress report given by Ms. Witte in which
25  she says there are immediate cash needs of $350,000.
```

28

1    Do you recall that discussion?

2        A.   Yes.

3        Q.   How would you compare that with the

4    current financial condition of USA Taekwondo?  Is

5    that -- is that improved or is it worse or is it the

6    same?

7            MR. LEVINSTEIN:  Objection.  Meeting

8    cash needs doesn't mean overall financial condition,

9    but go ahead.

10           THE WITNESS:  Well, the financial

11   condition was very poor at this time.  The financial

12   condition is now stabilized at the current time

13   frame.

14       Q.   BY MR. JONES:  Is it -- is USA Taekwondo

15   in the black?

16       A.   It's relatively in the black.  It's

17   paying its bills.

18       Q.   Same paragraph goes on to mention that

19   "membership renewals are lagging as many members and

20   clubs are apparently waiting to see if the

21   restructure succeeds."  Was that the situation at

22   that time as far as you know?

23       A.   As far as I know, yes.

24       Q.   What is the situation now?  Has it

25   gotten better, stayed the same, or gotten worse?

1        A.   Better.

2        Q.   And the last paragraph talks about a

3    discussion which was had concerning the team leader

4    and coach appointments for the Athens games and also

5    goes on to state that the eligibility requirements

6    are being written -- rewritten by the USOC, and the

7    earlier appointments may have to be rescinded as soon

8    as those new requirements are clarified by the USOC.

9    Further discussion will wait until the new

10   information is available.  Have I generally read that

11   correctly?

12       A.   Yes.

13       Q.   Other than what's stated there, can you

14   recall the details, if any, of anything that was

15   discussed in that conversation at that meeting on

16   February 5, 2004, amongst the GMC?

17       A.   No.

18       Q.   With respect to the actual writing of

19   the new coach selection criteria, is that what

20   happened?  Did the USOC write the new criteria as

21   that paragraph states?

22       A.   Insofar as I know.

23       Q.   Do you know who at the USOC wrote

24   the -- these new criteria?

25       A.   I do not.

1        Q.   As you sit here today, do you have any

2    recollection of any -- anything substance --

3    substantive as to what the new criteria would say or

4    be based on?

5        A.   At that point?

6        Q.   Yes.

7        A.   No.

8        Q.   At that point in time, did you know what

9    the previous coach selection criteria were at USTU?

10       A.   I did not.

11       Q.   So it's fair to state then that

12   you -- the committee did not have a copy of the

13   existing criteria on February 5, 2004, when the -- in

14   this meeting discussing criteria?

15       A.   I don't recall if we had the criteria.

16       Q.   At any time, did you research what the

17   old criteria were?

18       A.   I did not.

19       Q.   Is there any reason that you did not

20   research or attempt to find out what the old criteria

21   were?

22           MR. LEVINSTEIN:  Objection.

23           THE WITNESS:  We had issues that were

24   principally financial and governance related.  They

25   were of high, high priority that we had to deal with.

1    Principally, financial.

2        Q.   BY MR. JONES:  Does that -- does that

3    mean you did not have the time to look at -- go into

4    looking at the old coaching criteria?

5            MR. LEVINSTEIN:  Objection.

6            THE WITNESS:  It means that we were

7    concentrating, at least I was concentrating on the

8    financial aspects of this organization.

9        Q.   BY MR. JONES:  Do you know if any other

10   members of the GMC were working on coach selection

11   criteria at that point in time?

12       A.   I do not.

13       Q.   How did the GMC know as of February 5,

14   2004, that the coach selection criteria needed

15   changing if it didn't know what the previous criteria

16   were?

17           MR. LEVINSTEIN:  Objection.

18           THE WITNESS:  If you want me to be

19   precise, I can't because I don't recall that aspect

20   of the conversation.

21       Q.   BY MR. JONES:  So would the answer be "I

22   don't know"?

23       A.   I don't know.

24       Q.   And is it correct that as of the

25   February 5, 2004, meeting you did not know what the

1  relative success of the USTU had been in Olympic

2  competitions with respect to medals won under the old

3  coach selection criteria?

4       A.   I did not know that.

5       Q.   In other words, you didn't know how many

6  medals they won.

7       A.   No, I didn't.

8       Q.   You were unaware at that time that USTU

9  had won 22 medals under the old coach selection

10  criteria then?

11            MR. LEVINSTEIN:  Objection.

12       Q.   BY MR. JONES:  Is that fair?

13       A.   I was unaware of the medal accumulation,

14  period.

15       Q.   If you had known that, would it have

16  mattered?

17            MR. LEVINSTEIN:  That's speculative.

18       Q.   BY MR. JONES:  The answer is you don't

19  know?

20            MR. LEVINSTEIN:  Objection.

21            THE WITNESS:  It's imposs -- my answer

22  is it's impossible to speculate at this point.

23       Q.   BY MR. JONES:  Might it have mattered?

24            MR. LEVINSTEIN:  Objection.

25            THE WITNESS:  I don't know.

33

1       Q.   BY MR. JONES:  As you sit here today,

2  can you recall any statements by any of the other

3  members regarding coach selection at the February

4  5th, 2004, meeting?

5       A.   I do not recall any statements made in

6  that regard.

7       Q.   If you were to assume for a moment that

8  the old criteria required that the candidate for the

9  Olympic coach had to have prior coaching experience,

10  just assume that to be the case, would you agree that

11  prior coaching experience is a relevant precondition

12  for the job?

13       A.   Your question is:  Is relevant

14  coaching -- is prior coaching experience required for

15  the job?

16       Q.   If it -- if it was a key criteria under

17  the old coach selection criteria, prior experience,

18  coaching at international competitions, would you

19  agree with me that that is a relevant criteria?

20            MR. LEVINSTEIN:  Objection.

21            THE WITNESS:  I think I would have to

22  know more before I answered that question.  I

23  think -- I think it's a vague question.

24       Q.   BY MR. JONES:  As a general principle,

25  before anyone applies for a new job, would you agree

34

1  with me that prior experience at a similar job is

2  relevant?

3       A.   I would say it is a key component of

4  consideration.

5       Q.   Turning to page 2 of Exhibit 45, it

6  states that Mr. Skinner pointed out that the position

7  of secretary general for USTU was now vacant.  Who is

8  Mr. Skinner, if you know?

9       A.   Mr. Skinner is the sport partner or the

10  director, the liaison from the United States Olympic

11  Committee to taekwondo.  Taekwondo is part of his

12  portfolio.

13       Q.   Prior to joining the GMC, had you met

14  Mr. Skinner in any capacity?

15       A.   I have never met Mr. Skinner.

16       Q.   What -- at that time, what was your

17  understanding of the job description of the secretary

18  general of the USTU?

19       A.   Secretary general responsibility as I

20  understand it is the liaison from USA Taekwondo to

21  the International Federation.

22       Q.   It goes on to state in the minutes that

23  in the past it was separated from the CEO position

24  and held by a volunteer.  Discussion was held on the

25  merits of having one person fill both positions.

35

1  Consensus was reached and a motion made to name

2  Mr. Gambardella as the secretary general to allow a

3  more unified approach internationally as well as

4  domestically.  He will attend taekwondo test events

5  in Athens March 13th through 14th.  Have I read that

6  correctly, generally?

7       A.   Yes.

8       Q.   I realize this was the first meeting,

9  but how did -- how was decision making done in this

10  group of five?  Were -- were votes generally taken?

11       A.   Votes were taken.  Votes were taken of

12  all -- in all substantive issues.  This was a

13  substantive issue.  A vote was taken and was

14  approved.

15       Q.   In your understanding, what -- what was

16  needed to pass a vote?  Would it be unanimous or

17  majority?

18       A.   Majority.

19       Q.   So three out of five could carry the

20  day.

21       A.   Yes.

22       Q.   And did that continue to be the case up

23  to today, as far as you know?

24       A.   Yes.

25       Q.   When the decision was made to, shall I

36

1  say, delegate the duties of secretary general to

2  Mr. Gambardella, did anyone look at what the

3  remediation agreement documentation said in this

4  regard?

5         MR. LEVINSTEIN:  Objection.

6         THE WITNESS:  I don't recall.

7    Q.   BY MR. JONES:  You don't recall

8  any -- anyone mentioning that the remediation

9  agreement stated that the GMC was to assume these job

10  duties of the secretary general?

11   A.   Well, I do know that, but I do not

12  recall that discussion.  That was your question.

13   Q.   Yes.  You know that now?

14   A.   Yes.

15   Q.   When did you first learn that?

16   A.   When I read the remediation agreement.

17   Q.   And would that be before this meeting?

18   A.   Yes.

19   Q.   Knowing what it says, was that any cause

20  of concern before the consensus was taken to delegate

21  that position?

22   A.   No.

23         MR. LEVINSTEIN:  Objection.

24   Q.   BY MR. JONES:  Would it be fair to state

25  that as least for yourself you felt the -- those

37

1  duties were delegable?

2    A.   Yes.

3    Q.   And lastly, that set of minutes we're

4  looking at refers to a town meeting coming up at the

5  Sundome in Tampa on February 17.  Did you attend that

6  meeting, as it -- as it apparently says you would?

7    A.   Yes.

8    Q.   Okay.  Turning to the next page, if you

9  could turn to 57.

10         (Mr. Jones gives Exhibit 57 to Mr.

11  Levinstein.)

12         MR. LEVINSTEIN:  Thank you.

13   Q.   BY MR. JONES:  I'll give you a minute to

14  review that.

15         You've read Exhibit 57?

16   A.   Yes.

17   Q.   What is this exhibit?

18   A.   This is a copy of the minutes from the

19  February 26th, 2004, Governance and Management

20  Committee meeting.

21   Q.   You attended that meeting?

22   A.   I did.

23   Q.   Says at the end of the minutes on page 2

24  that they were approved on March 3rd, 2004.  Were

25  they, as far as you know?

38

1    A.   Insofar as I know.

2    Q.   Are they -- are the minutes true and

3  correct as to contents, as far as you can see?

4    A.   As best as I recall.

5    Q.   You had the opportunity to make changes

6  before approving them at the meeting on March 3rd?

7    A.   Indeed.

8    Q.   And as you sit here today, do you

9  remember making any changes?

10   A.   I don't recall.

11   Q.   Paragraph 2 talks about a, I guess,

12  comment by Gary Johansen noting that there were seven

13  votes lacking in order for the USTU Board of

14  Governors to ratify the remediation plan that the

15  USTU Executive Committee had approved.  Goes on to

16  state calls are being made to remind voters to send

17  in their ballots.  Do you recall that conversation?

18   A.   I recall Gary making that reference.

19   Q.   Do you know one way or the other whether

20  these seven votes were needed to make the remediation

21  a binding agreement?

22   A.   I don't know the outcome, but I presume

23  that it was.

24   Q.   That the seven votes were needed?

25   A.   Yes.

39

1    Q.   If it was your understanding on February

2  26th that seven votes were needed to make this

3  remediation binding, do you know why the GMC was

4  already meeting and conducting business before the

5  seven votes were obtained?

6    A.   I can't answer that because I don't

7  know.

8    Q.   Do you know if the seven votes were

9  eventually obtained?

10   A.   I presume they were.

11   Q.   Do you have any idea when?

12   A.   I do not.

13   Q.   Third paragraph, "Virginia Witte

14  reviewed the financial position summary as of

15  February 25th at 3 p.m."  It says in parentheses

16  "attached."  As far as you know, were there some sort

17  of financial statement attached to Exhibit 57

18  originally?

19   A.   I presume there was, but I cannot answer

20  that in any -- well, I presume there was.

21         MR. JONES:  Counsel, could I ask that we

22  have the complete document at some point unless

23  there's objection?

24         MR. LEVINSTEIN:  You have produced the

25  minutes and what was attached to them as we have,

40

1    so --

2         MR. JONES:  Is it your representation

3    that you do not have the financial statement either

4    that was attached?

5         MR. LEVINSTEIN:  I don't have a copy of

6    the minutes that had the financial position attached

7    to it, so I don't know that we know what the

8    financial position as of February 25th at 3:00 p.m.

9    was.  We didn't take minutes and remove things --

10        MR. JONES:  Okay.

11        MR. LEVINSTEIN:  -- that we knew were

12   attached.

13        MR. JONES:  Fair enough.

14   Q.   BY MR. JONES:  Goes on to state

15   that -- well, goes on to state, "Bob stated that his

16   first emphasis would be to find a strong CFO who can

17   take on other duties such as human resources and

18   insurance."  At some point in time, did USTU hire a

19   chief financial officer?

20   A.   Yes.

21   Q.   Who was that person?

22   A.   Tom.  I don't recall Tom's last name.

23   Q.   Do you have any feel for approximately

24   when he was hired?

25   A.   My best recollection was in mid-March.

1    Q.   Is he still with the organization?

2    A.   Yes.

3    Q.   Last sentence on page 1 goes into a

4    discussion regarding the loss of two credentials for

5    officials at the Athens games, explains that USTU

6    originally were allocated three credentials, team

7    leader, coach, team official.  It says it declined in

8    the sports that it qualified USOC had to cut a number

9    of credentials allocated to a number of sports, one

10   of which was taekwondo.  Various ideas on methods of

11   retaining at least one of the credentials were

12   discussed.  Bob will discuss with WTF on this and

13   this item will be placed on the agenda for discussion

14   with Jim Scherr during the conference call next

15   Wednesday.

16        Do you remember that discussion?

17   A.   Yes.

18   Q.   What do you recall specifically on the

19   credentials or loss of credentials discussion?

20   A.   Just as the paragraph suggests.

21   Q.   No other -- no other details?

22   A.   No.

23   Q.   Next paragraph mentions your name

24   stating that you will update the USOC Executive

25   Committee concerning taekwondo governance on their

1    conference call scheduled for Tuesday at 3:00 p.m.

2    Did that call that's referred to there go forward?

3    A.   Yes.

4    Q.   You -- did you call the USOC Executive

5    Committee or did they call you?

6    A.   I called in on the conference call, as

7    everybody else did.

8    Q.   And were you the only one from USTU that

9    participated in that conference call?

10   A.   As I recall, I think I was.  Bob may

11   have, but I just don't recall.

12   Q.   And roughly, how many people were on the

13   USOC Executive Committee at that time?

14   A.   23.

15   Q.   And they had a quorum of people

16   participating?

17   A.   As far as I know or they wouldn't have

18   conducted the call.

19   Q.   What was the agenda for the call, as far

20   as you remember?

21   A.   I don't recall --

22        MR. LEVINSTEIN:  Objection.

23        THE WITNESS:  -- the agenda.

24   Q.   BY MR. JONES:  As far as you know, did

25   you update the USOC on what was happening at USTU?

1    A.   Yes.

2    Q.   Was the update that you gave in written

3    form anywhere?

4    A.   No.

5    Q.   As you sit here today, can you remember

6    anything about the call?

7    A.   The update principally revolved around

8    financial issues and governance issues and review of

9    the meeting in Florida.

10   Q.   Anything in particular on those issues

11   you've just listed that you recall relating --

12   A.   Just a recap of the financial situation

13   at that time and what we were doing to resolve that

14   situation and review of the meeting that we had in

15   Florida during the open.

16   Q.   Was coaching selection discussed at all

17   in that conference call?

18   A.   No, not as I recall.

19   Q.   Did you retain any written notes of any

20   kind regarding the call?

21   A.   No.

22   Q.   The next bullet on page 2 talks about a

23   discussion concerning the event manager contract with

24   Tim Connolly.  It was decided to proceed to terminate

25   the agreement with the advice from Jeff Benz.  What

1  were the reasons for terminating Mr. Connolly's
2  contract, if you can recall?
3      MR. LEVINSTEIN:  Objection.  Instruct
4  him not to answer.  Calls for attorney/client
5  communication.  Probably shouldn't have even --
6  should have redacted that little bullet, but --
7      MR. JONES:  Okay.
8      MR. LEVINSTEIN:  -- it doesn't disclose
9  what the advice was, so --
10      MR. JONES:  Okay.
11      MR. LEVINSTEIN:  -- we decided that that
12  would cause concerns that we were redacting things --
13      MR. JONES:  All right.
14      MR. LEVINSTEIN:  -- but --
15      Q.  BY MR. JONES:  Separating whatever
16  Mr. Benz said for a moment, do you recall if
17  budgetary considerations were one of the reasons for
18  terminating the contract?
19      MR. LEVINSTEIN:  Objection.  Again,
20  whatever they said to Mr. Benz and whatever Mr. Benz
21  said back, if you can recall separate from any
22  conversation with Mr. Benz and so on, your reasons
23  that -- or the reasons that you believe the GMC
24  decided to terminate Mr. Connolly's agreement, any of
25  them -- again, I don't know what the relevance of

1  this is, and I'm concerned about an employment matter
2  between -- that has nothing to do with this case
3  between them and an employee in discussing that could
4  be a subject to litigation at some point, for all I
5  know, about what they were thinking and why they were
6  terminating him.
7      If you have a clear memory because they
8  thought they should terminate him and what factors
9  they were thinking about, I don't know how that's
10  relevant.  I mean, if you can try again.
11      MR. JONES:  Okay.
12      MR. LEVINSTEIN:  If you just could give
13  me some sense of why this is relevant.
14      MR. JONES:  Just basically because the
15  issue has been the financial condition of USTU, has
16  been the key supporting point for the
17  decertification.  Am I wrong?
18      MR. LEVINSTEIN:  No.  There's a ton of
19  noncompliance issues, but there was no
20  decertification.  It was an agreement, so what they
21  did in February -- it's clear that they terminated a
22  guy.  They didn't have to pay him anymore, so it
23  saved them money.
24      MR. JONES:  That's all -- that's all I'm
25  asking.

1      Q.  BY MR. JONES:  Do you agree with your
2  counsel?
3      A.  I do.
4      MR. JONES:  Okay.  Move on.
5      MR. LEVINSTEIN:  Okay.  That's not
6  necessarily why they terminated him, but the fact
7  that they did, they didn't have to pay him, and
8  obviously, that saves money.
9      Q.  BY MR. JONES:  Fifth bullet talks about
10  a mid-year meeting will be scheduled in Colorado
11  Springs, but all attendees must pay their own way
12  with the exception of the athletes.  No
13  constitutional amendments will be allowed.
14      Other than that statement, "no
15  constitutional amendments will be allowed," do you
16  remember any discussion about constitutional
17  amendments?
18      A.  I do not.
19      Q.  Don't know why that statement is in
20  there?
21      A.  I don't.
22      Q.  Did a mid-year meeting go forward in
23  Colorado Springs?
24      A.  Yes.
25      Q.  Do you remember the month it went

1  forward?
2      A.  I do not.
3      Q.  Then it goes on to mention that you as
4  the chair asked Tony Baggiano to lead a discussion on
5  governance and bylaw changes that must be formulated.
6  These four bullets were ideas or concepts that were
7  being considered by the -- by Mr. Baggiano and/or the
8  GMC?
9      A.  They were concepts being considered by
10  the GMC.
11      Q.  And in your understanding, were these
12  concepts toward satisfying requirements laid out in
13  the remediation agreement?
14      A.  They were concepts to not only do that,
15  but then also create an efficient governance system.
16      Q.  The March 11 conference call that's
17  mentioned in that paragraph is that conference call
18  that's different from the one that you participated
19  in with the USOC Executive Committee?
20      A.  Yes.
21      Q.  Did you participate in the March 11th
22  conference call?
23      A.  Insofar as I know, I believe I did.
24      Q.  Who -- who else besides you, Tony, Gary,
25  and Juan participated in the conference call, if you

1   can recall?

2         MR. LEVINSTEIN:  It says the next

3   committee conference call.

4         THE WITNESS:  Yeah.  The entire

5   committee.

6       Q.  BY MR. JONES:  Okay.  This was a GMC

7   conference call?

8       A.  Yes.

9       Q.  Now, is it correct to state that these

10   minutes do not mention Olympic coach selection or

11   changes in selection criteria?

12       A.  These minutes as we read them?

13       Q.  Yes.

14       A.  I do not see a reference to those, so

15   I'd say that's correct.

16       Q.  And is it correct that Olympic coach

17   selection criteria were, therefore, not discussed at

18   that meeting?

19         MR. LEVINSTEIN:  Objection.

20         MR. JONES:  Assuming these minutes to be

21   true as you've testified.

22         MR. LEVINSTEIN:  Objection.

23         THE WITNESS:  Insofar as I know.

24       Q.  BY MR. JONES:  And similarly, is it

25   correct that Olympic coach selection was not

49

---

1   discussed at the meeting?

2         MR. LEVINSTEIN:  Objection.

3         THE WITNESS:  Insofar as I know.

4         MR. JONES:  Next exhibit is 58.  Why

5   don't we take a break.  We've been going an hour.

6       (Recess taken from 10:12 a.m. to

7   10:19 a.m.)

8       Q.  BY MR. JONES:  Did you already take a

9   look at it?

10         MR. LEVINSTEIN:  I don't think he looked

11   at it.

12         MR. JONES:  Yeah.  Go ahead.

13         THE WITNESS:  Yes.

14       Q.  BY MR. JONES:  You've had a chance to

15   look at Exhibit 58?

16       A.  Yes.

17       Q.  Can you identify what that document is?

18       A.  It's a document sent to United States

19   Olympic Committee, Executive Committee, from Bob

20   Gambardella, myself having to do with Olympic team

21   staff selection.

22       Q.  And that's dated March 8, 2004?

23       A.  It is.

24       Q.  Is that your signature in script at the

25   top of the page?

50

---

1       A.  It is.

2       Q.  Do you know who wrote this document?

3       A.  I do not.

4       Q.  Did you write it?

5       A.  I don't recall if I did.

6       Q.  Is it possible that counsel wrote it,

7   legal counsel?

8         MR. LEVINSTEIN:  Objection.

9         MR. JONES:  If you know.

10         THE WITNESS:  I can't speak to who wrote

11   it.

12       Q.  BY MR. JONES:  Is the contents true and

13   correct as far as you're concerned?

14       A.  Insofar as I know.

15       Q.  Now, before the date of this document,

16   March 8, and after February 26, the date of the

17   meeting we've just gone over in Exhibit 57, were

18   there any other GMC meetings conducted of the full

19   committee?

20       A.  I don't recall.

21       Q.  As you sit here today you cannot recall

22   any other meetings?

23         MR. LEVINSTEIN:  Objection.  Not what he

24   said.

25         THE WITNESS:  I don't recall.

51

---

1       Q.  BY MR. JONES:  Would the fact that no

2   other minutes of meetings have been produced between

3   March 8th and February 26, if we assume there are no

4   minutes --

5         MR. LEVINSTEIN:  Objection.

6       Q.  -- lead you to conclude

7   that there were no meetings before March 8 and after

8   February 26?

9       A.  It does not lead me to conclude that.

10       Q.  Paragraph 2 of the document says, "After

11   our review, we determined that the -- that amending

12   the procedures at this time is paramount to the

13   success that we will have in Athens.  First, USTU

14   needs to be a performance-oriented organization.

15   Accordingly, selection procedures and nominations

16   must be based on objective standards that endeavor to

17   meet that goal."

18       "Second, it appears that because only

19   two taekwondo athletes have qualified for the 2004

20   Summer Olympic Games, the number of credentials that

21   are allowed to USTU must -- or may be limited.  Thus,

22   we must insure that the candidate for coach can also

23   fulfill team leader duties if called upon."

24       Have I read that generally correctly?

25       A.  Yes.

52

1    Q.   Paragraph 3 goes on to state that,
2  "Accordingly, we are submitting to you revised
3  selection procedures for coach and team leader
4  positions for the 2004 Summer Olympic Games.  We ask
5  that you vacate your earlier approval of the coach,
6  team leader selection procedures as well as the
7  nomination to fulfill those positions and adopt the
8  new procedures in their place.  By doing so, the
9  coach and team leader positions will be vacated until
10  such time as the USTU contemplates its athlete
11  selection process for nomination to" --
12        MR. LEVINSTEIN:  Completes.
13        MR. JONES:  Pardon me.  "Completes its
14  athlete selection process for nomination to the
15  Olympic team, thereby opening the coach and team
16  leader positions to any individual who meets the new
17  selection criteria.  After completion of the athlete
18  selection process, new nominations for coach and team
19  leader will be submitted to the USOC Executive
20  Committee for approval."
21        Have I read that generally correctly?
22     A.   Yes.
23        MR. LEVINSTEIN:  It was "fill" instead
24  of "fulfill" at one point.
25        MR. JONES:  I'm sorry.

1        MR. LEVINSTEIN:  It's okay.
2     Q.   BY MR. JONES:  With respect to paragraph
3  2, who is the "we" in the "we determined"?
4     A.   The Governance and Management Committee.
5     Q.   And with respect to paragraph 3, who is
6  the "we" in "we are submitting"?
7     A.   Governance and Management Committee.
8     Q.   Can you point to anywhere in the minutes
9  of the GMC meetings we have gone through so far
10  where the GMC approved of the -- well, let me ask you
11  this first.  Was a coach selection criteria attached
12  to this document, as far as you know?
13     A.   I don't know.
14     Q.   Paragraph 3 seems to suggest that in the
15  first sentence.  Does it not?
16     A.   It suggests that.
17     Q.   Assuming that that's correct, can you
18  point to anywhere in the minutes of the GMC meetings
19  that we've already gone through where the GMC
20  actually approved as a body the coach selection
21  criteria that were being sent over to the USOC
22  Executive Committee for approval?
23     A.   None in the minutes that we have seen so
24  far.
25     Q.   Can you point to anywhere in the minutes

1  that we looked at so far where the GMC as a body
2  determined that the previous coach selection body by
3  USTU that his appointment should be vacated?
4     A.   Not in the minutes we've reviewed so
5  far.
6     Q.   Assuming that there are no such
7  minutes --
8        MR. LEVINSTEIN:  Objection.
9     Q.   BY MR. JONES:  -- assume that -- what
10  would be the basis for representing to the USOC
11  Executive Committee that the GMC as a body wished to
12  amend the criteria if it were attached to the March
13  8th memo?
14     A.   You're asking me to presume, I presume
15  we had a telephonic conference call and came to that
16  conclusion.  That's my presumption.  Other than that,
17  I don't know.
18     Q.   As you -- let me ask you about that
19  telephone conference call.  As you sit here today, do
20  you know when such a conference call was had?
21     A.   You were asking me to presume, so I was
22  presuming.
23     Q.   I see.
24     A.   So I can't answer that.
25     Q.   You have no independent memory of such a

1  conference --
2     A.   I do --
3     Q.   -- call.
4     A.   -- not.
5     Q.   Nor do you have any independent memory
6  of what the substance of that conference call was?
7     A.   I don't.
8        MR. LEVINSTEIN:  Objection.
9     Q.   BY MR. JONES:  And you're not aware of
10  any documents that memorialize what went on in such a
11  conference call?
12     A.   I do not recall.
13     Q.   And you have no such notes or minutes
14  concerning such a call in your possession?
15     A.   I do not.
16        MR. LEVINSTEIN:  For the record, he has
17  no documents in his possession.
18     Q.   BY MR. JONES:  And would it be fair to
19  state that you don't know if USTU has any documents
20  in that regard in its possession?
21     A.   I do not know.
22     Q.   You have no independent recollection of
23  a vote being taken on the proposed new team -- new
24  coach selection criteria?
25     A.   I do not recall.

1    Q.   Next exhibit, 59.

2         Have you had a chance to look at that?

3    A.   Yes.

4    Q.   Look at Exhibit 59.  Can you please

5    identify what document that is?

6    A.   Exhibit 59 are minutes for the March

7    25th, 2004, Governance and Management Committee

8    meeting.

9    Q.   Do -- did you participate in that

10   meeting?

11   A.   Yes.

12   Q.   Is the portion which is disclosed true

13   and correct as to content as to what occurred at that

14   meeting, as far as you can see?

15        MR. LEVINSTEIN:  Objection.

16        THE WITNESS:  I'm not sure about the

17   committee ratifying the appointment of Jean Lopez at

18   that point.  That may be a mistake.

19   Q.   BY MR. JONES:  Okay.  Before today, were

20   you shown any testimony taken in this case from

21   anyone else?

22   A.   No.

23   Q.   Were you advised or given summaries of

24   testimony given by other witnesses in this case

25   before today?

1    sure -- and what he did, and we redacted it for that

2    reason.

3         MR. JONES:  Okay.

4    Q.   BY MR. JONES:  Is what your counsel

5    represented correct, as far as you know?

6    A.   Yes, it is.

7    Q.   Now, turning to page 2, it's the second

8    to the last line, separate sentences.  You had some

9    possible problems with that statement.  Let me read

10   it.  "The committee ratified the appointment of Jean

11   Lopez as the Olympic coach since USTU has only one

12   coach credential."

13        What is wrong with that statement, if

14   anything?

15   A.   I think it's prior to the fight-offs and

16   the selection of the Olympic team, so I believe that

17   is a mistake.

18   Q.   Do you know who wrote these minutes?

19   A.   Virginia Witte.

20   Q.   As you sit here today, can you remember

21   any discussions about Mr. Jean Lopez at that meeting?

22   A.   I can't.  I don't recall at all.  And in

23   fact, the only thing I can recall is that perhaps

24   there are two versions of these minutes, and I don't

25   recall a version having Lopez as being selected.

1         MR. LEVINSTEIN:  Objection.  Don't

2    disclose any communication with counsel that occurred

3    for this case.  Other than communications with

4    counsel, you can answer the question.

5    Q.   BY MR. JONES:  In other words, do you

6    know what anyone else said in this case --

7    A.   I don't.

8    Q.   -- so far?

9         Did Bob Gambardella tell you what he

10   testified to when he was deposed?

11   A.   I have not spoken to Bob about his

12   deposition.

13   Q.   We'll cover the item you mentioned in a

14   second.  But first, on the redacted portion, does

15   that redacted portion cover the summary of a

16   discussion regarding another lawsuit alleging racial

17   discrimination?

18        MR. LEVINSTEIN:  I'll answer this one.

19   It was an issue about behavior of an athlete and a

20   disciplinary issue about conduct related to the

21   training center that had nothing to do with racial

22   issue or anything like that.

23        MR. JONES:  Okay.

24        MR. LEVINSTEIN:  Just talked about an

25   athlete who might have been underage even -- I'm not

1    Q.   Something in your mind makes you think

2    there were two versions of these minutes?

3    A.   Well, this is -- I think if there

4    wasn't, this is a mistake.

5    Q.   First of all, who is Jean Lopez?

6    A.   Jean Lopez, whom I've never met, is

7    a -- as I understand, a brother of Steven Lopez, an

8    athlete.

9    Q.   As you sit here today, do you recall

10   anyone up to this point of this meeting and during

11   this meeting voicing support for Jean Lopez as a new

12   Olympic coach for the 2004 Olympics?

13   A.   I do not recall that.

14   Q.   You don't recall Bob Gambardella, for

15   instance, being in support of him?

16   A.   I do not recall that.

17   Q.   And to your recollection, was Jean

18   Lopez's name even mentioned in this March 25th, 2004,

19   meeting?

20   A.   I don't know.

21   Q.   Did Juan -- who is Juan Moreno?

22   A.   Juan Moreno is an athlete and he is on

23   the Governance and Management Committee.

24   Q.   I take it you talked with him during the

25   course of these various committee meetings that we've

6/30/2005 Locke, Steven

1  just gone through the minutes for?

2      A.   From time to time, yes.

3      Q.   Is it correct that he's the only one

4  with a actual taekwondo background at the competitive

5  level?

6      A.   He is the only one with the actual

7  competitive background, and he is the athlete

8  selection for the committee to meet our 20 percent

9  requirement.

10     Q.   As you sit here today, can you remember

11 Juan Moreno ever mentioning Jean Lopez's name up to

12 the point of this March 25th --

13     A.   I do not --

14     Q.   -- meeting?

15     A.   -- recall.

16     Q.   Did Juan Moreno ever mention that both

17 Steven Lopez and Jean Lopez had been approaching him

18 asking to be selected as -- for Jean to be selected

19 as the new coach?

20     A.   I don't recall that.

21     Q.   You would agree with me that as of March

22 25, at least, Mr. Dae Sung Lee was still the

23 appointed coach of the USTU for the Olympic team

24 coach position.

25     A.   I don't recall when we received the

61

6/30/2005 Locke, Steven

1  information back from the USOC Executive Committee,

2  so I cannot answer that.

3      Q.   Would it be fair to say, though, that he

4  was still the coach until the USOC removed him?

5      A.   Yes.

6      Q.   Would you agree with me that

7  ratification of Jean Lopez as the new Olympic coach

8  on March 25th would have been inappropriate for the

9  GMC?

10     A.   As the Olympic athletes had not been

11 selected, yes, I would agree with that.

12     Q.   Would you also agree if the new

13 coaching -- coach selection criteria had not yet been

14 approved by the USOC, it would be inappropriate for

15 the GMC to ratify his name?

16     MR. LEVINSTEIN:  Objection.

17     THE WITNESS:  I don't know when USOC

18 responded, so I can't answer.

19     Q.   BY MR. JONES:  If we -- if we assume

20 that the new criteria had not been approved yet,

21 wouldn't it be jumping the gun to go ahead and select

22 the coach?

23     A.   I think that's speculative and I don't

24 want to deal with assumptions like that.

25     Q.   So you don't know?

62

6/30/2005 Locke, Steven

1      A.   I don't know.

2      Q.   Had Mr. Jean Lopez ever corresponded

3  with you up to this point, being March 25th?

4      A.   I had never corresponded with Jean Lopez

5  nor have I ever met him.

6      MR. JONES:  This is going to be a new

7  exhibit.  I'm sorry I only have one copy of it.  Why

8  don't you look at it first, counsel, then we'll put a

9  sticker on it.

10     MR. LEVINSTEIN:  Do you have a number on

11 it?

12     MR. JONES:  Yeah.  I guess it would be

13 145.

14     (Exhibit No. 145 was marked for

15 identification by the court reporter.)

16     MR. LEVINSTEIN:  Did you don't think we've

17 had some other exhibits with that number?

18     MR. JONES:  These are supposed to be all

19 of them so far.

20     MR. LEVINSTEIN:  Of the ones she had in

21 Colorado.

22     MR. JONES:  You started new numbers, 1,

23 2, 3, something.

24     MR. LEVINSTEIN:  Okay.  I don't know.  I

25 just don't know.  She only did the ones that took

63

6/30/2005 Locke, Steven

1  place in Colorado.  Just for the record, the document

2  includes a transmittal to our firm on April 20th of

3  2005.  I just don't want him to be confused --

4      MR. JONES:  I understand.

5      MR. LEVINSTEIN:  -- about that date.

6      MR. JONES:  I was going to focus on

7  another part.

8      MR. LEVINSTEIN:  Below, the fact that it

9  was sent to our firm on that day.  I mean --

10     Q.   BY MR. JONES:  Please go ahead and read

11 the whole thing.

12     You've had a chance to look at 145?

13     A.   Yes.

14     Q.   Focusing on paragraphs 2 through the

15 bottom of the page, do you recall ever seeing this

16 document before?

17     A.   I don't recall.  Doesn't mean I didn't.

18     Q.   It purports to be an e-mail?

19     A.   Yes, it purports to be an e-mail.  This

20 is a document I may have not received simply because

21 my e-mail address is not accurate there.  It's at

22 MSN, and that's a former address I had, and I'm at

23 Yahoo.com now.

24     Q.   So you don't know if --

25     A.   I don't know if I ever received that or

64

1   not. That may be -- she may have been using an old
2   e-mail address at that point.
3        Q.   The e-mail states that it is from
4   Virginia Witte. Is that correct?
5        A.   That's right.
6        Q.   It states that it was sent Monday, March
7   29, 2004. Is that correct?
8        A.   It does.
9        Q.   And it -- besides listing your e-mail
10  address on there, which might be erroneous, it lists
11  a list of other people, Rich Bender, Mr. Baggiano,
12  Juan Moreno, and Mr. Gambardella and CC to others as
13  well. Is that correct?
14       A.   Yes.
15       Q.   It also purports to say, "See attached
16  for the draft minutes from March 25. Next conference
17  call is April 8." Is that correct?
18       A.   It says that.
19       Q.   The conference call would generally be
20  referring to, what, a GMC meeting?
21       A.   It would refer to a telephonic
22  conference call we had with the Governance and
23  Management Committee.
24       Q.   Now, it purports to attach the draft
25  minutes for the March 25 GMC meeting, which we have

65

1   else.
2        Q.   BY MR. JONES: Showing you Exhibit 146,
3   have you seen that before?
4        A.   I do not recall, and then reminding you,
5   too, that this e-mail address is obsolete.
6        Q.   You say "obsolete." It used to be your
7   address?
8        A.   Yes.
9        Q.   But changed it?
10       A.   Yes.
11       Q.   You don't remember when you changed it?
12       A.   No.
13       Q.   Do you remember seeing it as you sit
14  here today, though?
15       A.   I don't.
16       Q.   After you became a GMC member, did you
17  have regular meetings with Mr. Gambardella to discuss
18  USTU business outside of the formal committee
19  meetings which we've gone over in the minutes?
20       A.   Yes.
21       Q.   Would it be on any particular schedule
22  such as, you know, daily? Weekly?
23       A.   No.
24       Q.   As needed?
25       A.   As needed. Periodic.

67

1   just gone over as Exhibit 59. Is that right?
2            MR. LEVINSTEIN: Objection. You don't
3   know what version of the minutes --
4            THE WITNESS: Exactly.
5            MR. LEVINSTEIN: -- it is.
6            THE WITNESS: Purports that, yes.
7        Q.   BY MR. JONES: As you sit here today, do
8   you know whether you got Exhibit 59 by e-mail on or
9   about March 29 from Ms. Witte?
10       A.   I do not know as my e-mail address at
11  that point may have been obsolete.
12       Q.   Okay.
13           MR. LEVINSTEIN: And he doesn't know if
14  Exhibit 59 was attached.
15           MR. JONES: All right.
16       Q.   BY MR. JONES: Did you ever -- as you
17  sit here today, do you remember making any changes to
18  Exhibit 59 on March 29, which was four days after
19  this March 25th meeting, or at anytime after?
20       A.   I do not.
21           MR. JONES: Okay. Showing you another
22  new exhibit. I don't have an additional copy of it.
23           (Exhibit No. 146 was marked for
24  identification by the court reporter.)
25           MR. JONES: Let's show it to everybody

66

1        Q.   In the early days -- let's just take the
2   first couple of months -- as you sit here today, do
3   you think you met with him more than once a week?
4        A.   I suspect so.
5        Q.   Where physically is your office in
6   relation to his office at that time?
7        A.   My office is in my home, and we would
8   always meet in his office.
9        Q.   At the --
10       A.   At the --
11       Q.   -- USOC?
12       A.   -- USOC.
13       Q.   So you'd have to drive down to have a
14  meeting then?
15       A.   Yes.
16       Q.   And I'm sorry. Your response was to
17  your recollection you were seeing each other once a
18  week or no?
19       A.   Well, in the early -- you asked --
20       Q.   Yeah.
21       A.   -- in the early time.
22       Q.   Yes.
23       A.   And I suspected more than once a week.
24       Q.   More than twice a week, you think?
25       A.   Twice a week. I'd go for that.

68

1     Q.   When he received relevant correspondence

2  or documents from any party, was it his practice to

3  share documents with you to get your ideas?

4         MR. LEVINSTEIN:  Objection.

5         MR. JONES:  If you know.

6         MR. LEVINSTEIN:  Vague and ambiguous.

7         THE WITNESS:  Well, I don't know.  My

8  principal concern was that of financial and policy

9  concerns.

10        Q.   BY MR. JONES:  He did share

11 correspondence that had been received by you at

12 times, though?

13        A.   From time to time.

14        MR. LEVINSTEIN:  Objection.  Just so you

15 know, your question was:  "He shared correspondence

16 that had been received by you at times."

17        MR. JONES:  I'm sorry.  If I said that,

18 I meant received by him.

19        THE WITNESS:  From time to time.

20        Q.   BY MR. JONES:  Did you ever receive

21 correspondence directly from other parties regarding

22 USTU business during the early months?

23        A.   From time to time.

24        Q.   And was it your practice to share such

25 correspondence with him if you felt it was relevant

69

1         MR. JONES:  Uh-huh.

2         MR. LEVINSTEIN:  At the top, it was

3  dated April 8th, but on the second page it talks

4  about what the USOC Executive Committee did on April

5  12th.

6         MR. JONES:  Good point.

7         MR. LEVINSTEIN:  And if it wasn't

8  faxed -- or at least the fax top line says it was

9  faxed on April 14th.

10        MR. JONES:  Okay.

11        THE WITNESS:  I'm ready.

12        Q.   BY MR. JONES:  What is that document, if

13 you know?

14        A.   The document is a letter sent to Dae

15 Sung Lee from Bob Gambardella having to do with

16 Olympic selection procedures for coaches for the 2004

17 Olympic Games.

18        Q.   It is dated April 8th, 2004?

19        A.   It is dated April 8th on the document.

20        Q.   And your --

21        MR. LEVINSTEIN:  For the record, the one

22 he's looking at is different than the one you gave

23 me.  It's got handwritten notes on it.  It says

24 registered mail on the 18th as well.

25        MR. JONES:  Okay.

71

1  to do so?

2         A.   Yes.

3         Q.   Next exhibit, Exhibit 10.

4         (Mr. Jones gives Exhibit 10 to Mr.

5  Levinstein.)

6         MR. LEVINSTEIN:  Thank you.

7         MR. JONES:  If you could go ahead and

8  read that --

9         THE WITNESS:  Oh, I'm sorry.

10        MR. JONES:  -- please.  That's all

11 right.

12        MR. LEVINSTEIN:  Can I see Exhibit 146

13 for just one second?

14        Q.   BY MR. JONES:  Have you had a chance to

15 look at that one?

16        A.   I'm still reading.

17        Q.   Okay.

18        MR. LEVINSTEIN:  For the record, this is

19 the one with the wrong date because the letter talks

20 about something that happened April 12th and the

21 letter is dated April 8th, so it could be confusing.

22        MR. JONES:  Okay.  Why don't you go

23 ahead and correct what you think.

24        MR. LEVINSTEIN:  The letter says April

25 8th on it.

70

1         MR. LEVINSTEIN:  Just so what you're

2  looking at is not the same as what he's looking at.

3         MR. JONES:  All right.  Except for the

4  scratching on there.

5         MR. LEVINSTEIN:  Let me just look to see

6  if there's anything different.  That's all I see

7  right now.  I just thought you should know that.

8         MR. JONES:  Why don't we -- that one is

9  the one that was produced before.  Okay.  With that

10 change, it's Exhibit 10, except for the scratchings

11 is the one I gave counsel.

12        MR. LEVINSTEIN:  No.  It is Exhibit 10.

13        MR. JONES:  No.  I know.

14        MR. LEVINSTEIN:  Okay.

15        MR. JONES:  All right.

16        MR. LEVINSTEIN:  Sorry.

17        Q.   BY MR. JONES:  Counsel brought up the

18 date of the document.  First of all, do you know who

19 wrote this?

20        A.   I do not.

21        Q.   And it is courtesy copied to Governance

22 and Management Committee.

23        A.   Yes.

24        Q.   There were -- there have been other

25 documents that were courtesy copied to the Governance

72

1  and Management Committee.  As far as you know, does
2  that mean each person on the committee got one?
3       A.    Typically.
4       Q.    And as far as you know, did you get one?
5       A.    Insofar as I know.
6       Q.    Do you remember seeing this before?
7       A.    Vaguely.
8       Q.    Was it Mr. Gambardella's practice to
9  show you any of his correspondence in draft form
10 before it went out to a third party?
11      A.    In some cases.
12      Q.    As you sit here today, do you remember
13 him doing that with respect to this letter?
14      A.    I do not recall.
15      Q.    After reviewing the contents of it, do
16 you agree with the contents as -- as it is contained?
17      A.    With the exception of the dates.
18      Q.    Okay.  If you could change the date,
19 what would it be?
20            MR. LEVINSTEIN:  Objection.
21            THE WITNESS:  I do not know.
22      Q.    BY MR. JONES:  Had you seen the
23 attachment before?
24      A.    I don't know.
25      Q.    Had you seen the attachment before April

73

1  8?
2       A.    Well, I answered prior that I didn't
3  know if I had seen the attachment, so I don't know.
4       Q.    The attachment, for the record, is
5  entitled "Selection Procedures For Coaches" and
6  purports to be a new coach selection criteria.  Is
7  that right?
8       A.    That's right.
9       Q.    Now, it states in the letter, I believe,
10 that on April 12, 2004, the USOC Executive Committee
11 took certain action and vacated the previous coach
12 and staff selection and approved the new selection
13 criteria.  Is that more or less correct?
14      A.    Yes.
15      Q.    Do you know if April 12 is when that
16 happened?
17      A.    I do not know.
18      Q.    You learned at some point that that
19 happened.
20      A.    Yes.
21      Q.    And as you sit here today, you don't
22 know when that was?
23      A.    I do not.
24      Q.    Next exhibit, 11.
25            (Mr. Jones gives Exhibit 11 to Mr.

74

1  Levinstein.)
2            MR. LEVINSTEIN:  Thank you.
3            (A discussion was held off the record
4  between Mr. Johansen and Mr. Levinstein.)
5            THE WITNESS:  Two more paragraphs.
6            Okay.
7       Q.    BY MR. JONES:  Have you had a chance to
8  look at Exhibit 11?
9       A.    Yes.
10      Q.    Have you ever seen that exhibit before?
11      A.    I vaguely recall.
12      Q.    It's a letter dated June 2nd, 2004,
13 addressed to Bob Gambardella from Dae Sung Lee?
14      A.    Yes.
15      Q.    And it is courtesy copied to the
16 Governance Committee.  Is that correct?
17      A.    Yes.
18      Q.    At least that's what it says.
19      A.    Yes.
20      Q.    Was it ever discussed with Mr. Bob
21 Gambardella upon receipt?
22            MR. LEVINSTEIN:  By whom?
23            MR. JONES:  By you.
24            THE WITNESS:  I do not recall discussing
25 this letter.

75

1       Q.    BY MR. JONES:  To your knowledge, was it
2  ever discussed with -- was this letter ever discussed
3  in any meeting?
4       A.    Insofar as I know, I don't recall this
5  letter being discussed.
6       Q.    Exhibit 61 and this group of e-mails.
7            (Mr. Jones gives Exhibit 61 to Mr.
8  Levinstein.)
9            MR. LEVINSTEIN:  Thank you.
10           THE WITNESS:  Okay.
11      Q.    BY MR. JONES:  I don't want you to
12 identify each individual e-mail, but is it correct
13 that there are a group of e-mails going back and
14 forth between Mr. Gambardella and members of the GMC
15 regarding the Olympic coach nomination process?
16      A.    Yes.
17      Q.    Just want you to focus on one page, page
18 3 -- marked as USTU 00014.
19            MR. LEVINSTEIN:  They go backwards in
20 number.
21      Q.    BY MR. JONES:  In the middle of the page
22 there -- well, first of all, focusing on the contents
23 between the two kind of lines, what is that e-mail?
24      A.    It is an e-mail sent to the committee
25 plus Bob.

76

6/30/2005 Locke, Steven

1    Q.    And it's dated June 7th, 2004?

2    A.    Yes.

3    Q.    And what e-mail address is being used

4  there?

5    A.    It's an MSN address.

6    Q.    Is that the new one or the obsolete one?

7    A.    That's the -- that's the one that's no

8  longer used.

9    Q.    So as of June 7, 2004, does that refresh

10 you at least --

11   A.    Apparently, I was still using it at that

12 point.

13   Q.    So with respect to the earlier e-mail I

14 showed you from Ms. Witte to that address which

15 allegedly attached minutes of the March GMC meeting,

16 at least the address was right.

17   A.    Sure.

18   Q.    And I understand your testimony is that

19 you're not sure whether you got it.  But if that

20 address is correct, more likely than not did you get

21 it?

22   A.    I assume I would have received it.

23   Q.    Just going down a ways -- well, the top

24 is -- the salutation says it's directed to Juan,

25 Virginia, Rich, and Tony from you.  Is that right?

6/30/2005 Locke, Steven

1    A.    True.

2    Q.    The very last sentence says, "Should we

3  wait until the final fight-off to see who is

4  determined to be on the team?" question mark.  Why

5  was that question asked?

6    A.    Bearing in mind that I am doing this as

7  a volunteer and I'm engaged more in the financial and

8  policy issues, I wasn't up to date on day-to-day

9  happenings.  So this was a question.  And as it

10 turned out, the final audit had taken place the prior

11 weekend.  I didn't know that.

12   Q.    Okay.  And is it correct that you didn't

13 know at that point whether it would be correct --

14 whether it would be consistent with the new coach

15 selection criteria to vote before the final fight-off

16 was had?

17   A.    Just asking a question, this is a

18 day-to-day activity, and I was involved in policy

19 issues.

20   Q.    But the answer is you don't know whether

21 it was appropriate to vote at that point in time if

22 the final fight-off had not been -- had -- knowing

23 what you knew about the new coach selection criteria?

24   A.    Again, we were -- I was involved

25 specifically with policy and financial issues, and

6/30/2005 Locke, Steven

1  this -- this detail escapes me.  So I was asking a

2  question.

3    Q.    Exhibit 63.

4    (Mr. Jones gives Exhibit 63 to Mr.

5  Levinstein.)

6    MR. LEVINSTEIN:  Thank you.

7    MR. JONES:  Before I ask any more

8  questions, let's go ahead and take another break.

9    (Recess taken from 11:08 a.m. to

10 11:12 a.m.)

11   Q.    BY MR. JONES:  Did you have a chance to

12 look at Exhibit 63 yet?

13   MR. LEVINSTEIN:  No, I haven't.

14   THE WITNESS:  I have.

15   Q.    BY MR. JONES:  What is Exhibit 63?

16   A.    It is the set of minutes from the

17 Governance and Management Committee from July 1st,

18 2004.

19   Q.    I'm sorry.  Is that a two-page document

20 that you have?  Yeah.

21   Q.    Did you participate in the July 1, 2004,

22 GMC meeting that this refers to?

23   A.    I did.

24   Q.    Does it appear to be true and correct as

25 to contents, as far as you know?

6/30/2005 Locke, Steven

1    A.    Insofar as I can tell.

2    Q.    Paragraph -- well, last paragraph on the

3  first page refers to a woman named Nia Abdullah, an

4  Olympic athlete.  Do you know who she is?

5    A.    I do.

6    Q.    Have you met her before?

7    A.    I have.

8    Q.    Under what circumstances?

9    A.    Typically, at competitions.

10   Q.    So you attended some competitions and

11 saw her compete?

12   A.    Yes.

13   Q.    Other than what's stated in this

14 paragraph here about Ms. Abdullah, do you know what

15 the circumstances were that triggered this

16 discussion; what had happened before this meeting

17 that -- that brought up this discussion about her in

18 competition?

19   A.    Vaguely.

20   Q.    Give us your best --

21   A.    My best, vague recollection?

22   Q.    Yes.

23   A.    There were issues that she wanted her

24 coach to be there.  I think there were some issue or

25 pressure from her parents insofar was that concerned

1  and what we tried to do is accommodate.
2       Q.  As far as you know, did Ms. Abdullah
3  have some concerns about Jean Lopez being her coach?
4       A.  I wasn't aware of the concerns.
5       Q.  So then other than what you've stated,
6  you don't know precisely what the nature of Ms.
7  Abdullah's concerns were?
8       A.  I know that there -- as I mentioned
9  earlier, I have vague recollections of this.
10       Q.  Are you aware that she and -- or were
11  you aware at that time that she and Jean Lopez's
12  sister had faced each other in a critical competition
13  for the U.S. team position?
14       A.  Yes.
15       Q.  And that Ms. Abdullah had won?
16       A.  Yes.
17       Q.  And that it was a particularly tough
18  fight?
19       MR. LEVINSTEIN:  Objection.
20       THE WITNESS:  I didn't know that.
21       Q.  BY MR. JONES:  Were you aware that as of
22  this meeting that if something happened to Ms.
23  Abdullah that Jean Lopez's sister was first
24  runner-up?
25       A.  I wasn't aware of the step process.

81

1  coach.  Nothing about concerns about the head coach.
2       THE WITNESS:  Your question again?
3       Q.  BY MR. JONES:  This situation that Nia
4  had, wanting her own coach, instead having to have
5  Jean Lopez, whom she had concerns about, demonstrates
6  one of the weaknesses with the new coach selection
7  criteria.
8       MR. LEVINSTEIN:  Objection.
9       THE WITNESS:  I really can't answer
10  that.  I think all criteria -- well, I can't answer
11  that.  I don't know.
12       Q.  BY MR. JONES:  And according to this,
13  the GMC reacted by trying to make the best of the
14  situation --
15       MR. LEVINSTEIN:  Objection.
16       Q.  BY MR. JONES:  -- and looking into
17  sending Chul Ho Kim along?
18       MR. LEVINSTEIN:  Objection.  Compound
19  question.
20       Q.  BY MR. JONES:  Is that fair?
21       MR. LEVINSTEIN:  Objection.
22       THE WITNESS:  The GMC wanted to
23  accommodate Nia to help her perform well.
24       Q.  BY MR. JONES:  It did not have to do
25  that.

83

1       Q.  Under the -- well, at this point in
2  time, being July 1, you understood Jean -- pardon
3  me -- Jean Lopez to be the new U.S. team coach.
4       A.  Yes.
5       Q.  And you understood that he had been
6  selected under the new criteria.
7       A.  Yes.
8       Q.  And you understood that under these new
9  criteria someone like Nia, regardless of whatever
10  problems she had, had to have Jean Lopez as her head
11  coach.
12       A.  The criteria were straightforward and
13  objective and measurable.
14       Q.  But the answer is yes, that --
15       A.  Oh, yes, because of the adherence to the
16  criteria.
17       Q.  And as you sit here today, you don't
18  know who wrote those criteria?
19       A.  I do not.
20       Q.  This -- this situation with Nia having
21  concerns about her head coach demonstrates, does it
22  not, one of the weaknesses with the new coach
23  selection criteria?
24       MR. LEVINSTEIN:  Objection.  Misstates
25  what he said about her concerns.  She wanted her own

82

1       A.  No.
2       Q.  Under the new coach selection criteria,
3  did not have to do that.
4       A.  Did not have to.
5       Q.  But it did that to accommodate her.
6       A.  It did that to accommodate at least in
7  her training needs.
8       Q.  Because there was a concern that if they
9  did not then she might not perform as well.  Is that true?
10       A.  I think it's fair to say that when you
11  deal with athletes, you try to make them as
12  psychology -- psychologically stable as possible, and
13  it would be a benefit to her.
14       Q.  And in doing so, the GMC decided to
15  spend money that it did not have to spend to send
16  Chul Ho Kim along to Athens.  Is that true?
17       A.  It was non -- a nonbudgeted expense,
18  yes.
19       Q.  Okay.  But it was also understood that
20  he would have no coaching credential and, therefore,
21  could not sit with her during the competition.  Is
22  that true?
23       A.  That is true.
24       Q.  Exhibit 73.
25       A.  Okay.

84

1    Q.   What is Exhibit 73?

2    A.   That is an e-mail that I sent to Nia

3    concerning the provision of her coach, certain --

4    certain opportunities to attend the games in -- in

5    Athens.

6    Q.   You basically summarized what the -- the

7    decision that the GMC made on that very same day, on

8    July 1,

9    A.   Yes.

10    Q.   Is that correct?

11    A.   That's true,

12    Q.   And so no time was wasted in attempting

13    to put Nia Abdullah at ease.

14    A.   The attempt was -- yes, that's right.

15    Q.   Next exhibit, 62.

16    A.   Okay.

17    Q.   You've had a chance to look at that

18    exhibit?

19    A.   Yes.

20    Q.   Have you ever seen it before?

21    A.   I have not seen this letter.

22    Q.   Did -- during this first three -- three

23    or four months, say, up through July of 2004, in your

24    work as the GMC chair --

25         MR. LEVINSTEIN:  Objection.  He started

85

1    It could be just an operational day-to-day

2    requirement.  I do know that there are extenuating

3    circumstances from time to time that those time

4    frames are met.

5    Q.   You've heard of the proposition that

6    you're supposed to try and get those coach selection

7    criteria in at least a year in advance of the games?

8    A.   Sometimes difficult to do.

9    Q.   But you had heard something like that in

10    your work with the --

11    A.   Sure.

12    Q.   -- either the USOC or with USTU?

13    Did you hear about that the first time

14    at USTU or before?

15    A.   I suspect before my involvement with USA

16    Taekwondo.

17    Q.   And can you remember any particular

18    NGB's or situation you were thinking about when you

19    said extenuating circumstances sometimes require

20    exceptions?

21    A.   I think it's difficult for many NGB's to

22    meet that 12-month requirement because of the

23    selection of teams and coaches then follow.

24    Q.   Do you know of any other NGB's that have

25    a coach selection criteria like the one that the GMC

87

1    in February, so we've got --

2         MR. JONES:  February, March, April.

3    Okay.  Let's say February through July.

4    Q.   BY MR. JONES:  Were you aware of what

5    the USOC bylaws said about when coach selection

6    criteria needed to be submitted to the U.S. Olympic

7    Committee?

8    A.   I am vaguely aware of those

9    requirements, but I do know that from time to time

10    there are extenuating circumstances.

11         MR. LEVINSTEIN:  Objection.  For the

12    record, there's nothing about the USOC bylaws in this

13    sentence.  It's misleading the witness to say that

14    there is, but you can keep asking him questions.

15         MR. JONES:  I'm not asking him about

16    this exhibit.

17         MR. LEVINSTEIN:  USOC bylaws, it's

18    suggesting there are things in the bylaws that has

19    never been established, so -- we've been through this

20    before.

21    Q.   BY MR. JONES:  Mr. Locke, tell me what

22    you know generally about the USOC bylaw requirements

23    with respect to passing new coach selection criteria.

24    A.   I don't know if it's a bylaw

25    requirement.  I think it's an indication on the form.

86

1    passed in 2004?

2    A.   I do not.

3    Q.   In other words, based on identity of the

4    team selected.

5    A.   Based upon I haven't seen the other

6    selection criteria.

7    Q.   You'd agree with me that if a coach

8    selection criteria is based upon picking the team

9    first that it's -- it's very difficult to comply with

10    the one-year requirement, if not impossible.

11    A.   It's dependent upon the sport.

12    Q.   But for those sports that for the

13    selection process goes right up until, say, six

14    months before the games that it would be impossible.

15         MR. LEVINSTEIN:  What would be

16    impossible?

17         MR. JONES:  Select the coach.

18         THE WITNESS:  You know, it's -- the

19    sports are so different in practically all of the

20    components.  I wouldn't want to say just broad brush

21    agree with you.

22         MR. JONES:  Okay.

23         THE WITNESS:  So I'd just say I don't

24    know.

25         MR. JONES:  All right.  Exhibit 13.

88

6/30/2005 Locke, Steven

1    (Mr. Jones gives Exhibit 13 to Mr.
2  Levinstein.)
3    THE WITNESS:  I'm not sure I have a 13
4  in this book.  It's not labeled anywhere.  Goes from
5  11 to 22.
6    MR. JONES:  I will then mark it.
7    MR. LEVINSTEIN:  I'll give it to him.
8    MR. JONES:  Okay.
9    MR. LEVINSTEIN:  Do you want to give it
10  another number or --
11    MR. JONES:  No.  It's another 13.
12    Q.  BY MR. JONES:  Have you had a chance to
13  look at Exhibit 13?
14    A.  Yes.
15    Q.  Have you ever seen that document before?
16    A.  I do not recall seeing this -- this
17  letter.
18    Q.  Purports to be a letter from Robert
19  Gambardella to me dated July 21, 2004.  Does it not?
20    A.  It does.
21    Q.  And I take it your testimony is that you
22  did not see it before it went out.
23    A.  I do not recall seeing this letter.
24    Q.  In fact, you don't recall seeing it at
25  all.  It states in there that Jean Lopez was not

89

6/30/2005 Locke, Steven

1  approved till July 19, 2004.  As you sit here today,
2  you don't know whether that's true or not?
3    A.  That -- as I've not seen this letter
4  before, I don't know.
5    Q.  And independently, you don't recall the
6  date?
7    A.  I don't know the date that the USOC gave
8  final approval.
9    Q.  And I take it you also don't know who
10  wrote this letter?
11    A.  I do not.
12    Q.  Okay.  One other thing, he states in
13  paragraph 3 that you wrote a letter on April 8, 2004,
14  to Mr. Lee stating that the USOC Delegation Review
15  Committee recommended to the USOC Executive Committee
16  that the selection procedures for -- I guess the
17  prior selection procedures for coach be withdrawn and
18  replaced.  And then he says, "The USOC committee
19  approved the Delegation Review Committee's
20  recommendation and also vacated the previous
21  appointments."
22    Do you know if that's a true statement?
23    A.  I do not know.  I'm not familiar with
24  this letter nor the dates.
25    Q.  And you're not familiar -- what is the

90

6/30/2005 Locke, Steven

1  USOC Delegation Review Committee?
2    A.  I don't know.
3    Q.  So you don't know whether they had any
4  role in this coach selection process that we've been
5  going over?
6    A.  I just -- I don't know what the function
7  of -- I'm not saying the committee doesn't exist.  I
8  presume it does.  I just don't know of it.
9    Q.  So as you sit here today, you don't know
10  whether it's a true statement or not Mr. Gambardella
11  made to Mr. Lee.  You don't have any personal
12  knowledge.
13    A.  I do not have any personal knowledge.
14    Q.  In your various contacts with Mr. Bob
15  Gambardella, have you ever heard him say anything
16  racially insensitive about Koreans or
17  Korean-Americans?
18    A.  No.
19    Q.  Have you ever said -- have you heard him
20  say that he wanted to remove Korean-Americans from
21  USTU?
22    A.  No.
23    Q.  Ever observe any action by him in your
24  assessment appeared to be aimed at Koreans or
25  Korean-Americans within the USTU organization?

91

6/30/2005 Locke, Steven

1    A.  No.
2    Q.  Ever heard any member of the new
3  governing body of GMC voice a desire to remove
4  Koreans from positions of authority from USTU?
5    A.  No.
6    Q.  Are you aware that sometime after the
7  2004 Olympics that Chul Ho Kim was fired from his
8  position at the Olympic Training Center?
9    MR. LEVINSTEIN:  Objection.
10    THE WITNESS:  He was not fired.
11    MR. JONES:  Let me --
12    THE WITNESS:  The position ceased to --
13    MR. JONES:  Go ahead.
14    THE WITNESS:  -- exist.
15    Q.  BY MR. JONES:  The position ceased to
16  exist.  Was it phrased that his contract would not be
17  renewed, words to that effect?
18    A.  I don't know what the phrase was.  Just
19  that the -- the position ceased to exist.
20    Q.  Would you term it a layoff?
21    MR. LEVINSTEIN:  Objection.
22    THE WITNESS:  I'd say the position
23  ceased to exist because the program ceased to exist.
24    Q.  BY MR. JONES:  The Olympic Training
25  Center program?

92

**Page 93**

1    A.  The resident team program.
2    Q.  Resident team program.  Why did the
3 resident team program cease to exist, if you know?
4    A.  In my vague recollections -- I'll give
5 you a little bit of -- not a lecture, but
6 dissertation.  But every -- every NGB has to have a
7 high performance plan.  High performance plan is all
8 about developing the highest levels of performance
9 from grass roots all the way up to the upper levels.
10 Filling the pipelines.  USA Taekwondo had no high
11 performance plan whatsoever, which was really a
12 prerequisite to having a resident team program.
13 Having a resident team program without any semblance
14 of a high performance plan didn't make any sense.
15    As a result, it was terminated, and we
16 went through the process of creating a high
17 performance plan to begin the process of creating
18 what made some sense logically in developing
19 athletes.
20    Q.  Would you say then in your assessment
21 that the resident program was an unsuccessful
22 program?
23    A.  We had seen no measurement of success.
24    Q.  And how would one measure success?
25    A.  I think one measures success on

**Page 94**

1 performance.
2    Q.  And what does that mean exactly,
3 "performance"?
4    A.  Well, it's having to do with
5 improvement, winning of medals, winning of placements
6 in competitions.
7    Q.  As you sit here today, do you know how
8 many athletes came out of the resident program who
9 won medals?
10    A.  I cannot give you that kind of a -- I
11 don't know.
12    Q.  And did you know at the time that the
13 resident program was terminated how many athletes
14 came out of the resident program who had won medals
15 at the Olympics?
16    A.  I don't know.
17    Q.  Same question for the world competition.
18    A.  I don't know any of those questions.
19    Q.  Same for the Pan Am games?
20    A.  Right.
21    Q.  So if medals is a measure, you do not
22 know whether the prior resident program was
23 successful or not then.
24    A.  I do know that it is one component of a
25 high performance plan and going from the grass roots

**Page 95**

1 on up and filling pipelines to get into the level
2 where a resident program would be in place.
3    Q.  You state that you were primarily
4 focused on the financial concerns at USTU when you
5 came on board.  Is that right?
6        MR. LEVINSTEIN:  Objection.
7    BY MR. JONES:  Is that true or false?
8    A.  I focused a lot of the energy, our
9 energy on financial issues.
10    Q.  Do you know whether the residents --
11 resident program was profitable or not?
12    A.  You mean revenue stream?
13    Q.  Yes.
14    A.  I'm not sure if I understand the
15 relevance.
16    Q.  You don't understand the relevance of
17 profitability?
18    A.  Well, I certainly understand that, but
19 I'm not sure if I understand the relevance of --
20    Q.  I'm just asking if you knew whether it
21 was profitable or not.  If you don't know, you can
22 say so.
23    A.  Yeah.  I don't know.
24    Q.  Do you know if any of the programs at
25 USTU in effect when you came on board were

**Page 96**

1 profitable?
2        MR. LEVINSTEIN:  Objection.
3        THE WITNESS:  I knew of the
4 certification programs being somewhat profitable.
5    Q.  BY MR. JONES:  Certification of black
6 belts?
7    A.  Yes.
8    Q.  You believe that to be profitable?
9    A.  Somewhat profitable.
10    Q.  That was a -- a program to certify black
11 belts by the USTU.  Is that correct?
12    A.  There are two aspects.  One was the
13 certification coming out of USA Taekwondo plus the
14 Kukkiwan certifications in which there was a revenue
15 share.
16    Q.  Which one are we talking about that was
17 profitable?
18    A.  I think --
19    Q.  Was it both?
20    A.  I think both were.
21    Q.  Just focusing on the USTU side of it,
22 was that side continued?
23    A.  Yes.
24    Q.  Okay.  Because we had some testimony
25 that Mr. Gambardella suspended the program.

```
1       A.   Not to my knowledge.
2       Q.   So to your knowledge, the program's
3   still going on and creating a revenue stream?
4       A.   Yes, insofar as I know.
5       Q.   And your testimony is you don't know
6   whether the residents program was profitable or not
7   in the past.  Is that correct?
8       A.   Profitable would be -- I'm not quite
9   sure how it would be profitable.  How is it
10  profitable?
11      Q.   Well, defined profit is the incomes are
12  greater than the expenses.
13      A.   I understand that, but why -- how was
14  this profitable?
15           MR. LEVINSTEIN:  I think his question
16  is:  What revenue did the athletes generate?
17      Q.   BY MR. JONES:  My understanding is there
18  was revenues being created by the Olympic Training
19  Center.
20      A.   You mean --
21      Q.   People paying --
22      A.   Grant money coming in?
23      Q.   No.  People paying to participate.
24      A.   In competitions here?
25      Q.   No, at the -- for the training.  Paying
```

```
1   for the training.
2       A.   On the resident team?
3       Q.   I'm not sure.
4       A.   I'm not sure either.  I'm not sure if
5   you're sure.  This is all knew to me.  I -- I -- I
6   think you have to research that one more thoroughly.
7       Q.   Do you know if the camps were
8   profitable?
9       A.   I don't know.
10      Q.   Do you know if they were canceled?
11      A.   I don't know if there are camps.  I'm
12  not aware of the camps.
13      Q.   Any discussion by -- between you and
14  Mr. Gambardella for Chul Ho Kim's position was phased
15  out?
16           MR. LEVINSTEIN:  Objection.
17           MR. JONES:  Whatever you want to call
18  it.
19           THE WITNESS:  Was eliminated.
20           MR. JONES:  Was eliminated.
21           THE WITNESS:  The program was
22  eliminated.  We had those discussions.
23      Q.   BY MR. JONES:  Was that discussed among
24  the GMC?
25      A.   Yes.
```

```
1       Q.   At a meeting?
2       A.   Yes.
3            MR. JONES:  Turning to another area now,
4   I'd like to take a look at Exhibit 4.  You want to
5   see Exhibit 4?  You've probably got it memorized.
6            (Mr. Jones gives Exhibit 4 to Mr.
7   Levinstein.)
8            THE WITNESS:  Okay.
9       Q.   BY MR. JONES:  Have you ever seen that
10  letter before?
11      A.   I have not.
12      Q.   Turning to Exhibit 5 --
13      A.   I have no Exhibit 5.
14           MR. LEVINSTEIN:  Yes, you do.
15           THE WITNESS:  Where is it?
16           MR. LEVINSTEIN:  You're looking at the
17  Exhibit 5.
18           THE WITNESS:  Oh, this is the wrong one?
19           MR. LEVINSTEIN:  Yeah.
20           THE WITNESS:  I'm sorry.
21           MR. JONES:  The answer is probably going
22  to be the same anyway, but --
23           THE WITNESS:  Okay.
24           MR. JONES:  Why don't you look at 4 just
25  to be sure.
```

```
1            THE WITNESS:  Okay.  I have not seen
2   this letter before.
3            MR. LEVINSTEIN:  You're now referring to
4   Exhibit 4?
5            THE WITNESS:  Yes.
6       Q.   BY MR. JONES:  So you've not seen
7   Exhibit 4 and you've already read Exhibit 5 and
8   you've not seen that one?
9       A.   I have not seen either 4 or 5.
10           MR. LEVINSTEIN:  Please take this back.
11  I don't want to carry any more copies of paper.
12      Q.   BY MR. JONES:  Have you ever heard any
13  one of the volunteers with USOC refer to management
14  at USTU as Korean mafia or words to that effect?
15      A.   No.
16           MR. LEE:  Take one quick minute.  Just
17  one minute.  I need to ask you something.
18           (Recess taken from 11:47 a.m. to
19  11:50 a.m.)
20           (Mr. Jones gives Exhibit 69 to Mr.
21  Levinstein.)
22           MR. JONES:  Do you have Exhibit 69?
23           MR. LEVINSTEIN:  He does.
24           MR. JONES:  Okay.
25      Q.   BY MR. JONES:  Have you ever seen that
```

6/30/2005 Locke, Steven

1    letter before?
2          A.   I am cc'd on it, so apparently, I have.
3          Q.   Were you -- did you see a draft of it
4    before it went out?
5          A.   I don't recall.
6          Q.   Did you -- you discussed the substance,
7    though, before it went out, I take it.
8          A.   I don't recall.
9          Q.   You testified that you and
10   Mr. Gambardella did discuss the concepts about
11   phasing out of the resident program.  It's just that
12   you don't recall whether it was before or after this
13   letter.
14         MR. LEVINSTEIN:  He didn't say that.
15         THE WITNESS:  I said -- I think I said I
16   didn't recall seeing this letter.  Or what was your
17   prior question?
18         Q.   BY MR. JONES:  With respect to September
19   8, 2004, as you sit here today, you don't know when
20   you had a discussion with --
21         A.   I do not.
22         Q.   -- Mr. Gambardella --
23         A.   I do not.
24         Q.   -- about the resident program.  Thank
25   you.

101

6/30/2005 Locke, Steven

1          MR. LEVINSTEIN:  Well, just for the
2    record, you do know that before it was phased out you
3    talked about it.
4          THE WITNESS:  Yeah.
5          MR. LEVINSTEIN:  So I just don't want
6    there to be any confusion.
7          THE WITNESS:  No.
8          MR. LEVINSTEIN:  Just the September 8th
9    date --
10         MR. JONES:  Right.
11         MR. LEVINSTEIN:  -- he doesn't have any
12   particular knowledge about.
13         Q.   BY MR. JONES:  You were not involved --
14   other than coming on as the new GMC chair, you were
15   not involved at all in the decertification process of
16   USTU?
17         A.   I was not.
18         Q.   Has USTU ever -- I should call it USA
19   Taekwondo ever discussed possibly limiting
20   memberships in that organization to U.S. citizens?
21         MR. LEVINSTEIN:  Since he became
22   involved with it?
23         MR. JONES:  Yes.
24         THE WITNESS:  To qualify, we talked
25   about limiting voting rights in the elections to U.S.

102

6/30/2005 Locke, Steven

1    citizens, but not limiting membership.
2          Q.   BY MR. JONES:  And do you remember what
3    year that was discussed?
4          (Brief interruption in the proceedings.)
5          THE WITNESS:  Sorry, guys.  I'll turn it
6    off.
7          I suspect it was this year.
8          MR. LEVINSTEIN:  2005?
9          THE WITNESS:  2005.
10         Q.   BY MR. JONES:  And what would be the
11   rationale of limiting voting rights in USA Taekwondo
12   to U.S. citizens, if you know?
13         A.   Rationale is that it's the national
14   governing body for the United States for the sport.
15         Q.   And that's it?
16         A.   Well, yes.
17         Q.   Did that proposition or concept pass
18   with the GMC?
19         A.   It's in the new set of bylaws.
20         Q.   So it hasn't been voted upon by the
21   membership yet?
22         A.   The membership has delegated that
23   responsibility to the governing body.
24         (Brief interruption in the proceedings.)
25         THE WITNESS:  I thought I turned it

103

6/30/2005 Locke, Steven

1    off.
2          (A discussion was held off the record.)
3          THE WITNESS:  It's off.  Could you ask
4    that question again, please?
5          Q.   BY MR. JONES:  Sure.  I'm just trying to
6    understand.  Is that now law at the USA Taekwondo,
7    that only members who are U.S. citizens can vote in
8    USA Taekwondo matters?
9          A.   In elections, yes.
10         Q.   It's limited to elections.
11         A.   Well, they have no voting privileges
12   other than in elections.
13         Q.   Do you know whether that might have an
14   adverse impact on Koreans or other minorities who are
15   living in the United States who are members of USA
16   Taekwondo, but not U.S. citizens?
17         MR. LEVINSTEIN:  Objection.
18         THE WITNESS:  Do I know if it will have
19   an adverse -- it's an adverse action?  No, I don't
20   know.
21         Q.   BY MR. JONES:  Would it be fair to
22   assume that those people would not be able to vote?
23         A.   If they're not U.S. citizens, no, they
24   can't vote.
25         Q.   Is that -- is that a concern?

104

1    A.   I think it's a tradition.  It's
2  traditional in any NGB that you must be a U.S.
3  citizen to vote in the U.S. -- the United States NGB
4  representing that sport.
5    Q.   Have you seen similar bylaws or
6  procedures in other NGB's you've been involved with?
7    A.   Yes.
8    Q.   Which ones?
9    A.   USA Triathlon.
10    Q.   As you sit here today, do you know who
11  brought forth that proposed rule?
12    A.   I do not recall the individual.
13    Q.   Was it someone on the GMC?
14    A.   Yes.
15    Q.   Would that be a matter of record in the
16  minutes?
17    A.   I doubt it because we had general
18  discussions on just bylaw concepts.
19    Q.   It was not you?
20    A.   It was not me.
21    Q.   Do you know if there are any employees
22  of Korean extraction at the USA Taekwondo today?
23    A.   I --
24    Q.   Staff positions?  Administrative
25  positions?

1    A.   I do not know.
2    Q.   Same question for employees at the U.S.
3  Olympic Committee.  Are you aware of any people of
4  Korean extraction that work for them?
5    A.   That, I don't know either.
6    Q.   Same question for volunteers at the
7  USOC.  Are you aware of any people of Korean
8  extraction there?
9    A.   I do not know with the possible
10  exception on staff USOC of Jay Warwick.
11    Q.   You do not know whether he's
12  Chinese-Hawaiian or some other nationality?
13    A.   I'm not sure.
14    MR. JONES:  Why don't we take a break.
15  I think I'm about done.
16    MR. LEVINSTEIN:  Okay.
17    (Recess taken from 11:58 a.m. to
18  12:03 p.m.)
19    MR. JONES:  Just a few more questions.
20    Q.   BY MR. JONES:  Clarification on this new
21  action was taken to limit the election voting to U.S.
22  citizen members of USA Taekwondo.  Correct?
23    MR. LEVINSTEIN:  Just for the record,
24  there were things like that in the old bylaws.  Just
25  in these bylaws, it's included.

1    MR. JONES:  Okay.
2    MR. LEVINSTEIN:  There were provisions
3  like that in the old, but you couldn't be on a board
4  or you couldn't do certain things if you weren't a
5  U.S. citizen.
6    MR. JONES:  Okay.
7    MR. LEVINSTEIN:  Just for the record.
8    MR. JONES:  Thank you, counsel.
9    Q.   BY MR. JONES:  Was there discussions
10  about also excluding membership to non -- non-U.S.
11  citizens leading up to the decision to focus on
12  elections, election voting?
13    A.   The election focus was the focus.
14    Q.   So it was never something on the table
15  to exclude noncitizens from membership at USA
16  Taekwondo.
17    A.   Never anything on the table.  That would
18  be foolhardy.
19    Q.   Forgive me for asking these questions.
20  Have you ever been arrested?
21    A.   Have I been arrested?  No.
22    Q.   Ever been convicted of any crimes
23  involving dishonesty?
24    A.   No.
25    MR. JONES:  I'm done.

1    MR. LEVINSTEIN:  Okay.
2    (The deposition concluded at 12:06 p.m.)

6/30/2005 Locke, Steven

1       SIGNATURE OF WITNESS

2

3       I, STEVEN MICHAEL LOCKE, the witness in the

4   above deposition, have read the within transcript of

5   my testimony.  I have made _____ changes in said

6   testimony and have stated such changes, if any, and

7   the reason for each change on a separate sheet

8   attached to this transcript.  My testimony as given

9   herein is true and correct to the best of my

10  knowledge and belief.

11

12

13     _____

       STEVEN MICHAEL LOCKE

14

15      Subscribed and sworn to before me this

16  _____ day of _____, 2005.

17

18     _____

       Notary Public

19

20  My Commission Expires:

21

22  _____

23

24

25

                                    109

6/30/2005 Locke, Steven

1       REPORTER'S CERTIFICATE

2       I, JANICE L. DOYLE, Certified Court Reporter

3   and Notary Public within Colorado, appointed to take

4   the deposition of STEVEN MICHAEL LOCKE, do certify

5   that before the deposition he was duly sworn to

6   testify to the truth; that the deposition was taken

7   by me on June 30, 2005; then reduced to typewritten

8   form consisting of 109 pages herein; that the

9   foregoing is a true and accurate transcript of the

10  questions asked, testimony given, and proceedings

11  had.

12      I further certify that I am not related to

13  any party herein or their counsel and have no

14  interest in the result of this litigation.

15      In witness hereof, I have hereunto set my

16  hand this _____ day of July, 2005.

17

18  _____

    Janice L. Doyle, Certified Court

19  Reporter and Notary Public

20

21

22

23  My Commission Expires:

24  January 6, 2007

25

                                    110