IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| DAE SUNG LEE,<br><br>          Plaintiff,<br><br>vs,<br><br>UNITED STATES TAEKWONDO UNION, a Colorado nonprofit Corporation, UNITED STATES OLYMPIC COMMITTEE, a federally chartered nonprofit corporation; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10,<br><br>          Defendants. | Civil No. 04—00461 SOM TEK<br>DECLARATION OF KELLY SKINNER |

## DECLARATION OF KELLY SKINNER
### DIRECTOR, USOC SPORT PARTNERSHIPS DIVISION

1. My name is Kelly Skinner. I am currently serving as the Director of the Sport Partnerships Division of the United States Olympic Committee ("USOC"). I have held that position since May of 2003.

2. I received a Bachelor of Arts degree in Marketing from Western Michigan University in 1991. I subsequently earned a Masters of Arts degree in Sports Administration from Central Michigan University in 2002.

3. From July 1995 to August 1997 I was employed by USA Weightlifting as its director of marketing. In August 1997 I came to work for the USOC as a coordinator in the Grants and Planning Division. In August 1998, I left the USOC to work as a Vice President of Administration and Marketing for the North



EXHIBIT "B"

American Hockey League in Northville, Michigan. I returned to the USOC in July of 1999 as a Manager of Grants and Planning. That division eventually evolved into what is now known as the USOC Sport Partnerships Division. In May 2003, my title changed to Director of Sport Partnerships.

4. The primary responsibility of the USOC Sports Partnerships Division is to serve as the main USOC contact for all of the National Governing Bodies ("NGBs"). In that role, the Division develops the partnership and funding relationships between the USOC and the NGBs. Whenever an NGB requests funding or services from the USOC, the Sports Partnerships Division evaluates that request. In addition, when problems arise in the administration of a sport, the Division is often called upon to help solve those problems because of its familiarity with the NGBs' programs, performance, funding requirements, and members. The Division works with NGBs to support United States Olympic, Paralympic, and Pan-American athletes and to improve NGB performance in athlete and coach development and selection, event production, and all other aspects of NGB sport performance.

5. As Director of the Sports Partnerships Division, I oversee the United States NGBs for the following twelve sports: Archery, Badminton, Basketball, Field Hockey, Ice Hockey, Tennis, Shooting, Speedskating, Weightlifting, Roller Sports, Squash, and Taekwondo. I have been responsible for Taekwondo since May of 2003 and have worked with the sport's NGB—the United States Taekwondo Union ("USTU")—since that time.

6. When I first took responsibility for oversight of the USTU, it was experiencing major problems. The USTU was inappropriately spending its USOC funding and was failing to fulfill its administrative obligations on even the most basic levels: athletes were not informed about event schedules, necessary paperwork was not distributed, and facilities were not properly reserved. As a result of these problems, the USOC Audit Division expanded its review of the USTU's financial issues and the USOC Membership and Credentials Committee increased its focus on the USTU's inability to comply with its responsibilities as an NGB.

7. The USTU's organizational difficulties culminated in its agreement in early 2004 to a remediation plan that was approved and implemented by the USTU Board of Directors. Pursuant to this plan, the leadership of the USTU—its officers, executive committee, and state presidents—resigned their positions. They were

replaced by a five-person Governance and Management Committee and a Chief Executive Officer.

8. The new USTU leadership's primary focus was on reforming the USTU by reinforcing the primary mission of the USOC: to support United States Olympic and Paralympic athletes in achieving sustained competitive excellence and preserve the Olympic ideals, and thereby inspire all Americans. They sought to transform the USTU from a reward-based organization to a performance-based organization with a single goal—winning Olympic medals. Indeed, the USOC is required, under the federal statute granting its authority, to obtain for the United States, directly or by delegation to the appropriate national governing body, the most competent amateur representation possible in each event of the Olympic Games, the Paralympic Games, and the Pan-American Games. The most competent amateur representation possible requires, however, that the USTU select and nominate the coaches who are best suited to help the athletes perform at the peak of their abilities.

9. Unlike team sports, there is no single coach responsible for all of the potential competitors in taekwondo. Indeed, each athlete trains on his or her own with the coach that he or she feels is most beneficial.

10. The USTU "remediation plan" charged the USTU Governance and Management Committee with a number of duties, including "[d]oing whatever . . . is necessary to ensure that USTU succeeds as an organization and fulfills its mission regarding the sport of Taekwondo." One component of the USTU process for ensuring that the USTU fulfills its mission involved the implementation of new criteria for the selection of Olympic coaches. The new USTU leadership believed strongly that coaching decisions should be based on performance. Because a taekwondo coach sits next to the competition ring and is responsible for advising the competitors throughout each match, the coaches who work on a daily basis with each individual athlete—and who are thus familiar with the athlete's strengths, abilities and weaknesses—generally provide the greatest chance of victory. Therefore, familiarity with the athletes, and not knowledge of the taekwondo community, is the key to winning medals. Furthermore, because the taekwondo athletes representing the United States are not chosen until two or three months prior to the Olympic Games, the replacement of these coaches with someone unfamiliar with the athletes would be very disruptive to the training process and would leave insufficient time for the new coaches to develop an effective coaching relationship. The Olympians, who have worked closely with their coaches as they succeeded at the Olympic trials and other major events, will

not be willing to suddenly switch coaches as they train for the Olympic Games. The USTU was not willing to continue selecting and paying expenses for Olympic coaches whose sole role would be to show up at the Olympic competition. It was committed to selecting and supporting coaches who would be working with the Olympians on a daily basis, and who would be most likely to help the United States athletes bring home medals.

11.     The USTU's prior criteria for selecting Olympic coaches focused on the applicants' prior coaching experience in major international competitions, including the Olympic Games, the Pan-American Games, the World Championships, the World Cup, and the Pan-American Championships. The coaches selected under these criteria—although potentially having achieved some measure of success coaching at the international level—did not necessarily have any familiarity with the individual taekwondo competitors who were training for the Olympic Games. This resulted in the coaching position becoming more of a figurehead position, with taekwondo competitors often completely ignoring the coach's ringside instructions. In one memorable incident in 2000, Steven Lopez—a competitor from the United States—was forced to move this figurehead coach out of the way during the gold medal match so that he could hear the instructions and advice that his own coach, Jean Lopez, was shouting from the stands.

12.     During the beginning of 2004, the Sport Partnerships Division assisted the USTU in developing new coaching criteria designed to support the United States Olympians who would be competing in Athens. On February 11, 2004, the Sport Partnerships Division received the first draft of these criteria. After various discussions and revisions, the Division signed off on the criteria on March 4. The criteria were then approved by the USOC Delegation Review Committee on March 24 and by the USOC Executive Committee on April 9, at which time they became operative. This process is the exact same process that is followed by every NGB whenever a change in the selection criteria for coaches or athletes is considered.

13.     Under the new coaching criteria for the USTU, coaches are selected based on the following criteria, in priority order:
   (A) Number of athletes the coach has placed on the 2004 Olympic Team
   (B) Competition record (from June, 2003 to June, 2004) of the athletes placed on the 2004 Olympic Team. Priority consideration will be given to results from, in priority order:
   - 2003 World Championships
   - 2003 Pan American Games

14. The USTU coach selection procedures also require the USTU Chief Executive Officer to screen candidates to ensure that they meet the defined criteria and to forward the nominees to the USTU Governance and Management Committee, which must then vote on approval of the nominee.

15. There are four taekwondo weight classes for each gender in the Olympic Games. However, a maximum of four taekwondo athletes per country can participate in the Olympic Games.

16. Although the USTU had hoped to qualify four athletes, only two qualified: Steven Lopez and Nia Abdallah. As a result, to this point the USTU has only been allowed one taekwondo coaching credential for the 2004 Olympic Games. It is my understanding that Dae Sung Lee did not coach any of the athletes who participated in the qualifying tournaments.

17. In selecting the coach who would receive this credential, the USTU followed the exact procedures explained above. Although the coaches who had placed both Steven Lopez and Nia Abdallah on the Olympic Team—Jean Lopez and Chul Ho Kim—satisfied the first criterion, the relevant competition record of the Athlete Jean Lopez placed on the team was better. Therefore, the USTU's Chief Executive Officer forwarded Jean Lopez's name to the USTU Governance and Management Committee, and the Committee voted to recommend Jean Lopez to serve as the coach for the 2004 Olympic Games. This recommendation was then approved by the USOC on June 22.

18. Because the USTU's Governance and Management Committee continues to believe that its athletes perform better when assisted by coaches who have trained them, the Committee voted unanimously on July 1, 2004, to allocate the necessary funds to send Chul Ho Kim to the Malta training camp and to Athens to coach Nia Abdallah. However, Coach Kim, who was Nia Abdallah's coach at the Pan-American Games and is also her coach at the Olympic Training Center in Colorado Springs, does not have a coaching credential at this time. The Committee therefore advised him that he will not be permitted to coach Nia Abdallah ringside, but may still be able to provide support from the stands. However, the USTU is currently seeking another coaching credential that would permit Coach Kim to assist Nia Abdallah ringside. One important factor in the consideration given to the USTU's request for another coaching credential is that the potential recipient actually be a coach working and training with one of the athletes rather than a mere figurehead.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: *August 6, 2004*                    _____
                                                  Kelly Skinner