## Page 1

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF HAWAII
 2              CIVIL ACTION NO. 04-00461-SOM-LEK
 3     _____

       DEPOSITION OF BRUCE C.K.W. HARRIS, VOLUME I
 4     EXAMINATION DATE:  Wednesday, April 6, 2005
 5     _____

       DAE SUNG LEE,
 6
       Plaintiff,
 7
       v.
 8
       UNITED STATES TAEKWONDO UNION,
 9     a Colorado nonprofit corporation, et al.,
10     Defendants.
11     _____

12           PURSUANT TO SUBPOENA, the deposition of BRUCE
       C.K.W. HARRIS, VOLUME I, was taken at 4:47 p.m. on
13     Wednesday, April 6, 2005, at the Double Tree Hotel at
       1775 E. Cheyenne Mountain Boulevard, Colorado Springs,
14     Colorado, before Valorie S. Mueller, Registered
       Professional Reporter and Notary Public in and for the
15     State of Colorado, said deposition being taken pursuant
       to the Federal Rules of Civil Procedure.
16
17
18
                         Valorie S. Mueller
19                Registered Professional Reporter
```

## Page 2

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1                    A P P E A R A N C E S
 2
       For the Plaintiff:
 3
             WARD D. JONES, ESQ.
 4           Bervar & Jones
             1400 Pauahi Tower
 5           1001 Bishop Street
             Honolulu, Hawaii  96813
 6           (808) 550-4990
 7
       For the Defendants:
 8
             MARK LEVINSTEIN, ESQ.
 9           TODD BRAUNSTEIN, ESQ.
             Williams & Connolly, LLP
10           725 Twelfth Street, N.W.
             Washington, D.C.  20005
11           (202) 44-5171
12
       Also present:  Dae Sung Lee
13                    Gary Johansen, Deputy General Counsel,
                      United States Olympic Committee
14
15                           I N D E X
16     EXAMINATION BY:                                  PAGE
17     Mr. Jones .......................................   4
18
                       I N D E X  O F  E X H I B I T S
19
       DEPOSITION                                   PAGE FIRST
20     EXHIBIT NO.    DESCRIPTION                      APPEARS
21       4*     August 4, 2003 letter from Thomas Satrom
                to Bruce Harris ......................... 10
22
         5*     9/5/2003 letter from Thomas Satrom to
23              Bruce Harris ............................ 33
24       6*     10/9/03 memo from Bruce Harris to Sang Lee  41
25
```

## Page 3

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1       32*    Excerpt from the United States Olympic
                Committee Selection Procedures Manual .....  53
 2
         79     9/2/03 memo from Bruce Harris to Thomas
 3              Satrom ...................................  15
 4       80     9/1/03 memo from Bruce Harris to
                Christopher Telli ........................  46
 5
         81     9/12/03 letter from Jill Goodwin to
 6              Virginia Witte, with attached audit report  47
 7       82     8/21/03 letter to Bruce Harris from Kelly
                Skinner ..................................  48
 8
         83     7/24/03 memo from Bruce Harris to Kelly
 9              Skinner ..................................  51
10
11     *Exhibits previously marked.
```

## Page 4

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1                     P R O C E E D I N G S
 2                BRUCE C.K.W. HARRIS, VOLUME I
 3           The deponent herein, being first duly
 4     sworn to testify to the truth in the above cause, was
 5     examined and testified on his oath as follows:
 6                      E X A M I N A T I O N
 7     BY MR. JONES:
 8          Q    Mr. Harris, if you can give us your full
 9     name and home address for the record, please.
10          A    Full name is Bruce C.K.W. Harris.  Home of
11     record is 303090 Richmond Drive, Colorado Springs,
12     Colorado, 80922.
13          Q    Have you ever participated in a deposition
14     before?
15          A    No.
16          Q    Let me just run through some ground rules
17     to hopefully make things go more smoothly.
18               A deposition is an interview, but it's
19     different in the sense that it's under oath and for use
20     generally in court.  Everything I say, you say, anybody
21     says in here will be taken down by the court reporter
22     here and put into written form and put into a booklet
23     that reads kind of like a movie script.  And because it
24     is all transcribed into written form, it's important
25     that we all use words.
```

EXHIBIT "A"

1    So I would appreciate it if when you respond
2  to questions, you use a yes, no, I don't know, whatever
3  the appropriate response is. But please use words. We
4  all use gestures, such as nods of the head, uh-huh,
5  huh-uh, those types of remarks or sounds in everyday
6  language, but it becomes very ambiguous when you try
7  and write that out.
8    A    Certainly.
9    Q    If I don't make my questions clear, please
10  say so and ask me to rephrase or re-ask the question if
11  it doesn't make sense to you. If you go ahead and
12  respond, we'll all assume you understand the question
13  and you're responding truthfully and fully. Is that
14  okay?
15    A    That's fine.
16    Q    We will try to take breaks at least every
17  45 minutes or so, but if for any reason you want to
18  take a break, all you need to do is ask for it.
19    A    Okay.
20    Q    What is your age, sir?
21    A    53.
22    Q    Briefly, do you have formal education
23  after high school?
24    A    Yes. I attended Princeton University in
25  Princeton, New Jersey, for three and a half years. I

5

1  left and joined the Army, where I served for 29 years,
2  10 months, 17 days.
3    Q    Okay. Thank you. At Princeton, what
4  areas did you study?
5    A    I had a triple major in music, physics,
6  chemistry, a minor in psychology and teaching
7  education.
8    Q    You did not complete degrees in any of
9  those areas?
10    A    No, I didn't. This was during the era of
11  the draft, and several of my friends were drafted. I
12  got a draft number, but it wasn't low enough to affect
13  me. But at that time, we were all campus militant
14  rebels. So we burned down our ROTC and joined the
15  Army.
16    Q    And what rank did you retire at from the
17  Army?
18    A    Sergeant major. I might add, my last 24
19  years was spent -- 23 years was spent at the White
20  House as a White House musician.
21    Q    As a White House musician?
22    A    Yes.
23    Q    After leaving the Army, what did you do
24  professionally?
25    A    I joined the staff of U.S. Taekwondo Union

6

1  as the national events director. Subsequently, I
2  became the executive director.
3    Q    Were one or both of those positions
4  salaried positions?
5    A    Both were. And after assuming the
6  position of executive director, I also continued to
7  serve in the role as events director concurrently.
8  Both were salaried.
9    Q    At some point, did you leave U.S.
10  Taekwondo Union?
11    A    Yes. December of 2003.
12    Q    And what was the reason for leaving in
13  December 2003?
14    A    This was when the restructuring of the
15  organization was beginning. And part of the plan was
16  to put in place a different executive director from
17  outside the organization. So I voluntarily left to
18  facilitate with that.
19    Q    Do you have a background in Taekwondo?
20    A    Yes. I started Taekwondo in 1973 when I
21  was stationed in Seoul, Korea. I left there with my
22  second degree black belt. Went to Panama. Started
23  teaching. From there -- for three years. Then I moved
24  to Washington, D.C., where I opened three dojang
25  Taekwondo schools and started teaching and coaching.

7

1    Subsequently, I started the U.S. Army
2  Taekwondo program. I was its first coach for 12 years.
3  And during that time, I also became the coach of the
4  Armed Forces Taekwondo team. I was its coach for five
5  or six years.
6    It gets hazy. I'm still currently the
7  secretary of the World Military Taekwondo Organization
8  Technical Committee, which is in charge of the military
9  Taekwondo sport and its world championship.
10    I also began refereeing in 1978. And I was
11  the 2000 Sydney Olympic referee, one of 24. And I was
12  also named as the referee captain for that event to be
13  in charge of the 24.
14    After that, I became -- I obtained the
15  highest referee status in the world, which is S-class.
16  Currently I'm one of approximately 20 in the world.
17    Q    Do you recall when the --
18         (Whereupon, there was an interruption
19         in the deposition proceedings.)
20         (Whereupon, Mr. Johansen left the
21         deposition proceedings.)
22    Q    (BY MR. JONES) You alluded to the
23  reorganization of USTU. About when did you first hear
24  about the reorganization or efforts to reorganize USTU?
25    A    From the time I became executive director

8

**Page 9**

1  in 2001 -- no -- yeah -- 2002, there was talk of
2  answering Membership and Credentials' concerns, and
3  each of those had the sobriquet, I guess, of possible
4  restructuring if changes weren't made that were in
5  accordance with what USOC wanted.
6       The remediation plan itself started becoming
7  more prevalent in August or September of 2003, as I
8  recall.
9       (Whereupon, Mr. Johansen rejoined the
10         deposition proceedings.)
11    Q    (BY MR. JONES)  The remediation plan was
12  to be used interchangeably with the reorganization?
13    A    Yes.
14    Q    This was done -- this reorganization was
15  done at the request of the USOC?
16    A    Yes.
17    Q    That would be the Membership and
18  Credentials Committee --
19       MR. LEVINSTEIN:  Objection.
20    Q    (BY MR. JONES)  -- or different?
21       MR. LEVINSTEIN:  You can answer.  I'll
22  object, and you can just go ahead and answer.
23    Q    (BY MR. JONES)  Why don't you clarify who
24  at the USOC --
25    A    My understanding is the Membership and

**Page 10**

1  Credentials Committee had some questions and concerns
2  regarding the current structure and operation of the
3  U.S. Taekwondo Union at that time.  Failing responses
4  on behalf of the USTU that were adequate for USOC, then
5  they would go ahead with remediation or taking away the
6  Group A status from the U.S. Taekwondo Union.
7       One of those two things would happen.  Either
8  we'd be stripped of Group A status, or the remediation
9  plan would go into effect, which would cause us to
10  reorganize.  I don't know if it was the Membership and
11  Credentials Committee that caused that, but it was on
12  behalf of USOC.
13    Q    For those of us who don't know what Group
14  A Status is, could you just explain what the
15  ramifications are of losing Group A Status?
16    A    Group A Status means you're a member --
17  it's your Olympic designation.  All National Governing
18  Bodies, NGBs, have Group A status and thus enjoy the
19  rights and privileges of the use of the term Olympic
20  Organization.  If you're not a Group A member, then you
21  don't have that status.
22    Q    Let me show you an exhibit which has been
23  previously marked as Exhibit 4.
24       (Deposition Exhibit No. 4 was re-marked
25         for identification.)

**Page 11**

1    A    What was your question to me?
2    Q    (BY MR. JONES)  I just wanted you to look
3  at it first, and my question would be, would you please
4  identify that document?
5    A    Yes.  This is a document that I received
6  while serving as executive director for the U.S.
7  Taekwondo Union at that time from Mr. Thomas Satrom,
8  who was chairman of the Membership and Compliance (sic)
9  Committee.
10       MR. LEVINSTEIN:  Membership and
11  Credentials Committee?
12    A    Credentials Committee, sorry.  Yes.
13    Q    (BY MR. JONES)  And that's dated August 4,
14  2003?
15    A    Yes.
16    Q    And correct me if I'm wrong, but it has a
17  list of 12 items that he characterizes as problems?
18    A    That's correct.
19    Q    And did you read this when you got this
20  letter?
21    A    Yes.
22    Q    And what did you think about these 12
23  problems listed?
24    A    These 12 are a summary, I guess, of two
25  other sets of letters like this that had problem areas

**Page 12**

1  that I had to address almost immediately after becoming
2  executive director.  I think there were more of them
3  then.  And we kept whittling away at answering all of
4  them.
5       I think this was the last set of 12 prior to
6  being not found in compliance and ordering the vote for
7  remediation.
8    Q    And your testimony is that lists of
9  problems like this were incorporated in previous
10  correspondence going back to 2002?
11    A    Yes.  And as a result, we also had other
12  meetings with the Membership and Credentials Committee
13  on two other occasions, one of which I think was an
14  open town hall meeting in Denver.  One was done at the
15  Adams Mark in Colorado Springs, downtown.
16    Q    Were these two -- was the conference in
17  Denver --
18    A    Yes.
19    Q    -- after August 4, 2003?
20    A    No.  I think that was in May of 2003.
21    Q    Okay.  And then this other conference that
22  you just talked about at the -- what was it?
23    A    The Adams -- what was then the Adams Mark
24  Hotel in Colorado Springs.
25    Q    And a time frame for that one?

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1      A    I'm not certain, but I think it was around
 2  October of 2002, somewhere in that time frame.
 3      Q    Focusing in on Page 2, the Sentence No. 5,
 4  one of the problems that Mr. Satrom was listing was "An
 5  allegiance to Korea to the detriment of U.S. programs
 6  and the interest of U.S. athletes."
 7           Did you find that sentence to be racially
 8  insensitive when you first read it?
 9           MR. LEVINSTEIN:  Objection.  You can
10  answer.
11      Q    (BY MR. JONES)  You can go ahead.
12      A    I found it to be racially motivated by
13  its -- well, inherently, primarily because Taekwondo is
14  a Korean martial art.  It's still the home of -- the
15  birthplace of Taekwondo.
16           The international governing body is still in
17  Korea.  Many of our programs are tied directly to that
18  international governing body and Korea.  And this was
19  one that was answered each time it came up in the other
20  two instances.
21           I didn't understand "to the detriment of U.S.
22  programs" because the way the structure is nationally
23  and internationally, we had to go through the
24  international body for just about everything.  For
25  instance, when we pick a national team, they have to
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1  meet the international requirements to compete at a
 2  world championships, Olympic games, Pan Am games, et
 3  cetera.
 4           So we couldn't do it without some allegiance
 5  to the international body.  And that included a
 6  requirement for Kukkiwon black belt, which is a black
 7  belt certification from the World Taekwondo
 8  Federation's arm called Kukkiwon.  And they're the ones
 9  that certify black belt.
10      Q    That's in Korea?
11      A    Yes.  So it was impossible to meet the
12  requirements for participating at World Championship,
13  World Cup, Olympic Games, et cetera, without doing
14  that.
15           Our referees are certified, again, through
16  the international body, which is in Korea.  So all
17  international referees are certified through them.  So
18  to say it was a detriment to our U.S. programs was, I
19  thought, misleading in the very least.
20      Q    Okay.  You mentioned that you attempted to
21  respond in writing to the points listed in that letter?
22      A    Yes, sir.
23      Q    Let me show you a document.
24           MR. JONES:  If you could mark this one
25  next in order.
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1           (Deposition Exhibit No. 79 was marked
 2            for identification.)
 3      Q    (BY MR. JONES)  Take a look at it.  I
 4  don't know if you have looked at it very recently.
 5      A    No.  Yes, I've read it.
 6      Q    What is Exhibit 79?
 7      A    Exhibit 79 is my response letter to
 8  Mr. Satrom regarding the letter of August 3rd -- August
 9  4th, 2003.  And mine is dated 2 September 2003.  And it
10  went item by item in response to his 12 issues.
11      Q    And are the substantive responses you put
12  in this letter back to Mr. Satrom true and correct, or
13  were they true and correct as of the time you wrote
14  this letter?
15           MR. LEVINSTEIN:  Objection.  I'm going to
16  say objection a lot.  You can answer.  Just ignore my
17  objections, unless I -- no matter what I say.  Any
18  objection I say, wait until I'm done and then answer
19  the question.
20           THE DEPONENT:  Okay.  I have been
21  watching too much Columbo or Perry Mason.
22      A    Okay.  Yes, these were our reported
23  findings in trying to honestly answer the question.
24  And, factually, we were puzzled as to what was being
25  asked because it was, again, "the allegiance to Korea
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1  to the detriment of U.S. programs and to U.S.
 2  athletes," and we didn't substantively know what was
 3  really being asked.  So this was the best response that
 4  we could come up with to address that as best we could.
 5      Q    (BY MR. JONES)  And in this letter, did
 6  you more or less respond with what you just stated
 7  earlier --
 8      A    Yes.
 9      Q    -- when we were talking about, for
10  example, an allegiance to Korea?
11      A    Right.  And the International Federation
12  and the role that it plays and how we have to work
13  through them.
14      Q    I don't want you to go into a lot of
15  detail, but just please briefly touch on the 12 points
16  that were raised by the other side and briefly your
17  response.
18      A    Okay.  Item 1 was, "A governance system
19  that is based on club membership and control of state
20  organizations, which results in continual disputes
21  between [U.S. Taekwondo Union] and its membership."  In
22  essence, the answer was the club structure is the
23  structure that was there from the beginning of the U.S.
24  Taekwondo Union.  And in the past, the structure had
25  been approved by the USOC as it was.  We didn't change
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  that club structure.
2       And we answered that there were problems with
3  some states, but not the majority of states. So in our
4  opinion, it wasn't worth throwing out all of the states
5  to answer this question.
6       Q    Okay. Next item?
7       A    No. 2, "Presidential control of
8  appointments to the Board of Governors." This was an
9  issue actually that I had raised in a meeting with then
10 President Lee. And during our conversations, he had
11 agreed to give up completely the appointments on the
12 board of directors because that is a problem area.
13      I think that he had stated that at one of the
14 board meetings, but it hadn't been enacted in writing
15 or passed before I left. But the intent was to give up
16 the appointments because of the perception of too much
17 power in one hand.
18      No. 3, "A Board of Governors that is too
19 large and divisive to effectively oversee the
20 management of USTU, to perform long-range strategic
21 planning or to take decisive action in times of
22 crisis."
23      Our response again was this was the same
24 structure that had been in place, had been approved by
25 the USOC, and suddenly it was viewed as a problem. I

17

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1       Q    Okay.
2       A    The allegiance to Korea to the detriment
3  of U.S. programs --
4       Q    You have already --
5       A    We've talked about that.
6       No. 6 is "An adherence to the Kukkiwon
7  certification process and a failure to develop a US Dan
8  Certification Process (sic)."
9       Hmmm. This came up in every written report
10 from the Membership and Credentials Committee.
11 President Lee himself addressed this and said that
12 right now -- it's like the gold standard for money in
13 the world. That's the standard, gold.
14      For Taekwondo, the standard for black belts
15 is Kukkiwon certification. So, yes, we could implement
16 a U.S. Dan certification, but it wouldn't be to the
17 same standard of the Kukkiwon certification. And the
18 idea was to make a U.S. program that would, in time,
19 match the gold standard for black belts or Kukkiwon.
20      So we did develop a U.S. Dan certification
21 program, and we were ready to implement it when I left.
22      "Lack of financial standards or controls."
23 This we found to be valid. We were lacking a financial
24 manual for how things should work within the office.
25 We found that to be true, and we addressed that. We

19

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  didn't relate it to the fact that at this time USOC
2  itself was looking at restructuring.
3       But to my understanding, it was formed
4  basically to parallel the structure of the USOC in 1975
5  when it was formed.
6       Item 4, "Micromanagement of staff and
7  day-to-day activities by USTU officers and Board
8  members." According to my response, this was brought
9  up in an audit report that was done by USOC audit
10 staff. And this was because there was a chain where,
11 to approve expenditures, the executive director could
12 have been left out of that loop, which meant no
13 accountability; and yet the executive director was
14 responsible for everything that happens in the office.
15      As a result, we drafted a plan that changed
16 that so that expenditures, I think, up to either $1,000
17 or $2,000 was signed off by the office manager and the
18 executive -- oh, and the treasurer, and I had to
19 approve the check being written. But I didn't approve
20 the expenditure.
21      We changed that so that everything went
22 through the finance office. We came up with new
23 financial plans, which was another section that was
24 addressed later. But that was a valid item, we
25 thought, as well.

18

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  came up with the manual by working with the USOC audit
2  staff, specifically Mr. Christopher Telli. He was very
3  instrumental. And I also worked with Ms. Witte on
4  that. So that was absolutely true, and we did address
5  that.
6       "The complete disarray of financial records,"
7  that, too, was true. And this was found by an audit
8  done by Mr. Telli. At the time, our receipts for
9  expenditures were less than 30 percent. Before I left,
10 we had, I think it was, 92 percent of all the receipts.
11 So we went back, checked through all of the check
12 expenditures, called all of the places, got original
13 receipts from them, and came up to 92 percent before I
14 left at the end of 2003. But they were in bad shape.
15 That was true.
16      "The failure to timely develop and implement
17 a budget." That was true. And that was something
18 that, again, I jumped on as soon as I came onboard
19 because the way it worked at the time was we would have
20 an officers meeting in late January, early February, to
21 approve the budget for that year, which to me didn't
22 make sense. The year is already two months gone and
23 we're still developing a budget.
24      Again, before I left in 2003, by November, I
25 had submitted a budget for 2004 through Mr. Kelly

20

```
 1   Skinner, of Sports Partnership, and also Mr. Telli had
 2   also seen that.  So we had worked to change that so
 3   that it was much more functional and viable and
 4   workable, because that was an area of concern for us,
 5   as well.
 6          "Large cash transactions without an adequate
 7   process for safeguarding the assets."  As I recall,
 8   this alluded specifically to our Junior Olympic events,
 9   where we had large sums of cash, and by that I mean in
10   excess of $5,000, taken in at the event.  And that
11   money was for coaches' fees, people that had sent in
12   applications late and they owed us a late fee.  Often
13   they would pay that at the site.
14          As far as ticket sales, that was a different
15   matter, and I'll speak to that later.  But also there
16   were -- the USTU had its own sales booth where we sold
17   T-shirts, bags, other accouterments, and that was all
18   in the form of cash.
19          So at the end of the Junior Olympics, which
20   was at that time the largest Taekwondo event in the
21   world, we would often have 10-, 12-, $15,000 in cash
22   from that event.
23          What we did not have was a way to convert
24   that into checks on-site or somehow come up with a
25   system of safeguarding the transfer back to Colorado
```

21

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1   Springs.
 2          In my role as events director with my
 3   assistant at the time, who was Betsy Leach, what she
 4   and I would do, along with Gina Mendoza, the three of
 5   us would get together every night, count the tally of
 6   the day, sign our names on it to the amount, and at the
 7   end of the event, we did the same thing.
 8          The problem was we had to transfer that back
 9   in cash, and that wasn't a good way to do things.  We
10   realized that.
11          Later that got changed because we had to have
12   at that time cash on hand to pay referees, for
13   instance, which got a per diem based on the number of
14   participants, which was something that was enacted in
15   law for USTU.  Five dollars of every athlete's
16   participation fee went to be divided to the referees.
17   So that involved large sums of cash.
18          Other than that, we did make every effort to
19   make payments by check; for instance, to vendors, to
20   the venue, security, et cetera.  But there was an
21   accumulation of cash based on sales of the USTU items
22   and late payments that we had to transfer back.
23          Again, the procedure was once we got back, we
24   would verify that this was the amount that the three of
25   us had initialed, turn it into finance for deposit.
```

22

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1          Q     Okay.  Next item?
 2          A     Yes.  "Questionable use of funds (such as
 3   providing loans to employees, payment of questionable
 4   voluntary expenses and chartering aircraft to deliver
 5   medals from Korea)."
 6          This was a one-time happening.  Again, Junior
 7   Olympics at that time was the largest Taekwondo event
 8   in the world.  And we were looking at children from
 9   ages 6 to 17.  And at that time, it was in excess of
10   five thousand.
11          Q     Five thousand people?
12          A     People, participants, not spectators.  It
13   was a two and a half to one ratio of spectators to
14   participants.
15          The practice had been to order medals for --
16   enough medals for all of the participants that won, and
17   also participation medals.  So our medals totalled in
18   excess of 30,000.  They were ordered from Korea.  And,
19   again, that was the tradition when I arrived on scene.
20          The same process was adhered to where we
21   ordered them.  Junior Olympics take place over the 4th
22   of July weekend.  We always place the order by January
23   through Korea so that we would have them in time.
24          Each year, the design changed slightly, but
25   it was the same manufacturer, same distributor.  They
```

23

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1   also, at the same time, did the medals for our senior
 2   national events.  That only totalled about 8,000
 3   medals.  But together it was like 40,000 medals.
 4          This shipment that was in question was sent
 5   by boat.  I don't know why.  Nothing was done
 6   differently in the contract, but it was sent by boat
 7   first to California.  It was supposed to have been sent
 8   by train from there to Colorado Springs to arrive at
 9   our office for shipment with our office equipment on a
10   truck to make it to Junior Olympics in time.  That
11   didn't happen.
12          From three days prior to our loading up the
13   office, we started calling, where are the medals?  They
14   put a tracer on it and said it's arrived in Los
15   Angeles; we still hope it will be there on time; we'll
16   get back to you.
17          Well, they didn't arrive in time for our
18   shipment.  Whatever train delays and boat delays there
19   were, the medals were not there.  So then we were faced
20   with do you disappoint all of these kids, all of the
21   parents, 20,000 people, or do you make an extra effort
22   to get them there no matter what it requires.
23          We did not charter an airplane.  That's in
24   error.  What we did was we sent them by air freight.
25   The next day, as soon as they arrived, they were
```

24

## Page 25

1  expedited. We made phone calls, had people in place.
2  When they arrived in Denver, we put them on air freight
3  from there and paid the freight cost to ship them to
4  the Juniors. That was the cost that was incurred.
5  There was not an air charter. There were no people
6  flown from Korea with it, nothing like that. It got
7  exaggerated, and we answered that.
8       The loans to the employees, when I came
9  onboard, that had been the practice before because I
10 was one of their recipients of it. When I moved, I had
11 just retired from the Army. I needed an advance in
12 salary to be able to make a deposit to buy a house.
13 And that was done, and it was repaid. All of that is
14 in the financial records.
15      So we had -- under my tenure, as executive
16 director, one of the financial directors had a problem.
17 The same thing. She was buying a house, and she needed
18 an advance to be able to make the deposit for her house
19 payment. My thinking was, well, this was the same
20 courtesy extended to me. I can extend it to her. And
21 we set up a repayment plan that was worked out and
22 adhered to.
23      But I was brought to task for doing that, and
24 that policy was done away with. It never happened
25 again.

## Page 27

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  the beginning. There was nothing out of the ordinary
2  or new.
3       Suites at events. Those were negotiated by
4  me as part of being the events director, where we got
5  20 comp rooms for every -- I'm sorry -- one comp room
6  for every 20 rooms. And for Junior Olympics, again, we
7  had in excess of 1500 rooms.
8       So what I did was use the comp rooms to go
9  towards suites for the VIPs so that there wasn't
10 payment out of hand for the union. So it was value in
11 kind, a tradeoff.
12      Multiple communications accounts for
13 volunteers. Oh, this was where we had -- the
14 Secretary-General at that time had three sets of phones
15 and faxes and two mobile phones, I think. I may be
16 off. But there were multiple telephones and stuff, and
17 we ended up eliminating all of them, except for the
18 office phone, fax, and cell phone. Same for the
19 president.
20      One other thing we did was when I first came
21 onboard, there were, I think, 13 or 15 credit cards
22 that were spread among the officers. I don't remember
23 the total. One of the first things I did was got all
24 of them back. And I was the only person that had a
25 credit card for the use of the office. So we had

## Page 26

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1       Payment of questionable volunteer expenses.
2  This I'll have to review. One of these involved the
3  assistant to the president who worked at his office.
4  And the perception was that this person was on staff
5  but doing personal work for the president. And we
6  ended up just moving her to the USTU office. They
7  considered that a questionable payment, her salary.
8       Another was the airfare that we paid for the
9  WTF delegate to attend our event. One of the rules and
10 stipulations for a sanctioned event by the
11 International Federation is that we bear the expense of
12 a technical delegate. And it was not a first class
13 airfare. It was $1400 from Korea, round trip, to the
14 event. So that's by regulation in order to be in
15 compliance for a sanctioned event. So just that wasn't
16 questionable.
17      The housing of the president, the technical
18 delegate, and other VIPs at one hotel, that was
19 different from where the other officials stayed. It
20 had been common practice, again, for our organization.
21 And actually we got a lower fee by negotiating with --
22 it was the Caribe Royale for their rooms. And it also
23 included room rebates back to us as well.
24      But, again, the practice of VIP housing
25 separate from officials' housing had been there from

## Page 28

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  better accountability.
2       Payment of per diem to Secretary-General
3  after charging meals to his hotel room at National Team
4  Trials in 2002. This was prior to us implementing the
5  financial plan under the direction of Mr. Telli. But
6  this was all receipted and documented. And that
7  practice was done away with, with the new plan.
8       "Throughout 2001 and 2002 numerous greens
9  fees for golf at the Broadmoor has been a USTU expense,
10 in addition to numerous meals and protocol gifts
11 purchased from the Broadmoor Gift Shop."
12      This is something that we had -- it wasn't
13 clear in our budget. It came under International
14 Development and Protocol, but it wasn't clarified how
15 that was supposed to be expensed.
16      But in International Development, these
17 expenses were for hosting international guests that
18 came, played golf at the Broadmoor with the president,
19 had lunch. These were business meetings, et cetera.
20 And these were all charged to the account as
21 international development and like that.
22      But there wasn't -- and that was something
23 Mr. Telli made note of. We needed a specific line item
24 in the budget so that would no longer be a question.
25 And the budget proposed for 2004, that he and

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1   Mr. Skinner saw, that was done.  So it wouldn't have
 2   been questionable at all.
 3            "The USTU AAC Chair received payment for
 4   managing of an event in 2001."  I'll have to read this.
 5            Ah, I remember.  My predecessor as national
 6   events director was the current AAC Chair, Mr. Sammy
 7   Pejo.  When I first came onboard, the first event
 8   facing me at that time was Junior Olympics.  Once
 9   again, the largest Taekwondo event in the world.
10            He was paid a consulting fee to help bring me
11   up to speed so that this event functioned without just
12   suddenly failing because I didn't know the ins and outs
13   of what was involved in putting on that event.
14            It was only a consulting fee for the number
15   of hours that he worked.  And that was it.  It was a
16   one-time thing.
17       Q    Okay.  Have we addressed all the numbered
18   points?
19       A    Yes.  And Response C is the chartering of
20   the aircraft.
21       Q    Which you have already covered?
22       A    Right.  So yes.
23       Q    I had one other --
24            MR. LEVINSTEIN:  We didn't get 12.
25            MR. JONES:  Sorry.
```

29

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1            MR. LEVINSTEIN:  I don't care, if you
 2   don't want him --
 3       A    No.  What was 12?
 4       Q    (BY MR. JONES)  I'm sorry.  Better address
 5   that one.
 6       A    Oh, yes.  I'm sorry.  No. 12 is "Failure
 7   to fully utilize USOC grants in 2002 and 2003."  My
 8   predecessor as executive director was Mr. Jay Warwick.
 9   He was very successful in getting stipends from Sports
10   Partnerships that increased annually to go towards use
11   of USOC programs with Sports Partnership.
12            This included things such as sending the team
13   to international events as a precursor to going to
14   World Championships, having camps, inviting teams like
15   from China, from Korea, exchange programs, things like
16   that.
17            It became problematic in 2001 to use up all
18   the funds because people weren't traveling after 9/11.
19   It was much harder to get people out.  We didn't travel
20   as much.  We had money budgeted for events that we
21   didn't go to.
22            Again, Kelly Skinner was the person that I
23   dealt with as far as the Sports Partnership money.  He
24   understood and rolled the money over for 2002.
25            Well, in 2002, we had SARS, which, again,
```

30

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1   limited our participation in events that were
 2   scheduled.  And as a result, we weren't able to use the
 3   increased funding that we had gotten incrementally as a
 4   result of Mr. Warwick's work.
 5            It wasn't because we weren't trying to spend
 6   the money on the athletes.  Even athletes didn't want
 7   to travel under the conditions where SARS was prevalent
 8   or after 9/11.  It wasn't safe to travel.  And those
 9   were fully addressed.
10       Q    Okay.  I had a question about the last
11   paragraph of Page 9 (sic).
12            MR. LEVINSTEIN:  Exhibit 79?
13            MR. JONES:  Yes.  I'm sorry.
14       Q    (BY MR. JONES)  The same exhibit we were
15   just looking at.  You talked about those in opposition
16   to the current administration, after Item 12.
17       A    I see.
18       Q    Who were those in opposition to the
19   current administration?
20       A    Okay.  Let me read this paragraph for one
21   second.
22       Q    Okay.  Actually, let me ask it this way:
23   I think there would be a lot of names.  Was Jean Lopez
24   one of the people in opposition to the current
25   administration?
```

31

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1       A    It's my recollection that this paragraph
 2   was addressing the vocal groups at that time, which had
 3   banded together in different groups, such as the Ohio
 4   Group, the Pennsylvania Group, people that were not
 5   listening to Ronda, but -- Ronda Sweet, who has a
 6   website, but followers of her website that she
 7   organized to vocally complain about the administration.
 8       Q    You don't know if Jean Lopez was included?
 9            MR. LEVINSTEIN:  Objection.
10       A    I'm trying to remember.
11       Q    (BY MR. JONES)  If you don't know, that's
12   fine.
13       A    I'm trying to remember clearly.  We had
14   several discussions with Jean, I did, one on one, on
15   many issues.  So I'm trying to recollect if it was -- I
16   don't recall him as being one of the opposition members
17   in this sense.  I know at one point in time, he, Paris
18   Amani, and some -- she lives in Denver, an athlete --
19   Kim Dodson -- Kim Dodson they had expressed some
20   opposition to some things as well and some items
21   addressed in here.
22            But my recollection as to the larger
23   statement, it was the Ohio Group, the Pennsylvania
24   Group, the Ronda Sweet group, for instance.  I'm sorry.
25   I can't be clearer.
```

32

```
 1     Q     It's all right.  You can't answer
 2  everything.
 3           Next exhibit that has been previously marked
 4  as Exhibit 5.
 5     A     This is the same thing twice.
 6           MR. LEVINSTEIN:  When you marked the
 7  exhibit, you gave him --
 8           (Discussion off the record.)
 9     Q     (BY MR. JONES)  Have you seen that exhibit
10  before?
11     A     Yes, I have.
12     Q     And what is it?
13     A     This is another set of questions from the
14  chair of the USOC Membership and Credentials Committee,
15  Mr. Thomas Satrom, and it's dated September 5, 2003.
16     Q     And focusing on Page 3, Item No. 8, if you
17  could review that please.
18     A     Okay.  I've read it.
19     Q     What did you think of that list of
20  questions?
21           MR. LEVINSTEIN:  Objection.
22     A     I thought that it was an unfair
23  misstatement, if that makes sense, of Taekwondo and all
24  that it represents.  If I can refer to it, I'll answer
25  specifically.
```

33

```
 1     Q     (BY MR. JONES)  Sure.
 2     A     "... governed by cultural values emanating
 3  from Korea, which may not be in harmony with American
 4  values."
 5           Again, Taekwondo, the sport and martial art,
 6  had its origins in Korea.  Its value system, everything
 7  about it stemmed from Korea.  The fact that it may be
 8  different than American values may or may not be true.
 9  But the emphasis is on certain things that may not be
10  emphasized or codified in American culture.
11           For instance, in the sport of Taekwondo -- or
12  in the martial art Taekwondo, there are five, what they
13  call, tenets that are very important; perseverance,
14  self-control, integrity, things like that.
15           And these are consistent with American family
16  values.  So I disagree that it's not in harmony with
17  American values.  It's just that it's structured that
18  this is insisted upon as a part of learning the martial
19  art Taekwondo.  Is it Korean values?  I think it's
20  human values.
21           Going on, "The perception seems to be that
22  loyalty to one's instructor or supervisor is all
23  important, that 'respect' means subservience, and that
24  competitions are often based on 'political
25  determinations,' not on who is the best athlete on the
```

34

```
 1  mat."
 2           I think that's two sets of issues.  First of
 3  all, if you compare Taekwondo, the martial art, to
 4  American family values, it's exactly the same.  Respect
 5  for your parents.  It goes without saying.
 6           In the sport aspect, that ends once you step
 7  in the ring.  You're no longer judged by your parents.
 8  You're judged by a group of trained sports officials
 9  that determine the best athlete.  So I think those two
10  issues are blurred.
11           And I agree with the first part, the
12  perception that loyalty to one's instructor or superior
13  is all important, yes, just as loyalty to one's family
14  is all important.  It's the same thing.
15           "As an individual stated to the Committee,
16  '[l]ong ago I realized the USTU leadership could never
17  be held accountable.  For the most part, they did not
18  understand our American culture of sport nor embrace
19  its underlying values of un-biased officiating, a level
20  playing field, and fair play."
21           As it states, this is one person's opinion.
22  Mine is just the opposite.  Our sport has been set up
23  so that the play on the field determines the winner,
24  not who you are or who your instructor is.  And I say
25  that because, for instance, in the U.S., we eliminate
```

35

```
 1  patches and everything from uniforms.  Everyone comes
 2  in with a plain white uniform, maybe with your state or
 3  the sport name, or U.S.A. on it, but everyone is an
 4  individual.
 5           Again, it's set up -- it's structured so that
 6  the competition is handled by trained sports officials
 7  whose role is there to push buttons or one pointers,
 8  marking papers.
 9           As far as being held accountable, the sports
10  system itself has a system of accountability called
11  protests.  If you feel that you lost unfairly due to
12  some error that's -- it's something that you can
13  address.  You have a course of redress by filing a
14  protest within ten minutes after the end of your match.
15           And for national events, there was a fee of
16  $45.00.  Internationally, it's as high as $300 to
17  discourage it.  In the U.S., part of what USOC guidance
18  was, that was too strict for our national events.  So
19  our fee was $45 for a protest.  Anybody could lodge a
20  protest.  And it was heard by a different panel that
21  was not involved in that match.  So as far as no
22  accountability, I disagree with that.
23     Q     Okay.
24     A     "As another individual stated to the
25  Committee, 'Korean culture places a higher value on
```

36

1  loyalty to one's family, friends, school, [et cetera],
2  than it does on honesty and fair play."
3       I have seen nothing to support that. Again,
4  I have been doing this since '73. I have never seen
5  anything in the martial art that stipulates that.
6  Honesty is at the bottom of the list, no.
7       "As a third individual stated, 'the 'Korean
8  good ol' boy' system of promotions, certifications, and
9  selections of 'who attends what' has got to go.'" That
10 has some merit to it. For instance, the system of wild
11 cards was something that was closely looked at because
12 it was hotly contested by coaches and athletes, because
13 for a wild card -- and the way the system worked, the
14 top four people that finished 1st to 4th on the mat
15 were guaranteed spots. Then you could have up to two
16 wild cards that were given out based on past records,
17 et cetera.
18      So that's where it got to be difficult. You
19 couldn't quantify one's record over another. For
20 instance, if you have one athlete who is a junior
21 national champion but didn't make the cut, and you have
22 someone who lost to the eventual champion in the
23 fight-offs, how do they compare? Which one gets the
24 wild card, et cetera? So it was a dicey situation you
25 had to deal with and eventually it was eliminated.

37

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1       The perception that there was a good ol' boy
2  system that determined that, that could have been the
3  perception. In practice, it was based on competitors'
4  records. But to the public, it could seem like, well,
5  this person knows that person, or whatever was the
6  reason.
7       Q    Let me ask you, with respect to that last
8  sentence in Point No. 8, Page 3 --
9       A    Yes.
10      Q    -- when you read that, that statement,
11 were you thinking that that's what that individual was
12 referring to, the wild card selection process in
13 competition?
14           MR. LEVINSTEIN: Objection.
15      A    Well --
16      Q    (BY MR. JONES) I'm just asking -- that
17 was the first thing you were explaining.
18      A    No, not entirely. But the fact that they
19 said the system of promotions and certifications and
20 selections led me to the wild card thing. But
21 promotions, that's an individual school owner's
22 prerogative. And there are many more non-Korean school
23 owners in America than there are Korean school owners,
24 so that's a fallacy in and of itself.
25      Certifications, same thing. Unless you are

38

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  getting a national level certification, that's done
2  in-house by your instructor. But to become, for
3  instance, a national coach, there was a coaching
4  certification program that's open to anyone who meets
5  the criteria.
6       It's not like if 100 people apply, there was
7  a group of Koreans that got together and picked five of
8  the best. No. It was a matter of meeting the
9  standards of the program.
10      Same thing with referee certification. Those
11 were the only things that we certified nationally,
12 coaches and referees.
13      Q    Did you find this paragraph to be racially
14 insensitive --
15      A    Yes.
16      Q    -- to people, especially U.S. citizens of
17 Korean heritage?
18      A    Yes, not only them, but to me as well. My
19 background was in the military where when I first went
20 in, it was -- racial differences were abounding. And
21 even as child, it was during the civil rights era.
22      So I have a sensitivity anytime somebody
23 tries to spin something as being racist. To me, I
24 mean, those who know me know that I wouldn't be a part
25 of anything that perpetuated that, nor would I stand

39

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1  for it. And to say that this was de facto and
2  something that I allowed to happen just isn't true.
3  So, yeah, it did rub me as being racially insensitive.
4       Q    Did you respond in writing to this letter,
5  as well, like you did the August letter? Because I'm
6  not aware of any written responses that I have.
7       A    I'm pretty certain I did because I
8  responded to every letter that was sent by the
9  Membership and Credentials Committee without fail. I
10 don't know what the date on it was. If there was a
11 deadline for response -- this was in advance of the
12 meeting on the 13th. It might have been discussion
13 items for that meeting. But I'm pretty sure I drafted
14 written responses to everything from Membership and
15 Credentials.
16      Q    If you can check your files and provide us
17 with a copy of that.
18      A    When I left the office, I left everything
19 there.
20      Q    All right.
21      A    And I had a witness that I took nothing
22 from the office.
23      Q    Okay.
24      A    And she is still there.
25      Q    So you wouldn't have a copy then?

40

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1   A   No.
2   Q   All right. Let me show you exhibit next
3   in order -- or pardon me -- Exhibit No. 6.
4       (Deposition Exhibit No. 6 was re-marked
5        for identification.)
6   A   I've read it.
7   Q   (BY MR. JONES)  What is Exhibit No. 6?
8   First of all, have you seen it before?
9   A   Yes.
10  Q   Was it written by you?
11  A   Yes.
12  Q   And what is it?
13  A   This is the minutes of a meeting that we
14  held with the law offices of Holme Roberts and Owen.
15  It was my practice to always put in writing minutes of
16  meetings, even with the president. I would send him a
17  copy of the meeting so we had some record in case there
18  was a disagreement on what happened so we could discuss
19  it, and then he would get an amended copy. And this
20  was also sent to the officers as needed.
21  Q   Okay.
22  A   This particular thing was after a meeting,
23  and it's dated 9 October 2003, of the meeting at Holme
24  Roberts and Owen.
25  Q   Now, you attended this meeting that these

41

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1   minutes chronologize, right?
2   A   Yes.
3   Q   What did Jill Chalmers say at that
4   meeting?
5   A   As reflected in this document, we met for
6   about two and a half hours at their offices. And the
7   purpose was to discuss the status of the USTU with
8   regards to the proposed cancellation of our NGB status
9   by the USOC Membership and Credentials Committee.
10      At that time, they had been engaged to work
11  for us on our behalf through the remediation process
12  and to a successful conclusion, hopefully. That was
13  the purpose of the meeting, to find out our status.
14      As I recall, Jill and Steve Smith had been
15  meeting individually or somehow with the USOC legal
16  staff, or whomever, to help move the process forward.
17  And we were not privy to those meetings. That was with
18  members of the USOC legal staff, as I understood it.
19      Jill was the only person in the meeting at
20  first. Steve was supposed to have been there at the
21  time, but I think he came later. So Jill started, and
22  she spoke first of all to the Membership and
23  Credentials meeting that was held in Denver in
24  September, because she was present at that taking
25  notes. And we didn't get a chance to speak with each

42

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1   other following that meeting. We all just left.
2   Q   What did she say happened during that
3   Membership and Credentials meeting?
4   A   That was where she said that several
5   members of the USOC Membership and Credentials
6   Committee had used the term Korean Mafia with reference
7   to the structure and running of the U.S. Taekwondo
8   Union.
9   Q   Did you attend that meeting in Denver?
10  A   Yes.
11  Q   Did you hear the same things said?
12  A   No, this wasn't said in the public during
13  the meeting itself. Again, after -- first of all, that
14  meeting, we were told, was like an open town hall
15  meeting where anyone who had anything to say about the
16  status of USTU could show up and do so. I was told we
17  were under no obligation to present our side, or to
18  respond, but it would be good to be there and hear what
19  was being said.
20      After that meeting, which didn't exactly go
21  that way, we were asked to respond. But after the
22  meeting was finished, representatives from Holme
23  Roberts and Owen stayed and met with the Membership and
24  Credentials Committee, and I presume that's where this
25  happened, because at the public meeting, that wasn't

43

4/6/2005 Harris, Bruce C.K.W. VOLUME I

1   the way it went.
2   Q   All right. There was no name calling at
3   the public portion of the meeting?
4   A   No. We addressed the issues that were
5   outlined by them.
6   Q   Thank you.
7   A   Different members -- oh.
8   Q   The last paragraph, Mr. Smith asked, I
9   guess, the management team in attendance at the meeting
10  to consider the remediation plan that was submitted to
11  the USOC by the reform group to see if there were parts
12  of the plan --
13      MR. LEVINSTEIN: Before we go on, just so
14  you know, this document is out there. We've already
15  expressed to the Court that we don't think he has the
16  right to waive the attorney-client privilege. We don't
17  think this waives the attorney-client privilege. We
18  think these are hearsay statements and not admissible,
19  and all that stuff.
20      I'm not going to say that every time so
21  we don't disrupt, but I've got a continuing -- now that
22  you're going beyond one statement and you're going to
23  ask about legal discussion and advice, you can do that,
24  and I'm not going to stop you; I just want to state for
25  the record the objection.

44

```
 1           MR. JONES:  Objection noted.
 2      Q    (BY MR. JONES)  Let me ask the question
 3  this way:  Was there a remediation plan on the table on
 4  or about October 9, 2003 for USTU to consider?
 5      A    I think there were two sets of plans.  One
 6  was by the Ohio Group.  And that was this reform
 7  group --
 8      Q    Okay.
 9      A    -- that's specified here.  The other was
10  from the USOC, their remediation plan, proposed
11  remediation plan.
12      Q    And what were the significant differences
13  between the two plans?
14      A    Oh, they were like night and day.  The
15  USOC remediation plan called for -- now, there were
16  several iterations of it, so I may have -- I don't know
17  which one was in place at this meeting.  But at one
18  point called for all of the current officers to be
19  removed.  The executive director would be removed.
20           Later, there was another plan where some of
21  the officers or elected people could stay, but
22  appointed people had to go, things like that.  That was
23  all USOC remediation.
24           The reform group, the Ohio Group, was asking
25  for substitution of people from its group to be
```

45

```
 1  president, vice president, treasurer, et cetera, so
 2  they didn't want true remediation.  They just wanted to
 3  be in charge --
 4      Q    Okay.
 5      A    -- was the basic difference in the two.
 6      Q    To your knowledge, were any other racially
 7  insensitive comments made and relayed to you by
 8  Ms. Chalmers with respect to that Denver USOC meeting
 9  that she attended?
10           MR. LEVINSTEIN:  Objection.
11      A    Just the Korean Mafia running the
12  organization, and the Membership Committee was out of
13  control trying to get USTU.  That was it.
14           MR. JONES:  Mark this as the exhibit next
15  in order.
16           (Deposition Exhibit No. 80 was marked
17              for identification.)
18      A    I've reviewed it.
19      Q    (BY MR. JONES)  Did you write this
20  document?
21      A    Yes, sir.
22      Q    What is it?
23      A    This is an USOC Audit Division Executive
24  Summary Response.  It was written on -- or submitted on
25  1 September 2003, to Mr. Christopher Telli, the auditor
```

46

```
 1  for USOC.
 2      Q    And the purpose of this response?
 3      A    This was done in response to 19
 4  recommendations that he made after auditing our books
 5  at USTU to make things come into full compliance.
 6      Q    And according to this, Mr. Telli's audit
 7  that you were responding to was conducted from June
 8  through August 2003?
 9      A    Correct.
10      Q    And I won't go through each item, but are
11  the responses that you listed in here true and correct?
12           MR. LEVINSTEIN:  Objection.
13      A    To the best of my knowledge, they were at
14  the time and still remain so.
15           (Deposition Exhibit No. 81 was marked
16              for identification.)
17      Q    (BY MR. JONES)  What is that document
18  before you, sir?
19      A    This is a document from Waugh &
20  Associates, who were the CPA group that handled the
21  audits for the U.S. Taekwondo Union at that time.  It's
22  dated September 12th, 2003 and addressed to
23  Ms. Virginia Witte, Director of the Audit Division for
24  the U.S. Olympic Committee.  A carbon copy was sent to
25  myself, Chris Telli, and Steve Smith of Holme Roberts
```

47

```
 1  and Owen.
 2      Q    And who was Waugh & Associates?
 3      A    They were the accounting firm that
 4  conducted the annual and semi-annual audits of the
 5  USTU.  They were the independent auditing firm.
 6      Q    They were hired by USTU?
 7      A    Yes.  They were -- again, when I took
 8  over, they were the accounting firm of record from the
 9  past.
10      Q    And so this written response was designed
11  to respond to a USOC audit?
12      A    I think these were to reflect Chris
13  Telli's findings for the audit that he conducted, and
14  this was the start and us responding to it, like the 1
15  September document.
16      Q    Okay.
17      A    Yeah, these are the 19 items that we
18  responded to.
19      Q    I'm showing you exhibit next in order.
20           (Deposition Exhibit No. 82 was marked
21              for identification.)
22           MR. LEVINSTEIN:  Do you think this was a
23  one-page document without a signature?
24           MR. JONES:  It's all we've got.
25           MR. LEVINSTEIN:  Where did it come from?
```

48

```
1              MR. JONES:  It was filed in the
2    arbitration.
3              MR. LEVINSTEIN:  What arbitration?
4              MR. JONES:  The decertification in
5    response to the complaint.
6              MR. LEVINSTEIN:  Okay.  You mean it was
7    an exhibit to testimony in advance that was in
8    connection with the January USOC Executive Committee
9    hearing?  It's all right.
10             MR. JONES:  It's one of our exhibits from
11   the TRO.  We'll find out what it is.
12             MR. LEVINSTEIN:  I won't slow you down.
13       A     I have reviewed this document.
14       Q     (BY MR. JONES)  Have you ever seen it
15   before?
16       A     Yes.
17       Q     What is it?
18       A     Even without the signature, I recognize
19   this as having come from Mr. Kelly Skinner at Sports
20   Partnership of USOC.
21             As one of the findings with the reallocation
22   of funds that we didn't spend, I had to make a formal
23   request in writing to have the funds reallocated so
24   that we didn't lose them the following year.  This
25   letter was in response to that letter requesting that
```

49

```
1    the funds that we didn't spend be reallocated.  And it
2    followed verbal conversations with Mr. Skinner.
3        Q     He denied the request?
4        A     No.  It was . . .
5        Q     Part of the request?
6        A     Part of it, yes.  And this also was the
7    beginning of our discussion about setting up a High
8    Performance Director position, and that's what the rest
9    of the letter addresses.
10       Q     The third paragraph -- I guess this is the
11   part I wasn't clear on.  The second paragraph, he says,
12   "Your request for reallocation as outlined above has
13   been denied."  In the third paragraph, "Through
14   extensive conversations with you, we have agreed to
15   reallocate the entire $116,724 to 2004."
16       A     And that was to -- we were trying to have
17   that shortfall in 2003, but he moved it to 2004.
18       Q     I see.  Okay.
19             MR. LEVINSTEIN:  Actually, 2002, for the
20   record.
21             THE DEPONENT:  Pardon me?
22             MR. LEVINSTEIN:  2002 salary?
23             THE DEPONENT:  Of that coach, yes.  We
24   were trying to move it to 2003.  That was part of the
25   deferral to 2004, if that makes sense to you.
```

50

```
1              MR. LEVINSTEIN:  No.  We'll deal with it.
2    It's okay.
3              (Deposition Exhibit No. 83 was marked
4              for identification.)
5        A     Okay.  I've reviewed the document.
6        Q     (BY MR. JONES)  What is that?
7        A     This was a letter from me to Mr. Kelly
8    Skinner, Director of USOC Sports Partnerships,
9    requesting the reallocation of the 2002 grant funds.
10       Q     And that was the request that you were
11   alluding to a few minutes ago?
12       A     Right.
13       Q     I apologize for not showing you this one
14   first.
15       A     That's okay.
16       Q     And Mr. Skinner responded as stated?
17       A     Right.
18       Q     Can we take a short break?
19       A     Sure.
20             (Recess taken from 6:09 p.m. to 6:21
21             p.m.)
22       Q     (BY MR. JONES)  Let me jump to one area,
23   which is coach selection.  Were you involved at all in
24   the coach selection process in 2003 for the USTU
25   Olympic coach for 2004?
```

51

```
1        A     Yes.
2        Q     What was your involvement with that
3    process?
4        A     It was my responsibility to develop a set
5    of criteria, submit them to USOC for their approval,
6    and then implement it to select their coaches.
7        Q     So when you say "develop," you mean write?
8        A     Yes.
9        Q     Did you write the actual criteria that
10   were used in 2003?
11       A     There were three of us that worked on that
12   collaboratively.  At that time, Mr. Han Won Lee and
13   Mr. Sammy Pejo as well, and myself.  What we did is we
14   would meet with a committee from USOC on the standards,
15   and we would meet with them, get advice from them,
16   tweak it as they suggested they needed.  And this was
17   the overall selection process, not just coach
18   selection, but athlete, team leader, and coach.
19       Q     Okay.
20       A     There was one document.
21       Q     I'd like to show you --
22             MR. LEVINSTEIN:  I'll try to find it for
23   you.
24             MR. JONES:  Thanks.
25             MR. LEE:  32.
```

52

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1      Q    (BY MR. JONES)  Please take a look at
 2  Exhibit 32.  I'll represent to you that it's a
 3  partial --
 4           MR. LEVINSTEIN:  If he wants to look at
 5  the bigger one, I have that here too.
 6      A    Okay.  I have reviewed this.
 7      Q    (BY MR. JONES)  Can you identify it?
 8      A    Yes.
 9      Q    What is it?
10      A    This is a portion of the Selection
11  Procedures Manual for the USOC.  And this part pertains
12  specifically to the selection of coaches.
13      Q    Focusing on Page 29 for a moment --
14      A    Yes.
15      Q    -- it states, under No. 1, the question as
16  posed is, "What are your NGB and/or PSO prerequisites
17  for coaching positions?"  Answer, "Previous coaching
18  experience at the Olympic Games, Pan Am Games, World
19  Championships, World Cup, or Pan Am Championships for
20  Taekwondo."
21           Does this appear to be the coaching selection
22  criteria used by USTU when it selected Dae Sung Lee as
23  the Olympic coach in 2003?
24      A    Yes, that's one of the three things.
25           (Whereupon, there was an interruption in the
```

53

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1  deposition proceedings.)
 2      A    Yes, this was one of the three things that
 3  were a part of the selection process.
 4      Q    (BY MR. JONES)  One of the three things?
 5      A    Right, which continues with No. 2 and 3.
 6      Q    All right.  To your knowledge, were there
 7  any other criteria that went into his selection?  We
 8  had some testimony that cast some doubt, so I just want
 9  to make sure we're using the right selection criteria
10  when I ask you questions on this.
11      A    These were the only criteria that we used
12  when we came up with the selection.
13      Q    And the three individuals you identified
14  being yourself --
15      A    Han Lee, who was the OTC coach prior to
16  Chul Ho Kim, and Sammy Pejo, who was the USTU AAC,
17  Athletes Advisory Committee, representative.
18      Q    Collectively, you wrote this?
19      A    Yes.
20      Q    And this was then voted upon by someone --
21  or considered by someone for passage?
22      A    The officers approved this before we
23  submitted it to the USOC.  And all of this had to be
24  done -- the coaching committee had to make
25  recommendations.
```

54

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1      Q    Would that be the Coaching Science
 2  Committee?
 3      A    Yes, the Coaching Science Committee.  And
 4  they also nominated for the other positions that were
 5  appointed.  And as it says, the Executive Committee
 6  approved this criteria.
 7      Q    It says at the top that "Procedures for
 8  selection of coaches for the Games must be approved at
 9  least 12 months prior to the start of the Games"?
10      A    Yes.
11      Q    Was this procedure submitted at least 12
12  months prior to the start of the 2004 Games?
13      A    That's an excellent question.  As I
14  recall, there was -- looking at the bottom of this,
15  where it says December 2001, I think there was a later
16  document, which was around September of 2002.  And it
17  didn't affect this portion of the procedures, but it
18  did affect the athlete portion, where we were still
19  coming up with a system of open competitions, how many
20  would qualify from that to go to another round, et
21  cetera.
22           But this has remained intact from the 2001
23  document.  So this was something that I know was
24  submitted in 2001 and 2002 to Mr. Gary Moy.  And when
25  things came back, it came back as a total package with
```

55

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1  suggestions that we needed to tweak; where they were
 2  going to have wild cards, how are you going to select
 3  them, what's the criteria.  But, again, this remained
 4  untouched.
 5      Q    Meaning Page 29?
 6      A    Yes, the coaching selection completely.
 7      Q    And is it your testimony that it was
 8  approved more than 12 months prior to the start of the
 9  2004 Olympic Games?
10      A    I'm not certain of the date that it got
11  final approval.  I knew it was submitted well in
12  advance, because I remember distinctly the comment from
13  International Games that we were one of the first NGBs
14  to get ours submitted.
15           The approval thing, I'm not sure, because,
16  again, things would come back and we would have to
17  resubmit.  Things would come back, tweak this,
18  resubmit.  So I'm not sure of the final acceptance
19  date.  But I'm assuming it was very close to the year
20  out, if not before.
21      Q    Did this selection criteria here, previous
22  coaching experience, et cetera, listed on Page 29, did
23  it look like prior coach selection criteria used by
24  USTU?
25      A    Yes, definitely.
```

56

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1    Q    So you didn't tinker with that?
 2    A    Not with this at all no.
 3    Q    In your mind, just this sentence here, the
 4  description of the prerequisite --
 5    A    Right.
 6    Q    -- is it objective?
 7    A    Objective in the sense that it specifies
 8  exactly which competitions you have to have coached to
 9  be considered, yes.
10    Q    Are you familiar with the success that
11  coaches have had and teams have had by USTU in Olympic
12  competitions prior to 2004?
13    A    Yes.
14    Q    And they have won medals, have they not?
15    A    Yes.
16    Q    And the teams and coaches who have
17  contributed to winning those medals, the coaches in
18  particular, have they been selected using criteria
19  similar to the ones that we're looking at on Page 29?
20    A    Yes, sir, the same exact criteria.  This
21  was on file when I took over as executive director.
22  And, again, this section was not tweaked at all.  The
23  other parts were for athlete selection, but not for
24  coaches or team leaders.
25         MR. LEVINSTEIN:  Quick question.
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1         MR. JONES:  Sure.
 2         MR. LEVINSTEIN:  I just want to make sure
 3  I understood.  It was on file when you were the
 4  executive director, or you wrote it?
 5         THE DEPONENT:  No.  This document was on
 6  file as part of what comes up every four years in the
 7  office.  It's redone for each event, like the Olympics,
 8  the Pan Am Games.  So a copy of this was on file, the
 9  big document, from past things.  Then we had to develop
10  it specifically for the Olympic Games for 2004 and one
11  also for the Pan Am Games of 2003.
12         MR. LEVINSTEIN:  Okay.  But this is for
13  the Olympic Games, Page 29 --
14         THE DEPONENT:  Yes.
15         MR. LEVINSTEIN:  -- that you referred to?
16         THE DEPONENT:  Yes.
17         MR. LEVINSTEIN:  You seem to suggest it
18  was done in December 2001, but you also seem to suggest
19  you did it when you were the executive director, which
20  I didn't think happened until the summer of 2002.  So
21  I'm having a hard time understanding, but that's okay.
22         THE DEPONENT:  I can easily explain that.
23    Q    (BY MR. JONES)  Can you explain the
24  presence of the December 2001 down at the bottom?  What
25  does that mean exactly?  Is that the date that this
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1  thing is created, or is it something else?
 2    A    Well, to my understanding -- and, again,
 3  this was there when I came to the office.  This is
 4  what's given to us by the delegation review committee.
 5    Q    The USOC?
 6    A    From the USOC.  And it's in two formats.
 7  One has the previous information in it.  And there's a
 8  blank document that we have to, if we're changing
 9  anything, generate it and submit it.
10         So my assumption with this one is this is
11  what was given to the office in December of 2001 by the
12  review committee from USOC.  Then it was incumbent upon
13  me to tailor it to fit our criteria and have it
14  approved by them.
15         MR. LEVINSTEIN:  I think we have misled
16  him because I think Sammy Pejo did this online.  This
17  didn't come from the committee, and he's thinking this
18  came from the USOC, which it did not.  So I think
19  you're getting confused and wrong testimony because
20  Sammy Pejo, I believe, took the standard form document
21  from the USOC, which had a blank page, without anything
22  filled in under 1, 2, and 3, and then he typed in what
23  he thinks were the criteria and gave it to you all,
24  because Page 29 of the book from the USOC didn't come
25  with Taekwondo filled out, I don't believe.
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1         THE DEPONENT:  Right.  No, I understand
 2  what you are saying.  But in speaking directly with
 3  Mr. Moy, from International Games, he is the one that
 4  sent me the copy of what I needed to fill in.
 5         MR. LEVINSTEIN:  But when it came to you,
 6  it didn't have anything filled in on Page 29 that said
 7  "Taekwondo," did it?
 8         THE DEPONENT:  All I'm saying is that
 9  there was one on file with stuff filled in, and the one
10  that he sent me was blank that I had to fill in.  But
11  Sammy didn't develop the criteria that we used for
12  that.
13         MR. LEVINSTEIN:  Okay.  I'm not sure I
14  understand.
15         THE DEPONENT:  I know for sure that I'm
16  the one that submitted it and typed it up.
17         MR. LEVINSTEIN:  I understand.
18         THE DEPONENT:  Now, he might have typed
19  up a prototype document.  I don't know.
20         MR. LEVINSTEIN:  I don't know either.  I
21  just don't want you to testify because I think we've
22  misled you by the nature . . .
23         MR. JONES:  We'll think about your
24  comments, Counsel.  They're well taken.  It is past
25  6:30.  I suggest we adjourn at this point, and I will
```

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1   try and finish quickly tomorrow morning.
 2              MR. LEVINSTEIN:  And in light of this
 3   stuff, I'll try to too, but it could push past 3:00.
 4              MR. JONES:  I know.  But I'll do what I
 5   can.
 6              (The deposition adjourned at 6:35 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

61

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1                  A F F I D A V I T
 2   STATE OF COLORADO      )
                            ) ss.
 3   COUNTY OF              )
 4         I have read my deposition, and the same is
 5   true and accurate, save and except for changes and/or
 6   corrections, if any, as indicated by me on the
 7   amendment sheet(s) attached hereto as indicated.
 8
 9   Amendment sheet(s) attached [  ]
10   No changes; no amendment sheet attached [  ]
11
12
           _____
13              BRUCE C.K.W. HARRIS, VOLUME I
14
15      SUBSCRIBED AND SWORN TO before me on this
16   _____ day of _____, 2005.
17   My commission expires: _____
18
19           _____
                       NOTARY PUBLIC
20
         in and for the State of _____
21
22
23
24
25
```

62

4/6/2005 Harris, Bruce C.K.W. VOLUME I

```
 1                C E R T I F I C A T E
 2
     STATE OF COLORADO    )
 3                        ) ss.
     COUNTY OF DENVER     )
 4
 5
         I, VALORIE S. MUELLER, Registered
 6   Professional Reporter and Notary Public in and for the
     State of Colorado, duly appointed to take the
 7   deposition of BRUCE C.K.W. HARRIS, VOLUME I, certify
     that prior to the examination the deponent was duly
 8   sworn to testify to the truth in the matters in
     controversy between the parties herein; that the
 9   deposition was taken in shorthand by me at the time and
     place aforesaid and was thereafter reduced to
10   typewritten form by me and processed under my
     supervision, the same consisting of 62 pages, and that
11   the same is a full, true and complete transcription of
     my shorthand notes.  I further certify that I am not
12   related to, employed by, or counsel to any of the
     parties herein, or otherwise interested in the events
13   of the within cause.
14
         A transcript review of this deposition was
15   requested and is available to the deponent as notified
     by me.
16
17       IN WITNESS WHEREOF, I have affixed my notarial
     seal this 25th day of April, 2005.  My commission
18   expires December 11, 2006.
19
                  _____
20                         VALORIE S. MUELLER
                     Registered Professional Reporter
21
22
23
24
25
```

63