4/7/2005 Harris, Bruce C.F.K. VOLUME II

0064

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
CIVIL ACTION NO. 04-00461-SOM-LEK

DEPOSITION OF BRUCE C.K.W. HARRIS, VOLUME II
EXAMINATION DATE:  April 7, 2005

DAE SUNG LEE,

Plaintiff,

v.

UNITED STATES TAEKWONDO UNION,
a Colorado nonprofit corporation, et al.,
Defendants.

PURSUANT TO SUBPOENA, the deposition of BRUCE C.K.W. HARRIS, VOLUME II, was taken at 8:02 a.m. on April 7, 2005, at the Double Tree Hotel at 1775 E. Cheyenne Mountain Boulevard, Colorado Springs, Colorado, before Valorie S. Mueller, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.

Valorie S. Mueller
Registered Professional Reporter

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A P P E A R A N C E S

For the Plaintiff:

　　WARD D. JONES, ESQ.
　　GLENN UESUGI, ESQ.
　　Bervar & Jones
　　1400 Pauahi Tower
　　1001 Bishop Street
　　Honolulu, Hawaii 96813
　　(808) 550-4990

For the Defendants:
　　MARK LEVINSTEIN, ESQ.
　　TODD BRAUNSTEIN, ESQ.
　　Williams & Connolly, LLP
　　725 Twelfth Street, N.W.
　　Washington, D.C. 20005
　　(202) 44-5171

Also present:  Dae Sung Lee
　　　　　　　　Gary Johansen, Deputy General Counsel,
　　　　　　　　United States Olympic Committee

I N D E X

EXAMINATION BY:                              PAGE

Mr. Jones ........................ 68
Mr. Levinstein ................... 122
Mr. Jones ........................ 348
Mr. Levinstein ................... 369
Mr. Jones ........................ 374

I N D E X   O F   E X H I B I T S
DEPOSITION                              PAGE FIRST
EXHIBIT NO.    DESCRIPTION                APPEARS

4*   August 4, 2003 letter from Thomas Satrom
     to Bruce Harris .......................... 77

4/7/2005 Harris, Bruce C.F.K. VOLUME II

5*   9/5/2003 letter from Thomas Satrom to
     Bruce Harris ............................. 77

7*   3/30/04 e-mail from Bruce Harris to Dae
     Sung Lee, with forwarded 10/8/03 e-mail
     from Kelly Skinner to Bruce Harris ........ 72

32*  Excerpt from the United States Olympic
     Committee Selection Procedures Manual ..... 68

42*  USOC Remediation Plan for USTU January 27,
     2004 ..................................... 114

84   Responses to 16 Questions Submitted by Tom
     Satrom in September 5, 2003 Letter, Bates
     USOC00784-USOC00797 ...................... 78

85   10/30/03 letter from James Scherr to Bruce
     Harris ................................... 112

86   United States Taekwondo Union, Inc.
     Financial Statements For the Year Ended
     December 31, 2002, Bates
     USOC00422-USOC00432 ...................... 170

87   Selection Procedures for Coaches signed by
     Bruce Harris 1/20/03 ..................... 192

88   8/25/03 memo from Dr. Cha Sok Park to
     William Martin and James Scherr, Bates
     USOC00039-USOC00042 ...................... 246

89   Article entitled "USTU in Turmoil" by
     Ginny Lopez, Bates USOC00171-USOC00172 ... 252

90   9/2/03 and 9/1/03 exchange of e-mails
     between Kay Burton and Larry Voorhees,
     Bates USOC00186-USOC00188 ................ 256

91   4/30/03 e-mail from Kay Burton to the M&C
     Committee, forwarding a 4/30/03 e-mail
     from Diana Dunlap to Kay Burton, Bates
     USOC00124-USOC00125 ...................... 257

92   Printout from LadyTKD.com, Bates
     USOC00070-USOC00071 ...................... 260

4/7/2005 Harris, Bruce C.F.K. VOLUME II

93   11/29/03 e-mail from Bob Gallagher to USOC
     Executive Committee, Bates
     USOC00147-USOC00148 ...................... 270

94   9/1/03 e-mail from Bob Kestenbaum to Kay
     Burton, Bates USOC00048 .................. 275

95   9/1/03 letter from Guy Poos to Kay Burton,
     Bates USOC00189-USOC00190 ................ 278

96   9/2/03 e-mail from Kay Burton to M&C
     Committee, forwarding 8/31/03 e-mail from
     "jjstkd@aol.com" to the USOC, Bates
     USOC00192-USOC00193 ...................... 288

97   Letter from Larry Voorhees to Ms. Burton,
     Bates USOC00174-USOC00176 ................ 291

98   4/12/04 letter from Philip Acosta to Jim
     Scherr, Bates USOC00001-USOC00002 ........ 313

99   9/16/03 e-mail from Kay Burton to M&C
     Committee, forwarding 9/16/03 e-mail from
     Larry Cain to Kay Burton, Bates USOC00178  315

100  5/29/03 letter from Kim Sol to Thomas
     Satrom, Bates USOC00143-USOC00146 ........ 320

101  1/1/98 cover letter from Josiah Henson to
     the USOC, with attached 1/2/98 letter from
     Josiah Henson to Richard Schultz, Bates
     USOC00004-USOC00014 ...................... 339

EXHIBIT "B"

## Page 68

1    P R O C E E D I N G S
2    BRUCE C.K.W. HARRIS, VOLUME I
3        The deponent herein, being first duly
4    sworn to testify to the truth in the above cause, was
5    examined and testified on his oath as follows:
6        E X A M I N A T I O N
7    BY MR. JONES:
8        Q    I believe we were talking about the
9    Selection Procedures Manual for Taekwondo U.S. Olympic
10    coaches when we broke off yesterday.
11        A    Yes.
12        Q    Handing you Exhibit 32 once again. I had
13    some questions about that.
14            After reviewing that, does it appear to be
15    selection criteria that was in effect in 2003 in
16    preparation for the 2004 selection?
17        A    Yes, it appears to be so.
18        Q    And was a coach candidate selected in 2003
19    for the position of Olympic coach for the Athens
20    Olympics in 2004?
21        A    Yes, there was.
22        Q    And who was that?
23        A    Mr. Dae Sung Lee.
24        Q    Can you just briefly walk us through the
25    process by which he was selected, if you know?

## Page 69

1        A    Again, we followed the written criteria
2    that were approved by the USOC review committee, the
3    delegation review committee; and that included having
4    nominations come from the Coaching Science Committee.
5    And those nominations had to meet the criteria, No. 1,
6    which was either coaching experience in the Olympic
7    Games, Pan Am Games, World Championship, World Cup, or
8    Pan Am Championship.
9            After that, the Executive Committee would
10    approve those recommendations, and they would also make
11    the selection -- approval selection of the coach, which
12    ended up being Mr. Lee.
13        Q    Do you know why he was selected?
14            MR. LEVINSTEIN: Objection.
15        A    I wasn't privy to the nominating process,
16    but in reviewing what was submitted, I mean his resume
17    met the requirements in No. 1, where he had previous
18    experience in more than one of those areas -- one of
19    those events.
20        Q    (BY MR. JONES) Were Taekwondo athletes or
21    their representatives involved in the coach selection
22    process in 2003?
23            MR. LEVINSTEIN: Objection.
24        A    To my knowledge, there were athletes on
25    the Coaching Science Committee that made the nomination

## Page 70

1    because we had a 20 percent requirement for each
2    committee.
3        Q    (BY MR. JONES) Do you know who those
4    athletes were?
5        A    No, I don't.
6        Q    Were Taekwondo coaches or former coaches
7    involved in the selection process, if you know?
8        A    I'm trying to remember the makeup of the
9    Coaching Science Committee. I do know that there was
10    at least one coach that I remember being on there, and
11    there were probably more. I don't remember all the
12    names of the committee members.
13        Q    You said within USTU, the coach selection
14    process involved two bodies considering a given
15    candidate?
16        A    The Coaching Science Committee made the
17    recommendation and the nominations, and it was approved
18    by the Executive Committee.
19        Q    What happened, if you know, after the
20    Executive Committee nominated Dae Sung Lee?
21        A    After that was approved by the Executive
22    Committee, I was notified of that. I sent a letter to
23    the president, who already knew, but to have something
24    in writing saying that this was the result of the
25    Executive Committee determination. And then we would

## Page 71

1    follow up with the procedure to the USOC Delegation
2    Review Committee.
3        Q    Is that a matter of just sending something
4    over to the Delegation Review Committee?
5        A    Yes. And usually I sent it to Mr. Moy,
6    Gary Moy.
7        Q    What did the document look like?
8        A    As I recall, I just drafted a letter
9    saying that this was the results of the coaching
10    selection.
11        Q    Do you remember when approximately that
12    took place that you sent correspondence to the USOC
13    involving Dae Sung Lee's nomination?
14        A    I don't remember the exact month at all.
15    I've tried to remember that, but I don't.
16        Q    Do you recall whether or not Dae Sung Lee
17    was asked to attend a site visit in Athens, Greece, in
18    2003?
19        A    In 2003, there was a -- I think they
20    called it a team leaders meeting, which was a site
21    visit to Athens. He was supposed to have gone;
22    Lynnette Love was also supposed to have gone. And
23    those names were submitted to the International Games
24    Committee as well.
25        Q    Do you know if he went?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1      A    I knew he didn't.
2      Q    You knew what?
3      A    I knew that he did not.
4      Q    Do you know if there was a site visit
5  before the team leader conference that you just spoke
6  of?
7      A    Yes, there was, and I went on that one,
8  along with Mr. Lee.
9      Q    That was to Athens?
10     A    Yes.
11     Q    Do you remember when that was?
12     A    Unfortunately, I don't remember it.
13     Q    That's okay.  Showing you exhibit next in
14  order.  I apologize.  This is Exhibit 7.
15            (Deposition Exhibit No. 7 was re-marked
16             for identification.)
17     A    Okay.  I have reviewed that.
18     Q    (BY MR. JONES)  What is that document, do
19  you know?
20     A    It's an e-mail to Mr. Lee from me.  I
21  think it was in response to the request from Mr. Dae
22  Sung Lee regarding providing something that certified
23  that he had been approved as the coach for the 2004
24  Athens Olympics.
25     Q    So the top part is an e-mail from you?
```

72

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1      A    Yes.
2      Q    And what is the bottom part of that
3  Exhibit 7?
4      A    This is forwarded by Michelle Farrell, who
5  was on the Sports Partnership staff with Mr. Kelly
6  Skinner.  And it's -- the subject was "US Taekwondo
7  Approved Staff Nominations for 2004 SOGs, Athens," and
8  it says that "The USOC Executive Committee approved the
9  following US Taekwondo Staff Nominations for the 2004
10  Summer Olympic Games, Athens," and the names included
11  are Lynnette Love as team leader and Dae Sung Lee as
12  coach.
13     Q    What is the date of the e-mail that was
14  forwarded to you by -- was it forwarded to you?
15     A    I don't see my name listed.  Oh,
16  "USTUevents," yes.  That was to me, through the events
17  address at USTU.  And that date was 8/28/2003.
18     Q    All right.  There's another date in the
19  middle of the page that says forwarded by Michelle
20  Farrell, USOC --
21     A    On October -- or 10/8/2003.
22     Q    So your best answer is October 8, 2003 as
23  to --
24     A    Yes.
25     Q    -- when you got the e-mail from
```

73

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  Ms. Farrell?
2      A    Yes.
3      Q    And what was the purpose of this e-mail,
4  if you know?
5      A    To verify that the selections that we had
6  submitted to them had been approved.
7      Q    To your knowledge, was there anything
8  further needed to complete the coach nomination process
9  for U.S. Olympic coach of the Athens Games?
10     A    Not to my knowledge.
11     Q    What did you do after you got this e-mail
12  on or about October 8, 2003?
13     A    I informed Mr. Lee and also Ms. Love that
14  their names had been approved.
15     Q    How did you inform them?
16     A    Possibly by phone, possibly by e-mail.  I
17  don't remember.
18     Q    Do you have any idea what Mr. Dae Sung Lee
19  was doing in the interim period between the USTU
20  approval of his name as coach and the USOC verification
21  by e-mail that he had been approved by them as well?
22          MR. LEVINSTEIN:  Objection.
23     A    I don't know what he was doing, but I know
24  that he contacted me several times in regards to
25  whether it was official, whether he had been approved
```

74

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  or not.  I don't know what he was actually doing, other
2  than that.
3      Q    (BY MR. JONES)  In your role as Executive
4  Director, did you have to approve any expenses incurred
5  by Mr. Lee toward preparation for the Games?
6      A    Yes.
7      Q    Can you think of any expenses which you
8  approved during 2003?
9      A    I know that he went -- Mr. Lee went on
10  several trips with the team as part of the scouting
11  mission in preparation for the Games.  I don't remember
12  the dates, but I know that we did include him in the
13  travels as a preparation for the Games.
14     Q    And did the USTU pay for those --
15     A    Yes.
16     Q    -- travel expenses?  That would include --
17  would that include airfare?
18     A    Airfare, hotel, yes.
19     Q    Was per diem typically allowed?
20     A    We went through a process of changing the
21  way per diem worked, but there was some per diem as
22  well.
23     Q    And when various competitions came up that
24  he was expected to attend, how would he be notified, if
25  you know?
```

75

### Page 76

1    MR. LEVINSTEIN: Objection; assumes facts
2  not in evidence.
3    A    To the best of my knowledge, we would
4  publish the team makeup, which included the athletes,
5  the coaches, the trainer; and he was included in that.
6    Q    (BY MR. JONES) When flight reservations
7  were arranged for Mr. Lee, would he be told to -- would
8  tickets be sent to him, or would he be told just to
9  show up at the airport and pick them up?
10   A    Our events office handled all the airline
11 bookings. Sometimes it would be paper tickets,
12 sometimes it would be E-tickets, where he would show up
13 and show his ID.
14   Q    Would the events office be the one that
15 has records of those sorts of things, then?
16   A    Yes, definitely.
17   Q    The events office of USTU?
18   A    Yes.
19   Q    And who would that have been in 2003?
20   A    2003, that was Gina Mendoza.
21   Q    Would the events office also handle hotel
22 reservations for competitions for the team?
23   A    Yes. And I was also a part of that,
24 because I was still handling the events oversight. So
25 in addition to Gina Mendoza, it was also Linda Henry.

### Page 77

1    Q    I'd like to go back to one document,
2  Exhibit 5, if we could, and just ask you a few
3  questions about that, if you would look through it
4  briefly.
5    A    Yes, I have.
6    Q    Several of the points raised in Exhibit 5
7  seem similar to points raised in Exhibit 4, which was
8  an earlier letter from Mr. Satrom. Do you recall that?
9    A    Yes.
10   Q    Example, the questions about the Kukkiwon
11 system?
12   A    Yes.
13        MR. LEVINSTEIN: Hold on. I'm looking
14 for Exhibit 5, which became Exhibit 82. Go ahead.
15   Q    (BY MR. JONES) If you could just go
16 through this and tell us how you responded to the
17 problems, if you will, or inquiries, if you will, by
18 Mr. Satrom?
19        MR. LEVINSTEIN: I think there is a
20 document that we have given you. If we can go off the
21 record for one second --
22        MR. JONES: Okay. Sure.
23        (Discussion off the record.)
24        (Whereupon, Mr. Johansen left the
25            deposition proceedings.)

### Page 78

1    Q    (BY MR. JONES) If you can go through
2  point by point, and if you have already responded to a
3  given point, just say, you know, I handled that one
4  yesterday.
5    A    All right. No. 1 was providing a list --
6        MR. LEVINSTEIN: Time out.
7        (Discussion off the record.)
8        (Whereupon, Mr. Johansen rejoined the
9            deposition proceedings.)
10       (Deposition Exhibit No. 84 was marked
11           for identification.)
12   A    Yes, I recall this very well.
13   Q    (BY MR. JONES) We've handed you Exhibit
14 84. Yesterday, we were asking whether you had
15 responded in writing to the letter from Mr. Satrom
16 marked as Exhibit 5.
17   A    Yes.
18   Q    And you said you did recall doing that,
19 but we didn't have it yesterday, but today it's been
20 located by counsel and marked. Is that document one
21 which you wrote?
22   A    Yes.
23   Q    And was it done in response to Exhibit 5?
24   A    Yes, it was.
25   Q    Or was it? I don't want you to read all

### Page 79

1  the responses you did, because it's very lengthy, but
2  if you could just kind of summarize briefly, point by
3  point, so that we have it in the record.
4    A    Okay. The first issue was providing a
5  list of all grievances filed, and that was done in an
6  attachment. And it was done by Mr. Mark Bryant, who
7  was chair of Law and Legislation, which is why I didn't
8  respond to that one personally. He did. And that was
9  done as an attachment.
10       No. 2 was a question about individuals from
11 the Pan Am Region that were invited to the 2003 Junior
12 Olympics. It questioned how many people were invited,
13 how many attended, who paid for the cost, what was the
14 total cost associated with their attendance and the
15 purpose of inviting them to the Juniors.
16       Without reading the synopsis of it, I
17 remember that -- well, the cost specifically says it
18 was $41,787.65. That amount actually was paid for by a
19 gentleman by the name of Mr. Kim Chung, who was the
20 president of the Canadian Taekwondo Federation at that
21 time.
22       The purpose of inviting them was so that they
23 could get to experience the Junior Olympics, which
24 again is the largest Taekwondo event in the world.
25 That was done on more than one occasion, where we

1  invited guests and dignitaries. This time it happened
2  to be around 20 Federation presidents from the Pan Am
3  Region.
4           And, again, this was at no expense to the
5  USTU. The way this figure was arrived at was we got a
6  breakout from the hotel with room costs per room;
7  airfare was paid by him; the hotel costs were
8  individually itemized; and he submitted payment for
9  that as well. So it was at no cost to the USTU.
10          Of the 22 that were invited, I think there
11 were around 16 or 18 that came because a few couldn't
12 make it for last-minute reasons.
13          No. 3, explain how the 2003 Junior Olympics
14 are organized and administered. More specifically, the
15 Committee wanted to know whether the USTU runs the
16 event itself or contracts with a third party to run the
17 event. Also how the receipts and expenditures for the
18 event are handled. "That is, does USTU accept
19 participant fees and spectator fees in cash, check or
20 credit card. If cash is accepted, how does USTU
21 account for the cash receipts? Are expenditures paid
22 for in cash? If so, how are these expenditures
23 accounted for? ... what were the total gross receipts
24 for the Championships, total expenditures ... and net
25 revenue ... Finally, please provide the number of

80

1  individuals who participated at the Championships, with
2  a schedule of fees for participating. That is, is
3  there a one time fee, or does a participant pay
4  multiple fees depending upon the competitions entered?
5  Also, provide the total number of individuals who paid
6  spectator fees, with a schedule of fees for attending.
7  That is, are different fees collected for children,
8  adults, parents of participants, [et cetera]. Lastly,
9  what were the total revenues collected for participant
10 fees and for spectator fees?"
11          Well, just going from my recollection, the
12 response, without reading it, how is it organized? The
13 USTU at one time did contract our national events out.
14 There was a bid process, and individuals could garner
15 the bid to host the event; for example, say a $100,000
16 bid fee, you have the rights to put on the
17 Championship. It's your expenses, your revenue, your
18 income gained from the event.
19          That was one thing that we stopped doing when
20 I came on as Events Director. All of the events moved
21 in-house, which is to say that all of the national
22 events were handled by the USTU and its events staff.
23 The 2003 Junior Olympics was also one of them. So we
24 no longer contracted.
25          Do we accept participant fees and spectator

81

1  fees in cash, check, or credit card? At that time, we
2  accepted any form of payment. Sometimes it was to our
3  detriment because checks bounced. It was something
4  that later we amended or we no longer took checks, only
5  credit cards or money orders.
6           If cash is accepted, how was it accounted for
7  for cash receipts? When I first came on, we had very
8  poor receipting for everything. As I noted yesterday,
9  we only had 20-some percent of receipts in-house. And
10 that included things like cash receipts at events. So
11 that was a weakness in our system.
12          Some expenditures were paid for in cash. I
13 was personally responsible for contracting the venue,
14 the labor, the setup, everything else. Most places --
15 or most of the things accepted a check, which we did
16 and had a record of. If it was done in cash -- for
17 instance, I'm trying to think of one thing that we
18 might have paid for in cash. Delivery of audio-video
19 equipment, such as the monitors and the computers, some
20 companies wanted cash when they delivered, and we did
21 that and got a receipt for that. And that was in the
22 USTU records.
23          But for the most part, we tried to pay
24 everything by check from the USTU, which required my
25 signature and also either Gina Mendoza's or someone

82

1  else.
2           Total gross receipts, I'll have to go with
3  what's listed here. It says $680,489.69. Expenditures
4  were $487,113.92. Net revenue was $193,375.77.
5       Q   So the event made money?
6       A   Yes.
7       Q   Number of participants, according to this,
8  was 5,390. And that's tracked by the registration
9  system in the events office, depending on how you
10 registered.
11          I remember the question asking -- there was a
12 different price breakdown if a competitor competed in
13 one event, two events, three events; $70, $90, $110, I
14 think it was something like that.
15          Spectator fees were also tiered so that there
16 was a fee for -- the total four-day event for adults
17 was one fee; the total four-day event for children was
18 one fee; and individual day passes were also different
19 for adult and children.
20          I might note that the USTU did not handle --
21 what's that called when you walk up and pay? What was
22 the question? Spectator fees. We contracted a group
23 like TicketMaster to handle that. So they tracked the
24 daily receipts.
25          At the end of the day, I was called in, along

83

## Page 84

1  with the head of the TicketMaster group, in addition to
2  the local organizing committee, which was usually
3  someone from the convention center, and each day we
4  initialed the daily receipts, because we had a
5  percentage basis for revenue from spectator fees.
6      For instance, in Orlando, it was always
7  50/50, which was a terrible deal, I thought. In Tampa,
8  it was 75/25 for USTU. In Minnesota, it was 100
9  percent USTU. So we had to verify the daily receipts
10 so we knew how much we were getting.
11     In general, out of the spectator fees, we
12 ended up paying for the staffing for TicketMaster and
13 sometimes the staffing for security in the venue. And,
14 again, at the end, that was reconciled. We got their
15 bill, we had the total receipts from spectator fees,
16 there was an indication of what was subtracted, and
17 they would write a check to us.
18     Spectator fees were never given to us in
19 cash. It was either mailed or given to us at the
20 closeout by check. I think that covers No. 3.
21     Q    Thank you.
22     A    No. 4, "It has been reported that USTU
23 chartered an airplane," that was discussed yesterday
24 fully. Do I need to go into it further?
25     Q    No. That's fine.

## Page 85

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      A    No. 5, "As of September 1, 2003, what is
2  the current balance of USTU's total debt? ... current
3  amount of USTU's loans or other obligations? ...
4  current balance on USTU's line of credit? How much can
5  USTU draw on its line of credit? What is the amount of
6  USTU payables?" And those numbers are listed effective
7  at that time.
8      Q    Okay.
9      A    No. 6, "The committee has requested
10 information in the past from USTU regarding the number
11 of delegates that are appointed to the USTU Board of
12 Governors by the USTU President. The Committee has
13 gotten various responses regarding this question.
14 Please provide an accurate and complete accounting of
15 the number of appointments. How many delegates are on
16 the Board of Governors? How many of these delegates
17 are appointed by the USTU's President? Please provide
18 a list of delegates, the organization that they
19 represent, and indicate whether they were elected or
20 appointed. Also, please provide a list of Executive
21 Committee members, what category they fill on the
22 Executive Committee and whether or not they are
23 appointed by the President. Is it true that an
24 appointment to the Executive Committee is in effect
25 also an appointment to the Board of Governors?"

## Page 86

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      Okay. I don't know if you want me to list
2  the numbers that are here in response, but this was the
3  breakout as we discerned them at that time.
4      Q    You responded to it?
5      A    Yes. There were 127 voting members at
6  that time on the Board of Governors.
7      Q    Yeah. Why don't you go through and just
8  tell us the numbers you came up with so we understand
9  the structure.
10     A    Voting State Presidents listed were 13.
11 Non-voting State Presidents were 9.
12 Delegates-at-Large, 5. And Committee Chairpeople, 5.
13 Total number of Voting Delegates to the Board of
14 Governors equal 91. Total Number of Votes Cast by the
15 Voting Delegates at the Board of Governors was 127.
16 Total number of Votes Cast by the Members of the Board
17 of Governors Appointed by the President were 23. And
18 those were the numbers.
19     Q    Okay.
20     A    Attached was an Exhibit D which was a
21 detailed list of the current delegates to the Board of
22 Governors, their organizations, and whether each
23 delegate was elected or appointed. I noticed that
24 there were no exhibits attached to this, but I know
25 they were provided.

## Page 87

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      The Executive Committee was comprised of 20
2  people; 6 officers, 4 Coordinators of Divisional
3  Affairs, 1 Junior Olympic Chairperson; 1 Chair of Law
4  and Legislation; 1 Chair of National Coaching Staff; 1
5  chair of Technical Contest Rules and Referee Committee;
6  1 chair of National Championship, Tournaments, and
7  Ceremonies; 1 Chairperson of National Athletes Advisory
8  Council; and 4 Athlete Representatives selected by the
9  AAC.
10     In addition, the Executive Director of USTU
11 and Immediate Past President of USTU were nonvoting
12 members of the Executive Committee. There was also an
13 Exhibit E that was attached that listed the names of
14 the Executive Committee members, what category they
15 fill, and whether they were appointed by the president.
16     Q    Just as an aside, what was the total
17 number of members or estimated number of members
18 nationally in the USTU as of the time you were
19 responding to these questions?
20     A    In 2003 -- I think this was when the
21 response was.
22     Q    2003.
23     A    2003, I think by the end of the year, we
24 were at 34,000 members.
25     Q    So the body of -- the various structures

[Page 88]

1  you have just gone through describing the Committee's
2  management, et cetera, of USTU was speaking for a
3  membership of 34,000?
4       A    Yes.
5            MR. LEVINSTEIN:  Objection.
6       Q    (BY MR. JONES)  Thank you.  If you would
7  proceed.
8       A    Okay.  No. 7, "Please provide a detailed
9  summary of the Kukkiwon program."  The Committee wanted
10 a complete understanding of the program, its history,
11 who runs it, its purpose.
12           "Is the Kukkiwon program connected to the
13 [International Federation]?  Do competitors have to be
14 Kukkiwon certified to compete in international
15 competitions?  How about the Olympics or Pan [Am]
16 Games?  Is this an IF rule?  If so, what is the purpose
17 of such a rule?  Is there a standard ability level an
18 athlete must attain through some sort of testing
19 program to be certified, or is a certification the
20 result of a recommendation from an athlete's
21 instructor?  Please provide a complete explanation of
22 the fee schedule for Kukkiwon certification.  Are
23 different fees paid for different levels of
24 certification?  Who gets these fees?  That is, does the
25 athlete's instructor get a fee, does USTU get a fee,

[Page 89]

1  and does the IF get a fee?  How much of each fee goes
2  to each entity, including the Kukkiwon organization?
3  What was the total revenue to USTU as a result of the
4  Kukkiwon certification program in the years 2001 and
5  2002?"
6            Okay.  Kukkiwon, the institution, is an
7  adjunct to the World Taekwondo Federation, which is our
8  International Federation.  Its sole purpose is for
9  certifying black belts worldwide.  That's the purpose
10 of Kukkiwon.
11      Q    I think you have covered that yesterday.
12      A    Right.  Who runs it, they have their own
13 staff.  They're located in Korea.  They have their own
14 organization base.  Is the Kukkiwon program connected
15 to the International Federation?  Yes.
16      Q    That was the one you were saying was the
17 gold standard?
18      A    Right.  Kukkiwon is the gold standard.  Do
19 competitors have to be Kukkiwon certified to compete in
20 international competitions?  Not all international
21 competitions, just those sanctioned by the IF.  That
22 includes World Championship, World Cup, the regional
23 Federation Championships, like Pan Am Games, the
24 Olympic Games.
25           For those, you have to have Kukkiwon

[Page 90]

1  certification.  That's an International Federation
2  rule.  The purpose of the rule is so that, as I
3  understand it, there's some consistency to the level of
4  competition.  There are thousands -- literally
5  thousands of individual organizations that certify
6  people as black belts with no standard.
7            Kukkiwon, as the certifying organization, has
8  standards for promotion and certification through each
9  level of black belt.  So there is a standard that you
10 can assume when you see that someone is an 8th Dan
11 Kukkiwon black belt, a 2nd Dan Kukkiwon black belt.
12 That's consistent worldwide.  So, yes, there is a
13 standard ability level to be certified as a Kukkiwon
14 black belt.
15           Recommendation of an athlete's instructor is
16 a part of it.  Instructors are the ones that test
17 individuals based on the Kukkiwon standard and submit
18 it for certification.  That's the best way I know to
19 put that.
20           The fee schedule, I think we include -- yes,
21 and that's listed on the next page, Page 7.  And it
22 ranges from $70 for a 1st degree black belt to $700 for
23 a 9th degree black belt, and it's incremental; 70, 90,
24 120, et cetera.  It's listed.  And that's standard fees
25 for Kukkiwon black belts worldwide.

[Page 91]

1            Different fees are paid as noted on Page 7.
2  Who gets these fees?  The way the USTU Kukkiwon program
3  worked was in order to recommend for Kukkiwon
4  certification, an instructor had to show proof that
5  they were a 4th degree Kukkiwon black belt with the
6  USTU office, based on a copy of your 4th degree
7  certification.  And the standard is you have to be a
8  minimum 4th degree Kukkiwon to recommend others for
9  promotion.
10           And you can recommend for promotion up to one
11 level below your level.  For instance, if I'm a 4th
12 degree, I can only recommend my students up to the
13 level of 3rd degree Kukkiwon.
14           Our fee schedule was such that we got half of
15 the certification fees for Kukkiwon and sent half to
16 them.  So in the case of an application for a 1st
17 degree black belt, an instructor would send us the
18 application form signed with their Kukkiwon number, 4th
19 Dan or higher, and a money order for $70.  Of that $70,
20 $35 was sent to Kukkiwon, $35 stayed with the USTU.
21 And it was half, depending on whatever the fee schedule
22 was, on up to 9th.  Half of it stayed with USTU, half
23 went to Kukkiwon.
24           As far as athletes' instructors getting a
25 fee, I have no way of knowing whether that was the case

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  or not, because again they would submit to us the
2  posted Kukkiwon fees.
3        Does the IF get a fee?  Not the IF, per se,
4  but Kukkiwon did; the IF being the World Taekwondo
5  Federation, which was different from Kukkiwon.
6     Q    Okay.
7     A    Total revenue as a result of the
8  certification, I'd have to look.  In 2001 -- I'm
9  referring to Page 7 of this document -- the total
10 revenue to USTU was $158,915.  In 2002, it was
11 $183,835.  I think that answers No. 7.
12    Q    Okay.
13    A    No. 8, "Please provide a summary of the
14 USTU Dan Certification program.  When this was program
15 implemented?  How many individuals have been certified
16 under this program?  Is there a standard ability level
17 an athlete must attain through some sort of testing
18 program to be certified, or is certification the result
19 of a recommendation from an athlete's instructor?  What
20 is the fee schedule for certification on this program?
21 Are any of these fees shared with other persons or
22 organizations?  Is this program being supported by
23 Taekwondo clubs?  Are there any negatives of having a
24 USTU Dan Certification program?"
25       This program had been under development for

92

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  several years prior to this pseudo implementation.  A
2  gentleman by the name of Mr. Kim Sol in Montana was the
3  guiding force that was working on writing it, coming up
4  with the specifications and everything.
5        It wasn't implemented prior to this, again
6  for the reasons that were stated by then President Sang
7  Lee, which I discussed yesterday.  If Kukkiwon is the
8  gold standard, we would doom our program to possible
9  failure by trying to substitute it for the Kukkiwon
10 program because, again, that's the standard that
11 everyone wanted.
12       In developing the USTU Dan Certification
13 program, we paralleled the Kukkiwon program with
14 several distinctions, as noted in here.  All monies
15 collected would be kept by USTU.
16       We had made provisions for actual physical
17 testing of people at state, regional, and national
18 events as a part of the requirement for getting your
19 belt rank.  So it wouldn't just be a recommendation on
20 a paper application.
21       The USTU Dan program would be totally managed
22 by the USTU.  And there was a plan for the USTU Dan to
23 be the required standard for participation in USTU
24 national events.  That's how it differed from the
25 parallels with the Kukkiwon program.  Fees would have

93

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  been the same, so there was no advantage in cost or
2  savings by getting one or the other.
3        We implemented -- we began implementing it in
4  August of 2003, and we were accepting crossover
5  memberships.  For instance, if you had a 6th Dan
6  Kukkiwon, and you wanted the 6th Dan USTU
7  certification, you paid a $50 fee, and you would have
8  the USTU, as well.  And that was for all levels.
9        I think five people had done that at the time
10 of this report.  So it wasn't a smashing success.
11    Q    Five people?
12    A    Yes.  We had not conducted any physical
13 tests of people at that point.  Again, it was
14 implemented in August.  Our next national event
15 wouldn't have been until nationals in 2004, which would
16 have been in May.  But that was the plan to actually
17 have a board of examiners set up to test people at the
18 next national event.
19       Again, the fee schedule paralleled that of
20 Kukkiwon.  The new program did develop interest.  We
21 did get inquiries by phone and by e-mail to the Dan
22 office.  Mainly people, as I recall, were asking is it
23 going to be a requirement to participate at nationals
24 next year?  And our response was not yet, but at some
25 point down the line, it will be the requirement.

94

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1        But we did get lots of inquires about it,
2  but, again, only five people jumped on right away and
3  converted to the U.S. Dan.  We printed up certificates.
4  We printed up black belt cards, and we went by the
5  curriculum for certification that was developed by
6  Mr. Sol, Kim Sol, in Montana.
7        The negative side was initially, there wasn't
8  a lot of interest in converting, and there was no hope
9  of getting it accepted internationally.  Other
10 countries have national Dan certification programs.
11 But, again, at WTF sanctioned events, they're not
12 accepted.  And I have witnessed that firsthand.  So
13 that was the downside of the program.
14       No. 9, "How does USTU respond to the
15 perception that the USTU is governed by cultural values
16 emanating from Korea?"  This I discussed at length
17 yesterday.
18    Q    Yes.
19    A    No. 10, "USTU recently sent a proposal to
20 amend its bylaws to its Board of Governors.  What was
21 the proposal?  Why was it sent at this time, when the
22 Board of Governors is scheduled to meet in November?
23 Was the proposal sent to the entire Board of Governors
24 or was there a problem with the mailing?  If so, please
25 explain.  Does the USTU have a current list of who is

95

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  on the Board of Governors?  Will the individuals on the
 2  Board of Governors change at the November meeting, that
 3  is, will there be a new Board elected at that meeting?"
 4          I'm reviewing my response to this.  Oh, the
 5  proposed amendments that were sent out would eliminate
 6  the president's ability to make appointments.  As I
 7  said yesterday, he had verbally stated such in other
 8  meetings, but this was the first written attempt to
 9  inform the body, the Board of Governors, that it would
10  be on the ballot at the annual meeting in November.
11          So it would eliminate his ability to appoint
12  state presidents, where in the past if there were fewer
13  than five clubs, he could appoint a state president.
14  That would be gone.  And also the five at-large
15  members.  It would eliminate the contradictory language
16  within the USTU bylaws regarding the submission of
17  state delegates to the national meeting 60 days in
18  advance while maintaining the 45-day submission
19  requirement contained elsewhere in the bylaws.
20          Also it would eliminate the requirement that
21  delegates to the board of governors meeting be listed
22  with the national office, or the office of the
23  Executive Director, as registered members of the
24  corporation at least 60 days in advance of that
25  meeting.
```

96

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1          As I recall, this was sent out prior to the
 2  meeting to inform the Board of Governors that these
 3  things were going to be on the ballot and to draw their
 4  special attention to it.  That's an answer to the
 5  timeliness of that being sent out.
 6          The mail ballots were sent out as a result of
 7  the proximity of the meeting with the Membership and
 8  Credentials Committee.  My memory has been jogged.  I
 9  remember that in discussions with then President Lee,
10  he wanted to show good-faith evidence that this was a
11  proposal that was going forward.  So he wanted the
12  ballot to go out prior to the meeting with Membership
13  and Credentials.  Instead of saying we're going to, he
14  could then say we have sent out a mail ballot.
15          (Whereupon, Mr. Uesugi and Mr. Lee left
16          the deposition proceedings.)
17      A   President Lee has said voluntarily that he
18  had wanted to relinquish the authority.  I mentioned
19  that earlier.
20          MR. LEVINSTEIN:  I'm sorry.  There was a
21  ballot, or was it just a memo about the meeting?
22          THE DEPONENT:  A mail ballot.
23          MR. LEVINSTEIN:  Okay.
24      A   So a mail ballot was sent out, not just to
25  inform them, but to actually vote on it so that we
```

97

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  would have some results prior to the Membership and
 2  Credentials meeting.
 3          "The mail ballot was sent to all members of
 4  the Board of Governors."  Yes, initially, there was a
 5  problem with the mailing.  And my response in writing
 6  reminds me of that.
 7          Initially, it was sent only to the Executive
 8  Committee when it was supposed to have been sent to the
 9  entire Board of Governors.  When it was noted that this
10  didn't happen, another mailing was sent out; a correct
11  mailing was made within one day.  And the reason for
12  that, as I recall, as noted here, the staff person that
13  was tasked didn't understand that on our fax machine,
14  there's two different numbers; one for the Executive
15  Committee and one for the Board of Governors.  And that
16  person wasn't familiar with the difference in the two
17  groups and sent it to the Executive Committee.
18          We always kept a receipt of who it was sent
19  to, and I remember seeing the receipt and catching the
20  fact that it didn't go to the Board of Governors.  The
21  next day, that was corrected and the ballot was sent
22  out.
23          Those who didn't receive it by fax -- we had,
24  I think, three or four people that either did not have
25  a fax or an incorrect fax number, and those were sent
```

98

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  by certified mail to them.  That was our standard
 2  practice, if it was something official and we got a fax
 3  error or something.
 4          No. 11.
 5          MR. LEVINSTEIN:  Just for the record,
 6  there was a question about will the individuals on the
 7  Board of Governors change at the November meeting?
 8          THE DEPONENT:  Oh, I'm sorry.
 9          MR. LEVINSTEIN:  I don't know if that's
10  answered.
11          THE DEPONENT:  No.  Thanks for pointing
12  that out.
13      A   Membership to the Board of Governors was
14  based on each state's registration numbers, I think, as
15  of August, prior to the November meeting.  So there was
16  a possibility that each year there would be a change in
17  the makeup of the board of directors.  I don't know if
18  that addresses it or not.  But it's not like there's an
19  election for the board of directors that takes place at
20  the national meeting.
21          For instance, if a state has five clubs this
22  year that it didn't have last year, then they will have
23  a delegate at the board of directors meeting that
24  wasn't there last year.  But it wasn't an election that
25  took place at the national meeting.
```

99

            Did I miss anything else in here? Oh, and
there was a list, a current list, of who was on the
Board of Governors that was submitted as an exhibit as
well.
            (Whereupon, Mr. Uesugi and Mr. Lee
            rejoined the deposition proceedings.)
       A    No. 11, "Describe USTU's Coaching
Certification Program and its Referee Certification
Program. Describe USTU's Master's Instructor's
Licensing Program. What is the purpose of these
programs? Do individuals have to meet certain
qualifications to participate in these programs? Who
runs these programs? Are they run by USTU or are they
contracted to a third party?
            A Coaching Certification Program had
established guidelines to standardize our certification
of national coaches in the United States. It had
different levels, levels 1, 2, and 3 -- actually
through 5; whereas to be a coach for an Olympic event,
World Championship, you had to be a higher level coach,
like a Level 5, Level 4.
            Level 1 was an entry level, so that if I was
a school owner, and I took my students to a state
championship, for instance, or a local tournament, I
could come and take the certification program and be

4/7/2005 Harris, Bruce C.F.K. VOLUME II

certified as a Level 1 coach.
            Level 1 was required for every coach at our
national events. That was mandatory. There was a
seminar conducted at each national event for Level 1
and Level 2. And there were standardized criteria for
each.
            In order to take it, you had to be registered
as a coach, basically. The purpose, again, was to have
standardization in our coaching levels and to educate
them. It made requirements for CPR. They had to be
familiar with the competition rules, things that might
seem to be expected; but there was no standardization
prior to that.
            Who ran it? It was run by the USTU. It
wasn't contracted to a third party. As far as the
referee certification program, same thing. There's a
detailed book with the competition rules. There were
four levels and categories of referees, D, C, B, and A,
A being the highest national level. Within each letter
grade, there were three other categories, D-1, 2, 3;
C-1, 2, 3; B-1, 2, 3; A-1, 2, 3, with B and A being
national level referees.
            The reason for the differentiation in those,
in order to be recommended to become an international
referee, you had to, at the very least, be a national

4/7/2005 Harris, Bruce C.F.K. VOLUME II

level referee. Going through the different levels
presumed that you were getting more experience, and
therefore you were more qualified as you got to the A
level. This was run by the USTU and its referee
committee. It was not contracted to a third party.
            The Master Instructor Licensing Program.
This was set up to standardize the teaching methods for
Taekwondo in the United States. This was aside from
the sport aspect, where the referee and the coach's
certification had direct carryover to the sports
aspect. This addressed the teaching side of Taekwondo
and made an effort to standardize what is taught for
each belt rank, even through the color belts, not just
the black belt level.
            It also offered school management education,
tips on developing your school. It covered the legal
aspects, as far as liability, within your school. It
covered the philosophy of Taekwondo, the martial art,
and other subjects.
            This was a service provided by the USTU to
its members and its instructors. And they publicized
the names of instructors who had gone through this
program on the USTU website, so if a student or a
school wanted to see if their instructor had been
certified through its licensing program, it was there

4/7/2005 Harris, Bruce C.F.K. VOLUME II

for everyone to see.
            There were problems encountered with the
program because initially it was set up so that you had
to be one of the highest level black belt in order to
become licensed, and that automatically left people out
of the process, initially. For instance, you had to be
7th, 8th, or 9th Dan, which had limited numbers of
people just by the exclusivity of the level and how
long it takes to obtain it.
            This was run by the USTU. This one, we had
volunteers. For instance, we did contract for CPR. We
brought in other legal experts to address that part of
it. We had other instructors that were not on staff
with USTU to handle the philosophy aspect of it. And
there were some people that were not even USTU members
that offered -- that conduct seminars on dojo
development, for instance, where they might be a guest
speaker at different seminars, in addition to members
of the USTU that also did that.
            So it wasn't -- it was not contracted out.
It was done by USTU, but there were other volunteers,
and portions of it, like CPR, were paid for like
through Red Cross or whoever. I think that covers No.
11.
            No. 12, "How are coaches and staff selected

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   for the Olympic Games, Pan [Am] Games, World
 2   Championships and other major international events?"
 3       Q    (BY MR. JONES)  I think you kind of
 4   covered that question, but there were some subsidiary
 5   questions in there.
 6            MR. LEVINSTEIN:  I don't think he did,
 7   just for the record, other than the Olympic Games.
 8            MR. JONES:  Okay.
 9            MR. LEVINSTEIN:  It's up to you.
10       Q    (BY MR. JONES)  Yeah, if you can walk
11   through the others, if they're different.
12       A    The Pan Am Games, being a protected event,
13   like the Olympic Games, had the same standard.  We had
14   the same form that the Delegation Review Committee sent
15   that we had to send back for their approval for
16   selection; the Pan Am Games and Olympic Games.
17            For World Championship and other major
18   international events, it was a selection process done
19   in-house.  But the process was the same, where the
20   Coaching Science Committee nominated the candidates for
21   coaches, and it was approved by the officers on the
22   Executive Committee.
23            Criteria?  Again, I wasn't a part of the
24   committee.  I'm not a -- I wasn't a part of the
25   Coaching Science Committee, so I don't know their
```

104

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   criteria in coming up with the recommendations.
 2            "Are appointments made for political purposes
 3   or as a basis of rewarding certain individuals?"  I
 4   don't have a way of knowing that.
 5            "Do the coaches who are chosen have a recent
 6   record ([within the] last two Quadrennium) of
 7   developing athletes at the highest international
 8   levels?"  Coaches that are chosen.  Let me see what my
 9   response is.
10            Well, again, that was under the purview of
11   the Coaching Science Committee.  In retrospect, some
12   coaches did have direct development of the athletes
13   within the past eight years.  Others had just a proven
14   track record in coaching successfully at higher level
15   events, but that all was under the purview of the
16   Coaching Science Committee.
17            "Does USTU give any consideration to a coach
18   who places a large number of athletes on a team?"
19   Again, that was all under the purview of the Coaching
20   Science Committee.  I don't know if that was a direct
21   requirement for a nomination.  I can't speak to that.
22       Q    Okay.
23       A    No 13, "Are athletes ever required to
24   assist with clinics, seminars or training programs
25   offered by USTU, USTU's coaches, USTU members or other
```

105

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   individuals or organizations associated with USTU?  If
 2   so, what are the particulars of this arrangement?  Is
 3   the athlete penalized if he or she does not assist?  Is
 4   the athlete paid for his or her services?  Are these
 5   clinics a source of revenue for USTU, USTU's coaches,
 6   USTU members or other individuals or organizations
 7   associated with USTU?"
 8            I'm reviewing my written response to that.  I
 9   know that the OTC Resident Program had a head coach,
10   the OTC coach.  And a part of his payment included
11   bonuses for camp participation in order to develop the
12   grass roots side of it.
13            For instance, if we had a monthly OTC program
14   where 30 athletes from around the country would pay to
15   come, the OTC coach did get a bonus for numbers of
16   participants.  I don't think there was a baseline, but
17   I know the participation varied from as few as five
18   participants, sometimes, to 50 or 60 participants.
19            So I do know that there was a bonus
20   associated with that.  And I know that some of the OTC
21   residents assisted with the camps that were put on
22   monthly.
23            As far as money for that, they weren't
24   required to, and they weren't penalized if they didn't.
25   They were encouraged to assist with it.  They didn't
```

106

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   receive compensation; did not.  And the OTC budget
 2   itself was increased based on the number of
 3   participants in the resident program, so that affected
 4   everyone, all the athletes that were a part of it.
 5            Am I missing something?  Do athletes get
 6   penalized?  No.  Pay for their services?  No.  Clinics
 7   a source of revenue, yes.  For the coaches, only by way
 8   of a bonus.  The USTU members, no.  No.  That's 13.
 9            No. 14, "When is the next annual meeting of
10   USTU scheduled for?  When was the meeting date set?
11   Has a location, city and meeting place (hotel or other
12   site) for this meeting been determined?  If so, when
13   was the location, city and meeting place ...
14   determined?  Where is that location?  Please provide
15   both the city and meeting place (hotel or other site).
16   When was the date for the meeting made known to the
17   USTU membership/delegates who will be attending the
18   meeting?  When was the location, city and meeting place
19   ... made known to USTU membership/delegates who will be
20   attending the meeting?  How was the date and location
21   made known to the USTU membership/delegates?"
22            The 2000 (sic) meeting was scheduled for
23   November 20 through 22nd as noted.
24            MR. LEVINSTEIN:  2000?
25       A    I'm sorry, 2003.  The 2003 annual meeting
```

107

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   was scheduled for November 20 through the 22nd of 2003
 2   in Dallas, Texas, at the Double Tree Hotel.  The
 3   determination of the site, the date, et cetera, were
 4   made during the week of September 8th to the 12th,
 5   which was when I think these responses were submitted.
 6           "In accordance with the USTU Bylaws,
 7   notification of the Annual Meeting must be made
 8   forty-five days prior to the Annual Meeting."  As of
 9   the date of these responses, there was still more than
10   60 days prior to that meeting.
11           "Notification of the meeting date and site
12   will be made in accordance with the USTU Bylaws and
13   will be made by fax and certified mail."
14           No. 15, "What specifically has USTU done to
15   address those compliance issues raised by the
16   Committee, to communicate with its members about USTU's
17   compliance review status, to provide its Board of
18   Governors and Executive Committee with accurate
19   financial information and to provide the USOC auditors
20   with the documents and financial records they
21   requested?"
22           As noted here in writing, we tried to be as
23   proactive as possible in coming into compliance
24   financially.  That was a big concern of mine and the
25   office staff.  We terminated one finance director,
```

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   hired two other individuals, and had to re-sort through
 2   all the financial records.
 3           And I remember at the time having people on
 4   staff, a lot of it was taking their work and their work
 5   ethic at face value and just assuming that they were
 6   doing the right things.  They were working every day.
 7   If you asked for a report, it was given to you.  But
 8   the actual maintenance of records at that time was in
 9   shambles, which led to the firing of that financial
10   director and the hiring of two others.
11           I consulted with Jill Goodwin of Waugh &
12   Associates and also Ms. Witte and Chris Telli regarding
13   our financial situation and how we could better come in
14   compliance.
15           Chris Telli worked with me very closely and
16   with our office -- I mean, almost day to day for
17   weeks -- in monitoring what was going on in the
18   financial office.  And because of him and Ms. Witte, we
19   were able to come up with a lot of things.  We
20   identified problem areas, came up with a financial
21   manual, and were well on our way, I felt, to moving
22   into compliance in the financial area, especially as
23   far as reporting.
24           As far as overcoming deficits and things like
25   that, that would have taken more time.  But policies
```

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   and procedures had been implemented and were being
 2   followed.  They were approved by the officers and the
 3   Executive Committee.  So they went -- as soon as it was
 4   developed and approved by Chris Telli, they were
 5   approved within days by the officers and the Executive
 6   Committee and were implemented immediately.
 7           Our financials were definitely in bad shape
 8   for 2000.  It was our hope that by the end of 2003 in
 9   the November annual meeting that we would have the
10   audited financials by Waugh & Associates and by USOC so
11   that we could present to the membership at that annual
12   meeting in November.
13           And, again, the expectation was for a clean
14   audit, because once again we had gone back and improved
15   the receipt numbers from around 20 percent to over 90
16   percent, which would have facilitated a better audit.
17           The USTU had communicated by letter to the
18   Board of Governors regarding the compliance review
19   status, and we were requesting input from the USTU
20   body.  I think that --
21      Q    Is that completed?
22      A    I think -- what were we doing to provide
23   accurate financial information and to provide the USOC
24   auditors?  That was addressed.  I think that completes
25   15.
```

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1      Q    Let's take a break.
 2      A    There was one other question.
 3      Q    Oh, I'm sorry.
 4      A    16, the last question.  "What evidence can
 5   USTU point to in order to indicate to the Committee
 6   that it now has the managerial and financial capability
 7   to run the sport of Taekwondo?"
 8           The steps that we listed were, especially in
 9   the financial area, developing strict financial
10   procedures and policies and implementing them
11   immediately; improving the status of the 2003 financial
12   records.  And as of September 9th, the bank accounts
13   had been completely reconciled through August 31st, so
14   that was a big improvement over where they were.
15           We felt that we were operating for 2003 at a
16   net surplus.  I was confident that we would finish the
17   year around even.  We would be at a break-even level by
18   the end of 2003.
19           I had also come up with a list of budget
20   cuts, personally, that I had sent to Mr. Skinner and
21   Sports Partnership and also had shown Mr. Telli that
22   would have saved approximately $210,000 in 2004 without
23   making any cuts on the athlete programs.
24           It was in areas of international development,
25   office allowances to the officers, things like that.
```

1   All of that was done in an effort to demonstrate the
2   managerial capabilities. And, again, the financial
3   management was brought, we felt, into a manageable
4   situation to demonstrate that we could conduct
5   ourselves as an NGB. That's it for 16.
6       Q   Thank you. Now we'll take a break.
7           (Recess taken from 9:20 a.m. to 9:34
8           a.m.)
9           MR. JONES: Back on the record.
10      Q   (BY MR. JONES) Mr. Harris, we just went
11  through your responses to Exhibit 5. Notwithstanding
12  those responses, did the decertification action brought
13  by the USOC in 2003 proceed forward?
14      A   Yes.
15      Q   I'd like to show you one document we
16  should mark next in order.
17          (Deposition Exhibit No. 85 was marked
18          for identification.)
19      A   Okay. I've reviewed that document.
20      Q   (BY MR. JONES) What is that document?
21      A   This is a letter to me from Mr. Jim
22  Scherr, Chief of Sport Performance, but the interim CEO
23  for USOC. And it states that the USOC had initiated
24  the decertification process against USTU. And since
25  the process had been initiated, they had determined

112

1   that the interest of the Taekwondo athletes would not
2   best be served by continuing with the attendance of
3   Mr. Dae Sung Lee and Ms. Lynette Love at the team
4   leadership meeting in Athens in November.
5       Q   That was the meeting you spoke of that
6   they did not attend?
7       A   Right.
8       Q   Were you in Colorado Springs when this
9   letter was received?
10      A   Yes, I was.
11      Q   And what did you do, if anything, when you
12  received it?
13      A   I was actually in contact with Mr. Lee and
14  Ms. Love over at the Pan Am Games at the time. I
15  think -- or Ms. Love was at the Pan Am Games. I'm
16  trying to remember the time frame. I know that I was
17  in contact with them. I did inform them by phone that
18  they wouldn't be attending the Athens meeting.
19      Q   Do you recall where Mr. Dae Sung Lee was
20  when you contacted him?
21      A   I think he might have been in Chicago at
22  the time.
23      Q   Was he -- do you know if he was already on
24  his way to Athens?
25      A   He was en route because he had to come out

113

1   earlier from Hawaii in order to meet up with Ms. Love
2   en route to Athens.
3       Q   Other than getting this letter from
4   Mr. Scherr, were there any other communications with
5   Mr. Scherr about what was going on with the
6   decertification action during this period of late
7   October?
8       A   I knew that there had been a couple, I
9   think, of phone calls with Mr. Scherr, Kelly Skinner,
10  myself, and I think the officers of the USTU in regards
11  to accepting the remediation plan and the
12  decertification process. I don't know if it was prior
13  to this date or around that same time frame, but there
14  were, to my memory, a couple of phone calls with
15  Mr. Scherr.
16      Q   Okay.
17      A   But not one-on-ones.
18      Q   I'm showing you Exhibit 42, previously
19  marked. Can you identify that?
20      A   Yes, I recognize the document.
21      Q   What is that document?
22      A   This is the USOC Remediation Plan for the
23  U.S. Taekwondo Union, and it's dated January 27, 2004.
24      Q   Was that the plan that was ultimately
25  approved by USTU?

114

1           MR. LEVINSTEIN: Objection; lack of
2   foundation.
3       A   And that, I have no way of knowing,
4   because I was gone by then. But this was, again, just
5   in scanning it, the plan that I had seen before I left
6   the office.
7       Q   (BY MR. JONES) Okay. Were you privy to
8   any -- well, let me ask what your understanding is of
9   the remediation plan with respect to who would have to
10  leave their positions at the USTU and -- let me just
11  leave it at that. Who would have to leave their
12  positions at USTU?
13          MR. LEVINSTEIN: Objection; lack of
14  foundation. You can answer.
15      A   And, again, this went through several
16  discussions at the time that I was leaving, so I don't
17  know what the final version says. But at one point, it
18  was all the officers. At one point, it was appointed
19  office holders. At one point, there was a discussion
20  of the president and the treasurer. So it went through
21  various stages.
22      Q   (BY MR. JONES) Ultimately, though, who
23  lost their jobs?
24          MR. LEVINSTEIN: Objection.
25      A   That, I don't know, unless I read this

115

```
 1    quickly.
 2         Q    (BY MR. JONES) You don't know which
 3    people in the executive board member, which committee
 4    members --
 5         A    Well, I know for certain that the
 6    president did. Actually, everyone was removed, and a
 7    CEO was put in by the USOC. And that was, in fact, the
 8    only operating officer of the corporation, so all of
 9    the board was done away with, as I understand it.
10         Q    And you alluded a minute ago to having an
11    understanding that remediation plans that were less
12    drastic with respect to the number of people who would
13    be leaving were discussed --
14         A    Yes.
15         Q    -- prior to the final plan; is that right?
16         A    Yes.
17         Q    What's your understanding as to that?
18              MR. LEVINSTEIN: Objection.
19         A    At varying discussion stages, again, it
20    was my understanding that if the president, the
21    treasurer had resigned, someone would be put in place
22    and we would keep our NGB status and things would go
23    forward without a full -- oh, and I know that they were
24    going to put in a finance director. That didn't
25    happen.
```

```
 1              So discussions, as I understand it,
 2    continued, and it got to where all the officers had to
 3    leave; a CEO would be put in, a finance director, et
 4    cetera.
 5         Q    (BY MR. JONES) Could you just look at
 6    that document to verify whether or not all of the --
 7    everybody, as you put it, had to leave under the final
 8    remediation plan?
 9              MR. LEVINSTEIN: Objection. The document
10    speaks for itself. He's never seen it before.
11              MR. UESUGI: That's an objection --
12    sorry.
13         A    According to the document on Page 3,
14    "Effective immediately, all officers of USTU shall
15    retire, resign or shall be removed. Once the officers
16    resign, their positions will remain vacant until new
17    elections occur under the new governance structure,"
18    described in another section.
19              "All Presidential authority shall be
20    delegated to the Governance and Management Committee."
21              "Treasurer and Secretary General. The USOC
22    person on the Governance and Management Committee shall
23    then assume the duties of Treasurer, although that
24    person shall not hold the office nor assume the title
25    of Treasurer. USTU agrees not to elect an Acting
```

```
 1    Treasurer or otherwise fill the vacant position. The
 2    Governance and Management Committee shall assume the
 3    duties and authority of Secretary General."
 4              "Executive Committee. The members of the
 5    USTU Executive Committee agree to allow the Governance
 6    and Management Committee and the new Executive Director
 7    to handle the day-to-day domestic affairs and general
 8    governance of USTU."
 9         Q    (BY MR. JONES) Okay. So the positions
10    you've just read, was that what you were referring to
11    when you said everybody?
12         A    Well, yes, except this leads me to believe
13    that the Executive Committee may still be in place, but
14    they have agreed to allow the Governance and Management
15    Committee and the new Executive Director to handle the
16    day-to-day affairs.
17         Q    Okay.
18         A    If I can continue one thing, "does
19    terminate all appointed positions," as I did speak to.
20         Q    Do you wish to change any of your answer
21    then as far as everybody? Or is there anybody that you
22    can think of that remained?
23         A    I'm not clear on the Executive Committee,
24    according to the document, because it doesn't say that
25    it's disbanded. It just says that it agrees to allow
```

```
 1    the Governance Committee to handle the day-to-day
 2    authority.
 3              But to review my response, all appointed
 4    positions are gone, the president is gone, the officers
 5    are gone, the Executive Committee may be in place. I
 6    don't know.
 7         Q    What's your understanding of the number of
 8    Korean Americans in these positions that were replaced
 9    or removed?
10         A    As far as officers, of the six officers,
11    two were American-born.
12         Q    American-born Korean?
13         A    No. American-born American. So four of
14    the six would have been Korean Americans. Of the
15    appointed positions, I have no way of knowing without
16    looking at the list of names. Secretary and treasurer
17    were both Korean American. And, again, I'm not sure on
18    the status of the Executive Committee.
19         Q    Thank you. I'd like to now move to
20    another area, one in which you have a lot of expertise,
21    that being the referee --
22         A    Yes, sir.
23         Q    -- area. Have you heard or seen any
24    activities by the current management of USTU that you
25    would interpret to be or believe to be racially
```

**Page 120**

1  insensitive toward Korean American people?
2          MR. LEVINSTEIN:  Objection.
3      A   I don't have firsthand knowledge of it,
4  but I have heard that selecting referees who are
5  non-American-born Americans has been discouraged to the
6  point of saying that we want them to stop coming by the
7  current group.
8      Q   (BY MR. JONES)  And can you be more
9  specific as to when you say current group, are we
10 talking about anybody in particular, or the entire GMC,
11 or --
12         MR. LEVINSTEIN:  Objection.  He's already
13 said he has no firsthand knowledge, so he can't testify
14 about these things.  But go ahead.
15     A   I heard it was by the current CEO,
16 Mr. Gambardella.
17     Q   (BY MR. JONES)  And what is your source of
18 that information?
19     A   The referee chair, the interim chair.
20     Q   And who is that?
21     A   Ms. Barbara Wakefield.  And it occurred in
22 the process of trying to select referees for team
23 trials, especially, where her intent was to select the
24 most qualified referees for team trials to select the
25 best athletes.  It appears that she was discouraged

**Page 121**

1  from appointing several Korean referees.
2      Q   Discouraged by whom?
3      A   Mr. Gambardella.
4      Q   And has she repeated to you any purported
5  statements by Mr. Gambardella that sounded racially
6  insensitive?
7          MR. LEVINSTEIN:  Objection.
8      A   And, again, I can't remember verbatim, but
9  it was to the effect that we don't want them to come,
10 or we want -- I don't remember the verbiage that was
11 used, but it was not to select them, basically.  And I
12 do recall that she continued to go to bat, and as a
13 result, we still had some of them being used at events.
14     Q   (BY MR. JONES)  Some --
15     A   Some Korean Americans, but much fewer than
16 have been in evidence in the past, much fewer.
17     Q   Do you continue to participate as an
18 official?
19     A   Yes.
20     Q   Just in your observations, has the
21 percentage of Korean Americans making up the
22 officiating staff at various events changed in racial
23 content?
24     A   Yes, dramatically.
25     Q   In what way?

**Page 122**

1      A   I guess within the last four years, prior
2  to the last -- prior to the decertification, it was
3  close to a 50/50 mix, or maybe 60/40, American-born to
4  Korean Americans.  Now, it's 95 percent American-born
5  Americans.
6      Q   Do you attribute that to anything in
7  particular?
8          MR. LEVINSTEIN:  Objection.
9      A   I don't know whether it's a lack of people
10 applying and not being selected -- I know in speaking
11 with Ms. Wakefield, the number of applicants have
12 dropped dramatically because they don't feel that
13 they're invited to participate anymore, or welcome to
14 participate.
15     Q   (BY MR. JONES)  Thank you.  I don't think
16 I have any further questions.
17              E X A M I N A T I O N
18 BY MR. LEVINSTEIN:
19     Q   Mr. Harris, when did you first hear about
20 Mr. Dae Sung Lee's lawsuit against the USTU and USOC?
21     A   Hmmm.  My first recollection of it is
22 prior to the Olympic Games when I think the lawsuit was
23 for him to be allowed to continue to be the Olympic
24 coach for Athens.  That's the first time I heard it
25 prior to that.

**Page 123**

1      Q   And prior to the Games, did you speak with
2  Mr. Lee or his lawyers?
3      A   No.
4      Q   Did you believe that he should be the
5  Olympic coach?
6      A   It was my belief that since we had
7  followed the procedure for selecting him, that it was
8  his right to be the coach, yes.
9      Q   Did you know that the criteria had been
10 changed?
11     A   No, I did not.
12     Q   Do you now know that the criteria had been
13 changed?
14     A   No.  Again, I left the office at the end
15 of 2003, and I didn't know anything after that.
16     Q   Okay.  You said yesterday, I believe, that
17 you worked for the USTU until the end of December 2003?
18     A   No.  Beginning of December.  December
19 2002 -- -3, I'm sorry.
20     Q   Isn't it actually October 31st, 2003 when
21 you resigned?
22     A   I know that I submitted a letter to
23 Mr. Lee.  I don't know the date on the letter.  But I
24 also know that I was still around for a while after
25 that until Mr. Tim Connolly came onboard, and I don't

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   know the date of his hiring. But it was up until then.
2   Q    When did you first speak with Mr. Dae Sung
3   Lee or any lawyer representing him about his dispute?
4   A    I received a phone call saying that I had
5   a deposition scheduled for today, and that would have
6   been maybe two weeks ago.
7   Q    And then did you have any discussions
8   about what you were going to be asked in this
9   deposition?
10  A    No.
11  Q    Did you talk to Mr. Dae Sung Lee or his
12  lawyers before you showed up yesterday?
13  A    I had phone calls from Mr. Lee letting me
14  know what time and where, but we didn't discuss
15  anything else about it.
16  Q    You didn't talk in advance of the
17  deposition about what your conversations had been with
18  Ms. Wakefield about referee issues?
19  A    About Mrs. Wakefield?
20  Q    The questions you were just asked about
21  Ms. Wakefield and what she said, Ms. Barbara Wakefield,
22  had you discussed that with them before today?
23  A    No, not with Mr. Lee or the lawyers.
24  Q    Who had you discussed that with?
25  A    There was a group of six of us that were

124

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   working on referee revision for the certification
2   program, and Ms. Wakefield had made known to us that
3   she was having problems with making selections and
4   getting people that she wanted approved to come to
5   events. If you want the names of those members of the
6   group --
7   Q    Sure.
8   A    -- I can give those to you. John
9   Holloway, Leon Preston, William Sullivan, Anne Chase --
10  oh, Ms. Wakefield and myself. Those were the six
11  people.
12  Q    Who hired you to work for the USTU?
13  A    My hiring was done by the then president,
14  Sang Lee, and approved by the officers or Executive
15  Committee.
16  Q    Which was it, the officers or the
17  Executive Committee, do you know?
18  A    I don't know.
19  Q    There was any requirement that your hiring
20  be approved by the officers or the Executive Committee?
21  A    That, I don't know. And, again, initially
22  I came as the Events Director working under then
23  Mr. Warwick.
24  Q    Who decided that you would be promoted
25  from Events Director to both being the Events Director

125

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   and the Executive Director?
2   A    That would be then president Sang Lee.
3   Q    How did you know Mr. Sang Lee prior to his
4   hiring you as the Events Director?
5   A    I have been in the Taekwondo community
6   since -- oh, the U.S. Taekwondo community since '77.
7   So I've known most of the players. I was at Mr. Lee's
8   first Elite Tournament, which became the U.S. Open. So
9   I have known him for many years.
10  Q    Are you friends with him?
11  A    Friends?
12  Q    Yeah.
13  A    Yes.
14  Q    And how long have you known Mr. Dae Sung
15  Lee?
16  A    Less time than I have known Mr. Sang Lee.
17  But, again, through officiating, I actually officiated
18  some of his competition matches, and I have seen him as
19  a coach and as a competitor.
20  Q    Are you friends with Mr. Dae Sung Lee?
21  A    Yes.
22  Q    Do you know that he's in this case suing
23  the USTU and USOC for a lot of money?
24  A    I don't know the particulars. I never
25  asked.

126

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   Q    Based on what you know, do you think or
2   would you like him to be successful in that case?
3   A    I'd like the right thing to happen, based
4   upon whatever the results of the trial is.
5   Q    So you have been involved in Taekwondo the
6   last 22 years?
7   A    No. Longer. I started in 1973,
8   personally learning and training.
9   Q    My math is bad. Thirty-two years?
10  A    Yes, sir.
11  Q    I apologize. I did subtract '73 and I got
12  22. Sorry.
13  So since you were 21 years old?
14  A    Yes, sir.
15  Q    When did you first get involved in the
16  USTU?
17  A    1976.
18  Q    And when did you first learn that the USTU
19  had serious problems?
20  MR. JONES: Objection; lacks foundation.
21  A    I made a point of attending as many of the
22  meetings, the annual meetings, the semiannual meetings,
23  as possible once I started coaching the Army team,
24  because I had a vote on the board from then. And that
25  would have started in 1981.

127

```
 1          So since 1981, I started coming to the
 2   meetings.  But to become aware of any problems?  Every
 3   year, to my recollection, when I first started, there
 4   was always something afoot, whether it was arguments
 5   between the members in public at meetings or fights
 6   over where we should have meetings, things like that,
 7   which could have been considered problems.
 8          But I'm assuming that the problems you're
 9   alluding to are the ones that have led to the
10   decertification.
11      Q   (BY MR. LEVINSTEIN)  Just in general.
12   There were all sorts of problems from 1981 forward?
13      A   I mean, any organization has problems, but
14   not to the scope of leading to a decertification.  That
15   didn't occur to me until after I had left the Army to
16   come be a member here in 2001.
17      Q   Well, as a member of the board, were you
18   aware that there were issues starting at least with the
19   1996 Quadrennium about whether the USTU was in
20   compliance with its obligations as an NGB?
21          MR. JONES:  Objection; vague and
22   ambiguous.
23      A   I was aware that there was a compliance
24   review during that Quadrennium, but the way it was
25   reported was -- to my knowledge -- to my recollection,
```

128

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   it was reported that it's all been handled and we're in
 2   compliance.
 3      Q   (BY MR. LEVINSTEIN)  And who reported
 4   that?
 5      A   During that Quadrennium, it would have
 6   been Mr. Warwick, I think, as the Executive Director.
 7   Well, he came on in '98, but during the '96
 8   Quadrennium, it includes that period.
 9      Q   The Quadrennium is from '93 to '96?
10      A   I thought you were saying from '96 to
11   2000.
12      Q   No.  I'm sorry.  I refer to Quadrennium by
13   the Games.  I apologize.
14          In the Quadrennium from '93 to '96 --
15      A   No.
16      Q   -- did you learn that there were problems
17   with the Membership and Credentials Committee?
18      A   No, I did not.
19      Q   But you did know there were issues in the
20   '98 to 2001 Quadrennium --
21      A   Yes.
22      Q   -- 2002?
23      A   Yes, yes.
24          MR. JONES:  Wait for him to answer.
25      Q   (BY MR. LEVINSTEIN)  In the '96 to 2000
```

129

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   Quadrennium, you knew there were problems?
 2      A   Yes.
 3      Q   And did you understand Mr. Warwick was
 4   brought on to try to solve significant compliance
 5   problems?
 6          MR. JONES:  Objection; calls for
 7   speculation, lacks foundation.
 8      A   No, I wasn't aware of that being the
 9   reason he was hired.
10      Q   (BY MR. LEVINSTEIN)  Okay.  Over the years
11   on the board, did you, at meetings or elsewhere, hear
12   members of the USTU express dissatisfaction with
13   various issues concerning the USTU?
14      A   Yes.
15      Q   Can you give me what kinds of things they
16   were unhappy about?
17      A   Well, going back even to the '80s, there
18   was -- there were factions that always opposed whatever
19   group was in as the leaders at that time, with the
20   exception of earlier, and I'll give you a name, for
21   instance.
22          Dr. Dong Ja Yang, when he was president,
23   there were fewer membership complaints against the
24   leadership, per se.  After he was no longer president,
25   there was, it seemed to be, factions that were always
```

130

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   against whoever the leader wanted to be in, as opposed
 2   to out, of the leadership.  Questions about ability to
 3   lead with some of the past presidents.  Always
 4   questions about financial responsibility or lack
 5   thereof.  Could we have done the events with fewer
 6   expenditures, made more money off of it?  That's been
 7   going on since the '80s, at least.
 8          What other major . . .  Even the seating of
 9   delegates at meetings; recognizing who had a right to
10   vote at meetings has always been problematic, to my
11   memory.  Those are the basic general things.
12      Q   Okay.  When did you first hear concern
13   expressed by the USTU members that some USTU positions,
14   committee positions, board positions, Executive
15   Committee positions, were not selected on merit, but
16   were based on contacts, friends, or business
17   associations?
18          MR. JONES:  Objection; lacks foundation.
19      A   Board positions, meaning -- well, for
20   instance, I was on the board because I represented the
21   Armed Forces.  I'm not sure I understand your question.
22      Q   (BY MR. LEVINSTEIN)  Okay.  Did you hear,
23   ever, USTU members complain that there were some board
24   positions that people were appointed to or selected to
25   that was not based on merit, but rather was based on
```

131

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  who they knew?
2     A   Yes.
3     Q   When did you first start to hear those
4  issues?
5     A   Again, going back to forever, basically,
6  that's been a question of who should be on the board.
7     Q   What about with respect to committees; did
8  you hear people say committee positions were selected
9  and not based on merit, but based on friendships and
10 loyalties?
11    A   Yes. And that's been problematic from the
12 time I have been associated with the group.
13    Q   Were there problems with the state
14 associations that you were aware of?
15        MR. JONES: Objection; vague and
16 ambiguous.
17    A   Some state associations, yes.
18    Q   (BY MR. LEVINSTEIN) What kind of
19 problems?
20    A   There were -- and this is what I've heard.
21 It's hearsay. But some states had problems with
22 reporting income from state events. Some states had
23 problems with valid elections of their officers. Some
24 states had problems with following the USTU bylaws, as
25 far as how states are supposed to run and function.

132

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1         MR. JONES: Objection; move to strike all
2  of that witness's statement; it's all based on hearsay.
3     Q   (BY MR. LEVINSTEIN) As a member of the
4  board, were those issues that you were responsible for
5  trying to deal with?
6     A   No.
7     Q   Were they issues the board was responsible
8  for trying to deal with?
9         MR. JONES: Objection; calls for
10 speculation.
11    A   To my knowledge, we were never charged
12 with sorting out problems with state organizations.
13    Q   (BY MR. LEVINSTEIN) Did you understand
14 that the USTU was a National Governing Body?
15    A   Yes.
16    Q   Did you understand that that gave it
17 obligations to govern the sport in the United States?
18    A   Yes.
19    Q   Did you understand that that gave it the
20 obligation to resolve all disputes within the sport?
21    A   Yes, but more especially when it came to
22 disputes that were filed, there was a committee that
23 was tasked to handle those disputes.
24    Q   But -- go ahead.
25    A   And also the board only gathered twice a

133

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  year for a semiannual meeting and an annual meeting, at
2  which agendas were put forward and the agenda was
3  adhered to.
4         And to my recollection, addressing state
5  improprieties was never one of the agenda items at one
6  of those board meetings. And, again, that was referred
7  to a committee to handle protests and irregularities
8  like that.
9     Q   But you understood it was the USTU's
10 responsibility --
11    A   Yes.
12    Q   -- to solve those problems?
13    A   Yes.
14    Q   But you're just saying that as a board
15 member, no one ever put that on the agenda for the
16 board to address?
17        MR. JONES: Objection; that misstates the
18 testimony.
19    A   It was not one of the agenda items at any
20 of the meetings that I was at.
21    Q   (BY MR. LEVINSTEIN) But it was the
22 responsibility of the USTU to solve those problems?
23    A   The USTU as an organization, yes.
24    Q   And wasn't the board responsible for
25 making sure the USTU did everything it was required to

134

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  do?
2     A   Was that the board's --
3         MR. JONES: Objection; argumentative and
4  overbroad.
5     A   I'm trying to understand the question.
6  You're asking if it was the board's responsibility to
7  ensure that all problems were addressed, including
8  states?
9     Q   (BY MR. LEVINSTEIN) You said the USTU was
10 responsible for solving problems like state association
11 problems, correct?
12        MR. JONES: Objection; misstates the
13 testimony.
14    A   I agree that that was what you said, yes.
15    Q   (BY MR. LEVINSTEIN) Is that what you
16 said? Is the USTU responsible for solving problems,
17 like those that involve the state associations?
18        MR. JONES: Same objection.
19    A   My recollection of the question was, did I
20 understand that it was the USTU's responsibility to
21 handle problems, like the state issues for the
22 organization, to which I said yes.
23    Q   (BY MR. LEVINSTEIN) Okay. And I just
24 asked, was the board responsible, as the governing body
25 of the USTU, to make sure that the USTU did everything

135

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   it was supposed to do as a national governing body?
2       A    I'm not sure it was the board's
3   responsibility or the leadership's responsibility to
4   enforce that.
5       Q    Whose job was it to hold the leadership
6   accountable?
7       A    The membership.  Board members represent
8   their members.  For instance, in my position, as
9   representing the Armed Forces, every time I stood up, I
10  was speaking to something that addressed the Armed
11  Forces and my members.  For instance, selections to
12  team trials, recognition of Armed Forces athletes in
13  competition.  So it's the membership's responsibility
14  to hold me accountable if I don't push those issues, to
15  my understanding.
16      Q    Did you ever hear USTU members express
17  concern that Korean American leaders selected other
18  Korean Americans for leadership positions?
19      A    Did I ever hear the membership --
20      Q    Any member of the USTU express those
21  concerns.
22      A    I have no way of knowing if those people
23  were members at the time.  I have heard people say it.
24  I don't know if they were members at the time.
25      Q    Well, in what context did you hear people
```

136

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   say that?
2       A    At competitions, in the stands, in
3   hallways, et cetera.
4       Q    So you heard people involved in Taekwondo
5   competitions, but you don't know if they happened to be
6   current USTU members?
7       A    Right.  They could have been parents.
8   They could have been people that didn't renew for the
9   year or whatever, but they came to Taekwondo events.
10      Q    When did you first hear of those kinds of
11  concerns expressed?
12      A    First, first, first.  I think to the best
13  of my recollection, it was during President Ahn's
14  administration or President Hwa Chong.
15      Q    What years, ballpark?
16      A    I'm trying to narrow it down.
17      Q    Early '80, late '70s?
18      A    No.  It wouldn't have been early '70s.  It
19  would have been late '80s, mid-'80s, late '80s.
20      Q    That's when you first heard those kinds of
21  things?
22      A    Yes.
23      Q    And have you heard those things on an
24  ongoing basis to the present?
25           MR. JONES:  Objection; vague and
```

137

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   ambiguous as to ongoing.
2       A    Those remarks still occur.
3       Q    (BY MR. LEVINSTEIN) Did you hear
4   discussion of the issue of term limits --
5       A    Yes.
6       Q    -- within USTU?
7       A    Yes.
8       Q    And what was that issue?
9       A    This was after I was in the role of
10  Executive Director -- no, it was when Mr. Warwick was
11  still there, and I was in the role of the Events
12  Director.  We would meet with then President Lee once a
13  week or once every two weeks, and a discussion arose
14  about possible elimination of term limits.
15      Q    And were term limits eliminated?
16      A    Yes.
17      Q    And what term limits had existed?
18      A    I think it was a two-term, which was
19  eight -- it was either four or eight years, but two
20  terms was, I think, what was in practice until then.
21      Q    For what positions?
22      A    President.
23      Q    Were there term limits for any other
24  positions?
25      A    No.
```

138

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1       Q    Did you hear discussion of the possibility
2   of creating term limits for other positions?
3            MR. JONES:  Objection; calls for hearsay.
4       A    I don't remember that discussion.
5       Q    (BY MR. LEVINSTEIN) You don't remember
6   disputes or discussions at board meetings about the
7   need to have term limits so that people wouldn't stay
8   in positions for an eternity?
9       A    Yes, but still in relation to the
10  president only.  You said for other officers.
11      Q    What about the secretary general position;
12  were there discussions about term limits for that
13  position?
14      A    Not to my recollection.
15      Q    And who recommended that the term limit
16  for the president be eliminated?
17      A    I think that was a proposal that came up
18  from USTU legal, which was Mr. Bryant, Mark Bryant.
19      Q    It was his idea to eliminate it, or he
20  wrote the proposal?
21      A    He wrote the proposal as part of Law and
22  Legislation.
23      Q    Did Mr. Lee ask him to write that
24  proposal?
25      A    I don't know.
```

139

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1            MR. JONES:  Objection; calls for
 2   speculation.
 3        Q    (BY MR. LEVINSTEIN)  But the two-term
 4   limit for the president was eliminated?
 5        A    Yes.
 6        Q    And was there then no limit?
 7        A    Correct.
 8        Q    And after the term limit was eliminated,
 9   were there complaints by members of the USTU about
10   that?
11        A    Yes.
12        Q    Were there a lot of complaints?
13        A    Yes.
14        Q    Were there regular disputes involving
15   clubs at the local level, state organizations, and the
16   USTU?
17            MR. JONES:  Objection; vague and
18   ambiguous.
19        A    I'm not sure I understand.  Regular
20   disputes?
21        Q    (BY MR. LEVINSTEIN)  Yes.
22        A    Between local clubs --
23            MR. JONES:  Calls for speculation as
24   well.
25        A    You mean local clubs with the state
```

140

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   organization or local clubs with the USTU?
 2        Q    (BY MR. LEVINSTEIN)  Hold on one second.
 3   I'll withdraw that question, and we'll see what we can
 4   do.
 5            Did you ever hear -- I'm going to change the
 6   subject a little bit -- that there were issues about
 7   fraudulent registrations of USTU members?
 8        A    Yes.
 9        Q    Could you tell me about that?
10        A    I think it was the state of Pennsylvania
11   that --
12            (Whereupon, there was an interruption
13            in the deposition proceedings.)
14            (Whereupon, Mr. Johansen left the
15            deposition proceedings.)
16        A    The state of Pennsylvania members
17   complained that their state election was fraudulent
18   because the person -- at that time, it was the
19   president -- had used fraudulent names as part of the
20   determining number of members that allowed him a
21   certain number of votes.
22        Q    (BY MR. LEVINSTEIN)  And did that happen
23   more than once?
24        A    Yes.
25        Q    Was that alleged to be a common practice?
```

141

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1        A    In Pennsylvania, I'm speaking specifically
 2   of.  According to the people that complained about it,
 3   yes, and it happened on several occasions.
 4        Q    Were there ongoing squabbles between clubs
 5   at the local level?
 6            MR. JONES:  Excuse me.  Motion to strike
 7   the last line of inquiry based upon hearsay.  Go ahead.
 8        A    Squabbles between clubs?  Again, the only
 9   thing I can think of is with regard to registered
10   members that are going to determine the number of votes
11   that each club should get or whether they're a
12   recognized club, did they register on time, things like
13   that.
14        Q    (BY MR. LEVINSTEIN)  Let me ask you about
15   how important, as the Executive Director, did you find
16   the image of the USTU in trying to run the business of
17   the USTU?
18        A    Very important.
19        Q    And why was it important?
20        A    Well, it starts from a personal
21   standpoint.  I didn't want to be a part of anything
22   that was a failure, that looked poorly to anyone.  It's
23   not my nature.  It never was my background.  I wanted
24   it to be a success.
25            Beyond that, as an Olympic body, the term
```

142

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1   "Olympic" means a lot to me and to a lot of people, and
 2   I felt the necessity to make sure that it was portrayed
 3   in the best light at all times.
 4        Q    And as part of the Olympic movement,
 5   wasn't it a requirement of an NGB to do everything it
 6   could to keep the sport's image consistent with the
 7   Olympic ideals?
 8        A    Yes.
 9        Q    And in that regard, wasn't it as
10   important, the perceptions of the people who were
11   involved in the sport, as would actually might be the
12   reality?
13        A    Yes.
14            MR. JONES:  Objection; vague and
15   ambiguous.
16        Q    (BY MR. LEVINSTEIN)  And when you dealt
17   with sponsors, wasn't it important that the image of
18   the organization was one that sponsors wanted to be
19   involved with?
20        A    Yes.
21        Q    And if there were impressions that the
22   organization didn't function properly and the members
23   weren't happy, that that would hurt you with getting
24   sponsorship revenue?
25            MR. JONES:  Objection; calls for
```

143