1    speculation.
2         A    To my understanding, yes.
3         Q    (BY MR. LEVINSTEIN)  And when you talked
4    to sponsors, weren't there occasions in which they
5    expressed concern about disputes and controversies in
6    the Taekwondo world?
7         A    If I can clarify the question.  Sponsors
8    as far as like developing our sponsor revenue for our
9    events?
10        Q    Yes.
11        A    I didn't -- personally I did not find that
12   to be the case.
13        Q    But the USTU sponsorship revenue was
14   limited?
15             MR. JONES:  Objection; vague.
16        A    Actually, it increased when I took over
17   from -- because we had the process of bidding out to an
18   individual for sponsorship.  And at that time, the
19   revenue was $125,000.  In the almost three years that I
20   was there, it increased, doubled; it was over $250,000
21   when I left, and we had fewer vendors and sponsors.
22        Q    (BY MR. LEVINSTEIN)  You had fewer
23   sponsors?
24        A    And that was a purposeful decision on my
25   part; whereas before, one person would get 30 vendors,

1    so he could get his $125,000 back at the expense of the
2    vendors making money.  When I took over and convinced
3    them to let me take it in-house, I limited it to ten
4    vendors who paid me a guaranteed amount.  And they, in
5    turn, were allowed to make money because I restricted
6    the number, for instance, of martial arts vendors to
7    three.
8         I gave people proprietary sales and T-shirts
9    and photography, areas like that.  So they made more.
10   Whereas before, with 30 vendors, you have four
11   photographers, nobody is making money, et cetera.
12             (Whereupon, Mr. Johansen rejoined the
13             deposition proceedings.)
14        Q    (BY MR. LEVINSTEIN)  I was asking about
15   sponsors, not vendors, but that's okay.
16        A    But these were the only sponsors that I
17   dealt with, except for the title sponsor, which was, at
18   the time, Techno.  And we didn't have a problem with
19   them.  As a matter of fact, I had others like Quan,
20   Asian World, and Vision, who is now the sponsor, asking
21   for sponsorship deals that I hadn't initiated with
22   them.
23        Q    Do you remember a proposal for Century to
24   become a sponsor?
25        A    Yes, I do.

1         Q    And do you recall that the Century
2    proposal was much more advantageous to the USTU than
3    the Techno agreement?
4         A    I think that was a matter of
5    interpretation because of the way that it was
6    structured.  I remember lots of discussions about
7    Century versus Techno, yes.
8         Q    And do you remember who made the decision
9    that the USTU would stay with Techno, instead of
10   Century?
11        A    I don't know who made that decision.  It
12   wasn't me, no.
13        Q    Do you remember Mr. Warwick wanted to do a
14   deal with Century and he wasn't permitted to do so?
15             MR. JONES:  Objection; calls for
16   speculation.
17        A    I do remember seeing the proposal for
18   Century.  And it had like, if I recall correctly, like
19   nine areas that were specified.  But I wasn't in the
20   decision-making position at that time.  And I do
21   remember that Mr. Warwick did want to go with Century.
22   I don't know how that got stopped or who did that.
23        Q    (BY MR. LEVINSTEIN)  So you do remember
24   that Mr. Warwick thought, or presented it that the
25   Century deal was a much better deal for the USTU?

1             MR. JONES:  Objection; calls for
2    speculation, vague and ambiguous.
3         A    I don't know that it was presented as a
4    better deal, but one that he wanted to do.
5         Q    (BY MR. LEVINSTEIN)  Under the bylaws and
6    procedures that the Membership and Credentials
7    Committee was discussing with you in 2003, the USTU
8    president appointed five members of the Board of
9    Governors?
10        A    More.
11        Q    Okay.  Let me keep going.  He appointed
12   certain state presidents?
13        A    Yes.
14        Q    He appointed five of the ten delegates at
15   large?
16        A    Yes.
17        Q    He appointed five members of the Executive
18   Committee?
19        A    Yes, the committee chairs.
20        Q    He appointed the chairs of the five
21   essential working committees?
22        A    Yes.
23        Q    So he appointed the chair of the
24   Tournament Committee?
25        A    Yes.

```
1        Q    He appointed the chair of the Law and
2   Legislation Committee?
3        A    Yes.
4        Q    He appointed the chair of the Referee
5   Committee?
6        A    Yes.
7        Q    He appointed the chair of the Junior
8   Olympics Committee?
9        A    Yes.
10       Q    He appointed the chair of the Coaching
11  Science Committee?
12       A    Yes.
13       Q    And then after the Executive Committee was
14  selected by -- all the different spots were filled,
15  then the Executive Committee, in turn, elected five
16  other delegates at large?
17       A    Yes.
18       Q    And so based on your calculation, at least
19  27 of the 120 board members were selected by the
20  president?
21       A    Appointed by, yes.
22       Q    Plus himself.  He also was a member of the
23  Board of Governors?
24       A    Yes.
25       Q    So he appointed 27, and he had a vote as
```

```
1   well?
2        A    Correct.
3        Q    Was there weighted voting?
4        A    No.
5        Q    So everyone had one vote?
6        A    Yes.
7        Q    Did you hear concerns expressed -- when
8   did you first hear concerns expressed that the
9   president of the USTU had too much power?
10       A    Once I came onboard as Executive Director,
11  one of the first things that I was hit with was
12  answering the compliance of the Membership and
13  Credentials.  So that's the first time it hit me in my
14  face.  It wasn't a discussion item at a meeting.
15       Q    Well, you have been on the board a long
16  time.
17       A    Yeah.
18       Q    And you knew that the president got to
19  appoint a lot of people?
20       MR. JONES:  Objection, vague and
21  ambiguous.
22       (BY MR. LEVINSTEIN)  Strike that.  Did you
23  know the president got to appoint 27 members?
24       A    No, I didn't.  I actually didn't know that
25  until I was in a position to see everything right
```

```
1   before me.
2        Q    But during your time as a member of the
3   board, even though you didn't know the details of how
4   many he got to appoint, did you hear complaints from
5   USTU members that the president had too much power?
6        MR. JONES:  Objection, calls for hearsay.
7        A    I don't recall hearing it in those terms
8   at all until, like I said, I came onboard and we were
9   faced with answering compliance.  I have heard various
10  complaints against all of the presidents about their
11  authority, including Dr. Dong Ja Yang, who most thought
12  was the most authoritarian.  Once he said something,
13  end of story.
14       To varying degrees with other presidents who
15  had less command authority from the front, but all of
16  them had the same powers, to my understanding.
17       Q    (BY MR. LEVINSTEIN)  Was it your view,
18  when you became Executive Director and learned the
19  details, that the president had too much power?
20       A    Yes.
21       Q    And was it your view that the structure,
22  where he got to appoint all those people, created
23  compliance problems with your obligations as an NGB?
24       A    Yes.
25       Q    You talked about that the Board of
```

```
1   Governors only met twice a year?
2        A    (Deponent nodded in the affirmative.)
3        Q    Did you think the 120-member Board of
4   Governors was too large to conduct business?
5        A    I've gone over that in my mind, and I
6   didn't have anything to compare it to, because again I
7   came straight from the military, which was straight
8   from college.  So a board that big, again, in
9   comparison with the structure of the USOC at that time,
10  seemed not to be an anomaly.
11       As far as the unwieldiness of our group, it
12  seemed very difficult to deal with.  But as far as
13  comparing it to other boards, I had nothing to compare
14  it to.
15       Q    Was it the case that some board seats were
16  not specific to an individual but were held by an
17  association?
18       A    Yes.
19       Q    So at each meeting, different people might
20  show up and say that they were the people who were
21  there to be the board member from a particular state?
22       A    Not a state, an organization; for
23  instance, AEU or NCTA.  I was the only one from the
24  Armed Forces, but that could very well have been the
25  case from the Forces as well.
```

```
 1      Q    Let's take a state association that had
 2  three delegates.
 3      A    Yes.
 4      Q    Who decided who those would be?
 5          MR. JONES:  Objection; calls for
 6  speculation.
 7      A    In theory, the membership voted on its
 8  three delegates to each meeting if the state was
 9  authorized.
10      Q    (BY MR. LEVINSTEIN)  But you didn't --
11  USTU didn't conduct those elections?
12      A    No.
13      Q    And the USTU often didn't know in advance
14  who was going to show up to be the delegates the
15  various states?
16          MR. JONES:  Objection; calls for
17  speculation.
18      A    I think there was a requirement that we
19  were notified -- the Executive Director's office was
20  notified either 45 or 60 days in advance as to who
21  would be coming.
22      Q    (BY MR. LEVINSTEIN)  But were there
23  disputes at board meetings about which people were
24  actually authorized to vote?
25      A    Yes.
```

```
 1      Q    Did that happen on a regular basis?
 2          MR. JONES:  Objection; vague.
 3      A    Again, since we only had two meetings a
 4  year, you could say regular.
 5      Q    (BY MR. LEVINSTEIN)  At most meetings,
 6  were there disputes about those issues?
 7          MR. JONES:  Objection; vague.
 8      A    Recently, yes.  But in years past, no.
 9      Q    (BY MR. LEVINSTEIN)  So the problem has
10  gotten worse in recent years?
11      A    No, it's just surfaced more.  It's been
12  the same problem, but it was addressed because I guess
13  there was more need to know who is going to be here to
14  vote.  But the same situation, the same way people were
15  determined to come and vote, has always been there.  It
16  just wasn't an issue back then for whatever reason.
17      Q    Which part of the USTU -- which body did
18  you understand was responsible for performing
19  long-range strategic planning for the organization?
20          MR. JONES:  Objection; calls for
21  speculation.
22      A    I know that there was an annual officers
23  meeting at the beginning of the year, and in my
24  position as the Executive Director, I was able to see
25  that that was the body that actually came up with
```

```
 1  long-range developmental plans for the organization to
 2  include initial approval of budgets to send to the
 3  Executive Committee, et cetera.
 4          So a lot of it came from that group, the
 5  officers themselves.  I had no previous knowledge of
 6  who was responsible for the long-range planning.
 7      Q    (BY MR. LEVINSTEIN)  Okay.  But was it
 8  your view that the 120-plus-member Board of Governors
 9  really was not suitable for performing long-range
10  strategic planning?
11          MR. JONES:  Objection; vague and
12  ambiguous, lacks foundation, calls for speculation.
13      A    It was my understanding, from having
14  attended meetings since the '80s, that often the
15  meetings themselves were approval sessions.
16      Q    (BY MR. LEVINSTEIN)  Could you explain
17  what you mean by that?
18      A    It seemed as though many things were
19  decided in advance and brought up before the board
20  strictly for its approval.  Some items did get brought
21  up on the floor.  And, again, I can attest to that
22  firsthand because I had done it.
23          But a lot of the agenda items -- and it's not
24  just with this organization, but with many
25  organizations that I've been in, the meetings
```

```
 1  themselves are a formality of approving what's been
 2  decided.
 3          Rarely was there a time for sentiments from
 4  the floor.  Otherwise we would be there still for
 5  meetings.  And I guess that's a part of running an
 6  organization.
 7          So to the extent that this organization
 8  mirrors other organizations that I've been a part of,
 9  the meetings themselves were pretty much, that's been
10  decided, we vote to approve it.
11      Q    Were there sentiments expressed at
12  meetings by board members that something should be
13  changed so that board meetings would be more than
14  merely formalities of approval?
15      A    Yes.  And at some cases, at those same
16  board meetings where that was expressed, the chair
17  would then say, what's the sentiment from the floor,
18  and we would go into gripe sessions for a while.  But,
19  yes, that sentiment was expressed.
20      Q    As you sit here, were any major changes
21  ever adopted as a result of those sessions?
22      A    Actually, I can remember once, and
23  Mr. Juan Marino was instrumental in that.  There was an
24  argument over -- we had voted to approve the
25  competition format, and it had been approved, same pro
```

1  forma, passed, ayes, nays.
2         And near the end of the meeting, Mr. Moreno
3  brought it back up and said, can we consider -- he
4  said, I know it's already approved; can we consider
5  amending that?  And it was discussed and changed.
6      Q   But other than an individual instance in
7  which one resolution was changed instead of just
8  approved --
9      A   Right.
10     Q   -- were there any changes made in the
11 overall structure and function of the board as merely
12 an approval body?
13     A   No.
14     Q   How much did Board of Governors meetings
15 cost?
16     A   Cost?
17         MR. JONES:  Objection; vague.
18     A   Part of setting up the meeting fell under
19 my purview as Events Director, and the cost varied,
20 depending on the location.  We tried to hold it at a
21 hotel in a ballroom that could accommodate everyone
22 staying there.
23         In general figures, I'm thinking it was
24 around 25- to 40-, 50,000.
25     Q   (BY MR. LEVINSTEIN)  For each meeting?

1      A   Yes.  No, the annual meeting because more
2  people came to that one.  The midyear meeting was less
3  expensive.
4      Q   So about how much was the midyear meeting?
5      A   It would be on the low side, so around the
6  $20,000 figure.
7      Q   And was a lot of staff time spent
8  preparing for those meetings?
9      A   Yes.  Ramping up for the meetings was
10 probably a 30- to 45-day nonstop thing.  We had to get
11 agenda items, send back things to the board as to
12 what's going to be on the agenda, get it approved, get
13 all the notifications, put a book together.  And we
14 were working with the staff of about eight people in
15 the office then.
16         So in addition to ongoing membership
17 requirements, black belt processing, we had fewer
18 people that devoted most of their time to getting ready
19 for the meetings.
20         Correlating the minutes was a big problem.
21 We didn't use a stenographer until the midyear meeting
22 of 2003, I think it was, when I brought that, because
23 there was an argument about the accuracy of the
24 minutes.  And that's when we began hiring a
25 stenographer to take accurate notes.

1         But just getting the minutes done and put out
2  to people was a huge undertaking.  So, yes, it took up
3  a lot of staff time.
4      Q   Both the annual meeting and the Board of
5  Governors meeting took a tremendous amount of time?
6      A   The midyear meeting.
7      Q   Sorry.  The two meetings we talked about?
8      A   Yes.
9      Q   So close to three months out of the year,
10 the primary focus was simply on getting those meetings
11 together and running them?
12         MR. JONES:  Objection; misstates the
13 testimony.
14     A   Basically, yes.
15     Q   (BY MR. LEVINSTEIN)  Now, when the
16 Membership and Credentials Committee raised the concern
17 about the size and nature of the Board of Governors,
18 the response that you gave was simply it's always been
19 that way; isn't that correct?
20     A   Yes.
21     Q   Did that mean to you that it wasn't a
22 problem?
23     A   No.  What it meant to me was this was
24 already approved by the USOC as being a functioning
25 structure.  It's up to us to make it work.  But the

1  size of it and its competition has already been
2  approved.
3      Q   Did you understand that the USOC, as the
4  organization charged with deciding what NGBs were in
5  compliance, could over time change its views about what
6  meant compliance?
7          MR. JONES:  Objection; calls for
8  speculation.
9      A   I don't know.
10     Q   (BY MR. LEVINSTEIN)  Were you a member of
11 the USOC board of directors?
12     A   The president was the voting member of the
13 board of directors, but I attended all of the meetings
14 additionally with him.
15     Q   Did you attend meetings in 2003 about
16 improving the function of the USOC?
17     A   Yes.
18     Q   Had problems been identified with the
19 USOC's structure?
20     A   Yes.
21     Q   And in that connection, did you receive
22 materials and reports about requirements for proper
23 governance?
24     A   Yes.
25     Q   And did those documents discuss new legal

1  requirements, such as Sarbanes Oxley?
2      MR. JONES: Objection; calls for
3  speculation.
4      Q  (BY MR. LEVINSTEIN)  If you know.
5      A  I don't remember.
6      Q  Do you recall discussion about Congress
7  mandating that there be more accountability and better
8  governance of the Olympic movement?
9      MR. JONES: Same objection.
10     A  Yes. Yes.
11     Q  (BY MR. LEVINSTEIN)  And did those reports
12  talk about the need for smaller boards?
13     MR. JONES: Same objection.
14     A  Yes.
15     Q  (BY MR. LEVINSTEIN)  And you didn't vote?
16  Mr. Lee was the one who would cast the vote?
17     A  Correct.
18     Q  And if he couldn't attend, would you vote?
19     A  Yes.
20     Q  Were there meetings in 2003 that you
21  attended and he did not?
22     A  No.
23     Q  Did Mr. Lee vote for the reform of the
24  USOC?
25     MR. JONES: Objection; calls for

1      Q  Did you understand that it had a special
2  tax status as a result?
3      A  Yes.
4      Q  Did you understand it had special legal
5  responsibilities as a result?
6      MR. JONES: Objection; vague and
7  ambiguous. Also calls for a legal conclusion.
8      A  Legal responsibilities, I don't know.
9      Q  (BY MR. LEVINSTEIN)  Well, did you
10  understand that in order to maintain its not-for-profit
11  status, it had to meet certain legal standards?
12     MR. JONES: Same objection.
13     A  Such as filing and obtaining 501(c)(3)
14  status? I understood that.
15     Q  (BY MR. LEVINSTEIN)  Did you understand
16  that payments of money to individuals who were involved
17  with the organization could threaten its not-for-profit
18  status?
19     MR. JONES: Objection; calls for a legal
20  conclusion.
21     A  I didn't know that specifically.
22     Q  (BY MR. LEVINSTEIN)  Did you understand
23  that there was a concern about cash advances being paid
24  to volunteers?
25     MR. JONES: Objection; vague and

1  speculation.
2      A  I knew he cast a vote. I don't know which
3  way -- I don't remember which way it was.
4      Q  (BY MR. LEVINSTEIN)  Do you remember it
5  was unanimous to approve the USOC restructure?
6      MR. JONES: Objection; calls for
7  speculation.
8      MR. LEVINSTEIN: No. I asked if he
9  remembered. It's not calling for any speculation.
10     A  I'm trying to remember if there was a vote
11  that took place where it was unanimous and then the
12  move to make it unanimous.
13     Q  (BY MR. LEVINSTEIN)  Okay. Well, do you
14  remember Mr. Martin saying that the vote had been
15  unanimous and one delegate actually who represented an
16  organization involving the death said she wanted to be
17  the one who voted no?
18     A  I remember that.
19     Q  So everyone else voted yes?
20     A  Yeah.
21     Q  Including Mr. Lee, apparently?
22     A  Yeah.
23     Q  Did you understand the USTU was a
24  not-for-profit organization?
25     A  Yes.

1  ambiguous; calls for hearsay.
2      A  I know that was an issue that was raised
3  at some point by the Membership and Credentials
4  Committee.
5      Q  (BY MR. LEVINSTEIN)  Were you aware that
6  it was a practice of accounting people in the USTU to
7  get calls from officers asking for cash and the staff
8  would comply with that request?
9      MR. JONES: Calls for hearsay,
10  speculation.
11     A  I do remember that taking place, yes.
12     Q  (BY MR. LEVINSTEIN)  And as the Executive
13  Director, were you responsible for supervising the
14  financial people in the organization?
15     A  Yes. And that practice was discontinued
16  under me.
17     Q  And it was discontinued after it was
18  raised as a problem by the Membership and Credentials
19  Committee?
20     A  Yes. But, again, I wasn't in office for a
21  month before I had my first Membership and Credentials
22  complaint, so it was addressed early on by me.
23     Q  And you believed that was something that
24  should not have taken place?
25     A  Yeah.

```
1          Q    And I think you testified that during your
2     tenure, when the Membership and Credentials Committee
3     focused on financial issues related to the USTU, there
4     was a complete disarray of the financial records?
5          A    Yes.
6          Q    And it was true that the USTU failed to
7     timely develop and implement its budget?
8          MR. JONES:  Objection; misstates the
9     testimony.
10         A    That had been the practice.  Again, that's
11    something that I made certain to address early in my
12    tenure.
13         Q    (BY MR. LEVINSTEIN)  Well, it was being
14    addressed still in August of 2003, wasn't it?
15         A    It had not been a fate accompli, no, but
16    it was being addressed from the beginning of my tenure.
17         Q    But it still hadn't been fixed by August
18    of 2003?
19         A    Not completely, no.
20         Q    And were you aware that there were
21    problems in the accounting at the USTU that involved
22    falsification of receipts?
23         MR. JONES:  Objection; vague and
24    ambiguous, calls for speculation.
25         A    To my knowledge, through discovery, we
```

```
1     consecutively numbered ones.  I don't know the
2     circumstances surrounding that, but that might have
3     been.  But to say that they were doctored, I don't
4     know.
5          Q    Well, do you have any idea how someone
6     could have submitted expenses and had all of the
7     receipts for meals on different days with consecutive
8     numbers on the exact same form?
9          MR. JONES:  Objection; calls for
10    speculation, lack of foundation.  This witness
11    obviously has no personal knowledge of anything.
12         Q    (BY MR. LEVINSTEIN)  You saw those
13    receipts?
14         A    In going back, once we had an audit, yeah.
15         Q    When you saw them, you understood that
16    they couldn't be accurate?
17         MR. JONES:  Objection; misstates the
18    testimony.
19         A    They seemed irregular.
20         Q    (BY MR. LEVINSTEIN)  Was it a practice of
21    the USTU to give people cash advances when they went on
22    trips with the idea that they would submit receipts
23    later?
24         A    Yes.
25         Q    And were there a number of situations in
```

```
1     found that there were receipts that were not properly
2     documented.  I don't know if they were falsified.  I
3     know in some instances we asked people to translate
4     because a lot of the receipts were in Korean.
5          Q    (BY MR. LEVINSTEIN)  Do you remember a
6     situation in which some volunteers went on a trip with
7     athletes and spent money on meals and things like that
8     and came back and had no receipts?
9          MR. JONES:  Objection; calls for
10    speculation.
11         A    Volunteers?
12         Q    (BY MR. LEVINSTEIN)  Or staff.  People who
13    weren't the athletes went with the group, came back,
14    and had no receipts?
15         A    I think I remember something like that
16    happening.
17         Q    And you recall that when they were told
18    there were no receipts, they went to some restaurant or
19    somewhere and got a book of receipts and then submitted
20    consecutively numbered receipts as their receipts for a
21    multiday trip?
22         A    I'm not aware that that happened, but
23    that's possible that it did, because, again, when I
24    came on, we went back through all of the receipts to
25    see, and there was a situation where there were
```

```
1     which they never came back with receipts sufficient to
2     cover the amount of cash they had been given?
3          A    There were some situations, yes.
4          Q    And was it a practice of the USTU to give
5     a number of officers credit cards that would
6     automatically be paid by the USTU?
7          MR. JONES:  Objection; vague and
8     ambiguous.
9          A    And I spoke to that yesterday.  When I
10    came onboard, there were 13, 15 credit cards, which was
11    reduced to one.  I don't know the accounting procedure
12    prior to me taking the credit cards from them.
13         I do know that officers and others, committee
14    chairs, had credit cards that they could use that would
15    be paid by the office.  But I don't know approval
16    procedures or anything like that.
17         Q    (BY MR. LEVINSTEIN)  But you know that
18    they used these 13 to 15 credit cards and the bill came
19    to the USTU to be paid?
20         A    Correct.
21         Q    And the USTU had to pay it whether there
22    were receipts or not?
23         A    Correct.
24         Q    Were you aware in August 2003 that there
25    was a problem because three months of cancelled checks
```

1  weren't in the accounting department?
2       A    Yes.  And that's, like I said earlier
3  today, what led to the firing of that financial
4  director.  We were assuming that everything was
5  proceeding as it was supposed to.  We weren't having
6  monthly audits with the finance department at that
7  time.  We were getting reports monthly, but not check
8  reconciliation records or things like that.
9       Q    And were you aware from '92 to 2003 the
10  USOC had to conduct 11 audits of the USTU?
11            MR. JONES:  Objection; calls for
12  speculation.
13       A    I'm not aware that that's the number.
14       Q    (BY MR. LEVINSTEIN)  Were you aware that
15  every -- of every audit that you are aware of that the
16  USOC conducted, did every single one of them identify
17  deficiencies in the USTU's accounting practices?
18            MR. JONES:  Objection; vague.
19       A    Of the audits I'm aware of, yes, there
20  were deficiencies.
21       Q    (BY MR. LEVINSTEIN)  And every one of them
22  made recommendations about things that had to be
23  corrected?
24       A    Yes.
25       Q    And in 2003, wasn't the accounting of the

1  USTU so bad that your auditors refused to certify your
2  financial statements?
3            MR. JONES:  Objection; vague and
4  ambiguous, argumentative.
5       Q    (BY MR. LEVINSTEIN)  You can answer.
6       A    Oh, I thought you were getting something.
7            I don't know that that's the reason that they
8  refused to certify our finance materials, because they
9  had been tasked with coming up with audited financials
10  for our meetings.  And they requested records that we
11  provided.
12            And this happened coincident to, I think it's
13  the Ohio Group that wanted to come in and review the
14  financial records of the USTU.  Everything was out,
15  everything was in order.  It was sorted.  And this was
16  prior to this date in 2003, in August.  And I think
17  Ohio came the month before, maybe.
18            But the records were all laid out.  Anything
19  that was missing, that was when we were making the
20  effort to go back and get receipts for the previous
21  year because that was a big problem.  Initially, they
22  said we can't find the receipts.
23            Now, this is the same auditing group that had
24  done our financials for meetings for the past I don't
25  know how many years.  Nothing had changed on the

1  procedure and keeping the financial records, except for
2  the fact that we had to present the records for the
3  Ohio Group.  And we were going through the process of
4  getting past receipts to make an attempt to come into
5  compliance.
6            So I don't know how suddenly they couldn't
7  make a report when everything was there that had been
8  before.
9       Q    Did you know it was a requirement of the
10  not-for-profit part of the Olympic movement to have
11  audited financial statements?
12       A    Yes.
13            MR. LEVINSTEIN:  Why don't you make this
14  the next number.
15            (Deposition Exhibit No. 86 was marked
16            for identification.)
17       Q    (BY MR. LEVINSTEIN)  Is Exhibit 86 the
18  independent auditors report of Waugh & Associates
19  concerning the USTU for the year ended December 31,
20  2002?
21       A    Yes, it is.
22       Q    If you look at the first page, do you see
23  where it says, "Because of inadequacies in the
24  Corporation's accounting records, we were unable to
25  form an opinion regarding the amounts recorded for

1  event revenue, program expenses and supporting service
2  expenses in the accompanying statements of activities
3  and changes in net assets"?
4       A    Yes, I can read that.  You have the same
5  thing I have.  Yes, I see that.
6       Q    And as a result, does the last line say
7  that Waugh & Associates was unwilling to express an
8  opinion on the financial statements that were referred
9  to in the first paragraph?
10       A    Yes.
11       Q    So did you understand this was an auditors
12  report that, given your accounting, they couldn't
13  certify that your financial statements were accurate?
14       A    Yes.  And there was more that was intended
15  to this document.  I had meetings with Mr. Waugh
16  himself.  And the whole impetus was to get complete
17  financials by the end of the year for the meeting,
18  because in previous meetings with them for our midyear
19  meeting, they were lagging behind in developing the
20  meeting for the board.
21            One thing I was charged with from other
22  meetings, board meetings, was we need complete
23  financials.  And I understood that that was a
24  requirement.  This was from the membership of the
25  board.

1  We never had the completed audited financials
2  from Waugh & Associates. And in several discussions
3  with Mr. Waugh and his associate, Jill, this was the
4  effort to get that provided by the annual meeting in
5  November. For whatever reason, this is what he came
6  back with. I don't know if there was exterior pressure
7  or anything, but this is the report that he came back
8  with.
9      Q   Mr. Harris, didn't you understand that in
10 the summer of 2003, when the USOC auditors came over,
11 rather than have financial statements, there were
12 basically cardboard boxes with loose receipts in them?
13     MR. JONES: Objection.
14     (BY MR. LEVINSTEIN) That that was the
15 nature of the USTU's recordkeeping?
16     MR. JONES: Calls for speculation.
17     A   I understand that that was a part of it,
18 yes.
19     Q   (BY MR. LEVINSTEIN) Did you understand
20 that the USOC audit people who were supposed to oversee
21 45 NGBs and the USOC spent over 500 hours creating
22 financial records that didn't exist for the USTU?
23     MR. JONES: Objection; calls for
24 speculation.
25     A   I'm aware that we worked closely with them

1  I did was talk with Ms. Witte and ask if we could have
2  an audit to let me know where we stood because I had
3  been to meetings and I had heard the reports. And
4  starting from scratch, I don't know where we were.
5      And at this point in time, again, part of
6  coming into compliance was seeking their help, and this
7  was done proactively as well, as just coming into
8  compliance.
9      I spoke with Mr. Telli several times asking
10 if he could be detailed to help us to straighten this
11 out. I don't have that expertise. And obviously we
12 had problem areas with our financial people. So, yes,
13 he did help us an awful lot to help try to bring us
14 into compliance. But it's not like it was forced on us
15 to do.
16     Q   (BY MR. LEVINSTEIN) I'm not suggesting,
17 Mr. Harris, that you were at fault or made to do it.
18 I'm just trying to get an understanding, an accurate
19 record of what the state of the USTU was when the
20 Membership and Credentials Committee was focusing on it
21 in the summer and into the fall of 2003.
22     A   Yes, and that speaks to my response that
23 the records were in shambles. I found that out and
24 went to work at trying to remedy that.
25     Q   Okay. Were you aware that prior to your

1  in developing that, yes.
2      Q   (BY MR. LEVINSTEIN) Do you think that 500
3  hours might be a reasonable estimate of time spent by
4  USOC audit people to create financial records that the
5  USTU was supposed to have already created?
6      MR. JONES: Same objection.
7      A   Do I understand that that was a reasonable
8  number of hours?
9      MR. JONES: Lacks foundation.
10     Q   (BY MR. LEVINSTEIN) Is that a reasonable
11 estimate of how much time the USOC audit staff spent
12 creating records the USTU should have already had on
13 hand?
14     MR. JONES: Same objection.
15     A   That's probably a reasonable number
16 because I know that Mr. Telli was there daily with us
17 for four to six hours a day for a period of time.
18     Q   (BY MR. LEVINSTEIN) Did the USOC audit
19 staff work very hard to try to help you come into
20 compliance?
21     MR. JONES: Same objection.
22     A   Yes, they did, and it was also at our
23 request, too, for part of that. I think that's what is
24 missing from this.
25     When I came onboard, one of the first things

1  tenure, there had been a number of Article VIII
2  complaints filed against the USTU?
3      A   By hearsay, yes, and from being a board
4  member.
5      Q   But when you came on as the Executive
6  Director, you never went through the files to find
7  other proceedings that had been initiated and pursued
8  that related to noncompliance by the USTU?
9      A   I was kept abreast by Mr. Bryant of Law
10 and Legislation about the Article VIIIs that were
11 pending and that needed to be addressed by me.
12     MR. JONES: Can we take a break?
13     MR. LEVINSTEIN: Sure.
14     (Recess taken from 10:58 a.m. to 11:03
15     a.m.)
16     (Whereupon, the deposition proceedings
17     reconvened without the presence of
18     Mr. Johansen.)
19     Q   (BY MR. LEVINSTEIN) In discussions with
20 the USOC in 2003 about the problems with noncompliance
21 by the USTU, were there discussions of whether these
22 issues had been raised in the past with the USTU
23 leadership?
24     A   Yes.
25     Q   Was it communicated to you that many of

```
1   the problems you were having to deal with now, as the
2   Executive Director, had been problems that had been
3   identified by the USOC for three Quadrenniums?
4          MR. JONES:  Objection; calls for
5   speculation.
6       A    I don't know that it went back that far,
7   but those discussions did take place.  A lot of the
8   items were repeat items.  I also remember one
9   discussion when Mr. Warwick was Executive Director --
10  and it was prior to the Winter Games -- and I think
11  they had a compliance meeting, which was before me, and
12  it was done -- and, again, it's hearsay, but it was
13  done informally, you guys need to take care of this,
14  but it's okay.  And that was well within the past three
15  Quadreniums, which is why I just stated that.
16      Q    (BY MR. LEVINSTEIN)  But would it be fair
17  to say that your understanding was that the same kind
18  of problems had existed for a long time, but there had
19  been perhaps one point in time during Mr. Warwick's
20  tenure that things had gotten a lot better?
21         MR. JONES:  Objection; argumentative,
22  vague and ambiguous, calls for speculation, misstates
23  the prior testimony.
24      A    That's possible.
25      Q    (BY MR. LEVINSTEIN)  Is that consistent
```

```
1   with your understanding in the summer of 2003?
2       A    Yeah.  The only thing I differ with is
3   whether it was better when Mr. Warwick was there,
4   because I don't know if he had addressed -- or made
5   headway and suddenly we went back to doing the old
6   things again.  So that's my only reason for saying
7   possibly.
8       Q    Well --
9       A    If I might.
10      Q    Sure.
11      A    For instance, with the clubs, the clubs
12  were there when Mr. Warwick was Executive Director.
13  The arguments were there, the Chapter 8s, the finances
14  were there, the receipting problem, everything.  So I
15  don't know that it was done better then, just that it
16  was handled differently in a nonformal meeting.
17          (Whereupon, Mr. Johansen rejoined the
18           deposition proceedings.)
19      Q    (BY MR. LEVINSTEIN)  And it's possible
20  during the 2003 period, when a lot of problems in
21  accounting became severe, that the scrutiny of all the
22  issues increased?
23         MR. JONES:  Objection; argumentative,
24  vague and ambiguous, calls for speculation.
25      A    That's possible.
```

```
1       Q    (BY MR. LEVINSTEIN)  So do you believe
2   that the same problems that were there in 2003 were
3   probably there in Mr. Warwick's tenure; it's just that
4   the USOC wasn't as aware of them?
5          MR. JONES:  Calls for speculation, lacks
6   foundation.
7       A    I know that the problems were inherited
8   and not suddenly developed in my one month there when
9   the first compliance thing came up.
10      Q    (BY MR. LEVINSTEIN)  And the first
11  compliance issues came up one month after you started
12  as Executive Director?
13      A    Yes.
14      Q    So that would be --
15      A    Around September of 2002, I think it was.
16      Q    And for the next year, the USOC worked
17  with the USTU to try to solve those problems?
18      A    No.  After that first meeting, which was
19  at the then Adams Mark Hotel -- it's now the Hilton
20  Adams Mark or something -- the questions were laid out
21  with the problem areas, and we had brought responses to
22  them.  And I had started on addressing those problems.
23          There wasn't another correspondence from the
24  Membership and Credentials Committee until, I think,
25  around January or February of the next year, bringing
```

```
1   up the same issues again, saying that this hasn't been
2   complied with.
3          But the proactive help started when we
4   approached finance to help us get the records and start
5   working on that.
6       Q    Well, a lot of the issues identified in
7   September of 2002 --
8       A    Yes.
9       Q    -- included financial and accounting
10  problems?
11      A    Yes.
12      Q    And the USOC audit people were already
13  working with you at that time to try to conduct audits
14  and assess your recordkeeping?
15      A    Yes, yes.  That's when they first
16  conducted an audit so we could find out where we stood
17  and what needed to be fixed.
18      Q    And the audit in September of 2002
19  identified a number of things that needed to be fixed?
20      A    Right.
21      Q    And the response in 2002 of the USTU, led
22  by you, perhaps, was, we're going to fix these things?
23      A    Yes.  And at that time, I know for a
24  certainty that I trusted the staff that we had in the
25  finance office to address it, because I remember we
```

1  split up the parts that were given to us by the
2  Membership and Credentials Committee, the problem
3  areas.
4        Everything that addressed finance, I had
5  meetings with the finance department to say, can we fix
6  these? Are you guys capable of fixing this? Let's get
7  on it. And I left it to them to do.
8        So in my mind, these are the professionals
9  that do that; they'll get it done. And my attention
10 turned to other things.
11       And, personally, I'm still learning on the
12 job after one month. So, again, I turned it over to
13 the officials -- the professionals and expected them to
14 do their job. Then I get another report saying, well,
15 you're not in compliance with this. Now a flag goes
16 up. Wait a minute. They were supposed to be
17 addressing that. Maybe these aren't the people to be
18 addressing that and other steps have to be taken.
19       So that's the process that I went through in
20 trying to address the compliance issues. Finance
21 should have been handled by our financial people. The
22 other issues were things that needed my personal
23 attention to. Much to my thinking, that was taken care
24 of, or being taken care of.
25       Q  But in September 2002, wasn't one of the

1  recommendations of the audit that you didn't have a
2  financial person who was qualified to solve these
3  problems?
4        A  That's quite possible that that was one of
5  the recommendations.
6        Q  Wasn't it the case that the officers of
7  the USTU simply were not willing to extend the funds to
8  hire a qualified financial person to solve those
9  problems?
10       MR. JONES: Objection; calls for
11 speculation, lacks foundation.
12       A  I don't know that they didn't want to
13 spend the money. I don't think that early on, under my
14 tenure, I had identified the fact that these people
15 weren't able to handle it, even though I had a written
16 recommendation saying our office wasn't capable.
17       I mean, again, one month on the job, the
18 first thing I do is fire people because of a report?
19 While it might have been a valid thing to do, it didn't
20 happen right away with me.
21       Q  (BY MR. LEVINSTEIN) I'm not here to
22 revisit the past.
23       A  I take the blame for that.
24       Q  You're responsible for supervising those
25 financial people?

1        A  Yes.
2        Q  And having been told by the professionals
3  that did the audit that your financial people didn't
4  have the qualifications, you really had no way of
5  assessing whether they did?
6        A  Exactly.
7        Q  And you didn't take immediate action to
8  solve those problems?
9        A  Right, until after it was specifically
10 addressed as a result of the committee saying here are
11 the findings, and I gave it to them to work on and it
12 came back unresolved. Then I knew this is part of the
13 problem and moved to address that.
14       Q  But as of August 2003, no qualified
15 financial person had been hired to solve these
16 problems?
17       A  Right. We had gone through two financial
18 people, and still the problem was there.
19       Q  And, in effect, the USOC was providing you
20 your financial supervision?
21       MR. JONES: Objection; calls for
22 speculation, argumentative.
23       A  Much of it, yes.
24       Can I say something else? Our day-to-day
25 financial workings were things that the people that

1  were in place could handle, even the new people. But
2  as far as long-range planning like we needed to be
3  developing was problematic.
4        Like with the policies and procedures, that
5  never came up until a conversation with Mr. Telli when
6  he asked, let me see your policies and procedures
7  manual, and I went back to finance and said where is a
8  copy of our -- and everybody thought I was speaking
9  Greek.
10       So they could handle disbursements, writing
11 checks, day-to-day things. But as far as the
12 long-range vision, that was problematic. And that's
13 where Mr. Telli really helped us immeasurably.
14       Q  (BY MR. LEVINSTEIN) And as a NGB, you
15 were responsible for those things?
16       A  Yes.
17       Q  And you weren't in compliance?
18       A  No, not when I first came onboard. And at
19 the end of it, I think we were a lot further down the
20 line -- for instance, we had policies and procedures.
21 We had approved procedures for disbursements and
22 receipts. We had records that had improved.
23       Q  Were you aware that your what you called
24 the policies and procedures manual hadn't been
25 implemented by the people who were working there?

1     MR. JONES:  Objection; calls for
2  speculation.
3        A    No, I wasn't aware of that.
4        Q    (BY MR. LEVINSTEIN)  Were you aware that
5  what you all called the policies and procedures manual
6  didn't satisfy accounting requirements for the kinds of
7  policies and procedures you needed?
8        MR. JONES:  Same objection.
9        A    No, I didn't understand that because,
10  again, this was done closely with the supervision of
11  Mr. Telli.  We met on a day-to-day basis as that was
12  being developed.  And the final document we came up
13  with, according to him, satisfied what he was saying we
14  needed.
15        Q    (BY MR. LEVINSTEIN)  Didn't you recall
16  that the policies and procedures manual was a document
17  you got from Waugh & Associates?
18        A    I'm not sure that's the case.  I know that
19  we had -- that might have been the basis for our
20  working document that developed, but it wasn't the
21  end-all from Waugh & Associates.  I know that Jill from
22  Waugh & Associates also worked with us on it, because
23  the three of us met; Jill from Waugh & Associates,
24  Chris Telli, and myself, when he was giving us guidance
25  on what needed to be in the manual.  So, yes, she did

1  help with that as well.  I do remember that.
2        Q    Were you aware that that manual was never
3  approved by the Executive Committee?
4        MR. JONES:  Objection; calls for
5  speculation.
6        A    I know that the officers approved it.  I
7  don't know that the Executive Committee did.
8        Q    (BY MR. LEVINSTEIN)  In discussions with
9  the USOC, did they, people from Membership and
10  Credentials Committee, express the view to you that it
11  was getting too late to keep promising that things were
12  going to be done when they hadn't been done over the
13  past ten years?
14        MR. JONES:  Objection; calls for
15  speculation, hearsay.
16        A    I remember that discussion.
17        Q    (BY MR. LEVINSTEIN)  Did you sense
18  frustration on their part that they had been through
19  this before and had been promised that things would be
20  fixed and they never had been?
21        MR. JONES:  Same objection.
22        A    It seemed very evident to me because the
23  chair several times seemed to express outrage.  And my
24  personal opinion -- I mean, I could only take it
25  personally because I had just come onboard -- was that

1  I didn't have the time to fix it, but we could fix it.
2  But I did understand his frustration and outrage that
3  here we are revisiting this again with this body.  I
4  understood that.
5        Q    (BY MR. LEVINSTEIN)  And did you support
6  the idea of the USOC installing a financial officer to
7  take over those functions from the USTU?
8        A    Yes.
9        Q    And did you support the idea of bringing
10  in a qualified CEO to supervise the operation and the
11  finances and all aspects of the business of the USTU?
12        A    Initially, no, because in effect I was
13  voting for my replacement.  And, again, I felt that
14  given the time, we could have done the job.
15        But I did step aside because I didn't want to
16  hinder going forward with the remediation plan and
17  losing our status.  I didn't want to be the person that
18  caused that just because I had a little ego and wanted
19  to stay on the job.
20        Q    And I understand that must have been
21  difficult.  But by December of 2003, did you support
22  bringing in a new CEO to replace you?
23        A    I was forced to agree with that.
24        Q    And why did you think that should happen?
25        A    Again, in order to satisfy the

1  remediation -- it was clear in my mind that this would
2  not go away without satisfying, to the letter, what
3  Membership and Credentials wanted.  If the remediation
4  plan called for removal of the Executive Director and
5  replacement with a USOC person, then so be it.
6        It's not my first choice.  It's not my
7  preference.  At that point, it was my livelihood.  But,
8  again, far be it from me to stand in the way of keeping
9  our NGB status.  To me, that was foremost important, as
10  with taking the job was.
11        Q    When the Membership and Credentials
12  Committee started focusing on your issues in 2002, did
13  they offer you help and assistance to try to help you
14  get into compliance?
15        A    I don't recall that happening.  I do
16  recall that as part of my closing comments, at the
17  first meeting, saying that I'm new and I would
18  appreciate any help they would give me.
19        I never assumed that I knew how to do this
20  from the beginning.  I think that's a foolish premise.
21  And to be facing the USOC Membership and Credentials
22  Committee to me was a big thing.  It said right off the
23  bat, you have got lots of problems to address, and
24  there's a short time -- there's a short learning curve.
25        So my plea at the very end of the first

1　meeting was any help you guys can give me I would
2　appreciate.
3　　　　Q    Did the Sports Partnership people at the
4　USOC give you a lot of help?
5　　　　A    Definitely.  They stepped up to the bat
6　right away.
7　　　　Q    And who were they?
8　　　　A    It wasn't Kelly Skinner at the time.  It
9　was another gentleman who retired from the USOC.  I
10　forget his name.  There was another assistant named
11　Jill, and I forget the other lady's name.  There were
12　two of them and the other person.
13　　　　Q    Was Michelle Farrell involved?
14　　　　A    Yes.  No, not Michelle.  She came on with
15　Kelly.  It was -- I can't remember the names.
16　　　　Q    But there were initially some people from
17　Sports Partnerships who stepped right up and tried to
18　help you get into compliance?
19　　　　A    Yes.  And I met with them weekly to learn
20　all I could.  They taught me which reports needed to be
21　done when, the procedure for processing things,
22　developing the high performance -- not high performance
23　plan, the -- I forget what it's called.  The PPA.  All
24　of the things, they stepped right up to the front.  And
25　without their help, I would have fallen flat, flatter.

1　　　　(Whereupon, Mr. Johansen left the
2　　　　deposition proceedings.)
3　　　　Q    (BY MR. LEVINSTEIN)  So throughout the end
4　of 2002, was it your view that the USOC was trying to
5　help you come into compliance?
6　　　　A    Yes.
7　　　　Q    And did that view continue in 2003?
8　　　　A    Yes.
9　　　　Q    And at some point, those people switched,
10　and Kelly Skinner and Michelle Farrell became involved?
11　　　　A    Yes.
12　　　　Q    And were they also tremendously helpful?
13　　　　A    Very helpful.
14　　　　Q    And what kinds of things did they help you
15　with?
16　　　　A    Same thing.  Developing or requesting
17　funds for the athletes programs that we had been
18　supporting in the past and getting more money allocated
19　for that.  Documenting the expenses, letting me know
20　what's allowed, what's not, how to categorize things.
21　They were just very helpful.
22　　　　Q    Our approval process, when they were part of
23　the committee, aside from the Delegation Review
24　Committee, they helped work on those documents, as
25　well.  So they were instrumental.

1　　　　Q    Did you understand that they were doing a
2　lot of work to help you that other NGBs did without
3　help?
4　　　　MR. JONES:  Objection; calls for
5　speculation.
6　　　　A    That wasn't my total understanding because
7　several times they said we have -- we're responsible
8　for X number, six or eight NGBs, as far as Sports
9　Partnership, and we helped them develop their
10　performance plans, blah, blah, blah.  And I was at
11　meetings where other NGBs were discussed.
12　　　　So it was my understanding that this was part
13　of what they did for all of the NGBs, but I did feel
14　that they went an extra mile to help get me settled on
15　the job.
16　　　　(Whereupon, Mr. Johansen rejoined the
17　　　　deposition proceedings.)
18　　　　Q    (BY MR. LEVINSTEIN)  You felt they spent a
19　disproportionate amount of time on your NGB versus the
20　other ones?
21　　　　MR. JONES:  Objection; calls for
22　speculation.
23　　　　A    I don't know if it was disproportionate.
24　　　　Q    (BY MR. LEVINSTEIN)  Coming back to a
25　subject about the people that Mr. Sang Lee was allowed

1　to appoint, even after the issue was identified, were
2　there certain positions that he was unwilling to give
3　up his right to appoint?
4　　　　MR. JONES:  Objection; calls for
5　speculation.
6　　　　A    I don't know if he initially was or not,
7　but I know that repeatedly he said in front of others,
8　not just me, that the state president appointments will
9　go, I don't have a problem with that, all it does is
10　create problems.  And that was said repeatedly.  The
11　five delegates at large was never an issue.
12　　　　I think the only hesitancy was in the
13　committee chairs, like referee chairs, Junior Olympics,
14　Coaching Science, those.  And I remember the discussion
15　further that was if they were left to select or elect
16　from amongst their members, that problem would be
17　unwieldy.
18　　　　For instance, if the referee chair is
19　selected by all the referees, it becomes a popularity
20　contest possibly.  How do you set that up, for
21　instance?  And I remember those discussions.  And the
22　only hesitance I remember was in those committee
23　people.  But the others, no problem.
24　　　　Q    (BY MR. LEVINSTEIN)  But he wanted to
25　retain the right to appoint the chairmen to the five

```
 1   essential working committees?
 2        A     Right.  Tournament committee, referee
 3   committee, coaching science, Law and Legislation, and
 4   the other one.
 5        Q     And he appointed all the members of those
 6   committees, didn't he?
 7        A     No, not the members.
 8        Q     Who appointed the members?
 9        A     The chair.
10        Q     So he appointed the chair and then the
11   chair appointed the members?
12        A     Yeah.
13        Q     Now, would you take a look at the
14   selection criteria, Exhibit 32.
15              (Deposition Exhibit No. 87 was marked
16              for identification.)
17        Q     (BY MR. LEVINSTEIN)  Now, have you seen
18   this document before?
19        A     Yes.
20        Q     87.  You can stop looking at Exhibit 32.
21   Please look at Exhibit 87.
22        A     Okay.
23        Q     Is that your signature at the bottom of
24   the page?
25        A     A sterling signature it is.
```

```
 1        Q     John Hancock would be proud.
 2              Are these the selection procedures for
 3   coaches of the USTU that were in effect in early 2003?
 4        A     Yes, that's correct.
 5        Q     Now, the first item says that the
 6   prerequisite to be a coach was "Previous coaching
 7   experience at the Olympic Games, Pan Am Games, World
 8   Championships, World Cup, or Pan Am Championships for
 9   Taekwondo."  Is that correct?
10        A     Correct.
11        Q     How many people as of January 2003, in
12   your estimation, had previous coaching experience at
13   one of those five categories of events?
14        A     It would be a guesstimate on my part, but
15   I'm thinking between four and eight people, if that
16   many.
17        Q     No.  I mean as of January 2003, how many
18   people were alive in the United States who had been a
19   coach at the Olympic Games, Pan Am Games, World
20   Championships, World Cup, or Pan Am Championships for
21   Taekwondo?
22        A     What I'm considering though is head coach
23   and assistant coaches as well.
24        Q     Any coaching experience is what it says
25   there.
```

```
 1        A     Right.  Because --
 2              MR. JONES:  Could I clarify, Counsel?
 3   Are we talking about people that are willing to be
 4   coaches?
 5              MR. LEVINSTEIN:  No.  Let's start again.
 6              MR. JONES:  It could be anybody.
 7              THE DEPONENT:  Eligible.
 8        Q     (BY MR. LEVINSTEIN)  As of January 2003,
 9   how many Olympic Games had been involved in Taekwondo?
10        A     Two.  '88 and '92.  Oh, I'm sorry.  2000.
11   So three.
12        Q     There had been three Olympic Games.  How
13   many Pan Am Games had there been involving Taekwondo?
14        A     Pan Am Games are every other year, so
15   since when?  Or as of 2003?  Well, let's see.
16              MR. JONES:  Don't guess.
17        A     At least eight that I can recall.
18        Q     (BY MR. LEVINSTEIN)  So we have three
19   Olympic Games, eight Pan Am Games.  How many World
20   Championships?
21        A     It would probably be the same number as
22   Pan Am Games, because they're every other -- no, World
23   Championships are every four years, but not in an
24   Olympic year.  So let me go back again.  Probably six,
25   and that's a rough guesstimate.
```

```
 1        Q     And how many World Cups for Taekwondo?
 2        A     World Cups are every two years, so that
 3   would mirror the number of Pan Am Games.
 4        Q     And how many Pan Am Championships have
 5   there been?
 6        A     Pan Am Championships can be every year
 7   except the Olympic year, so that's three out of four
 8   years, so probably nine.
 9        Q     So now we have identified 3 Olympic Games,
10   8 Pan Am Games, 6 World Championships, 8 World Cups,
11   and 9 Pan Am Championships, correct?
12        A     And that's a rough guesstimate.
13        Q     I understand.  So adding those, my math
14   will be better this time, I get 34 events.
15              MR. LEVINSTEIN:  Does that match,
16   Counsel?  Sorry, I don't want to put you on the spot
17   with your math.
18              MR. JONES:  34 is correct.
19              MR. LEVINSTEIN:  So 34 different
20   events, and the candidate had to have previous coaching
21   experience --
22        A     At one of them.
23        Q     -- at at least one of those 34 events?
24        A     Uh-huh.
25        Q     How many different coaches do you think
```

1    had -- who were possible U.S. coaches had coached at
2    one of those 34 events? How many different people?
3        A    Well, again, I'm assuming --
4            MR. JONES:  Sorry.  Calls for
5    speculation.  It's kind of vague.
6        A    I'm assuming we took more than one coach
7    to each of those events, and sometimes if we took a
8    men's and a women's team, we had as many as four or six
9    coaches at an event.  So that's why I said at least
10   four to eight people that would be --
11       Q    Per event?
12       A    Huh?
13       Q    So it could be 100 people?
14       A    It could be.
15       Q    We don't know for sure, but 100 is a
16   reasonable number?
17       A    No, not really.  Because if we took six
18   people, which is a large number, to each of those
19   events, and there were six different people each time,
20   that's something that wouldn't have happened.  You
21   would have taken people that had experience before and
22   maybe added in some others.
23       Q    So 50 or 60?
24           MR. JONES:  Objection; calls for
25   speculation.

1        Q    -- what did the procedures require as the
2    method by which the coach --
3        A    Was selected?
4        Q    -- the Coaching Science Committee would
5    choose among those people?
6        A    Again, I was not a part of the Coaching
7    Science Committee, but it's my understanding that once
8    you had a list of people that met Criteria No. 1, those
9    people were considered by the Coaching Science
10   Committee and a recommendation was made.  After that
11   recommendation was made, the Executive Committee would
12   approve that.
13       Q    Okay.  Was the Coaching Science Committee
14   supposed to consider a large number of candidates?
15       A    Anyone that met that Criteria No. 1.
16       Q    And were they supposed to have a meeting
17   to discuss those candidates?
18       A    The Coaching Science Committee often
19   conducted business by phone rather than a meeting, a
20   face-to-face meeting, so I don't know how they would
21   have done this.
22       Q    But were they required to have a meeting
23   at which the athlete members were present?
24       A    Yes, some sort of meeting of the whole
25   group, which included athlete representation.

1        Q    (BY MR. LEVINSTEIN)  What would your
2    number be?
3            MR. JONES:  Calls for speculation.
4        A    The original question was how many people
5    do I think fit this criteria, right?
6        Q    (BY MR. LEVINSTEIN)  Right.
7        A    And my answer initially was around eight
8    or so.
9            MR. JONES:  It was four to eight.
10       Q    (BY MR. LEVINSTEIN)  You can't name more
11   than eight people who coached at one of these events?
12       A    I think I could only name eight, and there
13   were probably more.
14       Q    Were you aware that there were Taekwondo
15   events of these categories that dated back to the '70s?
16       A    Yeah.  I didn't count back that far.
17       Q    Okay.
18       A    So then mine was a guesstimate within a
19   range that I could justify.  The first World
20   Championship was 1977.
21       Q    So there could be 50 events?
22       A    Right.
23       Q    Okay.  And under these criteria, once
24   someone qualified by Item 1 --
25       A    Yes.

1        Q    And why did they have to have athletes at
2    these?
3        A    There's a 20 percent requirement for each
4    committee.
5        Q    And what was your understanding of the
6    source of that requirement?
7        A    It's probably USOC.
8        Q    Did you understand it was a federal law
9    that requires that?
10       A    I didn't understand that.
11       Q    Have you ever --
12       A    Federal law?
13       Q    -- read the Ted Stevens Olympic and
14   Amateur Sports Act?
15       A    Yeah.
16       Q    Did you understand that was a federal law?
17       A    Okay.  I do now.
18       Q    Is that where the 20 percent requirement
19   comes from?
20       A    Yes.
21       Q    Were you aware that the chairman of the
22   Coaching Science Committee selected Mr. Dae Sung Lee as
23   the coach without having a meeting?
24           MR. JONES:  Objection; calls for
25   speculation.

1     A    No, I'm not aware of that at all.

2     Q    (BY MR. LEVINSTEIN)  Did you ever see any

3  minutes of any meeting at which nominees were

4  considered?

5     A    No, sir.  And the way it worked, anytime I

6  dealt with the Coaching Science Committee -- for

7  instance, if we were preparing for the World

8  Championship, I would inform him either in writing or

9  by phone that we need to come up with coaches for this

10  next event; you need to have your committee meeting and

11  make nominations or recommendations to us.  And I would

12  call back every other day until it was completed, and

13  he would either tell me verbally or maybe in e-mail

14  saying that this is the nominee.

15     Q    And at some point, the chair of the

16  Coaching Science Committee told you the nominee for the

17  Olympics was Mr. Dae Sung Lee?

18     A    Yes.

19     Q    Either in writing or orally?

20     A    Yeah.

21     Q    And the Executive Committee simply

22  received a ballot with only an approve or disapprove

23  that nomination?

24     A    Correct.

25     Q    And would it violate these procedures for

1  the Coaching Science Committee chair to simply have

2  selected Mr. Dae Sung Lee without a meeting?

3        MR. JONES:  Objection; calls for

4  speculation.

5     A    It would appear to be a violation if

6  that's what happened.  But, again, I have no knowledge

7  that that's what happened.

8     Q    (BY MR. LEVINSTEIN)  Was Mr. Dae Sung Lee

9  a member of the Coaching Science Committee?

10     A    I'm not --

11        MR. JONES:  When?  Pardon me.

12     Q    (BY MR. LEVINSTEIN)  In 2003.

13     A    I'm not sure.  Again, I didn't know the

14  names of the members of that committee.  I don't know.

15     Q    Do you know how many people are on the

16  Coaching Science Committee?

17     A    No, I don't.

18     Q    Were there requirements of advance notice

19  of meetings of committees?

20     A    Requirements of each committee or --

21     Q    Or a general requirement that applied to

22  all your committees.

23        MR. JONES:  Objection; calls for

24  speculation.

25     A    I don't know that to be true.  And prior

1  to being Executive Director, I was on some committees,

2  and I know that I would be notified the day before if

3  there was a phone conference, and sometimes the morning

4  of if there's an afternoon.  So I don't know if there

5  was a requirement for prior notification or what that

6  was.

7     Q    (BY MR. LEVINSTEIN)  Were you on a lot of

8  committees over the years at the USTU?

9     A    Yes.

10     Q    And did some of the committees never meet?

11     A    Yes.  And they never reported as well.  I

12  mean, for instance, what committee was I on?  It might

13  have been a building fund committee that was inert and

14  inactive for two or three years.  And then it was

15  changed, and that committee went inactive for a year or

16  so, and then suddenly they started doing things.

17     Q    How many committees did the USTU have?

18     A    Standing committees we know of; other

19  committees were appointed as needed, and I don't know

20  what number that would be.

21     Q    Were there 27 standing committees?

22     A    No.  Like the ones that the president

23  appointed.

24     Q    There were five essential working

25  committees, I understand.

1     A    Right.

2     Q    But were there --

3     A    There were other committees that could be

4  appointed for whatever.

5     Q    Was there an ethics committee?

6     A    Late in my tenure there was one developed.

7  Prior to that, I think years and years before, under

8  the administration of Dr. Dong Ja Yang, I remember

9  there being one.  But for a long time there wasn't.

10     Q    Was there an audit committee?

11     A    Audit committee?  I remember there had

12  been one.  I don't know that they functioned.  But I do

13  know that there had been one.

14     Q    And was one responsibility of the audit

15  committee to make sure that the financial recordkeeping

16  and performance of the organization was in compliance?

17     A    That would probably be one of their

18  responsibilities.

19     Q    And for a long time, they didn't meet?

20     A    Not that I know of.  I was never on that

21  one.

22     Q    But in all of this issue involving the

23  Membership and Credentials Committee and all the

24  failure to comply with financial obligations, you never

25  recall an audit committee being involved?