8/12/2004 TRO Proceeding

```
1              IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF HAWAII
3
4    DAE SUNG LEE,                ) CIVIL NO.04-00461SOM
                                  )
5              Plaintiff,         )
                                  )
6       vs.                       )
                                  )
7    UNITED STATES TAEKWONDO UNION,)
     etc., et al.,                )
8                                 )
               Defendants.        )
9    _____)
10
11            PARTIAL TRANSCRIPT OF PROCEEDINGS
12       The above-entitled matter came on for hearing on
13   Thursday, August 12, 2004, at 11:30 a.m., at Honolulu, Hawaii,
14   BEFORE:     THE HONORABLE SUSAN OKI MOLLWAY
                 United States District Judge
15
     REPORTED BY:   STEPHEN B. PLATT, RMR, CRR
16                  Official U.S. District Court Reporter
17   APPEARANCES:   WARD D. JONES, ESQ.
                    Bervar & Jones
18                  1001 Bishop Street, Suite 1400
                    Honolulu, Hawaii  96813
19
                                   Attorney for the Plaintiff
20
                    ARTHUR F. ROECA, ESQ.
21                  APRIL LURIA, ESQ.
                    Roeca Louie & Hiraoka
22                  841 Bishop Street, Suite 900
                    Honolulu, Hawaii  96813
23
                                   Attorneys for the Defendants
24
25
```

8/12/2004 TRO Proceeding

```
                         I N D E X

STEVEN LOPEZ
  CROSS-EXAMINATION.............................  4

NIA NICOLE ABDALLAH
  CROSS-EXAMINATION BY MR. JONES................ 11
ROBERT PETER GAMBARDELLA
  CROSS-EXAMINATION BY MR JONES................. 18
  REDIRECT EXAMINATION BY MR. ROECA............. 35
KELLY SKINNER
  CROSS-EXAMINATION BY MR. JONES................ 44
  REDIRECT EXAMINATION BY MR. ROECA............. 51
HAN WAN LEE
  CROSS-EXAMINATION BY MR. ROECA................ 57
  REDIRECT EXAMINATION BY MR. JONES............. 58
  RECROSS-EXAMINATION BY MR. ROECA.............. 60

    AFTERNOON SESSION........................... 64

DAE SUNG LEE
  CROSS-EXAMINATION BY MR. ROECA................ 87
VIRGINIA WITTE
  CROSS-EXAMINATION BY MR. JONES................112
  REDIRECT EXAMINATION BY MR. ROECA.............124
  RECROSS-EXAMINATION BY MR. JONES..............130
```

8/12/2004 TRO Proceeding

```
1    THURSDAY, AUGUST 12, 2004                    11:30 A.M.
2                          * * *
3         THE CLERK:  Mr. Lopez, would you please raise your
4    right hand.
5         Do you solemnly affirm the testimony you are about
6    to give before this court shall be the truth, the whole truth,
7    and nothing but the truth?
8         THE WITNESS:  I do.
9         THE CLERK:  Would you please state your name for the
10   record and spell your last name.
11        THE WITNESS:  Steven Lopez, L-O-P-E-Z.
12        THE COURT:  Okay.
13        Now, Mr. Jones, can you come to the lectern?  And
14   you may go ahead and cross-examine Mr. Lopez within the scope
15   of his declaration.
16        And let me first make sure that, Mr. Lopez, the
17   statements in the declaration that you signed on August 6th,
18   2004, are true and correct and being submitted to the Court as
19   your testimony on all these matters live in the courtroom;
20   is that right?
21        THE WITNESS:  Yes, ma'am.
22        THE COURT:  Okay.  Go ahead.
23                       STEVEN LOPEZ,
24   called as a witness on behalf of the Defendants, having been
25   duly sworn, was examined and testified as follows:
```

8/12/2004 TRO Proceeding

```
1                      CROSS-EXAMINATION
2    BY MR. JONES:
3    Q.   Steven, this is Ward Jones.  I am Master Lee's attorney.
4         First of all, I want to congratulate you on making
5    the team.
6    A.   Thank you.
7    Q.   Master Lee -- you know Master Lee, isn't that correct?
8    A.   Correct.
9    Q.   He coached you in the capacity as head coach at the world
10   qualifications tournament in Croatia; isn't that correct?
11   A.   (No response.)
12   Q.   He was head coach?
13   A.   Let me think about it... Croatia?  Yeah, I think he did
14   coach me there.  I have difficulties remembering now, but,
15   yeah, I think he did.
16   Q.   Master Lee also coached you at the Pan American games in
17   2003?
18   A.   Yes, sir.
19   Q.   You won a gold medal there, did you not?
20   A.   Yes.
21   Q.   In your statement, you mentioned pushing a coach out of
22   the way at the Sydney Olympic games in 2000; do you recall
23   that?
24   A.   Yes.
25   Q.   Would that be Coach Han In Choe?
```

EXHIBIT "1"

1   A. Yeah, that was Coach Yan In Chon.
2   Q. Could you describe how that occurred?
3   A. Well, my -- Coach Yan In Chon, he gets very emotional
4   when he coaches. His English isn't very good to begin with,
5   much less when it's a high-pressured situation like the finals
6   of the Olympic games, and so he was basically -- I was down a
7   point, and he was yelling a bunch of things, and at that
8   moment, that's the last thing I needed, and I really couldn't
9   understand everything he was saying. And at that moment I
10  just needed someone to really calm me down and just -- if you
11  can just imagine being at the finals and you are down a point,
12  you need someone to calm you down. So I did physically push
13  him to the side. And I was looking for my brother, and I was
14  looking up to my brother.
15  Q. Your brother was in the spectator area?
16  A. Correct.
17  Q. As far as the layout of the sparring area at the Sydney
18  Olympics, isn't it correct that the fighting area was elevated
19  several feet, like a boxing rink?
20  A. Correct.
21  Q. And, so -- and isn't it also correct that the coaches
22  were not allowed to sit up in the fighting area, they were
23  down below, below you?
24  A. Correct.
25  Q. How is it, then, that you were able to physically move

1   Coach Chon?
2   A. Because I would go down the stairs, down the steps --
3   Q. I see.
4   A. -- and then sometimes Coach Chon would get really
5   excited, and either he would go up the steps or I would go
6   down the steps. I'm not sure which one, just because, like I
7   said, Coach Chon doesn't speak -- his English is pretty broken
8   up, and so I can't really understand anything he was saying,
9   so I would go down. Either -- like I said, I can't remember,
10  it's four years ago. Either I went down the steps or he was
11  up the steps.
12  Q. I see. And that was so you could get a look at your
13  brother?
14  A. Right. I mean throughout the match, anytime I was in the
15  chair, actually Coach Chon actually encouraged me to look up
16  at my brother.
17         THE COURT: Just so you make the record, your
18  brother is your coach; is that right, Mr. Lopez?
19  A. Yes, ma'am.
20         THE COURT: Okay.
21         MR. JONES: I'm sorry, Your Honor.
22  BY MR. JONES:
23  Q. When I say your brother, you are talking about Gene
24  Lopez; is that correct?
25  A. Correct.

1   Q. And Gene Lopez, at the 2000 Olympics, did not have any
2   title; isn't that correct?
3   A. He was my training partner.
4   Q. Okay. Did he have a credential?
5   A. Yes. To get into the high performance center where all
6   the U.S.A. delegation trained at, he had to have some kind of
7   accreditation to get in there to train with me.
8   Q. But he could not sit next to you where Coach Chon was;
9   isn't that right?
10  A. No, he was not -- he was not given Olympic coach
11  credentials.
12  Q. Okay.
13         Turning to another topic, which is your brother
14  Gene Lopez, you're close to him, are you not?
15  A. We're brothers.
16  Q. Do you love your brother?
17  A. Sir?
18  Q. Do you love your brother?
19  A. Yes, I love my brother.
20  Q. Your brother has a Taekwondo school which specializes in
21  sparring and competition?
22  A. No. He has a Taekwondo school that has -- is very
23  successful as far as placing people on the national team, but
24  he has 300 other students, where I would say 99 percent are
25  for people are there because they want to lose weight, or they

1   want to learn self discipline or whatnot, the tenets that
2   martial arts teaches you.
3   Q. You are a member of his school and came from his school?
4   A. Excuse me?
5   Q. Are you a member of his school or come from his school?
6   A. We trained -- I train at his school.
7   Q. Would you like to see his school grow and become more
8   successful?
9   A. I would love for my brother to be successful.
10  Q. Pardon?
11  A. I would love to see my brother be successful in life.
12  Q. Thank you.
13         Now, you were very happy, were you not, when he was
14  selected for Olympic coach in June of this year?
15  A. Yes.
16  Q. Did you try to help him get that nomination?
17  A. There was nothing I could have done to help him.
18  Q. Do you like having your --
19  A. As far as -- if you're asking, like, voting, or
20  nominating, or anything like that, as an athlete, I don't
21  think I -- uh, didn't know the procedures, as far as of
22  athletes, what athletes could or could not do.
23  Q. You didn't put in the good word to anybody you thought
24  might be able to help him?
25  A. No, I didn't know who are the people assigned to that

## Page 9

8/12/2004 TRO Proceeding

```
 1   Q.  [redacted]
 2       [redacted]
 3       [redacted]
 4   A.  [redacted]
 5   Q.  [redacted]
 6       [redacted]
 7   A.  [redacted]
 8   Q.  [redacted]
 9       [redacted]
10       [redacted]
11   A.  [redacted]
12   Q.  Even if he doesn't sit near you at ring-side?
13   A.  Excuse me?
14   Q.  Even if he's not sitting with you ring-side?
15   A.  Well, I mean, I -- you're breaking up when you speak to
16   us here, when we get it through here.  We didn't hear what the
17   question was, actually.
18   Q.  The question is -- let me repeat it:
19       [redacted]
20       [redacted]
21       [redacted]
22   A.  [redacted]
23       [redacted]
24       [redacted]
25       [redacted]
```

## Page 10

8/12/2004 TRO Proceeding

```
 1   Q.  Thank you very much?
 2           THE COURT:  Okay.
 3           Redirect?
 4           MR. ROECA:  I have nothing further.
 5           Thank you very much.
 6           THE COURT:  Okay.
 7           Then I'll ask Mr. Lopez to leave the room, and --
 8   are we going to take Ms. Abdallah next?
 9           MR. JONES:  Yes, Your Honor.
10           THE COURT:  Okay.
11           So, could Ms. Abdallah come into the room, and we'll
12   have her sworn.
13           MR. BENZ:  Okay, Your Honor, I'll do that.  It's
14   going to take me a minute or two.
15           THE COURT:  Okay.
16           [redacted]
17           [redacted]
18           [redacted]
19           [redacted]
20           [redacted]
21           [redacted]
22           [redacted]
23           [redacted]
24           [redacted]
25           [redacted]
```

## Page 11

8/12/2004 TRO Proceeding

```
 1           [redacted] do you solemnly affirm that the testimony you are
 2   about to give before this court shall be the truth, the whole
 3   truth, and nothing but the truth?
 4           THE WITNESS:  I do.
 5           THE CLERK:  Would you please state your name for the
 6   record and spell your last name?
 7           THE WITNESS:  Nia Nicole Abdallah.  The last name is
 8   spelled A-B-D-A-L-L-A-H.
 9           THE COURT:  All right.
10           And let me start by asking you, first, whether the
11   declaration that you signed on August 5, 2004, is true and
12   correct and states what you would say if you were asked
13   questions on these subjects and were appearing live in a
14   courtroom?
15           THE WITNESS:  Oh, yes, that's correct.
16           THE COURT:  Okay.
17           Then, Mr. Jones, you may cross-examine.
18           MR. JONES:  Thank you, Your Honor.
19           NIA NICOLE ABDALLAH,
20   called as a witness on behalf of the Defendants, having been
21   duly sworn, was examined and testified as follows:
22                       CROSS-EXAMINATION
23   BY MR. JONES:
24   Q.  Nia -- if I could call you that -- my name is Ward Jones.
25   I am the attorney for Coach Dae Sung Lee.  I want to
```

## Page 12

8/12/2004 TRO Proceeding

```
 1   congratulate you on making the team.
 2   A.  Thank you.
 3   Q.  First of all, is it correct that you came originally from
 4   a Houston Taekwondo school before going to Colorado Springs?
 5   A.  That's true.
 6   Q.  Who were your teachers there?
 7   A.  My teachers there was Coach Kim, in Houston, named So Hu
 8   Kim.
 9   Q.  Who is different from Chul Ho Kim, correct?
10   A.  Correct.
11   Q.  Do you know a Coach Han Wan Lee?
12   A.  Yes.
13   Q.  Who is he?
14   A.  He was head coach of the Olympic Training Center when I
15   originally moved there.
16   Q.  That was in 2002, correct?
17           THE COURT:  I'm sorry, I couldn't quite hear it.  He
18   was head coach where?
19   A.  At the Olympic Training Center in Colorado Springs when I
20   first moved there in 2002.
21           THE COURT:  Thank you.
22   BY MR. JONES:
23   Q.  Wasn't it Coach Han Wan Lee who first discovered you and
24   invited you there?
25   A.  It was probably along with Coach Chul Ho Kim.
```

1  Q. Coach Han Wan, though, was the head coach, and Coach Chul
2  Ho worked for him?
3  A. True.
4  Q. Coach Han Wan then resigned April of last year; do you
5  recall that?
6  A. Yes.
7  Q. And, at that time, Coach Chul Ho Kim took over your
8  training?
9  A. Well, he was training -- he was running practices
10 beforehand, but he just took the title as head coach after
11 Coach Lee left.
12 Q. Okay. So, then you worked with Chul Ho Kim --
13         THE COURT: Did she say after Coach Lee left?
14         MR. JONES: Yes.
15         THE COURT: Okay.
16 BY MR. JONES:
17 Q. And, at that point, did you just work with Coach Chul Ho
18 Kim after Coach Lee left?
19 A. Yes.
20 Q. Do you know Master Dae Sung Lee?
21 A. Yes.
22 Q. He was the head coach who went with you and Coach Chul Ho
23 Kim to the Pan American qualifying events in January of this
24 year, isn't he?
25 A. Yes.

1  Q. He was able to observe you at that event, wasn't he?
2  A. Yes.
3  Q. Will having Dae Sung Lee present as an extra coach hurt
4  you if Coach Chul Ho Kim is allowed to sit with you ring-side?
5  A. I think that him being there would be kind of a
6  distraction, because we -- we've been, as a team, a unit here
7  for a while, we've been together, and just having an extra
8  person -- everybody has their opinions and stuff, and it could
9  just throw off everything that I have been working on right
10 now. I don't think it's the time to change anything.
11 Q. If he were not to instruct you or suggest any of your
12 training regimen or techniques, would that be a distraction?
13 A. Well, if that happens, then I don't see a reason for him
14 to be here. I mean, if he's not going to help me, then I
15 don't see why he should be there. That extra person being
16 there is not needed.
17 Q. I see.
18         MR. JONES: Thank you.
19         THE COURT: Any redirect?
20         MR. ROECA: No, Your Honor.
21         THE COURT: Okay. Then the witness is excused.
22         Are any of the other witnesses in Athens? Where is
23 Kelly Skinner?
24         MR. BENZ: Kelly Skinner is present. I can get
25 Kelly Skinner, Your Honor.

1         THE COURT: It can be either Kelly Skinner or
2  Mr. Gambardella; who do you want to take first?
3         MR. JONES: Mr. Gambardella, Your Honor.
4         THE COURT: Can we have Mr. Gambardella first?
5         MR. BENZ: All right, Your Honor.
6         THE COURT: Mr. Jones, while they are getting
7  Mr. Gambardella, can you tell me if you have any objections to
8  the declaration of Robert Gambardella?
9         MR. JONES: I'm afraid I do have objections to
10 expert opinions contained therein, Your Honor.
11        THE COURT: Okay. I need you to give me the
12 paragraph number you are objecting to.
13        MR. BENZ: Okay, Your Honor, you have Bob
14 Gambardella present in the room.
15        THE COURT: Okay, hold on, now, we have some
16 objections to his declaration, and I am going to deal with
17 those first.
18        MR. JONES: Paragraph number seven.
19        THE COURT: Quote me the language you're objecting
20 to.
21        MR. JONES: All of it, Your Honor, as well as
22 paragraph number eight.
23        MR. LEVINSTEIN: Your Honor, this may not be -- I
24 may not be the most important person to hear this, but I can't
25 hear anything right now, and I just want to make sure we

1  haven't lost the line --
2         THE COURT: Oh, you can't hear anything because we
3  are all reading paragraphs seven and eight.
4         MR. LEVINSTEIN: Sorry.
5         THE COURT: Okay. And who was that who just spoke?
6         (No response.)
7         THE COURT: The person who just said you couldn't
8  hear anything, give me your name.
9         MR. BENZ: I'm sorry, this is Jeff Benz.
10        THE COURT: Thank you. There are a lot of voices,
11 so it will help us if people told us who is speaking...
12        Okay, who wants to respond to the evidentiary
13 objection to paragraphs -- it's to paragraphs seven and eight;
14 is that right?
15        MR. JONES: Yes, Your Honor, and also 12.
16        THE COURT: Seven, 8 and 12.
17        MR. BENZ: Could the objections please be restated?
18 This is Jeff Benz.
19        MR. JONES: Yes, Your Honor.
20        They call for expert opinions, and this witness has
21 absolutely no expertise in the field of Taekwondo coaching in
22 national or international competition.
23        THE COURT: Okay, well, paragraph seven, it seems to
24 me, doesn't really call for an expert opinion. Paragraph
25 seven has a little historical discussion.

1  MR. JONES: It --
2  MR. ROECA: Your Honor, if I might?
3  THE COURT: Okay.
4  MR. ROECA: I agree with the court's observation.
5  Secondly, the opinions are those of Mr. Gambardella, who was
6  on the committee that was establishing the criteria and
7  revisiting them. And, going to paragraph eight, part of that
8  is simply a recitation of what the new criteria were.
9  THE COURT: Okay, I am going to overrule the
10 objections to paragraphs seven and eight.
11 Can we all look at paragraph 12 now. And state the
12 objection. You think this is an expert opinion, and you think
13 he's not qualified; is that what it is?
14 MR. JONES: Yes, Your Honor.
15 THE COURT: Okay. I'm not sure that this is an
16 opinion. Isn't this a statement of the position of the
17 Taekwondo Union and then of the status of what's happening
18 with appointing coaches? I don't think this is an expert
19 opinion, so I'm going to overrule that.
20 Okay, anything else?
21 MR. JONES: No, Your Honor.
22 THE COURT: Okay.
23 Then let's have Mr. Gambardella given the oath or
24 affirmation.
25 THE CLERK: Would you please raise your right hand.

17

1  Is it correct that you have never competed in Taekwondo?
2  A. Yes, sir, that is correct.
3  Q. And that you have never coached athletes in competitive
4  Taekwondo at any level, have you?
5  A. Yes, sir, that is correct.
6  Q. What you know about Taekwondo you have sort of picked up
7  in the last six months?
8  A. Uh... no, sir.
9  Q. What else did you know about Taekwondo, just generally,
10 before becoming CEO of USTU?
11 A. Well, I worked with the United States Olympic Committee
12 in the Sport Partnership Division, and throughout that time
13 period, I had opportunity to observe Taekwondo in different
14 functions throughout the past four years. I'm not saying I am
15 an expert, but I have had an opportunity to kind of take a
16 look at it and analyze it.
17 Q. You do not hold yourself out as an expert in Taekwondo
18 competition based upon that experience, though?
19 A. That is correct.
20 Q. Is it correct that you recommended Gene Lopez to the
21 governing board?
22 A. Yes, sir.
23 Q. How did you get his name?
24 A. Can you say that again? I'm sorry.
25 Q. I'm sorry. How did you get his name?

19

1  Do you solemnly affirm that the testimony you are
2  about to give before this court shall be the truth, the whole
3  truth, and nothing but the truth?
4  THE WITNESS: I do.
5  THE CLERK: Will you please state your name for the
6  record, and spell your last name, please.
7  THE WITNESS: Yes. My name is Robert Peter
8  Gambardella. My last name is spelled G-A-M-B-A-R-D-E-L-L-A.
9  THE COURT: Okay, let me ask you, Mr. Gambardella,
10 looking at your declaration, which says it was signed on
11 August 5, 2004, I ask you if the statements in this document
12 are true and correct and represent what you would testify to
13 if you were asked questions in court and were appearing
14 live -- and the questions concern the matters raised in the
15 declaration.
16 THE WITNESS: Yes, Your Honor.
17 THE COURT: Okay.
18 Then, Mr. Jones, go ahead with cross-examination.
19 MR. JONES: Thank you, Your Honor.
20 ROBERT PETER GAMBARDELLA,
21 called as a witness on behalf of the Defendants, having been
22 duly sworn, was examined and testified as follows:
23 CROSS-EXAMINATION
24 BY MR. JONES:
25 Q. Mr. Gambardella, this is the attorney for Dae Sung Lee.

1  A. How did I get his name? How did I get his name for what?
2  Q. To -- to be considered by you.
3  A. Basically, the name came forward as a result of
4  performance of athletes.
5  Q. Nobody submitted the name to you?
6  A. Uh, no, sir.
7  Q. You were aware that Dae Sung Lee had been selected by
8  USTU in March 2003, were you not?
9  A. Yes, sir.
10 Q. You were also aware that USOC had approved his nomination
11 around October -- early October 2003?
12 A. Yes, sir.
13 Q. You were aware that Dae Sung Lee had some coaching
14 success with Steven Lopez at the 2003 Pan Am games?
15 A. Uh, I'm unaware of that, sir.
16 Q. Were you aware that Coach Dae Sung Lee coached Steven
17 Lopez at the Pan Am games?
18 A. Yes.
19 Q. And that --
20 A. I knew that.
21 Q. And, at that tournament, Steven Lopez won a gold medal?
22 A. Yes, sir.
23 Q. Isn't it also correct that at the world championships,
24 Dae Sung Lee was the head coach for that team?
25 A. I know he was on the coaching staff, but I don't know in

1  what exact position, to be honest with you.
2  Q.   Steven Lopez won a gold medal at that tournament, as
3  well; you're aware of that?
4  A.   Yes, sir.
5  Q.   Were you aware at the time you were doing the screening
6  that you refer to in your statement, the screening for head
7  coach, that Gene Lopez coached his sister, Diana Lopez,
8  against Nia Abdallah at the Olympic qualifications?
9  A.   I'm aware of that, yes.
10 Q.   Were you aware of it at the time you were doing the
11 screening?
12 A.   Yes, sir.
13 Q.   Were you aware that Nia Abdallah won and beat out Diana
14 for that position?
15 A.   Yes, that happened in June.
16 Q.   And, as a result, Diana is now first alternate to Nia
17 Abdallah?
18 A.   Yes, sir.
19 Q.   In other words, if something should happen to Nia, Diana
20 would get to take her place at the Olympics?
21 A.   Uh, yes.
22 Q.   How do you think that makes Nia feel, to have Gene Lopez
23 sitting with her ring-side in Olympic competition?
24 A.   Uh, I don't know.  I really haven't talked to him
25 specifically about that.

21

1  Q.   I'm sorry.  The question is, how do you think it makes
2  Nia feel?
3  A.   Well, I had a conversation with Nia about that, and I
4  think that we have come to a resolve, you know, in our
5  conversations that we have had over the several weeks prior to
6  us coming to our training in Malta and now in Athens.
7  Q.   And that resolution is to have someone other than Gene
8  Lopez sit with her?
9  A.   I'm sorry, could you say that again?
10 Q.   Would the resolution be that you have decided to have
11 someone other than Gene Lopez sit with her in competition?
12 A.   Gene Lopez is the head coach of the Olympic teams.
13 Q.   Right.  But why don't you explain what the resolution is
14 for Nia.
15 A.   Well, we had a meeting, I believe, around July 2nd or
16 3rd -- I can't remember the exact date -- and with our
17 governance and management committee, and it was decided that,
18 in the best interests of the program, that we would have Chul
19 Ho Kim come and help us in our efforts leading up to Malta and
20 to Athens.
21 Q.   And how is he going to help you?
22 A.   Basically, he's helping us in our training, and
23 basically, just, uh, in meetings that we have, uh, amongst
24 the coaching staff.
25 Q.   He does not have the title of "coach"; isn't that

22

1  correct?
2  A.   Actually, the title is, he's on our staff.
3  Q.   Okay.  But, to answer the question, Chul Ho Kim does not
4  have the title --
5       MR. BENZ:  Wait, wait, wait, wait, wait.  He hasn't
6  finished his answer.  I'd like to let him continue.
7  A.   Because, basically, within the rules and regulations
8  that's set forth right now by the United States Olympic
9  Committee, in terms of number of --
10      THE COURT:  Can I stop you?  I don't know who
11 grumbled that the witness hadn't finished his answer.  And the
12 court reporter needs to know who is speaking, and cannot tell.
13 So, if counsel wants to say anything from the telephone,
14 counsel needs to start whatever comment is being made by
15 telephone with counsel's name.  So, who said that?
16      MR. BENZ:  That was Mr. Benz, Your Honor.  Your
17 point is well taken.  I apologize.
18      THE COURT:  Okay, thank you.
19      I'm sorry, whoever was then speaking -- I think it
20 was the witness -- you can go ahead and continue.
21 A.   Yes, can you restate your question again?
22      THE COURT:  Sure.
23      Mr. Jones, can you repeat the question?
24      MR. JONES:  I forgot what it was...
25      THE COURT:  Well, hold on, we have to go back a

23

1  little.  The record is all messed up right now, because we
2  can't tell who is talking, but hold on, and I'll see if I can
3  figure this out.
4       Have you got it, Mr. Jones?
5       MR. JONES:  Yes.
6       THE COURT:  Okay.
7  BY MR. JONES:
8  Q.   Is it correct that Chul Ho Kim is not a credentialed
9  coach?
10 A.   Yes, sir.  And, basically, even myself, as being a team
11 leader of this team, I am not credentialed to get an ATHOC
12 credential; therefore, I cannot get into the Olympic Village
13 nor can I get into the venue.  So, yes, indeed -- and the same
14 thing has occurred with Chul Ho Kim as he's come to our Malta
15 trip, and our pre-games training, and to the Athens trip, the
16 Athens Olympics here as just a staff member, who is helping
17 in our training efforts in preparation for our competition.
18 Q.   Thank you.
19      Do you know if it is a conflict of interest for
20 Gene Lopez to be Nia Abdallah's coach during Olympic
21 competition?
22 A.   Uh... I don't think -- I don't believe so, but it can be
23 looked at by different -- you know, different people can look
24 at it different ways.
25 Q.   Did you recognize a conflict of interest when you were

24

8/12/2004 TRO Proceeding

1  screening Gene Lopez, as far as his relation with -- his prior
2  relation and record with Nia Abdallah?
3  A.  Uh, no, sir.
4  Q.  You did not see the conflict?
5  A.  No, sir, because, you know what?  If we were trying to
6  figure out everything that could have happened in the series
7  of all the athletes involved in the trials, trying to write
8  every situation down would probably be -- the text would be
9  larger than "War and Peace," so we just can't account for
10 everything.
11 Q.  Did the possibility that there was a conflict of interest
12 arise after Gene Lopez's name was sent by you to the governing
13 body?
14 A.  Yes, sir.
15 Q.  What did you do in reaction to that when the possibility
16 of conflict was brought to your attention?
17 A.  Well, it wasn't a reaction -- rather than a way to try to
18 develop solutions so that we come to Athens with a team that
19 is ready to compete for medals at the Athens Olympic games.
20 Q.  Did you ever consider pulling back Gene Lopez's name when
21 you discovered the conflict of interest?
22 A.  Well, as I said, I didn't see it as being a conflict of
23 interest, so at that point, with that being said, we weren't
24 considering pulling his name back.
25 Q.  And about when are we talking about when the issue of --

25

8/12/2004 TRO Proceeding

1  or the discussion of conflict came up?
2  A.  Please state your question again, I didn't hear you.
3  Q.  I'm sorry.
4       About what time period are we talking about when the
5  issue of conflict came up after Gene Lopez's initial
6  selection?
7  A.  It was approximately around, I believe, June 29th,
8  because I was on my way to Indianapolis for an executive
9  director's meeting, at which time I had several conversations
10 with the parents of Nia Abdallah, and the conversations --
11 several conversations after that I had with the parents and
12 with members of the governance and management committee.  And,
13 as I stated earlier, it was probably about July 2nd or 3rd
14 that we had a meeting of our governance and management
15 committee.
16 Q.  Okay.
17      According to your statement, Gene Lopez was
18 confirmed by USOC approximately June 22nd of this year?
19 A.  Yes, sir.  I don't know the exact date, but that sounds
20 somewhere -- probably right around the time.  I would say
21 maybe somewhere between the 21st, 22nd, or even the 20th.
22 Q.  Thank you.
23      Turning for a moment to Nia Abdallah 's history, do
24 you know when she was first discovered by the U.S. Olympic
25 people?

26

8/12/2004 TRO Proceeding

1  A.  You may want to be a little bit more specific, sir,
2  because I don't think that the USOC "discovers" anyone, but
3  rather, maybe the United States Taekwondo Union?
4  Q.  Yes, let me rephrase that.  When was she discovered by
5  USTU?
6  A.  Yeah, I think probably about two years ago.  And, just --
7  I want to state for the record, just so we don't have a
8  misunderstanding, my tenure at U.S. Taekwondo started February
9  4th of 2004, so some of this institutional history, which is
10 not documented, is just from what I have been trying to piece
11 together for the past several months.
12 Q.  Were you aware whether -- were you aware that Han Wan Lee
13 was the person who discovered her at USTU?
14 A.  I could not say one way or the other.  I don't know.
15 Q.  When you were applying the new criteria for coach
16 selection, would you research the first criteria, which is
17 whether the applicant had placed the athlete?
18 A.  Had I researched that?
19 Q.  Yes.
20 A.  Yes, we did.  We did take a look at that.  And I do have
21 a file up in my room with all the results.  And even I have
22 results of what athletes participated in what qualifiers.  So
23 we did look at that.
24 Q.  My question is whether you researched Nia Abdallah's
25 history to determine who placed her for purposes of criteria

27

8/12/2004 TRO Proceeding

1  number one.
2  A.  No, we hadn't.
3  Q.  So, criteria number one was applied without the benefit
4  of research to either determine who placed Nia Abdallah?
5  A.  Well, sir, it's my understanding that Chul Ho Kim was her
6  coach, and that she was training with him, and she was the one
7  who was asking for Chul Ho Kim -- and no one else -- as -- to
8  be her coach.
9  Q.  Is what the athlete asks for one of the criteria?
10 A.  No, basically, this is a conversation that we had several
11 times.  So, basically, in terms of the historical perspective,
12 you know, it has been Chul Ho Kim who has been the resident
13 coach of the program.
14 Q.  If it turned out that someone else and not Chul Ho Kim --
15 rather, Han Wan Lee -- placed her, then that would mean that
16 the first criteria was applied erroneously with respect to Nia
17 Abdallah, would it not?
18 A.  I guess that's a matter of opinion.
19 Q.  You can't have more than one coach placing an athlete,
20 can you?
21 A.  I don't believe so.
22 Q.  Now, you called the system of coach selection under the
23 old system at USTU an "award", is that right?
24 A.  Yes, sir.  That is basically -- and that's the opinion of
25 many people inside and outside the U.S. Taekwondo Union.

28

1  Q. It's correct, is it not, that you were not there in 2003
2  when USTU went through the coach selection process that led up
3  to Dae Sung Lee's nomination? Isn't that true?
4  A. Yes, sir. As I stated a little bit ago, I started with
5  Taekwondo February 4th of 2004.
6  Q. You don't know who was considered or what factors were
7  weighed in that selection, do you?
8  A. Uh, no, sir; however, I -- I talked to some of the former
9  board members, especially some of the AAC reps, and I think
10 that the process that was set forth probably wasn't proper,
11 because there wasn't -- what I understood -- understand is
12 that there wasn't enough athlete representation when it was
13 voted upon.
14 Q. You're aware, though, that the process by which Dae Sung
15 Lee was selected required AAC representation and voting prior
16 to a nomination being approved?
17 A. No.
18 Q. You weren't aware that AAC people were on the committee
19 that approved Dae Sung Lee?
20 A. I was aware of the fact. Again, this was before my time.
21 And, again, I can only go on what I have been told by other
22 AAC members.
23 Q. Assume that the bylaws require a certain number of AAC
24 people to approve -- number one, compose the selection
25 committee, and, number two, that it's got to be majority rule,

29

1  that would mean the AAC was represented in that selection
2  process, would it not?
3  A. Perhaps, yes. But, again, I really don't know.
4  Q. Now, you stated in your declaration that --
5       THE COURT: What is AAC?
6  A. Athletes' Advisory Council.
7       THE COURT: And is that a council that is part of
8  the U.S. Olympic Committee?
9  A. Well, NGB's, National Governing Bodies, have their own
10 AAC's, or AAC reps.
11      THE COURT: Okay.
12 A. It may be structured differently according to different
13 NGB's.
14      THE COURT: Okay, thank you.
15 A. But the USOC also has an AAC body that works with
16 the U.S. Olympic Committee.
17      THE COURT: All right.
18 BY MR. JONES:
19 Q. Next question, sir:
20    You stated that you have been unable to get an
21 additional credential for Chul Ho Kim, is that correct?
22 A. Yes. And, as I stated earlier, I was unable to get a
23 credential for myself.
24 Q. Who issues those credentials?
25 A. The United States Olympic Committee in cooperation with

30

1  the athletes' organizers.
2  Q. And has the U.S. Olympic Committee agreed to issue you
3  one?
4  A. No. As I stated a moment ago, I don't have a credential
5  to get into -- number one, into the Olympic Village or the
6  venue. I do have a USOC credential, which gets me into our
7  training site, which is outside the purview of the ATHOC
8  facilities.
9  Q. But it's correct, is it not --
10      THE COURT: Of the what facilities?
11 A. The American College of Greece.
12      MR. BENZ: Your Honor, this is Jeff Benz.
13      THE COURT: Yes?
14      MR. BENZ: ATHOC is an acronym that stands for the
15 organizing committee for the Olympic games in Athens. I think
16 it actually stands for the Athens Organizing Committee.
17      THE COURT: What was it --
18      MR. BENZ: They administer the games, they run the
19 games on site in accordance with IOC -- International Olympic
20 Committee -- policies and procedures.
21      THE COURT: What did you say was the acronym?
22      MR. BENZ: I'm sorry, A, T as in Tom, H as in
23 Harold, O-C.
24      THE COURT: Thank you.
25      Okay.

31

1  BY MR. JONES:
2  Q. So, just to understand this credentialing process, USOC
3  is one of the parties that issues one; is that right?
4  A. Yes -- yes, the USOC is in charge of X number of
5  credentials, which is based on -- the formula-driven equation
6  based on the numbers of athletes who qualify, as I understand
7  it.
8  Q. You also -- turning to another topic, you said in your
9  statement that a coach at the Sydney Olympics was pushed aside
10 by Steven Lopez; is that right?
11 A. Uh -- yes. My understanding from conversations with
12 Steven that he wasn't getting the correct information in his
13 finals, and so he was seeking information from his brother,
14 who was in the stands.
15 Q. I see. So you got that secondhand, you didn't see it?
16 A. Uh, no, sir. I got it from the athlete, yes.
17 Q. Thank you.
18    Now, you wrote a letter to me, you might recall, in
19 response to a query by me as to Dae Sung Lee's status back in
20 July, do you recall that?
21 A. Yes, I do.
22 Q. You wrote in that letter that the USOC approved of Gene
23 Lopez as coach on July 21; do you recall that?
24 A. Uh, I would have to look at it. It says, U.S. team
25 nominated Mr. Gene Lopez from Houston, Texas, as the 2004

32

1  Olympic coach for Taekwondo. His nomination was approved by
2  the United States Olympic Committee on July 19, 2004.
3  Q.  I believe, in your statement, though, your declaration,
4  you told us that it was June 22nd that that process occurred?
5  A.  If that was the case -- and I'm trying to find it right
6  now -- that's an error on my part, I guess.
7       MR. BENZ:  This is Jeff Benz.  Do you have a part of
8  the declaration he can refer to?
9       THE COURT:  Paragraph 11, at the bottom of paragraph
10 11.
11 A.  That, Your Honor, is a mistake, and it is -- the letter
12 here, July 19th, is correct, and this is a typographical error
13 that I didn't catch.
14 BY MR. JONES:
15 Q.  Thank you.
16      THE COURT:  So what is the correct date when the
17 recommendation was approved by the USOC?
18 A.  Yes, ma'am, it was July 19th, 2004.
19      THE COURT:  Okay.
20      MR. LEVINSTEIN:  Your Honor, this is Mark
21 Levinstein.  Just for clarification, I'm not sure the question
22 matched the answer.  It was a question about the USTU
23 recommendation versus the USOC approval.  I'm just not sure
24 that the record's clear on what he was answered.
25      THE COURT:  Okay.

1       MR. LEVINSTEIN:  I think he's saying that the USOC
2  approval was the 19th of July --
3       THE COURT:  Right.
4       MR. LEVINSTEIN:  But the USTU recommendation, I
5  think, was in your question as well.
6       THE COURT:  Well, Mr. Jones, from what I can tell,
7  had asked whether the USOC had approved Gene Lopez's coach
8  July 21.  And the witness said, well, I don't know.  Where is
9  it in the declaration?
10      So, when was Gene Lopez approved by the United
11 States Olympic Committee as the coach for the Taekwondo team?
12 A.  Your Honor, again, it was July 19th I received an e-mail
13 from a USOC staff member approving Gene Lopez and other
14 coaches and staff for the 2004 Olympic games.
15      THE COURT:  Okay.  So you're saying that it was July
16 19, 2004, that the United States Olympic Committee approved
17 Mr. Gene Lopez as the coach for the 2004 Olympic games; is
18 that right?
19 A.  Yes, Your Honor.
20      THE COURT:  Thank you.
21 BY MR. JONES:
22 Q.  And is it correct that -- just to understand, that
23 approximately a month before that is when the USTU approved
24 his name?
25 A.  Uh, I don't believe it was a month before.  I believe it

1  was, perhaps -- probably late June -- perhaps?  Maybe the
2  26th.  I don't have the exact date.
3  Q.  So a little less than a month, you're thinking?
4  A.  Well, first of all, we -- in order for us to do this
5  correctly, we had to wait and see who would win the Olympic
6  trials in San Jose, in order for us to try and keep the
7  process moving in the correct manner.  So our Olympic trials
8  were in June, and, basically, we had to wait until after that
9  and then, you know, send in a recommendation to the United
10 States Olympic Committee after that.
11      MR. JONES:  Thank you, I have no further questions.
12      THE COURT:  Okay.
13      Redirect?
14      MR. ROECA:  Okay, Your Honor.
15      THE COURT:  Okay, hold on.
16      (Discussion off the record.)
17           REDIRECT EXAMINATION
18 BY MR. ROECA:
19 Q.  Mr. Gambardella, Arthur Roeca.  I just have a few
20 follow-up questions.
21      One of the questions that was earlier put to you had
22 to do with the composition of the team with Nia and Mr. Lopez
23 being the competitors and Mr. Lopez's brother being the coach.
24      And my question for you is, have you observed the
25 team since you arrived in Athens, in terms of its cohesive

1  nature or lack of cohesive nature?
2  A.  Yes, Mr. Roeca.  As a matter of fact, our team --
3       MR. JONES:  Objection, Your Honor, outside the
4  scope.
5  A.  -- and Steven and Mark Lopez came to the U.S. Olympic
6  Committee prior to -- a week prior to our trip in Malta --
7       THE COURT:  Can I stop you?  There's an objection to
8  the question.  And the objection is, it's outside the scope.
9  Okay, well, I'm going to let it go.
10      Go ahead, overruled.  You can complete your answer.
11 A.  I just wanted to give you a little bit of the chronology.
12 The Lopez family came to Colorado Springs a week prior to us
13 departing for our Malta trip.  At that point, I had
14 opportunities to spend time watching, observing practice.
15 When we left for Malta -- we spent eight days in Malta.  We
16 were hosted by the Malta Olympic Committee.  I observed every
17 practice that they had, and the same here now in Athens, every
18 practice.  We have had two practices a day, 9:00 in the
19 morning, and then another one at 5:00 in the evening, and I
20 have been at those.  And I have seen, basically, a group of
21 individuals forming into what I think is a cohesive team,
22 which is really critical, especially when you're at games of
23 this magnitude.
24 BY MR. ROECA:
25 Q.  Mr. Gambardella, during one of the questions that was

8/12/2004 TRO Proceeding

1  asked earlier, that there was a suggestion raised as to
2  possible conflict of interest, my question is, during the time
3  you have had an opportunity to observe the U.S. Taekwondo
4  Olympic team, have you observed anything that would suggest to
5  you that there has been any conflict of interest that created
6  a negative atmosphere in the training or in the interaction of
7  any of the athletes or coaches?
8  A.   No, sir.
9  Q.   Based upon what you observed, have you reached a
10 conclusion as to whether you have been able to pull together
11 the team so that it has a best chance to compete as an Olympic
12 team in the 2004 Olympics?
13 A.   Based on everything that I know, in terms of what I've
14 read and researched, in terms of preparation for Olympic
15 games, two studies by Dan Gould of the University of North
16 Carolina, Greensboro -- presently my master's degree work that
17 I am doing is on athlete development through the University of
18 Lyon in France -- and all the research I have read through
19 that, I think that our team is ready to take on the world.
20 Q.   Now, one of the other questions had to do with who
21 coached whom as it related to who was selected to be coach of
22 the Olympic team; do you recall those general questions?
23 A.   Yes, sir.
24 Q.   And, the selection of coaches -- or of the coach, Gene
25 Lopez, this year, for the U.S. Olympic teams, based upon your

37

8/12/2004 TRO Proceeding

1  involvement in this, was that selection based upon criteria
2  that were established by the United States Taekwondo Union
3  and approved by the United States Olympic Committee?
4  A.   Can you repeat it once again? We just lost you a little
5  bit. I'm sorry.
6  Q.   Yes.
7       You were responding to questions about whether Nia
8  had a coach, and whether she had coached -- then coached for
9  certain activities. And my question for you is: The coach,
10 Gene Lopez, was the one selected in July of 2004, as you've
11 testified in response to questions; true?
12 A.   Yes, sir.
13 Q.   To your knowledge, was his selection based upon criteria
14 that had been established prior to the date of his selection?
15 A.   The criteria was developed prior to his selection, yes,
16 sir. Actually, I had an opportunity, when we first came on
17 board, I had an opportunity to talk and work with our sport
18 partnership division to try to help us develop selection
19 procedures.
20 Q.   And when the criteria were established, did you have any
21 idea, one way or another, as to who the coach would ultimately
22 be on the date that the criteria were established?
23 A.   No, sir. Because, basically, as I stated a little bit
24 earlier, I had to wait until our Olympic trials were over,
25 because there could have been, you know, other coaches that

38

8/12/2004 TRO Proceeding

1  could have won, whether it be in the female or male area, and,
2  you know, basically, we had to look at it and see how it
3  things settled out.
4        MR. ROECA: That's all I have; thank you.
5        THE COURT: Okay.
6        Did you have any more cross?
7        MR. JONES: No, Your Honor.
8        THE COURT: Okay.
9        Then the witness is excused.
10       We are going to take about a ten-minute break. I
11 know it's really, really late over there in Greece, so we
12 won't take more than ten minutes. I know we still have
13 Ms. Skinner to get back to by phone, so, ten minutes, then
14 we'll be right back.
15       Thank you.
16       THE CLERK: All rise.
17       This court will stand in recess for ten minutes.
18       (A recess was taken from 11:55 to 12:05 p.m.)
19       THE COURT: Okay, we're going to go back now to the
20 telephone witnesses. And I think Kelly Skinner is the last
21 witness we have from Greece, right?
22       MR. JONES: Yes.
23       THE COURT: Is she there in the room?
24       MS. LURIA: It's a man.
25       THE COURT: I'm sorry, I couldn't hear. Hello? Are

39

8/12/2004 TRO Proceeding

1  we connected okay?
2        THE CLERK: Your Honor, they were supposed to remain
3  on...
4        MR. LEVINSTEIN: You are connected with me,
5  Your Honor. This is Mark Levinstein in Washington. I think
6  they are there. Kelly Skinner is a man, though, not a woman.
7        THE COURT: I'm so sorry. That's why I was waiting
8  for the voice.
9        MR. LEVINSTEIN: But I don't hear anyone yet from
10 Athens.
11       Jeff Benz, are you there?
12       THE COURT: Mr. Benz, are you there?
13       MR. LEVINSTEIN: No, I'm not hearing him either.
14 But my phone shows that they are still conferenced in. I do
15 have a cell number, so we can also try to call that to make
16 sure they are there.
17       THE COURT: Okay, who is speaking now?
18       MR. LEVINSTEIN: This is Mark Levinstein in
19 Washington, Your Honor. I'm the one who is patching them in.
20 I'm not with them. But let me try to get him on the cell
21 phone.
22       THE COURT: Okay, hold on, we'll wait a little
23 while.
24       MR. JONES: Your Honor, if I can make a statement,
25 just to answer the court's inquiry. I've got the cite for

40

8/12/2004 TRO Proceeding

```
1   that one provision.
2           THE COURT:  Yes, thank you.
3           MR. JONES:  It's provision 19.1(f) of the USOC
4   bylaws.  It talks about the Olympic Committee's obligations,
5   as far as paying for athletes's and teams' expenses.
6   Transportation, equipment, housing --
7           THE COURT:  Does it include the coach?
8           MR. JONES:  Let's see, it says --
9           THE COURT:  What exhibit number are you looking at?
10          MR. JONES:  29.
11          THE COURT:  Exhibit to what?
12          MR. JONES:  Plaintiff's Exhibit 29; it's the bylaws
13  of the USOC.
14          THE COURT:  Okay.
15          I think Mr. Skinner and Mr. Benz are just not back
16  yet from their break.
17          MR. LEVINSTEIN:  We are calling his cell number now,
18  Your Honor.  This is Mark Levinstein in Washington.
19          THE COURT:  Okay, I am still not clear, even though
20  Mr. Jones has referred to 19.1(f)...
21          MR. JONES:  What's unclear on that provision is the
22  meaning of "team," I understand, Your Honor, whether that
23  includes staff, as well as athletes or not.
24          THE COURT:  Well, I'm looking at it.  It says the
25  corporation shall assume responsibility for transportation,
```

41

8/12/2004 TRO Proceeding

```
1   equipment, housing and living expenses of the Olympic, Pan
2   American, or Paralympic Games team from the time the athletes
3   depart for the team processing site until they are officially
4   disbanded on their return to the United States.
5           So what happens if, for example, the coach decides
6   to stay two days later in Greece?  Isn't his return plane fare
7   still covered, even though that is after the team has
8   departed?
9           MR. BENZ:  Your Honor, this is Jeff Benz from the
10  USOC.  I'm sorry, we're back.  We're in a facility that is not
11  the same kind of facility we would be using in the states,
12  so --
13          THE COURT:  Okay, well, let's go back for now to the
14  witnesses.
15          Okay, so --
16          MR. BENZ:  The answer to that question is that
17  the -- the coaches generally travel with the team and --
18          THE COURT:  Okay --
19          MR. BENZ:  -- do not allow tourism to occur during
20  the Olympic games, as a general rule --
21          THE COURT:  I am going to stop you, Mr. Benz.  I
22  want to go back to the witnesses right now.
23          So let's get Kelly Skinner on the line.
24          THE WITNESS:  Yes, I am.
25          THE COURT:  Okay, I will have the oath or
```

42

8/12/2004 TRO Proceeding

```
1   affirmation administered.
2           THE CLERK:  Would you please raise your right hand.
3           Do you solemnly affirm that the testimony you are
4   about to give before this court shall be the truth, the whole
5   truth, and nothing but the truth?
6           THE WITNESS:  I do.
7           THE CLERK:  Would you please state your name for the
8   record and spell your last name?
9           THE WITNESS:  Kelly Skinner, S-K-I-N-N-E-R.
10          THE COURT:  Mr. Skinner, could you tell me whether
11  the -- I'm looking for your declaration.  Hold on.  I've got
12  it.  Okay.
13          Could you tell me whether the declaration that you
14  executed on August 5, 2004, is true and correct and represents
15  what your answers would be if you were appearing live in a
16  courtroom and being questioned about the subject matters set
17  forth in your declaration?
18          THE WITNESS:  It does.
19          THE COURT:  Okay.
20          Then, Mr. Jones, you may go ahead with
21  cross-examination.
22          MR. JONES:  Thank you, Your Honor.
23                       KELLY SKINNER,
24  called as a witness on behalf of the Defendants, having been
25  duly sworn, was examined and testified as follows:
```

43

8/12/2004 TRO Proceeding

```
1                       CROSS-EXAMINATION
2   BY MR. JONES:
3   Q.  Hello, Mr. Skinner, this is Ward Jones, attorney for Dae
4   Sang Lee.
5   A.  Hello.
6   Q.  Your background is mainly marketing; is that correct?
7   A.  No.  My background is some marketing with a great deal
8   of sports administration.
9   Q.  Thank you.
10  Q.  You are a salaried employee of the USOC?
11  A.  Yes.
12  Q.  You've never competed in Taekwondo; is that true?
13  A.  That is correct.
14          THE COURT:  Mr. Jones, you didn't have any -- I
15  forgot to ask you -- any objections to the declaration?
16          MR. JONES:  No, Your Honor.
17          THE COURT:  Okay, then go ahead.
18  BY MR. JONES:
19  Q.  You've never coached athletes in competitive Taekwondo at
20  any level; is that true?
21  A.  That is correct.
22  Q.  What you know about Taekwondo you've picked up on the
23  job?
24  A.  Correct.
25  Q.  You stated in your declaration that USTU was not willing
```

44

8/12/2004 TRO Proceeding

1  to pay expenses for coaches whose sole role would be to show
2  up at the Olympic competition, is that correct?
3  A.  That is correct.
4  Q.  Were you referring to plaintiff Dae Sung Lee, in
5  particular, when you made that statement?
6  A.  I was referring to coaching practices of the USTU
7  coaches.
8  Q.  But not Dae Sung Lee in particular?
9  A.  Anybody who has been a coach at an international event
10 for the USTU in the past two years.
11 Q.  And were you thinking of anybody in particular when you
12 made that statement?
13 A.  No. All of their appointed coaches were people that that
14 statement was targeted at.
15 Q.  Okay.
16     When you say USTU was not willing, were you
17 referring to Robert Gambardella in particular?
18 A.  I'm sorry, I missed part of that question.
19 Q.  Sorry.
20     When you said that USTU was not willing to cover
21 these expenses any longer, were you referring to Robert
22 Gambardella?
23 A.  No.
24 Q.  Were you referring to the board?
25 A.  I was referring to the administration in place at that

45

8/12/2004 TRO Proceeding

1  A.  What they had was a series of fightoffs to try to make
2  the Olympic team. I did not see any athletes that registered
3  Mr. Lee as a coach that participated in any of those events.
4      THE COURT: In the "playoffs"?
5  A.  In the "fightoffs," yes, ma'am -- yes, Your Honor.
6      THE COURT: Okay, thank you.
7  BY MR. JONES:
8  Q.  Uh --
9      THE COURT: The "fightoffs," did you say, or the
10 "playoffs"? The "fightoffs"?
11 A.  F-I-G-H-T. "Fight."
12     THE COURT: Thank you.
13 BY MR. JONES:
14 Q.  Tell me, Mr. Skinner, do you know whether plaintiff, Dae
15 Sung Lee, attended a site visit in Greece in April at USTU's
16 request?
17 A.  I do not know.
18 Q.  Do you know whether he attended the world championship in
19 2003?
20 A.  Yes.
21 Q.  He did?
22 A.  Yes.
23 Q.  Do you know whether he attempted -- or, pardon me,
24 attended the Pan Am games in the Dominican Republic?
25 A.  Yes.

47

8/12/2004 TRO Proceeding

1  time.
2  Q.  And who was your understanding of who that is?
3  A.  The board of USTU, as well as the salaried staff.
4  Q.  Okay.
5      Now, do you know how the USOC bylaws describe the
6  Olympic coaches' function?
7  A.  I cannot cite it by verse, but I have the basic
8  understanding, yes.
9  Q.  State, in your own words, what you think a U.S. Olympic
10 coach is supposed to do under the bylaws.
11 A.  To prepare and coach athletes leading up to and during
12 major international events, including the Olympic games.
13 Q.  Do you know whether plaintiff Dae Sung Lee was attempting
14 to do those things?
15 A.  I do not see any record of him coaching any athletes that
16 were in the competitive pool that were attempting to make the
17 Olympic team in 2004.
18 Q.  And what kind of record are you referring to?
19 A.  Athletes who entered into -- (incomprehensible) -- that
20 occurred in January, March, April, May or June of 2004 --
21     THE COURT: Did you say --
22 A.  -- as well as those athletes who were members of the 2003
23 world championship team.
24     THE COURT: Okay, did you say athletes that had
25 entered into -- what?

46

8/12/2004 TRO Proceeding

1  Q.  That was six weeks long, wasn't it?
2  A.  You faded out during part of that.
3  Q.  That was six weeks long, wasn't it?
4  A.  That event was three weeks long.
5  Q.  You believe it to be three weeks?
6  A.  That event -- I don't have the dates in front of me, but
7  I wasn't gone for six weeks, and I was there before the games
8  started and after they ended.
9  Q.  Do you know whether Dae Sung Lee attended the regional
10 Olympic Pan American qualifications in Mexico?
11 A.  Yes, he did.
12 Q.  Do you know whether he attended the world qualifications
13 in France?
14 A.  Yes, he did.
15 Q.  Do you know whether he attended the Asian qualifications
16 in Thailand?
17 A.  I am not aware, because as far as I know, there were
18 no U.S. athletes in that event.
19 Q.  Do you know whether he attended the first U.S. Olympic
20 trials in Colorado?
21 A.  The first Olympic trials?
22 Q.  Yes, the U.S. Olympic trials in Colorado?
23 A.  In which year?
24 Q.  That would be 2004.
25 A.  There was one Olympic trial; that was in June in San

48

8/12/2004 TRO Proceeding

| | |
|---|---|
| 1 Jose, California. | 1 A. What -- what I mean by that is, it's not that simple. |
| 2    THE COURT: Well, did he attend? | 2 The U.S. Olympic Committee plays a very minor role. |
| 3 A. I did not see him there. | 3 International federations play a bigger role. The |
| 4 BY MR. JONES: | 4 International Olympic Committee plays a role, as well as |
| 5 Q. Are you aware of any other Olympic trials? You're only | 5 ATHOC, the Athens Organizing Committee, plays a role in these |
| 6 aware of one Olympic trial; is that correct? | 6 particular games. |
| 7 A. There is one official Olympic trial. Everything else was | 7 Q. Okay, we've heard about that association. |
| 8 a fight-off to try to get to that trial. | 8    To your knowledge, the USOC has not issued a |
| 9 Q. Do you know whether he attempted to go on a second Greece | 9 credential for Chul Ho Kim, correct? |
| 10 site visit at USTU's request? | 10 A. Correct. |
| 11 A. I was not aware of that. | 11 Q. Thank you. |
| 12 Q. Do you know if he attended the U.S. Pan American Games | 12    MR. JONES: No further questions. |
| 13 team trial in Colorado? | 13    THE COURT: Okay. |
| 14 A. I cannot recall. | 14    Any redirect? |
| 15 Q. It's common, is it not, for Olympic coaches to attend | 15    MR. ROECA: Yes, Your Honor. |
| 16 lots of these competitions in order to size up the foreign | 16    REDIRECT EXAMINATION |
| 17 competition? | 17 BY MR. ROECA: |
| 18 A. Those competitions -- everything except for the Pan | 18 Q. Good evening, Mr. Skinner. Arthur Roeca. Just a couple |
| 19 American Games and the world championships that you mentioned | 19 of follow-up questions. |
| 20 were competitions that featured U.S. athletes -- I'm sorry, | 20    You were asked a series of questions concerning |
| 21 you also mentioned an Asian event. Those are the only three | 21 Mr. Lee's attendance at a number of competitions over the |
| 22 events where you would be looking at anybody else; every other | 22 course of time. Are you aware of the qualification events |
| 23 event was totally full of American athletes. | 23 that occurred for the U.S. Olympic team, Taekwondo team, in |
| 24 Q. And, as part of a U.S. Olympic coach's duties, shouldn't | 24 June of 2004? |
| 25 he be at the United States' events, as well? | 25 A. Yes. |

8/12/2004 TRO Proceeding
8/12/2004 TRO Proceeding

| | |
|---|---|
| 1 A. Should he be at the United States' events, as well? Yes. | 1 Q. To your knowledge, did Mr. Lee coach any athlete who was |
| 2 Any coach who is preparing athletes should be at the events | 2 a competitor for a position on the United States Olympic team |
| 3 that are relevant to that athlete making an Olympic team. | 3 for the 2004 Olympics in June of 2004? |
| 4 Q. And we've just gone over the ones that Dae Sung Lee | 4 A. No. |
| 5 attended that you were aware of. Is that right? | 5 Q. Now, to your knowledge, was the selection of the coach |
| 6 A. I indicated which ones I was aware that he attended, yes. | 6 based upon the criteria that had been established prior to the |
| 7 Q. And you are aware of that how, by attending them with him | 7 qualification tournament that occurred in June of 2004? |
| 8 or by looking at receipts that are turned in? | 8 A. Yes. |
| 9 A. Some of those events I was at. Some of those events I | 9 Q. And were the criteria followed in the selection of the |
| 10 know he was at because of looking at delegation member names | 10 coach, Mr. John Lopez -- Gene Lopez, who has been -- |
| 11 on final rosters. One thing I want to make sure that was | 11 A. Yes. |
| 12 caught in the -- phone is that he attended many events, but I | 12    MR. ROECA: That's all I have, thank you. |
| 13 do not recall him having any athletes that were competing at | 13    THE COURT: Okay. |
| 14 any of those events. | 14    Anything more? |
| 15 Q. I see. So you're distinguishing between attending events | 15    MR. JONES: No, Your Honor; thank you. |
| 16 for preparation versus bringing athletes there from his school | 16    THE COURT: Okay. |
| 17 to compete; is that fair? | 17    Then we are going to excuse Mr. Skinner. And, at |
| 18 A. That is very fair. | 18 this point, I think we are done with the witnesses in Greece, |
| 19 Q. Now, let me ask you your understanding of the process for | 19 and we'll go back to the live witnesses. |
| 20 issuing coaching credentials. We heard testimony that the | 20    Did you want to -- Mr. Jones, did you want to do |
| 21 USOC, along with a Greek committee, are the ones that must | 21 Mr. Han Wan Lee, who is a non-party first, so that then we |
| 22 okay the issuance of additional credentials; is that your | 22 would be left with the parties only, and then the non-party |
| 23 understanding? | 23 witnesses would be excused? |
| 24 A. Generally, yes. | 24    MR. JONES: That would be fine, Your Honor. |
| 25 Q. And what committee would that be in Greece? | 25    THE COURT: Okay. |

8/12/2004 TRO Proceeding

```
 1         My suggestion is this:  That we take Mr. Han Wan
 2   Lee, and then take a lunch break.  And then come back to do
 3   the witnesses who are parties anyway, so they are going to be
 4   here, okay?
 5         MR. JONES:  Yes.  Thank you, Your Honor.
 6         THE COURT:  Okay, so let's call Mr. Han Wan Lee.
 7         MR. LEVINSTEIN:  Your Honor, are we first going to
 8   do objections to his declaration or not?
 9         THE COURT:  Yes, we are, but I am just bringing him
10   in, and then I'll take objections, and so forth.
11         Who is going to be examining -- cross-examining
12   Mr. Han Wan Lee?
13         MR. ROECA:  I will be, Your Honor.
14         THE COURT:  Okay.  So, are there any objections?
15         MR. ROECA:  If you'd give me one minute, Your Honor?
16         THE COURT:  All right.
17         (Mr. Lee approached the witness stand.)
18         (Discussion off the record.)
19         MR. ROECA:  Your Honor, we object to the --
20   paragraph eight, concerning -- well, on the grounds that it's
21   not relevant.
22         THE COURT:  Okay, just a minute.
23         MR. ROECA:  And paragraph nine, on the grounds of
24   relevance.
25         Number ten, on the grounds of relevance.
```

53

8/12/2004 TRO Proceeding

```
 1         (Perusing documents.)  Number ten on the grounds of
 2   relevance.
 3         11 on the grounds of relevance.
 4         And 12 on the grounds of relevance, Your Honor.
 5         MR. LEVINSTEIN:  Your Honor, Mark Levinstein in
 6   Washington.  Since I can't confer with my co-counsel, I just
 7   have the end of 12 -- also on the basis of he's testifying
 8   about the mental state of someone else, which I don't know how
 9   he testifies about whether Nia Abdallah would be uncomfortable
10   or not.
11         THE COURT:  Okay.  Well, I'll let Mr. Jones respond.
12   Paragraph eight, it seems to me, goes to the damage claim.
13   And so -- I mean, it's fine that it's in here, but you might
14   want to explain to me why I have to consider this evidence on
15   the preliminary injunction motion.
16         MR. JONES:  You're correct, Your Honor, it does go
17   to future damages.
18         THE COURT:  Okay.
19         So, for purposes of this hearing, I am sustaining
20   the objection to paragraph eight, but it's in the record if it
21   later gets referred to on the damage discussion.
22         Okay, then, looking at paragraph nine, Mr. Jones?
23         MR. JONES:  Again, this goes to the effects of
24   having one of these appointments, Your Honor.  Primarily, we
25   are talking about irreparable harm to the plaintiff --
```

54

8/12/2004 TRO Proceeding

```
 1         THE COURT:  Okay, but what about the last sentence,
 2   for example?  The last sentence probably goes to your damage
 3   claim, it seems to me.  I can see your argument that the first
 4   two sentences about getting the acclaim of going around and
 5   speaking in public might be some non-monetary damage.
 6         MR. JONES:  Yes, Your Honor.
 7         THE COURT:  Okay.
 8         So I'm going to sustain the objection to the last
 9   sentence of paragraph nine, and I won't consider that for
10   purposes of this preliminary injunction motion.
11         Paragraph ten, it seems to me, does go to what they
12   are claiming as irreparable harm, so I am going to overrule
13   the objection to paragraph ten.
14         Paragraph 11 -- I'll overrule the objection to
15   paragraph 11.
16         Paragraph 12, I think the objection with respect to
17   Nia Abdallah conceivably being uncomfortable is well taken, so
18   I'm going to sustain the objection to the last sentence.  In
19   paragraph 12, I think, also -- can this witness really talk
20   about whether or not something is or is not a conflict of
21   interest?
22         MR. JONES:  Yes, Your Honor.  Coaches are held to a
23   standard of their own ethics, and I think he's -- being an
24   expert, he's qualified to talk about what's ethical and what
25   isn't.
```

55

8/12/2004 TRO Proceeding

```
 1         THE COURT:  Okay, well, this subject has actually
 2   been raised with another witness, so I'm going to allow it;
 3   but, the last sentence of paragraph 12, it does seem to me, is
 4   speculative, and I'm going to not consider that.  So the
 5   objection is sustained to -- to summarize, paragraph 8; the
 6   last sentence of paragraph 9; and the last sentence of
 7   paragraph 12; and, in other respects, the objections are
 8   overruled.
 9         Now, I'll have the witness sworn.
10         THE CLERK:  Would you please rise and raise your
11   right hand.
12         Do you solemnly affirm that the testimony you are
13   about to give before this court shall be the truth, the whole
14   truth, and nothing but the truth?
15         THE WITNESS:  I do.
16         THE CLERK:  Please be seated.
17         State your name for the record and spell your last
18   name, please.
19         THE WITNESS:  Han Wan Lee, L-E-E.
20         THE COURT:  Okay.
21         Mr. Lee, do you have a copy in front of you, of your
22   declaration?
23         THE WITNESS:  I do not.
24         THE COURT:  You do not?
25         THE WITNESS:  I have it in my bag.
```

56