4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   A   No, not during my tenure.
2   Q   And as long as the person nominated by the
3   coaching selection committee chairman tendered to
4   you -- let me start again.
5       When the chair of the Coaching Science
6   Committee gave you the name of the nominee, the only
7   review you did of it was to get a bio or do some other
8   due diligence to make sure that the person nominated
9   had at some time coached at the Olympic Games, Pan Am
10  Games, World Championships, World Cups, or Pan Am
11  Championships?
12  A   Correct.
13  Q   And that was the only requirement you knew
14  of that would qualify or disqualify a coach?
15  A   Yeah.
16  Q   So if a person had coached the World Cup
17  team in 1976, and President Lee had no athletes
18  involved in high level competition, and he was
19  nominated by the Coaching Science Committee chair, you
20  would have had no reason to --
21  A   Right.
22  Q   -- disapprove that nomination?
23  A   Correct.
24  Q   And the Executive Committee, under these
25  guidelines, could have voted to approve that person?

204

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   A   Correct.
2   Q   You signed this document -- I'm pointing
3   to Exhibit 87 -- on January 20th, 2003?
4   A   Yes.
5   Q   But I think your testimony yesterday may
6   have been that these criteria were developed before you
7   came onboard?  Maybe not.  Let me ask it again.  Let me
8   just start.
9       Can you tell us, did you play a role in
10  writing Exhibit 87, or was it something that you just
11  took the content from something someone previously had
12  done?
13  A   I did not personally have a hand in
14  writing Exhibit 87.  This was a part of a larger
15  document, of the complete selection procedures for the
16  Olympic Games.  And personally what I did was tweak the
17  athlete selection process, because that process, others
18  were asking that we relook at that.
19      As far as the selection for coaches, which is
20  this specific exhibit, this was there for me when I got
21  the document itself.  So I didn't tweak that but signed
22  it as it was.
23  Q   So you played no role in writing any of
24  this document?
25  A   No.

205

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   Q   You just signed it?
2   A   Yes.
3   Q   And the date you signed it was the date
4   you submitted it to the USOC?
5   A   I'm assuming that's true, yes.
6   Q   And were you aware that by February 28,
7   the USTU had already selected and approved Mr. Dae Sung
8   Lee as a coach?
9   A   February 28?
10      MR. JONES:  Objection; calls for
11  speculation.
12  Q   (BY MR. LEVINSTEIN)  2002 (sic).
13  A   Of two thousand --
14  Q   I think so.
15  A   2002 you said?
16  Q   2003.
17  A   Oh, three.
18      MR. LEVINSTEIN:  If that's wrong, someone
19  should feel free to tell me, because I'm not trying to
20  mislead him.  Is that the date that Mr. Lee's
21  nomination was announced by the USTU, February 28,
22  2003?
23      MR. JONES:  By the USTU?
24      MR. LEVINSTEIN:  Yeah.
25  A   I'm not sure.

206

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   Q   (BY MR. LEVINSTEIN)  Maybe I can find
2   that.  I thought so.  I don't mean to create -- I
3   thought that was the date, so if I'm wrong, please, I'm
4   not trying to mislead anyone.
5       MR. UESUGI:  I know there was no World
6   Cup in 1976.
7       (Discussion off the record.)
8       MR. LEVINSTEIN:  If you want me to
9   change -- I'll change the question to help you out on
10  that one, as long as you're going to raise that issue.
11  Q   (BY MR. LEVINSTEIN)  If anyone had
12  participated in any Olympic Games -- if a coach had
13  participated in any Olympic Games, any Pan Am Games,
14  any World Championships, any World Cup, or any Pan Am
15  Championships, whenever they were held, even if it was
16  an event that was held in the '70s and involved
17  Taekwondo and was in one of those categories, and he
18  was nominated by the Coaching Selection Committee
19  chair, there was no reason he couldn't be approved by
20  the Executive Committee?
21  A   Correct.
22  Q   Let me keep going here.  What was the
23  relationship between Sang Lee and Dae Sung Lee, if you
24  know?
25  A   I know that Sang Lee was an Olympic coach

207

1  in 1980, and Mr. Dae Sung Lee was one of the athletes
2  that competed; not at the Olympics, but he was one of
3  the athletes that Sang Lee coached.
4      Q    Were they friends?
5      A    I would assume so. Well, at that time, I
6  think they were more --
7      Q    I'm not talking at that time. I'm sorry.
8  I'm talking 2003.
9      A    2003.
10     Q    I apologize. I have confused you.
11          As of 2003, were Sang Lee and Dae Sung Lee
12 friends?
13     A    I would assume so, yes.
14     Q    Dae Sung Lee had been Mr. Sang Lee's
15 student?
16     A    Athlete as a coach, yes.
17     Q    And in the world of Taekwondo, athlete
18 coach, same thing as student instructor?
19          MR. JONES:  Objection; vague.
20     A    Not necessarily, but a similar type
21 relationship.
22     Q    (BY MR. LEVINSTEIN)  Well, you talked
23 about the values --
24     A    Right.
25     Q    -- of respect and loyalty.  Were those

208

1  different in an athlete/coach versus a
2  student/instructor?
3      A    Somewhat, yes.  For instance, I had
4  Taekwondo schools.  My students have a different
5  relationship to me than the Army athletes that I
6  coached for years.  It's similar but different.
7      Q    They were in the Army, so maybe they had a
8  different relationship because they were employed.
9      A    No.  This was a coach thing.
10     Q    All right.
11     A    It's similar, but it's not like the
12 instructor/student relationship.
13     Q    Well, was your relationship with your
14 athletes in the Armed Services different because of the
15 overlay of the relationship between the officers and
16 enlisted men?
17     A    No.  The point I'm trying to make that I'm
18 not doing a very good job of is, for instance, my
19 athletes that came to me with the Army team were
20 someone else's student, but they were my athlete to
21 coach.  So that was a different relationship than their
22 student/teacher relationship.
23          And I would think it would be the same with
24 Mr. Dae Sung Lee and Mr. Sang Lee.  Mr. Sang Lee was
25 not Mr. Dae Sung Lee's instructor, but he was his coach

209

1  as an athlete.
2      Q    Did they have a business relationship?
3      A    A business relationship?
4           MR. JONES:  Objection; calls for
5  speculation.
6      A    I'm not sure.  I don't know.
7      Q    (BY MR. LEVINSTEIN)  Well, could you tell
8  us what U.S. Taekwondo Centers, Inc. is?
9      A    That's a group of Taekwondo schools that
10 were started by Mr. Sang Lee.
11     Q    And Mr. Sang Lee authorized other
12 individuals to --
13     A    Like a franchise, yes.
14     Q    And did Dae Sung Lee operate a U.S.
15 Taekwondo Center, Inc., school?
16     A    You know, I don't know.  I don't know if
17 that's his affiliation with Mr. Lee or not.
18     Q    Well, in the USTU, was it important that
19 all the officers and Executive Committee members
20 disclose all their business relationships with each
21 other?
22     A    Yes.  I'm just saying that I don't know
23 that that was his school affiliation with Mr. Lee.
24     Q    Did you have a conflict of interest policy
25 that required all the officers and Executive Committee

210

1  members to disclose potential conflicts of interest?
2      A    A conflict of interest policy?
3           MR. JONES:  Objection; calls for
4  speculation.
5      A    I don't know that there was one.
6      Q    (BY MR. LEVINSTEIN)  Did you at various
7  times in the USTU hear complaints by USTU members about
8  individuals who had business dealings with each other
9  who were in positions of leadership?
10          MR. JONES:  Objection; calls for hearsay.
11     A    Throughout my time and involvement, yes.
12     Q    (BY MR. LEVINSTEIN)  Did you hear concerns
13 about an "Old Guard"; that there were people who had
14 been the officers or board members for years and years
15 and years, and that it was a problem, that there wasn't
16 new blood that came into the organization?
17          MR. JONES:  Objection; vague and
18 ambiguous, argumentative.
19     A    Yes.  I have heard that over the years.
20 But now again, this isn't something new.  I mean,
21 again, I came onboard in the '70s.  And my thing was I
22 couldn't wait for that group to get out so we would
23 have a chance to get in, whomever they were.  And every
24 time there was another election, even if there were
25 different faces, it was the same thing.  It was like, I

211

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  can't wait till we get a chance to do this, do this.
2      So it's been an ongoing complaint for years.
3  It's not a new thing. I think that's true in every
4  organization as well, possibly.
5      Q    (BY MR. LEVINSTEIN) But the organization
6  you have been involved in is the USTU?
7      A    Well, for this meeting, yes. I have been
8  in other organizations.
9      Q    Been in any other organizations with a
10 120-member board?
11     A    I don't think I have been in another
12 organization with 127 members.
13     Q    On the board?
14     A    Members.
15     Q    There you go. Did you understand when you
16 came onboard as the Executive Director that there was
17 an emphasis ongoing in the U.S. Olympic movement to
18 emphasize supporting athletes to achieve sustained
19 competitive excellence?
20     A    Yes, as part of the mission statement.
21     Q    Was that mission statement something the
22 USTU was supposed to follow as a National Governing
23 Body?
24     A    Yes.
25     Q    Were you aware of complaints by USTU

212

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      MR. JONES: Objection; argumentative,
2  calls for speculation.
3      A    I don't know if they were necessary. But
4  we did have much larger delegations prior to my tenure.
5      Q    (BY MR. LEVINSTEIN) And when you reduced
6  the size of the delegations, it was your view that it
7  wasn't going to hurt the athletes' performance at the
8  events?
9      MR. JONES: Same objection.
10     A    I didn't think it would hurt them, no.
11     Q    (BY MR. LEVINSTEIN) So you didn't think
12 they were necessary, did you?
13     MR. JONES: Objection; argumentative.
14     A    In essence, no.
15     Q    (BY MR. LEVINSTEIN) When the issue arose
16 about term limits and eliminating the term limit --
17     A    Yes.
18     Q    -- did you tell anyone that it would be a
19 mistake for the USTU to eliminate the term limits?
20     A    Yes, I did, in a conference with then
21 President Lee.
22     Q    And he didn't follow your advice?
23     A    No. As I recall, there were four of us at
24 the meeting, and he asked everyone's opinion on it
25 before he recommended it as an agenda item.

214

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  members, including athletes, that delegations of the
2  USTU would go to events, and beyond the athletes and
3  the coaches, there would be large numbers of staff or
4  volunteers that the USTU paid to make those trips?
5      A    I was aware of that allegation, yes.
6      Q    And was that a problem that you worked on
7  when you were the Executive Director?
8      A    Yes, it was.
9      Q    And you mentioned something about cutting
10 $210,000 out of the budget. Was some of that involved
11 in cutting down the extent to which the organization
12 was paying for officers and others to engage in travel
13 and attending events?
14     A    I'm not sure that that was one of the
15 specific areas, but I think I listed maybe eight or ten
16 things, with a dollar amount with proposed cuts. And
17 one area was VIP as a catch-all.
18     We had come into compliance, again, with the
19 help of Kelly Skinner and the other Sports Partnership
20 people, as to the number of people we would send for
21 official delegations and limit it to that. And, again,
22 just their guidance helped ensure that that happened.
23     Q    But it had been a practice that a lot of
24 volunteers, who were unnecessary to the running of the
25 event, were paid for by the USTU to travel?

213

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      Q    And who else was in that meeting?
2      A    Let me try to remember. I know that Mark
3  Bryant was there. Sammy Pejo. I can't remember who
4  the other person was. And myself.
5      And he asked each of us in turn what we
6  thought of the idea, and I said I didn't think it was a
7  good idea, because the perception is that it eliminates
8  hope. And others felt that if that's what you want to
9  do, that's fine.
10     Q    Was Sammy Pejo one of Mr. Sang Lee's
11 students?
12     A    I'm not certain whether he's Mr. Sang
13 Lee's student. I know that he coached him, but I don't
14 know if he is one of his initial students.
15     Q    Did you ever have discussion with any USTU
16 members that this concept of respect and loyalty to
17 your senior interfered with younger people's
18 willingness to speak out on issues counter to views
19 expressed by people who were senior to them?
20     A    Did I have discussions to that effect?
21     Q    Yeah.
22     A    I don't recall specifically that
23 happening. I've had lots of discussions about
24 junior/senior relationships, but I'm trying to think in
25 the context of when I was Executive Director and it

215

1   interfering with things there.
2       Q   Was that a concern expressed by USTU
3   members?
4       A   Not so much a concern, rather than part of
5   our martial arts system, the junior/senior system. But
6   not that it was problematic in doing anything.
7       Q   What about concerns that committee
8   chairmen would pick their students to be committee
9   members?
10          MR. JONES: Objection; vague and
11  ambiguous.
12      A   I didn't have those discussions.
13      Q   (BY MR. LEVINSTEIN) You said that there
14  were budget cuts planned for 2004 that would save
15  $210,000, and you referenced that they concerned
16  allowances to officers. What did that refer to?
17      A   At one point, the officers had operating
18  expenses for their offices, like the secretary, the
19  treasurer, the president. And part of that was cutting
20  back on the allowance for those office expenses. And,
21  again, that dovetails with eliminating a lot of phones
22  and the payment of calls for those things.
23      Q   So before this happened, the USTU was
24  paying a lot of expenses for officers that involved
25  running their own office and business expenses like

216

1   phones and faxes and things like that?
2       A   Yes.
3       Q   And they had no obligation at the time to
4   document that these costs were limited to USTU
5   business?
6           MR. JONES: Objection; calls for
7   speculation.
8       A   What they did was send us a copy of the
9   bill. And if we had a question about a phone call --
10  for instance, there was a call to Africa that shows up.
11  It's something we would circle and get clarification
12  before the bills were paid, under my tenure. I don't
13  know about before.
14          But, for instance, if there was a
15  $12,000-a-year allowance for your office, and you sent
16  us a $2,000 phone bill, well, you've eaten up one-sixth
17  of your allowance, so it would draw inspection. And
18  that wasn't something that happened, but I'm saying for
19  instance.
20      Q   What kind of allowance, dollar amounts,
21  were these officers given?
22      A   I think $12,000 was an operating expense
23  for like the treasurer's office because they had to
24  phone, fax, mail things, send reports, whatever; toner
25  cartridges, blah, blah, blah.

217

1       Q   So the volunteer treasurer was paid
2   $12,000 a year towards his expenses?
3       A   No.
4           MR. JONES: Objection; misstates the
5   testimony.
6       A   That wasn't. He had an allocation so that
7   expenses -- say, for instance, his phone bill for the
8   month of official calls was $150. That was sent in to
9   the office. Once it was verified that these were
10  official calls, that was paid. It was never paid
11  directly to him to run his office.
12      Q   (BY MR. LEVINSTEIN) It was reimbursed to
13  him for costs he had expended?
14      A   No. It was paid from the office with that
15  amount being allocated to him.
16      Q   Well, did that include expenses for travel
17  and entertainment?
18      A   No.
19      Q   Did it include expenses for taking people
20  to play golf?
21      A   No.
22      Q   What account did the amounts USTU paid for
23  people to play golf come out of?
24      A   Again, that was under the International
25  Development or -- there were two budget items for that.

218

1   One was International Development. I forget the name
2   of the other.
3       Q   So the USTU reimbursed meals and golf fees
4   and things like that, based on the representation of
5   the officer that this was entertaining someone who had
6   to do with international development of Taekwondo?
7           MR. JONES: Objection; calls for
8   speculation. Also, lacks foundation.
9       A   It's something that could be determined.
10  For instance, if the president of WTF was coming to the
11  Washington, D.C. area, and the secretary general wants
12  to host him for a dinner and meet with him, that's
13  something that we know is an international development
14  item. They go play golf as part of the meetings.
15  That's included in there.
16          If, on the other hand, the secretary met with
17  a school owner, took him out to golf and eating and
18  stuff, that's not international development. That
19  wasn't something that was approved.
20      Q   (BY MR. LEVINSTEIN) That was not
21  something that should have been approved?
22      A   Something that wasn't approved, because,
23  again, I had the credit cards. So they had to submit
24  for reimbursement.
25      Q   Once the credit cards were eliminated?

219

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1    A    Yes.
2    Q    And were you aware of the issues related
3  to the 2002 Salt Lake Games that dealt with concerns
4  about giving gifts to international Olympic officials?
5    A    Oh, yes.  I thought you were talking about
6  Taekwondo.  Yes.
7    Q    What steps were implemented to make sure
8  that protocol gifts and things like that that violated
9  the policies that came out of the 2002 Olympic Games
10 didn't occur?
11   A    We didn't have policies in place for that.
12   Q    When you were the Executive Director, did
13 the USTU get into a deficit situation?
14   A    Yes.
15   Q    Did it owe more money than it had?
16        MR. JONES:  I'm sorry.  What time frame?
17        MR. LEVINSTEIN:  When he was Executive
18 Director.
19   A    So 2002, 2003.
20        MR. JONES:  Objection; overbroad, vague.
21   A    There was a point that we were operating
22 at a deficit, yes.
23   Q    (BY MR. LEVINSTEIN)  Were you aware that
24 at the end of 2003, the USTU was $900,000 in the red?
25        MR. JONES:  Objection; lacks foundation,
```

220

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  misstates the testimony.
2    A    No, I wasn't aware of that.
3    Q    (BY MR. LEVINSTEIN)  Were you aware -- a
4  different subject.  Were you aware that the advance
5  given to the employee for the purchase of her house was
6  never returned?
7    A    No, I wasn't aware of that.  I know that a
8  payment schedule was set, and it was supposed to have
9  been done directly with the finance department.  I
10 don't know that.
11   Q    But you don't know of any payments having
12 been made on that plan?
13   A    Well, I didn't follow up on that.
14   Q    You were aware that there were deficits of
15 the USTU in August of 2003?
16        MR. JONES:  Objection; misstates the
17 testimony.
18   A    I know that at some point we were at a
19 deficit.  It might have been that period.
20   Q    (BY MR. LEVINSTEIN)  Well, you testified,
21 I believe, that as of August and September of 2003, you
22 believed you were well on your way in moving into
23 compliance?
24   A    Yes.
25   Q    But you also testified, I think in the
```

221

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  next sentence, that overcoming deficits would take more
2  time?
3    A    Yes.
4    Q    So as of that time period, there were
5  deficits --
6    A    Yes.
7    Q    -- and you weren't going to be able to
8  solve those problems by the end of 2003?
9    A    Right.  We were hoping just to break even
10 by the end of the year, which was three months later.
11   Q    But that's break even for the year --
12   A    For the year.
13   Q    -- not solving the deficits that already
14 existed before the year started?
15   A    Correct.
16   Q    So there is no suggestion that you thought
17 that by the end of the year, the whole organization
18 would be a break-even; just that the 2003 time period
19 would be a break-even period.
20   A    Correct.
21   Q    And you don't know if that actually
22 happened?
23   A    No, I don't.
24   Q    You said that -- new subject.  You said
25 that OTC resident athletes were encouraged to assist in
```

222

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  camps?
2    A    Yes.
3    Q    And those camps, as you said, were a
4  financial item for the coach?
5    A    By way of a bonus, yes.
6    Q    The more people that came, the more
7  successful the camp, the more money the coach got?
8    A    Correct.
9    Q    And they had the same relationship with
10 their coach that we talked about before of respect and
11 loyalty?
12   A    Yes.
13   Q    And the coach is the one that was
14 encouraging them to assist in his camps?
15        MR. JONES:  Objection; calls for
16 speculation.
17   A    I think it's more than the coach, because
18 the way the camps themselves were set up in writing, it
19 listed that they were encouraged to participate.  So
20 the coach would emphasize that.
21   Q    (BY MR. LEVINSTEIN)  Didn't the materials
22 for the camps even advertise that some of those
23 athletes were going to be coaching?
24   A    Yes.
25   Q    And that was done -- it just said in the
```

223

1  materials that the athletes in the training camp would
2  be coaching at the camps?
3      A     Would also be a part of that, yes.
4      Q     And did you hear concerns and complaints
5  by athletes that they were required to work at camps
6  that didn't develop its athletes and they weren't paid
7  for them?
8      A     I did get one complaint about that. And,
9  again, I encouraged all of the athletes to come to me
10 if there was a problem that they viewed. I got one
11 complaint about that, and we addressed it.
12     Q     And you said they weren't required to?
13     A     Right.
14     Q     But would it be, in your experience, based
15 on these subjects, understandable for them to have
16 concerns about how the coach might react or judge them
17 if they weren't willing to participate in a camp at
18 which he makes money?
19           MR. JONES: Objection; vague, calls for
20 speculation.
21     A     That was what was expressed in the one
22 complaint that I did get.
23     Q     (BY MR. LEVINSTEIN) And after you got
24 that one complaint, did you make sure you addressed
25 that issue with all of the athletes in the camp?

1      A     Yes.
2      Q     So you did view it was a problem that had
3  to be dealt with?
4      A     Yes. Once that was brought to my
5  attention, that was something that was handled.
6      Q     And the way it was brought to your
7  attention was in part by the Membership and Credentials
8  Committee?
9      A     No. Actually, an athlete walked in the
10 door and said we need to talk to you.
11     Q     Was that during this compliance process?
12     A     My whole tenure was during the process.
13     Q     Did you attend these Membership and
14 Credentials Committee meetings at which members of the
15 USTU organization and members of the Taekwondo
16 community were invited to come and address the
17 committee about their views of how the USTU was doing?
18     A     Yes, I did.
19     Q     And were a lot of critical things said at
20 those meetings about the USTU?
21     A     Yes, several critical things were said. I
22 mean, a lot, I'm just trying to . . .
23     Q     Okay. Were you even concerned that a
24 disproportionate amount of the time at the meetings was
25 spent on so many people from the USTU community all

1  coming to say negative things about the USTU?
2      A     It was my understanding, going into that
3  May meeting, that this was an open forum for anyone to
4  come and express their opinion about it. And as with
5  everything else, people with negative things, they're
6  always going to show up. If I have something positive
7  to say, I'm not going to fly across the country to come
8  say I think you're doing a good job.
9            So I wasn't surprised that everything that
10 was said was critical. That didn't surprise me.
11     Q     And what was your view, from a Membership
12 and Credentials Committee's point of view, was the
13 purpose of the meeting?
14           MR. JONES: Objection; that's really
15 vague.
16     A     What was my opinion of what the purpose of
17 that meeting was?
18     Q     (BY MR. LEVINSTEIN) Yes.
19     A     Well, again, it was my understanding that
20 it was an open forum for anyone to speak on issues that
21 they felt concerned the USTU.
22     Q     And was it your understanding that the
23 Membership and Credentials Committee had also been
24 receiving in writing submissions from people with
25 concerns about the USTU and the sport of Taekwondo?

1      A     Yes, and some of them had informed me
2  about that.
3      Q     And you received copies of some of those
4  communications?
5      A     A portion of some of the communications.
6  And I'm clarifying because at the meeting, there was
7  obviously a bound document. I hadn't received the
8  document, but I had received some of the communications
9  that were a part of that.
10     Q     But when the whole document was submitted,
11 you got a copy?
12     A     No.
13     Q     Did you ask for a copy?
14     A     Yes.
15     Q     And they were unwilling?
16     A     I still have not received one.
17           MR. JONES: What was that?
18     A     At the May meeting, one portion of the
19 audience had prepared a bound document that had
20 complaints and communications. It wasn't given to us.
21 It was presented, I think, to the committee, and I
22 asked for a copy, but we never received it.
23     Q     (BY MR. LEVINSTEIN) But you understand
24 your lawyers were given a copy, the USTU's lawyers?
25     A     I don't know. I never saw it.

```
1       Q    Okay.  And was it your understanding --
2  strike that.
3            When concerns were raised to the Membership
4  and Credentials Committee, was it your understanding
5  that it was their job to investigate and study those
6  issues?
7            MR. JONES:  Objection; calls for
8  speculation.
9       A    That would be a reasonable expectation,
10 but I also found that most of the critiques and
11 critical things were things that the committee had
12 already brought up and that this group was speaking to
13 and elaborating on, with some exceptions.
14      Q    (BY MR. LEVINSTEIN)  Well, let's talk
15 about those two letters, the August and September.  You
16 don't have to pull them out, but the letters from
17 Mr. Satrom.
18      A    Okay.
19      Q    Had all of those things in those letters
20 already been raised by the committee in September of
21 2002?
22      A    Not in the September letter.  But the
23 August letter I think had many of the same things that
24 were from the September of 2002, the first one, but not
25 the September '03 one.  That was totally different.
```

```
1  And that was after the May meeting.
2       Q    Well, both the August and September
3  letters were after the May meeting?
4       A    But the August letter I'm saying --
5       Q    Is different?
6       A    -- paralleled the earlier one in September
7  of '02, whereas the September letter was completely
8  different.
9       Q    Okay.  We'll get to those then.
10      A    To my recollection.
11      Q    We'll talk about what's different about
12 them.  It's not a memory test, so we'll do that when
13 we're looking at them.
14      A    I'd fail that one.
15      Q    So in your view, the issues being raised
16 in August of 2003 were compliance problems that were
17 generally the same kinds of issues that had been
18 problems in September of 2002?
19           MR. JONES:  Objection; misstates the
20 testimony.
21      A    I think there were some.
22      Q    (BY MR. LEVINSTEIN)  And were there a
23 number of issues in that August 2003 letter that raised
24 problems that in September 2002 the USTU had promised
25 they would take care of?
```

```
1            MR. JONES:  Objection; misstates the
2  testimony.
3       A    Those were some of the same problems we
4  were addressing from September of 2002.
5       Q    (BY MR. LEVINSTEIN)  And at the end of
6  September '02, after those problems had been
7  identified, the USTU had said, yes, we will get on it
8  and we will fix these problems?
9            MR. JONES:  Same objection; misstates
10 testimony.
11      A    Yes.  But again, we were on the way to
12 addressing some of them.
13      Q    (BY MR. LEVINSTEIN)  I understand.  But a
14 year later, some of them hadn't been addressed?
15           MR. JONES:  Misstates the testimony.
16      A    I don't think they hadn't been addressed.
17 They might not have been completely resolved.
18      Q    (BY MR. LEVINSTEIN)  As of August 2003,
19 for example, nothing had been done yet about
20 eliminating the president's power to appoint people?
21           MR. JONES:  Misstates the testimony.
22      A    Well, we had an agreement for him to stop
23 doing that.  It had not been enacted with the board by
24 then, which was the reason for the mail ballot that
25 went out shortly after the hearing in September.
```

```
1       Q    (BY MR. LEVINSTEIN)  But as of August 5th,
2  or the date of that letter, no steps had been taken to
3  implement that commitment?
4       A    Not to implement it, but to force the
5  agreement, yes.
6       Q    A question about the master instructor's
7  licensing program.
8       A    Okay.
9            MR. UESUGI:  Should we take a break?
10           MR. LEVINSTEIN:  Fine.  Anytime.  It's
11 going to be awhile.
12           (Recess taken from 12:11 p.m. to 1:15
13           p.m.)
14           (Whereupon, the deposition proceedings
15           reconvened without the presence of
16           Mr. Uesugi.)
17      Q    (BY MR. LEVINSTEIN)  Let's go back a
18 little bit to the process the Membership and
19 Credentials Committee was following.  There was the May
20 open --
21      A    Forum.
22      Q    -- forum at which people came to express
23 their concerns, and you attended that meeting?
24      A    Yes.
25      Q    And did you speak at that meeting?
```

## Page 232

1  A   I think I answered one question about
2  Kukkiwon, and that was it.
3  Q   Did someone else speak on behalf of the
4  organization at that meeting?
5  A   No.  It was our information that there was
6  no requirement to respond unless direct questions were
7  asked to us.
8  Q   What had, if you know, led to the calling
9  of this meeting?
10  A   No idea.
11      (Whereupon, Mr. Uesugi rejoined the
12       deposition proceedings.)
13  Q   (BY MR. LEVINSTEIN)  And in addition to
14  the open meeting, it was your understanding that
15  written submissions were being sent to the members of
16  the Membership and Credentials Committee?
17  A   Yes.
18  Q   And between May and the August letter from
19  Tom Satrom, was there a process or a dialogue or
20  communications between you and the Membership and
21  Credentials Committee?
22  A   No.
23  Q   But you were having ongoing communications
24  with the Sports Partnership people?
25  A   Yes.

## Page 233

1  Q   And you were having ongoing communications
2  with the audit people?
3  A   Yes.
4  Q   And did the audit people and the Sports
5  Partnership people serve as advisors to the Membership
6  and Credentials Committee?
7  A   I'm certain they did.  I was told that
8  they would be monitoring our progress and reporting
9  back.
10  Q   And well, in your experience, when you
11  went to a meeting of the Membership and Credentials
12  Committee, were the Sports Partnership people from your
13  support and someone from audit there to participate in
14  the discussion of your sport?
15  A   Yes, always.
16  Q   And did you want to know what concerns
17  were being expressed to the Membership and Credentials
18  Committee?
19  A   Yes.
20  Q   Was it important to you to have an
21  opportunity to hear what they were hearing?
22  A   Yes.
23  Q   And why?
24  A   Again, so we would know what problems
25  existed and what to address and how to better serve our

## Page 234

1  members.
2  Q   And you didn't want them to make a
3  decision based on things that they had heard without
4  you first having a chance to correct misimpressions and
5  respond?
6  A   Correct.
7  Q   And at any time, did you or your lawyers
8  representing the USTU tell the Membership and
9  Credentials Committee you thought the Membership and
10  Credentials Committee had an obligation to let USTU
11  know what it was that was being communicated to the
12  Membership and Credentials Committee?
13      MR. JONES:  Objection; calls for
14  speculation.
15  A   There was, and I learned that from a
16  meeting with Holme Roberts and Owen.
17  Q   (BY MR. LEVINSTEIN)  You learned what?
18  A   That that request had been made.
19  Q   A request was made by your lawyers --
20  A   Yes.
21  Q   -- to the Membership and Credentials
22  Committee?
23  A   To let us know what complaints were coming
24  in, what was being said about us.
25  Q   And did you understand that part of the

## Page 235

1  purpose of the August 5th and September -- is that the
2  right date -- the August 5th and September 5th, or
3  August 4th and September --
4      MR. UESUGI:  Close enough.
5  Q   (BY MR. LEVINSTEIN)  The August and
6  September letters from Tom Satrom.  Let's talk about
7  those.
8      Did you understand that part of their purpose
9  was to communicate to the USTU what concerns had been
10  raised with the Membership and Credentials Committee?
11  A   Yes.
12  Q   I think you said the August letter from
13  Tom Satrom raised a lot of the same issues that had
14  been raised in September of 2002?
15  A   Let me recheck to make certain that that
16  is the case.
17  Q   We can pull those two letters out.
18  A   That's the September 6th letter.
19  Q   That's Exhibit 5?
20  A   Yes.
21  Q   And the August 4th letter is Exhibit 4.
22      MR. LEVINSTEIN:  He's got it.  There's
23  probably five of those.  We probably labeled a bunch of
24  them.
25  A   They're stated differently, but some of

1  them overlap. For instance, in the --
2      Q    (BY MR. LEVINSTEIN) Before you go on, the
3  question was about comparing the August letter to what
4  had happened in September 2002.
5      A    Yes.
6      Q    I thought you had said that the August
7  letter was similar to what happened in September 2002.
8      A    Yes, yes.
9      Q    That's all. I'm not going to make you
10 compare them. If you want to, you can, but I wasn't
11 trying to keep you from doing it.
12          Do you see the first paragraph of the August
13 4 letter? At the end of the paragraph, it recites that
14 "As part of the review process, the Committee reviewed
15 the compliance form submitted by USTU, the Committee
16 met with USTU on two occasions, the Committee made
17 written inquiries of USTU to which USTU responded, the
18 Committee held a public forum for individuals who were
19 interested in the sport of Taekwondo to present their
20 observations and comments on the governance of
21 Taekwondo, and the Committee requested that the USOC
22 Audit Division conduct an audit of USTU's financial
23 records."
24     A    Right.
25     Q    Do you know which meetings with the USTU

1  the members of the Membership and Credentials
2  Committee?
3      A    I knew one person prior to coming to the
4  first meeting.
5      Q    And who was that?
6      A    Retired Colonel Jeannie Picarriello,
7  formerly of Army Sports.
8      Q    But from going to board meetings, did you
9  know any of the other members -- oh, you're talking
10 about September of 2002.
11     A    Right. I didn't know anyone then.
12     Q    Did you get to know anyone on the
13 Membership and Credentials Committee during your time
14 as Executive Director?
15     A    Yes, I got to interact with several of
16 them at USOC board meetings. I did speak with
17 Mr. Satrom on several occasions. Let's see. Now I'm
18 drawing a blank. A couple of others as well. I can't
19 remember their names now.
20     Q    Do you remember Steve Sobel?
21     A    Yes. Yes.
22     Q    And when you did meet with the Membership
23 and Credentials Committee -- put aside the public
24 forums where other people were there -- was it just
25 USTU people and USOC staff, like the auditors and

1  on two occasions are being referred to? Do you know
2  what dates those were or months?
3      A    I know one was the September 2002 meeting.
4  I don't know when the other second one was, other than
5  the open forum in May, which wasn't really meeting with
6  us.
7      Q    Okay. So there may have been another
8  meeting between September 2002 and the open forum, or
9  you just don't remember?
10     A    I don't remember.
11     Q    And in your meetings with the Membership
12 and Credentials Committee and in responding to these
13 letters --
14     A    Yes.
15     Q    -- did you at times come of the view that
16 the Membership and Credentials Committee simply didn't
17 know enough about how Taekwondo worked?
18     A    In some areas, yes.
19     Q    And was it your impression that they were
20 trying to get information so they could inform
21 themselves?
22          MR. JONES: Objection; calls for
23 speculation.
24     A    Possibly.
25     Q    (BY MR. LEVINSTEIN) Did you know any of

1  Sports Partnership, and the members of the committee?
2      A    Other than the public forum?
3      Q    Yes.
4      A    Yes.
5      Q    And was the tone of those meetings
6  cooperative and friendly?
7      A    The first one was very -- well, the first
8  one sort of was. After that, it became more
9  contentious.
10     Q    But did they communicate to you that they
11 were trying to find ways to bring the USTU into
12 compliance?
13     A    At the first meeting, very much so.
14     Q    And you don't remember the second meeting?
15     A    I don't remember that there was a second
16 meeting, but -- unless there's a record of it.
17     Q    That's fine.
18     A    Now, I do recall meeting with Mr. Sobel
19 once.
20     Q    Okay. Could you tell me about that?
21     A    I'm trying to remember where it was. I
22 know we discussed some of the items that we had
23 submitted in response to the letter from Mr. Satrom.
24     Q    What sport did Mr. Sobel come from, if you
25 know?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1    A    I don't remember.
2    Q    But were you made aware that he was
3  someone who had been involved with the Olympic movement
4  for a long time?
5    A    Yes. I think he was the vice chair of the
6  committee as well.
7    Q    You mean, where he had previously been the
8  chair of the committee?
9    A    Yes.
10    Q    Was he meeting with you because he was
11  someone experienced in helping NGBs comply with their
12  obligations?
13    A    I think it was a follow-up or a meeting
14  that we had requested to talk about the responses and
15  the questions, because I remember he was the only
16  person that sat down with me and Mr. Sang Lee, I think
17  it was. I still forget where it was, but he did
18  discuss -- someone else from the committee was supposed
19  to have shown up, but they didn't make it.
20         So we had a discussion about the compliance
21  issues. That may be the second meeting that they were
22  talking about. But it wasn't the committee itself.
23    Q    Okay. Did you understand that there was
24  someone within the committee assigned particular
25  responsibility for Taekwondo?

240

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1    A    No, I didn't.
2    Q    What can you recall about the meeting with
3  Mr. Sobel, if anything?
4    A    I recall him asking me if I was clear on
5  what was being asked by the committee, and if I had any
6  questions that he could clarify. And that's when I
7  first raised the issue of the allegiance to Korea,
8  because I didn't understand what that meant. And he
9  couldn't give a full explanation of what that meant.
10  So all we did was theorize.
11         It was a very brief meeting. I remember
12  that, because it was in a room sort of like this, but
13  it was one table set up for maybe five people. And we
14  waited for awhile because he expected the other person
15  to show. I remember he and I had a soda by the thing
16  (indicating).
17         We didn't talk very much except, are there
18  any questions about what's being expected? Can I
19  clarify anything? I went through the allegiance to
20  Korea. The Kukkiwon, I said, well, no need to explain
21  that to me. I said the explanation seems to be
22  straightforward. And we didn't discuss anything else.
23  He said, well, let's just call it quits.
24    Q    Did you travel to attend that meeting?
25    A    I don't remember.

241

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1    Q    You don't know if it was in Colorado
2  Springs or some other city?
3    A    I don't know.
4    Q    Was it a positive meeting, or was it
5  contentious?
6    A    No, no. It was a positive meeting.
7    Q    It was a positive meeting?
8    A    Yeah.
9    Q    Was it between the August 4th letter and
10  the September 5th letter, do you think? If you don't
11  know, it's okay.
12    A    I don't know. I think it was more likely
13  it was between the September '02 letter and whatever
14  came next as far as correspondence.
15    Q    Did you remember you already had a letter
16  that mentioned allegiance to Korea?
17    A    In some form or other, there was something
18  about ties to Korea, because that came up at the
19  September 2002 meeting as well, as I recall.
20    Q    Okay. So you're not sure that you were
21  specifically having Mr. Sobel go through the August 4th
22  letter?
23    A    No, I'm not certain.
24    Q    There may have been some other list of
25  issues?

242

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1    A    Yes.
2    Q    But you do recall going through some sort
3  of list of issues of concerns of the committee?
4    A    As I recall, I was asked if there was
5  anything I didn't understand about what was being asked
6  that we had to respond to, rather than going through,
7  do you understand this, blah, blah, blah, blah.
8    Q    Do you have some recollection that between
9  August 4th and September 5th, the USTU asked the
10  Membership and Credentials Committee to give a little
11  more information about what was being referred to in
12  the August 4th letter?
13    A    Yes.
14    Q    So do you recall -- focus, if you would,
15  on Exhibit 5. If you'll look at Paragraph 8 on Page 3
16  which you talked about.
17         Did you understand that this was an attempt
18  by the Membership and Credentials Committee to give you
19  information about the kinds of things that they had
20  been told that had led them to put Item No. 5 in the
21  August 4th letter?
22    A    Yes, because it referred to what
23  individuals had said to them.
24    Q    And USTU at the time was requesting
25  specifics about what the concerns were?

243

```
 1      A    Correct.
 2      Q    And you understood Paragraph 8 to be
 3  communicating to you specific things that various
 4  individuals had said that related to that allegiance to
 5  Korea issue?
 6           MR. JONES:  Objection; calls for
 7  speculation.
 8      A    I think more so what it was saying to me
 9  was that we had addressed that issue before, but it's
10  still on the table as having not been resolved, not so
11  much just telling us what people were saying, but that
12  they didn't feel the issue was answered satisfactorily.
13      Q    (BY MR. LEVINSTEIN)  Okay.  You talked
14  about the importance of the USTU's relationship with
15  the WTF?
16      A    Yes.
17      Q    Beyond that you have to comply with the
18  rules of the WTF, why is it important for the USTU to
19  be on good terms with the people running the WTF?
20           MR. JONES:  Objection; calls for
21  speculation.
22      A    It's not so much being on good terms, as
23  much as being in compliance, being a good member
24  nation.  Just as being a good NGB is applicable to the
25  USOC, it's the same importance.
```

244

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1           And the difference is, even with the USOC, we
 2  had a partnership that was monetary with Sports
 3  Partnership and other things.  With WTF, that
 4  partnership didn't exist.  With Kukkiwon, we had a
 5  black belt program, but every member federation has
 6  that.
 7           So it wasn't that we were receiving anything
 8  above and beyond what other member nations received
 9  from the IF; it was just a matter of being a good
10  member nation.  It did result in appointments, which go
11  throughout the world, as far as the referee chair
12  currently is here in the United States, from
13  California.  Other committee positions, if you're in
14  good standing, you're liable to have appointments.
15      Q    (BY MR. LEVINSTEIN)  And those
16  appointments, you felt, were beneficial to the USTU?
17      A    Well, they're beneficial to whatever
18  country, yes.
19      Q    So you thought they were beneficial to the
20  sport of Taekwondo in the United States if those
21  appointments came to people in the United States?
22      A    Yes.  For instance, I was on the rules
23  committee prior to the Sydney Olympic Games, and I was
24  able to put some changes in that probably would not
25  have gone in.
```

245

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  I was able to dissent against the difference
 2  in time limits for women and men and bring up the fact
 3  that it's discriminatory, as viewed by the rest of the
 4  world, things like that; whereas otherwise you don't
 5  have that input.  You can't form the framework for
 6  competitions and things.  So that's a benefit to
 7  Taekwondo and to the country and to all our athletes.
 8           MR. LEVINSTEIN:  Next exhibit number.
 9           (Deposition Exhibit No. 88 was marked
10             for identification.)
11      Q    (BY MR. LEVINSTEIN)  Have you seen Exhibit
12  88 before?
13      A    No, I have not.
14      Q    Who is Mr. Cha Sok Park?
15      A    He is the current president of the Pan
16  American Taekwondo Union.
17      Q    President today or president in 2003, or
18  both?
19      A    Both.
20      Q    And he was a vice president of the WTF?
21      A    At that time, yes.
22      Q    I'd like to direct your attention to the
23  last paragraph on the first page.  "Although I do not
24  necessarily agree, I believe that the overwhelming
25  majority of practitioners of Taekwondo in American
```

246

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  (sic) believe that the USTU is non-democratic, corrupt,
 2  abused by those with commercial interests, dominated by
 3  the Korean ethnic minority (who account for over 80
 4  [percent] of the supposedly 'elected' state chairmen),
 5  non-representative of the interests of the athletes and
 6  controlled by forces outside the United States.  The
 7  number of complaints lodged against the USTU in the
 8  past two decades is probably the most brought against
 9  any NGB and that fact in itself should raise serious
10  concerns."
11           Do you see that paragraph par?
12      A    I certainly do.
13      Q    Had you heard similar sentiments expressed
14  by others?
15           MR. JONES:  Objection; calls for hearsay.
16      A    No, not to this extent.
17      Q    (BY MR. LEVINSTEIN)  As the person who was
18  the Executive Director of the USTU at that time, is it
19  troubling that the vice president of the World
20  Taekwondo Federation had that view?
21      A    No, because I know the source probably
22  better than some.  And this viewpoint, coming from him,
23  gives me reason to smile.
24      Q    Is there any reason that the Membership
25  and Credentials Committee or in this case Mr. Martin or
```

247

1  Mr. Scherr would have known whatever it is that you
2  know about Dr. Cha Sok Park?
3         MR. JONES: Objection; calls for
4  speculation.
5     A  They probably don't know.
6     Q  (BY MR. LEVINSTEIN) If you look at the
7  second page, the second paragraph starts with, "As a
8  Korean-born American citizen." Is Mr. Cha Sok Park, in
9  your understanding, a Korean-born American citizen?
10    A  Yes, he is.
11    Q  And is it correct that Mr. Cha Sok Park
12 has been involved in the sport of Taekwondo at many
13 different levels for the 30 years preceding August
14 2003?
15        MR. JONES: Objection; calls for
16 speculation.
17    A  As far as I know, yes.
18    Q  (BY MR. LEVINSTEIN) Was he a competitor?
19    A  A Judo competitor.
20    Q  Has he held positions within the USTU?
21        MR. JONES: Objection; calls for
22 speculation.
23    A  I know he has been a member of the USTU.
24 I don't remember that he held a position, an elected
25 position.

248

1     Q  (BY MR. LEVINSTEIN) Well, if you know,
2  how did he become -- well, first, the USTU is in the
3  Pan American Taekwondo Union?
4     A  Yes.
5     Q  Are the members of the Pan American
6  Taekwondo Union other -- are they NGBs from various
7  countries?
8     A  No. They're member national federations
9  in the Pan Am region.
10    Q  That's what I meant. Okay. We call them
11 NGBs.
12    A  Yeah.
13    Q  USTU is also a national federation?
14    A  Right. But for purposes of the Pan Am --
15        MR. UESUGI: National Association.
16    A  Yeah. NNA.
17    Q  (BY MR. LEVINSTEIN) Okay. But the
18 equivalent organizations to the USTU in other countries
19 that are within the Pan Am Region that relate to
20 Taekwondo are members of the Pan Am Taekwondo Union?
21    A  Yes.
22    Q  Now, Mr. Park, in this letter, makes
23 allegations about a Korean ethic minority dominating
24 the USTU. Do you see those words?
25    A  Second page still?

249

1     Q  No, the first page, that paragraph I read.
2     A  Yes, yes.
3     Q  Do you find that to be a racially
4  insensitive thing to say, coming from a Korean-born
5  American citizen?
6         MR. JONES: Objection; calls for hearsay.
7     A  Yes.
8     Q  (BY MR. LEVINSTEIN) But this was a
9  statement being made to the Membership and Credentials
10 Committee?
11    A  Yes.
12    Q  And given that Mr. Park was making
13 recommendations about what the Membership and
14 Credentials Committee should do and making statements
15 about his view of the sport in this country, the
16 information about the kind of allegations being made is
17 something you wanted the Membership and Credentials
18 Committee to tell you, correct? If that's too long,
19 I'll start over. I'll try again.
20    A  Please do.
21    Q  Mr. Park was communicating this
22 information to the USOC?
23    A  Yes.
24    Q  And I'll just tell you that the USOC
25 people passed it on to the Membership and Credentials

250

1  Committee because it was thought that that was the
2  organization presently dealing with this issue.
3     A  Okay.
4     Q  And this letter makes allegations about
5  the leadership of the USTU being corrupt.
6     A  Okay.
7     Q  And the question is, given that the
8  Membership and Credentials Committee is looking at the
9  USTU, you wanted the USTU to be told by the Membership
10 and Credentials Committee these kind of allegations
11 that were being made to it?
12    A  Yes.
13    Q  And the September 5th letter says that its
14 purpose is to let you know some of the things that are
15 being told to the Membership and Credentials Committee?
16    A  Yes.
17    Q  When is the first time you heard the term
18 "Korean Mafia" used?
19    A  In a discussion with Holme Roberts and
20 Owen with Jill Chalmers.
21    Q  You weren't aware that communications had
22 been made, like the Park communication, that referred
23 to the leadership of the USTU as a Korean Mafia?
24    A  No. And, again, I never saw the
25 communication from Dr. Park either.

251

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1    Q    Other than the communication involving
 2  Jill Chalmers, have you ever heard anyone else refer to
 3  the USTU, using the term Korean Mafia?
 4    A    Not in those terms, no.
 5         (Deposition Exhibit No. 89 was marked
 6          for identification.)
 7    Q    (BY MR. LEVINSTEIN) Do you know who Ginny
 8  Lopez is?
 9    A    I'm trying to recall.
10    Q    I'm not saying you should know who she is.
11  I'm just asking.
12    A    I think I do recall that she was the wife
13  of a gentleman from Miami who died, a Taekwondo
14  reporter, I think it was.
15    Q    Just because I don't really know, is she
16  any relation to Jean or Steven Lopez?
17    A    No, no. If this is the person I'm
18  thinking, her husband had a newspaper type thing that
19  he put out, and she was a reporter.
20    Q    Let me refer you to the fifth paragraph.
21  Oh, actually, it's the fourth paragraph, but there's a
22  break in the middle there. The paragraph starts,
23  "Leaders and individuals," but the last sentence says,
24  "It is unfortunate that the actions of some USTU
25  leaders have embarrassed and humiliated the Korean
```

252

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  community who have worked hard at getting TKD to where
 2  it is today in this country."
 3         (Whereupon, there was an interruption
 4          in the deposition proceedings.)
 5    A    I don't see it.
 6    Q    (BY MR. LEVINSTEIN) I'm sorry?
 7    A    Oh, I see.
 8         (Whereupon, Mr. Johansen left the
 9          deposition proceedings.)
10    Q    (BY MR. LEVINSTEIN) If you want to take
11  your time to read this, I'm not trying to rush you.
12    A    No, I see where you are now.
13    Q    Did you hear during these public meetings
14  statements made to that basic effect, that there was a
15  Korean leadership that wasn't behaving representatively
16  of the Korean community and that their conduct, not
17  representative of Koreans, but that their conduct was
18  humiliating the Korean community?
19         MR. JONES: Objection; calls for hearsay.
20    A    I don't recall hearing that at the open
21  forum.
22    Q    (BY MR. LEVINSTEIN) If you look at the
23  second page, do you see the reference in the
24  next-to-last sentence to a "fear of retribution by a
25  'Mafia-like' hierarchy"?
```

253

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1    A    Yes, I see that.
 2    Q    Do you remember ever seeing this article
 3  before?
 4    A    No, I haven't.
 5    Q    Did you ever hear anyone during your time
 6  as the Executive Director come to you and raise a
 7  concern but tell you that they didn't want the concern
 8  to be attributed to them because they were afraid of
 9  retribution?
10         MR. JONES: Objection; vague and
11  ambiguous, calls for speculation, calls for hearsay.
12    A    I think I can recall several instances
13  where people would not want their names to be public
14  for whatever reason, not necessarily for retribution.
15    Q    (BY MR. LEVINSTEIN) But do you remember
16  circumstances where people did express that they wanted
17  their names kept confidential because they were
18  concerned about retribution?
19    A    I don't recall that happening.
20    Q    In the Ginny Lopez article --
21    A    Yes.
22    Q    -- do you consider the "Mafia-like
23  hierarchy" to be a racially insensitive comment?
24    A    Somewhat, yes.
25    Q    Now, the term racist or racially
```

254

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1  insensitive has been used before, but was it your
 2  understanding that the primary concern was about the
 3  individual's national origin?
 4    A    When I think of things that are racially
 5  insensitive, to me, I think of substituting any racial
 6  name for the one that's there and thinking how that
 7  would affect that person, whether it's black, white,
 8  Italian, or whatever.
 9         Anything that is derogatory about a group of
10  people because of their background, to me, is racially
11  insensitive. And that's what I have been speaking to.
12  In this instance, it's Korean. But it could very well
13  be black.
14    Q    But if it were, say, Italian American, it
15  would be the same thing?
16    A    Yes.
17    Q    And in those cases, the people from Italy
18  are not necessarily of the same race?
19    A    Right.
20         (Whereupon, Mr. Johansen rejoined the
21          deposition proceedings.)
22    Q    (BY MR. LEVINSTEIN) So their country of
23  origin is, in your view, when you say racist, it may
24  mean discrimination against any kind of group like
25  that?
```

255

```
 1      A    Right.  Can I ask a question off the
 2  record maybe?
 3           (Discussion off the record.)
 4           (Deposition Exhibit No. 90 was marked
 5           for identification.)
 6      Q    (BY MR. LEVINSTEIN)  Have you seen this
 7  document before?
 8      A    No, I have not.
 9      Q    Okay.  For the record, it's just USOC
10  Production Nos. 00186 and 00187.
11           MR. LEVINSTEIN:  I'm sorry.  Speak up.
12  Don't be shy.  Tell me, hey, give me a copy.
13           MR. JONES:  Thanks.
14           MR. LEVINSTEIN:  I'm trying to move fast
15  so I'm working hard.
16      Q    (BY MR. LEVINSTEIN)  If you look at the
17  last sentence on the page, let me just read it on the
18  first page.  "I also firmly believe that the 'Korean
19  good ol' boy' system of promotions, certifications, and
20  selections of 'who attends what' has got to go.  I
21  believe that our current leadership is corrupt, biased,
22  and in-bred."
23           Do you see that?
24      A    Yes.
25      Q    And if you go down to the middle of the
```

256

```
 1  second page -- I don't know how to give you quite a
 2  reference to it, but "Korean or of Korean ancestry"
 3  words appear in the middle of the page on the second
 4  page.  There's a question that says --
 5      A    Naturalized or natural-born --
 6      Q    Yes.  There's a sentence that says, "We
 7  don't have a vote (our state is too small), we don't
 8  have a voice (we're not Korean or of Korean ancestry),
 9  and we don't have any means of redress (the Executive
10  Council and Board of Governors are run by a majority of
11  people who are appointed by the current national
12  president)."
13           Do you see those references?
14      A    Yes.
15      Q    And does some of the language from the
16  first page sound familiar, like the language that's
17  quoted by Mr. Satrom --
18      A    Yes.
19      Q    -- in the September 5th letter?
20      A    Yes.
21      Q    And you wanted Mr. Satrom to communicate
22  to you these kinds of things that he was being told by
23  members of the USTU, didn't you?
24      A    Certainly.
25           (Deposition Exhibit No. 91 was marked
```

257

```
 1           for identification.)
 2      Q    (BY MR. LEVINSTEIN)  Have you seen this
 3  document before?
 4      A    No, I haven't.
 5      Q    Let me just represent, it's Bates Stamp
 6  Nos. USOC00124 and 00125, and it appears to be an
 7  e-mail forwarded by Kay Burton of the USOC to certain
 8  other e-mail addresses.
 9      A    Okay.
10      Q    I'll represent I think they're members of
11  the Membership and Credentials Committee.  I just ask
12  that nobody now use those e-mail addresses to send them
13  e-mails.
14           And it's forwarding them an e-mail that came
15  to Kay Burton.  Now, was Kay Burton the contact person
16  for the Membership and Credentials Committee for the
17  Taekwondo community to send information?
18      A    I have no idea.
19      Q    You don't recall whether they picked her
20  as the staff person to receive information?
21      A    No, I don't.
22      Q    I don't either.  I just see a lot of
23  e-mails to Kay Burton, so I just was asking because you
24  might know.  And do you know who Diana Dunlap is?
25      A    Yes.
```

258

```
 1      Q    And where is Dunlap's Taekwondo, if you
 2  know?
 3      A    Yes.  Louisiana.
 4      Q    And did she speak at the May 2 open forum?
 5      A    I think she very well may have, yes.
 6      Q    This e-mail just suggests, we're rushing,
 7  but it just says, "This e-mail is in response to your
 8  request or information concerning my background and
 9  involvement in Taekwondo prior to the May 2 open
10  forum."  And I'm just -- did people sign up in advance
11  to have a time slot to speak at the May 2 open forum?
12      A    To my understanding, they just notified
13  someone that they were coming and that they would like
14  to be heard.
15      Q    And then do you recall the people who did
16  that were asked to give the committee some information
17  about who they were so that when they got up, there
18  would be some information about their background?
19      A    That, I don't know.
20      Q    And if you look at the bottom of the page,
21  I won't ask you about these 16 issues that Ms. Dunlap
22  says she would like to see addressed.
23      A    Yes.
24      Q    Those kinds of issues that were of concern
25  to USTU members, are those things that you wanted the
```

259

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   USTU to -- sorry -- that you wanted the Membership and
2   Credentials Committee to tell you about so that you
3   could respond to them?
4       A    Yes.
5            (Deposition Exhibit No. 92 was marked
6             for identification.)
7       Q    (BY MR. LEVINSTEIN)  Again, a document
8   previously produced, USOC Bates No. 00070 and 00071.
9   What's the LadyTKD website?
10      A    What is it?  It's a personal website
11  that's run by Ms. Ronda Sweet.
12      Q    Does it have chat rooms or -- no.
13           MR. LEVINSTEIN:  Somebody in the Internet
14  world could give me a better term.  What would you call
15  these things?  Glenn, you're the expert.
16           MR. UESUGI:  It's a Web page.
17           MR. LEVINSTEIN:  Okay.  But there's a
18  reference on the top to a thread.  I forget what it's
19  called when there are websites you go to and people can
20  post messages.
21           MR. UESUGI:  Bulletin board?
22           MR. LEVINSTEIN:  A bulletin board.  Okay.
23  Thank you.  I don't spend enough time on the Web.
24      Q    (BY MR. LEVINSTEIN)  Does the Ronda Sweet
25  website have -- or the LadyTKD website have bulletin
```

260

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   boards where people can express their thoughts?
2       A    As I understand it.  I must admit I don't
3   go to her Web page.
4       Q    In your two years --
5       A    Oh, I have in the past.
6       Q    Okay.
7       A    I don't make that a practice of going to
8   hers.
9       Q    I understand.
10      A    So I don't know if it's changed or what it
11  may have now.
12      Q    But when you were the Executive Director,
13  you did go and read it at times?
14      A    Occasionally, yes.
15      Q    And why?
16      A    It was a source of finding out what
17  concerns people had, issues to address.
18      Q    And did you feel that you learned about
19  what USTU members or others involved in the Taekwondo
20  community were thinking?
21      A    Somewhat.  Somewhat.
22      Q    Now, I don't know who sent this posting.
23  It may have even been anonymous, so I'm having a hard
24  time telling.  But are a lot of the postings at this
25  website, if you know, done by e-mail names that you
```

261

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   can't tell who the person is?
2       A    I'm not sure.  Some have screen names.
3   Some use their real names, from my understanding.
4       Q    And if they use a screen name, it might
5   not tell you who they are.
6       A    Right.
7       Q    If you look at the third paragraph, I
8   think it is, that starts with "even though"?
9       A    All right.
10      Q    Why don't I read it.  "Even though I have
11  only be (sic) back into TKD for the past couple of
12  years, it did not take me long (probably because I am a
13  former federal investigator and prosecutor specializing
14  in white collar crime) to see a problem with the
15  organization of TKD in Maryland and at the national
16  level.  It did not take me long to see what I call the
17  'Korean Mafia' at work.  State organizations and local
18  and state tournaments were dominated by a good-ol' boys
19  network of Korean instructors.  This of course is
20  natural since TKD comes from Korea, but the level of
21  their control over the sport is mind boggling.  I have
22  yet to be at a tournament where rules weren't changed,
23  or what you thought you signed up for was changed at
24  the last minute.  I have yet to be at a tournament
25  where the rules are even followed the way they are
```

262

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   intended to be."
2            "While we can all blame the pervasive
3   influence of Sang Lee or the 'Korean Mafia,'" the blame
4   really rests with each one of us, competitors and
5   instructors alike."
6       Q    Did you, during your term as a board member
7   or as an Executive Director, hear complaints that rules
8   of competitions were changed to favor one set of people
9   or another?
10           MR. JONES:  Objection; calls for hearsay.
11      A    Yes, and I served on the referee committee
12  for a long time, and these were issues that I have
13  spoke with several people who complained that we
14  weren't enforcing the rules consistently, and we had
15  discussions on that.
16      A    A lot of the time, I found that people didn't
17  understand the rules.  Even though they were
18  instructors, they had a wrong interpretation of things.
19  And I have not seen where the rules have been applied
20  one way on this match but differently on the next one
21  because it's someone else, especially as a referee.  It
22  just doesn't happen.
23      Q    It hasn't happened at events that you have
24  been at?
25      A    Exactly.
```

263