1    Q    But you only know about events where
2    you're the referee?
3    A    Of course.
4    Q    And you work very hard not to do that, not
5    to favor one person unfairly or another?
6    A    Right. That's the job of the referee.
7    Q    And if referees -- well, let me strike
8    that for a second.
9    Are you aware of the issues related generally
10   to the judging scandal that involved figure skating at
11   the 2002 Winter Games?
12   A    Yes.
13   Q    And at that time, you were employed by the
14   USTU, but you weren't yet the Executive Director?
15   A    Correct.
16   Q    And have there been controversies about
17   judging involving the USTU at the highest levels?
18   A    Yes. There's protests at many of the
19   high-level events.
20   Q    Are you aware of any match that you
21   witnessed that you believe the competitor was unfairly
22   not given the victory?
23   A    I witnessed matches where I thought the
24   better competitor didn't win, possibly by poor
25   application of the rules, possibly by poor scoring.

1    And one of those happened when I was sitting next to
2    Ms. Sweet, and we discussed that. It was an error that
3    could have been corrected, but because of the people on
4    the floor, they didn't correct it.
5    Q    Are you familiar with the boxing match in
6    Seoul, Korea involving, was it Roy Jones?
7    A    Yes.
8    Q    What can you tell me about what happened
9    there, as you recall?
10   A    Just that he ended up losing and he should
11   have won.
12   Q    And where was the match? What country?
13   A    That was in Korea.
14   Q    That was part of the 1988 Olympic Games?
15   A    Olympic Games.
16   Q    And who was his opponent, from what
17   country?
18   A    I don't remember that.
19   Q    You don't remember that it was a Korean
20   competitor?
21   A    That may be, but --
22   Q    Okay. And do you remember that there were
23   allegations that the Korean fighter had won the match
24   and been declared the winner, even though he clearly
25   didn't win, because he was from Korea?

1    A    I recall that.
2    Q    Any incident like that happen in Taekwondo
3    in 1988 that you're aware of?
4    A    In Taekwondo?
5    MR. JONES: Objection; improper
6    hypothetical, vague.
7    Q    (BY MR. LEVINSTEIN) Let me just ask:
8    Were you at the 1988 Olympic Games?
9    A    Yes.
10   Q    Did you watch Juan Moreno's final match?
11   A    I'm sure I did.
12   Q    Do you recall a discussion that Juan
13   Moreno clearly won the gold medal but that it was given
14   to his competitor?
15   A    I recall that.
16   Q    And what country was his competitor from?
17   A    Korea.
18   Q    And did you witness the match?
19   A    Yes.
20   Q    Were you a referee at that time?
21   A    Not at that --
22   Q    Not at the event, but were you a referee?
23   A    Yes.
24   Q    And did you agree that the person who had
25   performed the best and should have been given the gold

1    medal did not receive it?
2    A    I wasn't a nonpartisan observer of that
3    match. I wanted Juan to win, and I thought that he
4    should have won.
5    Q    And how is it possible that if they have a
6    referee system, that someone could lose who -- strike
7    that.
8    Is the refereeing objective in Taekwondo?
9    MR. JONES: Vague and ambiguous as to
10   what we're talking about. Are you talking about
11   generally?
12   Q    (BY MR. LEVINSTEIN) I'm talking about --
13   strike that. I'll ask it a different way.
14   If I'm a judge, a referee, in a Taekwondo
15   match, and I want to favor one competitor, is it
16   possible to do it?
17   A    Yes.
18   Q    It's easy to do it, isn't it?
19   A    It's possible, yeah.
20   Q    Well, don't I sit there with a button and
21   push the button when I think the competitor has scored
22   a point?
23   A    Yeah.
24   Q    And if I don't push the button for one
25   competitor, there are other referees, but collectively,

1    we decide whether he gets a point or not?

2         A    Correct.

3         Q    And it's based solely on my decision as to

4    when I push the button based on what I've seen?

5         A    Basically, yes.

6         Q    And so is it important -- was it important

7    to you, as an Executive Director of the USTU, that the

8    perception be that judging at Taekwondo events was

9    fair?

10        A    Absolutely.

11        Q    And it would be a major issue of concern

12   for the USTU and the WTF if it became a perception that

13   judging isn't fair?

14        A    Correct.

15        Q    What was done about Mr. Moreno's losing

16   the match?

17        A    I don't recall.  Was that where the

18   sit-down happened?

19        Q    You were there.  I'm not testifying.

20        A    I think that may be the match where he sat

21   in the ring to protest the decision.

22        Q    Juan Moreno did?

23        A    No.

24        Q    I think you're talking about the boxing

25   match.  We'll leave it.  If you don't remember --

1         A    I don't know.

2         Q    It's not a memory test.

3         A    There were so many matches.

4         Q    Do you know if a protest was filed?

5         A    I think there was a protest filed.

6         Q    Did you believe that Juan Moreno lost

7    because he was fighting a Korean in Korea?

8              MR. JONES:  Objection; calls for

9    speculation.

10        A    Not necessarily, because being a judge,

11   what people, as spectators, don't realize -- I try to

12   tell people whenever they're saying things that are

13   unseeded, that you have to look at what the judge's

14   perspective of the point is and where they see what.

15             So as a fan, yes, I felt Juan clearly won.

16   But when you look at what the judges may have seen,

17   they could see a totally different match.  And it

18   happens all the time.  That's why what we do for a

19   protest is put cameras over each judge's chair so you

20   can see in a protest what they should have seen.

21        Q    (BY MR. LEVINSTEIN)  But didn't you tell

22   people in 1988 that you thought Juan Moreno had been

23   robbed?

24        A    Sure, sure.

25        Q    And at that time, that was your best

1    judgment?

2         A    As a spectator, yes.

3         Q    And as a person who was a referee?

4         A    Well, not exactly.  As a referee, I have

5    to look at different things to consider.  As a fan, I

6    have the luxury of not seeing that, not considering

7    that.  And that's true every time.

8              (Deposition Exhibit No. 93 was marked

9              for identification.)

10        Q    (BY MR. LEVINSTEIN)  Exhibit 93, USOC

11   Document Production Nos. 00147 and 00148.  Just for the

12   record, it's a two-page printout of an e-mail from a

13   Robert F. Gallagher, who identifies himself as past

14   president of the Wyoming State TKD Association.

15             Do you know Mr. Gallagher?

16        A    Yes.

17        Q    And has he been actively involved in the

18   USTU for a long time?

19        A    Yes.

20        Q    Would you look at the next-to -- well, two

21   paragraphs up from the bottom?

22        A    Okay.

23        Q    It says, "While I'm sure," it begins?

24        A    Yes.

25        Q    It talks about a meeting that Sang Lee

1    supposedly called of all the Korean Grandmasters that

2    was held in Chicago.  Are you familiar with any meeting

3    of Korean Grandmasters?

4         A    I know there's a Grandmasters Association,

5    but outside of that, I'm not aware of what this is

6    speaking to.

7         Q    What do you know about the Korean

8    Grandmasters -- sorry.  Strike that.  You said a

9    Grandmasters Association?

10        A    Yes.

11        Q    What does that group do, if you know?

12        A    I have no idea.  I'm not a member, but I

13   know that they do meet.  I don't know what else they

14   do.

15        Q    What makes someone a Grandmaster, as

16   opposed to a master?

17        A    8th or 9th Dan.

18        Q    8th or 9th Dan?  How many -- okay.  Is

19   that a Kukkiwon ranking?

20        A    Yes.  Actually, their group, no, not all

21   of them are Kukkiwon 8th or 9th Dan, from what I know.

22        Q    Are there time limits to getting different

23   levels?

24        A    Yes.

25        Q    Can you give me a general idea, if I want

1    to be -- is 9th the highest?

2

3         A    Yes, until death.  You can get a 10th

4    posthumously.

5         Q    That's a lot of help.  I'd probably rather

6    fight the 10th degree than the 9th degree.

7              Is there a certain age requirement or number

8    of years of Taekwondo or number of years since you got

9    your first belt?  What's the time requirement to get

10   the higher belt?

11        A    You have to be 16 years old to be a

12   non-junior black belt.

13        Q    Okay.  16 to be a 1st degree?

14        A    Right.  To go for your 2nd degree, you

15   have to have been a 1st degree black belt at least one

16   year.

17        Q    Okay.  So 17, you could make 2nd degree?

18        A    For 3rd, two years after 2nd.

19        Q    So we're at 19 for a 3rd degree if we

20   really got a good start.

21        A    Right.  It goes progressively from one to

22   the other.  Like to 5th, you have to have been a 4th

23   for four years; 4th, you have to be a 3rd for three

24   years; 6th, you had to have been a 5th for five years;

25   7th, you have to have been a 6th for six years; 8th,

1    you have to have been a 7th for seven years; 9th, 8th

2    for eight years.  And these are minimum time

3    requirements.

4         Q    I lost track.

5         A    We need a calculator.

6         Q    We're talking 30-plus years?

7         A    Yeah.

8         Q    So even if you were really diligent, and

9    the second you were eligible got right on it, you

10   really couldn't until you were at least 50 be a 9th

11   degree black belt?

12        A    Right.

13        Q    You couldn't be an 8th degree black belt

14   at least in your 40s.

15        A    Right.

16        Q    Is it more likely that if you're an 8th

17   degree black belt you're in your 50s or 60s?

18        A    Probably.

19        Q    Given that this sport originated in

20   Korean, and it came over from Korea, how many

21   non-Korean 8th and 9th degree black belts are there, if

22   you know?

23        A    There's three that I know of.

24        Q    Out of how many?

25        A    I don't know what the total number is.

1         Q    Three 8th or 9th degree non-Korean,

2    non-Korean American?

3         A    Yeah.

4         Q    Are there more than 100 Korean

5    Grandmasters?

6         A    I'm sure there are.

7         Q    Are any of the three that you know that

8    are not Korean American members of the Grandmasters

9    Association?

10        A    I don't know.  I don't know their

11   membership.

12        Q    Do you recall any donations from Korean

13   Grandmasters in 2003?  If you look at the paragraph,

14   I'll read it.  "At this meeting" -- second sentence.

15   "At this meeting, Sang Lee told the Korean masters that

16   'Taekwondo as they all know it will disappear and will

17   be non-existent, if the USOC decertifies the USTU and

18   if I lose my position as President.  It is important

19   for me to remain in office, if Koreans are to survive

20   in this country.'  The real purpose of the meeting was

21   to get financial and moral support from his fellow

22   Grandmasters.  He succeeded, as he brought home a

23   whopping $200,000.  Bill Cho, the owner of Hallmark

24   Cards, and the founder of Precious Moments, made a

25   $100,000 donation himself.  Sang Lee then received an

1    additional $5000.00 pledge from about 20 of the

2    Grandmasters present."

3              "This story was recently told to me by a

4    young Korean master who is the son of one of the

5    Grandmasters in attendance at this meeting, and that

6    has pledged his support to a new and fair USTU."

7              Do you remember any donations coming in?

8              MR. JONES:  Objection; calls for hearsay.

9         A    No, sir.

10        Q    (BY MR. LEVINSTEIN)  Do you know a man

11   named Bob Kestenbaum?

12        A    No, I don't.

13             MR. LEVINSTEIN:  Please mark this as 94.

14             (Deposition Exhibit No. 94 was marked

15             for identification.)

16        Q    (BY MR. LEVINSTEIN)  It appears that Bob

17   Kestenbaum is a dentist, if that's what D.D.S. stands

18   for.  And Exhibit 94 is USOC Bates No. 00048.  And it

19   appears to be a half page e-mail from Bob Kestenbaum to

20   Kay Burton, again Kay Burton at the USOC.

21             And let me just read the first paragraph.

22   "Dear Ms. Burton.  You don't know me of course, but I

23   have been along with my son a member of the USTU since

24   he began competing in 1998.  My experience with this

25   organization has led me to a few conclusions about it.

1   1st, they are more concerned with making money than
2   they are about running a 'quality' operation (which
3   they are certainly capable of). 2nd, it is infested
4   with in-fighting and politics, going way beyond what
5   one typically would expect to find. Rules and
6   published procedures are ignored allowing officials to
7   make their own decisions, answering to nobody. 3rd,
8   I'm afraid to say, that Korean culture and values are
9   not the same as American values, yet Koreans are in
10  charge of this organization. We bend over backwards to
11  assure no appearance of favoritism or partiality in
12  this sport - a let the best man win attitude. Korean
13  culture places a higher value on loyalty to one's
14  family, friends, school, etc. than it does on honesty
15  and fair play. The result is that the best man usually
16  doesn't win, but the favorite son does."
17      Does some of that language sound familiar?
18      A    Yes.
19      Q    Does it sound like the language that
20  Mr. Satrom included in that Paragraph 8 in his
21  September 5th, 2003 letter to you?
22      A    Yes.
23      Q    And given that this is an e-mail that was
24  sent to the Membership and Credentials Committee that
25  they were seeking information about issues in the

1   sport, was it your hope, as the Executive Director of
2   the USTU, that the Membership and Credentials Committee
3   would tell you about these kinds of allegations?
4       MR. JONES: Objection; calls for hearsay,
5   also speculation.
6       A    Yes.
7       Q    (BY MR. LEVINSTEIN) So you wanted him,
8   before that September 13th, 2003 meeting, to give you
9   information about what allegations and issues had been
10  raised with his committee by people like
11  Mr. Kestenbaum?
12      A    Yes.
13      Q    And at that meeting, wasn't it helpful to
14  know what people had been saying to the Membership and
15  Credentials Committee?
16      A    Sure, to the extent that we were provided
17  that information, yes.
18      Q    So that Paragraph 8, which told you some
19  of the things that had been said in communications to
20  the Membership and Credentials Committee, was helpful
21  to you?
22      A    Yes.
23      Q    Were you aware that prior to your term as
24  Executive Director there had been periods of time when
25  the USTU had been placed on probation?

1       A    Yes.
2       Q    What do you remember about that?
3       A    Just that it had been mentioned that we
4   had been placed on probation, once that I recall. It
5   may have been more than once.
6       Q    And was it because of the same kinds of
7   issues that were being addressed in September of 2002?
8       MR. JONES: Objection; calls for
9   speculation.
10      A    I don't remember being told what the
11  issues were for the probation.
12      Q    (BY MR. LEVINSTEIN) But it had to do with
13  noncompliance with the obligations as a National
14  Governing Body?
15      A    I don't know. I would assume so,
16  but . . .
17      Q    95?
18      (Deposition Exhibit No. 95 was marked
19      for identification.)
20      Q    (BY MR. LEVINSTEIN) Let me show you
21  what's been marked as Exhibit 95 with USOC Bates Nos.
22  00189 and 00190. Who is Guy Poos, if you know?
23      (Whereupon, Mr. Johansen left the
24      deposition proceedings.)
25      A    A Taekwondo instructor in Oklahoma who

1   owns Poos Taekwondo. I know him very well.
2       Q    (BY MR. LEVINSTEIN) Hmmm?
3       A    I know him very well.
4       Q    You do?
5       A    Yeah.
6       Q    And how do you know him very well?
7       A    We have worked together for many years.
8   He has been on several USTU committees. We have looked
9   at designing and implementing scoring systems together.
10  I have just gone to his tournaments. I know his kids.
11      Q    If you know, what is his national origin
12  or background?
13      A    As far as I know, he's American-born
14  American.
15      Q    I never know from a name. Has he, in
16  these years that you've known him, expressed to you
17  grave concerns about how the USTU is run?
18      A    Yes, for many years.
19      Q    And has he been an active participant in
20  the USTU?
21      A    Yes.
22      Q    And were you aware that he had written to
23  the USOC to raise concerns about compliance issues?
24      A    I had no knowledge of that.
25      Q    Okay. If you look at the second page, the

1  first paragraph at the top says, "As egregious as these
2  non-compliance issues may prove, does anyone really
3  believe they represent anything more than the tip of
4  the USTU iceberg? Some of us for decades have opposed
5  what we believe are the undemocratic and corrupt
6  policies of the USTU leadership, even though, we
7  recognized that internal change was impossible. The
8  USTU bylaws continue to allow manipulation without
9  legislative restraint. We have a president for life,
10 and an appointment process that allows him to continue
11 his reign without the fear of ever encountering serious
12 opposition. Long ago I realized the USTU leadership
13 could never be held accountable. For the most part,
14 they did not understand our American culture of sport
15 nor embrace its underlying values of un-biased
16 officiating, a level playing field, and fair play.
17 Where has the USOC oversight been and where does the
18 'buck' stop?"
19      A    I see that.
20      Q    You know Mr. Poos pretty well?
21      A    Yes.
22      Q    Is he a racist?
23      A    I don't know, but I would assume not from
24 my dealings with him.
25      Q    So in all your dealings, there's never

280

1  been any suggestion that he was motivated by any kind
2  of racial bias?
3      A    Not that I could speak to.
4      Q    As the person who was the Executive
5  Director of the USTU in September of 2003, is it
6  troubling to you to know that someone like Mr. Poos,
7  who was so actively involved, has such negative
8  feelings about the organization that he was an active
9  member of?
10     A    Troubling, no, because again, like he
11 says, for decades he has been complaining against the
12 way the organization has worked, the way it's been
13 running. So it wasn't troubling. It was a
14 continuation of my knowing what he had been doing for
15 years and saying.
16     Q    Was he simply making these complaints
17 because he wanted to be running the place?
18     A    I don't know. I doubt that's the case,
19 but I don't know.
20          (Whereupon, Mr. Johansen rejoined the
21           deposition proceedings.)
22     Q    (BY MR. LEVINSTEIN) So because he has
23 been saying these same things for years and nothing has
24 changed, you're not troubled by the fact that he said
25 it in 2003?

281

1      A    I'm speaking to the fact that he and I
2  have spoken for years about issues concerning USTU to
3  the point that it's not troubling to see that he wrote
4  this.
5      Q    But in those discussions that you have had
6  over the years, haven't you agreed with him about a lot
7  of the things?
8      A    Much of it, yes.
9      Q    So much of what is in this letter are the
10 same kind of concerns you had?
11     A    Well, I only read the paragraph that you
12 cited.
13     Q    Let's talk about that paragraph. Did you
14 have those kinds of concerns that are expressed by
15 Mr. Poos?
16          (Whereupon, Mr. Uesugi left the
17           deposition proceedings.)
18     A    No. Some of it, no. For instance, the
19 part about values being different and the fair play
20 thing, no. I don't agree with that.
21     Q    (BY MR. LEVINSTEIN) What about the fact
22 that the USTU leadership hadn't been held accountable?
23     A    We disagreed as to how accountability is
24 determined. The fact that we still have the right to
25 protest things that go on says that you can do that.

282

1  He is saying that they're not being held accountable.
2  What's the level for accountability? Made to change or
3  what?
4      Q    But didn't you hear concerns over the
5  years that filing protests and grievances never really
6  led to any meaningful change?
7          MR. JONES: Objection; calls for hearsay.
8      A    I heard that, but I also saw where many
9  protests were resolved and a decision was made. Not
10 all of them just go away.
11     Q    (BY MR. LEVINSTEIN) No. But did you see
12 any significant structural changes in the organization
13 occur?
14         MR. JONES: Objection; vague.
15     A    Structural changes, no.
16     Q    (BY MR. LEVINSTEIN) And did you want
17 structural changes in the USTU?
18         MR. JONES: Objection; vague.
19     A    I wanted to get to the point where if I
20 wanted to, I could run for president. I wanted to be
21 in a situation where if he wanted to run for president,
22 he would feel comfortable doing so. If that was
23 structural changes, I don't think that's what that is.
24 It's a matter of getting people to support you.
25     Q    (BY MR. LEVINSTEIN) But when you took the

283

1    Executive Director job --
2        A    Uh-huh.
3        Q    -- didn't you believe there were serious
4    problems, and part of the reason you took the job was
5    you wanted a chance to try to improve the organization?
6        A    Yes, definitely.
7        Q    Did that include concerns about the
8    president appointing so many people?
9            (Whereupon, Mr. Uesugi rejoined the
10                deposition proceedings.)
11        A    Yes, that was a concern, as well as the
12    unwieldiness of the organization as it was structured.
13        Q    (BY MR. LEVINSTEIN)  And did you make
14    recommendations to the officers and the leadership of
15    the organization of changes that you thought would
16    improve the organization?
17        A    Yes.
18        Q    And did they, in many cases, ignore your
19    recommendations?
20        A    In some cases, yes.
21        Q    Were you very frustrated in dealing with
22    the governance of the USTU when you were the Executive
23    Director?
24        A    I was --
25            MR. JONES:  Objection; argumentative.

1        A    It was not the way it was.
2        Q    And, in fact, the only group that provided
3    any oversight really were the officers, because the
4    Executive Committee and the board were too large to
5    provide any kind of meaningful oversight over the
6    staff?
7            MR. JONES:  Objection; argumentative,
8    calls for speculation.
9        A    For whatever reason, that's the way it
10    functioned.
11        Q    (BY MR. LEVINSTEIN)  So the officers were
12    the people who governed you when you were the Executive
13    Director?
14            MR. JONES:  Objection; vague and
15    ambiguous.
16        A    The officers were the ones that I answered
17    to most of the time, unless I was answering direct
18    membership concerns with people.
19        Q    (BY MR. LEVINSTEIN)  Were you ever aware
20    of a situation in which the Executive Committee
21    overruled the officers?
22        A    I think there were some situations where
23    there were some budget considerations, and it was just
24    re-worked.  But other than that, I can't think of any.
25        Q    Did you have concern, when you were the

1        A    I was frustrated in not having the ability
2    or the authority to just implement and make it so.
3        Q    (BY MR. LEVINSTEIN)  Did you learn, during
4    the time that you were with the USTU, about the concept
5    of having a CEO who is empowered?
6        A    Did I learn that concept?
7        Q    Yes.
8        A    During the time I was Executive Director?
9    No.
10        Q    Did you know it already when you came?
11        A    Yes.
12        Q    So you were familiar with the idea that
13    modern governance theory involves the staff led by the
14    CEO having the authority and the power to run the
15    organization?
16        A    Yes.
17        Q    And that wasn't the case in the USTU, was
18    it?
19        A    Correct.
20        Q    And the role of the board is supposed to
21    be to set policy and provide oversight, correct?
22        A    Correct.
23        Q    And that wasn't the case in the USTU?
24        A    In many cases, yes.
25        Q    In many cases, yes, it was not?

1    Executive Director, that a lot of money was spent
2    supporting volunteers instead of athletes and coaches?
3        A    By volunteers, who do you mean?
4        Q    I'm sorry.  In the Olympic movement, we
5    generally refer to the people who are officers,
6    Executive Committee, and board as volunteers.  Let me
7    start over.
8            Were any of the officers, Executive
9    Committee, or board members paid a salary?
10        A    No.
11        Q    Okay.  So did you not view them as
12    volunteers?
13        A    Well, from my purview, volunteers are also
14    the people that staff our events and that we solicit to
15    help run things.
16        Q    Putting aside people who are volunteering
17    to work, let's talk about the volunteers who were
18    governing.  By that, I mean the officers, the Executive
19    Committee, and the board.
20            When you became the Executive Director, and
21    you learned the details of how the organization was
22    run, did you think there was a substantial problem that
23    an unreasonable amount of the organization's resources
24    were being spent on the volunteers, as opposed to on
25    the athletes and the coaches?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      MR. JONES: Objection; vague.
2      A    I don't know that I would term it
3  unreasonable, but I thought that it definitely needed
4  tweaking and attention, because practices that were in
5  play then I felt should have been different, and I
6  moved to make them so.
7      Q    (BY MR. LEVINSTEIN) And there was
8  resistance from a number of volunteers at having their
9  perks and benefits taken away, wasn't there?
10     A    Yes.
11     Q    And it seemed to you that the volunteers
12 didn't seem to get the idea that the mission was to
13 support athletes to achieve sustained competitive
14 excellence, correct?
15     A    Correct.
16          (Deposition Exhibit No. 96 was marked
17          for identification.)
18     Q    (BY MR. LEVINSTEIN) And as we said
19 before, the mission of the USTU was supposed to be to
20 help athletes achieve excellence?
21     A    Yes.
22          MR. JONES: Could we take a break?
23          MR. LEVINSTEIN: Whenever you want.
24          (Recess taken from 2:29 p.m. to 2:37
25          p.m.)

288

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1      Q    (BY MR. LEVINSTEIN) I show you what's
2  been marked as Exhibit 96, USOC Bates Nos. 00192 and
3  -193, and I'll ask, have you seen this before?
4      A    No, I have not.
5      Q    If you look -- it's an e-mail from a -- I
6  don't know that we know who is --
7      A    Mary McCagg.
8      Q    Well, Mary McCagg, this is her copy. She
9  was a member of the Membership and Credentials
10 Committee.
11     A    I see.
12     Q    And it was sent to her by Kay Burton, but
13 Kay Burton was forwarding an e-mail from someone at
14 "jjtstkd" at AOL, so someone's initials who may be JJS.
15 You don't recognize that address?
16     A    No.
17     Q    And you wouldn't know who the vice referee
18 chair for Maryland would have been, because he seems to
19 refer to himself as that, or herself?
20     A    No, I didn't.
21     Q    Okay. In it, it makes reference to, "In
22 Ireland and in Greece" -- this is the third paragraph.
23          First, let me just say who he is. He claims
24 that he is an AI referee and a parent of two
25 competitors. And it says, "I have been to every

289

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  Maryland and Virginia State tournaments and every adult
2  national championship and [junior] national
3  championship for the last nine years and the 2000 and
4  2002 [junior] world championships."
5          "In Ireland and in Greece [I] personally
6  witnessed many USTU members assigned job titles and
7  sent to these foreign countries for nothing more than
8  free vacations in Ireland and the [Junior] team was
9  left basically to run around by themselves with little
10 or no supervision, if not for the parents God only
11 knows what might have happened."
12          When you became the Executive Director of the
13 USTU, did you have concern that volunteers were being
14 sent to countries where they had no obligations with
15 respect to the event and, in effect, the USTU was
16 paying for vacations?
17          MR. JONES: Objection; calls for hearsay
18 and speculation.
19     A    I wouldn't word it that way, but the
20 concern was there, yes.
21     Q    (BY MR. LEVINSTEIN) You wouldn't give it
22 quite as extreme a characterization?
23     A    "Vacation."
24     Q    But you're paying for travel that didn't
25 benefit the USTU?

290

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1          MR. JONES: Objection; argumentative.
2      A    The concerns were there.
3          MR. LEVINSTEIN: Exhibit 97.
4          (Deposition Exhibit No. 97 was marked
5          for identification.)
6      Q    (BY MR. LEVINSTEIN) Have you seen Exhibit
7  97 before?
8      A    No, I have not.
9      Q    We haven't mentioned Larry Voorhees
10 before.
11     A    Yes.
12     Q    We did?
13     A    Yes.
14     Q    Okay. And he is a 5th degree black belt
15 from Des Moines, Iowa?
16     A    Yes.
17     Q    And do you know Mr. Voorhees?
18     A    Yes.
19     Q    Do you know him well?
20     A    Not well, but I knew him from having been
21 around.
22     Q    Just so you know, middle paragraph, "Bruce
23 Harris is an extremely competent individual," to put
24 that in the record.
25     A    Scratch that. That's a mistake.

291

1    Q    Just wanted to get something positive in
2    the record here.
3        And there's a reference in that same
4    paragraph that says, referencing both you and Jay
5    Warwick, "They both have done, and would continue to do
6    an outstanding job, if not for the micro-management of
7    President Lee and some of the more 'senior' officers
8    (or those that think their rank makes them 'senior'),
9    and if not for President Lee giving them specific
10   orders to do things that are in direct opposition to
11   the by-laws."
12       Were there circumstances in which you felt
13   that you were being micromanaged by President Lee or
14   the officers?
15       MR. JONES:  Objection; vague and
16   ambiguous, calls for hearsay.
17       A    Yes, I felt there was micromanagement, but
18   I was never directed to do anything against the bylaws,
19   nor would I.
20       Q    (BY MR. LEVINSTEIN)  And do you see three
21   paragraphs down, reference to "good-old-boy attempts at
22   political maneuvering"?
23       MR. JONES:  Same objection.
24       Q    (BY MR. LEVINSTEIN)  It says, "President
25   Lee is equally as infamous for his behind-the-back,

1    good-old-boy attempts at political maneuvering."
2        Were there -- you don't see that yet.  I'm
3    sorry.  Take your time.
4        A    Oh, I see it.
5        Q    Were there concerns expressed by members
6    of the board, for example, that when they showed up at
7    board meetings, everything seemed to have been
8    predetermined?
9        MR. JONES:  Objection; calls for
10   speculation.  Also hearsay.
11       A    I can't speak to what other board members
12   felt.  When I was merely a board member, that was often
13   the discussion with people around me.
14       Q    (BY MR. LEVINSTEIN)  Did you witness, when
15   you were the Executive Director, politicking in advance
16   of meetings in which members of the Executive Committee
17   or the officers called people up to line up votes or
18   had meetings to line up votes on issues that were
19   coming before them in advance of the meetings?
20       MR. JONES:  Objection; vague and
21   ambiguous.
22       A    I didn't witness that happening to be able
23   to speak to it.  I witnessed groups meeting and
24   talking, but I wasn't in any of the rooms, so I don't
25   know what they were talking about.

1    Q    (BY MR. LEVINSTEIN)  Were you in meetings
2    in which, during the meeting, groups of people spoke in
3    a foreign language and had discussions in your presence
4    that you couldn't understand?
5        A    Yes, sometimes.
6        Q    Did you consider that offensive?
7        A    No.
8        Q    Could you see how someone else might
9    consider that insensitive?
10       MR. JONES:  Objection; calls for
11   speculation.
12       A    It could, yes.
13       Q    (BY MR. LEVINSTEIN)  Did anyone voice to
14   you that it's inappropriate when we're having meetings
15   for some members to, in front of the others,
16   communicate among themselves in a language knowing that
17   we couldn't understand?
18       MR. JONES:  Objection; calls for
19   speculation.
20       A    Yeah, that had been stated before.
21       Q    (BY MR. LEVINSTEIN)  And who said that to
22   you?
23       A    Not to me, but it had been said by people
24   in the room, in the audience and stuff, in the group,
25   where that happened.

1    Q    Did you think it was inappropriate in a
2    meeting for some members to speak in Korean and
3    communicate with each other so that the other people in
4    the room couldn't hear what they were saying, couldn't
5    understand what they were saying?
6        A    Again, not necessarily, because, again, I
7    have worked a lot in the Pan Am Region, and the same
8    thing happens in Spanish.  And if you don't speak
9    Spanish, you don't understand.  But that's their way of
10   saying whatever they're saying, and a translation
11   usually ensues.
12       Q    But there was no translator to translate
13   for you what they were saying in these meetings?
14       A    In some cases, yes, you're right.
15       Q    And the purpose of speaking Korean was in
16   order to communicate with each other so you couldn't
17   hear what they were saying?
18       MR. JONES:  Objection; calls for
19   speculation.
20       Q    (BY MR. LEVINSTEIN)  Didn't it create
21   concern --
22       A    I don't know what the purpose was.
23       Q    -- that they may be saying things that
24   they were not willing to say in front of the group?
25       A    Sure.