1        MR. JONES: Same objection.
2        Q    (BY MR. LEVINSTEIN) Weren't you troubled
3   to be at a meeting in the United States at which some
4   members of the USTU'S governance group were speaking in
5   Korean instead of in English?
6        MR. JONES: Same objection.
7        A    Troubling, yeah. It's troubling when that
8   happened.
9        Q    (BY MR. LEVINSTEIN) So didn't you view,
10  to some extent, that the leadership, who were of a
11  knowledge of the Korean language, used that knowledge
12  in ways that were inappropriate in the USTU?
13       A    I don't know how to respond to that. I
14  know that in the past, we've had some leaders that
15  aren't as conversant in English and of necessity had to
16  communicate using Korean. Did I find that troubling
17  that I didn't know what was being said? Somewhat.
18  But, again, I have been in that situation in other
19  countries as well.
20       Q    But in other countries, you're in Spain,
21  and they're speaking Spanish?
22       A    But in Taekwondo for other countries, too.
23       Q    But here weren't there situations in which
24  everyone who was speaking in Korean, to your best
25  understanding, could also understand English just fine?

1        MR. JONES: Lacking foundation.
2        A    No. To my knowledge, that wasn't always
3   the case.
4        Q    (BY MR. LEVINSTEIN) But was it sometimes
5   the case?
6        A    Sometimes the case.
7        Q    And wasn't it sometimes the case that --
8   well, strike that.
9            Did that happen ever at officers meetings?
10       MR. JONES: Objection; vague.
11       A    During my tenure, no.
12       Q    (BY MR. LEVINSTEIN) But a majority of the
13  officers were of Korean national origin?
14       A    Yes.
15       Q    What about the majority of the Executive
16  Committee?
17       A    I would say so, but I'm not sure of the
18  exact numbers.
19       Q    Who was the head of the Coaching Science
20  Committee when you were the Executive Director?
21       A    A gentleman named Mr. Connolly from
22  California.
23       Q    And he was appointed by Sang Lee?
24       A    Yes.
25       Q    And do you know how long he had held that

1   position as chairman?
2        A    No, I don't.
3        Q    And he is the one who communicated to you
4   the nomination of Mr. Dae Sung Lee to be the coach?
5        A    Yes.
6        Q    And after -- I have Byung Kang; is that
7   correct?
8        A    Byung Won Kang, B-y-u-n-g, W-o-n, K-a-n-g.
9        Q    All right. He was appointed by Sang Lee
10  to be the chair of that committee?
11       A    Yes.
12       Q    And after you communicated the nomination
13  of Dae Sung Lee to the USOC --
14       A    Yes.
15       Q    -- did you get inquiry back as to whether
16  the coaching criteria had been followed?
17       A    That may be the case, but I don't have
18  recollection of that happening.
19       Q    When Mr. Byung Won Kang communicated to
20  you the nomination --
21       A    Yeah.
22       Q    -- did you ask him whether the Coaching
23  Science Committee had all met and all agreed on the
24  nomination?
25       A    No, I did not.

1        Q    Did you ask him if there had been a vote
2   and what the vote had been?
3        A    No, I did not.
4        Q    Did you ask him whether anyone else had
5   been considered?
6        A    No, I did not.
7        Q    If -- this is a hypothetical. If you had
8   learned that there had not been a meeting of the
9   Coaching Science Committee at which the decision had
10  been made, but that the chairman had made the decision
11  without having the meeting of the committees, would you
12  have still passed that name on to the USOC?
13       MR. JONES: Objection; calls for an
14  improper hypothetical. Also vague and ambiguous, lacks
15  foundation.
16       A    Probably not.
17       Q    (BY MR. LEVINSTEIN) And in your view,
18  would it have been an improper nomination if that had
19  occurred?
20       MR. JONES: Calls for a legal conclusion.
21       A    What I probably would have done is asked
22  him to make certain that he convenes the committee
23  before giving me the recommendation.
24       Q    (BY MR. LEVINSTEIN) Because it's your
25  view if he passed that nomination on without having the

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   committee meeting, he wouldn't have complied with the
2   coaching criteria?
3           MR. JONES: Same objection; lacks
4   foundation, calls for a legal conclusion, calls for
5   speculation, improper hypothetical.
6       A   Probably not.
7       Q   (BY MR. LEVINSTEIN) From the documents we
8   saw, the USOC didn't approve the nomination until
9   perhaps August of '03 of Mr. Dae Sung Lee? There's a
10  document you have that has an 8/28/03 e-mail and then a
11  10/8 forwarding of that e-mail. You have got it. Am I
12  correct that it indicates that the Executive Committee
13  had approved the nomination on August 28th, '03?
14      A   Yes. August 28th.
15      Q   That's the date of the e-mail. And the
16  content of the e-mail indicates that it was done that
17  same day, or something like that?
18          MR. JONES: For the record, it says
19  the . . .
20          MR. LEVINSTEIN: I don't have it in front
21  of me, I apologize.
22      Q   (BY MR. LEVINSTEIN) Okay. It doesn't say
23  when it occurred, but this is the only reference you've
24  seen to the first date as to which you have confidence
25  that the USOC Executive Committee had by that date

300

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   approved Lynnette Love and Dae Sung Lee?
2       A   Right.
3       Q   Is it correct that the first time that
4   information was communicated to you was on October 8th?
5       A   No. Actually, as I recollect, I did speak
6   with both Kelly Skinner and Michelle to ask them to get
7   me something in writing so we could move forward. So I
8   did have verbal conversations with them about that.
9       Q   So you think they told you sometime
10  between August 28th and October 8th, orally, that the
11  nominations had been approved?
12      A   Probably, most likely.
13      Q   And as soon as you heard, you would have
14  contacted Lynnette Love and Dae Sung Lee?
15      A   Yes.
16      Q   And until that nomination was approved by
17  the USOC, Mr. Dae Sung Lee wasn't yet the Olympic
18  coach?
19      A   He was the nominated coach, but not
20  confirmed. And we had discussions about that.
21      Q   And it wasn't too long thereafter when
22  Mr. Scherr sent the memo indicating -- where is it --
23  that -- it was on October 30th that Mr. Scherr sent his
24  memo, Exhibit 85, that there was some question because
25  of the certification process about the status of

301

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   Lynnette Love and Dae Sung Lee?
2       A   I recall seeing that earlier. October
3   30th, 2003.
4       Q   And that's Exhibit 85?
5       A   Yes.
6       Q   When did you first learn that USTU
7   officials gave gifts to WTF officials?
8           MR. JONES: Objection; lacks foundation.
9       Q   (BY MR. LEVINSTEIN) Okay. Strike that.
10  Did you learn at some point in time that USTU
11  officials gave what are called protocol gifts to WTF
12  officials?
13      A   Protocol gifts? I did learn that at some
14  point in time.
15      Q   Did you learn that the USTU was paying for
16  cigarettes and alcohol to be given to WTF officials?
17      A   No. That's the first I have heard that.
18      Q   You don't remember discussions with the
19  Membership and Credentials Committee about USTU
20  expenditures on alcohol and cigarettes?
21      A   Not to WTF members.
22      Q   What do you remember about who the
23  cigarettes and alcohol were purchased for?
24      A   I don't recall. Was that in response to
25  one of the items?

302

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1           MR. JONES: Don't ask questions.
2       Q   (BY MR. LEVINSTEIN) But you do recall
3   that the USTU was spending money buying cigarettes and
4   alcohol?
5           MR. JONES: Objection; vague and
6   ambiguous. As individuals or . . .
7       Q   (BY MR. LEVINSTEIN) Strike that. You do
8   remember that the organization, the USTU, was paying
9   for purchases of alcohol and cigarettes?
10      A   Yes.
11          MR. JONES: Same objection.
12      Q   (BY MR. LEVINSTEIN) And you did
13  understand that those products were traveling outside
14  the country, didn't you?
15      A   No.
16      Q   Then did you understand that those were
17  purchases for USTU governance personnel?
18      A   USTU governance personnel.
19      Q   Officers, Executive Committee members,
20  board members?
21      A   I'm confused. Please ask it again.
22      Q   The USTU was paying for cigarettes and
23  alcohol?
24      A   Okay.
25          MR. JONES: Objection; vague and

303

1  ambiguous.
2      Q    (BY MR. LEVINSTEIN) Who was getting the
3  cigarettes to smoke and the alcohol to drink? People
4  in the United States or people outside the United
5  States?
6      A    It was my understanding that it was for
7  people outside of the United States.
8      Q    Well, people in -- it was something for
9  Taekwondo?
10     A    Yeah.
11     Q    It wasn't for your staff?
12     A    No.
13     Q    And it wasn't for you?
14     A    Correct.
15     Q    Was it for USTU members?
16     A    Members? Yes.
17     Q    And those were people who were on either
18 the board or the Executive Committee or officers?
19     A    Correct.
20     Q    So to cut it down, the USTU was paying for
21 cigarettes and alcohol that was being owned or consumed
22 by members of the USTU officers, Executive Committee,
23 or board?
24     A    Yes.
25     Q    Do you know people in particular?

1      A    No.
2      Q    Did the USTU pay for a membership at the
3  Broadmoor?
4      A    That, I don't know. We didn't do that as
5  part of my tenure, that I can recall.
6      Q    You don't recall that President Sang Lee's
7  membership at the Broadmoor was paid for?
8      A    I knew that he had a membership at the
9  Broadmoor.
10     Q    You don't understand that it was paid for
11 by the USTU?
12     A    I don't know how the financial
13 arrangements for that were made.
14     Q    Do you recall that that was reimbursed as
15 part of business expenses that he might incur in
16 entertaining people?
17     A    No, sir, I don't.
18     Q    But you have no recollection of whether or
19 not the USTU either paid for or reimbursed Mr. Sang Lee
20 for his membership at the Broadmoor?
21     A    Correct, I don't know how that worked.
22     Q    In your response to Mr. Satrom's letter,
23 you refer to VIPs?
24     A    Yes.
25     Q    Who are VIPs?

1      A    They would be considered dignitaries from
2  other countries, other presidents of federations, WTF
3  officials, people of that ilk.
4      Q    And the officers of the USTU, are they
5  VIPs?
6      A    Not for that response, not in terms of
7  that response, no.
8      Q    Well, that response discussed Sang Lee and
9  people from other countries staying in luxury
10 accommodations. Do you recall that?
11     A    Yes.
12     Q    And the defense of that was that VIPs are
13 entitled to that sort of treatment?
14     A    Yes.
15     Q    And athletes and coaches didn't receive
16 that same kind of treatment, did they?
17     A    Correct.
18     Q    And didn't you believe that that was
19 contrary to the entire concept of the Olympic movement?
20          MR. JONES: Objection; argumentative.
21     A    Not necessarily.
22     Q    (BY MR. LEVINSTEIN) Do you think that
23 Mr. Lee was somehow entitled to stay at better
24 accommodations than the athletes on the United States
25 team?

1           MR. JONES: Same objection.
2      A    My thinking was if it had to be paid for
3  out of our, whatever, no, that's not appropriate. But,
4  again, it was set up so that this was not something
5  that had to be paid for.
6      Q    (BY MR. LEVINSTEIN) So VIK, which could
7  be used to get rooms for other people, doesn't count as
8  paying for it?
9      A    But it was VIK as opposed to like the
10 charges were for exorbitant fees for luxury suites.
11 That was not the case.
12     Q    But instead of taking the luxury suites,
13 you could have gotten several less expensive suites for
14 athletes or other people?
15          MR. JONES: Objection; calls for
16 speculation.
17     A    That's possible.
18     Q    (BY MR. LEVINSTEIN) And if instead of
19 getting him a suite you got him a room like the
20 athletes and the staff and the other people, you would
21 have had additional VIK to get rooms for other people?
22          MR. JONES: Same objection.
23     A    Possibly.
24     Q    (BY MR. LEVINSTEIN) You believe that's
25 true, don't you?

1   A   Possibly. Yes.
2   Q   Did the USTU pay for a full-time employee
3   who worked for President Lee?
4   A   No. There was a full-time employee that
5   worked at President Lee's office.
6   Q   And at President Lee's office, didn't she
7   both work on USTU business and work at his school as
8   well?
9   A   I really have no firsthand knowledge if
10  that's what she was doing during business hours. I
11  know that during my time when we called, she responded
12  to USTU business. When we had to do mailings or
13  whatever, we had full access to her. I don't know what
14  other business she conducted during those business
15  hours. I don't know.
16  Q   But she was part of the staff?
17  A   She was part of the staff, USTU staff.
18  Q   Yet she was outside of your supervision,
19  because she worked at his office, and you had access to
20  her, but when you didn't have a specific task for her,
21  she worked on whatever Mr. Lee directed her to do?
22  A   I know her title was assistant to the
23  president, and that was her USTU job. And,
24  additionally, we used her as we needed for other staff
25  purposes.

1   Q   So the USTU paid for a full-time assistant
2   for the president?
3       MR. JONES: Objection; misstates the
4   testimony, calls for speculation, lacks foundation.
5   A   For instance -- let me answer it this way:
6   I had an assistant to the Executive Director. She was
7   a staff employee. She worked the same way the
8   assistant to the president worked. If I needed
9   something, my assistant worked on it for USTU business,
10  and that's the assumption with the assistant to the
11  president. But when the staff needed to work on group
12  projects, for instance, my assistant worked on the
13  group projects, as did the president's assistant.
14  Q   (BY MR. LEVINSTEIN) But you didn't have
15  any other business to ask her to work on other than
16  USTU business?
17  A   I could have.
18  Q   You had another business?
19  A   Well, no.
20  Q   And it would have been inappropriate for
21  you to ask her to work on another business if you did
22  have another business?
23  A   Yeah. She could have booked gigs. That
24  was off the record.
25  Q   But you would never ask her to do that?

1   A   Right.
2   Q   Because it would have been inappropriate.
3       MR. JONES: Objection; argumentative.
4   Q   (BY MR. LEVINSTEIN) You talked earlier
5   about how the bylaws were going to be changed in 2002.
6   Sorry. Strike that. The question is wrong.
7       You talked about how the bylaws were going to
8   be changed at a meeting in November of 2003.
9   A   They were to be voted on, yes.
10  Q   So it was going be a meeting in November
11  of 2003. And at this meeting, the USTU was going to
12  follow through and make the changes in the bylaws that
13  they promised the USOC would be made?
14  A   Correct.
15  Q   And it was so important that these bylaw
16  changes be made that the changes were being sent out
17  back in September before the September 13th meeting in
18  order to convince the USOC that this time the USTU was
19  really serious about making the bylaw changes they had
20  promised?
21  A   I think it was a good faith show that this
22  is the intent to get these adopted in compliance with
23  what was requested.
24  Q   And who cancelled the November 2003
25  meeting?

1   A   As I recall, it came at the direction of
2   the president through the committee.
3   Q   Was that troubling to you?
4   A   Yes.
5   Q   Did the president, as far as you
6   understood, have the power to just cancel a meeting
7   that had been properly noticed?
8   A   I'm not certain what our bylaws say as far
9   as canceling goes. I have never seen it.
10  Q   Were you ever given a reason as to why the
11  president cancelled the meeting?
12  A   I think as I recall, it was supposed to
13  have been postponed to a later date, but, in effect, it
14  didn't happen in November. And before I left, it
15  hadn't happened.
16  Q   And no date had been set for it to have
17  happened?
18  A   Right.
19  Q   And did some people actually go and have a
20  meeting anyway?
21  A   To my understanding, yes.
22  Q   And in your view, to cancel that meeting
23  and not approve those bylaws, did that run directly
24  contrary to the representations that the USTU had made
25  to the USOC Membership and Credentials Committee?

1     MR. JONES: Objection; lacks foundation,
2  misstates the testimony.
3     A    It didn't follow up on our commitment to
4  do so.
5     Q    (BY MR. LEVINSTEIN) And it left the
6  president with the power to appoint all those people?
7     A    Right. The bylaws didn't get changed.
8     Q    And in your view, were those essential
9  bylaw changes?
10     MR. JONES: Objection; vague.
11     A    I think that they were critical, in my
12  opinion, based on our need to show compliance.
13     Q    (BY MR. LEVINSTEIN) And in your
14  discussions with the Membership and Credentials
15  Committee, weren't you trying to convince them that the
16  president really didn't have total control of how the
17  organization functioned, that there were checks and
18  balances on his power?
19     A    Yes.
20     Q    Didn't his unilaterally canceling a very
21  important meeting run counter to those representations?
22     MR. JONES: Objection; misstates the
23  testimony. The testimony was it was postponed, not
24  cancelled.
25     A    It gives that appearance.

1  MR. LEVINSTEIN: I only have one copy of
2  this, so I will -- for the record, I'll mark it as
3  Exhibit 98. And it's USOC Bates Nos. 00001 and 0002.
4         (Deposition Exhibit No. 98 was marked
5         for identification.)
6     Q    (BY MR. LEVINSTEIN) Why don't you just
7  let them look at it first for sort of efficiency here.
8         (Deposition Exhibit No. 99 was marked
9         for identification.)
10     MR. LEVINSTEIN: Why don't you take -- if
11  you don't mind, I'm going to stand behind because it's
12  the only copy I have.
13     MR. JONES: That's fine.
14     MR. LEVINSTEIN: For the record, Exhibit
15  98 has USOC Bates Nos. 0001 and 0002. And it's a
16  letter to Mr. Jim Scherr that I can't tell if it was
17  mailed or sent by electronic communication, but it's
18  dated April 12th, 2004, from Philip Acosta, it appears
19  to be, and it's copied to Bob Gambardella, Gary
20  Johansen, and Bill Martin, and it's re race
21  discrimination.
22     Q    (BY MR. LEVINSTEIN) I assume you have
23  never seen that document before?
24     A    Correct.
25     Q    Okay. In it, it discusses an allegation

1  of racial discrimination, and as one aspect, it says
2  that in a referee seminar in Illinois, the Caucasian
3  referee coaches and parents were directed to one room
4  of the referee school and all of the instructors of
5  Korean descent were directed to another room. And it
6  contends that none of the Korean attendees had ever
7  refereed at any sanctioned U.S. tournament, and yet
8  it's the understanding of the author that all of the
9  Korean attendants were upgraded right away to the A-1
10  level.
11     Had you, during your term as Executive
12  Director or in your involvement as a referee, heard
13  allegations that people had been given preferential
14  referee status based on their national origin?
15     MR. JONES: Objection; calls for hearsay
16  and speculation.
17     A    No, but I had heard of improper upgrades
18  in general, not just race-based.
19     Q    (BY MR. LEVINSTEIN) But improper upgrades
20  based on favoritism?
21     A    Of a sort, yes.
22     Q    So it might have been race-based or
23  national origin based?
24     MR. JONES: Objection; calls for
25  speculation.

1     Q    (BY MR. LEVINSTEIN) And it might have
2  been a friend or some other motivation someone had to
3  advance a person beyond what the rules permit?
4     MR. JONES: Same objection; calls for
5  speculation.
6     A    That would be a perception of that. I
7  know in teaching referee seminars, like this in
8  question, that there have been cases where people had
9  taken seminars years before and for whatever reason
10  didn't keep their participation certificate, et cetera;
11  continued going to seminars, didn't get their upgrades.
12  Finally, the paper trail caught up with them and they
13  were upgraded. But the perception was they went from C
14  to A at one seminar, things like that.
15     I have knowledge of many of those instances,
16  which is different than what this is alleging. But
17  that's why I say not just race-based, but other things
18  as well.
19     Q    (BY MR. LEVINSTEIN) Let me give you
20  what's been marked as Exhibit 99. This is USOC Bates
21  No. 00178, and it's an e-mail for Kay Burton, again,
22  that's been forwarded on September 16th, 2003 to
23  members of the Membership and Credentials Committee and
24  others, such as legal counsel. And it's from Larry
25  Cain, the state president of the Colorado State

```
 1   Taekwondo Association.  Do you know Mr. Cain?
 2        A    Very well.
 3        Q    Do you have a good relationship with
 4   Mr. Cain?
 5        A    Yes.
 6        Q    Is he a friend of yours?
 7        A    Yes.
 8        Q    Is he a racist?
 9        A    I don't know that to be true.
10        Q    Has he ever done anything in your presence
11   that suggested in any way that he was racist?
12        A    Not to my knowledge.
13        Q    If you look at Paragraph 4 of the letter,
14   or the e-mail --
15        A    Yes.
16        Q    -- it states from Mr. Cain, "The 'Korean
17   Element' are, or at least [many] [of] them are, racist
18   in that they are determined to control Sport Taekwondo
19   in the U.S. of A., to the exclusion of native born
20   Americans of other backgrounds."
21        A    I see that.
22        Q    Did Mr. Cain ever express to you his
23   concern that individuals in the USTU were trying to
24   control Sport Taekwondo?
25        A    No, we didn't have that discussion at all.
```

316

```
 1        Q    Were you aware of an issue in the sport
 2   about schools that were competing and some were
 3   Korean-American owned and others were owned by
 4   non-Korean Americans?
 5        A    Competing?
 6        Q    Competing for business.
 7        A    Oh.  Yes, that's a common discussion
 8   topic.
 9        Q    And you mentioned that a certification
10   process had been created for schools?
11        A    Yes.
12        Q    And originally you had to be a 7th degree
13   or higher black belt in order to qualify for the
14   certification?
15        A    Initially, yes.
16        Q    And at that time, was it in excess of 90
17   percent of the people who were eligible to qualify were
18   Korean American?
19        A    Yes.
20        Q    So was there a perception that the
21   certification and licensing had been designed to be
22   sure that the USTU would only certify schools owned by
23   Korean Americans?
24             MR. JONES:  Objection; calls for
25   speculation.
```

317

```
 1        A    That was a possible perception.
 2        Q    (BY MR. LEVINSTEIN)  Was there any reason
 3   that you needed to be a 7th degree black belt in order
 4   to have a school that met the standards being
 5   established by the USTU?
 6        A    As I understood it, the intent, as stated,
 7   was to pick a starting point, get those people done,
 8   and then filter it through everyone else.
 9        Q    And you didn't believe that, did you?
10        A    I did believe that was the intent.  I just
11   didn't think that was the best way of doing it.
12        Q    But you felt it was wrong?
13        A    Not necessarily wrong, because, again, in
14   Taekwondo, many things have happened in that same way
15   since the beginning.  So it would have been better had
16   it been done differently.
17        Q    So it favored the Korean Grandmasters?
18        A    Or any Grandmaster.
19        Q    But the vast, vast majority of all those
20   Grandmasters were Korean?
21             MR. JONES:  Objection; argumentative.
22        A    The greater percentage.
23        Q    (BY MR. LEVINSTEIN)  In excess of 90
24   percent?
25        A    Correct.
```

318

```
 1        Q    And you know of three today, but how
 2   recently did they become Grandmasters?
 3        A    I don't know that.
 4        Q    So it may have been less than three then?
 5        A    Possibly at that time.
 6        Q    And the USTU, after it certified those
 7   Grandmaster schools, put those schools' names on its
 8   website --
 9        A    Correct.
10        Q    -- in order to give the USTU's seal of
11   approval that those schools met USTU standards?
12             MR. JONES:  Objection; calls for
13   speculation.
14        A    That would be a perception.
15        Q    (BY MR. LEVINSTEIN)  And did people
16   complain about that?
17        A    Yes, and at some point it was taken out.
18        Q    Was it racist to complain about that?
19             MR. JONES:  Objection; argumentative.
20        A    I don't know the reason people complained.
21        Q    (BY MR. LEVINSTEIN)  But the group that
22   made the decision to limit the certification to that
23   level was the officers and Executive Committee of the
24   USTU?
25        A    Correct.
```

319

4/7/2005 Harris, Bruce C.F.K. VOLUME II

 1    Q    And, again, that group was more the
 2  majority membership that were Korean American?
 3    A    Correct.
 4         (Deposition Exhibit No. 100 was marked
 5         for identification.)
 6    Q    (BY MR. LEVINSTEIN) I show you what's
 7  been marked as Exhibit 100, USOC00143 to 00146, and
 8  it's a letter that I don't know if it was sent
 9  electronically or by mail to Thomas Satrom from Kim
10  Sol, the Montana state president of the USTU. I assume
11  you have not seen this document before?
12    A    Correct.
13    Q    Do you know Kim Sol?
14    A    Yes.
15    Q    Before we go on, you had talked about an
16  opposition group which was the Pennsylvania and the
17  Ohio associations?
18    A    Correct.
19    Q    But we have now seen the Montana state
20  president, the Colorado state president, and a host of
21  other people who wrote in. So the opposition to the
22  USTU's conduct that was expressed to the Membership and
23  Credentials Committee was broad based, wasn't it?
24         MR. JONES: Objection; argumentative,
25  lacks foundation, calls for speculation, implies that

320

4/7/2005 Harris, Bruce C.F.K. VOLUME II

 1  have a turnout didn't surprise me.
 2    Q    (BY MR. LEVINSTEIN) Were you aware, on
 3  the paragraph that carries over from the first page to
 4  the second page of Exhibit 100, of a reference to a
 5  news article of the previous year showing Sang Lee
 6  appearing at a press conference in Korea arguing that
 7  the Korean NGB, the Korean Taekwondo Association,
 8  needed to get its act together to continue to be the
 9  head of Taekwondo development? Are you familiar with
10  the news article referenced?
11    A    No, I'm not. I was informed of this by,
12  again, members who called and asked what was going on.
13  But I have no firsthand knowledge.
14    Q    Did you investigate?
15    A    No.
16    Q    Did you ask Mr. Lee about it?
17    A    No, I didn't.
18    Q    Why not?
19    A    No reason at that time.
20    Q    It was a concern to members, wasn't it?
21         MR. JONES: Objection; calls for
22  speculation.
23    A    Yes.
24    Q    (BY MR. LEVINSTEIN) And you just didn't
25  feel it was your place to ask them, did you?

322

4/7/2005 Harris, Bruce C.F.K. VOLUME II

 1  everybody is organized together in one opposition.
 2    A    That could be a perception.
 3    Q    (BY MR. LEVINSTEIN) Well, and I'm not
 4  suggesting they were organizing together. Without
 5  any -- these people, as far as you know, weren't
 6  organized together?
 7    A    No.
 8    Q    In fact, people from all over the country
 9  spent their own money to fly to this public meeting
10  because they had grave concerns about the USTU,
11  correct?
12    A    Correct.
13    Q    Didn't it surprise you the extent to which
14  people came from all over the United States to express
15  support of severe remedial action against the USTU?
16         MR. JONES: Objection; calls for
17  speculation.
18    A    I wasn't surprised.
19    Q    (BY MR. LEVINSTEIN) Because you already
20  knew there was wide-spread dissatisfaction all around
21  the United States, didn't you?
22         MR. JONES: Objection; overbroad, vague.
23    A    Again, most of my day was spent answering
24  the members' calls and memos. So I understood that
25  there was a lot of concern about our situation. So to

321

4/7/2005 Harris, Bruce C.F.K. VOLUME II

 1    A    No, that may not have been the case. I
 2  mean, at this point in time, I don't know what was
 3  going on, what I was otherwise doing as well. But,
 4  again, I didn't view -- part of the answer is I didn't
 5  feel it was my position to question the president. I
 6  didn't even know if that had occurred.
 7    Q    Were you aware that a major activity of
 8  the Kukkiwon, focusing on Page 2, was hosting Korean
 9  team development activities?
10    A    No.
11    Q    It just says here, "On its website, it
12  lists 'association offices' entirely limited to cities
13  in Korea. It's (sic) schedule of events primarily
14  consists of hosting Korean team development
15  activities." Do you know if that's true?
16    A    I don't know if that's true.
17    Q    And what you testified to was in those two
18  years that we focused on, the USTU sent $300,000 to the
19  Kukkiwon?
20    A    Correct.
21    Q    Of the people who paid those fees, what
22  percentage of them participated in international
23  competitions where they needed the Kukkiwon
24  certification?
25         MR. JONES: Objection; calls for

323