speculation.

A Only people that made the national team are required to have that.

Q (BY MR. LEVINSTEIN) What do you think the Kukkiwon fees during 2002, 2003 were from people on the U.S. national team?

A At most, there would be 16 people, and depending on the various belt levels, $5,000, $10,000.

Q But you only have to pay the year you get the belt?

A Yes. It's a one time, until your next promotion.

Q So of the 16 men on the U.S. national team, what percentage of them will get a new belt in any given year?

A I couldn't answer that. Probably all of them. Depends.

Q You can't get new belts for five or six years at a time?

A Depends. You could get it after a year, quite possibly. I don't know the belt makeup.

Q You say you don't know the belt maker?

A Belt makeup.

Q Makeup. Sorry. So $5,000 was the number you gave me. So $10,000 of the 300 grand is fees that





are going to Korea that the people don't have to pay in order to participate in an international competition?

A Correct, but there's more to that. You don't get your belt to participate in a national competition.

Q You get it because it's a symbol of achievement?

A Exactly.

Q From what you said, the way you get it is a person who already is above you in Kukkiwon certification gives you a task or watches you perform your Taekwondo activities --

A Correct.

Q -- and assesses whether you have met the standards for a belt below his level?

A Up to a belt below his level or her level.

Q So if I want to be a 1st degree Kukkiwon, I take a test, and someone who is 4th degree or higher is judging me?

A Correct.

Q And that individual decides whether I meet the requirements?

A Correct.

Q And fills out a form and sends the paperwork to the USTU?





A Correct.

Q And the USTU does what with the paperwork before they send it to Korea?

A A paper gets filed. A record is kept of the person who is applying. It's cross checked to make sure that the person administering the test is, in fact, a minimum 4th Dan black belt, which is also kept on file. At the end of each month, the fees are sent to Kukkiwon.

Q Oh, so Kukkiwon, besides getting the fees, they don't even have to approve the application for the level?

A No. That's up to each member nation federation. They process the belt.

Q Rather than processing the paperwork, what -- and making sure that the person giving the certification is eligible to give out such things, any other review of whether that person who got that certification is qualified?

A By USTU?

Q Yes.

A Not that I know of.

Q So how could that be the gold standard?

A The test isn't the gold standard. The certification is the gold standard.





Q So it's the image of the certification that is the gold standard, not that the certification is of a higher quality than what the USTU was proposing to do?

A Exactly.

Q In fact, the USTU certification would be more rigorous than the Kukkiwon, because besides the certification, there were some objective tests, and a neutral person who wasn't involved was going to check the certification?

A That's true up to a point. For instance, anything above 6th Dan, you have to appear in person to test.

Q But through level five, the USTU proposed system, in your view, was a much higher quality certification?

A The process was different. And that's the only thing I can differentiate.

Q And it's a profit-making activity, Kukkiwon certification for the USTU?

A As well as being a member, yes.

Q And there is no restriction on the person who's allowed to certify charging for administering the analysis necessary to decide whether their student should be given the certification?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A Correct.
Q So do you have any idea of what people charged to give Kukkiwon certifications?
A I know what I charge.
Q What do you charge?
A Exactly what's there.
Q So you get nothing?
A No.
Q But you don't know the extent to which it's a profit-making activity for instructors around the United States?
A No.
Q And there has been no attempt by the USTU to regulate that?
A Correct.
Q Were there Kukkiwon blank forms in the USTU office?
A Yes.
Q And is that what you asked for if you want to certify someone to be a Kukkiwon?
A Yes. Instructors can request the application for them to fill out.
Q When someone got certified as a Kukkiwon 1st degree, 2nd degree, whatever degree, the USTU actually filled out a Kukkiwon certificate and sent it

328

4/7/2005 Harris, Bruce C.F.K. VOLUME II

to them, correct?
A I don't know.
Q There were blank Kukkiwon certificates in the USTU office?
A Oh, I see. And, again, up to -- I know for 1st Dan, there were, because the turnaround time on them is like a week or was a week. Other than that, they were submitted as well to Kukkiwon for filling out and mailing back to us. So the turnaround time was two to three weeks above 1st degree black belt.
Q Because of the time it took to mail and get it back?
A Yeah.
Q Besides in some cases sending a certificate, what else did Kukkiwon do for 300 grand in two years?
A Well, part of what they did was monitor problem areas with instructors. For instance, during my tenure, there were a couple of cases where an instructor had been sanctioned and is no longer authorized to promote. He still tried floating certificates through the USTU. They were sent to Kukkiwon because we hadn't been informed that the person had been sanctioned. They monitor that. They would say, no, this we can't do, things like that.

329

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q You mean they take the application, they look at it, they check the name and saw that, oh, no, on my list, he is not allowed, and they wrote back to you?
A Right. And also Skip Dan certificates, they monitor things like that.
Q Pretty profitable activity on their end?
MR. JONES: Objection; calls for speculation.
Q (BY MR. LEVINSTEIN) Was it reasonable for the Membership and Credentials Committee and the USOC and members of USTU to want to find a way to keep the $290,000 in two years that was going to Kukkiwon that wasn't necessary for these people to compete internationally and find a way for those funds to be available to promote Taekwondo in the United States?
A I think my personal opinion, if the understanding wasn't there as to what Kukkiwon certificates represent, absent that, that's a fair assessment. But if you throw that into the mix, it becomes a different animal.
Q And what happened to the Kukkiwon funds?
A They became a part of the operating expense of the USTU.
Q Didn't they become part of WTF President

330

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Kim's bank account?
A I'm speaking for the money in USTU.
Q What about the money that went into Korea?
MR. JONES: Objection; calls for speculation.
Q (BY MR. LEVINSTEIN) Were you aware that President Kim was indicted for pocketing Kukkiwon funds?
A I heard something about that.
Q Were any officers, directors, or Executive Committee members of the USTU given a car?
A A car?
Q Yes.
A There was one staff car.
MR. JONES: Objection; vague.
A Under the provisions of the Olympic Committee's agreement with NGB, each NGB was authorized one vehicle from USOC primarily for the use of the Executive Director, I think.
Q (BY MR. LEVINSTEIN) Did you get the car, or did President Lee get the car?
A I didn't get the car.
Q But your understanding was that the USOC gave a staff car pursuant to their General Motors sponsorship agreement, and the VIK provided was that it

331

4/7/2005 Harris, Bruce C.F.K. VOLUME II

was supposed to be used by the staff of the USTU?

A Correct.

Q And in particular, to the extent it was decided who would use it, it would make sense the Executive Director, as the leader of the staff, would use it?

A In our situation, my understanding was, because this was questioned, that there was a vote by the officers or one of the committees that allowed the president to retain use of the car rather than the Executive Director.

Q Did the president submit documentation of the extent to which the car was used for personal use as opposed to business use?

A That came up during my tenure, and I know that it resulted in the documentation of it. I don't know the practice part.

Q Was President Lee given a 1099?

A Yes.

Q That was after the USOC audit committee intervened and said this was proper business practice?

A Correct.

Q Why didn't it happen before then?

A I can't speak to that.

Q You knew it hadn't occurred? It happened

332

4/7/2005 Harris, Bruce C.F.K. VOLUME II

while you were there?

A This was the situation when I arrived. I didn't know whether -- I didn't get guidance on things like that specifically. These are things that developed as my tenure went on. No one came and briefed me and said, hey, you should have the staff car. Whoever has it has to do a 1099, blah, blah, blah, until it became a point that came up in the Membership and Credentials compliance review.

Q These were USTU improprieties that only showed up after the USOC conducted an audit and discovered them?

A Correct, to my knowledge. I don't know if that was the case, again, with the previous -- my predecessor, because that was the case with the car then.

MR. LEVINSTEIN: Can we take a couple-minute break.

(Recess taken from 3:36 p.m. to 3:43 p.m.)

(Deposition Exhibit No. 101 was marked for identification.)

Q (BY MR. LEVINSTEIN) When you were the Executive Director, was there discussion about transferring the corporation's place of incorporation

333

4/7/2005 Harris, Bruce C.F.K. VOLUME II

from Ohio to Colorado?

A Yes.

Q Do you remember that being approved by the Executive Committee?

A I know we were at the end of the approval process because it needed signatures of all the officers, and we were lacking the signature of the secretary general.

Q Do you recall that the secretary general lost the paperwork and then you never got it done?

MR. JONES: Objection; calls for speculation.

A I remember him misplacing it, but I never knew that he had lost it.

Q (BY MR. LEVINSTEIN) Okay. But do you recall that it never happened because you never got all the signatures?

A That, I don't know.

Q But other than the last signature, all of the approvals had been properly conducted?

A Yes.

Q Did the International Federation, the WTF, have a rule that athletes in certain international competitions all had to wear uniforms manufactured by a designated Korean company?

334

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A That's not exactly correct.

Q Why don't you tell me what is correct?

A They had approved manufacturers for all WTF-sanctioned gear, including the uniform, but also head gear, chest protector, et cetera. And for international events, those were the companies that you had to use for that sanctioned equipment.

Q I don't mean to dwell on bad moments, but you were the Events Director throughout your time with the USTU, correct?

A Yes.

Q In the 2003 Junior Championship, did a lot of cash disappear?

A Approximately $5,000. And as a follow-up, I filed a police report with the police department of Colorado Springs, also with USOC security. And if you want, I can tell you the details of it.

Q It's okay. You never found where the money went?

A No.

Q Was it your understanding that it got misplaced or that someone stole it?

A It came down as being misplaced. Again, I spoke to having to transfer back amounts of cash. This $5,000 was in an envelope, a plain white envelope, that

335

4/7/2005 Harris, Bruce C.F.K. VOLUME II

was sealed. We had verified the amount of the money and left it in the chair at the finance office. I guess the finance person was out at the restroom at the time.

The person left it in the chair. The finance person claimed they never saw it. And that was the last we heard of it. So I initiated an investigation in-house with each of the staff members, went to the extent of setting up lie detector tests to verify some suspicions as to what might have happened with it, got USOC security involved, and filed a police report with Colorado Springs. But the money was never found.

Q You made reference in one of the discussions in response to one of the questions in Mr. Satrom's letters about cash at events.

A Yes.

Q And in that, you said that it was the practice of the USTU to pay referees at events in cash; is that correct?

A Yes.

Q Why did the USTU decide to pay referees in cash?

A That, I can't speak to. That decision was made before me. That was the practice at the time that we changed to issuing checks.

336

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q Didn't you have an obligation to issue some sort of documentation that you made a payment to a referee for providing referee services?

MR. JONES: Objection; calls for speculation, also calls for a legal conclusion.

A That was my opinion, which is why we switched to checks.

Q (BY MR. LEVINSTEIN) You thought it violated tax law to pay people in cash?

MR. JONES: Objection; calls for speculation, argumentative.

A I thought at the very least it was poor practice.

Q (BY MR. LEVINSTEIN) Now, you mentioned hearing about problems with state associations over various periods of time; but specifically, when you were the Executive Director, were you aware of continuing state association problems?

A Yes.

Q And continuing problems with state association elections?

MR. JONES: Objection; vague and ambiguous.

A Yes.

Q (BY MR. LEVINSTEIN) And you were aware of

337

4/7/2005 Harris, Bruce C.F.K. VOLUME II

continuing problems with forged membership applications being submitted?

MR. JONES: Objection; lacks foundation.

A I was aware of that being a problem, yes.

Q (BY MR. LEVINSTEIN) And just so I understand it, is it correct that people would fill out applications with names out of the telephone book and submit them in order to meet requirements of how many members were from their state in order to qualify for additional delegates on the Board of Governors?

MR. JONES: Calls for speculation, lacks foundation.

A The assumption was that these were names gathered from somewhere. I don't know if it was the phone book or wherever, but in actuality were not registered members. That was the assumption for the fraudulence.

Q (BY MR. LEVINSTEIN) So you knew for sure that applications came in for people to be members of the USTU with proper payment?

A Yes.

Q And it was later learned that the names on those applications were people who had no idea that they were becoming members of the USTU?

MR. JONES: Objection; calls for

338

4/7/2005 Harris, Bruce C.F.K. VOLUME II

speculation, lacks foundation, argumentative.

A I don't know that that's the case, but there were definitely -- I don't know if they knew whether they were becoming members, but there were signatures that were deemed to be fraudulent.

Q (BY MR. LEVINSTEIN) And by increasing the number of members from your state, it would affect how many delegates could be at the Board of Governors meeting?

A Correct.

Q Were any structural changes of the USTU considered in order to solve this ongoing problem?

A Structural changes?

MR. JONES: Objection; vague.

A I don't think that caused structural changes to be considered. I do know for a fact that other solutions were offered as to how to handle that.

Q (BY MR. LEVINSTEIN) Let me show you what's been marked as Exhibit 101.

MR. LEVINSTEIN: For the record, its Bates USOC00004 through 00014.

Q (BY MR. LEVINSTEIN) Have you seen this document before?

A I don't think that I have.

Q Let me represent that it's a cover letter

339

4/7/2005 Harris, Bruce C.F.K. VOLUME II

from Josiah Henson dated January 1, 1998, and a letter from Mr. Henson to Dick Schultz, or Richard D. Schultz, who in 1998 was the Executive Director of the USOC, and it's a complaint and exhibits.

First, I asked you about Article VIII complaints.

A Yes.

Q I didn't put on the record what that is. What's your understanding of what an Article VIII complaint is?

A Complaints that were filed in accordance with our complaint procedure in the USTU bylaws under Article VIII.

Q Article VIII complaints, when I refer to them, are complaints with the U.S. Olympic Committee under Article VIII of the USOC bylaws. So let me ask, is there an Article VIII in the USTU bylaws as well?

A We have a provision, as well, for complaint procedure that parallels the USOC.

Q Do you call those Article VIII procedures as well?

A I'm not sure if it's Article VIII or Article IX.

Q Just to help you out, to refresh, Article VIII in the USOC is to categories complaints and

340

4/7/2005 Harris, Bruce C.F.K. VOLUME II

challenges. Article IX in the USOC is athlete or coach complaints about right to compete.

A That's correct.

Q Okay. So as a member of the board in 1998, did you learn whenever an Article VIII complaint was filed against the USTU?

A I don't think we were informed as a matter of course, unless it came up as part of the semi- or annual meeting discussion.

Q If you look at Page 00009, Paragraph 21, this complaint alleges, "The pattern of discrimination against non-Korean taekwondo practitioners extends to the awarding of tournaments. In Virginia, for example, the Virginia state president refused to let the democracy of his own rules determine who was to host the 1997 Virginia State and Junior Olympic Taekwondo Championships in violation of," and it quotes sections of the USOC Constitution.

Were you aware of allegations of discrimination against non-Korean Taekwondo practitioners?

A At 1997?

Q Okay. 1998, when this was filed, were you aware of those kinds of allegations?

A I think I was aware of allegations of

341

4/7/2005 Harris, Bruce C.F.K. VOLUME II

discriminations for many years up until and including the time I became the Executive Director.

Q In Paragraph -- I guess this is only -- somehow this document, just for the record, appears to only be odd pages. So I don't know where this came from. It's from someone's files. But the pages are numbered 3, 5, 7. So I'll just represent it's not a complete document.

But let's just put it this way: The allegations of a Korean Mafia, or a Korean-controlled organization, or an organization that favored Korean Americans were nothing new in 2003, correct?

MR. JONES: Objection; lacks foundation.

A Allegations of discrimination, no.

Q (BY MR. LEVINSTEIN) And the primary allegations of discrimination involving the USTU over the years you have been involved have been discrimination by Korean Americans against non-Korean Americans, correct?

MR. JONES: Objection; speculation, lacks foundation.

A That's quite possible, yes.

Q (BY MR. LEVINSTEIN) And at the meetings that the Membership and Credentials Committee conducted, a large part of what the members of the USTU

342

4/7/2005 Harris, Bruce C.F.K. VOLUME II

came to them to complain -- a large part of what they were complaining about were allegations that Korean Americans controlled the USTU and used their positions on committees or board positions to advantage Korean Americans to the disadvantage of non-Korean Americans?

MR. JONES: Same objection; lacks foundation, calls for speculation.

A That was a part of what was presented at that open forum.

Q (BY MR. LEVINSTEIN) And Tom Satrom on August 4th and September 5th was writing to you to summarize the allegations that had been received by the Membership and Credentials Committee?

MR. JONES: Objection; calls for speculation, lacks foundation. This witness doesn't know what Thomas Satrom was doing.

A That's a fair determination after seeing the other things that were presented today. But at that time, I had no way of knowing that.

Q (BY MR. LEVINSTEIN) But now that you have seen the volume of communications to the Membership and Credentials Committee that made allegations that Korean Americans were discriminating against non-Korean Americans in ways that damage the sport of Taekwondo, do you now view his communicating those concerns to you

343

as having been in any way insensitive?

MR. JONES: Objection; lacks foundation, calls for speculation, irrelevant.

A I think more than anything, it clarifies the confusion as to what was meant when those statements kept coming up in the presentations. By seeing them in context from various sources, it adds context to that.

As far as racial insensitivity, I'm still not sure that that's not racially insensitive, because, again, out of 34,000 members, we may have had 80 people present at that open forum expressing their discontent. And we didn't hear from those that had positive things to offer.

Q (BY MR. LEVINSTEIN) But as you have said, you thought he had an obligation to summarize what he heard and to communicate it to you in writing so you could prepare for that September 13th meeting?

A Certainly.

MR. JONES: That misstates the testimony. It's not summarizing anything.

A Oh, I felt it was helpful to me for him to let us know the complaints that he was receiving so we would know what to address, how to address it.

Q (BY MR. LEVINSTEIN) And was there any way

for him to tell you what these people said without including in his communication what these people said?

MR. JONES: Counsel, how about just forwarding the communications?

A I was going to say it would have been more helpful if we had what he had to make his summarized comments about for our review, and we didn't. I didn't. I don't know if it was received elsewhere.

Q (BY MR. LEVINSTEIN) But would it have been racially insensitive to send on to you communications that included those same statements?

A Not racially insensitive to send them on, if he is passing on the concerns of our constituents.

Q But didn't you understand that one of the things the Membership and Credentials Committee had done was give some assurances of confidentiality of the source in order to make sure that people felt free to come forward without fear of retribution or adverse consequences?

A I understood that, but I think the better thing would have been to have a two-way street because we were always left responding instead of being proactive, and to have had something else that needed responding to -- it was just an awkward situation.

Q And reasonable people could differ about

the best way to handle it?

A Correct.

MR. LEVINSTEIN: Give me one minute, please.

Q (BY MR. LEVINSTEIN) And you met with the Membership and Credentials Committee three occasions?

A As I recall, yes.

Q And there was nothing that they did or said at any of those meetings when you were present that you in any way found to be racist or improper, did they?

A The only thing that might have bordered on improper was the anger that was shown by the chair at one of the meetings, and that was commented on somewhere else in a document.

Q But it wasn't any improper racial anger; it was that he showed hostility at all of the allegations that were being made toward the USTU?

MR. JONES: Objection; argumentative, lacks foundation.

A I took the anger to be directed at the organization and those that were running it, which, again, is predominantly, as you've established, Korean Americans.

And I found that, again, from my limited

corporate background, other than the U.S. Army, to be not the most professional way of dealing with it. Even if you're angry, I felt it could have been channeled differently at a public meeting or a local meeting.

Q (BY MR. LEVINSTEIN) Now that you have seen some of the extreme statements made to this committee by WTF officials, PATU officials, state presidents, and many others, does that give you a little context of the record that the Membership and Credentials Committee was viewing that may have caused them to be a bit angry?

MR. JONES: Objection; calls for speculation, irrelevant.

A I can understand them being frustrated. I can understand anger developing. What I don't understand is the expression of it at a hearing setting.

MR. LEVINSTEIN: One minute. Your witness.

MR. JONES: Take a break?

MR. LEVINSTEIN: Wait one second. Go ahead. We can take a break.

(Recess taken from 4:11 p.m. to 4:28 p.m.)

(Whereupon, the deposition proceedings reconvened without the presence of

Mr. Johansen.)

MR. JONES: Back on the record.

E X A M I N A T I O N

BY MR. JONES:

Q Mr. Harris, during cross-examination, you were asked about the United States Taekwondo Center, Inc., franchise?

A Yes.

Q Or so-called franchise?

A Yes.

Q Owned by Sang Lee?

A Yes.

Q You don't know for a fact that any other schools bearing that name in other locations of the country receive any franchise fees or any other sort of remuneration from Sang Lee's company, do you?

A No, I don't.

Q Now, when you were asked about your understanding of the former, shall I say, the management group that preceded Sang Lee, you, I believe, listed his name as Dong Ja Yang?

A He was prior to Sang Lee, but not immediately prior to.

Q After him, who was the next president of the USTU?

A To my recollection, the first was Ken Min, then Dong Ja Yang, then Kyung Won Ahn, then Hwa Chong. And I may have these out of order. I'm missing someone. There was one more, and then Sang Lee. Who am I missing?

Q I believe you said that when Mr. Dong Ja Yang was in control of things, that there were fewer membership complaints; is that true?

A That I was aware of, yes.

Q Do you know why that was?

A I attribute that personally to his style of leadership. I don't know that it was run any differently in the background, but his leadership style was such that it didn't endure much criticism. He leaned heavily on the religious aspect of leadership. It was just a different style of leadership.

Q Do you think when Sang Lee came to the position that there were more factions within the Taekwondo community struggling for recognition?

(Whereupon, Mr. Johansen rejoined the deposition proceedings.)

A Definitely. If I could draw an analogy to a family where the children become of age and all of them want the car, and there's one car to be had.

Earlier, when Dong Ja Yang was president, he

was the father figure, the kids were the kids. After he left, the kids assumed the mantel of wanting the car, and it was more contentious.

Q (BY MR. JONES) And did that struggle for recognition by these various factions continue throughout the time that you were with USTU?

A It's continued, to my way of seeing it, ever since Dong Ja Yang left office.

Q And were these factions the source of some of the criticisms that you had to respond to when the USOC started talking about decertification, talking about noncompliance with USOC bylaws?

MR. LEVINSTEIN: Objection.

A To my understanding, yes, they were definitely sect-based.

Q (BY MR. JONES) So there were groups with other agendas besides the best interest of athletes?

MR. LEVINSTEIN: Objection.

A That was the appearance from the way they comported themselves.

Q (BY MR. JONES) You also touched on the opinion or impression that in some of the semiannual and annual meetings that took place, that motions or items for consideration that were coming up seemed to have already been discussed and decided upon?

A Yes.

Q Something to that effect?

A Something to that effect, yes.

Q Do you think that is a good thing or a bad thing when you have a board as large as the one at USTU?

MR. LEVINSTEIN: Objection.

A I think it's a positive management tool for the administration. I think for the members, it's a negative because you don't get a chance to give input.

Q (BY MR. JONES) But you would agree with me that if you have 127 directors discussing points in a given meeting with the idea of trying to resolve it and vote on it within that one meeting would be a burdensome and unruly objective?

A I agree.

Q It wouldn't even be realistic, would it?

A Unless the agenda is only three items or so.

Q In fact, in modern corporate America, people do their influence pedaling and politicking and lobbying behind the scenes right up to the minutes before the meeting before they go in there to have a decision made; isn't that true?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

MR. LEVINSTEIN: Objection. No foundation that he knows about corporate America, the size of boards, any of those issues.
Q (BY MR. JONES) In fact, our own Congress operates that way, doesn't it?
A That's been my observation.
Q You talked about the relationship you had with both the auditing department and the Sports Partnership department --
A Yes.
Q -- when you, I guess, first came on in late 2002?
A Yes.
Q And you had an impression that things -- the relations were handled differently before you by your predecessor, Mr. Warwick; is that true?
MR. LEVINSTEIN: Objection.
A I don't understand the question.
Q (BY MR. JONES) You had informal meetings with Ms. Witte regarding resolving issues with her in the accounting area?
A I had informal talks to ask for her help with our situation, yes.
Q Did she ever talk about how things were handled under Mr. Warwick's management?

352

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A No, she didn't.
Q Did you get the impression that the same sorts of problems existed under Mr. Warwick's management in the accounting arena?
A I got that impression because, again, the first Membership and Credentials compliance meeting that I went to, it was expressed that these problems have existed and here we are again. So from that, I figured that this type of problem or situation had been around.
Q You told us this morning that notwithstanding the list of accounting issues and other issues brought up by Mr. Satrom in his two letters, August and September 2003, that you, given time, could fix all of those issues? Do you recall testifying to that this morning?
A Yes, that was my belief. Even to this point, I hold that given time, it could have been fixed with the people that we had in place. I had a year before it was yanked and said you guys aren't getting it done.
Q And during that time, you attempted to address every single item listed; is that true?
A Correct.
Q And as far as the annual budget, you

353

4/7/2005 Harris, Bruce C.F.K. VOLUME II

testified this morning that you were expected to break even by year end 2003; is that correct?
A That was the expectation.
Q However, the long-term debt would not be taken care of by end of 2003; isn't that correct?
A Correct.
Q So when you spoke of being given time to resolve that, is that what you were talking about, the long-term debt situation?
MR. LEVINSTEIN: Objection.
A No. My discussion was for resolving all of the issues that had been presented to us, including the financial issues.
Q (BY MR. JONES) Do you feel you were given adequate time to address those issues by the USOC?
A I didn't think one year was long enough to cover all of the issues that were facing me when I came on.
Q Do you feel they rushed the decertification proceedings?
MR. LEVINSTEIN: Objection.
A In looking at the big picture, I understand that the situation had existed for years. But from when I came onboard, I think that it was at the end of the line for them as far as patience. So

354

4/7/2005 Harris, Bruce C.F.K. VOLUME II

there was a sense of being rushed because of the years that this had persisted.
Q (BY MR. JONES) But isn't it correct that the first letters received in 2003 were August and September?
MR. LEVINSTEIN: Objection.
A I'm not certain that that's true because there were communications about the May meeting, and there was a follow-up to the September 2002 meeting that I attended.
Q (BY MR. JONES) But there were no threats of decertification until August and September of 2003; isn't that true?
MR. LEVINSTEIN: Objection.
Q (BY MR. JONES) I'm talking about written threats.
MR. LEVINSTEIN: Objection.
A I think the caveat always existed that if we didn't satisfy the compliance issues, we would be found in a noncompliance status, risking the NGB status. I think that was always a part of appearing before the Membership and Credentials board.
Q (BY MR. JONES) During much of the cross-examination today you were asked to look at a number of e-mails, letters, articles from various

355