```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF HAWAII
 2            CIVIL ACTION NO. 04-00461-SOM-LEK

 3   _____

 4   DEPOSITION OF:  ROBERT GAMBARDELLA
     EXAMINATION DATE:  April 5, 2005
 5   _____

 6   DAE SUNG LEE,

 7   Plaintiff,

 8   v.

 9   UNITED STATES TAEKWONDO UNION, a Colorado
     nonprofit Corporation, et al.,
10
     Defendants.
11   _____
             PURSUANT TO SUBPOENA, the deposition of
12   ROBERT GAMBARDELLA, was taken at 8:19 a.m. on
     April 5, 2005 at the Double Tree Hotel at 1775 E.
13   Cheyenne Mountain Boulevard, Colorado Springs,
     Colorado, before Susan L. Sims, Registered
14   Professional Reporter and Notary Public in and
     for the State of Colorado, said deposition being
15   taken pursuant to the Federal Rules of Civil
     Procedure.
16

17

18                     Susan L. Sims
            Registered Professional Reporter
19

20

21

22

23

24

25
```


EXHIBIT "A"

Case 1:04-cv-00461-SOM-LEK    Document 213-4    Filed 03/14/2006    Page 2 of 4

DEPOSITION OF ROBERT GAMBARDELLA                              4/5/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 101

1  Q   What does that mean, you
2  negotiated incremental funding for the USTU
3  through the USOC?
4      MR. LEVINSTEIN: Okay. For the record,
5  we've been here two hours. This has absolutely
6  nothing to do with this case. This is not a case
7  about everything going in the USTU and its
8  funding and so on. I understand you're curious,
9  but let's try to at least have something to do
10 with the case in the questions.
11     MR. UESUGI: We're coming up to it.
12     MR. LEVINSTEIN: It would be nice if
13 after two hours we got somewhere close. Go ahead
14 and answer that question.
15  A   Can you restate that question
16 again, Counsel?
17  Q   (BY MR. UESUGI) What does that
18 sentence mean?
19  A   What does that mean? That means
20 that three people collectively went to a division
21 of the US Olympic Committee, namely the marketing
22 division, and then Mr. Locke was able to
23 negotiate some incremental funding for the USTU
24 through its joint marketing agreement.
25  Q   What types of funding are you

Page 102

1  talking about?
2   A   Incremental marketing dollars.
3   Q   Which you're entitled to -- which
4  the USTU was entitled to?
5   A   Yes, could be. Eligible for, I
6  should say.
7   Q   Is this for athlete development?
8   A   Excuse me. Excuse me. Eligible
9  for.
10  Q   Eligible for?
11  A   Yes.
12  Q   Is this for athlete development
13 purposes?
14  A   This money is not earmarked
15 specifically towards one particular project.
16  Q   The next sentence is, in addition
17 the office will loan the USTU a USOC staff member
18 to develop a marketing package and videotape.
19 Was that ever developed?
20     MR. LEVINSTEIN: For the record, I'm
21 going to, at this point, say he's not going to
22 answer that question. It's got nothing to do
23 with this case.
24     MR. UESUGI: It has to do with the
25 finances. If you're saying that the financial

Page 103

1  situation of the USTU is not at issue, then okay,
2  I won't be asking these questions about finances.
3      MR. LEVINSTEIN: The financial
4  condition is at issue. Of course, it had a
5  terrible financial situation. Whether they
6  eventually made a video about marketing has
7  nothing to do with this lawsuit.
8      MR. UESUGI: In your opinion. Okay.
9  Are you instructing him not to answer?
10     MR. LEVINSTEIN: Yes.
11  Q   (BY MR. UESUGI) You do realize
12 that your Counsel has objected and he's
13 instructed you not to answer. We can file a
14 motion to compel, seeking costs and attorneys'
15 fees, and if we prevail, which there's
16 substantial likelihood which we will, you will
17 have to come back here and you have to answer
18 these questions at your expense?
19     MR. LEVINSTEIN: Don't answer. You can
20 say what you want. Continue.
21  Q   (BY MR. UESUGI) Do you understand
22 that?
23     MR. LEVINSTEIN: It's not for him to
24 answer that question. Go ahead.
25  Q   (BY MR. UESUGI) Okay. All right

Page 104

1  it talks about the resignation of Eui Ben Lee as
2  the referee chair; is that correct?
3   A   That's what I read, Counselor.
4   Q   Did any other committee chairs
5  resign?
6   A   Can you be a little bit more
7  specific, Counselor?
8   Q   Any time during 2004?
9   A   I don't know. This one here came
10 forward because there was a letter that was sent
11 in to the USTU. So this is the only one that I'm
12 aware of. But before my time, I don't know what
13 happened or what could have happened, who
14 resigned, whatever.
15  Q   Okay. From the time you were
16 hired February 4, 2004 until December 31, 2004
17 did any other committee chairs resign?
18  A   I don't remember.
19  Q   It says here, a letter will be
20 written thanking him for his service to the
21 organization. Did you write letters to everyone
22 who resigned from the USTU?
23  A   I don't remember.
24  Q   Here's the last paragraph on page
25 1, Discussion ensued concerning the team leader

DEPOSITION OF ROBERT GAMBARDELLA                                      4/5/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 125

1  signed sponsorship deals with US Olympic team
2  sponsors Samsung, Home Depot, 24-Hour Fitness and
3  Anheuser Busch?
4      A   Right.
5      Q   What did those sponsorship deals
6  entail?
7      A   Just cash to the organization.
8      Q   How much about Samsung donate?
9      MR. LEVINSTEIN: Objection.
10     A   I don't remember.
11     MR. LEVINSTEIN: At this point, how
12  much individual sponsors donated and what their
13  deals are is, one, confidential and, two,
14  completely irrelevant in this case.
15     MR. UESUGI: You don't feel that that's
16  something in the interest of transparency, which
17  you promised the membership, that they're
18  entitled to know.
19     A   That's your opinion.
20     MR. LEVINSTEIN: Objection. There are
21  confidentiality agreements in place. And these
22  agreements, we're not allowed to disclose them to
23  the membership, individual sponsors and what
24  their payments are and deals like this, because
25  of competitive concerns of the sponsors and the

Page 126

1  USOC.
2      Q   (BY MR. UESUGI) Okay. Was it a
3  one-time deal or was it an annual?
4      A   This is part of a joint marketing
5  agreement.
6      Q   What does that mean?
7      A   That means that it's money and
8  VIK to the organization like over, I believe,
9  it's a four-year period.
10     Q   So for the 2005-2008 quadrennium?
11     A   Yes, I believe so.
12     Q   This was in 2004, though?
13     A   But you asked me about the
14  program. Was it -- and I explained to you the
15  bigger picture of the program.
16     Q   Right.
17     A   So let's not get it mixed up, all
18  right?
19     Q   Right. So that's what I'm
20  asking. They came on board 2004; is that
21  correct?
22     A   Yeah.
23     Q   And the joint marketing
24  sponsorship deal is quadrennium based, meaning
25  from 2001 to 2004; is that correct?

Page 127

1      A   Exactly.
2      Q   Did Samsung renew their
3  sponsorship deal with the USTU for the 2005
4  through 2008?
5      A   They do it through the USOC, so
6  in my -- I guess, lack of a better way, they act
7  as an agent for these companies. And then
8  package as different NGBs, and then sells that to
9  a potential sponsor. So basically what happened
10  was that, if you remember the -- whatever exhibit
11  it was here we talked about, that there was
12  incremental dollars to the organization. And
13  this, my friend, is the incremental piece that we
14  referred to in exhibit whatever.
15     Q   Did Samsung renew its sponsorship
16  deal with the USTU for the 2005-2008 quadrennium?
17     A   To date, I do not believe that we
18  have a telecommunications sponsor at this moment.
19     Q   How about Home Depot?
20     MR. LEVINSTEIN: Objection, could you
21  just give me some theory as to why it matters
22  whether they renewed their sponsors for
23  2005-2008? It has to have something to do with
24  this case.
25     MR. UESUGI: Because the whole basis of

Page 128

1  the remediation was, again, financial concerns,
2  which was your main concern.
3      MR. LEVINSTEIN: But there were
4  concerns in 2003. So what does it matter whether
5  in 2005 they have a sponsor or not?
6      MR. UESUGI: Because it relates
7  again to the financial -- if you're saying that
8  the issue of financial feasibility and
9  responsibility isn't an issue in the USTU,
10  then --
11     MR. LEVINSTEIN: It's, of course, an
12  issue in the USTU.
13     MR. UESUGI: Okay. What's the big
14  deal?
15     MR. LEVINSTEIN: This is whether the
16  USOC renewed its sponsorship deals with specific
17  sponsors, which is not information relevant to
18  this case.
19     MR. UESUGI: I'm asking with respect to
20  the USTU.
21     MR. LEVINSTEIN: As he told you, this
22  is a deal with the USOC, that then there's
23  negotiations with individual NGBs. But even if
24  it is, what happens in 2005 is after this whole
25  case is over as far as what happened with Mr. Dae

35 (Pages 125 to 128)

**Page 129**

1  Sung Lee. So what's happening in 2005 has
2  nothing to do with this case.
3      MR. UESUGI: It doesn't?
4      MR. LEVINSTEIN: No.
5      MR. UESUGI: Okay. All right.
6      Q  (BY MR. UESUGI)  Were there any
7  other marketing, USOC marketing division
8  sponsorship deals with the USTU?
9      A  No. What you see here is what we
10 had tried to articulate.
11     Q  Okay. And these were all cash
12 disbursements to the USTU?
13     A  They could be cash and/or VIK.
14     Q  What is a VIK?
15     A  VIK is a marketing term that's
16 used within the profession of Value In Kind.
17 That means instead of giving you all in cash,
18 they can give you products. So we wanted to go
19 to Home Depot and buy some lumber on a VIK, then
20 we can go buy the lumber to build certain things.
21     Q  Or United Airlines would give you
22 tickets?
23     A  Or tickets, exactly. It's a VIK.
24     MR. UESUGI: Okay. Let's mark this
25 exhibit next in order.

**Page 130**

1      (Exhibit 52 was marked.)
2      Q  (BY MR. UESUGI)  Do you recognize
3  this document?
4      A  May I read it, Counsel?
5      Q  Yes.
6      A  I don't remember it, but it's
7  probably, it was on our website, an update.
8  Looks like they're giving you an update from the
9  Taekwondo governance and management committee.
10     Q  Who drafted this?
11     A  I don't know.
12     Q  It says, you discuss -- well, it
13 says right here that, Bob Gambardella, a loaned
14 executive from the USOC, is serving as CEO and
15 secretary general of the USTU. He is responsible
16 for the overall operations of the USTU, his areas
17 of concentration currently are -- and there are
18 six listed here. Do you see that?
19     A  Yes, I do.
20     Q  Why wasn't the development of the
21 Olympic coach and team leader selection criteria
22 listed here?
23     A  I don't know. You might have to
24 ask the governance and management committee.
25     Q  It wasn't one of your areas of

**Page 131**

1  responsibility?
2      MR. LEVINSTEIN: That's not what this
3  says. It says he's responsible for the overall
4  operations and these are areas of concentration,
5  if you read the document carefully.
6      Q  (BY MR. UESUGI)  This wasn't one
7  of your areas of concentration?
8      A  As the document states, these
9  were some of the six functional areas that they
10 were trying to show the membership, as I read it,
11 what the CEO was doing.
12     Q  Some? This wasn't all your areas
13 of concentration?
14     A  Okay. These were six areas that
15 were identified as to what I was doing at this
16 particular moment in time March 11, 2004.
17     Q  Okay. It says, No. 4 here,
18 working with staff to improve communication
19 through the USTU website and day-to-day phone,
20 e-mail and postal efforts. What does that mean?
21     A  Well, let's see here. One of the
22 things that I think I've heard a lot, especially
23 early on, was that the USTU needs to be more
24 customer friendly. And so that, I guess, in the
25 past as what some of our staff that worked prior

**Page 132**

1  to me coming on was that, you know, people call
2  in or send things in and they never get called
3  back. And there have been several instances
4  where when I was working in international
5  affairs, that I would call the executive director
6  and there would be no phone call back or maybe
7  several weeks later. So I did have some
8  experience in that frustration that I think some
9  people exhibited.
10     Q  So you think it's important to
11 return a phone call, respond to a letter?
12     A  Answer e-mails.
13     Q  Answer e-mail?
14     A  Yeah, I think it's a pretty good
15 common practice to try to strive towards.
16     Q  And you endeavor to do that with
17 the membership?
18     A  Yes, I do.
19     Q  Including with Mr. Dae Sung Lee?
20     A  There is correspondence that we
21 did follow up on some of his questions.
22     Q  Okay. It says on the governance
23 side, the committee -- which I assume is the
24 management and governance committee?
25     A  That's what I take it as.