# Exhibit B

```
0001
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF HAWAII
 2            CIVIL ACTION NO. 04-00461-SOM-LEK
   _____
 3
   DEPOSITION OF STEVEN SMITH, ESQUIRE
 4 EXAMINATION DATE:  Friday, April 8, 2005
   _____
 5
   DAE SUNG LEE,
 6
          Plaintiff,
 7
   v.
 8
   UNITED STATES TAEKWONDO UNION,
 9 a Colorado nonprofit corporation, et al.,
10       Defendants.
   _____
11
12        PURSUANT TO SUBPOENA, the deposition of
   STEVEN SMITH, ESQUIRE, was taken at 11:52 a.m. on
13 Friday, April 8, 2005, at the Double Tree Hotel at 1775
   E. Cheyenne Mountain Boulevard, Colorado Springs,
14 Colorado, before Valorie S. Mueller, Registered
   Professional Reporter and Notary Public in and for the
15 State of Colorado, said deposition being taken pursuant
   to the Federal Rules of Civil Procedure.
16
17
18
                  Valorie S. Mueller
19             Registered Professional Reporter
20
21
22
23
24
25
                              1
```

```
 1                  A P P E A R A N C E S
 2
   For the Plaintiff:
 3
          WARD D. JONES, ESQ.
 4        GLENN UESUGI, ESQ.
          Bervar & Jones
 5        1400 Pauahi Tower
          1001 Bishop Street
 6        Honolulu, Hawaii 96813
          (808) 550-4990
 7
   For the Defendants:
 8
          MARK LEVINSTEIN, ESQ.
 9        TODD BRAUNSTEIN, ESQ.
          Williams & Connolly, LLP
10        725 Twelfth Street, N.W.
          Washington, D.C.  20005
11        (202) 44-5171
12 For the Deponent:
13
          BRENT RYCHENER, ESQ.
14        Holme Roberts & Owen, LLP
          90 South Cascade, Suite 1300
15        Colorado Springs, CO  80903
          (719) 473-3800
16
   Also present:  Dae Sung Lee
17              Gary Johansen, Deputy General Counsel,
                 United States Olympic Committee
18
19
                      I N D E X
20
   EXAMINATION BY:                                    PAGE
21
   Mr. Jones ........................................   4
22 Mr. Levinstein ................................... 45
   Mr. Jones ........................................ 47
23
24
25
                              2
```

```
 1                 I N D E X   O F   E X H I B I T S
 2 DEPOSITION                                     PAGE FIRST
   EXHIBIT NO.   DESCRIPTION                         APPEARS
 3
    4*    August 4, 2003 letter from Thomas Satrom
 4        to Bruce Harris .......................... 7
 5  5*    9/5/2003 letter from Thomas Satrom to
          Bruce Harris ............................. 9
 6
    6*    10/9/03 memo from Bruce Harris to Sang Lee   23
 7
   22*    10/27/03 one-page, unsigned letter from
 8        Steven Smith to President Sang Lee ....... 43
 9 138*   9/9/03 letter from Steven Smith to Gary
          Johansen, Bates HRO204-HRO207 ............ 32
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                              3
```

```
 1                    P R O C E E D I N G S
 2             STEVEN SMITH, ESQUIRE
 3        The deponent herein, being first duly
 4 sworn to testify to the truth in the above cause, was
 5 examined and testified on his oath as follows:
 6                  E X A M I N A T I O N
 7 BY MR. JONES:
 8        Q    Can you give us your full name and work
 9 address for the record, please?
10        A    Steven Bradley Smith.  Work address is
11 Holme Roberts and Owen, 90 South Cascade Avenue, Suite
12 1300, Colorado Springs, Colorado, 80903.
13        Q    What is your occupation, sir?
14        A    I'm an attorney and partner with Holme
15 Roberts & Owen.
16        Q    Are you licensed in the state of Colorado?
17        A    Yes, I am.
18        Q    In your work as an attorney, have you ever
19 taken a deposition?
20        A    Yes, I have.
21        Q    I'll dispense with the normal rules, then,
22 in going through the normal rules.
23        A    Actually, if I may, I have been present.
24 I don't think I have actually taken one, but I'm
25 familiar with the rules.
                              4
```

```
 1        Q    All right.  Just for the record, if I
 2   don't make myself clear, please ask me to rephrase or
 3   re-ask, and I'd be happy to do so.  It's important that
 4   we use words and not "uh-huh," "huh-uh," and nods of
 5   the head and so forth --
 6        A    Sure.
 7        Q    -- because it becomes ambiguous as to what
 8   you're trying to communicate.
 9             We will take breaks every 45 minutes or hour,
10   but if you want to take a break for any reason before
11   that, just say so, and we'll go off the record.
12        A    Okay.
13        Q    How long have you been with Holme Roberts?
14        A    Over 13 years, a little over 13 years.
15        Q    Do you have an area of specialty that you
16   practice in?
17        A    Yeah.  I have a couple.  Most of my work
18   is done with sports organizations, which involves a lot
19   of work in the professional side and sponsorship and
20   naming rights.  I do a fair amount in the Olympic
21   world, especially representing National Governing
22   Bodies for Olympic sports.  Also universities,
23   collegiate conferences on the sports side.  And I also
24   work with a lot of nonprofit corporations and then in
25   the intellectual property area, trademark and
```

```
 1   copyright.
 2        Q    In the course of your work with Holme
 3   Roberts, have you ever represented the United States
 4   Taekwondo Union?
 5        A    Yes.
 6        Q    What is the United States Taekwondo Union?
 7        A    It is the -- or at least it was the
 8   National Governing Body for the sport of Taekwondo in
 9   the United States.
10        Q    Do you recall what year you first started
11   doing work for U.S. Taekwondo Union?
12        A    The first time we started working with
13   them was the first Membership and -- at the time they
14   appeared before the Membership and Credentials
15   Committee.  I believe it was '97 or '98, somewhere in
16   that range.
17        Q    And did you represent them continuously
18   through to the present or --
19        A    After the first Membership and Credentials
20   Committee process, we did some work for them, although
21   not that much.  And then we were asked again to help
22   them in connection with the second Membership and
23   Credentials Committee process in probably about August
24   of 2003.
25        Q    And during 2003, did you withdraw as
```

```
 1   counsel for USTU in that decertification action --
 2        A    Correct.
 3        Q    -- brought by the USOC?
 4        A    At the end of October.
 5        Q    We had testimony from Ms. Chalmers and a
 6   letter that was, I think, dated October 29, 2003.  Does
 7   that sound right?
 8        A    Yes.
 9        Q    Is it correct that USTU no longer exists
10   as a legal entity under that name?
11        A    It's my understanding that it's now USA
12   Taekwondo, but I'm not directly involved in that.
13        Q    Showing you what's previously been marked
14   as Exhibit 4.  I ask you to take a look at that.
15   Everybody has enough copies.  We've got more.
16             MR. LEVINSTEIN:  Please don't give me
17   one.
18        Q    (BY MR. JONES)  Have you seen that
19   document before?
20        A    Yes.
21        Q    What is it?
22        A    It's a letter to Bruce Harris, who was the
23   Executive Director of USTU, from Tom Satrom who was the
24   chairman of the Membership and Credentials Committee.
25   And the letter outlines some -- it notifies USTU that
```

```
 1   the USOC, the Membership and Credentials Committee,
 2   considers the USTU has problems, and it outlines what
 3   those are.
 4        Q    So when you got this letter, did you take
 5   it from Mr. Satrom to mean that there were listed
 6   problems that USTU was supposed to respond to?
 7        A    Yes.
 8        Q    And did you also understand that NGB
 9   certification for USTU or its continued certification
10   was at stake?
11        A    Yes.
12             MR. LEVINSTEIN:  Objection.
13             THE DEPONENT:  Oh, sorry.
14        Q    (BY MR. JONES)  One item that I wanted to
15   ask you about was Item No. 5.  Amongst the problems
16   listed was an allegiance to Korea to the detriment of
17   U.S. programs and the interest of U.S. athletes.  Just
18   as an individual, not as a lawyer, what did you think
19   of that when you saw that statement --
20             MR. LEVINSTEIN:  Objection.
21        Q    (BY MR. JONES)  -- listed as a problem?
22             MR. LEVINSTEIN:  Objection.  Calls for
23   mental processes.  He can't separate his personal views
24   from being a lawyer, and he was counsel to the USTU.
25   We would advise him not to answer that as privileged
```

1  work product.
2          MR. RYCHENER: I agree with that and will
3  so instruct.
4      Q   (BY MR. JONES) Let me rephrase it this
5  way: Did you find the statement to be racially
6  offensive toward Korean Americans when you read the
7  statement?
8          MR. LEVINSTEIN: Same objection; same
9  instruction.
10         MR. RYCHENER: Same.
11     Q   (BY MR. JONES) Are you going to follow
12 your --
13     A   Yes.
14     Q   -- counsel's advice?
15     A   Yes.
16     Q   I show you the next exhibit, 5.
17         MR. LEVINSTEIN: I don't want one of
18 those either.
19     Q   (BY MR. JONES) Have you had a chance to
20 look at Exhibit 5?
21     A   Yes.
22     Q   And what is that document?
23     A   It's a letter dated September 5th of '03,
24 again from Tom Satrom, per his direction to Bruce
25 Harris of the USTU. This outlines about another dozen

1  or so additional -- about 15 points that they want the
2  USTU to respond to, they being the Membership and
3  Credentials Committee.
4      Q   And, again, continued NGB certification
5  was at stake?
6      A   Yes.
7      Q   Having you focus for a minute on No. 8,
8  did you find that problem listed to be racially
9  insensitive to Korean Americans when you read that?
10         MR. LEVINSTEIN: Same instruction, same
11 objection.
12         MR. RYCHENER: Same.
13     Q   (BY MR. JONES) Are you going to follow
14 your --
15     A   Yes.
16     Q   -- counsel's advice?
17         I believe Exhibit 4 gave notice, did it not,
18 of an upcoming meeting that the Membership and
19 Credentials Committee wanted to have on September 12th
20 and 13th, 2003?
21     A   Correct.
22     Q   Did that meeting eventually take place?
23     A   Yes, it did, on the 13th.
24     Q   Did you attend that meeting?
25     A   Yes, I did.

1      Q   We heard testimony earlier that the
2  meeting kind of went in two parts, the first part being
3  sort of an open forum and the second part being more of
4  a closed-door session between you and Ms. Chalmers and
5  members of the USOC, Membership and Credentials
6  Committee; is that correct, in your recollection?
7      A   Yes. The first part was the actual open
8  meeting. And then at the end of that, the Membership
9  and Credentials Committee retired to a separate room to
10 deliberate. And after their deliberations, they called
11 Jill and me in.
12     Q   During the open session, where there
13 various members of the USTU who were present, did it
14 appear to be factions or individuals critical of
15 current governance at USTU?
16     A   Yes.
17     Q   I'm saying that based upon the types of
18 things they were saying?
19     A   Yes.
20     Q   Was all or most of the Membership and
21 Credentials Committee present at that open forum, if
22 you know?
23         MR. RYCHENER: Yeah, I'll object to lack
24 of foundation, in terms of how many are on it and how
25 many were there. But you can answer.

1      Q   (BY MR. JONES) Do you know how many
2  people are on that committee?
3      A   You know, I don't remember exactly. My
4  understanding at the time was that all or close to all
5  were there, but I couldn't tell you how many exactly
6  were there and how many were on the committee.
7      Q   During the open session, did you ever hear
8  any members of the USOC Membership and Credentials
9  Committee or their staff or any volunteers aligned with
10 the USOC make statements or ask questions that sounded
11 racially insensitive toward Korean Americans?
12     A   No.
13     Q   Turning now to the closed-door session
14 portion, were all of the members of the USTU invited to
15 leave when the closed-door session began?
16     A   The question doesn't really anticipate
17 what happens. Let me explain.
18         You have a large conference room for the open
19 session. The open session ends. And that's the end of
20 the meeting. Everyone then obviously leaves. The
21 Membership and Credentials Committee retires to another
22 smaller conference room to deliberate.
23         And I and Jill -- Jill and I and others were
24 milling out in the hallway after the meeting. Jill and
25 I stayed around in case the Membership and Credentials

**Page 13**

1  Committee had any follow-up questions of us.
2      Q   During the open portion of the -- the open
3  forum portion of the meeting, did you make any
4  presentation or say anything on behalf of USTU?
5      A   Yes.
6      Q   What sorts of things did you cover?
7      A   Essentially the meeting was our chance to
8  present our side of the story.  As you know, I'm sure
9  you have read through these, there were a lot of very
10 significant issues being raised by the USOC and the
11 Membership and Credentials Committee.
12         So in -- essentially what we presented was a
13 proposed remediation plan that would try to address
14 those issues that the USOC had raised that we felt had
15 not been addressed and to try to essentially convince
16 the USOC and the Membership and Credentials Committee
17 that in time, and with this particular remediation
18 process, that the USTU would come into compliance.
19     Q   Prior to formulating and actually
20 presenting the remediation plan to the USOC Membership
21 and Credentials Committee at the Denver meeting in the
22 open forum format, had you attempted to put together
23 any points for the remediation plan with attorneys for
24 the other side beforehand?
25     A   When you say attorneys for the other side,

**Page 14**

1  you mean attorneys for the USOC?
2      Q   Yes.
3      A   Yes.
4      Q   So that it wouldn't be just a total
5  surprise --
6      A   Correct.
7      Q   -- when the plan was presented?
8      A   That's right.
9      Q   Do you feel at the time that it was a
10 reasonable plan that you were proposing?
11         MR. LEVINSTEIN:  Objection.
12         MR. RYCHENER:  Yeah.  I object to the
13 extent it's calling for mental thought processes and
14 work product and instruct you not to answer.
15     Q   (BY MR. JONES)  Are you going to follow --
16     A   Yes.
17     Q   -- your attorney's instructions?
18     A   Uh-huh.
19     Q   Did you go over the plan, which we heard
20 some testimony earlier that it was a PowerPoint
21 presentation?
22     A   Right.
23     Q   So you went through -- tried to go through
24 point by point as to what the plan entailed?
25     A   With the USOC?

**Page 15**

1      Q   With the USOC.
2          MR. RYCHENER:  Before the meeting or at
3  the meeting?
4      Q   (BY MR. JONES)  At the meeting.
5      A   Oh, at the meeting, yes, we did.  Yes, at
6  the meeting we did.
7      Q   You put it up on the screen and went
8  through it?
9      A   Correct.  We also handed out handouts
10 showing essentially what the slides were so they could
11 read along.
12     Q   There were also some documents produced
13 from the files that appeared to be responses that the
14 USTU wanted to give in response to the many points
15 listed in Exhibits 4 and 5 by the United States Olympic
16 Committee that were put together, in part, by Bruce
17 Harris.  Do you recall those?
18     A   Yes, uh-huh.  I do.
19     Q   Did you go over that document with the
20 USOC Membership and Credentials Committee during the
21 open session portion?
22     A   No, we didn't.  We provided those to the
23 Membership and Credentials Committee in advance with
24 the hope that some of the issues that we felt that
25 there were responses for and explanations for, that

**Page 16**

1  those answers would essentially take care of those and
2  address those issues.
3          So the focus of the PowerPoint and the
4  meeting was to go over the issues that were unresolved;
5  mostly to go over the remediation plan.
6      Q   In the open portion of the meeting, was
7  Item 5 of Exhibit 4 discussed at all?  And this is the
8  one about the allegiance to Korea.
9      A   I don't recall it being discussed in the
10 open forum.
11     Q   By anyone?
12     A   That I would have heard -- that I could
13 hear, no.
14     Q   Same question for the point in Exhibit 5
15 about loyalty to Korea and fair play and so on?
16     A   No. 8?
17     Q   Yeah.
18     A   Again, I don't recall, but I don't recall
19 that it was discussed in the open forum.
20     Q   Turning to the closed session portion of
21 the meeting, same question with respect to the
22 allegation in Exhibit 4.  Was the allegation that there
23 was allegiance to Korea discussed in that closed-door
24 session?
25     A   No, there was not specific discussion on

**Page 17**

1  that point.
2      Q   How about with respect to the allegations
3  contained in Exhibit 5, Paragraph No. 8?
4      A   I guess I would say there was one comment
5  that maybe goes to that.  There was one member of the
6  Membership and Credentials Committee, Jeannie
7  Picariello, who made a comment -- I guess she made two
8  comments that are back to back.
9          One was a frustration that the athletes
10 within the USTU were essentially not stepping up and
11 handling the responsibilities within their positions;
12 you know, the athletes who maybe were on the Athletes
13 Advisory Council or on the board.
14         And then she went on to say, you know, to
15 express her dissatisfaction with the bowing and that
16 whole process even within Taekwondo, she made a comment
17 that she sees her -- I can't remember the exact words
18 she used -- but essentially she was associated with the
19 U.S. Army, so she said she sees her men or troops do
20 that and she said she didn't like that.
21     Q   Jill Chalmers, I think, testified this
22 morning that the comment by Ms. Picariello was to the
23 effect that they need to stop doing the bowing crap or
24 something along those lines?
25     A   Yeah, I'm not sure those were quite the

**Page 19**

1  up its mind and wanted to remove the current governance
2  from USTU as of the time of that meeting.
3          MR. LEVINSTEIN:  Objection.
4          MR. RYCHENER:  I'm going to object to
5  that characterization.
6          MR. LEVINSTEIN:  Completely contrary to
7  what she said.
8      Q   (BY MR. JONES)  What was your impression,
9  walking out of that meeting, as to what the Membership
10 and Credentials Committee had decided to do at that
11 point, if you had one?
12     A   Yeah.  I think there was really one
13 central issue coming out of that meeting.
14         By way of background, we had presented the
15 remediation plan.  And as part of that, we called for a
16 new Executive Director, a Governance and Management
17 Committee.  But the Membership and Credentials
18 Committee made it very clear that they felt that Sang
19 Lee, the president of the USTU, was part of the problem
20 and had to resign as well.
21     Q   During the process of the meeting, during
22 that Denver meeting, did you feel that the issues were
23 being presented in a one-sided fashion?  Let me
24 rephrase that.
25         During the open portion of the meeting, did

**Page 18**

4/8/2005 Smith, Steven Esq. (Pltf desig = Yellow, Dfts' counters = Blue)

1  words she used, but something along those lines.  You
2  could tell she didn't think that was appropriate.
3      Q   Did she use harsh terms like that with
4  respect to bowing?
5          MR. RYCHENER:  I'm going to object to
6  your characterization of it, and leading.  But you can
7  answer.
8      A   Yeah.  I don't remember the exact words,
9  but she was very clear that she did not think that that
10 was appropriate.  And she used -- yeah, she used
11 some -- I remember some words that made it very clear
12 that she didn't like it.
13     Q   (BY MR. JONES)  Other than that statement
14 or area you just mentioned, can you think of any other
15 questions or comments by the committee that went to
16 Point 8 in Exhibit 5?
17     A   No.
18     Q   Can you think of any questions or comments
19 that at all implied that the USTU management -- or
20 pardon me -- governance was too Korean?
21     A   No.
22         MR. LEVINSTEIN:  Objection.
23     Q   (BY MR. JONES)  We heard from Ms. Chalmers
24 that her impression, at least, was that the USOC
25 Membership and Credentials Committee had kind of made

**Page 20**

4/8/2005 Smith, Steven Esq. (Pltf desig = Yellow, Dfts' counters = Blue)

1  you think that equal time was given to you to present
2  USTU's side of the issues?
3          MR. LEVINSTEIN:  Objection.
4          MR. RYCHENER:  You can answer.
5      A   I would say that I was frustrated.  I
6  think anytime you are giving a presentation, you always
7  want more time.
8          If I can explain by way of background.  There
9  was the hearing -- the previous hearing that I was not
10 present at and had not been engaged by USTU to
11 represent them.  And it's my understanding that a large
12 portion, if not all of that meeting, was devoted to
13 grievances against the USTU, concerns about the USTU,
14 complaints about various items within the USTU.
15         We had hoped that the meeting would be almost
16 entirely devoted to our response.  I'd say -- I wasn't
17 watching the clock very closely, so I can't tell you
18 exactly a time.  I would say at least the first half
19 was devoted to our remediation plan, addressing some of
20 the issues that had been raised, but mostly the
21 remediation plan.  And the last part of the meeting --
22 again, some opinions of the opponents of the current
23 administration were allowed to come in.
24         So I would say I was frustrated that again
25 they were given another chance to speak.  But at the

## Page 21

1  same time, the USOC and Membership and Credentials
2  Committee had made it clear upfront that they would not
3  stop them from speaking at that open hearing.
4         I sure would have liked more time to address
5  those. I would love to have had -- we, at one point,
6  had made a request that all issues that we would have
7  to address be put on the table upfront. The USOC, and
8  I can understand their position, said no, we can't
9  because we don't know what people are going to say in
10 the open forum.
11        So, you know, as an attorney, you want to
12 have a chance upfront to know exactly what you're going
13 to have to answer and to put your answer together.
14        All that said, the focus of our presentation
15 was on the remediation plan. I mean, there were a lot
16 of issues that we did not have much of an answer for,
17 frankly. And our view was that we needed to -- rather
18 than looking back and essentially acknowledging and
19 trying to claim things like our -- certain things were
20 in order when they might not have been, our focus was
21 to try to put together a remediation plan to convince
22 the USOC that let's move forward, let's figure out a
23 way to make this work.
24    Q   (BY MR. JONES) Okay. During any part of
25 the closed session, did any members of the USOC

## Page 23

1         MR. JONES: I'm trying to limit the area
2  of inquiry here.
3         MR. LEVINSTEIN: I understand.
4    Q   (BY MR. JONES) Showing you Exhibit 6.
5         MR. RYCHENER: I guess, I mean, apart
6  from Exhibit 6, I will allow him to answer your
7  question assuming -- but with the caveat that we
8  certainly are not intending to waive attorney-client
9  privilege, but we'll allow him to answer at least that
10 question.
11        MR. LEVINSTEIN: But the idea is that he
12 can talk about the use of the term if the term is in a
13 sentence, a paragraph, whatever, that involves the
14 giving or receiving of legal advice. We'll get there,
15 but let's see what . . .
16        MR. JONES: Sure.
17   Q   (BY MR. JONES) I'm not asking for advice
18 given here. I'm just asking for your recollections as
19 to what was said to the client about what happened in
20 there, what people said.
21   A   Okay.
22        MR. RYCHENER: Again, I don't object to
23 that broad of a question. If you were to, again, ask
24 him the narrow question that you asked before --
25   Q   (BY MR. JONES) You said you did have a

## Page 22

1  Membership and Credentials Committee, their staff, or
2  other USOC volunteers present ever utter the words
3  "Korea Mafia" or words to that effect?
4    A   No.
5    Q   They never inferred or implied that the
6  current governance of the USTU was a Korea Mafia-run
7  organization?
8    A   Not that I recall, no.
9    Q   Did you have a meeting with some members
10 of the USTU governance after the Denver meeting to let
11 them know what happened in there?
12   A   Yes.
13   Q   Did either you or Ms. Chalmers use the
14 words "Korea Mafia" when explaining to the members of
15 the USTU governance as to what happened in the Denver
16 meeting?
17        MR. RYCHENER: Again, I think that is
18 calling for attorney-client communication. If you want
19 to refer him to the document, or if I may confer for
20 just a minute.
21        (Discussion off the record between
22        Mr. Rychener and Mr. Levinstein)
23        MR. LEVINSTEIN: It's a little tricky
24 because he wasn't in the whole meeting, as the document
25 shows.

## Page 24

1  meeting with the clients after the Denver meeting to
2  let them know what happened?
3    A   Several, yeah.
4    Q   Take a look at Exhibit 6 just for a
5  moment.
6    A   Uh-huh.
7    Q   What is that? I know you didn't write it
8  or . . .
9    A   Yeah, it looks like it's a memo to Sang
10 Lee from Bruce Harris, essentially trying to recount
11 the meeting that was supposedly held on October 8th.
12        MR. RYCHENER: I'll object again as to
13 lack of foundation, as to whether or not he's ever seen
14 that.
15   Q   (BY MR. JONES) Do you recall having a
16 meeting with that group on or about that date?
17   A   I remember there were several meetings in
18 the wake of the September 13th meeting with the
19 Membership and Credentials Committee. I don't remember
20 if we specifically had a meeting on the 8th. The only
21 date I can remember specifically was the Monday after
22 the hearing, so that would have been September 15th.
23   Q   Do you remember a meeting that I guess
24 started with Jill and the clients and then you came
25 later?

### Page 25

```
 1         A    Yes.
 2         Q    Assuming that's the one we're talking
 3   about --
 4         A    Uh-huh.
 5         Q    -- were you present when Jill Chalmers was
 6   speaking?
 7         A    There was a point when I was there with
 8   Jill, and she certainly spoke during that portion.
 9         Q    Did she ever use the words "Korea Mafia"?
10         A    Let me sort of give you the context of it.
11   I believe the words Korea Mafia were used, but it was
12   never attributed -- in the meeting while I was there, I
13   don't recall it ever being attributed to anybody from
14   the USOC or the Membership and Credentials Committee.
15              Let me explain that.  As you have pointed out
16   in the two documents, Exhibit 4 and Exhibit 5, there's
17   references to Korean issues.  There were other
18   communications from -- essentially those questions come
19   from compilations of complaints made to the USOC by
20   USTU members.
21              And frankly, there were -- in some of those
22   communications, I remember the use of the term "Korea
23   Mafia" by those other members.  So we at times used the
24   term "Korea Mafia" as a shorthand for those issues.  So
25   such and such a point goes to the Korea Mafia issue.
```

### Page 26

```
 1              I don't remember specifically Jill using that
 2   term on that particular date, but we all used that
 3   term, again as a shorthand to refer to that issue.
 4         Q    To your knowledge, did Jeannie Picariello
 5   ever use that shorthand with respect to Korean issues
 6   in any conversations that you observed of her?
 7         A    Not that I recall, no.
 8         Q    So is it your testimony that during that
 9   conversation, the shorthand "Korea Mafia" might have
10   come up?
11              MR. LEVINSTEIN:  Objection; that
12   conversation is really --
13         Q    (BY MR. JONES)  I'm sorry.  During the
14   conversation with the USTU people after the Denver
15   meeting that this October 9, 2003 memo refers to?
16         A    I don't have any specific recollection of
17   that term, but I would -- I think it's very likely that
18   it was probably used, again, as a shorthand term.
19         Q    And do you know who might have used it?
20         A    Oh, I suspect everyone there could
21   potentially have used it.
22         Q    Including Jill and yourself?
23         A    Yeah, we may have, again, as a shorthand.
24   And I think Sammy Pejo did.  Sang Lee probably did as
25   well.
```

### Page 27

```
 1         Q    You mentioned just now the possible source
 2   of the allegations contained in Exhibit 3 and 4 (sic)
 3   on the Korean issue being a compilation of complaints
 4   from other parties.
 5         A    Uh-huh.
 6         Q    Words to that effect?
 7         A    Right, right.
 8         Q    Did you see the actual documents from
 9   which those compilations were drawn?
10         A    I saw -- and I can't say that I saw all of
11   them frankly.  The USOC -- a lot of the complaints went
12   to the USOC.  Some came to the USTU and they were given
13   to me.  Some were given to us by the USOC.  I can't
14   tell you if the USOC gave us --
15         Q    All of them?
16         A    -- all of them.  I just wouldn't know.
17         Q    As far as a time frame, were you given
18   those actual complaints from third parties -- were you
19   given them at the Denver meeting or after or before?
20         A    I think the ones that I remember, we were
21   given before.  I would say that we had some frustration
22   because, again, you have seen these issues and we
23   didn't always feel like we knew all of the foundation
24   for those issues to be able to respond directly to it.
25         Q    A file was produced today responsive to a
```

### Page 28

```
 1   subpoena we served.  And you saw that file, I assume,
 2   before it came to us today?
 3         A    Yes, uh-huh.
 4         Q    I think Ms. Chalmers said it was -- she
 5   represented it to be kind of a merger of her file and
 6   yours, or maybe the way it was kept was just one
 7   file --
 8         A    Right.
 9         Q    -- under the client's name.
10              And I note that none of the complaints from
11   third parties that we have been talking about are in
12   that file.
13         A    Right.  If I remember correctly, to the
14   extent we saw those, they were shown to us by the
15   representatives of the USTU.  I'm not sure that we ever
16   kept any of them.
17         Q    So you would not be able to say, then,
18   exactly which complaints were shown to you at which
19   time?
20         A    Not without seeing them.
21         Q    It would have to be from memory, then,
22   totally?  I mean, if it's not in that file, it would
23   have to be from memory; is that correct?
24         A    Right.
25         Q    And your testimony is that some of the
```

## Page 29

1  complaints were actually shown to you by USTU?
2      A   That's my recollection.  Bruce Harris in
3  particular.
4      Q   Sorry to test your memory here.
5      A   That's quite all right.
6      Q   Can you give names of, I'll call them
7  authors, that you can recall that were shown to you by
8  Bruce Harris and when?
9      A   I couldn't give you names, no, without
10  seeing the documents.
11      Q   Could you give me authors of individual
12  complaints that were shown to you by USOC staff or
13  volunteers prior to the Denver meeting?
14      A   I couldn't give you names without seeing
15  them.
16      Q   Are you sure you weren't just given
17  Exhibit 4 and 5 before the Denver meeting?
18      A   It's possible that that's all -- my
19  recollection is that we at least were given some
20  information on the complaints.  But, again, it's
21  possible that it could have come afterwards.
22      Q   When you looked at especially Exhibit 5,
23  Paragraph No. 8, and asked to respond to it, was that a
24  difficult task?
25          MR. LEVINSTEIN:  Objection.

## Page 30

4/8/2005  Smith, Steven Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1          MR. RYCHENER:  I'm going to object.  I
2  think that goes directly to attorney-work product and
3  mental processes, and I will instruct you not to
4  answer.
5          THE DEPONENT:  Okay.
6      Q   (BY MR. JONES)  Did you assume that
7  Paragraph No. 8 to be true when you prepared for the
8  hearing?
9          MR. RYCHENER:  Same objection.
10          MR. LEVINSTEIN:  Same.
11          MR. RYCHENER:  Instruct the witness not
12  to answer.
13      Q   (BY MR. JONES)  It's correct, is it not,
14  that when the response was submitted to these
15  allegations, that USTU categorically denied the
16  allegations contained in Paragraph 8?  That's what the
17  response said, at least?
18      A   Uh-huh.
19      Q   Yes?
20      A   Yes.
21      Q   Same for the allegation in Paragraph 4,
22  which calls into question the allegiance of Korean
23  Americans?
24      A   Yes.
25      Q   Did you have any more direct contact with

## Page 31

1  members of the USOC Membership and Credentials
2  Committee or their staff or volunteers of the USOC with
3  respect to the decertification action between the
4  Denver conference and October 29, when your firm
5  withdrew?
6      A   Yes, quite a bit.
7      Q   In any of those either telephone or
8  personal contacts, were the Korean cultural issues
9  discussed at any time?
10      A   No, not that I remember.
11      Q   Did you ever hear any comments/questions
12  from USOC Membership and Credentials Committee members,
13  staff, or volunteers involved with USOC that you felt
14  were racially insensitive toward Korean Americans?
15      A   No, not that I remember.  No.
16      Q   Do you think that the decertification
17  action was, in part, brought to remove all of the
18  Korean Americans from the governance that were in their
19  positions in 2003 with the USTU?
20          MR. RYCHENER:  Object to the extent it
21  calls for mental attorney thought processes and
22  privileged information and instruct the witness not to
23  answer.
24      Q   (BY MR. JONES)  There was a letter written
25  by you to Mr. Satrom before the Denver conference

## Page 32

4/8/2005  Smith, Steven Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1  speaking to the issue of whether or not the committee
2  would be allowing more people to bring in more issues
3  outside the two lists of points that you already were
4  going to attempt to respond to.  Do you remember that
5  letter?
6      A   I do.
7      Q   And feel free to refresh yourself, if you
8  need to look at it.
9      A   Sure.
10      Q   Correct me if I'm wrong, but the thrust of
11  your letter was to ask the committee not to allow that
12  so that time could just be devoted toward the points on
13  the table?
14      A   Let me just refresh my memory on the
15  letter.
16      Q   Sure.
17          MR. RYCHENER:  I believe we're referring
18  to Exhibit 138.
19          MR. JONES:  Thank you.
20      A   Okay.  I'm sorry.  Could you restate the
21  question?
22      Q   (BY MR. JONES)  There were a couple of
23  letters produced.  One was one from you to Mr. Satrom
24  and then Mr. Satrom responding back.  I'm just trying
25  to shorten things up.  But the thrust of it was to try

## Page 33

1  to get the committee to limit the areas of discussion
2  to the points that were put forth in the Exhibit 4 and
3  Exhibit 5 that I have shown you.
4      A    Yes.
5      Q    And correct me if I'm wrong, but
6  Mr. Satrom or the committee said that they could not do
7  that and would allow an open forum with the other
8  problems, comments, complaints to be vented if they
9  came up; is that --
10     A    That's correct.
11          MR. RYCHENER:  I'll just note for the
12 record that as Ms. Chalmers read Exhibit 138 into the
13 record, there are about five items listed as the issues
14 that were to be addressed.  I don't know if they're all
15 of Exhibits 4 and 5.
16          MR. JONES:  Okay.  Thank you --
17     Q    (BY MR. JONES)  During the months that
18 followed the Denver meeting up until October 29th when
19 your firm withdrew, is it correct that both sides
20 attempted to work toward a mutually agreeable
21 remediation plan?
22     A    Yes.
23     Q    And we went through this file of yours and
24 saw several drafts going back and forth.  Is that your
25 recollection of how things proceeded?

## Page 34

1      A    Yes.
2      Q    And isn't it also correct that the matter
3  was not resolved by the time your firm withdrew on
4  October 29th?
5      A    Correct.
6      Q    Discussions were continuing and another
7  firm or firms took over at that point?
8      A    Correct.
9      Q    I'm going to read some names that might
10 have been at the Denver meeting and just ask if you
11 remember any of these people being there.
12          MR. BRAUNSTEIN:  Counsel, just for
13 clarification, which portion of the meeting are you
14 referring to?
15          MR. JONES:  Both.  Rather than -- well, I
16 believe -- let's start with the closed session.
17     A    Closed session.
18     Q    (BY MR. JONES)  Closed session.  Was
19 Robert Gambardella there?
20     A    No.
21     Q    Steve Locke?
22     A    No.
23     Q    Rich Bender?
24     A    No.
25     Q    Juan Moreno?

## Page 35

1      A    No.
2      Q    Virginia Witte?
3      A    I don't recall.  I can say with the
4  others -- basically, the group that was there was the
5  Membership and Credentials Committee.  I don't believe
6  Ms. Witte was on the Membership and Credentials
7  Committee.  She was the employee of the USOC.
8           There were several members of the USOC's
9  general counsel office being there.  I don't remember
10 Ms. Witte being there, but I don't recall for sure.
11     Q    Could she have been there in her capacity
12 as an audit person?
13     A    It wouldn't have surprised me if she was,
14 but I just don't remember her being there.
15     Q    Tony Baggiano?
16     A    Yes.
17     Q    William Martin?
18     A    No, he was not there.
19     Q    Jeff Benz?
20     A    No, I don't believe Jeff was there.
21     Q    Jim Scherr?
22     A    No.
23     Q    Jeannie Picariello?
24     A    Yes.
25     Q    Bob Foth?

## Page 36

1      A    I believe Bob was there.  I don't remember
2  for sure, but I believe he was.
3      Q    Tim Wiley?
4      A    I'm not sure I remember who Tim Wiley is.
5      Q    Steve Sobel?
6      A    Yes, Steve Sobel was there.
7      Q    Perry Toles?
8      A    Yes.
9      Q    Paul DePace?
10     A    Yes.
11     Q    Nancy Whiteman?
12     A    I believe she was there, but I don't
13 recall -- I don't know her very well.
14     Q    William Maxin?
15     A    Again, I believe so, but I don't know him
16 well.
17     Q    Mary McCagg?
18     A    Yes, she was there.
19     Q    Geraldine Andrews?
20     A    I don't recall.
21     Q    Barbara Smith?
22     A    Yes, she was.
23     Q    Any members of the committee that I
24 haven't named that were there?
25     A    If you had a list of the committee, I

## Page 37

1  could probably tell you, but I don't recall offhand.
2       Q    Tom Satrom?
3       A    Tom was there, yes.
4       Q    Anyone else from Jeff Benz's office?
5       A    Yeah, Gary Johansen was there and Jennifer
6  Gabrius.
7       Q    Do you know if any minutes or recordings
8  were taken of the closed session meeting?
9       A    I don't recall.  I didn't pay that close
10 attention.  I don't believe that there were.  It was --
11 when we joined -- now, keeping in mind that the group
12 had met separately to deliberate, so I have no idea if
13 they kept minutes of that session or not.
14           When they called Jill and me in, it was to
15 essentially explain what their decision was and to
16 communicate that to me.  So it's probably not something
17 you would ordinarily expect minutes to be kept of.
18      Q    None were provided to you after the
19 meeting?
20      A    No.
21      Q    Juan Moreno was present at the open
22 session portion of the meeting?
23      A    I don't recall that he was.  He may have
24 been.  There were a lot of people there, so he may have
25 been there, although I think my recollection is that we

## Page 38

1  may have had him ready to appear by phone, because he
2  may have had a competition or something.  But I don't
3  remember for sure.  I'm sorry.
4       Q    Did you have anybody in particular give
5  testimony to support your position at the open session
6  portion of the meeting?
7       A    We had a couple of athletes that had
8  specific expertise because of maybe the committee
9  position that they were on in connection with
10 particular issues.
11      Q    Do you remember their names?
12      A    No.  I can see them, but I can't
13 remember -- if I saw a list of their names, I'd
14 remember.
15      Q    And they did speak?
16      A    Yes.
17      Q    They talked about their positions or other
18 things?
19      A    No.  They talked about issues that they
20 would have particular expertise on.
21      Q    Was the topic of Olympic coach selection
22 discussed during either parts of the meeting in Denver?
23      A    I don't recall it being discussed in the
24 open forum.  It was not discussed in the closed
25 session.

## Page 39

1       Q    Do you know the Plaintiff in our case, Dae
2  Sung Lee?
3       A    I believe we may have met once or twice.
4  I don't know him well by any means.  But in the course
5  of all of this representation, I think we may have met
6  once or twice.
7       Q    You're aware that his appointment to be
8  the Olympic -- you were aware that he was appointed to
9  be the Olympic coach for the U.S. team as of the time
10 you were representing USTU during the decertification
11 action in 2003?
12      A    Only what's been represented to me by
13 others.  I was not aware of that at the time.
14      Q    During any of the discussions that
15 followed the Denver meeting up until the time your firm
16 withdrew, did anyone on the USOC side ever bring up the
17 topic of coach selection with you?
18      A    No, not that I remember.  No.
19      Q    Did you ever hear from them that there was
20 any intention to remove the current appointed coach or
21 members of the U.S. Olympic team?
22      A    No.
23      Q    Did you have contact with Mr. Jeff Benz
24 during the period following the Denver meeting and up
25 until your firm withdrew from representation of the

## Page 40

1  USTU?
2       A    Yes.
3       Q    Was that concerning the decertification
4  issues?
5       A    It was concerning trying to find some sort
6  of a remediation process that would be acceptable to
7  the Membership and Credentials Committee, as well as
8  the USTU.
9       Q    While that was happening, did an instance
10 come up where it became known to him that USTU planned
11 to write a letter to the then Senator Campbell from the
12 State of Colorado about what was going on with the
13 decertification action?
14      A    Yes.
15      Q    Did Mr. Benz ever threaten to take
16 punitive actions against USTU if it went forward with
17 such a letter?
18      A    It's my recollection that he did in the
19 sense of he was -- at the point that that came out, it
20 was a very sensitive time in the negotiations.  They
21 were trying to reach some sort of an agreement.
22           You have a situation where the main issue was
23 whether President Lee is going to stay on in his
24 capacity, and we were trying to find essentially a
25 middle ground where he would be allowed to stay on in

```
 1  some capacity, yet it would be clear that there was
 2  change coming.
 3          Essentially, Mr. Benz's communication to me
 4  was if something like this, these charges, come out in
 5  that letter to Senator Campbell that it would just
 6  inflame the situation.
 7      Q   Did he make a threat if the letter went
 8  out that the punitive steps previously outlined by the
 9  USOC would be taken immediately?
10      A   When you say punitive steps previously by
11  the USOC, what do you mean by that?
12      Q   Well, let me ask it this way:  Did the
13  USOC ever list punitive steps that were planned to be
14  taken in the decertification action?
15      A   I guess I'm getting hung up on your word
16  punitive steps.  You know, there's -- decertification
17  is not something that happens every day, but there's
18  things that go along with the decertification.
19          If you're no longer the NGB, you're no longer
20  eligible for USOC funding, you don't have the rights
21  and privileges of an NGB, et cetera, et cetera.
22      Q   Did Mr. Benz threaten to immediately
23  exclude all of the current governing personnel from
24  even being on the USTU office premises if such a letter
25  was sent to Senator Campbell?
```

41

```
 1          MR. LEVINSTEIN:  Objection; contrary to
 2  what the letter says.
 3      Q   (BY MR. JONES)  Do you recall him saying
 4  that he would lock everyone out?
 5          MR. LEVINSTEIN:  Objection.
 6          THE DEPONENT:  May I answer that?
 7          MR. RYCHENER:  Yeah, you can, if you
 8  recall.
 9      A   Okay.  Yeah, I think it's important to put
10  that in context here; that essentially the Membership
11  and Credentials Committee had decided, your proposal
12  for the remediation plan is not acceptable mostly
13  because of President Lee not being -- not resigning.
14          There was -- so essentially that absent some
15  sort of agreement and resolution, the decertification
16  process moves forward.
17          We were at a very sensitive time in
18  negotiations.  We're trying to work some sort of a
19  compromise.  And you have -- essentially, I think,
20  Mr. Benz, his message was, if this letter is sent and
21  these accusations are made to Senator Campbell, I'm not
22  going to be able to have the Membership and Credentials
23  Committee behind the resolution like what we're talking
24  about, and the decertification process goes forward.
25          In that context, yes, he did say that the
```

42

```
 1  office -- the USTU would no longer have an office on
 2  the complex.
 3      Q   (BY MR. JONES)  Showing you what's been
 4  previously marked as Exhibit 22 that you have before
 5  you.
 6      A   Uh-huh.
 7      Q   That's a partial letter?
 8      A   Uh-huh.
 9      Q   Is that a yes?  Sorry.
10      A   I'm sorry.  Yes.
11      Q   It says --
12          MR. RYCHENER:  Again, I'm going to object
13  to the extent that you're using this letter in any
14  capacity, because it is an attorney-client privileged
15  communication, and I have no indication that that
16  privilege has ever been waived by the USTU.
17          MR. LEVINSTEIN:  It has not.
18      Q   (BY MR. JONES)  Do you know if Jeff Benz
19  had the power to suddenly bar people from going to
20  their offices at the USTU?
21      A   I don't know if Jeff Benz specifically
22  would have that power.  I don't know.
23      Q   That would seem to lack a little due
24  process, don't you think?
25          MR. RYCHENER:  I'm going to object.
```

43

```
 1          MR. LEVINSTEIN:  Objection.
 2      Q   (BY MR. JONES)  The letter, nevertheless,
 3  went out to Senator Campbell; isn't that correct?
 4      A   That's my understanding.
 5      Q   And do you know if a response of some kind
 6  went out from the USOC side to Senator Campbell as
 7  well?
 8      A   I don't know.  This was right around the
 9  time when we withdrew, so we were very much out of the
10  loop after that.
11      Q   Senator Campbell was a person of some
12  influence in Olympic matters because of committees he
13  sat on?
14          MR. RYCHENER:  I'm going to object to
15  lack of foundation.
16          MR. LEVINSTEIN:  Object.
17      Q   (BY MR. JONES)  If you know?
18      A   No. 1, he is a senator.  No. 2, he is a
19  senator from Colorado.  He is a former Olympian
20  himself.  And he is a fairly senior senator, so he
21  would have the corresponding influence.
22      Q   Do you know if he took any action in
23  response to either letter?
24      A   I don't know.
25      Q   I think I'm about done.  Give me a few
```

44

```
 1  minutes?
 2  A      Absolutely.
 3         (Recess taken from 1:54 p.m. to 1:02
 4  p.m.)
 5  Q      (BY MR. JONES)  Thank you.  I don't
 6  believe I have any further questions.
 7         MR. LEVINSTEIN:  I just have a couple.
 8                    E X A M I N A T I O N
 9  BY MR. LEVINSTEIN:
10  Q      I'm not going to ask you for any mental
11  impressions or attorney advice, only as to a couple of
12  facts.
13         The meeting, the open meeting on September
14  12th --
15  A      September 13th?
16  Q      The open meeting on September 13th in
17  Denver, did the Membership and Credentials Committee
18  invite president Sang Lee to speak at that meeting?
19  A      Yes, I believe they did.
20  Q      And was he present at the meeting?
21  A      Yes, he was.
22  Q      And did he speak at the meeting?
23  A      No.
24  Q      And you made reference a couple of times
25  in your testimony in discussing the term Korea Mafia.
```

45

```
 1  I think your answer said something like "we all use
 2  that term"?
 3         MR. JONES:  Objection; misstates the
 4  testimony.
 5  Q      (BY MR. LEVINSTEIN)  Okay.  Well, to the
 6  extent your testimony makes reference to "we all use
 7  that term," could you tell us who it is that you say
 8  used the term "Korea Mafia"?  What people were you
 9  referring to?
10  A      I would like to consult with Brent.
11         THE DEPONENT:  That doesn't waive any
12  attorney-client privilege?
13         MR. RYCHENER:  I think we're certainly
14  now waiving the attorney-client privilege.  I'll allow
15  you to answer just with the names, as opposed to any
16  advice.
17  Q      (BY MR. LEVINSTEIN)  Here's my question
18  first.  When you said, "we all use that term," is it
19  clear that you were not referring at all to anyone
20  employed by or in a governance or management or staff
21  position with the U.S. Olympic Committee?
22  A      That's correct.
23  Q      And that you were referring only to
24  counsel for the USTU and people working for the USTU?
25  A      That's correct.
```

46

```
 1  Q      That's all I have.
 2                   E X A M I N A T I O N
 3  BY MR. JONES:
 4  Q      Following up on Korea Mafia, the phrase
 5  Korea Mafia you said came from one of those complaints
 6  that was then compiled into something else?
 7  A      That's my recollection, a complaint or a
 8  document.  It may have even been something that was
 9  forwarded to the USTU and not to the USOC.  I just
10  don't recall, but it was a term that we had seen
11  before.
12  Q      Exhibit 4, though, and Exhibit 5 don't
13  contain that term, do they?
14  A      No, they don't.
15  Q      Is it possible that that term was used in
16  the Denver meetings by someone?
17         MR. LEVINSTEIN:  Objection.  Is it
18  possible as opposed to his recollection?
19         MR. RYCHENER:  Or in his presence.
20  A      Yeah, I can say in my presence, and in my
21  recollection, no, it was never used.
22  Q      (BY MR. JONES)  Ballpark estimate of the
23  number of people in the open forum proceeding?  Are we
24  talking hundreds, or how big a meeting was this?
25  A      You have the Membership and Credentials
```

47

```
 1  Committee and USOC staff, which I would say probably
 2  numbers 15 to 20, somewhere in that range.  The people
 3  that we brought, we, being the USTU, brought, probably
 4  another 15 as well.  Others who were there either to
 5  observe or to speak out against the USTU, I'd say maybe
 6  another 15 to 20.  So you're probably looking at 50, 60
 7  would be my best recollection.
 8  Q      Did any of the USTU factions that were
 9  there and critical of USTU governance use words that
10  sounded harsh toward Korean Americans or insensitive?
11         MR. LEVINSTEIN:  Objection.
12         MR. RYCHENER:  I'm going to object to the
13  extent it's been asked and answered.  If you have any
14  other way to say it, you can answer.
15  A      No.
16         MR. JONES:  Okay.  No further questions.
17  Thanks.
18         MR. LEVINSTEIN:  Nothing from me.
19         (The deposition concluded at 1:07 p.m.)
20
21
22
23
24
25
```

48

```
     4/8/2005  Smith, Steven Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)
1                        A F F I D A V I T
2    STATE OF COLORADO        )
                              ) ss.
3    COUNTY OF                )
4           I have read my deposition, and the same is
5    true and accurate, save and except for changes and/or
6    corrections, if any, as indicated by me on the
7    amendment sheet(s) attached hereto as indicated.
8
9    Amendment sheet(s) attached [  ]
10   No changes; no amendment sheet attached [  ]
11
12
            _____
13                 STEVEN SMITH, ESQUIRE
14
15      SUBSCRIBED AND SWORN TO before me on this
16   _____ day of _____, 2005.
17   My commission expires: _____
18
19          _____
                       NOTARY PUBLIC
20
        in and for the State of _____
21
22
23
24
25

                                    49
```

```
     4/8/2005  Smith, Steven Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)
1                   C E R T I F I C A T E
2
     STATE OF COLORADO    )
3                         ) ss.
     COUNTY OF DENVER     )
4
5
            I, VALORIE S. MUELLER, Registered
6    Professional Reporter and Notary Public in and for the
     State of Colorado, duly appointed to take the
7    deposition of STEVEN SMITH, ESQUIRE, certify that prior
     to the examination the deponent was duly sworn to
8    testify to the truth in the matters in controversy
     between the parties herein; that the deposition was
9    taken in shorthand by me at the time and place
     aforesaid and was thereafter reduced to typewritten
10   form by me and processed under my supervision, the same
     consisting of 49 pages, and that the same is a full,
11   true and complete transcription of my shorthand notes.
     I further certify that I am not related to, employed
12   by, or counsel to any of the parties herein, or
     otherwise interested in the events of the within cause.
13
14      A transcript review of this deposition was
     requested and is available to the deponent as notified
15   by me.
16
        IN WITNESS WHEREOF, I have affixed my notarial
17   seal this 25th day of April, 2005.  My commission
     expires December 11, 2006.
18
19          _____
                       VALORIE S. MUELLER
20                Registered Professional Reporter
21
22
23
24
25

                                    50
```