# Exhibit B

0064

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF HAWAII
 2              CIVIL ACTION NO. 04-00461-SOM-LEK

 3        _____

 4        DEPOSITION OF BRUCE C.K.W. HARRIS, VOLUME II
          EXAMINATION DATE:  April 7, 2005
 5                                        _____

 6        DAE SUNG LEE,

 7              Plaintiff,

 8        v.

 9        UNITED STATES TAEKWONDO UNION,
          a Colorado nonprofit corporation, et al.,
10        Defendants.
          _____
11
12              PURSUANT TO SUBPOENA, the deposition of BRUCE
13        C.K.W. HARRIS, VOLUME II, was taken at 8:02 a.m. on
          April 7, 2005, at the Double Tree Hotel at 1775 E.
14        Cheyenne Mountain Boulevard, Colorado Springs,
          Colorado, before Valorie S. Mueller, Registered
15        Professional Reporter and Notary Public in and for the
          State of Colorado, said deposition being taken pursuant
16        to the Federal Rules of Civil Procedure.
17
18
19                    Valorie S. Mueller
                    Registered Professional Reporter
20
21
22
23
24
25
```

```
 1                    A P P E A R A N C E S
 2
          For the Plaintiff:
 3
               WARD D. JONES, ESQ.
 4             GLENN UESUGI, ESQ.
               Bervar & Jones
 5             1400 Pauahi Tower
               1001 Bishop Street
 6             Honolulu, Hawaii 96813
               (808) 550-4990
 7
 8        For the Defendants:
 9             MARK LEVINSTEIN, ESQ.
               TODD BRAUNSTEIN, ESQ.
10             Williams & Connolly, LLP
               725 Twelfth Street, N.W.
11             Washington, D.C.  20005
               (202) 44-5171
12
13        Also present:  Dae Sung Lee
                         Gary Johansen, Deputy General Counsel,
14                       United States Olympic Committee
15                            I N D E X
16
          EXAMINATION BY:                              PAGE
17
          Mr. Jones  .......................................  68
18        Mr. Levinstein ...................................  122
          Mr. Jones  .......................................  348
19        Mr. Levinstein ...................................  369
          Mr. Jones  .......................................  374
20
21              I N D E X   O F   E X H I B I T S
22        DEPOSITION                               PAGE FIRST
          EXHIBIT NO.   DESCRIPTION                 APPEARS
23
          4*    August 4, 2003 letter from Thomas Satrom
24              to Bruce Harris ..........................  77
25
```

```
 1        5*    9/5/2003 letter from Thomas Satrom to
                Bruce Harris .............................  77
 2
 3        7*    3/30/04 e-mail from Bruce Harris to Dae
                Sung Lee, with forwarded 10/8/03 e-mail
 4              from Kelly Skinner to Bruce Harris .......  72
 5        32*   Excerpt from the United States Olympic
                Committee Selection Procedures Manual ....  68
 6        42*   USOC Remediation Plan for USTU January 27,
 7              2004 ...................................... 114
 8        84    Responses to 16 Questions Submitted by Tom
                Satrom in September 5, 2003 Letter, Bates
 9              USOC00784-USOC00797 .......................  78
10        85    10/30/03 letter from James Scherr to Bruce
                Harris ................................... 112
11        86    United States Taekwondo Union, Inc.
12              Financial Statements For the Year Ended
                December 31, 2002, Bates
13              USOC00422-USOC00432 ...................... 170
14        87    Selection Procedures for Coaches signed by
                Bruce Harris 1/20/03 ..................... 192
15        88    8/25/03 memo from Dr. Cha Sok Park to
16              William Martin and James Scherr, Bates
                USOC00039-USOC00042 ...................... 246
17        89    Article entitled "USTU in Turmoil" by
                Ginny Lopez, Bates USOC00171-USOC00172 ... 252
18
19        90    9/2/03 and 9/1/03 exchange of e-mails
                between Kay Burton and Larry Voorhees,
20              Bates USOC00186-USOC00188 ................ 256
21        91    4/30/03 e-mail from Kay Burton to the M&C
                Committee, forwarding a 4/30/03 e-mail
22              from Diana Dunlap to Kay Burton, Bates
23              USOC00124-USOC00125 ...................... 257
          92    Printout from LadyTKD.com, Bates
24              USOC00070-USOC00071 ...................... 260
25
```

```
 1        93    11/29/03 e-mail from Bob Gallagher to USOC
                Executive Committee, Bates
 2              USOC00147-USOC00148 ...................... 270
 3        94    9/1/03 e-mail from Bob Kestenbaum to Kay
                Burton, Bates USOC00048 .................. 275
 4
 5        95    9/1/03 letter from Guy Poos to Kay Burton,
                Bates USOC00189-USOC00190 ................ 278
 6        96    9/2/03 e-mail from Kay Burton to M&C
                Committee, forwarding 8/31/03 e-mail from
 7              *jjstkd@aol.com* to the USOC, Bates
                USOC00192-USOC00193 ...................... 288
 8
 9        97    Letter from Larry Voorhees to Ms. Burton,
                Bates USOC00174-USOC00176 ................ 291
10        98    4/12/04 letter from Philip Acosta to Jim
                Scherr, Bates USOC00001-USOC00002 ........ 313
11
12        99    9/16/03 e-mail from Kay Burton to M&C
                Committee, forwarding 9/16/03 e-mail from
13              Larry Cain to Kay Burton, Bates USOC00178  315
14        100   5/29/03 letter from Kim Sol to Thomas
                Satrom, Bates USOC00143-USOC00146 ........ 320
15        101   1/1/98 cover letter from Josiah Henson to
                the USOC, with attached 1/2/98 letter from
16              Josiah Henson to Richard Schultz, Bates
                USOC00004-USOC00014 ...................... 339
17
18
19
20
21
22
23
24
25
```

**Page 68**

```
 1            P R O C E E D I N G S
 2            BRUCE C.K.W. HARRIS, VOLUME I
 3            The deponent herein, being first duly
 4    sworn to testify to the truth in the above cause, was
 5    examined and testified on his oath as follows:
 6            E X A M I N A T I O N
 7    BY MR. JONES:
 8        Q    I believe we were talking about the
 9    Selection Procedures Manual for Taekwondo U.S. Olympic
10    coaches when we broke off yesterday.
11        A    Yes.
12        Q    Handing you Exhibit 32 once again.  I had
13    some questions about that.
14            After reviewing that, does it appear to be
15    selection criteria that was in effect in 2003 in
16    preparation for the 2004 selection?
17        A    Yes, it appears to be so.
18        Q    And was a coach candidate selected in 2003
19    for the position of Olympic coach for the Athens
20    Olympics in 2004?
21        A    Yes, there was.
22        Q    And who was that?
23        A    Mr. Dae Sung Lee.
24        Q    Can you just briefly walk us through the
25    process by which he was selected, if you know?
```

**Page 69**

```
 1        A    Again, we followed the written criteria
 2    that were approved by the USOC review committee, the
 3    delegation review committee; and that included having
 4    nominations come from the Coaching Science Committee.
 5    And those nominations had to meet the criteria, No. 1,
 6    which was either coaching experience in the Olympic
 7    Games, Pan Am Games, World Championship, World Cup, or
 8    Pan Am Championship.
 9            After that, the Executive Committee would
10    approve those recommendations, and they would also make
11    the selection -- approval selection of the coach, which
12    ended up being Mr. Lee.
13        Q    Do you know why he was selected?
14            MR. LEVINSTEIN:  Objection.
15        A    I wasn't privy to the nominating process,
16    but in reviewing what was submitted, I mean his resume
17    met the requirements in No. 1, where he had previous
18    experience in more than one of those areas -- one of
19    those events.
20        Q    (BY MR. JONES)  Were Taekwondo athletes or
21    their representatives involved in the coach selection
22    process in 2003?
23            MR. LEVINSTEIN:  Objection.
24        A    To my knowledge, there were athletes on
25    the Coaching Science Committee that made the nomination
```

**Page 70**

```
 1    because we had a 20 percent requirement for each
 2    committee.
 3        Q    (BY MR. JONES)  Do you know who those
 4    athletes were?
 5        A    No, I don't.
 6        Q    Were Taekwondo coaches or former coaches
 7    involved in the selection process, if you know?
 8        A    I'm trying to remember the makeup of the
 9    Coaching Science Committee.  I do know that there was
10    at least one coach that I remember being on there, and
11    there were probably more.  I don't remember all the
12    names of the committee members.
13        Q    You said within USTU, the coach selection
14    process involved two bodies considering a given
15    candidate?
16        A    The Coaching Science Committee made the
17    recommendation and the nominations, and it was approved
18    by the Executive Committee.
19        Q    What happened, if you know, after the
20    Executive Committee nominated Dae Sung Lee?
21        A    After that was approved by the Executive
22    Committee, I sent a letter to that.  I sent a letter to
23    the president, who already knew, but to have something
24    in writing saying that this was the result of the
25    Executive Committee determination.  And then we would
```

**Page 71**

```
 1    follow up with the procedure to the USOC Delegation
 2    Review Committee.
 3        Q    Is that a matter of just sending something
 4    over to the Delegation Review Committee?
 5        A    Yes.  And usually I sent it to Mr. Moy,
 6    Gary Moy.
 7        Q    What did the document look like?
 8        A    As I recall, I just drafted a letter
 9    saying that this was the results of the coaching
10    selection.
11        Q    Do you remember when approximately that
12    took place that you sent correspondence to the USOC
13    involving Dae Sung Lee's nomination?
14        A    I don't remember the exact month at all.
15    I've tried to remember that, but I don't.
16        Q    Do you recall whether or not Dae Sung Lee
17    was asked to attend a site visit in Athens, Greece, in
18    2003?
19        A    In 2003, there was a -- I think they
20    called it a team leaders meeting, which was a site
21    visit to Athens.  He was supposed to have gone;
22    Lynnette Love was also supposed to have gone.  And
23    those names were submitted to the International Games
24    Committee as well.
25        Q    Do you know if he went?
```

1    A    I knew he didn't.

2    Q    You knew what?

3    A    I knew that he did not.

4    Q    Do you know if there was a site visit

5  before the team leader conference that you just spoke

6  of?

7    A    Yes, there was, and I went on that one,

8  along with Mr. Lee.

9    Q    That was to Athens?

10    A    Yes.

11    Q    Do you remember when that was?

12    A    Unfortunately, I don't remember it.

13    Q    That's okay.  Showing you exhibit next in

14  order.  I apologize.  This is Exhibit 7.

15            (Deposition Exhibit No. 7 was re-marked

16            for identification.)

17    A    Okay.  I have reviewed that.

18    Q    (BY MR. JONES)  What is that document, do

19  you know?

20    A    It's an e-mail to Mr. Lee from me.  I

21  think it was in response to the request from Mr. Dae

22  Sung Lee regarding providing something that certified

23  that he had been approved as the coach for the 2004

24  Athens Olympics.

25    Q    So the top part is an e-mail from you?

1  Ms. Farrell?

2    A    Yes.

3    Q    And what was the purpose of this e-mail,

4  if you know?

5    A    To verify that the selections that we had

6  submitted to them had been approved.

7    Q    To your knowledge, was there anything

8  further needed to complete the coach nomination process

9  for U.S. Olympic coach of the Athens Games?

10    A    Not to my knowledge.

11    Q    What did you do after you got this e-mail

12  on or about October 8, 2003?

13    A    I informed Mr. Lee and also Ms. Love that

14  their names had been approved.

15    Q    How did you inform them?

16    A    Possibly by phone, possibly by e-mail.  I

17  don't remember.

18    Q    Do you have any idea what Mr. Dae Sung Lee

19  was doing in the interim period between the USTU

20  approval of his name as coach and the USOC verification

21  by e-mail that he had been approved by them as well?

22            MR. LEVINSTEIN:  Objection.

23    A    I don't know what he was doing, but I know

24  that he contacted me several times in regards to

25  whether it was official, whether he had been approved

1    A    Yes.

2    Q    And what is the bottom part of that

3  Exhibit 7?

4    A    This is forwarded by Michelle Farrell, who

5  was on the Sports Partnership staff with Mr. Kelly

6  Skinner.  And it's -- the subject was "US Taekwondo

7  Approved Staff Nominations for 2004 SOGs, Athens," and

8  it says that "The USOC Executive Committee approved the

9  following US Taekwondo Staff Nominations for the 2004

10  Summer Olympic Games, Athens," and the names included

11  are Lynnette Love as team leader and Dae Sung Lee as

12  coach.

13    Q    What is the date of the e-mail that was

14  forwarded to you by -- was it forwarded to you?

15    A    I don't see my name listed.  Oh,

16  "USTUevents," yes.  That was to me, through the events

17  address at USTU.  And that date was 8/28/2003.

18    Q    All right.  There's another date in the

19  middle of the page that says forwarded by Michelle

20  Farrell, USOC --

21    A    On October -- or 10/8/2003.

22    Q    So your best answer is October 8, 2003 as

23  to --

24    A    Yes.

25    Q    -- when you got the e-mail from

1  or not.  I don't know what he was actually doing, other

2  than that.

3    Q    (BY MR. JONES)  In your role as Executive

4  Director, did you have to approve any expenses incurred

5  by Mr. Lee toward preparation for the Games?

6    A    Yes.

7    Q    Can you think of any expenses which you

8  approved during 2003?

9    A    I know that he went -- Mr. Lee went on

10  several trips with the team as part of the scouting

11  mission in preparation for the Games.  I don't remember

12  the dates, but I know that we did include him in the

13  travels as a preparation for the Games.

14    Q    And did the USTU pay for those --

15    A    Yes.

16    Q    -- travel expenses?  That would include --

17  would that include airfare?

18    A    Airfare, hotel, yes.

19    Q    Was per diem typically allowed?

20    A    We went through a process of changing the

21  way per diem worked, but there was some per diem as

22  well.

23    Q    And when various competitions came up that

24  he was expected to attend, how would he be notified, if

25  you know?

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    MR. LEVINSTEIN:  Objection; assumes facts
2  not in evidence.
3    A    To the best of my knowledge, we would
4  publish the team makeup, which included the athletes,
5  the coaches, the trainer; and he was included in that.
6    Q    (BY MR. JONES)  When flight reservations
7  were arranged for Mr. Lee, would he be told to -- would
8  tickets be sent to him, or would he be told just to
9  show up at the airport and pick them up?
10    A    Our events office handled all the airline
11  bookings.  Sometimes it would be paper tickets,
12  sometimes it would be E-tickets, where he would show up
13  and show his ID.
14    Q    Would the events office be the one that
15  has records of those sorts of things, then?
16    A    Yes, definitely.
17    Q    The events office of USTU?
18    A    Yes.
19    Q    And who would that have been in 2003?
20    A    2003, that was Gina Mendoza.
21    Q    Would the events office also handle hotel
22  reservations for competitions for the team?
23    A    Yes.  And I was also a part of that,
24  because I was still handling the events oversight.  So
25  in addition to Gina Mendoza, it was also Linda Henry.

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    I'd like to go back to one document,
2  Exhibit 5, if we could, and just ask you a few
3  questions about that, if you would look through it
4  briefly.
5    A    Yes, I have.
6    Q    Several of the points raised in Exhibit 5
7  seem similar to points raised in Exhibit 4, which was
8  an earlier letter from Mr. Satrom.  Do you recall that?
9    Q    Example, the questions about the Kukkiwon
10  system?
11
12    A    Yes.
13    MR. LEVINSTEIN:  Hold on.  I'm looking
14  for Exhibit 5, which became Exhibit 82.  Go ahead.
15    Q    (BY MR. JONES)  If you could just go
16  through this and tell us how you responded to the
17  problems, if you will, or inquiries, if you will, by
18  Mr. Satrom?
19    MR. LEVINSTEIN:  I think there is a
20  document that we have given you.  If we can go off the
21  record for one second --
22    MR. JONES:  Okay.  Sure.
23    (Discussion off the record.)
24    (Whereupon, Mr. Johansen left the
25    deposition proceedings.)

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    (BY MR. JONES)  If you can go through
2  point by point, and if you have already responded to a
3  given point, just say, you know, I handled that one
4  yesterday.
5    A    All right.  No. 1 was providing a list --
6    MR. LEVINSTEIN:  Time out.
7    (Discussion off the record.)
8    (Whereupon, Mr. Johansen rejoined the
9    deposition proceedings.)
10    (Deposition Exhibit No. 84 was marked
11    for identification.)
12    A    Yes, I recall this very well.
13    Q    (BY MR. JONES)  We've handed you Exhibit
14  84.  Yesterday, we were asking whether you had
15  responded in writing to the letter from Mr. Satrom
16  marked as Exhibit 5.
17    A    Yes.
18    Q    And you said you did recall doing that,
19  but we didn't have it yesterday, but today it's been
20  located by counsel and marked.  Is that document one
21  which you wrote?
22    A    Yes.
23    Q    And was it done in response to Exhibit 5?
24    A    Yes, it was.
25    Q    Or was it?  I don't want you to read all

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1  the responses you did, because it's very lengthy, but
2  if you could just kind of summarize briefly, point by
3  point, so that we have it in the record.
4    A    Okay.  The first issue was providing a
5  list of all grievances filed, and that was done in an
6  attachment.  And it was done by Mr. Mark Bryant, who
7  was chair of Law and Legislation, which is why I didn't
8  respond to that one personally.  He did.  And that was
9  done as an attachment.
10    No. 2 was a question about individuals from
11  the Pan Am Region that were invited to the 2003 Junior
12  Olympics.  It questioned how many people were invited,
13  how many attended, who paid for the cost, what was the
14  total cost associated with their attendance and the
15  purpose of inviting them to the Juniors.
16    Without reading the synopsis of it, I
17  remember that -- well, the cost specifically says it
18  was $41,787.65.  That amount actually was paid for by a
19  gentleman by the name of Mr. Kim Chung, who was the
20  president of the Canadian Taekwondo Federation at that
21  time.
22    The purpose of inviting them was so that they
23  could get to experience the Junior Olympics, which
24  again is the largest Taekwondo event in the world.
25  That was done on more than one occasion, where we

```
1    invited guests and dignitaries.  This time it happened
2    to be around 20 Federation presidents from the Pan Am
3    Region.
4            And, again, this was at no expense to the
5    USTU.  The way this figure was arrived at was we got a
6    breakout from the hotel with room costs per room;
7    airfare was paid by him; the hotel costs were
8    individually itemized; and he submitted payment for
9    that as well.  So it was at no cost to the USTU.
10           Of the 22 that were invited, I think there
11   were around 16 or 18 that came because a few couldn't
12   make it for last-minute reasons.
13           No. 3, explain how the 2003 Junior Olympics
14   are organized and administered.  More specifically, the
15   Committee wanted to know whether the USTU runs the
16   event itself or contracts with a third party to run the
17   event.  Also how the receipts and expenditures for the
18   event are handled.  "That is, does USTU accept
19   participant fees and spectator fees in cash, check or
20   credit card.  If cash is accepted, how does USTU
21   account for the cash receipts?  Are expenditures paid
22   for in cash?  If so, how are these expenditures
23   accounted for?  ... what were the total gross receipts
24   for the Championships, total expenditures ... and net
25   revenue ...  Finally, please provide the number of
```

```
1    fees in cash, check, or credit card?  At that time, we
2    accepted any form of payment.  Sometimes it was to our
3    detriment because checks bounced.  It was something
4    that later we amended or we no longer took checks, only
5    credit cards or money orders.
6            If cash is accepted, how was it accounted for
7    for cash receipts?  When I first came on, we had very
8    poor receipting for everything.  As I noted yesterday,
9    we only had 20-some percent of receipts in-house.  And
10   that included things like cash receipts at events.  So
11   that was a weakness in our system.
12           Some expenditures were paid for in cash.  I
13   was personally responsible for contracting the venue,
14   the labor, the setup, everything else.  Most places --
15   or most of the things accepted a check, which we did
16   and had a record of.  If it was done in cash -- for
17   instance, I'm trying to think of one thing that we
18   might have paid for in cash.  Delivery of audio-video
19   equipment, such as the monitors and the computers, some
20   companies wanted cash when they delivered, and we did
21   that and got a receipt for that.  And that was in the
22   USTU records.
23           But for the most part, we tried to pay
24   everything by check from the USTU, which required my
25   signature and also either Gina Mendoza's or someone
```

```
1    individuals who participated at the Championships, with
2    a schedule of fees for participating.  That is, is
3    there a one time fee, or does a participant pay
4    multiple fees depending upon the competitions entered?
5    Also, provide the total number of individuals who paid
6    spectator fees, with a schedule of fees for attending.
7    That is, are different fees collected for children,
8    adults, parents of participants, [et cetera].  Lastly,
9    what were the total revenues collected for participant
10   fees and for spectator fees?"
11           Well, just going from my recollection, the
12   response, without reading it, how is it organized?  The
13   USTU at one time did contract our national events out.
14   There was a bid process, and individuals could garner
15   the bid to host the event; for example, say a $100,000
16   bid fee, you have the rights to put on that
17   Championship.  It's your expenses, your revenue, your
18   income gained from the event.
19           That was one thing that we stopped doing when
20   I came on as Events Director.  All of the events moved
21   in-house, which is to say that all of the national
22   events were handled by the USTU and its events staff.
23   The 2003 Junior Olympics was also one of them.  So we
24   no longer contracted.
25           Do we accept participant fees and spectator
```

```
1    else.
2            Total gross receipts, I'll have to go with
3    what's listed here.  It says $680,489.69.  Expenditures
4    were $487,113.92.  Net revenue was $193,375.77.
5        Q   So the event made money?
6        A   Yes.
7        Q   Number of participants, according to this,
8    was 5,390.  And that's tracked by the registration
9    system in the events office, depending on how you
10   registered.
11           I remember the question asking -- there was a
12   different price breakdown if a competitor competed in
13   one event, two events, three events; $70, $90, $110, I
14   think it was something like that.
15           Spectator fees were also tiered so that there
16   was a fee for -- the total four-day event for adults
17   was one fee; the total four-day event for children was
18   one fee; and individual day passes were also different
19   for adult and children.
20           I might note that the USTU did not handle --
21   what's that called when you walk up and pay?  What was
22   the question?  Spectator fees.  We contracted a group
23   like TicketMaster to handle that.  So they tracked the
24   daily receipts.
25           At the end of the day, I was called in, along
```

1   with the head of the TicketMaster group, in addition to
2   the local organizing committee, which was usually
3   someone from the convention center, and each day we
4   initialed the daily receipts, because we had a
5   percentage basis for revenue from spectator fees.
6           For instance, in Orlando, it was always
7   50/50, which was a terrible deal, I thought.  In Tampa,
8   it was 75/25 for USTU.  In Minnesota, it was 100
9   percent USTU.  So we had to verify the daily receipts
10  so we knew how much we were getting.
11          In general, out of the spectator fees, we
12  ended up paying for the staffing for TicketMaster and
13  sometimes the staffing for security in the venue.  And,
14  again, at the end, that was reconciled.  We got their
15  bill, we had the total receipts from spectator fees,
16  there was an indication of what was subtracted, and
17  they would write a check to us.
18          Spectator fees were never given to us in
19  cash.  It was either mailed or given to us at the
20  closeout by check.  I think that covers No. 3.
21      Q    Thank you.
22      A    No. 4, "It has been reported that USTU
23  chartered an airplane," that was discussed yesterday
24  fully.  Do I need to go into it further?
25      Q    No.  That's fine.

1   A    No. 5, "As of September 1, 2003, what is
2   the current balance of USTU's total debt?  ... current
3   amount of USTU's loans or other obligations?  ...
4   current balance on USTU's line of credit?  How much can
5   USTU draw on its line of credit?  What is the amount of
6   USTU payables?"  And those numbers are listed effective
7   at that time.
8       Q    Okay.
9       A    No. 6, "The committee has requested
10  information in the past from USTU regarding the number
11  of delegates that are appointed to the USTU Board of
12  Governors by the USTU President.  The Committee has
13  gotten various responses regarding this question.
14  Please provide an accurate and complete accounting of
15  the number of appointments.  How many delegates are on
16  the Board of Governors?  How many of these delegates
17  are appointed by the USTU's President?  Please provide
18  a list of delegates, the organization that they
19  represent, and indicate whether they were elected or
20  appointed.  Also, please provide a list of Executive
21  Committee members, what category they fill on the
22  Executive Committee and whether or not they are
23  appointed by the President.  Is it true that an
24  appointment to the Executive Committee is in effect
25  also an appointment to the Board of Governors?"

1       Okay.  I don't know if you want me to list
2   the numbers that are here in response, but this was the
3   breakout as we discerned them at that time.
4       Q    You responded to it?
5       A    Yes.  There were 127 voting members at
6   that time on the Board of Governors.
7       Q    Yeah.  Why don't you go through and just
8   tell us the numbers you came up with so we understand
9   the structure.
10      A    Voting State Presidents listed were 13.
11  Non-voting State Presidents were 9.
12  Delegates-at-Large, 5.  And Committee Chairpeople, 5.
13  Total number of Voting Delegates to the Board of
14  Governors equal 91.  Total Number of Votes Cast by the
15  Voting Delegates at the Board of Governors was 127.
16  Total number of Votes Cast by the Members of the Board
17  of Governors Appointed by the President were 23.  And
18  those were the numbers.
19      Q    Okay.
20      A    Attached was an Exhibit D which was a
21  detailed list of the current delegates to the Board of
22  Governors, their organizations, and whether each
23  delegate was elected or appointed.  I noticed that
24  there were no exhibits attached to this, but I know
25  they were provided.

1       The Executive Committee was comprised of 20
2   people; 6 officers, 4 Coordinators of Divisional
3   Affairs, 1 Junior Olympic Chairperson; 1 Chair of Law
4   and Legislation; 1 Chair of National Coaching Staff; 1
5   chair of Technical Contest Rules and Referee Committee;
6   1 chair of National Championship, Tournaments, and
7   Ceremonies; 1 Chairperson of National Athletes Advisory
8   Council; and 4 Athlete Representatives selected by the
9   AAC.
10          In addition, the Executive Director of USTU
11  and Immediate Past President of USTU were nonvoting
12  members of the Executive Committee.  There was also an
13  Exhibit E that was attached that listed the names of
14  the Executive Committee members, what category they
15  fill, and whether they were appointed by the president.
16      Q    Just as an aside, what was the total
17  number of members or estimated number of members
18  nationally in the USTU as of the time you were
19  responding to these questions?
20      A    In 2003 -- I think this was when the
21  response was.
22      Q    2003.
23      A    2003, I think by the end of the year, we
24  were at 34,000 members.
25      Q    So the body of -- the various structures

1   you have just gone through describing the Committee's
2   management, et cetera, of USTU was speaking for a
3   membership of 34,000?
4        A    Yes.
5             MR. LEVINSTEIN:  Objection.
6        Q    (BY MR. JONES)  Thank you.  If you would
7   proceed.
8        A    Okay.  No. 7, "Please provide a detailed
9   summary of the Kukkiwon program."  The Committee wanted
10  a complete understanding of the program, its history,
11  who runs it, its purpose.
12           "Is the Kukkiwon program connected to the
13  [International Federation]?  Do competitors have to be
14  Kukkiwon certified to compete in international
15  competitions?  How about the Olympics or Pan [Am]
16  Games?  Is this an IF rule?  If so, what is the purpose
17  of such a rule?  Is there a standard ability level an
18  athlete must attain through some sort of testing
19  program to be certified, or is a certification the
20  result of a recommendation from an athlete's
21  instructor?  Please provide a complete explanation of
22  the fee schedule for Kukkiwon certification.  Are
23  different fees paid for different levels of
24  certification?  Who gets these fees?  That is, does the
25  athlete's instructor get a fee, does USTU get a fee,

1   and does the IF get a fee?  How much of each fee goes
2   to each entity, including the Kukkiwon organization?
3   What was the total revenue to USTU as a result of the
4   Kukkiwon certification program in the years 2001 and
5   2002?"
6           Okay.  Kukkiwon, the institution, is an
7   adjunct to the World Taekwondo Federation, which is our
8   International Federation.  Its sole purpose is for
9   certifying black belts worldwide.  That's the purpose
10  of Kukkiwon.
11       Q    I think you have covered that yesterday.
12       A    Right.  Who runs it, they have their own
13  staff.  They're located in Korea.  They have their own
14  organization base.  Is the Kukkiwon program connected
15  to the International Federation?  Yes.
16       Q    That was the one you were saying was the
17  gold standard?
18       A    Right.  Kukkiwon is the gold standard.  Do
19  competitors have to be Kukkiwon certified to compete in
20  international competitions?  Not all international
21  competitions, just those sanctioned by the IF.  That
22  includes World Championship, World Cup, the regional
23  Federation Championships, like Pan Am Games, the
24  Olympic Games.
25           For those, you have to have Kukkiwon

1   certification.  That's an International Federation
2   rule.  The purpose of the rule is so that, as I
3   understand it, there's some consistency to the level of
4   competition.  There are thousands -- literally
5   thousands of individual organizations that certify
6   people as black belts with no standard.
7           Kukkiwon, as the certifying organization, has
8   standards for promotion and certification through each
9   level of black belt.  So there is a standard that you
10  can assume when you see that someone is an 8th Dan
11  Kukkiwon black belt, a 2nd Dan Kukkiwon black belt.
12  That's consistent worldwide.  So, yes, there is a
13  standard ability level to be certified as a Kukkiwon
14  black belt.
15           Recommendation of an athlete's instructor is
16  a part of it.  Instructors are the ones that test
17  individuals based on the Kukkiwon standard and submit
18  it for certification.  That's the best way I know to
19  put that.
20           The fee schedule, I think we include -- yes,
21  and that's listed on the next page, Page 7.  And it
22  ranges from $70 for a 1st degree black belt to $700 for
23  a 9th degree black belt, and it's incremental; 70, 90,
24  120, et cetera.  It's listed.  And that's standard fees
25  for Kukkiwon black belts worldwide.

1           Different fees are paid as noted on Page 7.
2   Who gets these fees?  The way the USTU Kukkiwon program
3   worked was in order to recommend for Kukkiwon
4   certification, an instructor had to show proof that
5   they were a 4th degree Kukkiwon black belt with the
6   USTU office, based on a copy of your 4th degree
7   certification.  And the standard is you have to be a
8   minimum 4th degree Kukkiwon to recommend others for
9   promotion.
10          And you can recommend for promotion up to one
11  level below your level.  For instance, if I'm a 4th
12  degree, I can only recommend my students up to the
13  level of 3rd degree Kukkiwon.
14          Our fee schedule was such that we got half of
15  the certification fees for Kukkiwon and sent half to
16  them.  So in the case of an application for a 1st
17  degree black belt, an instructor would send us the
18  application form signed with their Kukkiwon number, 4th
19  Dan or higher, and a money order for $70.  Of that $70,
20  $35 was sent to Kukkiwon, $35 stayed with the USTU.
21  And it was half, depending on whatever the fee schedule
22  was, on up to 9th.  Half of it stayed with USTU, half
23  went to Kukkiwon.
24          As far as athletes' instructors getting a
25  fee, I have no way of knowing whether that was the case

1  or not, because again they would submit to us the
2  posted Kukkiwon fees.
3          Does the IF get a fee?  Not the IF, per se,
4  but Kukkiwon did; the IF being the World Taekwondo
5  Federation, which was different from Kukkiwon.
6      Q    Okay.
7      A    Total revenue as a result of the
8  certification, I'd have to look.  In 2001 -- I'm
9  referring to Page 7 of this document -- the total
10 revenue to USTU was $158,915.  In 2002, it was
11 $183,835.  I think that answers No. 7.
12     Q    Okay.
13     A    No. 8, "Please provide a summary of the
14 USTU Dan Certification program.  When this was program
15 implemented?  How many individuals have been certified
16 under this program?  Is there a standard ability level
17 an athlete must attain through some sort of testing
18 program to be certified, or is certification the result
19 of a recommendation from an athlete's instructor?  What
20 is the fee schedule for certification on this program?
21 Are any of these fees shared with other persons or
22 organizations?  Is this program being supported by
23 Taekwondo clubs?  Are there any negatives of having a
24 USTU Dan Certification program?"
25         This program had been under development for

1  several years prior to this pseudo implementation.  A
2  gentleman by the name of Mr. Kim Sol in Montana was the
3  guiding force that was working on writing it, coming up
4  with the specifications and everything.
5          It wasn't implemented prior to this, again
6  for the reasons that were stated by then President Sang
7  Lee, which I discussed yesterday.  If Kukkiwon is the
8  gold standard, we would doom our program to possible
9  failure by trying to substitute it for the Kukkiwon
10 program because, again, that's the standard that
11 everyone wanted.
12         In developing the USTU Dan Certification
13 program, we paralleled the Kukkiwon program with
14 several distinctions, as noted in here.  All monies
15 collected would be kept by USTU.
16         We had made provisions for actual physical
17 testing of people at state, regional, and national
18 events as a part of the requirement for getting your
19 belt rank.  So it wouldn't just be a recommendation on
20 a paper application.
21         The USTU Dan program would be totally managed
22 by the USTU.  And there was a plan for the USTU Dan to
23 be the required standard for participation in USTU
24 national events.  That's how it differed from the
25 parallels with the Kukkiwon program.  Fees would have

1  been the same, so there was no advantage in cost or
2  savings by getting one or the other.
3          We implemented -- we began implementing it in
4  August of 2003, and we were accepting crossover
5  memberships.  For instance, if you had a 6th Dan
6  Kukkiwon, and you wanted the 6th Dan USTU
7  certification, you paid a $50 fee, and you would have
8  the USTU, as well.  And that was for all levels.
9          I think five people had done that at the time
10 of this report.  So it wasn't a smashing success.
11     Q    Five people?
12     A    Yes.  We had not conducted any physical
13 tests of people at that point.  Again, it was
14 implemented in August.  Our next national event
15 wouldn't have been until nationals in 2004, which would
16 have been in May.  But that was the plan to actually
17 have a board of examiners set up to test people at the
18 next national event.
19         Again, the fee schedule paralleled that of
20 Kukkiwon.  The new program did develop interest.  We
21 did get inquiries by phone and by e-mail to the Dan
22 office.  Mainly people, as I recall, were asking is it
23 going to be a requirement to participate in nationals
24 next year?  And our response was not yet, but at some
25 point down the line, it will be the requirement.

1          But we did get lots of inquires about it,
2  but, again, only five people jumped on right away and
3  converted to the U.S. Dan.  We printed up certificates.
4  We printed up black belt cards, and we went by the
5  curriculum for certification that was developed by
6  Mr. Sol, Kim Sol, in Montana.
7          The negative side was initially, there wasn't
8  a lot of interest in converting, and there was no hope
9  of getting it accepted internationally.  Other
10 countries have national Dan certification programs.
11 But, again, at WTF sanctioned events, they're not
12 accepted.  And I have witnessed that firsthand.  So
13 that was the downside of the program.
14         No. 9, "How does USTU respond to the
15 perception that the USTU is governed by cultural values
16 emanating from Korea?"  This I discussed at length
17 yesterday.
18     Q    Yes.
19     A    No. 10, "USTU recently sent a proposal to
20 amend its bylaws to its Board of Governors.  What was
21 the proposal?  Why was it sent at this time, when the
22 Board of Governors is scheduled to meet in November?
23 Was the proposal sent to the entire Board of Governors
24 or was there a problem with the mailing?  If so, please
25 explain.  Does the USTU have a current list of who is

**Page 96**

1  on the Board of Governors?  Will the individuals on the
2  Board of Governors change at the November meeting, that
3  is, will there be a new Board elected at that meeting?"
4      I'm reviewing my response to this.  Oh, the
5  proposed amendments that were sent out would eliminate
6  the president's ability to make appointments.  As I
7  said yesterday, he had verbally stated such in other
8  meetings, but this was the first written attempt to
9  inform the body, the Board of Governors, that it would
10  be on the ballot at the annual meeting in November.
11      So it would eliminate his ability to appoint
12  state presidents, where in the past if there were fewer
13  than five clubs, he could appoint a state president.
14  That would be gone.  And also the five at-large
15  members.  It would eliminate the contradictory language
16  within the USTU bylaws regarding the submission of
17  state delegates to the national meeting 60 days in
18  advance while maintaining the 45-day submission
19  requirement contained elsewhere in the bylaws.
20      Also it would eliminate the requirement that
21  delegates to the board of governors meeting be listed
22  with the national office, or the office of the
23  Executive Director, as registered members of the
24  corporation at least 60 days in advance of that
25  meeting.

**Page 97**

1      As I recall, this was sent out prior to the
2  meeting to inform the Board of Governors that these
3  things were going to be on the ballot and to draw their
4  special attention to it.  That's an answer to the
5  timeliness of that being sent out.
6      The mail ballots were sent out as a result of
7  the proximity of the meeting with the Membership and
8  Credentials Committee.  My memory has been jogged.  I
9  remember that in discussions with then President Lee,
10  he wanted to show good-faith evidence that this was a
11  proposal that was going forward.  So he wanted the
12  ballot to go out prior to the meeting with Membership
13  and Credentials.  Instead of saying we're going to, he
14  could then say we have sent out a mail ballot.
15      (Whereupon, Mr. Uesugi and Mr. Lee left
16      the deposition proceedings.)
17      A    President Lee has said voluntarily that he
18  had wanted to relinquish the authority.  I mentioned
19  that earlier.
20      MR. LEVINSTEIN:  I'm sorry.  There was a
21  ballot, or was it just a memo about the meeting?
22      THE DEPONENT:  A mail ballot.
23      MR. LEVINSTEIN:  Okay.
24      A    So a mail ballot was sent out, not just to
25  inform them, but to actually vote on it so that we

**Page 98**

1  would have some results prior to the Membership and
2  Credentials meeting.
3      "The mail ballot was sent to all members of
4  the Board of Governors."  Yes, initially, there was a
5  problem with the mailing.  And my response in writing
6  reminds me of that.
7      Initially, it was sent only to the Executive
8  Committee when it was supposed to have been sent to the
9  entire Board of Governors.  When it was noted that this
10  didn't happen, another mailing was sent out; a correct
11  mailing was made within one day.  And the reason for
12  that, as I recall, as noted here, the staff person that
13  was tasked didn't understand that on our fax machine,
14  there's two different numbers; one for the Executive
15  Committee and one for the Board of Governors.  And that
16  person wasn't familiar with the difference in the two
17  groups and sent it to the Executive Committee.
18      We always kept a receipt of who it was sent
19  to, and I remember seeing the receipt and catching the
20  fact that it didn't go to the Board of Governors.  The
21  next day, that was corrected and the ballot was sent
22  out.
23      Those who didn't receive it by fax -- we had,
24  I think, three or four people that either did not have
25  a fax or an incorrect fax number, and those were sent

**Page 99**

1  by certified mail to them.  That was our standard
2  practice, if it was something official and we got a fax
3  error or something.
4      No. 11.
5      MR. LEVINSTEIN:  Just for the record,
6  there was a question about will the individuals on the
7  Board of Governors change at the November meeting?
8      THE DEPONENT:  Oh, I'm sorry.
9      MR. LEVINSTEIN:  I don't know if that's
10  answered.
11      THE DEPONENT:  No.  Thanks for pointing
12  that out.
13      A    Membership to the Board of Governors was
14  based on each state's registration numbers, I think, as
15  of August, prior to the November.  So there was
16  a possibility that each year there would be a change in
17  the makeup of the board of directors.  I don't know if
18  that addresses it or not.  But it's not like there's an
19  election for the board of directors that takes place at
20  the national meeting.
21      For instance, if a state has five clubs this
22  year that it didn't have last year, then they will have
23  a delegate at the board of directors meeting that
24  wasn't there last year.  But it wasn't an election that
25  took place at the national meeting.

1  Did I miss anything else in here?  Oh, and
2  there was a list, a current list, of who was on the
3  Board of Governors that was submitted as an exhibit as
4  well.
5  (Whereupon, Mr. Uesugi and Mr. Lee
6  rejoined the deposition proceedings.)
7  A  No. 11, *Describe USTU's Coaching
8  Certification Program and its Referee Certification
9  Program.  Describe USTU's Master's Instructor's
10  Licensing Program.  What is the purpose of these
11  programs?  Do individuals have to meet certain
12  qualifications to participate in these programs?  Who
13  runs these programs?  Are they run by USTU or are they
14  contracted to a third party?
15  A Coaching Certification Program had
16  established guidelines to standardize our certification
17  of national coaches in the United States.  It had
18  different levels, levels 1, 2, and 3 -- actually
19  through 5; whereas to be a coach for an Olympic event,
20  World Championship, you had to be a higher level coach,
21  like a Level 5, Level 4.
22  Level 1 was an entry level, so that if I was
23  a school owner, and I took my students to a state
24  championship, for instance, or a local tournament, I
25  could come and take the certification program and be

1  level referee.  Going through the different levels
2  presumed that you were getting more experience, and
3  therefore you were more qualified as you got to the A
4  level.  This was run by the USTU and its referee
5  committee.  It was not contracted to a third party.
6  The Master Instructor Licensing Program.
7  This was set up to standardize the teaching methods for
8  Taekwondo in the United States.  This was aside from
9  the sport aspect, where the referee and the coach's
10  certification had direct carryover to the sports
11  aspect.  This addressed the teaching side of Taekwondo
12  and made an effort to standardize what is taught for
13  each belt rank, even through the color belts, not just
14  the black belt level.
15  It also offered school management education,
16  tips on developing your school.  It covered the legal
17  aspects, as far as liability, within your school.  It
18  covered the philosophy of Taekwondo, the martial art,
19  and other subjects.
20  This was a service provided by the USTU to
21  its members and its instructors.  And they publicized
22  the names of instructors who had gone through this
23  program on the USTU website, so if a student or a
24  school wanted to see if their instructor had been
25  certified through its licensing program, it was there

1  certified as a Level 1 coach.
2  Level 1 was required for every coach at our
3  national events.  That was mandatory.  There was a
4  seminar conducted at each national event for Level 1
5  and Level 2.  And there were standardized criteria for
6  each.
7  In order to take it, you had to be registered
8  as a coach, basically.  The purpose, again, was to have
9  standardization in our coaching levels and to educate
10  them.  It made requirements for CPR.  They had to be
11  familiar with the competition rules, things that might
12  seem to be expected; but there was no standardization
13  prior to that.
14  Who ran it?  It was run by the USTU.  It
15  wasn't contracted to a third party.  As far as the
16  referee certification program, same thing.  There's a
17  detailed book with the competition rules.  There were
18  four levels and categories of referees, D, C, B, and A.
19  A being the highest national level.  Within each letter
20  grade, there were three other categories, D-1, 2, 3;
21  C-1, 2, 3; B-1, 2, 3; A-1, 2, 3, with B and A being
22  national level referees.
23  The reason for the differentiation in those,
24  in order to be recommended to become an international
25  referee, you had to, at the very least, be a national

1  for everyone to see.
2  There were problems encountered with the
3  program because initially it was set up so that you had
4  to be one of the highest level black belt in order to
5  become licensed, and that automatically left people out
6  of the process, initially.  For instance, you had to be
7  7th, 8th, or 9th Dan, which had limited numbers of
8  people just by the exclusivity of the level and how
9  long it takes to obtain it.
10  This was run by the USTU.  This one, we had
11  volunteers.  For instance, we did contract for CPR.  We
12  brought in other legal experts to address that part of
13  it.  We had other instructors that were not on staff
14  with USTU to handle the philosophy aspect of it.  And
15  there were some people that were not even USTU members
16  that offered -- that conduct seminars on dojo
17  development, for instance, where they might be a guest
18  speaker at different seminars, in addition to members
19  of the USTU that also did that.
20  So it wasn't -- it was not contracted out.
21  It was done by USTU, but there were other volunteers,
22  and portions of it, like CPR, were paid for like
23  through Red Cross or whoever.  I think that covers No.
24  11.
25  No. 12, *How are coaches and staff selected

1 for the Olympic Games, Pan [Am] Games, World
2 Championships and other major international events?*
3       Q   (BY MR. JONES) I think you kind of
4 covered that question, but there were some subsidiary
5 questions in there.
6       MR. LEVINSTEIN: I don't think he did,
7 just for the record, other than the Olympic Games.
8       MR. JONES: Okay.
9       MR. LEVINSTEIN: It's up to you.
10       Q   (BY MR. JONES) Yeah, if you can walk
11 through the others, if they're different.
12       A   The Pan Am Games, being a protected event,
13 like the Olympic Games, had the same standard. We had
14 the same form that the Delegation Review Committee sent
15 that we had to send back for their approval for
16 selection; the Pan Am Games and Olympic Games.
17       For World Championship and other major
18 international events, it was a selection process done
19 in-house. But the process was the same, where the
20 Coaching Science Committee nominated the candidates for
21 coaches, and it was approved by the officers on the
22 Executive Committee.
23       Criteria? Again, I wasn't a part of the
24 committee. I'm not a -- I wasn't a part of the
25 Coaching Science Committee, so I don't know their

1 criteria in coming up with the recommendations.
2       *Are appointments made for political purposes
3 or as a basis of rewarding certain individuals?* I
4 don't have a way of knowing that.
5       *Do the coaches who are chosen have a recent
6 record ([within the] last two Quadrennium) of
7 developing athletes at the highest international
8 levels?* Coaches that are chosen. Let me see what my
9 response is.
10       Well, again, that was under the purview of
11 the Coaching Science Committee. In retrospect, some
12 coaches did have direct development of the athletes
13 within the past eight years. Others had just a proven
14 track record in coaching successfully at higher level
15 events, but that all was under the purview of the
16 Coaching Science Committee.
17       *Does USTU give any consideration to a coach
18 who places a large number of athletes on a team?*
19 Again, that was all under the purview of the Coaching
20 Science Committee. I don't know if that was a direct
21 requirement for a nomination. I can't speak to that.
22       Q   Okay.
23       A   No 13, *Are athletes ever required to
24 assist with clinics, seminars or training programs
25 offered by USTU, USTU's coaches, USTU members or other

1 individuals or organizations associated with USTU? If
2 so, what are the particulars of this arrangement? Is
3 the athlete penalized if he or she does not assist? Is
4 the athlete paid for his or her services? Are these
5 clinics a source of revenue for USTU, USTU's coaches,
6 USTU members or other individuals or organizations
7 associated with USTU?*
8       I'm reviewing my written response to that. I
9 know that the OTC Resident Program had a head coach,
10 the OTC coach. And a part of his payment included
11 bonuses for camp participation in order to develop the
12 grass roots side of it.
13       For instance, if we had a monthly OTC program
14 where 30 athletes from around the country would pay to
15 come, the OTC coach did get a bonus for numbers of
16 participants. I don't think there was a baseline, but
17 I know the participation varied from as few as five
18 participants, sometimes, to 50 or 60 participants.
19       So I do know that there was a bonus
20 associated with that. And I know that some of the OTC
21 residents assisted with the camps that were put on
22 monthly.
23       As far as money for that, they weren't
24 required to, and they weren't penalized if they didn't.
25 They were encouraged to assist with it. They didn't

1 receive compensation; did not. And the OTC budget
2 itself was increased based on the number of
3 participants in the resident program, so that affected
4 everyone, all the athletes that were a part of it.
5       Am I missing something? Do athletes get
6 penalized? No. Pay for their services? No. Clinics
7 a source of revenue, yes. For the coaches, only by way
8 of a bonus. The USTU members, no. No. That's 13.
9       No. 14, *When is the next annual meeting of
10 USTU scheduled for? When was the meeting date set?
11 Has a location, city and meeting place (hotel or other
12 site) for this meeting been determined? If so, when
13 was the location, city and meeting place ...
14 determined? Where is that location? Please provide
15 both the city and meeting place (hotel or other site).
16 When was the date for the meeting made known to the
17 USTU membership/delegates who will be attending the
18 meeting? When was the location, city and meeting place
19 ... made known to USTU membership/delegates who will be
20 attending the meeting? How was the date and location
21 made known to the USTU membership/delegates?*
22       The 2000 (sic) meeting was scheduled for
23 November 20 through 22nd as noted.
24       MR. LEVINSTEIN: 2000?
25       A   I'm sorry, 2003. The 2003 annual meeting

1    was scheduled for November 20 through the 22nd of 2003
2    in Dallas, Texas, at the Double Tree Hotel.  The
3    determination of the site, the date, et cetera, were
4    made during the week of September 8th to the 12th,
5    which was when I think these responses were submitted.
6         "In accordance with the USTU Bylaws,
7    notification of the Annual Meeting must be made
8    forty-five days prior to the Annual Meeting."  As of
9    the date of these responses, there was still more than
10   60 days prior to that meeting.
11        "Notification of the meeting date and site
12   will be made in accordance with the USTU Bylaws and
13   will be made by fax and certified mail."
14        No. 15, "What specifically has USTU done to
15   address those compliance issues raised by the
16   Committee, to communicate with its members about USTU's
17   compliance review status, to provide its Board of
18   Governors and Executive Committee with accurate
19   financial information and to provide the USOC auditors
20   with the documents and financial records they
21   requested?"
22        As noted here in writing, we tried to be as
23   proactive as possible in coming into compliance
24   financially.  That was a big concern of mine and the
25   office staff.  We terminated one finance director,

1    and procedures had been implemented and were being
2    followed.  They were approved by the officers and the
3    Executive Committee.  So they went -- as soon as it was
4    developed and approved by Chris Telli, they were
5    approved within days by the officers and the Executive
6    Committee and were implemented immediately.
7         Our financials were definitely in bad shape
8    for 2000.  It was our hope that by the end of 2003 in
9    the November annual meeting that we would have the
10   audited financials by Waugh & Associates and by USOC so
11   that we could present to the membership at that annual
12   meeting in November.
13        And, again, the expectation was for a clean
14   audit, because once again we had gone back and improved
15   the receipt numbers from around 20 percent to over 90
16   percent, which would have facilitated a better audit.
17        The USTU had communicated by letter to the
18   Board of Governors regarding the compliance review
19   status, and we were requesting input from the USTU
20   body.  I think that --
21        Q    Is that completed?
22        A    I think -- what were we doing to provide
23   accurate financial information and to provide the USOC
24   auditors?  That was addressed.  I think that completes
25   15.

1    hired two other individuals, and had to re-sort through
2    all the financial records.
3         And I remember at the time having people on
4    staff, a lot of it was taking their work and their work
5    ethic at face value and just assuming that they were
6    doing the right things.  They were working every day.
7    If you asked for a report, it was given to you.  But
8    the actual maintenance of records at that time was in
9    shambles, which led to the firing of that financial
10   director and the hiring of two others.
11        I consulted with Jill Goodwin of Waugh &
12   Associates and also Ms. Witte and Chris Telli regarding
13   our financial situation and how we could better come in
14   compliance.
15        Chris Telli worked with me very closely and
16   with our office -- I mean, almost day to day for
17   weeks -- in monitoring what was going on in the
18   financial office.  And because of him and Ms. Witte, we
19   were able to come up with a lot of things.  We
20   identified problem areas, came up with a financial
21   manual, and were well on our way, I felt, to moving
22   into compliance in the financial area, especially as
23   far as reporting.
24        As far as overcoming deficits and things like
25   that, that would have taken more time.  But policies

1         Q    Let's take a break.
2         A    There was one other question.
3         Q    Oh, I'm sorry.
4         A    16, the last question.  "What evidence can
5    USTU point to in order to indicate to the Committee
6    that it now has the managerial and financial capability
7    to run the sport of Taekwondo?"
8         The steps that we listed were, especially in
9    the financial area, developing strict financial
10   procedures and policies and implementing them
11   immediately; improving the status of the 2003 financial
12   records.  And as of September 9th, the bank accounts
13   had been completely reconciled through August 31st, so
14   that was a big improvement over where they were.
15        We felt that we were operating for 2003 at a
16   net surplus.  I was confident that we would finish the
17   year around even.  We would be at a break-even level by
18   the end of 2003.
19        I had also come up with a list of budget
20   cuts, personally, that I had sent to Mr. Skinner and
21   Sports Partnership and also had shown Mr. Telli that
22   would have saved approximately $210,000 in 2004 without
23   making any cuts on the athlete programs.
24        It was in areas of international development,
25   office allowances to the officers, things like that.

1  All of that was done in an effort to demonstrate the
2  managerial capabilities.  And, again, the financial
3  management was brought, we felt, into a manageable
4  situation to demonstrate that we could conduct
5  ourselves as an NGB.  That's it for 16.
6      Q     Thank you.  Now we'll take a break.
7            (Recess taken from 9:20 a.m. to 9:34
8                 a.m.)
9            MR. JONES:  Back on the record.
10     Q     (BY MR. JONES)  Mr. Harris, we just went
11  through your responses to Exhibit 5.  Notwithstanding
12  those responses, did the decertification action brought
13  by the USOC in 2003 proceed forward?
14     A     Yes.
15     Q     I'd like to show you one document we
16  should mark next in order.
17            (Deposition Exhibit No. 85 was marked
18                 for identification.)
19     A     Okay.  I've reviewed that document.
20     Q     (BY MR. JONES)  What is that document?
21     A     This is a letter to me from Mr. Jim
22  Scherr, Chief of Sport Performance, but the interim CEO
23  for USOC.  And it states that the USOC had initiated
24  the decertification process against USTU.  And since
25  the process had been initiated, they had determined

1  earlier from Hawaii in order to meet up with Ms. Love
2  en route to Athens.
3      Q     Other than getting this letter from
4  Mr. Scherr, were there any other communications with
5  Mr. Scherr about what was going on with the
6  decertification action during this period of late
7  October?
8      A     I knew that there had been a couple, I
9  think, of phone calls with Mr. Scherr, Kelly Skinner,
10  myself, and I think the officers of the USTU in regards
11  to accepting the remediation plan and the
12  decertification process.  I don't know if it was prior
13  to this date or around that same time frame, but there
14  were, to my memory, a couple of phone calls with
15  Mr. Scherr.
16     Q     Okay.
17     A     But not one-on-ones.
18     Q     I'm showing you Exhibit 42, previously
19  marked.  Can you identify that?
20     A     Yes, I recognize the document.
21     Q     What is that document?
22     A     This is the USOC Remediation Plan for the
23  U.S. Taekwondo Union, and it's dated January 27, 2004.
24     Q     Was that the plan that was ultimately
25  approved by USTU?

1  that the interest of the Taekwondo athletes would not
2  best be served by continuing with the attendance of
3  Mr. Dae Sung Lee and Ms. Lynette Love at the team
4  leadership meeting in Athens in November.
5      Q     That was the meeting you spoke of that
6  they did not attend?
7      A     Right.
8      Q     Were you in Colorado Springs when this
9  letter was received?
10     A     Yes, I was.
11     Q     And what did you do, if anything, when you
12  received it?
13     A     I was actually in contact with Mr. Lee and
14  Ms. Love over at the Pan Am Games at the time, I
15  think -- or Ms. Love was at the Pan Am Games.  I'm
16  trying to remember the time frame.  I know that I was
17  in contact with them.  I did inform them by phone that
18  they wouldn't be attending the Athens meeting.
19     Q     Do you recall where Mr. Dae Sung Lee was
20  when you contacted him?
21     A     I think he might have been in Chicago at
22  the time.
23     Q     Was he -- do you know if he was already on
24  his way to Athens?
25     A     He was en route because he had to come out

1            MR. LEVINSTEIN:  Objection; lack of
2  foundation.
3      A     And that, I have no way of knowing,
4  because I was gone by then.  But this was, again, just
5  in scanning it, the plan that I had seen before I left
6  the office.
7      Q     (BY MR. JONES)  Okay.  Were you privy to
8  any -- well, let me ask what your communications is of
9  the remediation plan with respect to who would have to
10  leave their positions at the USTU and -- let me just
11  leave it at that.  Who would have to leave their
12  positions at USTU?
13            MR. LEVINSTEIN:  Objection; lack of
14  foundation.  You can answer.
15     A     And, again, this went through several
16  discussions at the time that I was leaving, so I don't
17  know what the final version says.  But at one point, it
18  was all the officers.  At one point, it was appointed
19  office holders.  At one point, there was a discussion
20  of the president and the treasurer.  So it went through
21  various stages.
22     Q     (BY MR. JONES)  Ultimately, though, who
23  lost their jobs?
24            MR. LEVINSTEIN:  Objection.
25     A     That, I don't know, unless I read this

1  quickly.

2      Q     (BY MR. JONES)  You don't know which

3  people in the executive board member, which committee

4  members --

5      A     Well, I know for certain that the

6  president did.  Actually, everyone was removed, and a

7  CEO was put in by the USOC.  And that was, in fact, the

8  only operating officer of the corporation, so all of

9  the board was done away with, as I understand it.

10     Q     And you alluded a minute ago to having an

11  understanding that remediation plans that were less

12  drastic with respect to the number of people who would

13  be leaving were discussed --

14     A     Yes.

15     -- prior to the final plan; is that right?

16     A     Yes.

17     Q     What's your understanding as to that?

18         MR. LEVINSTEIN:  Objection.

19     A     At varying discussion stages, again, it

20  was my understanding that if the president, the

21  treasurer had resigned, someone would be put in place

22  and we would keep our NGB status and things would go

23  forward without a full -- oh, and I know that they were

24  going to put in a finance director.  That didn't

25  happen.

1          So discussions, as I understand it,

2  continued, and it got to where all the officers had to

3  leave; a CEO would be put in, a finance director, et

4  cetera.

5      Q     (BY MR. JONES)  Could you just look at

6  that document to verify whether or not all of the --

7  everybody, as you put it, had to leave under the final

8  remediation plan?

9          MR. LEVINSTEIN:  Objection.  The document

10  speaks for itself.  He's never seen it before.

11         MR. UESUGI:  That's an objection --

12  sorry.

13     A     According to the document on Page 3,

14  "Effective immediately, all officers of USTU shall

15  retire, resign or shall be removed.  Once the officers

16  resign, their positions will remain vacant until new

17  elections occur under the new governance structure,"

18  described in another section.

19         "All Presidential authority shall be

20  delegated to the Governance and Management Committee."

21         "Treasurer and Secretary General.  The USOC

22  person on the Governance and Management Committee shall

23  then assume the duties of Treasurer, although that

24  person shall not hold the office nor assume the title

25  of Treasurer.  USTU agrees not to elect an Acting

1  Treasurer or otherwise fill the vacant position.  The

2  Governance and Management Committee shall assume the

3  duties and authority of Secretary General."

4          "Executive Committee.  The members of the

5  USTU Executive Committee agree to allow the Governance

6  and Management Committee and the new Executive Director

7  to handle the day-to-day domestic affairs and general

8  governance of USTU."

9      Q     (BY MR. JONES)  Okay.  So the positions

10  you've just read, was that what you were referring to

11  when you said everybody?

12     A     Well, yes, except this leads me to believe

13  that the Executive Committee may still be in place, but

14  they have agreed to allow the Governance and Management

15  Committee and the new Executive Director to handle the

16  day-to-day affairs.

17     Q     Okay.

18     A     If I can continue one thing, "does

19  terminate all appointed positions," as I did speak to.

20     Q     Do you wish to change any of your answer

21  then as far as everybody?  Or is there anybody that you

22  can think of that remained?

23     A     I'm not clear on the Executive Committee,

24  according to the document, because it doesn't say that

25  it's disbanded.  It just says that it agrees to allow

1  the Governance Committee to handle the day-to-day

2  authority.

3          But to review my response, all appointed

4  positions are gone, the president is gone, the officers

5  are gone, the Executive Committee may be in place.  I

6  don't know.

7      Q     What's your understanding of the number of

8  Korean Americans in these positions that were replaced

9  or removed?

10     A     As far as officers, of the six officers,

11  two were American-born.

12     Q     American-born Korean?

13     A     No.  American-born American.  So four of

14  the six would have been Korean Americans.  Of the

15  appointed positions, I have no way of knowing without

16  looking at the list of names.  Secretary and treasurer

17  were both Korean American.  And, again, I'm not sure on

18  the status of the Executive Committee.

19     Q     Thank you.  I'd like to now move to

20  another area, one in which you have a lot of expertise,

21  that being the referee --

22     A     Yes, sir.

23     Q     -- area.  Have you heard or seen any

24  activities by the current management of USTU that you

25  would interpret to be or believe to be racially

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1  insensitive toward Korean American people?
2          MR. LEVINSTEIN:  Objection.
3      A    I don't have firsthand knowledge of it,
4  but I have heard that selecting referees who are
5  non-American-born Americans has been discouraged to the
6  point of saying that we want them to stop coming by the
7  current group.
8      Q    (BY MR. JONES)  And can you be more
9  specific as to when you say current group, are we
10 talking about anybody in particular, or the entire GMC,
11 or --
12         MR. LEVINSTEIN:  Objection.  He's already
13 said he has no firsthand knowledge, so he can't testify
14 about these things.  But go ahead.
15     A    I heard it was by the current CEO,
16 Mr. Gambardella.
17     Q    (BY MR. JONES)  And what is your source of
18 that information?
19     A    The referee chair, the interim chair.
20     Q    And who is that?
21     A    Ms. Barbara Wakefield.  And it occurred in
22 the process of trying to select referees for team
23 trials, especially, where her intent was to select the
24 most qualified referees for team trials to select the
25 best athletes.  It appears that she was discouraged

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1  from appointing several Korean referees.
2      Q    Discouraged by whom?
3      A    Mr. Gambardella.
4      Q    And has she repeated to you any purported
5  statements by Mr. Gambardella that sounded racially
6  insensitive?
7          MR. LEVINSTEIN:  Objection.
8      A    And, again, I can't remember verbatim, but
9  it was to the effect that we don't want them to come,
10 or we want -- I don't remember the verbiage that was
11 used, but it was not to select them, basically.  And I
12 do recall that she continued to go to bat, and as a
13 result, we still had some of them being used at events.
14     Q    (BY MR. JONES)  Some --
15     A    Some Korean Americans, but much fewer than
16 have been in evidence in the past, much fewer.
17     Q    Do you continue to participate as an
18 official?
19     A    Yes.
20     Q    Just in your observations, has the
21 percentage of Korean Americans making up the
22 officiating staff at various events changed in racial
23 content?
24     A    Yes, dramatically.
25     Q    In what way?

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1      A    I guess within the last four years, prior
2  to the last -- prior to the decertification, it was
3  close to a 50/50 mix, or maybe 60/40, American-born to
4  Korean Americans.  Now, it's 95 percent American-born
5  Americans.
6      Q    Do you attribute that to anything in
7  particular?
8          MR. LEVINSTEIN:  Objection.
9      A    I don't know whether it's a lack of people
10 applying and not being selected -- I know in speaking
11 with Ms. Wakefield, the number of applicants have
12 dropped dramatically because they don't feel that
13 they're invited to participate anymore, or welcome to
14 participate.
15     Q    (BY MR. JONES)  Thank you.  I don't think
16 I have any further questions.
17         E X A M I N A T I O N
18 BY MR. LEVINSTEIN:
19     Q    Mr. Harris, when did you first hear about
20 Mr. Dae Sung Lee's lawsuit against the USTU and USOC?
21     A    Hmmm.  My first recollection of it is
22 prior to the Olympic Games when I think the lawsuit was
23 for him to be allowed to continue to be the Olympic
24 coach for Athens.  That's the first time I heard it
25 prior to that.

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1      Q    And prior to the Games, did you speak with
2  Mr. Lee or his lawyers?
3      A    No.
4      Q    Did you believe that he should be the
5  Olympic coach?
6      A    It was my belief that since we had
7  followed the procedure for selecting him, that it was
8  his right to be the coach, yes.
9      Q    Did you know that the criteria had been
10 changed?
11     A    No, I did not.
12     Q    Do you now know that the criteria had been
13 changed?
14     A    No.  Again, I left the office at the end
15 of 2003, and I didn't know anything after that.
16     Q    Okay.  You said yesterday, I believe, that
17 you worked for the USTU until the end of December 2003?
18     A    No.  Beginning of December.  December
19 2002 -- -3, I'm sorry.
20     Q    Isn't it actually October 31st, 2003 when
21 you resigned?
22     A    I know that I submitted a letter to
23 Mr. Lee.  I don't know the date on the letter.  But I
24 also know that I was still around for a while after
25 that until Mr. Tim Connolly came onboard, and I don't

1   know the date of his hiring.  But it was up until then.

2          Q    When did you first speak with Mr. Dae Sung

3   Lee or any lawyer representing him about his dispute?

4          A    I received a phone call saying that I had

5   a deposition scheduled for today, and that would have

6   been maybe two weeks ago.

7          Q    And then did you have any discussions

8   about what you were going to be asked in this

9   deposition?

10         A    No.

11         Q    Did you talk to Mr. Dae Sung Lee or his

12  lawyers before you showed up yesterday?

13         A    I had phone calls from Mr. Lee letting me

14  know what time and where, but we didn't discuss

15  anything else about it.

16         Q    You didn't talk in advance of the

17  deposition about what your conversations had been with

18  Ms. Wakefield about referee issues?

19         A    About Mrs. Wakefield?

20         Q    The questions you were just asked about

21  Ms. Wakefield and what she said, Ms. Barbara Wakefield,

22  had you discussed that with them before today?

23         A    No, not with Mr. Lee or the lawyers.

24         Q    Who had you discussed that with?

25         A    There was a group of six of us that were

1   and the Executive Director?

2          A    That would be then president Sang Lee.

3          Q    How did you know Mr. Sang Lee prior to his

4   hiring you as the Events Director?

5          A    I have been in the Taekwondo community

6   since -- oh, the U.S. Taekwondo community since '77.

7   So I've known most of the players.  I was at Mr. Lee's

8   first Elite Tournament, which became the U.S. Open.  So

9   I have known him for many years.

10         Q    Are you friends with him?

11         A    Friends?

12         Q    Yeah.

13         A    Yes.

14         Q    And how long have you known Mr. Dae Sung

15  Lee?

16         A    Less time than I have known Mr. Sang Lee.

17  But, again, through officiating, I actually officiated

18  some of his competition matches, and I have seen him as

19  a coach and as a competitor.

20         Q    Are you friends with Mr. Dae Sung Lee?

21         A    Yes.

22         Q    Do you know that he's in this case suing

23  the USTU and USOC for a lot of money?

24         A    I don't know the particulars.  I never

25  asked.

1   working on referee revision for the certification

2   program, and Ms. Wakefield had made known to us that

3   she was having problems with making selections and

4   getting people that she wanted approved to come to

5   events.  If you want the names of those members of the

6   group --

7          Q    Sure.

8          A    -- I can give those to you.  John

9   Holloway, Leon Preston, William Sullivan, Anne Chase --

10  oh, Ms. Wakefield and myself.  Those were the six

11  people.

12         Q    Who hired you to work for the USTU?

13         A    My hiring was done by the then president,

14  Sang Lee, and approved by the officers or Executive

15  Committee.

16         Q    Which was it, the officers or the

17  Executive Committee, do you know?

18         A    I don't know.

19         Q    There was any requirement that your hiring

20  be approved by the officers or the Executive Committee?

21         A    That, I don't know.  And, again, initially

22  I came as the Events Director working under then

23  Mr. Warwick.

24         Q    Who decided that you would be promoted

25  from Events Director to both being the Events Director

1          Q    Based on what you know, do you think or

2   would you like him to be successful in that case?

3          A    I'd like the right thing to happen, based

4   upon whatever the results of the trial is.

5          Q    So you have been involved in Taekwondo the

6   last 22 years?

7          A    No.  Longer.  I started in 1973,

8   personally learning and training.

9          Q    My math is bad.  Thirty-two years?

10         A    Yes, sir.

11         Q    I apologize.  I did subtract '73 and I got

12  22.  Sorry.

13         Q    So since you were 21 years old?

14         A    Yes, sir.

15         Q    When did you first get involved in the

16  USTU?

17         A    1976.

18         Q    And when did you first learn that the USTU

19  had serious problems?

20         MR. JONES:  Objection; lacks foundation.

21         A    I made a point of attending as many of the

22  meetings, the annual meetings, the semiannual meetings,

23  as possible once I started coaching the Army team,

24  because I had a vote on the board from then.  And that

25  would have started in 1981.

**Page 128**

```
 1        So since 1981, I started coming to the
 2  meetings.  But to become aware of any problems?  Every
 3  year, to my recollection, when I first started, there
 4  was always something afoot, whether it was arguments
 5  between the members in public at meetings or fights
 6  over where we should have meetings, things like that,
 7  which could have been considered problems.
 8        But I'm assuming that the problems you're
 9  alluding to are the ones that have led to the
10  decertification.
11      Q    (BY MR. LEVINSTEIN)  Just in general.
12  There were all sorts of problems from 1981 forward?
13      A    I mean, any organization has problems, but
14  not to the scope of leading to a decertification.  That
15  didn't occur to me until after I had left the Army to
16  come be a member here in 2001.
17      Q    Well, as a member of the board, were you
18  aware that there were issues starting at least with the
19  1996 Quadrennium about whether the USTU was in
20  compliance with its obligations as an NGB?
21        MR. JONES:  Objection; vague and
22  ambiguous.
23      A    I was aware that there was a compliance
24  review during that Quadrennium, but the way it was
25  reported was -- to my knowledge -- to my recollection,
```

**Page 130**

```
 1  Quadrennium, you knew there were problems?
 2      A    Yes.
 3      Q    And did you understand Mr. Warwick was
 4  brought on to try to solve significant compliance
 5  problems?
 6        MR. JONES:  Objection; calls for
 7  speculation, lacks foundation.
 8      A    No, I wasn't aware of that being the
 9  reason he was hired.
10      Q    (BY MR. LEVINSTEIN)  Okay.  Over the years
11  on the board, did you, at meetings or elsewhere, hear
12  members of the USTU express dissatisfaction with
13  various issues concerning the USTU?
14      A    Yes.
15      Q    Can you give me what kinds of things they
16  were unhappy about?
17      A    Well, going back even to the '80s, there
18  was -- there were factions that always opposed whatever
19  group was in as the leaders at that time, with the
20  exception of earlier, and I'll give you a name, for
21  instance.
22        Dr. Dong Ja Yang, when he was president,
23  there were fewer membership complaints against the
24  leadership, per se.  After he was no longer president,
25  there was, it seemed to be, factions that were always
```

**Page 129**

```
 1  it was reported that it's all been handled and we're in
 2  compliance.
 3      Q    (BY MR. LEVINSTEIN)  And who reported
 4  that?
 5      A    During that Quadrennium, it would have
 6  been Mr. Warwick, I think, as the Executive Director.
 7  Well, he came on in '98, but during the '96
 8  Quadrennium, it includes that period.
 9      Q    The Quadrennium is from '93 to '96?
10      A    I thought you were saying from '96 to
11  2000.
12      Q    No.  I'm sorry.  I refer to Quadrennium by
13  the Games.  I apologize.
14        In the Quadrennium from '93 to '96 --
15      A    No.
16      Q    -- did you learn that there were problems
17  with the Membership and Credentials Committee?
18      A    No, I did not.
19      Q    But you did know there were issues in the
20  '98 to 2001 Quadrennium --
21      A    Yes.
22      Q    -- 2002?
23      A    Yes, yes.
24        MR. JONES:  Wait for him to answer.
25      Q    (BY MR. LEVINSTEIN)  In the '96 to 2000
```

**Page 131**

```
 1  against whoever the leader wanted to be in, as opposed
 2  to out, of the leadership.  Questions about ability to
 3  lead with some of the past presidents.  Always
 4  questions about financial responsibility or lack
 5  thereof.  Could we have done the events with fewer
 6  expenditures, made more money off of it?  That's been
 7  going on since the '80s, at least.
 8        What other major . . .  Even the seating of
 9  delegates at meetings; recognizing who had a right to
10  vote at meetings has always been problematic, to my
11  memory.  Those are the basic general things.
12      Q    Okay.  When did you first hear concern
13  expressed by the USTU members that some USTU positions,
14  committee positions, board positions, Executive
15  Committee positions, were not selected on merit, but
16  were based on contacts, friends, or business
17  associations?
18        MR. JONES:  Objection; lacks foundation.
19      A    Board positions, meaning -- well, for
20  instance, I was on the board because I represented the
21  Armed Forces.  I'm not sure I understand your question.
22      Q    (BY MR. LEVINSTEIN)  Okay.  Did you hear,
23  ever, USTU members complain that there were some board
24  positions that people were appointed to or selected to
25  that was not based on merit, but rather was based on
```

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)
Case 1:04-cv-00461-SOM-LEK   Document 243-3   Filed 03/21/2006   Page 19 of 80
4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 132**

1  who they knew?
2      A     Yes.
3      Q     When did you first start to hear those
4  issues?
5      A     Again, going back to forever, basically,
6  that's been a question of who should be on the board.
7      Q     What about with respect to committees; did
8  you hear people say committee positions were selected
9  and not based on merit, but based on friendships and
10  loyalties?
11      A     Yes.  And that's been problematic from the
12  time I have been associated with the group.
13      Q     Were there problems with the state
14  associations that you were aware of?
15      MR. JONES:  Objection; vague and
16  ambiguous.
17      A     Some state associations, yes.
18      Q     (BY MR. LEVINSTEIN)  What kind of
19  problems?
20      A     There were -- and this is what I've heard.
21  It's hearsay.  But some states had problems with
22  reporting income from state events.  Some states had
23  problems with valid elections of their officers.  Some
24  states had problems with following the USTU bylaws, as
25  far as how states are supposed to run and function.

**Page 134**

1  year for a semiannual meeting and an annual meeting, at
2  which agendas were put forward and the agenda was
3  adhered to.
4      And to my recollection, addressing state
5  improprieties was never one of the agenda items at one
6  of those board meetings.  And, again, that was referred
7  to a committee to handle protests and irregularities
8  like that.
9      Q     But you understood it was the USTU's
10  responsibility --
11      A     Yes.
12      Q     -- to solve those problems?
13      A     Yes.
14      Q     But you're just saying that as a board
15  member, no one ever put that on the agenda for the
16  board to address?
17      MR. JONES:  Objection; that misstates the
18  testimony.
19      A     It was not one of the agenda items at any
20  of the meetings that I was at.
21      Q     (BY MR. LEVINSTEIN)  But it was the
22  responsibility of the USTU to solve those problems?
23      A     The USTU as an organization, yes.
24      Q     And wasn't the board responsible for
25  making sure the USTU did everything it was required to

**Page 133**

1      MR. JONES:  Objection; move to strike all
2  of that witness's statement; it's all based on hearsay.
3      Q     (BY MR. LEVINSTEIN)  As a member of the
4  board, were those issues that you were responsible for
5  trying to deal with?
6      A     No.
7      Q     Were they issues the board was responsible
8  for trying to deal with?
9      MR. JONES:  Objection; calls for
10  speculation.
11      A     To my knowledge, we were never charged
12  with sorting out problems with state organizations.
13      Q     (BY MR. LEVINSTEIN)  Did you understand
14  that the USTU was a National Governing Body?
15      A     Yes.
16      Q     Did you understand that that gave it
17  obligations to govern the sport in the United States?
18      A     Yes.
19      Q     Did you understand that that gave it the
20  obligation to resolve all disputes within the sport?
21      A     Yes, but more especially when it came to
22  disputes that were filed, there was a committee that
23  was tasked to handle those disputes.
24      Q     But -- go ahead.
25      A     And also the board only gathered twice a

**Page 135**

1  do?
2      A     Was that the board's --
3      MR. JONES:  Objection; argumentative and
4  overbroad.
5      A     I'm trying to understand the question.
6  You're asking if it was the board's responsibility to
7  ensure that all problems were addressed, including
8  states?
9      Q     (BY MR. LEVINSTEIN)  You said the USTU was
10  responsible for solving problems like state association
11  problems, correct?
12      MR. JONES:  Objection; misstates the
13  testimony.
14      A     I agree that that was what you said, yes.
15      Q     (BY MR. LEVINSTEIN)  Is that what you
16  said?  Is the USTU responsible for solving problems,
17  like those that involve the state associations?
18      MR. JONES:  Same objection.
19      A     My recollection of the question was, did I
20  understand that it was the USTU's responsibility to
21  handle problems, like the state issues for the
22  organization, to which I said yes.
23      Q     (BY MR. LEVINSTEIN)  Okay.  And I just
24  asked, was the board responsible, as the governing body
25  of the USTU, to make sure that the USTU did everything

**Page 136**

```
1    it was supposed to do as a national governing body?
2         A    I'm not sure it was the board's
3    responsibility or the leadership's responsibility to
4    enforce that.
5         Q    Whose job was it to hold the leadership
6    accountable?
7         A    The membership.  Board members represent
8    their members.  For instance, in my position, as
9    representing the Armed Forces, every time I stood up, I
10   was speaking to something that addressed the Armed
11   Forces and my members.  For instance, selections to
12   team trials, recognition of Armed Forces athletes in
13   competition.  So it's the membership's responsibility
14   to hold me accountable if I don't push those issues, to
15   my understanding.
16        Q    Did you ever hear USTU members express
17   concern that Korean American leaders selected other
18   Korean Americans for leadership positions?
19        A    Did I ever hear the membership --
20        Q    Any member of the USTU express those
21   concerns.
22        A    I have no way of knowing if those people
23   were members at the time.  I have heard people say it.
24   I don't know if they were members at the time.
25        Q    Well, in what context did you hear people
```

**Page 137**

```
1    say that?
2         A    At competitions, in the stands, in
3    hallways, et cetera.
4         Q    So you heard people involved in Taekwondo
5    competitions, but you don't know if they happened to be
6    current USTU members?
7         A    Right.  They could have been parents.
8    They could have been people that didn't renew for the
9    year or whatever, but they came to Taekwondo events.
10        Q    When did you first hear of those kinds of
11   concerns expressed?
12        A    First, first, first.  I think to the best
13   of my recollection, it was during President Ahn's
14   administration or President Hwa Chong.
15        Q    What years, ballpark?
16        A    I'm trying to narrow it down.
17        Q    Early '80, late '70s?
18        A    No.  It wouldn't have been early '70s.  It
19   would have been late '80s; mid-'80s, late '80s.
20        Q    That's when you first heard those kinds of
21   things?
22        A    Yes.
23        Q    And have you heard those things on an
24   ongoing basis to the present?
25             MR. JONES:  Objection; vague and
```

**Page 138**

```
1    ambiguous as to ongoing.
2         A    Those remarks still occur.
3         Q    (BY MR. LEVINSTEIN)  Did you hear
4    discussion of the issue of term limits --
5         A    Yes.
6         Q    -- within USTU?
7         A    Yes.
8         Q    And what was that issue?
9         A    This was after I was in the role of
10   Executive Director -- no, it was when Mr. Warwick was
11   still there, and I was in the role of the Events
12   Director.  We would meet with then President Lee once a
13   week or once every two weeks, and a discussion arose
14   about possible elimination of term limits.
15        Q    And were term limits eliminated?
16        A    Yes.
17        Q    And what term limits had existed?
18        A    I think it was a two-term, which was
19   eight -- it was either four or eight years, but two
20   terms was, I think, what was in practice until then.
21        Q    For what positions?
22        A    President.
23        Q    Were there term limits for any other
24   positions?
25        A    No.
```

**Page 139**

```
1         Q    Did you hear discussion of the possibility
2    of creating term limits for other positions?
3              MR. JONES:  Objection; calls for hearsay.
4         A    I don't remember that discussion.
5         Q    (BY MR. LEVINSTEIN)  You don't remember
6    disputes or discussions at board meetings about the
7    need to have term limits so that people wouldn't stay
8    in positions for an eternity?
9         A    Yes, but still in relation to the
10   president only.  You said for other officers.
11        Q    What about the secretary general position;
12   were there discussions about term limits for that
13   position?
14        A    Not to my recollection.
15        Q    And who recommended that the term limit
16   for the president be eliminated?
17        A    I think that was a proposal that came up
18   from USTU legal, which was Mr. Bryant, Mark Bryant.
19        A    It was his idea to eliminate it, or he
20   wrote the proposal?
21        A    He wrote the proposal as part of Law and
22   Legislation.
23        Q    Did Mr. Lee ask him to write that
24   proposal?
25        A    I don't know.
```

MR. JONES: Objection; calls for speculation.

Q (BY MR. LEVINSTEIN) But the two-term limit for the president was eliminated?

A Yes.

Q And was there then no limit?

A Correct.

Q And after the term limit was eliminated, were there complaints by members of the USTU about that?

A Yes.

Q Were there a lot of complaints?

A Yes.

Q Were there regular disputes involving clubs at the local level, state organizations, and the USTU?

MR. JONES: Objection; vague and ambiguous.

A I'm not sure I understand. Regular disputes?

Q (BY MR. LEVINSTEIN) Yes.

A Between local clubs --

MR. JONES: Calls for speculation as well.

A You mean local clubs with the state

organization or local clubs with the USTU?

Q (BY MR. LEVINSTEIN) Hold on one second. I'll withdraw that question, and we'll see what we can do.

Did you ever hear -- I'm going to change the subject a little bit -- that there were issues about fraudulent registrations of USTU members?

A Yes.

Q Could you tell me about that?

A I think it was the state of Pennsylvania that --

(Whereupon, there was an interruption in the deposition proceedings.)

(Whereupon, Mr. Johansen left the deposition proceedings.)

A The state of Pennsylvania members complained that their state election was fraudulent because the person -- at that time, it was the president -- had used fraudulent names as part of the determining number of members that allowed him a certain number of votes.

Q (BY MR. LEVINSTEIN) And did that happen more than once?

A Yes.

Q Was that alleged to be a common practice?

A In Pennsylvania, I'm speaking specifically of. According to the people that complained about it, yes, and it happened on several occasions.

Q Were there ongoing squabbles between clubs at the local level?

MR. JONES: Excuse me. Motion to strike the last line of inquiry based upon hearsay. Go ahead.

A Squabbles between clubs? Again, the only thing I can think of is with regard to registered members that are going to determine the number of votes that each club should get or whether they're a recognized club, did they register on time, things like that.

Q (BY MR. LEVINSTEIN) Let me ask you about how important, as the Executive Director, did you find the image of the USTU in trying to run the business of the USTU?

A Very important.

Q And why was it important?

A Well, it starts from a personal standpoint. I didn't want to be a part of anything that was a failure, that looked poorly to anyone. It's not my nature. It never was my background. I wanted it to be a success.

Beyond that, as an Olympic body, the term

"Olympic" means a lot to me and to a lot of people, and I felt the necessity to make sure that it was portrayed in the best light at all times.

Q And as part of the Olympic movement, wasn't it a requirement of an NGB to do everything it could to keep the sport's image consistent with the Olympic ideals?

A Yes.

Q And in that regard, wasn't it as important, the perceptions of the people who were involved in the sport, as would actually might be the reality?

A Yes.

MR. JONES: Objection; vague and ambiguous.

Q (BY MR. LEVINSTEIN) And when you dealt with sponsors, wasn't it important that the image of the organization was one that sponsors wanted to be involved with?

A Yes.

Q And if there were impressions that the organization didn't function properly and the members weren't happy, that that would hurt you with getting sponsorship revenue?

MR. JONES: Objection; calls for

1    speculation.

2        A    To my understanding, yes.

3        Q    (BY MR. LEVINSTEIN)  And when you talked

4    to sponsors, weren't there occasions in which they

5    expressed concern about disputes and controversies in

6    the Taekwondo world?

7        A    If I can clarify the question.  Sponsors

8    as far as like developing our sponsor revenue for our

9    events?

10       Q    Yes.

11       A    I didn't -- personally I did not find that

12   to be the case.

13       Q    But the USTU sponsorship revenue was

14   limited?

15           MR. JONES:  Objection; vague.

16       A    Actually, it increased when I took over

17   from -- because we had the process of bidding out to an

18   individual for sponsorship.  And at that time, the

19   revenue was $125,000.  In the almost three years that I

20   was there, it increased, doubled; it was over $250,000

21   when I left, and we had fewer vendors and sponsors.

22       Q    (BY MR. LEVINSTEIN)  You had fewer

23   sponsors?

24       A    And that was a purposeful decision on my

25   part; whereas before, one person would get 30 vendors,

1        Q    And do you recall that the Century

2    proposal was much more advantageous to the USTU than

3    the Techno agreement?

4        A    I think that was a matter of

5    interpretation because of the way that it was

6    structured.  I remember lots of discussions about

7    Century versus Techno, yes.

8        Q    And do you remember who made the decision

9    that the USTU would stay with Techno, instead of

10   Century?

11       A    I don't know who made that decision.  It

12   wasn't me, no.

13       Q    Do you remember Mr. Warwick wanted to do a

14   deal with Century and he wasn't permitted to do so?

15           MR. JONES:  Objection; calls for

16   speculation.

17       A    I do remember seeing the proposal for

18   Century.  And it had like, if I recall correctly, like

19   nine areas that were specified.  But I wasn't in the

20   decision-making position at that time.  And I do

21   remember that Mr. Warwick did want to go with Century.

22   I don't know how that got stopped or who did that.

23       Q    (BY MR. LEVINSTEIN)  So you do remember

24   that Mr. Warwick thought, or presented it that the

25   Century deal was a much better deal for the USTU?

1    so he could get his $125,000 back at the expense of the

2    vendors making money.  When I took over and convinced

3    them to let me take it in-house, I limited it to ten

4    vendors who paid me a guaranteed amount.  And they, in

5    turn, were allowed to make money because I restricted

6    the number, for instance, of martial arts vendors to

7    three.

8            I gave people proprietary sales and T-shirts

9    and photography, areas like that.  So they made more.

10   Whereas before, with 30 vendors, you have four

11   photographers, nobody is making money, et cetera.

12           (Whereupon, Mr. Johansen rejoined the

13           deposition proceedings.)

14       Q    (BY MR. LEVINSTEIN)  I was asking about

15   sponsors, not vendors, but that's okay.

16       A    But these were the only sponsors that I

17   dealt with, except for the title sponsor, which was, at

18   the time, Techno.  And we didn't have a problem with

19   them.  As a matter of fact, I had others like Quan,

20   Asian World, and Vision, who is now the sponsor, asking

21   for sponsorship deals that I hadn't initiated with

22   them.

23       Q    Do you remember a proposal for Century to

24   become a sponsor?

25       A    Yes, I do.

1            MR. JONES:  Objection; calls for

2    speculation, vague and ambiguous.

3        A    I don't know that it was presented as a

4    better deal, but one that he wanted to do.

5        Q    (BY MR. LEVINSTEIN)  Under the bylaws and

6    procedures that the Membership and Credentials

7    Committee was discussing with you in 2003, the USTU

8    president appointed five members of the Board of

9    Governors?

10       A    More.

11       Q    Okay.  Let me keep going.  He appointed

12   certain state presidents?

13       A    Yes.

14       Q    He appointed five of the ten delegates at

15   large?

16       A    Yes.

17       Q    He appointed five members of the Executive

18   Committee?

19       A    Yes, the committee chairs.

20       Q    He appointed the chairs of the five

21   essential working committees?

22       A    Yes.

23       Q    So he appointed the chair of the

24   Tournament Committee?

25       A    Yes.

```
1          Q    He appointed the chair of the Law and
2   Legislation Committee?
3          A    Yes.
4          Q    He appointed the chair of the Referee
5   Committee?
6          A    Yes.
7          Q    He appointed the chair of the Junior
8   Olympics Committee?
9          A    Yes.
10         Q    He appointed the chair of the Coaching
11  Science Committee?
12         A    Yes.
13         Q    And then after the Executive Committee was
14  selected by -- all the different spots were filled,
15  then the Executive Committee, in turn, elected five
16  other delegates at large?
17         A    Yes.
18         Q    And so based on your calculation, at least
19  27 of the 120 board members were selected by the
20  president?
21         A    Appointed by, yes.
22         Q    Plus himself?  He also was a member of the
23  Board of Governors?
24         A    Yes.
25         Q    So he appointed 27, and he had a vote as
```

```
1   well?
2          A    Correct.
3          Q    Was there weighted voting?
4          A    No.
5          Q    So everyone had one vote?
6          A    Yes.
7          Q    Did you hear concerns expressed -- when
8   did you first hear concerns expressed that the
9   president of the USTU had too much power?
10         A    Once I came onboard as Executive Director,
11  one of the first things that I was hit with was
12  answering the compliance of the Membership and
13  Credentials.  So that's the first time it hit me in my
14  face.  It wasn't a discussion item at a meeting.
15         Q    Well, you have been on the board a long
16  time.
17         A    Yeah.
18         Q    And you knew that the president got to
19  appoint a lot of people?
20              MR. JONES:  Objection; vague and
21  ambiguous.
22         Q    (BY MR. LEVINSTEIN)  Strike that.  Did you
23  know the president got to appoint 27 members?
24         A    No, I didn't.  I actually didn't know that
25  until I was in a position to see everything right
```

```
1   before me.
2          Q    But during your time as a member of the
3   board, even though you didn't know the details of how
4   many he got to appoint, did you hear complaints from
5   USTU members that the president had too much power?
6              MR. JONES:  Objection; calls for hearsay.
7          A    I don't recall hearing it in those terms
8   at all until, like I said, I came onboard and we were
9   faced with answering compliance.  I have heard various
10  complaints against all of the presidents about their
11  authority, including Dr. Dong Ja Yang, who most thought
12  was the most authoritarian.  Once he said something,
13  end of story.
14              To varying degrees with other presidents who
15  had less command authority from the front, but all of
16  them had the same powers, to my understanding.
17         Q    (BY MR. LEVINSTEIN)  Was it your view,
18  when you became Executive Director and learned the
19  details, that the president had too much power?
20         A    Yes.
21         Q    And was it your view that the structure,
22  where he got to appoint all those people, created
23  compliance problems with your obligations as an NGB?
24         A    Yes.
25         Q    You talked about that the Board of
```

```
1   Governors only met twice a year?
2          A    (Deponent nodded in the affirmative.)
3          Q    Did you think the 120-member Board of
4   Governors was too large to conduct business?
5          A    I've gone over that in my mind, and I
6   didn't have anything to compare it to, because again I
7   came straight from the military, which was straight
8   from college.  So a board that big, again, in
9   comparison with the structure of the USOC at that time,
10  seemed not to be an anomaly.
11              As far as the unwieldiness of our group, it
12  seemed very difficult to deal with.  But as far as
13  comparing it to other boards, I had nothing to compare
14  it to.
15         Q    Was it the case that some board seats were
16  not specific to an individual but were held by an
17  association?
18         A    Yes.
19         Q    So at each meeting, different people might
20  show up and say that they were the people who were
21  there to be the board member from a particular state?
22         A    Not a state, but an organization; for
23  instance, AEU or NCTA.  I was the only one from the
24  Armed Forces, but that could very well have been the
25  case from the Forces as well.
```

1    Q    Let's take a state association that had
2  three delegates.
3    A    Yes.
4    Q    Who decided who those would be?
5         MR. JONES:  Objection; calls for
6  speculation.
7    A    In theory, the membership voted on its
8  three delegates to each meeting if the state was
9  authorized.
10    Q    (BY MR. LEVINSTEIN)  But you didn't --
11  USTU didn't conduct those elections?
12    A    No.
13    Q    And the USTU often didn't know in advance
14  who was going to show up to be the delegates the
15  various states?
16         MR. JONES:  Objection; calls for
17  speculation.
18    A    I think there was a requirement that we
19  were notified -- the Executive Director's office was
20  notified either 45 or 60 days in advance as to who
21  would be coming.
22    Q    (BY MR. LEVINSTEIN)  But were there
23  disputes at board meetings about which people were
24  actually authorized to vote?
25    A    Yes.

1  long-range developmental plans for the organization to
2  include initial approval of budgets to send to the
3  Executive Committee, et cetera.
4         So a lot of it came from that group, the
5  officers themselves.  I had no previous knowledge of
6  who was responsible for the long-range planning.
7    Q    (BY MR. LEVINSTEIN)  Okay.  But was it
8  your view that the 120-plus-member Board of Governors
9  really was not suitable for performing long-range
10  strategic planning?
11         MR. JONES:  Objection; vague and
12  ambiguous, lacks foundation, calls for speculation.
13    A    It was my understanding, from having
14  attended meetings since the '80s, that often the
15  meetings themselves were approval sessions.
16    Q    (BY MR. LEVINSTEIN)  Could you explain
17  what you mean by that?
18    A    It seemed as though many things were
19  decided in advance and brought up before the board
20  strictly for its approval.  Some items did get brought
21  up on the floor.  And, again, I can attest to that
22  firsthand because I had done it.
23         But a lot of the agenda items -- and it's not
24  just with this organization, but with many
25  organizations that I've been in, the meetings

1    Q    Did that happen on a regular basis?
2         MR. JONES:  Objection; vague.
3    A    Again, since we only had two meetings a
4  year, you could say regular.
5    Q    (BY MR. LEVINSTEIN)  At most meetings,
6  were there disputes about those issues?
7         MR. JONES:  Objection; vague.
8    A    Recently, yes.  But in years past, no.
9    Q    (BY MR. LEVINSTEIN)  So the problem has
10  gotten worse in recent years?
11    A    No, it's just surfaced more.  It's been
12  the same problem, but it was addressed because I guess
13  there was more need to know who is going to be here to
14  vote.  But the same situation, the same way people were
15  determined to come and vote, has always been there.  It
16  just wasn't an issue back then for whatever reason.
17    Q    Which part of the USTU -- which body did
18  you understand was responsible for performing
19  long-range strategic planning for the organization?
20         MR. JONES:  Objection; calls for
21  speculation.
22    A    I know that there was an annual officers
23  meeting at the beginning of the year, and in my
24  position as the Executive Director, I was able to see
25  that that was the body that actually came up with

1  themselves are a formality of approving what's been
2  decided.
3         Rarely was there a time for sentiments from
4  the floor.  Otherwise we would be there still for
5  meetings.  And I guess that's a part of running an
6  organization.
7         So to the extent that this organization
8  mirrors other organizations that I've been a part of,
9  the meetings themselves were pretty much, that's been
10  decided, we vote to approve it.
11    Q    Were there sentiments expressed at
12  meetings by board members that something should be
13  changed so that board meetings would be more than
14  merely formalities of approval?
15    A    Yes.  And at some cases, at those same
16  board meetings where that was expressed, the chair
17  would then say, what's the sentiment from the floor,
18  and we would go into gripe sessions for a while.  But,
19  yes, that sentiment was expressed.
20    Q    As you sit here, were any major changes
21  ever adopted as a result of those sessions?
22    A    Actually, I can remember once, and
23  Mr. Juan Marino was instrumental in that.  There was an
24  argument over -- we had voted to approve the
25  competition format, and it had been approved; same pro

1  forma, passed, ayes, nays.
2      And near the end of the meeting, Mr. Moreno
3  brought it back up and said, can we consider -- he
4  said, I know it's already approved; can we consider
5  amending that?  And it was discussed and changed.
6      Q     But other than an individual instance in
7  which one resolution was changed instead of just
8  approved --
9      A     Right.
10     Q     -- were there any changes made in the
11 overall structure and function of the board as merely
12 an approval body?
13     A     No.
14     Q     How much did Board of Governors meetings
15 cost?
16     A     Cost?
17           MR. JONES:  Objection; vague.
18     A     Part of setting up the meeting fell under
19 my purview as Events Director, and the cost varied,
20 depending on the location.  We tried to hold it at a
21 hotel in a ballroom that could accommodate everyone
22 staying there.
23           In general figures, I'm thinking it was
24 around 25- to 40-, 50,000.
25     Q     (BY MR. LEVINSTEIN)  For each meeting?

1      A     Yes.  No, the annual meeting because more
2  people came to that one.  The midyear meeting was less
3  expensive.
4      Q     So about how much was the midyear meeting?
5      A     It would be on the low side, so around the
6  $20,000 figure.
7      Q     And was a lot of staff time spent
8  preparing for those meetings?
9      A     Yes.  Ramping up for the meetings was
10 probably a 30- to 45-day nonstop thing.  We had to get
11 agenda items, send back things to the board as to
12 what's going to be on the agenda, get it approved, get
13 all the notifications, put a book together.  And we
14 were working with the staff of about eight people in
15 the office then.
16           So in addition to ongoing membership
17 requirements, black belt processing, we had fewer
18 people that devoted most of their time to getting ready
19 for the meetings.
20           Correlating the minutes was a big problem.
21 We didn't use a stenographer until the midyear meeting
22 of 2003, I think it was, when I brought that, because
23 there was an argument about the accuracy of the
24 minutes.  And that's when we began hiring a
25 stenographer to take accurate notes.

1      But just getting the minutes done and put out
2  to people was a huge undertaking.  So, yes, it took up
3  a lot of staff time.
4      Q     Both the annual meeting and the Board of
5  Governors meeting took a tremendous amount of time?
6      A     The midyear meeting.
7      Q     Sorry.  The two meetings we talked about?
8      A     Yes.
9      Q     So close to three months out of the year,
10 the primary focus was simply on getting those meetings
11 together and running them?
12           MR. JONES:  Objection; misstates the
13 testimony.
14     A     Basically, yes.
15     Q     (BY MR. LEVINSTEIN)  Now, when the
16 Membership and Credentials Committee raised the concern
17 about the size and nature of the Board of Governors,
18 the response that you gave was simply it's always been
19 that way; isn't that correct?
20     A     Yes.
21     Q     Did that mean to you that it wasn't a
22 problem?
23     A     No.  What it meant to me was this was
24 already approved by the USOC as being a functioning
25 structure.  It's up to us to make it work.  But the

1  size of it and its competition has already been
2  approved.
3      Q     Did you understand that the USOC, as the
4  organization charged with deciding what NGBs were in
5  compliance, could over time change its views about what
6  meant compliance?
7            MR. JONES:  Objection; calls for
8  speculation.
9      A     I don't know.
10     Q     (BY MR. LEVINSTEIN)  Were you a member of
11 the USOC board of directors?
12     A     The president was the voting member of the
13 board of directors, but I attended all of the meetings
14 additionally with him.
15     Q     Did you attend meetings in 2003 about
16 improving the function of the USOC?
17     A     Yes.
18     Q     Had problems been identified with the
19 USOC's structure?
20     A     Yes.
21     Q     And in that connection, did you receive
22 materials and reports about requirements for proper
23 governance?
24     A     Yes.
25     Q     And did those documents discuss new legal

1  requirements, such as Sarbanes Oxley?
2          MR. JONES:  Objection; calls for
3  speculation.
4      Q     (BY MR. LEVINSTEIN)  If you know.
5      A     I don't remember.
6      Q     Do you recall discussion about Congress
7  mandating that there be more accountability and better
8  governance of the Olympic movement?
9          MR. JONES:  Same objection.
10     A     Yes.  Yes.
11     Q     (BY MR. LEVINSTEIN)  And did those reports
12 talk about the need for smaller boards?
13         MR. JONES:  Same objection.
14     A     Yes.
15     Q     (BY MR. LEVINSTEIN)  And you didn't vote?
16 Mr. Lee was the one who would cast the vote?
17     A     Correct.
18     Q     And if he couldn't attend, would you vote?
19     A     Yes.
20     Q     Were there meetings in 2003 that you
21 attended and he did not?
22     A     No.
23     Q     Did Mr. Lee vote for the reform of the
24 USOC?
25         MR. JONES:  Objection; calls for

1  speculation.
2      A     I knew he cast a vote.  I don't know which
3  way -- I don't remember which way it was.
4      Q     (BY MR. LEVINSTEIN)  Do you remember it
5  was unanimous to approve the USOC restructure?
6          MR. JONES:  Objection; calls for
7  speculation.
8          MR. LEVINSTEIN:  No.  I asked if he
9  remembered.  It's not calling for any speculation.
10     A     I'm trying to remember if there was a vote
11 that took place where it was unanimous and then the
12 move to make it unanimous.
13     Q     (BY MR. LEVINSTEIN)  Okay.  Well, do you
14 remember Mr. Martin saying that the vote had been
15 unanimous and one delegate actually who represented an
16 organization involving the death said she wanted to be
17 the one who voted no?
18     A     I remember that.
19     Q     So everyone else voted yes?
20     A     Yeah.
21     Q     Including Mr. Lee, apparently?
22     A     Yeah.
23     Q     Did you understand the USTU was a
24 not-for-profit organization?
25     A     Yes.

1          Q     Did you understand that it had a special
2  tax status as a result?
3      A     Yes.
4      Q     Did you understand it had special legal
5  responsibilities as a result?
6          MR. JONES:  Objection; vague and
7  ambiguous.  Also calls for a legal conclusion.
8      A     Legal responsibilities, I don't know.
9      Q     (BY MR. LEVINSTEIN)  Well, did you
10 understand that in order to maintain its not-for-profit
11 status, it had to meet certain legal standards?
12         MR. JONES:  Same objection.
13     A     Such as filing and obtaining 501(c)(3)
14 status?  I understood that.
15     Q     (BY MR. LEVINSTEIN)  Did you understand
16 that payments of money to individuals who were involved
17 with the organization could threaten its not-for-profit
18 status?
19         MR. JONES:  Objection; calls for a legal
20 conclusion.
21     A     I didn't know that specifically.
22     Q     (BY MR. LEVINSTEIN)  Did you understand
23 that there was a concern about cash advances being paid
24 to volunteers?
25         MR. JONES:  Objection; vague and

1  ambiguous, calls for hearsay.
2      A     I know that was an issue that was raised
3  at some point by the Membership and Credentials
4  Committee.
5      Q     (BY MR. LEVINSTEIN)  Were you aware that
6  it was a practice of accounting people in the USTU to
7  get calls from officers asking for cash and the staff
8  would comply with that request?
9          MR. JONES:  Calls for hearsay,
10 speculation.
11     A     I do remember that taking place, yes.
12     Q     (BY MR. LEVINSTEIN)  And as the Executive
13 Director, were you responsible for supervising the
14 financial people in the organization?
15     A     Yes.  And that practice was discontinued
16 under me.
17     Q     And it was discontinued after it was
18 raised as a problem by the Membership and Credentials
19 Committee?
20     A     Yes.  But, again, I wasn't in office for a
21 month before I had my first Membership and Credentials
22 complaint, so it was addressed early on by me.
23     Q     And you believed it was something that
24 should not have taken place?
25     A     Yeah.

1    Q    And I think you testified that during your
2    tenure, when the Membership and Credentials Committee
3    focused on financial issues related to the USTU, there
4    was a complete disarray of the financial records?
5    A    Yes.
6    Q    And it was true that the USTU failed to
7    timely develop and implement its budget?
8    MR. JONES:  Objection; misstates the
9    testimony.
10    A    That had been the practice.  Again, that's
11    something that I made certain to address early in my
12    tenure.
13    Q    (BY MR. LEVINSTEIN)  Well, it was being
14    addressed still in August of 2003, wasn't it?
15    A    It had not been a fate accompli, no, but
16    it was being addressed from the beginning of my tenure.
17    Q    But it still hadn't been fixed by August
18    of 2003?
19    A    Not completely, no.
20    Q    And were you aware that there were
21    problems in the accounting at the USTU that involved
22    falsification of receipts?
23    MR. JONES:  Objection; vague and
24    ambiguous, calls for speculation.
25    A    To my knowledge, through discovery, we

1    consecutively numbered ones.  I don't know the
2    circumstances surrounding that, but that might have
3    been.  But to say that they were doctored, I don't
4    know.
5    Q    Well, do you have any idea how someone
6    could have submitted expenses and had all of the
7    receipts for meals on different days with consecutive
8    numbers on the exact same form?
9    MR. JONES:  Objection; calls for
10    speculation, lack of foundation.  This witness
11    obviously has no personal knowledge of anything.
12    Q    (BY MR. LEVINSTEIN)  You saw those
13    receipts?
14    A    In going back, once we had an audit, yeah.
15    Q    When you saw them, you understood that
16    they couldn't be accurate?
17    MR. JONES:  Objection; misstates the
18    testimony.
19    A    They seemed irregular.
20    Q    (BY MR. LEVINSTEIN)  Was it a practice of
21    the USTU to give people cash advances when they went on
22    trips with the idea that they would submit receipts
23    later?
24    A    Yes.
25    Q    And were there a number of situations in

1    found that there were receipts that were not properly
2    documented.  I don't know if they were falsified.  I
3    know in some instances we asked people to translate
4    because a lot of the receipts were in Korean.
5    Q    (BY MR. LEVINSTEIN)  Do you remember a
6    situation in which some volunteers went on a trip with
7    athletes and spent money on meals and things like that
8    and came back and had no receipts?
9    MR. JONES:  Objection; calls for
10    speculation.
11    A    Volunteers?
12    Q    (BY MR. LEVINSTEIN)  Or staff.  People who
13    weren't the athletes went with the group, came back,
14    and had no receipts?
15    A    I think I remember something like that
16    happening.
17    Q    And you recall that when they were told
18    there were no receipts, they went to some restaurant or
19    somewhere and got a book of receipts and then submitted
20    consecutively numbered receipts as their receipts for a
21    multiday trip?
22    A    I'm not aware that that happened, but
23    that's possible that it did, because, again, when I
24    came on, we went back through all of the receipts to
25    see, and there was a situation where there were

1    which they never came back with receipts sufficient to
2    cover the amount of cash they had been given?
3    A    There were some situations, yes.
4    Q    And was it a practice of the USTU to give
5    a number of officers credit cards that would
6    automatically be paid by the USTU?
7    MR. JONES:  Objection; vague and
8    ambiguous.
9    A    And I spoke to that yesterday.  When I
10    came onboard, there were 13, 15 credit cards, which was
11    reduced to one.  I don't know the accounting procedure
12    prior to me taking the credit cards from them.
13    I do know that officers and others, committee
14    chairs, had credit cards that they could use that would
15    be paid by the office.  But I don't know approval
16    procedures or anything like that.
17    Q    (BY MR. LEVINSTEIN)  But you know that
18    they used these 13 to 15 credit cards and the bill came
19    to the USTU to be paid?
20    A    Correct.
21    Q    And the USTU had to pay it whether there
22    were receipts or not?
23    A    Correct.
24    Q    Were you aware in August 2003 that there
25    was a problem because three months of cancelled checks

1  weren't in the accounting department?

2       A    Yes.  And that's, like I said earlier

3  today, what led to the firing of that financial

4  director.  We were assuming that everything was

5  proceeding as it was supposed to.  We weren't having

6  monthly audits with the finance department at that

7  time.  We were getting reports monthly, but not check

8  reconciliation records or things like that.

9       Q    And were you aware from '92 to 2003 the

10  USOC had to conduct 11 audits of the USTU?

11            MR. JONES:  Objection; calls for

12  speculation.

13       A    I'm not aware that that's the number.

14       Q    (BY MR. LEVINSTEIN)  Were you aware that

15  every -- of every audit that you are aware of that the

16  USOC conducted, did every single one of them identify

17  deficiencies in the USTU's accounting practices?

18            MR. JONES:  Objection; vague.

19       A    Of the audits I'm aware of, yes, there

20  were deficiencies.

21       Q    (BY MR. LEVINSTEIN)  And every one of them

22  made recommendations about things that had to be

23  corrected?

24       A    Yes.

25       Q    And in 2003, wasn't the accounting of the

1  procedure and keeping the financial records, except for

2  the fact that we had to present the records for the

3  Ohio Group.  And we were going through the process of

4  getting past receipts to make an attempt to come into

5  compliance.

6       So I don't know how suddenly they couldn't

7  make a report when everything was there that had been

8  before.

9       Q    Did you know it was a requirement of the

10  not-for-profit part of the Olympic movement to have

11  audited financial statements?

12       A    Yes.

13            MR. LEVINSTEIN:  Why don't you make this

14  the next number.

15            (Deposition Exhibit No. 86 was marked

16                 for identification.)

17       Q    (BY MR. LEVINSTEIN)  Is Exhibit 86 the

18  independent auditors report of Waugh & Associates

19  concerning the USTU for the year ended December 31,

20  2002?

21       A    Yes, it is.

22       Q    If you look at the first page, do you see

23  where it says, "Because of inadequacies in the

24  Corporation's accounting records, we were unable to

25  form an opinion regarding the amounts recorded for

1  USTU so bad that your auditors refused to certify your

2  financial statements?

3            MR. JONES:  Objection; vague and

4  ambiguous, argumentative.

5       Q    (BY MR. LEVINSTEIN)  You can answer.

6       A    Oh, I thought you were getting something.

7       I don't know that that's the reason that they

8  refused to certify our finance materials, because they

9  had been tasked with coming up with audited financials

10  for our meetings.  And they requested records that we

11  provided.

12       And this happened coincident to, I think it's

13  the Ohio Group that wanted to come in and review the

14  financial records of the USTU.  Everything was out,

15  everything was in order.  It was sorted.  And this was

16  prior to this date in 2003, in August.  And I think

17  Ohio came the month before, maybe.

18       But the records were all laid out.  Anything

19  that was missing, that was when we were making the

20  effort to go back and get receipts for the previous

21  year because that was a big problem.  Initially, they

22  said we can't find the receipts.

23       Now, this is the same auditing group that had

24  done our financials for meetings for the past I don't

25  know how many years.  Nothing had changed on the

1  event revenue, program expenses and supporting service

2  expenses in the accompanying statements of activities

3  and changes in net assets"?

4       A    Yes, I can read that.  You have the same

5  thing I have.  Yes, I see that.

6       Q    And as a result, does the last line say

7  that Waugh & Associates was unwilling to express an

8  opinion on the financial statements that were referred

9  to in the first paragraph?

10       A    Yes.

11       Q    So did you understand this was an auditors

12  report that, given your accounting, they couldn't

13  certify that your financial statements were accurate?

14       A    Yes.  And there was more that was intended

15  to this document.  I had meetings with Mr. Waugh

16  himself.  And the whole impetus was to get complete

17  financials by the end of the year for the meeting,

18  because in previous meetings with them for our midyear

19  meeting, they were lagging behind in developing the

20  meeting for the board.

21       One thing I was charged with from other

22  meetings, board meetings, was we need complete

23  financials.  And I understood that was a

24  requirement.  This was from the membership of the

25  board.

## Page 172

```
 1              We never had the completed audited financials
 2   from Waugh & Associates.  And in several discussions
 3   with Mr. Waugh and his associate, Jill, this was the
 4   effort to get that provided by the annual meeting in
 5   November.  For whatever reason, this is what he came
 6   back with.  I don't know if there was exterior pressure
 7   or anything, but this is the report that he came back
 8   with.
 9       Q     Mr. Harris, didn't you understand that in
10   the summer of 2003, when the USOC auditors came over,
11   rather than have financial statements, there were
12   basically cardboard boxes with loose receipts in them?
13              MR. JONES:  Objection.
14       Q     (BY MR. LEVINSTEIN)  That that was the
15   nature of the USTU's recordkeeping?
16              MR. JONES:  Calls for speculation.
17       A     I understand that that was a part of it,
18   yes.
19       Q     (BY MR. LEVINSTEIN)  Did you understand
20   that the USOC audit people who were supposed to oversee
21   45 NGBs and the USOC spent over 500 hours creating
22   financial records that didn't exist for the USTU?
23              MR. JONES:  Objection; calls for
24   speculation.
25       A     I'm aware that we worked closely with them
```

## Page 174

```
 1   I did was talk with Ms. Witte and ask if we could have
 2   an audit to let me know where we stood because I had
 3   been to meetings and I had heard the reports.  And
 4   starting from scratch, I don't know where we were.
 5              And at this point in time, again, part of
 6   coming into compliance was seeking their help, and this
 7   was done proactively as well, as just coming into
 8   compliance.
 9              I spoke with Mr. Telli several times asking
10   if he could be detailed to help us to straighten this
11   out.  I don't have that expertise.  And obviously we
12   had problem areas with our financial people.  So, yes,
13   he did help us an awful lot to help try to bring us
14   into compliance.  But it's not like it was forced on us
15   to do.
16       Q     (BY MR. LEVINSTEIN)  I'm not suggesting,
17   Mr. Harris, that you were at fault or made to do it.
18   I'm just trying to get an understanding, an accurate
19   record of what the state of the USTU was when the
20   Membership and Credentials Committee was focusing on it
21   in the summer and into the fall of 2003.
22       A     Yes, and that speaks to my response that
23   the records were in shambles.  I found that out and
24   went to work at trying to remedy that.
25       Q     Okay.  Were you aware that prior to your
```

## Page 173

```
 1   in developing that, yes.
 2       Q     (BY MR. LEVINSTEIN)  Do you think that 500
 3   hours might be a reasonable estimate of time spent by
 4   USOC audit people to create financial records that the
 5   USTU was supposed to have already created?
 6              MR. JONES:  Same objection.
 7       A     Do I understand that that was a reasonable
 8   number of hours?
 9              MR. JONES:  Lacks foundation.
10       Q     (BY MR. LEVINSTEIN)  Is that a reasonable
11   estimate of how much time the USOC audit staff spent
12   creating records the USTU should have already had on
13   hand?
14              MR. JONES:  Same objection.
15       A     That's probably a reasonable number
16   because I know that Mr. Telli was there daily with us
17   for four to six hours a day for a period of time.
18       Q     (BY MR. LEVINSTEIN)  Did the USOC audit
19   staff work very hard to try to help you come into
20   compliance?
21              MR. JONES:  Same objection.
22       A     Yes, they did, and it was also at our
23   request, too, for part of that.  I think that's what is
24   missing from this.
25              When I came onboard, one of the first things
```

## Page 175

```
 1   tenure, there had been a number of Article VIII
 2   complaints filed against the USTU?
 3       A     By hearsay, yes, and from being a board
 4   member.
 5       Q     But when you came on as the Executive
 6   Director, you never went through the files to find
 7   other proceedings that had been initiated and pursued
 8   that related to noncompliance by the USTU?
 9       A     I was kept abreast by Mr. Bryant of Law
10   and Legislation about the Article VIIIs that were
11   pending and that needed to be addressed by me.
12              MR. JONES:  Can we take a break?
13              MR. LEVINSTEIN:  Sure.
14              (Recess taken from 10:58 a.m. to 11:03
15              a.m.)
16              (Whereupon, the deposition proceedings
17              reconvened without the presence of
18              Mr. Johansen.)
19       Q     (BY MR. LEVINSTEIN)  In discussions with
20   the USOC in 2003 about the problems with noncompliance
21   by the USTU, were there discussions of whether these
22   issues had been raised in the past with the USTU
23   leadership?
24       A     Yes.
25       Q     Was it communicated to you that many of
```

**Page 176**

```
 1   the problems you were having to deal with now, as the
 2   Executive Director, had been problems that had been
 3   identified by the USOC for three Quadrenniums?
 4              MR. JONES:  Objection; calls for
 5   speculation.
 6        A    I don't know that it went back that far,
 7   but those discussions did take place.  A lot of the
 8   items were repeat items.  I also remember one
 9   discussion when Mr. Warwick was Executive Director --
10   and it was prior to the Winter Games -- and I think
11   they had a compliance meeting, which was before me, and
12   it was done -- and, again, it's hearsay, but it was
13   done informally, you guys need to take care of this,
14   but it's okay.  And that was well within the past three
15   Quadrenniums, which is why I just stated that.
16        Q    (BY MR. LEVINSTEIN)  But would it be fair
17   to say that your understanding was that the same kind
18   of problems had existed for a long time, but there had
19   been perhaps one point in time during Mr. Warwick's
20   tenure that things had gotten a lot better?
21              MR. JONES:  Objection; argumentative,
22   vague and ambiguous, calls for speculation, misstates
23   the prior testimony.
24        A    That's possible.
25        Q    (BY MR. LEVINSTEIN)  Is that consistent
```

**Page 177**

```
 1   with your understanding in the summer of 2003?
 2        A    Yeah.  The only thing I differ with is
 3   whether it was better when Mr. Warwick was there,
 4   because I don't know if he had addressed -- or made
 5   headway and suddenly we went back to doing the old
 6   things again.  So that's my only reason for saying
 7   possibly.
 8        Q    Well --
 9        A    If I might.
10        Q    Sure.
11        A    For instance, with the clubs, the clubs
12   were there when Mr. Warwick was Executive Director.
13   The arguments were there, the Chapter 8s, the finances
14   were there, the receipting problem, everything.  So I
15   don't know that it was done better then, just that it
16   was handled differently in a nonformal meeting.
17              (Whereupon, Mr. Johansen rejoined the
18        deposition proceedings.)
19        Q    (BY MR. LEVINSTEIN)  And it's possible
20   during the 2003 period, when a lot of problems in
21   accounting became severe, that the scrutiny of all the
22   issues increased?
23              MR. JONES:  Objection; argumentative,
24   vague and ambiguous, calls for speculation.
25        A    That's possible.
```

**Page 178**

```
 1        Q    (BY MR. LEVINSTEIN)  So do you believe
 2   that the same problems that were there in 2003 were
 3   probably there in Mr. Warwick's tenure; it's just that
 4   the USOC wasn't as aware of them?
 5              MR. JONES:  Calls for speculation, lacks
 6   foundation.
 7        A    I know that the problems were inherited
 8   and not suddenly developed in one month there when
 9   the first compliance thing came up.
10        Q    (BY MR. LEVINSTEIN)  And the first
11   compliance issues came up one month after you started
12   as Executive Director?
13        A    Yes.
14        Q    So that would be --
15        A    Around September of 2002, I think it was.
16        Q    And for the next year, the USOC worked
17   with the USTU to try to solve those problems?
18        A    No.  After that first meeting, which was
19   at the Adams Mark Hotel -- it's now the Hilton
20   Adams Mark or something -- the questions were laid out
21   with the problem areas, and we had brought responses to
22   them.  And I had started on addressing those problems.
23              There wasn't another correspondence from the
24   Membership and Credentials Committee until, I think,
25   around January or February of the next year, bringing
```

**Page 179**

```
 1   up the same issues again, saying that this hasn't been
 2   complied with.
 3              But the proactive help started when we
 4   approached finance to help us get the records and start
 5   working on that.
 6        Q    Well, a lot of the issues identified in
 7   September of 2002 --
 8        A    Yes.
 9        Q    -- included financial and accounting
10   problems?
11        A    Yes.
12        Q    And the USOC audit people were already
13   working with you at that time to try to conduct audits
14   and assess your recordkeeping?
15        A    Yes, yes.  That's when they first
16   conducted an audit so we could find out where we stood
17   and what needed to be fixed.
18        Q    And the audit in September of 2002
19   identified a number of things that needed to be fixed?
20        A    Right.
21        Q    And the response in 2002 of the USTU, led
22   by you, perhaps, was, we're going to fix these things?
23        A    Yes.  And at that time, I know for a
24   certainty that I trusted the staff that we had in the
25   finance office to address it, because I remember we
```

**Page 180**

```
1   split up the parts that were given to us by the
2   Membership and Credentials Committee, the problem
3   areas.
4            Everything that addressed finance, I had
5   meetings with the finance department to say, can we fix
6   these?  Are you guys capable of fixing this?  Let's get
7   on it.  And I left it to them to do.
8            So in my mind, these are the professionals
9   that do that; they'll get it done.  And my attention
10  turned to other things.
11           And, personally, I'm still learning on the
12  job after one month.  So, again, I turned it over to
13  the officials -- the professionals and expected them to
14  do their job.  Then I get another report saying, well,
15  you're not in compliance with this.  Now a flag goes
16  up.  Wait a minute.  They were supposed to be
17  addressing that.  Maybe these aren't the people to be
18  addressing that and other steps have to be taken.
19           So that's the process that I went through in
20  trying to address the compliance issues.  Finance
21  should have been handled by our financial people.  The
22  other issues were things that needed my personal
23  attention to.  But to my thinking, that was taken care
24  of, or being taken care of.
25       Q    But in September 2002, wasn't one of the
```

**Page 181**

```
1   recommendations of the audit that you didn't have a
2   financial person who was qualified to solve these
3   problems?
4        A    That's quite possible that that was one of
5   the recommendations.
6        Q    Wasn't it the case that the officers of
7   the USTU simply were not willing to extend the funds to
8   hire a qualified financial person to solve those
9   problems?
10           MR. JONES:  Objection; calls for
11  speculation, lacks foundation.
12       A    I don't know that they didn't want to
13  spend the money.  I don't think that early on, under my
14  tenure, I had identified the fact that these people
15  weren't able to handle it, even though I had a written
16  recommendation saying our office wasn't capable.
17           I mean, again, one month on the job, the
18  first thing I do is fire people because of a report?
19  While it might have been a valid thing to do, it didn't
20  happen right away with me.
21       Q    (BY MR. LEVINSTEIN)  I'm not here to
22  revisit the past.
23       A    I take the blame for that.
24       Q    You were responsible for supervising those
25  financial people?
```

**Page 182**

```
1        A    Yes.
2        Q    And having been told by the professionals
3   that did the audit that your financial people didn't
4   have the qualifications, you really had no way of
5   assessing whether they did?
6        A    Exactly.
7        Q    And you didn't take immediate action to
8   solve those problems?
9        A    Right, until after it was specifically
10  addressed as a result of the committee saying here are
11  the findings, and I gave it to them to work on and it
12  came back unresolved.  Then I knew this was part of the
13  problem and moved to address that.
14       Q    But as of August 2003, no qualified
15  financial person had been hired to solve these
16  problems?
17       A    Right.  We had gone through two financial
18  people, and still the problem was there.
19       Q    And, in effect, the USOC was providing you
20  your financial supervision?
21           MR. JONES:  Objection; calls for
22  speculation, argumentative.
23       A    Much of it, yes.
24           Can I say something else?  Our day-to-day
25  financial workings were things that the people that
```

**Page 183**

```
1   were in place could handle, even the new people.  But
2   as far as long-range planning like we needed to be
3   developing was problematic.
4            Like with the policies and procedures, that
5   never came up until a conversation with Mr. Telli when
6   he asked, let me see your policies and procedures
7   manual, and I went back to finance and said where is a
8   copy of our -- and everybody thought I was speaking
9   Greek.
10           So they could handle disbursements, writing
11  checks, day-to-day things.  But as far as the
12  long-range vision, that was problematic.  And that's
13  where Mr. Telli really helped us immeasurably.
14       Q    (BY MR. LEVINSTEIN)  And as a NGB, you
15  were responsible for those things?
16       A    Yes.
17       Q    And you weren't in compliance?
18       A    No, not when I first came onboard.  And at
19  the end of it, I think we were a lot further down the
20  line -- for instance, we had policies and procedures.
21  We had approved procedures for disbursements and
22  receipts.  We had records that had improved.
23       Q    Were you aware that your what you called
24  the policies and procedures manual hadn't been
25  implemented by the people who were working there?
```

```
 1        MR. JONES:  Objection; calls for
 2   speculation.
 3        A    No, I wasn't aware of that.
 4        Q    (BY MR. LEVINSTEIN)  Were you aware that
 5   what you all called the policies and procedures manual
 6   didn't satisfy accounting requirements for the kinds of
 7   policies and procedures you needed?
 8        MR. JONES:  Same objection.
 9        A    No, I didn't understand that because,
10   again, this was done closely with the supervision of
11   Mr. Telli.  We met on a day-to-day basis as that was
12   being developed.  And the final document we came up
13   with, according to him, satisfied what he was saying we
14   needed.
15        Q    (BY MR. LEVINSTEIN)  Didn't you recall
16   that the policies and procedures manual was a document
17   you got from Waugh & Associates?
18        A    I'm not sure that's the case.  I know that
19   we had -- that might have been the basis for our
20   working document that developed, but it wasn't the
21   end-all from Waugh & Associates.  I know that Jill from
22   Waugh & Associates also worked with us in it, because
23   the three of us met; Jill from Waugh & Associates,
24   Chris Telli, and myself, when he was giving us guidance
25   on what needed to be in the manual.  So, yes, she did
```

```
 1   help with that as well.  I do remember that.
 2        Q    Were you aware that that manual was never
 3   approved by the Executive Committee?
 4        MR. JONES:  Objection; calls for
 5   speculation.
 6        A    I know that the officers approved it.  I
 7   don't know that the Executive Committee did.
 8        Q    (BY MR. LEVINSTEIN)  In discussions with
 9   the USOC, did they, people from Membership and
10   Credentials Committee, express the view to you that it
11   was getting too late to keep promising that things were
12   going to be done when they hadn't been done over the
13   past ten years?
14        MR. JONES:  Objection; calls for
15   speculation, hearsay.
16        A    I remember that discussion.
17        Q    (BY MR. LEVINSTEIN)  Did you sense
18   frustration on their part that they had been through
19   this before and had been promised that things would be
20   fixed and they never had been?
21        MR. JONES:  Same objection.
22        A    It seemed very evident to me because the
23   chair several times seemed to express outrage.  And my
24   personal opinion -- I mean, I could only take it
25   personally because I had just come onboard -- was that
```

```
 1   I didn't have the time to fix it, but we could fix it.
 2   But I did understand his frustration and outrage that
 3   here we are revisiting this again with this body.  I
 4   understood that.
 5        Q    (BY MR. LEVINSTEIN)  And did you support
 6   the idea of the USOC installing a financial officer to
 7   take over those functions from the USTU?
 8        A    Yes.
 9        Q    And did you support the idea of bringing
10   in a qualified CEO to supervise the operation and the
11   finances and all aspects of the business of the USTU?
12        A    Initially, no, because in effect I was
13   voting for my replacement.  And, again, I felt that
14   given the time, we could have done the job.
15        But I did step aside because I didn't want to
16   hinder going forward with the remediation plan and
17   losing our status.  I didn't want to be the person that
18   caused that just because I had a little ego and wanted
19   to stay on the job.
20        Q    And I understand that must have been
21   difficult.  But by December of 2003, did you support
22   bringing in a new CEO to replace you?
23        A    I was forced to agree with that.
24        Q    And why did you think that should happen?
25        A    Again, in order to satisfy the
```

```
 1   remediation -- it was clear in my mind that this would
 2   not go away without satisfying, to the letter, what
 3   Membership and Credentials wanted.  If the remediation
 4   plan called for removal of the Executive Director and
 5   replacement with a USOC person, then so be it.
 6        It's not my first choice.  It's not my
 7   preference.  At that point, it was my livelihood.  But,
 8   again, far be it from me to stand in the way of keeping
 9   our NGB status.  To me, that was foremost important, as
10   with taking the job was.
11        Q    When the Membership and Credentials
12   Committee started focusing on your issues in 2002, did
13   they offer you help and assistance to try to help you
14   get into compliance?
15        A    I don't recall that happening.  I do
16   recall that as part of my closing comments, at the
17   first meeting, saying that I'm new and I would
18   appreciate any help they would give me.
19        I never assumed that I knew how to do this
20   from the beginning.  I think that's a foolish premise.
21   And to be facing the USOC Membership and Credentials
22   Committee to me was a big thing.  It said right off the
23   bat, you have got lots of problems to address, and
24   there's a short time -- there's a short learning curve.
25        So my plea at the very end of the first
```

1    meeting was any help you guys can give me I would
2    appreciate.
3         Q    Did the Sports Partnership people at the
4    USOC give you a lot of help?
5         A    Definitely.  They stepped up to the bat
6    right away.
7         Q    And who were they?
8         A    It wasn't Kelly Skinner at the time.  It
9    was another gentleman who retired from the USOC.  I
10   forget his name.  There was another assistant named
11   Jill, and I forget the other lady's name.  There were
12   two of them and the other person.
13        Q    Was Michelle Farrell involved?
14        A    Yes.  No, not Michelle.  She came on with
15   Kelly.  It was -- I can't remember the names.
16        Q    But there were initially some people from
17   Sports Partnerships who stepped right up and tried to
18   help you get into compliance?
19        A    Yes.  And I met with them weekly to learn
20   all I could.  They taught me which reports needed to be
21   done when, the procedure for processing things,
22   developing the high performance -- not high performance
23   plan, the -- I forget what it's called.  The PPA.  All
24   of the things, they stepped right up to the front.  And
25   without their help, I would have fallen flat, flatter.

1         Q    Did you understand that they were doing a
2    lot of work to help you that other NGBs did without
3    help?
4         MR. JONES:  Objection; calls for
5    speculation.
6         A    That wasn't my total understanding because
7    several times they said we have -- we're responsible
8    for X number, six or eight NGBs, as far as Sports
9    Partnership, and we helped them develop their
10   performance plans, blah, blah, blah.  And I was at
11   meetings where other NGBs were discussed.
12        So it was my understanding that this was part
13   of what they did for all of the NGBs, but I did feel
14   that they went an extra mile to help get me settled on
15   the job.
16             (Whereupon, Mr. Johansen rejoined the
17             deposition proceedings.)
18        Q    (BY MR. LEVINSTEIN)  You felt they spent a
19   disproportionate amount of time on your NGB versus the
20   other ones?
21             MR. JONES:  Objection; calls for
22   speculation.
23        A    I don't know if it was disproportionate.
24        Q    (BY MR. LEVINSTEIN)  Coming back to a
25   subject about the people that Mr. Sang Lee was allowed

1             (Whereupon, Mr. Johansen left the
2             deposition proceedings.)
3         Q    (BY MR. LEVINSTEIN)  So throughout the end
4    of 2002, was it your view that the USOC was trying to
5    help you come into compliance?
6         A    Yes.
7         Q    And did that view continue in 2003?
8         A    Yes.
9         Q    And at some point, those people switched,
10   and Kelly Skinner and Michelle Farrell became involved?
11        A    Yes.
12        Q    And were they also tremendously helpful?
13        A    Very helpful.
14        Q    And what kinds of things did they help you
15   with?
16        A    Same thing.  Developing or requesting
17   funds for the athletes programs that we had been
18   supporting in the past and getting more money allocated
19   for that.  Documenting the expenses, letting me know
20   what's allowed, what's not, how to categorize things.
21   They were just very helpful.
22        Our approval process, when they were part of
23   the committee, aside from the Delegation Review
24   Committee, they helped work on those documents, as
25   well.  So they were instrumental.

1    to appoint, even after the issue was identified, were
2    there certain positions that he was unwilling to give
3    up his right to appoint?
4             MR. JONES:  Objection; calls for
5    speculation.
6         A    I don't know if initially he was or not,
7    but I know that repeatedly he said in front of others,
8    not just me, that the state president appointments will
9    go, I don't have a problem with that, all it does is
10   create problems.  And that was said repeatedly.  The
11   five delegates at large was never an issue.
12        I think the only hesitancy was in the
13   committee chairs, like referee chairs, Junior Olympics,
14   Coaching Science, those.  And I remember the discussion
15   further that was if they were left to select or elect
16   from amongst their members, that problem would be
17   unwieldy.
18        For instance, if the referee chair is
19   selected by all the referees, it becomes a popularity
20   contest possibly.  How do you set that up, for
21   instance?  And I remember those discussions.  And the
22   only hesitance I remember was in those committee
23   people.  But the others, no problem.
24        Q    (BY MR. LEVINSTEIN)  But he wanted to
25   retain the right to appoint the chairmen to the five

**Page 192**

1  essential working committees?
2      A.    Right.  Tournament committee, referee
3  committee, coaching science, Law and Legislation, and
4  the other one.
5      Q.    And he appointed all the members of those
6  committees, didn't he?
7      A.    No, not the members.
8      Q.    Who appointed the members?
9      A.    The chair.
10      Q.    So he appointed the chair and then the
11  chair appointed the members?
12      A.    Yeah.
13      Q.    Now, would you take a look at the
14  selection criteria, Exhibit 32.
15          (Deposition Exhibit No. 87 was marked
16          for identification.)
17      Q.    (BY MR. LEVINSTEIN)  Now, have you seen
18  this document before?
19      A.    Yes.
20      Q.    87.  You can stop looking at Exhibit 32.
21  Please look at Exhibit 87.
22      A.    Okay.
23      Q.    Is that your signature at the bottom of
24  the page?
25      A.    A sterling signature it is.

**Page 193**

1      Q.    John Hancock would be proud.
2          Are these the selection procedures for
3  coaches of the USTU that were in effect in early 2003?
4      A.    Yes, that's correct.
5      Q.    Now, the first item says that the
6  prerequisite to be a coach was "Previous coaching
7  experience at the Olympic Games, Pan Am Games, World
8  Championships, World Cup, or Pan Am Championships for
9  Taekwondo."  Is that correct?
10      A.    Correct.
11      Q.    How many people as of January 2003, in
12  your estimation, had previous coaching experience at
13  one of those five categories of events?
14      A.    It would be a guesstimate on my part, but
15  I'm thinking between four and eight people, if that
16  many.
17      Q.    No.  I mean as of January 2003, how many
18  people were alive in the United States who had been a
19  coach at the Olympic Games, Pan Am Games, World
20  Championships, World Cup, or Pan Am Championships for
21  Taekwondo?
22      A.    What I'm considering though is head coach
23  and assistant coaches as well.
24      Q.    Any coaching experience is what it says
25  there.

**Page 194**

1      A.    Right.  Because --
2          MR. JONES:  Could I clarify, Counsel?
3  Are we talking about people that are willing to be
4  coaches?
5          MR. LEVINSTEIN:  No.  Let's start again.
6          MR. JONES:  It could be anybody.
7          THE DEPONENT:  Eligible.
8      Q.    (BY MR. LEVINSTEIN)  As of January 2003,
9  how many Olympic Games had been involved in Taekwondo?
10      A.    Two.  '88 and '92.  Oh, I'm sorry.  2000.
11  So three.
12      Q.    There had been three Olympic Games.  How
13  many Pan Am Games had there been involving Taekwondo?
14      A.    Pan Am Games are every other year, so
15  since when?  Or as of 2003?  Well, let's see.
16          MR. JONES:  Don't guess.
17      A.    At least eight that I can recall.
18      Q.    (BY MR. LEVINSTEIN)  So we have three
19  Olympic Games, eight Pan Am Games.  How many World
20  Championships?
21      A.    It would probably be the same number as
22  Pan Am Games, because they're every other -- no, World
23  Championships are every four years, but not in an
24  Olympic year.  So let me go back again.  Probably six,
25  and that's a rough guesstimate.

**Page 195**

1      Q.    And how many World Cups for Taekwondo?
2      A.    World Cups are every two years, so that
3  would mirror the number of Pan Am Games.
4      Q.    And how many Pan Am Championships have
5  there been?
6      A.    Pan Am Championships can be every year
7  except the Olympic year, so that's three out of four
8  years, so probably nine.
9      Q.    So now we have identified 3 Olympic Games,
10  8 Pan Am Games, 6 World Championships, 8 World Cups,
11  and 9 Pan Am Championships, correct?
12      A.    And that's a rough guesstimate.
13      Q.    I understand.  So adding those, my math
14  will be better this time, I get 34 events.
15          MR. LEVINSTEIN:  Does that match,
16  Counsel?  Sorry, I don't want to put you on the spot
17  with your math.
18          MR. JONES:  34 is correct.
19      Q.    (BY MR. LEVINSTEIN)  So 34 different
20  events, and the candidate had to have previous coaching
21  experience --
22      A.    At one of them.
23      Q.    -- at at least one of those 34 events?
24      A.    Uh-huh.
25      Q.    How many different coaches do you think

**Page 196**

1  had -- who were possible U.S. coaches had coached at

2  one of those 34 events?  How many different people?

3      A    Well, again, I'm assuming --

4      MR. JONES:  Sorry.  Calls for

5  speculation.  It's kind of vague.

6      A    I'm assuming we took more than one coach

7  to each of those events, and sometimes if we took a

8  men's and a women's team, we had as many as four or six

9  coaches at an event.  So that's why I said at least

10  four to eight people that would be --

11      Q    Per event?

12      A    Huh?

13      Q    So it could be 100 people?

14      A    It could be.

15      Q    We don't know for sure, but 100 is a

16  reasonable number?

17      A    No, not really.  Because if we took six

18  people, which is a large number, to each of those

19  events, and there were six different people each time,

20  that's something that wouldn't have happened.  You

21  would have taken people that had experience before and

22  maybe added in some others.

23      Q    So 50 or 60?

24      MR. JONES:  Objection; calls for

25  speculation.

**Page 198**

1      Q    -- what did the procedures require as the

2  method by which the coach --

3      A    Was selected?

4      Q    -- the Coaching Science Committee would

5  choose among those people?

6      A    Again, I was not a part of the Coaching

7  Science Committee, but it's my understanding that once

8  you had a list of people that met Criteria No. 1, those

9  people were considered by the Coaching Science

10  Committee and a recommendation was made.  After that

11  recommendation was made, the Executive Committee would

12  approve that.

13      Q    Okay.  Was the Coaching Science Committee

14  supposed to consider a large number of candidates?

15      A    Anyone that met that Criteria No. 1.

16      Q    And were they supposed to have a meeting

17  to discuss those candidates?

18      A    The Coaching Science Committee often

19  conducted business by phone rather than a meeting, a

20  face-to-face meeting, so I don't know how they would

21  have done this.

22      Q    But were they required to have a meeting

23  at which the athlete members were present?

24      A    Yes, some sort of meeting of the whole

25  group, which included athlete representation.

**Page 197**

1      Q    (BY MR. LEVINSTEIN)  What would your

2  number be?

3      MR. JONES:  Calls for speculation.

4      A    The original question was how many people

5  do I think fit this criteria, right?

6      Q    (BY MR. LEVINSTEIN)  Right.

7      A    And my answer initially was around eight

8  or so.

9      MR. JONES:  It was four to eight.

10      Q    (BY MR. LEVINSTEIN)  You can't name more

11  than eight people who coached at one of these events?

12      A    I think I could only name eight, and there

13  were probably more.

14      Q    Were you aware that there were Taekwondo

15  events of these categories that dated back to the '70s?

16      A    Yeah.  I didn't count back that far.

17      Q    Okay.

18      A    So then mine was a guesstimate within a

19  range that I could justify.  The first World

20  Championship was 1977.

21      Q    So there could be 50 events?

22      A    Right.

23      Q    Okay.  And under these criteria, once

24  someone qualified by Item 1 --

25      A    Yes.

**Page 199**

1      Q    And why did they have to have athletes at

2  these?

3      A    There's a 20 percent requirement for each

4  committee.

5      Q    And what was your understanding of the

6  source of that requirement?

7      A    It's probably USOC.

8      Q    Did you understand it was a federal law

9  that requires that?

10      A    I didn't understand that.

11      Q    Have you ever --

12      A    Federal law?

13      Q    -- read the Ted Stevens Olympic and

14  Amateur Sports Act?

15      A    Yeah.

16      Q    Did you understand that was a federal law?

17      A    Okay.  I do now.

18      Q    Is that where the 20 percent requirement

19  comes from?

20      A    Yes.

21      Q    Were you aware that the chairman of the

22  Coaching Science Committee selected Mr. Dae Sung Lee as

23  the coach without having a meeting?

24      MR. JONES:  Objection; calls for

25  speculation.

**Page 200**

```
 1       A     No, I'm not aware of that at all.
 2       Q     (BY MR. LEVINSTEIN)  Did you ever see any
 3  minutes of any meeting at which nominees were
 4  considered?
 5       A     No, sir.  And the way it worked, anytime I
 6  dealt with the Coaching Science Committee -- for
 7  instance, if we were preparing for the World
 8  Championship, I would inform him either in writing or
 9  by phone that we need to come up with coaches for this
10  next event; you need to have your committee meeting and
11  make nominations or recommendations to us.  And I would
12  call back every other day until it was completed, and
13  he would either tell me verbally or maybe in e-mail
14  saying that this is the nominee.
15       Q     And at some point, the chair of the
16  Coaching Science Committee told you the nominee for the
17  Olympics was Mr. Dae Sung Lee?
18       A     Yes.
19       Q     Either in writing or orally?
20       A     Yeah.
21       Q     And the Executive Committee simply
22  received a ballot with only an approve or disapprove
23  that nomination?
24       A     Correct.
25       Q     And would it violate these procedures for
```

**Page 201**

```
 1  the Coaching Science Committee chair to simply have
 2  selected Mr. Dae Sung Lee without a meeting?
 3            MR. JONES:  Objection; calls for
 4  speculation.
 5       A     It would appear to be a violation if
 6  that's what happened.  But, again, I have no knowledge
 7  that that's what happened.
 8       Q     (BY MR. LEVINSTEIN)  Was Mr. Dae Sung Lee
 9  a member of the Coaching Science Committee?
10       A     I'm not --
11            MR. JONES:  When?  Pardon me.
12       Q     (BY MR. LEVINSTEIN)  In 2003.
13       A     I'm not sure.  Again, I didn't know the
14  names of the members of that committee.  I don't know.
15       Q     Do you know how many people are on the
16  Coaching Science Committee?
17       A     No, I don't.
18       Q     Were there requirements of advance notice
19  of meetings of committees?
20       A     Requirements of each committee or --
21       Q     Or a general requirement that applied to
22  all your committees.
23            MR. JONES:  Objection; calls for
24  speculation.
25       A     I don't know that to be true.  And prior
```

**Page 202**

```
 1  to being Executive Director, I was on some committees,
 2  and I know that I would be notified the day before if
 3  there was a phone conference, and sometimes the morning
 4  of if there's an afternoon.  So I don't know if there
 5  was a requirement for prior notification or what that
 6  was.
 7       Q     (BY MR. LEVINSTEIN)  Were you on a lot of
 8  committees over the years at the USTU?
 9       A     Yes.
10       Q     And did some of the committees never meet?
11       A     Yes.  And they never reported as well.  I
12  mean, for instance, what committee was I on?  It might
13  have been a building fund committee that was inert and
14  inactive for two or three years.  And then it was
15  changed, and that committee went inactive for a year or
16  so, and then suddenly they started doing things.
17       Q     How many committees did the USTU have?
18       A     Standing committees we know of; other
19  committees were appointed as needed, and I don't know
20  what number that would be.
21       Q     Were there 27 standing committees?
22       A     No.  Like the ones that the president
23  appointed.
24       Q     There were five essential working
25  committees, I understand.
```

**Page 203**

```
 1       A     Right.
 2       Q     But were there --
 3       A     There were other committees that could be
 4  appointed for whatever.
 5       Q     Was there an ethics committee?
 6       A     Late in my tenure there was one developed.
 7  Prior to that, I think years and years before, under
 8  the administration of Dr. Dong Ja Yang, I remember
 9  there being one.  But for a long time there wasn't.
10       Q     Was there an audit committee?
11       A     Audit committee?  I remember there had
12  been one.  I don't know that they functioned.  But I do
13  know that there had been one.
14       Q     And was one responsibility of the audit
15  committee to make sure that the financial recordkeeping
16  and performance of the organization was in compliance?
17       A     That would probably be one of their
18  responsibilities.
19       Q     And for a long time, they didn't meet?
20       A     Not that I know of.  I was never on that
21  one.
22       Q     But in all of this issue involving the
23  Membership and Credentials Committee and all the
24  failure to comply with financial obligations, you never
25  recall an audit committee being involved?
```

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts counters = Blue)

1    A    No, not during my tenure.

2    Q    And as long as the person nominated by the

3  coaching selection committee chairman tendered to

4  you -- let me start again.

5         When the chair of the Coaching Science

6  Committee gave you the name of the nominee, the only

7  review you did of it was to get a bio or do some other

8  due diligence to make sure that the person nominated

9  had at some time coached at the Olympic Games, Pan Am

10  Games, World Championships, World Cups, or Pan Am

11  Championships?

12    A    Correct.

13    Q    And that was the only requirement you knew

14  of that would qualify or disqualify a coach?

15    A    Yeah.

16    Q    So if a person had coached the World Cup

17  team in 1976, and President Lee had no athletes

18  involved in high level competition, and he was

19  nominated by the Coaching Science Committee chair, you

20  would have had no reason to --

21    A    Right.

22    Q    -- disapprove that nomination?

23    A    Correct.

24    Q    And the Executive Committee, under these

25  guidelines, could have voted to approve that person?

---

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    Correct.

2    Q    You signed this document -- I'm pointing

3  to Exhibit 87 -- on January 20th, 2003?

4    A    Yes.

5    Q    But I think your testimony yesterday may

6  have been that these criteria were developed before you

7  came onboard?  Maybe not.  Let me ask it again.  Let me

8  just start.

9         Can you tell us, did you play a role in

10  writing Exhibit 87, or was it something that you just

11  took the content from something someone previously had

12  done?

13    A    I did not personally have a hand in

14  writing Exhibit 87.  This was a part of a larger

15  document, of the complete selection procedures for the

16  Olympic Games.  And personally what I did was tweak the

17  athlete selection process, because that process, others

18  were asking that we relook at that.

19         As far as the selection for coaches, which is

20  this specific exhibit, this was there for me when I got

21  the document itself.  So I didn't tweak that but signed

22  it as it was.

23    Q    So you played no role in writing any of

24  this document?

25    A    No.

---

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts counters = Blue)

1    Q    You just signed it?

2    A    Yes.

3    Q    And the date you signed it was the date

4  you submitted it to the USOC?

5    A    I'm assuming that's true, yes.

6    Q    And were you aware that by February 28,

7  the USTU had already selected and approved Mr. Dae Sung

8  Lee as a coach?

9    A    February 28?

10         MR. JONES:  Objection; calls for

11  speculation.

12    Q    (BY MR. LEVINSTEIN)  2002 (sic).

13    A    Of two thousand --

14    Q    I think so.

15    Q    2002 you said?

16    Q    2003.

17    A    Oh, three.

18         MR. LEVINSTEIN:  If that's wrong, someone

19  should feel free to tell me, because I'm not trying to

20  mislead him.  Is that the date that Mr. Lee's

21  nomination was announced by the USTU, February 28,

22  2003?

23         MR. JONES:  By the USTU?

24         MR. LEVINSTEIN:  Yeah.

25    A    I'm not sure.

---

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    (BY MR. LEVINSTEIN)  Maybe I can find

2  that.  I thought so.  I don't mean to create -- I

3  thought that was the date, so if I'm wrong, please, I'm

4  not trying to mislead anyone.

5         MR. UESUGI:  I know there was no World

6  Cup in 1976.

7         (Discussion off the record.)

8         MR. LEVINSTEIN:  If you want me to

9  change -- I'll change the question to help you out on

10  that one, as long as you're going to raise that issue.

11    Q    (BY MR. LEVINSTEIN)  If anyone had

12  participated in any Olympic Games -- if a coach had

13  participated in any Olympic Games, any Pan Am Games,

14  any World Championships, any World Cup, or any Pan Am

15  Championships, whenever they were held, even if it was

16  an event that was held in the '70s and involved

17  Taekwondo and was in one of those categories, and he

18  was nominated by the Coaching Selection Committee

19  chair, there was no reason he couldn't be approved by

20  the Executive Committee?

21    A    Correct.

22    Q    Let me keep going here.  What was the

23  relationship between Sang Lee and Dae Sung Lee, if you

24  know?

25    A    I know that Sang Lee was an Olympic coach

1  in 1988, and Mr. Dae Sung Lee was one of the athletes
2  that competed; not at the Olympics, but he was one of
3  the athletes that Sang Lee coached.
4      Q    Were they friends?
5      A    I would assume so.  Well, at that time, I
6  think they were more --
7      Q    I'm not talking at that time.  I'm sorry.
8  I'm talking 2003.
9      A    2003.
10     Q    I apologize.  I have confused you.
11          As of 2003, were Sang Lee and Dae Sung Lee
12  friends?
13     A    I would assume so, yes.
14     Q    Dae Sung Lee had been Mr. Sang Lee's
15  student?
16     A    Athlete as a coach, yes.
17     Q    And in the world of Taekwondo, athlete
18  coach, same thing as student instructor?
19          MR. JONES:  Objection; vague.
20     A    Not necessarily, but a similar type
21  relationship.
22     Q    (BY MR. LEVINSTEIN)  Well, you talked
23  about the values --
24     A    Right.
25     Q    -- of respect and loyalty.  Were those

1  as an athlete.
2      Q    Did they have a business relationship?
3      A    A business relationship?
4          MR. JONES:  Objection; calls for
5  speculation.
6      A    I'm not sure.  I don't know.
7      Q    (BY MR. LEVINSTEIN)  Well, could you tell
8  us what U.S. Taekwondo Centers, Inc. is?
9      A    That's a group of Taekwondo schools that
10  were started by Mr. Sang Lee.
11     Q    And Mr. Sang Lee authorized other
12  individuals to --
13     A    Like a franchise, yes.
14     Q    And did Dae Sung Lee operate a U.S.
15  Taekwondo Center, Inc., school?
16     A    You know, I don't know.  I don't know if
17  that's his affiliation with Mr. Lee or not.
18     Q    Well, in the USTU, was it important that
19  all the officers and Executive Committee members
20  disclose all their business relationships with each
21  other?
22     A    Yes.  I'm just saying that I don't know
23  that that was his school affiliation with Mr. Lee.
24     Q    Did you have a conflict of interest policy
25  that required all the officers and Executive Committee

1  different in an athlete/coach versus a
2  student/instructor?
3      A    Somewhat, yes.  For instance, I had
4  Taekwondo schools.  My students have a different
5  relationship to me than the Army athletes that I
6  coached for years.  It's similar but different.
7      Q    They were in the Army, so maybe they had a
8  different relationship because they were employed.
9      A    No.  This was a coach thing.
10     Q    All right.
11     A    It's similar, but it's not like the
12  instructor/student relationship.
13     Q    Well, was your relationship with your
14  athletes in the Armed Services different because of the
15  overlay of the relationship between the officers and
16  enlisted men?
17     A    No.  The point I'm trying to make that I'm
18  not doing a very good job of is, for instance, my
19  athletes that came to me with the Army team are
20  someone else's student, but they were my athlete to
21  coach.  So that was a different relationship than their
22  student/teacher relationship.
23          And I would think it would be the same with
24  Mr. Dae Sung Lee and Mr. Sang Lee.  Mr. Sang Lee was
25  not Mr. Dae Sung Lee's instructor, but he was his coach

1  members to disclose potential conflicts of interest?
2      A    A conflict of interest policy?
3          MR. JONES:  Objection; calls for
4  speculation.
5      A    I don't know that there was one.
6      Q    (BY MR. LEVINSTEIN)  Did you at various
7  times in the USTU hear complaints by USTU members about
8  individuals who had business dealings with each other
9  who were in positions of leadership?
10         MR. JONES:  Objection; calls for hearsay.
11     A    Throughout my time and involvement, yes.
12     Q    (BY MR. LEVINSTEIN)  Did you hear concerns
13  about an 'Old Guard'; that there were people who had
14  been the officers or board members for years and years
15  and years, and it was a problem, that there wasn't
16  new blood that came into the organization?
17         MR. JONES:  Objection; vague and
18  ambiguous, argumentative.
19     A    Yes.  I have heard that over the years.
20  But now again, this isn't something new.  I mean,
21  again, I came onboard in the '70s.  And my thing was, I
22  couldn't wait for that group to get out so we would
23  have a chance to get in, whomever they were.  And every
24  time there was another election, even if there were
25  different faces, it was the same thing.  It was like, I

**Page 212**

1  can't wait till we get a chance to do this, do this.
2       So it's been an ongoing complaint for years.
3  It's not a new thing.  I think that's true in every
4  organization as well, possibly.
5       (BY MR. LEVINSTEIN)  But the organization
6  you have been involved in is the USTU?
7       A    Well, for this meeting, yes.  I have been
8  in other organizations.
9       Q    Been in any other organizations with a
10  120-member board?
11       A    I don't think I have been in another
12  organization with 127 members.
13       Q    On the board?
14       A    Members.
15       Q    There you go.  Did you understand when you
16  came onboard as the Executive Director that there was
17  an emphasis ongoing in the U.S. Olympic movement to
18  emphasize supporting athletes to achieve sustained
19  competitive excellence?
20       A    Yes, as part of the mission statement.
21       Q    Was that mission statement something the
22  USTU was supposed to follow as a National Governing
23  Body?
24       A    Yes.
25       Q    Were you aware of complaints by USTU

**Page 213**

1  members, including athletes, that delegations of the
2  USTU would go to events, and beyond the athletes and
3  the coaches, there would be large numbers of staff or
4  volunteers that the USTU paid to make those trips?
5       A    I was aware of that allegation, yes.
6       Q    And was that a problem that you worked on
7  when you were the Executive Director?
8       A    Yes, it was.
9       Q    And you mentioned something about cutting
10  $210,000 out of the budget.  Was some of that involved
11  in cutting down the extent to which the organization
12  was paying for officers and others to engage in travel
13  and attending events?
14       A    I'm not sure that that was one of the
15  specific areas, but I think I listed maybe eight or ten
16  things, with a dollar amount with proposed cuts.  And
17  one area was VIP as a catch-all.
18       We had come into compliance, again, with the
19  help of Kelly Skinner and the other Sports Partnership
20  people, as to the number of people we would send for
21  official delegations and limit it to that.  And, again,
22  just their guidance helped ensure that that happened.
23       Q    But it had been a practice that a lot of
24  volunteers, who were unnecessary to the running of the
25  event, were paid for by the USTU to travel?

**Page 214**

1       MR. JONES:  Objection; argumentative,
2  calls for speculation.
3       A    I don't know if they were necessary.  But
4  we did have much larger delegations prior to my tenure.
5       Q    (BY MR. LEVINSTEIN)  And when you reduced
6  the size of the delegations, it was your view that it
7  wasn't going to hurt the athletes' performance at the
8  events?
9       MR. JONES:  Same objection.
10       A    I didn't think it would hurt them, no.
11       Q    (BY MR. LEVINSTEIN)  So you didn't think
12  they were necessary, did you?
13       MR. JONES:  Objection; argumentative.
14       A    In essence, no.
15       Q    (BY MR. LEVINSTEIN)  When the issue arose
16  about term limits and eliminating the term limit --
17       A    Yes.
18       Q    -- did you tell anyone that it would be a
19  mistake for the USTU to eliminate the term limits?
20       A    Yes, I did, in a conference with then
21  President Lee.
22       Q    And he didn't follow your advice?
23       A    No.  As I recall, there were four of us at
24  the meeting, and he asked everyone's opinion on it
25  before he recommended it as an agenda item.

**Page 215**

1       Q    And who else was in that meeting?
2       A    Let me try to remember.  I know that Mark
3  Bryant was there.  Sammy Pejo.  I can't remember who
4  the other person was.  And myself.
5       And he asked each of us in turn what we
6  thought of the idea, and I said I didn't think it was a
7  good idea, because the perception is that it eliminates
8  hope.  And others felt that if that's what you want to
9  do, that's fine.
10       Q    Was Sammy Pejo one of Mr. Sang Lee's
11  students?
12       A    I'm not certain whether he's Mr. Sang
13  Lee's student.  I know that he coached him, but I don't
14  know if he is one of his initial students.
15       Q    Did you ever have discussion with any USTU
16  members that this concept of respect and loyalty to
17  your senior interfered with younger people's
18  willingness to speak out on issues counter to views
19  expressed by people who were senior to them?
20       A    Did I have discussions to that effect?
21       Q    Yeah.
22       A    I don't recall specifically that
23  happening.  I've had lots of discussions about
24  junior/senior relationships, but I'm trying to think in
25  the context of when I was Executive Director and it

1  interfering with things there.

2      Q      Was that a concern expressed by USTU

3  members?

4      A      Not so much a concern, rather than part of

5  our martial arts system, the junior/senior system.  But

6  not that it was problematic in doing anything.

7      Q      What about concerns that committee

8  chairmen would pick their students to be committee

9  members?

10          MR. JONES:  Objection; vague and

11  ambiguous.

12      A      I didn't have those discussions.

13      Q      (BY MR. LEVINSTEIN)  You said that there

14  were budget cuts planned for 2004 that would save

15  $210,000, and you referenced that they concerned

16  allowances to officers.  What did that refer to?

17      A      At one point, the officers had operating

18  expenses for their offices, like the secretary, the

19  treasurer, the president.  And part of that was cutting

20  back on the allowance for those office expenses.  And,

21  again, that dovetails with eliminating a lot of phones

22  and the payment of calls for those things.

23      Q      So before this happened, the USTU was

24  paying a lot of expenses for officers that involved

25  running their own office and business expenses like

1  phones and faxes and things like that?

2      A      Yes.

3      Q      And they had no obligation at the time to

4  document that these costs were limited to USTU

5  business?

6          MR. JONES:  Objection; calls for

7  speculation.

8      A      What they did was send us a copy of the

9  bill.  And if we had a question about a phone call --

10  for instance, there was a call to Africa that shows up.

11  It's something we would circle and get clarification

12  before the bills were paid, under my tenure.  I don't

13  know about before.

14          But, for instance, if there was a

15  $12,000-a-year allowance for your office, and you sent

16  us a $2,000 phone bill, well, you've eaten up one-sixth

17  of your allowance, so it would draw inspection.  And

18  that wasn't something that happened, but I'm saying for

19  instance.

20      Q      What kind of allowance, dollar amounts,

21  were these officers given?

22      A      I think $12,000 was an operating expense

23  for like the treasurer's office because they had to

24  phone, fax, mail things, send reports, whatever; toner

25  cartridges, blah, blah, blah.

1      Q      So the volunteer treasurer was paid

2  $12,000 a year towards his expenses?

3      A      No.

4          MR. JONES:  Objection; misstates the

5  testimony.

6      A      That wasn't.  He had an allocation so that

7  expenses -- say, for instance, his phone bill for the

8  month of official calls was $150.  That was sent in to

9  the office.  Once it was verified that these were

10  official calls, that was paid.  It was never paid

11  directly to him to run his office.

12      Q      (BY MR. LEVINSTEIN)  It was reimbursed to

13  him for costs he had expended?

14      A      No.  It was paid from the office with that

15  amount being allocated to him.

16      Q      Well, did that include expenses for travel

17  and entertainment?

18      A      No.

19      Q      Did it include expenses for taking people

20  to play golf?

21      A      No.

22      Q      What account did the amounts USTU paid for

23  people to play golf come out of?

24      A      Again, that was under the International

25  Development or -- there were two budget items for that.

1  One was International Development.  I forget the name

2  of the other.

3      Q      So the USTU reimbursed meals and golf fees

4  and things like that, based on the representation of

5  the officer that this was entertaining someone who had

6  to do with international development of Taekwondo?

7          MR. JONES:  Objection; calls for

8  speculation.  Also, lacks foundation.

9      A      It's something that could be determined.

10  For instance, if the president of WTF was coming to the

11  Washington, D.C. area, and the secretary general wants

12  to host him for a dinner and meet with him, that's

13  something that we know is an international development

14  item.  They go play golf as part of the meetings.

15  That's included in there.

16          If, on the other hand, the secretary met with

17  a school owner, took him out to golf and eating and

18  stuff, that's not international development.  That

19  wasn't something that was approved.

20      Q      (BY MR. LEVINSTEIN)  That was not

21  something that should have been approved?

22      A      Something that wasn't approved, because,

23  again, I had the credit cards.  So they had to submit

24  for reimbursement.

25      Q      Once the credit cards were eliminated?

1   A    Yes.

2   Q    And were you aware of the issues related

3   to the 2002 Salt Lake Games that dealt with concerns

4   about giving gifts to international Olympic officials?

5   A    Oh, yes.  I thought you were talking about

6   Taekwondo.  Yes.

7   Q    What steps were implemented to make sure

8   that protocol gifts and things like that that violated

9   the policies that came out of the 2002 Olympic Games

10  didn't occur?

11  A    We didn't have policies in place for that.

12  Q    When you were the Executive Director, did

13  the USTU get into a deficit situation?

14  A    Yes.

15  Q    Did it owe more money than it had?

16  MR. JONES:  I'm sorry.  What time frame?

17  MR. LEVINSTEIN:  When he was Executive

18  Director.

19  A    So 2002, 2003.

20  MR. JONES:  Objection; overbroad, vague.

21  A    There was a point that we were operating

22  at a deficit, yes.

23  Q    (BY MR. LEVINSTEIN)  Were you aware that

24  at the end of 2003, the USTU was $900,000 in the red?

25  MR. JONES:  Objection; lacks foundation,

1   next sentence, that overcoming deficits would take more

2   time?

3   A    Yes.

4   Q    So as of that time period, there were

5   deficits --

6   A    Yes.

7   Q    -- and you weren't going to be able to

8   solve those problems by the end of 2003?

9   A    Right.  We were hoping just to break even

10  by the end of the year, which was three months later.

11  Q    But that's break even for the year --

12  A    For the year.

13  Q    -- not solving the deficits that already

14  existed before the year started?

15  A    Correct.

16  Q    So there is no suggestion that you thought

17  that by the end of the year, the whole organization

18  would be a break-even; just that the 2003 time period

19  would be a break-even period.

20  A    Correct.

21  Q    And you don't know if that actually

22  happened?

23  A    No, I don't.

24  Q    You said that -- new subject.  You said

25  that OTC resident athletes were encouraged to assist in

1   misstates the testimony.

2   A    No, I wasn't aware of that.

3   Q    (BY MR. LEVINSTEIN)  Were you aware -- a

4   different subject.  Were you aware that the advance

5   given to the employee for the purchase of her house was

6   never returned?

7   A    No, I wasn't aware of that.  I know that a

8   payment schedule was set, and it was supposed to have

9   been done directly with the finance department.  I

10  don't know that.

11  Q    But you don't know of any payments having

12  been made on that plan?

13  A    Well, I didn't follow up on that.

14  Q    You were aware that there were deficits of

15  the USTU in August of 2003?

16  MR. JONES:  Objection; misstates the

17  testimony.

18  A    I know that at some point we were at a

19  deficit.  It might have been that period.

20  Q    (BY MR. LEVINSTEIN)  Well, you testified,

21  I believe, that as of August and September of 2003, you

22  believed you were well on your way in moving into

23  compliance?

24  A    Yes.

25  Q    But you also testified, I think in the

1   camps?

2   A    Yes.

3   Q    And those camps, as you said, were a

4   financial item for the coach?

5   A    By way of a bonus, yes.

6   Q    The more people that came, the more

7   successful the camp, the more money the coach got?

8   A    Correct.

9   Q    And they had the same relationship with

10  their coach that we talked about before of respect and

11  loyalty?

12  A    Yes.

13  Q    And the coach is the one that was

14  encouraging them to assist in his camps?

15  MR. JONES:  Objection; calls for

16  speculation.

17  A    I think it's more than the coach, because

18  the way the camps themselves were set up in writing, it

19  listed that they were encouraged to participate.  So

20  the coach would emphasize that.

21  Q    (BY MR. LEVINSTEIN)  Didn't the materials

22  for the camps even advertise that some of those

23  athletes were going to be coaching?

24  A    Yes.

25  Q    And that was done -- it just said in the

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

**[Page 224]**

1  materials that the athletes in the training camp would
2  be coaching at the camps?
3      A    Would also be a part of that, yes.
4      Q    And did you hear concerns and complaints
5  by athletes that they were required to work at camps
6  that didn't develop its athletes and they weren't paid
7  for them?
8      A    I did get one complaint about that.  And,
9  again, I encouraged all of the athletes to come to me
10 if there was a problem that they viewed.  I got one
11 complaint about that, and we addressed it.
12     Q    And you said they weren't required to?
13     A    Right.
14     Q    But would it be, in your experience, based
15 on these subjects, understandable for them to have
16 concerns about how the coach might react or judge them
17 if they weren't willing to participate in a camp at
18 which he makes money?
19         MR. JONES:  Objection; vague, calls for
20 speculation.
21     A    That was what was expressed in the one
22 complaint that I did get.
23     Q    (BY MR. LEVINSTEIN)  And after you got
24 that one complaint, did you make sure you addressed
25 that issue with all of the athletes in the camp?

**[Page 225]**

1      A    Yes.
2      Q    So you did view it was a problem that had
3  to be dealt with?
4      A    Yes.  Once that was brought to my
5  attention, that was something that was handled.
6      Q    And the way it was brought to your
7  attention was in part by the Membership and Credentials
8  Committee?
9      A    No.  Actually, an athlete walked in the
10 door and said we need to talk to you.
11     Q    Was that during this compliance process?
12     A    My whole tenure was during the process.
13     Q    Did you attend these Membership and
14 Credentials Committee meetings at which members of the
15 USTU organization and members of the Taekwondo
16 community were invited to come and address the
17 committee about their views of how the USTU was doing?
18     A    Yes, I did.
19     Q    And were a lot of critical things said at
20 those meetings about the USTU?
21     A    Yes, several critical things were said.  I
22 mean, a lot, I'm just trying to . . .
23     Q    Okay.  Were you even concerned that a
24 disproportionate amount of the time at the meetings was
25 spent on so many people from the USTU community all

**[Page 226]**

1  coming to say negative things about the USTU?
2      A    It was my understanding, going into that
3  May meeting, that this was an open forum for anyone to
4  come and express their opinion about it.  And as with
5  everything else, people with negative things, they're
6  always going to show up.  If I have something positive
7  to say, I'm not going to fly across the country to come
8  say I think you're doing a good job.
9          So I wasn't surprised that everything that
10 was said was critical.  That didn't surprise me.
11     Q    And what was your view, from a Membership
12 and Credentials Committee's point of view, was the
13 purpose of the meeting?
14         MR. JONES:  Objection; that's really
15 vague.
16     A    What was my opinion of what the purpose of
17 that meeting was?
18     Q    (BY MR. LEVINSTEIN)  Yes.
19     A    Well, again, it was my understanding that
20 it was an open forum for anyone to speak on issues that
21 they felt concerned the USTU.
22     Q    And was it your understanding that the
23 Membership and Credentials Committee had also been
24 receiving in writing submissions from people with
25 concerns about the USTU and the sport of Taekwondo?

**[Page 227]**

1      A    Yes, and some of them had informed me
2  about that.
3      Q    And you received copies of some of those
4  communications?
5      A    A portion of some of the communications.
6  And I'm clarifying because at the meeting, there was
7  obviously a bound document.  I hadn't received the
8  document, but I had received some of the communications
9  that were a part of that.
10     Q    But when the whole document was submitted,
11 you got a copy?
12     A    No.
13     Q    Did you ask for a copy?
14     A    Yes.
15     Q    And they were unwilling?
16     A    I still have not received one.
17         MR. JONES:  What was that?
18     A    At the May meeting, one portion of the
19 audience had prepared a bound document that had
20 complaints and communications.  It wasn't given to us.
21 It was presented, I think, to the committee, and I
22 asked for a copy, but we never received it.
23     Q    (BY MR. LEVINSTEIN)  But you understand
24 your lawyers were given a copy, the USTU's lawyers?
25     A    I don't know.  I never saw it.

1    Q    Okay.  And was it your understanding --
2  strike that.
3         When concerns were raised to the Membership
4  and Credentials Committee, was it your understanding
5  that it was their job to investigate and study those
6  issues?
7         MR. JONES:  Objection; calls for
8  speculation.
9    A    That would be a reasonable expectation,
10 but I also found that most of the critiques and
11 critical things were things that the committee had
12 already brought up and that this group was speaking to
13 and elaborating on, with some exceptions.
14   Q    (BY MR. LEVINSTEIN) Well, let's talk
15 about those two letters, the August and September.  You
16 don't have to pull them out, but the letters from
17 Mr. Satrom.
18   A    Okay.
19   A    Had all of those things in those letters
20 already been raised by the committee in September of
21 2002?
22   A    Not in the September letter.  But the
23 August letter I think had many of the same things that
24 were from the September of 2002, the first one, but not
25 the September '03 one.  That was totally different.

228

1    And that was after the May meeting.
2    Q    Well, both the August and September
3  letters were after the May meeting?
4    A    But the August letter I'm saying --
5    Q    Is different?
6    A    -- paralleled the earlier one in September
7  of '02, whereas the September letter was completely
8  different.
9    Q    Okay.  We'll get to those then.
10   A    To my recollection.
11   Q    We'll talk about what's different about
12 them.  It's not a memory test, so we'll do that when
13 we're looking at them.
14   A    I'd fail that one.
15   Q    So in your view, the issues being raised
16 in August of 2003 were compliance problems that were
17 generally the same kinds of issues that had been
18 problems in September of 2002?
19        MR. JONES:  Objection; misstates the
20 testimony.
21   A    I think there were some.
22   Q    (BY MR. LEVINSTEIN) And were there a
23 number of issues in that August 2003 letter that raised
24 problems that in September 2002 the USTU had promised
25 they would take care of?

1         MR. JONES:  Objection; misstates the
2  testimony.
3    A    Those were some of the same problems we
4  were addressing from September of 2002.
5    Q    (BY MR. LEVINSTEIN)  And at the end of
6  September '02, after those problems had been
7  identified, the USTU had said, yes, we will get on it
8  and we will fix these problems?
9         MR. JONES:  Same objection; misstates
10 testimony.
11   A    Yes.  But again, we were on the way to
12 addressing some of them.
13   Q    (BY MR. LEVINSTEIN)  I understand.  But a
14 year later, some of them hadn't been addressed?
15        MR. JONES:  Misstates the testimony.
16   A    I don't think they hadn't been addressed.
17 They might not have been completely resolved.
18   Q    (BY MR. LEVINSTEIN)  As of August 2003,
19 for example, nothing had been done yet about
20 eliminating the president's power to appoint people?
21        MR. JONES:  Misstates the testimony.
22   A    Well, we had an agreement for him to stop
23 doing that.  It had not been enacted with the board by
24 then, which was the reason for the mail ballot that
25 went out shortly after the hearing in September.

1    Q    (BY MR. LEVINSTEIN)  But as of August 5th,
2  or the date of that letter, no steps had been taken to
3  implement that commitment?
4    A    Not to implement it, but to force the
5  agreement, yes.
6    Q    A question about the master instructor's
7  licensing program.
8    A    Okay.
9         MR. UESUGI:  Should we take a break?
10        MR. LEVINSTEIN:  Fine.  Anytime.  It's
11 going to be awhile.
12        (Recess taken from 12:11 p.m. to 1:15
13        p.m.)
14        (Whereupon, the deposition proceedings
15        reconvened without the presence of
16        Mr. Uesugi.)
17   Q    (BY MR. LEVINSTEIN)  Let's go back a
18 little bit to the process the Membership and
19 Credentials Committee was following.  There was the May
20 open --
21   A    Forum.
22   Q    -- forum at which people came to express
23 their concerns, and you attended that meeting?
24   A    Yes.
25   Q    And did you speak at that meeting?

231

1    A    I think I answered one question about
2  Kukkiwon, and that was it.
3    Q    Did someone else speak on behalf of the
4  organization at that meeting?
5    A    No.  It was our information that there was
6  no requirement to respond unless direct questions were
7  asked to us.
8    Q    What had, if you know, led to the calling
9  of this meeting?
10    A    No idea.
11    (Whereupon, Mr. Uesugi rejoined the
12         deposition proceedings.)
13    Q    (BY MR. LEVINSTEIN)  And in addition to
14  the open meeting, it was your understanding that
15  written submissions were being sent to the members of
16  the Membership and Credentials Committee?
17    A    Yes.
18    Q    And between May and the August letter from
19  Tom Satrom, was there a process or a dialogue or
20  communications between you and the Membership and
21  Credentials Committee?
22    A    No.
23    Q    But you were having ongoing communications
24  with the Sports Partnership people?
25    A    Yes.

1  members.
2    Q    And you didn't want them to make a
3  decision based on things that they had heard without
4  you first having a chance to correct misimpressions and
5  respond?
6    A    Correct.
7    Q    And at any time, did you or your lawyers
8  representing the USTU tell the Membership and
9  Credentials Committee you thought the Membership and
10  Credentials Committee had an obligation to let USTU
11  know what it was that was being communicated to the
12  Membership and Credentials Committee?
13    MR. JONES:  Objection; calls for
14  speculation.
15    A    There was, and I learned that from a
16  meeting with Holme Roberts and Owen.
17    Q    (BY MR. LEVINSTEIN)  You learned what?
18    A    That that request had been made.
19    Q    A request was made by your lawyers --
20    A    Yes.
21    Q    -- to the Membership and Credentials
22  Committee?
23    A    To let us know what complaints were coming
24  in, what was being said about us.
25    Q    And did you understand that part of the

1    Q    And you were having ongoing communications
2  with the audit people?
3    A    Yes.
4    Q    And did the audit people and the Sports
5  Partnership people serve as advisors to the Membership
6  and Credentials Committee?
7    A    I'm certain they did.  I was told that
8  they would be monitoring our progress and reporting
9  back.
10    Q    And well, in your experience, when you
11  went to a meeting of the Membership and Credentials
12  Committee, were the Sports Partnership people from your
13  support and someone from audit there to participate in
14  the discussion of your sport?
15    A    Yes, always.
16    Q    And did you want to know what concerns
17  were being expressed to the Membership and Credentials
18  Committee?
19    A    Yes.
20    Q    Was it important to you to have an
21  opportunity to hear what they were hearing?
22    A    Yes.
23    Q    And why?
24    A    Again, so we would know what problems
25  existed and what to address and how to better serve our

1  purpose of the August 5th and September -- is that the
2  right date -- the August 5th and September 5th, or
3  August 4th and September --
4    MR. UESUGI:  Close enough.
5    Q    (BY MR. LEVINSTEIN)  The August and
6  September letters from Tom Satrom.  Let's talk about
7  those.
8    Did you understand that part of their purpose
9  was to communicate to the USTU what concerns had been
10  raised with the Membership and Credentials Committee?
11    A    Yes.
12    Q    I think you said the August letter from
13  Tom Satrom raised a lot of the same issues that had
14  been raised in September of 2002?
15    A    Let me recheck to make certain that that
16  is the case.
17    Q    We can pull those two letters out.
18    A    That's the September 6th letter.
19    Q    That's Exhibit 5?
20    A    Yes.
21    Q    And the August 4th letter is Exhibit 4.
22    MR. LEVINSTEIN:  He's got it.  There's
23  probably five of those.  We probably labeled a bunch of
24  them.
25    A    They're stated differently, but some of

1  them overlap.  For instance, in the --
2      Q    (BY MR. LEVINSTEIN)  Before you go on, the
3  question was about comparing the August letter to what
4  had happened in September 2002.
5      A    Yes.
6      Q    I thought you had said that the August
7  letter was similar to what happened in September 2002.
8      A    Yes, yes.
9      Q    That's all.  I'm not going to make you
10 compare them.  If you want to, you can, but I wasn't
11 trying to keep you from doing it.
12          Do you see the first paragraph of the August
13 4 letter?  At the end of the paragraph, it recites that
14 "As part of the review process, the Committee reviewed
15 the compliance form submitted by USTU, the Committee
16 met with USTU on two occasions, the Committee made
17 written inquiries of USTU to which USTU responded, the
18 Committee held a public forum for individuals who were
19 interested in the sport of Taekwondo to present their
20 observations and comments on the governance of
21 Taekwondo, and the Committee requested that the USOC
22 Audit Division conduct an audit of USTU's financial
23 records."
24     A    Right.
25     Q    Do you know which meetings with the USTU

1  on two occasions are being referred to?  Do you know
2  what dates those were or months?
3      A    I know one was the September 2002 meeting.
4  I don't know when the other second one was, other than
5  the open forum in May, which wasn't really meeting with
6  us.
7      Q    Okay.  So there may have been another
8  meeting between September 2002 and the open forum, or
9  you just don't remember?
10     A    I don't remember.
11     Q    And in your meetings with the Membership
12 and Credentials Committee and in responding to these
13 letters --
14     A    Yes.
15     Q    -- did you at times come of the view that
16 the Membership and Credentials Committee simply didn't
17 know enough about how Taekwondo worked?
18     A    In some areas, yes.
19     Q    And was it your impression that they were
20 trying to get information so they could inform
21 themselves?
22          MR. JONES:  Objection; calls for
23 speculation.
24     A    Possibly.
25     Q    (BY MR. LEVINSTEIN)  Did you know any of

1  the members of the Membership and Credentials
2  Committee?
3      A    I knew one person prior to coming to the
4  first meeting.
5      Q    And who was that?
6      A    Retired Colonel Jeannie Picarriello,
7  formerly of Army Sports.
8      Q    But from going to board meetings, did you
9  know any of the other members -- oh, you're talking
10 about September of 2002.
11     A    Right.  I didn't know anyone then.
12     Q    Did you get to know anyone on the
13 Membership and Credentials Committee during your time
14 as Executive Director?
15     A    Yes, I got to interact with several of
16 them at USOC board meetings.  I did speak with
17 Mr. Satrom on several occasions.  Let's see.  Now I'm
18 drawing a blank.  A couple of others as well.  I can't
19 remember their names now.
20     Q    Do you remember Steve Sobel?
21     A    Yes.  Yes.
22     Q    And when you did meet with the Membership
23 and Credentials Committee -- put aside the public
24 forums where other people were there -- was it just
25 USTU people and USOC staff, like the auditors and

1  Sports Partnership, and the members of the committee?
2      A    Other than the public forum?
3      Q    Yes.
4      A    Yes.
5      Q    And was the tone of those meetings
6  cooperative and friendly?
7      A    The first one was very -- well, the first
8  one sort of was.  After that, it became more
9  contentious.
10     Q    But did they communicate to you that they
11 were trying to find ways to bring the USTU into
12 compliance?
13     A    At the first meeting, very much so.
14     Q    And you don't remember the second meeting?
15     A    I don't remember that there was a second
16 meeting, but -- unless there's a record of it.
17     Q    That's fine.
18     A    Now, I do recall meeting with Mr. Sobel
19 once.
20     Q    Okay.  Could you tell me about that?
21     A    I'm trying to remember where it was.  I
22 know we discussed some of the items that we had
23 submitted in response to the letter from Mr. Satrom.
24     Q    What sport did Mr. Sobel come from, if you
25 know?

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    I don't remember.

2    Q    But were you made aware that he was

3 someone who had been involved with the Olympic movement

4 for a long time?

5    A    Yes.  I think he was the vice chair of the

6 committee as well.

7    Q    You mean, where he had previously been the

8 chair of the committee?

9    A    Yes.

10    Q    Was he meeting with you because he was

11 someone experienced in helping NGBs comply with their

12 obligations?

13    A    I think it was a follow-up or a meeting

14 that we had requested to talk about the responses and

15 the questions, because I remember he was the only

16 person that sat down with me and Mr. Sang Lee, I think

17 it was.  I still forget where it was, but he did

18 discuss -- someone else from the committee was supposed

19 to have shown up, but they didn't make it.

20       So we had a discussion about the compliance

21 issues.  That may be the second meeting that they were

22 talking about.  But it wasn't the committee itself.

23    Q    Okay.  Did you understand that there was

24 someone within the committee assigned particular

25 responsibility for Taekwondo?

---

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    You don't know if it was in Colorado

2 Springs or some other city?

3    A    I don't know.

4    Q    Was it a positive meeting, or was it

5 contentious?

6    A    No, no.  It was a positive meeting.

7    Q    It was a positive meeting?

8    A    Yeah.

9    Q    Was it between the August 4th letter and

10 the September 5th letter, do you think?  If you don't

11 know, it's okay.

12    A    I don't know.  I think it was more likely

13 it was between the September '02 letter and whatever

14 came next as far as correspondence.

15    Q    Did you remember you already had a letter

16 that mentioned allegiance to Korea?

17    A    In some form or other, there was something

18 about ties to Korea, because that came up at the

19 September 2002 meeting as well, as I recall.

20    Q    Okay.  So you're not sure that you were

21 specifically having Mr. Sobel go through the August 4th

22 letter?

23    A    No, I'm not certain.

24    Q    There may have been some other list of

25 issues?

---

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    No, I didn't.

2    Q    What can you recall about the meeting with

3 Mr. Sobel, if anything?

4    A    I recall him asking me if I was clear on

5 what was being asked by the committee, and if I had any

6 questions that he could clarify.  And that's when I

7 first raised the issue of the allegiance to Korea,

8 because I didn't understand what that meant.  And he

9 couldn't give a full explanation of what that meant.

10 So all we did was theorize.

11       It was a very brief meeting.  I remember

12 that, because it was in a room sort of like this, but

13 it was one table set up for maybe five people.  And we

14 waited for awhile because he expected the other person

15 to show.  I remember he and I had a soda by the thing

16 (indicating).

17       We didn't talk very much except, are there

18 any questions about what's being expected?  Can I

19 clarify anything?  I went through the allegiance to

20 Korea.  The Kukkiwon, I said, well, no need to explain

21 that to me.  I said the explanation seems to be

22 straightforward.  And we didn't discuss anything else.

23 He said, well, let's just call it quits.

24    Q    Did you travel to attend that meeting?

25    A    I don't remember.

---

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    Yes.

2    Q    But you do recall going through some sort

3 of list of issues of concerns of the committee?

4    A    As I recall, I was asked if there was

5 anything I didn't understand about what was being asked

6 that we had to respond to, rather than going through,

7 do you understand this, blah, blah, blah.

8    Q    Do you have some recollection that between

9 August 4th and September 5th, the USTU asked the

10 Membership and Credentials Committee to give a little

11 more information about what was being referred to in

12 the August 4th letter?

13    A    Yes.

14    Q    So do you recall -- focus, if you would,

15 on Exhibit 5.  If you'll look at Paragraph 8 on Page 3

16 which you talked about.

17       Did you understand that this was an attempt

18 by the Membership and Credentials Committee to give you

19 information about the kinds of things that they had

20 been told that had led them to put Item No. 5 in the

21 August 4th letter?

22    A    Yes, because it referred to what

23 individuals had said to them.

24    Q    And USTU at the time was requesting

25 specifics about what the concerns were?

1    A    Correct.
2    Q    And you understood Paragraph 8 to be
3 communicating to you specific things that various
4 individuals had said that related to that allegiance to
5 Korea issue?
6         MR. JONES:  Objection; calls for
7 speculation.
8    A    I think more so what it was saying to me
9 was that we had addressed that issue before, but it's
10 still on the table as having not been resolved, not so
11 much just telling us what people were saying, but that
12 they didn't feel the issue was answered satisfactorily.
13   Q    (BY MR. LEVINSTEIN)  Okay.  You talked
14 about the importance of the USTU's relationship with
15 the WTF?
16   A    Yes.
17   Q    Beyond that you have to comply with the
18 rules of the WTF, why is it important for the USTU to
19 be on good terms with the people running the WTF?
20        MR. JONES:  Objection; calls for
21 speculation.
22   A    It's not so much being on good terms, as
23 much as being in compliance, being a good member
24 nation.  Just as being a good NGB is applicable to the
25 USOC, it's the same importance.

1         And the difference is, even with the USOC, we
2 had a partnership that was monetary with Sports
3 Partnership and other things.  With WTF, that
4 partnership didn't exist.  With Kukkiwon, we had a
5 black belt program, but every member federation has
6 that.
7         So it wasn't that we were receiving anything
8 above and beyond what other member nations received
9 from the IF; it was just a matter of being a good
10 member nation.  It did result in appointments, which go
11 throughout the world, as far as the referee chair
12 currently is here in the United States, from
13 California.  Other committee positions, if you're in
14 good standing, you're liable to have appointments.
15   Q    (BY MR. LEVINSTEIN)  And those
16 appointments, you felt, were beneficial to the USTU?
17   A    Well, they're beneficial to whatever
18 country, yes.
19   Q    So you thought they were beneficial to the
20 sport of Taekwondo in the United States if those
21 appointments came to people in the United States?
22   A    Yes.  For instance, I was on the rules
23 committee prior to the Sydney Olympic Games, and I was
24 able to put some changes in that probably would not
25 have gone in.

1         I was able to dissent against the difference
2 in time limits for women and men and bring up the fact
3 that it's discriminatory, as viewed by the rest of the
4 world, things like that; whereas otherwise you don't
5 have that input.  You can't form the framework for
6 competitions and things.  So that's a benefit to
7 Taekwondo and to the country and to all our athletes.
8         MR. LEVINSTEIN:  Next exhibit number.
9         (Deposition Exhibit No. 88 was marked
10         for identification.)
11   Q    (BY MR. LEVINSTEIN)  Have you seen Exhibit
12 88 before?
13   A    No, I have not.
14   Q    Who is Mr. Cha Sok Park?
15   A    He is the current president of the Pan
16 American Taekwondo Union.
17   Q    President today or president in 2003, or
18 both?
19   A    Both.
20   Q    And he was a vice president of the WTF?
21   A    At that time, yes.
22   Q    I'd like to direct your attention to the
23 last paragraph on the first page.  "Although I do not
24 necessarily agree, I believe that the overwhelming
25 majority of practitioners of Taekwondo in American

1 (sic) believe that the USTU is non-democratic, corrupt,
2 abused by those with commercial interests, dominated by
3 the Korean ethnic minority (who account for over 80
4 [percent] of the supposedly 'elected' state chairmen),
5 non-representative of the interests of the athletes and
6 controlled by forces outside the United States.  The
7 number of complaints lodged against the USTU in the
8 past two decades is probably the most brought against
9 any NGB and that fact in itself should raise serious
10 concerns."
11   Q    Do you see that paragraph par?
12   A    I certainly do.
13   Q    Had you heard similar sentiments expressed
14 by others?
15        MR. JONES:  Objection; calls for hearsay.
16   A    No, not to this extent.
17   Q    (BY MR. LEVINSTEIN)  As the person who was
18 the Executive Director of the USTU at that time, is it
19 troubling that the vice president of the World
20 Taekwondo Federation had that view?
21   A    No, because I know the source probably
22 better than some.  And this viewpoint, coming from him,
23 gives me reason to smile.
24   Q    Is there any reason that the Membership
25 and Credentials Committee or in this case Mr. Martin or

1    Mr. Scherr would have known whatever it is that you
2    know about Dr. Cha Sok Park?
3                MR. JONES:  Objection; calls for
4    speculation.
5         A    They probably don't know.
6         Q    (BY MR. LEVINSTEIN)  If you look at the
7    second page, the second paragraph starts with, "As a
8    Korean-born American citizen."  Is Mr. Cha Sok Park, in
9    your understanding, a Korean-born American citizen?
10        A    Yes, he is.
11        Q    And is it correct that Mr. Cha Sok Park
12   has been involved in the sport of Taekwondo at many
13   different levels for the 30 years preceding August
14   2003?
15                MR. JONES:  Objection; calls for
16   speculation.
17        A    As far as I know, yes.
18        Q    (BY MR. LEVINSTEIN)  Was he a competitor?
19        A    A Judo competitor.
20        Q    Has he held positions within the USTU?
21                MR. JONES:  Objection; calls for
22   speculation.
23        A    I know he has been a member of the USTU.
24   I don't remember that he held a position, an elected
25   position.

1         Q    (BY MR. LEVINSTEIN)  Well, if you know,
2    how did he become -- well, first, the USTU is in the
3    Pan American Taekwondo Union?
4         A    Yes.
5         Q    Are the members of the Pan American
6    Taekwondo Union other -- are they NGBs from various
7    countries?
8         A    No.  They're member national federations
9    in the Pan Am region.
10        Q    That's what I meant.  Okay.  We call them
11   NGBs.
12        A    Yeah.
13        Q    USTU is also a national federation?
14        A    Right.  But for purposes of the Pan Am --
15                MR. UESUGI:  National Association.
16        A    Yeah.  NNA.
17        Q    (BY MR. LEVINSTEIN)  Okay.  But the
18   equivalent organizations to the USTU in other countries
19   that are within the Pan Am Region that relate to
20   Taekwondo are members of the Pan Am Taekwondo Union?
21        A    Yes.
22        Q    Now, Mr. Park, in this letter, makes
23   allegations about a Korean ethic minority dominating
24   the USTU.  Do you see those words?
25        A    Second page still?

1         Q    No, the first page, that paragraph I read.
2         A    Yes, yes.
3         Q    Do you find that to be a racially
4    insensitive thing to say, coming from a Korean-born
5    American citizen?
6                MR. JONES:  Objection; calls for hearsay.
7         A    Yes.
8         Q    (BY MR. LEVINSTEIN)  But this was a
9    statement being made to the Membership and Credentials
10   Committee?
11        A    Yes.
12        Q    And given that Mr. Park was making
13   recommendations about what the Membership and
14   Credentials Committee should do and making statements
15   about his view of the sport in this country, the
16   information about the kind of allegations being made is
17   something you wanted the Membership and Credentials
18   Committee to tell you, correct?  If that's too long,
19   I'll start over.  I'll try again.
20        A    Please do.
21        Q    Mr. Park was communicating this
22   information to the USOC?
23        A    Yes.
24        Q    And I'll just tell you that the USOC
25   people passed it on to the Membership and Credentials

1    Committee because it was thought that that was the
2    organization presently dealing with this issue.
3         A    Okay.
4         Q    And this letter makes allegations about
5    the leadership of the USTU being corrupt.
6         A    Okay.
7         Q    And the question is, given that the
8    Membership and Credentials Committee is looking at the
9    USTU, you wanted the USTU to be told by the Membership
10   and Credentials Committee these kind of allegations
11   that were being made to it?
12        A    Yes.
13        Q    And the September 5th letter says that its
14   purpose is to let you know some of the things that are
15   being told to the Membership and Credentials Committee?
16        A    Yes.
17        Q    When is the first time you heard the term
18   "Korean Mafia" used?
19        A    In a discussion with Holme Roberts and
20   Owen with Jill Chalmers.
21        Q    You weren't aware that communications had
22   been made, like the Park communication, that referred
23   to the leadership of the USTU as a Korean Mafia?
24        A    No.  And, again, I never saw the
25   communication from Dr. Park either.

1     Q    Other than the communication involving
2 Jill Chalmers, have you ever heard anyone else refer to
3 the USTU, using the term Korean Mafia?
4     A    Not in those terms, no.
5          (Deposition Exhibit No. 89 was marked
6          for identification.)
7     Q    (BY MR. LEVINSTEIN)  Do you know who Ginny
8 Lopez is?
9     A    I'm trying to recall.
10    Q    I'm not saying you should know who she is.
11 I'm just asking.
12    A    I think I do recall that she was the wife
13 of a gentleman from Miami who died, a Taekwondo
14 reporter, I think it was.
15    Q    Just because I don't really know, is she
16 any relation to Jean or Steven Lopez?
17    A    No, no.  If this is the person I'm
18 thinking, her husband had a newspaper type thing that
19 he put out, and she was a reporter.
20    Q    Let me refer you to the fifth paragraph.
21 Oh, actually, it's the fourth paragraph, but there's a
22 break in the middle there.  The paragraph starts,
23 "Leaders and individuals," but the last sentence says,
24 "It is unfortunate that the actions of some USTU
25 leaders have embarrassed and humiliated the Korean

1 community who have worked hard at getting TKD to where
2 it is today in this country."
3          (Whereupon, there was an interruption
4          in the deposition proceedings.)
5     A    I don't see it.
6     Q    (BY MR. LEVINSTEIN)  I'm sorry?
7     A    Oh, I see.
8          (Whereupon, Mr. Johansen left the
9          deposition proceedings.)
10    Q    (BY MR. LEVINSTEIN)  If you want to take
11 your time to read this, I'm not trying to rush you.
12    A    No, I see where you are now.
13    Q    Did you hear during these public meetings
14 statements made to that basic effect, that there was a
15 Korean leadership that wasn't behaving representatively
16 of the Korean community and that their conduct, not
17 representative of Koreans, but that their conduct was
18 humiliating the Korean community?
19         MR. JONES:  Objection; calls for hearsay.
20    A    I don't recall hearing that at the open
21 forum.
22    Q    (BY MR. LEVINSTEIN)  If you look at the
23 second page, do you see the reference in the
24 next-to-last sentence to a "fear of retribution by a
25 'Mafia-like' hierarchy"?

1     A    Yes, I see that.
2     Q    Do you remember ever seeing this article
3 before?
4     A    No, I haven't.
5     Q    Did you ever hear anyone during your time
6 as the Executive Director come to you and raise a
7 concern but tell you that they didn't want the concern
8 to be attributed to them because they were afraid of
9 retribution?
10         MR. JONES:  Objection; vague and
11 ambiguous, calls for speculation, calls for hearsay.
12    A    I think I can recall several instances
13 where people would not want their names to be public
14 for whatever reason, not necessarily for retribution.
15    Q    (BY MR. LEVINSTEIN)  But do you remember
16 circumstances where people did express that they wanted
17 their names kept confidential because they were
18 concerned about retribution?
19    A    I don't recall that happening.
20    Q    In the Ginny Lopez article --
21    A    Yes.
22    Q    -- do you consider the "Mafia-like
23 hierarchy" to be a racially insensitive comment?
24    A    Somewhat, yes.
25    Q    Now, the term racist or racially

1 insensitive has been used before, but was it your
2 understanding that the primary concern was about the
3 individual's national origin?
4     A    When I think of things that are racially
5 insensitive, to me, I think of substituting any racial
6 name for the one that's there and thinking how that
7 would affect that person, whether it's black, white,
8 Italian, or whatever.
9          Anything that is derogatory about a group of
10 people because of their background, to me, is racially
11 insensitive.  And that's what I have been speaking to.
12 In this instance, it's Korean.  But it could very well
13 be black.
14    Q    But if it were, say, Italian American, it
15 would be the same thing?
16    A    Yes.
17    Q    And in those cases, the people from Italy
18 are not necessarily of the same race?
19    A    Right.
20         (Whereupon, Mr. Johansen rejoined the
21         deposition proceedings.)
22    Q    (BY MR. LEVINSTEIN)  So their country of
23 origin is, in your view, when you say racist, it may
24 mean discrimination against any kind of group like
25 that?

1    A    Right.  Can I ask a question off the
2  record maybe?
3         (Discussion off the record.)
4         (Deposition Exhibit No. 90 was marked
5              for identification.)
6    Q    (BY MR. LEVINSTEIN)  Have you seen this
7  document before?
8    A    No, I have not.
9    Q    Okay.  For the record, it's just USOC
10  Production Nos. 00186 and 00187.
11         MR. LEVINSTEIN:  I'm sorry.  Speak up.
12  Don't be shy.  Tell me, hey, give me a copy.
13         MR. JONES:  Thanks.
14         MR. LEVINSTEIN:  I'm trying to move fast
15  so I'm working hard.
16    Q    (BY MR. LEVINSTEIN)  If you look at the
17  last sentence on the page, let me just read it on the
18  first page.  "I also firmly believe that the 'Korean
19  good ol' boy' system of promotions, certifications, and
20  selections of 'who attends what' has got to go.  I
21  believe that our current leadership is corrupt, biased,
22  and in-bred."
23         Do you see that?
24    A    Yes.
25    Q    And if you go down to the middle of the

1              for identification.)
2    Q    (BY MR. LEVINSTEIN)  Have you seen this
3  document before?
4    A    No, I haven't.
5    Q    Let me just represent, it's Bates Stamp
6  Nos. USOC00124 and 00125, and it appears to be an
7  e-mail forwarded by Kay Burton of the USOC to certain
8  other e-mail addresses.
9    A    Okay.
10    Q    I'll represent I think they're members of
11  the Membership and Credentials Committee.  I just ask
12  that nobody now use those e-mail addresses to send them
13  e-mails.
14         And it's forwarding them an e-mail that came
15  to Kay Burton.  Now, was Kay Burton the contact person
16  for the Membership and Credentials Committee for the
17  Taekwondo community to send information?
18    A    I have no idea.
19    Q    You don't recall whether they picked her
20  as the staff person to receive information?
21    A    No, I don't.
22    Q    I don't either.  I just see a lot of
23  e-mails to Kay Burton, so I just was asking because you
24  might know.  And do you know who Diana Dunlap is?
25    A    Yes.

1  second page -- I don't know how to give you quite a
2  reference to it, but "Korean or of Korean ancestry"
3  words appear in the middle of the page on the second
4  page.  There's a question that says --
5    A    Naturalized or natural-born --
6    Q    Yes.  There's a sentence that says, "We
7  don't have a vote (our state is too small), we don't
8  have a voice (we're not Korean or of Korean ancestry),
9  and we don't have any means of redress (the Executive
10  Council and Board of Governors are run by a majority of
11  people who are appointed by the current national
12  president)."
13         Do you see those references?
14    A    Yes.
15    Q    And does some of the language from the
16  first page sound familiar, like the language that's
17  quoted by Mr. Satrom --
18    A    Yes.
19    Q    -- in the September 5th letter?
20    A    Yes.
21    Q    And you wanted Mr. Satrom to communicate
22  to you these kinds of things that he was being told by
23  members of the USTU, didn't you?
24    A    Certainly.
25         (Deposition Exhibit No. 91 was marked

1    Q    And where is Dunlap's Taekwondo, if you
2  know?
3    A    Yes.  Louisiana.
4    Q    And did she speak at the May 2 open forum?
5    A    I think she very well may have, yes.
6    Q    This e-mail just suggests, we're rushing,
7  but it just says, "This e-mail is in response to your
8  request or information concerning my background and
9  involvement in Taekwondo prior to the May 2 open
10  forum."  And I'm just -- did people sign up in advance
11  to have a time slot to speak at the May 2 open forum?
12    A    To my understanding, they just notified
13  someone that they were coming and that they would like
14  to be heard.
15    Q    And then do you recall the people who did
16  that were asked to give the committee some information
17  about who they were so that when they got up, there
18  would be some information about their background?
19    A    That, I don't know.
20    Q    And if you look at the bottom of the page,
21  I won't ask you about these 16 issues that Ms. Dunlap
22  says she would like to see addressed.
23    A    Yes.
24    Q    Those kinds of issues that were of concern
25  to USTU members, are those things that you wanted the

**Page 260**

```
 1   USTU to -- sorry -- that you wanted the Membership and
 2   Credentials Committee to tell you about so that you
 3   could respond to them?
 4        A    Yes.
 5             (Deposition Exhibit No. 92 was marked
 6             for identification.)
 7        Q    (BY MR. LEVINSTEIN)  Again, a document
 8   previously produced, USOC Bates No. 00070 and 00071.
 9   What's the LadyTKD website?
10        A    What is it?  It's a personal website
11   that's run by Ms. Ronda Sweet.
12        Q    Does it have chat rooms or -- no.
13             MR. LEVINSTEIN:  Somebody in the Internet
14   world could give me a better term.  What would you call
15   these things?  Glenn, you're the expert.
16             MR. UESUGI:  It's a Web page.
17             MR. LEVINSTEIN:  Okay.  But there's a
18   reference on the top to a thread.  I forget what it's
19   called when there are websites you go to and people can
20   post messages.
21             MR. UESUGI:  Bulletin board?
22             MR. LEVINSTEIN:  A bulletin board.  Okay.
23   Thank you.  I don't spend enough time on the Web.
24        Q    (BY MR. LEVINSTEIN)  Does the Ronda Sweet
25   website have -- or the LadyTKD website have bulletin
```

**Page 262**

```
 1   can't tell who the person is?
 2        A    I'm not sure.  Some have screen names.
 3   Some use their real names, from my understanding.
 4        Q    And if they use a screen name, it might
 5   not tell you who they are.
 6        A    Right.
 7        Q    If you look at the third paragraph, I
 8   think it is, that starts with "even though"?
 9        A    All right.
10        Q    Why don't I read it. "Even though I have
11   only be (sic) back into TKD for the past couple of
12   years, it did not take me long (probably because I am a
13   former federal investigator and prosecutor specializing
14   in white collar crime) to see a problem with the
15   organization of TKD in Maryland and at the national
16   level.  It did not take me long to see what I call the
17   'Korean Mafia' at work.  State organizations and local
18   and state tournaments were dominated by a good-ol' boys
19   network of Korean instructors.  This of course is
20   natural since TKD comes from Korea, but the level of
21   their control over the sport is mind boggling.  I have
22   yet to be at a tournament where rules weren't changed,
23   or what you thought you signed up for was changed at
24   the last minute.  I have yet to be at a tournament
25   where the rules are even followed the way they are
```

**Page 261**

```
 1   boards where people can express their thoughts?
 2        A    As I understand it.  I must admit I don't
 3   go to her Web page.
 4        Q    In your two years --
 5        A    Oh, I have in the past.
 6        Q    Okay.
 7        A    I don't make that a practice of going to
 8   hers.
 9        Q    I understand.
10        A    So I don't know if it's changed or what it
11   may have now.
12        Q    But when you were the Executive Director,
13   you did go and read it at times?
14        A    Occasionally, yes.
15        Q    And why?
16        A    It was a source of finding out what
17   concerns people had, issues to address.
18        Q    And did you feel that you learned about
19   what USTU members or others involved in the Taekwondo
20   community were thinking?
21        A    Somewhat.  Somewhat.
22        Q    Now, I don't know who sent this posting.
23   It may have even been anonymous, so I'm having a hard
24   time telling.  But are a lot of the postings at this
25   website, if you know, done by e-mail names that you
```

**Page 263**

```
 1   intended to be."
 2        "While we can all blame the pervasive
 3   influence of Sang Lee or the 'Korean Mafia,' the blame
 4   really rests with each one of us, competitors and
 5   instructors alike."
 6        Did you, during your term as a board member
 7   or as an Executive Director, hear complaints that rules
 8   of competitions were changed to favor one set of people
 9   or another?
10             MR. JONES:  Objection; calls for hearsay.
11        A    Yes, and I served on the referee committee
12   for a long time, and these were issues that I have
13   spoke with several people who complained that we
14   weren't enforcing the rules consistently, and we had
15   discussions on that.
16        A lot of the time, I found that people didn't
17   understand the rules.  Even though they were
18   instructors, they had a wrong interpretation of things.
19   And I have not seen where the rules have been applied
20   one way on this match but differently on the next one
21   because it's someone else, especially as a referee.  It
22   just doesn't happen.
23        Q    It hasn't happened at events that you have
24   been at?
25        A    Exactly.
```

Case 1:04-cv-00461-SOM-LEK    Document 243-3    Filed 03/21/2006    Page 52 of 80

**Page 264**

1    Q    But you only know about events where
2    you're the referee?
3    A    Of course.
4    Q    And you work very hard not to do that, not
5    to favor one person unfairly or another?
6    A    Right.  That's the job of the referee.
7    Q    And if referees -- well, let me strike
8    that for a second.
9          Are you aware of the issues related generally
10   to the judging scandal that involved figure skating at
11   the 2002 Winter Games?
12   A    Yes.
13   Q    And at that time, you were employed by the
14   USTU, but you weren't yet the Executive Director?
15   A    Correct.
16   Q    And have there been controversies about
17   judging involving the USTU at the highest levels?
18   A    Yes.  There's protests at many of the
19   high-level events.
20   Q    Are you aware of any match that you
21   witnessed that you believe the competitor was unfairly
22   not given the victory?
23   A    I witnessed matches where I thought the
24   better competitor didn't win, possibly by poor
25   application of the rules, possibly by poor scoring.

**Page 266**

1    A    I recall that.
2    Q    Any incident like that happen in Taekwondo
3    in 1988 that you're aware of?
4    A    In Taekwondo?
5         MR. JONES:  Objection; improper
6    hypothetical, vague.
7    Q    (BY MR. LEVINSTEIN)  Let me just ask:
8    Were you at the 1988 Olympic Games?
9    A    Yes.
10   Q    Did you watch Juan Moreno's final match?
11   A    I'm sure I did.
12   Q    Do you recall a discussion that Juan
13   Moreno clearly won the gold medal but that it was given
14   to his competitor?
15   A    I recall that.
16   Q    And what country was his competitor from?
17   A    Korea.
18   Q    And did you witness the match?
19   A    Yes.
20   Q    Were you a referee at that time?
21   A    Not at that --
22   Q    Not at the event, but were you a referee?
23   A    Yes.
24   Q    And did you agree that the person who had
25   performed the best and should have been given the gold

**Page 265**

1    And one of those happened when I was sitting next to
2    Ms. Sweet, and we discussed that.  It was an error that
3    could have been corrected, but because of the people on
4    the floor, they didn't correct it.
5    Q    Are you familiar with the boxing match in
6    Seoul, Korea involving, was it Roy Jones?
7    A    Yes.
8    Q    What can you tell me about what happened
9    there, as you recall?
10   A    Just that he ended up losing and he should
11   have won.
12   Q    And where was the match?  What country?
13   A    That was in Korea.
14   Q    That was part of the 1988 Olympic Games?
15   A    Olympic Games.
16   Q    And who was his opponent, from what
17   country?
18   A    I don't remember that.
19   Q    You don't remember that it was a Korean
20   competitor?
21   A    That may be, but --
22   Q    Okay.  And do you remember that there were
23   allegations that the Korean fighter had won the match
24   and been declared the winner, even though he clearly
25   didn't win, because he was from Korea?

**Page 267**

1    medal did not receive it?
2    A    I wasn't a nonpartisan observer of that
3    match.  I wanted Juan to win, and I thought that he
4    should have won.
5    Q    And how is it possible that if they have a
6    referee system, that someone could lose who -- strike
7    that.
8         Is the refereeing objective in Taekwondo?
9         MR. JONES:  Vague and ambiguous as to
10   what we're talking about.  Are you talking about
11   generally?
12   Q    (BY MR. LEVINSTEIN)  I'm talking about --
13   strike that.  I'll ask it a different way.
14        If I'm a judge, a referee, in a Taekwondo
15   match, and I wanted to favor one competitor, is it
16   possible to do it?
17   A    Yes.
18   Q    It's easy to do it, isn't it?
19   A    It's possible, yeah.
20   Q    Well, don't I sit there with a button and
21   push the button when I think the competitor has scored
22   a point?
23   A    Yeah.
24   Q    And if I don't push the button for one
25   competitor, there are other referees, but collectively.

**Page 268**

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1  we decide whether he gets a point or not?
2      A      Correct.
3      Q      And it's based solely on my decision as to
4  when I push the button based on what I've seen?
5      A      Basically, yes.
6      Q      And so is it important -- was it important
7  to you, as an Executive Director of the USTU, that the
8  perception be that judging at Taekwondo events was
9  fair?
10     A      Absolutely.
11     Q      And it would be a major issue of concern
12  for the USTU and the WTF if it became a perception that
13  judging isn't fair?
14     A      Correct.
15     Q      What was done about Mr. Moreno's losing
16  the match?
17     A      I don't recall.  Was that where the
18  sit-down happened?
19     Q      You were there.  I'm not testifying.
20     A      I think that may be the match where he sat
21  in the ring to protest the decision.
22     Q      Juan Moreno did?
23     A      No.
24     Q      I think you're talking about the boxing
25  match.  We'll leave it.  If you don't remember --

268

**Page 269**

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1      A      I don't know.
2      Q      It's not a memory test.
3      A      There were so many matches.
4      Q      Do you know if a protest was filed?
5      A      I think there was a protest filed.
6      Q      Did you believe that Juan Moreno lost
7  because he was fighting a Korean in Korea?
8             MR. JONES:  Objection; calls for
9  speculation.
10     A      Not necessarily, because being a judge,
11  what people, as spectators, don't realize -- I try to
12  tell people whenever they're saying things that are
13  unseeded, that you have to look at what the judge's
14  perspective of the point is and where they see what.
15            So as a fan, yes, I felt Juan clearly won.
16  But when you look at what the judges may have seen,
17  they could see a totally different match.  And it
18  happens all the time.  That's why what we do for a
19  protest is put cameras over each judge's chair so you
20  can see in a protest what they should have seen.
21     Q      (BY MR. LEVINSTEIN)  But didn't you tell
22  people in 1988 that you thought Juan Moreno had been
23  robbed?
24     A      Sure, sure.
25     Q      And at that time, that was your best

269

**Page 270**

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1  judgment?
2      A      As a spectator, yes.
3      Q      And as a person who was a referee?
4      A      Well, not exactly.  As a referee, I have
5  to look at different things to consider.  As a fan, I
6  have the luxury of not seeing that, not considering
7  that.  And that's true every time.
8             (Deposition Exhibit No. 93 was marked
9                 for identification.)
10     Q      (BY MR. LEVINSTEIN)  Exhibit 93, USOC
11  Document Production Nos. 00147 and 00148.  Just for the
12  record, it's a two-page printout of an e-mail from a
13  Robert F. Gallagher, who identifies himself as past
14  president of the Wyoming State TKD Association.
15            Do you know Mr. Gallagher?
16     A      Yes.
17     Q      And has he been actively involved in the
18  USTU for a long time?
19     A      Yes.
20     Q      Would you look at the next-to -- well, two
21  paragraphs up from the bottom?
22     A      Okay.
23     Q      It says, "While I'm sure," it begins?
24     A      Yes.
25     Q      It talks about a meeting that Sang Lee

270

**Page 271**

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

1  supposedly called of all the Korean Grandmasters that
2  was held in Chicago.  Are you familiar with any meeting
3  of Korean Grandmasters?
4      A      I know there's a Grandmasters Association,
5  but outside of that, I'm not aware of what this is
6  speaking to.
7      Q      What do you know about the Korean
8  Grandmasters -- sorry.  Strike that.  You said a
9  Grandmasters Association?
10     A      Yes.
11     Q      What does that group do, if you know?
12     A      I have no idea.  I'm not a member, but I
13  know that they do meet.  I don't know what else they
14  do.
15     Q      What makes someone a Grandmaster, as
16  opposed to a master?
17     A      8th or 9th Dan.
18     Q      8th or 9th Dan?  How many -- okay.  Is
19  that a Kukkiwon ranking?
20     A      Yes.  Actually, their group, no, not all
21  of them are Kukkiwon 8th or 9th Dan, from what I know.
22     Q      Are there time limits to getting different
23  levels?
24     A      Yes.
25     Q      Can you give me a general idea, if I want

271

1  to be -- is 9th the highest?

2

3       A    Yes, until death.  You can get a 10th

4  posthumously.

5       Q    That's a lot of help.  I'd probably rather

6  fight the 10th degree than the 9th degree.

7            Is there a certain age requirement or number

8  of years of Taekwondo or number of years since you got

9  your first belt?  What's the time requirement to get

10  the higher belt?

11       A    You have to be 16 years old to be a

12  non-junior black belt.

13       Q    Okay.  16 to be a 1st degree?

14       A    Right.  To go for your 2nd degree, you

15  have to have been a 1st degree black belt at least one

16  year.

17       Q    Okay.  So 17, you could make 2nd degree?

18       A    For two, two years after 2nd.

19       Q    So we're at 19 for a 3rd degree if we

20  really got a good start.

21       A    Right.  It goes progressively from one to

22  the other.  Like to 5th, you have to have been a 4th

23  for four years; 4th, you have to be a 3rd for three

24  years; 6th, you had to have been a 5th for five years;

25  7th, you have to have been a 6th for six years; 8th,

1       Q    Three 8th or 9th degree non-Korean,

2  non-Korean American?

3       A    Yeah.

4       Q    Are there more than 100 Korean

5  Grandmasters?

6       A    I'm sure there are.

7       Q    Are any of the three that you know that

8  are not Korean American members of the Grandmasters

9  Association?

10       A    I don't know.  I don't know their

11  membership.

12       Q    Do you recall any donations from Korean

13  Grandmasters in 2003?  If you look at the paragraph,

14  I'll read it.  "At this meeting" -- second sentence.

15  "At this meeting, Sang Lee told the Korean masters that

16  'Taekwondo as they all know it will disappear and will

17  be non-existent, if the USOC decertifies the USTU and

18  if I lose my position as President.  It is important

19  for me to remain in office, if Koreans are to survive

20  in this country.' The real purpose of the meeting was

21  to get financial and moral support from his fellow

22  Grandmasters.  He succeeded, as he brought home a

23  whopping $200,000.  Bill Cho, the owner of Hallmark

24  Cards, and the founder of Precious Moments, made a

25  $100,000 donation himself.  Sang Lee then received an

1  you have to have been a 7th for seven years; 9th, 8th

2  for eight years.  And these are minimum time

3  requirements.

4       Q    I lost track.

5       A    We need a calculator.

6       Q    We're talking 30-plus years?

7       A    Yeah.

8       Q    So even if you were really diligent, and

9  the second you were eligible got right on it, you

10  really couldn't until you were at least 50 be a 9th

11  degree black belt?

12       A    Right.

13       Q    You couldn't be an 8th degree black belt

14  at least in your 40s.

15       A    Right.

16       Q    Is it more likely that if you're an 8th

17  degree black belt you're in your 50s or 60s?

18       A    Probably.

19       Q    Given that this sport originated in

20  Korean, and it came over from Korea, how many

21  non-Korean 8th and 9th degree black belts are there, if

22  you know?

23       A    There's three that I know of.

24       Q    Out of how many?

25       A    I don't know what the total number is.

1  additional $5000.00 pledge from about 20 of the

2  Grandmasters present."

3       "This story was recently told to me by a

4  young Korean master who is the son of one of the

5  Grandmasters in attendance at this meeting, and that

6  has pledged his support to a new and fair USTU."

7       Do you remember any donations coming in?

8       MR. JONES:  Objection; calls for hearsay.

9       A    No, sir.

10       Q    (BY MR. LEVINSTEIN)  Do you know a man

11  named Bob Kestenbaum?

12       A    No, I don't.

13       MR. LEVINSTEIN:  Please mark this as 94.

14            (Deposition Exhibit No. 94 was marked

15            for identification.)

16       Q    (BY MR. LEVINSTEIN)  It appears that Bob

17  Kestenbaum is a dentist, if that's what D.D.S. stands

18  for.  And Exhibit 94 is USOC Bates No. 00048.  And it

19  appears to be a half page e-mail from Bob Kestenbaum to

20  Kay Burton, again Kay Burton at the USOC.

21            And let me just read the first paragraph.

22  "Dear Ms. Burton.  You don't know me of course, but I

23  have been along with my son a member of the USTU since

24  he began competing in 1998.  My experience with this

25  organization has led me to a few conclusions about it.

1  1st, they are more concerned with making money than
2  they are about running a 'quality' operation (which
3  they are certainly capable of).  2nd, it is infested
4  with in-fighting and politics, going way beyond what
5  one typically would expect to find.  Rules and
6  published procedures are ignored allowing officials to
7  make their own decisions, answering to nobody.  3rd,
8  I'm afraid to say, that Korean culture and values are
9  not the same as American values, yet Koreans are in
10 charge of this organization.  We bend over backwards to
11 assure no appearance of favoritism or partiality in
12 this sport - a let the best man win attitude.  Korean
13 culture places a higher value on loyalty to one's
14 family, friends, school, etc. than it does on honesty
15 and fair play.  The result is that the best man usually
16 doesn't win, but the favorite son does."
17        Does some of that language sound familiar?
18        A    Yes.
19        Q    Does it sound like the language that
20 Mr. Satrom included in that Paragraph 8 in his
21 September 5th, 2003 letter to you?
22        A    Yes.
23        Q    And given that this is an e-mail that was
24 sent to the Membership and Credentials Committee that
25 they were seeking information about issues in the

1        A    Yes.
2        Q    What do you remember about that?
3        A    Just that it had been mentioned that we
4  had been placed on probation, once that I recall.  It
5  may have been more than once.
6        Q    And was it because of the same kinds of
7  issues that were being addressed in September of 2002?
8             MR. JONES:  Objection; calls for
9  speculation.
10       A    I don't remember being told what the
11 issues were for the probation.
12       Q    (BY MR. LEVINSTEIN)  But it had to do with
13 noncompliance with the obligations as a National
14 Governing Body?
15       A    I don't know.  I would assume so,
16 but . . .
17       Q    95?
18            (Deposition Exhibit No. 95 was marked
19                 for identification.)
20       Q    (BY MR. LEVINSTEIN)  Let me show you
21 what's been marked as Exhibit 95 with USOC Bates Nos.
22 00189 and 00190.  Who is Guy Poos, if you know?
23            (Whereupon, Mr. Johansen left the
24                 deposition proceedings.)
25       A    A Taekwondo instructor in Oklahoma who

1  sport, was it your hope, as the Executive Director of
2  the USTU, that the Membership and Credentials Committee
3  would tell you about these kinds of allegations?
4             MR. JONES:  Objection; calls for hearsay,
5  also speculation.
6        A    Yes.
7        Q    (BY MR. LEVINSTEIN)  So you wanted him,
8  before that September 13th, 2003 meeting, to give you
9  information about what allegations and issues had been
10 raised with his committee by people like
11 Mr. Kestenbaum?
12       A    Yes.
13       Q    And at that meeting, wasn't it helpful to
14 know what people had been saying to the Membership and
15 Credentials Committee?
16       A    Sure, to the extent that we were provided
17 that information, yes.
18       Q    So that Paragraph 8, which told you some
19 of the things that had been said in communications to
20 the Membership and Credentials Committee, was helpful
21 to you?
22       A    Yes.
23       Q    Were you aware that prior to your term as
24 Executive Director there had been periods of time when
25 the USTU had been placed on probation?

1  owns Poos Taekwondo.  I know him very well.
2        Q    (BY MR. LEVINSTEIN)  Hmmm?
3        A    I know him very well.
4        Q    You do?
5        A    Yeah.
6        Q    And how do you know him very well?
7        A    We have worked together for many years.
8  He has been on several USTU committees.  We have looked
9  at designing and implementing scoring systems together.
10 I have just gone to his tournaments.  I know his kids.
11       Q    If you know, what is his national origin
12 or background?
13       A    As far as I know, he's American-born
14 American.
15       Q    I never know from a name.  Has he, in
16 these years that you've known him, expressed to you
17 grave concerns about how the USTU is run?
18       A    Yes, for many years.
19       Q    And has he been an active participant in
20 the USTU?
21       A    Yes.
22       Q    And were you aware that he had written to
23 the USOC to raise concerns about compliance issues?
24       A    I had no knowledge of that.
25       Q    Okay.  If you look at the second page, the

1  first paragraph at the top says, "As egregious as these
2  non-compliance issues may prove, does anyone really
3  believe they represent anything more than the tip of
4  the USTU iceberg?  Some of us for decades have opposed
5  what we believe are the undemocratic and corrupt
6  policies of the USTU leadership, even though, we
7  recognized that internal change was impossible.  The
8  USTU bylaws continue to allow manipulation without
9  legislative restraint.  We have a president for life,
10  and an appointment process that allows him to continue
11  his reign without the fear of ever encountering serious
12  opposition.  Long ago I realized the USTU leadership
13  could never be held accountable.  For the most part,
14  they did not understand our American culture of sport
15  nor embrace its underlying values of un-biased
16  officiating, a level playing field, and fair play.
17  Where has the USOC oversight been and where does the
18  'buck' stop?"
19      A    I see that.
20      Q    You know Mr. Poos pretty well?
21      A    Yes.
22      Q    Is he a racist?
23      A    I don't know, but I would assume not from
24  my dealings with him.
25      Q    So in all your dealings, there's never

1      A    I'm speaking to the fact that he and I
2  have spoken for years about issues concerning USTU to
3  the point that it's not troubling to see that he wrote
4  this.
5      Q    But in those discussions that you have had
6  over the years, haven't you agreed with him about a lot
7  of the things?
8      A    Much of it, yes.
9      Q    So much of what is in this letter are the
10  same kind of concerns you had?
11      A    Well, I only read the paragraph that you
12  cited.
13      Q    Let's talk about that paragraph.  Did you
14  have those kinds of concerns that are expressed by
15  Mr. Poos?
16          (Whereupon, Mr. Uesugi left the
17          deposition proceedings.)
18      A    No.  Some of it, no.  For instance, the
19  part about values being different and the fair play
20  thing, no.  I don't agree with that.
21      Q    (BY MR. LEVINSTEIN)  What about the fact
22  that the USTU leadership hadn't been held accountable?
23      A    We disagreed as to how accountability is
24  determined.  The fact that we still have the right to
25  protest things that go on says that you can do that.

1  been any suggestion that he was motivated by any kind
2  of racial bias?
3      A    Not that I could speak to.
4      Q    As the person who was the Executive
5  Director of the USTU in September of 2003, is it
6  troubling to you to know that someone like Mr. Poos,
7  who was so actively involved, has such negative
8  feelings about the organization that he was an active
9  member of?
10      A    Troubling, no, because again, like he
11  says, for decades he has been complaining against the
12  way the organization has worked, the way it's been
13  running.  So it wasn't troubling.  It was a
14  continuation of my knowing what he had been doing for
15  years and saying.
16      Q    Was he simply making these complaints
17  because he wanted to be running the place?
18      A    I don't know.  I doubt that's the case,
19  but I don't know.
20          (Whereupon, Mr. Johansen rejoined the
21          deposition proceedings.)
22      Q    (BY MR. LEVINSTEIN)  So because he has
23  been saying these same things for years and nothing has
24  changed, you're not troubled by the fact that he said
25  it in 2003?

1  He is saying that they're not being held accountable.
2  What's the level for accountability?  Made to change or
3  what?
4      Q    But didn't you hear concerns over the
5  years that filing protests and grievances never really
6  led to any meaningful change?
7          MR. JONES:  Objection; calls for hearsay.
8      A    I heard that, but I also saw where many
9  protests were resolved and a decision was made.  Not
10  all of them just go away.
11      Q    (BY MR. LEVINSTEIN)  No.  But did you see
12  any significant structural changes in the organization
13  occur?
14          MR. JONES:  Objection; vague.
15      A    Structural changes, no.
16      Q    (BY MR. LEVINSTEIN)  And did you want
17  structural changes in the USTU?
18          MR. JONES:  Objection; vague.
19      A    I wanted to get to the point where if I
20  wanted to, I could run for president.  I wanted to be
21  in a situation where if he wanted to run for president,
22  he would feel comfortable doing so.  If that was
23  structural changes, I don't think that's what that is.
24  It's a matter of getting people to support you.
25      Q    (BY MR. LEVINSTEIN)  But when you took the

**Page 284**

1    Executive Director job --

2         A      Uh-huh.

3         Q      -- didn't you believe there were serious

4    problems, and part of the reason you took the job was

5    you wanted a chance to try to improve the organization?

6         A      Yes, definitely.

7         Q      Did that include concerns about the

8    president appointing so many people?

9                (Whereupon, Mr. Uesugi rejoined the

10               deposition proceedings.)

11        A      Yes, that was a concern, as well as the

12   unwieldiness of the organization as it was structured.

13        Q      (BY MR. LEVINSTEIN)  And did you make

14   recommendations to the officers and the leadership of

15   the organization of changes that you thought would

16   improve the organization?

17        A      Yes.

18        Q      And did they, in many cases, ignore your

19   recommendations?

20        A      In some cases, yes.

21        Q      Were you very frustrated in dealing with

22   the governance of the USTU when you were the Executive

23   Director?

24        A      I was --

25               MR. JONES:  Objection; argumentative.

**Page 286**

1         A      It was not the way it was.

2         Q      And, in fact, the only group that provided

3    any oversight really were the officers, because the

4    Executive Committee and the board were too large to

5    provide any kind of meaningful oversight over the

6    staff?

7                MR. JONES:  Objection; argumentative,

8    calls for speculation.

9         A      For whatever reason, that's the way it

10   functioned.

11        Q      (BY MR. LEVINSTEIN)  So the officers were

12   the people who governed you when you were the Executive

13   Director?

14               MR. JONES:  Objection; vague and

15   ambiguous.

16        A      The officers were the ones that I answered

17   to most of the time, unless I was answering direct

18   membership concerns with people.

19        Q      (BY MR. LEVINSTEIN)  Were you ever aware

20   of a situation in which the Executive Committee

21   overruled the officers?

22        A      I think there were some situations where

23   there were some budget considerations, and it was just

24   re-worked.  But other than that, I can't think of any.

25        Q      Did you have concern, when you were the

**Page 285**

1         A      I was frustrated in not having the ability

2    or the authority to just implement and make it so.

3         Q      (BY MR. LEVINSTEIN)  Did you learn, during

4    the time that you were with the USTU, about the concept

5    of having a CEO who is empowered?

6         A      Did I learn that concept?

7         Q      Yes.

8         A      During the time I was Executive Director?

9    No.

10        Q      Did you know it already when you came?

11        A      Yes.

12        Q      So you were familiar with the idea that

13   modern governance theory involves the staff led by the

14   CEO having the authority and the power to run the

15   organization?

16        A      Yes.

17        Q      And that wasn't the case in the USTU, was

18   it?

19        A      Correct.

20        Q      And the role of the board is supposed to

21   be to set policy and provide oversight, correct?

22        A      Correct.

23        Q      And that wasn't the case in the USTU?

24        A      In many cases, yes.

25        Q      In many cases, yes, it was not?

**Page 287**

1    Executive Director, that a lot of money was spent

2    supporting volunteers instead of athletes and coaches?

3         A      By volunteers, who do you mean?

4         Q      I'm sorry.  In the Olympic movement, we

5    generally refer to the people who are officers,

6    Executive Committee, and board as volunteers.  Let me

7    start over.

8                Were any of the officers, Executive

9    Committee, or board members paid a salary?

10        A      No.

11        Q      Okay.  So did you not view them as

12   volunteers?

13        A      Well, from my purview, volunteers are also

14   the people that staff our events and that we solicit to

15   help run things.

16        Q      Putting aside people who are volunteering

17   to work, let's talk about the volunteers who were

18   governing.  By that, I mean the officers, the Executive

19   Committee, and the board.

20               When you became the Executive Director, and

21   you learned the details of how the organization was

22   run, did you think there was a substantial problem that

23   an unreasonable amount of the organization's resources

24   were being spent on the volunteers, as opposed to on

25   the athletes and the coaches?

**Page 288**

```
1              MR. JONES:  Objection; vague.
2         A    I don't know that I would term it
3    unreasonable, but I thought that it definitely needed
4    tweaking and attention, because practices that were in
5    play then I felt should have been different, and I
6    moved to make them so.
7         Q    (BY MR. LEVINSTEIN)  And there was
8    resistance from a number of volunteers at having their
9    perks and benefits taken away, wasn't there?
10        A    Yes.
11        Q    And it seemed to you that the volunteers
12   didn't seem to get the idea that the mission was to
13   support athletes to achieve sustained competitive
14   excellence, correct?
15        A    Correct.
16             (Deposition Exhibit No. 96 was marked
17             for identification.)
18        Q    (BY MR. LEVINSTEIN)  And as we said
19   before, the mission of the USTU was supposed to be to
20   help athletes achieve excellence?
21        A    Yes.
22             MR. JONES:  Could we take a break?
23             MR. LEVINSTEIN:  Whenever you want.
24             (Recess taken from 2:29 p.m. to 2:37
25             p.m.)
```

**Page 290**

```
1    Maryland and Virginia State tournaments and every adult
2    national championship and [junior] national
3    championship for the last nine years and the 2000 and
4    2002 [junior] world championships."
5         "In Ireland and in Greece [I] personally
6    witnessed many USTU members assigned job titles and
7    sent to these foreign countries for nothing more than
8    free vacations in Ireland and the [Junior] team was
9    left basically to run around by themselves with little
10   or no supervision, if not for the parents God only
11   knows what might have happened."
12             When you became the Executive Director of the
13   USTU, did you have concern that volunteers were being
14   sent to countries where they had no obligations with
15   respect to the event and, in effect, the USTU was
16   paying for vacations?
17             MR. JONES:  Objection; calls for hearsay
18   and speculation.
19        A    I wouldn't word it that way, but the
20   concern was there, yes.
21        Q    (BY MR. LEVINSTEIN)  You wouldn't give it
22   quite as extreme a characterization?
23        "Vacation."
24        Q    But you're paying for travel that didn't
25   benefit the USTU?
```

**Page 289**

```
1         Q    (BY MR. LEVINSTEIN)  I show you what's
2    been marked as Exhibit 96, USOC Bates Nos. 00192 and
3    -193, and I'll ask, have you seen this before?
4         A    No, I have not.
5         Q    If you look -- it's an e-mail from a -- I
6    don't know that we know who is --
7         A    Mary McCagg.
8         Q    Well, Mary McCagg, this is her copy.  She
9    was a member of the Membership and Credentials
10   Committee.
11        A    I see.
12        Q    And it was sent to her by Kay Burton, but
13   Kay Burton was forwarding an e-mail from someone at
14   "jjtstkd" at AOL, so someone's initials who may be JJS.
15   You don't recognize that address?
16        A    No.
17        Q    And you wouldn't know who the vice referee
18   chair for Maryland would have been, because he seems to
19   refer to himself as that, or herself?
20        A    No, I didn't.
21        Q    Okay.  In it, it makes reference to, "In
22   Ireland and in Greece" -- this is the third paragraph.
23             First, let me just say who he is.  He claims
24   that he is an A1 referee and a parent of two
25   competitors.  And it says, "I have been to every
```

**Page 291**

```
1              MR. JONES:  Objection; argumentative.
2         A    The concerns were there.
3              MR. LEVINSTEIN:  Exhibit 97.
4              (Deposition Exhibit No. 97 was marked
5              for identification.)
6         Q    (BY MR. LEVINSTEIN)  Have you seen Exhibit
7    97 before?
8         A    No, I have not.
9         Q    We haven't mentioned Larry Voorhees
10   before.
11        A    Yes.
12        Q    We did?
13        A    Yes.
14        Q    Okay.  And he is a 5th degree black belt
15   from Des Moines, Iowa?
16        A    Yes.
17        Q    And do you know Mr. Voorhees?
18        A    Yes.
19        Q    Do you know him well?
20        A    Not well, but I knew him from having been
21   around.
22        Q    Just so you know, middle paragraph, "Bruce
23   Harris is an extremely competent individual," to put
24   that in the record.
25        A    Scratch that.  That's a mistake.
```

**[Page 292]**

1    Q    Just wanted to get something positive in
2 the record here.
3    And there's a reference in that same
4 paragraph that says, referencing both you and Jay
5 Warwick, "They both have done, and would continue to do
6 an outstanding job, if not for the micro-management of
7 President Lee and some of the more 'senior' officers
8 (or those that think their rank makes them 'senior'),
9 and if not for President Lee giving them specific
10 orders to do things that are in direct opposition to
11 the by-laws."
12    Were there circumstances in which you felt
13 that you were being micromanaged by President Lee or
14 the officers?
15    MR. JONES:  Objection; vague and
16 ambiguous, calls for hearsay.
17    A    Yes, I felt there was micromanagement, but
18 I was never directed to do anything against the bylaws,
19 nor would I.
20    Q    (BY MR. LEVINSTEIN)  And do you see three
21 paragraphs down, reference to "good-old-boy attempts at
22 political maneuvering"?
23    MR. JONES:  Same objection.
24    Q    (BY MR. LEVINSTEIN)  It says, "President
25 Lee is equally as infamous for his behind-the-back,

**[Page 293]**

1 good-old-boy attempts at political maneuvering."
2    Were there -- you don't see that yet.  I'm
3 sorry.  Take your time.
4    A    Oh, I see it.
5    Q    Were there concerns expressed by members
6 of the board, for example, that when they showed up at
7 board meetings, everything seemed to have been
8 predetermined?
9    MR. JONES:  Objection; calls for
10 speculation.  Also hearsay.
11    A    I can't speak to what other board members
12 felt.  When I was merely a board member, that was often
13 the discussion with people around me.
14    Q    (BY MR. LEVINSTEIN)  Did you witness, when
15 you were the Executive Director, politicking in advance
16 of meetings in which members of the Executive Committee
17 or the officers called people up to line up votes or
18 had meetings to line up votes on issues that were
19 coming before them in advance of the meetings?
20    MR. JONES:  Objection; vague and
21 ambiguous.
22    A    I didn't witness that happening to be able
23 to speak to it.  I witnessed groups meeting and
24 talking, but I wasn't in any of the rooms, so I don't
25 know what they were talking about.

**[Page 294]**

1    Q    (BY MR. LEVINSTEIN)  Were you in meetings
2 in which, during the meeting, groups of people spoke in
3 a foreign language and had discussions in your presence
4 that you couldn't understand?
5    A    Yes, sometimes.
6    Q    Did you consider that offensive?
7    A    No.
8    Q    Could you see how someone else might
9 consider that insensitive?
10    MR. JONES:  Objection; calls for
11 speculation.
12    A    It could, yes.
13    Q    (BY MR. LEVINSTEIN)  Did anyone voice to
14 you that it's inappropriate when we're having meetings
15 for some members to, in front of the others,
16 communicate among themselves in a language knowing that
17 we couldn't understand?
18    MR. JONES:  Objection; calls for
19 speculation.
20    A    Yeah, that had been stated before.
21    Q    (BY MR. LEVINSTEIN)  And who said that to
22 you?
23    A    Not to me, but it had been said by people
24 in the room, in the audience and stuff, in the group,
25 where that happened.

**[Page 295]**

1    Q    Did you think it was inappropriate in a
2 meeting for some members to speak in Korean and
3 communicate with each other so that the other people in
4 the room couldn't hear what they were saying, couldn't
5 understand what they were saying?
6    A    Again, not necessarily, because, again, I
7 have worked a lot in the Pan Am Region, and the same
8 thing happens in Spanish.  And if you don't speak
9 Spanish, you don't understand.  But that's their way of
10 saying whatever they're saying, and a translation
11 usually ensues.
12    Q    But there was no translator to translate
13 for you what they were saying in these meetings?
14    A    In some cases, yes, you're right.
15    Q    And the purpose of speaking Korean was in
16 order to communicate with each other so you couldn't
17 hear what they were saying?
18    MR. JONES:  Objection; calls for
19 speculation.
20    Q    (BY MR. LEVINSTEIN)  Didn't it create
21 concern --
22    A    I don't know what the purpose was.
23    Q    -- that they may be saying things that
24 they were not willing to say in front of the group?
25    A    Sure.

1        MR. JONES:  Same objection.
2        Q     (BY MR. LEVINSTEIN)  Weren't you troubled
3    to be at a meeting in the United States at which some
4    members of the USTU'S governance group were speaking in
5    Korean instead of in English?
6        MR. JONES:  Same objection.
7        A     Troubling, yeah.  It's troubling when that
8    happened.
9        Q     (BY MR. LEVINSTEIN)  So didn't you view,
10   to some extent, that the leadership, who were of a
11   knowledge of the Korean language, used that knowledge
12   in ways that were inappropriate in the USTU?
13       A     I don't know how to respond to that.  I
14   know that in the past, we've had some leaders that
15   aren't as conversant in English and of necessity had to
16   communicate using Korean.  Did I find that troubling
17   that I didn't know what was being said?  Somewhat.
18   But, again, I have been in that situation in other
19   countries as well.
20       Q     But in other countries, you're in Spain,
21   and they're speaking Spanish?
22       A     But in Taekwondo for other countries, too.
23       Q     But here weren't there situations in which
24   everyone who was speaking in Korean, to your best
25   understanding, could also understand English just fine?

1    position as chairman?
2        A     No, I don't.
3        Q     And he is the one who communicated to you
4    the nomination of Mr. Dae Sung Lee to be the coach?
5        A     Yes.
6        Q     And after -- I have Byung Kang; is that
7    correct?
8        A     Byung Won Kang, B-y-u-n-g, W-o-n, K-a-n-g.
9        Q     All right.  He was appointed by Sang Lee
10   to be the chair of that committee?
11       A     Yes.
12       Q     And after you communicated the nomination
13   of Dae Sung Lee to the USOC --
14       A     Yes.
15       Q     -- did you get inquiry back as to whether
16   the coaching criteria had been followed?
17       A     That may be the case, but I don't have
18   recollection of that happening.
19       Q     When Mr. Byung Won Kang communicated to
20   you the nomination --
21       A     Yeah.
22       Q     -- did you ask him whether the Coaching
23   Science Committee had all met and all agreed on the
24   nomination?
25       A     No, I did not.

1        MR. JONES:  Lacking foundation.
2        A     No.  To my knowledge, that wasn't always
3    the case.
4        Q     (BY MR. LEVINSTEIN)  But was it sometimes
5    the case?
6        A     Sometimes the case.
7        Q     And wasn't it sometimes the case that --
8    well, strike that.
9              Did that happen ever at officers meetings?
10       MR. JONES:  Objection; vague.
11       A     During my tenure, no.
12       Q     (BY MR. LEVINSTEIN)  But a majority of the
13   officers were of Korean national origin?
14       A     Yes.
15       Q     What about the majority of the Executive
16   Committee?
17       A     I would say so, but I'm not sure of the
18   exact numbers.
19       Q     Who was the head of the Coaching Science
20   Committee when you were the Executive Director?
21       A     A gentleman named Mr. Connolly from
22   California.
23       Q     And he was appointed by Sang Lee?
24       A     Yes.
25       Q     And do you know how long he had held that

1        Q     Did you ask him if there had been a vote
2    and what the vote had been?
3        A     No, I did not.
4        Q     Did you ask him whether anyone else had
5    been considered?
6        A     No, I did not.
7        Q     If -- this is a hypothetical.  If you had
8    learned that there had not been a meeting of the
9    Coaching Science Committee at which the decision had
10   been made, but that the chairman had made the decision
11   without having the meeting of the committee, would you
12   have still passed that name on to the USOC?
13       MR. JONES:  Objection; calls for an
14   improper hypothetical.  Also vague and ambiguous, lacks
15   foundation.
16       A     Probably not.
17       Q     (BY MR. LEVINSTEIN)  And in your view,
18   would it have been an improper nomination if that had
19   occurred?
20       MR. JONES:  Calls for a legal conclusion.
21       A     What I probably would have done is asked
22   him to make certain that he convenes the committee
23   before giving me the recommendation.
24       Q     (BY MR. LEVINSTEIN)  Because it's your
25   view if he passed that nomination on without having the

1  committee meeting, he wouldn't have complied with the
2  coaching criteria?
3        MR. JONES:  Same objection; lacks
4  foundation, calls for a legal conclusion, calls for
5  speculation, improper hypothetical.
6     A     Probably not.
7     Q     (BY MR. LEVINSTEIN)  From the documents we
8  saw, the USOC didn't approve the nomination until
9  perhaps August of '03 of Mr. Dae Sung Lee?  There's a
10  document you have that has an 8/28/03 e-mail and then a
11  10/8 forwarding of that e-mail.  You have got it.  Am I
12  correct that it indicates that the Executive Committee
13  had approved the nomination on August 28th, '03?
14     A     Yes.  August 28th.
15     Q     That's the date of the e-mail.  And the
16  content of the e-mail indicates that it was done that
17  same day, or something like that?
18        MR. JONES:  For the record, it says
19  the . . .
20        MR. LEVINSTEIN:  I don't have it in front
21  of me, I apologize.
22     Q     (BY MR. LEVINSTEIN)  Okay.  It doesn't say
23  when it occurred, but this is the only reference you've
24  seen to the first date as to which you have confidence
25  that the USOC Executive Committee had by that date

1  Lynnette Love and Dae Sung Lee?
2     A     I recall seeing that earlier.  October
3  30th, 2003.
4     Q     And that's Exhibit 85?
5     A     Yes.
6     Q     When did you first learn that USTU
7  officials gave gifts to WTF officials?
8        MR. JONES:  Objection; lacks foundation.
9     Q     (BY MR. LEVINSTEIN)  Okay.  Strike that.
10  Did you learn at some point in time that USTU
11  officials gave what are called protocol gifts to WTF
12  officials?
13     A     Protocol gifts?  I did learn that at some
14  point in time.
15     Q     Did you learn that the USTU was paying for
16  cigarettes and alcohol to be given to WTF officials?
17     A     No.  That's the first I have heard that.
18     Q     You don't remember discussions with the
19  Membership and Credentials Committee about USTU
20  expenditures on alcohol and cigarettes?
21     A     Not to WTF members.
22     Q     What do you remember about who the
23  cigarettes and alcohol were purchased for?
24     A     I don't recall.  Was that in response to
25  one of the items?

1  approved Lynnette Love and Dae Sung Lee?
2     A     Right.
3     Q     Is it correct that the first time that
4  information was communicated to you was on October 8th?
5     A     No.  Actually, as I recollect, I did speak
6  with both Kelly Skinner and Michelle to ask them to get
7  me something in writing so we could move forward.  So I
8  did have verbal conversations with them about that.
9     Q     So you think they told you sometime
10  between August 28th and October 8th, orally, that the
11  nominations had been approved?
12     A     Probably, most likely.
13     Q     And as soon as you heard, you would have
14  contacted Lynnette Love and Dae Sung Lee?
15     A     Yes.
16     Q     And until that nomination was approved by
17  the USOC, Mr. Dae Sung Lee wasn't yet the Olympic
18  coach?
19     A     He was the nominated coach, but not
20  confirmed.  And we had discussions about that.
21     Q     And it wasn't too long thereafter when
22  Mr. Scherr sent the memo indicating -- where is it --
23  that -- it was on October 30th that Mr. Scherr sent his
24  memo, Exhibit 85, that there was some question because
25  of the certification process about the status of

1        MR. JONES:  Don't ask questions.
2     Q     (BY MR. LEVINSTEIN)  But you do recall
3  that the USTU was spending money buying cigarettes and
4  alcohol?
5        MR. JONES:  Objection; vague and
6  ambiguous.  As individuals or. . .
7     Q     (BY MR. LEVINSTEIN)  Strike that.  You do
8  remember that the organization, the USTU, was paying
9  for purchases of alcohol and cigarettes?
10     A     Yes.
11        MR. JONES:  Same objection.
12     Q     (BY MR. LEVINSTEIN)  And you did
13  understand that those products were traveling outside
14  the country, didn't you?
15     A     No.
16     Q     Then did you understand that those were
17  purchases for USTU governance personnel?
18     A     USTU governance personnel.
19     Q     Officers, Executive Committee members,
20  board members?
21     A     I'm confused.  Please ask it again.
22     Q     The USTU was paying for cigarettes and
23  alcohol?
24     A     Okay.
25        MR. JONES:  Objection; vague and

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1  ambiguous.

2      Q      (BY MR. LEVINSTEIN)  Who was getting the

3  cigarettes to smoke and the alcohol to drink?  People

4  in the United States or people outside the United

5  States?

6      A      It was my understanding that it was for

7  people outside of the United States.

8      Q      Well, people in -- it was something for

9  Taekwondo?

10     A      Yeah.

11     Q      It wasn't for your staff?

12     A      No.

13     Q      And it wasn't for you?

14     A      Correct.

15     Q      Was it for USTU members?

16     A      Members?  Yes.

17     Q      And those were people who were on either

18  the board or the Executive Committee or officers?

19     A      Correct.

20     Q      So to cut it down, the USTU was paying for

21  cigarettes and alcohol that was being owned or consumed

22  by members of the USTU officers, Executive Committee,

23  or board?

24     A      Yes.

25     Q      Do you know people in particular?

304

---

1      A      They would be considered dignitaries from

2  other countries, other presidents of federations, WTF

3  officials, people of that ilk.

4      Q      And the officers of the USTU, are they

5  VIPs?

6      A      Not for that response, not in terms of

7  that response, no.

8      Q      Well, that response discussed Sang Lee and

9  people from other countries staying in luxury

10  accommodations.  Do you recall that?

11     A      Yes.

12     Q      And the defense of that was that VIPs are

13  entitled to that sort of treatment?

14     A      Yes.

15     Q      And athletes and coaches didn't receive

16  that same kind of treatment, did they?

17     A      Correct.

18     Q      And didn't you believe that that was

19  contrary to the entire concept of the Olympic movement?

20         MR. JONES:  Objection; argumentative.

21     A      Not necessarily.

22     Q      (BY MR. LEVINSTEIN)  Do you think that

23  Mr. Lee was somehow entitled to stay at better

24  accommodations than the athletes on the United States

25  team?

306

---

4/7/2005  Harris, Bruce  Vol. 2  (Pltf desig = Yellow, Dfts' counters = Blue)

1      A      No.

2      Q      Did the USTU pay for a membership at the

3  Broadmoor?

4      A      That, I don't know.  We didn't do that as

5  part of my tenure, that I can recall.

6      Q      You don't recall that President Sang Lee's

7  membership at the Broadmoor was paid for?

8      A      I knew that he had a membership at the

9  Broadmoor.

10     Q      You don't understand that it was paid for

11  by the USTU?

12     A      I don't know how the financial

13  arrangements for that were made.

14     Q      Do you recall that that was reimbursed as

15  part of business expenses that he might incur in

16  entertaining people?

17     A      No, sir, I don't.

18     Q      But you have no recollection of whether or

19  not the USTU either paid for or reimbursed Mr. Sang Lee

20  for his membership at the Broadmoor?

21     A      Correct, I don't know how that worked.

22     Q      In your response to Mr. Satrom's letter,

23  you refer to VIPs?

24     A      Yes.

25     Q      Who are VIPs?

305

---

1         MR. JONES:  Same objection.

2      A      My thinking was if it had to be paid for

3  out of our, whatever, no, that's not appropriate.  But,

4  again, it was set up so that this was not something

5  that had to be paid for.

6      Q      (BY MR. LEVINSTEIN)  So VIK, which could

7  be used to get rooms for other people, doesn't count as

8  paying for it?

9      A      But it was VIK as opposed to like the

10  charges were for exorbitant fees for luxury suites.

11  That was not the case.

12     Q      But instead of taking the luxury suites,

13  you could have gotten several less expensive suites for

14  athletes or other people?

15         MR. JONES:  Objection; calls for

16  speculation.

17     A      That's possible.

18     Q      (BY MR. LEVINSTEIN)  And if instead of

19  getting him a suite you got him a room like the

20  athletes and the staff and the other people, you would

21  have had additional VIK to get rooms for other people?

22         MR. JONES:  Same objection.

23     A      Possibly.

24     Q      (BY MR. LEVINSTEIN)  You believe that's

25  true, don't you?

307

1    A    Possibly.  Yes.

2    Q    Did the USTU pay for a full-time employee

3    who worked for President Lee?

4    A    No.  There was a full-time employee that

5    worked at President Lee's office.

6    Q    And at President Lee's office, didn't she

7    both work on USTU business and work at his school as

8    well?

9    A    I really have no firsthand knowledge if

10    that's what she was doing during business hours.  I

11    know that during my time when we called, she responded

12    to USTU business.  When we had to do mailings or

13    whatever, we had full access to her.  I don't know what

14    other business she conducted during those business

15    hours.  I don't know.

16    Q    But she was part of the staff?

17    A    She was part of the staff, USTU staff.

18    Q    Yet she was outside of your supervision,

19    because she worked at his office, and you had access to

20    her, but when you didn't have a specific task for her,

21    she worked on whatever Mr. Lee directed her to do?

22    A    I know her title was assistant to the

23    president, and that was her USTU job.  And,

24    additionally, we used her as we needed for other staff

25    purposes.

---

1    Q    So the USTU paid for a full-time assistant

2    for the president?

3         MR. JONES:  Objection; misstates the

4    testimony, calls for speculation, lacks foundation.

5    A    For instance -- let me answer it this way:

6    I had an assistant to the Executive Director.  She was

7    a staff employee.  She worked the same way the

8    assistant to the president worked.  If I needed

9    something, my assistant worked on it for USTU business,

10    and that's the assumption with the assistant to the

11    president.  But when the staff needed to work on group

12    projects, for instance, my assistant worked on the

13    group projects, as did the president's assistant.

14    Q    (BY MR. LEVINSTEIN)  But you didn't have

15    any other business to ask her to work on other than

16    USTU business?

17    A    I could have.

18    Q    You had another business?

19    A    Well, no.

20    Q    And it would have been inappropriate for

21    you to ask her to work on another business if you did

22    have another business?

23    A    Yeah.  She could have booked gigs.  That

24    was off the record.

25    Q    But you would never ask her to do that?

---

1    A    Right.

2    Q    Because it would have been inappropriate.

3         MR. JONES:  Objection; argumentative.

4    Q    (BY MR. LEVINSTEIN)  You talked earlier

5    about how the bylaws were going to be changed in 2002.

6    Sorry.  Strike that.  The question is wrong.

7         You talked about how the bylaws were going to

8    be changed at a meeting in November of 2003.

9    A    They were to be voted on, yes.

10    Q    So it was going be a meeting in November

11    of 2003.  And at this meeting, the USTU was going to

12    follow through and make the changes in the bylaws that

13    they promised the USOC would be made?

14    A    Correct.

15    Q    And it was so important that these bylaw

16    changes be made that the changes were being sent out

17    back in September before the September 13th meeting in

18    order to convince the USOC that this time the USTU was

19    really serious about making the bylaw changes they had

20    promised?

21    A    I think it was a good faith show that this

22    is the intent to get these adopted in compliance with

23    what was requested.

24    Q    And who cancelled the November 2003

25    meeting?

---

1    A    As I recall, it came at the direction of

2    the president through the committee.

3    Q    Was that troubling to you?

4    A    Yes.

5    Q    Did the president, as far as you

6    understood, have the power to just cancel a meeting

7    that had been properly noticed?

8    A    I'm not certain what our bylaws say as far

9    as canceling goes.  I have never seen it.

10    Q    Were you ever given a reason as to why the

11    president cancelled the meeting?

12    A    I think as I recall, it was supposed to

13    have been postponed to a later date, but, in effect, it

14    didn't happen in November.  And before I left, it

15    hadn't happened.

16    Q    And no date had been set for it to have

17    happened?

18    A    Right.

19    Q    And did some people actually go and have a

20    meeting anyway?

21    A    To my understanding, yes.

22    Q    And in your view, to cancel that meeting

23    and not approve those bylaws, did that run directly

24    contrary to the representations that the USTU had made

25    to the USOC Membership and Credentials Committee?

1      MR. JONES:  Objection; lacks foundation,
2  misstates the testimony.
3      A    It didn't follow up on our commitment to
4  do so.
5      Q    (BY MR. LEVINSTEIN)  And it left the
6  president with the power to appoint all those people?
7      A    Right.  The bylaws didn't get changed.
8      Q    And in your view, were those essential
9  bylaw changes?
10      MR. JONES:  Objection; vague.
11      A    I think that they were critical, in my
12  opinion, based on our need to show compliance.
13      Q    (BY MR. LEVINSTEIN)  And in your
14  discussions with the Membership and Credentials
15  Committee, weren't you trying to convince them that the
16  president really didn't have total control of how the
17  organization functioned, that there checks and
18  balances on his power?
19      A    Yes.
20      Q    Didn't his unilaterally canceling a very
21  important meeting run counter to those representations?
22      MR. JONES:  Objection; misstates the
23  testimony.  The testimony was it was postponed, not
24  cancelled.
25      A    It gives that appearance.

1  of racial discrimination, and as one aspect, it says
2  that in a referee seminar in Illinois, the Caucasian
3  referee coaches and parents were directed to one room
4  of the referee school and all of the instructors of
5  Korean descent were directed to another room.  And it
6  contends that none of the Korean attendees had ever
7  refereed at any sanctioned U.S. tournament, and yet
8  it's the understanding of the author that all of the
9  Korean attendants were upgraded right away to the A-1
10  level.
11      Had you, during your term as Executive
12  Director or in your involvement as a referee, heard
13  allegations that people had been given preferential
14  referee status based on their national origin?
15      MR. JONES:  Objection; calls for hearsay
16  and speculation.
17      A    No, but I had heard of improper upgrades
18  in general, not just race-based.
19      Q    (BY MR. LEVINSTEIN)  But improper upgrades
20  based on favoritism?
21      A    Of a sort, yes.
22      Q    So it might have been race-based or
23  national origin based?
24      MR. JONES:  Objection; calls for
25  speculation.

1      MR. LEVINSTEIN:  I only have one copy of
2  this, so I will -- for the record, I'll mark it as
3  Exhibit 98.  And it's USOC Bates Nos. 00001 and 0002.
4      (Deposition Exhibit No. 98 was marked
5      for identification.)
6      Q    (BY MR. LEVINSTEIN)  Why don't you just
7  let them look at it first for sort of efficiency here.
8      (Deposition Exhibit No. 99 was marked
9      for identification.)
10      MR. LEVINSTEIN:  Why don't you take -- if
11  you don't mind, I'm going to stand behind because it's
12  the only copy I have.
13      MR. JONES:  That's fine.
14      MR. LEVINSTEIN:  For the record, Exhibit
15  98 has USOC Bates Nos. 0001 and 0002.  And it's a
16  letter to Mr. Jim Scherr that I can't tell if it was
17  mailed or sent by electronic communication, but it's
18  dated April 12th, 2004, from Philip Acosta, it appears
19  to be, and it's copied to Bob Gambardella, Gary
20  Johansen, and Bill Martin, and it's re race
21  discrimination.
22      Q    (BY MR. LEVINSTEIN)  I assume you have
23  never seen that document before?
24      A    Correct.
25      Q    Okay.  In it, it discusses an allegation

1      Q    (BY MR. LEVINSTEIN)  And it might have
2  been a friend or some other motivation someone had to
3  advance a person beyond what the rules permit?
4      MR. JONES:  Same objection; calls for
5  speculation.
6      A    That would be a perception of that.  I
7  know in teaching referee seminars, like this in
8  question, that there have been cases where people had
9  taken seminars years before and for whatever reason
10  didn't keep their participation certificate, et cetera;
11  continued going to seminars, didn't get their upgrades.
12  Finally, the paper trail caught up with them and they
13  were upgraded.  But the perception was they went from C
14  to A at one seminar, things like that.
15      I have knowledge of many of those instances,
16  which is different than what this is alleging.  But
17  that's why I say not just race-based, but other things
18  as well.
19      Q    (BY MR. LEVINSTEIN)  Let me give you
20  what's been marked as Exhibit 99.  This is USOC Bates
21  No. 00178, and it's an e-mail for Kay Burton, again,
22  that's been forwarded on September 16th, 2003 to
23  members of the Membership and Credentials Committee and
24  others, such as legal counsel.  And it's from Larry
25  Cain, the state president of the Colorado State

4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)   4/7/2005 Harris, Bruce Vol. 2 (Pltf desig = Yellow, Dfts' counters = Blue)

Case 1:04-cv-00461-SOM-LEK   Document 243-3   Filed 03/21/2006   Page 65 of 80

1 Taekwondo Association. Do you know Mr. Cain?

2     A     Very well.

3     Q     Do you have a good relationship with

4 Mr. Cain?

5     A     Yes.

6     Q     Is he a friend of yours?

7     A     Yes.

8     Q     Is he a racist?

9     A     I don't know that to be true.

10    Q     Has he ever done anything in your presence

11 that suggested in any way that he was racist?

12    A     Not to my knowledge.

13    Q     If you look at Paragraph 4 of the letter,

14 or the e-mail --

15    A     Yes.

16    Q     -- it states from Mr. Cain, "The 'Korean

17 Element' are, or at least [many] [of] them are, racist

18 in that they are determined to control Sport Taekwondo

19 in the U.S. of A., to the exclusion of native born

20 Americans of other backgrounds."

21    A     I see that.

22    Q     Did Mr. Cain ever express to you his

23 concern that individuals in the USTU were trying to

24 control Sport Taekwondo?

25    A     No, we didn't have that discussion at all.

---

1     A     That was a possible perception.

2     Q     (BY MR. LEVINSTEIN)  Was there any reason

3 that you needed to be a 7th degree black belt in order

4 to have a school that met the standards being

5 established by the USTU?

6     A     As I understood it, the intent, as stated,

7 was to pick a starting point, get those people done,

8 and then filter it through everyone else.

9     Q     And you didn't believe that, did you?

10    A     I did believe that was the intent.  I just

11 didn't think that was the best way of doing it.

12    Q     But you felt it was wrong?

13    A     Not necessarily wrong, because, again, in

14 Taekwondo, many things have happened in that same way

15 since the beginning.  So it would have been better had

16 it been done differently.

17    Q     So it favored the Korean Grandmasters?

18    A     Or any Grandmaster.

19    Q     But the vast, vast majority of all those

20 Grandmasters were Korean?

21        MR. JONES:  Objection; argumentative.

22    A     The greater percentage.

23    Q     (BY MR. LEVINSTEIN)  In excess of 90

24 percent?

25    A     Correct.

---

1     Q     Were you aware of an issue in the sport

2 about schools that were competing and some were

3 Korean-American owned and others were owned by

4 non-Korean Americans?

5     A     Competing?

6     Q     Competing for business.

7     A     Oh.  Yes, that's a common discussion

8 topic.

9     Q     And you mentioned that a certification

10 process had been created for schools?

11    A     Yes.

12    Q     And originally you had to be a 7th degree

13 or higher black belt in order to qualify for the

14 certification?

15    A     Initially, yes.

16    Q     And at that time, was it in excess of 90

17 percent of the people who were eligible to qualify were

18 Korean American?

19    A     Yes.

20    Q     So was there a perception that the

21 certification and licensing had been designed to be

22 sure that the USTU would only certify schools owned by

23 Korean Americans?

24        MR. JONES:  Objection; calls for

25 speculation.

---

1     Q     And you know of three today, but how

2 recently did they become Grandmasters?

3     A     I don't know that.

4     Q     So it may have been less than three then?

5     A     Possibly at that time.

6     Q     And the USTU, after it certified those

7 Grandmaster schools, put those schools' names on its

8 website --

9     A     Correct.

10    Q     -- in order to give the USTU's seal of

11 approval that those schools met USTU standards?

12        MR. JONES:  Objection; calls for

13 speculation.

14    A     That would be a perception.

15    Q     (BY MR. LEVINSTEIN)  And did people

16 complain about that?

17    A     Yes, and at some point it was taken out.

18    Q     Was it racist to complain about that?

19        MR. JONES:  Objection; argumentative.

20    A     I don't know the reason people complained.

21    Q     (BY MR. LEVINSTEIN)  But the group that

22 made the decision to limit the certification to that

23 level was the officers and Executive Committee of the

24 USTU?

25    A     Correct.

1   Q      And, again, that group was more the

2   majority membership that were Korean American?

3   A      Correct.

4          (Deposition Exhibit No. 100 was marked

5          for identification.)

6   Q      (BY MR. LEVINSTEIN)  I show you what's

7   been marked as Exhibit 100, USOC00143 to 00146, and

8   it's a letter that I don't know if it was sent

9   electronically or by mail to Thomas Satrom from Kim

10  Sol, the Montana state president of the USTU.  I assume

11  you have not seen this document before?

12  A      Correct.

13  Q      Do you know Kim Sol?

14  A      Yes.

15  Q      Before we go on, you had talked about an

16  opposition group which was the Pennsylvania and the

17  Ohio associations?

18  A      Correct.

19  Q      But we have now seen the Montana state

20  president, the Colorado state president, and a host of

21  other people who wrote in.  So the opposition to the

22  USTU's conduct that was expressed to the Membership and

23  Credentials Committee was broad based, wasn't it?

24         MR. JONES:  Objection; argumentative,

25  lacks foundation, calls for speculation, implies that

---

1   have a turnout didn't surprise me.

2          Q      (BY MR. LEVINSTEIN)  Were you aware, on

3   the paragraph that carries over from the first page to

4   the second page of Exhibit 100, of a reference to a

5   news article of the previous year showing Sang Lee

6   appearing at a press conference in Korea arguing that

7   the Korean NGB, the Korean Taekwondo Association,

8   needed to get its act together to continue to be the

9   head of Taekwondo development?  Are you familiar with

10  the news article referenced?

11         A      No, I'm not.  I was informed of this by,

12  again, members who called and asked what was going on.

13  But I have no firsthand knowledge.

14         Q      Did you investigate?

15         A      No.

16         Q      Did you ask Mr. Lee about it?

17         A      No, I didn't.

18         Q      Why not?

19         A      No reason at that time.

20         Q      It was a concern to members, wasn't it?

21         MR. JONES:  Objection; calls for

22  speculation.

23         A      Yes.

24         Q      (BY MR. LEVINSTEIN)  And you just didn't

25  feel it was your place to ask them, did you?

---

1   everybody is organized together in one opposition.

2          A      That could be a perception.

3          Q      (BY MR. LEVINSTEIN)  Well, and I'm not

4   suggesting they were organizing together.  Without

5   any -- these people, as far as you know, weren't

6   organized together?

7          A      No.

8          Q      In fact, people from all over the country

9   spent their own money to fly to this public meeting

10  because they had grave concerns about the USTU,

11  correct?

12         A      Correct.

13         Q      Didn't it surprise you the extent to which

14  people came from all over the United States to express

15  support of severe remedial action against the USTU?

16         MR. JONES:  Objection; calls for

17  speculation.

18         A      I wasn't surprised.

19         Q      (BY MR. LEVINSTEIN)  Because you already

20  knew there was wide-spread dissatisfaction all around

21  the United States, didn't you?

22         MR. JONES:  Objection; overbroad, vague.

23         A      Again, most of my day was spent answering

24  the members' calls and memos.  So I understood that

25  there was a lot of concern about our situation.  So to

---

1          A      No, that may not have been the case.  I

2   mean, at this point in time, I don't know what was

3   going on, what I was otherwise doing as well.  But,

4   again, I didn't view -- part of the answer is I didn't

5   feel it was my position to question the president.  I

6   didn't even know if that had occurred.

7          Q      Were you aware that a major activity of

8   the Kukkiwon, focusing on Page 2, was hosting Korean

9   team development activities?

10         A      No.

11         Q      It just says here, "On its website, it

12  lists 'association offices' entirely limited to cities

13  in Korea.  It's (sic) schedule of events primarily

14  consists of hosting Korean team development

15  activities."  Do you know if that's true?

16         A      I don't know if that's true.

17         Q      And what you testified to was in those two

18  years that we focused on, the USTU sent $300,000 to the

19  Kukkiwon?

20         A      Correct.

21         Q      Of the people who paid those fees, what

22  percentage of them participated in international

23  competitions where they needed the Kukkiwon

24  certification?

25         MR. JONES:  Objection; calls for

1   speculation.

2        A    Only people that made the national team

3   are required to have that.

4        Q    (BY MR. LEVINSTEIN)   What do you think the

5   Kukkiwon fees during 2002, 2003 were from people on the

6   U.S. national team?

7        A    At most, there would be 16 people, and

8   depending on the various belt levels, $5,000, $10,000.

9        Q    But you only have to pay the year you get

10  the belt?

11       A    Yes.  It's one time, until your next

12  promotion.

13       Q    So of the 16 men on the U.S. national

14  team, what percentage of them will get a new belt in

15  any given year?

16       A    I couldn't answer that.  Probably all of

17  them.  Depends.

18       Q    You can't get new belts for five or six

19  years at a time?

20       A    Depends.  You could get it after a year,

21  quite possibly.  I don't know the belt makeup.

22       Q    You say you don't know the belt maker?

23       A    Belt makeup.

24       Q    Makeup.  Sorry.  So $5,000 was the number

25  you gave me.  So $10,000 of the 300 grand is fees that

---

1        A    Correct.

2        Q    And the USTU does what with the paperwork

3   before they send it to Korea?

4        A    A paper gets filed.  A record is kept of

5   the person who is applying.  It's cross checked to make

6   sure that the person administering the test is, in

7   fact, a minimum 4th Dan black belt, which is also kept

8   on file.  At the end of each month, the fees are sent

9   to Kukkiwon.

10       Q    Oh, so Kukkiwon, besides getting the fees,

11  they don't even have to approve the application for the

12  level?

13       A    No.  That's up to each member nation

14  federation.  They process the belt.

15       Q    Rather than processing the paperwork,

16  what -- and making sure that the person giving the

17  certification is eligible to give out such things, any

18  other review of whether that person who got that

19  certification is qualified?

20       A    By USTU?

21       Q    Yes.

22       A    Not that I know of.

23       Q    So how could that be the gold standard?

24       A    The test isn't the gold standard.  The

25  certification is the gold standard.

---

1   are going to Korea that the people don't have to pay in

2   order to participate in an international competition?

3        A    Correct, but there's more to that.  You

4   don't get your belt to participate in a national

5   competition.

6        Q    You get it because it's a symbol of

7   achievement?

8        A    Exactly.

9        Q    From what you said, the way you get it is

10  a person who already is above you in Kukkiwon

11  certification gives you a task or watches you perform

12  your Taekwondo activities --

13       A    Correct.

14       Q    -- and assesses whether you have met the

15  standards for a belt below his level?

16       A    Up to a belt below his level or her level.

17       Q    So if I want to be a 1st degree Kukkiwon,

18  I take a test, and someone who is 4th degree or higher

19  is judging me?

20       A    Correct.

21       Q    And that individual decides whether I meet

22  the requirements?

23       A    Correct.

24       Q    And fills out a form and sends the

25  paperwork to the USTU?

---

1        Q    So it's the image of the certification

2   that is the gold standard, not that the certification

3   is of a higher quality than what the USTU was proposing

4   to do?

5        A    Exactly.

6        Q    In fact, the USTU certification would be

7   more rigorous than the Kukkiwon, because besides the

8   certification, there were some objective tests, and a

9   neutral person who wasn't involved was going to check

10  the certification?

11       A    That's true up to a point.  For instance,

12  anything above 6th Dan, you have to appear in person to

13  test.

14       Q    But through level five, the USTU proposed

15  system, in your view, was a much higher quality

16  certification?

17       A    The process was different.  And that's the

18  only thing I can differentiate.

19       Q    And it's a profit-making activity,

20  Kukkiwon certification for the USTU?

21       A    As well as being a member, yes.

22       Q    And there is no restriction on the person

23  who's allowed to certify charging for administering the

24  analysis necessary to decide whether their student

25  should be given the certification?

```
1      A    Correct.
2      Q    So do you have any idea of what people
3  charged to give Kukkiwon certifications?
4      A    I know what I charge.
5      Q    What do you charge?
6      A    Exactly what's there.
7      Q    So you get nothing?
8      A    No.
9      Q    But you don't know the extent to which
10 it's a profit-making activity for instructors around
11 the United States?
12     A    No.
13     Q    And there has been no attempt by the USTU
14 to regulate that?
15     A    Correct.
16     Q    Were there Kukkiwon blank forms in the
17 USTU office?
18     A    Yes.
19     Q    And is that what you asked for if you want
20 to certify someone to be a Kukkiwon?
21     A    Yes.  Instructors can request the
22 application for them to fill out.
23     Q    When someone got certified as a Kukkiwon
24 1st degree, 2nd degree, whatever degree, the USTU
25 actually filled out a Kukkiwon certificate and sent it
```

```
1      Q    You mean they take the application, they
2  look at it, they check the name and saw that, oh, no,
3  on my list, he is not allowed, and they wrote back to
4  you?
5      A    Right.  And also Skip Dan certificates,
6  they monitor things like that.
7      Q    Pretty profitable activity on their end?
8          MR. JONES:  Objection; calls for
9  speculation.
10     Q    (BY MR. LEVINSTEIN)  Was it reasonable for
11 the Membership and Credentials Committee and the USOC
12 and members of USTU to want to find a way to keep the
13 $290,000 in two years that was going to Kukkiwon that
14 wasn't necessary for these people to compete
15 internationally and find a way for those funds to be
16 available to promote Taekwondo in the United States?
17     A    I think my personal opinion, if the
18 understanding wasn't there as to what Kukkiwon
19 certificates represent, absent that, that's a fair
20 assessment.  But if you throw that into the mix, it
21 becomes a different animal.
22     Q    And what happened to the Kukkiwon funds?
23     A    They became a part of the operating
24 expense of the USTU.
25     Q    Didn't they become part of WTF President
```

```
1  to them, correct?
2      A    I don't know.
3      Q    There were blank Kukkiwon certificates in
4  the USTU office?
5      A    Oh, I see.  And, again, up to -- I know
6  for 1st Dan, there were, because the turnaround time on
7  them is like a week or was a week.  Other than that,
8  they were submitted as well to Kukkiwon for filling out
9  and mailing back to us.  So the turnaround time was two
10 to three weeks above 1st degree black belt.
11     Q    Because of the time it took to mail and
12 get it back?
13     A    Yeah.
14     Q    Besides in some cases sending a
15 certificate, what else did Kukkiwon do for 300 grand in
16 two years?
17     A    Well, part of what they did was monitor
18 problem areas with instructors.  For instance, during
19 my tenure, there were a couple of cases where an
20 instructor had been sanctioned and is no longer
21 authorized to promote.  He still tried floating
22 certificates through the USTU.  They were sent to
23 Kukkiwon because we hadn't been informed that the
24 person had been sanctioned.  They monitor that.  They
25 would say, no, this we can't do, things like that.
```

```
1  Kim's bank account?
2      A    I'm speaking for the money in USTU.
3      Q    What about the money that went into Korea?
4          MR. JONES:  Objection; calls for
5  speculation.
6      Q    (BY MR. LEVINSTEIN)  Were you aware that
7  President Kim was indicted for pocketing Kukkiwon
8  funds?
9      A    I heard something about that.
10     Q    Were any officers, directors, or Executive
11 Committee members of the USTU given a car?
12     A    A car?
13     Q    Yes.
14     A    There was one staff car.
15         MR. JONES:  Objection; vague.
16     A    Under the provisions of the Olympic
17 Committee's agreement with NGB, each NGB was authorized
18 one vehicle from USOC primarily for the use of the
19 Executive Director, I think.
20     Q    (BY MR. LEVINSTEIN)  Did you get the car,
21 or did President Lee get the car?
22     A    I didn't get the car.
23     Q    But your understanding was that the USOC
24 gave a staff car pursuant to their General Motors
25 sponsorship agreement, and the VIK provided was that it
```

**Page 332**

1   was supposed to be used by the staff of the USTU?

2       A    Correct.

3       Q    And in particular, to the extent it was

4   decided who would use it, it would make sense the

5   Executive Director, as the leader of the staff, would

6   use it?

7       A    In our situation, my understanding was,

8   because this was questioned, that there was a vote by

9   the officers or one of the committees that allowed the

10  president to retain use of the car rather than the

11  Executive Director.

12      Q    Did the president submit documentation of

13  the extent to which the car was used for personal use

14  as opposed to business use?

15      A    That came up during my tenure, and I know

16  that it resulted in the documentation of it.  I don't

17  know the practice part.

18      Q    Was President Lee given a 1099?

19      A    Yes.

20      Q    That was after the USOC audit committee

21  intervened and said this was proper business practice?

22      A    Correct.

23      Q    Why didn't it happen before then?

24      A    I can't speak to that.

25      Q    You knew it hadn't occurred?  It happened

**Page 334**

1   from Ohio to Colorado?

2       A    Yes.

3       Q    Do you remember that being approved by the

4   Executive Committee?

5       A    I know we were at the end of the approval

6   process because it needed signatures of all the

7   officers, and we were lacking the signature of the

8   secretary general.

9       Q    Do you recall that the secretary general

10  lost the paperwork and then you never got it done?

11           MR. JONES:  Objection; calls for

12  speculation.

13      A    I remember him misplacing it, but I never

14  knew that he had lost it.

15      Q    (BY MR. LEVINSTEIN)  Okay.  But do you

16  recall that it never happened because you never got all

17  the signatures?

18      A    That, I don't know.

19      Q    But other than the last signature, all of

20  the approvals had been properly conducted?

21      A    Yes.

22      Q    Did the International Federation, the WTF,

23  have a rule that athletes in certain international

24  competitions all had to wear uniforms manufactured by a

25  designated Korean company?

**Page 333**

1   while you were there?

2       A    This was the situation when I arrived.  I

3   didn't know whether -- I didn't get guidance on things

4   like that specifically.  These are things that

5   developed as my tenure went on.  No one came and

6   briefed me and said, hey, you should have the staff

7   car.  Whoever has it has to do a 1099, blah, blah,

8   blah, until it became a point that came up in the

9   Membership and Credentials compliance review.

10      Q    These were USTU improprieties that only

11  showed up after the USOC conducted an audit and

12  discovered them?

13      A    Correct, to my knowledge.  I don't know if

14  that was the case, again, with the previous -- my

15  predecessor, because that was the case with the car

16  then.

17           MR. LEVINSTEIN:  Can we take a

18  couple-minute break.

19           (Recess taken from 3:36 p.m. to 3:43

20           p.m.)

21           (Deposition Exhibit No. 101 was marked

22           for identification.)

23      Q    (BY MR. LEVINSTEIN)  When you were the

24  Executive Director, was there discussion about

25  transferring the corporation's place of incorporation

**Page 335**

1       A    That's not exactly correct.

2       Q    Why don't you tell me what is correct?

3       A    They had approved manufacturers for all

4   WTF-sanctioned gear, including the uniform, but also

5   head gear, chest protector, et cetera.  And for

6   international events, those were the companies that you

7   had to use for that sanctioned equipment.

8       Q    I don't mean to dwell on bad moments, but

9   you were the Events Director throughout your time with

10  the USTU, correct?

11      A    Yes.

12      Q    In the 2003 Junior Championship, did a lot

13  of cash disappear?

14      A    Approximately $5,000.  And as a follow-up,

15  I filed a police report with the police department of

16  Colorado Springs, also with USOC security.  And if you

17  want, I can tell you the details of it.

18      Q    It's okay.  You never found where the

19  money went?

20      A    No.

21      Q    Was it your understanding that it got

22  misplaced or that someone stole it?

23      A    It came down as being misplaced.  Again, I

24  spoke to having to transfer back amounts of cash.  This

25  $5,000 was in an envelope, a plain white envelope, that

1  was sealed.  We had verified the amount of the money
2  and left it in the chair at the finance office.  I
3  guess the finance person was out at the restroom at the
4  time.
5          The person left it in the chair.  The finance
6  person claimed they never saw it.  And that was the
7  last we heard of it.  So I initiated an investigation
8  in-house with each of the staff members, went to the
9  extent of setting up lie detector tests to verify some
10  suspicions as to what might have happened with it, got
11  USOC security involved, and filed a police report with
12  Colorado Springs.  But the money was never found.
13      Q     You made reference in one of the
14  discussions in response to one of the questions in
15  Mr. Satrom's letters about cash at events.
16      A     Yes.
17      Q     And in that, you said that it was the
18  practice of the USTU to pay referees at events in cash;
19  is that correct?
20      A     Yes.
21      Q     Why did the USTU decide to pay referees in
22  cash?
23      A     That, I can't speak to.  That decision was
24  made before me.  That was the practice at the time that
25  we changed to issuing checks.

1      Q     Didn't you have an obligation to issue
2  some sort of documentation that you made a payment to a
3  referee for providing referee services?
4          MR. JONES:  Objection; calls for
5  speculation, also calls for a legal conclusion.
6      A     That was my opinion, which is why we
7  switched to checks.
8      Q     (BY MR. LEVINSTEIN)  You thought it
9  violated tax law to pay people in cash?
10          MR. JONES:  Objection; calls for
11  speculation, argumentative.
12      A     I thought at the very least it was poor
13  practice.
14      Q     (BY MR. LEVINSTEIN)  Now, you mentioned
15  hearing about problems with state associations over
16  various periods of time; but specifically, when you
17  were the Executive Director, were you aware of
18  continuing state association problems?
19      A     Yes.
20      Q     And continuing problems with state
21  association elections?
22          MR. JONES:  Objection; vague and
23  ambiguous.
24      A     Yes.
25      Q     (BY MR. LEVINSTEIN)  And you were aware of

1  continuing problems with forged membership applications
2  being submitted?
3          MR. JONES:  Objection; lacks foundation.
4      A     I was aware of that being a problem, yes.
5      Q     (BY MR. LEVINSTEIN)  And just so I
6  understand it, is it correct that people would fill out
7  applications with names out of the telephone book and
8  submit them in order to meet requirements of how many
9  members were from their state in order to qualify for
10  additional delegates on the Board of Governors?
11          MR. JONES:  Calls for speculation, lacks
12  foundation.
13      A     The assumption was that these were names
14  gathered from somewhere.  I don't know if it was the
15  phone book or wherever, but in actuality were not
16  registered members.  That was the assumption for the
17  fraudulence.
18      Q     (BY MR. LEVINSTEIN)  So you knew for sure
19  that applications came in for people to be members of
20  the USTU with proper payment?
21      A     Yes.
22      Q     And it was later learned that the names on
23  those applications were people who had no idea that
24  they were becoming members of the USTU?
25          MR. JONES:  Objection; calls for

1  speculation, lacks foundation, argumentative.
2      A     I don't know that that's the case, but
3  there were definitely -- I don't know if they knew
4  whether they were becoming members, but there were
5  signatures that were deemed to be fraudulent.
6      Q     (BY MR. LEVINSTEIN)  And by increasing the
7  number of members from your state, it would affect how
8  many delegates could be at the Board of Governors
9  meeting?
10      A     Correct.
11      Q     Were any structural changes of the USTU
12  considered in order to solve this ongoing problem?
13      A     Structural changes?
14          MR. JONES:  Objection; vague.
15      A     I don't think that caused structural
16  changes to be considered.  I do know for a fact that
17  other solutions were offered as to how to handle that.
18      Q     (BY MR. LEVINSTEIN)  Let me show you
19  what's been marked as Exhibit 101.
20          MR. LEVINSTEIN:  For the record, its
21  Bates USOC00004 through 00014.
22      Q     (BY MR. LEVINSTEIN)  Have you seen this
23  document before?
24      A     I don't think that I have.
25      Q     Let me represent that it's a cover letter

1  from Josiah Henson dated January 1, 1998, and a letter
2  from Mr. Henson to Dick Schultz, or Richard D. Schultz,
3  who in 1998 was the Executive Director of the USOC, and
4  it's a complaint and exhibits.
5          First, I asked you about Article VIII
6  complaints.
7      A    Yes.
8      Q    I didn't put on the record what that is.
9  What's your understanding of what an Article VIII
10 complaint is?
11     A    Complaints that were filed in accordance
12 with our complaint procedure in the USTU bylaws under
13 Article VIII.
14     Q    Article VIII complaints, when I refer to
15 them, are complaints with the U.S. Olympic Committee
16 under Article VIII of the USOC bylaws.  So let me ask,
17 is there an Article VIII in the USTU bylaws as well?
18     A    We have a provision, as well, for
19 complaint procedure that parallels the USOC.
20     Q    Do you call those Article VIII procedures
21 as well?
22     A    I'm not sure if it's Article VIII or
23 Article IX.
24     Q    Just to help you out, to refresh, Article
25 VIII in the USOC is to categories complaints and

1  challenges.  Article IX in the USOC is athlete or coach
2  complaints about right to compete.
3      A    That's correct.
4      Q    Okay.  So as a member of the board in
5  1998, did you learn whenever an Article VIII complaint
6  was filed against the USTU?
7      A    I don't think we were informed as a matter
8  of course, unless it came up as part of the semi- or
9  annual meeting discussion.
10     Q    If you look at Page 00009, Paragraph 21,
11 this complaint alleges, "The pattern of discrimination
12 against non-Korean taekwondo practitioners extends to
13 the awarding of tournaments.  In Virginia, for example,
14 the Virginia state president refused to let the
15 democracy of his own rules determine who was to host
16 the 1997 Virginia State and Junior Olympic Taekwondo
17 Championships in violation of," and it quotes sections
18 of the USOC Constitution.
19          Were you aware of allegations of
20 discrimination against non-Korean Taekwondo
21 practitioners?
22     A    At 1997?
23     Q    Okay.  1998, when this was filed, were you
24 aware of those kinds of allegations?
25     A    I think I was aware of allegations of

1  discriminations for many years up until and including
2  the time I became the Executive Director.
3      Q    In Paragraph -- I guess this is only --
4  somehow this document, just for the record, appears to
5  only be odd pages.  So I don't know where this came
6  from.  It's from someone's files.  But the pages are
7  numbered 3, 5, 7.  So I'll just represent it's not a
8  complete document.
9          But let's just put it this way:  The
10 allegations of a Korean Mafia, or a Korean-controlled
11 organization, or an organization that favored Korean
12 Americans were nothing new in 2003, correct?
13          MR. JONES:  Objection; lacks foundation.
14     A    Allegations of discrimination, no.
15     Q    (BY MR. LEVINSTEIN)  And the primary
16 allegations of discrimination involving the USTU over
17 the years you have been involved have been
18 discrimination by Korean Americans against non-Korean
19 Americans, correct?
20          MR. JONES:  Objection; speculation, lacks
21 foundation.
22     A    That's quite possible, yes.
23     Q    (BY MR. LEVINSTEIN)  And at the meetings
24 that the Membership and Credentials Committee
25 conducted, a large part of what the members of the USTU

1  came to them to complain -- a large part of what they
2  were complaining about were allegations that Korean
3  Americans controlled the USTU and used their positions
4  on committees or board positions to advantage Korean
5  Americans to the disadvantage of non-Korean Americans?
6          MR. JONES:  Same objection; lacks
7  foundation, calls for speculation.
8      A    That was a part of what was presented at
9  that open forum.
10     Q    (BY MR. LEVINSTEIN)  And Tom Satrom on
11 August 4th and September 5th was writing to you to
12 summarize the allegations that had been received by the
13 Membership and Credentials Committee?
14          MR. JONES:  Objection; calls for
15 speculation, lacks foundation.  This witness doesn't
16 know what Thomas Satrom was doing.
17     A    That's a fair determination after seeing
18 the other things that were presented today.  But at
19 that time, I had no way of knowing that.
20     Q    (BY MR. LEVINSTEIN)  But now that you have
21 seen the volume of communications to the Membership and
22 Credentials Committee that made allegations that Korean
23 Americans were discriminating against non-Korean
24 Americans in ways that damage the sport of Taekwondo,
25 do you now view his communicating those concerns to you

1  as having been in any way insensitive?

2          MR. JONES:  Objection; lacks foundation,

3  calls for speculation, irrelevant.

4      A   I think more than anything, it clarifies

5  the confusion as to what was meant when those

6  statements kept coming up in the presentations.  By

7  seeing them in context from various sources, it adds

8  context to that.

9          As far as racial insensitivity, I'm still not

10  sure that that's not racially insensitive, because,

11  again, out of 34,000 members, we may have had 80 people

12  present at that open forum expressing their discontent.

13  And we didn't hear from those that had positive things

14  to offer.

15      Q   (BY MR. LEVINSTEIN)  But as you have said,

16  you thought he had an obligation to summarize what he

17  heard and to communicate it to you in writing so you

18  could prepare for that September 13th meeting?

19      A   Certainly.

20          MR. JONES:  That misstates the testimony.

21  It's not summarizing anything.

22      A   Oh, I felt it was helpful to me for him to

23  let us know the complaints that he was receiving so we

24  would know what to address, how to address it.

25      Q   (BY MR. LEVINSTEIN)  And was there any way

1  the best way to handle it?

2      A   Correct.

3          MR. LEVINSTEIN:  Give me one minute,

4  please.

5      Q   (BY MR. LEVINSTEIN)  And you met with the

6  Membership and Credentials Committee three occasions?

7      A   As I recall, yes.

8      Q   And there was nothing that they did or

9  said at any of those meetings when you were present

10  that you in any way found to be racist or improper, did

11  they?

12      A   The only thing that might have bordered on

13  improper was the anger that was shown by the chair at

14  one of the meetings, and that was commented on

15  somewhere else in a document.

16      Q   But it wasn't any improper racial anger;

17  it was that he showed hostility at all of the

18  allegations that were being made toward the USTU?

19          MR. JONES:  Objection; argumentative,

20  lacks foundation.

21      A   I took the anger to be directed at the

22  organization and those that were running it, which,

23  again, is predominantly, as you've established, Korean

24  Americans.

25          And I found that, again, from my limited

1  for him to tell you what these people said without

2  including in his communication what these people said?

3          MR. JONES:  Counsel, how about just

4  forwarding the communications?

5      A   I was going to say it would have been more

6  helpful if we had what he had to make his summarized

7  comments about for our review, and we didn't.  I

8  didn't.  I don't know if it was received elsewhere.

9      Q   (BY MR. LEVINSTEIN)  But would it have

10  been racially insensitive to send on to you

11  communications that included those same statements?

12      A   Not racially insensitive to send them on,

13  if he is passing on the concerns of our constituents.

14      Q   But didn't you understand that one of the

15  things the Membership and Credentials Committee had

16  done was give some assurances of confidentiality of the

17  source in order to make sure that people felt free to

18  come forward without fear of retribution or adverse

19  consequences?

20      A   I understood that, but I think the better

21  thing would have been to have a two-way street because

22  we were always left responding instead of being

23  proactive, and to have had something else that needed

24  responding to -- it was just an awkward situation.

25      Q   And reasonable people could differ about

1  corporate background, other than the U.S. Army, to be

2  not the most professional way of dealing with it.  Even

3  if you're angry, I felt it could have been channeled

4  differently at a public meeting or a local meeting.

5      Q   (BY MR. LEVINSTEIN)  Now that you have

6  seen some of the extreme statements made to this

7  committee by WTF officials, PATU officials, state

8  presidents, and many others, does that give you a

9  little context of the record that the Membership and

10  Credentials Committee was viewing that may have caused

11  them to be a bit angry?

12          MR. JONES:  Objection; calls for

13  speculation, irrelevant.

14      A   I can understand them being frustrated.  I

15  can understand anger developing.  What I don't

16  understand is the expression of it at a hearing

17  setting.

18          MR. LEVINSTEIN:  One minute.  Your

19  witness.

20          MR. JONES:  Take a break?

21          MR. LEVINSTEIN:  Wait one second.  Go

22  ahead.  We can take a break.

23          (Recess taken from 4:11 p.m. to 4:28 p.m.)

24          (Whereupon, the deposition proceedings

25          reconvened without the presence of

1     Mr. Johansen.)

2     MR. JONES:  Back on the record.

3          E X A M I N A T I O N

4     BY MR. JONES:

5     Q    Mr. Harris, during cross-examination, you

6     were asked about the United States Taekwondo Center,

7     Inc., franchise?

8     A    Yes.

9     Q    Or so-called franchise?

10    A    Yes.

11    Q    Owned by Sang Lee?

12    A    Yes.

13    Q    You don't know for a fact that any other

14    schools bearing that name in other locations of the

15    country receive any franchise fees or any other sort of

16    remuneration from Sang Lee's company, do you?

17    A    No, I don't.

18    Q    Now, when you were asked about your

19    understanding of the former, shall I say, the

20    management group that preceded Sang Lee, you, I

21    believe, listed his name as Dong Ja Yang?

22    A    He was prior to Sang Lee, but not

23    immediately prior to.

24    Q    After him, who was the next president of

25    the USTU?

1     A    To my recollection, the first was Ken Min,

2     then Dong Ja Yang, then Kyung Won Ahn, then Hwa Chong.

3     And I may have these out of order.  I'm missing

4     someone.  There was one more, and then Sang Lee.  Who

5     am I missing?

6     Q    I believe you said that when Mr. Dong Ja

7     Yang was in control of things, that there were fewer

8     membership complaints; is that true?

9     A    That I was aware of, yes.

10    Q    Do you know why that was?

11    A    I attribute that personally to his style

12    of leadership.  I don't know that it was run any

13    differently in the background, but his leadership style

14    was such that it didn't endure much criticism.  He

15    leaned heavily on the religious aspect of leadership.

16    It was just a different style of leadership.

17    Q    Do you think when Sang Lee came to the

18    position that there were more factions within the

19    Taekwondo community struggling for recognition?

20         (Whereupon, Mr. Johansen rejoined the

21         deposition proceedings.)

22    A    Definitely.  If I could draw an analogy to

23    a family where the children become of age and all of

24    them want the car, and there's one car to be had.

25         Earlier, when Dong Ja Yang was president, he

1     was the father figure, the kids were the kids.  After

2     he left, the kids assumed the mantel of wanting the

3     car, and it was more contentious.

4     Q    (BY MR. JONES)  And did that struggle for

5     recognition by these various factions continue

6     throughout the time that you were with USTU?

7     A    It's continued, to my way of seeing it,

8     ever since Dong Ja Yang left office.

9     Q    And were these factions the source of some

10    of the criticisms that you had to respond to when the

11    USOC started talking about decertification, talking

12    about noncompliance with USOC bylaws?

13         MR. LEVINSTEIN:  Objection.

14    A    To my understanding, yes, they were

15    definitely sect-based.

16    Q    (BY MR. JONES)  So there were groups with

17    other agendas besides the best interest of athletes?

18         MR. LEVINSTEIN:  Objection.

19    A    That was the appearance from the way they

20    comported themselves.

21    Q    (BY MR. JONES)  You also touched on the

22    opinion or impression that in some of the semiannual

23    and annual meetings that took place, that motions or

24    items for consideration that were coming up seemed to

25    have already been discussed and decided upon?

1     A    Yes.

2     Q    Something to that effect?

3     A    Something to that effect, yes.

4     Q    Do you think that is a good thing or a bad

5     thing when you have a board as large as the one at

6     USTU?

7         MR. LEVINSTEIN:  Objection.

8     A    I think it's a positive management tool

9     for the administration.  I think for the members, it's

10    a negative because you don't get a chance to give

11    input.

12    Q    (BY MR. JONES)  But you would agree with

13    me that if you have 127 directors discussing points in

14    a given meeting with the idea of trying to resolve it

15    and vote on it within that one meeting would be a

16    burdensome and unruly objective?

17    A    I agree.

18    Q    It wouldn't even be realistic, would it?

19    A    Unless the agenda is only three items or

20    so.

21    Q    In fact, in modern corporate America,

22    people do their influence pedaling and politicking and

23    lobbying behind the scenes right up to the minutes

24    before the meeting before they go in there to have a

25    decision made; isn't that true?

**Page 352**

1    MR. LEVINSTEIN:  Objection.  No
2  foundation that he knows about corporate America, the
3  size of boards, any of those issues.
4    Q    (BY MR. JONES)  In fact, our own Congress
5  operates that way, doesn't it?
6    A    That's been my observation.
7    Q    You talked about the relationship you had
8  with both the auditing department and the Sports
9  Partnership department --
10    A    Yes.
11    Q    -- when you, I guess, first came on in
12  late 2002?
13    A    Yes.
14    Q    And you had an impression that things --
15  the relations were handled differently before you by
16  your predecessor, Mr. Warwick; is that true?
17    MR. LEVINSTEIN:  Objection.
18    A    I don't understand the question.
19    Q    (BY MR. JONES)  You had informal meetings
20  with Ms. Witte regarding resolving issues with her in
21  the accounting area?
22    A    I had informal talks to ask for her help
23  with our situation, yes.
24    Q    Did she ever talk about how things were
25  handled under Mr. Warwick's management?

**Page 353**

1    A    No, she didn't.
2    Q    Did you get the impression that the same
3  sorts of problems existed under Mr. Warwick's
4  management in the accounting arena?
5    A    I got that impression because, again, the
6  first Membership and Credentials compliance meeting
7  that I went to, it was expressed that these problems
8  have existed and here we are again.  So from that, I
9  figured that this type of problem or situation had been
10  around.
11    Q    You told us this morning that
12  notwithstanding the list of accounting issues and other
13  issues brought up by Mr. Satrom in his two letters,
14  August and September 2003, that you, given time, could
15  fix all of those issues?  Do you recall testifying to
16  that this morning?
17    A    Yes, that was my belief.  Even to this
18  point, I hold that given time, it could have been fixed
19  with the people that we had in place.  I had a year
20  before it was yanked and said you guys aren't getting
21  it done.
22    Q    And during that time, you attempted to
23  address every single item listed; is that true?
24    A    Correct.
25    Q    And as far as the annual budget, you

**Page 354**

1  testified this morning that you were expected to break
2  even by year end 2003; is that correct?
3    A    That was the expectation.
4    Q    However, the long-term debt would not be
5  taken care of by end of 2003; isn't that correct?
6    A    Correct.
7    Q    So when you spoke of being given time to
8  resolve that, is that what you were talking about, the
9  long-term debt situation?
10    MR. LEVINSTEIN:  Objection.
11    A    No.  My discussion was for resolving all
12  of the issues that had been presented to us, including
13  the financial issues.
14    Q    (BY MR. JONES)  Do you feel you were given
15  adequate time to address those issues by the USOC?
16    A    I didn't think one year was long enough to
17  cover all of the issues that were facing me when I came
18  on.
19    Q    Do you feel they rushed the
20  decertification proceedings?
21    MR. LEVINSTEIN:  Objection.
22    A    In looking at the big picture, I
23  understand that the situation had existed for years.
24  But from when I came onboard, I think that it was at
25  the end of the line for them as far as patience.  So

**Page 355**

1  there was a sense of being rushed because of the years
2  that this had persisted.
3    Q    (BY MR. JONES)  But isn't it correct that
4  the first letters received in 2003 were August and
5  September?
6    MR. LEVINSTEIN:  Objection.
7    A    I'm not certain that that's true because
8  there were communications about the May meeting, and
9  there was a follow-up to the September 2002 meeting
10  that I attended.
11    Q    (BY MR. JONES)  But there were no threats
12  of decertification until August and September of 2003;
13  isn't that true?
14    MR. LEVINSTEIN:  Objection.
15    Q    (BY MR. JONES)  I'm talking about written
16  threats.
17    MR. LEVINSTEIN:  Objection.
18    A    I think the caveat always existed that if
19  we didn't satisfy the compliance issues, we would be
20  found in a noncompliance status, risking the NGB
21  status.  I think that was always a part of appearing
22  before the Membership and Credentials board.
23    Q    (BY MR. JONES)  During much of the
24  cross-examination today you were asked to look at a
25  number of e-mails, letters, articles from various

1  persons who alleged impropriety by USTU during
2  different periods of time; isn't that true?
3      A    Yes.
4      Q    LadyTKD and people like that?
5          MR. LEVINSTEIN:  Objection; nothing from
6  LadyTKD.  Something from the website that she ran,
7  but . . .
8      Q    (BY MR. JONES)  However, those various
9  documents that you looked at today were not forwarded
10 to you during 2003, were they?
11     A    No, they weren't.
12     Q    In fact, none of them were?
13     A    No.  You're correct.  None of them were.
14     Q    And you asked for those communications,
15 didn't you?
16     A    From the May open forum, yes.  I don't
17 know if those communications all came after that or
18 whenever, but I did ask for --
19     Q    You asked for the communications?
20     A    Right, the book that was presented at the
21 May meeting.
22     Q    And instead of getting the actual
23 communications and the authors of those communications,
24 you were given these letters in August and September
25 from Mr. Satrom?

1      Q    (BY MR. JONES)  You were deprived of due
2  process?
3          MR. LEVINSTEIN:  Objection.
4      Q    (BY MR. JONES)  To the extent you
5  understand what due process means?
6          MR. LEVINSTEIN:  Objection.
7      A    I don't know how to answer that one.
8      Q    (BY MR. JONES)  A lot of time spent on
9  cross-examination regarding the Kukkiwon certification
10 system.
11     A    Yes.
12     Q    A lot of criticism apparently for the USTU
13 not putting into effect a USTU certification that would
14 draw in more of those dollars to the U.S. athletes
15 instead of part of it being shared with Korea.  Is that
16 true?
17     A    That's true.
18     Q    New management is in place at U.S.
19 Taekwondo as of February of 2004; is that true?
20     A    I'm not sure of the date, but yes.
21     Q    Something like that?
22     A    Right.
23     Q    So they've had a year or so to do what
24 they're going to do?
25          MR. LEVINSTEIN:  Objection.

1      A    Correct.
2      Q    And these letters took pieces from some of
3  these communications and stuck them together and put
4  them in the form of items that you had to respond to or
5  suffer decertification?
6          MR. LEVINSTEIN:  Objection.
7      A    That's -- I think that's a fair
8  assessment.
9      Q    (BY MR. JONES)  So when you got these
10 letters from Mr. Satrom, you were of the impression
11 that he was assuming those allegations to be true?
12          MR. LEVINSTEIN:  Objection.
13     Q    (BY MR. JONES)  And then the burden was on
14 you to respond to them?
15          MR. LEVINSTEIN:  Objection; compound
16 question.
17     A    Again, I think that's a fair assessment.
18     Q    (BY MR. JONES)  You were not given
19 opportunity to investigate and confront any of those
20 people who wrote in these e-mails and letters before
21 today?
22     A    Correct.
23     Q    You were put on the defensive?
24          MR. LEVINSTEIN:  Objection.
25     A    Yes.

1      Q    (BY MR. JONES)  Is that fair?
2      A    They have been in place for more than a
3  year, yes.
4      Q    Have they done anything with regard to
5  putting in a U.S. certification program for black
6  belts?
7          MR. LEVINSTEIN:  Objection; lack of
8  foundation.
9      Q    (BY MR. JONES)  If you know.
10     A    Not that I know of.  I think that they're
11 still processing Kukkiwon applications, though to a
12 smaller degree.  But I haven't seen a U.S. black belt
13 program instituted.
14     Q    So we have, what, these five people that
15 have got U.S. certification, and that's it?
16     A    That was the last number I was aware of.
17     Q    So what happened to the big revenue
18 generating idea that USOC was apparently so interested
19 in?
20          MR. LEVINSTEIN:  Objection; lack of
21 foundation.
22     A    I can't speak to that.
23     Q    (BY MR. JONES)  Has it fallen by the
24 wayside?
25     A    I can't speak to that.

```
1    Q    You're still a USTU member, are you not?
2    A    A life member.
3    Q    So you still keep your -- you take some
4    interest in trying to follow what's going on with it?
5    A    Definitely.
6    Q    A couple of these people that wrote in
7    these complaints or e-mailed them in or sent them into
8    the USOC in September of 2003, you testified you
9    personally knew?
10   A    Yes.
11        (Whereupon, Mr. Johansen left the
12        deposition proceedings.)
13   Q    (BY MR. JONES)  Did any of them have kids
14   that didn't get into the athletic programs at USOC
15   (sic), didn't make finals?
16        MR. LEVINSTEIN:  Objection.  I think you
17   misspoke.
18   A    Instead of USOC --
19   Q    (BY MR. JONES)  Pardon me.  USTU.  I'm
20   sorry.
21        MR. LEVINSTEIN:  Objection anyways.  But
22   that in particular was completely wrong.
23        (Whereupon, Mr. Braunstein left the
24        deposition proceedings.)
25   A    In reviewing the members that I knew, or
```

```
1    me ask you, do you know -- you said you know Guy Poos?
2    A    Yes.
3    Q    Who is he?
4    A    He's from Oklahoma.  He has Poos
5    Taekwondo.  He was also on a couple of committees
6    within USTU.  He holds an annual event.  His children
7    are competitors with USTU, or have been.  Now they're
8    on various positions, such as tournament committees,
9    coaching, et cetera.
10   Q    Did they try out for the U.S. Team?
11   A    Yes.
12   Q    Did they make it?
13   A    Not the national team.  I think maybe some
14   other form of a team, but not the national team.
15   Q    Could Mr. Poos' criticisms of USTU be
16   motivated by sour grapes because his kids didn't make
17   it to the team as well?
18        MR. LEVINSTEIN:  Objection.
19   A    Again, I can't speak to what motivated
20   him, but, I mean, that could be a possibility.
21   Q    (BY MR. JONES)  And you can't see into the
22   minds of any of these people who wrote in these
23   letters; isn't that true?  You are not a mind reader?
24   A    Not for pay anymore.  No.
25   Q    And you don't know whether these
```

```
1    know, there was Larry Cain, Voorhees, Guy Poos, oh,
2    Bob -- what was his last name -- from Colorado here
3    whose children are very active and had been trying to
4    make the team and didn't always make it.  See, now
5    Gambardella is stuck in my head.  But his name was
6    Gallagher.
7    Q    (BY MR. JONES)  Okay.
8    A    Bob Gallagher.  His children would be the
9    ones that I would think that fit that scenario where,
10   for years, they tried to make the team and didn't.
11   Q    Parents are particularly motivated to see
12   their children do well?
13   A    I would agree with that.
14        MR. LEVINSTEIN:  Objection.  Are you
15   testifying or asking a question?
16   A    I would agree with that.  I'm a parent.
17   Q    (BY MR. JONES)  And when your children
18   don't do well, isn't there a tendency to sometimes
19   blame?
20        MR. LEVINSTEIN:  Objection.
21   A    I don't know about all parents, but I
22   think that's human nature to always see the best in
23   whatever your child does, and if it doesn't turn out
24   that way, look first for other reasons.
25   Q    (BY MR. JONES)  Is it possible that -- let
```

```
1    criticisms are -- what the motivations of these
2    criticisms are that people write in?
3    A    I cannot speak to a certainty to anyone's
4    motivation, though some, by knowing them for years and
5    stances they've taken in the past, seem more
6    transparent than others, if that's a fair assessment.
7    Q    Do you know whether USOC did any
8    investigation into these e-mails and letters that came
9    in prior to incorporating it into the letter
10   threatening decertification of the USTU?
11        MR. LEVINSTEIN:  Objection.
12   A    I have no way of knowing.
13   Q    (BY MR. JONES)  Would the time frame
14   involved between the receipt of these letters and the
15   timing of the letters going out from Satrom to USTU
16   suggest that a very short time elapsed?
17        MR. LEVINSTEIN:  Objection.
18   A    Yes.  That's a fair assessment, I think.
19        (Whereupon, Mr. Braunstein rejoined the
20        deposition proceedings.)
21   Q    (BY MR. JONES)  One of the complaints
22   brought to your attention was from Mr. Kim Sol?
23   A    Yes.
24   Q    Who was he again?
25   A    The state president of Montana, USTU state
```

1  president.

2       Q    Was he the chief architect of the U.S. Dan

3  program that you spoke of or described?

4       A    Yes, he was, as I mentioned yesterday I

5  think it was.

6       Q    When it became clear that the U.S. Dan

7  system was not proceeding by USTU management, could it

8  have been that he wrote in a complaint letter because

9  of disappointment that his Dan program was not in

10  place?

11            MR. LEVINSTEIN:  Objection.

12       A    Again, I can't speak to his motivation,

13  but that's a possibility.

14       Q    (BY MR. JONES)  In the hierarchy of

15  executive officers with the USTU, who had more

16  authority, the president or Executive Director?

17       A    Let me try to understand the question.

18  Authority as far as running the office, running the

19  organization?

20       Q    Running the organization.

21       A    The president.

22            (Whereupon, Mr. Braunstein left the

23            deposition proceedings.)

24       Q    (BY MR. JONES)  Did you have any idea of

25  where that authority came from?  Is it written in the

1  NGB?

2       A    To my understanding, yes.

3       Q    And when was the first time that USOC made

4  sounds that they wanted to decrease the power of the

5  president in USTU, to your knowledge?

6       A    To my knowledge, once the USOC itself was

7  dealing with shrinking the size of its board, then

8  other NGBs became not a target so much as under that

9  same purview and scope.

10       Q    So you're telling us that the USOC had the

11  same problem?

12            MR. LEVINSTEIN:  Objection.

13       Q    (BY MR. JONES)  Same structural problems

14  that it was criticizing USTU for?

15            MR. LEVINSTEIN:  Objection.

16       A    I can speak to the fact that the USOC's

17  structure was brought up as an issue that needed to be

18  addressed, just as the USTU's structure was brought up

19  by USOC as an issue to be addressed.

20       Q    (BY MR. JONES)  Had USOC already shrunken

21  down its board to comply with some of these new federal

22  laws that counsel was throwing at you as of the time it

23  was bringing action against USTU, if you know?

24            (Whereupon, Mr. Uesugi rejoined the

25            deposition proceedings.)

1  bylaws, for example?

2            MR. LEVINSTEIN:  Objection.

3       A    Basically, yes, but bylaws are subject to

4  interpretation of course.

5       Q    (BY MR. JONES)  There's been, through

6  questioning, a lot of criticism levied at the president

7  with respect to the scope of his power under those

8  bylaws today, hasn't there?

9       A    Yes.

10            (Whereupon, Mr. Johansen rejoined the

11            deposition proceedings.)

12       Q    (BY MR. JONES)  But the bylaws say what

13  they say; is that true?

14       A    Correct.

15       Q    And isn't it also true that the USOC

16  approved those bylaws?

17       A    Correct.

18       Q    In fact, they have approved them over and

19  over through the years up until 2003?

20            MR. LEVINSTEIN:  Objection.

21       A    Correct.

22            (Whereupon, Mr. Uesugi left the

23            deposition proceedings.)

24       Q    (BY MR. JONES)  And, in fact, those bylaws

25  were reviewed at the time USTU became an Olympic-rated

1       A    To my recollection, it was in the process

2  of doing that.  But the actual restructuring of the

3  board and seating the new board had just recently took

4  place, which was after our compliance issues were

5  raised.

6       Q    (BY MR. JONES)  So that was a bit of the

7  pot calling the kettle black?

8            MR. LEVINSTEIN:  Objection.

9       Q    (BY MR. JONES)  They had the same problem,

10  but yet they're trying to force you -- cure the same

11  problem?

12            MR. LEVINSTEIN:  Objection.

13       A    I can see the similarities, yes.

14       Q    (BY MR. JONES)  And they hadn't even

15  cleaned their own house yet?

16            MR. LEVINSTEIN:  Objection.

17       A    I can understand the similarity there.

18       Q    (BY MR. JONES)  And worse, they were

19  limiting the time in which you had to comply?

20       A    I wasn't given a time limit, per se, but

21  with approximately a year on the job, it was determined

22  that that's long enough, you guys haven't complied.

23       Q    The time limit was determined by the date

24  of the decertification hearing, wasn't it?

25       A    I think our last -- the last letter that I

1  saw, the September letter stated that we had until
2  September 13th to respond, I think, finally.
3      Q    But once the decertification action was
4  filed, you had a clear deadline?
5      A    Yes.
6      Q    And when was that?
7      A    I think decertification was filed after I
8  had left.  So the start of January '04, I think I
9  remember seeing.
10             MR. JONES:  Can we just have a minute?
11             MR. LEVINSTEIN:  Sure.
12             (Discussion off the record.)
13      Q    (BY MR. JONES)  Just one final question.
14  Do you know if there was a rush by the USOC to
15  decertify USTU because of the Quadrennium ending in
16  early 2004?
17             MR. LEVINSTEIN:  Objection.
18      A    I don't have a basis for knowing that that
19  was the cause for the perceived rush or not.  I don't
20  know.
21      Q    (BY MR. JONES)  You don't know if
22  Mr. Satrom would be losing his position?
23             MR. LEVINSTEIN:  Objection.
24      A    I know that there was talk of all
25  committees being changed along with the new

1  restructuring of USOC, but I don't know if that
2  affected our situation or not.  There was also a
3  discussion that even if the structure was drastically
4  changed, some committees would stay on to handle
5  existing matters, so I don't know.
6      Q    (BY MR. JONES)  Thank you.  I don't have
7  any further questions.
8             MR. LEVINSTEIN:  A few quick ones.
9             E X A M I N A T I O N
10  BY MR. LEVINSTEIN:
11      Q    Sang Lee hired you?
12      A    Indirectly.  Again, I came on as Events
13  Director, which was under the hiring authority of the
14  Executive Director then, Jay Warwick.
15      Q    Were you aware that Mr. Sang Lee told
16  Mr. Warwick to hire you as the Events Director?
17      A    No, I was not aware of that.
18      Q    Were you aware that Sang Lee terminated
19  Mr. Warwick?
20      A    No.
21      Q    You didn't know that?
22      A    I didn't know how he was terminated.  That
23  was a source of discussion at my very first meeting,
24  did I understand the procedures in which Mr. Warwick
25  was eliminated and I was replacing him.  I don't.

1      Q    But that was discussed at your first
2  meeting?
3      A    By the Membership and Credentials
4  Committee.
5      Q    I see.  I thought your first meeting at
6  the USTU.
7      A    No.  That was one of the first questions
8  the committee asked me.
9      Q    You weren't aware that Mr. Warwick was
10  terminated as a result of a deal between the secretary
11  general and the president?
12      A    No, sir.
13      Q    It wasn't your understanding that USOC
14  approved your bylaws as they were changed, was it?
15      A    It was my understanding that when we did
16  change the bylaws, they had to be reviewed by the USOC
17  to make sure they were still in compliance somehow.
18      Q    Well, for example, when you eliminated
19  term limits, did you first have to check with the USOC
20  to see if that was in compliance before the president's
21  term limits were eliminated?
22      A    No, no.
23      Q    And the changes in the USOC's bylaws had
24  already been published in the summer of 2003?
25      A    I don't know what changes you're referring

1  to.
2      Q    Well, in October of 2003, are you aware
3  that at the USOC board meeting, all of the USOC bylaws
4  were completely changed to a completely new governance
5  structure?
6      A    Yes.
7      Q    That's the meeting you talked about --
8      A    Yes.
9      Q    -- that Mr. Sang Lee voted in favor of
10  that?
11      A    Yes.
12      Q    And as far as comparing the USOC situation
13  to the USTU's, there was never any suggestion that the
14  recordkeeping or financial situation of the USOC was
15  anything approaching that of the USTU, was there?
16      A    Correct.  I understood his reference to be
17  the structure changes paralleling each other.
18      Q    Well, you understood it to be, I think,
19  simply that having a large board was a similar issue?
20      A    Right.
21      Q    And did you understand that if the USTU
22  wanted, they had the complete right to go to an
23  Executive Committee hearing and present their case that
24  they wanted more time and that they shouldn't be
25  decertified?

1     MR. JONES:  Objection; calls for
2  speculation, calls for a legal conclusion.
3     A     That wasn't my understanding, based on,
4  again, the letters that we had received that said if
5  you're not found in compliance by such and such a date,
6  this would happen.  I wasn't aware of the executive
7  review possibility.
8     Q     (BY MR. LEVINSTEIN)  You didn't understand
9  that the Membership and Credentials Committee had
10  absolutely no power to decertify you?
11     A     It was my understanding that once the
12  Membership and Credentials Committee came up with that
13  recommendation to decertify, the end was near.
14     Q     Well, did you understand -- did you ever
15  look at the USOC bylaws or have anyone explain to you
16  how the decertification process worked?
17     A     We did have an explanation of the
18  decertification process.  I'm trying to remember who
19  did that for us.
20     Q     Didn't you know that the process was the
21  Membership and Credentials Committee recommended to the
22  USOC board, if the USOC board saw a problem they would
23  charter the Executive Committee to have a de novo
24  hearing on the issue, the issue would be presented to
25  the Executive Committee, the Executive Committee would

1  then make a recommendation to the board, and unless the
2  Executive Committee recommended decertification and the
3  board approved it, the USTU would not be decertified?
4     MR. JONES:  Objection; asked and
5  answered, calls for a legal conclusion, calls for
6  speculation.
7     A     What I do recall is that the way I
8  understood the process, once the Membership and
9  Credentials Committee came up with a recommendation to
10  decertify, that would go before a vote of USOC -- not
11  the Board of Governors, but whatever group would be the
12  group to approve that or say no, we don't agree with
13  it.  That was my understanding.
14     Q     (BY MR. LEVINSTEIN)  Okay.  You identified
15  all the presidents of the USTU and its history that you
16  can remember?
17     A     I think I did.  I might have left one out.
18     Q     You named all the ones you can remember?
19     A     Yes.
20     Q     And how many of those presidents were
21  Korean Americans?
22     A     All that I named.
23     Q     And was there a WTF rule -- strike that.
24  I'm done.  No questions.
25     MR. JONES:  Just, I think, one.

1     E X A M I N A T I O N
2  BY MR. JONES:
3     Q     USOC approved USTU's bylaws in 1997?
4     MR. LEVINSTEIN:  Objection; calls for a
5  legal conclusion.
6     A     I believe that to be true because it's on
7  the written document on the front.
8     Q     (BY MR. JONES)  A stamp or a signature or
9  something?
10     A     Right, saying that it was approved then.
11     Q     And --
12     MR. LEVINSTEIN:  The bylaws or --
13     THE DEPONENT:  Our bylaws.
14     MR. LEVINSTEIN:  -- the selection
15  criteria?
16     MR. JONES:  Bylaws.
17     THE DEPONENT:  Our bylaws.
18     Q     (BY MR. JONES)  We were talking about all
19  this structuring business and pressure by USOC to
20  change the structure.
21     MR. LEVINSTEIN:  Objection; move to
22  strike.  Not a question.
23     Q     (BY MR. JONES)  The USOC -- you just said
24  the USOC approved the USTU bylaws in 1997 because there
25  was something written on the bylaws; is that correct?

1     A     Right.  There's a date on the cover page
2  of the bylaws that says the date they were approved and
3  reviewed.
4     Q     And were the bylaws that you were working
5  with for USTU in 2003 substantially similar to the '97
6  bylaws?
7     A     As far as I know, yes.
8     Q     Thank you.
9     MR. LEVINSTEIN:  You're done.
10     (The deposition concluded at 5:11 p.m.)

```
 1                    A F F I D A V I T

 2    STATE OF COLORADO       )

                              ) ss.

 3    COUNTY OF               )

 4          I have read my deposition, and the same is

 5    true and accurate, save and except for changes and/or

 6    corrections, if any, as indicated by me on the

 7    amendment sheet(s) attached hereto as indicated.

 8

 9    Amendment sheet(s) attached [  ]

10    No changes; no amendment sheet attached [  ]

11

12
       _____

13          BRUCE C.K.W. HARRIS, VOLUME II

14

15          SUBSCRIBED AND SWORN TO before me on this

16    _____ day of _____, 2005.

17    My commission expires:  _____

18

19            _____

                    NOTARY PUBLIC

20
          in and for the State of _____

21

22

23

24

25
```

```
 1                  C E R T I F I C A T E

 2
      STATE OF COLORADO  )

 3                        ) ss.
      COUNTY OF DENVER   )

 4

 5
             I, VALORIE S. MUELLER, Registered

 6    Professional Reporter and Notary Public in and for the
      State of Colorado, duly appointed to take the

 7    deposition of BRUCE C.K.W. HARRIS, VOLUME II, certify
      that prior to the examination the deponent was duly

 8    sworn to testify to the truth in the matters in
      controversy between the parties herein; that the

 9    deposition was taken in shorthand by me at the time and
      place aforesaid and was thereafter reduced to

10    typewritten form by me and processed under my
      supervision, the same consisting of 312 pages, and that

11    the same is a full, true and complete transcription of
      my shorthand notes.  I further certify that I am not

12    related to, employed by, or counsel to any of the
      parties herein, or otherwise interested in the events

13    of the within cause.

14
             A transcript review of this deposition was

15    requested and is available to the deponent as notified
      by me.

16

17           IN WITNESS WHEREOF, I have affixed my notarial
      seal this 25th day of April, 2005.  My commission

18    expires December 11, 2006.

19            _____

20                  VALORIE S. MUELLER
                Registered Professional Reporter

21

22

23

24

25
```