# Exhibit B

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DAE SUNG LEE,                    :
                                 :
          Plaintiff,             :
                                 :
vs.                              : NO. CV 04 00461 SOM TEK
                                 :
UNITED STATES TAE KWON DO        :
UNION, a Colorado nonprofit      :
corporation, UNITED STATES       :
OLYMPIC COMMITTEE, a             :
federally chartered nonprofit    :
corporation, JOHN DOES 1-10,     :
JANE DOES 1-10, DOE              :
PARTNERSHIPS 1-10, DOE           :
CORPORATIONS 1-10,               :
                                 :
          Defendants.            :

VIDEOTAPED DEPOSITION OF JOHN SEIBER
Knoxville, Tennessee
Tuesday, February 28, 2006

## Page 2

APPEARANCES:

      FOR THE PLAINTIFF:
            Michael Green, Esquire
            Glenn H. Uesugi, Esquire
            345 Queen Street
            2nd Floor
            Honolulu, Hawaii 96813

      FOR THE DEFENDANTS:
            Robert L. Moore, Esquire
            Williams & Connolly LLP
            725 Twelfth Street N.W.
            Washington, D. C. 20005

## Page 3

I N D E X
_ _ _ _

                                              Page No.

Direct Examination,
    by Mr. Moore -------------------- 5
Cross-Examination,
    by Mr. Green -------------------- 17
Redirect Examination,
    by Mr. Moore -------------------- 56

## Page 4

The Deposition of John Seiber, called as a witness at the instance of the Defendants, for use in evidence, taken by agreement on the 28th day of February, 2006, at the offices of Club LeConte, Knoxville, Tennessee, before Danny C. Fuston, Court Reporter and Notary Public, pursuant to the stipulation of counsel.

S T I P U L A T I O N
_ _ _ _ _ _ _ _ _ _ _

It being agreed that Danny C. Fuston, Court Reporter and Notary Public, may swear the witness, report this deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

                    DIRECT EXAMINATION
BY MR. MOORE:
    Q.    Please state your name and address for
the record.
    A.    My name is John Seiber. My address is
308 Hagaman Lane, Andersonville, Tennessee, 37705.
    Q.    Mr. Seiber, are you married?
    A.    Yes.
    Q.    What's your wife's name?
    A.    Lois.
    Q.    Have long you been married?
          MR. GREEN: Will you speak a little
    louder, please?
          THE WITNESS: Yes, sir. Twenty-five
      and a half years.
BY MR. MOORE:
    Q.    And do you have any children?
    A.    Four.
    Q.    Would you please give me their names
and ages?
    A.    John is 23, Cheryl is 22, Stacy is 20,
and then the one the doctor said we couldn't have just
turned five.
    Q.    Mr. Seiber, have you ever studied Tae
Kwon Do?

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

    A.    Yes.
    Q.    How long have you studied Tae Kwon Do?
    A.    Thirty years.
    Q.    Did you achieve any rank or belt?
    A.    I'm currently a fifth degree black
belt, and I'm an international referee through the
World Tae Kwon Do Federation.
    Q.    And have you ever taught Tae Kwon Do?
    A.    Yes.
    Q.    How long have you taught Tae Kwon Do?
    A.    I taught for my instructor some in the
'80s in Kenosha, Wisconsin. I had a school for about
ten years in northern Illinois. And I have had one
down here for a couple of years.
    Q.    What was the name of the school in
northern Illinois?
    A.    US Tae Kwon Do Academy.
    Q.    Did you own that school?
    A.    Yes.
    Q.    And you also taught at that school?
    A.    Yes.
    Q.    For approximately how many years?
    A.    Roughly ten, maybe a little more.
    Q.    And did you say you currently own a
different Tae Kwon school?

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

    A.    Yes.
    Q.    And what is the name of that school?
    A.    Same name, only down here in Tennessee,
US Tae Kwon Do Academy.
    Q.    Approximately how long have you owned
and operated that school?
    A.    The new building that I built we have
been in for a year next month. And we were doing it
part-time in a health club prior to that. And then
when the students grew at a great enough rate, we
built our own building and bought our own land and so
on.
    Q.    Approximately how many students do you
have?
    A.    I would say approximately 90 at this
time.
    Q.    Are you the only teacher there, or are
there additional teachers?
    A.    I have my son who helps me, and another
young man named Tim Walker who is a Knoxville police
officer, but he also helps out on the weekends.
    Q.    I believe you also stated that you are
an international referee?
    A.    That's correct.
    Q.    And what types of events do you

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

referee?
    A.    Anything that would not be considered
US. In other words different world championships or
things that would be sanctioned through the WTF or
international events like the Mexico Open, Canadian
Open. Last year, the last couple of years I have done
like the Aruba Open, Canada Open. I did the Pan
American Championships down in the Dominican republic.
I did the World Tae Kwon Do Festival in Seoul, Korea,
a couple of years ago. Back in '97 I did the World
Championships in Hong Kong, China, and things like
that.
    Q.    And for approximately how many years
have you been a referee?
    A.    I have been a referee for probably at
least 20, but an international referee since 1993.
    Q.    When you say international referee, do
you also currently do events in the United States, or
only international events?
    A.    Yes, I do stuff in the United States as
well.
    Q.    And what kind of events in the United
States do you referee?
    A.    Everything, our junior Olympics
regional type stuff, our national senior

```
 1  championships, US team trials and things like that.
 2     Q.    Mr. Seiber, do you know Mary Brunner?
 3     A.    Yes.
 4     Q.    And how do you know her?
 5     A.    I met Mary in the early '90s, probably
 6  around '93 I would say.  We did the junior Olympics
 7  together when they were in Chicago, Illinois, at the
 8  Rosemont Horizon.  Her instructor and my instructor
 9  were good friends.  I was asked back at that time to
10  be part of the organizing committee for that event
11  when Chicago won the right to host it.  I was the
12  event chairman for that, which basically meant that my
13  responsibilities were to work with the organizing
14  committee from USTU at that time in pulling off the
15  event, everything from security to airport
16  transportation to the actual running of the event
17  itself to awards.  Mary at that time I think was
18  responsible for most of the financial matters for her
19  instructor, Ki Hong Kim, who was the gentleman who won
20  the right to host that event.  That is when we became
21  friends.  And I already had a school in Antioch,
22  Illinois, and we just kind if hit it off there.
23     Q.    After that event you just described --
24     MR. MOORE:  Excuse me, I didn't hear
25           the last thing he said.
```

9

```
 1           THE WITNESS:  The last thing I said is
 2     Mary --
 3           MR. GREEN:  After I had a school in
 4           Antioch.
 5           THE WITNESS:  Yeah.  I said I had a
 6           school in Antioch, Illinois.  And Mary at
 7           that time had talked to me about different
 8           areas to possibly open a school.  At that
 9           time I suggested McHenry, Illinois.  And we
10           eventually wound up opening up the school
11           together.  That's how I know her.
12  BY MR. MOORE:
13     Q.    And what was the name of the school you
14  opened together?
15     A.    McHenry Tae Kwon Do.
16     Q.    And what year was that?
17     A.    Latter '94 or early '95.  I wouldn't be
18  positive on it.  The Juniors were July of '94, so it
19  was probably, oh, six months to a year later before we
20  actually probably got open.
21     Q.    And how long did you work, or how long
22  did you work and/or operate the McHenry Tae Kwon Do?
23     A.    I would say that I was probably
24  partners with her in that for probably around six
25  months.  No longer than that.
```

10

```
 1     Q.    And why did that relationship end?
 2     A.    I could not get along with her.
 3     Q.    Did you continue to have any
 4  interactions with Mary following those six months?
 5     A.    Well, I would certainly see her at
 6  different events and things like that, different Tae
 7  Kwon Do events and things like that.  And our teachers
 8  were friends, so certainly like the Illinois State
 9  Championships and things like that obviously we would
10  work together for the betterment of the tournament,
11  but we never really saw eye-to-eye on quite a few
12  things after we tried to partner together.
13     Q.    I believe you said you originally met
14  Mary Brunner, was it in '93?
15     A.    '93 or '94, early '94, in there, yes.
16     Q.    So you have known her for approximately
17  12 years?
18     A.    Yes.
19     Q.    In your interactions with Ms. Brunner
20  over those 12 years, did those interactions cause you
21  to form an opinion as to her truthfulness?
22     A.    Yes.
23     Q.    And what was that opinion?
24     MR. GREEN:  I Object as to foundation.
25           Wait.  Wait.  I'm sorry, but the lawyers
```

11

```
 1           didn't tell you what the protocol was or the
 2           rules about depositions.  I will go in to it
 3           when I question you.  But please if there is
 4           an objection, please stop answering until
 5           the objection is made.  I object as to
 6           foundation asking for this witness to give
 7           an opinion on character of Ms. Brunner.  Go
 8           ahead.
 9           THE WITNESS:  Re-ask the question.
10  BY MR. MOORE:
11     Q.    What was that opinion?
12     A.    Well, you know, my opinion at first was
13  good.  We worked very well together for the junior
14  Olympics.  But when we actually went into business
15  together, we just had completely different ideas as to
16  how that business should operate.  Mary felt like in
17  some ways that I had absolutely no value by certain
18  things that were stated to me from her.  And it just
19  got to be -- I have been married 25 years.  I have
20  never been through a divorce.  But it came to a point
21  where I really felt like I had to divorce myself from
22  that situation, because I found myself disliking her
23  immensely.
24     Q.    Okay.  Aside from your dislike of her,
25  I believe you just said immensely, did you form an
```

12

```
 1  opinion as to her truthfulness?
 2          MR. GREEN:  Same objection.
 3  BY MR. MOORE:
 4      Q.  You can answer.
 5          MR. GREEN:  Go ahead.
 6          THE WITNESS:  Okay.  Yeah, just certain
 7      things that -- just her actions I would say
 8      throughout the way we did things, I didn't
 9      think she was the most honest person I had
10      ever dealt with, and I didn't want to stay in
11      a partnership with her.
12  BY MR. MOORE:
13      Q.  Are you currently an active member of
14  the United States Tae Kwon Union, also known as USA
15  Tae Kwon Do?
16      A.  Yes.
17      Q.  And is Mary Brunner also an active
18  member of the United States Tae Kwon Do?
19      A.  I have no way of knowing that.
20      Q.  Have there been times or events over
21  the years where active members of the United States
22  Tae Kwon Do Union, or USA Tae Kwon Do have had
23  occasion to come together for events?
24      A.  Yes.
25      Q.  Approximately how many times per year
```

13

```
 1  whatever, but Mary was one that had a fair amount of
 2  talk about, you know, how she officiated or how she
 3  did as far as what calls she made and so on.
 4      Q.  And what was the nature of that talk?
 5      A.  Typically --
 6          MR. GREEN:  I object as to calling for
 7      hearsay, and there is still not a proper
 8      foundation.  But you can answer the
 9      question, and we will deal with this when we
10      get to court.  Go ahead.
11          THE WITNESS:  Okay.  And again, it
12      wouldn't be just Mary.  It would be a lot of
13      referees they would talk about, but a lot
14      of people felt like she would call certain
15      matches some ways for some people and
16      different for others and not necessarily
17      consistent on the way penalties were called.
18  BY MR. MOORE:
19      Q.  Mr. Seiber, has anybody contacted you
20  about providing testimony in this case?
21      A.  Yes.
22          MR. GREEN:  I sorry, I missed the
23      question.  Sorry, Mr. Seiber, I missed the
24      question.  Please repeat it.
25  BY MR. MOORE:
```

15

```
 1  would you say that that is?
 2      A.  Well, the way it used to be we would
 3  all have our state championships and things like that,
 4  so we would get together for that.  And then typically
 5  from a referee standpoint we would ref the junior
 6  Olympics which obviously are all the kids 17 and down,
 7  and then we would have our senior national
 8  championships which were obviously the ages above
 9  that.  So typically from a referee standpoint Mary and
10  I together and a lot of other referees as well used to
11  do all of those events.
12      Q.  In your interactions with other members
13  of the United States Tae Kwon Do Union members during
14  these events, did you ever hear other people mention
15  Mary Brunner?
16      A.  Yes.
17      Q.  And have you heard people, those same
18  people, express opinions as to her reputation for
19  truthfulness or honesty?
20      A.  Yes, to a point.  I mean understand
21  that a lot of coaches or athletes won't always be
22  happy with referees.  So there are a lot of times
23  after the competitions are done and everybody is
24  hanging around the lounge or so on, there will be
25  comments about, you know, this ref or that ref or
```

14

```
 1      Q.  The question was, Mr. Seiber, has anyone
 2  contacted you about providing testimony in this case?
 3      A.  Yes.
 4      Q.  And who contacted you?
 5      A.  My instructor called me.  I have a very
 6  difficult time understanding him.  His English is very
 7  broken, Ki Woong Kim.  And basically what I got out of
 8  it was that he was asking me what was going on related
 9  to this.  And I told him that, you know, I really
10  didn't know.  And then when he said a couple of things
11  to me, I told him I didn't understand.  And he at that
12  time said he would have Ki Hong Kim call me.  I have
13  had a lot of conversations with Ki Hong and have
14  worked well with him over the years.  And he called me
15  up and wanted to know what was going on related to
16  this case, that he thought I was going to be deposed,
17  which is happening here today, and I said that I
18  honestly didn't know.  He just explained to me from
19  his viewpoint what he thought this was all about.
20      Q.  And was that the end of the
21  conversation?
22      A.  He pretty much told me from his
23  viewpoint what he thought was going on here.  He
24  didn't get into details.  I know obviously that this
25  is Dae Sung Lee, but he didn't get into any details
```

16

## Page 17

1  related to that.  All he said to me was that he
2  thought I would be asked questions concerning Mary,
3  and that if I hurt Mary I might hurt this case.  And
4  that was the end of the conversation.  My response to
5  him, you know, and then it ended, was that obviously I
6  know nothing about the Dae Sung Lee case.  I had met
7  Mr. Lee obviously at tournaments a few times, but
8  never really had a conversation other than hi or
9  whatever.  And as far as Mary goes, I said I don't
10 know what types of questions I will be asked, but
11 obviously whatever they are I will answer them
12 honestly.
13              MR. MOORE:  Thank you very much, Mr.
14       Seiber.  No further questions.
15                  CROSS-EXAMINATION
16 BY MR. GREEN:
17      Q.      You know, I have some questions, Mr.
18 Seiber, and we may break shortly after I ask some
19 preliminaries, so bear with me for a minute.  Let me
20 go over some rules and regulations of a deposition for
21 you; okay?
22      A.      Yes.
23      Q.      You haven't been deposed before, have
24 you?
25      A.      Yes, I have.

## Page 18

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1      Q.      And what were the circumstances,
2  please?
3       A.      I'm going to say that it was probably
4  around 1995 or '96.  I'm guessing.  It actually had to
5  do with Mary Brunner.  The circumstances were when her
6  and I partnered on the first Tae Kwon Do school, it
7  ended obviously several months later, and that lease
8  was a long-term triple net lease.  And Mary broke that
9  lease and went and bought a building.  I had no idea
10 this happened until the landlord called me and wanted
11 to talk to me about it.  I told him that I was
12 obviously no longer a part of that business.  He then
13 wanted to talk to me about his involvement with Mary,
14 and I obviously didn't want to talk to him about it.
15 so my attorney created a -- wrote up a covenant not to
16 sue I believe is what it's called, and said that we
17 would be more than happy to answer questions providing
18 he didn't try to come after me for anything related to
19 that lease.  That happened.  And then I was deposed
20 because my understanding is this gentleman sued Mary
21 to try to get the value of his lease.  As to how that
22 case -- basically the only questions they asked me
23 was, you know, just certain things related to that
24 lease.  And I have no idea whatever happened with it.
25 I never went to court, and I never testified in any

## Page 19

1  way, shape or form.  I don't know what the outcome
2  was.
3       Q.      Any other depositions that you attended
4  as a deponent?
5       A.      No.
6       Q.      Where you asked questions?
7       A.      No.
8       Q.      It's important that you understand my
9  questions so that you are giving an answer that's
10 responsive.  Do you understand that?
11      A.      Yes.
12      Q.      If you don't understand a question, you
13 tell me and I will try to make it more clear for you
14 so you are actually responding to the question I'm
15 asking; will you do that?
16      A.      Yes.
17      Q.      Don't guess at any of the answers
18 because no lawyers are interested in a pure guess.
19 But you are certainly able to give answers based on
20 your experience and knowledge based on perhaps a
21 question I ask you.  So if it's a pure guess, tell me.
22 If you are basing your answer on some experience,
23 knowledge or training you have had in the past, then
24 you can answer the question; okay?
25      A.      Yes.

## Page 20

1       Q.      This deposition is under oath.  The
2  fact that a court reporter administered the oath to
3  you is no different than a judge or a clerk in a
4  courtroom doing it.  It's under penalty of perjury; do
5  you understand that?
6       A.      Yes.
7       Q.      It's possible that you will have to
8  appear in Hawaii for this trial.  It's also possible
9  that your videotape may be presented.  It depends on
10 how the lawyers want to approach this.  But you should
11 know that if you give a different answer at a trial if
12 you are called, the jury will have a right to know
13 what you said today and whether they believe your
14 answer is substantially different at trial; do you
15 understand that?
16      A.      Yes.
17      Q.      All right.  One of the things I want to
18 go into immediately is, first of all, whoever called
19 you about this deposition did not impact or effect the
20 answers you have given so far; is that right?
21      A.      That's correct.
22      Q.      From what I understand you have given
23 truthful answers, right?
24      A.      Absolutely.
25      Q.      You and Mary Brunner in the past have

```
 1  been in business together; is that right?
 2      A.   That's correct.
 3      Q.   And you and she have had bad feelings
 4  about each other from that business and perhaps other
 5  schools, and that's true, isn't it?
 6           MR. MOORE:  Objection, assumes.  You
 7       can answer.
 8  BY MR. GREEN:
 9      Q.   That's a question.  That's true, isn't
10  it?
11      A.   Kind of.
12      Q.   Well, I mean kind of.  At one point she
13  called the police on you to return a sign that was
14  removed from the school she took over at Antioch,
15  right?
16      A.   Well, that's not really the
17  circumstance.  But she did do that.  But if you want
18  me to explain, I would be more than happy to explain
19  that situation if you would like.
20      Q.   We may go into that, we may or may not,
21  but I want to be clear that some sergeant, and I have
22  his name somewhere, called you and said, you know, you
23  went and removed the sign from the school Mary took
24  over at Antioch a year before, and you need to bring
25  that sign back, or words to that effect, right?
```

21

```
 1      Q.   I understand that.  Where was the sign
 2  prior to you returning it?
 3      A.   With me in Tennessee.
 4      Q.   Yeah, but I mean you didn't have it in
 5  your pocket at your house.  Where was it?
 6      A.   In Tennessee.  I took it --
 7      Q.   You took it from Antioch, Illinois?
 8      A.   Right.
 9      Q.   To someplace in Tennessee, right?
10      A.   Correct, yes, sir.
11      Q.   Right?
12      A.   Yes.
13      Q.   Yeah.  And you took the sign about a
14  year after you moved to Tennessee, right?
15      A.   Right in that range, yes.
16      Q.   It cost you probably hundreds of
17  dollars or thousands to take it off the wall,
18  transport it to Tennessee and bring it back, right?
19      A.   It cost me 200 to remove it and 375 to
20  put it back.
21      Q.   Okay.  And you left a note telling Mary
22  you took the sign, right?
23      A.   Yes, I did that because basically when
24  Mary came in -- and just to go back and clarify
25  this --
```

23

```
 1           MR. MOORE:  Objection, hearsay.
 2           MR. GREEN:  Everything you asked,
 3       counsel, was hearsay in the beginning.
 4       Go ahead.
 5           THE WITNESS:  The sergeant that you're
 6       referring to is actually a detective, and
 7       his name is Darrell Youngs.
 8  BY MR. GREEN:
 9      Q.   That's the guy.
10      A.   Darrell Youngs having been a student of
11  mine prior to that, and then I believe his son wound
12  up going out to Mary's McHenry Tae Kwon Do location,
13  basically knew the circumstance of that school.  If we
14  go into it later, I will explain.  He said, John, he
15  said I know based on my knowledge that that is
16  probably yours, but you have nothing in writing to
17  prove that it is.  My suggestion to you would be to
18  put the sign back.  So I actually paid three hundred
19  and 75 --
20      Q.   Let me --
21      A.   Let me finish this, please.
22      Q.   Go ahead, John.
23      A.   I actually spent $375 and returned the
24  sign to the building and had it installed and put back
25  completely one hundred percent the way it was.
```

22

```
 1      Q.   John, let's be clear.  Remember I said
 2  to try to listen to my questions?
 3      A.   Yes.
 4      Q.   Yeah.  All I want to know is did you
 5  leave a note for Mary saying you were taking the sign?
 6      A.   Yes, and many other things on the note
 7  as well.
 8      Q.   Okay.  I'm sure there were.  Now, let's
 9  jump back to what you said about being a referee and
10  some people discussing Mary's integrity or honesty as
11  a referee.
12      A.   Yes.
13      Q.   Do you remember saying that?
14      A.   Yes.
15      Q.   You are, from what I understand in
16  researching you, a very well and highly thought of
17  international referee; and do you think you enjoy that
18  reputation?
19      A.   Yes.
20      Q.   And how many people do you think there
21  are in the United States that are international
22  referees such as yourself?
23      A.   Well, to be honest with you I wouldn't
24  know a true number.  I know active ones that actually
25  work as referees, probably around 25, but there's
```

24

```
 1   probably at least a hundred more that are not active
 2   that actually went to the seminar so they could put
 3   that title on their business card, but don't really
 4   even work.
 5        Q.    I want to ask you a little bit about
 6   titles on business cards in a moment.  But as I
 7   understand it in order to be an international referee
 8   or perhaps a national referee, are you selected by a
 9   chair referee from the USOC, is that how you are
10   selected?  In other words is your name submitted
11   somewhere, and then you may be selected or not
12   selected?
13        A.    To be selected for a current event now,
14   or how did I become an IR, which one are you asking
15   me?
16        A.    No.  II'm sorry, John.  I mean for a
17   current event now if the USOC -- I guess it's called
18   the USAT today, wants to submit your name for an
19   international event in Panama or Yugoslavia or any
20   place in the world, who actually submits your name,
21   who is the person or persons?
22              MR. MOORE:  I'm going to object for a
23         second.  I object to the reference of the
24         USOC and the USAT.  Go ahead.
25   BY MR. MOORE:
```

                                25

```
 1        Q.    No.  I think the USOC is now called the
 2   USAT; is that right, John?
 3        A.    You mean the USTU?
 4        Q.    Yes, I beg your pardon.  Thank you for
 5   correcting me.  You're right.  I'm referring -- so the
 6   record is clear when we were talking before, I'm
 7   talking about the former United States Tae Kwon Do
 8   Union, and it's now the USAT; is that correct?
 9        A.    Yes.
10        Q.    Okay.  Are those the people, or is one
11   person that's responsible for submitting like your
12   name or my name if I was certified to be an
13   international referee, would they submit my name to
14   some place for some competition around the world?
15        A.    In the past it used to work that way
16   some.  What has happened ever since it has changed to
17   the USAT, is we actually apply typically online or we
18   will download it online and fax it in, and we apply
19   for events that we are interested in.  For example,
20   that just happened for two events this year.  And then
21   the USAT goes ahead and submits a list of names to the
22   WTF that they would like recommend, and then even on
23   that application it says even though we are submitting
24   these names, it's still up to the World Tae Kwon
25   Federation to make the selections.  They can follow
```

                                26

```
 1   the USAT recommendation, or they can go ahead and
 2   pick whoever they would like regardless of it.
 3        Q.    I gotcha.  Now, would names also be
 4   submitted in the United States?  In other words
 5   national events in the United States, the US Open and
 6   things like that, how does someone like you get to be
 7   a referee in that kind of a competition?
 8        A.    We send in an application.
 9        Q.    To who?
10        A.    To the USAT.  We send it -- typically
11   it goes to Jenna Mendoza who is in charge of -- you
12   know, is the staff person in the office for referees.
13   We send it in, and then a referee chair person, and
14   for the last couple of years the interim chair person
15   was Barbara Wakefield, and they would go ahead and
16   select who they wanted to work the event.
17        Q.    I want to ask you about Barbara.  I'm
18   keep saying I'm going to ask, and I keep moving along.
19   Excuse me, I have had a cold for a while.  I didn't
20   mean to do that in your ear.  Now, you have been
21   refereeing for how many years both internationally and
22   nationally?
23        A.    Internationally since 1993.  And I
24   think the first nationals that I ever did -- I will be
25   honest with you, I can't recall the exact year.  But
```

                                27

```
 1   we did all of the local things, and we did state
 2   championships and all the stuff throughout the '80s as
 3   well.
 4        Q.    All right.  You have been refereeing a
 5   total of what, 20, 25, 30 years?
 6        A.    Not that long.  Probably 20.
 7        Q.    Okay.  And how many events have you
 8   refereed total between local, national and
 9   international, how many would you say?
10        A.    It would probably average somewhere
11   around maybe 10 or 12 a year.  So you could just
12   multiply that by 20 and get a number.
13        Q.    Okay.  I mean you look like a pretty
14   tough guy to me.  I can't imagine somebody coming up
15   to you and saying you know what, John, I think you're
16   a crook.  I think you took money or took a dive and
17   you refereed a match to make sure that someone won.
18   No one ever came up and said that to you, did they?
19        A.    Believe it or not I have had people
20   approach me in the ring and threaten me and act like
21   they were going to punch me and do things like that
22   just because they were upset their player lost.  And
23   then, of course, a lot of times coaches will just want
24   to blame the ref.
25        Q.    Well, that is not something that would
```

                                28

### Page 29

1 be rare or unusual for a referee to be called corrupt
2 or dishonest; that happens from time to time, right?
3     A.    If it happens -- if I was going to put
4 a percentage on it, I would probably say maybe one
5 percent of the time I do a match somebody is pissed
6 off.  Most of the time they are pretty happy.
7     Q.    Well, you're saying they may be pissed
8 off, but you don't know what they are saying that you
9 can't hear about, right?
10     A.    That's correct.
11     Q.    I mean there could be all kind of
12 people that think you were a bad referee or you were
13 making intentional calls to hurt one competitor or the
14 other, right?
15         MR. MOORE:  Objection, calls for
16         speculation.  You can answer.
17 BY MR. GREEN:
18     Q.    Well, I mean that's the nature of the
19 game, right?
20     A.    I think that's probably going a little
21 too far with it.  But typically there would be some
22 people that would be upset, but for the most part most
23 of your coaches understand who does a good job
24 refereeing and who doesn't and when it was fair and
25 when it wasn't.

### Page 30

1     Q.    Some referees are better than others,
2 yes?
3     A.    Of course.
4     Q.    So what people maybe said to you or you
5 heard that they thought Mary Brunner was a bad referee
6 or was sided with one side or the other, that doesn't
7 mean it was true, does it?
8     A.    Not necessarily.
9     Q.    I mean people could be upset, and more
10 upset at her then you or someone else, people may have
11 an ax to grind, but that doesn't mean she did anything
12 illegal or dishonest at any time she refereed; and
13 that's true, right?
14     A.    That would be true.
15     Q.    Now, this business stuff you had where
16 you thought she did something wrong to you, that's why
17 you ended your business together?
18         MR. MOORE:  Objection.  Misstates his
19         testimony.
20 BY MR. GREEN:
21     Q.    Do you remember talking about that, the
22 six month deal you guys had?
23     A.    So you're talkinging about the original
24 school we opened?
25     Q.    The original school, not the Antioch

### Page 31

1 school, the McHenry school.
2     A.    Okay.  Would you like me to explain
3 that part to you now, is that what you're asking?
4     Q.    Well, what I'm saying is, there were
5 things that happened in that business that you just
6 wanted to get out, right?
7     A.    Yeah.  Quite frankly, I couldn't get
8 along with her, so I wanted out.
9     Q.    Right.  And my guess is to this day you
10 may hold some hard feelings about her; and do you?
11     A.    Not really.  To be honest with you life
12 is too short.
13     Q.    Yeah, but I mean wouldn't it seem
14 reasonable to you that maybe there be some things that
15 upset her about you as well, it's part of the business
16 transaction between two people who eventually go their
17 separate ways, right?
18         MR. MOORE:  Objection, calls for
19         speculation.  You can answer.
20         THE WITNESS:  No.  Again, you know, we
21         didn't get along there for a lot of reasons.
22         Obviously I could go into detail if you
23         wanted me to.  But I really didn't hold
24         any feelings against her.  And quite
25         frankly, that's how she even heard about the

### Page 32

1         Antioch school years later is because of me
2         and what happened and circumstances there.
3         So if I disliked her, I certainly wouldn't
4         want to give her an opportunity to go ahead
5         and try to do something.  I actually saw her
6         two weeks ago in Dallas, Texas, and talked
7         to her, and fine, and no problem.
8 BY MR. GREEN:
9     Q.    I think the next step in the
10 questioning would be that if you thought she was
11 dishonest from your experience in McHenry, you
12 wouldn't have asked her to take over the Antioch
13 school; and that's true, right?
14     A.    I didn't ask her to take over the
15 Antioch school.
16     Q.    Well, the Antioch school you originally
17 sold -- and I don't have the name in front of me, but
18 I can find it.  You sold that Antioch school -- who
19 was the first person you sold it to, Timmy who?
20     A.    Tim Walker was a student of mine, and I
21 sold the school to him.  Approximately --
22     Q.    And was there --
23     A.    I will go ahead and finish if you like.
24 Approximately a year later or so he was getting a
25 little bit behind, and he has been like a son to me.

**Page 33**

1  He has been with me since he was nine years old.  And
2  his grandparents raised him, and there's a whole long
3  story on that, and I won't go in to it.  And he
4  actually called me up and said he would like to come
5  down here to Tennessee by me.  He's now a police
6  officer here.  So when he did that, based on the terms
7  of our contract it basically meant since he was in
8  default with me, that it was back to me.  So a mutual
9  friend of ours in Illinois, a gentleman by the name of
10 Skip Valley, knew a guy that was looking for a school.
11 His name was Bobby Crouch.  So we sold the school to
12 Bobby Crouch.
13     Q.   Who is we?
14     A.   Me.  I shouldn't say we.  It's me.  So
15 it was sold to Bobby Crouch.  His son and another
16 gentleman, whose name I don't recall now, were
17 actually part of that.  They gave me a certain amount
18 of money at this time.  I had been in discussion with
19 Mary about the school at this time, but Mary chose to
20 not want to be involved, Mary and some other people in
21 Illinois as well.  Bobby Crouch and his group so many
22 months in to it weren't doing things well and not
23 having much luck with the business.  Basically they
24 went belly up.  And when that happened I had called --
25 because obviously I had some concerns for the students

**Page 34**

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  there that I would like to see them continue to have
2  instruction.  So I called several people.  The first
3  one was somebody that knows Mary, Sly Lawson and Carl
4  Lauder.  They also are under Ki Hong Kim.  I asked
5  them if they were interested, and they weren't.
6      When I called Mary I said I'm not selling this
7  to anybody.  I will just put you in contact with the
8  landlord and you can work out whatever deal you would
9  like.  I just want to see the kids be able to have Tae
10 Kwon Do instruction.  At that time I said all of the
11 things that are in there are mine again.  They came
12 back to me because of the default from Bobby Crouch.
13 The flooring, the signs out on the pole, on the wall,
14 I said you can have it all just to take care of the
15 kids, but some day I want the block letter sign.  That
16 has some pretty good value.  When I build my school in
17 Tennessee, I want that.  At that time that's where we
18 went.  Mary went and did a month-to-month lease --
19     Q.   Let's slow down.  The answer is taking
20 half an hour.  So let's take it one at a time.
21     A.   I'm almost done.
22     Q.   When you sold the school to Timmy, was
23 there ever a representation you had at least a hundred
24 students?
25     A.   Well, when I sold the school --

**Page 35**

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1      Q.   Yes, or no?
2      A.   When I sold the school to Timmy, we had
3  over a hundred students, yes.
4      Q.   Okay.  And how long did he have the
5  school?
6      A.   I'm going to guess it was probably
7  someone around -- you told me to use the word guess --
8  but I think it was around 12 months.
9      Q.   And then when Crouch came in, was there
10 a representation to him that he had a hundred students
11 at that school?
12     A.   No.
13     Q.   Was there any discussion about you
14 suing him or him suing you for misrepresentation about
15 the number of students?
16     A.   Bobby Crouch threatened to sue me, yes.
17     Q.   For misrepresentation?
18     A.   That's what his letter to me said, yes.
19     Q.   Right.  Do you still have a copy of
20 that letter?
21     A.   I don't know.
22     Q.   I'm not saying he was being fair or
23 honest with you.  I'm just saying that the letter he
24 sent to you basically said you lied to me about the
25 school, you lied to me about the number of students,

**Page 36**

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  you committed a fraud on me, and I'm going to sue you;
2  and that's basically the general tone of the letter,
3  right?
4           MR. MOORE:  Objection, foundation,
5       hearsay.
6           MR. GREEN:  Well, if you can tell me
7       what the foundation is, I will try to lay
8       it, but I don't know what you're talking
9       about.  Go ahead.
10          THE WITNESS:  Yeah.  A lot of what you
11      just said was in the letter as well.  And
12      quite frankly, I gave the letter to my
13      attorney, and my attorney laughed and there
14      were none of those things.  Basically there
15      was no lawsuit.
16 BY MR. GREEN:
17     Q.   I understand there was no lawsuit.  I'm
18 just saying that you have got a guy that has a
19 business that he buys from you, and he's calling you a
20 fraud and all kinds of things.  I'm not saying that's
21 true, but that's what he accused you of, right?
22     A.   Right.
23          MR. MOORE:  Objection, hearsay.  Go
24      ahead.
25          THE WITNESS:  Yeah.  Basically he gave

1              me a small portion down, and then never even
2              finished paying the balance of what he owed.
3              He just wanted to bail quick.  And then
4              quite frankly, he stole everything out of
5              the school.
6    BY MR. GREEN:
7         Q.   My next question is, he kind of looted
8    the place, he took all kinds of stuff, right?
9         A.   Some of the things, yes.  There were
10   two layers of --
11        Q.   And Mary comes in -- go ahead.
12        A.   There were two layers of flooring.  We
13   had a real nice mat, like a sponge floor that he
14   couldn't remove because it was glued in.  And then we
15   had interlocking mats over it.  He took the
16   interlocking mats.  But for years all we used was the
17   first layer, which was real good.  That actually cost
18   me about 45 hundred at the time.
19        Q.   John, let me do a lawyer thing here
20   that you're not going to know what I'm talking about,
21   but I want to make this record clear.  When I asked
22   you about the circumstances of this letter where he
23   accused you of being a fraud and dishonest and
24   cheating him, I want the record to show the purpose of
25   that question was not to establish the truthfulness of

                                 37

1    the letter and what was contained therein, but to show
2    the state of mind of this witness as to why you then
3    contacted Mary and other people to take over the
4    school.  With that being said, Mr. Seiber, after he
5    kind of took apart the floors and whatever else he
6    took, how much after that time did Mary Brunner
7    basically take over the school?
8         A.   If you will allow me, I think I lied a
9    little bit.  I believe the landlord of the building
10   called me to tell me that the guy had vacated.  He
11   actually -- Bobby Crouch was removing some stuff
12   there.  And when the landlord asked him what are you
13   doing, he said, well, I'm just going to clean the
14   carpets.  He actually was looting the place.  Joe
15   Sturbans is this gentleman's name.  He called me and
16   said the guy hit the road.  So that's when I started
17   to make some phone calls to try to help the students.
18   And when I --
19        Q.   Let me -- go ahead.
20        A.   I was going to say when I spoke with
21   Mary, Mary said to me that a gentleman named Michael
22   Klein was interested in starting his own school, and
23   that she would help him.  I find out later that I
24   think Michael worked there, but I believe it was
25   Mary's son and Mary that actually had it, and Michael

                                 38

1    was just kind of part of it with them in some fashion.
2    I really don't know the details.
3         Q.   All right.  Is it fair to say that you
4    love the sport, Tae Kwon Do?
5         A.   Yes.
6         Q.   You have a vested interest in the young
7    people who want to learn the art and the craft of Tae
8    Kwon Do?
9         A.   Yes.
10        Q.   Even though the school may not have
11   worked out in Antioch, you still felt the commitment
12   to your students and perhaps their families?
13        A.   Yes.  I was there obviously for many
14   years and had a lot of students.  And obviously when I
15   left, unfortunately a lot of them left as well.
16        Q.   Right.  Mary then you knew was at least
17   operating your school and perhaps training or teaching
18   some of your former students?
19        A.   I did not know that.  I was under the
20   impression when I talked to Mary that Michael Klein
21   was going to be the guy doing it, not Mary.
22        Q.   Once you found out that she was at that
23   school, did you try to stop her and throw her out?
24        A.   Oh, no, not in any way.
25        Q.   Did you know one way or another when

                                 39

1    you met Mary that she had been involved in Tae Kwon Do
2    since the 1970s?
3         A.   When I first met her in the early '90s,
4    I think she talked about her past a little bit as to
5    when she started and with who, but I don't recall all
6    the information.
7         Q.   Whether or not she owned at least five
8    facilities from time to time, and I'm talking about
9    Tae Kwon Do in the state of Illinois?
10             MR. MOORE:  Objection, assumes
11        facts not in evidence.
12   BY MR. GREEN:
13        Q.   Did you know that one way or the other?
14        A.   No, sir, I did not.
15        Q.   Whether she had been an international
16   referee Second Class; did you know that one way or the
17   other?
18             MR. MOORE:  Objection, assumes
19        facts not in evidence.
20             MR. GREEN:  Just so the record is
21        clear, whether he knew it one way or the
22        other is the question.  Did you?
23             MR. MOORE:  But whether he knew it
24        assumes that it actually is a fact.  That's
25        my objection.

                                 40

```
 1              MR. GREEN:  I said one way or the other
 2         did he know it.
 3   BY MR. GREEN:
 4         Q.    Go ahead.
 5         A.    Okay.  Mary got her international
 6   referee with me in '93, so I knew she was an IR.  As
 7   to what class she is now, I don't know.
 8         Q.    I gotcha.  A-1, did you know whether or
 9   not she was an A-1 rated USTU or AAU referee one way
10   or the other, did you know?
11         A.    I have no idea about AAU in any way.
12   And as far as USTU I don't know what her rating was
13   when she became an IR.
14         Q.    Now let me just ask you about your Tae
15   Kwon Do instructor.  His name is what, the gentleman
16   who has been teaching you in Chicago and other places?
17         A.    Oh, the person that actually was my
18   teacher?
19         Q.    Yes.
20         A.    Okay.  His name is Koang Woong Kim.
21         Q.    And how was it that you selected him to
22   be your instructor?
23         A.    When I was in high school, early in
24   high school and decided that I wanted to do Tae Kwon
25   Do, a very good friend of mine whose name is Bob
```

                                                    41

```
 1   Ludwig was already a black belt at that facility.
 2   Koang Woong Kim had come up from Chicago and bought
 3   this school in Kenosha, Wisconsin.  My friend was
 4   already there, and he talked about what a great guy he
 5   was and how much he liked him.  He told me he had
 6   always been wanting to do this.  Why don't you come
 7   on.  And that's when I started.  And that was roughly
 8   1976.
 9         Q.    And this gentleman, this master, he
10   holds what belts?
11         A.    He has been a ninth degree black belt I
12   think since the early '90s.
13         Q.    What does that mean in the world of Tae
14   Kwon Do?
15         A.    That he's a pretty highly thought of
16   human being in Tae Kwon Do.
17         Q.    How is it -- is there one higher than
18   that?
19         A.    No.
20         Q.    When you -- I have got a lot going on
21   in my head in Hawaii, but did you mention something
22   about on your business card you listing an
23   international referee?
24         A.    Yeah.  There are a lot of people that
25   will take an international referee's seminar, this is
```

                                                    42

```
 1   what I had said, that really have no desire to
 2   referee.  They just want to be able to have that on
 3   their business card at their school that they are such
 4   and such black belt, such and such referee, such and
 5   such this, so obviously it looks good for marketing
 6   reasons.
 7         Q.    Do you market yourself?  In other words
 8   what I mean by that, not just the man you are, but do
 9   you market yourself either through advertising or your
10   business card or other places as to your achievements
11   in Tae Kwon Do over the years?
12         A.    Yes.
13         Q.    In other words if I go to Tennessee
14   next week and I decide I want to relocate there and
15   have my son take up the sport, are you in the Yellow
16   Pages?
17         A.    Yes.
18         Q.    Are there other Tae Kwon Do schools in
19   the area where your school is?
20         A.    Yes.
21         Q.    Give me an idea of how many.
22         A.    Oh, well, what type of radius are you
23   talking, 10 miles 20 miles, 30 miles?
24         Q.    Well, you know, you have students that
25   travel how far to see you in your school?
```

                                                    43

```
 1         A.    Probably the farthest might be 20 or 25
 2   miles.
 3         Q.    Okay.  And I have got to assume in that
 4   20 to 25 miles there are other schools?
 5         A.    Yes.
 6         Q.    Between those students, yes, right?
 7         A.    Yeah, probably four or five.
 8         Q.    So is it reasonable when you talk about
 9   marketing yourself that there are certain
10   distinguishing qualities or characteristics or
11   features that you would like people to know about you
12   and your school so they can consider you as opposed to
13   the closer schools to their home, yes?
14         A.    Yes.
15         Q.    And some of the things that you might
16   -- let's say you want me to go to your school, or my
17   son.  What are some of the things you would do to tell
18   me about your yourself?  Not just how nice your school
19   is or whether it's in a nice neighborhood, but tell me
20   something strictly about teaching my kid.  What do I
21   want to know about you that would separate you from
22   other schools?
23         A.    Well, you know, obviously when somebody
24   walks through the door most Tae Kwon Do schools will
25   have a lot of things on walls, pictures, plaques,
```

                                                    44

## Page 45

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  things, you know, news clips or any type of photo-op
2  that there has ever been.  We are no different.  One
3  of the things that I have always been more than happy
4  to tell a lot of people is, you know, if you are out
5  actually shopping and you're looking for a martial
6  arts school, why not do it the same way that you would
7  when you were choosing your children's education.  You
8  know, don't just decide on anybody.  Make sure that
9  they are a good person, that they are a good
10 instructor, that they are not doing things in ways
11 that I would consider to be not good for the martial
12 arts.
13         Q.    I mean it's a philosophy which I
14 understand, but just about you and how you would be
15 better able to teach me or my son as opposed to the
16 guy that's five miles closer to my home?
17         A.    Well, I mean if people start to ask me
18 about my actual experience, then it's easy for me to
19 tell them about the places, you know, the things that
20 I did in the '70s and '80s or where I ref'd or what I
21 did, you know.  Being part of, you know, refereeing
22 the world championships in 1997, things like that, I
23 mean obviously other than the Olympics that's the
24 biggest event that I could work as an official.  So
25 I'm certainly proud of that.  And I think what that

## Page 46

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  tells a prospective student or parent is that at least
2  as far as Tae Kwon Do is concerned in the US, I'm
3  trying to do things by a certain set of criteria,
4  trying to do things the right way.
5         Q.    Right.  Other than simply you having a
6  philosophy and as being part of the Tae Kwon Do world,
7  there are certain things just simply to bring in
8  students and make a living that you would distinguish
9  yourself from other schools or instructors, yes?
10        A.    I don't really know what -- you know,
11 it might sound crazy but I don't really know what
12 other people say.  I just know what I say, you know,
13 when somebody comes in to talk.
14        Q.    I hear what you say.  In other words
15 what I mean by that is that maybe the higher degree of
16 belts may interpret into being a more skilled
17 instructor, yes?
18        A.    Some people might interpret it that
19 way.  Personally I wouldn't agree with that.
20        Q.    I mean, for example, if I wanted the
21 best teacher or the most knowledgeable person around,
22 you would want to tell me maybe you are an
23 international referee, maybe that you are a fourth or
24 fifth degree black belt and things like that, right?
25        A.    Yeah, I would certainly say that.  But

## Page 47

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  what I meant by I wouldn't interpret it that way, is
2  the two US team coaches that we have currently, I
3  can't be factual on this but I'm pretty sure they are
4  both fourth degree black belts.  One of them is a two
5  time Olympic medalist.  So the point is that I'm
6  higher than them, but quite frankly I would say they
7  are probably a better teacher than I am.
8         Q.    Would you agree, based on your years of
9  training and experience, that when you get to be the
10 Tae Kwon Do Olympic coach, that kind of speaks for
11 itself as to your abilities in the art of Tae Kwon Do,
12 yes?
13        A.    Well, I would certainly say that it's
14 something very good to put on your resume.
15        Q.    I mean can you think of -- you know,
16 when we talk about the selection of the United States
17 Olympic Tae Kwon Do coach, if you are honored with
18 that position, that's something that if you can open a
19 school you want people to know about, right?
20        A.    Oh, absolutely.
21        Q.    I mean if you went to another country,
22 let's say your child -- I know your son is in Tae Kwon
23 Do, right?
24        A.    Yes, sir.
25        Q.    Let's assume that your son decides and

## Page 48

2/28/2006 Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  your family decides that he wants to study abroad for
2  a year.  You go to England, you go to Italy, you go
3  someplace to another country, but you want your son
4  to still take instructions in Tae Kwon Do, and someone
5  says you have got five schools in England within
6  15 to 20 miles of your house and one of the schools is
7  the Olympic coach for England in the 2004 Olympics,
8  you're going to kind of look at that guy and say, hey,
9  you can't get much better than this in this country,
10 right?
11             MR. MOORE:  Objection.  Speculation.
12       Go ahead.
13 BY MR. GREEN:
14        Q.    I'm talking about your experience and
15 training.
16             MR. MOORE:  You actually asked him a
17       hypothetical with nine hundred hypotheticals
18       in it.  But go ahead, you can answer.
19 BY MR. GREEN:
20        Q.    Go ahead.
21        A.    I think knowing what I know about Tae
22 Kwon Do, if I was going to research a school I
23 certainly would look for the person that I thought had
24 the best knowledge and experience.  And obviously if
25 they were the Olympic coach, they more than likely

## Page 49

have a lot of that. The only thing that I could add to that is obviously I don't know how somebody gets chosen to be the Olympic coach. So I really can't speculate or speak too much to that.

BY MR. GREEN:

Q. Do you how they are chosen in the United States?

A. I do not.

Q. If you were the Olympic coach, would you publish that?

A. Absolutely.

Q. Would you expect to derive revenue simply from the fact that you went to the Olympics, you coached an American Tae Kwon Do competitor or competitors and now came back and opened your school, that would be something that you would want to publish, wouldn't you?

A. Yeah, I would definitely publish it.

Q. You would expect it to be an asset in just revenue sources because you were the Olympic coach, right?

A. Well, I would think if a student walked through my door, a prospective student, and saw that I was the past Olympic coach, I would think the possibilities of closing that sale would increase

## Page 50

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

greatly.

Q. Do you know Hong Wong Lee?

A. Yes.

Q. How do you know him?

A. I met him throughout the years. He was the OTC Olympic training center coach for a long time. I actually took my son to Northern Michigan University, I believe that's what it's called, to an Olympic training center camp. He was up there once. I believe my son was 13 at the time. Just basically I met him. Obviously he was coaching the resident athletes at the Olympic training center for a while. Do I know him well personally, no. It was typically hi, how are you, those kind of things back and forth. I probably never had any kind of a conversation with him.

Q. Did you know he was the Olympic coach for our country in 2000?

A. Yes.

Q. One of two Olympic coaches for the United States, yes, if you know?

A. I believe so, yes.

Q. Do you know whether he has a school in Colorado?

A. I have been told he has. I honestly

## Page 51

don't know that he has, but I have been told he has.

Q. Do you ever travel out west, either vacation or business to the western part of our country, Colorado or Montana or Wyoming?

A. Many times. I was in Colorado just six weeks ago during the team trials.

Q. And people, if you know and can tell me, people in that area of Colorado, does it seem to be general knowledge based on your conversations with people or things you may have overheard that there is a 2000 Olympic coach who has a school in Castle Rock, Colorado, have you ever heard that?

A. I have not.

MR. GREEN: Let's take a break.

(Break Taken.)

MR. GREEN: Are we back on the record, or are we waiting?

MR. MOORE: We are back on the record.

MR. GREEN: Okay. Thank you for your courtesy.

BY MR. GREEN:

Q. Mr. Seiber, I really don't have very many more questions. But I want to just touch on something you testified to on your direct examination

## Page 52

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

that had to do with a woman named Barbara Wakefield; do you remember that?

A. You told me you were going to ask me a question about her, yes.

Q. Yeah, I did. Barbara Wakefield you mentioned during your direct examination was the interim referee chair, was she, as of 2004?

A. I don't know exactly when she was appointed, but she has been for like the last two years, yeah.

Q. Were you at the US Open in 2004, I think in Orlando, Florida?

A. To be honest with you I don't remember if I did that event or not. I know I did last year's in Atlanta. I don't remember if I did Orlando or not.

Q. It's my understanding, and please correct me if your memory is different, that sometime in 2004 the USOC took over the USTU or what was known as the USTU at the time; is that your memory?

A. Yes.

Q. That a gentleman named Robert Gambardella was appointed as the chief executive officer at that time; is that your memory?

A. Yes.

Q. Did you know Mr. Gambardella from

### Page 53

1  before 2004?
2      A.      I never met him before meeting him at
3  the first Tae Kwon Do function that I refereed.
4      Q.      In fact, do you know whether or not he
5  had even seen a Tae Kwon Do match or competition
6  before he was appointed the executive officer of that
7  organization?
8      A.      I have no idea.
9      Q.      Do you know -- did you ever actually
10 sit down and speak with him?
11     A.      Yes.
12     Q.      Was Mary Brunner ever present when you
13 spoke with him?
14     A.      No.
15     Q.      Did you know Barbara Wakefield prior to
16 2004?
17     A.      Yes.
18     Q.      How did you know her?
19     A.      Refereeing with her.
20     Q.      And credential-wise how would you
21 compare yourself to her?
22     A.      Well, I don't know what her rank would
23 be as far as a black belt is concerned.  But as far as
24 seniority as an international referee, she is one of
25 the more senior US people.  I think she got her IR in

### Page 54

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1  the late '80s.
2      Q.      Prior to 2004, and I'm talking about
3  when Gambardella came in and his committee, did you
4  ever form an opinion or do you even have an opinion
5  now as to whether or not the referees that refereed
6  the nationals or international competitions, what
7  percentage of those were Korean-Americans?
8      A.      Well, you know, I don't really know
9  that I could put a percentage on it and it be factual
10 at all.  But I know in the early '90s when Koang Woong
11 Kim was the referee chairman, there were a lot more
12 Koreans working the events.  And then about the late
13 '90s that went away quite a bit.  There was a lot
14 less.  And as far as when this shake-up, if that's
15 what you want to call it with the USTU happened, a lot
16 of those referees didn't work anymore, and quite a few
17 of them still did.
18     Q.      After -- we will call it the shake-up
19 of 2004.  Would you agree that the percentage of
20 Korean-American referees probably was cut by at least
21 30 or 40 percent?
22             MR. MOORE:  Objection.  Calls for
23     speculation.
24 BY MR. GREEN:
25     Q.      Based on your observations?

### Page 55

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1      A.      Based on my observations I wouldn't put
2  a percentage on it, but definitely a lot of the
3  referees that had ref'd before were not ref'ing
4  anymore.
5      Q.      And we are talking about referees that
6  were Korean-American, right?
7      A.      Correct.
8      Q.      In any conversation you had with
9  Gambardella or that governance -- have you ever been
10 around this governance committee other than
11 Gambardella and Wakefield, did ever have any
12 conversations with them after 2004?
13     A.      When you say governance committee, do
14 you mean the other people that were on the board?
15     Q.      Yes, sir.
16     A.      The only other person on the board that
17 I know is Juan Moreno who was on that board when that
18 happened, and I have had conversations with Juan
19 Moreno for many, many, many years.
20     Q.      Is he a good guy?
21     A.      I think one of the best.
22     Q.      Okay.  Did you ever get the impression
23 from speaking to Gambardella that he believed that
24 Korean-Americans seemed to have dominated Tae Kwon Do
25 over the years as competitors and officiating?

### Page 56

2/28/2006  Seiber, John   (Pltf desig = Yellow, Dfts' counters = Blue)

1      A.      No, I did not get that impression.  We
2  never discussed anything like that.
3             MR. GREEN:  Okay.  I don't have any
4      more questions.  Thank you for your
5      courtesy.  Mr. Moore may want to ask you
6      something else.
7             REDIRECT EXAMINATION
8  BY MR. MOORE:
9      Q.      I have only got a couple of questions
10 here.  During the cross-examination just now one of
11 the things that you discussed was advertising or
12 expecting increased revenues if you were selected as
13 an Olympic coach; is that correct?
14     A.      I'm sorry, sir, in Hawaii, I don't know
15 your name, but, yes, this gentleman asked me that,
16 yes.
17     Q.      Would you expect increases if you had
18 already been the Olympic coach twice?
19             MR. GREEN:  I missed the question.  I'm
20     sorry.
21             THE WITNESS:  Me too.
22 BY MR. MOORE:
23     Q.      The question is if you had already been
24 named the Olympic coach twice, would you expect being
25 named the third time to result in any increased

## Page 57

1  revenues?
2     A.   I would have no way of really knowing
3  that to be honest with you.  Like I said before, I
4  would think that obviously if a student walked in to
5  your school and they then found out that you were the
6  Olympic coach, I would think the odds of your closing
7  that sale or getting that student would be far better
8  than any other school in the area.  But as to -- I
9  would suspect that that would depend on how well you
10 advertised and marketed and went out to the schools
11 and did demonstrations and did all the kinds of things
12 that we typically do.  Obviously if the person was the
13 Olympic coach doing those things, then I would think
14 that he would probably do quite well.
15    Q.   The only other question I have deals
16 with the referees.  I believe you testified that the
17 percentage -- or you couldn't specify percentage,
18 excuse me, the number of Korean-American or Korean
19 referees declined in 2004?
20    A.   I think a lot of that started to
21 decline even in '88 and '89.  I have personal opinions
22 as to why I think that.  I think the referee chair
23 person after Koang Woong Kim wasn't as well liked.  So
24 I think a lot of referees, Korean and non-Korean,
25 walked away some.  Certainly in 2004 after the

## Page 58

1  shake-up some people that would be of Korean ethnicity
2  walked away.  As to exactly why, who knows.  There's
3  always rumors.  I don't know what the reason is.  But
4  I know that there are still quite a few
5  Korean-Americans that are highly involved.
6     Q.   And do you know whether any of the -- I
7  believe you said several of the Korean-American or
8  several referees walked away, I believe that was the
9  language you just used?
10    A.   Well, I don't see them anymore, so
11 yeah.
12    Q.   Do you know whether or not they
13 continue to apply to be referees?
14    A.   I would have no way of knowing.
15       MR. GREEN:  I missed the question.  I'm
16    sorry guys.  Can you speak a little louder,
17    Mr. Moore?
18       MR. MOORE:  Sure.  I think that was my
19    last question anyway, but I will do it
20    again.  It was do you know whether any of
21    those referees continue to apply for
22    refereeing positions, and he said no.
23       THE WITNESS:  I would have no way of
24    knowing if they applied or not.
25       MR. MOORE:  No further questions.

## Page 59

1        MR. GREEN:  Thanks guys.  Have a safe
2     trip, Glenn.  Thanks Mr. Seiber.  I
3     appreciate your testimony.
4        FURTHER THE DEPONENT SAITH NOT.
5           (Signature Waived.)

## Page 60

1               C E R T I F I C A T E
2               _ _ _ _ _ _ _ _ _ _
3
4  STATE OF TENNESSEE:
5  COUNTY OF KNOX:
6
7           I, Danny Fuston, Court Reporter
8  and Notary Public, do hereby certify that I reported
9  in machine shorthand the above testimony, and that the
10 foregoing pages, numbered from  1 to 60, inclusive,
11 were typed under my personal supervision and
12 constitute a true and accurate record of the
13 proceedings.
14          I further certify that I am not an
15 attorney or counsel for any of the parties, nor a
16 relative or employee of any attorney or counsel
17 connected with the action, nor financially interested
18 in the action.
19          Witness my hand and official seal
20 this 4th day of March, 2006.
21
22          _____
23          DANNY FUSTON
24          Court Reporter
25          and Notary Public