# Exhibit B



0001
1              IN THE UNITED STATES DISTRICT COURT
2                      DISTRICT OF HAWAII
3      DAE SUNG LEE,                    )
                                        )
4          Plaintiff,                   ) Civil No. 04-00461
                                        ) Som Tek
5      UNITED STATES TAEKWONDO          )
       UNION, a Colorado nonprofit      )
6      corporation, UNITED STATES       )
       OLYMPIC COMMITTEE, a             )
7      federally chartered              )
       nonprofit corporation; JOHN      )
8      DOES 1-10; JANE DOES 1-10;       )
       DOE PARTNERSHIPS 1-10; DOE       )
9      CORPORATIONS 1-10,               )
                                        )
10         Defendants.                  )
                                        )
11
12
13
14
15
16            DEPOSITION OF KELLY SKINNER
17                  JUNE 30, 2005
18
19      PURSUANT TO NOTICE, the deposition of KELLY SKINNER
20      was taken on behalf of the Plaintiff pursuant to the
21      Federal Rules of Civil Procedure, at 90 South Cascade
22      Avenue, Suite 1300, Colorado Springs, Colorado, this
23      date at 1:10 p.m., before Janice L. Doyle, a
24      Certified Court Reporter and a Notary Public.
25

1

1                       I N D E X
2
3      DEPOSITION WITNESS:                              PAGE
4      KELLY SKINNER
5      Examination by Mr. Jones                         7
6
7
8
9             EXHIBITS PREVIOUSLY MARKED
10     EXHIBIT      DESCRIPTION                         PAGE

11       4     Letter to Bruce Harris From Thomas      58
12             L. Satrom Dated August 4, 2003
13       5     Letter to Bruce Harris From Thomas      68
14             L. Satrom Dated September 5, 2003
15       45    Governance and Management Committee     90
16             Minutes of Meeting, February 5,
17             2004, Numbered USTU00004
18       57    Minutes of USTU Governance and          98
19             Management Committee Meeting,
20             February 26, 2004, Numbered
21             USTU00002 Through USTU00003
22       58    Memorandum to USOC Executive            102
23             Committee From Bob Gambardella
24             and Steve Locke Dated March 8,
25             2004, Numbered USTU00001

3

1                     APPEARANCES
2          MR. WARD D. JONES, Attorney at Law, from the
3      law firm of Bervar & Jones, 1400 Pauahi Tower, 1001
4      Bishop Street, Honolulu, Hawaii, 96813, (808)
5      550-4990, appeared on behalf of the Plaintiff.
6          MR. MARK S. LEVINSTEIN, Attorney at Law, from
7      the law firm of Williams & Connolly, LLP, 725 Twelfth
8      Street, N.W., Washington, D.C., 20005, (202)
9      434-5012, and MR. GARY JOHANSEN, Attorney at Law,
10     United States Olympic Committee, 1 Olympic Plaza,
11     Colorado Springs, Colorado, 80909, (719) 866-4526,
12     appeared on behalf of the Defendants.
13         Also Present:  Mr. Dae Sung Lee
14
15
16
17
18
19
20
21
22
23
24
25

2

1      EXHIBIT       DESCRIPTION                        PAGE

2       63    USTU Governance and Management          127
3             Committee Minutes, July 1, 2004,
4             Numbered USTU00008 Through
5             USTU00009
6       73    Various E-mails                         136
7       83    Memorandum to Kelly Skinner From         57
8             Bruce Harris Dated July 24, 2003
9       85    Letter to Bruce Harris From James E.     77
10            Scherr Dated October 30, 2003
11      87    Selection Procedures for Coaches         36
12            Dated January 20, 2003
13      120   Letter to Bruce Harris From Kelly        71
14            Skinner Dated October 24, 2003,
15            Numbered HRO 138 Through HRO 141
16      141   Letter to Bruce Harris From Thomas       67
17            L. Satrom Dated August 26, 2003,
18            Various Fax Cover Sheets, Numbered
19            HRO 214 Through HRO 217
20
21
22
23
24
25

4

6/30/2005  Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)
6/30/2005  Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 5**

```
1              EXHIBITS MARKED
2  EXHIBIT    DESCRIPTION                PAGE
3  147    Memorandum to Gary Johansen, Jennifer    49
4         Gabrius, Bob Foth From Kelly Skinner,
5         Michelle Farrell Dated June 3, 2003
6  148    Taekwondo Review                79
7  149    Declaration of Kelly Skinner Dated    137
8         August 6, 2004
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
1              EXAMINATION
2  BY MR. JONES:
3       Q.   Sir, if you could please state your name
4  and home address for the record.
5       A.   Sure.  Kelly Skinner, 1608 Yuma,
6  Colorado Springs, Colorado, 80909.
7       Q.   Have you ever had your deposition taken
8  before?
9       A.   No.
10      Q.   I'm sure your counsel explained to you a
11 little bit about what a deposition is.
12      MR. LEVINSTEIN:  Should have, but I'm
13 not sure if he --
14      Q.   BY MR. JONES:  Well, I'll quickly run
15 through the ground rules to avoid any problems.  A
16 deposition is an interview.
17      A.   Uh-huh.
18      Q.   Question and answer.  However, it's
19 under oath and generally for use in court.  Should
20 this matter go to court, it can be used in lieu of
21 your live evidence if you're unable to appear in
22 Hawaii for the trial.  Therefore, it's important to
23 try and answer as completely and truthfully as you
24 can so that we get it right the first time around.
25      If I don't make my questions clear,
```

6/30/2005  Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 6**

```
1       WHEREUPON, the following proceedings were
2  had:
3       IT WAS STIPULATED AND AGREED that the within
4  proceedings were taken pursuant to the Federal Rules
5  of Civil Procedure.
6
7       WHEREUPON,
8              KELLY SKINNER,
9  the witness herein, having been first duly sworn by
10 the notary public, was examined and testified as
11 follows:
12
13      MR. LEVINSTEIN:  For the record, I gave
14 counsel two documents, and I've hand-numbered them
15 20001, and the back of the first page is 20002
16 through 20005.  And it's just documents that we
17 didn't know about previously that --
18      MR. JONES:  These are the USTU
19 documents?
20      MR. LEVINSTEIN:  I think these would be
21 USOC documents.
22      MR. JONES:  Okay.
23      MR. LEVINSTEIN:  I think these are Mr.
24 Skinner's documents that he produced.
25      MR. JONES:  All right.
```

6/30/2005  Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 8**

```
1  please say, "Mr. Jones, I don't understand the
2  question."
3       A.   Okay.
4       Q.   "Can you rephrase it or reask it?" or
5  "What do you mean?"  I'd be happy to do that.  If you
6  go ahead and respond, we'll all assume you're
7  responding -- number one, that you understand the
8  question; number two, that you're responding
9  truthfully and fully.
10      If your counsel makes objections, in
11 those situations, pause so we don't have two people
12 talking at the same time and let him get out his
13 objection and then continue with your response unless
14 he instructs you not to answer, then we can address
15 that.
16      I'll try and take breaks at least every
17 hour to give the court reporter and you a rest.  And
18 if you need to take a break for any reason, just say
19 so, and we'll take a break before that.
20      Because everything will be transcribed
21 in kind of script form, question and answers, after
22 it's all said and done, which you'll have the
23 opportunity to look at, it's very important to
24 respond with words.  We all use "uh-huh," "huh-uh,"
25 nods of the head in everyday language, but it sounds
```

1  very ambiguous when you write that out as to whether
2  you mean a yes or a no or something else.  So try to
3  use words, and we'll remind you if you forget.
4          Any other -- any reason why we can't
5  proceed?
6          A.    None.
7          Q.    Your -- let's see.  Have you ever been a
8  party to a lawsuit?
9          A.    No.
10         Q.    Can you just briefly describe your
11 education after high school, formal education?
12         A.    I have a bachelor's degree in marketing
13 from Western Michigan University.  Got that in 1991.
14 Graduate degree from Central Michigan University in
15 sport administration.  Received that in 2002.
16         Q.    That would be a master's or a Ph.D.?
17         A.    It's a master's degree.
18         Q.    That was in sports --
19         A.    Sport administration.
20         Q.    Now, if you could briefly run through
21 your full-time employment history from whenever you
22 started working full-time for anybody.
23         A.    If it's okay, can I focus on the sports
24 side or do you want everything?
25         Q.    Well, I guess everything just in case.

1  called athlete support, grants and planning, and I
2  believe there may have been one other.  I don't
3  recall fully.  And people that were in those
4  positions were offered a chance to apply for
5  positions within the newly created Sport Partnership
6  division.
7          Q.    Back before it changed to sports
8  partnership --
9          A.    Uh-huh.
10         Q.    -- were the tasks you had different from
11 what you're doing now?
12         A.    They were different in that they weren't
13 as encompassing.  My focus at grants and planning was
14 to strictly manage a -- what we call a marker
15 program, which was the evaluation of governing bodies
16 on how they did performance-wise and maybe on
17 coaching clinics, other types of things that we would
18 call task markers.
19               We also administered funds.  Now I have
20 greater responsibility.
21         Q.    What sports are you now responsible for,
22 if I could use that term?
23         A.    Okay.
24         Q.    Sports Partnerships.
25         A.    There are 12.  The winter sports are ice

1  You never know.
2          A.    Okay.  Out of -- after I received my
3  bachelor's degree, I started working for a copier and
4  fax sales company.  Went from there to work for a
5  consultant doing program administration.  Went --
6  left him to go to graduate school.
7          During my master's degree, I had to get
8  an internship.  Did that with USA Weightlifting in
9  marketing.  Was formally hired on as a director of
10 marketing for USA Weightlifting.  Left USA
11 Weightlifting to be a coordinator in grants and
12 planning at the U.S. Olympic Committee.  Left the
13 USOC to become the vice president of marketing and
14 administration with the North American Hockey League,
15 which is in Michigan.
16          Left there to come back to the Olympic
17 Committee as a manager in grants and planning and was
18 then promoted to director.  I'm sorry.  That manager
19 position morphed into a manager of Sport Partnerships
20 and was then promoted to director of Sport
21 Partnerships.
22         Q.    When you say "morphed," did the
23 organization change its name or restructure or
24 something?
25         A.    The organization eliminated divisions

1  hockey and speed skating.  The Pan American only
2  sports are roller sports and squash.  My Olympic
3  sports that I work with are archery, badminton,
4  basketball, field hockey, tennis, taekwondo,
5  shooting, weightlifting.
6               MR. LEVINSTEIN:  And alphabetically.
7          Q.    BY MR. JONES:  At times has the sports
8  you've been responsible for changed and been
9  reassigned to someone else or has that been kind of
10 constant as far as that group of sports you're
11 handling right now?
12         A.    Since being in Sport Partnerships, the
13 sports that have been added I have not had any
14 removed.  The sports that have been added to my group
15 or my responsibility are taekwondo, basketball, field
16 hockey, and speed skating.
17         Q.    Have you ever been involved with
18 taekwondo as a participant?
19         A.    No.
20         Q.    Is it correct then you've not competed
21 in taekwondo competition?
22         A.    Correct.
23         Q.    And is it also correct that you've not
24 coached anyone in taekwondo competition?
25         A.    Correct.

1   Q.   And is it correct that other than your
2   professional responsibilities with respect to these
3   various sports that you're responsible for that
4   you've not personally been involved as a participant
5   in any of those sports at a -- call it a competitive
6   level?
7          MR. LEVINSTEIN:  An elite level.
8          MR. JONES:  An elite level.
9          THE WITNESS:  At an elite level, no.
10         MR. LEVINSTEIN:  Certainly wouldn't want
11  to say played competitive basketball.
12         MR. JONES:  Yeah.  I'm not talking about
13  pickup basketball.
14         THE WITNESS:  High school basketball,
15  but that's not elite basketball.
16     Q.   BY MR. JONES:  What year and month, if
17  you can remember, did you become responsible for
18  taekwondo?
19     A.   May of 2003.
20     Q.   Do you know who was handling taekwondo
21  before you?
22     A.   I do.  The original Sport Partnership
23  concept had five teams, and Terry Kent was the
24  director that had taekwondo within its mix.  Terry
25  left.  Jill Savory, one of the managers, ended up

1   overseeing that entire group of sports.  So Jill
2   Savory.  And then when Jay Warwick and I were hired,
3   taekwondo was removed from that portfolio and moved
4   into my group.
5      Q.   Was that by any chance because Jay came
6   from taekwondo?
7      A.   Absolutely.
8      Q.   Would that be considered some sort of
9   a -- would it be considered inappropriate or some
10  sort of a conflict?
11     A.   No, it would not be that because I came
12  from the sport of weightlifting, and weightlifting is
13  in my mix of sports.  It always has been.  It was
14  simply a function of giving Jay an opportunity to
15  move away from taekwondo because he had been involved
16  with that sport for quite a long time, which was his
17  expertise.
18     Q.   Did he request to be removed, to have
19  taekwondo removed?
20     A.   I have no idea.  I just went into a
21  meeting with Jay and the other directors, and they
22  said, "Here's the way the break-out of the sports
23  will be now."
24     Q.   Who was your boss, using the term
25  loosely, in 2003 at Sports Partnership?

1      A.   Jim Shear.
2      Q.   Is he still your boss?
3      A.   He's the -- he's the ultimate boss.
4   He's the CEO.
5      Q.   So he's moved up?
6      A.   Yes, but my direct report is to Steve
7   Rousch, chief of sport performance.
8      Q.   And when did Mr. Rousch become your
9   boss?
10     A.   He officially became my boss sometime
11  towards the end of 2004.
12     Q.   Did that correspond with Mr. Shear
13  moving up?
14     A.   Mr. Shear was asked to assume the role
15  of acting CEO.  Without that title, he was still the
16  chief of sport performance.  Upon the departure of
17  Lloyd Ward, who had left the USOC sometime in 2003,
18  early 2003, so Mr. Shear had been in that role since
19  that time.  He was officially named the end of April
20  2005.
21     Q.   Are you a salaried employee of the USOC
22  in your current job?
23     A.   Yes, I am.
24     Q.   And in your job, have you ever had
25  reason to review the budget of the whole USOC?

1      A.   Not the entire USOC, no.
2      Q.   So you have -- do you have any idea what
3   the annual budget of USOC is in millions of dollars?
4      A.   I have a rough idea of the budget.
5      Q.   What would that amount be?
6      A.   About 116 million.
7      Q.   1-1-6?
8      A.   1-1-6.
9      Q.   How did you -- how did that information
10  become known to you?
11     A.   The board made it public that they had
12  approved the budget around that number for the year.
13     Q.   Focusing on your duties with Sports
14  Partnerships -- and again, your formal title today is
15  Sport Partnerships?
16     A.   Director of Sport Partnerships.
17     Q.   Just describe briefly what the duties of
18  the director are.
19     A.   Briefly.
20     Q.   Maybe it's a long list.  I don't know.
21     A.   We -- our division is responsible for
22  planning with the governing bodies, allocating
23  resources against high performance plans, sport
24  plans.  We work with the governing bodies on
25  selection procedures.  We work with them on joint

**Page 17**

```
1    marketing.  We have some involvement there.  Value in
2    kind that they may get.
3            It seems to run training center access,
4    the approval of resident training programs.  We have
5    a incredible amount of involvement with the governing
6    bodies.  What we have become is a first phone call
7    for the sports that we work with to say, "How do I
8    get this done?"  And if I -- if my team cannot do it,
9    we direct them to who can do it.
10       Q.   Would it be fair to say -- and I don't
11   want to put words in your mouth.  But currently,
12   Sports Partnerships touches on all aspects of NGB
13   day-to-day business.
14           MR. LEVINSTEIN:  Objection.
15           THE WITNESS:  We have involvement in
16   several areas, but I would not know to say all
17   aspects of their business.
18       Q.   BY MR. JONES:  Your duties are broad?
19       A.   Yes.
20       Q.   Other than taekwondo --
21       A.   Uh-huh.
22       Q.   -- among the various sports that you've
23   handled, have any of those other sports you've been
24   involved with ever had financial difficulties?  By
25   that, I mean in situations where the budgets are
```

**Page 18**

```
1    operating at a deficit.
2        A.   Not that I recall.  And -- no, not that
3    I recall at a budget deficit, no.
4        Q.   Defining budget is having higher
5    expenses than incomes for a given year at the time
6    the accounting is done.
7        A.   That is actually a very -- if I look at
8    the sports that I work with on a four-year move,
9    moving number, that would not be the case.  And the
10   reason I say it that way is this:  Several of their
11   marketing deals are structured to whether they're
12   front-end loaded or back-end loaded.  So you may have
13   years in the middle where you operate at a deficit,
14   however, at the end it is all covered.  So they're on
15   a four-year budget.  They at least break even or
16   hopefully yielding a little bit of money.
17       Q.   I take it NGB's, they're not
18   corporations for profit; their primary goal is not to
19   make money.  Is that true?
20       A.   Correct.
21       Q.   And as you've just pointed out, they're
22   looking at a minimum to break even.
23       A.   Uh-huh.  Yes.
24       Q.   And if they can do better than that,
25   that's great.  Right?
```

**Page 19**

```
1            MR. LEVINSTEIN:  Objection.  They're
2    not-for-profit entities, but they want to make money
3    to accomplish their goals.  So I'm not sure what you
4    mean by all of what you just said.  But you can
5    answer the question.
6            THE WITNESS:  What -- what they would do
7    is if they were in a position that had some extra
8    money at the end of the year, they would bulk up
9    their foundations because down the road the
10   foundations will help them further their business.
11   But it's a rare case, very rare case.
12       Q.   BY MR. JONES:  But ultimately, they have
13   to use all of their surpluses on NGB programs.  Isn't
14   that correct?
15           MR. LEVINSTEIN:  Objection.
16           MR. JONES:  And/or expenses.
17           MR. LEVINSTEIN:  Calls for a legal
18   conclusion about multiple different entities and
19   they're very differently situated, but you can
20   answer.
21           THE WITNESS:  Again, not being an expert
22   in 501(C)(3) law, I would not want to provide an
23   answer.
24       Q.   BY MR. JONES:  But as you mentioned, it
25   would not be unusual to see some NGB's in mid-year
```

**Page 20**

```
1    taking a snapshot mid-year of going into the red.  Is
2    that correct?
3            MR. LEVINSTEIN:  Objection.
4            MR. JONES:  That happens.
5            MR. LEVINSTEIN:  Objection.
6            THE WITNESS:  If you could just clarify
7    that.  I'm sorry.  If you could clarify that for me.
8        Q.   BY MR. JONES:  You mentioned there were
9    situations you had seen where NGB's operated at a
10   deficit mid-year because of the way they've
11   structured their planning as being front-end or
12   back-end loaded?
13       A.   Actually, I was addressing over a
14   four-year span of time, but --
15       Q.   Okay.  Well, use a four-year plan then.
16   Is the -- at some point in time during that four
17   years there might be a point where the expenses
18   exceed the incomes?
19           MR. LEVINSTEIN:  Objection because,
20   again, they're contracted for revenues when they come
21   in.  Doesn't mean their revenues are less than
22   expenses, but you can answer.  I don't know what the
23   point of any of this is, but go ahead.
24           THE WITNESS:  That's possible.
25       Q.   BY MR. JONES:  Have you ever had any of
```

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)    Document 246-3    6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

Case 1:04-cv-00461-SOM-LEK    Document 246-3    Filed 03/21/2006    Page 7 of 42

**Column 1 (page 21)**

```
1    your sports being, shall I say, watched closely by
2    the USOC auditing department because of what the
3    auditing department perceives as a poor fiscal
4    situation for that individual NGB other than USTU?
5         A.   None.
6         Q.   Have any of the sports that you've been
7    responsible for ever been the subject of a
8    decertification action other than USTU?
9         A.   No.
10        Q.   Have any of the sports you've been
11   responsible for ever been subject to any sort of
12   discipline by USOC other than USTU?
13             MR. LEVINSTEIN:  Objection.
14             THE WITNESS:  That's -- to the best of
15   my recollection, I don't recall.  And discipline is a
16   pretty broad --
17        Q.   BY MR. JONES:  Okay.  Turning now to the
18   subject of just coach selection generally, is it
19   correct that one of the functions of a NGB is to
20   create criteria for selection of coaches and athletes
21   for the Olympics?
22        A.   Yes.
23        Q.   And are there definite procedures or
24   rules NGB's are supposed to follow with respect to
25   the timing of submission of such criteria to the
```

**Column 2 (page 23)**

```
1              MR. LEVINSTEIN:  -- time.
2              MR. JONES:  Oh, okay.
3         Q.   BY MR. JONES:  If the procedures have
4    changed, what was the situation in 2003?
5         A.   If the --
6         Q.   Did that Team Selection Working Group
7    was that first stage of review by the USOC during
8    calendar 2003?
9         A.   There was, and I do not recall when the
10   transition happened.  There's been a great deal of
11   change.  There was a time when it transferred from a
12   group called the Delegation Review Committee to a
13   Team Selection Working Group.  When that piece
14   happened, I do not recall, but that was the group.
15        Q.   So at some point in the past a committee
16   called the Delegation Review Committee would see it
17   first?
18        A.   Correct.
19        Q.   And then it would go to the Team
20   Selection Working Group?
21        A.   No.  They -- they were -- it was
22   previously called the Delegation Review Committee,
23   which then the name changed --
24        Q.   Okay.
25        A.   -- is all that it was.
```

**Column 3 (page 22)**

```
1    USOC?
2         A.   There's guidelines.
3         Q.   With respect to the timing, what's your
4    understanding of the guidelines?
5         A.   We ask that we have procedures at least
6    12 months in advance.
7         Q.   And is it correct that those procedures
8    must at some point be approved by the USOC before
9    they can be used by the NGB in actual selection?
10        A.   Correct.
11             MR. LEVINSTEIN:  Again, we're talking
12   about Olympic coaches.
13             MR. JONES:  Olympic coaches.
14        Q.   BY MR. JONES:  And for those of us who
15   don't know, what -- what department in particular,
16   what committee in particular is the one that would
17   use the coach selection criteria or committees?
18        A.   The coach selection criteria for the
19   Olympic games would be reviewed by the Team Selection
20   Working Group.
21             (A discussion was held off the record
22   between Mr. Levinstein and Mr. Johansen.)
23             MR. JONES:  And then --
24             MR. LEVINSTEIN:  For the record --
25             MR. JONES:  Oh.
```

**Column 4 (page 24)**

```
1         Q.   All right.
2         A.   To Team Selection Working Group.
3         Q.   All right.  And then let's take the past
4    first.
5         A.   Okay.
6         Q.   Where -- where would it go, if anywhere,
7    after Team Selection Working Group or was that it?
8              MR. LEVINSTEIN:  You said the past.  Now
9    you're using Team Selection Working Group.  The past would be
10   the Delegation Committee.
11             MR. JONES:  Okay.
12        Q.   BY MR. JONES:  Where would it go after
13   the Delegation Review Committee in the past, if
14   anywhere?
15        A.   It would go to the Executive Committee
16   of the board for final approval.
17        Q.   All right.  And in 2003, do you know who
18   was on the Delegation Review Committee?
19        A.   I do not know.  I did not work closely
20   with that group.
21        Q.   Do you have any idea how big it was?
22        A.   I do not.
23        Q.   And same question for the Executive
24   Committee of the board in 2003, do you know who was
25   on there or how many people?
```

**Page 25**

1    A.   I -- to give you a 100 percent assured,
2  do not know.
3    Q.   Okay.  Now, just moving forward to the
4  time that the name changed to Team Selection Working
5  Group --
6    MR. LEVINSTEIN:  For the record, despite
7  the testimony, it was more than a name change.
8    MR. JONES:  Oh, okay.
9    MR. LEVINSTEIN:  One was a governance
10 committee of the USOC and USOC restructured.  It's
11 not --
12   MR. JONES:  All right.
13   MR. LEVINSTEIN:  -- the same thing.
14 That's why it's called a working group instead of a
15 committee.  I just don't want to leave the record
16 unclear.
17   Q.   BY MR. JONES:  After the name change,
18 what is your understanding of who, if anyone, would
19 review the coach selection criteria after the Team
20 Selection Working Group?
21   A.   After the Team Selection Working Group
22 would be -- once the Team Selection Working Group was
23 comfortable and approved a set of procedures, they
24 would go to the board of directors.
25   Q.   Not the Executive Committee of the

**Page 26**

1  board?
2    A.   To the best of my knowledge, we do not
3  have an Executive Committee within our board
4  structure currently.
5    Q.   So that's one of the changes then?
6    A.   Part of the whole restructure --
7    Q.   Okay.
8    A.   -- of the USOC.
9    Q.   And as you sit here today, we don't
10 know -- you don't know what month or year that change
11 came about?
12   A.   The restructure was an evolving process,
13 so to give you a definitive date, I could not tell
14 you.
15   Q.   Thank you.  You called it the one-year
16 guideline?
17   A.   Uh-huh.  Correct.
18   Q.   Do you know where that guideline is in
19 writing?  Do you know where it comes from?
20   A.   Comes from our desire to get better
21 information out to the athletes earlier.  I don't
22 know of it being in writing anywhere except in our
23 selection procedures manual that is put out.
24   Q.   Are there also guidelines for when the
25 coach -- actual coach selection of the candidate, the

**Page 27**

1  person, should take place?
2    A.   We ask for all procedures to be
3  submitted at the same time, but it rarely happens.
4    Q.   So --
5    MR. LEVINSTEIN:  He didn't answer your
6  question, just for the record.  You asked him when
7  the coach decision was made.
8    MR. JONES:  Yes.
9    MR. LEVINSTEIN:  You answered sort of
10 about when the procedure would be submitted.
11   MR. JONES:  I guess I was interpreting
12 it as he was saying one in the same.
13   Q.   BY MR. JONES:  But did you understand
14 the difference?
15   A.   The question was:  When do we ask for
16 coach procedures?
17   Q.   No.  The person.  When do you ask for
18 the actual name of the candidate to look at for USOC
19 approval?
20   A.   We don't have a set date as to when we
21 ask for a name.
22   Q.   There's no guideline on that?
23   A.   Not -- I don't have a manual here with
24 me and I haven't committed it to memory, but I do not
25 know of a guideline on we would like to see a coach

**Page 28**

1  named by.
2    Q.   In the capacity as a director now --
3    A.   Uh-huh.
4    Q.   -- have you at times had to consult
5  either the past USOC bylaws or any revisions to the
6  USOC bylaws that have come afterwards?
7    A.   Consult them?
8    Q.   Read them and use them.
9    A.   Yes.
10   Q.   Have you read the bylaws front to back?
11   A.   Once.
12   Q.   You'd agree with me that those are not
13 guidelines.
14   A.   I would agree.
15   Q.   Those are rules, procedures which
16 everybody is supposed to abide by, if they apply.  Is
17 that fair?
18   MR. LEVINSTEIN:  Objection.  They're the
19 bylaws.  Go ahead.
20   THE WITNESS:  That's it.  They're our
21 governing documents.
22   Q.   BY MR. JONES:  You try to follow them if
23 you can?
24   A.   I try to follow them so I can keep a
25 job.

1    Q.   Any other rules in your department that
2  you follow to keep your job other than the USOC
3  bylaws?
4    A.   No.
5        (A discussion was held off the record
6  between Mr. Levinstein and Mr. Johansen.)
7    Q.   BY MR. JONES:  Is it correct that it's
8  the individual NGB's job to determine particular
9  selection criteria for Olympic coaches?
10       MR. LEVINSTEIN:  Objection.
11   Q.   BY MR. JONES:  With USOC approval, I
12  understand that.  But it's -- it's the NGB's function
13  to come up with the criteria.
14   A.   The NGB's function to develop criteria,
15  but often in consultation with the Olympic Committee.
16   Q.   And that's because it's assumed that
17  they know their sport very well, totally familiar
18  with it?
19       MR. LEVINSTEIN:  Objection.
20       THE WITNESS:  It is assumed that they
21  know their sport very well, yes.
22   Q.   BY MR. JONES:  When -- and when a
23  criteria has been approved by the USOC and then the
24  individual NGB, does its actual coach selection of
25  the person -- but let's pick 2003, first of all,

1    Q.   And let's take the --
2        MR. LEVINSTEIN:  Just for clarification,
3  we're not sure, but it's possible that they both
4  existed at one point in time.  They went from the
5  Team Selection Working Group to the Delegation Review
6  Committee and then to -- Gary's told me this and I'm
7  not positive and I just don't want to --
8        MR. JONES:  Okay.
9        MR. LEVINSTEIN:  I'm not sure.  If I'm
10  wrong, I'm wrong.
11       MR. JONES:  That's fine.
12       MR. LEVINSTEIN:  I just don't want to
13  mislead you here.
14       MR. JONES:  Let's go with what the
15  witness knows then.
16       MR. LEVINSTEIN:  Right.
17   Q.   BY MR. JONES:  Just give me your best
18  response.  If we're wrong, we're wrong.
19       After the Delegation Review Committee --
20  well, your department looks at it first, the name,
21  makes sure it complies with the approved procedure.
22  And, what, you look at the name of the person and his
23  qualifications.
24   A.   Qualifications.
25   Q.   Is a resume or something from the person

1  because I don't know if the procedures has changed.
2        MR. LEVINSTEIN:  Objection.  Start over.
3  NGB's in general?  Let's get the question clear.
4        MR. JONES:  I think it is clear.
5    Q.   BY MR. JONES:  2003, an NGB submits its
6  individual coach selection candidate and the person's
7  identified.  Who is that submitted to and what's the
8  process for getting that person approved at the USOC
9  stage?
10   A.   So just to clarify, once procedures for
11  selecting a coach have been approved?
12   Q.   Right.  That's done.
13   A.   And now the governing body is coming
14  forward with a name.
15   Q.   Right.
16   A.   The name is given to the appropriate
17  Sport Partnership team, whoever it is that works with
18  that sport.  That person makes sure that the
19  candidate matches up with the approved procedures,
20  and then that name, if that is all in order, is
21  brought forward to the Team Selection Working Group.
22   Q.   And before the Team Selection Working
23  Group came into vogue, would that be the Delegation
24  Review Committee?
25   A.   Correct.

1  usually submitted along with the name?
2    A.   Typically.  It is within the procedures
3  that a biographical sketch or some type of
4  biographical information is provided.
5    Q.   And then assuming Sports Partnership
6  gives its okay, it goes to the -- possibly the
7  Delegation Review Committee first back when that
8  existed?
9    A.   Possibly it could have to the point that
10  was made about the evolving restructure.  It could
11  have gone to the partnership team to the Team
12  Selection Working Group to the Delegation Review
13  Committee to the board.  Or the way it is now, it
14  goes Sport Partnership, Team Selection Working Group
15  to the board.
16   Q.   In the -- in the past --
17       MR. LEVINSTEIN:  For the record, when
18  you said board the first time, he probably meant
19  selection committee.
20       Q.   BY MR. JONES:  Is your counsel probably
21  right?
22       A.   Probably.
23       Q.   Yeah.  I was going to ask about the
24  Executive Committee.  So it's not --
25       MR. LEVINSTEIN:  One thing I can make

6/30/2005 Skinner, Kelly   (Pltf desig = Yellow, Dfts' counters = Blue)

1  easier.  The Executive Committee, Delegation Review
2  Committee ran the business simultaneously.
3          THE WITNESS:  Right.
4          MR. LEVINSTEIN:  So if one existed, the
5  other did.
6          MR. JONES:  I can see why a
7  restructuring was required.
8          THE WITNESS:  Yeah, definitely.
9          (A discussion was held off the record
10  between Mr. Levinstein and Mr. Johansen.)
11          Q.  BY MR. JONES:  The individual person
12  could theoretically be rejected at any one of these
13  USOC stages that you just described?
14          A.  Correct.
15          Q.  Or something noted and sent back for
16  further study?
17          A.  Correct.
18          Q.  And once -- back when the Executive
19  Committee was in the loop, once they approved the
20  candidate, was that it, or would that then go to the
21  board, the whole board?
22          A.  I was not involved at that point in time
23  to tell you what the next steps would be in terms of
24  the next aspect.
25          Q.  Just testify to what you know now then.

33

---

1  removing the coach other than for cause, not doing
2  his job or illness?  Are you aware of any other
3  reason for doing that?
4          A.  So code of conduct violation?  Anything
5  in there?  You would -- code of conduct violation
6  definitely would be a removal, but not to the best of
7  my knowledge do I recall anything along those lines.
8          Q.  A coach being removed for other than
9  cause, code of conduct?
10          MR. LEVINSTEIN:  Objection.
11          Q.  BY MR. JONES:  Or perhaps illness?
12          A.  Understood.  Not that I've personally
13  been involved with, but there's been hundreds of
14  coaches nominated to the Olympic Committee.  I do not
15  know the fate of all of them.
16          Q.  Turning to Dae Sung Lee, have you ever
17  met Dae Sung Lee, the plaintiff in this case?
18          A.  I have met him maybe once, twice.
19          Q.  What was the situation?
20          A.  I wouldn't -- I would not be telling you
21  the truth if I gave you an idea.  There was several
22  events that I was at several different meetings
23  that I was involved in.
24          Q.  Could it have been some competition or
25  something you attended?

35

---

1  What -- where would it go?
2          A.  Right now it would go from the Team
3  Selection Working Group to the board.
4          Q.  The board is a lot smaller now than it
5  was?
6          A.  Correct.
7          Q.  But that body would have the opportunity
8  to approve of every single Olympic coach then?
9          MR. LEVINSTEIN:  That body?
10          MR. JONES:  The board.
11          MR. LEVINSTEIN:  Okay.
12          THE WITNESS:  Correct.
13          Q.  BY MR. JONES:  And once that happens,
14  the person is then formally the coach.  Is that
15  right?
16          A.  They are formally nominated to be the
17  coach at that point in time.
18          Q.  So nobody that has to look at it any
19  further?
20          A.  Correct.
21          (A discussion was held off the record
22  between Mr. Levinstein and Mr. Johansen.)
23          Q.  BY MR. JONES:  Are you aware of any
24  basis for removing an Olympic coach once that process
25  that you've just described is completed at the USOC.

34

---

1          A.  Could have been.  Could have been a
2  meeting.
3          Q.  Were you involved in reviewing any part
4  of, first of all, the -- I'll call it the old coach
5  selection criteria at USTU?
6          A.  No.
7          Q.  Just to show you something, Exhibit 87,
8  I think it's -- if you look in that book here.  I
9  hope it's in here.
10          A.  Okay.
11          Q.  Have you ever seen Exhibit 87 before?
12          A.  Possibly when the transfer of documents
13  from the previous team to our team, but I don't
14  recall ever seeing it, but it's possible.
15          Q.  I'm showing you a document entitled
16  "Selection Procedures For Coaches, U.S. Taekwondo."
17  It's signed by Bruce Harris and dated January 20,
18  2003.  Is that correct?
19          A.  That's correct.
20          Q.  So you might have seen it, but nothing
21  jumps out at you as to when exactly or if?
22          A.  No.  When exactly, definitely not.
23          Q.  So you don't know what stage this
24  document might have been at in the various USOC
25  review procedures as of May 2003 when you took over

36

1  taekwondo?
2      A.   I do not know.  No, I don't.
3      Q.   Was it your impression as of May 2003
4  that USTU had a set of coaching criteria in effect
5  when you came on board?
6      A.   Yes.
7      Q.   So is it also correct then that you had
8  no opportunity to reject or comment on whatever was
9  contained in the old criteria during 2003?
10      A.   That would be correct.  I was not a
11  member of the group that worked on these, so did not
12  have that opportunity.
13      Q.   Looking at them just for a moment since
14  you've handled so many NGB's, would you -- just
15  looking at the criteria that are contained there,
16  would you consider that the criteria contained in
17  that document to be objective, subjective, or none of
18  the above?
19      A.   Subjective.
20      Q.   And just if you just read in the record
21  what the document states.
22      A.   The entire document?
23      Q.   Just the answer to number one.
24      A.   Okay.  The question number one is:
25  "What are your NGB and/or PSO prerequisites for

1  individual sports?
2      A.   Yes, several.
3      Q.   Which ones would you term individual?
4      A.   Archery, badminton, weightlifting,
5  shooting, speed skating, squash, roller sports.
6      Q.   Okay.
7      A.   That should be nine.  I have --
8          MR. LEVINSTEIN:  Tennis.
9          THE WITNESS:  Tennis.  Thank you.
10         MR. JONES:  Okay.
11         MR. LEVINSTEIN:  That was not in
12  alphabetical order.
13         THE WITNESS:  I know.  If it's not
14  alphabetical, I don't do it right.
15         MR. LEVINSTEIN:  Although doubles
16  tennis.
17         THE WITNESS:  There are team components
18  to some of those sports.
19      Q.   BY MR. JONES:  And you've seen the
20  coaching selection criteria for all of those?
21      A.   I have.
22      Q.   When you say that some of these other
23  individual sports have criteria that contain more
24  or -- excuse me.
25         MR. LEVINSTEIN:  Here you go.

1  coaching positions?"
2          The answer is:  "Previous coaching
3  experience at the Olympic Games, Pan American Games,
4  World Championships, World Cup, or Pan Am
5  Championships for taekwondo."
6          MR. LEVINSTEIN:  That's not the whole
7  thing.  There's a 2 and a 3.
8          MR. JONES:  I know that.
9          MR. LEVINSTEIN:  Okay.  Just for the
10  record, you asked him to do one thing, and then you
11  told him to do something else.
12         MR. JONES:  I don't think that that
13  correctly characterizes what I'm doing.
14      Q.   BY MR. JONES:  But let me ask you this:
15  Contrasting that with or comparing it with any other
16  coaching selection criteria you've seen at the other
17  NGB's you've handled, have you ever seen coaching
18  selecting criteria that looked like this?
19      A.   No.  This may be one minor part of it,
20  but typically what I've seen is things that are much
21  more -- criteria that is much more objective.
22      Q.   Now, taekwondo is a individual sport.
23  Is that correct?
24      A.   Correct.
25      Q.   Do you -- are you in charge of any other

1          MR. JONES:  Thanks.  I'm sorry.  Why
2  don't you restate what your --
3          MR. LEVINSTEIN:  I think he said, "I
4  have seen much more objective criteria."  That's what
5  I have written down.
6          THE WITNESS:  Right.
7      Q.   BY MR. JONES:  Why don't you explain
8  your answer when you say "much more objective."
9      A.   Okay.  Typically what I see in these
10  procedures, whether it be for coach or team leader or
11  any other staff member, is a performance focus,
12  meaning actively coaching athletes that could be on
13  the Olympic games team or whatever team it is we are
14  approving athletes for or whatever procedures -- I'm
15  sorry -- or what we're approving.  Number of athletes on
16  a team, if you are the current national team coach,
17  performances of athletes when you've coached them at
18  high-level international events.  That's typically
19  the way it's broken up.  The procedures here are very
20  appropriate for a team leader.
21      Q.   "Here" meaning in Exhibit 87?
22      A.   Correct.  Previous experience at an
23  event is good indicator of maybe there would be some
24  success of that person in an event as a team leader.
25      Q.   But you would not consider previous

1    coaching experience at the Olympic games, for
2    example, to be appropriate for determining an Olympic
3    coach?
4         A.   Depending on when the Olympic games are
5    that they coached, it may play a role.  But if it was
6    quite awhile ago, maybe there is somebody that has
7    athletes that are going to be participating on an
8    Olympic team and have an opportunity to make the
9    Olympic team that would be better suited for the
10   position.
11        Q.   But you'd agree, though, that if the
12   coach candidate in question had recent Olympic coach
13   experience, it would be a relevant trait to require?
14        A.   I don't know that it's necessary.  I've
15   seen coaches, because it's the coach of the athlete
16   that's performing, be tremendously successful at one
17   of the games and that could be the absolute wrong
18   coach for the next Olympic games.  So I would not use
19   that as a rule of thumb.
20        Q.   When you say performance -- use the term
21   performance as being an objective in coach selection?
22        A.   I say that we focus on performance.
23        Q.   So it's more of -- it's a goal then.  Is
24   that fair when you say --
25        A.   It's an absolute -- within my position,

1    it's an absolute demanded outcome.
2         Q.   And how does one measure performance?
3         A.   Success at the games.
4         Q.   And how does one measure success at the
5    games?
6         A.   Medals.
7         Q.   And is more medals better than less?
8         A.   Absolutely, without a doubt.
9         Q.   So if you have a lot of medals, you've
10   performed.
11             MR. LEVINSTEIN:  Objection.
12             THE WITNESS:  If a national governing
13   body has won a large number of medals, that could be
14   seen as an indicator of success.
15        Q.   BY MR. JONES:  Okay.  Looking at Exhibit
16   87 for a moment and assuming that was the selection
17   procedures in effect --
18        A.   Uh-huh.
19        Q.   -- at least through calendar 2003, do
20   you know how many medals the USTU had won in the
21   Olympic competition using these criteria to select
22   their coaches?
23             MR. LEVINSTEIN:  Objection.
24             THE WITNESS:  Using these criteria?
25             MR. JONES:  Yeah.  That -- the answer is

1    no?
2             MR. LEVINSTEIN:  Objection.  These are
3    criteria for 2004.
4             MR. JONES:  Let's assume that the same
5    criteria were used in the past.  If you assume that.
6             MR. LEVINSTEIN:  For what events?
7         Q.   BY MR. JONES:  Why don't you answer a
8    simpler question.  Do you know how many medals the
9    USTU had won in those Olympics that it had
10   participated in prior to 2004?
11        A.   Off the top of my head, only one medal
12   comes to mind in 2000.  That's it.
13        Q.   Jay Warwick gave an interview that he
14   counted 22 in the 3 Olympics that USTU had
15   participated in before 2004.  Do you have any
16   evidence that refutes that?
17             MR. LEVINSTEIN:  Objection.  It is what
18   it is.
19        Q.   BY MR. JONES:  Do you have any evidence
20   that refutes it?
21        A.   I have nothing to refute that.
22        Q.   And you -- you only know of the one
23   medal you just mentioned in 2000?
24        A.   I said I'm not looking at results.
25   Please understand I work with 12 sports.  I have a

1    great deal of information in my head about 12 sports.
2    So to recall what any one of my sports that I work
3    with did in 2000 or in 2002 would potentially provide
4    you with a false answer.
5             MR. LEVINSTEIN:  For the record, the
6    other two games were in '92 and '88.  We're talking a
7    long, long time ago.
8         Q.   BY MR. JONES:  Is it your testimony that
9    none of your other sports have coaching selection
10   criteria that looks like number one in Exhibit 87?
11             MR. LEVINSTEIN:  Objection.  Vague and
12   ambiguous.  We're talking about individual sports
13   versus team sports?
14             MR. JONES:  Individual sports.
15             THE WITNESS:  Without having all of
16   their procedures in front of me, to the best of my
17   recollection, this -- we would look for more to a
18   coach selection process than what is indicated here.
19        Q.   BY MR. JONES:  Okay.  Were you
20   responsible for U.S. Taekwondo when Dae Sung Lee's
21   name was submitted as a coach candidate for the
22   position of U.S. Olympic coach?
23             MR. LEVINSTEIN:  Objection.
24             MR. JONES:  To USOC.
25             MR. LEVINSTEIN:  Objection.

**Page 45**

1   THE WITNESS:  I do not recall when his
2   name was submitted.  If it was after May of 2003,
3   then I was a director of that team, but I do not
4   recall when his name was submitted.
5   Q.  BY MR. JONES:  Did you have any
6   involvement at all in his selection process during
7   2003?
8   A.  None.
9   Q.  Do you know if Olympic coaches or coach
10  candidates were being sent by individual NGB's to the
11  Athens Olympic site at USOC expense in the month of
12  April 2003?
13  A.  April 2003?
14  Q.  I realize there's a conversion in there
15  for you.
16  A.  Not that I -- not that I recall were
17  coaches sent to Athens in April of 2003, but I wasn't
18  a part of that if it did happen.
19  Q.  You weren't involved with sending --
20  having anything to do with the process of arranging
21  for coaches to go to visit the site in April 2003 in
22  any of your NGB's?
23  A.  I was not involved at all, no, not that
24  I recall.
25  Q.  All right.

**Page 46**

1   (A discussion was held off the record
2   between Mr. Levinstein and Mr. Johansen.)
3   Q.  BY MR. JONES:  Do you have any
4   understanding of what the job description is for a
5   U.S. Olympic coach?
6   A.  It varies from sport to sport.
7   Q.  Do you know what the USCO bylaws say?
8   A.  About the Olympic coach?
9   Q.  Yeah, his job description.
10  A.  I would not want to go out of USOC
11  bylaws on that issue.  I have a -- I have a
12  familiarity, but I do not -- I would not want to be
13  citing verse from the bylaws.
14  Q.  What is your understanding of what a
15  U.S. Olympic coach is supposed to do?
16  A.  I can only --
17  MR. LEVINSTEIN:  Objection.  Go ahead.
18  THE WITNESS:  I can only answer that
19  based on what I've seen from my experience with
20  governing bodies and what appears to be successful,
21  but I cannot answer it based on what it is USOC has
22  outlined without looking at the bylaws.
23  Q.  BY MR. JONES:  Okay.  Do you know
24  whether Dae Sung Lee attended the world championship
25  for taekwondo in 2003?

**Page 47**

1   A.  I do not know.
2   Q.  Do you recall testifying in federal
3   court that yes, he did?
4   A.  (No oral response.)
5   Q.  You don't recall?
6   A.  I do not recall that.
7   Q.  You were under oath at that time.
8   A.  Understood.  You asked if I recall right
9   now today that he was at the 2003 world
10  championships.  That testimony was during the Olympic
11  games nearly a year ago.  What I said a year ago, I
12  do not recall.
13  Q.  Were you at that championship?
14  A.  No, I was not at that championship.
15  Q.  Do you know whether he attended, Dae
16  Sung Lee attended the Pan Am games in the Dominican
17  Republic in 2003?
18  A.  I do not know if he did.  It's quite
19  possible.
20  Q.  You earlier testified that yes, he did.
21  Do you know --
22  A.  Can I just make a point?
23  Q.  Sure.
24  A.  I did not take it upon myself to, for
25  coming here today, understand the complete history of

**Page 48**

1   Mr. Lee.  So where he has been, I do not know at this
2   point in time.  So you can continue to ask me those
3   questions.  I will continue to tell you I do not
4   know.
5   Q.  That's all we're asking for is your
6   current knowledge.
7   A.  That's what you're getting.
8   Q.  Do you know whether Dae Sung Lee
9   attended the regional -- I'm sorry.  You already
10  answered that one.  I think -- I'm sorry.
11  Q.  Do you know whether he attended the
12  regional Pan Am qualifications in Mexico?
13  A.  I do not recall.
14  Q.  Do you know whether he attended the
15  world qualifications in France?
16  A.  I do not recall.
17  Q.  How about the first Olympic qualifiers
18  in Colorado?
19  A.  I do not recall.
20  MR. JONES:  Let's take a break.  It's
21  been an hour.
22  MR. LEVINSTEIN:  We're okay.  It's up to
23  you.
24  (Recess taken from 2:08 p.m. to
25  2:13 p.m.)

1    Q.   BY MR. JONES:  With respect to the coach
2    selection of Dae Sung Lee, did you ever write any
3    correspondence to Mr. Johansen regarding the
4    circumstances surrounding Dae Sung Lee's approval as
5    coach?
6    A.   Utilizing him by name?  Mentioning Mr.
7    Lee by name?
8    Q.   Not mentioning him by name, no.
9    A.   If you're referring to the June 3rd
10   memo, I had sent a memo to three people within the
11   Olympic Committee to make them aware of what I
12   observed at a May -- end of May 2003 board of
13   governors meeting of U.S. Taekwondo, one item of
14   which was that the coach selection process was
15   challenged on the floor of that meeting.
16   Q.   Let's mark --
17        MR. LEVINSTEIN:  It's not identical
18   because my handwriting is a little different.  Other
19   than that, they're identical because I have the right
20   Bates number.
21        (Exhibit No. 147 was marked for
22   identification by the court reporter.)
23   Q.   BY MR. JONES:  Do you need to review it
24   again before I ask questions about it?  Go ahead, if
25   you need.

49

---

1    regarding the circumstances of selection of the
2    Olympic coach at USTU.  Is that right?
3    A.   This -- you're asking for me to
4    summarize what this paragraph says or what?
5    Q.   Well, generally, the topic of the
6    paragraph is selection of the coach at USTU?
7    A.   It's the involvement of the athletes in
8    the selection of the Olympic coach.
9    Q.   First of all, this memo is not signed.
10   Is there a reason it wasn't signed?  Is that your
11   normal practice?
12   A.   That's my normal practice.  I do not
13   sign them.
14   Q.   And other than sending this memorandum
15   to the recipients, was any follow-up of any kind done
16   to see when happened at USTU with respect to
17   selection of the coach and athlete participation in
18   that decision process?
19   A.   Any follow-up by which parties?
20   Q.   By you.
21   A.   Those athletes that we could talk to we
22   talked to.
23   Q.   And who was that?
24   A.   We talked to several athletes at that
25   point in time.  I don't recall all the athletes that

51

---

1    A.   The entire document or you just want me
2    to focus on the paragraph concerning the coach?
3    Q.   Just focus on the --
4    A.   Okay.
5    Q.   -- back page.
6    A.   Okay.
7    Q.   What is that document?
8    A.   This document is a memo from me to -- me
9    and Michelle Farrell, a member of my team, because we
10   both attended the board of governors meeting to Gary
11   Johansen, Jennifer Gabrius, and Bob Foth of the U.S.
12   Olympic Committee outlining things that we had
13   observed at the taekwondo board of governors meeting
14   and Executive Committee meeting.
15   Q.   That meeting you observed was May 23,
16   2003?
17   A.   The meeting, yes.
18   Q.   In New Orleans?
19   A.   In New Orleans, Louisiana, yes.
20   Q.   And the purpose was to keep the
21   recipients advised of what the status of things
22   happening with USTU?
23   A.   Correct.
24   Q.   The back page, first paragraph refers to
25   what you just said, matters discussed at the meeting

50

---

1    I spoke with.
2    Q.   That was after the meeting or at the
3    same time or --
4    A.   After.
5    Q.   Do you know if there were any further
6    meetings or communications between members of the
7    Coaching Sciences Committee at USTU after this
8    meeting?
9    A.   I do not have any information on that.
10   That would have been a USTU issue, and I would not
11   have been involved in those types of communications.
12   So none that I'm aware of at this time.
13   Q.   Other than the meeting you observed
14   which touched on the coach selection process at USTU
15   and Athens representation in that process and your
16   follow-up with a letter to Mr. Johansen on June 3rd,
17   2003, can you think of any other correspondence you
18   sent or received, correspondence you received from
19   other parties regarding coach selection in 2003 at
20   USTU?
21   A.   Not off the top of my head.  I do not
22   recall any at this point in time.
23   Q.   And other than the conversations with
24   athletes that you just mentioned, were there any
25   other conversations, for example, with the chair of

52

**Page 53**

1  the Coaching Science Committee as to follow-up?

2      A.   I did not speak with the chair of the

3  Coaching Science Committee personally.  If there was

4  other follow-up, I am not sure.

5      Q.   So you don't know what his position was

6  on what actually happened?

7      A.   What I do know is at that particular

8  point in time there were two things that were very

9  apparent to us within Sport Partnerships.  Number

10  one, nobody was really sure who was on which

11  committee, and the second thing was defining the

12  chair of those committees was equally challenging.

13      Q.   You -- so you weren't -- you weren't

14  even sure who the chair was --

15      A.   Correct.

16      Q.   -- of Coaching Science --

17      A.   Correct.

18      Q.   And your -- you had a perception that

19  other people didn't know who the chair was or the

20  members were?

21      A.   I definitely from sitting through a May

22  2nd or May 3rd membership and credentials meeting,

23  open forum meeting in Denver, had strong belief that

24  there were several people that were not sure who was

25  on which committees, particularly within the ranks of

**Page 54**

1  the athletes.

2      Q.   You already mentioned that as you sit

3  here today you can't recall names of any athletes you

4  talked to, but you've got some recollection of

5  talking to athletes --

6      A.   Correct.

7      Q.   -- at some time after this meeting.

8      A.   Correct.

9      Q.   But as you sit here today, you can't

10  tell us how many conversations, for example?

11      A.   No, not at all.  I had access to

12  athletes or I would talk to athletes at events.

13  Athletes would stop by my office and see me.  You

14  have resident program in place.  There were athletes

15  on campus.  Part of what I was doing at that point in

16  time was learning about the sport through talking to

17  the athletes.  So I spoke to a great number of

18  athletes within the sport.

19      Q.   Any -- understanding you don't know any

20  names, any recollection of any specific

21  conversations, the substance of what was said to you?

22      MR. LEVINSTEIN:  About coach selection

23  in 2003?

24      MR. JONES:  Yes, about the substance of

25  this paragraph that we're talking about.

**Page 55**

1      THE WITNESS:  The substance of this

2  paragraph was on the floor of the board of governors

3  meeting.

4      Q.   BY MR. JONES:  I understand, but you

5  talked with athletes afterwards, I assume, about the

6  same topic.  Am I wrong?

7      A.   I did not make it my personal mission to

8  go out to talk to every athlete about the coach

9  selection process.

10      Q.   Okay.

11      A.   I talked to them about a variety of

12  items.

13      Q.   Turning now to another topic, you're

14  aware, of course, that at some point in time a

15  decertification action was brought against USTU in

16  2003.

17      MR. LEVINSTEIN:  Objection, but you know

18  what he's referring to.

19      THE WITNESS:  Yes.

20      MR. LEVINSTEIN:  He calls it that, but I

21  don't know if that's the proper term for it, but --

22      Q.   BY MR. JONES:  You know what I'm talking

23  about?

24      A.   I know that in 2003 the organizations

25  were trying to find some resolution to some

**Page 56**

1  challenges within the sport of taekwondo.

2      Q.   Did you get involved with that process?

3      A.   Involved meaning -- clearly, I wrote a

4  memo.  I attended meetings.  So there was some level

5  of involvement, yes.

6      Q.   I notice a lot of the correspondence

7  flying back and forth would courtesy copy you.

8      A.   Yes.

9      Q.   Was that typical procedure?

10      A.   Typical procedure within the Olympic

11  movement is that if there's correspondence between

12  the U.S. Olympic Committee and a national governing

13  body that happens to be a sport that falls within my

14  group of sports, I tend to get a courtesy copy.  Not

15  always, but I tend to.

16      Q.   Okay.  Because one of your duties you

17  try to at least monitor and know what's happening

18  with your NGB's.  Is that right?

19      A.   Correct.  Yes.

20      Q.   Did you ever have any discussions with

21  Jay Warwick about what was happening with USTU as far

22  as decertification and trying to resolve that during

23  2003?

24      A.   I did not have any conversations of

25  substance with Mr. Warwick at all, and that was

**Page 57**

1   intentional.

2        Q.   Did he ask?

3        A.   He honored the situation that I was

4   trying to keep everything away from him and not have

5   him get involved, at least to the best of my

6   knowledge.  Jay works three doors down from me, so if

7   I don't recall any substantive conversations with

8   him.

9        Q.   I want to show you some documents

10  that -- do you have Exhibit 83 in the book there?  Do

11  you recall seeing that document before?

12       A.   I recall seeing this document.

13       Q.   What is it?

14       A.   It's a request from Mr. Bruce Harris,

15  the executive director of the USTU, to myself

16  regarding funding, some funding that had been awarded

17  to the USTU and the movement of some of the dollars

18  within that funding.

19       Q.   These were several reallocation

20  requests?

21       A.   Correct.

22       Q.   Movement being the same thing as

23  reallocation?

24       A.   Correct.

25       Q.   What was your response to this letter,

**Page 59**

1   these problems."  And there's no 1, but there's a 2.

2   And does it really start with 'a governance system'?

3            MR. JONES:  I don't think so.

4            MR. LEVINSTEIN:  It might have been a

5   copying problem.

6            THE WITNESS:  Okay.

7            MR. LEVINSTEIN:  That's what yours says,

8   too.

9            MR. JONES:  Yeah.

10           MR. LEVINSTEIN:  You can see it's been

11  maybe shrunk and distorted.  It looks like it was

12  folded a little because some letters are missing in

13  the middle.  But I know there are better copies than

14  this, but this is what we've got.

15           MR. JONES:  Is this his?

16           MR. LEVINSTEIN:  Yes.  If you want to

17  write the numbers on -- she's going to want that.

18       Q.   BY MR. JONES:  Have you had a chance to

19  look at that one, Exhibit 4?

20       A.   I looked it over, yes.

21       Q.   I'm asking you about it because it's one

22  of those documents that was apparently courtesy

23  copied to you.

24       A.   Correct.

25       Q.   Do you remember seeing it before?

6/30/2005  Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 58**

1   if any?

2        A.   Well, I definitely responded.  Without

3   having the letter in front of me, my recollection is

4   at that time we were working very aggressively to

5   help Mr. Harris through some funding challenges the

6   NGB was having.  So we looked at all these, but what

7   our ultimate decision was -- and I know there's a

8   response.  I just off the top of my head do not

9   recall what I said.

10       Q.   Do you know if you refused?

11       A.   I don't recall.  I don't recall.

12       Q.   Okay.  If you could take a look at

13  Exhibit 4.

14           MR. JONES:  You got one?

15           MR. LEVINSTEIN:  I gave it back.

16           MR. JONES:  Be that way.  I thought you

17  didn't want to see it anymore.

18           MR. LEVINSTEIN:  It depends.  If you

19  want me to take it home with me, I'm not going to

20  take this one home with me either.  I'm giving it

21  back to you after you're done asking.

22           MR. JONES:  It's a multipage document.

23  Why don't you take your time.

24           THE WITNESS:  Okay.  Is part of this

25  missing?  "The following are examples of some of

**Page 60**

1        A.   I remember seeing this document, yes.

2        Q.   Did you have any input at all into the

3   contents of it before it went out?

4        A.   None.  None that I recall.

5        Q.   Did anyone discuss with you before

6   August 4, 2003, the possibility that the Membership

7   and Credentials Committee might write a letter like

8   this involving compliance review?

9            MR. LEVINSTEIN:  Objection.

10           THE WITNESS:  I don't recall every

11  meeting I sat in that discussed potential outcomes

12  with the U.S. Taekwondo Union, but it's quite

13  possible that it was discuss at some meeting that I

14  attended.

15       Q.   BY MR. JONES:  This is a serious letter,

16  is it not, as far as an NGB is concerned?

17           MR. LEVINSTEIN:  Objection.

18           THE WITNESS:  I considered it to be a

19  very serious letter when I read it.

20           MR. JONES:  I mean, NGB's don't get

21  letters like this every day.

22           THE WITNESS:  Thankfully not.

23       Q.   BY MR. JONES:  And as you sit here

24  today, you can't recall if there were any discussions

25  about compliance review before August 4 with you?

```
1           MR. LEVINSTEIN:  That's not what he
2    said.  You asked him about the letter before.  Now
3    you've asked him about compliance review.  That's a
4    different question.
5           THE WITNESS:  As mentioned, I sat in a
6    series, more than -- more meetings than I'd ever want
7    to remember about this particular issue.  So what was
8    discussed in all those meetings --
9           MR. JONES:  Okay.
10          THE WITNESS:  -- there was always a
11   number of scenarios that could play itself out.
12      Q.  BY MR. JONES:  When you say "these
13   meetings," about when did these meetings begin?
14      A.  May 2nd, 2003, my first membership and
15   credentials meeting in Denver.
16      Q.  And after that, did you attend regular
17   meetings, like monthly meetings or weekly meetings
18   involving USTU?
19      A.  And I want to make sure I answered your
20   first question clearly.  I'll get to this one.  That
21   was the first meeting I was involved with regarding
22   taekwondo, that May 2nd meeting.  There could have
23   been other meetings before that.  I don't know.
24          There was not a regularly scheduled
25   taekwondo meeting that I was aware of or was a part
```

```
1    of the Membership and Credentials Committee, people
2    from the United States Olympic Committee staff as
3    well as people within the membership of the U.S.
4    Taekwondo Union, athletes from the U.S. Taekwondo
5    Union, which, obviously, are going to be within the
6    membership, as well as some U.S. Taekwondo Union
7    staff and volunteers.
8       Q.  Did some lawyers show up for the USTU at
9    that meeting?
10      A.  Yes, there were lawyers there for the
11   USTU at that meeting.
12      Q.  Now, we've had some testimony by other
13   attendees of that meeting that in May of -- kind of
14   taking place in two stages, the first stage being, I
15   guess, everybody invited and say what they will.  And
16   then the second stage was more closed doors with just
17   the lawyers and, I believe, USOC people.
18      A.  I recall the first open forum or however
19   it is you characterize it.  Everybody can come on in
20   and have their opportunity.  And there was a
21   follow-on after that of the Membership and
22   Credentials Committee as well as some USOC staff.
23      Q.  Were you allowed to attend the second
24   stage of the meeting that was closed doors?
25      A.  I was allowed to attend that meeting,
```

```
1    of.
2       Q.  When we say "meetings," were these
3    meetings by only USTU people and you or joint
4    meetings between USTU and USOC people?
5       A.  I attended meetings with both USTU staff
6    and with USOC staff.  The only time I attended a
7    meeting with both groups in the room would be
8    membership and credential meetings, like the May 2nd
9    meeting and other meetings.
10      Q.  Okay.  Is this letter --
11      A.  There may have been a meeting with
12   Mr. Lee at one point.  I know there was a
13   meeting -- I just don't recall when it all
14   happened -- and some USOC staff.  Mr. Sang Lee.
15      Q.  Sang Lee.
16      A.  Yeah.
17      Q.  All right.  This letter of August 4
18   states on page 2 that the committee has placed USTU
19   on its meeting agenda for September 12th, 13, 2003,
20   in Denver, Colorado.  Do you recall attending such a
21   meeting in Denver, Colorado, in September?
22      A.  I did attend, yes.
23      Q.  And what -- what did you observe at that
24   meeting?  First of all, who was there generally?
25      A.  Generally, you had the various members
```

```
1    yes.
2       Q.  What happened in that meeting, if you
3    know?
4           MR. LEVINSTEIN:  For the record, the
5    first was sort of three stages the lawyers weren't
6    in.  I think you heard testimony that they met to
7    deliberate or discuss what they had heard in the
8    meeting, and then at some point they were joined by
9    the lawyers.  I may be wrong, but I don't think that
10   Steve Smith and Jill Chalmers were present for the
11   whole thing.
12          THE WITNESS:  That is correct.  There
13   was -- there was the open general meeting.  There was
14   Membership and Credentials Committee with USOC staff,
15   as I said.  And then later the -- the legal team for
16   the USTU was brought in.  So --
17      Q.  BY MR. JONES:  In the closed door
18   session, whether we call it the second or the third
19   stage, do you know who Jeannie Picarriello is?
20      A.  I do know who Jeannie is.
21          MR. LEVINSTEIN:  I'm just going to
22   advise on the second stage when the lawyers from USTU
23   were not there, the meeting with the lawyers about
24   what had happened, I'll instruct him not to answer
25   about what happened in that membership and
```

1    credentials session with the lawyers.  So it's
2    important for you to distinguish -- if you ask him
3    who Jeannie Picarriello is, you can ask about that at
4    any stage of the meeting.
5         But if you ask questions about what was
6    said in connection with the Membership and
7    Credentials Committee with USOC staff and its lawyers
8    and the USTU lawyers were not present, I'm going to
9    instruct him not to answer questions about that
10   session.
11        Q.   BY MR. JONES:  Okay.  I'm talking about
12   the stage behind closed doors when USTU lawyers from
13   this firm, Holmes and Robert or whatever or -- yeah,
14   Holmes and Robert are talking with Membership and
15   Credential Committee members, you've testified you
16   were there.  Is that right?
17        A.   Yes.
18        Q.   And you've also testified that you know
19   who Jeannie Picarriello is?
20        A.   Yes.
21        Q.   She's a member of the Membership and
22   Credentials Committee.  Is she not?
23        MR. LEVINSTEIN:  Objection.
24        Q.   BY MR. JONES:  Or was at that time?
25        A.   At that time, she was, yes.

65

1    Q.   Did you ever hear during that meeting
2    Ms. Picarriello refer to the management at the USTU
3    as Korean mafia?
4         A.   No.
5         Q.   Did you ever hear her tell the lawyers
6    for USTU that USTU needs to cut out the bowing crap?
7         A.   No, I don't recall that language.
8         Q.   Do you recall any language at all that
9    referred to the use of the word Korean?
10        A.   Not that -- no, not at all.  The only
11   time I ever heard reference to Korean was in regards
12   where the Kukkiwan was located.  So at that point in
13   time, we would have been talking about the Kukkiwan
14   and where their headquarters were.  So no, not that I
15   recall.
16        Q.   Did you take notes at that meeting?
17        A.   No, I did not.
18        Q.   Was anyone else from your -- from Sports
19   Partnerships with you at the meeting during that
20   stage?
21        A.   I'm trying to recall if Michelle
22   Farrell -- she had attended the meeting with me, but
23   she had to leave early, so I do not believe that she
24   was there, but I do not recall because she had to get
25   back for some family obligation.  She wanted to be at

66

1    the open forum, but I do not recall if she was there
2    or not.
3         Q.   You have Exhibit 141.
4         MR. LEVINSTEIN:  What about number 5?
5         MR. JONES:  What?
6         MR. LEVINSTEIN:  What about number 5?
7    Did you skip that one?
8         MR. JONES:  For some reason, they didn't
9    CC him on that.
10        MR. LEVINSTEIN:  People get asked when
11   they never even seen it before, so I figured --
12        THE WITNESS:  141?  From August 26th?
13        MR. JONES:  Yes.
14        THE WITNESS:  Okay.
15        Q.   BY MR. JONES:  That's just a one-pager.
16   Right?
17        A.   Yes.  All of this behind it is three
18   pages of fax --
19        Q.   Okay.
20        A.   -- cover sheets.
21        Q.   I guess I removed the rest of it.  For
22   the record, I'm just using page 1 of 141.
23        Q.   Okay.
24        Q.   This is another courtesy copy that you
25   received from Mr. Satrom regarding the September 13

67

1    meeting.  Is that --
2         A.   Yes.
3         Q.   -- correct?
4         A.   Yes, it's correct.
5         Q.   And you did attend the meeting that you
6    just testified to.  Correct?
7         A.   Right.
8         Q.   I guess we do have to look at Exhibit 5.
9         MR. JONES:  We don't have to.  Just
10   didn't think you would think a deposition was
11   complete if we didn't look at document 5.
12        THE WITNESS:  Okay.
13        Q.   BY MR. JONES:  I'm sorry I didn't show
14   this to you earlier.  This one actually predates the
15   September 13 meeting that you attended.  Does it not?
16        A.   It does.
17        Q.   It's a letter that is courtesy copied to
18   you dated September 5?
19        A.   Yes.
20        Q.   From Bruce Harris -- I mean to Bruce
21   Harris from Mr. Satrom?
22        A.   Correct.
23        Q.   And you received it and read it?
24        A.   I did.
25        Q.   And were the points of inquiry in

68

**Page 69**

1    Exhibits 4 and 5 discussed at the September 13
2    meeting that you attended?
3            MR. LEVINSTEIN:  Objection.  Compound
4    question.
5            MR. JONES:  Or some of the points.
6            THE WITNESS:  The -- the meeting of
7    everybody, is that the meeting --
8            MR. JONES:  Yes.
9            THE WITNESS:  -- that you're talking
10   about right now?
11           MR. JONES:  Yes.
12           THE WITNESS:  Some of these issues -- to
13   the best of my recollection, this was the focus of
14   the meeting.  What all was discussed there, I do not
15   recall, but this is what they were -- what USTU was
16   asked to respond to at that meeting.
17           MR. JONES:  Okay.
18           THE WITNESS:  I don't recall everything
19   that we went through.  It was rather lengthy.
20           Q.  BY MR. JONES:  Did you have any dealings
21   with members of the Membership and Credentials
22   Committee before the September 13 meeting one on one
23   or you or with small groups?
24           A.  Me personally?
25           Q.  Yes.

**Page 70**

1            A.  No.  And no one-on-one.  I do not recall
2    any of that -- any types of meetings like that.
3            Q.  How about after the September 13
4    meeting?
5            MR. LEVINSTEIN:  For the record, the May
6    2nd meeting he attended was a Membership and
7    Credentials Committee meeting of the whole as long as
8    we're clear on that.
9            MR. JONES:  Yes.
10           MR. LEVINSTEIN:  Okay.
11           THE WITNESS:  The only time that I was
12   with a member or members of the Membership and
13   Credentials Committee when taekwondo was a topic of
14   discussion was at one of these meetings.
15           MR. JONES:  Okay.
16           THE WITNESS:  Or if there happened to be
17   a conference call of a subgroup, I might be looped
18   into that conference call.  But never one on one.
19   There are members of that committee that I do know
20   that I work with on other issues, but I did not talk
21   to them about taekwondo unless it was with the entire
22   group.
23           Q.  BY MR. JONES:  Have you ever heard
24   anyone from Membership and Credentials Committee at
25   anytime say something racially insensitive about

**Page 71**

1    Korean-Americans?
2            A.  Never.
3            MR. LEVINSTEIN:  Are you done with that
4    one?
5            MR. JONES:  Yes.  Thank you.
6            MR. LEVINSTEIN:  Thank you.
7            MR. JONES:  Exhibit 120, please.
8            THE WITNESS:  120.  Okay.
9            Q.  BY MR. JONES:  Can you please identify
10   the document?
11           A.  This is a letter written by me on
12   October 24th of 2003 to Bruce Harris.
13           Q.  And in what capacity were you writing
14   that letter?
15           A.  I was writing the letter as the director
16   of Sport Partnerships notifying the sport that I work
17   with of the next steps in the process.
18           Q.  The process of decertification?
19           A.  Decertification.
20           Q.  Second sentence states that the USOC had
21   hoped that president Lee in his meeting with Jim
22   Scherr last evening would have seen the wisdom of
23   endorsing a remediation plan that would have allowed
24   USTU to reorganize and to continue serving at the NGB
25   for taekwondo under the guidance and with the

**Page 72**

1    assistance of the USOC.
2            Just to understand the dynamics here, it
3    was the Membership and Credentials Committee that was
4    bringing the decertification action, not Sports
5    Partnerships.  Am I right?
6            A.  That is correct.
7            Q.  Why is Sports Partnership writing a
8    letter like this to USTU --
9            MR. LEVINSTEIN:  Objection.
10           Q.  BY MR. JONES:  -- on behalf of USOC?
11           MR. LEVINSTEIN:  Objection.  As of this
12   date, that status had changed.  There was a complaint
13   that had already been issued by USOC board, I
14   believe, by October 24th, but I may be wrong.  I
15   think that might have changed the --
16           THE WITNESS:  It had.  Actually, at a
17   board meeting --
18           MR. JONES:  Let me just state something.
19   I don't think it's appropriate for counsel to, in
20   essence, coach the witness with those kinds of
21   comments unless the witness knows.  I prefer to know
22   what the witness knows first and you can make your
23   objection, but --
24           MR. LEVINSTEIN:  You've asked questions
25   that assumes facts that are false, therefore, it's

1  important so that the testimony doesn't become

2  misleading or meaningless, for the record.

3          MR. JONES:  Okay.  Well, I prefer just

4  an objection that says assumes facts not in evidence

5  rather than stating what your recollection of the

6  facts are without any other testimony that's been

7  given.  But let's move on.

8          Q.  BY MR. JONES:  The -- what was the role

9  of Sports Partnerships at this point in time, being

10  October 24th, 2003?

11         A.  The role that it is today, to work the

12  governing body.

13         Q.  Were you speaking for the Membership and

14  Credentials Committee?

15         A.  I was speaking in an effort to try to

16  help the USTU not go through a decertification

17  process, which nobody wanted to endure.

18         Q.  You were not -- were you writing as an

19  adversary?

20         MR. LEVINSTEIN:  Objection.

21         THE WITNESS:  Not at all.  I'm trying to

22  help Bruce Harris get out of a bad situation.

23         Q.  BY MR. JONES:  Okay.  Can you -- can you

24  explain what is referred to when you talked about a

25  meeting with Jim Scherr last evening?  First of all,

1  who attended the meeting, if you know?

2          A.  I do not know.  I was not there.

3          Q.  At least, apparently, president Lee and

4  Jim Scherr were there, though.  Is that your

5  understanding?

6          A.  Based on the letter, that would be my

7  understanding.

8          Q.  Did you talk with Jim Scherr about the

9  contents of this letter before sending it out?

10         A.  Whether or not Jim Scherr saw this

11  letter before it went out, I do not know.

12         Q.  Someone must have come to you and given

13  you the information that a --

14         A.  I was --

15         Q.  -- meeting had occurred.

16         A.  I was definitely asked to write this

17  letter.  What -- the words are my words, but I was

18  asked to write the letter.

19         Q.  And it says at the bottom courtesy copy

20  to "Jim Scherr, USOC Chief, Sport Performance."  He

21  was still your direct boss at that time or no?

22         A.  Yes.

23         Q.  Do you know -- then it goes on to state

24  that "as you're aware, the primary stumbling block to

25  the remediation plan was President Lee's refusal to

1  resign his duties as president of USTU."

2          So at that stage of the negotiations he

3  was, meaning president Lee was refusing to step down?

4          A.  Correct.

5          Q.  I mean, as part of a --

6          A.  Plan to -- right.

7          Q.  -- overall plan?

8          A.  Correct.  To remediate the NGB versus

9  decertify.

10         Q.  Did you continue to have a role in the

11  negotiations going back and forth to resolve it short

12  of actual decertification?

13         A.  It was not my role to resolve it.  My

14  role was to work with the governing body to help

15  hopefully bring a good conclusion to this.  So I did

16  not negotiate it.

17         Q.  This is the only letter I have come

18  across written by you to Bruce Harris or anyone else

19  on the USTU side specifically about, you know,

20  resolving -- resolving the decertification action

21  through mediation.  Do you recall any other letters

22  going out from you?

23         A.  I do not recall.  This is what you're

24  seeing here is a last ditch effort of, "Hey, Bruce.

25  We've been working together.  We've got to correct

1  this."

2          Q.  Were you in favor of giving more time to

3  the negotiation process?

4          A.  I was in favor of the most efficient

5  resolution possible.  We had -- at this time, we had

6  Olympic games in less than ten months away, so we

7  needed an efficient resolution to a problem that we

8  had.

9          Q.  Do you know if at some point in

10  time -- well, obviously, at some point in time

11  president Lee did agree to resign his duties.

12         A.  Correct.

13         Q.  Do you know if there were other sticking

14  points or stumbling blocks as the negotiations

15  progressed even after president Lee agreed to resign?

16         A.  Other sticking points after he agreed to

17  resign?

18         Q.  Let me be more specific.

19         A.  Okay.

20         Q.  Are you aware of a plan that was on the

21  table in which president Lee and the financial

22  officers would agree to step down and be replaced by

23  a USOC installed person to oversee all the financial

24  duties?  Did you ever hear of that plan?

25         A.  My understanding was that they would

1    step down, but the Governance and Management
2    Committee would be formed of members that would come
3    in and assume those duties.  They would not be
4    recognized as the president of the governing body,
5    but they would come in and assume those
6    responsibilities.
7        Q.   Was it always your understanding
8    that -- that the -- well, withdraw that question.
9        Showing you Exhibit 85.
10       (Mr. Jones gives Exhibit 85 to Mr.
11   Levinstein.)
12       MR. LEVINSTEIN:  Thank you.
13       THE WITNESS:  Okay.
14       Q.   BY MR. JONES:  Have you seen that
15   document before?
16       A.   Yes, I have.
17       Q.   It's a letter dated October 30, 2003, to
18   Bruce Harris from Jim Scherr, chief of sports
19   performance, courtesy copy to you.  Is it not?
20       A.   That's correct.
21       Q.   Do you recall any discussions with
22   Mr. Scherr about this letter either before or after
23   it was dated?
24       A.   I recall a discussion regarding that
25   taekwondo had two individuals going to the team

1    Love and Mr. Lee know they were no longer going to be
2    traveling to Athens for the team leadership meeting.
3        Q.   Was that because of the possibility that
4    if decertification went through USTU would no longer
5    be the NGB?
6        A.   That's exactly it.  We had no idea what
7    the future was of the sport.
8        Q.   And if USTU was no longer the NGB, then
9    its appointees would no longer be a member -- members
10   of the U.S. team.  Correct?
11       A.   If USTU was decertified as a member
12   organization, that's correct.  We would then have to
13   handle -- the U.S. Olympic Committee would have to
14   handle all the nominations, selection, everything.
15   Getting athletes there, everything we would have to
16   do.
17       MR. JONES:  Okay.  Might as well go
18   through this document.  Mark it next in order.
19       (Exhibit No. 148 was marked for
20   identification by the court reporter.)
21       MR. JONES:  Go ahead and review it if
22   you need.
23       THE WITNESS:  We can go ahead and talk
24   about it, if you'd like to.
25       Q.   BY MR. JONES:  All right.  First of all,

1    leadership meeting in Athens.  And based on what was
2    happening, is that the right course of action?
3    Clearly, the USOC then took an action, but I don't
4    recall being involved on the final decision on that
5    would be the action that we take.  I may have been
6    there.  I just don't recall.  Again, it's one of
7    those times where we were regularly communicating
8    with each other, so there's a lot of conversation.
9        Q.   This is -- may be one of the first
10   letters, but based on Lee's name on it, is that when
11   you first became aware that he and Ms. Lynette Love
12   were appointees?
13       A.   I probably knew at some point previous
14   to this.  I just don't know when because we had to
15   have had a discussion about who the -- we had to have
16   had a discussion about had U.S. Taekwondo had
17   approved procedures, had they submitted names, where
18   are we at with that process, where are the people on
19   the -- where are the people had been named on the
20   roster to travel to Athens.  So there had to have
21   been a discussion that took place.
22       Q.   And do you know why this letter was
23   written?
24       A.   This letter was written in an effort to
25   let Mr. Harris know that we would ask him to let Ms.

1    what is that three-page document before you?
2        A.   This is the typed version of a meeting
3    that I had with Bob Gambardella, and I believe it was
4    in early November of 2003 when at the point it looked
5    like we would hopefully have a remediation plan which
6    would call for the USOC to insert a staff employee --
7    an employee on loan.  So it was my effort to walk
8    through with him over the course of four or five
9    hours what I knew at the time as we were doing this.
10       Q.   Okay.  So this was done well before any
11   remediation agreement was signed.  Is that true?
12       A.   Well, clearly as you -- as was noticed
13   in my October -- I believe the date was October 23rd
14   letter, there's a mention that we tried to do
15   remediation, but that looks like it's off the table.
16   So the hope continued to be in my mind that we would
17   find a way to remediate this versus having to
18   recertify.  So this is before the remediation
19   agreement, but not before the concept of remediation.
20       Q.   This is before Mr. Gambardella had
21   formally been appointed by USOC?
22       A.   Correct.
23       Q.   A top ten list.
24       A.   Yep.
25       Q.   Page 1.

1   A.   Yes.
2        Q.   "Review, recreate team leader and coach
3   selection for Athens."  Whose -- where did that come
4   from?
5        A.   Well, the USOC had taken an action and
6   not had Ms. Love and Mr. Lee travel to Athens.  As
7   the status of the membership of taekwondo within the
8   USOC was in jeopardy, there may be a need -- that's
9   all this is.  Things that may need to be looked at.
10  There may be a need to review or recreate the
11  selection process.
12       Q.   What was -- at that point in time, what
13  was wrong with the selection process, if anything,
14  from your perspective?
15       A.   I was not sure.  Just like I was not
16  sure the expenses that HRO had in the Q, item number
17  2.  I was not sure of the event status of upcoming
18  events.  Item number 1, I was not sure of the
19  direction of the staffing plan.  I was not sure of
20  the status of the oversight committee.  I was not
21  sure.
22       Q.   Okay.  These items, though, they came
23  from somewhere.  Was it the September 13 meeting
24  or --
25       A.   I have no idea how many hours you've put

1   at hiring somebody.  We were working with taekwondo
2   to hire somebody to oversee their national team
3   development program.  And it's just that there was a
4   targeted 11/19 hire date.  Obviously, that was put on
5   hold based on what was happening.
6        So, again, every area within here was a
7   summary of things I had heard, what was happening,
8   things he needs to look at if tomorrow -- because we
9   were on a day-by-day basis.  If tomorrow there had
10  been a signed remediation plan and we needed to go in
11  and take control of the NGB, we would at least have
12  something.  He could have walked in there the next
13  day wet and said, "Okay.  I've got to figure out for
14  myself, but at least here's some things I should be
15  looking at instead of walking in cold."  That's all
16  this was.
17       Q.   This was to help him.
18       A.   That's exactly right.  With the
19  transition.  Whenever that transition may be, if it
20  was to ever be.  At this point, I had no idea if that
21  would even happen.
22       Q.   Okay.  Under "financials," what was
23  the -- I'm sorry -- Dan account?
24       A.   That's how much money was in that
25  account, at least to the best of my understanding.

1   in on taekwondo since you've been involved.  I can
2   tell you that from May 1st until this point in time,
3   a significant portion of my life had been put into
4   taekwondo.  It came from all those meetings.
5        Q.   Under "athletes," this was various
6   upcoming possible expenditures for the athletes and
7   the Olympic games?
8        A.   Athletes -- what it was was it was a
9   listing of money that was being paid by the Olympic
10  Committee, the Athlete Support Performance Pool is
11  what the ASPP stands for.  There were four athletes
12  that we were supporting at that time, the amount that
13  they were being supported for.  There were 12 other
14  athletes within the taekwondo system that were being
15  supported at $1,000 a month.  It details that for Mr.
16  Gambardella.
17       It lets them know their elite athlete
18  health insurance slots, their basic grant slots, and
19  that we are all set with those.  It gives him basic
20  information, such as how many men and how many women
21  of the weight classes would be funded as well as how
22  many men and how many women can actually go per
23  country.
24       And then the NBD process is actually --
25  it's a perform directing process, and we were looking

1   This would have been information I would have
2   received from our audit division.  Just so he had an
3   accurate picture of the financial situation within
4   taekwondo.
5        Q.   I'm sorry.  Above that "Base PPF," what
6   is that?
7        A.   Base funding and performance pool
8   funding.  So far, about $188,000 had been allocated.
9   Also remains $188,000 to be distributed.  We
10  had -- obviously, if this was written in November, we
11  were sitting on their October -- on their August 15th
12  check because the NGB was not in compliance and we
13  would have an upcoming November 15th.  So what that
14  let him know was that of the $366,000 that we had
15  allocated for taekwondo in 2003, $188,000 had been
16  spent; $188,000 had not.  Because the best we knew
17  based on the financial situation of the organization,
18  that may be the only money he had walking in the door
19  to run an organization.
20       Q.   188?
21       A.   Yep.  So I wanted him to know yes.  I
22  wanted him to know what was potentially there.  I did
23  not know the status of all the accounts.
24       Q.   Page 2, second bullet, Kukkiwan
25  equals --

1    A.   Yep.  Our -- this is -- the Kukkiwan, we
2    had been told, was about a $300,000 line item a year
3    for U.S. Taekwondo of which 150,000 of it would go to
4    pay certifications within -- it would be sent to the
5    Kukkiwan group in Korea.  150,000 of it would stay in
6    the United States.  Again, just a picture.  Here's
7    what's happening within the sport.
8    Q.   That would be an income item?
9    A.   An income item, potential, depending on
10   what was in there at that time.  Just like salary
11   structure run rate, he had to cut some salary to make
12   it work.  Just to look at the whole picture.
13   Q.   Under *programs,* there are several --
14   A.   Yes.
15   Q.   -- things, types of programs listed.  Do
16   you know if any of these programs were running at a
17   loss?  By that, I mean costing more than --
18   A.   Right.
19   Q.   -- they were bringing in.
20   A.   I understand.  The -- the -- actually,
21   my understanding would be that I did not know the
22   financials of the U.S. Open, but it was an upcoming
23   event coming up in February of '04.  None of these
24   would be programs that should be running at a loss,
25   frankly.  The resident program should be a

1    break-even.  And the elite training camps, as we were
2    getting to know what they were because we were
3    getting calls from people saying, *I'm coming to a
4    camp.  Is it still on?* were revenue-generating camps
5    for U.S. Taekwondo.
6         Coaching is just who are your coaches.
7    We weren't sure if Sammy was going to be a coach or
8    not going to be a coach.  We didn't know what his
9    role was within the organization.  We knew Chul Ho
10   Kim was a coach.  So that would not be a loss item.
11   That would just be a status.
12   Q.   I'm sorry.  You didn't know what about
13   Chul Ho Kim?
14   A.   We knew he was a resident coach at that
15   time.
16   Q.   Qualification lists a number of
17   competitions upcoming?
18   A.   Yes, or what's already happened.
19   Q.   And that's to help Mr. Gambardella get
20   an idea of what the calendar looked like ahead for
21   events?
22   A.   Yes, that's correct.
23   Q.   Because those would involve expense, I
24   take it?
25   A.   Expense and opportunities.

1    Q.   Bottom, *questions.*  *Holloway as team
2    leader,* question mark.  What was that about?
3    A.   We were -- in assessing overall, you
4    look -- we looked at, obviously, or talked about.  I
5    shouldn't say looked at.  It would be much more
6    definite than it was.  I talked about the OTC
7    coaches, who the resident coaches were.  One name
8    that had been mentioned to us as somebody that would
9    be good team leader for an upcoming event, whether it
10   be the world qualifier, the event that went on in the
11   Pan Am regional, if we needed a team leader, if we
12   were running the sport, the one person that would be
13   a good team leader would be John Holloway.
14   Q.   And then *people to check* on the last
15   page.
16   A.   Uh-huh.
17   Q.   *AAU* paren *Mike Friello,* end paren,
18   and then *MBSH.*  What is -- oh, membership?  What is
19   MBSH?
20   A.   Correct.  AAU, Mike wanted to talk to
21   whoever it was going to be running taekwondo, if we
22   were to get in that situation.  These are all people
23   that had been very vocal, very active.  They're
24   people I talked to.  It was not at all to mean an
25   exhaustive list.  It was a few names and a few

1    groups.
2    Q.   These were people to talk to about what?
3    A.   The sport, learn about the sport, find
4    out what's going on.
5    Q.   I note that there are no Korean names on
6    there.  Is there a reason why no Korean people were
7    to be checked or consulted?
8    A.   Well, a reason, no, but my understanding
9    is that within the Ohio and Pennsylvania contingent
10   there are people that are of Korean heritage that
11   could be consulted there, but it was not an
12   intentional or an oversight.  It was just a list.
13   Q.   Elite team, Lopez Amani, Lopez meaning
14   Rich Lopez?
15   A.   Well, all of them.  I mean, what I
16   thought at that point in time coming out of the Pan
17   American games and a world championships you had Jean
18   Lopez, who was establishing himself as a solid coach,
19   Steven Lopez, Mark Lopez, Diana Lopez, Peter Lopez.
20   Manny Maroon is down there.  You have a cadre of
21   athletes that are worthwhile to talk to and go see.
22   Q.   Mr. Amani.  You've worked with
23   Mr. Lopez?
24   A.   Correct.
25   Q.   And they were people who you said were

**[Page 89]**

1  vocal early on?

2      A.  No, they were not overly vocal.  In

3  fact, they -- there was times that every one of these

4  groups that are listed here at some point or another,

5  whether it be at a board of governor's meeting or a

6  Membership and Credentials meeting or by way of

7  e-mail or phone call may have reached out to me.

8  That's all that they were.  So these are folks you

9  should talk to.  But not -- no one of these groups

10  was in talking to me every single day.

11      Q.  Is it correct that people from elite

12  team may have reached out to you at some point before

13  this memo was generated in November?

14      A.  It would be correct to assume that.  I

15  think I had talked to members of the elite team

16  before that, yes.

17      Q.  And I'm sorry.  Would this be like -- do

18  you have a feel for what -- what part of the month of

19  November this was generated?  Before Thanksgiving?

20      A.  Yeah, I would imagine before

21  Thanksgiving.

22          (Brief interruption in the proceedings.)

23          (Recess taken from 3:15 p.m. to

24  3:20 p.m.)

25      Q.  BY MR. JONES:  Other than what we've

**[Page 90]**

1  covered on document 148, were any names for possible

2  coach selections discussed between you and

3  Mr. Gambardella in that November meeting leading up

4  to this document?

5          MR. LEVINSTEIN:  Objection.  There was

6  never any mention of names at all before, so I don't

7  know what other than part --

8          MR. JONES:  No.  I just meant other than

9  what we've discussed already.

10          THE WITNESS:  There was never a

11  discussion even of existing names.  There was never a

12  discussion of names.

13          MR. JONES:  Okay.

14          THE WITNESS:  Are you done with this?

15          MR. JONES:  Yes.  Now, I'd like to move

16  to another area.  Don't worry.  We're not going to go

17  through all these.

18          MR. LEVINSTEIN:  Not worried.

19      Q.  BY MR. JONES:  Exhibit 45, I think, I

20  gave you.  I'm sorry.  I don't have more copies.

21  Comes from the deposition this morning.

22          MR. LEVINSTEIN:  Hold on.  I have it

23  here.

24          MR. JONES:  Please go ahead and review

25  that.

**[Page 91]**

1          THE WITNESS:  Okay.

2      Q.  BY MR. JONES:  Have you seen this

3  document before?

4      A.  Yes, I have.

5      Q.  What is it?

6      A.  It is minutes of a February 5th, 2004,

7  meeting of the USOC Governance and Management

8  Committee.

9      Q.  Did you attend the -- I'll call it GMC

10  meeting on February 5, 2004, as it represents?

11      A.  I did.

12      Q.  Was there any practice established

13  whereby that whoever took the minutes would provide

14  you with a copy at some point after for your records?

15      A.  I don't recall a process being

16  established.  I just recall I would receive them, but

17  I don't recall a process being established.

18      Q.  Looking at these, as best as you can

19  recall, do they appear accurate as to what took place

20  during that meeting on February 5, 2004, at the GMC?

21          MR. LEVINSTEIN:  Objection.

22          THE WITNESS:  To the best of what I can

23  recall, these were items that we would have been

24  talking about when this group started to get

25  together.

**[Page 92]**

1      Q.  BY MR. JONES:  It's been awhile, but

2  would you -- is there anything that you would add or

3  change as you sit here today that would make these

4  more accurate?

5          MR. LEVINSTEIN:  Objection.  Compound

6  question.  Improper as to the entire document asking

7  him to do that.

8          THE WITNESS:  That is a very challenging

9  question for me to answer.

10      Q.  BY MR. JONES:  Were there any other

11  subjects discussed -- as you sit here today, can you

12  recall any other subjects that were discussed at this

13  particular meeting that aren't listed in here?

14      A.  As I sit here today well over a year

15  later, I do not recall everything we discussed at

16  that meeting.

17      Q.  Okay.  Was it your practice to take

18  notes at these GMC committee meetings?

19      A.  My practice to take notes?  No.  There

20  was somebody assigned to take minutes of the meeting.

21      Q.  Would you take them for your own -- take

22  notes for your own purposes?

23      A.  No, not that I recall.

24      Q.  Ms. Witte allegedly gave a progress

25  report on USTU financial condition and mentioned that

1    there were immediate cash needs of USTU of $350,000.
2    Do you remember that discussion generally?
3        A.    I remember a general discussion around
4    the financial health of the organization once we were
5    in place.
6        Q.    Were you familiar with the financial
7    health of the organization at this point in time?
8        A.    I had been given some information
9    regarding some challenges there may be, but I could
10   not tell you as indicated in other documents we've
11   looked at exact balances, the overall picture, but I
12   had an idea.
13       Q.    Okay.  Last paragraph of page 1 states
14   that "a discussion ensued concerning the team leader
15   and coach appointments for the Athens games.
16   Eligibility requirements are being written --
17   rewritten by the USOC and the earlier appointments
18   may have to be rescinded as soon as those new
19   requirements are clarified by the USOC.  Further
20   discussion will wait until the new information is
21   available."
22              Is that paragraph generally correct as
23   to content, as far as you can remember?
24            MR. LEVINSTEIN:  Objection.
25            THE WITNESS:  There was a general

1    conversation regarding selection procedures, what was
2    going to happen with them.  There was concern being
3    expressed by these people in U.S. Taekwondo and
4    others about the procedures and the process that was
5    used as outlined in my June 3rd memo to others may
6    have to be looked, may have to be rescinded.  Let's
7    have an ongoing discussion about it and see what
8    happens.
9        Q.    BY MR. JONES:  Okay.  Just the first
10   sentence, discussion ensued.  Were specific -- first
11   of all, were the old criteria discussed?
12       A.    I don't recall what was discussed
13   verbatim.
14       Q.    Okay.  You testified earlier that you
15   had not seen the old criteria.
16            MR. LEVINSTEIN:  Objection.  That's not
17   what he testified to.
18       Q.    BY MR. JONES:  Let's clarify that.  As
19   of this meeting, did you have the old criteria?
20       A.    As of this meeting?
21       Q.    Yes.
22       A.    I would have had the criteria, correct.
23       Q.    What did you do with them?  Did you
24   share them with the other attendees?
25       A.    I don't recall ever presenting the

1    Governance and Management Committee with the previous
2    criteria, but that is entirely possible when they're
3    looking at several documents as I was.
4        Q.    Were there any discussions on February
5    5, 2004, about possible new criteria?
6        A.    There was a discussion about reviewing
7    what it is that wasn't -- that I was to be working
8    with -- again, within all the groups had expressed
9    interest in reopening or looking at that issue; that
10   I was to work with Mr. Gambardella on seeing if we
11   needed to recreate, rewrite, review whatever it may
12   be, the criteria, we were directed to look at those.
13       Q.    Before today, did you discuss anyone
14   else's -- anyone else's testimony that had been taken
15   in this case thus far?
16       A.    Before today?
17       Q.    Yes.
18       A.    No.
19       Q.    Are you aware of what anyone else has
20   said in their depositions in this case?
21       A.    In regard to this particular issue or
22   just period?
23       Q.    Period.
24       A.    I have had -- I have made it a point to
25   not have conversations with other people that have

1    been deposed about this deposition process.
2        Q.    You stated that you were going to work
3    with Bob Gambardella on coach selection criteria?
4        A.    The Governance and Management Committee
5    had asked, but everything was to be worked with the
6    entire group, but they understand that their job was
7    not to micromanage the process that Bob was going to
8    undertake with myself.  Therefore, we were to report
9    back to them, but they were not going to be involved
10   in every single step of the process.  They would
11   review comments when needed, but it was Bob and
12   mine's job to write those procedures.
13       Q.    You said something about other people
14   having input into that process as well.
15       A.    I said at the June 3rd -- I'm
16   sorry -- at the May 23rd meeting we had heard on the
17   floor athletes had expressed concern about the
18   process.
19       Q.    Was it your intent to or intention --
20   well, was it your understanding that you were also
21   supposed to consult with any of those groups when you
22   were working on this project that has been discussed
23   on February 5, 2004?
24       A.    It was my understanding that based on a
25   remediation plan that had been signed we did not have

1   to work with those groups.

2       Q.   Okay.  And at Sports Partnerships was it

3   only you working on coach -- new coach selection

4   criteria or were others in your department involved?

5       A.   It was -- I was a lead.  I would include

6   Michelle Farrell if I needed her to be included.

7   Michelle Farrell was our representative of the Team

8   Selection Working Group, so she would take forward

9   whatever it was that had been created.  But it was my

10  job to work with Bob.

11      Q.   So is it correct that on February 5

12  there was no specific concept in place as far as

13  coach selection criteria or no specific criteria that

14  were to be used as a result of this February 5, 2004,

15  you and Mr. Gambardella were going to create some?

16      MR. LEVINSTEIN:  Objection.

17      THE WITNESS:  What we had been asked to

18  do was to look at what was existing and see if there

19  was better criteria out there that was more

20  performance impactful, which is exactly what we did.

21      Q.   BY MR. JONES:  All right.  And who asked

22  you to do this?

23      A.   The Governance and Management Committee.

24      Q.   All of them?

25      A.   Well, you're in a group with them.  I

1   recall?

2       MR. LEVINSTEIN:  Objection.

3       THE WITNESS:  Since I -- to the best of

4   my recollection, to the best of what I can recall,

5   these appear to be the correct minutes.

6       Q.   BY MR. JONES:  Paragraph 2 talks about

7   some votes being needed from the USTU board of

8   governors to ratify the remediation plan that the

9   USTU Executive Committee had approved.  Do you know

10  if and when these seven votes were eventually

11  obtained?

12      A.   I do not know.

13      Q.   Was it your understanding that they were

14  needed to make the remediation plan a done deal?

15      MR. LEVINSTEIN:  Objection.

16      MR. JONES:  If you know.

17      THE WITNESS:  Yeah.  I do not know.

18      Q.   BY MR. JONES:  Last -- the very last

19  sentence on page 1 carrying over to page 2 talks

20  about loss of two credentials for the officials at

21  the Athens games.  Other than what's stated in this

22  paragraph, do you remember any other details about

23  what was discussed?

24      A.   Details, no, I do not recall any other

25  details.

1   don't know which ones are members.

2       Q.   Was a vote taken?

3       A.   I do not recall if a vote was taken.  It

4   wouldn't have been an approval.  The only time an

5   approval would have been needed would have been these

6   are what we want to go with type of situation, not

7   should we look at them.

8       Q.   Okay.  And that hadn't happened as of

9   February 5?

10      A.   On February 5th we did not walk in the

11  room with criteria.

12      Q.   Okay.  Let's see.  Exhibit 57.

13      A.   Okay.

14      Q.   Have you seen these before?

15      A.   I'm sure that I was sent copies of these

16  minutes, but I don't recall off the top of my head.

17      Q.   They purport to be the minutes of the

18  GMC for a meeting on February 26th, 2004.  Is that

19  correct?

20      A.   That's correct.

21      Q.   And as -- your name is again listed as

22  also present.  Were you there?

23      A.   Apparently, I was there, yes.

24      Q.   And again, do the minutes appear

25  generally correct as to content from what you can

1       Q.   Do you have any understanding of the

2   process of obtaining credentials?

3       A.   I have a general understanding of the

4   process of obtaining credentials, yes.

5       Q.   I mean, as it existed then.  I don't

6   know what it is now, but --

7       A.   Yes.

8       Q.   -- as it existed then.

9       Can you just summarize in your own words

10  what you think the process involves?

11      A.   We are -- every national Olympic

12  committee is assigned a number of credentials based

13  on the size of the team that actually qualifies for

14  the Olympic games.  As teams do not qualify or do not

15  qualify a full-time team, such as USTU did not

16  qualify two women and qualified more than one,

17  everytime we don't fill our maximum, our numbers of

18  credentials go down.

19      So what happens is the USOC has a number

20  of credentials that they can have.  We also have

21  spots that we need to fill with USOC staff and other

22  critical staff to make the game -- help the games

23  function.  A decision then was made or needs to be

24  made about how to best maximize the use of those

25  credentials to make the most of those credentials

6/30/2005 Skinner, Kelly (Pltf desig = Yellow, Dfts' counters = Blue)
Case 1:04-cv-00461-SOM-LEK   Document 246-3   Filed 03/21/2006   Page 27 of 42
6/30/2005 Skinner, Kelly (Pltf desig = Yellow, Dfts' counters = Blue)

1  because we're there to win medals. Reality.
2          A decision was made that one way to do
3  that would be one credential per two athletes. In
4  the team setting you can adjust it a little bit
5  different. Therefore, we were not in a position
6  where three credentials were going to be assigned to
7  a sport with two athletes. That happened to sports I
8  work with of taekwondo, badminton, weightlifting.
9  They all had credentials removed that they originally
10  thought they were going to have based on the reality
11  of team size.
12          Badminton got one credential as well for
13  two athletes. They had previously approved number of
14  two. Every sport went through a review. We as a
15  sport partnership team tried to maximize what we
16  thought we could, but the bottom line is this. We
17  can only deal with what's available to us from the
18  IOC.
19      Q.  Who makes the decision on the number of
20  credentials given the time -- the size of the team
21  you just described? Is that a --
22      A.  The U.S. Olympic Committee by formula
23  gets us an overall allotment of credentials.
24      Q.  Do you know the rationale? Is it a
25  budgetary one or are there other reasons?

1      Q.  I'm sorry. Is that a "yes"?
2      A.  That's yes. I'm sorry.
3      Q.  Your name isn't anywhere on this
4  document, I realize, but did you recall seeing a
5  document like it around March 8, 2004?
6      A.  I don't recall at this point in time.
7      Q.  The document states at page -- or
8  paragraph 3, "Accordingly, we are submitting to you
9  revised selection procedures for coach and team
10  leader positions for 2004 Summer Olympic Games."
11          Do you recall if as of March 8th, 2004,
12  a set of new criteria had been generated with your
13  participation?
14      A.  Had to have been created by this time
15  because apparently by reading this memo only and by
16  not knowing if I saw it or not, the words "we are
17  submitting to you" are in there. So apparently,
18  something had been created and was going forward to
19  the executive committee.
20      Q.  All right. In other words, you have no
21  reason to dispute that one wasn't --
22      A.  correct.
23      Q.  -- completed by March 8th, 2004, to go
24  along with this memo?
25      A.  Right. Correct.

1      A.  I would not want to guess as to how the
2  IOC does their business, but I would imagine there's
3  a little bit of budget, a little bit of game size,
4  keeping credential access to a minimum.
5      Q.  It states on page 2, "Various ideas of
6  methods of regaining at least one of the credentials
7  were discussed." Any recollection of what kinds of
8  ideas were discussed on regaining --
9      A.  I recall two. One was to actively lobby
10  the managing director of international games, Doug
11  Ingram, to free one up from another sport. The other
12  one was for Bob to work with the WTF to try to find
13  another credential. Both of those efforts did not
14  work.
15      Q.  As you sit here today, other than the
16  credential discussion, was there any further
17  discussion on coach selection criteria?
18          MR. LEVINSTEIN: At the February --
19          MR. JONES: At the February 26th, 2004,
20  meeting.
21          THE WITNESS: Not that I recall. I
22  don't see it reflected here, and I just don't recall.
23      Q.  BY MR. JONES: Okay. Exhibit 58. Have
24  you had a chance to look at that?
25      A.  Uh-huh.

1      Q.  Now, we've gone through meeting minutes
2  of which at least I am aware leading up to this March
3  8th memorandum.
4      A.  Okay.
5          MR. LEVINSTEIN: Objection.
6      Q.  BY MR. JONES: And my question to you
7  is: Did you participate in any GMC meetings of the
8  entire group in which your procedures were presented
9  and they discussed and voted on those procedures?
10      A.  Did I participate? Not that I recall,
11  but I wouldn't have to be there. Bob could do that
12  role without me. So not that I recall.
13      Q.  So the answer is no?
14      A.  Correct. The answer would be not that I
15  recall.
16      Q.  Okay. And as you sit here today, you
17  cannot recall any minutes submitted to you of such a
18  meeting that took place without your participation?
19      A.  I received minutes from numerous
20  meetings of the Governance and Management Committee
21  that I did not attend. I think I'm on their courtesy
22  minute list, but I have been at very few of those
23  meetings.
24      Q.  Is it your practice to keep those
25  minutes in a file somewhere in your office when

**Page 105**

```
1     they're given to you?
2          A.   It is -- it was my practice until the
3     amount of paper became overwhelming and then no
4     longer was my practice.
5          Q.   Have you gotten rid of such files?
6          A.   To the best of my knowledge, I've gotten
7     rid of as much as I could.  I don't know what all
8     I've gotten rid of.
9          Q.   Well, because we feel it's highly
10    relevant, if you can find any minutes between --
11    well, any minutes that we haven't gone over between
12    the first meeting, February 5, through March 8
13    concerning meetings of the whole GMC board regarding
14    your coach selection criteria, I'd appreciate it.
15         A.   I understand and I will definitely go
16    look and see what I may have.
17              MR. LEVINSTEIN:  For the record, there
18    was a meeting on February 12th.  The February 5th
19    document says the minutes were approved on February
20    12th.
21              MR. JONES:  Okay.
22              MR. LEVINSTEIN:  Are you with me?
23              MR. JONES:  Yeah.  Do we have minutes of
24    February 12?
25              MR. LEVINSTEIN:  I don't know.  I don't
```

**Page 106**

```
1     know.  And I'm guessing there was a meeting on the
2     19th as well.  I'm guessing that was every week, but
3     I'm just -- I don't know.
4              THE WITNESS:  I will look.
5              MR. JONES:  Are you telling me there's
6     more minutes out there that we haven't been provided?
7              MR. LEVINSTEIN:  No.  I think there were
8     more meetings that minutes were not made.
9              MR. JONES:  Okay.
10             MR. LEVINSTEIN:  But I don't know if
11    there's minutes on those dates, but I just --
12             MR. JONES:  Interesting.
13             MR. LEVINSTEIN:  There was a meeting on
14    the 12th.  And actually, if you see on the February
15    5th document it says it was decided the whole week of
16    conference calls each Thursday morning at 10:00 a.m.,
17    Mountain Standard Time.  And I'm assuming that
18    happened.  Are you with me?
19             MR. JONES:  Yeah.
20             MR. LEVINSTEIN:  That's all.  I'll stop
21    talking.  I didn't mean to interrupt.  I don't know
22    if that changes anything.
23         Q.   BY MR. JONES:  As you sit here today,
24    other than the meeting that we discussed, which was
25    the first meeting given the job --
```

**Page 107**

```
1          A.   Right.
2          Q.   -- to meet with your job, do your thing
3     with the criteria, can you recall any meetings that
4     were had where your -- or these new coach selection
5     criteria were discussed and voted upon either in a
6     face-to-face meeting or by telephone conference?
7          A.   I don't recall any meetings right now,
8     but as was just discussed, there was a number of
9     meetings happening, but I don't recall when the issue
10    may have been talked about or the process that --
11    when exactly dates happened.  I do not recall.
12         Q.   Okay.  Outline as best or chronologize
13    as best you can the process of writing the new
14    criteria.  What happened after the February 5th
15    meeting when you began the project?
16         A.   More than likely what happened is I went
17    back instead of asking Bob to create the wheel, I
18    gave him samples of procedures that were used by
19    other national governing bodies that were seen as
20    effective that were performance oriented and athlete
21    centered, which is what the USOC is about.  From that
22    point, we would have talked about procedures that may
23    or may not work for taekwondo.
24              We would have continued writing and
25    revising and going back and forth.  And at some
```

**Page 108**

```
1     point -- I'm not sure when -- Governance and
2     Management Committee would sign off on whatever new
3     procedures were presented.
4          Q.   Can you remember any of the sports that
5     you might have given him samples from?
6          A.   Definitely weightlifting.
7          Q.   Do you still have them in a file
8     somewhere?
9          A.   We have copies of all former selection
10    procedures, yes, we do.
11         Q.   And who did the first draft of a new
12    USTU coach selection criteria, if you know?
13         A.   It was more of a collaboration, so
14    whether we were sitting in my office or sitting in
15    Bob's office, I don't recall, but it would have been
16    the two of us together.  I would have had with me the
17    other wheels as I've referred to them before, but how
18    we actually drafted them, I don't know if it was at
19    my desk or his desk.
20         Q.   I'm sorry.  The other --
21         A.   The wheels, the other samples.  We
22    create a better wheel.
23         Q.   As you sit here today, you don't know
24    who put pen to paper?
25         A.   It would have been -- I -- I do not know
```

1   who typed the first words.  I would have imagined
2   that it would be -- it could have been either one of
3   us.  We were meeting in each other's offices daily at
4   that point in time.
5        Q.   As you sit here today, do you know
6   whether they were done on a computer or just a piece
7   of paper?
8        A.   I'm sure -- I'm fairly confident that
9   they were -- everything was done on computer, but
10  it's entirely possible we were at that point still
11  pen and paper.
12       Q.   If they were done on a computer, was it
13  your practice to use a laptop or carry around one to
14  do something like this?
15       A.   I don't carry my laptop and neither does
16  Bob for meetings, so we would have been at someone's
17  desk.
18       Q.   And what became of the first draft, if
19  you know?
20       A.   I don't know, actually.  That's an
21  excellent question.  I'm sure there was a great
22  discussion regarding is this the direction to go, but
23  I do not recall off the top of my head what became of
24  the first draft.  And based on the -- the cut and dry
25  nature of the procedures, I don't know how many

1        Q.   It sounds like early on you and
2   Mr. Gambardella decided that a change was needed from
3   the old criteria.  Is that fair?
4        A.   No.  What we discussed was that we
5   needed to make sure whatever criteria was put in
6   place needed to be the criteria that would be the
7   most performance impactful criteria possible.
8   Whether that meant a change or not, we didn't know
9   when we first started discussing it.  That's why the
10  bullets from that meeting say review slash recreate.
11  We were not sure.
12       Q.   Within a month, I believe, yeah, March
13  5 -- pardon me -- February 5 to March 8, it was
14  decided, though, to change the criteria from the old
15  ones.
16       A.   Correct.
17       Q.   And do you have any idea where the old
18  drafts are?
19       MR. LEVINSTEIN:  Objection.  I don't
20  know if there were any old drafts, but --
21       THE WITNESS:  If there were any, I -- I
22  would have to look, but I don't know if there ever
23  were any that were actually produced.  It would just
24  probably be a constant revision.  No, I do not know
25  where they may be.

1   drafts there were.  There may have been only two or
2   three drafts.
3        Q.   As you sit here today, do you know
4   any -- can you recall any of the differences as the
5   criteria evolved into a final draft?
6        A.   The -- first criteria point of
7   number of athletes that make the team was there from
8   the beginning and never wavered.  The second criteria
9   point was the one that how do you break a tie.
10  Because at the time we were doing this we clearly
11  knew that we're going to have one man and one woman.
12  So that was the -- one of the most conversation, how
13  do you most effectively break that tie.
14       Q.   So we're talking about a time frame
15  between February 5 and March 8.  Is that -- is that
16  correct?
17       A.   Apparently, yes.
18       Q.   And you were already contemplating that
19  there would be one man and one woman on the team?
20       A.   It was a -- it was a known deal.  We had
21  had our final qualifier -- well, we hadn't.  The
22  final qualifier at the end of January, we knew that
23  we had qualified one man and one woman.  We had no
24  idea who those athletes would be, but we knew we'd
25  only be sending two athletes to the games.

1        MR. JONES:  If you find them --
2        THE WITNESS:  Absolutely.
3        MR. JONES:  -- I'd appreciate it.
4        THE WITNESS:  No problem.
5        Q.   BY MR. JONES:  Because they're certainly
6   relevant.
7        And it's your testimony that the number
8   of athletes that are placed on the U.S. team was a
9   criteria, you said, that was there from the beginning
10  of the first draft?
11       A.   The first point of review was the number
12  of athletes that an individual has on the team would
13  be the first consideration, correct.
14       Q.   So that was one of those that you came
15  up with early on --
16       A.   Very early on.
17       Q.   -- and stayed on.
18       A.   Yes.
19       Q.   And that idea came from weightlifting
20  or --
21       A.   Weightlifting was the -- was the sport
22  that I went to first because I knew that one the
23  best.  I knew they utilized it and I had seen it pay
24  dividends for them in 2000 and hopefully again in
25  2004.

**Page 113**

1    Q.   When you say "pay dividends," you mean
2    translate to medals?
3         A.   After 2000, we did a review with the
4    sports that we worked with, and we asked the athletes
5    what made a difference, and the overwhelming comment
6    was "having my personal coach or my coach there as I
7    was participating."  So I knew it paid dividends in
8    terms of winning medals or maximizing performance.
9         Q.   And for those of us who are unaware with
10   how well the U.S. team did in weightlifting in
11   2000 --
12        A.   First two medals ever.
13        Q.   First two medals --
14        A.   Ever by women.  First time women ever
15   lifted and won the first gold in those games.  So
16   they did very well.  Two women won medals.  But it
17   wasn't just the weightlifting athletes.  It was other
18   athletes as well, but I knew that weightlifting had
19   paid a dividend.
20        Q.   So the women's team got a total of two
21   medals?
22        A.   Correct.  Four athletes.
23        Q.   And the men's team?
24        A.   In weightlifting?
25        Q.   Yes.

**Page 115**

1    with the governing bodies, the coach at the Olympic
2    games.  He would then have assistant coaches.
3    Assistant coaches spots would be filled by the coach
4    that had the most athletes on the team.
5         The women did not have a women's
6    national team coach, therefore, the women's coach at
7    the Olympic games was the coach that had the most
8    athletes on the team, women athletes on the team.
9         Q.   Was there a different coaching criteria
10   for the women's weightlifting coach versus the men's?
11        A.   The only difference was that the men's
12   team had a national team coach.  In the absence of a
13   national team coach, everything is the same.
14        Q.   Same as the new --
15        A.   Most athletes on the team.
16        MR. LEVINSTEIN:  Men and women.
17        MR. JONES:  All right.
18        BY MR. JONES:  National team coach, what
19   is the national team coach?
20        A.   It varies by governing body to governing
21   body.
22        Q.   But with respect to weightlifting.
23        A.   He was -- he is no longer, but he was a
24   gentleman employed.  He lived and trained -- lived
25   here in Colorado Springs, trained with the resident

**Page 114**

1         A.   They didn't win any medals.
2         Q.   Pardon?
3         A.   They did not win any medals in 2000.
4         Q.   How many men on the team in 2000?
5         A.   There were four.  I'm sorry.  There were
6    three women on the women's team and four men on the
7    men's team to the best of my recollection in 2000.
8         Q.   So seven athletes came home with two
9    medals?
10        A.   Correct.
11        Q.   And they had coaches who were appointed
12   using a pairing of home coaches with athletes?
13        A.   The number one criteria for the men's
14   coach was that the national team coach would be the
15   coach.  Assistant coaches would be filled with number
16   one criteria would be number of athletes placed on
17   the team.  The number one criteria for the women's
18   team because there was not a national coach was the
19   person with the most athletes on the team would be
20   the coach.  And then things fell behind that.
21        Q.   I'm sorry.  Can you explain the national
22   coach part one more time on the men's side?
23        A.   U.S.A. Weightlifting employs a men's
24   national team coach, at least they did at that time.
25   That person was automatically, which is very common

**Page 116**

1    athletes.  He was identified as the national team
2    coach.  His job was to coach the athletes, the men's
3    athletes at all major international events, and he
4    did that.  World championships, junior world
5    championships, that was his job.
6         Q.   You're familiar with coach Chul Ho Kim?
7         A.   Yes, I am.
8         Q.   Would he be the equivalent of the
9    national team coach in taekwondo?
10        A.   Everybody -- everyone identified their
11   national team coaches differently.  U.S. Taekwondo at
12   that time did not have someone identified to my
13   knowledge as a national team coach.
14        Q.   Would he have similar duties, though, to
15   a national team coach living and working here and
16   training the athletes who trained here?
17        A.   Well, there's a -- there's a -- and I
18   understand what you're asking me, but this is apples
19   to oranges conversation because, frankly, your U.S.
20   Olympians in weightlifting, the men are coming out of
21   the Colorado Springs program.  I do not believe you
22   can say that about taekwondo.  Completely different
23   resident programs.  U.S.A. Weightlifting resident
24   program leading up to 2000 and 2004 was a very high
25   level, elite, the best of the best, they were here.

1    One person in 2000 made the team that
2    was not living here, a woman.  We wanted to make sure
3    that woman was with her coach when she went to the
4    Olympic games.  She was because we know that personal
5    coaches are the most effective way to get the end
6    result.
7        So taekwondo is a completely different
8    situation.  Mr. Kim in what he was doing with the
9    athletes here, excellent stuff.  Was he a true
10   national team coach?  I don't know.  He was not
11   labeled that.  That was not his job title.  But that
12   resident program and the U.S.A. Weightlifting program
13   completely different animals.
14       Q.   Besides you and Bob Gambardella, did
15   anybody else have input into the actual coach
16   selection criteria before they were submitted to the
17   USOC, if you know?
18       MR. LEVINSTEIN:  Objection.
19       THE WITNESS:  I'm not sure everybody
20   that Mr. Gambardella talked to.  I would have talked
21   with Michelle, who could have been possibly talking
22   to the Team Selection Working Group, but I do not
23   recall.
24       MR. LEVINSTEIN:  Are we not including
25   the GMC?

1        Q.   Is it correct that as of the time you
2    were writing these coach selection criteria between
3    February 5 and March 8 you did not know how many
4    medals USTU had brought home using the old coach
5    selection criteria?
6        MR. LEVINSTEIN:  Objection.
7        THE WITNESS:  It was irrelevant to me.
8        BY MR. JONES:  It was irrelevant?  Why
9    was it irrelevant?
10       A.   Because how they had done in the past is
11   not a guarantee necessarily indicating how we're
12   going to do in the future.  I -- is it the most
13   effective way?  Possibly.  I don't know.  But if you
14   talk to the athletes, they will say that the coach
15   had no impact on their performance in 2000.  I don't
16   know if you've talked to the athletes, but I would
17   suggest that.
18       Q.   Which athletes had you talked to?
19       A.   Talk to any one of them that were on
20   that Olympic team.
21       Q.   On --
22       A.   Particularly, I talked to Steven Lopez
23   about it.
24       Q.   So you can think of Steven Lopez for
25   sure as one example.  Who else?

1        MR. JONES:  I'm asking him.
2        THE WITNESS:  Again, I don't recall
3    speaking with the GMC, but who Bob talked to, I do
4    not recall and I do not know.
5        MR. JONES:  Okay.  Let's take a break.
6        (Recess taken from 4:03 p.m. to
7    4:10 p.m.)
8        Q.   BY MR. JONES:  Mr. Skinner, we're
9    talking about the process you went through in writing
10   new coach selection criteria for USTU.  Would you
11   agree with me that weightlifting is not a --
12   considered a combat sport?
13       A.   I would agree.
14       Q.   Is there any reason why you didn't look
15   to perhaps your coworkers in other NGB's, for
16   example, boxing, to take a look at coaching selection
17   criteria there before writing the USTU coach
18   selection criteria?
19       A.   Is there any reason I didn't?
20       Q.   Yeah.
21       A.   No.  I wanted to create with
22   Mr. Gambardella -- it wasn't me creating this.  With
23   Mr. Gambardella the most effective athlete-centered,
24   performance-oriented criteria that we could create.
25   That's what we did.

1        A.   Again, I said I've talked to a variety
2    of athletes, so --
3        Q.   Can you think of any other names in
4    particular of athletes you talked to?
5        A.   I've talked to Juan Moreno about the
6    best way to get a coach, to get the best coaches.
7        Q.   And this -- these talks were during the
8    process of writing new criteria?
9        A.   Not at all.
10       Q.   Before?
11       A.   Before, during.  Before and after.  Is
12   this the best criteria?  Absolutely.
13       Q.   For purposes of this area right now, I
14   have to focus on your thought process in writing
15   these new criteria and who had influence and who
16   didn't.  Steve Lopez had influence.
17       MR. LEVINSTEIN:  Objection.
18       THE WITNESS:  No.
19       Q.   BY MR. JONES:  No?
20       A.   He did not have influence.  What I heard
21   on the floor on May 23rd had influence.  That's
22   athletes saying, "We had no involvement in this
23   process."  That's a huge influencer on me.
24       Q.   That was a huge influence.
25       A.   The athletes, absolutely.

1    Q.   I mean, what -- what occurred on the
2  floor in that earlier meeting in May of the previous
3  year?
4    A.   And that they had no involvement in the
5  process was an influence on me without a doubt.
6    Q.   In what way?
7    A.   Is the process that's been outlined the
8  best process?
9    Q.   Did that translate to, what, a more
10  objective criteria?  Is that how that influenced you
11  when you actually sat down to write new criteria
12  because the athletes were saying they weren't
13  involved with the voting process back in May 2003?
14  How did that translate to your thought process when
15  you sat down to write something else?
16          MR. LEVINSTEIN:  Objection.
17          MR. JONES:  I just want to make sure I
18  understand the rationale and the logic here.  Because
19  under the new criteria, it looks like the athletes
20  don't vote at all.
21          THE WITNESS:  They do vote.  They vote
22  on the competition area.  That's where they should
23  vote.
24    Q.   BY MR. JONES:  Pardon me?
25    A.   They vote when they go compete.

1    A.   No, that's just because that's the only
2  one that I have the most familiarity with because I
3  used to work there.
4    Q.   Okay.
5          (A discussion was held off the record
6  between Mr. Levinstein and Mr. Johansen.)
7    Q.   BY MR. JONES:  You said that you've
8  talked with Steven Lopez?
9    A.   I talked with Steven Lopez, absolutely.
10  I tried talking to several athletes.
11    Q.   How many times, if you can remember?
12    A.   I do not recall.
13    Q.   Was it before you started writing the
14  criteria?
15    A.   I talked with them -- I wouldn't be
16  doing my job if I was not talking to athletes from
17  the day I was the director through today.  So
18  absolutely.  I talked to him and others before the
19  criteria was written.
20    Q.   Did he have any thoughts on what kind of
21  criteria would be good?
22    A.   Not at all.  He did not offer any
23  thoughts.  I did not ask him for his thoughts.
24    Q.   Did he ask you that his brother be
25  allowed to be his coach?

1    Q.   But I mean, they don't -- they don't
2  vote in the selection process.  Their home coach
3  either makes it or he doesn't if they make it.
4    A.   If there's an athlete -- absolutely.
5  That's one way.  But there's an athlete on the
6  Governance and Management Committee who would approve
7  these procedures as being the procedures that are
8  going to be used.  But ultimately, if I am in the mix
9  -- and remember, in February, March, there is several
10  athletes still in the mix.  We have no idea who the
11  two athletes are going to be.  We didn't know until
12  the end of June 5th who the athletes were going to
13  be.  We had no idea who our coaches were going to be.
14          These were not written for any
15  individual.  These were written to make sure the
16  athletes that got there had their coach with them.
17  That's it.  If you want your coach to be there, get
18  in the system, win it.
19    Q.   Okay.  As you sit here today,
20  weightlifting is the only example you can --
21    A.   As I sit here today, there are several,
22  but that's the only one I'm going to talk about right
23  now.
24    Q.   Okay.  That's because that's the only
25  one you can recall?

1    A.   No.
2    Q.   He never asked you that?
3    A.   He did not ask me for his brother to be
4  his coach in the Olympic games.  Absolutely not.
5  That's not something I could control.
6    Q.   Did any other athlete ask that their
7  home coach be their coach at the Olympic games?
8    A.   Again, I think you think we had a lot
9  more conversation with the athletes about this issue
10  than we did, but no.  Nobody said, "I want my coach
11  to be the coach."  The theme that we heard -- the
12  theme that we heard was "we would like our coaches to
13  be with us at these competitions coaching us when it
14  matters."
15          MR. LEVINSTEIN:  Other than Nia.  We've
16  had testimony about her asking for her coach.
17          THE WITNESS:  But that was after.
18          MR. LEVINSTEIN:  I understand.  Your
19  question was so general, I just want to be clear.
20  Okay?
21          MR. JONES:  Okay.
22          MR. LEVINSTEIN:  Because if any athlete
23  had asked, I just wanted to be clear we've already
24  had testimony about that.
25          THE WITNESS:  Your question was before I

**Page 125**

```
1   started writing the criteria.
2        MR. JONES:  Just focusing on who --
3        MR. LEVINSTEIN:  I apologize.
4        Q.  BY MR. JONES:  Whose comments were in
5   mind when we're writing this stuff out.  Okay?
6            And what did Steve -- what was Steven's
7   comments about coach selection, if anything?
8        A.  He had no comments regarding the Olympic
9   coach selections.
10       Q.  What did he talk to you about then?
11       A.  All he said to me was that in 2000 it
12  was a shame that he was not able to have his brother
13  with him at the mat, but it had no impact on the 2004
14  coaches.
15       Q.  Okay.  Steven won a gold medal, though,
16  at the 2000 Olympics.  Didn't he?
17       A.  Yeah.  Absolutely.
18       Q.  So as far as results go, it was a great
19  result.
20       A.  Sure it was.  Was it the most efficient
21  way to get the gold medal?  I have no idea.
22       Q.  Did you do any research specifically in
23  taekwondo to see what the experience of taekwondo
24  athletes were with respect to having their home
25  coaches versus not having their home coaches in their
```

**Page 126**

```
1   corner at the critical time when they're in the
2   critical matches?
3        A.  No, I did not.
4        Q.  You don't know whether taekwondo
5   athletes have been successful in winning medals with
6   their home coach or without their home coach other
7   than what Steven Lopez told you?
8        A.  That's a very incorrect assessment.
9   What I do know is this:  Those athletes get to those
10  games through a qualifying process, and throughout
11  that qualifying process they're with their coaches.
12  Then we take them away from their coaches at the most
13  critical games of a four-year period.
14       Q.  Which qualifying matches are you
15  speaking of when they're with their own coaches?
16       A.  Any.  Any event that they qualify for.
17       Q.  What about the major international
18  competitions?
19       A.  To me, if they qualified to make a team,
20  they're with their personal coach.
21       Q.  Are they --
22       A.  At that point, then they're removed from
23  their coach and given to somebody else.  Absolute
24  ineffective way to run a business.
25       Q.  Are they with their personal coach at
```

**Page 127**

```
1   the world competition?
2        A.  Personal coaches can go.  Are they mat
3   side?  Not always.
4        Q.  Not always sitting in the chair.  Right?
5        A.  Not always sitting in the chair.
6        Q.  Same goes for the Pan Am games?
7        A.  Correct.  Not always sitting in the
8   chair.
9        Q.  What did Juan Moreno say about --
10       A.  I don't recall any --
11       Q.  -- coach selection?
12       A.  -- of the exact conversations with any
13  person, so --
14       Q.  Okay.
15       A.  -- you can ask me about every single one
16  of them, but I don't recall the exact conversation.
17           (A discussion was held off the record
18  between Mr. Levinstein and Mr. Johansen.)
19           MR. JONES:  If we could turn to Exhibit
20  63.
21           MR. LEVINSTEIN:  Is that one you gave me
22  before?
23           MR. JONES:  Yeah.
24           MR. LEVINSTEIN:  I got it.
25           MR. JONES:  Minutes of July 1.
```

**Page 128**

```
1           MR. LEVINSTEIN:  I'm sorry.  We have not
2   discussed this with him yet.  I apologize.
3           MR. JONES:  I was thinking --
4           MR. LEVINSTEIN:  I thought it was with
5   him.  I'm sorry.  I'm sorry.  I lost track of that in
6   the last deposition.  It's all the same exhibits.
7   It's hard to remember which is what and who said
8   what.
9           THE WITNESS:  Okay.
10       Q.  BY MR. JONES:  It's the minutes of the
11  July 1, 2004, meeting for the GMC.  Is that correct?
12       A.  That's correct.
13       Q.  Is this one of those minutes that was
14  sent to you or probably sent to you?
15       A.  Probably was sent to me.
16       Q.  And we're asking you about it because
17  you're listed as a person present.  Do you remember
18  being at this one, this meeting?
19       A.  I don't recall being there on July 1st,
20  but it's -- apparently, I was.
21       Q.  As best as you can tell from the
22  substance of what's summarized, does it appear to
23  cover the general areas that were covered in that
24  meeting?
25       A.  Apparently, but again, I don't recall
```

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

1    exactly what was spoken about there, so I do not
2    know.
3        Q.    All right.  Focusing on page 1, last
4    paragraph, a discussion was had regarding Olympic
5    athlete Nia Abdullah.
6        A.    Okay.
7        Q.    Do you know whether she came out of the
8    Olympic Training Center or not?
9        A.    She was a resident athlete, yes.
10       Q.    And her coach was Mr. Chul Ho Kim --
11       A.    right.
12       Q.    -- who we've discussed a few minutes
13   ago.
14             Do you know anything about the
15   background of what happened between her and Jean
16   Lopez's sister that triggered this discussion?
17       A.    I do not.
18             MR. LEVINSTEIN:  Objection.  Assumes
19   facts not in evidence.
20       Q.    BY MR. JONES:  You weren't aware that
21   she and Jean Lopez's sister had a particularly tough
22   match to determine who would be on the U.S. team and
23   Jean Lopez's sister lost?
24       A.    Was I aware that they had competed
25   against each other or was I aware that there was a

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

1    problem with the competition?
2        Q.    Were you -- first question:  Were you
3    aware that they competed against each other?
4        A.    I was aware they competed against each
5    other on June 5th, yes.
6        Q.    And were you aware that Jean Lopez
7    coached his own sister in that match?
8        A.    I believe I remember seeing Jean there
9    coaching his sister, yes.
10       Q.    And do you remember anything about what
11   happened in that match?
12       A.    Outside of the fact that Nia won, I do
13   not recall anything.
14       Q.    You don't remember having seen Nia get
15   her head stomped by Jean's sister?
16       A.    I do not recall anything of that.
17       Q.    And did you know on the July 1 meeting
18   that as a result of that match that you observed that
19   Jean's sister would be runner-up if something
20   happened to Nia before the Olympics?
21       A.    As a result of that competition, was I
22   aware that --
23       Q.    Jean's sister would be first runner-up
24   to replace Nia if something happened to her and she
25   couldn't --

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

1        A.    Yes --
2        Q.    -- compete?
3        A.    -- I was aware of that.
4        Q.    Do you know if those facts led to any of
5    the concerns of -- voiced concerns of Nia Abdullah?
6        A.    Well, based on my recollection, I don't
7    know if those are facts.  But I do not know -- I do
8    not recall of anything being voiced of a concern
9    regarding what happened on the mat at that particular
10   event.
11       Q.    Anyhow, is it correct that on July 1 the
12   GMC tried to accommodate Nia by allocating money to
13   send Chul Ho Kim to assist her at the Olympics?
14       A.    They did much more than try.  They sent
15   him and provided for all his accommodations,
16   everything from the time the team left the United
17   States.
18       Q.    It was understood, however, that he
19   would not be able to sit with her ringside.
20       A.    That is correct.  There was only one
21   credential.
22       Q.    And when you only have one credential
23   and more than one team member, somebody is going to
24   get what they want and somebody is not going to get
25   what they want --

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

1        A.    Correct.
2        Q.    -- when you use the, quote, unquote,
3    objective coach selection criteria.  Isn't that true?
4        A.    That is --
5             MR. LEVINSTEIN:  Objection.
6             MR. JONES:  Go ahead.
7             THE WITNESS:  That is entirely possible
8    that somebody may not be happy with the outcome.
9    It's entirely possible.
10       Q.    BY MR. JONES:  And if you define
11   athletes as being unhappy, that would be seen as a
12   possible weakness in the new coach selection
13   criteria?
14             MR. LEVINSTEIN:  Objection.
15             THE WITNESS:  No, I would not find that
16   particular -- athletes being unhappy with criteria,
17   absolutely right.
18             MR. JONES:  No.
19             THE WITNESS:  Athletes wanting
20   their -- athletes wanting their coach to be with
21   them, that's unfortunate that you cannot always make
22   that happen.  But you can do your best to at least
23   get somebody there with them that has been there with
24   them.
25       Q.    BY MR. JONES:  But you'd agree with me

**Page 133**

1   that if athletes are unhappy with the coach they've
2   got or call it concerned, as it's been phrased here,
3   concerned with the coach they've got, that
4   performance might not be enhanced?
5          MR. LEVINSTEIN:  Objection.  What are
6   you quoting from about concern?  It doesn't say
7   anything about concern.  I don't see anything like
8   that.  Maybe I missed it.
9          MR. JONES:  It might have come from Mr.
10  Locke's e-mail.
11         MR. LEVINSTEIN:  I don't think it came
12  from anywhere, but you can go ahead.
13         THE WITNESS:  Sorry.  What was the
14  question?
15     Q.  BY MR. JONES:  If an athlete on a
16  multiple team situation like we've got here --
17     A.  Uh-huh.  Yes.
18         MR. LEVINSTEIN:  A multiple team
19  situation.
20     Q.  BY MR. JONES:  Multiple person team
21  situation, as we've got here, two people --
22     A.  Okay.
23     Q.  -- one coach, the athlete that does not
24  get to bring her home coach is maybe unhappy with the
25  situation.

**Page 135**

1          THE WITNESS:  Correct.  It was
2   unrelated.  You could -- they -- the NGB could send
3   whoever it is they want to send to be there.  Several
4   of the sports sent extra coaches to the Olympic games
5   to be around their athletes leading up to --
6   realizing only that there are so many credentials
7   that can be had.  It was the NGB being responsible.
8      Q.  BY MR. JONES:  How can an NGB send extra
9   coaches without credentials?
10     A.  We had a housing unit at the American
11  College of Greece.  We could house whoever we wanted
12  to house there.  The credential only gets you into
13  the field of play and into the -- into the -- this --
14  acronym for Athens was ATOC, okay, the Athens
15  Organizing Committee.  And then ATOC controlled areas
16  is what the credential got you.  Outside of that, it
17  doesn't take a credential to land in the Athens
18  airport and drive around.
19     Q.  I guess I'm misunderstanding as to what
20  you mean by coach.  I'm talking about a credential
21  coach and you're talking about someone who's a coach
22  who is not allowed into the --
23     A.  Competition --
24     Q.  -- competition area.
25     A.  But he had access to her.  They did all

**Page 134**

1          MR. LEVINSTEIN:  Objection.
2      Q.  BY MR. JONES:  Is that true?
3      A.  I'm not Nia, so I can't speak for Nia.
4      Q.  Well, do you think Nia was happy with
5   the selection of Jean Lopez?
6      A.  I did not talk to Nia about the
7   selection of Jean Lopez.
8      Q.  Why then do you think the committee
9   spent money that they didn't have to spend to send
10  Chul Ho Kim to the Olympics?
11     A.  Well, apparently, she had expressed
12  something to somebody within the committee or to Mr.
13  Gambardella, but I think the reason that the
14  committee spent money that the USOC provided for them
15  to spend was to give her her coach as much as
16  possible so she could maximize her performance.  And
17  might I add, she had not done much on the
18  international level and she brought home a silver
19  medal from the Olympic games.  I would say it was
20  effective.
21     Q.  But again, strictly following the coach
22  selection criteria, the committee should not have
23  sent Chul Ho Kim.
24         MR. LEVINSTEIN:  Objection.  Criteria
25  about the head coach.

**Page 136**

1   of their training almost exclusively at the American
2   College of Greece.  Taekwondo did.  Chul Ho Kim was
3   with her the entire time.  The only time he was not
4   with her was when she went to actually compete.  And
5   again, I will hold up -- I know it doesn't really
6   matter to some, but it matters greatly to me.
7   Somebody who had not done much internationally came
8   home with a silver medal from the Olympic games.  I
9   would say she was not traumatized by coach Kim not
10  being the head coach who was ringside.
11     Q.  Okay.
12     A.  But you'd have to ask her for her exact
13  thoughts.
14     Q.  Exhibit 73, you have it.  Have you seen
15  Exhibit 73 before?
16     A.  I'm sure that I did.  I was copied on
17  the e-mail.
18     Q.  First sentence, "Nia, this letter is in
19  response to your concern regarding the nomination of
20  Jean Lopez as to the taekwondo Olympic coach."  Have
21  I read that correctly?
22     A.  Well, the sentence continues, but up to
23  that point, absolutely.
24     Q.  And that's from Steve Locke to Nia -- or
25  to firstlady0422@aol.com.  Salutation, Nia, dated

**Page 137 (left)**

1    July 1, 2004, same date as that meeting that we just
2    went over.  Is that right?
3        A.    Yes.
4        MR. JONES:  Okay.  Next exhibit, I
5    think, we're going to have to mark as a new one.
6        (Exhibit No. 149 was marked for
7    identification by the court reporter.)
8        THE WITNESS:  Okay.
9        Q.  BY MR. JONES:  First of all, what is
10   that document that I've shown you that's been
11   previously marked as Exhibit 2 and it's been remarked
12   as 149?
13       A.    It's a Declaration of Kelly Skinner.
14       Q.    Did you write this?
15       A.    Did I write this document?  Yes, I did
16   in cooperation with our legal team, but it was my
17   words.
18       Q.    Somebody else actually typed it out,
19   though.
20       A.    Yes.  I was in Athens at the time and
21   not able to do it.
22       Q.    But you read it and signed it and
23   adopted it as your --
24       A.    I spoke it.
25       Q.    -- true and correct --

**Page 139 (right)**

1    today.
2        Q.    Okay.  Then what was your basis for
3    saying that that was -- the past nature of the USTU
4    that it was previously a reward-based organization?
5        A.    In looking at past coaches and looking
6    at past assignments, it wasn't always going --
7    positions were not always going to people who are
8    actively coaching athletes that were on the mat.  It
9    was people that had been put there through some other
10   process.
11       Q.    Was Han Wan Lee one of those people you
12   were referring to?
13       A.    I wasn't referring to anybody in
14   particular.
15       Q.    How do you know what you're saying in
16   this sentence is correct or true?  What was your
17   basis -- what was your factual basis for saying that
18   then?
19       A.    The factual basis for saying that was
20   strictly based on looking to who had coached the past
21   teams.
22       Q.    Okay.  Who had coached the past teams?
23       A.    Sitting here today, I don't know.  I'm
24   not looking at their coaching run-down.  I knew then.
25   I don't know today.

**Page 138 (left)**

1        A.    Read it.
2        Q.    -- testimony?
3        A.    Absolutely correct.
4        Q.    Paragraph number 8, skim that one once
5    more.  One of the statements is there -- in there is
6    that speaking U.S. team's new leadership, second
7    sentence, "They sought to transform the USTU from a
8    reward-based organization to a performance-based
9    organization with a single goal, winning Olympic
10   medals."
11       What was -- first of all, what do you
12   mean by reward-based organization?
13       A.    You're rewarded for what you may have
14   done in the past.  You are given what comes to you
15   based on what is happening on the performance of your
16   athletes at this time.
17       Q.    So you say not rewarded based upon what
18   you've done in the past?
19       A.    What that says there, there was -- the
20   system before was a reward-based organization.
21   Whether or not you had athletes actively
22   participating at the time did not matter.  What
23   matters is what you had done in your past.  What we
24   are changing the philosophy to be and a change
25   amongst the USOC that it matters what you're doing

**Page 140 (right)**

1        Q.    And your testimony is that you knew then
2    at the time you did this declaration that there were
3    coaches who had coached in past Olympics that were
4    not coaching at the time that they were selected to
5    go to the Olympics?
6        MR. LEVINSTEIN:  Objection.
7        Q.  BY MR. JONES:  Is that what you're
8    saying?
9        A.    I'm saying across the board of all
10   events in which taekwondo was involved in.  I was not
11   focused on one of them.
12       Q.    And so as you sit here today, you can't
13   give me any examples then?
14       A.    That's correct.
15       Q.    And when you say performance-based
16   organization, are you talking about coach selection
17   in particular?
18       A.    No.  I'm talking about across the board.
19   Athlete performance, coach performance, staff
20   performance, everybody.
21       Q.    And when you wrote or participated in
22   writing paragraph 8 then and made these assertions,
23   you did not know what medals USTU had achieved in the
24   Olympics it had participated in.
25       MR. LEVINSTEIN:  Objection.  Comes from

```
1    the testimony.
2           MR. JONES:  He's talked about coaches.
3    He hasn't talked about medals yet.
4           MR. LEVINSTEIN:  You're talking about
5    medals in 2000.
6       Q.   BY MR. JONES:  Is that correct?
7       A.   That's not what I testified to.
8       Q.   Do you know what medals were won in 2000
9    by the USTU team?
10      A.   I don't know every single medal that was
11   won at every single Olympic games by the USTU, but I
12   do know that medals were won.
13      Q.   And you also know that medals were won
14   using the old coach selection criteria.
15          MR. LEVINSTEIN:  Objection.
16          THE WITNESS:  I don't know what the old
17   coach selection criteria was.  I know medals were
18   won.
19          MR. JONES:  Okay.
20          (A discussion was held off the record
21   between Mr. Levinstein and Mr. Johansen.)
22      Q.   BY MR. JONES:  And you're -- pardon me.
23   Paragraph 10, if you'd let me know when you're done
24   skimming that.
25      A.   I'm fine.
```

```
1    of my players better than any other varsity coach
2    knows because I'm with those guys every single day.
3           And if there's a coach out there who
4    will testify or state that someone besides himself or
5    herself knows the strengths and weaknesses of his
6    athletes better than he does or she does, that coach
7    is not doing their job.
8       Q.   And so when you stated that just now,
9    you were basing that on your experience --
10      A.   No.
11      Q.   -- as a basketball coach?
12      A.   No, not at all.  Not at all.  I'm basing
13   it on the reality of any coach you talk to, any coach
14   that I've talked to -- excuse me -- and athletes that
15   I've talked to, their coaches, their personal coaches
16   know them the best.  That's what I'm basing it on.
17   Has nothing to do with my perception of anything.
18      Q.   Again, though, it's based upon, my first
19   question, people you've talked to.
20      A.   When I talked to athletes and coaches, I
21   don't know who better subject matters are if I'm
22   talking about athletes and coaches.
23      Q.   It does not come from personal
24   experience coaching or competing in taekwondo, this
25   statement.  Is that true?
```

```
1       Q.   Okay.  Sentence -- beginning with
2    sentence number two, "One component of the USTU
3    process for ensuring that the USTU fulfills its
4    mission involved the implementation of new criteria
5    for the selection of Olympic coaches.  The new USTU
6    leadership believed strongly that coaching decisions
7    should be based on performance.  Because a taekwondo
8    coach sits next to the competition ring and is
9    responsible for advising the competitors throughout
10   each match, the coaches who work on a daily basis
11   with each individual athlete and who are thus
12   familiar with the athlete's strengths, abilities, and
13   weaknesses generally provide the greatest chance of
14   victory."
15           And what's your basis for saying that?
16      A.   The basis for saying that is that the
17   coach that coaches an athlete every single day knows
18   that athlete's strengths and weaknesses better than
19   anybody who is not -- that is not around that athlete
20   every single day without a doubt.
21      Q.   That's something you've heard?
22      A.   I'm a coach.  I coach high school
23   basketball.  Okay?  It's not elite stuff, but you
24   talk to a coach.  I happen to be one of the high
25   school players.  I know my strengths and weaknesses
```

```
1       A.   That's true.
2       Q.   And the coaches that have told you this,
3    again, that support your statement here are --
4       A.   I have -- we have not talked about them.
5    I'm not going to run through the litany of coaches
6    that I know.
7       Q.   No.  I'm talking about taekwondo
8    coaches.  Which taekwondo coaches told you --
9       A.   It is not a sport-specific issue.
10   You're trying to make it that way.  I know that's
11   your job, but it's not.  The best coaches are the
12   personal coaches no matter what the sport is.
13      Q.   If I could just have an answer to the
14   question, though.  Have you talked with any
15   taekwondo --
16      A.   I don't recall it was taekwondo coaches
17   I talked to about this issue.
18      Q.   Last couple of lines of paragraph 10 on
19   page 3, "The Olympians, who have worked closely with
20   their coaches as they succeeded at the Olympic trials
21   and other major events," comma, "will not be willing
22   to suddenly switch coaches as they train for the
23   Olympic games."
24           Who is not willing to suddenly switch
25   coaches at U.S. Taekwondo, if you know?
```

**Page 145**

1    A.    Who was not willing to suddenly switch
2 coaches?
3    Q.    Switch coaches as they train for the
4 Olympic games.
5    A.    Hasn't this whole conversation been
6 about the preferences of athletes to have their
7 personal coach with them the entire time?  So
8 athletes that I've talked to.
9    Q.    Any particular Olympic -- members of the
10 U.S. Olympic team --
11    A.    Two Olympic athletes at this time, Lopez
12 and Abdullah, had no desire to switch their coaching.
13    Q.    Did they say they would not be willing
14 to switch?
15    A.    I don't recall exactly what the comments
16 were, but they testified in court that they wanted to
17 stay with the way it was.  So I would assume that
18 that was their feeling about, but I do not know that.
19    Q.    If they didn't state words that
20 strongly, this statement would be incorrect then,
21 right, "not be willing"?
22        MR. LEVINSTEIN:  Objection.  It's
23 forward looking and it was about Olympic trials and
24 other major events.  It wasn't aimed at those
25 particular people.

---

**Page 147**

1 USTU decided it would not continue selecting and
2 paying expenses for Olympic coaches whose sole role
3 would be to show up at the Olympic competition?
4        MR. LEVINSTEIN:  Objection.
5        MR. JONES:  Because I have not seen
6 anything like that.
7        THE WITNESS:  I don't have all the
8 minutes in front of me, so I can't show you anything
9 from the minutes.  But from the minutes we've
10 reviewed, I don't remember seeing that statement.
11    Q.  BY MR. JONES:  Okay.  Going on to
12 paragraph 11, if you take a look at that one.
13    A.    Okay.
14    Q.    "The USTU's prior criteria for selecting
15 Olympic coaches focused on the applicant's prior
16 coaching experience in major international
17 competitions, including the Olympic games, the Pan
18 American games, the World Championships, the World
19 Cup, and the Pan American Championships.  The coaches
20 selected under these criteria, although potentially
21 having achieved some measure of success coaching at
22 the international level, did not necessarily have any
23 familiarity with the individual taekwondo competitors
24 who were training for the Olympic games."
25        Were you -- did you have any particular

---

**Page 146**

1    Q.  BY MR. JONES:  Those two athletes never
2 told you that they would not be willing to suddenly
3 switch coaches.  Did they?
4    A.    I don't recall every single conversation
5 with them.
6    Q.    The paragraph goes on to state, "The
7 USTU was not willing to continue selecting and paying
8 expenses for Olympic coaches whose sole role would be
9 to show up at the Olympic competition."
10        What was your basis for that statement?
11 Was that --
12    A.    If they're not the personal coach of the
13 athlete and they show up at the Olympic games and
14 they train them before going to competition and coach
15 them during the Olympic games.  That's what that's
16 all about.
17    Q.    When you say the USTU, were you talking
18 about Robert Gambardella?
19    A.    I was talking about the United States
20 Taekwondo Union, who was Bob Gambardella as CEO, the
21 staff of the USTU, and the Governance and Management
22 Committee.  It's not Bob Gambardella, otherwise, I
23 would have said Bob Gambardella.
24    Q.    Can you point to any -- anything in the
25 minutes we've gone through so far that says that the

---

**Page 148**

1 coaches in mind when you made this statement?
2    A.    No.  I'm just saying generally the way
3 coaches have been selected.  There's no guarantee
4 that there's familiarity.
5    Q.    What did you mean when you said,
6 "Although potentially having achieved some measure of
7 success coaching at the international level"?  Do you
8 mean having achieved past success?
9    A.    That's exactly what it means.  Maybe
10 they would have coached in some of these events and
11 had some success.
12    Q.    Notwithstanding the fact that the
13 athletes they coach bring home medals because they
14 don't have familiarity with the individual
15 competitors, that's still not good enough?  Is that
16 what you're saying?
17        MR. LEVINSTEIN:  Objection.
18        THE WITNESS:  I'm saying that eventually
19 that lack of working with an athlete day to day is
20 going to catch up with the sport and we're not going
21 to be as successful maybe as we have been in the
22 past.  If we don't put the right people in the right
23 seats, meaning the personal coaches, eventually
24 there's going to be that day where we don't bring
25 home anything.

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 149**

```
 1        Q.   BY MR. JONES:  That was your projection?
 2        A.   It's a possibility.  Last thing in the
 3   world I want to see happen.  And again, I'll state it
 4   so it continues to be in the record.  Two athletes,
 5   two medals, gold, silver.  I don't think we failed in
 6   what we did.  This was not about individual.  This
 7   was about getting the athletes what they needed, and
 8   we got it to them, and they delivered big time.
 9        Q.   But you didn't know what was going to
10   happen when you wrote this declaration.  Right?
11        A.   No, but I knew the best way to maximize
12   the opportunity for success was to put the personal
13   coaches there with them.
14        Q.   And again, that was not based upon
15   personal experience in taekwondo.  That was based
16   upon people you had talked to.  Right?
17             MR. LEVINSTEIN:  Objection.
18        Q.   BY MR. JONES:  Is that fair?
19        A.   That was based on ten years of
20   experience in sport management, who I've seen, what
21   I've talked -- who I've talked to, what I've seen.
22        Q.   Okay.
23        A.   It wasn't a close my eyes and hope type
24   of a situation.
25        Q.   Hypothetically, you've got a
```

**Page 151**

```
 1   states number of athletes on the team.  If we have
 2   three with three different coaches, then it looks at
 3   the overall record with the first look being at 2003
 4   World Championships.  Whoever finished best there,
 5   their coach goes.
 6             If we're still tied, then it would be
 7   the 2003 Pan American games.  If we all are tied
 8   there, what would have happened next?  I am not clear
 9   on that.  But it had nothing to do with we're going
10   to pick the coach who we think has the -- whose
11   athlete has the best chance of the medal.  It's very
12   clearly stated.  If we have two, three, four and we
13   have four different coaches, first tiebreaker is
14   this.  Clearly stated.  It's based on performance.
15        Q.   BY MR. JONES:  But if you have only one
16   coaching credential, only one coach goes.  Only one
17   credentialed coach goes.
18        A.   And that's what this -- that's why these
19   procedures address that.  Otherwise, there would only
20   be one bullet point.  If your athlete makes the team,
21   you go.  But you know what?  The reality of it is we
22   only have one credential, therefore, there's another
23   bullet point.  Here's how we figure out who gets the
24   credential.
25        Q.   But at the Olympics there's only one
```

**Page 150**

```
 1   three-person team.  Three athletes have made it to
 2   the U.S. team, and you've got one coaching
 3   credential.  You can't send three coaches.  You can
 4   send one coach.  Is that right?
 5        A.   Correct.
 6        Q.   So you follow this new criteria.  The
 7   person with the best record and who has the best
 8   chance of getting a metal -- I guess the best chance
 9   of getting the highest medal, his coach goes.  Right?
10        A.   That --
11             MR. LEVINSTEIN:  Objection.
12             THE WITNESS:  -- has nothing to do with
13   the criteria.  Sorry.
14             MR. LEVINSTEIN:  These criteria were
15   developed in a particular circumstance.  You're
16   talking about when they knew how many athletes were
17   going and all the rest.  Whether these were the right
18   criteria if the facts are different is a whole
19   different issue.  So you're dealing with
20   hypotheticals.  You know, it's an incomplete
21   hypothetical.  You can go ahead and ask him these
22   things, but they're not admissible.  They're not
23   relevant.  Go ahead.
24             THE WITNESS:  That doesn't accurately
25   reflect what the criteria states.  The criteria
```

**Page 152**

```
 1   coach.
 2             MR. LEVINSTEIN:  Credentialed.
 3        Q.   BY MR. JONES:  One credentialed coach
 4   who sits with all three of those athletes.  Right?
 5        A.   I have no idea of three.  We had two
 6   athletes go to the games.
 7        Q.   But I'm talking about a hypothetical
 8   now.
 9        A.   See, it's when you work in hypothetical
10   that you have grievances and you end up in lawsuits.
11   I will not go hypothetical.
12        Q.   So you're refusing to answer the
13   hypothetical.
14        A.   You can ask the question.  I will do my
15   very best.
16        Q.   What I'm saying is:  If you've got one
17   credentialed position, three athletes, two out of the
18   three do not get to bring their coach as a
19   credentialed coach.  Am I wrong?
20             MR. LEVINSTEIN:  No matter what the
21   criteria are.
22        Q.   BY MR. JONES:  Am I wrong?  Two out of
23   three do not get to bring their home coach.
24             MR. LEVINSTEIN:  Do not get them to sit
25   in their chair.
```

```
 1                 MR. JONES:  Right.
 2                 THE WITNESS:  Right.  Two out of three
 3     could not have their coach sitting in the chair.
 4     Absolutely right.
 5           Q.   BY MR. JONES:  And so those people are
 6     not going to have the benefit of the guy who they're
 7     most comfortable with.
 8           A.   First of all, I don't know if all the
 9     coaches are men, so there could be women involved.
10     But their coach would have been -- if it was
11     taekwondo, in this instance and based on what U.S.
12     Taekwondo did, they would have made every situation
13     available for their coach to be with their athlete up
14     until the time of their competition.  So they would
15     have been with their athlete up until they got on the
16     mat.
17           Q.   So you're assuming that sending home
18     coaches as trainers along with the Olympics or
19     support people to be with the athlete corrects any
20     problems?
21                 MR. LEVINSTEIN:  Objection.  Go ahead.
22                 THE WITNESS:  I'm assuming nothing.
23           Q.   BY MR. JONES:  Am I correct then -- and
24     you may have stated this, but I want to make it very
25     clear that when you were writing these new coaching
```

```
 1     criteria you wrote them with Steven Lopez and Nia
 2     Abdullah in mind?
 3           A.   Absolutely not.
 4           Q.   You wrote them with one male member of
 5     the U.S. team and one female member of the U.S. team
 6     in mind?
 7           A.   That we would eventually have one and
 8     one.  That's all we knew.  We had no idea who they
 9     would be.  There were still several athletes
10     competing for those two spots.
11           Q.   And so you might change the criteria in
12     the future if the circumstances are different.
13           A.   I don't know why we would or
14     what -- it's up to taekwondo.  It's their criteria.
15     My suggestion would be to stay with what is there.
16     Weightlifting has used it for a couple of games.
17     Other NGB's are using it for more games.  It works.
18     Two athletes, two metals, gold, silver.  It worked.
19           Q.   Number 11, an incident is referred to in
20     which you state, "In one memorable incident in 2000,
21     Steven Lopez, a competitor from the United States,
22     was forced to move his figurehead coach out of the
23     way during the gold medal match so that he could hear
24     the instructions and advice that his own coach, Jean
25     Lopez, was shouting from the stands."
```

```
 1                 Did you observe that?
 2           A.   I didn't observe it, but I had enough
 3     people relay the exact same story to me that I
 4     believed to be true.
 5           Q.   Okay.  So this statement was not based
 6     on personal knowledge then.  Was it?
 7           A.   I was not there to see that, so no.
 8                 MR. LEVINSTEIN:  Could we take a break?
 9                 MR. JONES:  Okay.
10                 MR. LEVINSTEIN:  How much longer do you
11     think?
12                 MR. JONES:  I'm very close.
13                 (Recess taken from 5:08 p.m. to
14     5:12 p.m.)
15           Q.   BY MR. JONES:  Paragraph 12 states, "On
16     February 11, 2004, the Sports Partnership Division
17     received the first draft of these criteria."
18                 Is that correct?  I mean, is that a true
19     statement?
20           A.   It would not be in there if it was not a
21     true statement.
22           Q.   Okay.  That is -- correct me if I'm
23     wrong, but that is six days after the -- seven days
24     after the first meeting of the USTU that we took a
25     look at?
```

```
 1           A.   February 5th meeting?
 2           Q.   Yeah.
 3           A.   It would be six days.
 4           Q.   Six days after.  So within six days of
 5     that meeting you had come up with a first draft?
 6           A.   Absolutely.
 7           Q.   And not to be overly technical here, but
 8     it says, "On February 11, 2004, the Sports
 9     Partnerships Division received the first draft of
10     these criteria."
11                 Does that mean -- what do you mean by
12     that?
13           A.   That's where I work, so --
14           Q.   You wrote it and gave it to the Sports
15     Partnership?
16           A.   I am one part of the Sport Partnership
17     Division.  I'm one member of that division.
18           Q.   So this suggests then that Bob did the
19     first draft and gave it to you?
20           A.   Bob and I -- it was a collaborative
21     effort, but they officially have to be submitted from
22     the governing body to me.  I can't just say, okay,
23     here it is.  It has to be officially submitted.  So
24     Bob and I would have worked on it.  It would have
25     officially come.  Here it is.
```

1    Q.   Okay.

2    A.   Let's take it from here.

3    Q.   That's why it's phrased like that?

4    A.   Correct.

5    Q.   *After various discussions and

6   revisions, the division signed off on the criteria on

7   March 4.*

8           The *division* being partnerships

9   division?

10   A.   That's correct.

11   Q.   *The criteria were then approved by the

12   USOC Delegation Review Committee on March 24.*

13          And we've seen one memo that suggests

14  that it was sent over around March 8.  Is that fair?

15   A.   Based on that memo we looked at from

16  Bob, it seems to be.

17   Q.   Bob and Steve Locke?

18   A.   That's correct.  It seems to be that's

19  when that happened, but I don't recall.

20   Q.   Okay.  Even though you helped write

21  these, is it correct that your division still has to

22  sign off on it?

23   A.   It's the Team Selection Working Group,

24  which is comprised of several members from our

25  division as well as a couple other divisions has to

1    Q.   And then what?  He --

2    A.   He makes the recommendations to the

3   Governance and Management Committee, who then

4   approves or disapproves.

5    Q.   And it's always to be one name submitted

6   by the CEO to the --

7    A.   This --

8    Q.   -- GMC?

9    A.   This was one -- this was one instance --

10  you know what?  In 2008, we may have 12 credentials

11  for taekwondo.  I have no idea.  In 2004, we had one.

12  So in this instance, it was one.

13   Q.   So does that mean only one name then

14  should be submitted to the --

15   A.   Only --

16   Q.   -- GMC?

17   A.   -- one name, that's correct.

18   Q.   Not two?

19   A.   Not two names.  One name for who should

20  be going forward as the coach.

21   Q.   And the GMC in your understanding then

22  does what?

23   A.   They vote to approve or not to approve.

24   Q.   And so the phrase *forward the nominees

25  to the USTU Governance and Management Committee*

1   sign off on it.  So yes, our division has to accept

2   it and then willing to go to the Team Selection

3   Working Group.  They then process it the rest of the

4   way.

5    Q.   Okay.  Number 14, paragraph 14, *The

6   USTU coach selection procedures also require the USTU

7   Chief Executive Officer to screen candidates to

8   ensure that they meet the defined criteria and to

9   forward the nominees to the USTU Governance and

10  Management Committee, which must then vote on

11  approval of the nominee.*

12          Why does it say the CEO needs to screen

13  candidates in plural?  Is that intentional or not?

14   A.   You have more than one -- like we talked

15  about, you have more than one coach who has an

16  athlete on the team.  There's candidates.

17   Q.   And in your understanding, what does he

18  then do after screening the candidates?

19   A.   All he's doing in here is he's saying,

20  okay, who are the coaches of the athletes that have

21  made the team?  Then he lines them up against the

22  criteria.  Whichever coach would be the one that most

23  satisfies the criteria.  The one that satisfies the

24  criteria is the coach of the team.  That's all that

25  process is.

1   really would change to *nominee*?

2    A.   Yes, I would change it to nominee.

3    MR. JONES:  I think I'm about done.

4   Let's take a short break.

5    (Recess taken from 5:19 p.m. to

6   5:24 p.m.)

7    MR. JONES:  I'm done.

8    (The deposition concluded at 5:25 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

```
1          SIGNATURE OF WITNESS
2
3          I, KELLY SKINNER, the witness in the above
4     deposition, have read the within transcript of my
5     testimony.  I have made _____ changes in said
6     testimony and have stated such changes, if any, and
7     the reason for each change on a separate sheet
8     attached to this transcript.  My testimony as given
9     herein is true and correct to the best of my
10    knowledge and belief.
11
12
13         _____
           KELLY SKINNER
14
15         Subscribed and sworn to before me this
16    _____ day of _____, 2005.
17
18         _____
           Notary Public
19
20    My Commission Expires:
21
22    _____
23
24
25
```

6/30/2005 Skinner, Kelly  (Pltf desig = Yellow, Dfts' counters = Blue)

```
1          REPORTER'S CERTIFICATE
2          I, JANICE L. DOYLE, Certified Court Reporter
3     and Notary Public within Colorado, appointed to take
4     the deposition of KELLY SKINNER, do certify that
5     before the deposition he was duly sworn to testify to
6     the truth; that the deposition was taken by me on
7     June 30, 2005; then reduced to typewritten form
8     consisting of 160 pages herein; that the foregoing is
9     a true and accurate transcript of the questions
10    asked, testimony given, and proceedings had.
11         I further certify that I am not related to
12    any party herein or their counsel and have no
13    interest in the result of this litigation.
14         In witness hereof, I have hereunto set my
15    hand this _____ day of July, 2005.
16
17    _____
      Janice L. Doyle, Certified Court
18    Reporter and Notary Public
19
20
21
22    My Commission Expires:
23    January 6, 2007
24
25
```