# Exhibit B

0001

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF HAWAII
 2            CIVIL ACTION NO. 04-00461-SOM-LEK
 3    _____
 4    DEPOSITION OF:  ROBERT GAMBARDELLA
      EXAMINATION DATE:  April 5, 2005
 5
 6    DAE SUNG LEE,
 7        Plaintiff,
 8        v.
 9    UNITED STATES TAEKWONDO UNION, a Colorado
      nonprofit Corporation, et al.,
10
          Defendants.
11    _____
              PURSUANT TO SUBPOENA, the deposition of
12    ROBERT GAMBARDELLA, was taken at 8:19 a.m. on
      April 5, 2005 at the Double Tree Hotel at 1775 E.
13    Cheyenne Mountain Boulevard, Colorado Springs,
      Colorado, before Susan L. Sims, Registered
14    Professional Reporter and Notary Public in and
      for the State of Colorado, said deposition being
15    taken pursuant to the Federal Rules of Civil
      Procedure.
16
17
18                    Susan L. Sims
                 Registered Professional Reporter
19
20
21
22
23
24
25
```

---

```
 1                         I N D E X
 2    EXAMINATION BY:                           PAGE
 3    Mr. Uesugi                                   5
 4
 5              I N D E X   O F   E X H I B I T S
 6
 7    DEPOSITION                        PAGE FIRST
      EXHIBIT NO.     DESCRIPTION         APPEARS
 8
 9     3-18-04 Letter from Dae Sung Lee to
             Bob Gambardella                      200
10    10 4-8-04 letter to Mr. Dae Sung Lee from
             Mr. Bob Gambardella.                 202
11
      42 1-27-04 USOC Remediation Plan for USTU   40
12
      43 2-4-04 USOC Press Release                60
13
      44 2-5-04 USTU Webpage                      77
14
      45 2-5-04 USTU Governance & Management
15          Committee Minutes of Meeting          98
16    46 2-6-04 USOC Press Release               110
17    47 2-13-04 USOC Press Release              112
18    48 2-18-04 USTU Webpage                    114
19    49 2-13-04 USTU Webpage                    116
20    50 2-17-04 USTU Webpage                    120
21    51 2-27-04 USTU Press Release              124
22    52 3-11-04 USTU Webpage                    130
23    53 3-22-04 USTU Webpage                    135
24    54 4-29-04 USTU Webpage                    143
25    55 4-5-04 USTU Webpage                     145
```

---

```
 1                  A P P E A R A N C E
 2    For the Plaintiff:
 3        GLENN UESUGI, ESQ.
          WARD D. JONES, ESQ.
 4        Bervar & Jones
          1400 Pauahi Tower
 5        1001 Bishop Street
          Honolulu, Hawaii 96813
 6        (808) 550-4990
 7    For the Defendants:
 8        MARK LEVINSTEIN, ESQ.
          TODD BRAUNSTEIN, ESQ.
 9        Williams & Connolly, LLP
          725 Twelfth Street, N.W.
10        Washington, D.C. 20005
          (202) 434-5171
11
12    Also present:  Dae Sung Lee, Plaintiff
                     Gary Johansen, Deputy General
13                   Counsel, United States Olympic
                     Committee
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
 1    56 4-29-04 USTU Webpage                    166
 2    57 2-26-04 Minutes of USTU Governance and
             Management Committee Meeting         185
 3
      58 3-8-04 Memo from Bob Gambardella and
 4           and Steve Locke to USOC
             Executive Committee                  189
 5
      59 3-25-04 Minutes of the Governance and
 6           Management Committee                 223
 7    60 6-9-04 Memo from Bob Gambardella to
             Members Governance & Management
 8           Committee USTU                       231
 9    61 June 2004 E-mails from Steven Lock to
             Bob Gambardella                      233
10
      62 7-19-04 Letter to Mr. Gambardella from
11           Mr. Lee                              238
12    63 7-1-04 USTU Governance and Management
             Committee Minutes                    247
13
      64 7-27-04 USTU Webpage                     251
14
      65 9-1-04 Open Letter, USTU Webpage         274
15
      66 6-24-04 Letter to Mr. Gambardella from
16           Chul Ho Kim                          283
17    67 6-25-04 E-mail to Coach Kim from Bob
             Gambardella                          283
18
      68 7-19-04 Letter for Coach Chul Ho Kim     284
19
      69 9-8-04 Letter to Mr. Kim from Bob
20           Gambardella                          285
21    70 12-9-04 Letter to Mr. Scherr from
             Chul Ho Kim                          292
22
      71 11-26-04 E-mail                          300
23
24
25
```

1          P R O C E E D I N G S

2              ROBERT GAMBARDELLA

3          The deponent herein, being first duly

4      sworn to testify to the truth in the above cause,

5      was examined and testified on his oath as

6      follows:

7              E X A M I N A T I O N

8      BY MR. UESUGI:

9          Q    Will you please state your name.

10         A    My name is Robert Peter

11     Gambardella, G-a-m-b-a-r-d-e-l-l-a.

12         Q    And your address?

13         A    My address, work or home?

14         Q    Work is fine.

15         A    One Olympic Plaza, Colorado

16     Springs, Colorado 80909.

17         Q    And your telephone number?

18         A    At work or home?

19     MR. LEVINSTEIN:  Just work.

20         A    My work, (719) 866-4632.

21         Q    (BY MR. UESUGI)  And your date of

22     birth?

23         A    6-3-54.

24         Q    Have you ever had your deposition

25     taken before?

5

1      That means you can't shake or nod your head in

2      response to a question.  Do you understand that?

3          A    Yes, I do.

4          Q    Also, uh-huhs or huh-uhs don't

5      pick up very well on the record, so I ask that

6      you please don't use that in response to a

7      question from me.  If a question calls for a yes

8      or no answer, I'd ask that you please state yes

9      or no.  Do you understand?

10         A    Yes.

11         Q    Do you understand?

12         A    Yes.

13         Q    Also, please don't guess.  If you

14     don't understand a question or what I'm asking,

15     please tell me and I'll rephrase my question for

16     you.  Do you understand that?

17         A    Yes, I do.

18         Q    If you don't ask for a rephrase

19     or if you don't ask for a clarification, I will

20     assume that you understand what my question was.

21     Is that fair?

22     MR. LEVINSTEIN:  No.  Don't ask him

23     what's fair or not fair.  You can ask questions,

24     he'll answer them.  We're not entering into prior

25     agreements.  The transcript will speak for

7

1          A    No, I haven't.

2          Q    Have you ever testified in court

3      before?

4          A    Yes, I have, once before.

5          Q    And when was that?

6          A    It was via telephone in the

7      Athens Olympic Games.

8          Q    With respect to this case?

9          A    Yes.

10         Q    Any other times you testified in

11     court before?

12         A    No.

13         Q    Before we start, let me go over a

14     few ground rules.  When we started, the court

15     reporter gave you an oath to tell the truth, the

16     whole truth and nothing but the truth.  Did you

17     understand that oath?

18         A    Yes, I did.

19         Q    I will be asking questions and I

20     ask that you please listen to my questions

21     carefully and answer truthfully to the best of

22     your knowledge.  Can you do that for me?

23         A    I will.

24         Q    The court reporter is taking down

25     your testimony, so we need you to answer orally.

6

1      itself.

2          Q    (BY MR. UESUGI)  Okay.  You can

3      answer the question.

4      MR. LEVINSTEIN:  No, I instruct him not

5      to answer that question.

6          Q    (BY MR. UESUGI)  Do you consider

7      Mr. Levinstein your personal attorney?

8          A    He is my attorney, yes.

9          Q    And you understand that at some

10     point a situation might arise where your

11     interests and the interests of the USTU or the

12     USOC may come in conflict.  Do you understand

13     that?

14     MR. LEVINSTEIN:  That's a legal

15     question.  That's not a proper question.  I don't

16     know how his interests would differ from those of

17     the USOC.  You're asking for his legal opinion

18     about something.  He's not a lawyer.

19         Q    (BY MR. UESUGI)  And at some point

20     when your interest and the USOC/USTU interests

21     conflict, he is representing the USTU?

22     MR. LEVINSTEIN:  I'm Mr. Gambardella's

23     lawyer in this deposition.

24         Q    (BY MR. UESUGI)  All right.  Okay.

25     Please don't guess.  All right.  I asked that

8

**Page 9**

```
1    already.
2         If you don't know an answer to a
3    question, please state "I don't know."  "I don't
4    know" is a perfectly fine answer.  Do you
5    understand that?
6         A    Yes, I do.
7         Q    Okay.  Also, if you don't
8    remember, please state that you don't remember.
9    "I don't remember" is a perfectly fine answer
10   also.
11        A    Yes, I understand.
12        Q    Okay.  Any time that you wish to
13   take a break, use the rest room or you just want
14   to stop, please tell me and I'll be happy to
15   accommodate you.  This isn't the Spanish
16   Inquisition, and I want you to be comfortable and
17   I want you to give the best answers that you
18   possibly can.
19        A    Thank you.
20        Q    Also, for the sake of the court
21   reporter and so we have a clean record, I'd ask
22   that you please wait until I finish my question
23   before you start your answer.  And I will try to
24   extend you the same courtesy.  Do you understand
25   that?
```

**Page 10**

```
1         A    Yes, I do.
2         Q    After your depo is concluded, the
3    court reporter will transcribe your testimony
4    into a little booklet which you'll have the
5    opportunity to read and make any changes to the
6    transcript.
7         A    That sounds fair and reasonable.
8         Q    But if you do make any changes,
9    we have the right to ask you about the changes
10   that you made and the reason why you made those
11   changes.
12        A    I understand.
13        Q    Is that fair?
14        A    Yes.
15        Q    Did you take any sort of
16   medication, drugs or alcohol today?
17        A    No.
18        Q    Before you came?
19        A    No.
20        Q    Is there any reason we can't go
21   forward with your deposition?
22        A    I don't see why not.
23        Q    You were served with a notice of
24   a deposition and you were also asked to bring
25   down documents with you?
```

**Page 11**

```
1         A    Yes.
2         Q    Did you bring those documents
3    with you?
4         MR. LEVINSTEIN:  For the record, I am
5    turning over documents numbered USTU 21 -- well,
6    USTU 00021 through USTU 00052.
7         Q    (BY MR. UESUGI)  These are
8    previously produced documents?
9         MR. LEVINSTEIN:  I don't know.  I don't
10   think so.  I don't think all of them were
11   previously produced.
12        MR. UESUGI:  I'm asking the witness.
13        A    I don't know.
14        MR. LEVINSTEIN:  I don't think he would
15   know what was produced.
16        Q    (BY MR. UESUGI)  Is there anything
17   that you didn't produce?
18        A    I don't know.
19        Q    There was objections filed and
20   you made certain objections.  Was there anything
21   that you withheld?
22        MR. LEVINSTEIN:  I'll respond on his
23   behalf, since we handled the document production.
24        MR. UESUGI:  All right.
25        MR. LEVINSTEIN:  There were no
```

**Page 12**

```
1    documents that were responsive that were withheld
2    other than privileged documents were withheld
3    previously in response to the other document
4    request.  But no responsive documents that we
5    know of.  Other than we did not reproduce --
6    well, there were some documents that may have
7    been responsive that have already been produced
8    that we didn't reproduce.  It's possible some of
9    these have been produced before or some slightly
10   different form.
11        Q    (BY MR. UESUGI)  Okay.  Let's get
12   into a little background information.  Where were
13   you born?
14        A    I was born in Staten Island, New
15   York.
16        Q    Is that where you grew up?
17        A    Yes.
18        Q    Is that where you went to high
19   school?
20        A    That's where I went to high
21   school.
22        Q    Where did you graduate high
23   school?
24        A    Where I did graduate from high
25   school?  At St. Peter's High School for Boys.
```

1      Q     What year was that?

2      A     1972.

3      Q     Did you go to college?

4      A     Yes, I did.

5      Q     Where did you go to college?

6      A     I went to George Williams

7   College.

8      Q     Where is that?

9      A     It's in Downers Grove, Illinois.

10     Q     And your major?

11     A     Was in health education.

12     Q     And that's what you got your

13   degree in?

14     A     Yes, it is.

15     Q     Did you pursue your education

16   past college?

17     A     Yes, I did.

18     Q     Where did you go and what was

19   your degree?

20     A     My second degree was at the

21   University of Northern Colorado in sport

22   management.

23     Q     That was a master's degree?

24     A     Yes, sir.

25     Q     When did you receive that degree?

1   Illinois.

2      Q     Your alumni?

3      A     Yes.

4      Q     Volleyball?

5      A     Yes.

6      Q     How long did you do that?

7      A     A year and a half.

8      Q     Were you the head coach?

9      A     Yes, I was.

10     Q     After you left there, what did

11   you do?

12     A     I was the head volleyball coach

13   and an instructor of physical education at the

14   United States Military Academy at West Point, New

15   York.

16     Q     How long?

17     A     Thirteen years.

18     Q     What years?

19     A     1983 to 1996.

20          MR. LEVINSTEIN:  Slow down.  You're

21   going too fast.  Take your time.

22     Q     (BY MR. UESUGI)  What was your

23   record while you were coaching at the West Point?

24     A     Well, I was the third most

25   winning coach at West Point.  And I believe my

1      A     1997, I believe.

2      Q     Okay.  Any other degrees?

3      A     Yes, I just completed another

4   degree in conjunction with the International

5   Olympic Committee and the University of Lyon,

6   France in sport management.

7      Q     That was a master's degree?

8      A     Yes, in October of 2004.

9      Q     Congratulations.  After you

10   graduated college, did you go to work?

11     A     Yes.

12     Q     Where did you work?

13     A     At the YMCA.

14     Q     Doing what?

15     A     I was a director of physical

16   education.

17     Q     How long did you do that?

18     A     It was just about a year,

19   perhaps.

20     Q     Okay.  And you left for what

21   reason?

22     A     To coach at George Williams

23   College.

24     Q     Where is that?  The same place?

25     A     Yes, it's in Downers Grove,

1   record was somewhere in upwards of 470 wins and

2   230 losses, perhaps.  I can't quite remember.

3      Q     Did you win any national

4   championships?

5      A     No, I haven't.

6      Q     Did you win any regional

7   championships?  Is there such a thing?

8      A     No, there isn't.  Division I

9   Volleyball, I was conference coach --

10   conference -- we won our conference, I believe,

11   three years.

12     Q     After you left West Point, what

13   did you do?

14     A     I was hired on as the director of

15   youth in junior high performance programs at USA

16   Volleyball.

17     Q     What does that job entail?

18     A     It entails building a seamless

19   athlete pipeline for world class athlete

20   development.

21     Q     What does that mean?

22     A     What does that mean, is that you

23   want to prepare athletes for high level

24   competitions, such as Olympics, Pan Am Games,

25   world championships.

1   Q    What does a seamless athlete
2   pipeline mean?
3   A    What that means is that an
4   athlete can start at the age of, let's say, nine
5   years old and work all the way through an entire
6   system all the way to the National Team program.
7   Q    How would such a person do that?
8   A    Excuse me?
9   Q    How would such a person do that?
10  A    How would a person --
11  Q    Yes.  Take a person, a
12  nine-year-old boy.  I want to be on the US
13  Olympic team.  How would I progress through the
14  seamless athletic pipeline?
15  A    They would go through different
16  camps and different programs.
17  Q    Such as?
18  A    Such as a high performance camp,
19  a youth national team, a junior national team, a
20  world university team, so on and so forth.
21  Q    I'm trying to understand the term
22  seamless.  What does that mean?
23  A    Seamless means that a person can
24  go through a pipeline, okay, right from, as I
25  say, from nine, ten years old all the way through

1   A    Prior to me?
2   Q    Yes.
3   A    Basically, it was really a
4   glorified all-star team.
5   Q    What do you mean by that?
6   A    What do I mean, is that I would
7   pick athletes and then bring them together for
8   camp and they'd go on to a competition.
9   Q    Who would pick the athletes?
10  A    Basically, again, before my time.
11  Could have been the coaching staff.
12  Q    So you weren't involved in USA
13  Volleyball before being hired as a staff member?
14  A    Oh, yes, I was.
15  Q    But you don't know the athlete
16  selection process?
17  A    I do know the athlete selection
18  process in some other programs that were being
19  sponsored that I was involved with, yes.
20  Q    Prior you to starting at USA
21  Volleyball, how did they choose the USA
22  Volleyball National Team?
23  A    National Team, I don't remember.
24  And I don't have that information with me to
25  provide to you.

1   the National Team level, so without interruption.
2   Q    Through the volleyball NGB?
3   A    Yes.
4   Q    And you designed that program for
5   USA Volleyball?
6   A    I, along with some other
7   colleagues, yes.
8   Q    Prior you to starting at USA
9   Volleyball, what was the athlete development
10  program in place?
11  A    The athlete development program
12  was just a couple of programs that they hosted in
13  the summer months.
14  Q    What were those couple of
15  programs?
16  A    It would have been the Junior
17  National Team, the Youth National Team, depending
18  on the year and the resources available.
19  Q    So it was just two camps during
20  the summer?
21  A    Could have been.
22  MR. LEVINSTEIN:  Programs, not camps.
23  Q    (BY MR. UESUGI)  What did those
24  two programs entail?  Start with the first that
25  you mentioned.

1   Q    Were you involved in the
2   selection of the USA Volleyball National Team
3   during your tenure there from 1996 to 1999?
4   A    With the women's team partially,
5   yes.
6   Q    What was your involvement?
7   A    Well, my move from the director
8   of the youth and junior program to the director
9   of the National Team programs.
10  Q    What does that mean?
11  A    That means that I was directly
12  involved with the administration of the national
13  teams of USA Volleyball.
14  Q    Did you select the National Team
15  for USA Volleyball?
16  A    Did I select the team, no.
17  Q    Who did?
18  A    Other head coach, with input from
19  others.
20  Q    Who selected the head coach?
21  A    Who selected -- the
22  administration selected the head coach.
23  Q    When you say administration, who
24  do you mean?
25  A    The executive director.  And they

1  had input from others in the organization.
2          Q      Such as?
3          A      I don't know.
4          Q      Did you have input into the
5  selection of the National Team?
6          A      No, I didn't.
7          Q      Okay.  I'm trying to compare the
8  USA Volleyball program which you participated in
9  and the USA Taekwondo USTU program.  That's why
10  I'm asking these questions.  Do you understand?
11          A      Yes, I do.
12          Q      After you left USA Volleyball,
13  what did you do?
14          A      I went to the United States
15  Olympic Committee Sport Partnerships Division.
16          Q      This was in October of 2002?
17          A      Yes, after the Olympic Games.
18          Q      How did you come to work for the
19  USOC?
20          A      I was asked if I was interested
21  in the position.
22          Q      By who?
23          A      By the United States Olympic
24  Committee.
25          MR. LEVINSTEIN:  Hold on one second.  I

21

1          Q      And you were hired in
2  October 2000; is that correct?
3          A      My date of hire, I believe, was
4  October, in the middle of October when I got back
5  from the Olympic Games.
6          Q      Is that the same position that
7  Kelly Skinner was in?
8          A      Yes.
9          Q      So you were the same rank, so to
10  speak?
11          A      Yes, I was.
12          Q      Did you know Kelly Skinner back
13  then?
14          A      When I first came to work there,
15  I knew who he was but I didn't know him.
16          Q      Which sports were you in charge
17  of?
18          A      Figure skating, team -- excuse
19  me, volleyball, water polo, team handball, and
20  softball, I believe.  And we worked with other
21  sports within our portfolio, but those are the
22  ones that I focused on.
23          Q      What do you mean by that, other
24  sports in your portfolio?
25          A      Well, there were ten sports in

23

1  think you said 2002.
2          MR. UESUGI:  No, October 2000.
3          THE DEPONENT:  Right after the Olympic
4  Games.
5          MR. LEVINSTEIN:  I thought I heard
6  2002.  I just wanted to clarify.
7          Q      (BY MR. UESUGI)  Was there a
8  specific person that asked you?
9          A      There were a couple people.
10          Q      Who were they?
11          A      Rebecca Crawford.  And I had some
12  conversation with Scott Blackman.
13          Q      Who is Rebecca?
14          A      Rebecca Crawford.  She's a
15  director of sport partnerships.  She's one of the
16  four directors of sport partnerships.
17          Q      And Scott Blackman was the old
18  general counsel?
19          A      Yes, and then CEO.
20          Q      Did you have to submit an
21  application for this position?
22          A      A resume, and a letter of
23  application.
24          Q      Was there an interview?
25          A      Yes, there was.

22

1  the portfolio at that time.  So basically what we
2  did is in order to facilitate, you know, good
3  customer service with those sports, we broke it
4  down individually.  However, we all did have a
5  hand in working with the ten sports.
6          Q      Who's we?
7          A      Myself, Lynn Wetland and Steve
8  Roush.
9          Q      Who are they, part of your team?
10          A      Yes.
11          Q      What were their job titles?
12          A      Steve was the director of that
13  sport partnership portfolio and Lynn was a
14  manager.
15          Q      Okay.  So there were ten, you got
16  five, Lynn got five?
17          A      Yes.  Well, it was it changed.
18  But yeah, that's basically it, yes.
19          Q      What were your responsibilities
20  as manager of the sports partnership division?
21          A      Oh, basically to help sports
22  build an infrastructure.
23          Q      What do you mean by that?
24          A      Well, to build a good foundation
25  for the notion of sustained competitive

24

**Page 25**

1   excellence.

2      Q   How would you do that?

3      A   You work with people

4   individually.  You see what their needs are

5   through a SWOT analysis, through high performance

6   planning.  Then we try to partner up with them in

7   terms of developing programs that will help them

8   develop this notion of sustained competitive

9   excellence.

10      Q   You said SWOT analysis?

11      A   Yes, SWOT analysis.  It's just a

12   basic tool that administrators use in terms of

13   looking at what the strengths, weaknesses,

14   opportunities and threats are of an organization.

15      Q   What does SWOT stand for?

16      A   Okay, strength, weakness,

17   opportunity and -- S-W-O-T.  Strengths,

18   weaknesses, opportunities and threats.  So they

19   name it as an acronym, SWOT.

20      Q   Forgive me if I sound ignorant,

21   because I'm not versed in USOC.  So I need to

22   understand this kind of stuff.

23      A   No.  I'm willing to share it, for

24   the record.

25      Q   Thank you for that.  And how long

**Page 27**

1      Q   What is Hernando doing now, do

2   you know?

3      A   I don't know.  I haven't talked

4   to him.

5      Q   What was your duties as associate

6   director of international programs?

7      A   Basically an interface with

8   United States Olympic Committee and the

9   International Olympic Committee Olympic

10   Solidarity Program.

11      Q   What is the Olympic Solidarity

12   Program?

13      A   It's a program that is one out of

14   Lausanne, Switzerland, which they take revenues

15   from TV from Olympic Games and they put together

16   programs for other countries, Third World

17   countries, let's say, or athletes who don't have

18   the means/resources available to prepare for

19   world class athletics, world class sport.

20      Q   Can you give an example?

21      A   An example would be Abhinav

22   Bindra from India.  He's a shooter who came to

23   the United States Olympic Committee.  And we put

24   together a two-year program for him to train for

25   the Olympic Games.

**Page 26**

1   did you work there?

2      MR. LEVINSTEIN:  Work where?

3      Q   (BY MR. UESUGI) As the manager of

4   the sport partnership division?

5      A   Two and a half years.

6      Q   And then in 2002 you became the

7   associate director of international programs?

8      A   Yes.

9      Q   In the USOC's international

10   affairs division?

11      A   Yes.

12      Q   How did you come to go to that

13   position?

14      A   Well, they were looking for

15   someone and they knew that I had some experience

16   in the area of, you know, just international

17   programming.  And so they had asked me if I was

18   interested.  And at that point, I looked at it

19   and I thought it would be something that I would

20   like to do.

21      Q   Who is they?  Who approached you?

22      A   Hernando Madronero, managing

23   director of international affairs.

24      Q   Is Hernando still there?

25      A   No, he's not.

**Page 28**

1      Q   So you help other country's

2   athletes prepare for the Olympics?

3      A   Yes, as part of the philosophy of

4   the Olympic movement, yes.

5      Q   What philosophy are you talking

6   about?

7      A   Extending the wreath, the olive

8   branch to other countries, fellow family members.

9      Q   Anything else you did?  What else

10   did you do?

11      A   We worked in conjunction with

12   PASO, Pan American Sports Organization, in

13   hosting clinics at the US Olympic Committee in

14   different sports and then sending coaches and

15   other subject matter experts to other countries

16   who were hosting different clinics.

17      Q   Was this US coaches or coaches

18   from other countries also?

19      A   US coaches going to other

20   countries, and then other countries coming to the

21   US.

22      Q   Can you give an example?

23      A   An example would be we had a PASO

24   badminton course and I believe we had probably

25   over 20 coaches from all over the PASO region who

1 came and learned about different programs and
2 ideas through a best practices approach in
3 development of badminton, the infrastructure and
4 actually of the sport development side of it,
5 too.
6 Q Okay. Anything else? What else
7 did you do as the associate director of
8 international programs?
9 A I had some travel
10 responsibilities.
11 Q Such as?
12 A The most notable one was I went
13 to Iraq.
14 Q For?
15 A As a special representative of
16 the International Olympic Committee to watch the
17 first democratic election in 35 years of that
18 country.
19 Q Of the president?
20 A Of the Olympic Committee
21 president and his cabinet.
22 Q When was that?
23 A That was January, a couple days
24 into February of 2004.
25 Q Did you have any responsibilities

1 Q What do you mean by that?
2 A Well, giving our support to other
3 divisions as they're preparing for the Olympic
4 Games, if they needed some help in terms of
5 protocol maybe, or what have you.
6 Q Did you participate at the 2003
7 Pan American Games?
8 A Yes, I did.
9 Q In what capacity?
10 A I was in charge of the housing
11 for the Pan American Games, the American
12 delegation.
13 Q What did your responsibilities
14 include?
15 A Putting people into beds, 700
16 people over a 14-day time span. And getting
17 people in and out of the village. And most
18 importantly, just to help the security folks in
19 keeping a safe environment for our coaches and
20 athletes.
21 Q Did you have an opportunity to
22 interface with Taekwondo athletes during the Pan
23 American Games?
24 A With the team leader.
25 Q Which was who?

1 with respect to the election?
2 A No. As official observer, that
3 was my role.
4 Q And after you observed, you wrote
5 a report?
6 A I believe I had, yeah.
7 Q And who did you give that report
8 to?
9 A To my boss.
10 Q Which was?
11 A At that time, it was Greg Harney.
12 Q Okay. Is that report still
13 available?
14 A I don't know.
15 Q Did you write other reports as
16 the associate director of international programs?
17 A Depends on the situation, but I
18 couldn't tell you for sure.
19 Q You don't remember?
20 A No.
21 Q Okay. What else did you do as
22 the associate director of international programs?
23 A Let's see here. Helped them with
24 just any support in the area of games
25 preparation, depending on the time of the year.

1 A Mr. Lee, Eui Ben Lee, I believe
2 his name is.
3 Q Eui Ben Lee?
4 A I guess.
5 Q Anybody else from Taekwondo?
6 A Let's see. One day when I was
7 running around the athlete village, I ran into
8 Kevin Padilla. I saw Mr. Lee at one point doing
9 a Poomse in the courtyard. But I'm just too busy
10 to be running around to try to shake hands with
11 people, but -- so I did see people at the Pan Am
12 Games.
13 Q Did you watch any of the
14 Taekwondo competition while you were at the Pan
15 Am Games?
16 A I believe I didn't, no.
17 Q In your capacity at the USOC as
18 associate director of international programs, did
19 you have the opportunity to watch any Taekwondo
20 competition?
21 A No, I hadn't. Basically it's a
22 24/7 --
23 Q Job?
24 A Yeah.
25 Q How about as a manager in the

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

**Page 33**

```
1   sports partnership division, did you have an
2   opportunity to watch any Taekwondo competition?
3        A    No, it wasn't in my portfolio --
4   wasn't in our portfolio, excuse me.
5        Q    How did you happen to become
6   employed as the USTU executive director?
7        A    Oh, I was asked if I was
8   interested in taking on a challenge.
9        Q    Who were you asked by?
10       A    United States Olympic Committee.
11       Q    Was there anybody specific in the
12  United States Olympic Committee that asked you?
13       A    Kelly Skinner.
14       Q    When was this?  When did he ask
15  you?
16       A    We had a conversation November of
17  2003.
18       Q    What did Kelly Skinner tell you
19  during that conversation?
20       A    I can't remember.  Basically, are
21  you interested in doing something along this
22  line?  And I said, seems like a good challenge
23  and, you know, I would consider it.
24       Q    Did you have to fill out an
25  application?
```

**33**

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

**Page 35**

```
1   certification process with the USTU?
2        A    No.
3        Q    Why not?
4        A    I have no reason.
5        Q    You didn't think that knowledge
6   of the certification process would be helpful if
7   and when you accepted the position of the
8   executive director for the USTU?
9        A    I don't know.
10       Q    Excuse me?
11       A    I don't know.  As I said earlier,
12  we would do a SWOT analysis, that would tell us
13  everything we need to know.
14       Q    Did you look for the SWOT
15  analysis for Taekwondo prior to being hired as
16  the USTU executive director?
17       A    No.
18       Q    Did anyone recommend you for the
19  position to Kelly Skinner, do you know?
20       A    Couldn't tell you.
21       Q    Do you know if Herb Perez
22  recommended you?
23       A    I don't remember, but he could
24  have, but I don't know.
25       Q    And when were you hired?
```

**35**

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

**Page 34**

```
1        A    No, I hadn't.
2        Q    So what was the process, just
3   Kelly Skinner asking you?
4        A    Well, that was just one part of
5   it, yeah.
6        Q    What were the other parts?
7        A    Well, basically, I don't know
8   what was going on prior to my being hired, I was
9   doing other things.  But what happened was that I
10  think as things started to escalate, whatever
11  that may be, because I don't know what was going
12  on then, there was more of a conversation that,
13  would you consider this.
14       Q    Prior to you being hired as the
15  USTU executive director, what was your
16  understanding of the certification process, I
17  guess, of the USTU?
18       A    Don't know, because I didn't
19  bother with it.  It wasn't part of my job.  I
20  just felt that it was something that I shouldn't
21  spend time on.
22       Q    Even after you were approached by
23  Kelly Skinner?
24       A    Yes.
25       Q    You weren't interested in the
```

**34**

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

**Page 36**

```
1        A    Oh, I would say sometime after
2   February 5th or 6th, somewhere right around there
3   I got back from my trip from Iraq.  And then it
4   was probably that Tuesday, I don't know.  It was
5   right around then.
6        Q    When was the election in Iraq?
7        A    I believe it was January 29th.
8        Q    Then you came back the end of
9   January?
10       A    No, I came back a day or two
11  after, in February.
12       Q    And that's when you were
13  approached with the offer to be USTU executive
14  director?
15       A    Well, I received correspondence,
16  a phone call.
17       Q    From who?
18       A    Mr. Jeff Benz.
19       Q    What did Jeff Benz tell you
20  during that telephone conversation?
21       A    Basically, I don't know, but are
22  you interested in a job?  That's all I can
23  remember.
24       Q    Didn't you already have a job?
25       A    Yes, he knew that.  I was working
```

**36**

1  in international affairs.
2       Q    And did he explain the situation
3  in the USTU to you?
4       A    Yeah.  Just really quickly, it
5  wasn't anything in depth.
6       Q    What did he say about the
7  situation in the USTU?
8       A    It seemed that the remediation
9  plan was going to be signed by the president.
10  And that the USOC was going to install a CEO or
11  an executive director in that position and would
12  I be interested.
13       Q    Did you ask him any questions?
14       A    Well --
15       Q    With respect to the situation in
16  the USTU?
17       A    I don't think we had -- we got
18  into it at that point, no.
19       Q    Did he speak about specifics or
20  starting salary, benefits?
21       A    Not in that conversation, no.
22       Q    Did you accept the position
23  during that conversation with Mr. Benz?
24       A    Well, I told him when I'd get
25  back and then we'll meet and go from there.

1       Q    This telephone conversation, was
2  it in Iraq; you were in Iraq, he was calling you?
3       A    No, it wasn't.  I believe it was
4  when I was in Kuwait City on my way back.  But
5  I'm not sure.  There's no phone in Iraq.  Didn't
6  work for obvious reasons.
7       Q    When you got back, did you meet
8  with Mr. Benz?
9       A    Yes, I did.
10       Q    Anybody else present at the
11  meeting?
12       A    I think in the beginning, I
13  believe that maybe Jim Scherr was there and then
14  he left.
15       Q    When was this meeting?
16       A    I don't know.  Upon my return.
17       Q    Okay.  And what was said at that
18  meeting by Mr. Benz?
19       A    Well, here's a situation and
20  would you like the position.  And there's going
21  to be lots of challenges in rebuilding an
22  organization.  And I said, in a nutshell at this
23  part of my career, I think I'm ready for this
24  type of a challenge.  So I looked at it as a very
25  positive type of challenge for me.

1       Q    How long was the meeting with
2  Mr. Benz and Mr. Scherr?
3       A    Well, it was just a couple
4  minutes with Mr. Scherr, but it was, I would say,
5  venture to guess, I don't even know, but
6  maybe half hour.
7       Q    Was this in Mr. Benz's office?
8       A    I can't remember.
9       Q    Did he give you more information
10  about the USTU remediation situation?
11       A    Well, he gave me a remediation
12  document and I looked at that.  However, in the
13  beginning when I started, it was all about, you
14  know, trying to stabilize an environment, an
15  organization.
16       Q    What do you mean by that?
17       A    Well, just try to, you know,
18  figure out where we're at, what we need to do,
19  and take it from there.
20       Q    Was this the remediation plan
21  that Mr. Benz showed you?
22       A    This looks like it, yes.  I would
23  have to read the whole thing but, yeah, that's
24  what it looks like, yeah.
25       MR. LEVINSTEIN:  One second.

1       MR. UESUGI:  Why don't we mark this as
2  Exhibit 42.
3       (Exhibit 42 was marked.)
4       Q    (BY MR. UESUGI) Can you please
5  not mark this.  That's the exhibit to the
6  deposition.
7       MR. LEVINSTEIN:  Don't write on it.
8       A    Okay.
9       Q    (BY MR. UESUGI) Can you please
10  review the document?
11       MR. LEVINSTEIN:  Exhibit 42?
12       MR. UESUGI:  Yes.
13       MR. JONES:  Yeah.  For the record,
14  Counsel, we're just using the same numbering we
15  used in the hearing.
16       MR. LEVINSTEIN:  You went to 41 in the
17  hearing?
18       MR. JONES:  Doesn't seem like it.
19       MR. LEVINSTEIN:  I was on the phone, so
20  I wasn't as clear.
21       Q    (BY MR. UESUGI)  I'd ask that you
22  please review the document marked as Exhibit 42.
23       A    What part?
24       Q    The entire document.
25       A    The entire document?  You want to

1  take a recess and I can go through it then.
2      Q    If you feel comfortable, if
3  that's what you want to do?
4      A    Sure.
5      MR. UESUGI:  Go off the record.
6      (A recess was taken from 8:54 a.m. to
7      9:00 a.m.)
8      MR. UESUGI:  Back on the record.
9      Q    (BY MR. UESUGI)  Is Exhibit 42
10  what Mr. Benz showed you?
11     A    Yes, it is.
12     Q    Did he explain the remediation
13  plan to you?
14     A    Yeah.
15     Q    What did he tell you?
16     A    I can't remember.  It was over a
17  year ago.
18     Q    All right.  What did -- what was
19  Mr. Jim Scherr's role in the meeting?
20     A    Initially, as I said, he was
21  there for, you know, a brief time just to say,
22  you know, that he has the confidence in me to be
23  able to, you know, help the organization.
24     Q    Did you have any dealings with
25  Mr. Scherr prior to this meeting with Mr. Benz?

1      A    No, he didn't.
2      Q    Did Mr. Benz tell you or instruct
3  you to get rid of all the Koreans during that
4  meeting?
5      A    No, he didn't.
6      Q    Was this a promotion for you?
7      A    Sure, it was.
8      Q    Okay.  When you were manager of
9  the sports partnership division, how much did you
10  start off at, your salary?
11     MR. LEVINSTEIN:  What's the relevance
12  of this?  I mean, it's kind of personal
13  information.  Unless we get some kind of
14  confidentiality in place, I don't think there's
15  any reason to get his prior salaries.
16     MR. UESUGI:  It relates in the sense
17  that the financial situation of the USTU is at
18  issue.
19     MR. LEVINSTEIN:  If you want to ask
20  what he got paid by the USTU when he got hired,
21  that's one thing.  But what he was paid back in
22  his other jobs is not relevant.
23     MR. UESUGI:  My understanding is that
24  he still works for the USOC.
25     MR. LEVINSTEIN:  He does.

1      A    Regarding?
2      Q    Anything?
3      A    Well --
4      Q    Did you know Mr. Scherr before
5  that meeting with Mr. Benz?
6      A    Yes.  Mr. Scherr prior to being
7  the interim was the chief of sport performance
8  for the US Olympic Committee.
9      Q    Was that a position that you
10  reported to?  Is it part of the sport
11  partnerships division?
12     A    Yeah, that was.  Yeah, he oversaw
13  the sport partnership division and other
14  divisions at that time.
15     Q    So you worked for him, basically?
16     A    Yes.
17     Q    During that meeting with Mr. Benz
18  and Mr. Scherr, did Mr. Scherr mention anything
19  about the USTU being run by a Korean mafia?
20     A    No.
21     Q    Did Mr. Scherr tell you to get
22  rid of all the Koreans in the USTU?
23     A    No, he didn't.
24     Q    How about Mr. Benz, did Mr. Benz
25  mention anything about the Korean mafia?

1      MR. UESUGI:  Right.
2      MR. LEVINSTEIN:  But the issue is
3  USTU's finances.  You can ask him about what he's
4  paid by the USTU.
5      Q    (BY MR. UESUGI)  Are you getting
6  more as the -- without getting specific, are you
7  getting more as the interim director of the USTU
8  than you were as the manager of the sports
9  partnership division?
10     MR. LEVINSTEIN:  Objection.  I don't
11  think that's his title.
12     MR. UESUGI:  Excuse me?
13     MR. LEVINSTEIN:  I don't think he's the
14  interim director.
15     A    Can I make a statement?  I have
16  issue with this, just because of the fact that
17  this gentleman that's asking me the questions has
18  a public Internet website.  And I'm a little bit
19  concerned about the fact that he's a lawyer for
20  Mr. Lee and at the same time he publicly blasts,
21  not only me, but other people throughout the
22  United States.  So I have a strong objection to
23  some of that questioning.
24     Q    (BY MR. UESUGI)  Okay.  Are you
25  making more as the USTU executive director than

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

```
1    you were as the manager of sport partnerships
2    division with the USOC?
3         A    Can you restate that one more
4    time, please?
5         Q    Are you making more money in
6    terms of salary as the USTU executive director
7    than you were as the manager of the sports
8    partnership division?
9         A    When you say that, are you asking
10   about specifically cash or VIK or other perks
11   that one may get?
12        Q    You stated that you consider this
13   a promotion.  So I'm just exploring that.  One of
14   the things one receives when you get a promotion
15   is an increase in salary?
16        MR. LEVINSTEIN:  His prior position was
17   not the position you indicated.
18        Q    (BY MR. UESUGI)  Right.  So I'm
19   just starting at the beginning, the first USOC
20   position that you had.
21        A    My first position as the manager
22   of sport partnerships.
23        Q    Yes.  Did you make more money --
24   are you making more money as the manager -- it's
25   a yes or no question.  Are you making more money
```

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

```
1    as the manager of the sports partnerships
2    division than you are as the USTU executive?
3         A    Yes, I am, Glenn.
4         MR. LEVINSTEIN:  That's backwards.  You
5    asked that backwards.  You asked whether he's
6    making more as a manager than he was with the
7    USTU.
8         Q    (BY MR. UESUGI)  And you are?
9         A    Yes.
10        Q    Is that incorrect?
11        A    Okay.  How about we start again?
12        Q    Okay.  Why don't you explain it
13   in your own words?
14        A    Okay.  When I came to the United
15   States Olympic Committee, I -- and then through
16   my movement within the organization, and when I
17   came to the USA Taekwondo, I do make more money
18   at this moment.
19        Q    Okay.  Are you making more money
20   as the USTU executive director than you were as
21   the associate director of international programs?
22        A    I think I just answered your
23   question.  And again, I strongly object to what
24   you're asking because of the fact of your
25   involvement with a Internet site that puts
```

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

```
1    everything on there.
2         MR. UESUGI:  Okay.  We'll go off the
3    record.
4         (Discussion held off the record.)
5         MR. UESUGI:  Back on the record.
6         Q    (BY MR. UESUGI)  So you make more
7    money as -- just to start where we were.  You
8    make more money as the USTU executive director
9    than you did as the associate director of
10   international programs?
11        MR. LEVINSTEIN:  What Mr. Gambardella
12   has testified to is throughout his career, his
13   salary has increased.  So any prior positions had
14   less money than subsequent positions.  So simply
15   by looking at the chronology, you can tell that
16   his salary was higher at the more recent
17   positions than it was in the previous positions.
18        MR. UESUGI:  Great.  Now we all
19   understand.
20        THE DEPONENT:  Thank you.
21        Q    (BY MR. UESUGI)  At this meeting
22   with Mr. Benz, was salary discussed?
23        A    Yes.
24        Q    What else was asked?
25        A    Basically the task that I have in
```

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

```
1    front of me.
2         Q    Were your benefits increased
3    also?  Did you get the same benefits as the
4    associate director of international programs?
5         A    The same benefits, yes.
6         Q    What were those benefits?
7         A    Tell you the truth, my wife
8    handles all the health benefits and issues like
9    that, so you'd have to depose her.  But I don't
10   know, they were the same.  Gold plan, 403
11   retirement.  But you'd have to ask her.  She
12   handles that part of our family.
13        Q    At the time of your hire, was
14   your salary increased from the associate director
15   position?
16        A    Yes.
17        Q    Did you receive any subsequent
18   salary increases as the USTU executive director?
19        A    No.
20        Q    Are you making the same what you
21   are today as you did when you started?
22        A    Affirmative.
23        Q    Did you ask for a raise?
24        A    No, I haven't.
25        Q    And at this meeting with Mr.
```

1   Benz, did you accept the position of USTU
2   executive director?
3           A    Yes.
4           Q    Do you know the date of this
5   meeting?
6           A    No, but I know it was before the
7   6th of February.
8           Q    Okay.  How many days after that
9   meeting with Mr. Benz did you start your
10  employment with the USTU?
11          A    It might have been the next day.
12          Q    You didn't have to give notice to
13  the international programs division?
14          A    I talked to them.
15          Q    And he let you go, you didn't
16  have to give notice?
17          A    Well, that's neither here nor
18  there.  He didn't want to see an employee go, but
19  he knew it was something that he had to do.
20          Q    Do you consider yourself a USOC
21  employee?
22          A    I consider myself an USTU on-loan
23  employee, yeah.  So I'm a US Taekwondo employee
24  on loan from the US Olympic Committee.
25          Q    And your paycheck comes from the

49

1           Q    How about your cell phone bill?
2           A    My cell phone bill, yes.
3           Q    Gets paid for by the USOC?
4           A    It is actually paid for by the
5   USA Taekwondo.
6           Q    Anything else you receive?
7           A    No.
8           MR. LEVINSTEIN:  For the record, I
9   don't think we consider paying your cell phone a
10  benefit.  Business expense that is covered by the
11  employer.
12          MR. UESUGI:  Okay.
13          Q    (BY MR. LEVINSTEIN)  Prior to your
14  employment as the USTU executive director, did
15  you have any martial art experience?
16          A    No.  The only type of combative
17  experience I had was I was trained at the United
18  States Military Academy in the area of boxing,
19  which was part of the self-defense curriculum.
20          Q    You took a course at West Point?
21          A    Constant ongoing staff training.
22          Q    And part of that training was in
23  boxing?
24          A    It was in boxing, yes.
25          Q    When was this?

51

1   USOC?
2           A    Well, my paycheck, I actually get
3   direct deposit into the bank, so it's a direct
4   deposit from the US Olympic Committee into my
5   bank account, yes.
6           Q    Can I ask you your salary?
7           MR. LEVINSTEIN:  Hold on one sec.
8           (Discussion held off the record.)
9           A    Yeah, I make $90,000 per annum.
10          Q    (BY MR. UESUGI)  And in addition
11  to the USOC health benefits, 401(k) gold plan, is
12  that yes?
13          A    In addition, yes, those things,
14  those benefits that we prior talked about,
15  previously talked about.
16          Q    Do you receive any other benefits
17  in addition to what we've already discussed?
18          A    Do I presently receive any
19  benefits from where?  From who?
20          Q    From the USOC as a temporary
21  on-loan employee USTU executive director?
22          A    No benefits, no.  No other
23  benefits, no.
24          Q    Do you get a car?
25          A    No, I don't get a car.

50

1           A    I taught boxing for nine years,
2   so from 1983 and nine years later.
3           Q    How often would you train in
4   boxing?
5           A    Well, we would train every -- you
6   know, before each term, more or less, it would be
7   a, just train the trainer.  You get in there.
8   You would learn some of the sport boxing and how
9   to teach it.  The pedagogical, not only the
10  sport, but the pedagogical, use a lot of motor
11  learning techniques to try to enhance the
12  learner's experience.
13          Q    Was this a short course every
14  year?
15          A    Twenty lessons.  And there were
16  three terms.  And then there was one in between
17  Christmas and then there was a summer term.  But
18  I was never involved in the summer term.  So
19  basically I was involved with -- depending on my
20  season what I was in, you know, I'd be involved
21  with three terms of it.
22          Q    So 60 lessons per year?
23          A    I guess if you do the math, yeah.
24          Q    How long were the lessons?
25          A    The lessons lasted for an hour,

52

1  right around an hour.
2       Q    What did the lessons consist of?
3       A    Let's see here.  Basic offense,
4  defense, transitional moves.
5       Q    Punch the bag, speed bag?
6       A    Oh, yeah sure.
7       Q    Jump rope?
8       A    Live sparring.  Not so much jump
9  rope, but really actually engage in an activity
10 to lower one's level of fear if ever in that type
11 of situation.
12      Q    What situation, self-defense?
13      A    Yes.
14      Q    So it was more a self-defense
15 training rather than the sport of boxing?
16      A    It was using boxing as a way in
17 which to lower one's level of fear if confronted
18 in a real live situation.  However, boxing
19 techniques were taught.  Everything from a jab to
20 combinations to power right-hands, defensive
21 moves, so on, so forth.
22      Q    So you put on the gloves and you
23 sparred also?  That was part of the training?
24      A    No, there was not any sparring
25 between instructors and students.  However, the

1       A    No, I don't remember.  I don't
2  remember what I had for lunch yesterday, no less
3  13 years ago.
4       Q    So you basically have zero
5  martial arts experience, other than the boxing
6  for self-defense that you took at West Point?
7       A    What you said is exactly true.
8       Q    Do you have kids?
9       A    I have two children.
10      Q    How old are they?
11      A    One is 23 and the other is 14.
12      Q    Did you ever sign them up for
13 martial art lessons?
14      A    I signed my children up for the
15 things in which they want to do.
16      Q    And martial art lessons wasn't a
17 part of that?
18      A    Martial arts lessons were not
19 part of that.
20      Q    How about your wife, did she ever
21 take any martial art?  I'm skipping ahead.  Are
22 you married?
23      A    Yeah, I'm married, yeah.
24      Q    And your wife, did she ever take
25 any martial art courses?

1  instructors did put on bags and they would work
2  through different routines.
3       Q    Hand mitts?
4       A    The hand mitts, the big bag, just
5  all different types of things.  In addition to
6  that I was -- worked with the intramural program,
7  which we led up to kind of a boxing finals which
8  one year was on ESPN.
9       Q    Oh, really?
10      A    Yeah.
11      Q    Did you participate as a
12 competitor?
13      A    No, Glenn, I didn't participate
14 as a competitor.  I ran the whole thing.
15      Q    Oh, you ran the whole thing?
16      A    Yes, I did.
17      Q    Okay.  Was there a Taekwondo
18 program at West Point?
19      A    I believe there was, yes.
20      Q    Did you happen to observe any
21 practices?
22      A    You know, in my 13-year tenure, I
23 observed lots of different things and so I could
24 have.
25      Q    You don't remember?

1       A    No.
2       Q    So I take it that because you
3  have no martial art experience, you never
4  competed in any Taekwondo events?
5       A    You are correct.
6       Q    And you never coached at any
7  Taekwondo events?
8       A    You are correct.
9       Q    And you never participated as a
10 volunteer at any Taekwondo events, prior to your
11 hiring?
12      A    Oh, okay.  Prior to my hiring,
13 yeah, no, I hadn't.
14      Q    Just so we have a clear record,
15 prior to your hiring as the USTU executive
16 director, you never volunteered at a Taekwondo
17 event?
18      A    No, I hadn't.
19      Q    Do you have any interest in the
20 martial arts?
21      A    Well, now that I've been involved
22 and engaged in the sport for, what is it, over a
23 year now, 12 months, 13 months, I think it's
24 really opened my eyes to see the art form and the
25 sport portion of it.  So yeah, I am.  It's been

1    very interesting.
2         Q    Prior to your hire as the USTU
3    executive director, did you have any interest in
4    martial arts?
5         A    I had interest in sport in
6    general.
7         Q    But not martial arts
8    specifically?
9         A    No.
10        Q    You didn't like to go watch Kung
11   Fu movies or nothing like that?
12        A    Actually, when I grew up in New
13   York City, we would go to Chinatown and we would
14   see some Bruce Lees and things like that.  It was
15   just part of the whole experience of going to New
16   York City and seeing different things.
17        Q    But you never had any interest in
18   training?
19        A    No, no, I don't.
20        MR. LEVINSTEIN:  By that you mean
21   martial arts training and Taekwondo?
22        MR. UESUGI:  Yes.
23        MR. LEVINSTEIN:  Just to be clear.
24        Q    (BY MR. UESUGI)  When did you
25   become interested?  As your capacity as executive

1    director, that's when your interest came about in
2    martial arts?
3         A    Yeah, as executive director.  And
4    then as things have kind of stabilized a little
5    bit and you can kind of see the sport, and at the
6    Olympic Games, just watching it has been a great
7    appreciation.
8         Q    Do you feel that having no
9    martial art experience prior to your hire as the
10   USTU executive director, is that a detriment?
11        MR. LEVINSTEIN:  Objection to form.
12   It's contrary to the record, because we're
13   talking about boxing and so on.
14        Q    (BY MR. UESUGI)  You can answer
15   the question.
16        A    I believe sport is sport.  And
17   how it's managed, I think that there are some
18   clear-cut generalities that I think one could
19   bring, especially with a background in world
20   class sport development.
21        Q    So being involved in sport has
22   some advantages and crossover?
23        A    I believe so.
24        Q    Is there any disadvantages to not
25   having practiced Taekwondo?

1         A    Well, you know, when you first
2    get there, I mean, one would not know what a
3    padduh chagi is or an axe kick or things of that
4    sort.  But one who's inquisitive would find out
5    these things and learns pretty quickly about
6    again the moves in the sports.
7         Q    So you now know what a paddu
8    chagi is?
9         A    Yeah.  You move back and then you
10   come back and kick, and things like that.  So I'm
11   learning.  I'm learning, slowly but surely.
12        Q    Actually, padduh chagi is -- the
13   translation is receiving kick, so it doesn't
14   necessarily mean what you just said.  But in any
15   event --
16        A    Okay.  Thank you for the
17   clarification.
18        Q    So you don't feel there's any
19   disadvantage to not having any Taekwondo training
20   in your job?
21        A    Depends if you have an open mind.
22        Q    So if you have an open mind,
23   there's no disadvantage to not having a Taekwondo
24   background?
25        A    I think that's a huge part of it.

1    yes.  If you're willing to learn.  I mean, that's
2    a very important thing, I guess, for all of us.
3         Q    Okay.  When did you start at the
4    USTU?
5         A    Well, earlier I told you I
6    believe maybe around February 6th perhaps, but I
7    can't quite remember.  But February 6th I think
8    is a safe date to --
9         Q    Okay.  I'm going to hand you
10   which would be marked the exhibit next in order.
11        (Exhibit 43 was marked.)
12        Q    (BY MR. UESUGI)  This is a press
13   release that was placed on the USOC web page.  Do
14   you recognize it?
15        A    I have to read it.  But yeah, it
16   looks like something that was on the website.
17        Q    Why don't you take a couple
18   minutes and we'll go off the record and you can
19   read it?
20        A    All right.  Thank you.
21        (A recess was taken from 9:23 a.m. to
22        9:25 a.m.)
23        MR. UESUGI:  Back on the record.
24        Q    (BY MR. UESUGI)  Did you have a
25   chance to review --

1   A   43?

2   Q   Yes.

3   A   Yes, I did.

4   Q   Does that refresh your

5   recollection as to when you started at the USTU?

6   A   Yeah.  I guess it says that they

7   started, you know, February 4th.

8   Q   Did you meet with Bill Martin

9   prior to your hire?

10   A   No, I didn't.

11   Q   In the second paragraph, can you

12   please read for me the last sentence?

13   A   The second paragraph of page 1 or

14   page 2?

15   Q   Page 1, please.

16   A   Page 1, okay.  So it says, I

17   quote, We are pleased, that one?

18   Q   The last sentence.

19   A   Oh, the last sentence?  Okay.

20   Q   Yes.

21   A   His solid background in sport

22   performance and international relations makes him

23   the ideal person to lead the USTU in critical

24   time for final preparations in the 2004 Olympic

25   Games in Athens, Greece, unquote.

---

1   person to lead the USTU in this critical time?

2   A   I have a knowledge, skill and

3   experience of world class sport.

4   Q   Do you agree with this sentence

5   with respect to yourself?

6   MR. LEVINSTEIN:  Ideal person, compared

7   to whom?  It's a nice sentence.  I don't know

8   what the question means.

9   A   You know --

10   Q   (BY MR. UESUGI)  Do you agree?

11   It's a simple question.  Do you agree with that

12   sentence?

13   A   It's idealized, yeah.  I mean, I

14   think that, again, you as a lawyer, me as a sport

15   manager, people around the room here, you know, I

16   don't think that we're ever the ideal, because

17   ideal means the top.  I think we're always

18   working towards that.  The process of moving

19   towards an idealized type, I think, is critical.

20   Q   So you don't feel you're the

21   ideal person to lead, because there's only one

22   and that's the top person?

23   MR. LEVINSTEIN:  Objection, that's not

24   what he said.

25   THE DEPONENT:  I feel I'm getting

---

1   Q   We've already discussed some of

2   your activities in sport performance.  Is there

3   anything else that we didn't discuss that would

4   make you the ideal person to lead the USTU in

5   this critical time of final preparation for the

6   2000 Olympic Games?

7   MR. LEVINSTEIN:  Objection.  You can

8   answer.  If you're asking what was thought of by

9   Jim Scherr when he said that sentence?

10   MR. UESUGI:  No, no, no.  I'm not

11   asking about Jim Scherr.  I'm asking for his

12   personal knowledge of his experiences and

13   background in sport performance that makes him

14   the ideal --

15   MR. LEVINSTEIN:  That's kind of vague

16   and ambiguous as to all the things in his life

17   that might prepare him for a job.  So I don't

18   know what that question's asking for.

19   A   I wouldn't even know what else to

20   tell you based on this last sentence.  It seems

21   to be someone else's opinion.

22   Q   (BY MR. UESUGI)  Is that your

23   opinion?  Do you feel that you have a solid

24   background in sports performance and

25   international relations which makes you the ideal

---

1   harassed.

2   MR. LEVINSTEIN:  That's okay.  Why

3   don't you ask another question?

4   Q   (BY MR. UESUGI)  Why don't you

5   answer that question?  So you don't feel -- so

6   you disagree with this statement?  You don't feel

7   you're the ideal person?

8   MR. LEVINSTEIN:  That's not what he

9   said.

10   A   That's not what I'm saying.

11   MR. UESUGI:  Why don't we read back his

12   response to that last part?

13   MR. LEVINSTEIN:  For the record, what

14   he said was that the ideal person doesn't exist,

15   that he was striving to be as good as he can be

16   toward an ideal.

17   THE DEPONENT:  I mean, you know, you

18   want to read it back?

19   MR. LEVINSTEIN:  Let him do what he

20   wants.  There's no question pending.

21   MR. UESUGI:  Yes.  Can you please read

22   back the statement by the witness.

23   (The record was read.)

24   Q   (BY MR. UESUGI)  So once again,

25   you don't feel you're the ideal candidate?

1     MR. LEVINSTEIN:  Objection.  That's not
2  what he said.
3         A    That's not what I said.
4         Q    (BY MR. UESUGI)  What did you say?
5         A    Read it for the record.  Would
6  you please read it again?
7         MR. LEVINSTEIN:  That's what he said.
8         A    That's what I said.
9         Q    (BY MR. UESUGI)  Okay.  What would
10  make you -- what would make someone the ideal
11  person?
12         MR. LEVINSTEIN:  Are we talking about
13  what would make the ideal person in 2004
14  February?
15         Q    (BY MR. UESUGI)  In your opinion,
16  what would make someone the ideal person to lead
17  the USTU in this critical time of final
18  preparations for the 2000 Olympic Games?
19         MR. LEVINSTEIN:  2004?
20         Q    (BY MR. UESUGI)  2004 Olympic
21  Games.  I'm sorry, my mistake.
22         A    We're talking in generalities
23  here?  Is that what you're saying, generally
24  speaking?
25         Q    Yes.

1         A    I think the person who comes to
2  the table with knowledge, skill and experience in
3  the area of sport and sport management.
4         Q    Would a background in Taekwondo
5  help make a person an ideal person to lead the
6  USTU in the critical time of final preparation?
7         A    It depends on the situation.
8         Q    What do you mean by that?
9         A    Depends on what level the
10  organization is at in their development.  It
11  could play a key role.  And then again, depending
12  on where an organization is in their whole life
13  cycle, it doesn't really matter.
14         Q    How about where the USTU was in
15  the beginning of 2004 when you came on board as
16  the executive director?
17         A    I believe when I came on board as
18  the executive director, there were other areas of
19  concern, grave concern, such as a $1.1 million
20  debt with a $650,000 accounts payable that was
21  owed.  So it was looking at trying to, again, as
22  I said earlier in this deposition, a
23  stabilization of an organization.
24         Q    So in the beginning of 2004, in
25  your opinion, you don't feel that a Taekwondo

1  background was necessary to be the executive
2  director?
3         A    At that point of the organization
4  where it was at, no, I don't feel it was
5  important to have a vast understanding of the
6  sport of Taekwondo.
7         Q    Because you were concerned about
8  the financial situation?
9         A    That is correct.
10         Q    But weren't there other areas of
11  the organization that you were also entrusted
12  with responsibilities?
13         A    Yes, there were.
14         Q    What were those other areas
15  besides financial?
16         A    Well, like as you see on that
17  last document, we had to hire, you know, a CFO,
18  you know, things of that sort of trying to put
19  together a stable work environment.
20         Q    Outside of the financial area,
21  what other areas of responsibilities did you
22  have?
23         A    At what point, Counsel?
24         Q    In the beginning when you first
25  started?

1         A    In the beginning?  In the
2  beginning was just trying, as I said, stabilize
3  and learn about where we're currently at in the
4  organization, thus putting together a SWOT
5  analysis list and things of that sort.
6         Q    Did you do that?
7         A    Yes, I did.
8         Q    Was that a written document?
9         A    Yes, it is.
10         Q    Has that document been produced;
11  do you know?
12         A    I don't know.
13         Q    When did you prepare this
14  document?
15         A    Beginning of February.
16         Q    And when you prepared that
17  document, what was your analysis or what did you
18  do in preparation of drafting that SWOT analysis?
19         A    Well, any basic course in the
20  area of organizational development would say that
21  you need to know what your strengths, weaknesses,
22  opportunities and threats are.  And then you can
23  start to do some planning from that perspective.
24         Q    When you first started, what were
25  some of the strengths of the USTU?

1    A    Well, there were very few, if
2  any.
3    Q    What were they?
4    A    I would have to look at the SWOT
5  analysis.  I can't remember, so I don't want to
6  guess at this moment.
7    Q    Okay.  How about the weaknesses?
8    A    As I just mentioned, I think that
9  we were financially, you know, had some
10  challenges there, which was a huge weakness in
11  terms of, you know, whether or not you're going
12  to keep the doors open.
13    Q    Any other weaknesses?
14    A    Not that I can remember at this
15  moment.
16    Q    What were some of the
17  opportunities that were present when you first
18  start as executive director?
19    A    I just think, you know, at the
20  end of the day, I think that there were a lot of
21  people who, you know, have commented on the fact
22  that the sport had so much potential, you know,
23  in terms of not at the Olympic level, but just
24  other levels.  And so I think that was an
25  opportunity.  What that specifically meant at

1  athletes who have that ability to compete at the
2  highest level.
3    Q    So the term sport-for-all, that
4  comes from the Olympic charter; is that correct?
5    A    I believe it does, yes.
6    Q    Have you read the Olympic
7  charter?
8    A    Not in a very long time, no.
9    Q    Have you read the USOC bylaws,
10  prior to you starting as the executive director
11  of the USTU in February 2004?
12    A    I read the bylaws when I was
13  first hired by the US Olympic Committee.
14    Q    In their entirety?
15    A    Certain sections of it.
16    Q    But the bylaws has changed since
17  then, right?  It's different bylaws since 2000?
18    A    Of course you do read certain
19  sections of the new bylaws.  But I just wanted to
20  give you a history that I did, yes, at some point
21  at the beginning when I started, yeah.
22    Q    Is it your understanding that the
23  USOC bylaws were completely reworked?
24    A    Yes.
25    Q    When were the bylaws completely

1  that time was just generally speaking, you know,
2  looking at how we can rally around, you know, to
3  promote, you know, our future programs.
4    Q    Are you talking about grass-roots
5  development?
6    A    I think it runs the gamut.
7    Q    Of what?
8    A    Of grass-root, high performance,
9  world class.
10    Q    Grass-roots, high performance,
11  world class.  What is your understanding of the
12  grass-roots development?
13    A    Well, let's start even the one
14  before that is a sport-for-all entity, which
15  allows people just to participate in sport.  And
16  there's really -- it's just for the appreciation
17  of it.  A grass-root type of a program could be
18  one, depending on how it's designed, that gives
19  people an opportunity to participate in sport
20  and, you know, basically, you know, get involved
21  with it at a certain point.
22    High performance level is one at which
23  the athletes have been identified to possess, you
24  know, potential, world class potential.  And the
25  world class one is really as it is.  It's

1  reworked?
2    A    I can't tell you.  I don't know.
3    Q    Was it before or after you were
4  hired as the USTU executive director?
5    A    Could have been during.  I don't
6  know.
7    Q    Did you read those new bylaws?
8    A    I've read the bylaws, yes.  As I
9  said, parts that pertain to some of the things
10  that we were dealing with.
11    Q    So you never read the USOC bylaws
12  in their entirety?
13    A    The newest edition, not in their
14  entirety.
15    Q    What sections have you read?
16    A    I can't tell you.  I don't know.
17  I don't remember.
18    Q    Did you read the section with
19  respect to national governing bodies?
20    A    Probably.
21    Q    Probably?  You don't know?
22    A    I don't remember.
23    Q    Going back to that last sentence,
24  it says you have a solid background in
25  international relations.  And you also previously

---

**Page 73**

1  testified that you did have an international
2  background and that was one of the reasons or
3  that was the primary reason that you were hired
4  as the USTU executive director; is that correct?
5      A    Yeah.
6      Q    What was your international
7  experience prior to being hired as the USTU
8  executive director?
9      A    Well, well traveled.
10     Q    What does that mean?
11     A    Been to many countries, have
12  worked with different Olympic committees, have
13  established relationships with, you know,
14  individuals and groups throughout the world.
15     Q    Was this personal travel,
16  vacations or --
17     A    No, it was --
18     Q    -- work related?
19     A    -- business, yeah, work related
20  mostly, yeah, 99 percent of it, perhaps.
21     Q    In what capacity?  What job are
22  you talking about?
23     A    Well, in several functional
24  areas.  I mean, being a team leader on
25  competitions.  You know, as I mentioned before

---

**Page 74**

1  for the record, you know, being at the 2003
2  Olympic -- excuse me, Pan American Games.  Going
3  on a trip to, like, to, say, Guatemala to help
4  them in certain areas of programming, help the
5  Olympic Committee out with the certain of their
6  programs.  So it's a myriad of different
7  experiences.
8      Q    When did you go to Guatemala?
9      A    I don't remember.
10     Q    Prior to being hired as the USTU
11  executive director?
12     A    Yes.
13     Q    Were all these experiences
14  internationally, did it come as a result of your
15  hire as the associate director for international
16  programs?
17     A    State that again, please.
18     Q    Your international experience
19  that you just discussed, were they all related to
20  your position as associate director of
21  international programs with the USOC?
22     A    Some were.
23     Q    Some weren't?
24     A    No.  In that position, there
25  was -- I gave you kind of a global look at what

---

**Page 75**

1  I've done.  And some were under during that
2  position and some were when I was at volleyball.
3      Q    What international experiences
4  did you gain when you were with volleyball?
5      A    As I said, team leader, went to
6  regionalized -- regional meetings, such as, you
7  know, meetings in Santo Domingo.
8      Q    Where's that?
9      A    Santo Domingo in the Dominican
10  Republic.
11     Q    Okay.  With respect to the Pan Am
12  Games, no?
13     A    No.  Basically it was just
14  focusing on volleyball in terms of looking at
15  developing new programs in this part of the
16  hemisphere.
17     Q    PASO?
18     A    Well, yeah, PASO.
19     Q    Any other international?
20     A    In volleyball, it was an acronym
21  called NORCECA.  So NORCECA region specific to
22  volleyball, which was pretty much almost PASO
23  regional.
24     Q    So it would was sort of like the
25  PATU, Pan American Taekwondo Union, except for

---

**Page 76**

1  you were working for volleyball?
2      A    Exactly, exactly.
3      Q    This was when you were working
4  for USA Volleyball?
5      A    Uh-huh.
6      Q    That's a yes?
7      A    Excuse me, yes.
8      Q    What was the first thing that you
9  did when you was hired at the USTU executive
10  director?
11     MR. LEVINSTEIN:  Objection.
12     A    I don't even remember.
13     MR. LEVINSTEIN:  First thing?
14     Q    (BY MR. UESUGI)  Okay.  What were
15  some of the -- we went through the SWOT analysis.
16  What were some of the threats that you identified
17  with respect to the USTU?
18     A    I cannot remember.
19     Q    What would be a threat?  What
20  does that constitute?
21     A    Well, a threat could be like
22  another organization that's trying to take
23  membership away or things of that sort.  So that
24  could be a common threat.
25     Q    Like the AAU Taekwondo program?

4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)
Case 1.04-cv-00461-SOM-LEK    Document 247-3    Filed 03/21/2006    Page 21 of 79
4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)

1   A    Other organizations. I'm not
2   going to name any specific organization.
3   Q    When you first started as the
4   USTU executive director, did you consider the AAU
5   Taekwondo program a threat for SWOT analysis
6   purposes?
7   A    I cannot remember. I cannot
8   remember.
9   Q    It would be in your document?
10  A    I believe so.
11  Q    I'd like to hand you another
12  document from the USTU web page, which we'll mark
13  as the exhibit next in order.
14  (Exhibit 44 was marked.)
15  Q    (BY MR. UESUGI) Do you recognize
16  that document?
17  A    Yes, I do.
18  Q    What is this?
19  A    It's a letter just to the
20  membership.
21  Q    Which you wrote?
22  A    For the record, yeah. It's
23  clearly signed by Bob Gambardella, chief
24  executive officer, yes.
25  Q    Is this a true and correct copy

1   (A recess was taken from 9:44 a.m. to
2   9:48 a.m.)
3   MR. UESUGI: Back on the record.
4   Q    (BY MR. UESUGI) Did you have a
5   chance to review the Exhibit 44?
6   A    Yes, I did.
7   Q    Did you write this letter?
8   A    Yes, it seems to be
9   philosophically in line with what I believe. So
10  yes, I did read it -- write it.
11  Q    What was your purpose in writing
12  this letter?
13  A    Just to say hello, Taekwondo
14  World, how are you doing? Here's who I am and
15  here's what we're going to be, you know, focusing
16  on in the short term.
17  Q    Let's go into it. You list three
18  things here that you intend to focus your time
19  and efforts?
20  A    Right.
21  Q    Athletes, Athens and
22  infrastructure?
23  A    Right.
24  Q    Let's go into the athlete
25  section.

1   of what you wrote?
2   A    Say again. I'm sorry.
3   Q    Is this a true and correct copy
4   of what you wrote?
5   A    Yeah, yeah.
6   MR. LEVINSTEIN: It's tough for him to
7   know. You represented to him that it came off
8   the website, so we have no way of knowing if it's
9   the exact document.
10  Q    (BY MR. UESUGI) Do you have a
11  hard copy of this document?
12  A    In my person, no.
13  Q    In the office?
14  A    I would imagine so.
15  Q    Do you have any reason to believe
16  this isn't what you wrote?
17  A    Can we then take a break and let
18  me read it and then I can tell you whether or
19  not? How's that?
20  Q    Why don't we do that. Whenever I
21  go through any of these documents, we'll take a
22  break and you can review the document in its
23  entirety and then go back on the record.
24  A    Sounds good.
25  MR. UESUGI: Off the record.

1   A    Sure.
2   Q    Can you read me that paragraph?
3   A    Athletes - As we all know,
4   athletes are the core and key components to any
5   NGB. We would become an organization that values
6   the concept of athletes first. We are fortunate
7   that we have several outstanding athletes who are
8   part of our sport and the potential for growth is
9   tremendous. It is our job to make sure that
10  these athletes, present and future, have the
11  resources necessary to achieve sustained
12  competitive excellence.
13  Q    What does the concept athletes
14  first mean to you?
15  A    Basically, it really comes from
16  the fact that as an organization, we really are
17  athlete centered. So the athlete is the central
18  point of everything that we do.
19  Q    So every decision that you make
20  you consider athletes first?
21  A    I don't think it's every
22  decision, because there may be another decision
23  that it just doesn't deal with that. But in the
24  majority of decisions, yes.
25  Q    Which athletes wouldn't be

1  athletes-first-consideration-type decisions?
2      A    You may want to ask that again.
3      Q    You stated that certain decisions
4  that you make do not involve the concept of
5  athletes first; is that correct?
6      A    There could be some situations
7  where it's not a purely programmatic process or
8  thing that we're working on and it involves
9  to deal with, you know, athletes.  And some
10 decisions are made based on just best business
11 practices.
12     Q    Can you give an example of what
13 would be a decision that you have made that
14 didn't involve the concept of athletes first?
15     A    Well, how you go to work and try
16 to figure out how to pay the $1.1 million deficit
17 down.
18     Q    Anything other than financial?
19     A    At this point, that was the --
20 you know, that would be a prime example of that.
21     Q    So are you saying that the
22 financial situation of the USTU is not an
23 athletes-first type of decision?
24     A    At that point, Counselor,
25 basically we were trying to keep the doors open.

1  a Mandy Meloon.  You know, so those are the ones
2  that come to my mind and were probably the ones
3  that I most notably knew about in the beginning.
4      Q    So Steven Lopez, Mark Lopez,
5  Diana Lopez and Mandy Meloon were athletes that
6  you had in mind when you wrote this letter?
7      A    I would say so.
8      Q    How did you learn of Steven Lopez
9  being an outstanding athlete?
10     A    Well, he was a 2000 Sydney games
11 gold medalist.
12     Q    How did you learn about him?
13     A    How did I learn about him?
14     Q    Yes.  You previously stated that
15 you had no knowledge of Taekwondo when you first
16 started.
17     MR. LEVINSTEIN:  Objection.
18     A    Taekwondo, the sport, but not the
19 personalities.  I think we need to differentiate
20 that.
21     Q    (BY MR. UESUGI)  Okay.
22     A    As two.
23     Q    When did you first learn about
24 Steven Lopez?  Did you know about him before you
25 were hired as the executive director?

1      Q    What do you mean by that?
2      A    Well, keep the lights on, the
3  doors open that people can transact business.
4  And so that was really, you know, something that
5  we focused on.
6      Q    In what ways did you focus on the
7  concept of athletes first when you first started
8  as the USTU executive director?
9      A    Just trying to gain information
10 about, you know, what athletes are out there, who
11 are -- you know, I knew who some of the
12 performers were but, you know, what is the
13 overall environment in terms of what athletes,
14 how they -- how they're progressing, so on, so
15 forth.
16     Q    You state here that we're
17 fortunate to have several outstanding athletes
18 who are part of our sport; is that correct?
19     A    Yeah.
20     Q    Who were those outstanding
21 athletes that you were referring to in your
22 February 5 letter?
23     A    Yeah, initially the first one
24 would come to mind would be Steven Lopez, you
25 know, Mark Lopez, you know, a Diana Lopez.  Maybe

1      A    Yeah, right around the 2000
2  Olympic Games.  You get press releases and things
3  like that.  You read about all the athletes.
4      Q    You remember him from the 2000
5  Sydney games?
6      A    Yes, yes.
7      Q    How about Mark Lopez, when did
8  you first learn about Mark Lopez being an
9  outstanding athlete in Taekwondo?
10     A    Probably right around when I was
11 hired.  I know that I read something about the
12 family affair of the Lopezes and just read of his
13 name, as I did Diana, how the father kind of got
14 his children into the sport.  So I read a story
15 somewhere about the story part of it.
16     Q    Where did you read the story?
17     A    I don't remember.
18     Q    Was it online?
19     A    I don't remember.
20     Q    Okay.  How about Diana Lopez,
21 same thing?
22     A    Same thing, yes.
23     Q    How about Mandy Meloon, where did
24 you learn about her?
25     A    Just a name that from someone --

1    I don't know who it was -- in passing a
2    conversation, but seemed the kid, this athlete,
3    had some potential also.  But I don't remember
4    who told me that.  But those are the names that,
5    you know, come forward.
6          Q     When did you hear of Mandy
7    Meloon's name in passing?
8          A     I cannot remember.  I cannot
9    remember.
10         Q     It was before you were hired?
11         A     Yeah, yes.
12         Q     Any other athletes that you had
13   in mind when you were --
14         A     Not to my recollection, no.
15         Q     Can you please wait until I -- I
16   have to finish my sentence.
17         A     Okay.  Yes, Counselor.
18         Q     You have to finish your answer
19   and then it's my turn to ask a question.
20         A     All right.
21         Q     So just to be clear, Steven
22   Lopez, Mark Lopez, Diana Lopez and Mandy Meloon
23   were the athletes that you had in mind when you
24   wrote this letter?
25         A     Those are athletes that, yes,

1    competitive excellence.  And that you're at the
2    top of the world from one quadrennium to the
3    next.  Not only -- let me answer.
4          Q     (BY MR. UESUGI)  Go ahead.
5          A     Not only just in terms of medals
6    but, you know, a program that is, you know, is
7    all encompassing, that has, you know, just all
8    different components to it that will lend itself
9    to the end.
10         Q     When you mentioned resources,
11   what did you mean?
12         A     Financial and otherwise.  You
13   know, support staff, you know.
14         Q     Support staff, what does that
15   mean?
16         A     That means that just people who
17   are interested in helping, you know, grow a sport
18   in all areas of programming.
19         Q     I don't understand what you're
20   trying to say.
21         A     Well, basically --
22         MR. LEVINSTEIN:  Stop.  Ask a question.
23         A     Well, basically --
24         Q     (BY MR. UESUGI)  Can you rephrase
25   your answer?

1    came to my mind, yes.
2          Q     As outstanding athletes who are
3    part of our sport?
4          A     Yes.
5          Q     And there are no others?
6          A     Back then, there could be others,
7    but I just don't remember.
8          Q     It says here that your job or our
9    job is to make sure that these athletes have the
10   resources necessary to achieve sustained
11   competitive excellence.  What did you mean by
12   that?
13         MR. LEVINSTEIN:  For the record, could
14   you read the whole sentence?
15         Q     (BY MR. UESUGI)  It is our job to
16   make sure that these athletes, present and future
17   athletes, have the resources necessary to achieve
18   sustained competitive excellence.  What did you
19   mean by that?
20         MR. LEVINSTEIN:  Objection, the
21   document speaks for itself, but you can answer.
22         A     Yeah, basically, you know, at the
23   end of, you know, every program, you want to be
24   able to be measured in terms of being able to
25   develop a program with this notion of sustained

1          MR. LEVINSTEIN:  Can you ask a new
2    question?  You asked a question, but I don't
3    think he knows what you're asking.  You're a long
4    way from the last question.  So if you want to
5    state a question so the record's clear, fine.
6          MR. UESUGI:  Can you read back the
7    question?
8          MR. LEVINSTEIN:  For the record, the
9    question she reads, he already answered.  So if
10   you want to ask another one, you can, but --
11         (The record was read.)
12         Q     (BY MR. UESUGI)  Support staff,
13   what does that mean?
14         A     What it means is that you're
15   building a team around a team.  That means that
16   you're putting together resources of people and
17   subject matter experts to help you, you know,
18   guide a program in a certain direction.
19         Q     Who would be an example of a
20   resource, one of your support staff resources?
21         A     Sport science people.
22         Q     At OTC?
23         A     Anywhere.  Anyone who has, you
24   know, knowledge in the area of sport science,
25   different disciplines.

1  Q  Who would be an example of that?

2  A  An example would be a person

3  who's concerned with, you know, performance

4  enhancement.

5  Q  Do you have -- did you retain any

6  specific support staff in order to develop the

7  resources necessary to achieve sustained

8  competitive excellence?

9  MR. LEVINSTEIN:  Objection.

10  Q  (BY MR. UESUGI)  Did you hire

11  anybody -- I'm using your terminology.  You said

12  that one of the resources necessary was support

13  staff?

14  A  It's all pro bono.

15  Q  It's all pro bono?

16  A  Yeah, yeah.

17  Q  Who would be an example?

18  A  An example would be Peter Haberl,

19  who's a sport psychologist who works for the

20  United States Olympic Committee.

21  Q  At OTC?

22  A  Yes, at the United States Olympic

23  Committee Olympic Training Center in Colorado

24  Springs, yeah.

25  Q  And what did you do to make sure

1  integrate a team around a team concept.

2  Q  What I'm asking is did you inform

3  the membership that Peter was available for the

4  athletes?

5  A  The membership?

6  Q  Yes.

7  A  No.

8  Q  Why not?

9  A  This is a high performance

10  program.

11  Q  What does that mean?

12  A  That means it was targeted

13  towards, you know, the highest or the higher

14  level of athletes.

15  Q  Did you inform our higher level

16  athletes, the one in which you refer?

17  A  As I said earlier, yes.  I can't

18  give you a specific date.  But yes, I mean, I

19  remember it was part of our conversations with

20  athletes, you know, and that if that came up or

21  came up, we would explain to them that there are

22  services available.

23  Q  Okay.  Who did you tell?  Which

24  athletes?

25  A  I cannot remember, Counselor.

1  that Peter was available to Taekwondo athletes so

2  that they could achieve sustained competitive

3  excellence?

4  A  Well, it's not that easy.  I

5  mean, that's just one of the parts of it.  But we

6  are -- you know, have been in meetings and

7  planning meetings and moving forward in terms of

8  developing that, as I said, that team around the

9  team.  Things don't just happen overnight.

10  Q  Did you inform the USTU athletes

11  or membership that a sports psychologist at the

12  Olympic Training Center was available as a

13  resource so that they could sustain competitive

14  excellence?

15  A  You may want to rephrase that a

16  little bit.

17  Q  Did you tell people that, hey, we

18  have Peter, the sports psychologist, at OTC and

19  he's available as a resource support staff so

20  that you, the athlete, present and future, have

21  the resources necessary to achieve sustained

22  competitive excellence?

23  A  I don't quite remember any

24  specific instance.  But yes, generally that is

25  part of our overall plan in terms of trying to

1  Q  Okay.  That's a perfectly fine

2  answer.

3  MR. LEVINSTEIN:  I'm glad you approve.

4  MR. UESUGI:  And I'm glad that you're

5  acknowledging that.

6  Q  (BY MR. UESUGI)  Okay.  Let's turn

7  to Athens.

8  A  Uh-huh.

9  Q  Can you please read that

10  paragraph?

11  A  That paragraph.  Okay, Athens -

12  the Olympic Games are only 191 days away.  What

13  we know is that we will be sending two

14  athletes -- one man, one woman -- to Athens to

15  represent the USA.  It is our job to make sure

16  that the athlete who ends up qualifying to

17  represent us will have all our support in order

18  to maximize their performance in the Olympic

19  Games, period.

20  Q  When you stated all our support

21  in order to maximize their performance in the

22  Olympic Games, what did you mean by that?

23  A  Again, Counselor, building a team

24  around a team; having a support infrastructure to

25  help maximize potential.

1  Q    So you're talking about
2  resources?
3  A    Everything, yes, a team around a
4  team.
5  Q    How about infrastructure, can you
6  please read the first sentence?
7  A    We will ensure our transparency
8  to the membership in our business dealings and we
9  will work diligently to bring about fiscal and
10  ethical responsibility.
11  Q    Stop.  Just the first sentence.
12  When you stated transparency, what did you mean?
13  A    What did I mean, is the fact that
14  our philosophy at USA Taekwondo, and even at the
15  US Olympic Committee, is one that we want to try
16  to provide information to its members.
17  Q    So if something's going on, you
18  tell the membership?
19  A    If there's a need to know.  Like
20  take, for instance, you know, just most recently
21  about our membership cards, we put something out
22  on the web that they're going to be held up.  So
23  that's just a simple example.  But that's an
24  example of that.
25  Q    Are there things that you

1  wouldn't tell the membership?  Need to know, what
2  do you mean by that?
3  A    Just basically give them
4  information that they would need to know about,
5  you know, what could be happening, you know,
6  like, you know, governance proposals.  We put
7  that it's on a separate bar so people can kind of
8  see where we're at in terms of handing over the
9  new governance structure, the new governance to
10  the membership and so forth.
11  Q    So the membership needs to know
12  about the governance proposal, so that's why you
13  put it out there?
14  A    Yes.
15  Q    What is something that you
16  wouldn't put out, for example?
17  A    I can't tell you.  I don't know.
18  Nothing comes to mind at this moment.
19  Q    How about the Olympic coaching
20  selection criteria, is that something the
21  membership needs to know?
22  A    I would think so.
23  Q    What steps did you take to inform
24  the membership about the Olympic coach selection
25  criteria?

1  A    I cannot remember.
2  Q    Do you remember doing anything
3  about that, informing the membership?
4  A    I don't remember specifically.
5  Q    Okay.
6  A    Again, it was at a different
7  time, you know, a different time of then and
8  where we're at then.
9  Q    Was that something that the
10  membership would need to know?
11  A    They could, by the Amateur Sports
12  Act, yes, it should be something that's
13  communicated.
14  Q    Did you put it on the USTU web
15  page?
16  A    I cannot remember.
17  Q    You also in your letter
18  introduced the governance and management
19  committee.  Steve Locke, Tony Baggiano, Rich
20  Bender, Juan Moreno and Virginia Witte?
21  A    Correct.
22  Q    Prior to your employment as USTU
23  director, did you know Steve Locke?
24  A    I knew him just in passing he
25  being in triathlon and me being in volleyball.

1  Q    You see him in the hall?
2  A    Yeah, I see him or different
3  meetings or what have you, yes.
4  Q    You didn't have any sort of a
5  social relationship with him?
6  A    No, none whatsoever.
7  Q    How about Tony Baggiano?
8  A    No, just knew the name.
9  Q    You never met him prior to
10  your --
11  A    No.
12  Q    -- employment as executive
13  director?
14  A    No, I never have.
15  Q    How about Rich Bender?
16  A    Knew who he was.  Again, in the
17  same light as Steve Locke.  You know, knew who he
18  was and met him once before.
19  Q    Who was he, the executive
20  director of?
21  A    Of USA Wrestling.
22  Q    That was the capacity you saw him
23  at One Olympic Plaza?
24  A    Yeah.
25  Q    But no social relationship?

**Page 97**

1  A  No.
2  Q  How about Juan Moreno?
3  A  Basically met him when I came to
4  work for the US Taekwondo.
5  Q  Did you know his name?
6  A  As I started to hear more, you
7  know, like in the beginning of my tenure that I
8  heard that he was going to be, you know, possibly
9  named to the governance management, so, yeah.
10  Q  But prior to that you had never
11  met Juan Moreno?
12  A  No, I hadn't.
13  Q  And you never heard his name?
14  A  No, I hadn't.
15  Q  How about Virginia Witte?
16  A  Oh, yeah, we worked together and
17  she was -- she's in auditing and I was in sport
18  partnership. And so there was, you know, an
19  ongoing working relationship with the auditing
20  division.
21  Q  So you had a direct working
22  relationship with Virginia Witte?
23  A  I don't know if it was a direct,
24  but we would be in meetings together, yeah.
25  Q  With respect to the five sports

**Page 98**

1  that you were supervising?
2  A  Within our portfolio, yes.
3  Q  Did you ever know her socially?
4  A  No.
5  Q  On February 5, there was a USTU
6  governance and management committee meeting; is
7  that correct?
8  A  Don't know. But maybe you have
9  something that will tell us the date.
10  Q  Yes, let's mark this as the
11  exhibit next in order, 45.
12  (Exhibit 45 was marked.)
13  Q  (BY MR. UESUGI) You want to take
14  a minute to just quickly review that?
15  A  Thank you.
16  (Discussion held off the record.)
17  Q  (BY MR. UESUGI) Have you reviewed
18  the document that I just handed to you?
19  A  Are we back on record again?
20  Q  Yes.
21  A  Yes, I did.
22  Q  What is this?
23  A  These, as you can see, are
24  minutes of a meeting, February 5th, 2004,
25  governance and management committee meeting.

**Page 99**

1  Q  This was the first meeting of the
2  USTU GMC?
3  A  I believe so.
4  Q  How often would the GMC meet?
5  A  Well, it was based on, you
6  know -- the time was weekly. It might have been
7  biweekly. And depending on, you know, what was
8  happening, you know, so there wasn't a set time
9  frame. It was, you know, really as needed. And
10  it's still pretty much as needed. But generally
11  every two weeks.
12  Q  And every time the GMC meets,
13  minutes would be produced?
14  A  Yes.
15  Q  Who would produce the minutes?
16  A  Virginia Witte.
17  Q  I notice on the bottom it says
18  minutes approved February 12th, 2004?
19  A  Right.
20  Q  What does that mean? What was
21  that for?
22  A  That means that the governance
23  and management committee would have an
24  opportunity to go over the minutes to see if
25  everything was correct. And then they would send

**Page 100**

1  back any corrections to Virginia for, I think,
2  inclusion. And then at that point it would be
3  voted on to move that the minutes be approved.
4  Q  So you were following Roberts
5  Rules of Order?
6  MR. LEVINSTEIN:  Objection.
7  A  I don't know.
8  Q  (BY MR. UESUGI) Were Roberts
9  Rules of Order used at the meeting?
10  A  I don't know.
11  Q  The second paragraph talks about
12  the financial situation. Was that the major
13  concern at the time?
14  A  I believe, yeah, it was. I mean,
15  it seemed to be a huge problem.
16  Q  Okay. It states here in the
17  third paragraph, and I'm going to just read it,
18  it says that, quote, Mr. Locke reported that he
19  and Mr. Gambardella and Mr. Skinner met with the
20  USOC marketing division. He was able to
21  negotiate incremental funding for USTU through
22  the USOC joint marketing agreement. Did I read
23  that correctly?
24  A  You read what was on here
25  correctly, yes, sir.

1  Q    What does that mean, you
2  negotiated incremental funding for the USTU
3  through the USOC?
4      MR. LEVINSTEIN:  Okay.  For the record,
5  we've been here two hours.  This has absolutely
6  nothing to do with this case.  This is not a case
7  about everything going in the USTU and its
8  funding and so on.  I understand you're curious,
9  but let's try to at least have something to do
10  with the case in the questions.
11      MR. UESUGI:  We're coming up to it.
12      MR. LEVINSTEIN:  It would be nice if
13  after two hours we got somewhere close.  Go ahead
14  and answer that question.
15      A    Can you restate that question
16  again, Counsel?
17      Q    (BY MR. UESUGI)  What does that
18  sentence mean?
19      A    What does that mean?  That means
20  that three people collectively went to a division
21  of the US Olympic Committee, namely the marketing
22  division, and then Mr. Locke was able to
23  negotiate some incremental funding for the USTU
24  through its joint marketing agreement.
25      Q    What types of funding are you

1  situation of the USTU is not at issue, then okay,
2  I won't be asking these questions about finances.
3      MR. LEVINSTEIN:  The financial
4  condition is at issue.  Of course, it had a
5  terrible financial situation.  Whether they
6  eventually made a video about marketing has
7  nothing to do with this lawsuit.
8      MR. UESUGI:  In your opinion.  Okay.
9  Are you instructing him not to answer?
10      MR. LEVINSTEIN:  Yes.
11      Q    (BY MR. UESUGI)  You do realize
12  that your Counsel has objected and he's
13  instructed you not to answer.  We can file a
14  motion to compel, seeking costs and attorneys'
15  fees, and if we prevail, which there's
16  substantial likelihood which we will, you will
17  have to come back here and you have to answer
18  these questions at your expense?
19      MR. LEVINSTEIN:  Don't answer.  You can
20  say what you want.  Continue.
21      Q    (BY MR. UESUGI)  Do you understand
22  that?
23      MR. LEVINSTEIN:  It's not for him to
24  answer that question.  Go ahead.
25      Q    (BY MR. UESUGI)  Okay.  All right

1  talking about?
2      A    Incremental marketing dollars.
3      Q    Which you're entitled to -- which
4  the USTU was entitled to?
5      A    Yes, could be.  Eligible for, I
6  should say.
7      Q    Is this for athlete development?
8      A    Excuse me.  Excuse me.  Eligible
9  for.
10      Q    Eligible for?
11      A    Yes.
12      Q    Is this for athlete development
13  purposes?
14      A    This money is not earmarked
15  specifically towards one particular project.
16      Q    The next sentence is, in addition
17  the office will loan the USTU a USOC staff member
18  to develop a marketing package and videotape.
19  Was that ever developed?
20      MR. LEVINSTEIN:  For the record, I'm
21  going to, at this point, say he's not going to
22  answer that question.  It's got nothing to do
23  with this case.
24      MR. UESUGI:  It has to do with the
25  finances.  If you're saying that the financial

1  it talks about the resignation of Eui Ben Lee as
2  the referee chair; is that correct?
3      A    That's what I read, Counselor.
4      Q    Did any other committee chairs
5  resign?
6      A    Can you be a little bit more
7  specific, Counselor?
8      Q    Any time during 2004?
9      A    I don't know.  This one here came
10  forward because there was a letter that was sent
11  in to the USTU.  So this is the only one that I'm
12  aware of.  But before my time, I don't know what
13  happened or what could have happened, who
14  resigned, whatever.
15      Q    Okay.  From the time you were
16  hired February 4, 2004 until December 31, 2004
17  did any other committee chairs resign?
18      A    I don't remember.
19      Q    It says here, a letter will be
20  written thanking him for his service to the
21  organization.  Did you write letters to everyone
22  who resigned from the USTU?
23      A    I don't remember.
24      Q    Here's the last paragraph on page
25  1, Discussion ensued concerning the team leader

4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)

1  and coach appointments for the Athens games.
2  Eligibility requirements are being rewritten by
3  the USOC and the earlier appointments may have to
4  be rescinded as soon as those new requirements
5  are clarified by the USOC.  Further discussion
6  will wait until the new information is available.
7  Did I read that correctly?
8          A    Word by word, it seems like what
9  you articulated verbally is what is on paper,
10  yes, Counselor.
11         Q    What eligibility requirements
12  were being rewritten by the USOC?
13         A    The team leader and coach
14  appointments, coaching selection procedures.
15         Q    Who in the USOC was rewriting
16  these eligibility requirements?
17         A    The members of the United States
18  Olympic Committee sport partnership division.
19         Q    Do you know who specifically?
20         A    I would imagine it would be Kelly
21  Skinner and/or his staff.
22         Q    Prior to this meeting did you
23  speak with Kelly Skinner about this issue?
24         A    About which issue?
25         Q    The eligibility requirements

1          A    Not sure.
2          Q    Okay.  Was the membership
3  informed that the eligibility requirements are
4  being rewritten by the USOC on or about
5  February 5, 2004?
6          A    I don't remember.
7          Q    At the top of the second page --
8          A    Yes, sir.
9          Q    -- it says that there was a
10  discussion about the secretary general position
11  and a consensus was reached to name you as the
12  secretary general for the USTU; is that correct?
13         A    That is correct, Counselor.
14         Q    Are you aware that the USOC
15  remediation plan which was signed on January 27,
16  2004 states that the governance and management
17  committee shall assume the duties and authorities
18  of secretary general?
19         A    If that's in there, then I guess
20  that's what it says.
21         Q    Is there any mention in the USOC
22  remediation plan for USTU dated January 27, 2004
23  with regard to the executive director assuming
24  the secretary general position?
25         A    One more time, please.

1  being rewritten by the USOC?
2          A    This had this came up about at
3  this meeting.
4          Q    But it states here that the
5  eligibility requirements are being rewritten.  So
6  was it a process that had already been set in
7  motion?
8          A    I can't remember.  It might have
9  been.  But again, it might be before my time.
10         Q    Who raised this issue?
11         A    I do not remember.
12         Q    What was your input with respect
13  to this issue at this meeting?
14         A    There were other things that I
15  was trying to get my arms around that -- I was
16  maybe a day or two on the job, so there were just
17  a myriad of issues that were being thrown at me,
18  you know, by people.
19         Q    Is the fact that the eligibility
20  requirements being rewritten by the USOC for team
21  leader and coach appointments for the Athens
22  games, is that something that the membership
23  needs to know?
24         A    Perhaps.
25         Q    You're not sure?

1          Q    Is there any mention about the
2  executive director assuming the secretary general
3  position in the USOC remediation plan dated
4  January 27, 2004?
5          A    I don't believe so.
6          Q    Can you please quickly review
7  that?
8          A    I will, thank you.  Okay.  Again,
9  your question?
10         MR. UESUGI:  Can you read back the
11  question, please?
12         (The record was read.)
13         A    No, there isn't.
14         Q    (BY MR. UESUGI)  Would you
15  consider this a deviation from the remediation
16  plan?
17         MR. LEVINSTEIN:  Objection.
18         Q    (BY MR. UESUGI)  In your opinion?
19         A    What are you describing when you
20  say a deviation?  What exactly do you mean by
21  that?
22         Q    What I mean by that is that the
23  remediation plan calls for the governance and
24  management committee to assume the duties and
25  authority of secretary general.  The remediation

1  plan also makes no mention of the executive
2  director assuming the duties, authority and title
3  of the secretary general for the USTU.
4         MR. LEVINSTEIN:  Objection.  Again,
5  what does it matter whether they did or did not?
6         Q    (BY MR. UESUGI)  I'm just asking
7  for his opinion.  He's the executive director.
8  Is it your understanding that you are allowed to
9  assume the secretary general title and position
10  of the USTU?
11         A    It seems --
12         Q    According to the USOC
13  remediation?
14         A    It seems to me that the
15  governance and management committee has broad
16  oversight powers and they can perhaps do whatever
17  they need to do based on the situation as it
18  exists.
19         Q    So they're not bound by the words
20  of the remediation plan?
21         MR. LEVINSTEIN:  Objection.
22         A    You have to talk to the people
23  who drafted this document.  I cannot answer that,
24  Counselor.
25         Q    (BY MR. UESUGI)  Who drafted the

1         A    I believe so.
2         Q    Who drafted this?
3         A    I couldn't tell you.
4         Q    What was the purpose of this
5  press release?  Was it to document the meeting of
6  February 5, 2004?
7         A    One can only speculate.  I don't
8  know.
9         Q    Well, you're the executive
10  director?
11         MR. LEVINSTEIN:  This is a USOC press
12  release.
13         Q    (BY MR. UESUGI)  Okay.  Do you see
14  any mention about the eligibility requirements
15  being rewritten by the USOC?
16         A    As I go over it again, no.
17         Q    Do you know why there's no
18  mention of that?
19         A    No, I don't know why.
20         Q    If you were drafting this, would
21  you have included it?
22         MR. LEVINSTEIN:  Objection, calls for
23  speculation.
24         A    I don't know what my frame -- our
25  frame of reference or my frame of reference of

1  remediation plan?
2         A    I do not know, Counselor.
3         Q    All right.  I'm going to hand you
4  which we'll mark as the exhibit next in order.
5         (Exhibit 46 was marked.)
6         Q    (BY MR. UESUGI)  Can you please
7  review that?
8         MR. UESUGI:  Off the record.
9         (A recess was taken from 10:26 a.m. to
10         10:32 a.m.)
11         MR. UESUGI:  Back on the record.
12         Q    (BY MR. UESUGI)  Did you have a
13  chance to review Exhibit 46?
14         A    Yes, I have.
15         Q    And what is this?
16         A    It appears to me to be a US
17  Olympic Committee press release dated February 6,
18  2004 entitled US Taekwondo Union governance and
19  management committee meets with USTU CEO Bob
20  Gambardella.
21         Q    Is this the first time you're
22  seeing this?
23         A    No, I believe it was on their
24  website.
25         Q    So you have seen this before?

1  mind was back then, so it's very difficult to
2  answer anything.  So I don't know.
3         Q    (BY MR. UESUGI)  Was there --
4  okay.  Okay.  You're objecting to the financial.
5  I guess we won't to this one.  We'll just do this
6  short one.
7         MR. UESUGI:  We'll mark this as the
8  next one.
9         (Exhibit 47 was marked.)
10         Q    (BY MR. UESUGI)  Could you quickly
11  review that?  I'm not going to spend a lot of
12  time to this.
13         MR. LEVINSTEIN:  Rather than read the
14  whole thing, if you want to point him to a
15  specific paragraph, he'll read that paragraph.
16         Q    (BY MR. UESUGI)  Okay.  Do you
17  know what this is, this document?
18         A    Yes, it's a US Olympic Committee
19  press release dated February 13th and entitled US
20  Taekwondo Union financial situation improving
21  thanks to a donation from the Colorado Springs
22  Sports Corporation.
23         Q    And there was a $25,000 donation
24  from that organization; is that correct?
25         A    Yes, there was.

1  There is a quote there in the
2  second paragraph, the last sentence says, the
3  timing of the USTU restructuring was such that it
4  allowed the Sports Corp. to donate money we
5  already had earmarked for an international
6  Taekwondo tournament that was canceled.  Do you
7  know what tournament they're talking about?
8      A   No, I don't.  You'd have to ask
9  Mr. Osborne.
10      Q       Was there other donation that
11  came in?
12      A   No.
13      Q   This was the only one?
14      A   Yes, it was.
15      Q   At least in this dollar amount?
16      A   Yes, anything significant, right.
17      Q   Or higher?
18      A   Yes.
19      Q   Did you look for any donations?
20  Was that part of your --
21      A   Well, I mean, we tried to.  There
22  was only so many sympathetic ears.  And these
23  folks from the Sports Corporation came through
24  for us.
25          MR. UESUGI:  Okay.  Let's mark the next

1      Q   Do you know why they made Junior
2  Olympic and Senior Nationals as open events?
3      A   You would have to ask them for
4  their opinion as they made that decision.
5      Q   Were you in favor of making JOs
6  and nationals open events?
7      A   Based on what I knew that for as
8  a temporary situation, I thought it was probably
9  a remedy that would at least stabilize some of
10  the existing problems that may have happened in
11  the past.
12      Q   In what way?
13      A   Basically, as I've heard, is that
14  there's just some states that the money wasn't
15  getting funneled at the end of the day to the
16  athletes.
17      Q   And your solution was to make JOs
18  and Nationals open events?
19      A   Yes.
20          MR. LEVINSTEIN:  Objection, that wasn't
21  his solution.  The solution --
22          THE DEPONENT:  The solution of the US
23  governance, right, was --
24          MR. UESUGI:  The solution of the USTU.
25          MR. LEVINSTEIN:  Again, he didn't say

1  exhibit in order.
2          (Exhibit 48 was marked.)
3      Q   (BY MR. UESUGI) Do you recognize
4  this document?
5      A   No.  But I see what it reads, but
6  I don't actually remember it.
7      Q   It's dated February 18, 2004 and
8  it announces that the 2004 Junior Olympic and
9  Senior Nationals will be open events.  Do you
10  remember that decision being made on or about
11  that time?
12      A   Yeah, I believe it was done
13  before that time.
14      Q   Okay.  Who made the decision?
15      A   It was a collective decision, I
16  believe, with the governance and management group
17  committee.
18      Q   Did you get involved in that
19  decision making process?
20      A   No.  I mean, basically I might
21  have had some input, but other than that it was
22  really the group's decision as a board.
23      Q   The GMC?
24      A   Governance and management group,
25  exactly, committee.

1  that was why they did it.  He didn't know why
2  they did it.
3      Q   (BY MR. UESUGI)  Did you ever
4  receive any comments to the fact that if you make
5  JOs and Nationals open events it would destroy
6  the infrastructure of Taekwondo in the United
7  States?
8      A   I don't remember.
9      Q   You don't remember receiving any
10  comments?
11      A   I could have, but I don't
12  remember.
13          MR. UESUGI:  Okay.  Next exhibit in
14  order.
15          (Exhibit 49 was marked.)
16          (Discussion held off the record.)
17      Q   (BY MR. UESUGI)  Do you recognize
18  this document?
19      A   Yes, I do.
20      Q   It's a document from the USTU web
21  page dated February 13, 2004 in which it's
22  announced that the OTC camps are canceled; is
23  that correct?
24      A   That is correct.
25      Q   Do you remember this decision

1  being made on or about this time?

2  A   Somewhere around then, yes.

3  MR. LEVINSTEIN:  Hold on one second.  I

4  think you gave me your copy with the highlighting

5  on it.

6  MR. UESUGI:  That's okay.

7  MR. LEVINSTEIN:  I apologize.  I didn't

8  want to interrupt.

9  Q   (BY MR. UESUGI)  Who made this

10  decision?

11  A   It was a staff decision.

12  Q   Which means you?

13  A   Ultimately, yes, me.

14  Q   Why did you make this decision?

15  A   Basically, it seemed to me that

16  the camps weren't doing what they needed to do.

17  It was just a way, as I understood in talking to

18  some staff that were working there, that it was

19  just a money maker and had no impact on

20  performance, which is what we're all about.

21  Q   Okay.  Any other reasons?

22  A   That's the only reason,

23  performance, impact on performance.

24  Q   In previous years, did the OTC

25  camps make money for their organization?

---

1  A   I can't tell you.  You'd have to

2  look at their financials.

3  Q   Wasn't that one of your concerns

4  about the financial state of the USTU?

5  A   Moving forward.

6  Q   Moving forward, yes?

7  A   Trying to stabilize something and

8  moving forward to have a positive cash flow.

9  Q   Did you investigate whether the

10  camps in the past had made money?

11  A   I don't remember.

12  Q   Would that have been a factor in

13  your decision making?

14  A   Probably not, because of the fact

15  that, again, it didn't have impact on

16  performance.

17  Q   But it did have impact on the

18  financial situation of the USTU?

19  A   You might know better than I do

20  whether it did.

21  Q   Well, if it made money, it would

22  be good for the USTU's situation?

23  A   I don't know if it made money, so

24  I can't answer that yes.

25  Q   If the camps did make money,

---

1  would you agree that it would be good for the

2  financial situation of the USTU?

3  A   I don't know.

4  Q   You don't know?

5  A   No.  Basically, here's the deal.

6  Q   All right.

7  A   It's cash in.  The bottom line is

8  that it doesn't impact performance.  So when I

9  have to answer to certain people about certain

10  programs and it doesn't have a connection in some

11  way, shape or form to performance, then it's, in

12  my opinion, not a valuable program.

13  Q   These OTC camps, who would be

14  invited or who would be allowed to come?

15  A   Your question is -- I don't know.

16  Q   You don't know?

17  A   I don't know.

18  Q   Who would lead the camp?

19  A   I don't know.

20  Q   The OTC coach, resident coach?

21  A   Perhaps.

22  Q   So you don't know anything about

23  the OTC camps?

24  A   No, I'd have to go back and look

25  at it.

---

1  Q   And yet you canceled it?

2  A   Yes, Counselor, I did.

3  Q   Okay.

4  MR. UESUGI:  The exhibit next in order.

5  (Exhibit 50 was marked.)

6  Q   (BY MR. UESUGI)  Do you recognize

7  this.

8  A   Yes.

9  Q   This is a document from the USTU

10  web page date February 17th, 2004 announcing that

11  the USTU black belt certification program has

12  been suspended until further notice; is that

13  correct?

14  A   That's what it says, yes.

15  Q   Do you remember this decision

16  being made on or about this time?

17  A   I don't remember it, no.

18  Q   What is the state of the USTU

19  black belt certification program?

20  A   My understanding is there was a

21  paper that was developed in putting together a US

22  version of a Kukkiwon.  And basically when this

23  was, you know, happening, we just didn't have the

24  staff to put towards trying to develop something

25  at this point.  Again, we were in this trying to

1  stabilize rather than to grow at this point.

2       Q    You didn't have staff in the

3  office to handle this USTU certification program?

4       A    Our staff was overburdened in

5  terms of just trying to get membership cards out,

6  that adding another factor, another program could

7  have just not put out a quality program that our

8  members would expect.

9       Q    Didn't you have USTU Dan office

10  at this time?

11       A    Yes, we do.

12       Q    That handled Kukkiwon

13  certification?

14       A    Right.

15       Q    Who was in charge of that

16  certification?

17       A    Dedra McClay.

18       Q    Anybody else working that?

19       A    No.

20       Q    Did you have any conversations

21  about the USTU black belt certification program

22  with her on or about this time?

23       A    We probably talked about it, but

24  no, I don't remember.

25       Q    She didn't tell you that she

1       MR. UESUGI:  Are you answering for him?

2       MR. LEVINSTEIN:  No.

3       MR. UESUGI:  Just asking.

4       Q  (BY MR. UESUGI)  What is the state

5  of it at this point?  You never answered that.

6       MR. LEVINSTEIN:  The state of what?

7       Q  (BY MR. UESUGI)  The USTU black

8  belt certification program which you suspended

9  until further notice?

10       A    What we've had is, I had before

11  Dedra McClay left the organization, we were

12  working on developing a program in this USTU

13  black belt certification.  So it's in the

14  process.

15       Q    And who was developing it?

16       A    Dedra McClay has been talking to

17  certain individuals.  I believe Leon Preston was

18  one that she contacted.  I believe Jay Warwick.

19  But I can't remember the other folks that were

20  involved in it.

21       Q    And she subsequently left the

22  organization?

23       A    Yes.

24       Q    And so now what is the status of

25  the program?

1  could handle it, no problem?

2       A    I don't remember.

3       Q    Who made the decision to cancel

4  the black belt course or suspend the program

5  until further notice?

6       A    Ultimately it was my decision.

7       Q    But you don't remember making it?

8       A    No, I'd have to go back and start

9  digging out files, but no.

10       Q    Were you aware that one of the

11  concerns of the USOC was the allegiance to Korea

12  or alleged allegiance to Korea through the

13  Kukkiwon Dan certification program?

14       MR. LEVINSTEIN:  Objection.

15       Q  (BY MR. UESUGI)  Were you aware of

16  that?

17       A    No.  At this point,

18  February 17th?

19       Q    Yes.

20       A    No.

21       Q    Did you subsequently become aware

22  that there was a concern?

23       A    No.

24       MR. LEVINSTEIN:  Objection to these

25  questions.

1       A    The program is suspended until

2  further notice.

3       Q    Are you working on it actively?

4       A    Not actively, but we're working

5  on it.  We're working towards that end.

6       Q    What are you doing, you

7  specifically?

8       A    Me specifically at this point,

9  I'm not doing anything with it.

10       MR. UESUGI:  Exhibit next in order.

11       (Exhibit 51 was marked.)

12       Q  (BY MR. UESUGI)  Can you just

13  please review the first paragraph?  I'm just

14  going to ask about that so we can speed things

15  along.

16       A    Yes.

17       Q    Do you remember this?

18       A    Yes, I do.

19       Q    This is a USTU press release

20  dated February 27, 2004 which announces that the

21  USTU inks new sponsors for 2004; is that correct?

22       A    Yes.

23       Q    And it says that, with the

24  assistance of the United States Olympic

25  Committee's marketing division, the USTU has

1  signed sponsorship deals with US Olympic team
2  sponsors Samsung, Home Depot, 24-Hour Fitness and
3  Anheuser Busch?
4       A    Right.
5       Q    What did those sponsorship deals
6  entail?
7       A    Just cash to the organization.
8       Q    How much about Samsung donate?
9       MR. LEVINSTEIN:  Objection.
10      A    I don't remember.
11      MR. UESUGI:  At this point, how
12  much individual sponsors donated and what their
13  deals are is, one, confidential and, two,
14  completely irrelevant in this case.
15      MR. UESUGI:  You don't feel that that's
16  something in the interest of transparency, which
17  you promised the membership, that they're
18  entitled to know.
19      A    That's your opinion.
20      MR. LEVINSTEIN:  Objection.  There are
21  confidentiality agreements in place.  And these
22  agreements, we're not allowed to disclose them to
23  the membership, individual sponsors and what
24  their payments are and deals are like this, because
25  of competitive concerns of the sponsors and the

1       A    Exactly.
2       Q    Did Samsung renew their
3  sponsorship deal with the USTU for the 2005
4  through 2008?
5       A    They do it through the USOC, so
6  in my -- I guess, lack of a better way, they act
7  as an agent for these companies.  And then
8  package as different NGBs, and then sells that to
9  a potential sponsor.  So basically what happened
10  was that, if you remember the -- whatever exhibit
11  it was here we talked about, that there was
12  incremental dollars to the organization.  And
13  this, my friend, is the incremental piece that we
14  referred to in exhibit whatever.
15      Q    Did Samsung renew its sponsorship
16  deal with the USTU for the 2005-2008 quadrennium?
17      A    To date, I do not believe that we
18  have a telecommunications sponsor at this moment.
19      Q    How about Home Depot?
20      MR. LEVINSTEIN:  Objection, could you
21  just give me some theory as to why it matters
22  whether they renewed their sponsors for
23  2005-2008?  It has to have something to do with
24  this case.
25      MR. UESUGI:  Because the whole basis of

1  USOC.
2       Q    (BY MR. UESUGI)  Okay.  Was it a
3  one-time deal or was it an annual?
4       A    This is part of a joint marketing
5  agreement.
6       Q    What does that mean?
7       A    That means that it's money and
8  VIK to the organization like over, I believe,
9  it's a four-year period.
10      Q    So for the 2005-2008 quadrennium?
11      A    Yes, I believe so.
12      Q    This was in 2004, though?
13      A    But you asked me about the
14  program.  Was it -- and I explained to you the
15  bigger picture of the program.
16      Q    Right.
17      A    So let's not get it mixed up, all
18  right?
19      Q    Right.  So that's what I'm
20  asking.  They came on board 2004; is that
21  correct?
22      A    Yeah.
23      Q    And the joint marketing
24  sponsorship deal is quadrennium based, meaning
25  from 2001 to 2004; is that correct?

1  the remediation was, again, financial concerns,
2  which was your main concern.
3       MR. LEVINSTEIN:  But there were
4  concerns in 2003.  So what does it matter whether
5  in 2005 they have a sponsor or not?
6       MR. UESUGI:  Because it relates
7  again to the financial -- if you're saying that
8  the issue of financial feasibility and
9  responsibility isn't an issue in the USTU,
10  then --
11      MR. LEVINSTEIN:  It's, of course, an
12  issue in the USTU.
13      MR. UESUGI:  Okay.  What's the big
14  deal?
15      MR. LEVINSTEIN:  This is whether the
16  USOC renewed its sponsorship deals with specific
17  sponsors, which is not information relevant to
18  this case.
19      MR. UESUGI:  I'm asking with respect to
20  the USTU.
21      MR. LEVINSTEIN:  As he told you, this
22  is a deal with the USOC, that then there's
23  negotiations with individual NGBs.  But even if
24  it is, what happens in 2005 is after this whole
25  case is over as far as what happened with Mr. Dae

1  Sung Lee.  So what's happening in 2005 has
2  nothing to do with this case.
3          MR. UESUGI:  It doesn't?
4          MR. LEVINSTEIN:  No.
5          MR. UESUGI:  Okay.  All right.
6          Q    (BY MR. UESUGI)  Were there any
7  other marketing, USOC marketing division
8  sponsorship deals with the USTU?
9          A    No.  What you see here is what we
10  had tried to articulate.
11          Q    Okay.  And these were all cash
12  disbursements to the USTU?
13          A    They could be cash and/or VIK.
14          Q    What is a VIK?
15          A    VIK is a marketing term that's
16  used within the profession of Value In Kind.
17  That means instead of giving you all in cash,
18  they can give you products.  So we wanted to go
19  to Home Depot and buy some lumber on a VIK, then
20  we can go buy the lumber to build certain things.
21          Q    Or United Airlines would give you
22  tickets?
23          A    Or tickets, exactly.  It's a VIK.
24          MR. UESUGI:  Okay.  Let's mark this
25  exhibit next in order.

1  responsibility?
2          MR. LEVINSTEIN:  That's not what this
3  says.  It says he's responsible for the overall
4  operations and these are areas of concentration,
5  if you read the document carefully.
6          Q    (BY MR. UESUGI)  This wasn't one
7  of your areas of concentration?
8          A    As the document states, these
9  were some of the six functional areas that they
10  were trying to show the membership, as I read it,
11  what the CEO was doing.
12          Q    Some?  This wasn't all your areas
13  of concentration?
14          A    Okay.  These were six areas that
15  were identified as to what I was doing at this
16  particular moment in time March 11, 2004.
17          Q    Okay.  It says, No. 4 here,
18  working with staff to improve communication
19  through the USTU website and day-to-day phone,
20  e-mail and postal efforts.  What does that mean?
21          A    Well, let's see here.  One of the
22  things that I think I've heard a lot, especially
23  early on, was that the USTU needs to be more
24  customer friendly.  And so that, I guess, in the
25  past as what some of our staff that worked prior

1          (Exhibit 52 was marked.)
2          Q    (BY MR. UESUGI)  Do you recognize
3  this document?
4          A    May I read it, Counsel?
5          Q    Yes.
6          A    I don't remember it, but it's
7  probably, it was on our website, an update.
8  Looks like they're giving you an update from the
9  Taekwondo governance and management committee.
10          Q    Who drafted this?
11          A    I don't know.
12          Q    It says, you discuss -- well, it
13  says right here that, Bob Gambardella, a loaned
14  executive from the USOC, is serving as CEO and
15  secretary general of the USTU.  He is responsible
16  for the overall operations of the USTU, his areas
17  of concentration currently are -- and there are
18  six listed here.  Do you see that?
19          A    Yes, I do.
20          Q    Why wasn't the development of the
21  Olympic coach and team leader selection criteria
22  listed here?
23          A    I don't know.  You might have to
24  ask the governance and management committee.
25          Q    It wasn't one of your areas of

1  to me coming on was that, you know, people call
2  in or send things in and they never get called
3  back.  And there have been several instances
4  where when I was working in international
5  affairs, that I would call the executive director
6  and there would be no phone call back or maybe
7  several weeks later.  So I did have some
8  experience in that frustration that I think some
9  people exhibited.
10          Q    So you think it's important to
11  return a phone call, respond to a letter?
12          A    Answer e-mails.
13          Q    Answer e-mail?
14          A    Yeah, I think it's a pretty good
15  common practice to try to strive towards.
16          Q    And you endeavor to do that with
17  the membership?
18          A    Yes, I do.
19          Q    Including with Mr. Dae Sung Lee?
20          A    There is correspondence that we
21  did follow up on some of his questions.
22          Q    Okay.  It says on the governance
23  side, the committee -- which I assume is the
24  management and governance committee?
25          A    That's what I take it as.

4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)
Case 1:04-cv-00461-SOM-LEK   Document 247-3
4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)
Filed 03/21/2006   Page 35 of 79

1    Q    It says three areas here.
2    Reviewing issues identified in the USOC's
3    remediation plan, reviewing the strengths and
4    weaknesses of USTU's current organizational
5    structure, and considering a time line and
6    process for completion of the governance
7    restructuring.
8    Was that your understanding of the
9    concentration on the governance side?
10   A    Well, I don't quite remember what
11   exactly, you know, we did in the early stages.
12   But it seems that we did -- I mean, we're
13   actually working now on No. 3.  And that, those
14   time lines and restructuring in terms of, you
15   know, voting for a board of directors, you know,
16   we have that time line that developed.  And as we
17   did the bylaws and things of that sort.
18   Q    My question is --
19   A    Yes.
20   Q    -- why wasn't the -- why wasn't
21   there any mention with regard to the amendment of
22   the head of team or team leader and Olympic coach
23   positions for 2004?
24   A    Yeah, regarding this part of
25   this, this web announcement, it says on the

1    governance side.  And if you read the remediation
2    plan that we referred to several times this
3    morning, I think you would have to ask that
4    question to the governance and management
5    committee that currently is in place.
6    Q    But it was your responsibility to
7    improve communication through the USTU website?
8    A    Yeah, hiring someone that we can
9    get or someone who can really help us in that
10   light, yeah.  It was -- the website was
11   problematic.  I mean, it was a disaster.  And we
12   were trying to fix certain things and try to get
13   a steady flow of communication.
14   Q    Who was working on the USTU
15   website at this time, March 11, 2004?
16   A    It's my recollection that we had
17   three or four different staff people actually
18   being able to post things up on the web.  Which
19   we needed really kind of a unified, one person.
20   So that was something that we eventually evolved
21   into.
22   Q    Who did you assign to work with
23   these press releases and web issues with respect
24   to governance and management issues?
25   A    Yeah, what would occur is -- and

1    I can't remember exactly who, but there were
2    situations like this, whether the president of
3    the governance and management committee would put
4    something together and we'd look at it and get it
5    up there.  So I can't tell you specifics, but
6    that was generally the mechanism.
7    Q    You didn't write this?
8    A    No, I didn't.
9    Q    And if you did write something,
10   you would have your name, your signature and name
11   on it?
12   A    In most cases I try to do that.
13   MR. UESUGI:  Exhibit next in order.
14   (Exhibit 53 was marked.)
15   Q    (BY MR. UESUGI)  Please tell me
16   when you're finished reviewing it.
17   A    Okay.
18   Q    Do you recognize this?
19   A    As I read it, it was something
20   that was put together, sure, by myself, yes.
21   Q    Did you write this?
22   A    I don't believe I did.  I signed
23   it.
24   Q    It says from Bob Gambardella,
25   CEO, secretary general, United States Taekwondo

1    Union?
2    A    Yes.
3    Q    But you didn't write this?
4    A    I signed my name.
5    Q    But you didn't draft this?
6    A    I've asked different people.  And
7    I can't remember who it was, you know, to help
8    put something together because of the bylaws that
9    existed.  And we wanted to try to at least adhere
10   to the bylaws as best as we could.  So we've
11   asked for, you know, input from others.
12   Q    You felt that it was important to
13   follow the USTU bylaws?
14   A    Well, basically we felt that we
15   had to work with something.
16   Q    You felt that it was important to
17   follow the USTU bylaws?
18   MR. LEVINSTEIN:  Objection, in light of
19   the remediation plan and other documents.  He
20   answered your question already.
21   A    I answered your question.
22   Q    (BY MR. UESUGI)  Did you read the
23   USTU bylaws?
24   A    The old bylaws.
25   Q    Which one did you read?

1     A     The ones that were the last
2   bylaws of the US Taekwondo Union.
3     Q     Which ones were those?
4     A     I don't know, Glenn.  Maybe you
5   have a copy in there.  Maybe you can take a look
6   at it.  I don't know.
7     Q     Maybe we do.  Did you read it?
8   You read the old bylaws?
9     A     At some point I did.  I don't
10   remember when or whenever.  But I mean, you know,
11   we did look at it.
12     Q     Who's we?
13     A     Myself and the governance and
14   management group.
15     Q     And you did try to attempt to
16   follow the bylaws, that's why you put this notice
17   on the web page?
18     A     Yeah, we tried it in the best
19   efforts, yes.
20     Q     Did you mail this also to the
21   board of governors?
22     A     I cannot remember.  So we would
23   have to ask Molly Shook and look in her files to
24   see if, indeed, there was a card sent out by
25   everyone who signed it and sent it back.  So I

1   have to go back and ask Molly Shook to see if
2   that was done.  So I can't venture to guess at
3   this moment.
4     Q     It says here, the governance and
5   management committee will seek input on, 1,
6   suggestions for a revamped governance structure;
7   2, improvement of opportunities for Taekwondo
8   athletes, and let's just stop there.  Seek input
9   on suggestions for a revamped governance
10   structure, and improvement of opportunities for
11   Taekwondo athletes.  Do you see that?
12     A     No. 2, yes, I see that.
13     Q     What did you mean when you stated
14   that the governance committee would seek
15   improvement of opportunities for Taekwondo
16   athletes?
17     MR. LEVINSTEIN:  Objection, it says
18   they would seek input about that subject.
19     (BY MR. UESUGI)  Right.  What did
20   you mean by that, since this is your document
21   that you signed?
22     A     Well, it says the governance and
23   management committee will seek input on the
24   suggestion and any improvement of opportunities
25   for Taekwondo.  So from that perspective, you

1   can't answer that at this time.
2     Q     Who would you send this out
3   pursuant to the bylaws?
4     A     I don't know.  Again, we would
5   have to go and take at look at our files and see
6   what we did or who we sent it to.
7     Q     I'm not asking who you sent it
8   to.  I was asking pursuant to the old bylaws,
9   which you called them, who would be entitled to
10   receive this notice of the mid-year meeting?
11     A     Well, it clearly states on top, I
12   would think that it's to the members of the board
13   of governors, AAC and the United States Taekwondo
14   Union.
15     Q     On the second page --
16     A     Yes.
17     Q     -- it says that the agenda will
18   be published on the USTU website.  Do you see
19   that?  Right after Molly Shook's name and phone
20   number, 20 days prior to the mid-year meeting, an
21   agenda will be published on the USTU website.  Do
22   you see that?
23     A     I see it.
24     Q     Was that, in fact, done?
25     A     I don't know.  Again, I would

1   would have to ask them what exactly they meant.
2     Q     So you don't know what this
3   means?
4     A     I cannot answer for Virginia
5   Witte, Steve Locke, Tony Baggiano, Rich Bender or
6   Juan Moreno.
7     Q     You didn't discuss this with
8   them?
9     A     I don't know.
10     Q     You don't remember discussing the
11   agenda of the 2004 mid-year meeting?
12     A     I remember discussing an agenda,
13   but I don't know the details of it.
14     Q     And it says, will provide
15   information on, 1, the USTU's current financial
16   picture; and, 2, USTU's activities to support its
17   athletes at the 2004 Olympic Games in Athens,
18   Greece and beyond.  Do you see that?
19     A     Yes, sir.
20     Q     What did you mean by that?
21     A     Well, the financial picture, we
22   gave an overall overview of where we're at as,
23   you know, basically at that meeting of -- I know
24   one of the things that we talked about was one of
25   the first initiatives was to get athletes paid

1  up, you know, in terms of their stipends.  So
2  that was one of the things that we felt was
3  important if, indeed, we believe in the
4  philosophy of athlete-centered organization.
5       Q    Are you talking about the
6  financial picture?
7       A    Yes.
8       Q    So the $1,000 National Team
9  stipend was still in effect?
10      A    Yes, it was.  It was a contract
11 from the last CEO or last two CEOs, and we just
12 started again paying it.  And I think there was
13 some back payments that weren't paid.
14      Q    So that was $1,000 per National
15 Team member per month?
16      A    I do not know if it's $1,000 per
17 team member per month.  We'd have to look at the
18 records and see exactly what was paid.
19      Q    But you don't remember at this
20 time?
21      A    I don't remember, right.
22      Q    The USTU's activities to support
23 its athletes at the 2004 Olympic Games in Athens,
24 Greece and beyond.  What did you mean by that?
25      A    Again, we would have to ask the

1       Q    Okay.  Great.
2       MR. UESUGI:  Exhibit next in order.
3       (Exhibit 54 was marked.)
4       Q    (BY MR. UESUGI)  Do you see this?
5       A    Do I see Exhibit No. 54?
6       Q    Yes.
7       A    Yes.
8       Q    What is this?
9       A    Can I read it?
10      Q    Yes, you can.
11      A    Thank you.  Okay.
12      Q    Do you recognize this document?
13      A    I faintly remember it, yeah.
14      Q    It's a document taken from the
15 USTU web page dated April 29, 2004 in which the
16 USTU GMC announces that it will host a public
17 town meeting on May 7th; is that correct?
18      A    That's what it says.
19      Q    Is this the same town meeting
20 that we were discussing earlier in the previous
21 exhibit, the May 7 mid-year meeting?
22      A    Yeah.  So probably this was
23 something that was sent.  So it looked like it
24 was sent again right before the meeting.
25      Q    Why the name change from mid-year

1  five members.  But basically, just starting to
2  put together, you know, a plan as to, you know,
3  what do we want to do, you know, in terms of
4  moving towards the 2004 Olympic Games in Athens,
5  Greece and beyond.
6       Q    Did this include providing
7  information with respect to the amended Olympic
8  coach selection criteria?
9       A    Say that again, please.
10      Q    Did this notice of mid-year
11 meeting in which you state in your document which
12 you signed, the GMC will provide information on
13 USTU activities to support its athletes at the
14 2004 Olympic Games Athens, Greece and beyond?
15      A    Yeah, and I think again, you need
16 to talk to the governance and management
17 committee specifically what they meant by that.
18      Q    You don't know?
19      A    In order to get an accurate
20 answer to your question, you need to speak with
21 them about that.
22      Q    Okay.  So you don't know?
23      A    No, I don't know.
24      Q    But you wrote this?
25      A    Yes, I did write it.

1  meeting to town meeting?
2       A    I don't know.  You'd have to ask
3  Mr. Steve Locke.
4       Q    You didn't have any input into
5  that?
6       A    No.
7       Q    Is your understanding of the old
8  USTU which allow for public town meetings in lieu
9  of a mid-year meeting?
10      A    I'd have to look at the bylaws.
11      Q    But you don't know at this time?
12      A    I do not know at this time,
13 Counsel.
14      Q    It says that Bob Gambardella, US
15 Taekwondo Union CEO/secretary general will also
16 be in attendance and will report on progress to
17 date.  What progress did you report to the
18 membership at the town meeting?
19      A    As I mentioned earlier, it was
20 the payments to the athletes, the back payments
21 that were due to athletes.  That's the one thing
22 I can remember.
23      Q    Anything else you reported?
24      A    I don't remember.
25      Q    Did you report on the status of

1  the Olympic coach and team leader selection
2  criteria?
3       A    No, I don't believe so.
4       Q    Did the GMC committee members
5  report on the status of the Olympic coach and
6  team leader selection criteria at the town
7  meeting?
8       A    I don't know and you'd have to
9  ask them.
10      Q    You weren't there?
11      A    I was there, but I don't
12  remember.
13      Q    Okay.  Fair enough.  So if
14  someone did say that, no, no mention of the
15  Olympic coach and team leader selection criteria
16  was discussed at this town meeting, you wouldn't
17  have any knowledge one way or the other of this?
18      A    I don't remember, yes.
19      Q    Okay.  Fair enough.
20      (Exhibit 55 was marked.)
21      Q    (BY MR. UESUGI)  Do you recognize
22  this exhibit, 55?
23      A    No, I don't remember it.
24      Q    Okay.
25      A    I should have printed it out,

1  were terminated in 2004?
2       A    I can't remember.
3       Q    You don't know at this time?
4       A    I can't remember.
5       Q    Okay.  Fair enough.  Let's go
6  back to events.  What was the first event that
7  you attended as the executive director of the
8  USTU?
9       A    Let's see, it was --
10      MR. LEVINSTEIN:  An event meaning a
11  competition?
12      MR. UESUGI:  Yes.
13      A    I would say it would be the US
14  Open in Tampa, Florida.  I don't know the date.
15      Q    (BY MR. UESUGI)  You attended in
16  your capacity as executive director; is that
17  correct?
18      A    Yes.
19      Q    Do you know approximately when
20  the competition was?
21      A    I want to say it was in the
22  middle of February, but I can't give you an exact
23  date, I believe.
24      Q    Did you have any input as to the
25  organization or running of that tournament?

1  maybe I would have, but I don't know.
2       Q    This is a document from the USTU
3  web page dated April 5, 2004 in which is the
4  notice of termination to appointed state
5  presidents and to appointed delegates at large.
6  Do you remember this notice going out on or about
7  this time, April 5, 2004?
8       MR. LEVINSTEIN:  For the record, it's a
9  heading like that and then it has a link.  There
10  is no notice on this page.
11      MR. UESUGI:  Okay.  Fair enough.
12      A    I honestly don't remember it.  I
13  don't remember this.
14      Q    (BY MR. UESUGI)  You didn't write
15  those letters?
16      A    No.
17      Q    Do you still have those letters?
18      A    I would imagine we do, but I
19  can't be certain.
20      Q    Who signed the letters
21  terminating the appointed state presidents and
22  appointed delegates at large?
23      A    I wouldn't even venture to guess
24  and I don't know.
25      Q    Any other appointed positions

1       A    No.
2       Q    Because it was already something
3  that had been already in progress?
4       A    Uh-huh.
5       Q    That's a yes?
6       A    Yes, yes.
7       Q    So you didn't approve or
8  disapprove of the referees who attended?
9       A    I might have, but I can't
10  remember.
11      Q    How about the tournament
12  committee, did you select the tournament
13  committee members?
14      A    I don't remember.
15      Q    Did you have a chance to speak to
16  spectators, coaches, athletes at the US Open?
17      A    Yeah, the governance and
18  management committee called a town hall meeting
19  at the event.  I do remember that.
20      Q    Do you know if the Olympic coach
21  and team leader selection criteria was discussed?
22      A    I don't believe so, so I don't
23  know.
24      Q    Is that the only time that you
25  spoke to USTU memberships at the town meeting?

1    A    That was the first time.

2    Q    Did you have any informal

3    conversations with USTU members?

4    A    I might have.  I don't remember.

5    I don't remember any specifics.

6    Q    You don't remember telling anyone

7    at US Open that you were going to get rid of all

8    the Koreans on the US team?

9    A    No, I don't remember ever saying

10   that.

11   Q    Do you remember saying anything

12   substantially similar to that?

13   A    I don't remember saying that.

14   Q    At US Open, did you tell anyone

15   that you don't want Koreans at USTU events?

16   A    No.

17   Q    Did you say anything

18   substantially similar to that?

19   A    I cannot remember.

20   Q    Did you say anything to the

21   effect that Koreans don't deserve to be at USTU

22   events?

23   A    No.

24   Q    Did you say anything

25   substantially similar to that?

---

1    A    I cannot remember.

2    Q    Was it before the Olympic

3    qualification No. 1?

4    A    Yes, I believe it was at the US

5    Open.

6    Q    Oh, at the US Open?

7    A    Yeah, I believe.  I'm almost

8    positive.

9    Q    So what was the process of

10   referee selection?  Can you explain that to me?

11   A    You would have to ask Barbara

12   Wakefield.

13   Q    You don't know?

14   A    No.

15   Q    You didn't have any input into

16   the referee selection at all?

17   A    No.

18   Q    Did you have the final say as to

19   which referees attend?

20   A    Maybe, perhaps, maybe I signed

21   something, again, but I cannot remember.

22   Q    You don't remember Barbara

23   Wakefield bringing you a list of 50 percent

24   Korean referees and 50 percent American born

25   referees?

---

1    A    No, I don't remember.

2    Q    Okay.  What was the next event

3    that you attended?  Was it the Olympic

4    qualification No. 1 held on March 31st, 2004 or

5    thereabouts?

6    A    Yeah, I don't know what the exact

7    name of it was, but at the Olympic Training

8    Center there were two events there.

9    Q    Two weight classes?

10   A    No.  I mean, I'm sorry, in March

11   there was one and then I believe there was one in

12   April, yeah.

13   Q    Right.  So did you attend the

14   first one?

15   A    Yes, I did.

16   Q    Did you have any authority with

17   respect to referee selection at that event?

18   A    Maybe, but I don't remember.

19   Q    Eui Ben Lee had resigned and the

20   GMC had voted to accept his resignation; is that

21   correct?

22   A    Yes.

23   Q    Who was the interim chair?

24   A    Barbara Wakefield.

25   Q    When was she elected?

---

1    A    No.

2    Q    Do you remember ever telling

3    Barbara Wakefield that you didn't want certain

4    Korean referees participating at the Olympic

5    qualification No. 1?

6    A    No, I don't remember saying that.

7    Q    How about Chang Kim, did she

8    mention that she wanted to appoint Chang Kim to

9    the Olympic qualification No. 1?

10   A    I can't remember.

11   Q    Do you know who Chang Kim is?

12   A    Chang Kil Kim from San Jose?

13   Q    Chang Kil Kim from San Jose.

14   A    Yes, I do.  Yes, I do.

15   Q    Who is he?

16   A    He's a referee, I believe, from

17   San Jose, California.

18   Q    He's from Santa Clara.

19   A    Santa Clara, okay.

20   Q    Same thing.  Do you know who is

21   Myung Chang Kim?

22   A    I believe that's the gentleman

23   from North Carolina.

24   Q    North or South Carolina?

25   A    One of the Carolinas, yes.

1  Q   Do you remember him, his name
2  being submitted by Barbara Wakefield?
3  A   I don't remember.
4  Q   Are you aware that Myung Chang
5  Kim was passing around a petition to have Chang
6  Kim selected as the next referee chair?  Do you
7  remember that?
8  A   Yeah, I remember that.  And I
9  found out about it after he gave me the names.
10  Q   What names?
11  A   I don't know.  People's
12  signatures and names.
13  Q   On the petition?
14  A   Yes.
15  Q   What did you do with the
16  petition?
17  A   What did I do with it?
18  Q   Yes.
19  A   I think I gave it to our
20  membership department.  Because I just wanted to
21  see who was who.
22  Q   Okay.  Did you ever tell Barbara
23  Wakefield that you didn't want Myung Chang Kim
24  participating as a referee at the Olympic
25  qualification tournament because he was passing

1  around a petition recommending that Chang Kil Kim
2  be the next referee chair?
3  A   I don't remember that.
4  Q   Do you know who is Ji Ho Choi?
5  A   Yes, Ji Ho Choi.
6  Q   Who is Ji Ho Choi?
7  A   Ji Ho Choi is the executive
8  director of the PATU.
9  Q   Who was he back in March 2004?
10  A   I think, yeah, he's from New
11  Jersey.  A referee maybe.
12  Q   Okay.
13  A   Yeah, he was a referee, yeah.
14  Q   Did you have any objection at
15  this time, the March 2004, with respect to Ji Ho
16  Choi?
17  A   Oh, well, what happened was that
18  he was -- something happened with the state.  And
19  there was some sort of a problem between him, I
20  believe, and Mark Williams.  And basically I said
21  that he will not referee until we can get this
22  resolved.  And once it was resolved, he was
23  reinstated to referee.
24  Q   What was the conflict?
25  A   They were arguing over equipment

1  that, I guess, was bought by the state.  I can't
2  remember all the details.
3  Q   When was that situation resolved?
4  A   It was resolved when Mr. Choi
5  sent in all the supporting documentation.  The
6  month, I don't know.  And then I did call him and
7  say that everything from my perspective,
8  everything is fine.
9  Q   Do you know which events Ji Ho
10  Choi refereed at, if any, in 2004?
11  A   I don't know.
12  Q   How about Myung Chang Kim?
13  A   I know that he was at one of the
14  Olympic qualifiers, but I can't remember which
15  one.
16  Q   Okay.  How about Chang Kim?
17  A   Chang Kil Kim, in my
18  recollection, has been a steady supporting
19  referee for us in all our events.
20  Q   Is he your friend?
21  A   I don't know if we're friends
22  but, I mean, we have a good relationship.
23  Q   Did you ever tell him that you
24  were his friend?
25  A   Maybe.  I was just -- we were

1  together in WTF and then had a dinner together in
2  Seoul.  So I mean, I guess if that's a
3  friendship, yeah, I mean, that's --
4  Q   Did you ever tell him that you
5  were my friend, you are my friend?
6  A   I don't know.  But, I mean, I
7  don't consider him an enemy.  I see him as a
8  supporting member of the organization.
9  Q   He never told you that at the
10  first regional qualifier in 2005, or you never
11  told him that at the first regional qualifier in
12  San Jose?
13  A   I can't remember, yeah.  You're
14  mixing up things here.  Let's go back and get
15  clarification.  So clarify, please.
16  Q   You never told Chang Kil Kim at
17  the 2005 --
18  A   2005, okay.
19  Q   -- regional qualification
20  tournament No. 1?
21  A   There's no such thing as a
22  regional qualifier tournament, but there are
23  qualifier tournaments.  The first one that was
24  held in San Jose recently.
25  Q   You never told Chang Kil Kim

**Column 1 (Page 157)**

1  that, quote, you are my friend?

2       A    I don't remember.  But, no, he's

3  been very supportive, so maybe I did.

4       Q    So you don't remember him telling

5  you, you are not my friend?

6       A    No.

7       Q    Okay.  No problem.  Let me get

8  back to the termination of the appointed state

9  presidents and the appointed delegates at large

10  here.  Just a moment.  Did that create any issues

11  in your mind with respect to the bylaws?

12       A    What types of issues?

13       MR. LEVINSTEIN:  Objection.  Could we

14  just refer to the remediation plan that required

15  that?  It was pursuant to the remediation plan

16  that required that.

17       MR. UESUGI:  Okay.

18       MR. LEVINSTEIN:  You want to just read,

19  upon appointment of the governance and management

20  committee, all prior appointed state presidents

21  and delegates at large shall be notified of the

22  termination of their appointment.

23       MR. UESUGI:  I'm not disputing that

24  issue.  What I'm asking is whether that

25  termination --

**Column 2 (Page 159)**

1  I don't have any -- I'm not aware, but I can't

2  speak for them that they had problems.  All we

3  know that we were, again, moving forward and

4  trying to fix something, an organization.

5       Q    (BY MR. UESUGI)  You were trying

6  to fix the organization?

7       A    Yeah.

8       Q    But did the termination of

9  appointed state presidents and appointed

10  delegates at large, did it create any new

11  problems?

12       A    You got to talk to the people who

13  crafted this.

14       Q    You never became aware?  No one

15  came to you and said, hey, this is a problem?

16       A    Of course you had people telling

17  you in your ear about different things all the

18  time.

19       Q    Such as what?

20       A    I don't know.  It has nothing to

21  do with the question you just asked me.

22       Q    You don't know or are you

23  refusing because you feel it has anything to do

24  with the question or this lawsuit?  That's two

25  different things.

**Column 3 (Page 158)**

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1       MR. LEVINSTEIN:  That's a legal

2  question.

3       Q    (BY MR. UESUGI)  Did you become

4  aware of any issues that arose as a result of the

5  termination of appointed state presidents and

6  appointed delegates at large?

7       MR. LEVINSTEIN:  Again, these issues

8  don't seem to have anything to do with this case.

9  They may have to do with another grievance that

10  Mr. Dae Sung Lee has filed that don't relate to

11  this case.  But I am getting concerned about use

12  of this deposition for purposes having absolutely

13  nothing to do with this case.

14       If you know of any -- remember having

15  problems because that notice was sent out

16  terminating the state presidents, go ahead and

17  answer his question.  But this is a fishing

18  expedition that has nothing to do with this

19  lawsuit.

20       MR. UESUGI:  Your objection is noted

21  and you can answer.

22       MR. LEVINSTEIN:  Go ahead.

23       A    I don't remember anything that

24  was -- that would be substantive in nature.  I

25  mean, I can't speak for the appointed presidents.

**Column 4 (Page 160)**

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1       A    Basically, then I could say I

2  don't know, because I can't speak on the behalf

3  of people who put something together before my

4  tenure.

5       Q    Okay.  How about at the -- well,

6  there was the World Junior Trials; is that

7  correct?  Do you remember that?

8       A    The same weekend as I think the

9  second Olympic qualifier, yes.

10       Q    It was held in conjunction?

11       A    Yeah, I believe it was held the

12  second weekend, yes.

13       Q    Did you have a hand in the

14  referee selection?

15       A    I honestly cannot remember.  But

16  again, there may be something there that

17  someone -- I don't know.

18       Q    Again, you don't remember stating

19  that you don't want Koreans at USTU events?

20       A    No, I don't remember saying that.

21       Q    At the World Qualification No. 2

22  or Junior World Trials?

23       A    No, I don't remember saying that.

24       Q    You don't remember saying

25  anything substantially similar to that?

A No, I don't remember saying any of that.

Q You don't remember saying that you were going to get rid of all the Koreans in the USTU?

A I don't remember saying that.

Q You don't remember saying anything substantially to that?

A No, I don't remember saying anything substantially similar to that.

Q Did you say that you didn't want -- Koreans don't deserve to be at USTU events at Olympic qualification No. 2?

A No.

Q Let's just get -- in 2004, have you ever told anyone that you were going to get rid of all Koreans in the USTU?

A No.

Q Did you ever say to anyone in 2004 something substantially similar to that?

A No, I don't remember.

Q You don't remember or, no, you didn't say that?

A No, I don't remember, no, saying anything like that.





Q In 2004, did you ever tell anyone that you did not want Koreans at USTU events?

A No.

Q Did you say something substantially similar to that?

A No, I don't remember ever saying anything like that.

Q In 2004 did you ever tell anyone that Koreans don't deserve to be in the USTU?

A No.

Q Did you, in 2004, did you ever say anything substantially similar to that?

A No, I don't. And I don't even remember saying anything like that.

Q Ever?

A I don't remember saying anything like that.

Q How about prior, in 2003?

A No.

Q So you've never said anything derogatory about Koreans ever?

A To the best of my knowledge, I don't ever remember saying anything along those lines.

Q To anyone?





A To anyone.

Q Ever?

A Again, I don't remember.

Q You could have?

A I don't remember.

Q How do you feel about Koreans?

A What exactly do you want me to answer? What exactly do you want to say? What are you saying?

Q How do you feel about Koreans?

A Well, I'll answer it like this, as I said to you just a little bit ago. I went to -- I was in Seoul. I spent three days in Seoul. I had dinner with many Korean Americans. I don't know everyone that was there. But I enjoyed myself.

Q When was this?

A It was at the last WTF technical meeting. So I think that that gives you a picture that I try to embrace whoever and whomever as we, you know, deal in any situation.

Q You don't hate Koreans?

A I don't hate. I don't hate Koreans.

Q You don't discriminate against





Koreans because of their race?

A I don't -- I make it a point not to discriminate against anyone. And I just want to tell you why, if that's possible.

Q Yes, it is. Go ahead.

A My family was discriminated against at one point, and I didn't like it. So I don't want to do that to anyone else.

Q In what way was your family discriminated against?

A Just name calling.

Q What do you mean?

A Just different names about my --

Q Ethnic background?

A Yes, my ethnicity, right.

Q What ethic background are you?

A I'm an Italian American.

Q And your family was subjected to racial slurs because of that?

A Yes, in New York.

Q How about yourself personally?

A As a young kid, yes.

Q Who made those racial slurs?

A Just different people in the neighborhood.

1       Q       Non-Italians?

2       A       Could be.

3       Q       You don't remember specifically?

4       A       No, it's many years ago.

5       Q       How about against your family

6    members, who made those kinds of comments to you?

7       A       I don't know.

8       Q       You don't know what racial

9    background they were?

10      A       (Shook head.)

11      Q       But even given all of that, that

12   you don't remember, you don't discriminate

13   because of race; is that correct?

14      A       I don't like to be treated in a

15   certain way, so I tend not to treat others in a

16   way in which I don't like to be treated.

17      Q       Have you ever treated any members

18   in the USTU differently because they were born in

19   Korea?

20      A       No.

21      Q       You didn't hold Korean borns in

22   the USTU to a different standard than non-Korean

23   borns?

24      A       No, I don't.

25      MR. UESUGI:  Exhibit next in order.

---

1           (Exhibit 56 was marked.)

2       Q       (BY MR. UESUGI) Let me ask you a

3    couple questions.  If you found out someone, a

4    USTU member, was treating someone in a racially

5    discriminatory fashion, what do you do?

6       MR. LEVINSTEIN:  Objection, incomplete

7    hypothetical.  USTU member?  That could be

8    thousands of people.

9       Q       (BY MR. UESUGI) Yeah.  So just a

10   single USTU member.  You found out that a USTU

11   member was making racist comments to another USTU

12   member.  What would you do?

13      MR. LEVINSTEIN:  Objection, context,

14   calls for speculation.  You can answer.

15      A       I think we would want to gather

16   the facts and then take it and give the person

17   both sides of due process, bring it to a higher

18   authority, which would be in this case the

19   governance and management committee, if something

20   were to happen like that.

21      Q       (BY MR. UESUGI) Has something

22   like that ever come up, to your knowledge?

23      A       Not to my knowledge.  I don't

24   ever remember anything along that line.

25      Q       But if it did, you would conduct

---

1    an investigation?

2       A       We would give it its due process

3    and do some sort of a hearing.  And then take it

4    to, in this case the group to be the governance

5    and management committee.

6       Q       Because racial discrimination is

7    a serious issue and you take that seriously; is

8    that correct?

9       A       Well, we just would give it its

10   process to have both sides be heard, yeah.

11      Q       Okay.  And then after that

12   process -- have you had a chance to review this?

13      A       No.

14      Q       Can you please review it and let

15   me know when you've finished your review?

16      A       Okay.

17      Q       Do you recognize this?

18      A       I recognize it, yes.

19      Q       What is this?

20      A       This is an announcement 2004

21   Junior World Championship team staff and the

22   athletes.

23      Q       And this was announced on the

24   USTU web page, April 29, 2004?

25      A       I would imagine it was, yes.

---

1       Q       You didn't prepare this?

2       A       I don't know.

3       Q       Who did?  Do you remember?

4       A       I don't remember.

5       Q       It says, head of delegation, Herb

6    Perez.  Do you see that?

7       A       Oh, second page, yes.

8       Q       What was the process, if any,

9    whereby Herb Perez was selected head of

10   delegation?

11      A       Basically, we had -- the

12   selection was that I wanted to rely on his

13   overall knowledge, experience in the sport.  And

14   I wanted to have someone out in front who

15   understood, you know, the sport and basically had

16   a network of people out there.  More importantly,

17   Herb Perez is a staff member of the Olympic

18   Council of Asia.  So with that being said, going

19   to the world championships, I thought that that

20   would be the right person for the right time.

21      Q       Did he hold that position with

22   the World Council of Asia at the time that you

23   appointed him?

24      A       I believe so.

25      Q       Did you appoint him?

1        A    Yes, I did.
2        Q    Did you look at any other
3   candidates for head of delegation?
4        A    No, in this case I didn't.
5        Q    Why not?
6        A    Because I felt that he was -- can
7   definitely help us in terms of, you know, this
8   whole program and moving forward.
9        Q    Were you aware that his
10  membership in the USTU was terminated back in the
11  '90s?
12       A    No, I wasn't aware of that.
13       Q    So you don't know about the
14  incident at the 1993 world championships?
15       A    I don't.
16       Q    Where there were allegations of
17  embezzlement of ticket money?
18       A    No.  I don't know, you'd have to
19  talk to him about that and get a clarification.
20       Q    You never asked about that?
21       A    No.
22       Q    No one ever told you about that?
23       A    No.
24       Q    This is the first time you're
25  hearing about it?

1   Herb Perez?
2        A    Herb and I have been friends for
3   a couple years, and met him when he was serving
4   on the international relations committee as a
5   member of that committee.
6        Q    For the USOC?
7        A    Yes.
8        Q    Did you also serve on that
9   committee?
10       A    I was a staff member, so I did
11  not serve on the committee.
12       Q    When did you meet him again, what
13  year was that?
14       A    We really got to know each other
15  about 2002 maybe.  I don't know exactly.  I can't
16  really pinpoint it.
17       Q    When did you first meet him,
18  though, do you know?
19       A    I met him -- the first time I met
20  him was at the 2000 Olympic Games.
21       Q    Okay.  You didn't come up with
22  him through the USOC at the same time?
23            MR. LEVINSTEIN:  Objection, I don't
24  know what that means.
25       A    I don't know what that means

1        A    This is the first time hearing
2   about something about embezzlement, yeah.
3        Q    What did you hear?
4        A    I heard that he had a fight or
5   problem with the USTU.  Didn't know what it was.
6        Q    You didn't ask him about it?
7        A    No.
8        Q    Why not?  You're appointing head
9   of delegation.  Didn't you want to know about
10  something like that?
11       A    I found out about it, I would
12  imagine, after this.
13       Q    When did you find out about that?
14       A    I don't remember when, but we did
15  talk about it.  And he said that he was
16  exonerated, so at that point it seemed like he
17  was given his due process and that, you know,
18  everything fell into place.  So I felt that I
19  didn't need to go into it anymore.
20       Q    Did he tell you that he had to
21  resign as a member of the USTU, that his
22  membership was terminated?
23       A    No, I don't remember him ever
24  telling me that.
25       Q    What is your relationship with

1   either.
2        Q    (BY MR. UESUGI)  Well, do you
3   remember you and I spoke -- I'm a USTU member.
4   And then someone asked me to call the USTU
5   offices in November 2004, so we had a
6   conversation on the telephone.  Do you remember
7   that conversation?
8        A    I remember a conversation by
9   which that you were very negative and attacking
10  me.  That conversation?  Yeah, I do remember that
11  one, yeah.
12       Q    We only had one conversation.
13       A    Yeah.  And that conversation went
14  where I asked if you were coming to an event.
15  And you said, no, you wouldn't show up.  And you
16  were just very negative towards me.  And I don't
17  know why it was, but that conversation I do
18  remember.
19       Q    You don't remember telling me at
20  that point that you -- during that conversation
21  that you came up through the USOC with Herb
22  Perez, that you've known him for over ten years?
23       A    I don't remember.
24       Q    Is that true, did you come up
25  with Herb Perez?

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1     A    Well, we've been involved with
2  the USOC for a number of years, in Olympic
3  festivals dating back from 1983.  So again, I've
4  seen him a lot.  But the first time that we had
5  substantive conversation was at the Sydney
6  Olympic Games.
7     Q    So the first time you saw him was
8  at the Olympic sports festival in 1983; is that
9  what you said?
10    A    No.  I said my involvement in the
11 US Olympic Committee.  I'm talking about myself.
12    Q    Okay.
13    A    Yeah.
14    Q    And then you first met him at the
15 Sydney games?
16    A    Yeah.
17    MR. LEVINSTEIN:  First substantive
18 communication.
19    A    Right.  We've seen each other.
20 And he was always around, you know, with USOC
21 board of director activities.  We'd chat and talk
22 to one another.
23    Q    (BY MR. UESUGI)  Right.  Because
24 he was a US Olympic Committee AAC member?
25    A    I don't know all his titles.

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1     A    Well, that's not an appointment.
2  That's just to help us craft selection committee
3  selection procedures, as we did with John Ruger,
4  Kelly Skinner.  But it wasn't -- I don't know.
5  The way you're saying it, it wasn't a formal
6  committee.  It was a group of people who were
7  very interested in wanting to put together
8  selection procedures that were done correctly, so
9  we didn't have to go back and make changes or
10 amendments to it.  So that's why first and
11 foremost we would talk to John Ruger, you know,
12 the athlete ombudsman.
13    Q    All right.  So there was no USTU
14 task force created to come up with the athlete
15 selection guidelines in 2004?
16    A    There was a task force that was
17 developed and has been on hold because of the
18 fact that we're spending a lot of money on legal
19 help at this moment.  And we felt that we
20 couldn't put that together because we're spending
21 money on a monthly basis to, you know, different
22 legal proceedings.
23    Q    Are you paying for this lawsuit?
24    A    No, I'm not.
25    Q    Insurance is paying?

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1  He's on the executive committee and other types
2  of functions.
3     Q    It's your understanding that he
4  was on the executive committee?
5     A    I believe he was, the USOC
6  executive committee.
7     Q    Do you know what period that was?
8     A    No, I don't.
9     Q    And you've previously stated that
10 you don't remember or you don't know whether Herb
11 Perez recommended you for the job of USTU
12 executive director?
13    A    I don't know.  I don't know.
14 That's a conversation you'll have to have with
15 Herb and whoever else you think he said it to.
16    Q    Does he have a position in the
17 USTU, official title?
18    A    No.
19    Q    Was he given or did you appoint
20 him to any positions in 2004 other than the head
21 of delegation?
22    A    Not that I remember.
23    Q    You never had asked him to work
24 on the athlete selection guidelines for
25 competitions in 2004?

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1     A    I don't know who's going to be
2  paying for it at this moment, but there are some
3  other complaints out there that we have to pay
4  for.
5     Q    So there's only -- so in your
6  opinion, there's only one task force, the USTU
7  task force?
8     MR. LEVINSTEIN:  There's only one task
9  force?
10    Q    (BY MR. UESUGI)  There's only one
11 task force in the USTU?
12    MR. LEVINSTEIN:  You said the USTU.
13 You switched back and forth.
14    Q    (BY MR. UESUGI)  No, no.  The USTU
15 the USTU task force, there is one?
16    A    I had a conversation with Barbara
17 Wakefield, because apparently they've been naming
18 the committee or looking at developing referee
19 guide -- a book on referee development.  And they
20 started to name themselves task force.  And I
21 said to Barbara, you cannot name yourself as a
22 task force.  It was a group of people who were
23 interested in updating a referee handbook, yes.
24    Q    Okay.  But they were calling
25 themselves the USTU referee task force, and you

1 put a stop to it?
2 A Yes. I spoke to her last week
3 about it when I found out about it.
4 Q How about the athlete selection;
5 what was that, just a group of people?
6 A Yes.
7 Q Or was it a task force?
8 A It was a group of people
9 interested in just wanting to help put together
10 selection procedures for the world championships.
11 Q Who were the members of that
12 group?
13 A It's on the bottom of the
14 selection procedures.
15 MR. LEVINSTEIN: Objection. Before you
16 go on again, we're getting so far out of having
17 anything to do with this lawsuit.
18 MR. UESUGI: Coaching selection
19 procedures?
20 MR. LEVINSTEIN: No, it was athlete
21 selection procedures you were asking about for
22 the future, and a task force or a committee and
23 what was their role and different people. You
24 got to tie this somehow to this case, or we're
25 going to go see the Court. We'll stop the

1 deposition, we'll call the judge and say, we
2 believe this has nothing to do with this case and
3 that you have other things going on. And we'd
4 like to investigate what it is you're involved in
5 and what it is you're pursuing this deposition
6 for.
7 MR. UESUGI: Okay. No problem.
8 Q (BY MR. UESUGI) The athlete
9 selection process for 2004, did it involve coach
10 selection process as well?
11 A Counselor, the 2004 athlete
12 selection procedures were done before me, so I
13 couldn't tell you.
14 Q That committee you talked about
15 where Herb Perez helped you out, what did he do?
16 What was he working on?
17 A Basically, what we would do is we
18 would craft something and then we would just send
19 it out to just a different pair of eyes. So Juan
20 Moreno would look at it from AAC perspective,
21 Kelly Skinner from a sport partnership division,
22 John Ruger from athlete ombudsman.
23 Q And Herb Perez?
24 A Herb Perez.
25 Q Why Herb Perez?

1 A Because he has experience as
2 being an Olympian. So I felt it was important
3 just to have him take a look at it also.
4 Q How about Jean Lopez, is he part
5 of that group?
6 A He had some input on it also,
7 yes.
8 Q Was there formal meetings of this
9 group or --
10 A No, it was just pretty much just
11 send it out and talk to people.
12 Q Were you a member of this group
13 as well?
14 A I don't know if you want to call
15 me a member of the group, but I was the one that
16 just consolidated things and looked at them. And
17 we would have a phone call and just look at it.
18 Q Are you talking about the Pan Am
19 selection procedure?
20 A Excuse me?
21 Q The 2004?
22 MR. LEVINSTEIN: 2004 is over.
23 A No, the 2005 world championship
24 selection procedure.
25 Q (BY MR. UESUGI) What about the

1 2004 Pan Am selection?
2 A The 2004 Pan Am championship
3 selection procedure was deemed a developmental
4 program. So pretty much we were looking at
5 developing athletes and coaches and giving them a
6 look at where they're at.
7 Q Did Herb Perez participate with
8 that, too?
9 A No, he didn't.
10 Q He did not?
11 A No, he did not. Well, he did
12 with the camp, with the camp, yes.
13 Q But he had nothing to do with the
14 selection procedure?
15 A No, there was -- basically we
16 laid it out as to, you know, what we were looking
17 for and tried to use this more as a developmental
18 type of program. So at that point we can do a
19 staff type of program, looking at it and
20 selecting kids that we think might have the
21 potential. Because it's not a protected
22 competition as a world championship in our
23 opinion.
24 Q Because of that, Herb Perez
25 wasn't involved? That was my question.

4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)      4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)

Case 1:04-cv-00461-SOM-LEK    Document 247-3     Filed 03/21/2006    Page 47 of 79

**Page 181**

1      A    He was involved in the

2 development camp.

3      Q    But he wasn't involved in the

4 selection procedure?

5      A    To the best of my knowledge, no.

6 I don't remember him actually being involved with

7 the actual selection. I know Juan, Joe Kim.

8 There was a Liz Evans. And basically they were

9 doing evaluations of these athletes. Jean Lopez

10 was there. I can't remember everybody.

11      Q    Did he participate in the

12 selection criteria, development of that?

13      A    I don't remember. As I said, it

14 was more of a developmental program, so we had a

15 little bit more latitude in terms of being able

16 to do what we wanted to do in terms of

17 development of maybe athletes who are the next

18 generation.

19      Q    But he did for sure work on the

20 2005 world championship selection?

21      A    Yes, he did.

22      Q    What did he do?

23      MR. LEVINSTEIN: Again --

24      A    Just provided input.

25      Q    (BY MR. UESUGI) Who else was on

**Page 183**

1 why you're objecting. But we are talking about

2 the period in which this lawsuit relates. So,

3 you know, what can I say?

4      (BY MR. UESUGI) And so we're

5 talking about coach selection. I'm sorry if I

6 mentioned only athlete selection. But as Bob,

7 Mr. Gambardella, will tell you, the athlete

8 selection and the coach selection process is all

9 laid out in the same document; isn't that

10 correct?

11      A    In the 2005 world championships?

12      Q    Yes.

13      A    I believe it is.

14      Q    Okay.

15      A    I would have to actually look at

16 the document. So I'm not trying to hide

17 anything, but I don't have the document in front

18 of me.

19      Q    I'm not trying to be

20 argumentative. I'm just trying to understand

21 Herb Perez's role in the USTU during 2004.

22      MR. UESUGI: Counselor, I'm sorry if

23 I'm upsetting you with all of this stuff flying

24 back and forth.

25      MR. LEVINSTEIN: You're wasting time.

**Page 182**

1 that?

2      MR. LEVINSTEIN: Objection. I'm going

3 to instruct him not to answer any more questions

4 about who was on committees to develop 2005

5 athlete selection.

6      MR. UESUGI: But it wasn't only athlete

7 selection. That's a misnomer. Because in that

8 process, it involves coaches also.

9      Q    (BY MR. UESUGI) Right? Is that

10 correct?

11      A    I'd have to look at it. I don't

12 remember. But again, I don't know.

13      MR. LEVINSTEIN: That's for the future.

14 It's nothing to do with this lawsuit.

15      MR. UESUGI: Yes, but it was developed

16 during the period of this lawsuit, coach

17 selection process. Do you feel that's

18 irrelevant?

19      MR. LEVINSTEIN: I don't know what

20 you're talking about, Counsel. But these

21 questions about who was on one committee about

22 2005 athlete selection are way beyond this

23 lawsuit.

24      MR. UESUGI: I'm sorry if you're

25 confused and don't know what's going on, that's

**Page 184**

1      THE DEPONENT: First of all, can I just

2 use the bathroom?

3      MR. UESUGI: Sure.

4      (A lunch recess was taken from 11:50

5      a.m. to 1:03 p.m.)

6      MR. UESUGI: Go back on the record,

7 please. Let's just get -- let's get into the

8 meat of it, switch gears here.

9      Q    (BY MR. UESUGI) Did you have a

10 chance to review the old selection procedures?

11      A    Which selection procedures are

12 you referring to?

13      Q    The Olympic coach selection

14 procedures 2004.

15      A    The ones that were originally

16 done?

17      Q    Yes.

18      A    No, I never saw those.

19      Q    When was it decided to change the

20 selection procedure, Olympic criteria, do you

21 know?

22      A    February 2000.

23      Q    Who made that decision?

24      A    It seemed to be a collective

25 decision.

1    Q    Of who?

2    A    USOC and myself.

3    Q    Anybody else?

4    A    No.

5    Q    I'm going to hand you what we

6    will mark as the exhibit next in order.

7    MR. LEVINSTEIN:  57.

8    (Exhibit 57 was marked.)

9    Q    (BY MR. UESUGI)  I want you to

10    just look at the paragraph at the end of the

11    first page and which continues on at the top of

12    the second page, if you could, please.  Could you

13    please read that paragraph for us?

14    A    Discussion was held concerning

15    the loss of credentials for two officials at the

16    Athens Olympic Games -- Athens Games.  USTU

17    originally were allocated three credentials:

18    Team leader, coach, team official.  Because of

19    the decline in the sports that have qualified,

20    the USOC had to cut the number of credentials

21    allocated to a number of sports, one of which was

22    Taekwondo.  Various ideas on methods of regaining

23    at least one credential were discussed.  Bob

24    Gambardella discussed it with the WTF and this

25    item will be placed on the agenda for discussion

1    to the governance and management committee to see

2    what their recollection might be.

3    Q    Isn't there a GMC committee

4    meeting minutes that would reflect that?

5    A    I don't know.  Maybe you have

6    them.  I don't know.  I don't know about meeting

7    minutes.

8    Q    It says here that you will

9    discuss with the WTF.  Did you, in fact, do that?

10    A    We had had some conversation at

11    some point, but I don't remember.  I would have

12    to look and see my memos regarding that.  Again,

13    I don't remember.

14    Q    Did you bring those memos with

15    you today?

16    A    No, I didn't.

17    Q    Why not?

18    MR. LEVINSTEIN:  He didn't bring

19    anything that's already been produced.

20    MR. UESUGI:  Okay.  The reason why we

21    asked you to bring those, so you could refresh

22    your recollection, not for purposes of production

23    of documents.

24    MR. LEVINSTEIN:  That was what the

25    request was for.  It was a request for production

1    with Jim Scherr during the conference call next

2    Wednesday.

3    Q    At this meeting, which is the

4    minutes of the February 26th, 2004 GMC committee

5    meeting, was the change in the selection criteria

6    discussed?

7    A    I do not remember.

8    Q    You stated earlier that the first

9    time the selection criteria was being discussed

10    to change it was in February; is that correct?

11    MR. LEVINSTEIN:  That's not what he

12    said.  When was it decided to change the

13    procedures was the question.

14    MR. UESUGI:  Okay.

15    Q    (BY MR. UESUGI)  Had it already

16    been decided by this point, February 26th, 2004?

17    A    What was decided?

18    Q    To change the Olympic coach

19    selection criteria?

20    A    I believe so, yes.

21    Q    Was it changed by the GMC?

22    A    I think that they were informed

23    and had some input.

24    Q    Where is that noted?

25    A    I don't know.  You'd have to talk

1    of documents.  So we didn't reproduce documents

2    and you've got copies.  So if there's anything

3    you want to show him, you can show him.

4    Q    (BY MR. UESUGI)  And this item

5    will be placed on the agenda for discussion with

6    Jim Scherr during the conference call next

7    Wednesday, which is the next GMC meeting; is that

8    correct?

9    A    You have the minutes.  We can

10    look at the next minutes, perhaps.

11    Q    Do we have the next minutes?

12    A    The next what you're referring to

13    and we'll see what the minutes say.

14    Q    See, that's the problem, we don't

15    have the next minutes.

16    MR. LEVINSTEIN:  If he doesn't

17    remember, he doesn't remember.

18    Q    Then I don't remember then.  I

19    leave it at that.

20    MR. LEVINSTEIN:  It's hard to know if

21    the conference call referred to was a GMC meeting

22    or some other conference call.

23    Q    (BY MR. UESUGI)  Was it some other

24    conference call, do you know?

25    A    I don't remember.

1   Q    I'm going to hand you which is
2   going to be marked as the exhibit next in order.
3        (Exhibit 58 was marked.)
4   Q    (BY MR. UESUGI)  Are you familiar
5   with this document?
6   A    Yes.
7   Q    Did you write this document?
8   A    I cannot remember.  I want to say
9   that I think it was written by a legal counsel.
10  Q    Who?
11  A    I don't know.  And again, I would
12  have to go back and look.
13  Q    USOC legal counsel?
14  A    I don't know.
15  Q    Which legal counsel do you use in
16  the USOC?
17  A    Presently we Faegre & Benson.
18  And we were -- we are in some things using HRO.
19  And then early on we were -- just the USOC
20  office, just to help with us in certain areas.
21  Q    Okay.  It says here at the top of
22  the second paragraph, after our review, we
23  determined that amending the procedures at this
24  time is paramount to the success that we have in
25  Athens.  Do you see that?

1   again, just so we have it?
2   A    Basically, again, it goes back to
3   the notion of development of sustained
4   competitive excellence, which is the, you know,
5   the end result.  And developing programs that
6   will help us to that end, help us achieve that
7   end.
8   Q    Then second it appears that
9   because only two Taekwondo athletes have
10  qualified for the 2004 Summer Olympic Games, the
11  number of credentials that are allotted to the
12  USTU may be limited, thus we must ensure that the
13  candidate for coach can also fulfill team leader
14  duties if called upon; is that correct?
15  A    Yes, yes.
16  Q    So that was an important factor?
17  A    That's another factor.  It's
18  another factor, right.  An additional factor that
19  was, you know, looked at.
20  Q    Okay.  Also I skipped a sentence,
21  sorry.  Accordingly, selection procedures and
22  nominations must be based on objective standards
23  that endeavor to meet that goal.  What did you
24  mean by that?
25  A    Again, it goes back to taking a

1   A    Yes, I do.
2   Q    Who is "we"?
3   A    Well, I think if you look at it,
4   it's basically the Bob Gambardella, Steve Locke,
5   and representing the governance and management
6   committee.
7   Q    So you determined that -- you and
8   Steve Locke determined that the amending the
9   procedures at this time is paramount?
10  MR. LEVINSTEIN:  Objection.
11  A    And the governance and management
12  committee, yes.  So collectively there were
13  several people involved in this.
14  Q    (BY MR. UESUGI)  And the reasons
15  that you gave for amending the procedures follows
16  in the next sentences?
17  A    Yeah, it's actually performances
18  rings out loud and clear.  Maximizing our
19  performance, having impact with performance in a
20  major competition.
21  Q    So first USTU needs to be a
22  performance oriented organization; is that
23  correct?
24  A    That's what it says.
25  Q    And what do you mean by that

1   look at what athletes are going to be qualified
2   and matching up, you know, the coach based on the
3   selection procedures guidelines that we put
4   together.  So again, performance.
5   Q    What would be an objective
6   standard in your mind as opposed to subjective?
7   A    Well, objective is which athletes
8   made the team.
9   Q    And that would directly influence
10  who you would select as a coach?
11  A    Yes.
12  Q    Why?
13  A    Because we're a performance based
14  organization.
15  Q    Okay.  And in your opinion,
16  selecting a coach with respect to the -- what
17  would you say -- in conjunction with athlete
18  selection is the way to go as far as performance
19  oriented --
20  MR. LEVINSTEIN:  Objection.  I don't
21  know what that sentence all meant, but it was
22  kind of incoherent.
23  MR. UESUGI:  Was it?  Can you read it
24  back?
25  MR. LEVINSTEIN:  You never even

1   finished it, so why don't you try it again?

2         MR. UESUGI:  I would have finished it

3   if you let me.

4         MR. LEVINSTEIN:  I couldn't tell.

5         MR. UESUGI:  Can you read back the

6   question, please?

7         (The record was read.)

8   Q   (BY MR. UESUGI)  -- organization's

9   goal?  That's okay.  You don't have to answer

10  that.

11        The next question it says here,

12  accordingly, we are submitting to you revised

13  selection procedures for coach and team leader

14  positions for the 2004 Summer Olympic Games.  Do

15  you see that?

16        A   Yes, I do.

17        Q   Where are those revised selection

18  procedures?  Was it attached with your memo?

19        A   I don't know.  I don't remember.

20        Q   Do you have it?

21        MR. LEVINSTEIN:  We produced the

22  revised procedures.

23        THE DEPONENT:  Yes.

24        MR. UESUGI:  Those are dated March 25,

25  2004.  This is March 8, 2004.

1         MR. LEVINSTEIN:  I think March 25 might

2   have been the approval date, but I don't know.

3   We produced all the procedures we have copies of.

4         MR. UESUGI:  Okay.

5         MR. LEVINSTEIN:  And I don't know if

6   they were attached to this document or not.  I

7   just don't know.

8         A   Yeah, I don't know.

9         Q   (BY MR. UESUGI)  Was it attached

10  to this document?

11        A   That, I don't know.  I wasn't the

12  one who took the documents and assembled them.

13        Q   When you signed the letter, was

14  the revised selection procedures included with

15  the memorandum?

16        A   I cannot remember.

17        Q   So we ask that you vacate your

18  earlier approval of the coach and team leader

19  selection procedures as well as the nominations

20  to fill these positions and adopt the new

21  procedures in their place.  So the USTU, you and

22  Steve Locke, requested that the USOC vacate their

23  earlier approval of the 2004 Olympic coach

24  criteria; is that correct?

25        A   Well, let's see here.  Bob

1   Gambardella, Steve Locke and the USTU governance

2   and management committee, I think, had made that

3   decision.  And as I said early on, you know, we

4   had the USOC sport partnership divisions, I

5   think, also involved in the decision of it.

6         Q   No, but my question was, it was

7   you and Steve Locke who requested that the USOC

8   vacate their earlier approval of the coach and

9   team leader selection procedures; is that

10  correct?

11        A   One more time, please.

12        Q   You and Steve Locke were the

13  persons who requested that the USOC vacate their

14  earlier approval of the coach and team leader

15  selection procedures?

16        A   Myself and Steve Locke, who is

17  also speaking on behalf of the USTU governance

18  and management committee.

19        Q   Yes.

20        A   Yes.

21        Q   So it wasn't the USOC who

22  requested that the -- initiated the process of

23  vacating the approval of the coach and team

24  leader selection procedures?

25        A   That's something that you would

1   have to talk to the US Olympic committee about

2   also.

3         Q   You don't know?

4         A   As I said, there was a lot of

5   things going on prior to my being hired.  And so

6   I don't know exactly what was happening.

7         Q   I'm not talking about that.  I'm

8   talking about what you wrote, what you signed.

9   Is this your signature?

10        A   That is my signature.

11        Q   I'm talking about this.  So what

12  were you talking about when you said, we ask that

13  you vacate your earlier approval of the coach and

14  team leader selection procedures?

15        MR. LEVINSTEIN:  He answered that

16  question.  All he's telling you is he does not

17  know if the USOC had done some things in the same

18  regard before he got involved.  He can't speak to

19  that.

20        MR. UESUGI:  I'm not asking about that.

21        MR. LEVINSTEIN:  You said, you asked if

22  he and not the USOC did this.  And he said he

23  doesn't know if the USOC had already done that

24  before he got involved.

25        Q   (BY MR. UESUGI)  What you do know

**Page 197**

1  is you and Steve Locke did request that the USOC
2  vacate their earlier approval of the coach and
3  team leader selection procedures; is that
4  correct?
5        A    I would think that the USOC had
6  these conversations prior to and they might have
7  said something along the lines.  So I can't
8  answer that for you, because I wasn't there.
9        Q    Do you have any documents that
10  would tend to show that the USOC initiated the
11  vacation of the earlier approval of the coach and
12  team leader selection procedures in the USTU
13  office?
14        A    I don't know.  If you have
15  something, but I don't have anything with me.
16        Q    Did you review such documents?
17  Never?
18        A    Excuse me?
19        Q    Did you ever review such
20  documents?
21        A    No.  Just conversation.
22        Q    With who?
23        A    With Kelly Skinner of the sport
24  partnership division, the USTU governance and
25  management group, and myself.

**Page 198**

1        Q    So you spoke with Kelly Skinner
2  of the USOC.  And he told you before this
3  document was written that they were going to
4  vacate the earlier approval?
5        A    That's something that you have to
6  talk to Kelly Skinner about.
7        Q    I'm asking you with respect to
8  your conversation.
9        MR. LEVINSTEIN:  That's not what he
10  said.  You keep mischaracterizing his testimony.
11  It would be a lot more helpful if you'd listen to
12  what he said and then ask him questions.
13        MR. UESUGI:  It would be very helpful
14  if he'd listen to my question and then answer
15  what I'm asking.
16        A    That's why I ask you twice when I
17  don't understand what you're saying.
18        Q    (BY MR. UESUGI) You said you
19  spoke to Kelly Skinner, right, prior to this
20  being drafted?
21        A    Yes.
22        Q    With regard to the USOC revising
23  the coach and team leader selection criteria?
24        MR. LEVINSTEIN:  Objection.
25        A    Yes.

**Page 199**

1        Q    (BY MR. UESUGI)  Okay.  What did
2  Kelly Skinner tell you?
3        A    Basically, that we had to relook
4  at the selection procedures as they stand and we
5  want to be more performance oriented in our
6  selection of coaches.
7        Q    Were you aware that Kelly Skinner
8  was the one who approved the selection, the
9  original selection procedure?
10        A    I couldn't tell you.  That was
11  before my time.
12        Q    Did he mention that to you?
13        A    Not in the conversation, no.
14        Q    The reason why I ask is in the
15  minutes of the GMC committee documenting the
16  February 5, 2004 meeting, which is Exhibit 43, it
17  states at the bottom of the first page --
18        MR. LEVINSTEIN:  Exhibit 43 is a press
19  release.
20        MR. UESUGI:  What exhibit is that?
21        MR. LEVINSTEIN:  45, if you're talking
22  about the minutes of the February 5th meeting.
23        Q    (BY MR. UESUGI)  Exhibit 45, it
24  says, eligibility requirements are being
25  rewritten by the USOC and the earlier

**Page 200**

1  appointments may have to be rescinded as soon as
2  those new requirements are clarified by the USOC.
3  Do you see that?
4        A    Yes, I do.
5        Q    So if the eligibility
6  requirements were being rewritten by the USOC,
7  why would you need to request that they vacate
8  their earlier approval?
9        A    I don't remember, to be honest
10  with you.
11        Q    Okay.  I'm going to show you a
12  document which is going to be marked Exhibit 9.
13        (Exhibit 9 was marked.)
14        Q    (BY MR. UESUGI)  Did you have a
15  chance to review that document?
16        A    No, not yet.
17        Q    Do you remember receiving this
18  letter from --
19        A    Yes, I do.
20        Q    -- Dae Sung Lee?  What did you do
21  when you received this?
22        A    Your question, please?
23        Q    What did you do when you received
24  this letter?
25        A    I read it.

1    Q    Anything else?

2    A    I shared it with Steve Locke.

3    Q    Anything else?

4    A    The recommendation I believe was

5    for USOC legal to take a look at it.

6    Q    What did you tell Steve Locke

7    about this letter?

8    A    Steve, we received a letter from

9    Dae Sung Lee regarding coaching at the Olympic

10   Games.

11   Q    And?

12   A    That's it.  And then I gave it to

13   him and he read it.

14   Q    Did you make any sort of

15   recommendation as to how to respond?

16   A    No, that's why I was asking for a

17   recommendation as to what they thought we should

18   do at this point.

19   Q    And what did Steve say?

20   A    Again, I cannot remember the

21   conversation, so I would ask that you talk to

22   Steve Locke and see what his recollection is.

23   Q    Okay.  Did you eventually respond

24   to this letter?

25   A    I believe I did.  I don't know

1    know, guidance and counsel from, you know,

2    members of the USTU such as Steve Locke.

3    Q    So who made the determination

4    that this is what would be done?

5    A    Determination that what will be

6    done?

7    Q    That sentence, I just read it.

8    As a result of that process, every position in

9    the USTU has been or will be reviewed to

10   determine the necessity of such positions, the

11   skills needed for positions determined to be

12   necessary to impact performance and the

13   appropriate individuals to serve in the remaining

14   necessary positions.  Who made the determination

15   that that was what was going to be done?

16   A    It's our governance and

17   management group.  We looked at it and basically

18   gave some direction on what we want to do and the

19   direction which we want to go.

20   Q    So you didn't make this

21   determination?

22   A    It was a collective decision.

23   Q    Between you and the GMC?

24   A    Yes.

25   Q    As you might expect, with the

1    the date.

2    Q    But I do.

3    (Exhibit 10 was marked.)

4    Q    (BY MR. UESUGI)  Did you write

5    this letter which has been marked as Exhibit 10?

6    A    Yes, I signed this letter, yes.

7    Q    That wasn't my question.  I asked

8    if you wrote this letter?

9    A    No, I most likely didn't.  I

10   don't remember, but I did sign this letter.

11   Q    Who wrote this letter?

12   A    I don't know for sure.

13   Q    It says here, as you know, since

14   you were selected, the United States Taekwondo

15   Union has come under new management and new

16   governance.  As a result of that process, every

17   position in the USTU has been or will be reviewed

18   to determine the necessity of such positions, the

19   skills needed for positions determined to be

20   necessary to impact performance and the

21   appropriate individuals to serve in the remaining

22   necessary positions.  Who decided that is what

23   was going to be done?  Did you decide that?

24   A    I -- again, there are certain

25   decisions that have been made that I seek, you

1    change in management and governance at the USTU,

2    there has been a change in view about the head

3    coach position for Athens games.  What did you

4    mean by that?  What was the change in view that

5    you were talking about with respect to the head

6    coach position for the Athens games?

7    A    Very simply stated, it's all

8    about impact on performance.

9    Q    Go on.

10   A    That's my answer.

11   Q    What was the change in view?

12   What was wrong with the old view?

13   A    As I said, that's before my time.

14   And talking about this, again, performance was

15   basically the philosophy that we were looking for

16   impact on performance.

17   Q    After formation of the USTU

18   governance and management committee, and my being

19   named to the position of CEO/secretary general,

20   the committee and I met to discuss how to

21   maximize USTU's performance in Athens.  We felt

22   that the selection procedures for the coach at

23   the Athens games needed to be reevaluated to

24   ensure that the coaching position is best

25   utilized in a way to match up the coach with

1  those athletes who were selected to compete at
2  the games.
3         MR. LEVINSTEIN:  Who will be selected
4  to compete at the games.
5         Q   (BY MR. UESUGI)  Why?
6         A   Again, based on impact on
7  performance.
8         Q   So performance was your main
9  concern?
10        A   Again, our notion of developing
11 the model of sustained competitive excellence is
12 the model.  And things that work down through
13 that are parts of that whole notion of sustained
14 competitive excellence.
15        Q   It says here, Also, as you know,
16 the USTU failed to qualify more than two athletes
17 to compete in the games in Athens.  In addition,
18 American athletes in all sports in general did
19 not qualify as many spots as had been predicted.
20 As a result, the number of credentials available
21 for the US Olympic team, and for the sport of
22 Taekwondo in particular, has been reduced
23 dramatically.  Previously it was thought that
24 Taekwondo would receive two credentials, one for
25 team leader and one for coach.  That number now

1  based on the performance of coaches and based on
2  the situation that certain teams did not qualify,
3  this was an added-on responsibility.
4         Q   This wasn't the first time this
5  dual duty as coach and team leader came -- this
6  wasn't the first time that it came up, was it?
7  This was an earlier consideration as far back as
8  February 2004, was it not?
9         A   It might be.  We can look through
10 the documents.
11        Q   Yes, why don't you look at the
12 minutes from February 26, 2004.
13        MR. LEVINSTEIN:  Tell us the number,
14 we'll find it.
15        MR. UESUGI:  I don't know.  I didn't
16 write it.
17        MR. LEVINSTEIN:  Looks like 57.
18        MR. UESUGI:  Yeah.
19        MR. LEVINSTEIN:  Okay.  It says they
20 might lose a credential, that part on the bottom.
21        MR. UESUGI:  Right, that bottom part.
22        MR. LEVINSTEIN:  Actually, they had
23 three credentials down to one.  It says in this
24 one.  But it was still in flux at that time.
25        Q   (BY MR. UESUGI)  So your answer is

1  has been reduced to one.  Rather than use the
2  single credential designated for team support for
3  Taekwondo on a team leader position, the USTU has
4  determined that it will attempt to maximize
5  athletic performance by providing a credential to
6  the coach, who must also fulfill the team leader
7  duties if called upon.
8         So was that an important consideration,
9  having a coach who could also fulfill team leader
10 duties?
11        A   Based on the situation at hand,
12 they would have to double up.  So it became a
13 part of the overall scheme.
14        Q   Was that included in the revised
15 amended selection procedure for coaches, a coach
16 that could also fulfill the team leader duties if
17 called upon?
18        A   Are you referring to this
19 document?
20        Q   Yes, the last page of Exhibit 10.
21        A   No.
22        Q   Why not?
23        A   Maybe I just didn't think of it,
24 we didn't think of it as a group.  We felt that
25 this was -- the selection procedures, again,

1  that the reason why this wasn't put in was
2  because you forgot?
3         A   No.  As I said, the selection
4  procedures really focused on the coaches and how
5  we were going to select the coaches for this
6  competition.
7         Q   If performance was the issue, why
8  didn't you include this in your letter to Mr. Dae
9  Sung Lee?
10        A   We just wanted to make him aware
11 of what was happening.  So I don't know, maybe
12 being transparent, just trying to put everything
13 on that we knew at that moment.
14        Q   Did you consider that when you
15 were screening coaches for the 2004 Olympic Games
16 whether they could function in a team leader and
17 a coach capacity?
18        A   Yeah, that was considered as part
19 of the process.  Afterwards, you know, we looked
20 at it to see what we would need to do to maximize
21 everyone's performance potential at the Athens
22 Olympic Games.
23        Q   So at this point, you were
24 still -- you didn't know who the Olympic coach
25 was.  The only purpose of this letter was to tell

1  Mr. Dae Sung Lee that he would no longer be the
2  coach; is that correct?
3      A     It says basically what it says
4  here, that we're looking at developing new
5  criteria.
6      Q     Had you selected a new coach at
7  this point?
8      A     No, we hadn't.
9      Q     Yes, because in the second or
10  third to the last paragraph you state,
11  accordingly --
12      A     Which page?
13      Q     Page 2.  Accordingly, USTU will
14  evaluate pursuant to the revised selection
15  procedures those individuals who qualify for the
16  Taekwondo coach position for the Athens games.
17  When a coaching nominee is selected, the name of
18  that person will be forwarded to the USOC
19  executive committee for its approval.
20      So at this point, you didn't have any
21  Taekwondo coach selected for the Athens games?
22      A     No.
23      Q     When was this -- on page 3 of
24  that letter, Exhibit 10, when did you draft or
25  who drafted this?

1      Q     (BY MR. UESUGI)  You tell me.  Is
2  that when you amended the selection procedure?
3      A     I believe that's when it was
4  signed and sent to the US Olympic Committee.
5      Q     Okay.  Can you read the top of
6  the selection procedure for coaches, starting
7  with directions?
8      A     Directions?
9      Q     The first sentence.
10      A     Procedures for selection of
11  coaches for the games must be approved at least
12  12 months prior to the start of the games.  Names
13  of --
14      Q     No, no, stop right there.
15      A     Okay.
16      Q     Did this selection procedure
17  fulfill this requirement?
18      A     No.
19      Q     Why not?
20      A     Because it was inside the window
21  of 12 months.
22      Q     So you were required to make
23  selection procedures approved at least 12 months
24  prior to the games, but this one was not; is that
25  correct?

1      MR. LEVINSTEIN:  Objection, it's not
2  page 3 of the letter, if you mean the attached
3  selection procedure for coach document.
4      Q     (BY MR. UESUGI)  Yeah.  Well, page
5  3 of the exhibit.  Who drafted this?
6      A     What it was was, as I said
7  earlier, that the US Olympic Committee sport
8  partnership division, you know, drafted it.  I
9  looked at it and adopted it, you know, based
10  on -- I don't think we made many changes, if any.
11  I can't remember.  But it seemed to be clear and
12  concise and objective in what we were looking to
13  do.
14      Q     The document that you sent to Dae
15  Sung Lee was unsigned.  Is there a reason for
16  that?
17      A     I don't know.
18      MR. LEVINSTEIN:  The exhibit you just
19  showed us was signed.
20      MR. UESUGI:  No, the selection
21  procedure for coaches, the document that I'm
22  having the witness look at, page 3 of the
23  exhibit, is unsigned.
24      A     It says, as amended, was it 3-25
25  of '04, on the bottom, amended?

1      A     That's what it says.
2      Q     Why not?  Did you take that into
3  consideration when revising the coaching
4  selection procedure?
5      A     I think I looked at it, and based
6  on what was going on in terms of, you know,
7  listening to what was being said from the US
8  Olympic Committee and that there's a need for
9  more of a performance orientation here, we went
10  forward with it.
11      Q     Do you know where this
12  requirement comes from?
13      A     I would think some sort of rules
14  of the international games preparation.  They
15  have their own rule book, which is part of a
16  greater, some sort of a competition guidelines.
17      Q     Would it surprise you if I told
18  you that that comes directly from the USOC
19  bylaws?
20      A     No, it wouldn't surprise me.
21      Q     Did you ever read this
22  requirement in the USOC bylaws prior to changing
23  the selection procedure for coaches?
24      A     Oh, I might have.
25      Q     And you went ahead anyway and

1    changed the selection procedure?
2         A    Yes.
3         Q    Why?
4         A    As a selective decision.
5         Q    Aren't you bound by the USOC
6    bylaws?
7         A    Yes.
8         Q    And yet you violated the USOC
9    bylaws by changing the selection procedure?
10        MR. LEVINSTEIN:  Objection.
11        Q    (BY MR. UESUGI)  Isn't that
12   correct?
13        MR. LEVINSTEIN:  The process was
14   approved by the executive committee of the USOC
15   so, no, it's not correct.
16        Q    (BY MR. UESUGI)  So is it your
17   position that the USOC executive committee can
18   disregard the USOC bylaws if it sees so fit?
19        MR. LEVINSTEIN:  If you want to ask
20   legal questions, you can deal with them in court.
21   It's not for this witness to answer.  The facts
22   are what he's here to testify about.
23        Q    (BY MR. UESUGI)  Okay.  And the
24   facts is you knew about this requirement and yet
25   you went ahead anyway; is that correct?

1    criteria.  And so we moved it forward, I moved it
2    forward, yes.
3         Q    Did you change anything with
4    respect to the selection procedures that Kelly
5    Skinner handed to you?
6         A    I cannot remember.
7         MR. LEVINSTEIN:  Can we take a break
8    for one second?
9         MR. UESUGI:  Yes.
10        (A recess was taken from 1:40 p.m. to
11        1:48 p.m.)
12        MR. LEVINSTEIN:  Before you start, we
13   want to clarify one thing.  You've been asking a
14   bunch of questions about drafting.  And I think
15   that's caused a confusion.  His answers have all
16   been correct, but I think it may have created a
17   misleading impression about who decided the
18   content of those.  If you want, he'll clarify it.
19   But just so you know, who drafted them and who
20   decided the content is two different questions.
21        MR. UESUGI:  Okay.  You can argue that
22   at trial.
23        MR. LEVINSTEIN:  Well, then, why don't
24   you just for the record, Bob, why don't you
25   explain the difference between those two?

1         A    I went ahead and put together an
2    objective procedure with the help of others to
3    select a coach that will ultimately impact
4    performance at the highest level.
5         Q    Which was not approved at least
6    12 months prior to the start of the Olympic
7    Games?
8         A    That is correct.
9         Q    Who came up with these selection
10   criteria in No 1?
11        A    Specifically, I don't know who.
12   But again, it was -- we started the process with
13   the US Olympic Committee.
14        Q    It wasn't you?
15        A    As I said originally, if we go
16   through it, the US Olympic Committee sport
17   partnerships, they went through it, they came up
18   with what they thought was reasonable objective
19   criteria for selecting the coach for the Olympic
20   Games which will have impact on performance.
21        Q    So it's your testimony today that
22   the sport partnerships and Kelly Skinner was the
23   one who drafted this?
24        A    They started it and then I took
25   it.  And then I felt it was a good, objective

1         A    Well, really, as I remember
2    correctly, that what happened was I met with our
3    sport partnership of partners there, Kelly
4    Skinner and maybe Michelle Farrell, I believe.
5    And what we did is we talked about a concept,
6    okay, what I would like to see in the concept,
7    that we can choose a coach based on objective
8    criteria.  And then what they did was they came
9    to write down, you know, selection procedures.
10        And at that point, I looked at them and
11   I felt this is exactly what we had articulated in
12   our prior conversation meeting and that's what
13   exactly that we had signed.
14        Q    (BY MR. UESUGI)  In your opinion
15   the old selection procedures, they were not
16   objective?
17        A    I can't answer that because I
18   hadn't seen them.
19        Q    Let's turn to the -- and yet you
20   made these -- that's okay.  Let's turn to the
21   coaching selection criteria themselves.  No. 1,
22   number of athletes the coach has placed on the
23   2004 Olympic team.  Why is that important?
24        A    It's important especially in this
25   sport that you want to be able to match athletes

4/5/2006 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)
Case 1:04-cv-00461-SOM-LEK   Document 247-3   Filed 03/21/2006   Page 56 of 79
4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)

1   up with their coaches who they have been working
2   with and feel comfortable with.
3          Q      Why?
4          A      Because there's a long-term
5   relationship that has been developed.
6          Q      Can you tell me on the 2000
7   Olympic team which gold medalist was paired with
8   their coach?
9          A      The 2000 Olympic team, again, I
10  wasn't here.  I wasn't there as part of that, so
11  I would only be guessing, but --
12         Q      That's fine.  How about on the
13  1992 Taekwondo Olympic team?
14         A      That's way before my time.
15         Q      I take it for the 1988 Olympic
16  team you wouldn't know any coaches that were
17  paired with their athletes and they achieved the
18  gold medal?
19         A      Right, yes.
20         Q      Would it surprise you to tell you
21  that no athlete who won a gold medal for
22  Taekwondo in the 1988, 1992 2000 Olympic Games
23  were paired with their coach that trained them?
24         MR. LEVINSTEIN:  Is that you
25  testifying?

1          A      Because as I said, I'm a strong
2   believer of trying to maximize the best situation
3   possible.  And in my mind and my feeling is
4   having coaches athletes work with their coaches.
5          Q      But you have no empirical
6   evidence that pairing coaches with their athletes
7   produces gold medals?
8          A      Empirically speaking?
9          Q      Yes.
10         A      That's experiential, from your
11  experience.  Yeah, so basically, I just feel that
12  based on my experiences, that this is the best
13  way to go for this sport.
14         Q      Okay.  Competition record of the
15  athletes placed on the 2004 Olympic team.
16  Priority consideration will be given to results
17  in priority order, 2003 World Championships, 2003
18  Pan American Games.  Why was that important?
19         A      Again, you want to try to take a
20  look at a track record of what, you know, what is
21  happening, what the results are.
22         Q      Are you aware of any coach that
23  was paired with his or her athlete and won a gold
24  medal at the World Championships?
25         A      I would have to go back and look

1          MR. UESUGI:  No, I'm asking a question.
2          MR. LEVINSTEIN:  No, you're not.  Was
3   it surprising?  We don't know if it's true.
4          Q      (BY MR. UESUGI)  Assume that
5   that's correct, that no coach the 1988, 1992
6   or 2000 Olympic team for Taekwondo in the United
7   States won gold while coached at the Olympic
8   Games by their trainer or home instructor.  Would
9   that have any relevance to you with respect to
10  these selection procedures?
11         A      As I said, I took a look at these
12  selection procedures based on moving forward.
13         Q      That wasn't my question.  My
14  question was assume that no athlete or competitor
15  at the 1988, 1992, 2000 Olympic Games for
16  Taekwondo in the United States were paired with
17  their home instructor at the Olympic Games and
18  yet and won a gold medal, would that have
19  influenced your decision in determining or
20  drafting these selection procedures?
21         A      Would that have influenced my
22  decision?
23         Q      Yes.
24         A      No.
25         Q      Why not?

1   at that.
2          Q      How about at the 2003 Pan Am
3   Games, was there any coach that was paired with
4   their athlete at the Pan Am Games that resulted
5   in a gold medal?
6          A      I, again, would have to go back
7   and do some research on that.
8          Q      You don't remember?
9          A      I don't remember.
10         Q      Did you know at one point?
11         A      I would have to, again, go back
12  and research it.
13         Q      It says here, USTU CEO/executive
14  director will screen candidates to ensure the
15  candidate nominee meets the defined criteria and
16  will forward the nominee to the USTU governance
17  and management committee.  What does that mean to
18  you?
19         A      I'll take a look at the coaches
20  based on the athlete's performance, and then
21  screen candidates.  And then meet basically what
22  was up in No. 1 here.  And then send it to the US
23  Taekwondo Union governance and management for
24  their approval.
25         Q      Which coaching candidates did you

1   screen for the 2004 Olympic Games?

2         A    Well, based on this Jean Lopez.

3   And our group also talked about Chul Ho Kim.

4         Q    Anybody else?

5         A    No.

6         Q    When did the screening take

7   place?

8         A    Well, what happened was -- let's

9   see, the last Olympic qualifier was June 5th, and

10  so I believe we sent the names to the governance

11  and management, you know, therefore.  So after

12  the -- so after.

13        Q    After June 5th?

14        A    Yes.

15        Q    Okay.  Was it your understanding

16  that you would just send one candidate nominee?

17        A    That's what I did was to send one

18  candidate, yes.

19        Q    Why didn't you send both Jean

20  Lopez and Chul Ho Kim?

21        A    Well, what happened was there was

22  only one head coach.  But again, based on the

23  credential situation.

24        Q    Why didn't you give the G&M

25  committee a choice, Jean Lopez and Chul Ho Kim?

1         A    Well, and that's what happened,

2   it came down to that where we took both of them.

3         Q    I know, but for purposes of

4   voting?

5         A    Well, it was in my opinion that

6   the coach -- the head coach that was selected

7   was -- seemed to match the objective criteria

8   that was placed forward.

9         Q    Okay.  So you never, at no time

10  did you consider submitting for the vote of the

11  GMC the names of Jean Lopez and Chul Ho Kim?  You

12  never considered sending both names so they could

13  chose?

14        A    We didn't, because it was based

15  on my screening process.  And at the end of the

16  day, both coaches were selected to attend the

17  Olympic Games.

18        Q    That wasn't my question.  My

19  question was at no time did you consider putting

20  both names on the ballot?

21        A    No.  I selected one person as the

22  head coach.

23        Q    Why?

24        A    Based on his experience.

25        Q    You didn't feel Chul Ho Kim could

1   do an adequate job?

2         MR. LEVINSTEIN:  Objection.

3         A    It's subjective now.  We were

4   looking at objective criteria.

5         MR. UESUGI:  Let's look at the minutes

6   from the March 25, 2004 meeting.

7         (Exhibit 59 was marked.)

8         Q    (BY MR. UESUGI)  Specifically, I

9   want you to look at the second to last paragraph

10  on page 2.

11        A    Okay.

12        Q    Can you read that sentence for

13  me?

14        A    Let's see here, second to last.

15  Committee ratified the appointment of Jean Lopez

16  as the Olympic coach since the USTU has only one

17  coach credential.

18        Q    What does that mean?

19        A    In my opinion, that means that

20  there was a mistake in their meeting minutes.

21        Q    How so?

22        A    Well, this definitely didn't

23  happen March 25th.  What I think they said here

24  was the committee had ratified the appointment of

25  the coach.  What they meant to say was the

1   coaching selection procedures, that's what I

2   would take it.

3         Q    Why is Jean Lopez's name listed

4   here?

5         A    You know, you would have to ask

6   the governance and management committee that

7   question.

8         Q    You weren't present at this

9   meeting?

10        A    I was present at this meeting

11  but, again, or you should maybe ask the person

12  who took the minutes.  All the other minutes were

13  approved, but this one isn't.  So I'm wondering

14  if there's a corrected version that may show --

15        Q    I'm asking you for your

16  recollection.  At this meeting, which you

17  attended, was the appointment of Jean Lopez as

18  the Olympic coach discussed?

19        A    I -- based on this question

20  here, no, we did not ratify the appointment of

21  Jean Lopez as Olympic coach.

22        Q    Was Jean Lopez's name mentioned

23  at all at this meeting?

24        A    That, I don't know.  I don't

25  remember.

1  Q.   Okay.  I want to go back to this
2  Exhibit 9, the March 18 letter from Dae Sung Lee
3  to you.  When did you first open this letter or
4  when did you receive this letter?
5  MR. LEVINSTEIN:  He's supposed to
6  remember when he received it?
7  A.   I don't remember when I received
8  it nor when I read it.
9  Q.   (BY MR. UESUGI)  Nor when you
10  opened the envelope?
11  A.   Yes, or maybe it was faxed.  I
12  couldn't even tell you.
13  Q.   Mr. Dae Sung Lee wasn't present
14  when you opened this envelope at the USTU office?
15  A.   I honestly don't remember.  I
16  don't remember.
17  Q.   Do you remember having Mr. Dae
18  Sung Lee visit you in March 2004 prior to the
19  Olympic qualifier?
20  A.   Yes, I do.  Yes, I do.  Actually,
21  came to my office and was gracious enough to give
22  myself and Molly a box of macadamia nuts,
23  chocolate nuts, and came and introduced himself,
24  yeah.
25  Q.   And that was in conjunction with

1  the first qualifier?
2  A.   I believe it was, yes.  Yes, it
3  was.
4  Q.   Which is at the end of March?
5  A.   Yes.
6  Q.   You don't recall him asking you
7  about the letter that he wrote, this March 18,
8  2004 letter?
9  A.   I don't remember.
10  MR. LEVINSTEIN:  Just for the record,
11  are you suggesting that he handed him that letter
12  at the end of March instead?
13  MR. UESUGI:  No, that's not what I'm
14  suggesting at all.
15  MR. LEVINSTEIN:  Okay.  You just asked
16  a question about whether it was handed to him,
17  and I thought you might know that it was true.
18  A.   Yeah, that's what I thought he
19  said too.
20  Q.   (BY MR. UESUGI)  Did he ask you
21  about this letter?  You don't remember, right?
22  A.   I don't remember.  I don't
23  remember, but I can tell you I did receive it.
24  Q.   Do you remember discussing this
25  letter with Dae Sung Lee when he came to visit?

1  A.   What I remember is, as I said,
2  Mr. Lee came in, said hello, gave us the
3  chocolates, and we had some sort of discussion,
4  but it wasn't long.
5  Q.   What was the discussion about?
6  A.   I don't remember.  I think it was
7  more of a cordial type of, you know, hello
8  conversation.
9  Q.   Do you know if the Olympic coach
10  position was discussed at all during that meeting
11  with Mr. Lee?
12  A.   I don't remember.
13  Q.   Then the team, the final trials
14  was on June 5th, 2004; is that correct?
15  A.   Yes, it was in San Jose.  I think
16  it was San Jose State University.
17  Q.   And Steven Lopez and Nia Abdallah
18  won; is that correct?
19  A.   Yes.
20  Q.   Did you attend the Olympic team
21  trials?
22  A.   Yes, I did.
23  Q.   After you found out who the
24  winners were, what did you do?
25  MR. LEVINSTEIN:  Objection.

1  A.   I congratulated the athletes.
2  Q.   (BY MR. UESUGI)  With respect to
3  the Olympic coach selection process, what did you
4  do?
5  A.   I congratulated the athletes.
6  Q.   Once you found out who the
7  athletes were, what did you do with respect to
8  the Olympic coach selection process?
9  A.   I don't remember.  I had -- as I
10  said, I had a meeting with the athletes and
11  congratulated them.
12  Q.   Did you do anything with respect
13  to the coach selection process after the Olympic
14  trials?
15  A.   I remember talking to the coaches
16  to say we'll be in touch.
17  Q.   Which coaches did you talk to?
18  A.   Jean Lopez and Chul Ho Kim.
19  Q.   Did you speak to Dae Sung Lee?
20  A.   I don't remember speaking to
21  Mr. Lee.  I don't even know if he was there.
22  Q.   You don't remember seeing him at
23  the Olympic trials?
24  A.   No.
25  MR. LEVINSTEIN:  Olympic trials,

1  June 5th event?

2          MR. UESUGI:  Right.

3      A   Yes.

4      Q   (BY MR. UESUGI)  So if you don't

5  remember seeing him there, obviously you don't

6  remember speaking to him about the coach

7  selection process?

8      A   No.

9          MR. LEVINSTEIN:  He already said that.

10     Q   (BY MR. UESUGI)  I'm going to hand

11  you Exhibit 11.

12         (Exhibit 11 was marked.)

13     Q   (BY MR. UESUGI)  Do you remember

14  receiving this letter?

15     A   Yes, I do.

16     Q   Did you respond to it?

17     A   I would have to look.  I believe

18  I did.

19     Q   What was your response?

20     A   I don't remember, because I would

21  have to look and see.  I would imagine there

22  would be something in the discovery documents,

23  but I don't know.

24         MR. LEVINSTEIN:  You don't know if you

25  did?

---

1          Q   (BY MR. UESUGI)  If you received

2  this letter -- did you receive this letter by

3  e-mail from Dae Sung Lee?

4      A   I don't remember.

5      Q   If this were an e-mail, would you

6  have saved the e-mail information, to, from,

7  dates, subject and all of that information?

8      A   I think so.

9      Q   So in your opinion, was this a

10  regular letter or was it an e-mail?

11     A   I don't know.

12         MR. LEVINSTEIN:  Could have been an

13  attachment to an e-mail, is all I'm suggesting,

14  because it's not signed if you note.

15         MR. UESUGI:  Okay.  Whatever.  Exhibit

16  next in order.

17         (Exhibit 60 was marked.)

18     Q   (BY MR. UESUGI)  What is this

19  document?

20     A   This was based on the selection

21  procedures, you can see that the USTU, I would

22  forward the nominee to the USTU governance and

23  management committee for their vote.

24     Q   So you nominated Jean Lopez and

25  sent out this ballot?

---

1          THE DEPONENT:  I don't know.

2          MR. UESUGI:  Well, we looked through

3  the discovery documents and there was no response

4  produced.

5      Q   (BY MR. UESUGI)  Would that

6  indicate to you that you did not respond?

7      A   Don't know.

8      Q   Because if you wrote a response,

9  it would have been produced; is that correct?

10     A   Yeah, I would think so.

11     Q   I'm going to hand you --

12         MR. LEVINSTEIN:  For the record, this

13  was an e-mail?  I believe it's talking about via

14  e-mail on the documents.  So there may have been

15  an e-mail response, there may not have been.  I

16  just wanted, for the record, to indicate that

17  there's an e-mail indication below the cc's on

18  the last page.

19         MR. UESUGI:  That says cc via e-mail.

20         MR. LEVINSTEIN:  It says cc to three

21  people.  Then it says via e-mail.  So presumably,

22  this document doesn't have letterhead like the

23  other letter does, so it's just hard to tell.  I

24  don't know if that helped anything, but this

25  might have been an e-mail and not a letter.

---

1      A   Yes, I did.

2      Q   And again, you only put Jean

3  Lopez's name on there?

4      A   Yeah, because there's only one

5  head coach designation.

6      Q   And this was a vote, right?  In

7  elections when you're voting, there isn't usually

8  two candidates?

9          MR. LEVINSTEIN:  Objection.

10     A   It's ratifying a position that I

11  was recommending.

12     Q   (BY MR. UESUGI)  So this wasn't a

13  vote then?

14         MR. LEVINSTEIN:  Objection.

15     Q   (BY MR. UESUGI)  Says here, please

16  download this ballot and return via fax to the

17  USTU office.

18         MR. LEVINSTEIN:  They had to vote,

19  agree, disagree or abstain.  That's a vote.

20         MR. UESUGI:  Fine.

21     Q   (BY MR. UESUGI)  Was Jean Lopez

22  ratified by the G&M committee?

23     A   Yes.

24     Q   Was it unanimous?

25     A   I would have to check the

**Page 233 (left column)**

1  records, but I believe it was.

2      Q    Juan Moreno didn't abstain

3  initially from the vote?

4      A    That, you would have to look at

5  the minutes, if there were any minutes or any

6  correspondence.  I don't remember.

7      Q    Was there a meeting with respect

8  to this vote, such that minutes would have been

9  generated?

10      A    That, I don't know.

11     (Exhibit 61 was marked.)

12      Q  (BY MR. UESUGI)  What is this?  Is

13  this all one long e-mail or is this a series of

14  e-mails?

15      A    Can I read?

16      Q    It's hard to tell.

17      A    Can I read it?

18      Q    Yes, you can.  Are these all one

19  e-mails or -- I can't tell.

20      A    It looks like it's a continuous

21  e-mail, but I really don't know.

22      Q    Okay.  I guess that really

23  doesn't matter.  There is one here on the first

24  page from you, Bob Gambardella to Steven M.

25  Locke, did you write that e-mail?

**Page 235 (right column)**

1  it from that.

2     MR. UESUGI:  Okay.

3      Q    (BY MR. UESUGI)  About whether you

4  could vote via e-mail or fax.  And then there's

5  an e-mail here from you.  It's on USTU page

6  00014.  Says, on page 14 of the bylaws, it states

7  that yes, sent out by e-mail.  However, it needs

8  to be signed by the EXCOM members.  Do you see

9  that?

10      A    Yeah, they're referring to the US

11  Olympic Committee bylaws.

12      Q    And what is EXCOM?

13      A    Executive committee members.

14      Q    And in your opinion, the

15  executive committee of the -- is this referring

16  to the executive committee of the USOC or the

17  USTU?

18      A    The US Olympic Committee.  They

19  have to approve all selections.

20     MR. LEVINSTEIN:  It might help -- I

21  think he's trying to draw some parallel to what

22  the USOC bylaws say about e-mail ballots.  That's

23  why he's referring to that.  But the next part I

24  think is about mailing, just what procedures they

25  follow by e-mail.

**Page 234 (bottom left column)**

1      A    Yes, I did.

2      Q    Is this the first time -- is this

3  who you nominated Jean Lopez as the 2004 Olympic

4  coach?

5      A    Well, I think it probably went

6  concurrently with the letter or maybe it was

7  beforehand.  I don't remember.  I mean, but the

8  dates show that there is a time stamp of the 7th

9  and then this went out on the 9th.  Or was dated

10  the 9th.  Could have been sent out earlier but

11  dated on the 9th.

12      Q    Weren't you in Korea on the 9th?

13      A    I might have been.  I might have

14  been at the Junior Worlds, but I don't know the

15  exact dates.

16      Q    Was this about the time you

17  nominated Jean Lopez as the Olympic coach,

18  June 7, 2:08 p.m.?

19      A    Yeah, Monday, when we got back

20  from San Jose.

21      Q    And then there's some kind of

22  discussion about whether you can vote via --

23     MR. LEVINSTEIN:  Just for the record,

24  the reference to him going to Korea was on

25  Wednesday, if you read the e-mail and try to get

**Page 236 (bottom right column)**

1      Q    (BY MR. UESUGI)  Why didn't you

2  look at the USTU bylaws?

3      A    Again, this is a US -- when you

4  make a nomination, you take that nomination to

5  the US Olympic Committee.  And they're the ones

6  who will approve all recommendations for their

7  Olympic teams or any Pan Am or Olympic teams.

8      Q    Who are you talking about here in

9  the voting?  Are you talking about the G&M

10  committee voting to ratify Jean Lopez's

11  nomination or are you talking about the USOC

12  executive committee ratifying the USTU's proposed

13  coach?

14      A    The governance and management

15  committee's ratification on this one.  They may

16  not be -- they may be separate e-mails.

17      Q    And why didn't you look at the

18  USTU bylaws?

19     MR. LEVINSTEIN:  For the record, it's

20  hard to know what he was doing there, because the

21  note's attached to Steve Locke's thing saying,

22  see Bob's note below re electronic voting on

23  resolutions.  He wasn't responding to an e-mail.

24     MR. UESUGI:  That's why we're asking

25  him, that's why he's here.  Because it's unclear,

1   that's why we're asking him.
2           MR. LEVINSTEIN:  If he remembers.
3       A    I don't remember, because there
4   could be some, you know, something to do with the
5   USOC EXCOM voting on approving the nomination of
6   a coach.
7       Q    (BY MR. UESUGI)  It's just
8   confusing.  I'm just trying to clear it up.  I'm
9   not trying to trap you or attack or anything like
10  that.  I just want to know what happened, this
11  process of approving the Olympic coach, okay?
12          MR. LEVINSTEIN:  We're not going to say
13  okay as to what your intentions were.  We heard
14  your representations.  Go ahead.
15      Q    (BY MR. UESUGI)  Was the ballot
16  filled out?
17      A    Yes.
18      Q    Where are they?  Why weren't
19  those produced?
20      A    I don't know.
21      Q    Do you still have them?
22      A    I think I have them, yes, I do.
23  I can go back and look for them.
24      Q    Signed, dated, with the printed
25  name and the date of the ballot?

1       A    Again, I would have to go back
2   and look.  I don't know.  But I'll be more than
3   happy to go back and look.
4           MR. LEVINSTEIN:  We will look for the
5   balls.  We produced everything that was found
6   that was responsive, but we didn't see the
7   balls.
8       Q    (BY MR. UESUGI)  At what point did
9   you bring in -- strike that.
10          When did you tell Mr. Dae Sung Lee
11  about Jean Lopez being selected for the coach
12  position?
13      A    I cannot remember, so I don't
14  know.
15      Q    I'm going to show you exhibit
16  next in order.
17          (Exhibit 62 was marked.)
18      Q    (BY MR. UESUGI)  Do you remember
19  receiving this letter?
20      A    Yes, I do.  July 19th, yes.
21      Q    And this letter you responded to,
22  did you?
23      A    I believe I did, but I can't be
24  certain.
25      Q    You don't remember?

1       A    I don't remember.
2       Q    But you do remember responding to
3   Dae Sung Lee's inquiries about his Olympic
4   coaching position?
5       A    What dates are you talking about?
6   Earlier correspondence?
7       Q    Do you remember responding to
8   Mr. Dae Sung Lee about Jean Lopez being selected?
9   Did you ever tell him?  Do you remember that?
10      A    I cannot remember.
11          MR. LEVINSTEIN:  Is this third page
12  attached to this exhibit on purpose?
13          THE DEPONENT:  It doesn't make sense.
14          MR. LEVINSTEIN:  You gave me three
15  pages and the last one is some e-mails.
16          MR. UESUGI:  Right.  If you read the
17  letter, it refers to this e-mail.  And on the
18  bottom of the page 2, it says enclosures.  That's
19  the enclosure.
20          MR. LEVINSTEIN:  I'm sorry.  Okay.  Let
21  me look.  The e-mail from Michelle Farrell to
22  Mr. Harris.  Okay.  It's not at this time, it's
23  an old e-mail.
24          MR. UESUGI:  Right.  It was an old
25  e-mail attached to the July 19, 2004 letter.

1           MR. LEVINSTEIN:  Okay.
2       Q    (BY MR. UESUGI)  At what point did
3   you consider Chul Ho Kim to be an additional
4   coach?
5       A    Our committee, we talked about
6   that there were certain issues with Nia.  And
7   apparently again, this is before my time,
8   something happened with Nia and Diana.  I don't
9   know what happened, but there was some bad
10  feelings that existed.  And there was some
11  potential problem with Nia's mother and Jean
12  Lopez.  And so at that point we felt that it
13  would be important to fund another position to
14  try to help us along with smoothing that out.
15      Q    Nia's mom and Jean Lopez didn't
16  get along, they were having some problems?
17          MR. LEVINSTEIN:  Objection.
18      A    Again, that's, you know -- I
19  didn't experience it or witness it.  It's just
20  kind of what I've heard, there was some
21  questions.
22      Q    (BY MR. UESUGI)  You didn't
23  receive an e-mail from Nia's mom expressing
24  concern about the selection of Jean Lopez as head
25  coach?

**Page 241**

1        A     I had a conversation with her on
2    the phone.
3        Q     What did she say?
4        A     We talked about just that there
5    were some problems in the past with Diana and
6    Nia.  And she had some concerns.  I believe I was
7    in the airport, the Chicago O'Hare airport, and
8    we had a long conversation.  And I don't remember
9    where I was going on that trip.  And I said that
10   we would talk about it.  And I maybe was going to
11   the Junior Olympics.  I believe it was the Junior
12   Olympics, and we would talk about it and we'd
13   bring it forward with the governance and
14   management committee.
15        Q     At that point, did you recognize
16   that there was a potential conflict of interest
17   with Jean Lopez being selected as the coach due
18   to Nia's mom's --
19        A     No.
20        Q     -- concerns as expressed to you?
21        A     No.
22        Q     In your opinion, is there a
23   conflict?  Does a conflict of interest exist with
24   Jean Lopez coaching Nia Abdallah?
25        A     No.

**Page 242**

1        Q     Why not?
2        A     Because I felt that it was
3    something that we would be able to work out.
4        Q     What standard is used in deciding
5    whether a conflict of interest exists; do you
6    know?
7        MR. LEVINSTEIN:  Objection.
8        A     I don't know.  I don't know how
9    to answer.
10       MR. LEVINSTEIN:  Conflict of interest
11   doesn't apply at all, just for the record.
12       Q     (BY MR. UESUGI)  Well, if there's
13   an appearance of impropriety, would you take that
14   into consideration?
15       MR. LEVINSTEIN:  Objection, there's
16   nothing in the record that suggests that there's
17   any impropriety in the fact that a coach may have
18   had some prior problem with an athlete, doesn't
19   create a conflict of interest or any impropriety.
20   Lots of coaches have had disputes with athletes
21   and none of it has anything to do with conflict
22   of interest.
23       THE DEPONENT:  Can we take a break,
24   please?
25       MR. UESUGI:  Yes.

**Page 243**

1        (A recess was taken from 2:23 p.m. to
2    2:34 p.m.)
3        MR. UESUGI:  Back on the record.
4        Q     (BY MR. UESUGI)  I'm sorry for
5    skipping around, but I have to go back to
6    something in the selection procedures, Exhibit
7    10.  It's attached to your letter of April 8th,
8    2004.
9        MR. LEVINSTEIN:  You can look at my
10   copy.  Is that the same one?  Let's not separate
11   it from the exhibit, because she's eventually
12   going to have to have it.
13       THE DEPONENT:  I think it's up more.
14   It's right around this one here.
15       MR. LEVINSTEIN:  Let's keep it together
16   for the court reporter later.
17       Q     (BY MR. UESUGI)  When we're
18   talking about the criteria, you stated that you
19   had empirical evidence.  And based on that
20   empirical or experience, you felt that the
21   selection procedure was the way to go as far as
22   the USTU; is that correct?
23       A     Well, you brought up the word.
24       Q     Empirical?
25       A     Empirical, exactly.

**Page 244**

1        Q     What empirical evidence did you
2    have when you were reviewing or approving the
3    selection procedure process?
4        A     Basic just general principles of
5    whatever experience over the years, so there
6    isn't anything in particular per se.  As it
7    states, we're selecting a coach, okay.  And based
8    on the number of athletes that have placed on the
9    2004 Olympic team, and if there's a tie there,
10   then we're going to look at the competition
11   records based on the 2003 World Championships and
12   the Pan American Games.  So it's fairly -- it's
13   fairly -- outlined very simply right there.
14       Q     We're looking at the basis of
15   creating these criteria.  Do you have any
16   empirical evidence with respect to Taekwondo?
17       A     No.  As I said, just generally
18   speaking, there's not one thing I could pull
19   from.
20       Q     How about in volleyball, do you
21   have any empirical evidence that shows that a
22   coach paired with their athlete results in a gold
23   medal?
24       MR. LEVINSTEIN:  Objection.
25       A     No.  Actually, you cannot really

**Page 245**

```
1    compare a team ball sport with an individual
2    combative sport.  They're just two different
3    sports altogether.
4         Q    (BY MR. UESUGI)  Okay.  So the
5    athlete pipeline is completely different for
6    volleyball?
7         A    You're talking about a coach.
8         Q    Okay, coaching.
9         A    We're not talking about an
10   athlete pipeline.
11        Q    Okay.
12        A    So in these two instances,
13   they're totally different.  But if you'd like to
14   offer an opinion to me, I'd like to hear it.
15        Q    Okay.  So the selection -- so
16   there's no crossover between volleyball and
17   Taekwondo as far as selecting coaches criteria?
18        A    Again, I will state here that
19   volleyball is a team ball sport and Taekwondo is
20   an individual combative sport.
21        Q    Were you ever involved in any
22   individual sports?
23        A    My only involvement, as I say,
24   was at US Olympic Committee sport partnership.
25   And I was working with figure skating.
```

**Page 247**

```
1         (Exhibit 63 was marked.)
2         Q    (BY MR. UESUGI)  Can you read the
3    last paragraph for me on page 1?
4         A    Juan Moreno joined the call and
5    discussion began on the letter from Olympic
6    athlete Nia Abdallah asking that her current
7    coach be available to coach her at Athens.  Kelly
8    pointed out that Jean Lopez is qualified to be
9    Olympic coach under the US's coaches selection
10   procedure and has been recommended to the USOC
11   board of directors for approval.
12        There is only one coaching credential
13   available for USTU.  The committee voted
14   unanimously to direct USTU to allocate funds
15   necessary to send coach Chul Ho Kim to the Malta
16   training camp and the Athens games to work with
17   Nia Abdallah.  She will be advised that he,
18   meaning Coach Kim, will not be able to coach her
19   at ringside during the competition, but they will
20   have access to the training facility at the
21   American College of Greece.  Bob will work with
22   Nia to make sure she has training partners at the
23   OTC leading up to the games.
24        Q    Is that what Nia was told, that
25   Coach Chul Ho Kim won't be able to coach her at
```

**Page 246**

```
1         Q    Okay.  In figure skating do they
2    pair athletes with their coaches at the Olympics?
3         A    I cannot remember exactly how
4    they do their selection criteria, but that's
5    something that you would have to talk to the US
6    Figure Skating about.
7         Q    Okay.  So that wasn't a factor
8    when you were reviewing this, what figure skating
9    did?
10        A    No.
11        Q    Any other individual sports that
12   you were associated with?
13        A    No.
14        MR. LEVINSTEIN:  You're talking about
15   Olympic sports?  Clearly he was involved in
16   teaching boxing and so on.
17        Q    (BY MR. UESUGI)  How about in
18   boxing?  To your knowledge, do they pair coaches
19   with their athletes?
20        A    One, I can't speculate on that
21   because I don't know anything about how they do
22   their selection procedures.
23        Q    Okay.  Fair enough.  Let's get
24   back to Nia and the appointment of Chul Ho Kim.
25   I'm going to give you exhibit next in order.
```

**Page 248**

```
1    the Athens games because there's only one
2    coaching pass?
3         A    I think so.
4         MR. LEVINSTEIN:  At ringside.
5         A    At ringside, yes.
6         Q    (BY MR. UESUGI)  When was she told
7    that?
8         A    I don't know.
9         Q    Was she told that in Athens?
10        A    I don't know.
11        MR. LEVINSTEIN:  He said he didn't
12   know.
13        Q    (BY MR. UESUGI)  Did you
14   subsequently tell her that you were working on
15   getting Coach Chul Ho Kim a coaching credential?
16        A    We tried through the US Olympic
17   Committee to get other credentials.
18        Q    What steps did you take to get
19   Coach Kim a coaching credential for Athens?
20        A    Well, I went to Doug Ingram.
21        Q    Who's that?
22        A    He's the managing director of
23   international games, who actually has the
24   knowledge of the number of credentials that could
25   be available throughout the games.
```

1     Q    He works for the USOC?
2     A    Yes, he does.
3     Q    And what did he say?
4     A    He said that there's nothing
5  available, coaching credentials.
6     Q    When did you have this
7  conversation with him?
8     A    I don't know.  It was at some
9  time before the games.
10     Q    Was it before you left for Malta?
11     A    There might have been an
12  instance, but I can't remember.
13     Q    Any other efforts to secure a
14  coaching pass for Coach Kim?
15     A    Yes.  During when we arrived into
16  Athens, I would check with sport partners, sport
17  partnership division, to see if there was
18  anything available.
19     Q    Who, Kelly Skinner?
20     A    Sport partner, yes.  Kelly
21  Skinner, yes.
22     Q    What did he say?
23     A    They said they're going to check
24  on it.
25     Q    Did he get the coaching pass?

1     (Exhibit 64 was marked.)
2     Q    (BY MR. UESUGI)  It is a document
3  from the USTU web page written by Kevin Wilson,
4  USTU intern, dated July 27, 2004, announcing that
5  the US Olympic Taekwondo team is starting a
6  four-day mini-camp for Athens, Greece.  Do you
7  recognize this?
8     A    I recognize Kevin Wilson, who
9  wrote it.  It must have been on our website.  I
10  don't remember it specifically.
11     Q    I'm more concerned about page 2.
12  It lists Jean Lopez, National Team head coach.
13  Do you see that?
14     A    Right.
15     Q    Is this the first time that the
16  USTU had announced that Jean Lopez was the
17  National Team coach, July 27, 2004?
18     A    What we had to wait for was the
19  USOC giving their approval on announcing a coach.
20  So whenever that was, then that probably was
21  announced right after.  We cannot, you know, give
22  any details as a who's, what and where, until
23  it's been approved by the US Olympic Committee.
24     Q    So you cannot keep the membership
25  informed, you wouldn't say the G&MC committee

1     A    No coaching pass.  No coaching
2  credential.
3     Q    What happened?  Why not?
4     A    I don't know.  I can't speculate
5  as to why.
6     Q    Anything else you did?
7     A    Excuse me?
8     Q    Anything else you did to secure a
9  coaching credential for Coach Kim?
10     A    Well, based on everything that we
11  tried to do, I think we exhausted every avenue
12  while we were there.
13     Q    Were you keeping Nia informed of
14  the progress of getting the coaching pass for
15  Coach Kim?
16     A    I think we've had conversations,
17  yes.  To what extent, I don't remember.
18     Q    So you never promised that she
19  would get -- you would get a coaching pass for
20  Coach Kim?
21     A    I don't think I would put myself
22  in that position to promise her, no.  But I
23  cannot remember.
24     Q    I'm going to show you what will
25  be marked as exhibit next in order.

1  voted on Jean Lopez on June 9 and his name was
2  submitted?  So that would be inappropriate in
3  your opinion?
4     MR. LEVINSTEIN:  Objection.
5     A    Yes.
6     Q    (BY MR. UESUGI)  Until the final
7  approval from the USOC executive committee came
8  through, you weren't going to announce it?
9     A    Correct.
10     MR. LEVINSTEIN:  Objection.  Just to
11  correct the record, it wasn't the executive
12  committee, because it was July 2.  There was no
13  executive committee by then, but just to clarify.
14     Q    (BY MR. UESUGI)  When did the USOC
15  approve of Jean Lopez's selection as the Olympic
16  coach?
17     A    I don't know that.
18     MR. LEVINSTEIN:  For the record,
19  there's some suggestion it was anticipated in
20  Exhibit 63, if that helps.
21     Q    (BY MR. UESUGI)  Right.  In the
22  minutes of the G&MC committee dated July 1?
23     MR. LEVINSTEIN:  It says it may happen.
24     A    Just may happen.  I don't think
25  it happened on that date.  I don't know.

1    Q    (BY MR. UESUGI)  When did it
2  happen, do you know?
3    A    I don't know.
4    Q    So from your personal knowledge,
5  this is the first time that Jean Lopez was
6  formally recognized as the Olympic coach,
7  July 27?
8    MR. LEVINSTEIN:  Before you go on, I
9  may interrupt.  There is a letter in which he
10  indicates to Dae Sung lee the date of approval.
11  So there's some document that you have that
12  answers that question in case.
13    A    Yeah, I believe there is.
14    MR. UESUGI:  Okay.  Sometimes documents
15  have mistakes in them.
16    MR. LEVINSTEIN:  I understand.  But you
17  did suggest this wasn't a memory test and wasn't
18  an attempt to confuse him.  I just wanted to
19  suggest that there is a document that answers
20  that question.
21    Q    (BY MR. UESUGI)  It says here, the
22  last line, team leader, Colorado Springs,
23  Colorado.  Do you see that?
24    A    Yes, I do.
25    Q    When were you selected as the

1  were.  As I said, we named him based as a head
2  coach and due to the situation that occurred with
3  less credentials, he had to double up as a team
4  leader.
5    Q    Whether or not he had any prior
6  team leader experience or not?
7    A    Yes.
8    Q    You don't think experience as a
9  team leader is important?
10    A    I think, depending on knowing how
11  to organize and keep things moving in a positive
12  direction, I think is important.  And as we were
13  going through this, we had several conversations
14  about certain logistical things because I
15  couldn't get into the athlete --
16    Q    Athlete village?
17    A    -- athlete village, either.  And
18  that's where a lot of the team leader functions
19  would happen is inside the village.
20    Q    Well, it says here on the
21  document, the 2004 US Olympic team consists of,
22  and then the last line says, Bob Gambardella,
23  team leader?
24    A    Yeah.
25    Q    What about that?

1  team leader of the US Taekwondo Olympic team?
2    A    Well, I wasn't selected as the
3  team leader for the US Olympic team.  I was the
4  team leader for the trip of getting athletes to
5  Malta, getting them on the planes and organizing
6  those types of things prior to the competition.
7    Q    So you weren't the team leader
8  for the Taekwondo?
9    A    No, I was not named the team
10  leader.  As I said, the head coach had to assume
11  those duties as a team leader.  However, I did --
12  when we went to Malta, you know, I made all the
13  arrangements.  And then I kind of led the team,
14  you know, to Malta and tried to help pave the way
15  for having a good camp prior to the Olympic
16  Games.  And once we hit the ground in Athens,
17  then it was Jean Lopez that took over those
18  duties.
19    Q    So Jean Lopez functioned as the
20  team leader in Athens, Greece?
21    A    Yes.
22    Q    Do you know what was his
23  experience as team leader prior to his
24  appointment as the Olympic coach 2004?
25    A    I don't know what his experiences

1    MR. LEVINSTEIN:  It's the article about
2  the mini-training camp.  It's him playing intern.
3  You want to ask more questions, he answered them.
4    Q    (BY MR. UESUGI)  So you weren't
5  the team leader, right?  Okay.
6    MR. LEVINSTEIN:  Couldn't get into the
7  village.
8    A    No, I wasn't the team leader for
9  the Olympic Games.
10    MR. LEVINSTEIN:  Couldn't be the team
11  leader because he couldn't get into the village.
12    Q    (BY MR. UESUGI)  Let's talk about
13  the Malta trip.  How was that arranged?
14    A    Talk about what?  I'm sorry.
15    Q    Malta, trip to Malta.
16    A    How was that arranged?
17    Q    Yes.
18    A    Which aspect?  What do you want
19  to know specifically?
20    Q    Why Malta?
21    A    Why Malta?
22    Q    Yeah.
23    A    Well, let's see, No. 1, same time
24  zone as Athens.  Pretty much the same
25  temperature, you know, the environment.  Thirdly,

1   what happened was that one of my students in my
2   IOC program works for the Malta Olympic Committee
3   and was gracious enough to help us put something
4   together as a pre-staging for the Olympic Games.
5        Q    Do you know if anybody from Malta
6   participated at the Olympic venue in Athens as a
7   competitor?
8        A    Don't think so.  I don't know.
9        Q    When you went to Malta, you
10  didn't train with the Malta Olympic team?
11       A    No, we didn't.
12       Q    Why not?
13       A    Why?  Because the coach wanted to
14  have opportunity just to get in the same time
15  zone and environment and just train with no
16  distractions prior to the Olympic Games.
17       Q    Who was that, Jean Lopez?
18       A    Jean Lopez, yes.
19       Q    How much input did Chul Ho Kim
20  have in making decisions with regard to the
21  Olympic team?
22       MR. LEVINSTEIN:  Objection, vague and
23  ambiguous.
24       Q    (BY MR. UESUGI)  Did Jean Lopez
25  make all the coaching decisions?

1        A    At the end of the day, yeah, I
2   mean, he made all final decisions with input from
3   Chul Ho Kim.
4        Q    What did you do in Malta as far
5   as what type of training was done in Malta?
6        A    Some of the same training we see
7   going on right now with the world championship
8   team, lots of line drills, some sparring, those
9   types of activities.
10       Q    Did you observe those practices?
11       A    Yes, I did.
12       Q    All of them?
13       A    Yes, I did.
14       Q    Okay.  There was mention about a
15  seminar with the Malta Taekwondo Association.
16  What was that about?
17       A    Oh, well, as part of our trip
18  there, we wanted to give, I don't know, maybe a
19  two-, three-hour clinic to the Taekwondo
20  Federation in Malta as a way of basic Olympic
21  solidarity.
22       Q    Who showed up from the Malta
23  Taekwondo Association?
24       A    I don't remember.  I believe the
25  executive director or the president.

1        Q    No, no, I'm talking about the
2   participants.
3        A    Athletes, I think there might
4   have been a handful of athletes.  I can't quite
5   remember the exact number, but maybe six, seven,
6   eight athletes.
7        Q    And in your opinion that enhanced
8   the probability of winning medals at the Olympic
9   Games?
10       A    No.  It was an Olympic solidarity
11  effort to try to build a relationship with
12  another Olympic committee, that's all it was.
13       Q    Were you aware of any complaints
14  about the Malta trip, people were asking why
15  Malta amongst the Olympic team members?
16       A    Not that I was aware of.
17       Q    Would there be -- was there any
18  discussion about training with any other
19  countries, Germany, France, a team that would be
20  sending competitors to the Olympics?
21       A    No.
22       Q    Why not?
23       A    It has never, never, never
24  occurred, we never talked about it.  This was
25  just an ideal situation, get as close to the

1   proximity of Greece and we wanted to acclimate
2   ourselves from that perspective.
3        MR. LEVINSTEIN:  For the record,
4   there's no talk about training with Malta, so the
5   other words assumes facts not in evidence.  They
6   simply went to a country and trained there.
7        A    That's all we did.
8        Q    (BY MR. UESUGI)  Did the training
9   camp in Malta result in a unified team?
10       A    In my opinion, yes.
11       Q    How so?  How did the Malta trip
12  unify the team?
13       A    Well, I mean, you can't focus on
14  everything, however, you can just watch and see
15  the interactions between different team members
16  and see them be positive.  Based on my opinion,
17  you know, what I saw, and then the feedback that
18  I would get from the head coach.
19       Q    You weren't getting any feedback
20  from Nia Abdallah that she was having some
21  conflicts with Jean Lopez as her head coach?
22       A    No.
23       Q    You didn't get any feedback from
24  Chul Ho Kim about the situation with Jean Lopez
25  and Steve Lopez?

**Page 261**

```
 1        A    No, no.
 2        Q    Everything was fine, according to
 3   you?
 4        A    Yes.
 5        Q    You stayed there for how long?
 6        A    Maybe nine days.
 7        Q    And then you went to Athens?
 8        A    Yes.
 9        Q    When was that?
10        A    I think I want to say August 8th,
11   but I can't be for sure.  8th or 9th, I don't
12   know.
13        Q    And you stayed there until?
14        A    Till the end of Olympic Games, so
15   whenever the closing ceremonies were.
16        Q    You left the next day or that
17   same day?
18        A    I think the next day.
19        Q    Okay.  How was the training in
20   Athens?  Did you have an opportunity to observe
21   the training in Athens?
22        A    I went to all practices, yes.
23        Q    How was it?
24        A    I thought it went well.
25        Q    No conflicts between Nia and
```

**Page 263**

```
 1        Q    Okay.  Did you have a
 2   conversation with Nia about that?
 3        A    I can't remember.
 4        Q    Did you let her stay outside of
 5   the village?
 6        A    No, she stayed in the athletes
 7   village, yes.
 8        Q    Why is that?
 9        A    Just security reasons overall,
10   basic security reasons.
11        Q    Is that what the Olympic handbook
12   says, that athletes may not stay outside of the
13   village?
14        A    I don't know.
15        Q    Are you aware of any other
16   athletes that stayed outside of the village?
17        A    No.  I don't know that.
18        Q    Where did you stay?
19        A    I stayed at the American College
20   of Greece, in a kitchen.
21        Q    In the kitchen?
22        A    Yeah.
23        Q    Who else stayed with you?
24        A    Chul Ho Kim and Mark Lopez roomed
25   together.  And Jamie Houston had her own room.
```

**Page 262**

```
 1   Jean?
 2        A    Not to my knowledge.  Not to
 3   my -- I never saw anything like that.
 4        Q    No conflicts between Nia and
 5   Steven?
 6        A    No.
 7        Q    No conflicts between Chul Ho Kim
 8   and Steven Lopez?
 9        A    No.
10        Q    No conflicts between Chul Ho Kim
11   and Jean Lopez?
12        A    No.
13        Q    Were you ever informed that on
14   one occasion or at least one occasion Nia
15   Abdallah requested that she stay with Jamie
16   Houston, her training partner, rather than stay
17   in the Olympic Village?  Do you remember that?
18        A    I vaguely remember something
19   along that line, yes.
20        Q    Do you know why Nia wanted to
21   stay outside of the village?
22        A    No.
23        Q    It had nothing to do with either
24   Jean or Steven Lopez?
25        A    Tell me.  I don't know.
```

**Page 264**

```
 1        Q    Were they in a room or -- were
 2   you in the kitchen of the college or --
 3        A    I was in the kitchen of the
 4   apartment, yes.
 5        Q    By choice?
 6        A    By choice, yes, to give the
 7   athletes and them, you know, the best rooms
 8   there.
 9        Q    And where were the practices
10   conducted?
11        A    The practices were conducted at
12   the American College of Greece.
13        Q    Where you were staying?
14        A    Yes.
15        Q    Was there someone staying with
16   you in your room during the Olympics?
17        A    Yes, Pano.
18        Q    Who is that?
19        A    He was a young athlete who was in
20   Athens.  And I -- his parents called me to see if
21   there was anything we could do for this young
22   man.  I didn't know any hotels, so we offered him
23   the couch in the apartment.
24        Q    Why didn't you take the couch?
25   Why were you in the kitchen?
```

1     A    Because.
2     MR. LEVINSTEIN:  Please don't answer
3  that question.
4     MR. UESUGI:  I was joking.
5     Q    (BY MR. UESUGI)  Is he an athlete?
6  Is he an Olympic athlete?
7     A    No, he's not an athlete.
8     Q    Just a tourist?
9     A    He was a young kid who's
10  participated in US Taekwondo events, yeah.
11     Q    Did you manage to secure a
12  credential for yourself?
13     A    Yes, a GT credential.
14     Q    What does that mean?
15     A    That means that you can get into
16  a competition site, but you have no other access
17  anywhere else.
18     Q    The competition site meaning?
19     A    Meaning getting into the --
20  getting in.  If there's a seat available, you can
21  sit there.
22     Q    In the venue?
23     A    Yes.
24     Q    It's not a VIP pass?
25     A    No.

1     Q    Why wasn't Jean Lopez handling
2  that responsibility?
3     A    Because it was the people who
4  were not in the village, so I was the point of
5  contact staying there.  And it would be better
6  managed by myself, you know, outside at the
7  American College of Greece.
8     Q    What team leader functions did
9  Jean Lopez do while in Athens?
10     A    Checked on scheduling, just all
11  of the things that occurred.  Meetings with, you
12  know, delegation meetings, you know, things of
13  that sort.
14     Q    Anything else?
15     A    I don't remember.
16     Q    What did you do while in Athens
17  with respect to the US team?  You reimbursed them
18  for their --
19     A    Right.
20     Q    -- actual expenses?
21     A    Right.
22     Q    Anything else?
23     A    I would help.
24     MR. LEVINSTEIN:  You want to know what
25  he did for 21 days while in Athens?

1     Q    How did you get that pass?
2     A    Well, about 11 days into the
3  Olympic Games, or I don't know exactly, but it
4  was a number of days, because everywhere we had
5  to go, we walked to the practices and things of
6  that sort.  And then one came available because
7  it's a GT, which means -- T means it's
8  transferable.  And apparently one came up and
9  they saw that we needed some help and they gave a
10  GT credential to me.
11     Q    Why didn't you give it to Chul Ho
12  Kim?
13     A    Because basically he had tickets
14  and his tickets were going to get him the same
15  place they got me.
16     Q    Did the coaches -- did Chul Ho
17  Kim receive a per diem?
18     A    What we did was we paid actual
19  expenses on all meals that was for everybody.  So
20  basically throughout the whole time.  And anyone
21  wanted anything, I gave them the money and they
22  gave me a receipt.  And that's how we handled it
23  and it's all documented.
24     Q    And this was in Athens?
25     A    Yes, it was in Athens, yes.

1     Q    (BY MR. UESUGI)  In general.  In
2  general, what was your function?
3     A    Basically to try to keep the
4  non-credentialed athletes and coaches and staff
5  just on schedule, basically what was going on.
6  So it was just a constant communication of all,
7  you know, all the credentialed folks and the
8  non-credentialed working together and getting
9  people to certain areas, you know, throughout the
10  time we were there.
11     Q    Actual expenses.  So they would
12  have to go out and buy something, give you the
13  receipt and then you would reimburse them?
14     A    No, no.
15     Q    How did it go?
16     A    I always gave them the money
17  upfront and they can have whatever they want.
18     Q    Did you give them money upfront
19  every day or weekly?
20     A    Whenever they wanted money, okay,
21  I would sit down and give it to them.  The only
22  proviso was please get me a receipt back.
23  Because if I don't get a receipt, then I've got
24  to pay for it.
25     Q    Did you get them also tickets?

1  Did you provide tickets to the venue?

2         A    Yes.  One of the things that did

3  happen with the USTU prior to my arrival was that

4  they did reserve tickets, yes.

5         MR. LEVINSTEIN:  He means prior to

6  coming to the games.

7         A    Something that was already in

8  place.

9         MR. LEVINSTEIN:  Not before Athens.

10        Q    (BY MR. UESUGI)  So tickets were

11  available for Chul Ho Kim?

12        A    Yes.  Friends, family.  Yes, yes.

13        Q    The two training partners?

14        A    Yes.

15        Q    How were those tickets doled out?

16  Did they just give them the three days, all the

17  tickets?

18        A    We just give them to them as

19  needed.  It was pretty much just give them the

20  tickets.

21        Q    Was the ticket good for morning

22  session, afternoon session?  Was there separate

23  tickets for that?

24        A    I honestly don't remember.  But I

25  think that they were tickets for morning session

1  people were needing tickets and they didn't have

2  them in the afternoon sessions?

3         A    No.

4         Q    That didn't come up to you?

5         A    No.

6         Q    Okay.  Who fought first at the

7  Olympics, Nia or Steven?

8         A    I believe Nia did.

9         Q    And Jean coached Nia?

10        A    Yes.

11        Q    At the venue, was it possible for

12  Chul Ho Kim to coach Nia from the stands?

13        A    I couldn't tell you.  I don't

14  know.  I don't know.

15        Q    Were you aware that Chul Ho Kim

16  attempted to coach Nia from the stands?

17        A    No, I was not aware of that.

18        Q    After the competition was

19  completed, there was an interview with

20  television, American television.  Were you aware

21  of that?

22        A    There were several interviews

23  throughout the whole time, but I'm not aware of,

24  you know, specifics, yeah.

25        Q    Was there a press conference with

1  and afternoon session.  But again, I just

2  can't --

3         Q    Would you give the tickets for

4  the morning and the afternoon session in advance?

5         A    I don't remember what I did.

6         Q    Because there was some -- were

7  you aware of some disappointment, I guess, in the

8  fact that some of the Olympic team members or the

9  training partners stated that you would give them

10  the ticket in the morning, then you disappeared

11  in the afternoon and they were stuck outside the

12  venue; they couldn't even get in?

13        A    I don't know.

14        Q    Were you aware of that?

15        A    No, I wasn't aware of that.  I

16  know one instance where I'm standing up on some

17  sort of a pole trying to find Jamie Houston,

18  saying, Jamie, where are you?  And she's saying,

19  I'm over here.  And I'm looking over where I

20  think she is and she's not there.  And she was

21  already inside the venue.  So there was just a

22  communication error that existed.  But if that's

23  the one that you're talking about, I think that

24  we handled it as best as we could.

25        Q    Okay.  Were you aware that some

1  the US Taekwondo team?

2         A    No, each athlete had their own

3  press conferences individually.  I believe that

4  that's how it went.

5         Q    Did everybody attend the press

6  conferences?

7         A    I don't know.

8         MR. LEVINSTEIN:  Everybody?

9         Q    (BY MR. UESUGI)  Well, I mean,

10  when I say everybody, I'm talking about the US

11  Taekwondo team?

12        A    That, I can't remember.

13        Q    Did you make sure that everyone

14  was informed about the --

15        A    Well, what it was, was that Cecil

16  Bleiker was one that was handling all the PR for

17  Taekwondo and badminton.  So he was the direct

18  link right to the coaching staff and the

19  athletes.

20        Q    So it wasn't you who told people?

21        A    There were a lot of times when

22  they were at one place and I was someplace else.

23  Like take, for instance, we're at the America

24  College of Greece and the credentialed staff and

25  athletes were at the Olympic Village.  So Cecil

1    was the one that would have the direct interface
2    with the coach.
3        Q    Cecil Bleiker, you mean the
4    person who used to work for the USTU?
5        A    Yes.
6        Q    Did you see Dae Sung Lee at the
7    Olympic Taekwondo venue?
8        A    I did.
9        Q    Did you talk to him?
10       A    No.
11       Q    Why not?
12       A    We exchanged, you know, a little
13   hello, you know, just wave to each other and that
14   was it.
15       Q    Did you happen to see Dae Sung
16   Lee sitting with Chul Ho Kim?
17       A    I honestly don't remember.  I
18   don't remember.  But yeah, well, he was sitting
19   with John Holloway.  I remember John Holloway at
20   one point, because I think I was sitting behind
21   him, yeah.
22       Q    So I take it you don't remember
23   any conversations relating to Chul Ho Kim sitting
24   with Dae Sung Lee?
25       A    No, I do remember John Holloway

1        Q    And it's addressed to all six of
2    the Olympic team participants?
3        A    Yes.
4        Q    It says here that, again, we
5    extend our congratulations, our thanks and best
6    wishes to you for the future.  Did you mean that
7    for everyone listed on the letter or only certain
8    people?
9        A    Everyone.  Everyone.
10       Q    When you came back to the OTC,
11   did you change the locks on Chul Ho Kim's office?
12       A    No, I didn't change the lock on
13   Chul Ho Kim's office.  It was basically an office
14   that -- you know, he may say it's his, but what
15   happened was there was another person using that
16   office and they were asked to leave I think like
17   June 20th.  So I wanted to make sure that there
18   were new locks on the door so that someone else
19   wouldn't have access.
20       Q    Who was that other person, Sammy
21   Pejo?
22       A    Sammy Pejo, yes.
23       Q    Why was Sammy Pejo asked to
24   leave?
25       A    Because the resident team program

1    sitting with him.
2        Q    You don't remember telling Chul
3    Ho Kim that you were upset with him for sitting
4    with Dae Sung Lee?
5        A    No, I don't remember that.
6        Q    You don't remember --
7        A    No.
8        Q    -- telling Jean Lopez you were
9    upset with Chul Ho Kim because he sat with Dae
10   Sung Lee at the Olympic venue?
11       A    I don't remember that.
12       Q    Do you remember telling Herb
13   Perez that you were upset with Chul Ho Kim
14   because he was sitting with Dae Sung Lee at the
15   Olympic venue in Athens?
16       A    I don't remember saying that to
17   Herb Perez.
18       Q    Do you remember -- that's okay.
19   Then you came back from the Olympic Games and you
20   wrote this letter which we'll mark exhibit next
21   in order.
22       (Exhibit 65 was marked.)
23       Q    (BY MR. UESUGI)  Do you remember
24   this letter?
25       A    Yes.

1    was suspended and there was no need for volunteer
2    services at that point.
3        Q    Why was -- or when was the OTC
4    resident athlete program for Taekwondo canceled
5    or suspended?
6        A    It was sometime in late June.
7        Q    Why?
8        A    Why?
9        Q    Why was the program suspended?
10       A    We were evaluating the entire
11   program.
12       Q    What does that mean?
13       A    That means you're looking at the
14   entire program and what type of features that you
15   want to put in in the future.
16       Q    Did you have -- when you first
17   started as the executive director in February,
18   did you watch any practices of the OTC athletes?
19       A    Yes.
20       Q    How many?
21       A    I really don't know.  I can't
22   remember.
23       Q    More than ten?
24       A    I would say probably about ten,
25   maybe.

1    Q    And all those practices were run
2    by Chul Ho Kim?
3    A    I don't remember that.  I think
4    it was a combination of maybe Sammy and Chul Ho
5    Kim.
6    Q    Was Chul Ho Kim there all the
7    time that you -- whenever you visited the OTC
8    training?
9    A    I cannot remember every time that
10    I went there.
11    Q    Okay.  Did Chul Ho Kim,
12    subsequent to finding out that the office that he
13    was using, the locks were changed, did he come
14    talk to you?
15    A    Yes.
16    Q    And what did he say during that
17    conversation?
18    A    I said I believe I sent him a
19    letter stating that his contract was not going to
20    be renewed as per the contract, the covenants in
21    the contract.
22    Q    Okay.  Why was that?
23    A    There's no need for a coach when
24    there's no athletes training full time.
25    Q    And what did he say to you?

1    A    I don't remember what he said to
2    me.
3    Q    Did he inform you that if he
4    doesn't have the position at OTC, that he would
5    lose his visa?
6    A    We did have that conversation,
7    yes.
8    Q    And what did you tell him?
9    A    I told him that we would write a
10    letter of support to help him.
11    Q    But the fact that if there was no
12    job, that he would -- one of the requirements for
13    his visa was that he be employed?
14    A    Well, basically, as I remember it
15    correctly when I wrote the letter, it was -- and
16    I can't remember when the date was, but it was
17    currently what he was getting paid and, you know,
18    that was it.
19    Q    Did he say that if he didn't have
20    the job at OTC as the resident coach that he
21    would have to go back to Korea?
22    A    He mentioned that, yes.
23    Q    What was your response?
24    A    My response -- he made it sound
25    like it was such a negative thing.  And I said,

1    Chul Ho, I was there in June and I think that
2    Korea's a really great place.  I mean, what's
3    wrong, you know?  And apparently he took it the
4    wrong way.  And I was trying to be positive and
5    he just took it and turned it around in a
6    negative manner.
7    Q    So did you tell him that Korea's
8    a great place, why don't you go back to Korea?
9    Did you say that to him?
10    A    No, I said if you have to go back
11    to Korea, there's lots of opportunity, I would
12    think, for a person like yourself who has many
13    years of experience as a world champion athlete,
14    so on and so forth.  So I was trying to make it a
15    positive type of thing in the fact that I'm not
16    just talking from -- you know, I've been there
17    and I've seen it and I've experienced the culture
18    and I thought it was a great place.
19    Q    So you never told him that maybe
20    he should go back to Korea?
21    A    No, not in that context.
22    Q    You never -- what did you say?
23    What context?  Did you say that in another
24    context?
25    A    What I just said, was that I

1    think that Korea's a great place and I think
2    there could be opportunity for him.  But I did
3    not say that you can go back to Korea.  It's been
4    taken out of context, I can tell you that.
5    Q    What has, the statement?
6    A    What he said to other people.
7    Q    Did you actually say that, why
8    don't you go back to Korea?
9    A    No, I didn't.
10    Q    Did you say something
11    substantially similar to that?
12    MR. LEVINSTEIN:  He just told you what
13    the conversation was.  You want to do it all over
14    again?  Read it back.
15    A    I just said what I just said, is
16    that I think Korea's a great place and there
17    could be opportunities.  But I did not say, why
18    don't you just go back?  I wouldn't do that.  I
19    wouldn't say that.  I was trying to be positive
20    with him and try to help him.
21    Q    (BY MR. UESUGI)  There was an
22    incident at the Titan games involving one of his
23    athletes, Jason Han.  Do you know who Jason Han
24    is?
25    A    Yes, I do.

4/5/2006 Gambardella, Robert (Pltf desig = Yellow Dfts' counter = Blue)
Case 1:04-cv-00461-SOM-LEK   Document 247-3   Filed 03/21/2006   Page 72 of 79
4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)

**Page 281**

1  Q   Do you remember sitting next to
2  Jason Han at the Titan games?
3  A   No.
4  Q   Apparently Jason Han was cheering
5  for one of the US players competing at the Titan
6  games, and you allegedly told him to sit down and
7  be quiet.  Is that true?
8  A   I don't think that's exactly
9  true.  I believe what was happening in the
10  situation was that the coach who was coaching,
11  and I think it was -- I'm almost positive it was
12  Kevin Padilla -- was trying to coach her and she
13  was actually just not listening to what he had to
14  say and it was causing a disruption.
15  Q   Who was the athlete in question?
16  A   I can't remember.
17  Q   It was a female athlete?
18  A   I believe it was.
19  Q   Was Kevin -- Jason Han a resident
20  athlete at the time?
21  A   When were the Titan games?  I
22  don't know but probably, yes.
23  Q   Did you tell him to sit down and
24  be quiet?
25  A   I don't remember what I said.

**Page 283**

1  said?
2       MR. LEVINSTEIN:  Don't guess.
3       A   No.
4  Q   (BY MR. UESUGI)  You don't
5  remember?
6  A   I don't remember it.
7  Q   Okay.  Well, I'm going to show it
8  to you then.
9  A   Okay.
10  Q   Why don't we take this in order.
11       (Exhibits 66 and 67 were marked.)
12  Q   (BY MR. UESUGI)  Do you recognize
13  this letter?
14  A   Yes, I do.
15  Q   It's a letter from Chul Ho Kim
16  dated June 24, 2004 requesting an update for his
17  status as a USTU staff member?
18  A   (Nodded.)
19  Q   Do you remember responding to
20  this letter?
21  A   Yes, I responded June 25th, 2004.
22  Q   That's this letter.  Actually an
23  e-mail?
24  A   Yes, via e-mail, it says here in
25  black and white.  We have someone out there.  You

**Page 282**

1  Q   But you do remember that?
2  A   Talking to him about it, yes.
3  Q   Talking to Jason Han?
4  A   Yeah.
5  Q   At the venue?
6  A   Yes, at that venue.
7  Q   But you don't remember the
8  specifics?
9  A   No.
10       Q   Jason Han is Asian?
11       MR. LEVINSTEIN:  Is that a question?
12  Q   (BY MR. UESUGI)  Yes.  Is Jason
13  Han Asian?
14  A   I imagine he might be.  His last
15  name is Han.  He may be Asian.
16  Q   But you don't know?
17  A   No, I don't know.  All I know is
18  that he's a graduate of University of
19  California-Berkeley and has done exceptionally
20  well.  And that's what I know about him.
21  Q   Did you become aware of a letter
22  written by Chul Ho Kim to Jim Scherr in late
23  2004?
24  A   Yes.
25  Q   Do you remember what the letter

**Page 284**

1  may want to close the doors.
2  Q   Speak of the devil.  In the first
3  paragraph, the last sentence, it says, In
4  addition, I am willing to help you with your
5  green card, so please do not worry about that?
6  A   Right.
7  Q   What did you mean by that
8  sentence?
9  A   That I would write him a letter,
10  that I would write a letter in his behalf.
11  Q   And on behalf of his family?
12  A   I can't remember that.  I don't
13  know.
14  Q   And this help that you were going
15  to give him with his green card, did it come with
16  any conditions?
17  A   No.  I just said I would help
18  write a letter for his green card.  Maybe I
19  should have written it, but, hey, this is what we
20  have and my intention was to write him a letter,
21  a letter on his behalf.
22  Q   And in fact, you did write a
23  letter on July 19.
24       (Exhibit 68 was marked.)
25  Q   (BY MR. UESUGI)  This letter is in

4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)
Case 1:04-cv-00461-SOM-LEK Document 247-3 Filed 03/21/2006 Page 73 of 79
4/5/2005 Gambardella, Robert (Pltf design = Yellow, Dfts' counter = Blue)

**Page 285**

1    support of his wife and children?

2        A    Yes, that's what it seems, yes.

3        Q    And you wrote this letter without

4    conditions attached; is that correct?

5        A    I wrote this letter on his

6    behalf.

7        Q    Okay.  And you subsequently wrote

8    this letter to him on September 8th, which we'll

9    mark as exhibit next in order.

10       (Exhibit 69 was marked.)

11        Q   (BY MR. UESUGI)  Informing him,

12    Chul Ho Kim, that you were not going to renew his

13    employment agreement for the year 2005?

14        A    Right.

15        Q    Because the US Taekwondo will not

16    sponsor resident program in 2005; is that

17    correct?

18        A    I think what it says -- actually,

19    I received some help from -- legal help on this

20    one.  And basically, I just -- it says what it

21    says.  Pursuant to the employment agreement, I

22    must give a person notice and we were not

23    renewing his employment agreement.

24        Q    What is the plans for the

25    resident program for 2005?

**Page 287**

1        MR. LEVINSTEIN:  Objection, just made

2    reference to 2000 and canceling the program.  And

3    I don't know that's what you meant.

4        Q   (BY MR. UESUGI)  In 2004 when you

5    canceled the program or when you suspended the

6    program, were you aware of the fact that

7    50 percent of the athletes on the US National

8    Team were resident athletes at OTC?

9        A    Fifty percent of the National

10    Team athletes were resident.  What class -- I

11    mean, you got to kind of give me a little bit

12    more on that one.

13        Q    National Team members, there were

14    eight National Team members at OTC when the

15    program was suspended.  Were you aware of that?

16        A    What I was aware of was the fact

17    that we took a look and see who was qualified,

18    who would be qualified to go to the next Olympic

19    Games.  And that's what we looked at.  And we

20    felt that there was a point in time if we're

21    going to take -- if we're going to suspend a

22    program, that we do it after we got to a certain

23    point prior to the Olympics because a lot of

24    these athletes would not have been able to go to

25    the Olympic Games and qualify for whatever

**Page 286**

1        A    We're still working on that and

2    we would like to be able to incorporate the new

3    leadership once that gets in, just to kind of get

4    a project going with them so they feel that

5    there's some, you know, ownership as we move

6    forward.

7        Q    Are you aware of the fact that

8    the OTC resident athlete program is by far the

9    most successful Taekwondo athlete development

10    program that the USTU has ever promulgated?

11        A    That, I'm unaware of.

12        Q    That almost every single National

13    Team member or national coach presently competing

14    has either been a resident athlete or enjoyed the

15    benefits of a training under a coach who trained

16    at OTC as an athlete?

17        A    You said two things just then.

18        Q    Okay.  Are you aware that the

19    vast majority of our National Team members have

20    at one point trained at OTC?

21        A    No, I'm not aware of that.

22        Q    Were you aware that in 2000 -- at

23    the time that you canceled the program,

24    50 percent of our National Team members were

25    resident athletes at OTC?

**Page 288**

1    reasons they didn't qualify.  So there was a

2    conscious decision at that point to suspend the

3    program.

4        Q    Because?

5        A    After a certain point, because

6    No. 1, there was not going to be anyone around to

7    coach these athletes.  And we're looking at, you

8    know, developing -- we're looking at how -- what

9    we do going forward.

10        Q    Why wouldn't there be anyone to

11    coach the athletes at the OTC program?  Wasn't

12    Chul Ho Kim here?

13        A    If you remember correctly, he was

14    on his way -- would be on his way going to Malta

15    and to the Olympic Games, so there would be no

16    one there coaching them.

17        Q    Han Won Lee was the OTC resident

18    athlete coach in 2000 and he participated at the

19    Olympic Games.  The program wasn't shut down.

20    Were you aware of that?

21        A    No, I wasn't aware of that.

22        Q    Were you aware that Mr. Dae Sung

23    Lee was the resident athlete coach in 1992 and he

24    participated in the Olympic Games and the program

25    wasn't shut down?

1     A    No, I was not aware of that.

2     Q    If you were aware of such

3  information, would that have affected your

4  decision to suspend the OTC program?

5     A    I don't think so.

6     Q    Why not?

7     A    Because there were other inherent

8  problems that were -- that existed.

9     Q    Such as?

10     A    Behavior types of things.

11     Q    Behavior of who?

12     A    Of some athletes.

13     Q    Was it -- how many athletes, who

14  are you specifically speaking of?

15     A    I was just giving you a general

16  overview of one of the conditions.  That's all.

17        MR. LEVINSTEIN:  You can just say he

18  shut down the program, but I don't know what it

19  has anything to do with this case.  He made

20  business decision to shut down the resident

21  program.

22     Q    (BY MR. UESUGI)  That's what we're

23  trying to find out.  Was it a business decision?

24     A    Yes, it was.

25     Q    What was the business of?  What

1  athletes, small percentage.

2     Q    In spite of that, you closed the

3  program?

4     A    Yes.  We as a group,

5  collectively, talked about it and then made a

6  decision to close the program.

7     Q    After she made the US Olympic

8  team?

9     A    It was -- basically the program

10  was shut, I want to say, was suspended like

11  June 20th just to give everyone an opportunity to

12  go to the qualification -- last qualification

13  tournament and then give them some time, rather

14  than just throwing them out on the street.  We

15  didn't want to do that.  So we gave them some

16  time to prepare to move on to different cities.

17     Q    When was this decision made?

18     A    I don't know the exact dates, but

19  it was early, early on.

20     Q    In February?

21     A    I can't remember, but it was

22  early.

23     Q    Was this a GMC committee

24  decision?

25     A    Yes, collectively it was a

1  was the business decision?  Was it a financial

2  decision?

3     A    Yes, it was.

4     Q    How much did it cost to fund the

5  OTC resident athlete program per year?

6     A    I'd have to ask the USOC per

7  year.

8     Q    You don't know?

9     A    I imagine it's $60 per day per

10  athlete per room and board.

11     Q    Is that what the USTU has to pay?

12     A    If it's a resident program, they

13  don't have to pay.  However, there are now in the

14  provisions that, again, programs have to have

15  impact.  And if you've watched what's happened in

16  the past couple months, you can see that programs

17  have been moving off because of the fact that

18  they may not have the impact that the US Olympic

19  Committee has.

20     Q    Nia Abdallah, who made the US

21  Olympic team in 2004, she was a resident athlete;

22  isn't that correct?

23     A    Yes.

24     Q    Isn't that an impact?

25     A    Yeah, certain percentage of the

1  management committee decision.

2     Q    Okay.  And that would have been

3  documented in the minutes?

4     A    I would think so.

5     Q    I don't remember seeing it.  Was

6  it -- did you produce it?

7     A    I don't know.

8     Q    Okay.  This is the letter to Jim

9  Scherr from Mr. Kim, which we will mark as the

10  exhibit next in order.

11        (Exhibit 70 was marked.)

12     Q    (BY MR. UESUGI)  In the third

13  paragraph, it says, I strongly believe that sense

14  of mutual trust and respect is a crucial part of

15  any organization, especially in Taekwondo.

16  Unfortunately, when I attempted to access my

17  office after returning from Olympics, I was

18  shocked to find that my door locks has been

19  changed without prior notice.  Certainly not the

20  type of welcome I had expected.  Is that what

21  happened?

22     A    Well, whenever you have change in

23  personnel, I think it's a common practice that

24  you do change locks on doors.  And I did offer

25  Mr. Kim the opportunity to come and work within

1 our office area. We did have an office area
2 within there, in that area. So again, it may be
3 just hearing half of the story.
4    Q    Next paragraph, when I visited
5 Mr. Bob Gambardella, the acting CEO of USTU for
6 an explanation, I was coldly told that my service
7 was no longer needed and was ask to leave the OTC
8 and US when my visa expires. Is that what
9 happened?
10    A    No, not at all.
11    Q    What did happen?
12       MR. LEVINSTEIN: He's already testified
13 to this.
14    A    Here, right here. This is the
15 letter. This is what happened. We had that
16 meeting and I talked to you about what
17 transpired.
18    Q    (BY MR. UESUGI) My youngest of
19 three children was born in the US in July 2003
20 and Mr. Gambardella had previously promised to
21 assist our family attain our visa to stay in the
22 US. Do you understand the significance of
23 Mr. Kim's son or child being born in the US?
24    A    No, I don't know exactly what you
25 mean, but maybe you might want to tell me.

1    Q    If a child is born in the US from
2 Korean-born parents and if they move back to
3 Korea, like it has been alleged that you
4 suggested, that child would be ineligible for
5 such things as medical benefits, schooling, or
6 those kinds of things that are offered to
7 citizens that are born in Korea.
8    So the fact that Mr. Kim's youngest was
9 born in the US meant that he couldn't get many
10 benefits that other Korean-born children were
11 able to attain. Did he explain that to you?
12    A    No.
13    Q    There's a statement here, among
14 our mutual agreements he had also assured --
15       MR. LEVINSTEIN: Among other.
16    Q    (BY MR. UESUGI) Among other
17 mutual agreements, he had already assured me --
18       MR. LEVINSTEIN: Reassured.
19    Q    (BY MR. UESUGI) Reassured me,
20 sorry, the continued OTC coaching position
21 contingent upon winning an Olympic medal,
22 promises I kept. Was that your mutual agreement?
23    A    It's not an agreement that I came
24 up with.
25    Q    Did you have any agreement with

1 Chul Ho Kim with respect to performance at the
2 Olympics?
3    A    No, nothing. I would never put
4 myself in a position like this.
5    Q    Whose agreement was that, do you
6 know? Do you know if anyone made this type of
7 agreement to Chul Ho Kim?
8    A    You'd have to ask Mr. Kim.
9    Q    Did Mr. Herb Perez approach you
10 about Chul Ho Kim's situation and talk to you
11 about whether he could stay if he -- contingent
12 upon him helping Nia Abdallah win a medal at the
13 Olympics?
14    A    No, we never had that
15 conversation.
16    Q    Did you have any conversations
17 with Herb Perez about Chul Ho Kim?
18    A    He asked me about him. And I
19 said I would take a look at it, you know,
20 afterwards. We want to focus on the Olympic
21 Games. And based on, you know, the contract, I
22 mean, we've got to make a decision when we get
23 back. And that's the conversation I had with
24 Herb Perez.
25    Q    When did you have this

1 conversation with him?
2    A    I don't know. I don't remember.
3    Q    Was it in Athens?
4    A    I don't remember, no. I don't
5 think it was, but I don't remember.
6    Q    Because you stated when you got
7 back you had to make a decision?
8    A    Well, because of the contract.
9 If you look at the contract, I can't remember how
10 many days out that you have to provide a notice.
11 And so that's what I meant by getting -- when I
12 get back afterwards.
13    Q    Did you let Chul Ho Kim know
14 other than that letter?
15    A    This letter here?
16    Q    Right.
17    A    Yes.
18    Q    Was that the only form in which
19 you communicated to Mr. Kim about?
20    A    Yes, I was told that I should
21 write a letter stating, you know, what the future
22 is. I was advised, I should say.
23    Q    In your e-mail to Coach Kim on
24 the 6-25-2004, you blind carbon copy
25 Gold92@aol.com. Do you know who that is?

1     A     That's Herb Perez.

2     Q     Why did you blind carbon copy

3  Herb Perez?

4     A     Because I know that they were

5  friends and he was helping him and supporting

6  him.  So I just wanted to keep Herb in the loop

7  of what was going on.

8     Q     Why a blind carbon copy, why not

9  just a cc?

10     A     I don't remember.

11     Q     Did you subsequently receive a

12  copy of this letter?

13     A     Which letter?

14     Q     Exhibit 70, the letter from Chul

15  Ho Kim to Jim Scherr?

16     A     Yes.

17     Q     How did you get a copy of that

18  letter?

19     A     His secretary sent it to me.

20     Q     What was your response?

21     A     I just tried to answer it as best

22  as I could on my recollection of what had

23  happened.

24     Q     Did you subsequently write a

25  letter on his behalf to the immigration and

1  naturalization service?

2     A     At one point I did.  Yes, I did.

3     Q     Did you attach any conditions to

4  that letter?

5     A     I don't believe I did.

6     Q     Did you tell Mr. Kim that if he

7  signed the release, and only if he signed the

8  release, that you would sign -- write a letter

9  for him?

10     A     Oh, that is true.

11     Q     That you would only sign a letter

12  to INS if he had signed a release?

13     A     Yeah.  We were getting complaints

14  and getting sued by so many people.  We wanted to

15  try to eliminate, you know, just another lawsuit.

16     Q     If he didn't sign that release,

17  would you have signed his INS letter?

18     A     I don't know.  I would have to

19  sit and think about it, because I did have

20  discussions with Mr. Hurley, his immigration

21  lawyer, we did talk.  And he agreed to the fact

22  that this was -- the timing wasn't the greatest

23  in trying to help him.  And I couldn't figure out

24  why he would, you know, sent this letter when he

25  did.

1     Q     This is different from your

2  June 2004 e-mail in which you said, don't worry

3  about it, I'm going to help you with your green

4  card; is that correct?

5     A     Yes.

6     MR. LEVINSTEIN:  Objection.  It's a

7  different document you mean?

8     Right.  It's when this came

9  forward.

10     Q     (BY MR. UESUGI)  That changed

11  things?

12     A     It was a little bit

13  disheartening, to tell you the truth.

14     Q     In what way?

15     A     Just some of the things that he

16  alleged in that letter, which we've already gone

17  over.

18     Q     You felt hurt by the letter?

19     A     I don't know if I was hurt, but

20  it was a little bit of just a shock that, you

21  know, he, you know, says a couple of things in

22  this letter.  I would never reassure anyone, you

23  know, based on an Olympic medal.  You know, the

24  whole aspect of trust and respect, you know, I

25  was -- I'm just taken aback a little bit.

1     Q     Okay.  I want to show you an

2  exhibit that we're going to mark next in order.

3  It is an e-mail from a World Champion TKD.

4     (Exhibit 71 was marked.)

5     MR. UESUGI:  What exhibit is this?

6     THE REPORTER:  71.

7     Q     (BY MR. UESUGI)  Do you remember

8  receiving this e-mail?

9     A     I think you sent it to me.

10     Q     No, I didn't.  Do you remember

11  receiving this letter from World Champion TKD?

12     A     Okay, yeah.  As I read the line,

13  yes.

14     Q     That's your e-mail address,

15  bob.gambardella@usoc.org?

16     A     It sure is.

17     Q     What did you do when you received

18  this e-mail?

19     A     What I did was I read it and then

20  I just deleted it.  Because I'm not going to get

21  in between you and John and anyone else's fights.

22  So I felt that it's ridiculous that your e-mails,

23  which would perpetuate somebody writing something

24  like this, would bring it to this level.

25     Q     So you didn't conduct --

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1    MR. LEVINSTEIN:  I don't know what the
2  relevance of this document is.  It's completely
3  an outrageous document.  It has no relevance to
4  this case.  I don't want to have to send this to
5  the court and explain to them, these are the
6  kinds of things you're asking the witness about
7  that has nothing to do with this case.
8    MR. UESUGI:  All right.  That's fine.
9    MR. LEVINSTEIN:  But I will if we have
10  to.
11    MR. UESUGI:  Okay.
12    Q    (BY MR. UESUGI)  Did you conduct
13  an investigation with respect to this e-mail?
14    A    No.  It's none of my -- this is
15  none of my business.  This is not my business.
16  This is from some guy to Xplosive.  What do I got
17  to do, check every e-mail that someone sends me
18  that I got to go through and do an investigation
19  on it?
20    Q    Did you talk to Herb Perez about
21  this e-mail?
22    A    He talked to me about it, because
23  basically this guy sent it to him.  Let me read
24  it.  I got this e-mail from Herb Perez.  Well, I
25  don't think it's Herb Perez.  You should have

4/5/2005 Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1  seen the e-mails I got from him the last time.
2  So I have asked him who Chinesey is.  He doesn't
3  know anyone named Chinesey.
4    Q    What steps have you taken to
5  ascertain whether chinesey@aol.com is, in fact,
6  one of Herb Perez's e-mail --
7    A    I haven't done a thing.
8    Q    In fact, subsequent to this
9  e-mail, you went to Herb Perez's wedding, isn't
10  that true, in January?
11    A    Yes, I did.  Yes, I did.
12    Q    And you also appointed him head
13  of teams for the world championship teams in
14  2005?
15    A    Yes, as one of the team leaders
16  exactly, yes, I did.
17    MR. UESUGI:  Why don't we take a break?
18    (A recess was taken from 3: 42 p.m. to
19      3:46 p.m.)
20    MR. UESUGI:  Back on the record.
21    Q    (BY MR. UESUGI)  When Jean Lopez
22  became the 2004 Olympic coach, what did that
23  entitle him to?
24    MR. LEVINSTEIN:  Objection.  I don't
25  know what that means.

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1    A    I don't know what that means
2  either.
3    Q    (BY MR. UESUGI)  Did he get his
4  airfare paid from Houston to Colorado Springs for
5  the four-day camp?
6    A    I believe so, yes.
7    Q    Did you give him per diem?
8    A    No, I think they had all their
9  meals and room and board.
10    Q    With OTC?
11    A    Yes.
12    MR. LEVINSTEIN:  He's talking about the
13  Olympic Village, weren't you?
14    A    No, training in Colorado Springs,
15  yeah.
16    Q    (BY MR. UESUGI)  From Colorado
17  Springs to Malta, who paid for that airfare?
18    A    We received a grant from the
19  United States Olympic Committee, Athens training
20  grant and that incorporated that, yeah.
21    Q    That covered Jean Lopez's
22  expenses?
23    A    Yes.
24    Q    Did he get a per diem in Malta?
25    A    All our meals were at a hotel.

4/5/2005  Gambardella, Robert  (Pltf desig = Yellow, Dfts' counter = Blue)

1  And I believe, and I think we have the
2  documentation backing this, that we gave everyone
3  like $20, you know, for travel, you know, if they
4  wanted to get something in the airport.  And
5  everyone received that.
6    Q    And also being part of the US
7  Olympic team, you get goodies, right?  Warm-up,
8  T-shirt, hat, shorts?
9    A    Yes.
10    Q    And also his trip from Malta to
11  Athens, Greece was also paid for?
12    A    Yes.  Yes, it was, as was
13  everyone else's.
14    Q    As was everyone else's?
15    A    Yeah.
16    Q    And he got to stay in the Olympic
17  Village?
18    A    Yes.
19    Q    And he got his meals?
20    A    Yes.
21    Q    Was there a per diem involved
22  also?
23    A    I don't believe so, no.
24    Q    And he didn't have to pay an
25  entry fee for the coaching credential?

4/5/2006 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)        4/5/2005 Gambardella, Robert (Pltf desig = Yellow, Dfts' counter = Blue)

Case 1:04-cv-00461-SOM-LEK    Document 247-3    Filed 03/21/2006    Page 78 of 79

1      A    To the Olympic Games?
2      Q    Yes.
3      A    No.
4      Q    And then for his airfare back
5   from Athens to Houston, that was also covered; is
6   that correct?
7      A    Yes.
8      Q    Did he receive anything else?
9      A    Not that I'm aware of.
10         MR. UESUGI:  I guess that's it.  No
11   more questions from me.
12         MR. LEVINSTEIN:  Before we leave, I
13   just want to put on the record that the gentlemen
14   who is asking questions does not appear as
15   counsel in this case, and is apparently a named
16   counsel in another proceeding involving Dae Sung
17   Lee in front of the USOC.
18         And there's been a representation by
19   Mr. Jones that he is going to enter his
20   appearance as counsel.  And we will take action
21   as soon as we get confirmation that he is
22   counsel.
23         MR. UESUGI:  I would like to get a
24   clarification, that I am not representing Dae
25   Sung Lee in any other matter before the USOC or

305

1   answer.  I reviewed the documents and that was
2   it.  Okay.  As a matter of procedure,
3   Mr. Johansen has been participating in this
4   proceedings.  I'd like to clarify in what
5   capacity?
6         MR. LEVINSTEIN:  He's a representative
7   of the client.  And he's on papers as of counsel
8   to the proceedings.
9         MR. UESUGI:  He's of counsel.  He's
10   made an appearance.
11         MR. LEVINSTEIN:  He doesn't have to
12   make a formal appearance.  He's a representative
13   of the client.
14         MR. UESUGI:  Excuse me?
15         MR. LEVINSTEIN:  He's a representative
16   of one of the defendants in this case.  He
17   doesn't need to make an appearance to
18   participate.
19         MR. UESUGI:  That's not what he told
20   me.  He said that -- he told me that he was
21   participating as an attorney for the USOC.
22         MR. LEVINSTEIN:  He is an attorney for
23   the USOC.  And as inside counsel, he doesn't need
24   to make an appearance under the rules of Hawaii.
25   But you can deal with that with the judge if you

307

1   any other -- if you look at any of the -- I know
2   what you're talking about, there's an Article 26
3   complaint filed.  But you don't see my name on
4   there, I've never made an appearance for him, I
5   never --
6         MR. LEVINSTEIN:  Did you participate in
7   writing or editing any of the documents he
8   submitted?
9         MR. UESUGI:  I'm not going to answer
10   that question.
11         MR. LEVINSTEIN:  You need to, because
12   as an attorney in Colorado, if you enter -- if
13   you prepare legal documents and submit them on
14   someone's behalf without disclosing your identity
15   that you're counsel, it has ethical implications.
16   So I'd like to ask you now, did you prepare the
17   materials on his behalf that he submitted in what
18   are legal proceedings before the USOC?
19         MR. UESUGI:  I'm not a Colorado
20   attorney, so I don't have to answer that
21   question.  I've reviewed the documents that
22   you're talking about.  I know what you're talking
23   about.
24         MR. LEVINSTEIN:  Did you draft them?
25         MR. UESUGI:  Again, I'm not going to

306

1   like.  But it's got nothing to do with -- he's
2   clearly been identified in papers as who he is
3   and on pleadings filed in court in this case.
4         MR. UESUGI:  As an attorney on the
5   case?
6         MR. LEVINSTEIN:  As an attorney for the
7   United States Olympic Committee.
8         MR. UESUGI:  On this case?
9         MR. LEVINSTEIN:  As an attorney for the
10   United States Olympic Committee.
11         MR. UESUGI:  On this case?
12         MR. LEVINSTEIN:  On every case that the
13   US Olympic Committee is involved in, yes.
14         MR. UESUGI:  Has he made an appearance
15   in this case?
16         MR. LEVINSTEIN:  He's not filed a
17   motion pro hac vice.  But, yes, he has appeared
18   in this case.
19         MR. UESUGI:  As counsel?
20         MR. LEVINSTEIN:  Yes.
21         (The deposition concluded at 3:52 p.m.)
22
23
24
25

308

4/5/2006  Gambardella, Robert   (Pltf desig = Yellow, Dfts' counter = Blue)

```
1              A F F I D A V I T
2
3    STATE OF COLORADO        )
                              )  ss.
4    COUNTY OF DENVER         )
5            I have read my deposition, and the same
6    is true and accurate, save and except for changes
7    and/or corrections, if any, as indicated by me on
8    the amendment sheet(s) attached hereto as
9    indicated.
10
11   Amendment sheet(s) attached [ ]
12   No changes; no amendment sheet attached [ ]
13
14
15       _____
         ROBERT GAMBARDELLA
16
17       SUBSCRIBED AND SWORN TO before me on this
18   _____ day of _____, 2005.
19       My commission expires: _____.
20
21
         _____
22           NOTARY PUBLIC
23   in and for the State of _____.
24   ss
25
```

309

4/5/2005  Gambardella, Robert   (Pltf desig = Yellow, Dfts' counter = Blue)

```
1            C E R T I F I C A T E
2
3
4    STATE OF COLORADO        )
                              )  ss.
5    COUNTY OF DENVER         )
6
7            I, Susan L. Sims, Registered
     Professional Reporter and Notary Public in and
8    for the State of Colorado, duly appointed to take
     the deposition of ROBERT GAMBARDELLA, certify
9    that prior to the examination the deponent was
     duly sworn to testify to the truth in the matters
10   in controversy between the parties herein; that
     the deposition was taken in shorthand by me at
11   the time and place aforesaid and was thereafter
     reduced to typewritten form by me and processed
12   under my supervision, the same consisting of 309
     pages; and that the same is a full, true, and
13   complete transcription of my machine shorthand
     notes.  I further certify that I am not related
14   to, employed by, nor counsel to any of the
     parties herein, nor otherwise interested in the
15   events of the within cause.
16           A transcript review of this deposition
     was requested and is available to the deponent as
17   notified by me.
18           IN WITNESS WHEREOF, I have affixed my
     notarial seal this 25th day of April, 2005.  My
19   commission expires December 21, 2006.
20
21
22       _____
             Susan L. Sims
23       Registered Professional Reporter
24
25
```

310