# Exhibit B



```
0001
 1                IN THE UNITED STATES DISTRICT COURT
 2                        DISTRICT OF HAWAII
 3    DAE SUNG LEE,                    )
                                       )
 4         Plaintiff,                  ) Civil No. 04-00461
                                       ) Som Tek
 5    UNITED STATES TAEKWONDO          )
 6    UNION, a Colorado nonprofit      )
      corporation, UNITED STATES       )
 7    Olympic COMMITTEE, a             )
      federally chartered              )
 8    nonprofit corporation; JOHN      )
      DOES 1-10; JANE DOES 1-10;       )
 9    DOE PARTNERSHIPS 1-10; DOE       )
      CORPORATIONS 1-10,               )
10                                     )
           Defendants.                 )
11                                     )
12
13
14
15           DEPOSITION OF STEVEN MICHAEL LOCKE
16                        JUNE 30, 2005
17
18    PURSUANT TO NOTICE, the deposition of STEVEN MICHAEL
19    LOCKE was taken on behalf of the Plaintiff pursuant
20    to the Federal Rules of Civil Procedure, at 90 South
21    Cascade Avenue, Suite 1300, Colorado Springs,
22    Colorado, this date at 9:03 a.m., before Janice L.
23    Doyle, a Certified Court Reporter and a Notary
24    Public.
25
```

1

```
 1                         I N D E X
 2
 3    DEPOSITION WITNESS:                          PAGE
 4    STEVEN MICHAEL LOCKE
 5    Examination by Mr. Jones                      6
 6
 7
 8
 9
10
11
12           EXHIBITS PREVIOUSLY MARKED
13    EXHIBIT      DESCRIPTION                     PAGE
14    4        Letter to Bruce Harris From Thomas   99
15             L. Satrom Dated August 4, 2003
16    5        Letter to Bruce Harris From Thomas   99
17             L. Satrom Dated September 5, 2003
18    10       Letter to Dae Sung Lee From Bob      70
19             Gambardella Dated April 8, 2004;
20             Selection Procedures for Coaches
21    11       Letter to Bob Gambardella From       74
22             Dae Sung Lee Dated June 2, 2004
23    13       Fax Cover Sheet and Letter to Ward   88
24             D. Jones From Bob Gambardella
25             Dated July 21, 2004 (Not Retained)
```

3

```
 1                      APPEARANCES
 2         MR. WARD D. JONES, Attorney at Law, from the
 3    law firm of Bervar & Jones, 1400 Pauahi Tower, 1001
 4    Bishop Street, Honolulu, Hawaii, 96813, (808)
 5    550-4990, appeared on behalf of the Plaintiff.
 6         MR. MARK S. LEVINSTEIN, Attorney at Law, from
 7    the law firm of Williams & Connolly, LLP, 725 Twelfth
 8    Street, N.W., Washington, D.C., 20005, (202)
 9    434-5012, and MR. GARY JOHANSEN, Attorney at Law,
10    United States Olympic Committee, 1 Olympic Plaza,
11    Colorado Springs, Colorado, 80909, (719) 866-4526,
12    appeared on behalf of the Defendants.
13         Also Present:  Mr. Dae Sung Lee
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1    EXHIBIT      DESCRIPTION                     PAGE
 2    45       Governance and Management Committee  27
 3             Minutes of Meeting, February 5,
 4             2004, Numbered USTU00004
 5    57       Minutes of USTU Governance and       38
 6             Management Committee Meeting,
 7             February 26, 2004, Numbered
 8             USTU00002 Through USTU00003
 9    58       Memorandum to USOC Executive         58
10             Committee From Bob Gambardella
11             and Steve Locke Dated March 8,
12             2004, Numbered USTU00001
13    59       Governance and Management Committee  57
14             Minutes, March 25, 2004, Numbered
15             USTU00005 Through USTU00007
16    61       Various E-mails, Numbered USTU00016  76
17             Through USTU00012
18    62       Letter to Bob Gambardella From Ward
19             D. Jones Dated July 19, 2004
20    63       USTU Governance and Management       79
21             Committee Minutes, July 1, 2004,
22             Numbered USTU00008 Through
23             USTU00009
24    69       Letter to Chul Ho Kim From Bob      100
25             Gambardella Dated September 8, 2004
```

4

**Page 5**

```
1        EXHIBIT     DESCRIPTION                    PAGE
2        73     Various E-mails                      84
3
4
5
6
7                      EXHIBITS MARKED
8   EXHIBIT     DESCRIPTION                          PAGE
9   145    Various E-Mails, Numbered USTU00100        63
10  146    E-Mail to Mr. Lee From Bob Gambardella     66
11         Dated April 9, 2004, Numbered
12         USTU00116
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1   the executive director of USA Triathlon.
2        Q.   About how many would you estimate if you
3   had to estimate?
4        MR. LEVINSTEIN:  How many cases --
5        MR. JONES:  Deposed in.
6        THE WITNESS:  Several hundred times.
7        Q.  BY MR. JONES:  Well, as an experienced
8   witness then, I don't have to go through all the
9   ground rules.  The same rules apply as in those other
10  cases, and that is to answer orally with words as
11  you've been doing so that we have a clear record and
12  not to use gestures, "uh-huh, "huh-uh," those sorts
13  of things that we use in everyday language, but
14  become ambiguous when you try and write them out as
15  to what the witness means -- intends.
16        Secondly, please go ahead and let me get
17  out my whole question before you start responding so
18  we have a clear transcript as well.  I don't always
19  take breaks at the right time, but I will try to do
20  so at least every hour so that nobody becomes too
21  fatigued --
22        MR. LEVINSTEIN:  But if at anytime --
23        Q.  BY MR. LEVINSTEIN:  -- as well as the
24  court reporter.
25        MR. LEVINSTEIN:  If at anytime you want
```

**Page 7**

```
1        WHEREUPON, the following proceedings were
2   had:
3        IT WAS STIPULATED AND AGREED that the within
4   proceedings were taken pursuant to the Federal Rules
5   of Civil Procedure.
6
7        WHEREUPON,
8             STEVEN MICHAEL LOCKE,
9   the witness herein, having been first duly sworn by
10  the notary public, was examined and testified as
11  follows:
12
13                 EXAMINATION
14  BY MR. JONES:
15       Q.   Can you please state your name and home
16  address for the record?
17       A.   Yes.  Steven Michael Locke, 19 East
18  Columbia Street, Colorado Springs, Colorado, 80907.
19       Q.   Have you ever had your deposition taken
20  before, Mr. Locke?
21       A.   Yes.
22       Q.   In what kinds of cases or case?
23       A.   Accident cases, cases dealing
24  with -- when I was a director of the state park
25  system in Indiana, and I had various cases when I was
```

```
1   to go to the bathroom or you want to take a break for
2   any reason, just say, "Can we take a break?"
3        THE WITNESS:  Thanks.
4        Q.  BY MR. JONES:  Have you been deposed as
5   a representative of United States Taekwondo Union
6   before?
7        A.   No.
8        Q.   Have you ever been named as a party
9   personally in any litigation?
10       A.   Personally?
11       Q.   Either as a plaintiff or a defendant.
12       A.   Yes.
13       Q.   What kinds of cases would that be?  The
14  accident cases you were talking about?
15       A.   Most typically, accident cases, yes.
16       Q.   Any other types of cases?  Commercial
17  actions?
18       A.   Employment cases.
19       Q.   Were you a plaintiff or a defendant?
20       A.   Defendant --
21       Q.   Was the --
22       A.   -- and plaintiff.
23       Q.   So it was -- were they like wrongful
24  termination-type claims?
25       A.   Yes.
```

**Page 6**

**Page 8**

**Page 9**

1  Q.  Do you remember the names of any of the
2  cases for the record?
3  A.  Offhand, no.
4  Q.  Were they Colorado cases or some other
5  state?
6  A.  Both Indiana and Colorado.
7  Q.  Turning now to a little bit of your
8  background, could you just briefly summarize your
9  occupational history, I guess, from earliest up to
10  now, say, after you went to work full-time after
11  getting out of college or whatever?
12  A.  Okay.  Left college, graduated from
13  college in 1969.  Became employed by the
14  Indiana -- well, became employed as a school teacher
15  at Edinburgh, Indiana, and Franklin, Indiana,
16  teaching physics, physiology, biology, and chemistry.
17  After that one-year horrendous experience, went to
18  the Department of Natural Resources in Indiana and
19  began work within the Indiana state park system.
20  Stayed there through 19 -- 1971 through 1991.
21  In the interim, I had several small
22  businesses I operated at the same time.  Businesses
23  in Indianapolis, there were three of those.  One was
24  an Indy car racing operation.  One was an endurance
25  management company for races like marathons and

**Page 11**

1  A.  Taught, unbelievably, in both elementary
2  and high school.
3  Q.  Okay.
4  A.  Elementary in Edinburgh and then high
5  school at Franklin, Indiana.
6  Q.  Do you have any experience in Olympic
7  athletes either as a competitor athlete or as a coach?
8  A.  I'm not that level of athlete.  I'm a
9  recreational athlete.
10  Q.  You do triathlon for recreation?
11  A.  Yes.
12  Q.  Do you have any background in taekwondo
13  before 2003?
14  A.  I had none.
15  Q.  You mentioned that you were executive
16  director with the Olympic national governing body for
17  triathlon?
18  A.  Yes.
19  Q.  I'm sorry.  That's called --
20  A.  It's called USA Triathlon.
21  Q.  USA Triathlon.  You did that for 12
22  years up through 2003 or '4?
23  A.  January 12th, 2004, I think, was the
24  date I resigned.
25  Q.  Did you -- did you leave Triathlon?

**Page 10**

1  triathlons and that sort of thing.  And another was a
2  restaurant in Indianapolis.
3  And then I migrated to Colorado Springs
4  in 19 -- in the late part of 1991 after being
5  selected as executive director of USA Triathlon.  Was
6  in that role for 12 years and in the interim also had
7  a small business in Louisville, Colorado.  It was a
8  restaurant.
9  Currently after having resigned from my
10  position as executive director of USA Triathlon, I
11  owned a small business in Colorado Springs.
12  Q.  Another restaurant business?
13  A.  No.  It's completely different.  This is
14  a franchise operation.  It's a junk collection
15  business called 1-800-Got-Junk.
16  Q.  And so you maintain that business
17  and -- as a full-time vocation?
18  A.  Yes.
19  Q.  And briefly, what formal education did
20  you have after high school?
21  A.  I have an undergraduate degree from Ball
22  State University with a major in biology and
23  chemistry minors and physics minors.
24  Q.  I'm sorry.  You said you did some
25  teaching.  What level were you teaching at?

**Page 12**

1  A.  On my own accord, yes.
2  Q.  What were the reasons for deciding to
3  leave?
4  A.  I had two reasons.  One I had prostate
5  cancer and was dealing with prostate cancer at that
6  point.  And then secondly was we had a board of
7  directors that was conducting an election in an
8  illegal fashion that was determined to be illegal
9  after an investigation by USOC.
10  Q.  Did you say a board of directors?
11  A.  Yes.
12  Q.  How many people are on the board of
13  directors or were on the board of directors during
14  that inquiry?
15  A.  There are -- there were and there are 11
16  members.
17  Q.  Was there some sort of a arbitration or
18  hearing that determined what you just said?
19  A.  There was a hearing conducted by the
20  United States Olympic Committee hearings panel that
21  determined the election was improperly conducted.
22  Q.  And who was the one being elected that
23  you referred to?
24  A.  There were several being elected, and so
25  the election was overturned and was rerun.

**Page 13**

1    Q.   Was it -- was it because of that finding
2  the reason that you decided to go your separate way?
3    A.   No.  The finding was subsequent to my
4  resignation.
5    Q.   So you discovered the deficiencies with
6  the election process and decided you didn't want to
7  be affiliated any longer?
8    A.   I found them to be unacceptable, and
9  then also dealing with prostate cancer was creating
10  some time issues for me.
11    Q.   Did -- did U.S.A Triathlon ever have any
12  financial problems?  By that, I mean, getting into
13  situations where the expenses were greater than the
14  incomes?
15    A.   Well, I wouldn't call them financial
16  problems.  I would call them at first when I first
17  arrived financial constraints.  We had very limited
18  revenue streams.
19    Q.   And like taekwondo is only a part of
20  triathlon's budget subsidized by the USOC?
21    A.   At that time when I arrived, we were not
22  an Olympic sport, and we were an affiliated sport
23  organization.  So we had very little income coming in
24  for the United States Olympic Committee.
25    Q.   Over time was USA Triathlon able to get

**Page 14**

1  its certification to become an Olympic sport?
2    A.   Yes.  We first became an American -- a
3  Pan Am sport, then we became an Olympic sport.
4    MR. LEVINSTEIN:  Just for the record, it
5  was not in the games, so it wasn't that USA Triathlon
6  didn't qualify while other countries had a triathlon.
7    THE WITNESS:  Right.
8    MR. LEVINSTEIN:  We had to wait until
9  the Olympics said triathlon was in.  So your question
10  sort of suggested they hadn't been certified, but
11  they could be certified in was an Olympic sport --
12    BY MR. JONES:  Do you agree with your
13  counsel?
14    A.   I do.  And just so you know, I think you
15  know this.  Triathlon became an Olympic sport when
16  taekwondo became an Olympic sport officially on the
17  program.
18    Q.   What year was that?
19    A.   I think we were accepted as an NGB -- we
20  went through the compliance issues in 1998.
21    Q.   Once USA Triathlon started getting money
22  from USOC, did it have to submit to the same audit
23  procedures that all NGB's have to submit to?
24    A.   Yes, we did.
25    Q.   Did USOC ever find fault with or ever

**Page 15**

1  criticize USA Triathlon regarding any of its
2  accounting practices?
3    A.   We had no deficiencies.
4    Q.   So the answer is no?
5    A.   The answer is no.
6    Q.   Was USA Triathlon's various
7  certifications ever in jeopardy or -- as far as USOC
8  was concerned as far as you know?
9    MR. LEVINSTEIN:  Objection.  Vague and
10  ambiguous what certifications you're talking about.
11    THE WITNESS:  No.
12    Q.   BY MR. JONES:  As an executive director
13  of USA Triathlon, did you ever participate in the
14  process of determining coach selection criteria for
15  any of the events that USA Triathlon participated in?
16    A.   No.
17    Q.   Did it -- did it have a coach selection
18  criteria?
19    A.   We had a coaching selection criteria,
20  yes.
21    Q.   Do you know anything about -- can you
22  describe to me what the coach selection criteria was
23  that was in effect as of the last years you were with
24  USA Triathlon?
25    MR. LEVINSTEIN:  Objection.

**Page 16**

1    THE WITNESS:  I honestly do not recall
2  what that criteria was.
3    Q.   BY MR. JONES:  And is it -- is it
4  correct that triathlon and taekwondo are the only
5  Olympic sports that you've been directly involved
6  with?
7    MR. LEVINSTEIN:  Objection.
8    THE WITNESS:  Directly, yes.
9    Q.   BY MR. JONES:  Have you ever been
10  associated in any capacity with the United States
11  Olympic Committee?
12    A.   I was a board member and a member of
13  various committees.
14    Q.   During what years were you a board
15  member, if it was in the past?
16    A.   1998 through the term -- through my
17  resignation.  Well, actually, would be on my
18  resignation.  Until the board was suspended as it was
19  constituted at that time.
20    Q.   Have any idea what year we're talking
21  about?
22    A.   The board was reconstituted in 2004, the
23  USOC board was.
24    Q.   Was reconstituted.  Does that mean cut
25  down in size?

**Page 17**

1      A.   Yes.

2      Q.   Do you know what the size was from '98

3  to 2004, if it was one size?

4      A.   Approximately 123 at that time when I

5  was serving.  Currently now, I think it is 11.

6      Q.   And what was your understanding of

7  functions of the board during '98 to 2004?

8      MR. LEVINSTEIN:  Objection.

9      MR. JONES:  If you know.

10     THE WITNESS:  Development in --

11  development of policy, voting of officers.

12     Q.   BY MR. JONES:  Not unlike the board of

13  directors of a corporation?

14     MR. LEVINSTEIN:  Objection.

15     THE WITNESS:  I don't know.  I don't

16  know the -- what the equivalencies would be.

17     Q.   BY MR. JONES:  Turning to the committees

18  that you recall serving on, what committees were you

19  on or subcommittees of the USOC?

20     A.   I was on a committee called the Training

21  Centers Committee, which dealt with all four training

22  centers under the auspices of the USOC, and I was on

23  the Budget Committee.

24     Q.   During what years were you on the

25  Training Centers Committee?

**Page 18**

1      A.   The Training Centers Committee I was on

2  from 1998 to approximately 2000.  I think in 2000 it

3  was suspended and no longer existed.  I was on the

4  Budget Committee from 2000 until the suspension of

5  the board as it was constituted.

6      Q.   2004.  Is that correct?

7      A.   Yes.

8      Q.   The training centers -- I'm sorry.  The

9  Training Centers Committee was responsible for what?

10  Training centers as it says or --

11     A.   Provided overview for the operation of

12  Olympic Training Centers, providing guidance on

13  preventive maintenance, rehab, rehabilitation,

14  capital expenses.

15     Q.   Would that be training centers for all

16  sports?

17     A.   No.  Training centers for the Olympic

18  Training Centers of which there are four.

19     Q.   Colorado Springs would be one?

20     A.   Yes.  San Diego is the other; Marquette

21  is another, and Lake Placid is the fourth.

22     Q.   Are the positions you have held with the

23  USOC, first as a board member, is that a voluntary

24  position?

25     A.   All positions I have held with USOC are

**Page 19**

1  voluntary positions.

2      MR. LEVINSTEIN:  Objection.  Just

3  volunteer positions?

4      MR. JONES:  Volunteer, yes.

5      MR. LEVINSTEIN:  As opposed to not paid.

6      THE WITNESS:  Nonpaid positions.

7      MR. LEVINSTEIN:  I assume all positions

8  are voluntary in some sense paid-wise.

9      Q.   BY MR. JONES:  Is it correct you have

10  never been on salary with the USOC?

11     A.   That is correct.

12     Q.   As a former member of the Budget

13  Committee, did you review the budget of the USOC

14  during the years you served?

15     A.   Yes.

16     Q.   Roughly, what was the gross operating

17  budget of the USOC during 2004, if you remember?

18     MR. LEVINSTEIN:  Objection.

19     THE WITNESS:  I do not remember.  I

20  don't remember that number.

21     Q.   BY MR. JONES:  It's in the tens of

22  millions of dollars?

23     MR. LEVINSTEIN:  Objection.

24     THE WITNESS:  Is it in the tens of

25  millions of dollars?

**Page 20**

1      MR. JONES:  Tens of millions.

2      THE WITNESS:  Sure.

3      Q.   BY MR. JONES:  Is it --

4      A.   Yes.

5      Q.   Is it over a hundred million?

6      MR. LEVINSTEIN:  Objection.

7      THE WITNESS:  You know, I don't recall.

8  I don't think so.

9      Q.   BY MR. JONES:  Is the USOC budget public

10  record, if you know?

11     A.   I believe it is.

12     Q.   Where would one go to see the USOC's

13  budget, if it's public record?

14     A.   You know, I -- I take that back.  I'll

15  have to say I don't know if it is public record.

16     Q.   Did you keep any of your annual

17  statements from the USOC given to you as a member of

18  the Budget Committee from 2004?

19     A.   I did not.

20     Q.   In your capacity as a board member of

21  the USOC up through 2004 or whenever it was exactly

22  that you resigned, did you ever attend any USOC

23  committee meetings which specifically concerned the

24  United States Taekwondo Union?

25     A.   I did not.

1  MR. LEVINSTEIN:  For the record, I don't
2  know that he resigned from the USOC board or just
3  automatically stopped being on the board when a new
4  board took over.
5  MR. JONES:  Okay.  I'll use whatever
6  term you're comfortable with.  Call it ending the
7  relationship.
8  MR. LEVINSTEIN:  His term ended.
9  MR. JONES:  Term ended.
10  Q.  BY MR. JONES:  Outside of a meeting
11  context with the USOC, did you as a board member
12  ever -- were you ever called upon just to discuss any
13  issues concerning USTU?
14  A.  I was not.
15  Q.  Do you now hold any titles with United
16  States Taekwondo Union, which I'll continue to call
17  USTU?
18  MR. LEVINSTEIN:  It's now USA Taekwondo,
19  but --
20  MR. JONES:  Aka USA Taekwondo.
21  THE WITNESS:  Well, it's not aka.  It is
22  USA Taekwondo.  And the chair of the Governance and
23  Management Committee.
24  Q.  BY MR. JONES:  When did you become
25  chair?

1  other relationship you have with him?
2  A.  I have no relationship other than a
3  business relationship with Jim.
4  Q.  Can you describe for us that business
5  relationship?
6  A.  The essence of the business relationship
7  is the appointment to the Governance and Management
8  Committee.
9  Q.  Did he personally ask you to serve?
10  A.  He asked through Jeff Benz, counsel,
11  USOC.
12  Q.  Was this before or after you had already
13  ended your relationship with USA Triathlon?
14  A.  It was after.
15  Q.  And what, if anything, was said by
16  Mr. Benz to you when the offer was made?
17  A.  Other than asking me if I would be
18  willing to accept the position, there was little
19  said.
20  Q.  No one described to you the tasks that
21  lay ahead or the problems that USTU faced?
22  MR. LEVINSTEIN:  Objection.
23  THE WITNESS:  In very vague terms.
24  Mostly financial were -- was my view; really, my
25  expertise.

1  A.  Approximately February of 2004.
2  February, March time frame.
3  Q.  I'll refer to that Governance and
4  Management Committee as GMC at times, if I could.
5  A.  Okay.
6  Q.  What -- what do you see as your duties
7  as chair of GMC?
8  A.  To provide oversight, to provide policy
9  direction.
10  Q.  I'm sorry.  Policy direction?
11  A.  Yes.
12  Q.  Do you know a Mr. Jim Scherr?
13  A.  I do.
14  Q.  How -- well, first of all, who is he as
15  far as the USOC is concerned?
16  A.  Jim is the CEO of the USOC.
17  Q.  Have you worked with him?
18  A.  Have I worked with Jim before?
19  Q.  Yes.
20  A.  In --
21  Q.  In any capacity.
22  A.  No official capacity.
23  Q.  You've met him?
24  A.  Yes.
25  Q.  Other than having met him, is there any

1  Q.  BY MR. JONES:  Do you know a Mr. Tom
2  Satrom?
3  A.  I do.
4  Q.  How do you know him?
5  A.  Satrom was on the board of directors at
6  the same time I was, and he was chair of the
7  Membership Credentials Committee for the United
8  States Olympic Committee.
9  Q.  Have you ever had cause -- well, you
10  worked with him then as board members on the same
11  board?
12  A.  Remembering that this board was a big
13  board, no, I didn't work with Tom.
14  Q.  How does one conduct a meeting with 120
15  board members?
16  MR. LEVINSTEIN:  Object.
17  Q.  BY MR. JONES:  I mean, is it conference
18  call or --
19  A.  Typically, we met two times a year en
20  masse.
21  Q.  Did you meet him at those mass meetings?
22  A.  I would see him at those meetings.
23  Q.  Any other context or business dealings
24  with Mr. Satrom as far as USOC work?
25  A.  I've never been involved with Tom on a

**Page 25**

1  committee or any other capacity.
2      Q.   Same question for Ms. Jeannie
3  Picarriello.  Do you know her?
4      A.   I do.
5      Q.   And how do you know her?
6      A.   Jeannie served on the board of directors
7  during the same time frame I did.
8      Q.   Would the response be the same as far as
9  how you -- how often you saw her?
10      A.   Precisely the same as Tom.
11      Q.   And before joining the GMC, did you know
12  Mr. Robert Gambardella in any capacity?
13      A.   I did.
14      Q.   And how did you know him?
15      A.   I knew Bob when he was in volleyball and
16  knew when he migrated from volleyball into USOC
17  Sports Partnerships and then after that migrating
18  into International Relations.
19      Q.   Did you ever work with him on any
20  particular projects?
21      A.   No.
22      Q.   I'd like to turn now to another area.
23  I'm sorry.  Before I -- before I jump into
24  the -- this other area, I just had one question.  Did
25  you ever serve as a member of a hearing panel for the

**Page 27**

1  it was three or more.
2      THE WITNESS:  Was it three?  How time
3  slips away.  Was it three?
4      MR. LEVINSTEIN:  It was in 2002 or
5  earlier, I think.
6      THE WITNESS:  Okay.
7      MR. LEVINSTEIN:  Fairly sure, but he's
8  got a document.  He may know.
9      MR. JONES:  I will be referring at times
10  in the deposition to documents that have already been
11  marked and identified in previous depositions.  I
12  will try to give counsel copies if I have them.
13  First one is the -- has been marked as Exhibit 45.
14      (Mr. Jones gives Exhibit 45 to Mr.
15  Levinstein.)
16      MR. LEVINSTEIN:  Thank you, sir.
17      Q.   BY MR. JONES:  Why don't you take a
18  minute to go ahead and review that, please.
19      Have you had a chance to review Exhibit
20  45?
21      A.   Yes.
22      Q.   What is Exhibit 45?
23      A.   It is -- it consists of the minutes of
24  the first meeting that we had as a Governance and
25  Management Committee.

**Page 26**

1  equestrian NGB?
2      A.   I did.
3      Q.   As a hearing panel member, what did that
4  mean?  Were you serving as an arbitrator or a judge?
5      A.   We were serving as an arbitrator
6  arbitrating an issue between the two organizations
7  within equestrian.
8      Q.   "Two organizations," meaning was one of
9  them the NGB for equestrian?
10      A.   It was a coshared responsibility.
11      Q.   What was the nature of the dispute that
12  you were called upon to help decide?
13      A.   The nature of the dispute was complex,
14  so complex it's lost upon me now exactly what took
15  place.
16      Q.   Was -- was one of the group's
17  certification as the NGB in jeopardy in that
18  proceeding?
19      MR. LEVINSTEIN:  Object.
20      THE WITNESS:  I don't recall.
21      Q.   BY MR. JONES:  How long ago are we
22  talking about as far as that hearing?
23      A.   I think approximately two, two and a
24  half years ago.
25      MR. LEVINSTEIN:  For the record, I think

**Page 28**

1      Q.   The second page of the document says
2  that it was approved on February 12, 2004.  Does it
3  not?
4      A.   It does say that.
5      Q.   Was it approved on February 12th, 2004,
6  as far as you know?
7      A.   As far as I know.
8      Q.   Is the document a true and -- true and
9  accurate as to what went on at the meeting on
10  February 5th, 2004, as far as you know?
11      MR. LEVINSTEIN:  Objection.
12      THE WITNESS:  As far as I know.
13      Q.   BY MR. JONES:  You were given the
14  opportunity to change the contents of the document if
15  you saw inaccuracies, I assume, at the next meeting?
16      A.   Sure.
17      Q.   And were any done by you?
18      MR. LEVINSTEIN:  Objection.
19      THE WITNESS:  I do not recall.
20      Q.   BY MR. JONES:  The second paragraph, if
21  you'll focus on that one for a second.
22      A.   Of which page?
23      Q.   I'm sorry.  Page 1.  Talks about a
24  financial progress report given by Ms. Witte in which
25  she says there are immediate cash needs of $350,000.

1    Do you recall that discussion?

2         A.   Yes.

3         Q.   How would you compare that with the

4    current financial condition of USA Taekwondo?  Is

5    that -- is that improved or is it worse or is it the

6    same?

7              MR. LEVINSTEIN:  Objection.  Meeting

8    cash needs doesn't mean overall financial condition,

9    but go ahead.

10             THE WITNESS:  Well, the financial

11   condition was very poor at this time.  The financial

12   condition is now stabilized at the current time

13   frame.

14        Q.   BY MR. JONES:  Is it -- is USA Taekwondo

15   in the black?

16        A.   It's relatively in the black.  It's

17   paying its bills.

18        Q.   Same paragraph goes on to mention that

19   "membership renewals are lagging as many members and

20   clubs are apparently waiting to see if the

21   restructure succeeds."  Was that the situation at

22   that time as far as you know?

23        A.   As far as I know, yes.

24        Q.   What is the situation now?  Has it

25   gotten better, stayed the same, or gotten worse?

1         Q.   As you sit here today, do you have any

2    recollection of any -- anything substance --

3    substantive as to what the new criteria would say or

4    be based on?

5         A.   At that point?

6         Q.   Yes.

7         A.   No.

8         Q.   At that point in time, did you know what

9    the previous coach selection criteria were at USTU?

10        A.   I did not.

11        Q.   So it's fair to state then that

12   you -- the committee did not have a copy of the

13   existing criteria on February 5, 2004, when the -- in

14   this meeting discussing criteria?

15        A.   I don't recall if we had the criteria.

16        Q.   At any time, did you research what the

17   old criteria were?

18        A.   I did not.

19        Q.   Is there any reason that you did not

20   research or attempt to find out what the old criteria

21   were?

22             MR. LEVINSTEIN:  Objection.

23             THE WITNESS:  We had issues that were

24   principally financial and governance related.  They

25   were of high, high priority that we had to deal with.

1         A.   Better.

2         Q.   And the last paragraph talks about a

3    discussion which was had concerning the team leader

4    and coach appointments for the Athens games and also

5    goes on to state that the eligibility requirements

6    are being written -- rewritten by the USOC, and the

7    earlier appointments may have to be rescinded as soon

8    as those new requirements are clarified by the USOC.

9    Further discussion will wait until the new

10   information is available.  Have I generally read that

11   correctly?

12        A.   Yes.

13        Q.   Other than what's stated there, can you

14   recall the details, if any, of anything that was

15   discussed in that conversation at that meeting on

16   February 5, 2004, amongst the GMC?

17        A.   No.

18        Q.   With respect to the actual writing of

19   the new coach selection criteria, is that what

20   happened?  Did the USOC write the new criteria as

21   that paragraph states?

22        A.   Insofar as I know.

23        Q.   Do you know who at the USOC wrote

24   the -- these new criteria?

25        A.   I do not.

1    Principally, financial.

2         Q.   BY MR. JONES:  Does that -- does that

3    mean you did not have the time to look at -- go into

4    looking at the old coaching criteria?

5              MR. LEVINSTEIN:  Objection.

6              THE WITNESS:  It means that we were

7    concentrating, at least I was concentrating on the

8    financial aspects of this organization.

9         Q.   BY MR. JONES:  Do you know if any other

10   members of the GMC were working on coach selection

11   criteria at that point in time?

12        A.   I do not.

13        Q.   How did the GMC know as of February 5,

14   2004, that the coach selection criteria needed

15   changing if it didn't know what the previous criteria

16   were?

17             MR. LEVINSTEIN:  Objection.

18             THE WITNESS:  If you want me to be

19   precise, I can't because I don't recall that aspect

20   of the conversation.

21        Q.   BY MR. JONES:  So would the answer be "I

22   don't know"?

23        A.   I don't know.

24        Q.   And is it correct that as of the

25   February 5, 2004, meeting you did not know what the

1  relative success of the USTU had been in Olympic

2  competitions with respect to medals won under the old

3  coach selection criteria?

4      A.   I did not know that.

5      Q.   In other words, you didn't know how many

6  medals they won.

7      A.   No, I didn't.

8      Q.   You were unaware at that time that USTU

9  had won 22 medals under the old coach selection

10  criteria then?

11      MR. LEVINSTEIN:  Objection.

12      Q.   BY MR. JONES:  Is that fair?

13      A.   I was unaware of the medal accumulation,

14  period.

15      Q.   If you had known that, would it have

16  mattered?

17      MR. LEVINSTEIN:  That's speculative.

18      Q.   BY MR. JONES:  The answer is you don't

19  know?

20      MR. LEVINSTEIN:  Objection.

21      THE WITNESS:  It's imposs -- my answer

22  is it's impossible to speculate at this point.

23      Q.   BY MR. JONES:  Might it have mattered?

24      MR. LEVINSTEIN:  Objection.

25      THE WITNESS:  I don't know.

1  with me that prior experience at a similar job is

2  relevant?

3      A.   I would say it is a key component of

4  consideration.

5      Q.   Turning to page 2 of Exhibit 45, it

6  states that Mr. Skinner pointed out that the position

7  of secretary general for USTU was now vacant.  Who is

8  Mr. Skinner, if you know?

9      A.   Mr. Skinner is the sport partner or the

10  director, the liaison from the United States Olympic

11  Committee to taekwondo.  Taekwondo is part of his

12  portfolio.

13      Q.   Prior to joining the GMC, had you met

14  Mr. Skinner in any capacity?

15      A.   I have never met Mr. Skinner.

16      Q.   What -- at that time, what was your

17  understanding of the job description of the secretary

18  general of the USTU?

19      A.   Secretary general responsibility as I

20  understand it is the liaison from USA Taekwondo to

21  the International Federation.

22      Q.   It goes on to state in the minutes that

23  in the past it was separated from the CEO position

24  and held by a volunteer.  Discussion was held on the

25  merits of having one person fill both positions.

1      Q.   BY MR. JONES:  As you sit here today,

2  can you recall any statements by any of the other

3  members regarding coach selection at the February

4  5th, 2004, meeting?

5      A.   I do not recall any statements made in

6  that regard.

7      Q.   If you were to assume for a moment that

8  the old criteria required that the candidate for the

9  Olympic coach had to have prior coaching experience,

10  just assume that to be the case, would you agree that

11  prior coaching experience is a relevant precondition

12  for the job?

13      A.   Your question is:  Is relevant

14  coaching -- is prior coaching experience required for

15  the job?

16      Q.   If it -- if it was a key criteria under

17  the old coach selection criteria, prior experience,

18  coaching at international competitions, would you

19  agree with me that that is a relevant criteria?

20      MR. LEVINSTEIN:  Objection.

21      THE WITNESS:  I think I would have to

22  know more before I answered that question.  I

23  think -- I think it's a vague question.

24      Q.   BY MR. JONES:  As a general principle,

25  before anyone applies for a new job, would you agree

1  Consensus was reached and a motion made to name

2  Mr. Gambardella as the secretary general to allow a

3  more unified approach internationally as well as

4  domestically.  He will attend taekwondo test events

5  in Athens March 13th through 14th.  Have I read that

6  correctly, generally?

7      A.   Yes.

8      Q.   I realize this was the first meeting,

9  but how did -- how was decision making done in this

10  group of five?  Were -- were votes generally taken?

11      A.   Votes were taken.  Votes were taken of

12  all -- in all substantive issues.  This was a

13  substantive issue.  A vote was taken and was

14  approved.

15      Q.   In your understanding, what -- what was

16  needed to pass a vote?  Would it be unanimous or

17  majority?

18      A.   Majority.

19      Q.   So three out of five could carry the

20  day.

21      A.   Yes.

22      Q.   And did that continue to be the case up

23  to today, as far as you know?

24      A.   Yes.

25      Q.   When the decision was made to, shall I

**[Page 37]**

```
 1   say, delegate the duties of secretary general to
 2   Mr. Gambardella, did anyone look at what the
 3   remediation agreement documentation said in this
 4   regard?
 5              MR. LEVINSTEIN:  Objection.
 6              THE WITNESS:  I don't recall.
 7        Q.  BY MR. JONES:  You don't recall
 8   any -- anyone mentioning that the remediation
 9   agreement stated that the GMC was to assume these job
10   duties of the secretary general?
11        A.  Well, I do know that, but I do not
12   recall that discussion.  That was your question.
13        Q.  Yes.  You know that now?
14        A.  Yes.
15        Q.  When did you first learn that?
16        A.  When I read the remediation agreement.
17        Q.  And would that be before this meeting?
18        A.  Yes.
19        Q.  Knowing what it says, was that any cause
20   of concern before the consensus was taken to delegate
21   that position?
22        A.  No.
23              MR. LEVINSTEIN:  Objection.
24        Q.  BY MR. JONES:  Would it be fair to state
25   that as least for yourself you felt the -- those
```

**[Page 38]**

```
 1   duties were delegable?
 2        A.  Yes.
 3        Q.  And lastly, that set of minutes we're
 4   looking at refers to a town meeting coming up at the
 5   Sundome in Tampa on February 17.  Did you attend that
 6   meeting, as it -- as it apparently says you would?
 7        A.  Yes.
 8        Q.  Okay.  Turning to the next page, if you
 9   could turn to 57.
10              (Mr. Jones gives Exhibit 57 to Mr.
11   Levinstein.)
12              MR. LEVINSTEIN:  Thank you.
13        Q.  BY MR. JONES:  I'll give you a minute to
14   review that.
15              You've read Exhibit 57?
16        A.  Yes.
17        Q.  What is this exhibit?
18        A.  This is a copy of the minutes from the
19   February 26th, 2004, Governance and Management
20   Committee meeting.
21        Q.  You attended that meeting?
22        A.  I did.
23        Q.  Says at the end of the minutes on page 2
24   that they were approved on March 3rd, 2004.  Were
25   they, as far as you know?
```

**[Page 39]**

```
 1        A.  Insofar as I know.
 2        Q.  Are they -- are the minutes true and
 3   correct as to contents, as far as you can see?
 4        A.  As best as I recall.
 5        Q.  You had the opportunity to make changes
 6   before approving them at the meeting on March 3rd?
 7        A.  Indeed.
 8        Q.  And as you sit here today, do you
 9   remember making any changes?
10        A.  I don't recall.
11        Q.  Paragraph 2 talks about a, I guess,
12   comment by Gary Johansen noting that there were seven
13   votes lacking in order for the USTU Board of
14   Governors to ratify the remediation plan that the
15   USTU Executive Committee had approved.  Goes on to
16   state calls are being made to remind voters to send
17   in their ballots.  Do you recall that conversation?
18        A.  I recall Gary making that reference.
19        Q.  Do you know one way or the other whether
20   these seven votes were needed to make the remediation
21   a binding agreement?
22        A.  I don't know the outcome, but I presume
23   that it was.
24        Q.  That the seven votes were needed?
25        A.  Yes.
```

**[Page 40]**

```
 1        Q.  If it was your understanding on February
 2   26th that seven votes were needed to make this
 3   remediation binding, do you know why the GMC was
 4   already meeting and conducting business before the
 5   seven votes were obtained?
 6        A.  I can't answer that because I don't
 7   know.
 8        Q.  Do you know if the seven votes were
 9   eventually obtained?
10        A.  I presume they were.
11        Q.  Do you have any idea when?
12        A.  I do not.
13        Q.  Third paragraph, "Virginia Witte
14   reviewed the financial position summary as of
15   February 25th at 3 p.m."  It says in parentheses
16   "attached."  As far as you know, were there some sort
17   of financial statement attached to Exhibit 57
18   originally?
19        A.  I presume there was, but I cannot answer
20   that in any -- well, I presume there was.
21              MR. JONES:  Counsel, could I ask that we
22   have the complete document at some point unless
23   there's objection?
24              MR. LEVINSTEIN:  You have produced the
25   minutes and what was attached to them as we have,
```

1  so --
2         MR. JONES:  Is it your representation
3  that you do not have the financial statement either
4  that was attached?
5         MR. LEVINSTEIN:  I don't have a copy of
6  the minutes that had the financial position attached
7  to it, so I don't know that we know what the
8  financial position as of February 25th at 3:00 p.m.
9  was.  We didn't take minutes and remove things --
10         MR. JONES:  Okay.
11         MR. LEVINSTEIN:  -- that we knew were
12  attached.
13         MR. JONES:  Fair enough.
14     Q.  BY MR. JONES:  Goes on to state
15  that -- well, goes on to state, "Bob stated that his
16  first emphasis would be to find a strong CFO who can
17  take on other duties such as human resources and
18  insurance."  At some point in time, did USTU hire a
19  chief financial officer?
20     A.  Yes.
21     Q.  Who was that person?
22     A.  Tom.  I don't recall Tom's last name.
23     Q.  Do you have any feel for approximately
24  when he was hired?
25     A.  My best recollection was in mid-March.

1  conference call scheduled for Tuesday at 3:00 p.m.
2  Did that call that's referred to there go forward?
3     A.  Yes.
4     Q.  You -- did you call the USOC Executive
5  Committee or did they call you?
6     A.  I called in on the conference call, as
7  everybody else did.
8     Q.  And were you the only one from USTU that
9  participated in that conference call?
10     A.  As I recall, I think I was.  Bob may
11  have, but I just don't recall.
12     Q.  And roughly, how many people were on the
13  USOC Executive Committee at that time?
14     A.  23.
15     Q.  And they had a quorum of people
16  participating?
17     A.  As far as I know or they wouldn't have
18  conducted the call.
19     Q.  What was the agenda for the call, as far
20  as you remember?
21     A.  I don't recall --
22         MR. LEVINSTEIN:  Objection.
23         THE WITNESS:  -- the agenda.
24     Q.  BY MR. JONES:  As far as you know, did
25  you update the USOC on what was happening at USTU?

1     Q.  Is he still with the organization?
2     A.  Yes.
3     Q.  Last sentence on page 1 goes into a
4  discussion regarding the loss of two credentials for
5  officials at the Athens games, explains that USTU
6  originally were allocated three credentials, team
7  leader, coach, team official.  It says it declined in
8  the sports that it qualified USOC had to cut a number
9  of credentials allocated to a number of sports, one
10  of which was taekwondo.  Various ideas on methods of
11  retaining at least one of the credentials were
12  discussed.  Bob will discuss with WTF on this and
13  this item will be placed on the agenda for discussion
14  with Jim Scherr during the conference call next
15  Wednesday.
16         Do you remember that discussion?
17     A.  Yes.
18     Q.  What do you recall specifically on the
19  credentials or loss of credentials discussion?
20     A.  Just as the paragraph suggests.
21     Q.  No other -- no other details?
22     A.  No.
23     Q.  Next paragraph mentions your name
24  stating that you will update the USOC Executive
25  Committee concerning taekwondo governance on their

1     A.  Yes.
2     Q.  Was the update that you gave in written
3  form anywhere?
4     A.  No.
5     Q.  As you sit here today, can you remember
6  anything about the call?
7     A.  The update principally revolved around
8  financial issues and governance issues and review of
9  the meeting in Florida.
10     Q.  Anything in particular on those issues
11  you've just listed that you recall relating --
12     A.  Just a recap of the financial situation
13  at that time and what we were doing to resolve that
14  situation and review of the meeting that we had in
15  Florida during the open.
16     Q.  Was coaching selection discussed at all
17  in that conference call?
18     A.  No, not as I recall.
19     Q.  Did you retain any written notes of any
20  kind regarding the call?
21     A.  No.
22     Q.  The next bullet on page 2 talks about a
23  discussion concerning the event manager contract with
24  Tim Connolly.  It was decided to proceed to terminate
25  the agreement with the advice from Jeff Benz.  What

1  were the reasons for terminating Mr. Connolly's
2  contract, if you can recall?
3          MR. LEVINSTEIN:  Objection.  Instruct
4  him not to answer.  Calls for attorney/client
5  communication.  Probably shouldn't have even --
6  should have redacted that little bullet, but --
7          MR. JONES:  Okay.
8          MR. LEVINSTEIN:  -- it doesn't disclose
9  what the advice was, so --
10         MR. JONES:  Okay.
11         MR. LEVINSTEIN:  -- we decided that that
12 would cause concerns that we were redacting things --
13         MR. JONES:  All right.
14         MR. LEVINSTEIN:  -- but --
15     Q.  BY MR. JONES:  Separating whatever
16 Mr. Benz said for a moment, do you recall if
17 budgetary considerations were one of the reasons for
18 terminating the contract?
19         MR. LEVINSTEIN:  Objection.  Again,
20 whatever they said to Mr. Benz and whatever Mr. Benz
21 said back, if you can recall separate from any
22 conversation with Mr. Benz and so on, your reasons
23 that -- or the reasons that you believe the GMC
24 decided to terminate Mr. Connolly's agreement, any of
25 them -- again, I don't know what the relevance of

45

1  this is, and I'm concerned about an employment matter
2  between -- that has nothing to do with this case
3  between them and an employee in discussing that could
4  be a subject to litigation at some point, for all I
5  know, about what they were thinking and why they were
6  terminating him.
7          If you have a clear memory because they
8  thought they should terminate him and what factors
9  they were thinking about, I don't know how that's
10 relevant.  I mean, if you can try again.
11         MR. JONES:  Okay.
12         MR. LEVINSTEIN:  If you just could give
13 me some sense of why this is relevant.
14         MR. JONES:  Just basically because the
15 issue has been the financial condition of USTU, has
16 been the key supporting point for the
17 decertification.  Am I wrong?
18         MR. LEVINSTEIN:  No.  There's a ton of
19 noncompliance issues, but there was no
20 decertification.  It was an agreement, so what they
21 did in February -- it's clear that they terminated a
22 guy.  They didn't have to pay him anymore, so it
23 saved them money.
24         MR. JONES:  That's all -- that's all I'm
25 asking.

46

1      Q.  BY MR. JONES:  Do you agree with your
2  counsel?
3      A.  I do.
4          MR. JONES:  Okay.  Move on.
5          MR. LEVINSTEIN:  Okay.  That's not
6  necessarily why they terminated him, but the fact
7  that they did, they didn't have to pay him, and
8  obviously, that saves money.
9      Q.  BY MR. JONES:  Fifth bullet talks about
10 a mid-year meeting will be scheduled in Colorado
11 Springs, but all attendees must pay their own way
12 with the exception of the athletes.  No
13 constitutional amendments will be allowed.
14         Other than that statement, "no
15 constitutional amendments will be allowed," do you
16 remember any discussion about constitutional
17 amendments?
18     A.  I do not.
19     Q.  Don't know why that statement is in
20 there?
21     A.  I don't.
22     Q.  Did a mid-year meeting go forward in
23 Colorado Springs?
24     A.  Yes.
25     Q.  Do you remember the month it went

47

1  forward?
2      A.  I do not.
3      Q.  Then it goes on to mention that you as
4  the chair asked Tony Baggiano to lead a discussion on
5  governance and bylaw changes that must be formulated.
6  These four bullets were ideas or concepts that were
7  being considered by the -- by Mr. Baggiano and/or the
8  GMC?
9      A.  They were concepts being considered by
10 the GMC.
11     Q.  And in your understanding, were these
12 concepts toward satisfying requirements laid out in
13 the remediation agreement?
14     A.  They were concepts to not only do that,
15 but then also create an efficient governance system.
16     Q.  The March 11 conference call that's
17 mentioned in that paragraph is that conference call
18 that's different from the one that you participated
19 in with the USOC Executive Committee?
20     A.  Yes.
21     Q.  Did you participate in the March 11th
22 conference call?
23     A.  Insofar as I know, I believe I did.
24     Q.  Who -- who else besides you, Tony, Gary,
25 and Juan participated in the conference call, if you

48

**Page 49**

1    can recall?
2           MR. LEVINSTEIN:  It says the next
3    committee conference call.
4           THE WITNESS:  Yeah.  The entire
5    committee.
6       Q.  BY MR. JONES:  Okay.  This was a GMC
7    conference call?
8       A.  Yes.
9       Q.  Now, is it correct to state that these
10   minutes do not mention Olympic coach selection or
11   changes in selection criteria?
12      A.  These minutes as we read them?
13      Q.  Yes.
14      A.  I do not see a reference to those, so
15   I'd say that's correct.
16      Q.  And is it correct that Olympic coach
17   selection criteria were, therefore, not discussed at
18   that meeting?
19          MR. LEVINSTEIN:  Objection.
20          MR. JONES:  Assuming these minutes to be
21   true as you've testified.
22          MR. LEVINSTEIN:  Objection.
23          THE WITNESS:  Insofar as I know.
24      Q.  BY MR. JONES:  And similarly, is it
25   correct that Olympic coach selection was not

**Page 50**

1    discussed at the meeting?
2           MR. LEVINSTEIN:  Objection.
3           THE WITNESS:  Insofar as I know.
4           MR. JONES:  Next exhibit is 58.  Why
5    don't we take a break.  We've been going an hour.
6           (Recess taken from 10:12 a.m. to
7    10:19 a.m.)
8       Q.  BY MR. JONES:  Did you already take a
9    look at it?
10          MR. LEVINSTEIN:  I don't think he looked
11   at it.
12          MR. JONES:  Yeah.  Go ahead.
13          THE WITNESS:  Yes.
14      Q.  BY MR. JONES:  You've had a chance to
15   look at Exhibit 58?
16      A.  Yes.
17      Q.  Can you identify what that document is?
18      A.  It's a document to United States
19   Olympic Committee, Executive Committee, from Bob
20   Gambardella, myself having to do with Olympic team
21   staff selection.
22      Q.  And that's dated March 8, 2004?
23      A.  It is.
24      Q.  Is that your signature in script at the
25   top of the page?

**Page 51**

1       A.  It is.
2       Q.  Do you know who wrote this document?
3       A.  I do not.
4       Q.  Did you write it?
5       A.  I don't recall if I did.
6       Q.  Is it possible that counsel wrote it,
7    legal counsel?
8           MR. LEVINSTEIN:  Objection.
9           MR. JONES:  If you know.
10          THE WITNESS:  I can't speak to who wrote
11   it.
12      Q.  BY MR. JONES:  Is the contents true and
13   correct as far as you're concerned?
14      A.  Insofar as I know.
15      Q.  Now, before the date of this document,
16   March 8, and after February 26, the date of the
17   meeting we've just gone over in Exhibit 57, were
18   there any other GMC meetings conducted of the full
19   committee?
20      A.  I don't recall.
21      Q.  As you sit here today you cannot recall
22   any other meetings?
23          MR. LEVINSTEIN:  Objection.  Not what he
24   said.
25          THE WITNESS:  I don't recall.

**Page 52**

1       Q.  BY MR. JONES:  Would the fact that no
2    other minutes of meetings have been produced between
3    March 8th and February 26, if we assume there are no
4    minutes --
5           MR. LEVINSTEIN:  Objection.
6       Q.  BY MR. JONES:  -- lead you to conclude
7    that there were no meetings before March 8 and after
8    February 26?
9       A.  It does not lead me to conclude that.
10      Q.  Paragraph 2 of the document says, "After
11   our review, we determined that the -- that amending
12   the procedures at this time is paramount to the
13   success that we will have in Athens.  First, USTU
14   needs to be a performance-oriented organization.
15   Accordingly, selection procedures and nominations
16   must be based on objective standards that endeavor to
17   meet that goal."
18          "Second, it appears that because only
19   two taekwondo athletes have qualified for the 2004
20   Summer Olympic Games, the number of credentials that
21   are allowed to USTU must -- or may be limited.  Thus,
22   we must insure that the candidate for coach can also
23   fulfill team leader duties if called upon."
24          Have I read that generally correctly?
25      A.  Yes.

1    Q.    Paragraph 3 goes on to state that,
2  "Accordingly, we are submitting to you revised
3  selection procedures for coach and team leader
4  positions for the 2004 Summer Olympic Games.  We ask
5  that you vacate your earlier approval of the coach,
6  team leader selection procedures as well as the
7  nomination to fulfill those positions and adopt the
8  new procedures in their place.  By doing so, the
9  coach and team leader positions will be vacated until
10 such time as the USTU contemplates its athlete
11 selection process for nomination to" --
12         MR. LEVINSTEIN:  Completes.
13         MR. JONES:  Pardon me.  "Completes its
14 athlete selection process for nomination to the
15 Olympic team, thereby opening the coach and team
16 leader positions to any individual who meets the new
17 selection criteria.  After completion of the athlete
18 selection process, new nominations for coach and team
19 leader will be submitted to the USOC Executive
20 Committee for approval."
21         Have I read that generally correctly?
22    A.    Yes.
23         MR. LEVINSTEIN:  It was "fill" instead
24 of "fulfill" at one point.
25         MR. JONES:  I'm sorry.

1          MR. LEVINSTEIN:  It's okay.
2     Q.    BY MR. JONES:  With respect to paragraph
3  2, who is the "we" in the "we determined"?
4     A.    The Governance and Management Committee.
5     Q.    And with respect to paragraph 3, who is
6  the "we" in "we are submitting"?
7     A.    Governance and Management Committee.
8     Q.    Can you point to anywhere in the minutes
9  of the GMC meetings that we have gone through so far
10 where the GMC approved of the -- well, let me ask you
11 this first.  Was a coach selection criteria attached
12 to this document, as far as you know?
13    A.    I don't know.
14    Q.    Paragraph 3 seems to suggest that in the
15 first sentence.  Does it not?
16    A.    It suggests that.
17    Q.    Assuming that that's correct, can you
18 point to anywhere in the minutes of the GMC meetings
19 that we've already gone through where the GMC
20 actually approved as a body the coach selection
21 criteria that were being sent over to the USOC
22 Executive Committee for approval?
23    A.    None in the minutes that we have seen so
24 far.
25    Q.    Can you point to anywhere in the minutes

1  that we looked at so far where the GMC as a body
2  determined that the previous coach selection body by
3  USTU that his appointment should be vacated?
4     A.    Not in the minutes we've reviewed so
5  far.
6     Q.    Assuming that there are no such
7  minutes --
8          MR. LEVINSTEIN:  Objection.
9     Q.    BY MR. JONES:  -- assume that -- what
10 would be the basis for representing to the USOC
11 Executive Committee that the GMC as a body wished to
12 amend the criteria if it were attached to the March
13 8th memo?
14    A.    You're asking me to presume.  I presume
15 we had a telephonic conference call and came to that
16 conclusion.  That's my presumption.  Other than that,
17 I don't know.
18    Q.    As you -- let me ask you about that
19 telephone conference call.  As you sit here today, do
20 you know when such a conference call was had?
21    A.    You were asking me to presume, so I was
22 presuming.
23    Q.    I see.
24    A.    So I can't answer that.
25    Q.    You have no independent memory of such a

1  conference --
2     A.    I do --
3     Q.    -- call.
4     A.    -- not.
5     Q.    Nor do you have any independent memory
6  of what the substance of that conference call was?
7     A.    I don't.
8          MR. LEVINSTEIN:  Objection.
9     Q.    BY MR. JONES:  And you're not aware of
10 any documents that memorialize what went on in such a
11 conference call?
12    A.    I do not recall.
13    Q.    And you have no such notes or minutes
14 concerning such a call in your possession?
15    A.    I do not.
16         MR. LEVINSTEIN:  For the record, he has
17 no documents in his possession.
18    Q.    BY MR. JONES:  And would it be fair to
19 state that you don't know if USTU has any documents
20 in that regard in its possession?
21    A.    I do not know.
22    Q.    You have no independent recollection of
23 a vote being taken on the proposed new team -- new
24 coach selection criteria?
25    A.    I do not recall.

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 57**

1     Q.   Next exhibit, 59.

2          Have you had a chance to look at that?

3     A.   Yes.

4     Q.   Look at Exhibit 59.  Can you please

5 identify what document that is?

6     A.   Exhibit 59 are minutes for the March

7 25th, 2004, Governance and Management Committee

8 meeting.

9     Q.   Do -- did you participate in that

10 meeting?

11    A.   Yes.

12    Q.   Is the portion which is disclosed true

13 and correct as to content as to what occurred at that

14 meeting, as far as you can see?

15         MR. LEVINSTEIN:  Objection.

16         THE WITNESS:  I'm not sure about the

17 committee ratifying the appointment of Jean Lopez at

18 that point.  That may be a mistake.

19    Q.   BY MR. JONES:  Okay.  Before today, were

20 you shown any testimony taken in this case from

21 anyone else?

22    A.   No.

23    Q.   Were you advised or given summaries of

24 testimony given by other witnesses in this case

25 before today?

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 58**

1          MR. LEVINSTEIN:  Objection.  Don't

2 disclose any communication with counsel that occurred

3 for this case.  Other than communications with

4 counsel, you can answer the question.

5     Q.   BY MR. JONES:  In other words, do you

6 know what anyone else said in this case --

7     A.   I don't.

8     Q.   -- so far?

9          Did Bob Gambardella tell you what he

10 testified to when he was deposed?

11    A.   I have not spoken to Bob about his

12 deposition.

13    Q.   We'll cover the item you mentioned in a

14 second.  But first, on the redacted portion, does

15 that redacted portion cover the summary of a

16 discussion regarding another lawsuit alleging racial

17 discrimination?

18         MR. LEVINSTEIN:  I'll answer this one.

19 It was an issue about behavior of an athlete and a

20 disciplinary issue about conduct related to the

21 training center that had nothing to do with racial

22 issue or anything like that.

23         MR. JONES:  Okay.

24         MR. LEVINSTEIN:  Just talked about an

25 athlete who might have been underage even -- I'm not

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 59**

1 sure -- and what he did, and we redacted it for that

2 reason.

3          MR. JONES:  Okay.

4     Q.   BY MR. JONES:  Is what your counsel

5 represented correct, as far as you know?

6     A.   Yes, it is.

7     Q.   Now, turning to page 2, it's the second

8 to the last line, separate sentences.  You had some

9 possible problems with that statement.  Let me read

10 it.  "The committee ratified the appointment of Jean

11 Lopez as the Olympic coach since USTU has only one

12 coach credential."

13         What is wrong with that statement, if

14 anything?

15    A.   I think it's prior to the fight-offs and

16 the selection of the Olympic team, so I believe that

17 is a mistake.

18    Q.   Do you know who wrote these minutes?

19    A.   Virginia Witte.

20    Q.   As you sit here today, can you remember

21 any discussions about Mr. Jean Lopez at that meeting?

22    A.   I can't.  I don't recall at all.  And in

23 fact, the only thing I can recall is that perhaps

24 there are two versions of these minutes, and I don't

25 recall a version having Lopez as being selected.

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 60**

1     Q.   Something in your mind makes you think

2 there were two versions of these minutes?

3     A.   Well, this is -- I think if there

4 wasn't, this is a mistake.

5     Q.   First of all, who is Jean Lopez?

6     A.   Jean Lopez, whom I've never met, is

7 a -- as I understand, a brother of Steven Lopez, an

8 athlete.

9     Q.   As you sit here today, do you recall

10 anyone up to this point of this meeting and during

11 this meeting voicing support for Jean Lopez as a new

12 Olympic coach for the 2004 Olympics?

13    A.   I do not recall that.

14    Q.   You don't recall Bob Gambardella, for

15 instance, being in support of him?

16    A.   I do not recall that.

17    Q.   And to your recollection, was Jean

18 Lopez's name even mentioned in this March 25th, 2004,

19 meeting?

20    A.   I don't know.

21    Q.   Did Juan -- who is Juan Moreno?

22    A.   Juan Moreno is an athlete and he is on

23 the Governance and Management Committee.

24    Q.   I take it you talked with him during the

25 course of these various committee meetings that we've

1    just gone through the minutes for?

2         A.   From time to time, yes.

3         Q.   Is it correct that he's the only one

4    with a actual taekwondo background at the competitive

5    level?

6         A.   He is the only one with the actual

7    competitive background, and he is the athlete

8    selection for the committee to meet our 20 percent

9    requirement.

10        Q.   As you sit here today, can you remember

11   Juan Moreno ever mentioning Jean Lopez's name up to

12   the point of this March 25th --

13        A.   I do not --

14        Q.   -- meeting?

15        A.   -- recall.

16        Q.   Did Juan Moreno ever mention that both

17   Steven Lopez and Jean Lopez had been approaching him

18   asking to be selected as -- for Jean to be selected

19   as the new coach?

20        A.   I don't recall that.

21        Q.   You would agree with me that as of March

22   25, at least, Mr. Dae Sung Lee was still the

23   appointed coach of the USTU for the Olympic team

24   coach position.

25        A.   I don't recall when we received the

1         A.   I don't know.

2         Q.   Had Mr. Jean Lopez ever corresponded

3    with you up to this point, being March 25th?

4         A.   I had never corresponded with Jean Lopez

5    nor have I ever met him.

6         MR. JONES:  This is going to be a new

7    exhibit.  I'm sorry I only have one copy of it.  Why

8    don't you look at it first, counsel, then we'll put a

9    sticker on it.

10        MR. LEVINSTEIN:  Do you have a number on

11   it?

12        MR. JONES:  Yeah.  I guess it would be

13   145.

14        (Exhibit No. 145 was marked for

15   identification by the court reporter.)

16        MR. LEVINSTEIN:  You don't think we've

17   had some other exhibits with that number?

18        MR. JONES:  These are supposed to be all

19   of them so far.

20        MR. LEVINSTEIN:  Of the ones she had in

21   Colorado.

22        MR. JONES:  You started new numbers, 1,

23   2, 3, something.

24        MR. LEVINSTEIN:  Okay.  I don't know.  I

25   just don't know.  She only did the ones that took

1    information back from the USOC Executive Committee,

2    so I cannot answer that.

3         Q.   Would it be fair to say, though, that he

4    was still the coach until the USOC removed him?

5         A.   Yes.

6         Q.   Would you agree with me that

7    ratification of Jean Lopez as the new Olympic coach

8    on March 25th would have been inappropriate for the

9    GMC?

10        A.   As the Olympic athletes had not been

11   selected, yes, I would agree with that.

12        Q.   Would you also agree if the new

13   coaching -- coach selection criteria had not yet been

14   approved by the USOC, it would be inappropriate for

15   the GMC to ratify his name?

16        MR. LEVINSTEIN:  Objection.

17        THE WITNESS:  I don't know when USOC

18   responded, so I can't answer.

19        Q.  BY MR. JONES:  If we -- if we assume

20   that the new criteria had not been approved yet,

21   wouldn't it be jumping the gun to go ahead and select

22   the coach?

23        A.   I think that's speculative and I don't

24   want to deal with assumptions like that.

25        Q.   So you don't know?

1    place in Colorado.  Just for the record, the document

2    includes a transmittal to our firm on April 20th of

3    2005.  I just don't want him to be confused --

4         MR. JONES:  I understand.

5         MR. LEVINSTEIN:  -- about that date.

6         MR. JONES:  I was going to focus on

7    another part.

8         MR. LEVINSTEIN:  Below, the fact that it

9    was sent to our firm on that day.  I mean --

10        Q.  BY MR. JONES:  Please go ahead and read

11   the whole thing.

12        You've had a chance to look at 145?

13        A.   Yes.

14        Q.   Focusing on paragraphs 2 through the

15   bottom of the page, do you recall ever seeing this

16   document before?

17        A.   I don't recall.  Doesn't mean I didn't.

18        Q.   It purports to be an e-mail?

19        A.   Yes, it purports to be an e-mail.  This

20   is a document I may have not received simply because

21   my e-mail address is not accurate there.  It's at

22   MSN, and that's a former address I had, and I'm at

23   Yahoo.com now.

24        Q.   So you don't know if --

25        A.   I don't know if I ever received that or

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)
Case 1:04-cv-00461-SOM-LEK    Document 248-3    Filed 03/21/2006    Page 18 of 29
6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

1  not.  That may be -- she may have been using an old
2  e-mail address at that point.
3        Q.   The e-mail states that it is from
4  Virginia Witte.  Is that correct?
5        A.   That's right.
6        Q.   It states that it was sent Monday, March
7  29, 2004.  Is that correct?
8        A.   It does.
9        Q.   And it -- besides listing your e-mail
10  address on there, which might be erroneous, it lists
11  a list of other people, Rich Bender, Mr. Baggiano,
12  Juan Moreno, and Mr. Gambardella and CC to others as
13  well.  Is that correct?
14        A.   Yes.
15        Q.   It also purports to say, "See attached
16  for the draft minutes from March 25.  Next conference
17  call is April 8."  Is that correct?
18        A.   It says that.
19        Q.   The conference call would generally be
20  referring to, what, a GMC meeting?
21        A.   It would refer to a telephonic
22  conference call we had with the Governance and
23  Management Committee.
24        Q.   Now, it purports to attach the draft
25  minutes for the March 25 GMC meeting, which we have

1  else.
2        Q.   BY MR. JONES:  Showing you Exhibit 146,
3  have you seen that before?
4        A.   I do not recall, and then reminding you,
5  too, that this e-mail address is obsolete.
6        Q.   You say "obsolete."  It used to be your
7  address?
8        A.   Yes.
9        Q.   But changed it?
10        A.   Yes.
11        Q.   You don't remember when you changed it?
12        A.   No.
13        Q.   Do you remember seeing it as you sit
14  here today, though?
15        A.   I don't.
16        Q.   After you became a GMC member, did you
17  have regular meetings with Mr. Gambardella to discuss
18  USTU business outside of the formal committee
19  meetings which we've gone over in the minutes?
20        A.   Yes.
21        Q.   Would it be on any particular schedule
22  such as, you know, daily?  Weekly?
23        A.   No.
24        Q.   As needed?
25        A.   As needed.  Periodic.

1  just gone over as Exhibit 59.  Is that right?
2             MR. LEVINSTEIN:  Objection.  You don't
3  know what version of the minutes --
4             THE WITNESS:  Exactly.
5             MR. LEVINSTEIN:  -- it is.
6             THE WITNESS:  Purports that, yes.
7        Q.   BY MR. JONES:  As you sit here today, do
8  you know whether you got Exhibit 59 by e-mail on or
9  about March 29 from Ms. Witte?
10        A.   I do not know as my e-mail address at
11  that point may have been obsolete.
12        Q.   Okay.
13             MR. LEVINSTEIN:  And he doesn't know if
14  Exhibit 59 was attached.
15             MR. JONES:  All right.
16        Q.   BY MR. JONES:  Did you ever -- as you
17  sit here today, do you remember making any changes to
18  Exhibit 59 on March 29, which was four days after
19  this March 25th meeting, or at anytime after?
20        A.   I do not.
21             MR. JONES:  Okay.  Showing you another
22  new exhibit.  I don't have an additional copy of it.
23             (Exhibit No. 146 was marked for
24  identification by the court reporter.)
25             MR. JONES:  Let's show it to everybody

1        Q.   In the early days -- let's just take the
2  first couple of months -- as you sit here today, do
3  you think you met with him more than once a week?
4        A.   I suspect so.
5        Q.   Where physically is your office in
6  relation to his office at that time?
7        A.   My office is in my home, and we would
8  always meet in his office.
9        Q.   At the --
10        A.   At the --
11        Q.   -- USOC.
12        A.   -- USOC.
13        Q.   So you'd have to drive down to have a
14  meeting then?
15        A.   Yes.
16        Q.   And I'm sorry.  Your response was to
17  your recollection you were seeing each other once a
18  week or no?
19        A.   Well, in the early -- you asked --
20        Q.   Yeah.
21        A.   -- in the early time.
22        Q.   Yes.
23        A.   And I suspected more than once a week.
24        Q.   More than twice a week, you think?
25        A.   Twice a week.  I'd go for that.

**Column 1 (Page 69)**

1    Q.   When he received relevant correspondence
2    or documents from any party, was it his practice to
3    share documents with you to get your ideas?
4         MR. LEVINSTEIN:  Objection.
5         MR. JONES:  If you know.
6         MR. LEVINSTEIN:  Vague and ambiguous.
7         THE WITNESS:  Well, I don't know.  My
8    principal concern was that of financial and policy
9    concerns.
10        Q.   BY MR. JONES:  He did share
11   correspondence that had been received by you at
12   times, though?
13        A.   From time to time.
14        MR. LEVINSTEIN:  Objection.  Just so you
15   know, your question was:  "He shared correspondence
16   that had been received by you at times."
17        MR. JONES:  I'm sorry.  If I said that,
18   I meant received by him.
19        THE WITNESS:  From time to time.
20        Q.   BY MR. JONES:  Did you ever receive
21   correspondence directly from other parties regarding
22   USTU business during the early months?
23        A.   From time to time.
24        Q.   And was it your practice to share such
25   correspondence with him if you felt it was relevant

**Column 2 (Page 71)**

1         MR. JONES:  Uh-huh.
2         MR. LEVINSTEIN:  At the top, it was
3    dated April 8th, but on the second page it talks
4    about what the USOC Executive Committee did on April
5    12th.
6         MR. JONES:  Good point.
7         MR. LEVINSTEIN:  And if it wasn't
8    faxed -- or at least the fax top line says it was
9    faxed on April 14th.
10        MR. JONES:  Okay.
11        THE WITNESS:  I'm ready.
12        Q.   BY MR. JONES:  What is that document, if
13   you know?
14        A.   The document is a letter sent to Dae
15   Sung Lee from Bob Gambardella having to do with
16   Olympic selection procedures for coaches for the 2004
17   Olympic Games.
18        Q.   It is dated April 8th, 2004?
19        A.   It is dated April 8th on the document.
20        Q.   And your --
21        MR. LEVINSTEIN:  For the record, the one
22   he's looking at is different than the one you gave
23   me.  It's got handwritten notes on it.  It says
24   registered mail on the 18th as well.
25        MR. JONES:  Okay.

**Column 3 (Page 70)**

1    to do so?
2         A.   Yes.
3         Q.   Next exhibit, Exhibit 10.
4         (Mr. Jones gives Exhibit 10 to Mr.
5    Levinstein.)
6         MR. LEVINSTEIN:  Thank you.
7         MR. JONES:  If you could go ahead and
8    read that --
9         THE WITNESS:  Oh, I'm sorry.
10        MR. JONES:  -- please.  That's all
11   right.
12        MR. LEVINSTEIN:  Can I see Exhibit 146
13   for just one second?
14        Q.   BY MR. JONES:  Have you had a chance to
15   look at that one?
16        A.   I'm still reading.
17        Q.   Okay.
18        MR. LEVINSTEIN:  For the record, this is
19   the one with the wrong date because the letter talks
20   about something that happened April 12th and the
21   letter is dated April 8th, so it could be confusing.
22        MR. JONES:  Okay.  Why don't you go
23   ahead and correct what you think.
24        MR. LEVINSTEIN:  The letter says April
25   8th on it.

**Column 4 (Page 72)**

1         MR. LEVINSTEIN:  Just so what you're
2    looking at is not the same as what he's looking at.
3         MR. JONES:  All right.  Except for the
4    scratching on there.
5         MR. LEVINSTEIN:  Let me just look to see
6    if there's anything different.  That's all I see
7    right now.  I just thought you should know that.
8         MR. JONES:  Why don't we -- that one is
9    the one that was produced before.  Okay.  With that
10   change, it's Exhibit 10, except for the scratchings
11   is the one I gave counsel.
12        MR. LEVINSTEIN:  No.  It is Exhibit 10.
13        MR. JONES:  No.  I know.
14        MR. LEVINSTEIN:  Okay.
15        MR. JONES:  All right.
16        MR. LEVINSTEIN:  Sorry.
17        Q.   BY MR. JONES:  Counsel brought up the
18   date of the document.  First of all, do you know who
19   wrote this?
20        A.   I do not.
21        Q.   And it is courtesy copied to Governance
22   and Management Committee.
23        A.   Yes.
24        Q.   There were -- there have been other
25   documents that were courtesy copied to the Governance

1  and Management Committee.  As far as you know, does
2  that mean each person on the committee got one?
3      A.   Typically.
4      Q.   And as far as you know, did you get one?
5      A.   Insofar as I know.
6      Q.   Do you remember seeing this before?
7      A.   Vaguely.
8      Q.   Was it Mr. Gambardella's practice to
9  show you any of his correspondence in draft form
10 before it went out to a third party?
11     A.   In some cases.
12     Q.   As you sit here today, do you remember
13 him doing that with respect to this letter?
14     A.   I do not recall.
15     Q.   After reviewing the contents of it, do
16 you agree with the contents as -- as it is contained?
17     A.   With the exception of the dates.
18     Q.   Okay.  If you could change the date,
19 what would it be?
20          MR. LEVINSTEIN:  Objection.
21          THE WITNESS:  I do not know.
22     Q.   BY MR. JONES:  Had you seen the
23 attachment before?
24     A.   I don't know.
25     Q.   Had you seen the attachment before April

1  Levinstein.)
2          MR. LEVINSTEIN:  Thank you.
3          (A discussion was held off the record
4  between Mr. Johansen and Mr. Levinstein.)
5          THE WITNESS:  Two more paragraphs.
6          Okay.
7      Q.   BY MR. JONES:  Have you had a chance to
8  look at Exhibit 11?
9      A.   Yes.
10     Q.   Have you ever seen that exhibit before?
11     A.   I vaguely recall.
12     Q.   It's a letter dated June 2nd, 2004,
13 addressed to Bob Gambardella from Dae Sung Lee?
14     A.   Yes.
15     Q.   And it is courtesy copied to the
16 Governance Committee.  Is that correct?
17     A.   Yes.
18     Q.   At least that's what it says.
19     A.   Yes.
20     Q.   Was it ever discussed with Mr. Bob
21 Gambardella upon receipt?
22          MR. LEVINSTEIN:  By whom?
23          MR. JONES:  By you.
24          THE WITNESS:  I do not recall discussing
25 this letter.

1  8?
2      A.   Well, I answered prior that I didn't
3  know if I had seen the attachment, so I don't know.
4      Q.   The attachment, for the record, is
5  entitled "Selection Procedures For Coaches" and
6  purports to be a new coach selection criteria.  Is
7  that right?
8      A.   That's right.
9      Q.   Now, it states in the letter, I believe,
10 that on April 12, 2004, the USOC Executive Committee
11 took certain action and vacated the previous coach
12 and staff selection and approved the new selection
13 criteria.  Is that more or less correct?
14     A.   Yes.
15     Q.   Do you know if April 12 is when that
16 happened?
17     A.   I do not know.
18     Q.   You learned at some point that that
19 happened.
20     A.   Yes.
21     Q.   And as you sit here today, you don't
22 know when that was?
23     A.   I do not.
24     Q.   Next exhibit, 11.
25          (Mr. Jones gives Exhibit 11 to Mr.

1      Q.   BY MR. JONES:  To your knowledge, was it
2  ever discussed with -- was this letter ever discussed
3  in any meeting?
4      A.   Insofar as I know, I don't recall this
5  letter being discussed.
6      Q.   Exhibit 61 and this group of e-mails.
7          (Mr. Jones gives Exhibit 61 to Mr.
8  Levinstein.)
9          MR. LEVINSTEIN:  Thank you.
10          THE WITNESS:  Okay.
11     Q.   BY MR. JONES:  I don't want you to
12 identify each individual e-mail, but is it correct
13 that there are a group of e-mails going back and
14 forth between Mr. Gambardella and members of the GMC
15 regarding the Olympic coach nomination process?
16     A.   Yes.
17     Q.   Just want you to focus on one page, page
18 3 -- marked as USTU 00014.
19          MR. LEVINSTEIN:  They go backwards in
20 number.
21     Q.   BY MR. JONES:  In the middle of the page
22 there -- well, first of all, focusing on the contents
23 between the two kind of lines, what is that e-mail?
24     A.   It is an e-mail sent to the committee
25 plus Bob.

**Page 77**

1        Q.    And it's dated June 7th, 2004?

2        A.    Yes.

3        Q.    And what e-mail address is being used

4    there?

5        A.    It's an MSN address.

6        Q.    Is that the new one or the obsolete one?

7        A.    That's the -- that's the one that's no

8    longer used.

9        Q.    So as of June 7, 2004, does that refresh

10   you at least --

11       A.    Apparently, I was still using it at that

12   point.

13       Q.    So with respect to the earlier e-mail I

14   showed you from Ms. Witte to that address which

15   allegedly attached minutes of the March GMC meeting,

16   at least the address was right.

17       A.    Sure.

18       Q.    And I understand your testimony is that

19   you're not sure whether you got it.  But if that

20   address is correct, more likely than not did you get

21   it?

22       A.    I assume I would have received it.

23       Q.    Just going down a ways -- well, the top

24   is -- the salutation says it's directed to Juan,

25   Virginia, Rich, and Tony from you.  Is that right?

**Page 78**

1        A.    True.

2        Q.    The very last sentence says, "Should we

3    wait until the final fight-off to see who is

4    determined to be on the team?" question mark.  Why

5    was that question asked?

6        A.    Bearing in mind that I am doing this as

7    a volunteer and I'm engaged more in the financial and

8    policy issues, I wasn't up to date on day-to-day

9    happenings.  So this was a question.  And as it

10   turned out, the final audit had taken place the prior

11   weekend.  I didn't know that.

12       Q.    Okay.  And is it correct that you didn't

13   know at that point whether it would be correct --

14   whether it would be consistent with the new coach

15   selection criteria to vote before the final fight-off

16   was had?

17       A.    Just asking a question, this is a

18   day-to-day activity, and I was involved in policy

19   issues.

20       Q.    But the answer is you don't know whether

21   it was appropriate to vote at that point in time if

22   the final fight-off had not been -- had -- knowing

23   what you knew about the new coach selection criteria?

24       A.    Again, we were -- I was involved

25   specifically with policy and financial issues, and

**Page 79**

1    this -- this detail escapes me.  So I was asking a

2    question.

3        Q.    Exhibit 63.

4        (Mr. Jones gives Exhibit 63 to Mr.

5    Levinstein.)

6        MR. LEVINSTEIN:  Thank you.

7        MR. JONES:  Before I ask any more

8    questions, let's go ahead and take another break.

9        (Recess taken from 11:08 a.m. to

10   11:12 a.m.)

11       BY MR. JONES:  Did you have a chance to

12   look at Exhibit 63 yet?

13       MR. LEVINSTEIN:  No, I haven't.

14       THE WITNESS:  I have.

15       BY MR. JONES:  What is Exhibit 63?

16       A.    It is the set of minutes from the

17   Governance and Management Committee from July 1st,

18   2004.

19       Q.    I'm sorry.  Is that a two-page document

20   that you have?  Yeah.

21       Did you participate in the July 1, 2004,

22   GMC meeting that this refers to?

23       A.    I did.

24       Q.    Does it appear to be true and correct as

25   to contents, as far as you know?

**Page 80**

1        A.    Insofar as I can tell.

2        Q.    Paragraph -- well, last paragraph on the

3    first page refers to a woman named Nia Abdullah, an

4    Olympic athlete.  Do you know who she is?

5        A.    I do.

6        Q.    Have you met her before?

7        A.    I have.

8        Q.    Under what circumstances?

9        A.    Typically, at competitions.

10       Q.    So you attended some competitions and

11   saw her compete?

12       A.    Yes.

13       Q.    Other than what's stated in this

14   paragraph here about Ms. Abdullah, do you know what

15   the circumstances were that triggered this

16   discussion, what had happened before this meeting

17   that -- that brought up this discussion about her in

18   competition?

19       A.    Vaguely.

20       Q.    Give us your best --

21       A.    My best, vague recollection?

22       Q.    Yes.

23       A.    There were issues that she wanted her

24   coach to be there.  I think there were some issue or

25   pressure from her parents insofar was that concerned

**Page 81**

1  and what we tried to do is accommodate.

2      Q.   As far as you know, did Ms. Abdullah

3  have some concerns about Jean Lopez being her coach?

4      A.   I wasn't aware of the concerns.

5      Q.   So then other than what you've stated,

6  you don't know precisely what the nature of Ms.

7  Abdullah's concerns were?

8      A.   I know that there -- as I mentioned

9  earlier, I have vague recollections of this.

10     Q.   Are you aware that she and -- or were

11  you aware at that time that she and Jean Lopez's

12  sister had faced each other in a critical competition

13  for the U.S. team position?

14     A.   Yes.

15     Q.   And that Ms. Abdullah had won?

16     A.   Yes.

17     Q.   And that it was a particularly tough

18  fight?

19         MR. LEVINSTEIN:  Objection.

20         THE WITNESS:  I didn't know that.

21     Q.   BY MR. JONES:  Were you aware that as of

22  this meeting that if something happened to Ms.

23  Abdullah that Jean Lopez's sister was first

24  runner-up?

25     A.   I wasn't aware of the step process.

**Page 82**

1      Q.   Under the -- well, at this point in

2  time, being July 1, you understood Jean -- pardon

3  me -- Jean Lopez to be the new U.S. team coach.

4      A.   Yes.

5      Q.   And you understood that he had been

6  selected under the new criteria.

7      A.   Yes.

8      Q.   And you understood that under these new

9  criteria someone like Nia, regardless of whatever

10  problems she had, had to have Jean Lopez as her head

11  coach.

12     A.   The criteria were straightforward and

13  objective and measurable.

14     Q.   But the answer is yes, that --

15     A.   Oh, yes, because of the adherence to the

16  criteria.

17     Q.   And as you sit here today, you don't

18  know who wrote those criteria?

19     A.   I do not.

20     Q.   This -- this situation with Nia having

21  concerns about her head coach demonstrates, does it

22  not, one of the weaknesses with the new coach

23  selection criteria?

24         MR. LEVINSTEIN:  Objection.  Misstates

25  what he said about her concerns.  She wanted her own

**Page 83**

1  coach.  Nothing about concerns about the head coach.

2         THE WITNESS:  Your question again?

3      Q.   BY MR. JONES:  This situation that Nia

4  had, wanting her own coach, instead having to have

5  Jean Lopez, whom she had concerns about, demonstrates

6  one of the weaknesses with the new coach selection

7  criteria.

8         MR. LEVINSTEIN:  Objection.

9         THE WITNESS:  I really can't answer

10  that.  I think all criteria -- well, I can't answer

11  that.  I don't know.

12     Q.   BY MR. JONES:  And according to this,

13  the GMC reacted by trying to make the best of the

14  situation --

15         MR. LEVINSTEIN:  Objection.

16     Q.   BY MR. JONES:  -- and looking into

17  sending Chul Ho Kim along?

18         MR. LEVINSTEIN:  Objection.  Compound

19  question.

20     Q.   BY MR. JONES:  Is that fair?

21         MR. LEVINSTEIN:  Objection.

22         THE WITNESS:  The GMC wanted to

23  accommodate Nia to help her perform well.

24     Q.   BY MR. JONES:  It did not have to do

25  that.

**Page 84**

1      A.   No.

2      Q.   Under the new coach selection criteria,

3  did not have to do that?

4      A.   Did not have to.

5      Q.   But it did that to accommodate her.

6      A.   It did that to accommodate at least in

7  her training needs.

8      Q.   Because there was a concern that if they

9  did not she might not perform as well.  Is that true?

10     A.   I think it's fair to say that when you

11  deal with athletes, you try to make them as

12  psychology -- psychologically stable as possible, and

13  it would be a benefit to her.

14     Q.   And in doing so, the GMC decided to

15  spend money that it did not have to spend to send

16  Chul Ho Kim along to Athens.  Is that true?

17     A.   It was non -- a nonbudgeted expense,

18  yes.

19     Q.   Okay.  But it was also understood that

20  he would have no coaching credential and, therefore,

21  could not sit with her during the competition.  Is

22  that true?

23     A.   That is true.

24     Q.   Exhibit 73.

25     A.   Okay.

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)
Case 1:04-cv-00461-SOM-LEK    Document 248-3    Filed 03/21/2006    Page 23 of 29
6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q.   What is Exhibit 73?
2    A.   That is an e-mail that I sent to Nia
3 concerning the provision of her coach, certain --
4 certain opportunities to attend the games in -- in
5 Athens.
6    Q.   You basically summarized what the -- the
7 decision that the GMC made on that very same day, on
8 July 1.
9    A.   Yes.
10    Q.   Is that correct?
11    A.   That's true.
12    Q.   And so no time was wasted in attempting
13 to put Nia Abdullah at ease.
14    A.   The attempt was -- yes, that's right.
15    Q.   Next exhibit, 62.
16    A.   Okay.
17    Q.   You've had a chance to look at that
18 exhibit?
19    A.   Yes.
20    Q.   Have you ever seen it before?
21    A.   I have not seen this letter.
22    Q.   Did -- during this first three -- three
23 or four months, say, up through July of 2004, in your
24 work as the GMC chair --
25         MR. LEVINSTEIN:   Objection.   He started

1 in February, so we've got --
2         MR. JONES:   February, March, April.
3 Okay.   Let's say February through July.
4    Q.   BY MR. JONES:   Were you aware of what
5 the USOC bylaws said about when coach selection
6 criteria needed to be submitted to the U.S. Olympic
7 Committee?
8    A.   I am vaguely aware of those
9 requirements, but I do know that from time to time
10 there are extenuating circumstances.
11         MR. LEVINSTEIN:   Objection.   For the
12 record, there's nothing about the USOC bylaws in this
13 sentence.   It's misleading the witness to say that
14 there is, but you can keep asking him questions.
15         MR. JONES:   I'm not asking him about
16 this exhibit.
17         MR. LEVINSTEIN:   USOC bylaws, it's
18 suggesting there are things in the bylaws that has
19 never been established, so -- we've been through this
20 before.
21    Q.   BY MR. JONES:   Mr. Locke, tell me what
22 you know generally about the USOC bylaw requirements
23 with respect to passing new coach selection criteria.
24    A.   I don't know if it's a bylaw
25 requirement.   I think it's an indication on the form.

1 It could be just an operational day-to-day
2 requirement.   I do know that there are extenuating
3 circumstances from time to time that those time
4 frames are met.
5    Q.   You've heard of the proposition that
6 you're supposed to try and get those coach selection
7 criteria in at least a year in advance of the games?
8    A.   Sometimes difficult to do.
9    Q.   But you had heard something like that in
10 your work with the --
11    A.   Sure.
12    Q.   -- either the USOC or with USTU?
13         Did you hear about that the first time
14 at USTU or before?
15    A.   I suspect before my involvement with USA
16 Taekwondo.
17    Q.   And can you remember any particular
18 NGB's or situation you were thinking about when you
19 said extenuating circumstances sometimes require
20 exceptions?
21    A.   I think it's difficult for many NGB's to
22 meet that 12-month requirement because of the
23 selection of teams and coaches then follow.
24    Q.   Do you know of any other NGB's that have
25 a coach selection criteria like the one that the GMC

1 passed in 2004?
2    A.   I do not.
3    Q.   In other words, based on identity of the
4 team selected.
5    A.   Based upon I haven't seen the other
6 selection criteria.
7    Q.   You'd agree with me that if a coach
8 selection criteria is based upon picking the team
9 first that it's -- it's very difficult to comply with
10 the one-year requirement, if not impossible.
11    A.   It's dependent upon the sport.
12    Q.   But for those sports that for the
13 selection process goes right up until, say, six
14 months before the games that it would be impossible.
15         MR. LEVINSTEIN:   What would be
16 impossible?
17         MR. JONES:   Select the coach.
18         THE WITNESS:   You know, it's -- the
19 sports are so different in practically all of the
20 components.   I wouldn't want to say just broad brush
21 agree with you.
22         MR. JONES:   Okay.
23         THE WITNESS:   So I'd just say I don't
24 know.
25         MR. JONES:   All right.   Exhibit 13.

1    (Mr. Jones gives Exhibit 13 to Mr.
2  Levinstein.)
3         THE WITNESS:  I'm not sure I have a 13
4  in this book.  It's not labeled anywhere.  Goes from
5  11 to 22.
6         MR. JONES:  I will then mark it.
7         MR. LEVINSTEIN:  I'll give it to him.
8         MR. JONES:  Okay.
9         MR. LEVINSTEIN:  Do you want to give it
10  another number or --
11         MR. JONES:  No.  It's another 13.
12         Q.   BY MR. JONES:  Have you had a chance to
13  look at Exhibit 13?
14         A.   Yes.
15         Q.   Have you ever seen that document before?
16         A.   I do not recall seeing this -- this
17  letter.
18         Q.   Purports to be a letter from Robert
19  Gambardella to me dated July 21, 2004.  Does it not?
20         A.   It does.
21         Q.   And I take it your testimony is that you
22  did not see it before it went out.
23         A.   I do not recall seeing this letter.
24         Q.   In fact, you don't recall seeing it at
25  all.  It states in there that Jean Lopez was not

1  approved till July 19, 2004.  As you sit here today,
2  you don't know whether that's true or not?
3         A.   That -- as I've not seen this letter
4  before, I don't know.
5         Q.   And independently, you don't recall the
6  date?
7         A.   I don't know the date that the USOC gave
8  final approval.
9         Q.   And I take it you also don't know who
10  wrote this letter?
11         A.   I do not.
12         Q.   Okay.  One other thing, he states in
13  paragraph 3 that you wrote a letter on April 8, 2004,
14  to Mr. Lee stating that the USOC Delegation Review
15  Committee recommended to the USOC Executive Committee
16  that the selection procedures for -- I guess the
17  prior selection procedures for coach be withdrawn and
18  replaced.  And then he says, "The USOC committee
19  approved the Delegation Review Committee's
20  recommendation and also vacated the previous
21  appointments."  Do you know if that's a true statement?
22         A.   I do not know.  I'm not familiar with
23  this letter nor the dates.
24         Q.   And you're not familiar -- what is the

1  USOC Delegation Review Committee?
2         A.   I don't know.
3         Q.   So you don't know whether they had any
4  role in this coach selection process that we've been
5  going over?
6         A.   I just -- I don't know what the function
7  of -- I'm not saying the committee doesn't exist.  I
8  presume it does.  I just don't know of it.
9         Q.   So as you sit here today, you don't know
10  whether it's a true statement or not Mr. Gambardella
11  made to Mr. Lee.  You don't have any personal
12  knowledge.
13         A.   I do not have any personal knowledge.
14         Q.   In your various contacts with Mr. Bob
15  Gambardella, have you ever heard him say anything
16  racially insensitive about Koreans or
17  Korean-Americans?
18         A.   No.
19         Q.   Have you ever said -- have you heard him
20  say that he wanted to remove Korean-Americans from
21  USTU?
22         A.   No.
23         Q.   Ever observe any action by him in your
24  assessment appeared to be aimed at Koreans or
25  Korean-Americans within the USTU organization?

1         A.   No.
2         Q.   Ever heard any member of the new
3  governing body of GMC voice a desire to remove
4  Koreans from positions of authority from USTU?
5         A.   No.
6         Q.   Are you aware that sometime after the
7  2004 Olympics that Chul Ho Kim was fired from his
8  position at the Olympic Training Center?
9         MR. LEVINSTEIN:  Objection.
10         THE WITNESS:  He was not fired.
11         MR. JONES:  Let me --
12         THE WITNESS:  The position ceased to --
13         MR. JONES:  Go ahead.
14         THE WITNESS:  -- exist.
15         Q.   BY MR. JONES:  The position ceased to
16  exist.  Was it phrased that his contract would not be
17  renewed, words to that effect?
18         A.   I don't know what the phrase was.  Just
19  that the -- the position ceased to exist.
20         Q.   Would you term it a layoff?
21         MR. LEVINSTEIN:  Objection.
22         THE WITNESS:  I'd say the position
23  ceased to exist because the program ceased to exist.
24         Q.   BY MR. JONES:  The Olympic Training
25  Center program?

**Page 93**

```
1        A.   The resident team program.

2        Q.   Resident team program.  Why did the

3   resident team program cease to exist, if you know?

4        A.   In my vague recollections -- I'll give

5   you a little bit of -- not a lecture, but

6   dissertation.  But every -- every NGB has to have a

7   high performance plan.  High performance plan is all

8   about developing the highest levels of performance

9   from grass roots all the way up to the upper levels.

10  Filling the pipelines.  USA Taekwondo had no high

11  performance plan whatsoever, which was really a

12  prerequisite to having a resident team program.

13  Having a resident team program without any semblance

14  of a high performance plan didn't make any sense.

15       As a result, it was terminated, and we

16  went through the process of creating a high

17  performance plan to begin the process of creating

18  what made some sense logically in developing

19  athletes.

20       Q.   Would you say then in your assessment

21  that the resident program was an unsuccessful

22  program?

23       A.   We had seen no measurement of success.

24       Q.   And how would one measure success?

25       A.   I think one measures success on
```

**Page 94**

```
1   performance.

2        Q.   And what does that mean exactly,

3   "performance"?

4        A.   Well, it's having to do with

5   improvement, winning of medals, winning of placements

6   in competitions.

7        Q.   As you sit here today, do you know how

8   many athletes came out of the resident program who

9   won medals?

10       A.   I cannot give you that kind of a -- I

11  don't know.

12       Q.   And did you know at the time that the

13  resident program was terminated how many athletes

14  came out of the resident program who had won medals

15  at the Olympics?

16       A.   I don't know.

17       Q.   Same question for the world competition.

18       A.   I don't know any of those questions.

19       Q.   Same for the Pan Am games?

20       A.   Right.

21       Q.   So if medals is a measure, you do not

22  know whether the prior resident program was

23  successful or not then.

24       A.   I do know that it is one component of a

25  high performance plan and going from the grass roots
```

**Page 95**

```
1   on up and filling pipelines to get into the level

2   where a resident program would be in place.

3        Q.   You state that you were primarily

4   focused on the financial concerns at USTU when you

5   came on board.  Is that right?

6             MR. LEVINSTEIN:  Objection.

7        Q.   BY MR. JONES:  Is that true or false?

8        A.   I focused a lot of the energy, our

9   energy on financial issues.

10       Q.   Do you know whether the residents --

11  resident program was profitable or not?

12       A.   You mean revenue stream?

13       Q.   Yes.

14       A.   I'm not sure if I understand the

15  relevance.

16       Q.   You don't understand the relevance of

17  profitability?

18       A.   Well, I certainly understand that, but

19  I'm not sure if I understand the relevance of --

20       Q.   I'm just asking if you knew whether it

21  was profitable or not.  If you don't know, you can

22  say so.

23       A.   Yeah.  I don't know.

24       Q.   Do you know if any of the programs at

25  USTU in effect when you came on board were
```

**Page 96**

```
1   profitable?

2             MR. LEVINSTEIN:  Objection.

3             THE WITNESS:  I knew of the

4   certification programs being somewhat profitable.

5        Q.   BY MR. JONES:  Certification of black

6   belts?

7        A.   Yes.

8        Q.   You believe that to be profitable?

9        A.   Somewhat profitable.

10       Q.   That was a -- a program to certify black

11  belts by the USTU.  Is that correct?

12       A.   There are two aspects.  One was the

13  certification coming out of USA Taekwondo plus the

14  Kukkiwan certifications in which there was a revenue

15  share.

16       Q.   Which one are we talking about that was

17  profitable?

18       A.   I think --

19       Q.   Was it both?

20       A.   I think both were.

21       Q.   Just focusing on the USTU side of it,

22  was that side continued?

23       A.   Yes.

24       Q.   Okay.  Because we had some testimony

25  that Mr. Gambardella suspended the program.
```

1    A.   Not to my knowledge.

2    Q.   So to your knowledge, the program's

3    still going on and creating a revenue stream?

4    A.   Yes, insofar as I know.

5    Q.   And your testimony is you don't know

6    whether the residents program was profitable or not

7    in the past.  Is that correct?

8    A.   Profitable would be -- I'm not quite

9    sure how it would be profitable.  How is it

10   profitable?

11   Q.   Well, defined profit is the incomes are

12   greater than the expenses.

13   A.   I understand that, but why -- how was

14   this profitable?

15        MR. LEVINSTEIN:  I think his question

16   is:  What revenue did the athletes generate?

17   Q.   BY MR. JONES:  My understanding is there

18   was revenues being created by the Olympic Training

19   Center.

20   A.   You mean --

21   Q.   People paying --

22   A.   Grant money coming in?

23   Q.   No.  People paying to participate.

24   A.   In competitions here?

25   Q.   No, at the -- for the training.  Paying

---

1    Q.   At a meeting?

2    A.   Yes.

3        MR. JONES:  Turning to another area now,

4    I'd like to take a look at Exhibit 4.  You want to

5    see Exhibit 4?  You've probably got it memorized.

6        (Mr. Jones gives Exhibit 4 to Mr.

7    Levinstein.)

8        THE WITNESS:  Okay.

9    Q.   BY MR. JONES:  Have you ever seen that

10   letter before?

11   A.   I have not.

12   Q.   Turning to Exhibit 5 --

13   A.   I have no Exhibit 5.

14        MR. LEVINSTEIN:  Yes, you do.

15        THE WITNESS:  Where is it?

16        MR. LEVINSTEIN:  You're looking at the

17   Exhibit 5.

18        THE WITNESS:  Oh, this is the wrong one?

19        MR. LEVINSTEIN:  Yeah.

20        THE WITNESS:  I'm sorry.

21        MR. JONES:  The answer is probably going

22   to be the same anyway, but --

23        THE WITNESS:  Okay.

24        MR. JONES:  Why don't you look at 4 just

25   to be sure.

---

1    for the training.

2    A.   On the resident team?

3    Q.   I'm not sure.

4    A.   I'm not sure either.  I'm not sure if

5    you're sure.  This is all knew to me.  I -- I -- I

6    think you have to research that one more thoroughly.

7    Q.   Do you know if the camps were

8    profitable?

9    A.   I don't know.

10   Q.   Do you know if they were canceled?

11   A.   I don't know if there are camps.  I'm

12   not aware of the camps.

13   Q.   Any discussion by -- between you and

14   Mr. Gambardella for Chul Ho Kim's position was phased

15   out?

16        MR. LEVINSTEIN:  Objection.

17        MR. JONES:  Whatever you want to call

18   it.

19        THE WITNESS:  Was eliminated.

20        MR. JONES:  Was eliminated.

21        THE WITNESS:  The program was

22   eliminated.  We had those discussions.

23   Q.   BY MR. JONES:  Was that discussed among

24   the GMC?

25   A.   Yes.

---

1        THE WITNESS:  Okay.  I have not seen

2    this letter before.

3        MR. LEVINSTEIN:  You're now referring to

4    Exhibit 4?

5        THE WITNESS:  Yes.

6    Q.   BY MR. JONES:  So you've not seen

7    Exhibit 4 and you've already read Exhibit 5 and

8    you've not seen that one?

9    A.   I have not seen either 4 or 5.

10        MR. LEVINSTEIN:  Please take this back.

11   I don't want to carry any more copies of paper.

12   Q.   BY MR. JONES:  Have you ever heard any

13   one of the volunteers with USOC refer to management

14   at USTU as Korean mafia or words to that effect?

15   A.   No.

16        MR. LEE:  Take one quick minute.  Just

17   one minute.  I need to ask you something.

18        (Recess taken from 11:47 a.m. to

19   11:50 a.m.)

20        (Mr. Jones gives Exhibit 69 to Mr.

21   Levinstein.)

22        MR. JONES:  Do you have Exhibit 69?

23        MR. LEVINSTEIN:  He does.

24        MR. JONES:  Okay.

25   Q.   BY MR. JONES:  Have you ever seen that

---

**Page 101**

1    letter before?

2         A.   I am cc'd on it, so apparently, I have.

3         Q.   Were you -- did you see a draft of it

4    before it went out?

5         A.   I don't recall.

6         Q.   Did you -- you discussed the substance,

7    though, before it went out, I take it.

8         A.   I don't recall.

9         Q.   You testified that you and

10   Mr. Gambardella did discuss the concepts about

11   phasing out of the resident program.  It's just that

12   you don't recall whether it was before or after this

13   letter.

14             MR. LEVINSTEIN:  He didn't say that.

15             THE WITNESS:  I said -- I think I said I

16   didn't recall seeing this letter.  Or what was your

17   prior question?

18        Q.   BY MR. JONES:  With respect to September

19   8, 2004, as you sit here today, you don't know when

20   you had a discussion with --

21        A.   I do not.

22        Q.   -- Mr. Gambardella --

23        A.   I do not.

24        Q.   -- about the resident program.  Thank

25   you.

**Page 102**

1             MR. LEVINSTEIN:  Well, just for the

2    record, you do know that before it was phased out you

3    talked about it.

4             THE WITNESS:  Yeah.

5             MR. LEVINSTEIN:  So I just don't want

6    there to be any confusion.

7             THE WITNESS:  No.

8             MR. LEVINSTEIN:  Just the September 8th

9    date --

10            MR. JONES:  Right.

11            MR. LEVINSTEIN:  -- he doesn't have any

12   particular knowledge about.

13        Q.   BY MR. JONES:  You were not involved --

14   other than coming on as the new GMC chair, you were

15   not involved at all in the decertification process of

16   USTU?

17        A.   I was not.

18        Q.   Has USTU ever -- I should call it USA

19   Taekwondo ever discussed possibly limiting

20   memberships in that organization to U.S. citizens?

21            MR. LEVINSTEIN:  Since he became

22   involved with it?

23            MR. JONES:  Yes.

24            THE WITNESS:  To qualify, we talked

25   about limiting voting rights in the elections to U.S.

**Page 103**

1    citizens, but not limiting membership.

2         Q.   BY MR. JONES:  And do you remember what

3    year that was discussed?

4             (Brief interruption in the proceedings.)

5             THE WITNESS:  Sorry, guys.  I'll turn it

6    off.

7             I suspect it was this year.

8             MR. LEVINSTEIN:  2005?

9             THE WITNESS:  2005.

10        Q.   BY MR. JONES:  And what would be the

11   rationale of limiting voting rights in USA Taekwondo

12   to U.S. citizens, if you know?

13        A.   Rationale is that it's the national

14   governing body for the United States for the sport.

15        Q.   And that's it?

16        A.   Well, yes.

17        Q.   Did that proposition or concept pass

18   with the GMC?

19        A.   It's in the new set of bylaws.

20        Q.   So it hasn't been voted upon by the

21   membership yet?

22        A.   The membership has delegated that

23   responsibility to the governing body.

24            (Brief interruption in the proceedings.)

25            THE WITNESS:  I thought I turned it

**Page 104**

1    off.

2             (A discussion was held off the record.)

3             THE WITNESS:  It's off.  Could you ask

4    that question again, please?

5         Q.   BY MR. JONES:  Sure.  I'm just trying to

6    understand.  Is that now law at the USA Taekwondo,

7    that only members who are U.S. citizens can vote in

8    USA Taekwondo matters?

9         A.   In elections, yes.

10        Q.   It's limited to elections.

11        A.   Well, they have no voting privileges

12   other than in elections.

13        Q.   Do you know whether that might have an

14   adverse impact on Koreans or other minorities who are

15   living in the United States who are members of USA

16   Taekwondo, but not U.S. citizens?

17            MR. LEVINSTEIN:  Objection.

18            THE WITNESS:  Do I know if it will have

19   an adverse -- it's an adverse action?  No, I don't

20   know.

21        Q.   BY MR. JONES:  Would it be fair to

22   assume that those people would not be able to vote?

23        A.   If they're not U.S. citizens, no, they

24   can't vote.

25        Q.   Is that -- is that a concern?

6/30/2005 Locke, Steven    (Pltf desig = Yellow, Dfts' counters = Blue)

1      A.   I think it's a tradition.  It's
2  traditional in any NGB that you must be a U.S.
3  citizen to vote in the U.S. -- the United States NGB
4  representing that sport.
5      Q.   Have you seen similar bylaws or
6  procedures in other NGB's you've been involved with?
7      A.   Yes.
8      Q.   Which ones?
9      A.   USA Triathlon.
10     Q.   As you sit here today, do you know who
11 brought forth that proposed rule?
12     A.   I do not recall the individual.
13     Q.   Was it someone on the GMC?
14     A.   Yes.
15     Q.   Would that be a matter of record in the
16 minutes?
17     A.   I doubt it because we had general
18 discussions on just bylaw concepts.
19     Q.   It was not you?
20     A.   It was not me.
21     Q.   Do you know if there are any employees
22 of Korean extraction at the USA Taekwondo today?
23     A.   I --
24     Q.   Staff positions?  Administrative
25 positions?

1      MR. JONES:  Okay.
2      MR. LEVINSTEIN:  There were provisions
3  like that in the old, but you couldn't be on a board
4  or you couldn't do certain things if you weren't a
5  U.S. citizen.
6      MR. JONES:  Okay.
7      MR. LEVINSTEIN:  Just for the record.
8      MR. JONES:  Thank you, counsel.
9      Q.   BY MR. JONES:  Was there discussions
10 about also excluding membership to non -- non-U.S.
11 citizens leading up to the decision to focus on
12 elections, election voting?
13     A.   The election focus was the focus.
14     Q.   So it was never something on the table
15 to exclude noncitizens from membership at USA
16 Taekwondo.
17     A.   Never anything on the table.  That would
18 be foolhardy.
19     Q.   Forgive me for asking these questions.
20 Have you ever been arrested?
21     A.   Have I been arrested?  No.
22     Q.   Ever been convicted of any crimes
23 involving dishonesty?
24     A.   No.
25     MR. JONES:  I'm done.

1      A.   I do not know.
2      Q.   Same question for employees at the U.S.
3  Olympic Committee.  Are you aware of any people of
4  Korean extraction that work for them?
5      A.   That, I don't know either.
6      Q.   Same question for volunteers at the
7  USOC.  Are you aware of any people of Korean
8  extraction there?
9      A.   I do not know with the possible
10 exception on staff USOC of Jay Warwick.
11     Q.   You do not know whether he's
12 Chinese-Hawaiian or some other nationality?
13     A.   I'm not sure.
14     MR. JONES:  Why don't we take a break.
15 I think I'm about done.
16     MR. LEVINSTEIN:  Okay.
17     (Recess taken from 11:58 a.m. to
18 12:03 p.m.)
19     MR. JONES:  Just a few more questions.
20     Q.   BY MR. JONES:  Clarification on this new
21 action was taken to limit the election voting to U.S.
22 citizen members of USA Taekwondo.  Correct?
23     MR. LEVINSTEIN:  Just for the record,
24 there were things like that in the old bylaws.  Just
25 in these bylaws, it's included.

1      MR. LEVINSTEIN:  Okay.
2      (The deposition concluded at 12:06 p.m.)

1          SIGNATURE OF WITNESS

2

3          I, STEVEN MICHAEL LOCKE, the witness in the

4    above deposition, have read the within transcript of

5    my testimony.  I have made _____ changes in said

6    testimony and have stated such changes, if any, and

7    the reason for each change on a separate sheet

8    attached to this transcript.  My testimony as given

9    herein is true and correct to the best of my

10   knowledge and belief.

11

12

13        _____

          STEVEN MICHAEL LOCKE

14

15        Subscribed and sworn to before me this

16   _____ day of _____, 2005.

17

18        _____

          Notary Public

19

20   My Commission Expires:

21

22   _____

23

24

25

109

1          REPORTER'S CERTIFICATE

2          I, JANICE L. DOYLE, Certified Court Reporter

3    and Notary Public within Colorado, appointed to take

4    the deposition of STEVEN MICHAEL LOCKE, do certify

5    that before the deposition he was duly sworn to

6    testify to the truth; that the deposition was taken

7    by me on June 30, 2005; then reduced to typewritten

8    form consisting of 109 pages herein; that the

9    foregoing is a true and accurate transcript of the

10   questions asked, testimony given, and proceedings

11   had.

12        I further certify that I am not related to

13   any party herein or their counsel and have no

14   interest in the result of this litigation.

15        In witness hereof, I have hereunto set my

16   hand this _____ day of July, 2005.

17

18   _____

     Janice L. Doyle, Certified Court

19   Reporter and Notary Public

20

21

22

23   My Commission Expires:

24   January 6, 2007

25

110