Exhibit B



**Page 1 (0001)**

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF HAWAII
 2            CIVIL ACTION NO. 04-00461-SOM-LEK
      _____
 3
      DEPOSITION OF JILL J. CHALMERS, ESQUIRE
 4    EXAMINATION DATE:  Friday, April 8, 2005

 5    _____

      DAE SUNG LEE,
 6
      Plaintiff,
 7
      v.
 8
      UNITED STATES TAEKWONDO UNION,
 9    a Colorado nonprofit corporation, et al.,
10    Defendants.
      _____
11
12            PURSUANT TO SUBPOENA, the deposition of JILL
      J. CHALMERS, ESQUIRE, was taken at 8:11 a.m. on Friday,
13    April 8, 2005, at the Double Tree Hotel at 1775 E.
      Cheyenne Mountain Boulevard, Colorado Springs,
14    Colorado, before Valorie S. Mueller, Registered
      Professional Reporter and Notary Public in and for the
15    State of Colorado, said deposition being taken pursuant
      to the Federal Rules of Civil Procedure.
16
17
18
                    Valorie S. Mueller
19              Registered Professional Reporter
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X   O F   E X H I B I T S

 2    DEPOSITION                              PAGE FIRST
      EXHIBIT NO.    DESCRIPTION                APPEARS
 3
 4    4*   August 4, 2003 letter from Thomas Satrom
           to Bruce Harris ........................ 13
 5
      5*   9/5/2003 letter from Thomas Satrom to
 6         Bruce Harris ........................... 17
 7    6*   10/9/03 memo from Bruce Harris to Sang Lee  23
 8    22*  10/27/03 one-page, unsigned letter from
           Steven Smith to President Sang Lee ....... 82
 9
      23*  11/17/03 fax cover sheet with attached
10         11/12/03 letter from Sang Lee, Barb
           Kunkel, Sammy Pejo, and others, to Hon.
11         Ben Nighthorse Campbell ................. 82
12    102  9/12/03 memo from Steve Smith and Jill
           Chalmers to USOC Membership and
13         Credentials Committee, Bates HRO001 ...... 39
14    103  Responses to 12 Problems Outlined by Tom
           Satrom in August 4, 2003 Letter, Bates
15         HRO002-HRO017 ........................... 40
16    104  Responses to 16 Questions Submitted by Tom
           Satrom in September 5, 2003 Letter, with
17         attachments A-G, Bates HRO018-HRO059 ..... 41
18    105  9/12/03 letter from Jill Goodwin to
           Virginia Witte, with attached audit
19         report, Bates HRO060-HRO065 ............. 44
20    106  United States Taekwondo Union Financial
           Policies and Procedures, Bates
21         HRO066-HRO077 ........................... 45
22    107  2/13/04 fax cover sheet from Steve Smith
           to Gary Johansen, with attached USTU Board
23         of Governors as of September 11, 2003,
           Bates HRO078-HRO084 ..................... 46
24
25
```

**Page 2**

```
 1             A P P E A R A N C E S
 2
 3    For the Plaintiff:

 4         WARD D. JONES, ESQ.
           GLENN UESUGI, ESQ.
           Bervar & Jones
 5         1400 Pauahi Tower
           1001 Bishop Street
 6         Honolulu, Hawaii 96813
           (808) 550-4990
 7
 8    For the Defendants:
 9         MARK LEVINSTEIN, ESQ.
           TODD BRAUNSTEIN, ESQ.
10         Williams & Connolly, LLP
           725 Twelfth Street, N.W.
11         Washington, D.C.  20005
           (202) 44-5171
12
      For the Deponent:
13
           BRENT RYCHENER, ESQ.
14         Holme Roberts & Owen, LLP
           90 South Sascade, Suite 1300
15         Colorado Springs, CO  80903
           (719) 473-3800
16
      Also present:  Dae Sung Lee
17                 Gary Johansen, Deputy General Counsel,
                   United States Olympic Committee
18
19                   I N D E X
20    EXAMINATION BY:                          PAGE
21    Mr. Jones  ......................................... 8
22
23
24
25
```

**Page 4**

```
 1    108  11/22/03 e-mail from Steven Smith to Judi
           Cope, forwarding 10/22/03 exchange of
 2         e-mail between Judi Cope and Gary
           Johansen, Bates HRO085-HRO086 ............ 47
 3
      109  10/22/03 exchange of e-mail between Judi
 4         Cope and Gary Johansen, with attached
           remediation plan, Bates HRO145-HRO149 .... 48
 5
      110  11/20/03 e-mail correspondence between
 6         Steve Smith and Gary Johansen, with
           attached 11/20/03 letter from Stephen Bull
 7         to The Honorable Ben Campbell, and
           attached press release, Bates
 8         HRO087-HRO098 ........................... 50
 9    111  10/31/03 and 10/30/03 exchange of e-mail
           between Steven Smith and Gary Johansen,
10         Bates HRO099 ........................... 53
11    112  10/30/03 letter from Kenneth Waugh to Sang
           Lee, Bates HRO100-HRO101 ................. 53
12
      113  10/30/03 and 10/29/03 exchange of e-mail
13         between Gary Johansen and Steven Smith,
           with attachments, Bates HRO102-HRO111 .... 54
14
      114  10/29/03 letter from Steven Smith to Gary
15         Johansen, Bates HRO112-HRO114 ............ 54
16    115  10/28/03, 10/13/03 and 10/12/03 exchange
           of e-mail among Steven Smith, Gary
17         Johansen, and Jim Cahn, with attached
           Implementation of a Remediation Plan for
18         the United States Taekwondo Union, Bates
           HRO115-HRO120 ........................... 56
19
      116  10/28/03 e-mail from Steven Smith to Jeff
20         Benz and Gary Johansen, Bates HRO121 ..... 57
21    117  Printout of PowerPoint presentation
           prepared for USOC Membership and
22         Credentials Committee September 13, 2003,
           Bates HRO122-HRO130 ..................... 58
23
      118  10/27/03 letter from Steven Smith to
24         Jeffrey Benz, Bates HRO131-HRO134 ........ 61
25
```

**Page 5**

1  119  10/27/03 e-mail from Steven Smith to Jeff
2       Benz and Gary Johansen, with attached
        10/27/03 letter from same, Bates
3       HRO135-HRO137 ............................ 61
4  120  10/24/03 letter from Kelly Skinner to
        Bruce Harris, with attached Draft Press
5       Release, Bates HRO138-HRO141 ............. 61
6  121  10/24/03 e-mail correspondence among
        Steven Smith, Gary Johansen and Jill
7       Chalmers, Bates HRO142 ................... 62
8  122  10/24/03 letter from Mark Bryant to Sang
        Lee and Bruce Harris, Bates HRO143-HRO144 . 63
9  123  10/22/03 e-mail from Gary Johansen to Judi
        Cope, with attached Remediation Plan for
10      USTU, Bates HRO150-HRO154 ................ 63
11 124  10/22/03 e-mail from Gary Johansen to Judi
        Cope, with attached Remediation Plan for
12      USTU, Bates HRO155-HRO159 ................ 63
13 125  10/22/03 exchange of e-mail between Gary
        Johansen and Judi Cope, Bates
14      HRO160-HRO162 ............................ 64
15 126  10/22/03 exchange of e-mail between Gary
        Johansen and Judi Cope, with attached
16      Summary of USOC's Position and Proposed
        Plan to Remedy USOC's Concerns, Bates
17      HRO163-HRO168 ............................ 64
18 127  10/7/03 letter from Kelly Skinner to Bruce
        Harris, Bates HRO169 ..................... 65
19
20 128  10/7/03 e-mail from Gary Johansen to
        Steven Smith and Jill Chalmers, with
21      attached e-mail correspondence between
        Dedra McClay and Ronda Sweet, Bates
22      HRO170-HRO171 ............................ 65
23 129  10/3/03 exchange of e-mail between Steven
        Smith and Gary Johansen, Bates HRO172 .... 66
24 130  9/26/03 and 9/25/03 exchange of e-mail
        between Steven Smith and Gary Johansen,
25      Bates HRO173 ............................. 66

**Page 7**

1  144  9/12/03 resignation letter from Bruce
2       Harris, Bates HRO232-HRO233 .............. 77

4       *Exhibits previously marked.

**Page 6**

1  131  9/22/03 e-mail from Jill Chalmers to Kay
        Burton, Bates HRO174 ..................... 67
2  132  9/19/03 and 9/18/03 exchange of e-mail
3       between Jill Chalmers and Gary Johansen,
        Bates HRO175-HRO176 ...................... 67
4  133  9/19/03 e-mail from Gary Johansen to Jill
5       Chalmers and Jill Chalmers, with
        attached 9/16/03 letter from Bruce Harris
6       to Member USTU School and sample letter to
        Honorable Ben Campbell, Bates
7       HRO177-HRO179 ............................ 67
8  134  9/12/03 exchange of e-mail between Steven
        Smith and Gary Johansen, with attached
9       Proposed Remediation for USTU, Bates
        HRO180-HRO189 ............................ 68
10
11 135  9/12/03 exchange of e-mail between Steven
        Smith and Jeff Benz, et al., Bates
12      HRO190-HRO191 ............................ 68
13 136  9/11/03 exchange of e-mail between Jill
        Chalmers and Jeff Benz, et al., Bates
14      HRO192-HRO195 ............................ 69
15 137  9/11/03 letter from Thomas Satrom to
        Steven Smith, Bates HRO196-HRO198 ........ 70
16 138  9/9/03 letter from Steven Smith to Gary
17      Johansen, Bates HRO204-HRO207 ............ 71
18 139  9/11/03 e-mail from Steven Smith to Gary
        Johansen, et al., with draft Proposed
19      Remediation for USTU, Bates HRO199-HRO203 . 75
20 140  9/9/03 e-mail from Steven Smith to Gary
        Johansen, et al., Bates HRO208 ........... 75
21 141  8/26/03 letter from Thomas Satrom to Bruce
        Harris, Bates HRO214-HRO217 .............. 75
22
23 142  8/26/03 and 8/21/03 exchange of e-mail
        between Gary Johansen and Steven Smith,
24      Bates HRO218-HRO221 ...................... 76
25 143  8/21/03 e-mail from Steven Smith to Gary
        Johansen, Bates HRO221 ................... 76

**Page 8**

1        P R O C E E D I N G S
2        JILL J. CHALMERS, ESQUIRE
3        The deponent herein, being first duly
4   sworn to testify to the truth in the above cause, was
5   examined and testified on her oath as follows:
6        E X A M I N A T I O N
7   BY MR. JONES:
8        Q   Would you please state your name and
9   business address for the record, please?
10       A   Jill J. Chalmers.  I'm at Holme Roberts &
11  Owen, 90 South Cascade, Suite 1300, Colorado Springs,
12  80913.
13       MR. RYCHENER:  And if I could just state,
14  now that we're on the record, that Holme Roberts & Owen
15  has produced, in response to your subpoena, documents
16  this morning which we've Bates stamped HRO-1 through
17  HRO-251.
18       MR. JONES:  And are those documents
19  responsive to the subpoena?
20       MR. RYCHENER:  Yes.
21       Q   (BY MR. JONES)  Ms. Chalmers, what is your
22  occupation?
23       A   I'm an attorney.
24       Q   Are you licensed in the state of Colorado?
25       A   Yes.

1    Q    Have you ever taken a deposition before?

2    A    Never.

3         MR. LEVINSTEIN:  Taken or given?

4         MR. JONES:  Taken.

5    Q    (BY MR. JONES)  Given the fact that you

6    haven't taken one before, I'll briefly run through the

7    ground rules to avoid problems as we proceed along.

8         As your attorney might have told you, a

9    deposition is basically an interview.  It is an

10   under-oath interview, so it is important that we get a

11   clear record.  The purpose of the deposition is

12   primarily for use in court.

13        If this matter goes to trial and you are not

14   able to testify in Hawaii where the action is pending,

15   the deposition could be read directly to the jury in

16   place of your live testimony.  You understand that?

17   A    Yes.

18   Q    I will try and make myself clear, but if I

19   do not in my questioning, please say, I don't

20   understand the question, could you please rephrase it

21   or re-ask it, and I'll be happy to do so.

22        Nobody wants you to guess.  We're just asking

23   for your best answers based upon personal knowledge

24   today.

25   A    Okay.

1    Q    If you do go ahead and respond to

2    questions, we'll all assume that you understand the

3    question and are responding fully and truthfully.  Is

4    that fair?

5    A    That's fine.

6    Q    We will take breaks every 45 minutes or

7    so, but if for any reason you want to take a break,

8    just ask for one, and we'll go off the record.

9    A    Okay.

10        MR. LEVINSTEIN:  For the record, I just

11   want to say that taking the deposition of a lawyer of

12   the defendant is a very unusual thing.  It raises all

13   sorts of concerns about attorney work product and

14   privilege.  We are going to go very slowly so we can

15   make sure we identify those issues.  Ms. Chalmers has

16   her own counsel here.

17        And, in general, our view is if there are

18   events at which there are other people available to

19   testify, in general it is not appropriate to take the

20   deposition of Ms. Chalmers about things that counsel

21   has special knowledge.

22        In fact, the questions you're going to

23   ask, we have the view are all privileged, given the

24   limited allowance the judge made at the hearing on that

25   document to come in.  We have not challenged that she

1    will be questioned about certain limited subjects.  But

2    we're making no waiver by allowing her to be here

3    today.

4         MR. JONES:  Understood.

5    Q    (BY MR. JONES)  Where are you employed,

6    Ms. Chalmers?

7    A    At Holme Roberts & Owen.

8    Q    That is a law firm?

9    A    That's correct.

10   Q    And where is it located?

11   A    We have many offices, but I work in

12   Colorado Springs.

13   Q    How long have you been with that firm?

14   A    Since 2000.

15   Q    Do you have an area that you specialize

16   in?

17   A    I have a few areas I specialize in.  They

18   include representation of nonprofit organizations.  I

19   also have a subspecialty in intellectual property.

20   Q    In your position at Holme Roberts, has

21   your firm ever represented the United States Taekwondo

22   Union?

23   A    Yes, we did represent the United States

24   Taekwondo Union.

25   Q    Roughly during what period has it or did

1    it represent United States Taekwondo Union?

2    A    To my knowledge, I know that we

3    represented USTU at least from 2002.  And I know we

4    withdrew representation at some time and continued

5    representation recently again.

6    Q    I saw some documentation in the documents

7    that were just furnished that suggests you might have

8    withdrawn around October 2003, something like that.

9    Does that sound about right?

10   A    That sounds correct.

11   Q    I'm not going to hold you to that date,

12   but I just noticed one letter.

13        What was the scope of your representation

14   during 2002 through 2003, if you can recall, of USTU?

15        MR. LEVINSTEIN:  Objection; calls for

16   privilege.

17   Q    (BY MR. JONES)  During 2002 and 2003, did

18   you represent USTU in a decertification action brought

19   by the United States Olympic Committee against it?

20        MR. LEVINSTEIN:  Objection.  You can

21   answer.

22   A    Yes.

23   Q    (BY MR. JONES)  Just to clarify, does the

24   USTU still exist under that name?

25   A    No.  USTU was merged out of existence due

**Page 13**

```
 1   to a reincorporation in Colorado.
 2        Q    Did that happen recently?
 3        A    Yes.  That happened in November of last
 4   year.
 5        Q    What is the new name, which I assume is
 6   public record?
 7        A    The new name is USA Taekwondo.
 8        Q    Is it correct that the decertification
 9   action brought by the USOC against USTU during 2003 was
10   settled at some point?
11        A    To my knowledge, it was settled.
12        Q    When the settlement took place, was --
13   well, was your representation terminated before the
14   actual final settlement was agreed upon?
15        A    Yes.
16        Q    Did other counsel take over in your place?
17        A    Yes.
18        Q    What was the name of that counsel?
19        A    I believe his name is Richard Tagmeyer.
20        Q    I'd like to show you an exhibit, if I
21   could, marked as exhibit -- previously marked as
22   Exhibit 4.
23             MR. LEVINSTEIN:  Thanks again.
24        Q    (BY MR. JONES)  Have you had a chance to
25   skim through Exhibit 4?
```

**Page 14**

```
 1        A    Yes, I've skimmed it.
 2        Q    Have you seen that document before?
 3        A    Yes, I have.
 4        Q    Is that a letter from Thomas Satrom,
 5   Chairman of the USOC Membership and Credentials
 6   Committee, to Bruce Harris, Executive Director of the
 7   U.S. Taekwondo Union, dated August 4, 2003?
 8        A    That's what it appears to be.
 9        Q    When did you first see this document?
10        A    I don't know an exact date, but generally
11   in early fall of 2003.
12        Q    Would it be roughly around the time it was
13   sent out to Bruce Harris, if you know?
14        A    I don't know.  I don't think we were
15   retained immediately upon its sending.
16        Q    The letter contains a list of problems,
17   does it not, that the USOC apparently perceived that
18   the USTU had?
19             MR. LEVINSTEIN:  Objection.  Contrary to
20   the document.  Speaking on behalf of the Membership and
21   Credentials Committee, not the USOC.
22        A    The letter appears to list a number of
23   problems or concerns.
24        Q    (BY MR. JONES)  Concerns of the Membership
25   and Credentials Committee of the USOC?
```

**Page 15**

```
 1        A    That's my understanding, yes.
 2        Q    And correct me if I'm wrong, but one of
 3   the listed problems, they state, is an allegiance to
 4   Korea to the detriment of U.S. programs and the
 5   interest of U.S. athletes?
 6        A    Yes, that's listed as No. 5.
 7        Q    Did you understand about the time your
 8   firm was retained to handle the decertification action
 9   against USTU that a substantial number of Korean
10   Americans held management positions with USTU?
11        A    Can you repeat the question again?  Sorry.
12        Q    Did you understand or learn that at the
13   time you were retained and began work for USTU that a
14   substantial number of Korean Americans were in
15   management or appointed positions for USTU?
16        A    My understanding was that there were a
17   number of Korean Americans in governance positions,
18   which are different, in my mind, than management
19   positions.
20        Q    Fair enough.  And was it a substantial
21   number?
22             MR. LEVINSTEIN:  Objection.
23        A    That was my understanding.  I guess,
24   substantial, I'm not sure.  But in a regular
25   organization that I deal with, yes, it seemed to be
```

**Page 16**

```
 1   substantial in comparison to organizations that I
 2   normally deal with.
 3        Q    (BY MR. JONES)  Given that knowledge, did
 4   you personally feel, when you read this letter, that
 5   No. 5 listed on Page 2 appeared to be racially
 6   insensitive --
 7             MR. LEVINSTEIN:  Objection.
 8        Q    (BY MR. JONES)  -- to Korean-born
 9   Americans?
10             MR. LEVINSTEIN:  Objection.  Calls for
11   attorney work product.  It's privileged information.
12             MR. JONES:  I'm just asking for her
13   individual feelings when she saw that.
14             MR. LEVINSTEIN:  She was in a position as
15   an attorney at the time representing a client.  There's
16   no way to separate out those views from advice given on
17   other issues, so I think it's work product.
18             MR. RYCHENER:  And I think if the entity
19   is asserting the work-product privilege and
20   attorney-client, then I'll instruct her not to answer.
21             MR. JONES:  Fair enough.
22        Q    (BY MR. JONES)  This letter, Exhibit 4,
23   gave notice that the USOC Membership and Credentials
24   Committee was intending to have a meeting on September
25   12th, 2003 in which decertification would be discussed.
```

1  Do you recall that?
2       A    Yes.
3       Q    Did you ultimately attend that meeting
4  whenever it occurred?
5       A    Yes.
6       Q    Where was that meeting held?
7       A    The meeting was held in Denver.
8       Q    And you attended on behalf of USTU?
9       A    That's correct.
10      Q    Did any other attorneys from your firm
11 attend that meeting on behalf of USTU?
12      A    Yes.  Steve Smith, a partner of our firm,
13 attended as well.
14      Q    Showing you Exhibit 5 previously marked.
15           MR. LEVINSTEIN:  Thank you.
16      Q    (BY MR. JONES)  You've had a chance to
17 skim Exhibit 5?
18      A    Yes.
19      Q    And is that another letter from Mr. Satrom
20 of the USOC Membership and Credentials Committee
21 directed to Bruce Harris of the USTU dated September 5,
22 2003?
23      A    That's what it appears to be.
24      Q    And did you see this letter before
25 sometime in 2003?

1       A    Yes, I've seen this letter before.
2       Q    What was the purpose of this letter, if
3  you know?
4            MR. LEVINSTEIN:  Objection.
5       A    My understanding was this letter was from
6  the Membership and Credentials Committee to raise
7  additional concerns that they expected USTU to respond
8  to prior to or during the September meeting.
9       Q    (BY MR. JONES)  So you understood that
10 items 1 through -- I guess numbered items 1 through 15
11 needed to be responded to by USTU before or during the
12 upcoming meeting in Denver?
13           MR. LEVINSTEIN:  Objection.
14      A    That was my understanding.
15      Q    (BY MR. JONES)  And did you have an
16 understanding as to what would happen if USTU did not
17 respond appropriately or fully to these points listed
18 in the September 5 letter?
19           MR. LEVINSTEIN:  Objection.  Calls for
20 legal advice given to the client.  It's work-product
21 privilege and it's probably attorney-client as well.
22           MR. RYCHENER:  I also object, lack of
23 foundation to the extent you are asking about her
24 understanding of what the USOC committee intended.  But
25 to the extent they raised the attorney-client

1  privilege, I'll instruct her not to answer.
2            MR. JONES:  Fair enough.
3       Q    (BY MR. JONES)  Focusing on Item No. 8, if
4  you'd read that one.
5       A    Okay.
6       Q    When you read that, did you believe it to
7  be racially insensitive toward Korean Americans?
8            MR. LEVINSTEIN:  Objection.  It's calling
9  for attorney work product and privilege.
10           MR. RYCHENER:  I'll instruct her not to
11 answer.
12      Q    (BY MR. JONES)  You told us that you did
13 attend the meeting held in Denver by the USOC
14 Membership and Credentials Committee, along with
15 Mr. Smith; is that correct?
16      A    That's correct.
17      Q    About how long was that meeting?  Just a
18 rough estimate.
19      A    I guess half a day.
20      Q    Did it take place on September 13?
21      A    That's my recollection.
22      Q    Who else was in attendance at the meeting,
23 if you remember?
24      A    There were a large number of people
25 attending the meeting; many members of USTU attended,

1  as well as management and some members of the
2  governance of USTU.
3       Q    Were the USTU members who were present at
4  the meeting invited or allowed to stay through the
5  whole meeting, or did the meeting kind of go in two
6  stages where they were invited to leave or asked to
7  leave and then the meeting continued?
8       A    My understanding is it was one meeting
9  that was open to all of the membership or any
10 interested person, and that was the only meeting of the
11 Membership and Credentials Committee.  I understood
12 that the Membership and Credentials Committee met
13 separately, but that was an internal meeting, not part
14 of the meeting to discuss USTU and compliance issues.
15      Q    Were you asked to sit in on the
16 closed-door session of the USOC Membership and
17 Credentials Committee for all or part of it?
18      A    Steve Smith and I were asked to join a
19 meeting that had been in session for some time near the
20 end of their meeting.
21      Q    Can you tell us what areas were discussed
22 in the open forum portion of the meeting, if you can
23 remember anything about it?
24      A    What areas were discussed?
25      Q    (Counsel nodded.)

**Page 21**

```
 1        A    There were a number of areas that were
 2   discussed.  Primarily issues raised by the Membership
 3   and Credentials Committee, many of them that were
 4   listed in the two letters that we have just discussed,
 5   as well as a number of additional issues that were
 6   raised by USTU members during the meeting, mainly
 7   relating to the compliance or noncompliance of USTU
 8   with the USOC bylaws and articles of incorporation in
 9   the Ted Stevens Olympic and Amateur Sports Act.
10        Q    Did the members of the U.S. Olympic
11   Committee ask questions during the open forum portion?
12        A    Members of the USOC's Membership and
13   Credentials Committee did ask a number of questions.
14        Q    And did people speaking on behalf of the
15   USTU or appearing to be speaking on behalf of the USTU
16   attempt to respond to those questions?
17        A    Yes.  And in addition, other members from
18   the USTU who attended on their own behalf also
19   responded and asked additional questions.
20        Q    Did there appear to be groups of USTU
21   members at the meeting who opposed each other based
22   upon the kinds of things they were saying?
23        MR. LEVINSTEIN:  Objection.
24        A    Yes.  There were many individual groups of
25   members whom I perceived to have different agendas and
```

**Page 22**

```
 1   disputes among each other and with the USTU.
 2        Q    (BY MR. JONES)  So this meeting, the whole
 3   meeting, was as much as a half day, you said?
 4        A    It may have even been a bit longer than a
 5   half day.
 6        Q    Were you asked to speak or did you ask to
 7   speak during the open session on behalf of USTU?
 8        A    I believe I spoke briefly during the open
 9   session on behalf of USTU.
10        Q    Were you -- or did you go in expecting to
11   have to give a formal presentation?
12        A    It was our hope to give a formal
13   presentation, although it had been planned that Steve
14   Smith would primarily lead the presentation.
15        Q    Was it your intention to try and respond
16   to all these points in Exhibits 4 and 5 as best you
17   could?
18        A    That wasn't our plan.
19        Q    It was not?
20        A    No.
21        Q    Was there any intention to present
22   witnesses at any portion the USOC Membership and
23   Credentials Committee meeting in Denver?
24        A    Yes.
25        Q    What witnesses were at least planned?
```

**Page 23**

```
 1        MR. RYCHENER:  Again, I think that's
 2   going into attorney work product.  I think you can ask
 3   her what witnesses they put on; but in terms of what
 4   their strategy was, again, I think that gets too far
 5   into attorney-client work product.
 6        MR. JONES:  That's fair.
 7        Q    (BY MR. JONES)  What witnesses did you put
 8   on, if any?
 9        A    I don't recall specifically who we were
10   able to put on.  I know generally we asked athletes to
11   speak, I believe some state association presidents we
12   asked to speak.
13        I recall asking Jill Goodwin, USTU's
14   independent auditor at that time, to speak on behalf of
15   the organization.  I believe we asked Bruce Harris to
16   speak, but he may have spoken without our prompting.
17        I can explain our intent was a lot.
18        MR. RYCHENER:  Again, I instruct you not
19   to get into attorney-client and work-product issues in
20   terms of strategy.
21        MR. JONES:  All right.
22        Q    (BY MR. JONES)  I'm showing you what's
23   previously been marked as Exhibit 6.
24        A    Okay.
25        Q    Have you had a chance to read Exhibit 6?
```

**Page 24**

```
 1        A    Yes.
 2        Q    Have you seen that document before?
 3        A    No, I have not.
 4        Q    It appears to be a memo written by Bruce
 5   Harris directed to Sang Lee dated October 9, 2003,
 6   which summarizes a meeting between you and various USTU
 7   individuals and governance; is that correct?
 8        A    I don't know if it's a memo or a letter.
 9        MR. LEVINSTEIN:  And for the record,
10   again, this document came into evidence that certain
11   issues can be discussed, but we don't consider it a
12   waiver of privilege.  We also have severe doubts that
13   whoever produced it had the right to waive privilege,
14   to the extent there's a limited waiver of certain
15   things -- actually, not a waiver, but there's
16   information here that should have been preserved by the
17   entity.
18        That's it.  Go ahead.
19        Q    (BY MR. JONES)  In it, Mr. Harris says
20   that you mentioned that several members of the M&C
21   Committee during that Denver meeting had referred to
22   the USTU as a Korea Mafia-run organization; that you
23   specified that Jeannie Picariello, a member of the
24   committee, was one of the more vocal persons using the
25   racially derogatory language; and further that you
```

```
 1   expressed your feeling that the Membership and
 2   Credentials Committee was running amuck.  Did --
 3              MR. LEVINSTEIN:  Let's take them one at a
 4   time and separate them out because they present
 5   different issues.
 6        Q    (BY MR. JONES)  Did you hear Jeannie
 7   Picariello state that she felt USTU -- or refer to USTU
 8   as a Korea Mafia-run organization during any portion of
 9   the meeting in Denver?
10        A    No.
11        Q    Did you hear anyone on the USOC side use
12   language similar in reference to the USTU -- language
13   similar, I mean, "Korea Mafia" or words to that effect?
14        A    No one from the USOC Membership and
15   Credentials Committee or from the USOC.
16        Q    Who, if anyone, did you hear use that kind
17   of language?
18        A    Sammy Pejo.
19        Q    Your best memory of what Sammy Pejo said
20   at the Denver meeting?
21        A    I didn't hear Sammy use that term during
22   the Denver meeting.
23        Q    It was at a different time?
24        A    Yes.
25        Q    When, if you can say?
```

```
 1        A    Can you repeat your question, something
 2   about racially insensitive?
 3        Q    Let me break it up.
 4        A    Yeah, thanks.
 5        Q    During the open -- there were two parts --
 6        A    Yes.
 7        Q    -- the open session and I'll call it the
 8   closed session; is that correct?
 9        A    Yes.
10        Q    There were just two parts?  During the
11   first session, did you hear anyone on the Membership
12   and Credentials side or the USOC side use terms or
13   words that sounded racially insensitive to Korean
14   American people?
15              MR. LEVINSTEIN:  Objection.  You may
16   answer.
17        A    I don't recall hearing words that I
18   thought people would feel are racially insensitive
19   during the open meeting.
20        Q    (BY MR. JONES)  Same question now for the
21   closed session.  Did you hear anyone on the USOC side
22   or the Membership and Credentials side use words,
23   phrases that sounded racially insensitive to Korean
24   Americans?
25        A    It's a hard question for me to answer
```

```
 1        A    During an attorney-client meeting
 2   following the hearing.
 3        Q    So just to understand, your testimony
 4   today is that during all parts of the Denver meeting
 5   arranged by USOC Membership and Credentials Committee,
 6   you never heard anyone on the USOC side or the
 7   Membership and Credentials side refer to USTU
 8   governance as a Korea Mafia-run organization, or words
 9   to that effect?
10        A    Never the words Korean or Korea Mafia.
11        Q    Did you ever hear words or terms used by
12   the USOC Membership and Credentials Committee that
13   sounded racially insensitive to Korean Americans?
14              MR. LEVINSTEIN:  Objection; vague and
15   ambiguous.  But she can answer that.
16              MR. RYCHENER:  And this question is not
17   limited to the Denver meeting, or is it about the
18   Denver meeting?
19        Q    (BY MR. JONES)  I'm just focusing on the
20   Denver meeting for now.
21        A    And can I clarify if your question refers
22   to the Denver meeting or the meeting of the Membership
23   and Credentials Committee that Steve and I were invited
24   to attend afterward?
25        Q    Either.
```

```
 1   because I'm not a Korean American, so I can't tell you
 2   how Korean Americans might have felt after hearing some
 3   comments made during the closed hearing.  But I can
 4   tell you that I recall some comments that were -- I'm
 5   not sure if insensitive would be the word, but
 6   inflammatory would be a word I would use.
 7        Q    What words did you hear that you would
 8   consider inflammatory?
 9              MR. LEVINSTEIN:  Objection.
10        A    I specifically remember hearing words such
11   as, the athletes need to get their heads out of their
12   asses; they need to cut the deferential bowing crap and
13   think for themselves, and words to that effect.
14        Q    (BY MR. JONES)  Any other inflammatory
15   words that you heard at that closed session meeting in
16   Denver?
17        A    Those were the -- are the only specific
18   words I recall.
19        Q    Were any minutes taken at that meeting
20   by -- did it appear to you that minutes were being
21   taken at that meeting by staff or volunteers on the
22   USOC side?  And I'm focusing on the closed session
23   portion.
24        A    I don't recall minutes being taken.
25        Q    Were you provided with minutes after the
```

**Page 29**

```
 1  meeting?
 2       A    No.
 3       Q    Did you take notes regarding things that
 4  were said during the closed session meeting?
 5       A    No.
 6       Q    Do you know if Mr. Smith did?
 7       A    I don't know if he did.
 8       Q    So should we assume that notes were not
 9  produced today pursuant to the subpoena duces tecum?
10       A    I did not produce any notes, and I'm not
11  aware of any.
12       Q    Who was the person that stated that the
13  athletes should quit bowing during the closed session
14  meeting, if you remember?
15       A    Jeannie Picariello said the statement to
16  that effect.  And I recall, I think it was cut the
17  bowing crap.
18       Q    Did she explain why she thought that was
19  an inappropriate habit by the athletes?
20       A    My understanding was Jeannie was very
21  frustrated by the athletes who testified at the hearing
22  that they were members of committees but didn't know
23  who the chair of the committees were or what their
24  roles were.
25            And I know the athletes made statements that
```

**Page 31**

```
 1  ahead.
 2       A    I don't recall any other -- I don't recall
 3  any person making any statement of their frustration
 4  with the USTU resulting from any Korean issue.
 5       Q    (BY MR. JONES)  During the closed-door
 6  session, was the point made in Mr. Satrom's first
 7  letter about members of the USTU having more allegiance
 8  to Korea discussed in any way, shape, or form during
 9  the closed-door session?
10       A    I don't recall that issue being discussed.
11       Q    How about Item 8 in his second letter?
12            MR. RYCHENER:  Referring to Exhibit 5?
13       Q    (BY MR. JONES)  Yes.  Was any part of that
14  discussed during the closed-door session?
15            MR. RYCHENER:  Any part of Item 8?
16            MR. JONES:  Yes.
17       A    Item 8 wasn't specifically discussed, but
18  I suppose you might make a connection between Jeannie
19  Picariello's statements to Item 8.  But we didn't look
20  down at any letters during that meeting and say focus
21  on Item 8, let's discuss it.
22       Q    (BY MR. JONES)  Did fairness of
23  officiating during competitions come up in discussion
24  during the closed-door session?
25       A    I really don't recall.
```

**Page 30**

```
 1  they just tried to focus on training, rather than
 2  getting involved in the politics.  And I understood her
 3  comments were out of frustration of the athletes' lack
 4  of ability or desire to govern the organization,
 5  despite their election to governance positions.
 6       Q    She understood, though, that that was a
 7  requirement that athletes participate and have a voice
 8  in governance of USTU?
 9            MR. LEVINSTEIN:  Objection.
10            MR. RYCHENER:  Objection; lack of
11  foundation.
12       Q    (BY MR. JONES)  Did it appear she
13  understood that to you?
14            MR. RYCHENER:  Same objection.
15       A    It appeared to me that she understood.
16       Q    (BY MR. JONES)  Were there any other
17  actions on the part of USTU governance that the
18  Membership and Credentials Committee, during the
19  closed-door session, was critical of that concerned
20  Korean cultural --
21       A    I don't --
22            MR. LEVINSTEIN:  Objection.
23       Q    (BY MR. JONES)  -- Korean culture.
24            MR. LEVINSTEIN:  Other actions?  I don't
25  know what other actions we're talking about.  But go
```

**Page 32**

```
 1       Q    Did accountability of the USTU leadership
 2  come up during the closed door discussion at the Denver
 3  meeting?
 4       A    Yes.
 5       Q    And what was said about that, if you can
 6  recall?
 7       A    I don't recall exact words, but generally
 8  I recall members discussing their belief that the
 9  leadership of USTU had to go for accountability
10  reasons.
11       Q    Had to go -- in other words, had to be
12  replaced?
13       A    Resign, I think would be the best
14  characterization.
15       Q    And did they say --
16            MR. LEVINSTEIN:  Is this about the closed
17  door meeting or the open meeting as well?
18            MR. JONES:  Closed door meeting.
19       A    That was my understanding, closed door
20  meeting.
21            MR. LEVINSTEIN:  Okay.  I apologize.
22       Q    (BY MR. JONES)  Is that how it was tied
23  into accountability; that they weren't accountable, and
24  that's why they had to go, or was it something else?
25       A    We were trying to negotiate a remediation
```

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 33**

1   plan where the leadership would be retained, although
2   the Executive Director would resign.  And it was clear
3   during the closed door meeting that members, and I
4   can't remember individually which members, but certain
5   members felt that the leaders of the organization
6   should be held accountable for noncompliance with the
7   USOC directives.
8       Q     So did it sound to you like the committee
9   had already made up its mind by the Denver meeting that
10  that's what they wanted to do?
11            MR. LEVINSTEIN:  Objection.
12      A     During the meeting, it was my belief that
13  certain members had made up their mind about
14  noncompliance and that the leadership and management of
15  the organization was insufficient.
16      Q     (BY MR. JONES)  Bruce Harris stated that
17  you told the USTU management after the meeting that you
18  thought the committee was running amuck.  Was that a
19  fair characterization of what was going on in there?
20            MR. LEVINSTEIN:  Objection.
21            MR. RYCHENER:  And I also object, I think
22  that does ask for attorney work product, thought
23  processes.  I mean, if you want to ask, did she say
24  that, I think that's where to start.
25      Q     (BY MR. JONES)  Did you say that?

**Page 35**

1       Q     (BY MR. JONES)  Were you ever provided
2   with written correspondence, e-mails, letters from
3   these various factions that were critical of USTU
4   governance?
5       Q     Were we ever given the materials?
6       Q     Yes.
7             MR. LEVINSTEIN:  Objection.
8       A     I know we were provided with some
9   materials showing concerns of the members from our
10  client.  And independently I reviewed websites relating
11  to Taekwondo, so I was aware of some concerns that
12  certain factions or portions of USTU membership had
13  with the organization.
14      Q     (BY MR. JONES)  Did either the Membership
15  and Credentials Committee or staff working for that
16  committee independently provide you with individual
17  complaints --
18            MR. LEVINSTEIN:  Objection.
19      Q     (BY MR. JONES)  -- from USTU members
20  critical of the current governance at that time?
21            MR. LEVINSTEIN:  Objection.
22      A     I don't know who provided our firm with
23  documentation.  I know I -- I know there was an open
24  hearing which our firm did not attend.  I know -- I
25  understood from discussions with our client --

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 34**

1       A     Those are not my words.
2       Q     Did the committee appear to be running
3   amuck --
4             MR. LEVINSTEIN:  Objection.
5       Q     (BY MR. JONES)  -- during the closed-door
6   session?
7             MR. LEVINSTEIN:  I think that's tied in
8   with legal advice and work product.  I don't even know
9   what it means.
10      A     And I'm not sure what running amuck means.
11  I can tell you that I thought that USTU, during the
12  open meeting, did not have proper opportunity to fully
13  explore the remediation plan that they were proposing
14  and to show the USOC the efforts they were taking to
15  try to comply with the requirements, because during the
16  meeting, much of the time was taken by members of the
17  USTU who spoke against the governance and management
18  during that meeting.
19            So from a time standpoint, it was very
20  difficult for us to represent and defend the USTU when
21  they were being questioned not only from the Membership
22  and Credentials Committee but from members and factions
23  of the organization itself.  And for that reason, it
24  did not seem to me that USTU had a fair opportunity to
25  be heard.

**Page 36**

1             MR. RYCHENER:  I would instruct you not
2   to reveal attorney-client communications.
3       Q     (BY MR. JONES)  The meeting that you did
4   not attend, was that the first portion, the open forum
5   portion, or are you talking about a separate meeting
6   before that?
7       A     A separate meeting before we were retained
8   to assist USTU with this.
9       Q     Your best estimate as to when that
10  occurred, if you know?
11      A     I don't know, but I'm guessing July.
12      Q     Of 2003?
13      A     That would be correct.
14            MR. LEVINSTEIN:  We ought to not leave
15  her with a misimpression, since you know when it was.
16  Why don't you tell her?  You don't have to, but I don't
17  want to get confused testimony based on a
18  misunderstanding.
19            MR. JONES:  Fair enough.
20      Q     (BY MR. JONES)  Did the subject of a
21  Taekwondo student's loyalty to his instructor being all
22  important come up during that meeting behind closed
23  doors in Denver?
24      A     Not specifically, but I would tie Jeannie
25  Picariello's frustration to deference given by athletes

4/8/2005 Chalmers, Jill J. Esq.   (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 37**

1  to instructors, managers, or organizers.

2  Q   Was discussion about Korean culture

3  placing a higher value on loyalty to one's family,

4  friends, school than on honesty and fair play discussed

5  during the closed-door session?

6  A   Not specifically.

7  Q   How about indirectly?

8  A   I guess I could tie Jeannie's statements

9  to that, but my understanding was Jeannie was very

10  angry and frustrated by the athletes who were in

11  attendance at the meeting; their inability to think for

12  themselves was my understanding of her frustration.

13  Q   What happened after the meeting in Denver?

14  By that, I mean just chronologically, how did the

15  decertification action proceed?

16  MR. LEVINSTEIN:  Objection.  I don't see

17  how she could possibly do that without mixing in

18  discussions with the client, advice given, meetings

19  held.  So I don't know how she can answer that

20  question.

21  MR. RYCHENER:  Yeah, I agree that that

22  would necessarily include attorney-client

23  communications.

24  Q   (BY MR. JONES)  You mentioned that

25  attempts were made at coming up with a mutually

4/8/2005 Chalmers, Jill J. Esq.   (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 38**

1  agreeable remediation plan; is that correct?

2  A   Yes.

3  Q   Did those efforts continue up until the

4  time Holme Roberts withdrew?

5  A   Yes.

6  Q   During your representation of USTU, was

7  there ever a plan on the table which involved removing

8  only the chief executive officer and those financial

9  officers involved with handling day-to-day financial

10  issues for USTU?

11  MR. LEVINSTEIN:  Objection.  First, I

12  don't know what on the table means.  Is it who

13  presented it, didn't present it?  There are documents

14  that show specifically what proposals were made and so

15  on.  And I see no basis for getting into her

16  recollection or thought processes when she may be

17  incorrect and may be influenced by communications with

18  the client.  And there are documents which would show

19  exactly those issues.

20  MR. RYCHENER:  And I object, as well, to

21  the extent a plan may refer to internal strategy that

22  was never developed into a plan that was provided to

23  the other side.

24  Q   (BY MR. JONES)  Since you have provided a

25  stack of documents, why don't we go through them, since

4/8/2005 Chalmers, Jill J. Esq.   (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 39**

1  there doesn't seem to be any problem with using those.

2  MR. JONES:  Let me go ahead and mark

3  HRO-001 as next exhibit in order.

4  (Deposition Exhibit No. 102 was marked

5  for identification.)

6  MR. LEVINSTEIN:  For the record, the mere

7  fact that they have produced nonprivileged documents

8  does not mean that it's okay to ask questions about

9  them, just for the record.  So you can do what you want

10  to do.

11  Q   (BY MR. JONES)  Can you tell me what that

12  exhibit is, 102?

13  A   It appears to be a memo from Steve Smith

14  and myself to the Membership and Credentials Committee

15  to which our written responses to sets of questions

16  that were raised by the Membership and Credentials

17  Committee responded to.

18  Q   And this was after the Denver meeting?

19  A   I believe it was before -- immediately

20  before the Denver meeting.

21  Q   Oh, that's right.  The meeting was on the

22  13th.  So this was given to them the day before?

23  A   Yes.

24  Q   And we've had testimony by Mr. Bruce

25  Harris testifying to two sets of responses -- at least

4/8/2005 Chalmers, Jill J. Esq.   (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 40**

1  two sets of responses that he prepared specifically to

2  Exhibits 4 and 5, which we already looked at.

3  Were those the items that were turned over to

4  Mr. Satrom?

5  MR. LEVINSTEIN:  Objection.

6  A   Attached to this letter?

7  MR. LEVINSTEIN:  You can look at what

8  follows.  She wouldn't know what Bruce Harris said or

9  what documents that he produced.

10  MR. JONES:  She might.

11  Exhibit next in order.

12  (Deposition Exhibit No. 103 was marked

13  for identification.)

14  Q   (BY MR. JONES)  What is that document?

15  A   This is USTU's response to the initial 12

16  problems that were outlined in the letter from Tom

17  Satrom on behalf of the Membership and Credentials

18  Committee, this dated August 4th of 2003.

19  Q   So that was USTU's response to Exhibit 4;

20  is that correct?

21  A   I can't recall if Exhibit 4 --

22  Q   August 4 --

23  A   Yes.

24  Q   -- 2003 letter?

25  A   That's correct.

1    Q    And did you believe that Bruce Harris
2 prepared this document?
3    A    Bruce Harris had assisted with the
4 preparation of this document.
5    Q    And in it, Page 3, Item 5, it states that
6 USTU categorically denies the assertion that USTU has
7 an allegiance to Korea to the detriment of U.S.
8 programs and the interests of U.S. athletes?
9    A    Yes, that's what it says.
10         (Deposition Exhibit No. 104 was marked
11          for identification.)
12    Q    (BY MR. JONES)  Showing you Exhibit 104.
13 What is that document?
14    A    These are the written responses of USTU to
15 additional questions that were raised by the Membership
16 and Credentials Committee in a letter that was dated
17 September 5th of 2003.
18    Q    And, again, was this document prepared
19 with input from Bruce Harris?
20    A    That's correct, yes.
21    Q    And it attaches Exhibits A through G in
22 further support of the answers?
23    A    Yes.
24    Q    And Item 9 at Page 8 states that USTU
25 disagrees with the perception of the -- the perceptions

1 side, or attorneys?
2    A    We had conversations with Gary Johansen
3 following the October -- or sorry -- the November -- or
4 September meetings and prior to our withdrawal.
5    Q    Was he the spokesperson -- did you believe
6 him to be the spokesperson for the Membership and
7 Credentials Committee and/or the USOC?
8         MR. LEVINSTEIN:  Objection.
9    A    I didn't understand his role to be the
10 spokesperson for the Membership and Credentials
11 Committee.  That, to my understanding, was Tom Satrom.
12    Q    (BY MR. JONES)  Did you understand Gary
13 Johansen to be the attorney for the USOC and/or the
14 Membership and Credentials Committee?
15    A    It was my understanding that he was the
16 attorney for the USOC.
17    Q    And, again, you had no direct
18 conversations with Mr. Satrom after the Denver meeting
19 regarding the decertification action?
20    A    I remember we had telephone conversations
21 with Mr. Satrom, but I don't believe they were after
22 the meeting.
23    Q    You had discussions with him before?
24    A    Yes.
25    Q    What was the nature of the discussions?

1 listed in Item 9?
2    A    Yes.
3    Q    Was the substance contained in the
4 response in Item 9 discussed during the closed session
5 meeting in Denver, other than the bowing remark that
6 you have already gone over?
7    A    I don't recall any specific other
8 discussions.
9    Q    After the Denver meeting and before your
10 firm withdrew, were there any face-to-face discussions
11 with either members of the USOC volunteers or staff
12 regarding the decertification action?
13         MR. LEVINSTEIN:  Objection.
14         MR. JONES:  I'm not talking about their
15 attorneys now.  I'm talking about the actual volunteers
16 or staff of the USOC.
17         MR. LEVINSTEIN:  Meetings by whom with
18 those people?
19         MR. JONES:  With Ms. Chalmers.
20    A    I don't recall any.
21    Q    (BY MR. JONES)  Was all discussion done
22 between attorneys when it came to dealing with the
23 other side?
24    A    That's my recollection.
25    Q    And who was the attorney on the other

1    A    I don't recall the specific discussions,
2 but generally relating to our proposed remediation
3 plan.
4    Q    Did Mr. Satrom ever use language or terms
5 with you that one could interpret as racially
6 insensitive toward Korean Americans?
7    A    No.
8         (Deposition Exhibit No. 105 was marked
9          for identification.)
10    Q    (BY MR. JONES)  What is that document?
11    A    It is a letter from Jill Goodwin of Waugh
12 & Associates, USTU's outside auditor, responding --
13 containing responses to questions that were raised by
14 Virginia Witte of the Audit Division of the USOC
15 relating to USTU's finances.
16    Q    This was provided the day before the
17 Denver meeting, as well, to the Membership and
18 Credentials Committee?
19    A    Yes, that's correct.
20    Q    And the purpose, again, was what?
21         MR. RYCHENER:  Object to lack of
22 foundation.
23    Q    (BY MR. JONES)  Why was it passed on to
24 the Membership and Credentials Committee?
25         MR. LEVINSTEIN:  Objection.

1    A    To respond that they had
2  raised or that the USOC had raised concerning the
3  finances and accounting at USTU.
4            (Deposition Exhibit No. 106 was marked
5            for identification.)
6    Q    (BY MR. JONES)  Exhibit 106.  What is that
7  document, do you know?
8    A    I believe it was an attachment to the
9  letter sent by Jill Goodwin.  And if it wasn't an
10  attachment, I think it was referred to either in Jill's
11  letter or during the USOC Membership and Credentials
12  Committee meeting.
13    Q    It's a multiple-page document entitled the
14  "United States Taekwondo Union Financial Policies and
15  Procedures"?
16    A    That's correct.
17    Q    Did you believe it to be just that, a
18  statement of United States Taekwondo Union's Financial
19  Policies and Procedures?
20            MR. LEVINSTEIN:  Objection.
21    A    I believe this was policies and procedures
22  that Jill Goodwin was working with USTU management to
23  draft and implement in an effort to bring USTU -- or
24  with the goal of bringing the USTU into compliance with
25  their requirements under the Act and USOC bylaws and

1  constitution.
2    Q    (BY MR. JONES)  Was this discussed at the
3  closed-door session in Denver?
4    A    I don't recall it being discussed in the
5  closed-door session.
6            (Deposition Exhibit No. 107 was marked
7            for identification.)
8            MR. LEVINSTEIN:  To help move this along
9  a little, the attachment to the cover page of Exhibit
10  107 is already an attachment to a previous document
11  you've marked.  It's one of the exhibits to a prior
12  response.
13            MR. JONES:  Yeah.
14    Q    (BY MR. JONES)  What is this document?
15    A    It is a categorized listing of members of
16  the USTU Board of Governors, including Executive
17  Committee members and other categorizations of the
18  members of the Board of Governors.
19    Q    And this is the same document as one of
20  the exhibits in 104 --
21    A    I believe so, yes.
22    Q    -- that we looked at earlier?
23    A    Yes, I believe it is.  Exhibit D.
24    Q    And this breaks down the structure and
25  people on the governance as it existed in 2003 for

1  USTU.
2    A    That's correct.
3            (Deposition Exhibit No. 108 was marked
4            for identification.)
5    A    Okay.
6    Q    (BY MR. JONES)  Have you had a chance to
7  look at Exhibit 108?
8    A    Yes.
9    Q    What is that?
10    A    It appears to be an e-mail string to and
11  from Steve Smith, via his secretary, Judi Cope, to Gary
12  Johansen, attaching our proposed draft of a remediation
13  plan.
14    Q    Just to speed things up, in the pile you
15  provided, is the remediation plan that's being referred
16  to in this e-mail contained?
17    A    In the e-mail?
18    Q    I'm sorry.  In the stack of documents
19  you're bringing today.
20    A    I believe so.
21    Q    Could you take a look at the pile and tell
22  us which page number to look at, and I might put it
23  with it.
24    A    I believe HRO-145.  I believe it's the
25  same plan attached to HRO-145, starting at -146.

1    Q    So the date of the e-mail on 108 to
2  Mr. Johansen was what?
3    A    On the initial e-mail or the e-mail --
4    Q    The one attaching the actual remediation
5  plan for his consideration.
6    A    Wednesday, October 22nd -- or October --
7  October 22.
8            (Deposition Exhibit No. 109 was marked
9            for identification.)
10    Q    (BY MR. JONES)  And what that is document?
11    A    It's also an e-mail string from Judi Cope,
12  a secretary of our firm, and Gary Johansen.
13    Q    And what are the remaining pages of that
14  document?
15    A    It is a draft proposed remediation plan
16  for USTU.
17    Q    Pardon me?
18    A    A draft proposed remediation plan for the
19  USTU.
20    Q    And was this plan accepted by the other
21  side?
22            MR. LEVINSTEIN:  Objection.
23    A    I don't believe this is the plan that was
24  ultimately accepted.
25    Q    (BY MR. JONES)  Do you recall the reasons

1  given by the other side, the USOC Membership and
2  Credentials Committee, as to why this one was
3  unacceptable?
4            MR. LEVINSTEIN:  Objection; assumes facts
5  not in evidence.
6       A    I don't recall specifically the reasons
7  that were given, and I don't know if this is -- I
8  haven't compared this to the plan that we finally
9  proposed before the Membership and Credentials
10  Committee.  I don't know if it's the same or a
11  subsequent draft.
12       Q    (BY MR. JONES)  This plan we're looking at
13  calls for the replacement of Bruce Harris?
14       A    Yes, it does call for the replacement of
15  Bruce Harris.
16       Q    It also calls for the replacement of
17  whoever was functioning as chief financial officer?
18  I'm sorry.  It calls for the hiring of a competent
19  financial manager or outside contractor to serve as
20  chief financial officer?
21       A    Yes, that's what it calls for.
22       Q    It also calls for a new governance and
23  management committee comprised of five persons and
24  describes the type of people or type of qualifications?
25       A    Yes.  It includes the provision that the

1       Q    And what are the attachments?
2            MR. RYCHENER:  I'll object to the lack of
3  foundation.  There's no indication that she was copied
4  on this or anything.
5       Q    (BY MR. JONES)  Are the documents attached
6  to this -- stapled to this e-mail, do they go along
7  with the e-mail?
8            MR. RYCHENER:  Same objection.
9       Q    (BY MR. JONES)  Do you know?
10       A    I believe they were attached to the
11  e-mail.
12       Q    The first attachment is a letter addressed
13  to Senator Campbell dated November 20, 2003, signed by
14  Stephen Bull?  Who is Stephen Bull, do you know?
15       A    I don't know.
16       Q    Senator Campbell was the senator from
17  Colorado at the time?
18       A    That's correct.
19       Q    Do you know if this letter was some sort
20  of response to a letter sent out by USTU to Senator
21  Campbell?
22            MR. LEVINSTEIN:  Objection.  To have her
23  read the document to answer things not from her
24  personal knowledge is just inappropriate.
25       A    Yeah.  I don't know.  I could read and

1  USOC would select those five people, with input from
2  USTU or recommendations.
3       Q    It calls for the immediate resignation of
4  the president, who was Sang Lee?  Page 3?
5       A    Yes.  And putting him in a new capacity.
6       Q    With the chair of the Governance and
7  Management Committee assuming the duties of the
8  president?
9            MR. LEVINSTEIN:  I just object to her
10  being asked to sit and read the document.  I don't know
11  what the point of it is.  The document says what it
12  says.
13       A    That's what the document says, yes.  It's
14  part of this plan.
15            (Deposition Exhibit No. 110 was marked
16            for identification.)
17       Q    (BY MR. JONES)  Had chance to look at
18  Exhibit 110?
19       A    Yes.
20       Q    What is that?
21       A    It's an e-mail message from Gary Johansen
22  to Steve Smith of our office in response to an e-mail
23  message that Steve sent to Gary asking about a separate
24  matter for a different client and about news that the
25  USTU had filed a discrimination claim against the USOC.

1  tell you.
2       Q    (BY MR. JONES)  The second attachment is a
3  press release?
4            MR. RYCHENER:  I would also note -- I
5  would object on lack of foundation.  I would also note
6  that all of these attachments are dated after Holme
7  Roberts & Owen withdrew from representation.
8       A    It looks to me like a press release.
9       Q    (BY MR. JONES)  Given the date on the
10  third -- well, on all of these exhibits, do you happen
11  to know why they're in your file?
12       A    We keep correspondence relating to clients
13  in our files.
14            MR. LEVINSTEIN:  Her file or Steven
15  Smith's files?  These were all together, so . . .
16       Q    (BY MR. JONES)  Just to understand, Steven
17  Smith's and your files have been merged?
18       A    That's correct.  We keep one set of client
19  files.
20       Q    Okay.  So he might have gotten this after
21  you were no longer involved with the case?
22       A    That's my best understanding.
23            MR. LEVINSTEIN:  For the record, he got
24  it after both of them were no longer involved in the
25  case.

| | |
|---|---|
| 1 | MR. JONES: Right. Understood. |
| 2 | MR. UESUGI: Should we take a break? |
| 3 | We've been going about an hour and a half. |
| 4 | MR. JONES: Good idea. |
| 5 | (Recess taken from 9:43 a.m. to 9:52 |
| 6 | a.m.) |
| 7 | (Deposition Exhibit No. 111 was marked |
| 8 | for identification. |
| 9 | Q (BY MR. JONES) What is Exhibit 111? |
| 10 | A This looks like an e-mail from Steve Smith |
| 11 | to Gary Johansen in response to an e-mail from Gary to |
| 12 | Steve. |
| 13 | Q Gary was apparently advising of the |
| 14 | resignations of Mark Bryant, Juan Moreno, and Waugh & |
| 15 | Associates? |
| 16 | A That's correct. |
| 17 | (Deposition Exhibit No. 112 was marked |
| 18 | for identification. |
| 19 | Q (BY MR. JONES) Exhibit 112, what is that? |
| 20 | A It is a letter that was sent by fax to us |
| 21 | from Waugh & Associates, and the letter is to the |
| 22 | president of USTU, Sang Lee, at the time from Ken Waugh |
| 23 | informing USTU of Waugh & Associates resignation as |
| 24 | their accountant. |
| 25 | Q Do you happen to know why Waugh & |

| | |
|---|---|
| 1 | Q (BY MR. JONES) Just like a day after, |
| 2 | right? |
| 3 | A That's correct. |
| 4 | Q Why did Holme and Roberts withdraw from |
| 5 | representation on October 29, 2003, if you know? |
| 6 | MR. LEVINSTEIN: Objection; calls for |
| 7 | attorney-client privileged communication. |
| 8 | MR. RYCHENER: Same objection. |
| 9 | MR. JONES: Instructing her not to |
| 10 | answer? |
| 11 | MR. RYCHENER: That's correct, to the |
| 12 | extent it calls for attorney-client communications. I |
| 13 | think the letter indicates, to some extent. But beyond |
| 14 | the letter, I think I will instruct her not to answer. |
| 15 | Q (BY MR. JONES) Was Holme Roberts also |
| 16 | representing USOC in any matters during this period, if |
| 17 | you know? |
| 18 | A I don't believe so, but I don't know for |
| 19 | certain. |
| 20 | Q Do you know if it had in the past? |
| 21 | A I believe it had in the past. |
| 22 | Q It had represented USOC in the past? |
| 23 | A I believe so, but I don't know for |
| 24 | certain. |
| 25 | Q Going back to Exhibit 113, these |

| | |
|---|---|
| 1 | Associates resigned? |
| 2 | A No. |
| 3 | (Deposition Exhibit No. 113 was marked |
| 4 | for identification.) |
| 5 | Q (BY MR. JONES) What is that document, |
| 6 | Exhibit 113? |
| 7 | A It's an e-mail from Gary Johansen to Steve |
| 8 | Smith containing a draft press release from the USOC, a |
| 9 | draft letter to Bruce Harris from Kelly Skinner, a |
| 10 | draft letter to Bruce Harris from Jim Scherr, and a |
| 11 | draft remediation plan. |
| 12 | Q This one is dated October 30, 2003? |
| 13 | A That's correct. |
| 14 | Q Were you still representing USTU on |
| 15 | October 30th, 2003? |
| 16 | MR. LEVINSTEIN: Why don't you look at |
| 17 | the next document? |
| 18 | MR. JONES: I know. |
| 19 | A I believe so. I can't recall the date of |
| 20 | our resignation. |
| 21 | MR. JONES: Let me mark the next one. |
| 22 | (Deposition Exhibit No. 114 was marked |
| 23 | for identification.) |
| 24 | A No. At that time, we were no longer |
| 25 | representing USTU. |

| | |
|---|---|
| 1 | attachments were received by Steve Smith? |
| 2 | A Yes. |
| 3 | Q Did you read them after he received them? |
| 4 | A Yes. |
| 5 | Q For what purpose? |
| 6 | A Curiosity. |
| 7 | Q The last exhibit attached to 113 is a |
| 8 | remediation plan. When you read it, did you understand |
| 9 | it to be a counterplan proposed by USOC, if you had any |
| 10 | understanding of what it was? |
| 11 | A Yeah, that was my understanding of what it |
| 12 | was. |
| 13 | Q And did you understand it to be a |
| 14 | counterproposal to the plan we looked at earlier? |
| 15 | MR. LEVINSTEIN: Objection. |
| 16 | A That was my understanding. |
| 17 | Q (BY MR. JONES) Do you know if the plan |
| 18 | received on October 30 was the plan that was ultimately |
| 19 | approved? |
| 20 | MR. LEVINSTEIN: Objection. |
| 21 | A I don't know, but I could guess. |
| 22 | Q (BY MR. JONES) It's all right. |
| 23 | (Deposition Exhibit No. 115 was marked |
| 24 | for identification.) |
| 25 | Q (BY MR. JONES) What is that document, |

1   Exhibit 114 (sic)?

2       A     Exhibit 115?

3       Q     I'm sorry.  Exhibit 115.

4       A     It looks like an e-mail message from Gary

5   Johansen forwarding suggestions for revisions to a

6   suggested remediation proposal proposed by the Ohio

7   Taekwondo Association.

8       Q     Was the Ohio Taekwondo Association one of

9   those groups that were critical of current

10  management -- pardon me -- current governance at USTU

11  in 2003?

12      A     That's my recollection, yes.

13      Q     And is this an alternate remediation plan

14  that they were proposing or changes to the existing

15  plan to serve their interests?

16      A     It appears that's what it is.

17      Q     We heard testimony yesterday that the Ohio

18  Group was actually planning substitution of its own

19  people into governance as a remediation solution.

20      A     That's my understanding of a portion of

21  the plan, yes.

22            MR. JONES:  Okay.  Next exhibit.

23            (Deposition Exhibit No. 116 was marked

24            for identification.)

25      Q     (BY MR. JONES)  That one is dated October

57

1       A     Yeah, Steve Smith did.

2       Q     Did Steve Smith prepare this?

3       A     Steve and I jointly prepared this.

4       Q     What was the Membership and Credentials

5   Committee's response, at least verbally, during that

6   meeting to this, if there was one?

7             MR. LEVINSTEIN:  There's all sorts of

8   nonlawyers who can testify about that meeting, but --

9       A     I don't recall a specific response.  I

10  know it was not accepted.

11      Q     (BY MR. JONES)  Turning to the, I guess,

12  third-to-the-last page?

13      A     Page 6 or Page 5?

14      Q     Pardon me.  Page 7.

15      A     Okay.  Yes.

16      Q     Looking at the composition of the new

17  proposed Government and Management Committee, were

18  there any aspects to your proposal as to the content of

19  that meeting that the USOC criticized verbally at the

20  Denver meeting?

21      A     I don't recall any specifics or objections

22  raised during the meeting.  There might have been some,

23  but I don't recall.

24      Q     Was it criticized after the meeting and

25  before October 30 when you withdrew by USOC?

59

1   28, 2003.  And what is that?

2       A     It looks like an e-mail message from Steve

3   Smith to Gary Johansen and Jeff Benz, counsel of USOC

4   regarding a USTU Executive Committee conference call.

5       Q     Did you participate in that Executive

6   Committee conference call?

7       A     No.

8             (Deposition Exhibit No. 117 was marked

9             for identification.)

10      Q     (BY MR. JONES)  117.  What is that

11  document?

12      A     This is a printout of a PowerPoint

13  presentation that was prepared for the Membership and

14  Credentials Committee meeting in September, and it was

15  actually used during that meeting.  It outlines the

16  USTU's proposed remediation plan to the USOC.

17      Q     That was the Denver meeting?

18      A     That's correct.

19      Q     Was this proposed on a screen?

20      A     Yes.  And also, I think, distributed hard

21  copy as well.

22      Q     Was it shown during the open session?

23      A     Yes.

24      Q     And did anyone walk through the points

25  verbally?

58

1       A     Yes.

2       Q     What aspects did they criticize, if you

3   can recall?  Was it --

4       A     I believe -- my recollection is not great

5   on the specifics, but I believe they were dissatisfied

6   with the second and third proposed composition being

7   the USTU member who was satisfied and a USTU member who

8   was not satisfied.

9       Q     They didn't want any USTU members on the

10  board?

11            MR. LEVINSTEIN:  Objection.

12      A     I don't know if that's what they wanted.

13  My general sense is they were not interested in hearing

14  more from the detractors, I guess I would characterize

15  them, or dissatisfied members.  I think they had heard

16  quite a bit from them and didn't necessarily think that

17  members from those factions should serve on the

18  Governance and Management Committee.

19            And I believe -- again, my recollection is

20  fuzzy, but I believe they wanted clarification about

21  reasonably satisfied -- who that reasonably satisfied

22  member, what that category could be filled by.  So I

23  think they had issues with both of those.

24      Q     Okay.  Thank you.

25            MR. JONES:  Next exhibit.

60

1      (Deposition Exhibit No. 118 was marked
2          for identification.)
3      Q      (BY MR. JONES)  What is Exhibit 118?
4      A      This is a letter from Steve Smith to Jeff
5  Benz, general counsel for USOC, relating to matters
6  that President Lee would like -- wanted to have the
7  ability to address if he resigned.
8      Q      Those matters were the Regional Olympic
9  Qualifier and the 2006 World Cup Championship, the
10 Kukkiwon Dan Certification, and the Cup/Trophy for
11 Dr. Un Yong Kim?
12     A      Yes, aspects of each of those issues.
13     Q      This letter was dated a couple of days
14 before your firm withdrew.  Was there any response from
15 Mr. Benz to this letter before you withdrew?
16     A      I don't recall.
17             (Deposition Exhibit No. 119 was marked
18             for identification.)
19     Q      (BY MR. JONES)  119.  119 appears to be
20 the same thing as 118, without an e-mail; is that
21 correct?
22     A      That's correct.
23             (Deposition Exhibit No. 120 was marked
24             for identification.)
25     Q      (BY MR. JONES)  120 appears to be a

1  wanted also to protect --
2      Q      Assets?
3      A      -- assets.  They also withdrew their offer
4  to suspend the decertification pursuant to any
5  remediation plan.
6             (Deposition Exhibit No. 122 was marked
7             for identification.)
8      Q      (BY MR. JONES)  Next exhibit?
9      A      Yes.
10     Q      What is that?
11     A      This looks like a letter from Mark Bryant
12 to USTU president, Executive Committee, and Executive
13 Director at the time, informing them of his resignation
14 as the chair of the Law and Legislation Committee and
15 as one of their counselors.
16             (Deposition Exhibit No. 123 was marked
17             for identification.)
18     Q      (BY MR. JONES)  And have we seen this
19 document before?
20     A      I believe so.
21     Q      And what is it?
22     A      One of the draft remediation plans
23 forwarded by Gary Johansen.
24             (Deposition Exhibit No. 124 was marked
25             for identification.)

1  document we've looked at already?
2      A      Yeah, I think these are the signed
3  versions of those draft documents that we looked at
4  earlier.
5      Q      The first page is the October 24 letter to
6  Bruce Harris from Kelly Skinner?
7      A      That's correct.
8      Q      This letter refers to a meeting between
9  Sang Lee and Jim Scherr previous to October 24, 2003.
10 You didn't attend that meeting?
11     A      No.
12             (Deposition Exhibit No. 121 was marked
13             for identification.)
14     Q      (BY MR. JONES)  This is Document 121.
15 What is this?
16     A      This e-mail correspondence from Gary
17 Johansen to Steve Smith and myself informing us of the
18 USOC's plans with respect to USTU.
19     Q      And this was dated October 24th, 2003,
20 about five days before your firm withdrew?
21     A      That is correct.
22     Q      Gary Johansen was advising that they were
23 going to move forward with a complaint, a formal
24 complaint for decertification?
25     A      That's correct.  And advised that the USOC

1             MR. LEVINSTEIN:  Sixteen minutes earlier.
2      Q      (BY MR. JONES)  We've seen this one before
3  as well?
4      A      I'm not sure if we've seen this one
5  before.
6             MR. LEVINSTEIN:  No.  It's a 16 minutes
7  earlier e-mail.  Couldn't have made many changes in 16
8  minutes.
9      A      I think the previous e-mail says there's a
10 couple of minor changes.  But, again, another draft
11 remediation plan.
12     Q      (BY MR. JONES)  Okay.
13             (Deposition Exhibit No. 125 was marked
14             for identification.)
15     Q      (BY MR. JONES)  What is that document?
16     A      I believe it's an e-mail string from Gary
17 Johansen to and from Judi Cope, a secretary of our
18 firm, with respect to a draft remediation plan.
19             (Deposition Exhibit No. 126 was marked
20             for identification.)
21     Q      (BY MR. JONES)  126?
22     A      I believe it's the same correspondence as
23 Exhibit 125, except for containing the attachment.
24     Q      Is the attachment -- it says "Summary of
25 USOC's Position."  This was --

**Page 65**

1    A    This was our draft.

2         MR. JONES:  Next exhibit.

3         (Deposition Exhibit No. 127 was marked

4    for identification.)

5    Q    (BY MR. JONES)  What is Exhibit 127?

6    A    It looks like a draft letter from Kelly

7    Skinner to Bruce Harris relating to questions about

8    USTU's tax exempt status.  I'm not even sure that this

9    document is responsive to the production request.

10        (Deposition Exhibit No. 128 was marked

11   for identification.)

12   Q    (BY MR. JONES)  Have you had a chance to

13   look at that one?

14   A    Yeah.

15   Q    What is it?

16   A    It's an e-mail message from Gary Johansen

17   to Steve Smith and myself asking specific questions

18   about the USTU and it's, in particular, questions

19   regarding Dan fees and questioning why USTU doesn't

20   disclose the fees and forwarding proposals -- or asking

21   us to review proposals.

22   Q    Were these the Dan fees under the Korean

23   certification system or the proposed U.S. certification

24   system?

25   A    My understanding, it's the U.S.

**Page 66**

1    certification system.

2         (Deposition Exhibit No. 129 was marked

3    for identification.)

4    Q    (BY MR. JONES)  What is Exhibit 129?

5    A    It looks like it's e-mail correspondence

6    to and from Gary Johansen and Steve Smith with respect

7    to an alternate remediation plan.

8    Q    Was this an ultimate remediation plan,

9    other than the Ohio Group, or is it the same?

10   A    I believe it's the Ohio Group's

11   remediation plan.

12   Q    The name at the bottom of the -- bottom of

13   the page, Exhibit 129, is Melissa Nelke?

14   A    Yes.

15   Q    Did you understand her to be with the Ohio

16   Group?

17   A    Yes, in addition to some of the other

18   persons mentioned in the text of the e-mail immediately

19   above.

20        (Deposition Exhibit No. 130 was marked

21   for identification.)

22   Q    (BY MR. JONES)  What is 130?

23   A    It appears to be correspondence from Steve

24   Smith to Gary Johansen in response to e-mail

25   correspondence that he forwarded with a question from

**Page 67**

1    Ronda Sweet regarding notice of a Board of Governors

2    meeting.

3         (Deposition Exhibit No. 131 was marked

4    for identification.)

5    Q    (BY MR. JONES)  What is that?

6    A    It's an e-mail from myself to Kay Burton,

7    Gary Johansen's prior assistant, explaining changes to

8    a list of USTU officers that Gary either had prepared

9    or had.

10   Q    Were these like structural changes?

11   A    These are explanations, bylaw

12   explanations.

13        (Deposition Exhibit No. 132 was marked

14   for identification.)

15   Q    (BY MR. JONES)  What is 132?

16   A    It's an e-mail message from me to Gary

17   Johansen forwarding information about some of the

18   officers of USTU at that time.

19        MR. JONES:  133.

20        (Deposition Exhibit No. 133 was marked

21   for identification.)

22   Q    (BY MR. JONES)  What is 133?

23   A    It's an e-mail message from Gary Johansen

24   to Steve Smith and myself forwarding a letter prepared

25   by Bruce Harris, and a draft letter attachment to that

**Page 68**

1    to Senator Nighthorse Campbell.  Bruce was asking USTU

2    members to sign and forward the draft letter attached

3    to Senator Campbell.

4    Q    And what was the nature of the letter they

5    wanted to send to Senator Campbell, if you know?

6    A    If you read the letter, it tells the

7    nature of it.  But asking the senator to step in to try

8    to support the remediation plan.

9    Q    USTU's remediation plan?

10   A    That's my understanding, yes.

11   Q    And Gary Johansen says in his e-mail that

12   he suspects that this is not going to make the

13   Membership Committee very happy?

14   A    That's what it says, yes.

15        (Deposition Exhibit No. 134 was marked

16   for identification.)

17   Q    (BY MR. JONES)  What is 134?

18   A    It is an e-mail message from Gary Johansen

19   to Steve Smith responding to an e-mail that Steve Smith

20   had sent Gary with one of our draft remediation plans

21   to which he responded with suggested revisions.

22        (Deposition Exhibit No. 135 was marked

23   for identification.)

24   Q    (BY MR. JONES)  Exhibit 135?

25   A    Uh-huh.

1    Q    What is 135?
2    A    It's e-mail correspondence to and from
3    Jeff Benz and Steve Smith with respect to draft
4    remediation plans.
5         (Deposition Exhibit No. 136 was marked
6         for identification.)
7    Q    (BY MR. JONES)  What is Exhibit 136?
8    A    It's an e-mail message from me to Jeff
9    Benz explaining a provision of the Ohio Revised Code.
10   Q    That was applicable to USTU because it was
11   an Ohio nonprofit?
12   A    That's correct.
13   Q    And that was in response to Jeff Benz's
14   question at the bottom --
15   A    That's correct.
16   Q    -- "Where is the legal authority for the
17   proposition that a committee has to consist of all
18   board members if it does board functions that the
19   board, in the exercise of its fiduciary obligations,
20   has chosen to delegate to a committee of non board
21   members?"
22   A    That's correct.
23   Q    There were communications going back and
24   forth with Mr. Benz over the propriety of having an
25   oversight committee over USTU?

1    letter dated September 9, 2003.
2         MR. RYCHENER:  What number?
3    Q    (BY MR. JONES)  The Bates stamp is
4    HRO-204.  My question is whether 137 responds to that
5    September 9 letter?
6    A    Yes, that's my understanding, that that's
7    what the letter is responsive to.
8    Q    Okay.  Did you assist Steve Smith in
9    writing the September 9 letter, or was that his work?
10   A    I don't recall assisting Steve drafting a
11   letter, but I remember discussing these concerns.
12   Q    And looking at -- well, let's go ahead and
13   mark Steve Smith's earlier letter.
14        (Deposition Exhibit No. 138 was marked
15        for identification.)
16   Q    (BY MR. JONES)  138.  Exhibit 138 is the
17   September 9, 2003 letter to Gary Johansen from Steve
18   Smith --
19   A    Yes.
20   Q    -- that you said you had some knowledge
21   of?
22   A    Yeah.
23   Q    What were the concerns that caused or
24   triggered the writing of this letter to Gary Johansen?
25        MR. RYCHENER:  I'm going to object.  I

1    A    That's correct.
2    Q    Just to understand, was an oversight
3    committee different from a new governing board, or were
4    they the same, in the context of these discussions?
5         MR. LEVINSTEIN:  New Governance and
6    Management Committee?
7         MR. JONES:  Yes.
8         MR. LEVINSTEIN:  You said the governing
9    board.  I don't know what that meant.
10   Q    (BY MR. JONES)  I'm sorry.  The
11   five-person new governing body that was set forth in
12   the remediation plan, was the oversight committee the
13   same thing or something different?
14   A    I can't recall if oversight committee was
15   something different.  But what eventuated was a
16   Governance and Management Committee suggestion.
17        (Deposition Exhibit No. 137 was marked
18        for identification.)
19   Q    (BY MR. JONES)  What is Exhibit 137?
20   A    It's a letter from Tom Satrom to Steve
21   Smith in response to correspondence from Steve Smith
22   outlining some of our concerns or ground rules for the
23   Membership and Credentials Committee meeting.
24   Q    If you can look through your own file for
25   a moment, just two documents down, there's another

1    think other than what's stated in the letter, I think
2    you are asking for work-product privilege, and I will
3    instruct the witness not to answer with respect to
4    discussions among counsel beyond what is stated in the
5    letter.
6    Q    (BY MR. JONES)  Were you concerned that
7    the format of the meeting was to allow critics of USTU
8    governance to bring in even more issues than were
9    already being addressed by you as their attorneys?
10        MR. RYCHENER:  Same objection.
11        MR. LEVINSTEIN:  Objection.
12        MR. RYCHENER:  You can ask her what's
13   stated in the letter, but I'll instruct her not to
14   answer with respect to conversations, other than what
15   are stated in the letter.
16   Q    (BY MR. JONES)  What is stated in the
17   letter with regard to your concerns about the format of
18   the upcoming Denver meeting?
19        MR. LEVINSTEIN:  Objection.  I object to
20   asking her to interpret or go beyond.  The letter
21   speaks for itself.  I don't know how she can summarize
22   it.
23   Q    (BY MR. JONES)  Go ahead and summarize it.
24        MR. LEVINSTEIN:  I don't see how she can
25   without -- she can read it to you.

1      A     Would you like me to read it to you?
2      Q     (BY MR. JONES)  That's fine.  Read it into
3  the record.
4      A     I'll start with the first paragraph.
5  "Dear Gary:  We understand that the U.S. Taekwondo
6  Union's ('USTU') Compliance Meeting with the United
7  States Olympic Committee's ('USOC') Membership and
8  Credentials Committee occurring on September 13, 2003
9  at 1:00 p.m. will be an open meeting.  Although we
10 appreciate the need for those associated with USTU and
11 the sport of Taekwondo to be able to hear the
12 proceedings, we are concerned about the possibility of
13 critics of USTU using this meeting as an avenue to
14 raise additional issues in an attempt to undermine
15 USTU.  It is our firm belief that the critics of USTU
16 have had ample opportunity to raise their concerns
17 about USTU with the USOC during the May 2, 2003 open
18 forum and through their various communications with you
19 and your staff.  We plan to spend a fair amount of time
20 during the hearing regarding those issues.  However, to
21 allow opponents of the current USTU management and
22 administration the opportunity to raise additional new
23 issues with the USTU during the September 13, 2003
24 meeting would be unfair for USTU since USTU would not
25 have adequate time to properly respond."

1      Next paragraph.  "As you are aware, USTU is
2  in the process of preparing responses to (i) the 12
3  issues [raised] in the USOC Membership and Credentials
4  Committee's August 4, 2003 letter, (ii) the 19
5  recommendations raised in the USOC's Audit Division's
6  August 29, 2003 letter, (iii) the 10 issues regarding
7  'questionable expenses' you raised in an email on
8  August 26, 2003, and (iv) the 16 issues raised in the
9  USOC Membership and Credentials Committee's September
10 5, 2003 letter, as well as preparing for the September
11 13, 2003 meeting.  Although we believe we will have
12 adequate responses to those issues, we feel it is
13 justified to expect that any new issues of critics be
14 raised before the hearing.  Therefore, on behalf of the
15 USTU, we respectfully request that the USOC Membership
16 and Credentials Committee require that any additional
17 issues be raised with the USTU prior to September 13."
18     Q     And in Mr. Satrom's response, was he going
19 to require that new issues be brought up by
20 complainants before the meeting?
21     MR. LEVINSTEIN:  Objection; the letter
22 speaks for itself.
23     A     No.  He says the committee is not of a
24 mind to preclude anyone from raising an issue that he
25 or she feels are important.

1      (Deposition Exhibit No. 139 was marked
2      for identification.)
3      Q     (BY MR. JONES)  What is 139?
4      A     It's an e-mail message from Steve Smith to
5  various persons at the USOC with a draft of our
6  proposed remediation plan.
7      Q     That was the plan as of September 11,
8  2003?
9      A     Yes, that's correct.
10     (Deposition Exhibit No. 140 was marked
11     for identification.)
12     Q     (BY MR. JONES)  What is 140?
13     A     It's an e-mail message from Steve Smith to
14 Gary Johansen and Jennifer Gabrius asking a question in
15 response to an e-mail that they had sent informing
16 Steve of interviews or telephone conferences with the
17 USTU athlete representative, Juan Moreno.
18     Q     Steve Smith was asking if you and he were
19 allowed to participate?
20     A     That's correct.
21     (Whereupon, Mr. Uesugi left the
22     deposition proceedings.)
23     MR. JONES:  141.
24     (Deposition Exhibit No. 141 was marked
25     for identification.)

1      Q     (BY MR. JONES)  What is 141?
2      A     It's a letter from Tom Satrom to Bruce
3  Harris informing Bruce that the USOC Membership and
4  Credentials Committee would place Taekwondo on their
5  agenda for their September 13th meeting at one o'clock.
6  And it was faxed from Steve to Jill Goodwin at Waugh &
7  Associates.
8      MR. JONES:  142.
9      (Deposition Exhibit No. 142 was marked
10     for identification.)
11     Q     (BY MR. JONES)  What is 142?
12     A     It's an e-mail correspondence from Gary
13 Johansen to Steve Smith in response to a question in a
14 previous e-mail that Steve asked to Gary with respect
15 to inappropriate volunteer expenses that were noted by
16 the Membership and Credentials Committee and contains a
17 list of some of the questionable volunteer expenses
18 that the Membership and Credentials Committee had
19 concerns.
20     (Deposition Exhibit No. 143 was marked
21     for identification.)
22     MR. LEVINSTEIN:  This is just the e-mail
23 in the last one.
24     MR. JONES:  Yeah, apparently.  There's
25 nothing attached to it.

1    A    Sometimes our files have duplicate copies
2 of e-mails.
3    Q    (BY MR. JONES)  Is this the same?
4    A    Yes.
5    Q    Okay.  Sorry.
6         MR. LEVINSTEIN:  I think there's only one
7 new one left.
8              (Deposition Exhibit No. 144 was marked
9              for identification.)
10    Q    (BY MR. JONES)  What is 144?
11    A    It's a letter from Bruce Harris tendering
12 his resignation as the Executive Director.
13    Q    And he tendered that September 12, 2003 or
14 thereabouts?
15    A    He wrote the letter on September 12th,
16 2003, but I don't know that that's the exact date that
17 he tendered his resignation.
18    Q    Okay.  Do you know if he continued on at
19 USTU after that date?
20    A    Yes, I believe he did.
21    Q    Did you ever meet Dae Sung Lee?
22    A    I don't believe I met him.  I might have
23 met him during the last November Board of Governors
24 meeting, but I can't recall.
25    Q    You never met him after the Denver meeting

1 insufficient time and opportunity provided for USTU to
2 present its side of things during the -- at least the
3 period that you were representing them in the
4 decertification action.  Do you recall that?
5         MR. LEVINSTEIN:  Objection.
6         MR. RYCHENER:  Yeah.  I'm not sure that's
7 what she said.  I think it was only directed in the
8 September meeting.
9    Q    (BY MR. JONES)  Do you recall saying that
10 with respect to the September meeting?
11    A    Yes.
12    Q    If you had your way, how would you have
13 changed things?
14         MR. LEVINSTEIN:  Objection; calls for
15 thought processes and representation of a client.
16    Q    (BY MR. JONES)  Requested more time
17 perhaps?
18         MR. RYCHENER:  I'll object and instruct
19 you not to answer, to the extent it's calling for
20 privileged information.
21    Q    (BY MR. JONES)  Did the proceedings at the
22 Denver open forum seem very one-sided in favor of the
23 critics of USTU's existing governing body?
24         MR. LEVINSTEIN:  Objection; calls for
25 mental impressions.  I don't know what one-sided means.

1 when you summarized what happened in the meeting?
2    A    I don't believe so.
3    Q    During your representation of USTU up
4 until, I guess it was, October 29, was U.S. Olympic
5 coach selection ever discussed with representatives of
6 the United States Olympic Committee directly?
7    A    I don't recall specific discussions with
8 the USOC, but I believe there was a question about the
9 process, which was responded to in written answers.
10 But I don't recall specific discussions with members of
11 the USOC.
12    Q    So other than Bruce Harris' response or
13 input into responding into the area of how Olympic
14 coaches are selected, you cannot recall any specific
15 discussions that occurred, for example, during the
16 Denver meeting hosted by the USOC Membership and
17 Credentials Committee?
18              (Whereupon, Mr. Uesugi rejoined the
19              deposition proceedings.)
20    A    There may have been questions, but I don't
21 recall a specific discussion.
22    Q    (BY MR. JONES)  Was his name, Dae Sung
23 Lee's name, discussed during the Denver meeting?
24    A    I don't believe so.
25    Q    You mentioned that you thought there was

1         MR. RYCHENER:  I'll object as well.  I
2 mean, if you want to ask her how much time was given or
3 something like that.  But I think if you're asking for
4 mental impressions, I'll instruct her not to answer.
5    Q    (BY MR. JONES)  Are you going to follow
6 your counsel's instruction?
7    A    Yes.
8    Q    Just to make sure I understood who was at
9 the meeting, do you know if Thomas Satrom was at any
10 portion -- attended any portion of the Denver meeting?
11    A    Yes, I believe he even served as chair
12 during the meeting.
13    Q    Was Robert Gambardella present?
14    A    I don't recall.
15    Q    Steve Locke?
16    A    I don't believe so.
17    Q    Rich Bender?
18    A    I don't believe so.
19    Q    Juan Moreno?
20    A    I believe Juan was present, but I'm not
21 entirely sure.
22    Q    Virginia Witte?
23    A    I believe Virginia was present.
24    Q    Tony Baggiano?
25    A    Tony was present.

**Page 81**

```
1       Q    William Martin?
2       A    I don't know.
3       Q    Jeff Benz?
4       A    I believe Jeff was present.
5       Q    Jim Scherr?
6       A    I don't recall with specificity that he
7  was there.
8       Q    Gary Johansen?
9       A    I know Gary was there.
10      Q    Jeannie Picariello, who we already said,
11 was there?
12      A    Jeannie was there.
13      Q    Bob Foth?
14      A    I don't know Bob Foth by recognition.
15      Q    Tim Wiley?
16      A    I wouldn't recognize Tim Wiley.
17      Q    Steven Sobel?
18      A    I believe he was present, but I can't
19 specifically recall seeing him.
20      Q    Perry Toles?
21      A    I know Perry was present.
22      Q    Paul DePace?
23      A    I don't know him by recognition.
24      Q    Nancy Whiteman?
25      A    I also don't know Nancy by recognition.
```

**Page 83**

```
1            re-marked for identification.)
2       Q    (BY MR. JONES)  I'm showing you Exhibits
3  22 and 23 together.
4       A    Yes.
5       Q    First of all, Exhibit 23, have you ever
6  seen that one before?
7       A    Yes.
8       Q    Do you know who wrote that letter?
9       A    I believe either Bruce Harris or Sang Lee.
10      Q    It is signed by Sang Lee and others,
11 correct?
12           MR. RYCHENER:  Object to the extent
13 you're asking her to identify signatures or whether you
14 just want her to read the names that are on there.
15      A    It looks like it appears that it was
16 signed by Sang Lee, Barb Kunkel, Sammy Pejo, and Dae
17 Sung Lee; I can't recognize the signature above it or
18 below it; and Lynnette Love.
19      Q    (BY MR. JONES)  And it is directed to
20 Honorable Ben Nighthorse Campbell, U.S. Senator?
21      A    That's correct.
22      Q    Dated November 12, 2003?
23      A    That's correct.
24      Q    Have you ever seen this letter?
25      A    Yes.
```

**Page 82**

```
1       Q    William Maxin?
2       A    I don't know William Maxin.
3       Q    Mary McCagg?
4       A    I know Mary was present.
5       Q    Geraldine Andrews?
6       A    I don't recall if Geraldine was present.
7       Q    And last, Barbara Smith?
8       A    I believe Barbara was present.
9       Q    And is your testimony about minutes not
10 being taken true for the open portion of the meeting as
11 well?
12      A    That's my understanding.
13           MR. LEVINSTEIN:  Testimony about minutes
14 not being taken?
15           MR. JONES:  Yes.  At least she didn't see
16 anybody who looked like they were taking minutes.
17      A    I didn't take minutes.  Steve didn't take
18 minutes.  And I don't recall anyone in particular
19 taking minutes.
20      Q    (BY MR. JONES)  To your knowledge, did
21 anyone record the proceeding?
22      A    Not to my knowledge.
23           MR. JONES:  Let's take another break, if
24 we can.
25           (Deposition Exhibit Nos. 22 and 23 were
```

**Page 84**

```
1       Q    About when did you see it?  It was before
2  your firm withdrew as counsel for USTU?
3       A    That's correct.
4       Q    Looking at Exhibit --
5       A    Well, I saw a letter that was similar to
6  this.  I don't know if it's the exact letter.
7       Q    It could have been a draft?
8       Q    It could have been a draft.
9       Q    Exhibit 22, have you seen that partial
10 letter before?
11           MR. RYCHENER:  I'll let her answer if
12 she's seen the letter, but it appears to be the first
13 page of a multipage letter, but it appears clear to me
14 that it is an attorney-client communication that would
15 be privileged, and I would instruct her not to answer
16 questions about it because of the attorney-client
17 privilege.
18      Q    (BY MR. JONES)  The letter has Steve
19 Smith's name at the bottom; is that correct?
20      A    That's correct.
21      Q    And it is directed to President Sang Lee;
22 is that right?
23      A    That's correct.
24      Q    And it is dated October 27, 2003, two days
25 before your firm withdrew?
```

1    A    That's correct.

2    Q    And it does state in the middle that

3  the -- excuse me.  At the top, it says regarding *Draft

4  Letter to Senator Campbell*; is that correct?

5        MR. RYCHENER:  I'm going to instruct her

6  not to answer questions about this unless I'm told that

7  the USTU has waived the privilege.

8        MR. LEVINSTEIN:  We have not.

9    Q    (BY MR. JONES)  Okay.  Did you have any

10  direct contact with Jeff Benz during the period of the

11  decertification up until the time your firm withdrew?

12        MR. RYCHENER:  You mean in person as

13  opposed to correspondence?

14    Q    (BY MR. JONES)  In person, yeah.

15    A    I -- we had a few in-person meetings with

16  representatives from the USOC, but I cannot

17  specifically recall if Jeff was present.  I really

18  can't recall if he was present.  Sorry.

19    Q    Did you ever hear or see in written form

20  any threats by Mr. Benz threatening to take punitive

21  action against USTU if any letters were sent to Senator

22  Ben Nighthorse Campbell by USTU?

23    A    Can you ask -- sorry.  Can you ask that

24  question again?

25    Q    Did you ever hear Mr. Benz or

1  Mr. Johansen, for that matter, or see any written

2  communications threatening punitive action against USTU

3  if it wrote any correspondence to Senator Ben

4  Nighthorse Campbell?

5    A    No, I did not personally hear or see

6  anything from Jeff Benz.

7    Q    And the same goes for Mr. Johansen?

8    A    That's correct.

9    Q    Do you recall attending a November

10  membership meeting in 2004 for USTU or USA Taekwondo?

11    A    Yes.

12    Q    At that meeting, did you give a

13  presentation on the subject of a proposed merger in

14  which USA Taekwondo and USTU would merge into a new

15  entity?

16        MR. RYCHENER:  I'm sorry.  I didn't hear

17  what meeting this was, but I assume if it was client

18  representatives, it would be attorney-client privilege,

19  and I would instruct her not to answer; but I may have

20  missed the question in terms of what the meeting was.

21    Q    (BY MR. JONES)  At this meeting, were

22  members of the old USTU present?

23        MR. LEVINSTEIN:  Objection; I don't know

24  what that means.

25    Q    (BY MR. JONES)  If you know.

1    A    Yes, members from USTU were present.

2    Q    At that meeting, were there persons who

3  were involved in former governance of USTU?

4    A    Yes.

5    Q    And there were people involved in current

6  governance of USTU as well; is that correct?

7    A    If you're referring to membership -- or

8  the Governance and Management Committee --

9    Q    Yes.

10    A    -- yes, they were in attendance.

11    Q    With that, did you give a presentation of

12  a proposed merger between USA Taekwondo and USTU?

13    A    Yes.

14    Q    And according to your presentation, would

15  USTU cease to exist --

16        MR. LEVINSTEIN:  Objection.

17    Q    (BY MR. JONES)  -- after the merger?

18        MR. LEVINSTEIN:  Objection.

19    A    It would cease to exist as a result of a

20  merger with and into a new corporation.  So, yes, it

21  would cease to exist.

22    Q    (BY MR. JONES)  There's only one survivor

23  in a merger; is that correct?

24    A    That's correct.

25    Q    And the survivor would be a new company

1  called USA Taekwondo?

2    A    That's correct.

3    Q    And that's a Colorado corporation?

4    A    That's correct.

5    Q    And it would be the new NGB for Taekwondo?

6        MR. LEVINSTEIN:  Objection.  Continue to

7  be the NGB for Taekwondo.

8    Q    (BY MR. JONES)  Continue to be the NGB for

9  Taekwondo?

10    A    That's correct.

11    Q    And do you know if that action was

12  approved by the persons present?

13    A    Yes.  It's my understanding that it was

14  approved by the persons present.

15    Q    A requisite vote was obtained?

16    A    There was a specific resolution that was

17  passed by the requisite required vote.

18    Q    And so is that now a fate accompli?  Has

19  it been completed and does the old USTU now cease to

20  exist?

21    A    That's correct.

22    Q    And you mentioned that your firm withdrew

23  as counsel for USTU on October 29, 2003 and then came

24  back onboard as counsel for USTU sometime in 2004?

25    A    Yes, we were rehired as counsel.

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    Among the things you handled, would it
2    have included the merger?
3    A    That's correct.
4    Q    Does your firm currently do work for USOC,
5    if you know?
6    A    I don't know if we are representing USOC
7    in any matters.
8    Q    I believe I am done.
9        And forgive me if I have asked this before; I
10    better ask it one more time.  During your tenure as
11    counsel for USOC -- I mean, pardon me -- USTU, have you
12    ever heard/observed statements or conduct by any staff
13    or volunteers of USOC that the average person may take
14    to be racially insensitive?
15        MR. LEVINSTEIN:  Objection.
16    A    I can't answer what an average person --
17    Q    (BY MR. JONES)  How about you as an
18    average person?
19        MR. LEVINSTEIN:  Objection.
20    Q    (BY MR. JONES)  You would interpret as
21    racially insensitive?
22        MR. RYCHENER:  I'm going to object to the
23    extent that you have asked and she has answered that
24    question before, but --
25    Q    (BY MR. JONES)  If you could just answer

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1    it one more time, whatever the answer was.
2    A    I have no other additional information
3    than I have provided.  I know that the Membership and
4    Credentials Committee posed questions to the USTU that
5    I can't tell you how other people might interpret.  And
6    I told you about a statement made by Jeannie
7    Picariello.  And that's all I've heard or seen from the
8    USOC.
9    Q    Did any of the questioning by members of
10    the Membership and Credentials Committee during the
11    Denver meeting ever sound racially insensitive to you?
12    A    During all parts of the meeting?
13    Q    All parts, yeah.
14    A    Did it sound racially insensitive to me?
15    Q    You covered the statement that was made.
16    I'm just asking now about the types of questioning.
17    A    I don't recall any questioning that would
18    have appeared to be racially insensitive.
19    Q    Okay.  No further questions.  Thank you.
20    A    Thank you.
21        (The deposition concluded at 11:40 a.m.)
22
23
24
25

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1        A F F I D A V I T
2    STATE OF COLORADO    )
                          ) ss.
3    COUNTY OF            )
4        I have read my deposition, and the same is
5    true and accurate, save and except for changes and/or
6    corrections, if any, as indicated by me on the
7    amendment sheet(s) attached hereto as indicated.
8
9    Amendment sheet(s) attached [  ]
10    No changes; no amendment sheet attached [  ]
11
12
       _____
13        JILL J. CHALMERS, ESQUIRE
14
15    SUBSCRIBED AND SWORN TO before me on this
16    _____ day of _____, 2005.
17    My commission expires:  _____
18
19
       _____
          NOTARY PUBLIC
20
       in and for the State of _____
21
22
23
24
25

4/8/2005 Chalmers, Jill J. Esq.  (Pltf desig = Yellow, Dfts' counters = Blue)

1        C E R T I F I C A T E
2
    STATE OF COLORADO    )
3                        ) ss.
    COUNTY OF DENVER     )
4
5
6    I, VALORIE S. MUELLER, Registered
    Professional Reporter and Notary Public in and for the
7    State of Colorado, duly appointed to take the
    deposition of JILL J. CHALMERS, ESQUIRE, certify that
8    prior to the examination the deponent was duly sworn to
    testify to the truth in the matters in controversy
9    between the parties herein; that the deposition was
    taken in shorthand by me at the time and place
10    aforesaid and was thereafter reduced to typewritten
    form by me and processed under my supervision, the same
11    consisting of 90 pages, and that the same is a full,
    true and complete transcription of my shorthand notes.
12    I further certify that I am not related to, employed
    by, or counsel to any of the parties herein, or
13    otherwise interested in the events of the within cause.
14    A transcript review of this deposition was
    requested and is available to the deponent as notified
15    by me.
16
    IN WITNESS WHEREOF, I have affixed my notarial
17    seal this 25th day of April, 2005.  My commission
    expires December 11, 2006.
18
19
       _____
20        VALORIE S. MUELLER
          Registered Professional Reporter
21
22
23
24
25