# Exhibit B

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF HAWAII
2
3   DAE SUNG LEE,                    )
4        Plaintiff,                  )
5        vs.                         ) CV 04 00461 SOM TEK
6   UNITED STATES TAE KWON DO        )
    UNION, a Colorado nonprofit      )
7   corporation, UNITED STATES       )
    OLYMPIC COMMITTEE, a             )
8   federally chartered nonprofit )
    corporation, JOHN DOES 1-10,  )
9   JANE DOES 1-10, DOE              )
    PARTNERSHIPS 1-10, DOE           )
10  CORPORATIONS 1-10,               )
                                     )
11       Defendants.                 )
12
13        Videotaped deposition of MARY M. BRUNNER taken
14  before CAROL CONNOLLY, CSR, CRR, and Notary Public,
15  pursuant to the Federal Rules of Civil Procedure for the
16  United States District Courts pertaining to the taking
17  of depositions, at 3400 West Euclid Avenue, Arlington
18  Heights, Illinois, commencing at 9:12 a.m. on the 28th
19  day of June, 2005.
20
21
22
```

```
1                  I N D E X
2   VIDEOTAPED DEPOSITION OF MARY M. BRUNNER
3             TAKEN June 28, 2005
4
5   EXAMINATION BY                      PAGE
6   Mr. Levinstein                    5, 216
7   Mr. Jones                       180, 234
8
9
10                 - - - - - - - -
11             EXHIBITS MARKED
12        (Attached to the transcript.)
13                                     PAGE
14  Deposition Exhibit No. 1              8
15  Deposition Exhibit No. 2             10
16  Deposition Exhibit No. 3             80
17  Deposition Exhibit No. 4            125
18  Deposition Exhibit No. 5            138
19  Deposition Exhibit No. 6            156
20  Deposition Exhibit No. 7            160
21
22
```

```
1             There were present at the taking of this
2   deposition the following counsel:
3        BERVAR & JONES by
         MR. WARD D. JONES, ESQUIRE
4        1001 Bishop Street
         Pauahi Tower, Suite 1400
5        Honolulu, Hawaii 96813
         (808) 550-4990
6
             Appeared on behalf of the Plaintiff;
7
8        WILLIAMS & CONNOLLY, LLP, by
         MR. MARK S. LEVINSTEIN, ESQUIRE
9        725 Twelfth Street, Northwest
         Washington, D.C. 20005
10       (202) 434-5000
11           Appeared on behalf of the Defendants.
12
13  ALSO PRESENT:
14       Mr. Dae Sung Lee
15       Mr. Donald Peterson, Videographer
16
17
18
19
20
21
22
```

```
1        THE VIDEOGRAPHER:  We're going on the video record
2   at 9:12 a.m.  Today's date is June 28th, 2005.  My name
3   is Donald Peterson, and I'm a legal videographer in
4   association with LAD Reporting, Washington, D.C.
5        The court reporter today is Carol Connolly.
6   Here begins the videotaped deposition of Mary M. Brunner
7   taken in the matter of Lee versus U.S. Tae Kwon Do
8   Union, et al. bearing case number CV 04 00461 SOM LEK in
9   the U.S. District Court for the District of Hawaii.
10       This deposition is being held at 3400 West
11  Euclid in Arlington Heights, Illinois and is being taken
12  on behalf of the defendant.
13       Will counsel, please, identify themselves for
14  the record and state whom you represent starting with
15  the noticing party.
16     MR. LEVINSTEIN:  Mark Levinstein of the law firm of
17  Williams and Connolly representing the defendant.
18     MR. JONES:  Good morning.  Ward Jones on behalf of
19  plaintiff, Dae Sung Lee, who is present in the
20  deposition today.
21       THE VIDEOGRAPHER:  Will the court reporter please
22  swear the witness.
```

1    MARY M. BRUNNER,
2  called as a witness herein, having been first duly
3  sworn, was examined upon oral interrogatories and
4  testified as follows:
5    EXAMINATION
6    By Mr. Levinstein:
7    Q   Would you please state your full name and spell
8  your last name.
9    A   Am I supposed to speak into the camera or to
10  the person that's addressing me, or does it matter?
11    Mary M. Brunner.
12    Q   Could you spell your last name?
13    A   B like boy; R like Robert; U like under; N,
14  Nelly; N, Nelly; E, Edward; R, Robert.
15    Q   Ms. Brunner, do you understand that you're here
16  because you've been identified as a witness on his
17  behalf?
18    A   Yes.
19    Q   Are you here to testify for Dae Sung Lee in his
20  lawsuit?
21    A   I'm assuming I'm just swearing or testifying to
22  facts.  As far as I'm concerned not to either party.

1    Q   When was that?
2    A   Last night.
3    Q   And what time was that?
4    A   Late evening, between 9:00 and 10:00, something
5  like that.
6    Q   Where did you meet?
7    A   In Arlington Heights.
8    Q   At what location?
9    A   I don't remember the address.  At a restaurant.
10    Q   Did you have dinner together?
11    A   Yes.
12    Q   Was that with Mr. Jones?
13    A   Yes, he was there, yes.
14    Q   Who else was present?
15    A   Mr. Lee.
16    Q   How long were you at that restaurant with
17  Mr. Jones and Mr. Lee?
18    A   Approximately an hour.
19    Q   In that time you spent together did Mr. Jones
20  talk to you about what questions I was likely to be
21  asking you?
22    A   Basically we went over the document that I

1    Q   Did Mr. Lee call you at some point in time and
2  ask you if you would testify for him in this lawsuit?
3    A   Yes, he did.
4    Q   When did that happen?
5    A   I don't remember.  Some weeks back.
6    Q   Can you give me an idea of what month it was?
7    A   Couple of months ago.
8    Q   Best estimate May?
9    A   Sure.  I don't remember.
10    Q   But it was during 2005?
11    A   Yes.
12    Q   Did you speak to Mr. Lee about his lawsuit?
13    A   He asked me some questions about his lawsuit,
14  yes.
15    Q   Did you speak to his lawyers?
16    A   Yes.
17    Q   Did you submit a declaration in support of
18  Mr. Lee's position in this lawsuit?
19    A   As I said I just stated facts as I knew them.
20    Q   Did you meet with any lawyer representing
21  Mr. Lee?
22    A   Yes.

1  received from you.  I asked questions concerning some of
2  the items that were requested and we also discussed my
3  declaration.
4    Q   Let me show you what's been marked as
5  Brunner 1 --
6    A   Is this the same document you served?
7    Q   I believe it is.
8    (Document marked as Exhibit 1)
9    Q   When did you receive what's been marked as
10  Brunner Exhibit 1?
11    A   Late afternoon on Friday.
12    Q   That would mean Friday, June 24th?
13    A   According to the document the -- whatever the
14  date was on Friday.
15    Q   If Monday was the 27th, Friday the 24th of
16  June?
17    A   I would guess.
18    Q   And did you understand that document asked you
19  to produce documents at this deposition?
20    A   Yes.
21    Q   And do you have any documents to produce?
22    A   Absolutely not.

1  Q    Is that because it would take longer to produce
2  those documents?
3     A    Well, the -- this document asked for records
4  dating back to 1996.  That's approximately 10 years of
5  records.  That's a massive request.
6     Q    But you didn't produce any documents in
7  response?
8     A    Absolutely not.  In 2 hours of business when my
9  classes start in the late afternoon at the same time
10  that I received this request, impossible.
11     Q    But you are willing to produce documents at
12  some point in the future?
13     A    Some documents, yes.
14     MR. LEVINSTEIN:  We'll reserve the right to continue
15  this deposition after we receive those documents at some
16  point in the future.
17     MR. JONES:  We will also reserve the right to object
18  to a continuance of the deposition if it is to ask
19  questions about documents.  I think this witness -- her
20  identity has certainly been disclosed for a number of
21  months and contents of her declaration has been in the
22  hands of defense counsel for 4 to 6 weeks.  A -- a

1     Q    Who drafted this document?
2     A    Counsel for Mr. Lee.  I edited the document.
3     Q    Do you have in your possession any drafts of
4  the document?
5     A    No.
6     Not here today?
7     A    No.
8     Q    What happened to the document you edited?
9     A    Garbage.
10     Q    Why did you throw away the draft?
11     A    It's not my lawsuit.
12     Q    Have you been in lawsuits before?
13     A    Yes.
14     Q    What did they concern?
15     A    The Ford family that I had forcibly removed
16  from my property.
17     Q    Any other lawsuits?
18     A    The one over a lease.
19     Q    Any other lawsuits?
20     A    Several years back during my professional
21  business years.
22     Q    About what?

1  documents request could have been submitted quite a
2  while ago so that we would not be forced to go to the
3  expense to having a second deposition.
4     I also point out that counsel with respect to a
5  motion to quash reminded us that 45 days notice was
6  needed prior to a subpoena duces tecum, and if that's
7  the case, same rule applies to defense.  So we do
8  reserve the right to contest the right to a second
9  deposition if it's solely to go over documents.
10     MR. LEVINSTEIN:  Q  Let me show you what's been
11  marked as Brunner Exhibit 2 and ask you if you recognize
12  that document.
13     (Document marked as Exhibit 2)
14     A    Yes.
15     Q    Is that the declaration that you submitted in
16  this lawsuit?
17     A    Yes.
18     Q    And was that document signed on or about
19  May 6th, 2005?
20     A    It's dated May 6th, yes.
21     Q    Was that the date that you signed it?
22     A    Yes.

1     A    Money owed the company, unfairness of the
2  company, et cetera.
3     Q    Let's take those one at a time.
4     The lawsuit by the Ford family was a lawsuit
5  against you?
6     A    They filed a complaint with the USTU.  The USTU
7  Council advised them that he would not entertain the
8  complaint until they had gone through civil court, which
9  they did, and it was dismissed with prejudice as a
10  frivolous lawsuit.
11     Q    What were the allegations of the Ford family in
12  their lawsuit?
13     A    Basically that I was denying their child the
14  right to learn.  They wanted to come to my school.  His
15  father came at me over my desk, which is when I called
16  the police and had him removed.
17     Q    Did the lawsuit concern your refereeing of
18  events?
19     A    No.  They didn't want me to referee their son.
20  That wasn't what the lawsuit was about.
21     Q    Did the lawsuit seek an order that you wouldn't
22  be allowed to referee their son --

1    A    No.  It said that we mutually agreed that I
2    would not be in the ring with their son.  However, I am
3    not mutually in the ring with any of my students.
4    That's ethically done by any referee.
5    Q    But did they bring a lawsuit that included a
6    request for an order that you not be allowed to be
7    involved --
8    A    As I said, yes.  As my counter indicated I
9    didn't want to be in the ring.
10    Q    Was an order entered by a court saying that you
11    couldn't referee at those matches?
12    A    No, there was no order.  We agreed that that
13    would not happen.
14    Q    Did you sign an agreement to that effect?
15    A    Yes.
16    Q    Was that filed with the court?
17    A    I suppose it was.  I don't know.
18    Q    Was it entered as an agreed order?
19    A    I really don't know.  I signed it.  I don't
20    know what they did with it.  I'm not legally trained.  I
21    don't know.  I'm answering as best I know.
22    Q    Then there was a lawsuit over a lease.

1    ordered to pay backpay.
2    Q    Was it just an issue of salary they hadn't
3    paid?
4    A    And commissions.
5    Q    Is there any allegations of discrimination in
6    that?
7    A    No.
8    Q    So you didn't allege that they discriminated
9    against you?
10    A    No.  They owed me money.  I asked for them to
11    pay me what was due, I showed up at the place of the
12    meeting with documents proving what they owed and they
13    were ordered to pay me.
14    Q    Have you been deposed before?
15    A    Yes.
16    Q    In which case?
17    A    The lease thing.
18    Q    Was your deposition taken in the Ford case?
19    A    I don't recall that it was.
20    Q    How long have you been involved in the U.S. Tae
21    Kwon Do Union?
22    A    Since its inception probably.

1    A    Yes.
2    Q    Were you the plaintiff or the defendant?
3    A    Plaintiff.
4    Q    Who did you sue?
5    A    I'm sorry.  They sued me.
6    Q    So were you the defendant?
7    A    Yes.
8    Q    Who sued you?
9    A    The landlord.
10    Q    Was the claim that you hadn't paid your rent?
11    A    Yes.
12    Q    And then several years back in your
13    professional life there was a lawsuit about money owed
14    the company.  Is that what you said?
15    A    The company owed me money.
16    Q    So did you sue your prior employer?
17    A    I didn't sue.  I went to the Labor Relations
18    Board and asked for money to be paid.  You asked if
19    there were any cases.  Is that correct?
20    Q    Doesn't matter.
21    A    Then that's my mistake.  It went a lawsuit.  I
22    went to the Labor Relations Board.  The company was

1    Involved means what?
2    Q    In any capacity.  Since its inception you
3    think?
4    A    I think you need to clarify the question.
5    Q    Were you a member of the AAU that had
6    responsibility for tae kwon do before the United States
7    Tae Kwon Do Union?
8    A    I was not a member.
9    Q    But were you involved back with tae kwon do
10    back when the AAU was in charge of tae kwon do?
11    A    Yes.
12    Q    After the USTU was formed, did you become a
13    member of the USTU?
14    A    At some point, yes.
15    Q    Any idea how long ago that was?
16    A    10 years approximately, but I'm sure the USTU
17    would have records.
18    Q    I hope so.  I don't think so.  They don't go
19    back that far.
20    A    Not my job, man.
21    Q    Before you became a member were you involved in
22    USTU events?

1    A    Yes.

2    Q    In what ways were you involved?  Were you a

3    competitor ever?

4    A    Yes.

5    Q    When were you a tae kwon do competitor?

6    A    '70s, late '70s.

7    Q    What level of competition did you participate

8    in?

9    A    I don't understand that question.  It needs

10    explanation.

11    Q    Did you go to State tournaments?

12    A    Yes.

13    Q    Did you go National tournaments?

14    A    Yes.

15    Q    As a competitor?

16    A    Yes.

17    Q    What's the most success you had as a

18    competitor?

19    A    Not getting killed.

20    Q    That's a success?

21    A    Walking off the ring.  Also competed

22    internationally.

1    Q    Where did you compete international?

2    A    In Korea.

3    Q    In what events?

4    A    I don't remember.  I think it was called the

5    World Championships at that time.  It was the late '70s.

6    Q    Were you there representing the United States?

7    A    No.  I was there representing myself.

8    Q    So you competed at the Tae Kwon Do World

9    Championships?

10    A    I don't remember what the name of the

11    tournament, but it was in Korea, and it was an

12    international tournament.

13    Q    Did you have a ranking in the United States as

14    a tae kwon do competitor?

15    A    A ranking?  I don't understand that question.

16    Q    Did you win any major competitions in the

17    United States?

18    A    At that time there was no such thing as those

19    types of records being kept.  They were still very

20    quiet, very informal.

21    Q    Did you win any competitions --

22    A    State tournaments, local tournaments,

1    Invitationals, opens, whatever it was that I went to.  I

2    was generally a pretty successful competitor.

3    MR. JONES:  Excuse me.  I don't mean to interrupt

4    the deposition.

5    If I could just advise the witness to pause a

6    little bit after counsel asked the question.  I'm

7    concerned that the record is going to be pretty broken

8    up.

9    THE WITNESS:  All right.

10    MR. LEVINSTEIN:  Q  Did you compete in forms?

11    A    No.

12    Q    Did you compete in breaking boards?

13    A    Well, actually I did compete in forms.  They

14    were just different forms back then.

15    Q    Did you compete in breaking boards?

16    A    No.

17    Q    Did you compete in sparring?

18    A    Yes.

19    Q    Was it in sparring you won State tournaments

20    and local tournaments?

21    A    It was in both.

22    Q    It was in sparring and forms that you won State

1    tournaments and local tournaments?

2    A    Yes.

3    Q    And this was in the late '70s?

4    A    Yes.

5    Q    Did you participate in any national tournaments

6    in the United States?

7    A    I don't remember.  If they were there, I

8    probably went to them.  I don't remember the names of

9    them.  That was 30 years ago.

10    Q    What state did you live in the late '70s?

11    A    Illinois.

12    Q    Did you compete in tournaments outside the

13    State of Illinois?

14    A    No, but that doesn't necessarily mean they were

15    just state tournaments.

16    Q    I understand.  So if you competed in any

17    National tournaments though they would have been

18    National tournaments held in Illinois?

19    A    Probably.  People didn't travel as much for tae

20    kwon do.

21    Q    But you specifically said did you not compete

22    in any tournaments outside State of Illinois other than

1    the events you mentioned in Korea?
2        A    Yes.
3        Q    So if you did compete in a National tournament,
4    it had to be a National tournament held in Illinois?
5        A    What did I just answer?
6        Q    You said probably I think.
7        A    That's probably true.
8        Q    Did there come a time when you -- why did you
9    become a member of the USTU?
10       A    Probably on the request of one of the referee
11   trainers.
12       Q    Were you already a referee at the time you
13   joined the USTU?
14       A    In order for you to become a referee with the
15   USTU you have to be a member first.
16       Q    When did you first apply to be a referee?
17       A    I can't remember.  Approximately 15 years ago.
18            With the USTU is that your question?
19       Q    No.  Just when did you become a referee.
20       A    Late '70s.
21       Q    You became a tae kwon do referee in the late
22   '70s?

1        Q    Taken to the present, have you become a member
2    of any tae kwon do organization other than the USTU?
3        A    WTF.
4        Q    Any other organizations?
5        A    AAU.
6        Q    Any others?
7        A    USTW.
8        Q    What's the USTW?
9        A    United States Tae Kwon Won.
10       Q    Is that W-O-N?
11       A    Yes.
12       Q    Any other tae kwon do organizations?
13       A    Modern Arnis and Jujitsu.
14       Q    Modern?
15       A    Arnis and Jujitsu Federation.
16       Q    Does that involve tae kwon do?
17       A    No.
18       Q    Any other martial arts organizations you're a
19   member of?
20       A    Hapkido.
21       Q    That's a style of martial arts.  Is there a
22   Hapkido organization?

1        A    Yes.
2        Q    That was not about the USTU?
3        A    There was no USTU then.
4        Q    Was it with another organization?
5        A    It was with whomever asked me to referee.
6        Q    Were you a member in the late '70s of any other
7    tae kwon do organization?
8        A    I don't understand that question.
9        Q    Well, at some point you became a member of the
10   USTU.
11       A    Exactly.
12       Q    I'm just asking before you became a member of
13   the USTU, were you the member of any other tae kwon do
14   organizations?
15       A    Again I don't understand.  My instructor was.
16       Q    What organization was your instructor a member
17   of?
18       A    I don't know.  It was not my business at that
19   time.
20       Q    When you refereed in the late '70s, you did it
21   without being a member of any organization?
22       A    As far as I recall that's correct.

1        A    Several hundred probably.
2        Q    Which ones are you a member of?
3        A    I don't remember the exact name.  I don't have
4    the documents in front of me.
5        Q    Do you referee at Modern Arnis events?
6        A    No.
7        Q    Do you referee at jujitsu events?
8        A    No.
9        Q    What involvement do you have in the modern
10   Arnis and jujitsu Federation?
11       A    More specific question.
12       Q    Do you referee events related to the modern
13   Arnis and Jujitsu Federation?
14       A    No.
15       Q    Do you teach Modern Arnis or Jujitsu?
16       A    I did.  I have now removed it from my
17   curriculum.
18       Q    Do you teach Hapkido?
19       A    Yes.
20       Q    Do you referee Hapkido events?
21       A    No.
22       Q    Are there Hapkido events?

1    A    I'm sure there are.

2    Q    Are there any other martial arts organizations

3 you're a member of or have been a member of?

4    A    Those are the ones I recall.  In 30 years I may

5 have belonged to several others.  I don't remember.

6    Q    Does your school belong to any tae kwon do

7 organizations?

8    A    Can you clarify the question?

9    Q    Are you aware that schools are sometimes

10 members of organizations?

11    A    I don't think that's the way it's done.  I

12 don't understand your question.

13    Q    You weren't aware that schools -- there's such

14 a thing as a school member of --

15    A    To pay a school fee, but they aren't members.

16    Q    And to what organizations can you pay a school

17 fee?

18    A    Probably whoever creates an organization can

19 ask for school fee.

20    Q    Does your school pay fees to any martial arts

21 organizations?

22    A    USTW currently.

1    Q    Does your school pay a fee to the USTU?

2    A    No.

3    Q    Did your school used to pay a fee to the USTU?

4    A    Yes.

5    Q    When was that?

6    A    Several years back before this new regime came

7 in.

8    Q    Why did your school pay a fee to the USTU

9 before the new regime came in?

10    A    At that time they provided some materials that

11 were helpful to business.  They no longer do that.

12    Q    What materials did they provide?

13    A    Collateral pieces.

14    Q    Give me an example.

15    A    Advertising pieces.

16    Q    I don't understand.  They gave you an

17 advertising piece.  What does that mean?

18    A    Mockups for a potential ad.

19    Q    So they gave you some artwork that you could

20 use to turn into an ad?

21    A    It wasn't really art work.  It was just ideas.

22    Q    As a school member did your school have the

1 right to vote on selection of people involved in

2 governance?

3    A    More specific question, please.

4    Q    When your school was a member of the USTU, did

5 the school get to vote on certain matters?

6    A    Concerning -- again --

7    Q    Concerning anything.  If schools --

8    A    At the city level, at the state level?  I don't

9 understand what you're asking.

10    Q    Well, I don't understand the answer.  I'm

11 trying to get an understanding from you.  The school

12 became a member of the USTU.

13    A    Yes.

14    Q    Then were there levels, whatever levels, at

15 which the school cast votes on certain things as a

16 member?

17    A    Sometimes there were.

18    Q    Do you remember an example of what school the

19 voted on?

20    A    No, I don't.

21    Q    You've been a referee for 30 years?

22    A    No.  Approximately the late '70s.

1    Q    For 25 years plus?

2    A    Correct.

3    Q    Have you held referee positions beyond being

4 just a referee to refereed events, did you hold any

5 referee titles?

6    A    Yes.  I was briefly assigned referee chair for

7 the USTW.

8    Q    Did you have any state association positions as

9 a referee?

10    A    Referee chair, referee vice chair.

11    Q    In what organization?

12    A    USTU.

13    Q    Did you hold any state referee positions in the

14 USTW?

15    A    No.  There's no such thing.

16    Q    When were you the referee vice chair?

17    A    I don't remember.  Several years back.

18    Q    When were you the referee chair?

19    A    This year.  For the state --

20    Q    I'm sorry.  I thought you were saying this was

21 a state position.

22    A    Yes.

1    Q    Okay.  So I was going to say for the State of
2    Illinois, but you cut me off.
3        A    I briefly answered which is why I cut you off
4    because you repeated the question.
5        Q    I just want to be clear on what I was asking.
6            So you were the referee chair for the State of
7    Illinois for the --
8        A    Vice chair.  Referee chair and vice chair.
9        Q    I understand.  Several years ago you were the
10   referee vice chair?
11       A    Yes.
12       Q    And at what point in time did you become the
13   referee chair for the State of Illinois?
14       A    I don't remember.  It's been several years.
15       Q    But you were the referee chair last year?
16       A    No.  I said I was briefly the referee chair for
17   the USTW this year.
18       Q    I see.  You said the referee chair for the
19   USTW.  That wasn't for the entire USTW, that was for the
20   State of Illinois?
21       A    Referee chair for the USTW.
22       Q    For the entire country?

1        Q    Are you aware that there was an agreement
2    signed by the USTU in January of 2004 called the
3    Remediation Plan?
4        A    I don't know the specifics of it.  I heard
5    there was turmoil.  I didn't get involved.
6        Q    Did you become aware that certain officers of
7    the USTU resigned in January of 2004?
8        A    I became aware that certain officers were no
9    longer with the Tae Kwon Do Union.
10       Q    Do you have any knowledge about the process in
11   2003 that led to change in who the officers were in
12   2004?
13       A    By knowledge you mean what?
14       Q    What do you know about that process?
15       A    The process itself, nothing.
16       Q    Do you know that there were meetings held by
17   the USOC Membership and Credentials Committee concerning
18   the USTU?
19       A    First person knowledge, no.  As I said before,
20   I did not get involved.  That was not my business.
21       Q    In 2003 were you a member of the USTU?
22       A    I'm a lifetime member.

1        A    Yes.  Third time.  USTW.
2        Q    But in response to another question you said
3    you said you were referee chair and referee vice chair
4    for the USTU.
5        A    State of Illinois, two different organizations.
6    You're asking two different questions.  I'm trying to
7    keep it straight and keep going back which makes me
8    answer that question and then you confuse that with the
9    USTW group.  It's two groups.
10       Q    Let's stick with the USTU.
11       A    That's what I was trying to do.
12       Q    Let's talk about the State of Illinois.
13       A    Yes.
14       Q    Let's talk about the position as referee chair.
15       A    Yes.
16       Q    When did you hold --
17       A    As I said, I don't remember.  It was several
18   years back.
19       Q    Prior to the January -- Strike that.
20            Are you familiar with the 2004 Remediation
21   plan?
22       A    I don't know what you're talking about.

1        Q    In 2003 did you hold any positions with the
2    USTU?
3        A    No.  That I recall, no.
4        Q    In 2003 were you actively involved in
5    refereeing USTU events?
6        A    Yes.
7        Q    Have you held any positions with the WTF?
8        A    Yes.
9        Q    What positions?
10       A    International referee.
11       Q    Are you held any administrative positions with
12   the WTF?
13       A    No.
14       Q    So you have worked for the WTF as a referee at
15   international events?
16       A    Yes.
17       Q    Is there anything else that you mean by the
18   position of international referee?
19       A    I don't understand the question.
20       Q    Are you on any WTF committees?
21       A    No.
22       Q    Have you served as a trainer of referees for

**Page 33**

```
 1   the WTF?
 2       A   No.
 3       Q   Have you served as a trainer of referees for
 4   the USTU?
 5       A   I don't believe there ever was a position like
 6   that so I don't understand the question.
 7       Q   Have you been involved in running events for
 8   the USTU?
 9       A   Events like what?
10       Q   Any events.
11       A   Yes.
12       Q   What events have you been involved in running
13   for the USTU?
14       A   I don't know what you mean by running.  As a
15   referee?
16       Q   In any capacity.  Have you been involved in
17   running events for the USTU?
18       A   Yes.  You mean managing them, directing them,
19   in control of or being in attendance at?  I don't
20   understand the question.  It's no nebulous.
21       Q   Having some position involved in management or
22   operation of the event.
```

**Page 35**

```
 1       A   Late paperwork, not -- correspondence not being
 2   returned, documentation not being forwarded,
 3   documentation being incorrect.
 4       Q   In your opinion were these serious problems?
 5       A   When they affected me they had to be serious.
 6       Q   Did you try to do something to correct the
 7   problems?
 8       A   Other than corresponding, no.
 9       Q   With whom did you correspond?
10       A   Whomever happened to be in charge of that
11   particular area at that particular point in time.
12       Q   Did you send letters to the USTU complaining
13   about their administration?
14       A   I don't recall that.
15       Q   But you corresponded about the administrative
16   problems?
17       A   About the core -- I corresponded about issues
18   that related to me.
19       Q   So when there were problems with late paperwork
20   or documentation not being forwarded or documentation
21   being incorrect, you sent letters to the appropriate
22   people at the USTU about those problems?
```

**Page 34**

```
 1       A   Yes.
 2       Q   What events are those?
 3       A   The first Pan Am Tae Kwon Do Union Open in
 4   1993, I was executive director.  I've assisted in
 5   several state tournaments.  And I was the executive
 6   director for the 1994 Junior Olympics.
 7       Q   Prior to January of 2004 did you observe
 8   problems in how the USTU was run?
 9       A   Yes.
10       Q   Can you tell us what some of those problems
11   were?
12       A   Administrative, management, operational.
13       Q   What administrative problems did you observe?
14       A   What the term indicates, anything to do with
15   paperwork.
16       Q   What problems were there?
17       A   Well, I wasn't privy to their intermachinations
18   so I can't give specifics.
19       Q   You said you observed problems in their
20   administration.
21       A   Yes.
22       Q   What did you observe?
```

**Page 36**

```
 1       A   No.  As I said, I sent correspondence about
 2   those issues relating to me.
 3       Q   And you sent the correspondence to whom?
 4       A   Whomever was in charge of that particular
 5   department at that particular point in time.
 6       Q   These were people in the USTU?
 7       A   Yes.
 8       Q   And in your judgment were the problems all
 9   handled quickly and efficiently by the USTU?
10       A   As I said, no, that's why it was a problem.
11       Q   What management problems did you observe with
12   the USTU?
13       A   Lack of management.
14       Q   In particular what management was lacking?
15       A   Lack of experience, lack of background, lack of
16   education in the field with which they were connected.
17   Management by crisis rather than management by planning.
18       Q   Was this in connection with running of events?
19       A   Connection with anything.
20       Q   You observed these problems in all aspects of
21   the USTU's management?
22       A   Pretty much.
```

1    Q    Were there people in particular that you blamed
2  for these problems?
3    A    No.  The whole organization was and still is
4  run the same way.
5    Q    And did you correspond about these problems as
6  well?
7    A    I don't recall.  Again, that wasn't my
8  business.
9    Q    When it affected you it was your business?
10    A    Exactly.
11    Q    And a lot of times you knew about it because it
12  affected you?
13    A    Only if it affected me did I get involved, the
14  rest was not my business.
15    Q    When it did affect, did you correspond with the
16  US --
17    A    As I stated before several times, yes, I did.
18  If it related to me, I wrote about that particular
19  issue.
20    Q    I apologize.  You said that about the
21  administrative problems.  I wasn't sure if the same was
22  true of the management problems.

1    A    In all aspects, if there were an issue relating
2  to me in particular, I sent correspondence if I felt it
3  necessary concerning my issue.
4    Q    What operational problems did you perceive with
5  the USTU?
6    A    I don't understand that question.
7    Q    Well, I had asked you what kind of problems you
8  perceived with the USTU, and you said administrative,
9  management and operational.
10    A    Yes.
11    Q    And so if those were different then --
12    A    Can you be a little more specific?
13    Q    Since I don't want to put words in your mouth,
14  I don't know what you meant by operational problems.
15  So, can you tell me what you meant by operational
16  problems?
17    A    Nothing in particular, just that it didn't
18  operate well.
19    Q    Did you observe people in the USTU who were
20  involved in misuse of funds?
21    A    Did I observe it?  Meaning was I at the USTU
22  headquarters?

1    Q    No.  But did you believe there had been misuse
2  of funds by people involved with the USTU?
3    MR. JONES:  Objection, vague and ambiguous as to
4  believe.
5    MR. LEVINSTEIN:  Q  You can answer the question.
6    A    Well, my perception was that the funds weren't
7  always channeled where they should have been.
8    Q    Were there particular people who you believe
9  were involved in misuse of funds?
10    A    It would be perception only.
11    Q    Did you correspond and assert that people had
12  been involved in misuse of funds?
13    A    No.  It was not my business.
14    Q    Did you observe decisions that were made that,
15  in your opinion, were made based on favoritism rather
16  than merit?
17    MR. JONES:  Objection, vague and ambiguous.
18    THE WITNESS:  I don't understand the question.  Can
19  you be a little more specific?
20    MR. LEVINSTEIN:  Q  You were involved in the USTU?
21    A    Yes.
22    Q    And you saw decisions being made by USTU

1  personnel?
2    A    In the ring?
3    Q    Okay.  That's one place where you saw decisions
4  being made.  You also saw decisions being made about
5  management, administration, things like that, correct?
6    A    In the ring, when it affected me in my
7  environment, yes.
8    Q    Did you see decisions about people being
9  selected for certain positions?
10    MR. JONES:  Objection, vague.
11    THE WITNESS:  Again I have to say do you mean in the
12  ring?
13    MR. LEVINSTEIN:  Q  No.
14    A    Do you mean refereeing?
15    Q    I mean refereeing but not in the ring.  People
16  were picked for referee positions but they weren't
17  selected in the ring they were selected outside the ring
18  to serve as referees or hold referee positions.
19    A    Yes, several times.
20    Q    I'm not sure what I asked and what you answered
21  so let's be clear.
22    A    Because you asked, like, five questions all in

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1   a row.

2        Q   I apologize.  I'm trying to be clear.  So any

3   problem, just tell me.

4        So leaving aside the ring, we'll get to that in

5   a second.

6        Let's talk about there were referee positions

7   that people were selected to hold.

8        A   Yes.

9        Q   And did you -- withdrawn.

10       Did you observe situations in which people were

11  selected for referee positions that you believed were

12  based on favoritism and not on merit?

13       A   Yes.

14       Q   Can you give me some examples?

15       A   Barbara Wakefield.

16       Q   For what positions was Barbara Wakefield

17  selected based on favoritism?

18       A   Referee chair interim.

19       Q   Any other positions?

20       MR. JONES:  Objection, now vague.

21       THE WITNESS:  I don't know if she was chosen as a

22  favor -- in a favoritism manner for her referee vice

41

---

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1        Q   Okay.  Prior to 2004 were you aware of

2   situations in which people in authority led to others

3   not wanting to be involved in the organization?

4        A   Yes.

5        Q   Can you give me some examples?

6        A   Kim Davis.

7        Q   Who is Kim Davis?

8        A   Referee out of Dallas, Texas.

9        Q   And did Mr. Davis -- is a Mister?

10       A   Miss Davis.

11       Q   I can't tell with the word Kim in this group

12  whether it's a man or woman.

13       So Ms. Davis -- did Ms. Davis stop being

14  involved with refereeing?

15       A   Yes.

16       Q   And whose conduct in authority led Ms. Davis

17  not to be involved?

18       A   Barbara Wakefield.

19       Q   When was that?

20       A   Several years ago.

21       Q   And were you friends with Ms. Davis?

22       A   Yes.

43

---

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1   chair position, but I do believe that interim referee

2   chair was a matter of favoritism.

3        MR. LEVINSTEIN:  Q  Because of a personal

4   relationship?

5        A   With me?

6        Q   No, no, no.  She was picked because of

7   favoritism.  By that do you mean she was picked because

8   of who she knew?

9        A   Yes.  That was direction -- that information

10  was given to me by Bob Gambardella.

11       Q   We'll get to that.

12       Were there situations in which the conduct of

13  certain people in authority in the USTU led to others

14  not wanting to be involved in the organization?

15       A   In what aspect?

16       Q   In any aspect.

17       A   I don't have firsthand knowledge.  I'm sure

18  there were.  It's a big organization.

19       Q   Did you tell people that people were leaving

20  the organization because of conduct of certain

21  individuals?

22       A   That's a fact.  I'm one of them.

42

---

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1        Q   Are you still friends with Ms. Davis?

2        A   I'm friends with any referee.

3        Q   What did Barbara Wakefield do that led

4   Ms. Davis to stop being involved?

5        A   Basically she torpedoed her at a tournament.

6        Q   I'm sorry.  I don't know what that means.  She

7   torpedoed her at a tournament, what did she do?

8        A   She could have stood up in her defense.  And

9   what was apparent to the referees sitting in the stands

10  when that event happened, she didn't do that.  Steven

11  Dring and Bill Sullivan witnessed it and stood up in Kim

12  Davis' defense against Barbara.

13       Q   Okay.  Any idea what year this was?

14       A   Several years back.  I'm sure it's on record

15  with the USTU.

16       Q   Okay.  That's not really available to me, but I

17  understand.

18       There's a tournament several years ago.  Where

19  was the tournament?

20       A   Colorado Springs, U.S. Open.

21       Q   And what was Barbara Wakefield's position at

22  the time?

44

**Page 45**

```
 1    A    Vice chair.
 2    Q    And Ms. Davis was refereeing a match?
 3    A    Was supposed to be there, had been invited and
 4  Barbara uninvited her.  That was my perception at the
 5  tournament after she had paid -- Ms. Davis had paid for
 6  her ticket to be there.
 7    Q    Ms. Davis had paid for her ticket to fly to
 8  Colorado Springs to be at the U.S. Open?
 9    A    Because she had been invited.
10    Q    And Ms. Wakefield didn't assign her to referee
11  any matches?
12    A    Actually they told her to leave the tournament.
13    Q    What reason did they give for telling her to
14  leave the tournament?
15    A    That she wasn't needed.
16    Q    And do you have a reason why -- why do you
17  think they -- they didn't need her?
18    A    My personal perception was that it was strictly
19  a personal decision.  That was my perception.
20    Q    So Barbara Wakefield didn't like Kim Davis?
21    A    That would be my guess.
22    Q    Is there anything else I'm missing that you're
```

**Page 47**

```
 1  about that, you can't leave until you return ticket is
 2  useful.  You have to pay your own meals and your own
 3  room and board while you're there to be told you're not
 4  needed.  For that reason every single referee there,
 5  except maybe two of Barbara's friends, stood up in
 6  unison and said, this is wrong, we should leave rather
 7  than have someone from the referee ranks treated in this
 8  manner.  The most voiceful about it and forceful were
 9  the Canadians referees, and, as I said, the gentleman
10  from England and Bill Sullivan and Steven Dring.
11    Q    Were you vocal about the problem?
12    A    No.
13    Q    Why not?
14    A    It wasn't my place to be at that point in time.
15    Q    Who were the friends of Barbara Wakefield that
16  you referred who supported her side?
17    A    I'm assuming Valerie Long was there.
18    Q    You said friends, plural.  Is there anyone else
19  you're referring to?
20    A    Not that I remember.
21    Q    Valerie Long is a friend of Barbara
22  Wakefield's?
```

**Page 46**

```
 1  referring to?
 2    A    That would be my guess.
 3    Q    Steven Dring and Bill Sullivan believed that
 4  Ms. Davis should not be told to leave the tournament?
 5    A    Absolutely.  Everyone there did.  They in
 6  particular stood up and were very forcefully -- voice
 7  their opinion as did some of the referees from Canada,
 8  as did the referee from England who stood up and said
 9  that we should all walk out in protest.  That's how
10  wrong that situation was and how it was perceived by all
11  the international referees.  It was so wrong they were
12  all willing to walk out of the U.S. Open and shut the
13  tournament down rather than have one of the referees
14  treated in that manner by Barbara Wakefield.
15    Q    Did Barbara Wakefield do anything besides say
16  we don't need you to referee?
17    A    That's all that was needed.
18    Q    I'm just trying to get an understanding of what
19  got everybody so upset.
20    A    When you are selected to referee at an
21  international event and you pay your own way to get
22  there, and then you show up and they say go home, sorry
```

**Page 48**

```
 1    A    Yes.
 2    Q    And supports Barbara Wakefield?
 3    A    Well -- yes.
 4    Q    Is it fair to say that you've not liked Barbara
 5  Wakefield for a long time?
 6    MR. JONES:  Objection, vague and ambiguous.
 7    THE WITNESS:  Ask the question again, please.
 8    MR. LEVINSTEIN:  Q  Is it fair to say that you have
 9  not liked Barbara Wakefield for a long time?
10    A    As I stated at the outset, when I see
11  injustices done, I will stand up for them no matter who
12  it is that's involved.  In the case of Barbara Wakefield
13  where I have seen her perform items or situations or
14  handle anything that is lacking in integrity, I will not
15  like that, but that would apply to anyone that has no
16  integrity.  Tae kwon do teaches integrity.
17    Q    But it's your view that Barbara Wakefield has
18  no integrity?
19    A    That on some of the instance that she's been
20  involved that I have observed, that would be the case.
21    Q    There have been a number of those instances?
22    A    There have been some instances.  That situation
```

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1   with Ms. Davis was one of them.  And since every
2   international referee had the same opinion that I did, I
3   could only assume that that was a worldwide opinion.
4       Q    It was your understanding it was a worldwide
5   opinion?
6       A    There were worldwide referees at that U.S. Open
7   from different countries.
8       Q    This is a worldwide opinion Ms. Wakefield was
9   not doing a good job?
10      A    As I said there were referees in attendance
11  from several countries at the U.S. Open, therefore, it
12  is an international event.
13      Q    I understand.  It's an international event.
14      A    So people being from other countries would be
15  giving their international opinion.
16      Q    Fine.  But your view was there was some of a
17  consensus among these international referees that
18  Miss Wakefield was doing things that were improper?
19      A    That was unethical.
20      Q    I just want to understand was there more to it
21  in your understanding than she didn't like Kim Davis?
22  Had there been some prior dispute between Ms. Wakefield

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1   A    Yes.
2       Q    Prior to January of 2004 did you have the view
3   that there was often discrimination in the refereeing or
4   judging of matches?
5       MR. JONES:  Objection, vague.
6       THE WITNESS:  Ask the question again.
7       MR. LEVINSTEIN:  Q  I'm focusing on the time period
8   before the new regime, before January of 2004.
9       A    Yes.
10      Q    I'm just asking in that time period before
11  January of 2004, based on the matches you watched or the
12  matches that you were one of the referees during the
13  match, was it your view that there was often
14  discrimination in the refereeing or judging of matches?
15      A    At what level?
16      Q    At any level.
17      MR. JONES:  Same objection, vague.
18      THE WITNESS:  That is -- that's an impossible
19  question to answer.  I mean at what level?
20      MR. LEVINSTEIN:  Q   What levels did you watch?  I
21  don't know how to identify levels of matches.
22      A    Then maybe I can't answer the question.  I

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1   and Ms. Davis?
2       A    I don't understand that question.  I don't
3   think you understand refereeing.
4       Q    Well, that's very possible, I don't understand
5   refereeing.  I'm not a referee.  You've described
6   someone who flew all the way to Colorado Springs and was
7   going to referee and was told she wasn't needed.  And
8   you seem to think it was more than an administrative
9   decision that we don't need you.  I'm just wondering if
10  you think there was some discriminatory motivation or
11  something beyond Ms. Wakefield didn't like Ms. Davis.  I
12  just want to know if there's something more I'm missing.
13      A    There could be.  I don't know.
14      Q    Let's go to the ring.  In your years as a
15  referee, besides refereeing events you attended lots of
16  matches?
17      A    Lots of tournaments.
18      Q    And -- what do you call the individual bouts
19  within a tournament?
20      A    A match.
21      Q    So you watched a lot of matches in which you
22  weren't the referee?

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1   don't understand the question.  That's really an
2   open-ended, nebulous, out there question.
3       Q    You'd remember there if there was a match you
4   watched in which you thought the outcome was not based
5   on who was the best competitor but was based on improper
6   factors?
7       A    Well, there again it's a question that almost
8   can't be answered.
9       Q    I just want to know your opinion.
10      MR. JONES:  Objection, vague.
11      THE WITNESS:  My -- the reason I'm trying to clarify
12  here is because it's an impossible question.  I mean
13  that's like saying what created infinity.  There has to
14  be -- draw some parameters in a little bit then I'd be
15  happy to answer it.  It's not that I'm avoiding
16  answering it.  I don't know how to answer you because
17  it's so open.
18      MR. LEVINSTEIN:  Q  Have you told people over the
19  years that you believe the outcome of matches is
20  affected by the national origin of the competitors?
21      A    National origin?
22      Q    Whether they're Korean-Americans or they're

1  Hispanic or they're some other national origin.
2      A   I do not recall ever making that specific
3  statement.
4      Q   Do you recall making statements similar to
5  that?
6      A   I don't recall making statements similar to
7  that.
8      Q   Do you recall telling people that you thought
9  that Korean-American referees favor Korean-American
10  competitors?
11     A   I don't recall making that statement.
12     Q   Do you believe that that happened?
13     A   I believe that it could have happened in some
14  instances as could have happened that Americans did the
15  same thing.
16     Q   Non-Korean American referees favored
17  non-Korean-American competitors?
18     A   Yes.
19     Q   You believe that both of those things happened?
20     A   Yes.
21     Q   Do you have specific matches in mind where you
22  believe that happened?

1      MR. LEVINSTEIN:  Q  In your opinion you saw a
2  significant number of matches in which you felt that the
3  winner of the match was -- person declared the winner of
4  the match had not won the match on merit?
5      MR. JONES:  Misstates the testimony.
6      THE WITNESS:  Sorry.
7      MR. JONES:  Misstates the testimony.
8      MR. SNAO:  Q  You can answer.  He's just got to make
9  those objections for the record.  They don't affect your
10  answering the questions.
11     A   When you have referees that are not properly
12  trained, or you select referees to officiate at a match
13  who are not of the proper experience to handle the level
14  of the competition to which they have been invited to
15  officiate, you stand the chance repeatedly of having the
16  incorrect competitor declared the winner.
17     Q   That happened a lot of times in your
18  experience?
19     A   It's happening especially in the last year.
20     Q   Prior to 2004 did it happen?
21     A   Not as much.
22     Q   But did it happen?

1      A   No.
2      Q   But has it happened a number of times over the
3  years?
4      MR. JONES:  Objection, vague.
5      THE WITNESS:  For that reason -- again you're asking
6  questions that are almost impossible to answer.  There
7  have been literally thousands of matches at which I have
8  been around.  So answer a question like that, it's too
9  open a question.
10     MR. LEVINSTEIN:  Q  But have there been many matches
11  in those thousands in which you believed that whether
12  the competitor or referee was Korean-American or not
13  affected the outcome of the match?
14     A   Generally my opinion wasn't based on race.  My
15  opinion was based on facts of the match.
16     Q   You just think you saw a match and you thought
17  the person declared the winner wasn't the winner?
18     A   Yes.
19     Q   Did that happen a lot?
20     MR. JONES:  Objection, vague.
21     THE WITNESS:  Yes.
22     MR. JONES:  Move to strike.

1      A   Of course it happened because there were
2  occasions when once in a while we would get a D3 level
3  referee.  Now it's happening all the time.
4      Q   Is that because of conduct by Barbara
5  Wakefield?
6      A   Could be, but generally it's happening because
7  of the way this regime is running the USTU.
8      Q   You don't believe this regime is running the
9  USTU properly?
10     A   When the membership has decreased in the
11  numbers that it has, the number of competitors having
12  decreased in the numbers that they have, specifically in
13  2003 there were about 5,000 competitors at the juniors,
14  about -- those were approximate figures -- 1500
15  competitors at the seniors, then in 2004 the same
16  tournaments are approximately half, U.S. Open was 1500
17  approximately in the year 2003 and about half of that in
18  2004, and I understand that this year at the U.S. Open
19  there were even less.  So those figures are available
20  readily through the USTU they're not my perception,
21  those are facts.
22     Q   I understand the numbers are less.  But you

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1  believe this regime is not running the USTU properly?
2      A    Well, I'm going say that if they were running
3  it better than the regime before those numbers would
4  have increased.  At least that's what my perception
5  would be on the data.  But that's not the case.  So my
6  perception and my conclusion would be that apparently
7  they're doing half the job the previous this regime was
8  doing because we have half of the numbers and we have
9  less qualified referees.
10     Q    Okay.  Prior to January of 2004 was it your
11 view that the national origin of competitors and
12 referees at high level matches affected who was declared
13 the winner of the matches?
14     A    Repeat the question.
15     Q    Prior to January of 2004 was it your view that
16 the national origin of competitors and referees affected
17 who was declared the winner of high level matches?
18     MR. JONES:  Objection, vague.
19     THE WITNESS:  As I stated before, my perception was
20 based on the facts of the individual match that I was
21 observing, not particularly who was refereeing, who was
22 judging or who the competitors were.  My perceptions

1      A    When you're -- I don't know that.  They might
2  be.  I'm not aware of that.  I don't have firsthand
3  knowledge.
4      Q    I didn't think they were, and I was just using
5  the word volunteer to talk about not whether they were
6  hired to be employees of the USTU, but these category of
7  leadership positions, whether it's members of the board,
8  members of the executive committee, referee positions,
9  those sorts of positions.
10     A    I don't have firsthand knowledge of who is paid
11 what or in how they are compensated.
12     Q    Okay.  But you understand that category of
13 positions that people held, management positions --
14     A    I can answer you only to the best of what I
15 know.
16     Q    Was it your understanding there was
17 discrimination, in your opinion, in who was selected to
18 hold those types of positions?
19     MR. JONES:  Objection, vague and ambiguous.
20     MR. LEVINSTEIN:  Q  Prior to January of 2004.
21     A    I don't recall thinking of that, thinking that
22 way.

1  were drawn on what I saw going on in the ring.
2      MR. LEVINSTEIN:  Q  But didn't you tell people that
3  you believed that Korean-American referees were favoring
4  Korean-American --
5      MR. JONES:  Objection, misstates the testimony.
6      THE WITNESS:  I believe I stated before that I
7  didn't recall making that statement.  I still don't
8  recall making that statement.
9      MR. LEVINSTEIN:  Q  Was there discrimination in your
10 opinion in who was selected to hold volunteer leadership
11 positions in the USTU?
12     A    I don't know what a volunteer position is.
13     Q    Do you understand that referee positions are
14 volunteer positions?
15     A    Well, they're really not.  There's a selection
16 process for that.  You can't just show up and referee.
17     Q    I know.  By I mean volunteer not paid.
18     A    They are paid.
19     Q    They're paid to referee?
20     A    Yes.
21     Q    Are they paid to hold the positions of chair
22 and vice chair?

1      Q    Did you believe prior to January of 2004 that
2  who would get those positions, the referee positions,
3  the board positions, the executive committee positions
4  in the USTU was affected by friendships and who people
5  knew rather than based on merit?
6      A    You're talking about the vice chair referee
7  chair and the vice chair positions, is that what you're
8  asking?
9      Q    Those kind of positions that you were aware of.
10     A    They had to be.  The referee chair selected his
11 own group so it had to be.
12     Q    Did he make those selections based on merit and
13 based on friendships?
14     A    I can't tell you how anybody was thinking.  I
15 know how I would think had I been in that position, but
16 those were selected positions, appointed positions.
17     Q    But did you believe that they were appointed
18 unfairly some of those people?
19     A    I can't tell you that.  I wasn't in the
20 position to appoint them.
21     Q    Did you observe problems, in your view, about
22 how these people were selected?

## Page 61

1　　　A　　They were appointed positions so how could

2　there be a problem because the person who appointed them

3　was making the selection.

4　　　Q　　Prior to the Remediation Agreement in January

5　of 2004, did you believe that there had been

6　discrimination against you by individuals of

7　Korean-American descent?

8　　　A　　I don't believe I ever stated that.

9　　　Q　　I didn't ask whether you stated it.  I asked

10　whether you believed that.

11　　　A　　I don't believe I ever voiced that opinion, nor

12　did I have that opinion.

13　　　Q　　You don't believe you were discriminated

14　against because you were a woman prior to January of

15　2004?

16　　　A　　That's a different question.

17　　　Q　　Okay.  Prior to the remediation agreement in

18　January of 2004, had there been discrimination against

19　you because you were a woman in the USTU?

20　　　A　　I don't have firsthand knowledge of that.

21　　　Q　　Did you believe that?

22　　　A　　I don't think I ever made an opinion of that.

## Page 63

1　time is 10:20 a.m.

2　　　MR. LEVINSTEIN:  Q  Ms. Brunner, when you met with

3　Mr. Jones and Mr. Lee yesterday, did you look at any

4　documents besides your declaration and the subpoena?

5　　　A　　The document that you sent me.

6　　　Q　　Did you discuss or talk about any other

7　documents?

8　　　A　　No, not that I recall.

9　　　Q　　Did you show him or bring any other documents

10　that you had?

11　　　A　　No.

12　　　Q　　Prior to January of 2004, was it your view that

13　there had been discrimination against you in connection

14　with your refereeing because you were Hispanic?

15　　　A　　Prior to, no.

16　　　Q　　Since January of 2004 do you believe you have

17　been discriminated against because you are Hispanic?

18　　　A　　Yes.

19　　　Q　　By whom?

20　　　A　　By the people that make the decisions for

21　referees.

22　　　Q　　Is that Barbara Wakefield?

## Page 62

1　　　Q　　Never expressed that view?

2　　　A　　I don't recall it.

3　　　Q　　And never held that view?

4　　　A　　I might have held that view.  Worldwide, it's a

5　big world.

6　　　Q　　I'm not focusing on worldwide.  I'm focusing on

7　the USTU.

8　　　A　　But I referee worldwide.

9　　　Q　　I'm talking about the USTu.  Did you have an

10　opinion that the people within the USTU discriminated

11　against you because you were a woman?

12　　　A　　I don't believe because of my gender.  I don't

13　believe that I had that opinion, I don't believe so.

14　　　Q　　Do you believe --

15　　　MR. JONES:  Excuse me, Counsel.  Can we take a

16　break?  We've been going an hour.

17　　　MR. LEVINSTEIN:  Sure.  By the way, anytime you want

18　to take a break, we'll take a break.

19　　　THE VIDEOGRAPHER:  We're going off the record at

20　10:15 a.m.

21　　　(Off the record)

22　　　THE VIDEOGRAPHER:  We're back on the record.  The

## Page 64

1　　　A　　It's my understanding it's Bob Gambardella and

2　I don't know who else he chose to take counsel from.

3　　　Q　　Prior to January of 2004, in your capacity as a

4　referee, was any improper or abusive conduct directed at

5　you?

6　　　MR. JONES:  Objection, vague.

7　　　THE WITNESS:  Abusive.  What does that mean,

8　somebody hit me?

9　　　MR. LEVINSTEIN:  Q  I don't know.  When you were

10　refereeing was it your view that there had been

11　situations in which people had been improper and abusive

12　towards you?

13　　　A　　Which people?

14　　　Q　　Anyone in your capacity when you were a

15　referee.

16　　　A　　Somebody threw a chair in our ring once.  I saw

17　bottles flying into the rings, several rings, some in my

18　proximity.  I don't believe that they were directed at

19　me.  I saw tables flipped at the tournaments where I

20　officiated it.  I saw several coaches throw chairs.  I

21　saw Mark Williams get in a -- try to stop a tussle in

22　San Antonio several years ago which somebody pushed him

1  backwards, he grabbed one of the people who was in the
2  stands and ripped her dress off, that was on camera.
3  And we had several people that were injured and passed
4  out at tournaments.  One person died at San Antonio.
5  Those types of things, I don't know.  That's why I said
6  your question is a little vague.
7      Q    The question is directed at you.  That was in
8  every question.  Was there any abusive or improper
9  conduct directed at you at tournaments besides these
10  random things that were thrown in the ring?
11      A    I don't know because if someone threw something
12  in the ring, there's no way to tell if it was directed
13  toward me or towards the match or towards the judges or
14  towards what had happened in the match up to that point.
15  That's impossible to know.
16      Q    Did you believe that any group of people, for
17  example, Korean-American instructors had directed
18  improper or abusive conduct at you?
19      A    When was this?
20      Q    Prior to January of 2004.
21      A    I don't recall that.  Not to say it didn't
22  happen.  I personally don't recall it.  So if there were

65

1  abuses behind the scenes there would be no way for me to
2  know that.
3      Q    But you're not aware of any improper abusive
4  conduct by Korean-American instructors directed at you
5  openly in front of you?
6      A    I don't recall that.  Other than in the course
7  of questioning decisions in the ring which is normal
8  procedure, but then I don't -- I don't know if that's
9  what your question is.  It's hard to answer.
10      Q    You didn't think that was improper or abusive?
11      A    That's very generally what happens in the
12  course of a tournament, even though the verbiage used
13  might not be acceptable on the street or in everyday
14  business language, it is generally accepted behavior in
15  a tournament environment.
16      Q    So you never complained that Korean-American
17  instructors directed improper abusive conduct toward
18  you?
19  MR. JONES:  Objection, vague.
20      You mean Korean-American instructors?
21  MR. LEVINSTEIN:  Q  Yes.  Or coaches or whatever you
22  call the people who were with the athlete.

66

1      A    I don't remember that being the case.
2      Q    Prior to the Remediation Plan in January of
3  2004, focusing on referee positions, was it your view
4  that certain people were in line for positions?
5      A    I want to restate.  I don't know what the
6  remediation plan was.  I don't know the details of it.
7  I wasn't privy to it.
8      Q    I just gave a date --
9      A    So I don't want to go record to say I have any
10  knowledge about that document or that procedure or that
11  process because I didn't, I don't, and I don't intend to
12  have any knowledge about it.  It's not my business.
13  MR. JONES:  Also could I pose an objection to the
14  vague and ambiguous as to in line to certain positions.
15  MR. LEVINSTEIN:  Q  Prior to January of 2004 was it
16  your view that certain people in the referee ranks were
17  in line for certain positions?
18      A    My general perception had always been that the
19  most qualified, the people with the most seniority for
20  the appropriate positions would be the ones selected.
21  That's the way as I understand tae kwon do has been run
22  for thousands of years.  I could have expected no

67

1  different or nothing to change in the last ten years
2  that would change that perception, that's martial arts,
3  specifically how tae kwon do.  Seniority and rank have a lot
4  it say in how things are done.
5      Q    So it was your view that by virtue of their
6  rank or seniority certain people are supposed to be
7  selected --
8      A    Should have been and experience I said.
9      Q    Even if someone thought they weren't the best?
10  MR. JONES:  Objection.
11  MR. LEVINSTEIN:  Q  Rank and seniority should be
12  taken into position?
13      A    Sorry.
14      Q    Even if someone's view was they were not the
15  best people for the job because of their rank or
16  seniority and their experience, your view was they were
17  supposed to be selected for those positions?
18  MR. JONES:  Objection, vague and ambiguous.
19  THE WITNESS:  I don't believe that's what I said.
20  MR. LEVINSTEIN:  Q  How did people view's peoples on
21  their merit come into this rank and seniority of
22  experience formula?

68

**Page 69**

1    A    How did people's view, I don't know other

2    people's views.

3    Q    If someone is making the decision on who to

4    select, and they believe one person has a lot of merit,

5    personal skills, management skills, whatever skills, was

6    it your view they were supposed to select the people

7    they thought were the best for the position or take into

8    account rank, seniority and experience?

9    A    I can't tell you what went in their mind.  I

10   wasn't privy to that selection process.

11   Q    But what was your view about the way it should

12   run?

13   A    The way I would have done it would be -- would

14   have been based on experience, on rank, on seniority,

15   management skills, business skills, people skills,

16   that's how I would have based my decision.

17   Q    As of the end of 2003 was someone in particular

18   in line to be the referee chair?

19   A    I don't know.  I wasn't privy to that

20   information.  I wasn't part of that process.

21   Q    Did you have a view based on your involvement

22   in refereeing that there was a person who was in line at

**Page 70**

1    the end of 2003 to be the referee chair?

2    A    As I just stated I was not part of that

3    process, it was an appointed position.  There would be

4    no way I would have knowledge of that.

5    Q    What was your view of Mr. Sang Lee and his

6    leadership of the USTU prior to January of 2004?

7    A    Can you be more specific?

8    Q    No.  Did you have a view about whether he had

9    done a good job as the person running the USTU?

10   A    Good job, in respect to what?

11   Q    You identified the problems, administrative,

12   problems, management problems, operational problems.  He

13   was the head of the USTU?

14   A    He was the president.

15   Q    He had been the president for a long time?

16   A    Several years.

17   Q    12 years?

18   A    I don't know.

19   Q    Okay.  Was it your view that he was responsible

20   for a lot of the problems the organization had?

21   A    He was the president and I would assume the

22   buck stopped there.

**Page 71**

1    Q    Did you support him in his leadership?

2    A    There was no reason for me to support or not

3    support him.  I would assume that those people who were

4    members were supporting by actions -- by their action of

5    being a member.

6    Q    And you were a member.

7    A    Yes.

8    Q    What is your view of Gene Lopez and his

9    performance and success as a coach?

10   A    He's awesome.

11   Q    Did you believe prior to 2004 gene Lopez had

12   not been given fair consideration for USTU coaching

13   positions?

14   A    Yes.

15   Q    And why do you think he was not given fair

16   consideration?

17   A    He was -- I believe part of it had to do with

18   him being Hispanic and part of it had to do that he was

19   not liked by certain people.

20   Q    Who in particular?

21   A    Well, I know Barbara did not like him.  She

22   started a petition to get him ousted.

**Page 72**

1    Q    Did Barbara Wakefield have any role in deciding

2    who would be the national coaches?

3    A    I don't know that.  I was not part of that

4    process.  I have no information firsthand of any of

5    that.

6    Q    Besides Barbara Wakefield were there others

7    that you thought didn't like Gene Lopez?

8    A    Don't have firsthand knowledge.

9    Q    You said you thought one of the reasons Gene

10   Lopez had not been first given fair consideration for a

11   USTU coaching position was because he was Hispanic?

12   A    I did not say that.  I said that was my

13   impression.

14   Q    Was it because he was Hispanic or because he

15   was not Korean-American in your impression?

16   A    I believe I said Hispanic.

17   Q    But was it your view that anyone who was not

18   Korean-American had a difficulty getting fair treatment

19   for USTU coaching positions?

20   MR. JONES:  Objection, misstating the testimony.

21   THE WITNESS:  I did not say that.  I repeated it I

22   believe three times.  You asked me a specific about Gene

1   Lopez and I replied about Gene Lopez.

2       MR. LEVINSTEIN:  Q  I understand.

3       A    Thank you.

4       Q    I understand he was Hispanic.

5       A    Yes.  Is.

6       Q    Is Hispanic.

7            Did you view that it would be a problem for

8   Korean-American referees to work for or report to a

9   woman referee chair?

10      A    Probably.  You mean if they were selected?

11      Q    If a woman was selected to be the woman --

12  Strike that.

13           If a woman was selected to be the referee

14  chair, was it your view that there would be unhappiness

15  among Korean-American referees to have a woman as the

16  chair?

17      MR. JONES:  Objection, vague.

18      THE WITNESS:  I can only answer it as vaguely as

19  you're asking it, and, that is, that generally there

20  were no women in the United States qualified -- with the

21  referee credentials qualified to hold that position.

22      MR. LEVINSTEIN:  Q  Well, let's change it then just

1       THE WITNESS:  I believe I answered that.

2       MR. LEVINSTEIN:  Q  Could you indulge me, answer

3   again.

4       A    I said I did not believe that would be the

5   case.

6            Can you have her read back if I did answer that

7   previous?

8       Q    It's okay.

9       A    For my own knowledge, I would like --

10      Q    That is a different question.  It was a little

11  different.  I just asked it a second time.

12      A    Because you seem to take offense at that, and

13  if I misunderstood, I'd like to know that to make sure I

14  am listening properly.

15      Q    If you want you can read the question back

16  for --

17      A    Both questions, the one previous and the last

18  one.

19      Q    If you would make her feel better I think you

20  should do that.

21           (Question read)

22      Q    Your answer was about women and my question

1   to a non-Korean-American.  In your view would it be a

2   problem for Korean-American referees to work for or

3   report to a non-Korean-American referee chair?

4       A    I don't believe that would be the case.

5       Q    In January of 2004 did you believe that having

6   a non-Korean-American referee chair might cause

7   Korean-American referees to stop refereeing?

8       A    As I just stated, we had no one, have no one

9   that is female that is at the level required to hold

10  that kind of respect from the other referees.

11      Q    Did my question have the word female it?

12      A    You said woman.

13      Q    Did I say woman in this question?

14      MR. JONES:  I don't think.

15      MR. LEVINSTEIN:  I don't think I did.  Let me try it

16  again.  I said non-Korean-American.

17      Q    So let's -- was it your view in January of 2004

18  that if a non-Korean-American was chosen to be the

19  referee chair that that was likely to cause

20  Korean-American referees not to want to continue to be

21  referees?

22      MR. JONES:  Objection, vague.

1   wasn't about women.

2       A    The second time, not the first time.

3       Q    Prior to January of 2004 are you aware of any

4   situation involving referee education or referee

5   training at which there was segregation of instructors

6   or referees of Korean-American heritage?

7       A    Yes.

8       Q    Can you tell me about that situation?

9       A    Several situations.

10      Q    Why was that done?

11      A    I don't know.  I was not part of that process

12  or decision making.

13      Q    Were you present when that happened?

14      A    When the decision was made?

15      Q    When they were segregated?

16      A    I was present at the event at which segregation

17  occurred, yes.

18      Q    And did you have a view that that was improper?

19      A    Yes.

20      Q    And can you tell me was it one time this

21  happened or did it happen a number of times?

22      A    Number of times.

1    Q    Who was in charge who caused that to occur?

2    A    Whoever happened to be in charge at that

3  particular point in time for that particular event for

4  that particular association and/or organization.

5    Q    Did you believe it appropriate when that

6  occurred?

7    A    I just stated, no.

8    Q    Did you try to do something about it?

9    A    Nothing I could do.  That was not my position

10  to do that.

11    Q    Are you aware of any situation which

12  Korean-Americans were treated differently concerning

13  referee certification than referees who were not

14  Korean-American?

15    A    Yes, I just stated that.

16    Q    That was segregation of the people, I'm --

17    A    You said treated differently.

18    Q    Concerning their certification.

19    A    Then it probably would be an easier process if

20  you were a little more specific on your questions.

21    Q    I'm trying.  I'm trying.

22    A    I'm trying to answer but you're taking offense

1    A    Generally.

2    Q    So the certification, you mean the actual

3  receiving of the certificate?

4    A    No.  Certification means actually getting

5  certified and/or promoted and/or upgraded in your

6  referee status.

7    Q    And did you have to attend the seminars in

8  order to get upgraded in status?

9    A    That was part of the process, yes.

10    Q    And were there situations in which in your

11  experience prior to 2004 certain people who were

12  Korean-Americans were promoted more quickly than the

13  rules allowed?

14    MR. JONES:  Objection, vague.

15    THE WITNESS:  That situation occurred without race

16  being taken into consideration.

17    MR. LEVINSTEIN:  Q  Well, were you aware of a -- of

18  any situation in which there was discrimination in an

19  effort to artificially increase the number of

20  Korean-American referees?

21    MR. JONES:  Objection, vague.

22    THE WITNESS:  That is an impossible question to

1  or exception with my answers, and I can only answer a

2  vague question with maybe nebulous answers.  That's why

3  I keep asking for more clarification on the questions so

4  that there is no nebulous answer.

5    Q    Focusing on referee certification.

6    A    Yes, sir.

7    Q    Prior to 2004.

8    A    What level of referee certification?

9    Q    Well, were there referee certification programs

10  in Illinois?

11    A    Yes.

12    Q    Were you involved in those?

13    A    How do you mean?

14    Q    Did you attend meetings at which referees were

15  trained and received certification based on their

16  performance at training sessions?

17    A    It wasn't done that way.  The certification

18  followed the seminar.

19    Q    Was there a test given?

20    A    Sometimes.

21    Q    But in general by attending the seminar you

22  later received a certificate?

1  answer.  You need to be a little more specific, please.

2    MR. LEVINSTEIN:  Q  Are you aware of any referee

3  seminars to which only Korean-Americans were invited

4  prior to January of 2004?

5    MR. JONES:  Objection, calls for speculation.

6    THE WITNESS:  I was not in attendance of -- at any

7  of those, and I was not part of the process or decision

8  making in allowing those to occur, if they did occur.

9    MR. LEVINSTEIN:  Q  Is it your understanding they

10  did or did not occur?

11    A    I do not know.  I was not part of that process.

12    Q    I'm going to give you what's been marked as

13  Brunner Exhibit 3, and I apologize because the second

14  page -- it's the best copy I had when I got ready --

15  it's hard to read some of the language on the second

16  page.  I ask if you've seen that document before.

17    (Document marked as Exhibit 3)

18    A    Yes, I've seen maybe not this document, but

19  something similar.

20    Q    Can you tell me who signed it?  Do you know who

21  this letter was written by?

22    A    I can't read that.  Somebody Williams.

1  Millmer.  I can't read --

2      Q    Lori Millmer.  Is that a Lori.  I'm guessing?

3      A    I don't know.  I can't read it.  I can't read

4  half the page.

5      Q    Let's focus on the first page.

6          In March of 2004 was there an Illinois referee

7  seminar held at the school of Day-Inn Kim in Palatine,

8  Illinois?

9      A    Palatine, yes.

10     Q    Did you teach at that seminar?

11     A    I was assisting someone that was teaching.

12     Q    Let me speed this up.  I'll read you what the

13  letter says as I read it, you can tell me if that's

14  correct or not correct.

15     A    I can read it.

16     Q    But for the record so we know what you're being

17  asked about.  The letter from this person says,

18  concerning race discrimination, and it's a letter to Jim

19  Scherr.

20          Do you know who Jim Scherr is?

21     A    No.

22     Q    Were you aware that Jim Scherr was the acting

1  upgraded one level, but let's move on.

2          Was this a seminar in 2003?

3      A    Are we still reading from the letter?

4      Q    Before we read from it -- it says March.  Was

5  this held in 2003 or 2004, do you know?

6      A    I would assume since the letter is written in

7  April that it was probably in reference to the seminar

8  held in March.

9      Q    My only concern is the paragraph says my

10  upgrade and certification arrived in January.

11     A    Probably of 2005.  I don't know.

12     Q    This letter is dated April 12th of 2004.

13     A    I didn't write the letter, sir.

14     Q    So I'm -- you don't remember if the seminar was

15  in 2003 or 2004?

16     A    All right.  Maybe we can call Ms. Williams.

17     Q    Maybe you can tell me.

18     A    I did not write this letter.

19     Q    I know.  But you went to the seminar at the

20  Day-Inn Kim school at Palatine in Illinois?

21     A    Yes, I did.

22     Q    Do you remember if that was 2004 or 2003?

1  chief executive officer of the United States Olympic

2  Committee?

3      A    I just stated I don't know who he is.  Don't

4  get involved at that level.

5      Q    First sentence says, the following instance of

6  racial discrimination should be immediately rectified.

7  Next paragraph says, I attended the March, Illinois

8  referee seminar held at the school of Day-Inn Kim in

9  Palatine, Illinois.  This seminar was taught by Mary

10  Brunner and also attended by Chang Kil Kim the senior

11  vice chair for the USTU Referee Committee.

12          Is that consistent with your recollection?

13     A    Yes.  But I was not the assigned instructor.

14  That's what I tried to clarify to you before.  The

15  assigned instructor was Chang Kil Kim.  I was assisting

16  him.

17     Q    Okay.

18     A    The perception is their perception.

19     Q    So you did teach at the seminar but --

20     A    I assisted Chang Kil Kim in teaching.

21     Q    The person writing the letter says her upgrade

22  and certification arrived in January and she was only

1      A    Actually I don't.  The last one that I attended

2  was in the same timeframe as Chang Kil Kim, the senior

3  vice chair for the USTU Referee Committee.  Again those

4  documents are on file with the USTU.

5      Q    But you don't remember whether it was in 2003

6  or 2004?

7      A    I don't recall at this time.

8      Q    Okay.  It says during the seminar all of the

9  Caucasian referees, coaches and parents were directed to

10  one room of the school and all of the instructors of

11  Korean descent were directed to another room, is that

12  true?

13     A    Yes.

14     Q    It says, none of the Korean attendees have ever

15  refereed any sanctioned USTU tournament as a certified

16  USTU referee and had never before attended an official

17  USTU certification seminar, nor did they have any

18  referee rating prior to this seminar.

19          Do you know if that was correct?

20     A    I do not know.  That information came from who

21  was writing this letter.

22     Q    Then it says Bill Cho, the Illinois Tae Kwon Do

**Page 85**

1   Association President, gave a brief address to us prior
2   to the start of the seminar.
3        Do you recall that?  Is that correct?
4   A   Yes.
5   Q   And then it says, when we asked Bill Cho, the
6   Illinois State Tae Kwon Do President, why there were
7   separate rooms for the same seminar, we were told that
8   they had a language problem.
9        Did you hear Mr. Cho say that?
10  A   Yes.
11  Q   It then says, when one of the referees pointed
12  out that the seminars were supposed to be conducted in
13  English and all attendees should speak or understand
14  English, the referee was told to be quiet by Bill Cho.
15       Do you recall that exchange?
16  A   I believe that occurred, maybe not in that
17  exact verbiage, but I believe the situation occurred.
18  Q   Do you agree that the seminars were supposed to
19  be conducted in English?
20  A   That's by stipulation in the bylaws.
21  Q   So that is a requirement?
22  A   Yes.

**Page 87**

1   A   Top.
2   Q   It's the highest level of referee
3   certification?
4   A   For what?
5   Q   I don't know.  Is there anything above A-1
6   level?
7   A   I don't know what the question refers to.
8   Q   I asked about A-1 level.  You said it's the
9   top.
10  A   Sir, there are hundreds, maybe thousands of
11  organizations within the world.  You need to be a little
12  more specific.
13  Q   Then you tell me what is A-1 level?
14  A   Within what parameters?
15  Q   I'm not trying to mislead you or confuse.
16  You're the one who knows about all these terms.  It's a
17  term that you are familiar with.  I'm asking you -- if
18  you can't tell me what it means, that's okay.  I'm just
19  trying to ask you to explain to me what an A-1 level
20  means.
21  A   I can tell you what it means in several
22  different aspects, but you're asking a very nebulous

**Page 86**

1   Q   And along with that it was basically a
2   requirement that in order to attend the seminar you had
3   to speak or understand English since the seminar was
4   going to be conducted in English?
5   A   I thought I just answered that.
6   Q   I'm just taking it one line at a time making
7   sure we're on the same page.
8   It says, at the conclusion of the seminar Mary
9   Brunner attempted to log the Korean applications on the
10  log sheets.
11       Is that correct?
12  A   Yes.
13  Q   Then it says, Bill Cho literally grabbed the
14  applications out of her hand and stated loud enough for
15  us to hear that he would be handling the Korean
16  applications personally.
17       Did that occur?
18  A   Yes.
19  Q   It then says, it is my understanding that all
20  of the Korean attendees were upgraded right away to A-1
21  level.
22       First, what is A-1 level?

**Page 88**

1   question.  So I am trying to get you to ask me a
2   specific question so I can give you a specific answer.
3   I am also not trying to be evasive, except that I can
4   answer this question for three hours.  I don't think you
5   want that.
6   Q   Do you know what A-1 level meant in the context
7   of this seminar in Illinois?
8   A   Yes.  It's the highest level rank for the USTU
9   certification process for the referee committee.
10       Is that what you meant?
11  Q   Yes.
12  A   Thank you.
13  Q   It says in the letter again, it is my
14  understanding that all of the Korean attendees were
15  upgraded right away to A-1 level.
16       Is that your understanding?
17  A   This is coming from this person.
18  Q   I know.
19  A   All right.  You need to ask her.
20  Q   You don't know the answer to that, whether that
21  happened or not?
22  A   I don't know whether that actually happened or

1    not.  I know that Bill Cho told me that he was going to
2    upgrade them to a higher level.
3         Q    I know.  Was that contrary to the rules?
4         A    Yes.
5         Q    It then says, several of us have talked with
6    and complained to Mary Brunner, the Illinois referee
7    chair.  So let me just ask.  At the time of this seminar
8    were you the Illinois referee chair?
9         A    No.
10        Q    So she's mistaken when she describes you as
11   that?
12        A    Yes.
13        Q    But did several of the people in attendance at
14   the seminar talk with and complain to you about what had
15   happened?
16        A    Yes.
17        Q    Did you tell them that you had been told by
18   Bill Cho several weeks prior to the seminar that Bill
19   Cho would provide all of the referees for the tournament
20   from his organization and that they would be A-1
21   certified from the State of Illinois?
22        A    Yes.  I didn't tell them.

1         Q    Had Bill Cho said that to you?
2         A    Yes.
3         Q    Did you tell the people who complained to you
4    that Bill Cho had said that?
5         A    Some of them, yes.
6         Q    It then says, Mary Brunner further advised Bill
7    Cho that the referees needed to be from any and all
8    schools or organizations and USTU certified in order to
9    conduct a fair state tournament.
10        Is that correct?
11        A    Yes.
12        Q    It says Ms. Brunner also told him --
13        A    I believe I said that to him at the seminar.
14        Q    Okay.  It says, Ms. Brunner also told him,
15   referring to Mr. Cho, that since she had been Illinois
16   referee chair for several years, she was aware of all of
17   the A-1 certified referees in the State and that there
18   were only about five, and three of them was active.
19        So you had not been Illinois referee chair for
20   several years, is that correct?
21        A    No.
22        Q    So let's take that part out of what she

1    thought.
2         A    I don't know what she thought, sir.
3         Q    I understand.
4         A    I cannot speak for someone that wrote this
5    letter.  I cannot speak for someone that is not here.
6         Q    I'm not asking you to speak for her.  I'm
7    asking did you tell Mr. Cho that you were aware of all
8    of the A-1 certified referees in the State of Illinois?
9         A    Yes.
10        Q    And did you tell him that there were only about
11   five and none of them were active referees?
12        A    I don't recall the number.  I don't believe I
13   stated a number.
14        Q    Do you recall that there weren't enough to
15   staff the tournament?
16        A    Absolutely.
17        Q    Did you tell him that?
18        A    Yes.
19        Q    Did Mr. Cho tell you that the referees were
20   certified in Korea?
21        A    Yes.
22        Q    Did you tell Mr. Cho this did not qualify them

1    to referee in USTU events?
2         A    Yes.
3         Q    Did you tell Mr. Cho they would have to go
4    through the USTU referee certification process just like
5    everyone else?
6         A    I believe I would have said they should go
7    through the process like everyone else.
8         Q    Do you believe that was done?
9         A    I don't know what the final result was of the
10   upgrades.  I only know what he told me.  I cannot state
11   what the final upgrades were.  I am not part of that
12   process.
13        Q    It says, Bill Cho scheduled another referee
14   seminar in June or July and invited only Koreans, once
15   again and with the intention of upgrading still another
16   group of Koreans above the level of the Caucasians.
17        Do you think that's correct?  Is that your
18   understanding?
19        MR. JONES:  Objection, calls for speculation.
20        THE WITNESS:  I don't know what Bill Cho did or
21   didn't do.  I wasn't privy to his thinking process, nor
22   was I a part of the process that involved anything to do

1    with the Illinois State Association.

2    MR. LEVINSTEIN:  Q  Okay.  It then says, this

3    referee seminar was scheduled when it was announced that

4    Sang Chul Lee would be ousted from the USTU and they

5    needed to hurry to get this done while his regime was

6    still in power.

7    Did you hear discussions about a hurry to get

8    referees certified before Mr. Sang Lee's regime was out

9    of power?

10   A    No.

11   Q    It says, Ms. Brunner had previously attempted

12   to get some of our Illinois referees double upgraded to

13   rectify previous upgrade errors.

14   Had that occurred?

15   A    Yes.

16   Q    It says, she, meaning you, were told by Eui Bin

17   Lee that he would never authorize more than a one level

18   upgrade and only once per year.

19   Is that correct?

20   A    That's what he said to me, however, he

21   apparently had exceptions for people -- other people

22   because he did it for others, just not for me.

---

1    A    I was not a part of that process, sir.  I was

2    not part of the management group.  You would probably

3    need to speak to Mr. Lee.

4    Q    Eui Bin Lee?

5    A    Yes.

6    Q    Do you know who the members are of the USTU

7    governance --

8    A    Can you read the last three paragraphs or four

9    paragraphs?

10   Q    I would if I could, but I'm not sure what they

11   say.

12   A    Then how is that done for Bill Cho and his

13   group.  The rest of that I cannot read.

14   Q    I'll do my best job.  It says, then how is it

15   this was done for Bill Cho and his group.  Then I

16   believe it says, the Korean attendees should be upgraded

17   like we have been only one level, dash between, have

18   been and only one level.

19   And then if there are -- if there is any,

20   something, attendee who attended either of the two

21   referee seminars that I outlined above, March or

22   June/July that is now higher than a D-3 they need to be

---

1    Q    And was it your view that it had to do with

2    whether they were Korean-Americans, whether they got the

3    double upgrade?

4    MR. JONES:  Objection, calls for speculation.

5    THE WITNESS:  In fact, the knowledge that I have it

6    was -- no, that's not the case.

7    MR. LEVINSTEIN:  Q  Okay.  But in your view

8    different people were treated differently as far as the

9    upgrading process?

10   MR. JONES:  Objection, vague.

11   THE WITNESS:  I don't know.  I wasn't part of the

12   process there.

13   MR. LEVINSTEIN:  Q  Okay.  He told you that you

14   couldn't do double upgrades?

15   A    That's exactly right.

16   Q    But your understanding is he did it for other

17   people?

18   A    Speculation.  I don't know, in fact, if it

19   happened.  I wasn't part of the process or the

20   management group.

21   Q    But you -- it's your understanding that it

22   happened, you were told that?

---

1    immediately downgraded to D-3 level prior to the

2    Illinois State Championship scheduled for April.

3    A    So apparently this person also didn't know if,

4    in fact, that had been done.

5    Q    They understood it happened and they were

6    asking that if it had happened to reverse it, yes,

7    that's my understanding?

8    A    If it had, yes.

9    Q    Well, all he said was that there was the

10   intention of upgrading them, that it had been scheduled

11   in June or July if you read that paragraph?

12   A    As I believe you asked me if in fact it

13   happened.

14   Q    I just wanted to know if you knew whether it

15   happened, yes.  Then it says, not only is this

16   discriminatory, but it is against the law and something,

17   something class action suit if not immediately

18   rectified, but I would prefer to solve this immediately

19   and amicably through you.  And then please provide me a

20   list of the names of Korean attendees in referee

21   seminars held in Illinois in March and in June and

22   please indicate what their current referee rank is,

**Page 97**

1  sincerely, a name of someone I'm not sure what the name
2  is 921 Wildwood Court, St. Charles, Illinois, 60174, and
3  it's addressed to Mr. Scheer with copies to Bob
4  Gambardella, Gary Johansen and Bill Wood.
5  A    Were those copies provided by the USTU?
6  Q    I don't know whether they were sought.  I don't
7  if this they were responsive to any question.
8       Do you know who the members are of the USTU
9  Members Governance Committee?
10  A    I don't know what the committee is.  I don't
11  know get involved at that level, don't intend to, not my
12  job.
13  Q    Simple no is okay.
14  A    It's just you asked several times.  The answer
15  is still the same.
16  Q    Have you ever met or spoken with Virginia
17  Witty?
18  A    Virginia who?
19  Q    Virginia Witty.  Let me speed this up.  Let me
20  just give you some names and ask if you know any of
21  these people.
22       Virginia Witty, Rich Bender, Tony Bangiano,

**Page 99**

1  A    Yes.
2  Q    Prior to 2004 are you aware of any situation in
3  which someone held the position as referee chair and was
4  forced out of the position by President Sang Lee?
5  A    I don't remember anything like that.
6  Q    Have you ever been present at any meetings or a
7  referee business situation in which Korean was spoken
8  and you thought that was inappropriate, the meeting was
9  conducted in Korean or people were --
10  A    There's about five questions there.
11  Q    Let's start again.
12       Have you been present at meetings or referee
13  business situations in which Korean was spoken?
14  A    Yes.
15  Q    Have you been present in those situations where
16  you believed Korean was being spoken in order that the
17  non-Korean-Americans present wouldn't understand what
18  was being said?
19  A    I can't speak for why they did that.
20  Q    Were you in any meeting like that where you
21  objected to discussions being held in Korean when you
22  couldn't understand Korean?

**Page 98**

1  Steven Lock, do you know any of those people?
2  A    I may know their faces having been in a
3  tournament, but I don't recognize any of those names.
4  Q    You did not attend any United States Olympic
5  Committee Membership and Credential Committee Meetings
6  about the USTU during 2003?
7  A    I don't believe so.  Where were they held?
8  Q    You would have known if you attended it.  They
9  were opening meetings to discuss whether the USTU was in
10  compliance with its obligations of the National
11  Governing Body?
12  A    Don't know anything about compliance, don't
13  know anything about remediation, doesn't know anything
14  about that process, nor do I wish to know.
15  Q    Have you ever been terminated or dismissed from
16  any position with the tae kwon do organization?
17  A    Yes.  I stated to you before USTW, briefly I
18  was assigned as the referee chair.
19  Q    How did you end being the referee chair?
20  A    I refused to give them permission to print my
21  referee manual.
22  Q    Did they terminate you as a result of that?

**Page 100**

1  A    Yes.
2  Q    And did it happen a lot or can you remember
3  specific instances?
4  MR. JONES:  Objection, vague.
5  THE WITNESS:  Can you be more specific, please?
6  MR. LEVINSTEIN:  Q  You have a recollection of
7  meetings in which Korean was spoken and you objected.
8  A    Meeting, singular.
9  Q    Meeting, okay.  That's what I wanted to know.
10  It happened one time.  You objected one time?
11  A    Rephrase your question.
12  Q    Meeting.
13  A    Yes.
14  Q    There was a meeting only once where Korean was
15  spoken and you objected?
16  A    That wasn't your first question.
17  Q    I'm sorry.  Let me try again.  I'm not trying
18  to be difficult.
19  A    Neither am I, but I want to be sure I'm
20  answering correctly.
21  Q    You said you were present at meetings, plural,
22  in which Korean was spoken.

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)    6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

Case 1:04-cv-00461-SOM-LEK    Document 250-3    Filed 03/21/2006    Page 27 of 61

1    A    Correct.

2    Q    How many meetings were you at in which Korean

3    was spoken and you objected?

4    A    One.

5    Q    Okay.  When was that meeting?

6    A    Several years ago.

7    Q    What was the -- where was the meeting?

8    A    I don't recall.

9    Q    What was the subject of the meeting?

10    A    Refereeing, credentials, certification,

11    seminar, upgrade, refreshing.

12    Q    Was it the meeting referred to by the letter we

13    just looked at?

14    A    No.

15    Q    Okay.  But it was a meeting about referee

16    certification?

17    A    Referee seminars are about all of those things

18    I just mentioned by nature of the beast.

19    Q    Okay.  And who was it who was speaking Korean,

20    if you recall?

21    A    All of the Koreans.

22    Q    Was there someone running that meeting who

101

---

1    A    Barbara Wakefield approached me while I was

2    corner judging during a match while the tournament was

3    in process and asked me to sign a petition requesting

4    that Gene Lopez be sanctioned as a coach.

5    Q    What was the reason she gave for either in the

6    petition or orally as to why Gene Lopez should be

7    sanctioned?

8    A    She referred to an instance where a bottle was

9    thrown, bounced off the floor while he was in the ring.

10    Q    Thrown by whom?

11    A    Gene Lopez.

12    Q    And did you sign the petition?

13    A    No.

14    Q    Did you think the petition was inappropriate?

15    A    Absolutely.

16    Q    And did you complain to anyone about the

17    petition?

18    A    To her.

19    Q    To anyone else?

20    A    Could be.  I don't recall exactly who.

21    Q    Did you send any letter to anyone about that?

22    A    Yes.

103

---

1    was --

2    A    Yes.

3    Q    Do you remember who that was?

4    A    Whoever the referee chair happened to be at

5    that particular point in time for that particular

6    tournament for that particular organization.  It was an

7    international tournament.

8    Q    You don't remember who the person was?

9    A    Whoever the referee chair was from the WTF.

10    Q    You said there was a situation in which Barbara

11    Wakefield had treated Gene Lopez unfairly?

12    MR. JONES:  Objection, misstates the testimony.

13    MR. LEVINSTEIN:  Q  Was there a situation in which

14    you thought Barbara Wakefield was taking some action

15    versus Gene Lopez that was inappropriate?

16    A    Yes.

17    Q    When did that happen?

18    A    One situation was at the team trials a couple

19    of years ago.

20    Q    Do you remember what year that was?

21    A    No, I don't.

22    Q    What happened?

102

---

1    Q    And to whom did you write?

2    A    Sang Chu Lee.

3    Q    What did you want Mr. Lee to do?

4    A    I don't recall.  I asked for definition of

5    function and/or decision.  I don't recall exactly what

6    it was in the letter, but basically it was inappropriate

7    behavior, it was unethical during the course of a

8    tournament that would determine Olympic participants,

9    and it was absolutely out of line in character, moral

10    and otherwise.

11    Q    What other complaints did you have over the

12    years about Barbara Wakefield?

13    A    I would call that being about the only one.  I

14    didn't like her not defending Kim Davis.

15    Q    Did you believe she was improperly influenced

16    by other people?

17    MR. JONES:  Objection, vague.

18    THE WITNESS:  When she approached me with the

19    petition to sign I would assume that she had been given

20    directive.

21    MR. LEVINSTEIN:  Q  And did you have someone in

22    particular in mind that --

104

**Page 105**

1    A    No, I did not.

2    Q    Was there someone that you thought that Barbara

3  Wakefield looked to for direction?

4    A    Traditionally a lot of people refer -- give

5  deference to their instructors.

6    Q    Is that person sometimes referred to as their

7  master?

8    A    Yes.

9    Q    Was it your view that Barbara Wakefield gave

10  deference in her position as a referee to her master?

11    A    That's not what I said.  I said traditionally

12  that is what is done.  I cannot speak for her.

13    Q    Did you tell people that you thought her master

14  influenced her?

15    A    I don't recall that, but, as I said, I cannot

16  speak for her.

17    Q    Was her master Korean-American?

18    A    Yes.

19    Q    Who was her master?

20    A    Somebody from Minnesota.  Park.  I don't

21  remember his full name.

22    Q    Was it your view that Ms. Wakefield's actions

**Page 106**

1  against Mr. Lopez or the -- trying to get the petition

2  signed was motivated by someone who had animosity

3  against Mr. Lopez because he was Hispanic?

4    A    I cannot say or speak for her.

5    Q    Was it your view in general that some of the

6  discrimination against Mr. Lopez because he was Hispanic

7  came from the Korean-American tae kwon do community?

8    A    We were speaking about Barbara Wakefield.

9    Q    This is a different question.

10    A    That I don't know.  You have to speak with the

11  Korean-American individuals.

12    THE VIDEOGRAPHER:  Mr. Levinstein, we'll have to

13  change the tape in about 5 minutes.

14    MR. LEVINSTEIN:  Want to wait 5 minutes, take a

15  break now?

16    MR. JONES:  Take a break now.  It's been about an

17  hour.

18    MR. LEVINSTEIN:  Is it okay to change the tape

19  early?

20    THE VIDEOGRAPHER:  This is the end of the tape 1 of

21  the deposition of Mary M. Brunner.  The time is 11:06

22  a.m.

**Page 107**

1    (Off the record)

2    THE VIDEOGRAPHER:  This is the beginning of tape

3  number 2 of the deposition of Mary M. Brunner.  The time

4  is 11:15 a.m.

5    MR. LEVINSTEIN:  Q  Did you learn in 2004 that

6  Barbara Wakefield had been appointed the interim referee

7  chair?

8    A    Yes.

9    Q    And how did you learn that?

10    A    Bob Gambardella told me.

11    Q    Was this at the meeting referred to in your

12  declaration?

13    A    Yes.

14    Q    So before the meeting started you didn't know

15  that she had been appointed?

16    A    Not specifically, no.

17    Q    Let me refer to your declaration.  You have one

18  in front of you so let me find my copy.

19    It says on paragraph 4, on or about February 4,

20  2004, while declarant was -- you okay?  I thought you

21  said something.

22    A    No.

**Page 108**

1    Q    Paragraph 4 it says, on or about February 4,

2  2004 while declarant was attending the U.S. Open

3  competition for tae kwon do in Orlando, Florida she did

4  speak with Bob Gambardella the newly appointed chief

5  executive officer for the USTU for approximately 2

6  hours.

7    Was this a meeting that had been set up in

8  advance?

9    A    No.

10    Q    Where did the meeting take place?  I understand

11  it was in Orlando, Florida, but where did you meet with

12  Mr. Gambardella?

13    A    On the floor.

14    Q    What were you doing at that event?

15    A    Refereeing.

16    Q    Were you sitting with him in the stands?

17    A    On the floor.

18    Q    You were standing on the floor where the

19  competition is taking place?

20    A    Sitting on the floor where the tournament was

21  taking place.

22    Q    Sitting on the floor you mean --

1    A    I was sitting in a chair which was placed on
2    the floor during the course of where the tournament was
3    taking place during for the U.S. Open in Florida.
4    Q    Was anyone else with you and Mr. Gambardella
5    when you spoke with him for 2 hours?
6    A    No.
7    Q    Just the two of you were together for 2 hours
8    with no one else around?
9    A    Approximately 2 hours. We were alone. Two or
10    three people came up asked him questions, conversation
11    paused while those people were asked, answered or taken
12    care of and dismissed by Mr. Gambardella and then
13    conversation continued.
14    Q    Do you know any of the other people who came up
15    while you were talking with Mr. Gambardella?
16    A    No.
17    Q    Do you remember them or you just can't remember
18    who they are?
19    A    I didn't know them, nor did I care to know. It
20    wasn't my business.
21    Q    What was the reason that Mr. Gambardella gave
22    you that Ms. Wakefield had been selected?

1    she handled the situation with Gene Lopez, and I had a
2    concern with the -- with which -- with the integrity
3    with which she handled the situation with Kim Davis.
4    They were not disputes. I had no verbal contact with
5    her concerning them.
6    Q    But you complained to Mr. Sang Lee about her?
7    A    In -- in regard to the integrity of the
8    situation. Had it been anyone else in that position, my
9    issue would have been the same. So the issue was not
10    with Barbara Wakefield. The issue was with the
11    situation and with the lack of integrity that occurred
12    in those two specific instances concerning Juan Gene
13    Lopez and, two, Kim Davis.
14    Q    Were there situations in which you believe
15    Ms. Wakefield had caused disputes or problems besides
16    the two you mentioned?
17    MR. JONES: Objection, vague and ambiguous.
18    THE WITNESS: How can I answer something so
19    nebulous? That's impossible to answer.
20    MR. LEVINSTEIN: Q Had you told anyone that Barbara
21    Wakefield had caused disputes and problems?
22    A    Caused disputes and problems, I don't recall

1    A    He said she's the only referee that he had come
2    into contact with the USTU and she had been present at a
3    tournament that he was there also in attendance at. And
4    since he knew her from that tournament he selected her
5    on that basis. My question to him was why wasn't due
6    diligence followed in selecting somebody who was
7    absolutely qualified for the position.
8    Q    At the U.S. Open did certain referees not want
9    to referee for Ms. Wakefield as the interim chair?
10    A    You'd have to ask the referees.
11    Q    Did someone have to speak to the
12    Korean-American referees at the U.S. Open to convince
13    them not to walk up?
14    A    You'd have to speak to the referees. I'm not
15    going to speak for anyone else.
16    Q    Do you know about any such meeting taking
17    place?
18    A    I'm not privy to what took place in their
19    conversations. You would have to ask them.
20    Q    As we heard earlier you previously had disputes
21    or disagreements with Barbara Wakefield.
22    A    I had a concern about the integrity in which

1    that verbiage ever coming out of my mouth.
2    Q    Was there a disagreement you had with
3    Ms. Wakefield about conducting inspection of athletes?
4    A    Disagreement, I don't recall a disagreement.
5    Q    First, what is inspection of athletes?
6    A    Meaning inspection desk?
7    Q    Is there a process where referees have to
8    inspect athletes before matches?
9    A    Well, that can either be done in the ring or at
10    an inspection desk.
11    Q    Okay. Was there a situation in which
12    Ms. Wakefield assigned you to inspect athletes and you
13    didn't think that was appropriate?
14    A    She didn't assign me. She asked if I would do
15    inspections. That position had normally been given to
16    the less senior attendees, of which I was not.
17    Q    And were you upset that it had been -- that
18    assignment was being asked of you instead of someone who
19    was less senior?
20    A    I did not say I was upset. I asked her why she
21    had asked me.
22    Q    And were you unhappy that she asked you?

6/28/2005 Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    Not necessarily. I asked why she had asked me.
2  As I said that -- that position had normally been given
3  to the least senior people. In fact, at the U.S. Open
4  two years before the Canadian, Guy -- his name was
5  Guy -- was asked to do inspection and he asked the same
6  question that I did. That was a common question. He
7  was a sixth degree black belt. That position was
8  normally assigned to less senior attendees.
9    Q    What degree black belt are you?
10    A    Now I'm a sixth degree.
11    Q    Did you believe Ms. Wakefield was
12  discriminating against you?
13    A    I felt that she had selected me when there were
14  other people she could have selected.
15    Q    Did you think there was some improper
16  motivation behind it?
17    A    I don't know her motivation. You'd have to ask
18  her.
19    Q    Did you think it was because you were Hispanic?
20    A    You'd have to ask her why her decision was
21  made.
22    Q    Did you tell her you thought it was because you

113

1  in 2004.
2    A    I don't recall who was the --
3    Q    Had there been referee chairs prior to Ms.
4  Wakefield that you thought had performed badly?
5    MR. JONES: Objection, vague and ambiguous.
6    THE WITNESS: At the dinner table? I mean -- please
7  -- can you be a little more specific? That's a very
8  open question.
9    MR. LEVINSTEIN: Q  Have there been prior referee
10  chairs that you thought had been involved in improper
11  conduct?
12    A    I don't know what their conduct was before or
13  after drink. I didn't spend time with referee chairs.
14    Q    Had the prior referee chairs increased the
15  number and quality of the referees?
16    A    Yes.
17    Q    Had they retained the best referees?
18    A    Retained?
19    Q    Caused the best referees to stay refereeing.
20    A    Yes. You mean the most qualified, the most
21  well trained?
22    Q    Ones you thought were the best.

115

1  were Hispanic?
2    A    No, I did not.
3    Q    Did you tell her it was because you thought --
4  that you were a woman?
5    A    No, I did not.
6    Q    Did you tell her it was because you were not
7  Korean-American?
8    A    No, I did not.
9    Q    Did you accuse Ms. Wakefield of being a racist?
10    A    No, I did not.
11    Q    Prior to Miss Wakefield's selection as the
12  interim chair, who had been the previous referee chairs?
13    A    Eui Bin Lee.
14        Chairs, is that a plural?
15    Q    Yes.
16    A    Eui Bin Lee that I recall. Hong Kong Kim that
17  I recall. Leo -- I don't remember his first name out of
18  Texas. Koang Woong Kim. I don't recall the others if
19  in fact there were others.
20    Q    Focusing on the two prior to Ms. Wakefield.
21    A    Who were they?
22    Q    I don't know. People who were referee chairs

114

1    A    No. That's not the same thing.
2    Q    What makes a referee the best isn't that
3  whether they are the best trained and most experienced
4  and best qualified?
5    A    Not necessarily. They could be best trained
6  and most experienced and make bad judgments in the ring.
7    Q    And it was your view that it was a mistake for
8  Bob Gambardella to select Barbara Wakefield as the
9  referee chair?
10    A    I felt that there were many more -- much more
11  qualified people that could have been selected.
12    Q    Was it your view -- again you've asked this but
13  I want to make sure -- I've asked this before.
14        But was it your view that selecting a referee
15  chair who was not Korean-American would be a mistake?
16    A    My answer would probably be the same as I gave
17  before. Whatever that was I would state that again.
18    Q    Which is it was your view that it mattered
19  whether it was Korean-American or not?
20    A    If that's what I said previously then yes.
21    Q    You said previously that selecting a
22  non-Korean-American referee chair would not, in your

116

1   view, cause the USTU to loss Korean-American referees?
2       A    To explain again.  The tradition of tae kwon do
3   is held on rank and seniority.  Along with that comes
4   respect.  When you have the first two, you generally
5   also have the respect of the individuals with whom you
6   are dealing.  If you do not have the respect, regardless
7   of if they're pink, yellow, gold, whatever, that won't
8   happen in the tae kwon do community.  It is very
9   difficult for me to take direction from one of my own
10  students.  Why?  Because I have more knowledge than they
11  did, which is why I am the master instructor at my
12  facilities.  Make sense?  And that follows with
13  referees.
14      So it would be horrible and unspeakable to
15  request that a D-3 level referee be assigned as any form
16  of position and expect others to follow.  It's not done.
17      Q    Did you have a view if the person who the USTU
18  selected to be the referee chair needed to have respect
19  in the Korean-American community and in the
20  non-Korean-American referee community?
21      A    Absolutely.
22      Q    Did you view that these were two separate

1   communities of the referees?
2       A    They were two separate races being addressed,
3   yes.
4       Q    And they needed to both be addressed,
5   separately?
6       A    They need -- state your question again.
7       Q    They both needed to be addressed?
8       A    That wasn't your initial question.
9       Q    They both needed to be addressed separately,
10  that was my initial question.
11      A    No.  The respect needed to come from both
12  factions.
13      Q    And was it your view that the only people who
14  had the likelihood of being respected by those groups
15  were Korean-Americans?
16      MR. JONES:  Objection, vague and ambiguous, and also
17  misstates the testimony.
18      THE WITNESS:  Fourth time.  I will state it again.
19  Respect came from seniority, from experience, from rank.
20  I believe I've already answered that three times.  The
21  answer is the same.  It would not have made a difference
22  to people of rank and experience within the tae kwon do

1   community who it was as long as those credentials were
2   there.
3       MR. LEVINSTEIN:  Q  Were there any
4   non-Korean-Americans who in your view had seniority,
5   experience and rank sufficient to hold that referee
6   chair position?
7       A    I believe I also answered that before.
8       Q    No, you didn't.
9       A    Yes, I did.  At the beginning you asked that,
10  and I said yes, there were.
11      Q    Were there particular people that you believed
12  should have been the key candidates to be the referee
13  chair?
14      A    Anyone that had the experience, the credentials
15  and held the respect of most of the referees could have
16  qualified as that, and there were several people in that
17  category.
18      Q    Were there two particular ones that you
19  recommended?
20      A    To whom?
21      Q    To Bob Gambardella.
22      A    One of them I believe was Chang Kil Kim.

1       Q    Is there another that you recommended as well?
2       A    There was.  I don't remember who.
3       Q    How about Koang Wong Kim?
4       A    Koang Woong Kim.  He had been a previous
5   referee chair.  Very highly respected, ninth degree --
6   tenth degree back belt, special class international
7   referee status.
8       Q    How had he stopped being the referee chair?
9       A    I don't know.  I believe that was an appointed
10  position so whomever was in charge of the USTU at that
11  point would appoint on who they wished to have as
12  referee chair.
13      Q    Had he been forced out?
14      A    I have no knowledge of that.
15      Q    Was there a situation at the U.S. Open in 2003
16  or 2004 in which there was almost a walkout by referees?
17      MR. JONES:  Objection, vague.
18      THE WITNESS:  You'd have to ask all the other
19  referees.
20      MR. LEVINSTEIN:  Q  You don't know of such a thing?
21      A    I was not involved in anything like that.
22      Q    You weren't aware of anything like that?

6/28/2005 Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1      A    I was not involved in anything like that.

2      Q    Were you aware of anything like that?

3      A    As I said, you have to ask the other referees.

4    I don't get in anyone else's mind.  I only deal with me.

5      Q    Was there a walkout of referees at the 1999

6    Junior Olympics?

7      A    Where was that held?

8      Q    I don't know.

9      A    You have to give me a location.  I don't go by

10   dates.  Referees walked out of one of the tournaments

11   that I was at.

12     Q    Why did they walk out?

13     A    I don't know.  They shut down the tournament,

14   we sat there and watched for two hours.  I wasn't

15   officiating.  So I don't know.  I have personally never

16   been involved in a walkout.

17     Q    So your meeting with Bob Gambardella was on the

18   floor, not at lunch?

19     A    I believe it was both.  I believe we had two

20   separate meetings at that -- at that tournament.  I

21   believe we talked briefly on the floor and then I

22   believe during lunch we sat at a table for a little

6/28/2005 Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    while.

2      Q    Well, but there was a 2-hour meeting on the

3    floor you said?

4      A    Between the two, the floor is wherever the

5    referees are.

6      Q    Okay.  There's two hours on the floor then

7    there was a meeting at lunch?

8      A    Together I spoke with him for approximately 2

9    hours.

10     Q    Okay.  And you were meeting with him in what

11   capacity?

12     A    I just wanted to discuss some of the questions

13   that came to my mind concerning the USTU and its

14   direction.

15     Q    Besides Barbara Wakefield's appointment what

16   other issues you were concerned that you wanted to

17   discuss with Bob?

18     A    I was not concerned with Barbara Wakefield's

19   "appointment".  I had an issue with the most qualified

20   referee chair.  Those are your words.  I also asked

21   about the direction of the USTU, I asked about future

22   plans, I asked about why some of the things had been

6/28/2005 Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    done the way they had been done, what were his plans for

2    the future, how was he going to clear up some of the

3    situations that had existed in the past.  Basically how

4    it was going to affect my business.

5      Q    You introduced yourself to him?

6      A    Yes.

7      Q    He knew who you were?

8      A    I gave him my name.  At that point I assumed he

9    remembered the name.

10     Q    You spent a very long time discussing all these

11   issues with him?

12     A    Is a very long time approximately 2 hours?

13   That's how long I spent.

14     Q    We've only been going two-and-a-half.

15     A    Approximately.  I didn't time it.  I didn't

16   think I had to.

17     Q    But you had no doubt that he knew who you were

18   and knew what you were meeting about?

19     A    No.  I introduced myself.  He didn't know who I

20   was before then.  I didn't know who he was.  I didn't

21   even know what his last name was.  I had to introduce

22   myself to him.

6/28/2005 Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1      Q    You knew he was the CEO of the USTU?

2      A    No.  I knew he was supposedly in charge.  I did

3    not know what his title was, didn't care.

4      Q    According to your declaration --

5      A    Which item number?

6      Q    Paragraph 5.  It says, declarant inquired of

7    Mr. Gambardella to the reason why Ms. Barbara Wakefield

8    was appointed by him as the interim referee chairperson

9    of the USTU.

10          He told you because she was the only person

11   that he knew?

12     A    Whatever I stated before.

13     Q    And did you ask him why a particular person --

14   it says, specifically declarant asked why someone who

15   had more support in the tae kwon do referee community

16   including racial minorities such as Korean-Americans had

17   not been selected.

18          Was it your view that racial minorities such as

19   Korean-Americans had more support in the tae kwon do

20   referee community?

21     A    Restate the question.

22     Q    It says, you asked him why someone who had more

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)    Document 250-3    6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

Case 1:04-cv-00461-SOM-LEK    Document 250-3    Filed 03/21/2006    Page 33 of 61

1   support in the tae kwon do referee community, including
2   racial minorities such as Korean-Americans had none
3   selected, is that correct?
4       A    As I stated before, anyone with the proper
5   seniority, with the proper rank, which follows that you
6   get the respect of the referees, would have been
7   acceptable.
8       Q    Let me first give you Exhibit 4.
9           (Document marked as Exhibit 4)
10      Q    I ask you if you've seen that letter before.
11      A    Do you purposely reduce all of these so people
12  can't read them.  This is reduced, right?
13      Q    I don't think so.
14      A    70 percent, yes.  Yes, I wrote this document.
15      Q    And for the record, this is a 3 page letter
16  dated June 22nd, 2000 from you to Sang Lee, the USTU
17  president, Sang Chul Lee, is that correct?
18      A    Yes.  It's dated June 22nd, date to Sang Chul
19  Lee, USTU President, from me, copied Gary Johansen,
20  Jerome Reitenbach, Mark Bryant, Kim Dotson-Peck, Rhoda
21  Sweet.
22      Q    This is the letter you referred to earlier

125

1       Q    And on the second page you talk about --
2       A    We're skipping over the rest of the first page?
3       Q    You want to read it, you're certainly welcome
4   to.
5       A    I know what it says.
6       Q    But you were complaining about conduct that we
7   talked about earlier about Barbara Wakefield?
8       A    I was complaining about -- I believe this is
9   the fifth time that I've stated this, the situation that
10  appeared that -- that occurred at that tournament
11  expressing lack of integrity on the part of what
12  happened in that particular situation.  Had it been
13  anybody else in that position other than Barbara
14  Wakefield, my response would have been exactly the same.
15  The situation is what was bad as it states in the first
16  paragraph, to bring a negative issue.
17      Q    Okay.  And on page 2 you indicate that Gene
18  Lopez should not be sanctioned and that he --
19      A    Which paragraph are you referring to?
20      Q    Says two important thoughts on top of third
21  paragraph of page 2.
22      A    Third paragraph, yes.

127

1   about the incident involving Gene Lopez and Barbara
2   Wakefield?
3       A    Yes.
4       Q    It says in the first paragraph that you're
5   writing to bring a negative issue to Mr. Sang Chul Lee's
6   attention, is that correct?
7       A    Yes.
8       Q    And it says that you believe that both Barbara
9   Wakefield and Ji Ho Choi took actions you found to be
10  improper in the next paragraph?
11      A    Yes.
12      Q    In the second paragraph it says, I repeat what
13  I have always said in the past.  I believe strongly in
14  your leadership, the USTU and the ideals which we as an
15  organization compositively project to the rest of the
16  world.
17          Was that correct?  Was that your view?
18      A    Yes, that's why I wrote it.
19      Q    You believe strongly in Sang Chul Lee's
20  leadership?
21      A    Yes.  As I would believe strongly in the
22  leadership of any person.

126

1       Q    Why were you even thinking about sanctioning
2   the one and only coach who trained and coached 6 out of
3   20 competitors who competed at the Olympic team trials.
4   No one else in the USA or in the world for this matter
5   can claim such as accomplishment.  He is obviously doing
6   something right.
7           Those were your views about Gene Lopez?
8       A    Those are facts.
9       Q    It says we should be petitioning to have Gene
10  Lopez nominated to act as USTU national coach, not
11  threatening to sanction him over a plastic water bottle
12  thrown at the floor.
13          That was your view as well?
14      A    That's also fact.
15      Q    And again you said earlier you thought that
16  Mr. Lopez had not been treated fairly for positions in
17  the USTU at the coaching level because he was Hispanic?
18      A    Is that what I said?
19      Q    Yes.
20      A    Yes.
21      Q    Okay.  The next paragraph refers to a Las Vegas
22  incident that Barbara Wakefield and Ji Ho Choi evidently

128

**Page 129**

1    had been instigators at.
2          What was that referring to?
3    A    The next paragraph.
4    Q    If you look at the bottom of paragraph 2 it
5    says, the whole scenario with the petition seemed like a
6    repeat of the Las Vegas incident with Barbara Wakefield
7    and Ji Ho Choi as instigator once again.
8    A    I believe there was a tournament at which they
9    had requested a walkout.
10   Q    Who is they?
11   A    Those two individuals, I believe.  As I said, I
12   wasn't officiating when that walkout took place.  I was
13   there with my team and we waited for several hours until
14   it was resolved.  And I believe that it was that
15   incident for which Ji Ho Choi ended up being sanctioned
16   as a referee.  The only way you can get sanctioned is if
17   you did something really, really wrong.  Otherwise, you
18   can't get sanctioned.  So obviously whoever it was that
19   sanctioned him and initiated that action was in
20   consensus of opinion with me because he wouldn't have
21   been sanctioned otherwise, nor would it have stood if it
22   wasn't correct.  So someone in the USTU agreed and had

**Page 131**

1    anything derogatory by that individual to the judges
2    that are then judging that individual on merit and on
3    performance, which is exactly what happened.  That was
4    my objection.
5          If there was some sanctioning to be done, if in
6    fact it was legitimate, if in fact it was called for, it
7    should have been either prior to the tournament or after
8    the tournament, but not during.  All of us there in
9    attendance as referees were in a position that we had to
10   judge and comment via our scores on those individuals.
11   That was improper to do during the course of a
12   tournament while the judging was taking place.  Do it
13   after.  That was my contention, that's why I didn't want
14   to get involved with it.  I thought it was improper.
15         Had I been involved with a walkout that Ji Ho
16   Choi and Barbara initiated during some other tournament,
17   I would have said the same thing, it's improper.  If you
18   want to handle it, handle it another way.  I won't walk
19   out on a tournament, which is why I personally have
20   never been involved in a walkout.  It's not ethical to
21   do that.  We are there as officials for the benefit of
22   the competitors, and if you can't do that job, you

**Page 130**

1    him sanctioned.  I don't know who they were, but he was
2    sanctioned.
3    Q    And how was this incident of Mr. -- with
4    Mr. Lopez related to or how did it seem like a repeat of
5    the Las Vegas incident?
6    A    Let me read the whole paragraph.  On reflection
7    it seems that Ji Ho Choi attended this tournament for
8    only reason, to cause another problem for the USTU in
9    retaliation for his so-called punishment, that
10   sanctioning.  The whole scenario with the petition
11   seemed like the repeat of the Las Vegas incident, with
12   Barbara Wakefield and Ji Ho Choi as instigators once
13   again, which is exactly what happened when he got
14   sanctioned.  So it's very clear.
15   Q    This was a case where they are circulating a
16   petition to ask for Gene Lopez to be sanctioned?
17   A    Yes, to cause a problem for the USTU and the
18   tournament and the whole process.
19         To circulate a document asking that someone be
20   sanctioned who is actively participating in the
21   tournament is unethical.  That is like saying in the
22   middle of a track run during the Olympics somebody says,

**Page 132**

1    shouldn't be there in the first place.  That's how I
2    felt about this situation.
3          Had it been Barbara or anyone else, my feeling
4    would have been the same.  This memo was written, not
5    contrary to Barbara or anyone else, but contrary to the
6    situation that took place.
7    Q    But in this Las Vegas incident you were very
8    disturbed that Barbara Wakefield as a referee would be
9    involved in a walkout?
10   A    I will have been, would have been, will be in
11   the future, disturbed that anyone would do it, not
12   specifically Barbara, not specifically Ji Ho.  If you
13   were the referee that initiated a walkout, I would feel
14   just as strongly about you personally, because it
15   affects me, it affects my income and my school.  It
16   affects the impression that my parents and my
17   competitors that are sitting at that tournament
18   observing what is happening in a very negative manner.
19         I don't teach that way at my school.  I
20   personally don't follow those principles.  So when lack
21   of integrity rears its ugly head, it will have a
22   negative response for me regardless of who is involved.

1   Q   What was the problem in Las Vegas --

2   A   I don't know.

3   Q   Let me finish my question.

4   A   Sorry.

5   Q   What was the problem in Las Vegas that lead
6   Barbara Wakefield and Ji Ho Choi to be involved in a
7   referee walkout?

8   A   I don't know.

9   Q   So you can't imagine anything whatsoever that
10  might have occurred that might have justified referees
11  considering walking out of a tournament?

12  A   As I just said, had someone asked me to walk
13  out I would not have done that, as I didn't do when
14  those occasions were presented to me.  My personal
15  decision is and will always be referees are there for
16  the benefit of the competitors, not self-serving their
17  own ambitions, whoever those might be, whatever those
18  might be.  I personally would not think positively about
19  someone staging a walkout when there are 4,000 people
20  waiting for a tournament to continue.  It's unethical to
21  do that.

22  Q   Moving down the page.  There's a sentence in

1   discrimination.

2   Q   I know what it says.  I'm trying clear that up.

3   A   I'm repeating that.

4   Q   You didn't know the reason or had any reason to
5   know what Ms. Wakefield's motivation toward Mr. Lopez
6   was, but you were saying because he is Hispanic someone
7   might claim that it was because of racial
8   discrimination?

9   A   I'll repeat -- I'll read what I wrote because
10  it's very clear.  It doesn't need clarification.  Only
11  one coach was singled out in that petition, he was
12  Hispanic.  There is potential for a case of race
13  discrimination by law.  That's not my decision that's
14  law, Article VII.

15  Q   But he was singled out, according to the
16  petition, because he threw a bottle, correct?

17  A   I don't know why.  I didn't read the whole
18  thing.  I didn't sign it.  I refused to sign it.  You
19  need to speak with whomever wrote the document.  And I
20  don't know who that was.

21  Q   But if you look at the first page of this
22  document, at the bottom of the fourth paragraph, it

1   the middle of the long paragraph under the fourth bullet
2   that says, also since only one coach who is Hispanic was
3   singled out, there's potential for a case of racial
4   discrimination.

5       Do you see that?

6   A   Yes.

7   Q   Was that your view about what was going on here
8   with Mr. Lopez?

9   A   Any time someone of ethnicity is targeted
10  there's potential for legal action.

11  Q   Whether it's because of their race or not?

12  A   Any time that someone that is targeted because
13  of ethnicity --

14  Q   Well, you said anyone who is targeted who is of
15  an ethnic background.

16  A   Of a specific ethnic background is -- is
17  putting themself liable.

18  Q   But -- slow down.  Did you know that the reason
19  Barbara Wakefield was targeting Gene Lopez was because
20  he was Hispanic?

21  A   Since only one coach who is Hispanic was
22  singled out, there is potential for a case of racial

1   says, for some reason a plastic water bottle thrown at
2   the floor was considered worthy of a petition.  So it's
3   the throwing of the water bottle that led to the
4   petition?

5   A   I don't know that.  I didn't write the
6   petition.

7   Q   But whether it was or wasn't a plastic water
8   bottle that was involved, because only one coach who is
9   Hispanic was singled out, it was your understanding
10  there was a potential for a lawsuit claiming race
11  discrimination?

12  A   That's what I stated in the letter.

13  Q   On the last page there's a sentence that says,
14  twice now I have seen this sort of support initiated.
15  The other one involved Barbara Wakefield and a Korean
16  referee at the Louisville Junior Olympics.

17  A   Where are you reading?

18  Q   The second bullet on the last page.

19      Twice now I have seen there sort of support
20  initiated.  The other one involved Barbara Wakefield and
21  a Korean referee at the Louisville Junior Olympics.
22  Does this mean that all referees should openly rebel

1    only if Ms. Wakefield is mistreated?

2          Do you recall what that refers to?

3      A.  Yes.  Again I was not officiating at that

4    tournament.  I was there with my team.  You want my

5    hearsay evidence?

6      Q.  I want to know what you're referring to when

7    you wrote that --

8      A.  It's all hearsay.  You want me to tell you what

9    I heard?  I wasn't officiating.

10      Q.  You said you saw something that happened.

11      A.  This sort of action --

12      Q.  I want to know what you saw in Louisville.

13      A.  I wasn't officiating.  We were told in the

14    audience that she had had an altercation with a Korean

15    referee and she was demanding that the Korean referees

16    apologize to her, otherwise, all of the referees should

17    walk out if that did not occur.  That's what we were

18    told.

19      Q.  And it says this sort of support initiated.

20      A.  Let's walk out if I don't get my apology.

21      Q.  Was there something about a walkout involved in

22    the Gene Lopez petition?

137

1      A.  I don't know.  I didn't read the petition as I

2    stated three times before.  I just refused to sign it

3    when she gave me the general gist of it.

4      Q.  And focusing on the last sentence, you

5    believed -- it says my final comment at the referee

6    meeting was that I have enough integrity that I will not

7    "railroad" without due diligence and due process.

8         Did you believe that Ms. Wakefield and Mr. Choi

9    were railroading Gene Lopez without due diligence and

10    due process?

11      A.  When you're asked to sign a document in the

12    middle of a match while you're sitting in the ring not

13    allowed to read and/or discuss and/or give objections to

14    or rewrite a document that everyone is asked to sign,

15    yes.

16         If a document is going to be signed by a group

17    of people, it should be reviewed, voted on and composed

18    by that group of people, not by one or two individuals

19    and then pretty much strongarmed into signing it.

20      Q.  Let me show you what's been marked as Brunner

21    Exhibit 5.

22         (Document marked as Exhibit 5)

1      Q.  Do you recognize this letter?

2      A.  Yes, I wrote the document.  It's dated

3    February 26th to Bob Gambardella from me.

4      Q.  It's four pages long.  And did you write and

5    send it around February 26th, 2004?

6      A.  If that's when I dated it, I would assume that.

7      Q.  And beginning it says, thank you for your

8    letter thanking me for donating my time to referee at

9    the U.S. Open.

10         Did you get a letter from Bob Gambardella that

11    thanked you for refereeing?

12      A.  I would assume that.

13      Q.  Do you remember receiving such a letter?

14      A.  No.

15      Q.  It says, that is a first for me and greatly

16    appreciated.

17         Is that true it was a first time someone had

18    sent you a letter thanking you for refereeing?

19      A.  No.

20      Q.  What was the first for you?

21      A.  I don't know.  I don't remember.  This was a

22    year plus ago.

139

1      Q.  It says, I also thank you for taking the time

2    to visit with me at the U.S. Open.  I was the lady you

3    talked to at lunch.

4      A.  Yes.

5      Q.  Did you put that to make sure he remembered who

6    you were?

7      A.  I don't remember.

8      Q.  If you look down close to the bottom of the

9    page, the next to last paragraph, it says, it was

10    announced at our referee meeting that you appointed an

11    interim referee chairman based solely on the fact that

12    you had some personal contact prior to the U.S. Open.

13         What referee meeting was that?

14      A.  Probably the referee meeting.

15      Q.  Okay.  At the U.S. Open?

16      A.  Yes.

17      Q.  Before you met with Mr. Gambardella?

18      A.  I would assume Gambardella is the one that gave

19    the information at the referee meeting.

20      Q.  Okay.  It then says, you also confirmed that

21    Barbara was the only person you interacted with prior to

22    your appointment and therefore selected her.

140

1    So was that at the referee meeting?

2    A    No.  That was probably in my conversation with

3    him because he would have confirmed it to me.

4    Q    If you look at the last paragraph on the page, you

5    had testified earlier that the previous referee chairs

6    had increased the number and quality of referees, but

7    the last sentence says, we have lost approximately 100

8    very good and qualified referees during the tenure of

9    the last two referee chairs.

10    What does that refer to?

11    A    That we have lost approximately qualified

12    referees during the tenure of the last two referee

13    chairs.

14    Q    Turn to the next page, it says, of course, some

15    attrition is also always expected but neither of the

16    last two referee chairs did much to cultivate, motivate

17    nor recruit and train additional replacement referees.

18    Rather they were involved in misusing funds and open

19    favoritism which resulted in so many of our good

20    referees quitting, never to return.

21    Is that your view on that date?

22    A    On that day, yes.

---

1    So contrary to what you said earlier it was

2    your view in 2004 that only two Korean-American referees

3    met the requirements to be the referee chair?

4    A    The position -- the previous paragraph says,

5    requires a strong leader, several years of business

6    management experience and strong administrative and

7    organizational skills.  The referee chair should also

8    have seniority, both in age and rank.  It is common

9    respect from the tae kwon do --

10    Q    To command respect?

11    A    To command respect.  From both the American and

12    Korean-American referees, and most importantly have some

13    degree of influence with the world of Tae Kwon Do

14    Federation, whose technical rules and regulations the

15    USTU follows.

16    Yes, that is true in those statements.  There

17    are, however, many referees who have the seniority and

18    the experience to fill the position of referee chair.

19    However, I was specifically referring to the influence

20    in the World Tae Kwon Do Federation, which is the mother

21    organization for the USTU.  So the statement is true

22    with reference to the WTF involvement.

---

1    Q    That your view today?

2    A    Probably.

3    Q    If you look at the bottom of the next

4    paragraph, it says -- leaving out the and so, the last

5    line, it is very important how our positions as referees

6    are perceived and accepted, most especially at the state

7    level.  I have endured being cursed, shouted at and

8    physically pushed by Korean-American instructors.

9    Is that the case?

10    A    Yes.

11    Q    Why earlier when I asked you if you had any

12    kind of abusive or similar conduct by Korean-American

13    instructors you answered none that you were aware of?

14    A    Not that I remembered.  Probably didn't

15    remember it, and yes, I do.

16    Q    You said earlier that there were a number of

17    people who were qualified to be referee chair, but if

18    you look down about four more paragraphs, this paragraph

19    starts, in my opinion -- in my opinion there are only

20    two people who satisfy these requirements Koang Woong

21    Kim from Kenosha, Wisconsin and Chang Kil Kim from

22    California.

---

1    Q    So because you thought WTF involvement was

2    important as well, it was your view that only two

3    Korean-Americans were qualified to satisfy the

4    requirements to be the referee chair?

5    A    I believe Mr. Gambardella agrees with me in

6    that regard because now he has actively sought and

7    received a position with the international community

8    understanding he -- he understands clearly that that's

9    necessary in tae kwon do and has, therefore, sought and

10    accepted a position with the world organizations.

11    Q    But back to my question.  It was your view at

12    this time that the only two people who met the

13    requirement to be referee chair when you took into

14    account the involvement with the World Tae Kwon Do

15    Federation were two Korean-Americans?

16    A    No.  This states that they had influence with

17    the world tae kwon do community at that point in time.

18    That does not say there were not other people qualified

19    to hold that position.  That does not say that there

20    were other people who did not have the proper seniority

21    and/or credentials and/or influence in the nation to

22    hold that position.

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

**Page 145**

1   It merely states these two individuals had a
2   great deal of influence with the WTF, the mother
3   organization, the World International Federation, and
4   Mr. Gambarella agrees with that summation because he has
5   now sought a position with the PATU group, understanding
6   that he needs the world involvement.
7        Q   But back to what you said.  Given that
8   requirement that you have some degree of influence with
9   the WTF in your opinion there were only two people who
10  satisfied those requirements?
11       A   At that point in time they had influence with
12  the World Tae Kwon Do Federation, that was necessary and
13  I feel it still is, but that does not preclude that
14  there are not other individuals who do not have the
15  proper credentials, rank, seniority and following within
16  the U.S. that can hold a referee chair position.  There
17  are several people like that.
18       Q   I asked you earlier if you thought that an
19  American referee chair would cause the USTU to lose
20  Korean-American referees, and you said no, you hadn't
21  held that view, you never expressed that view.  Do you
22  recall that?

**Page 147**

1   lies with the responsibility of the job and not personal
2   relationships.
3        What did you mean by saying that -- by being
4   forced out it shows that he had integrity?
5        A   I don't recall.  Whatever it was that I was
6   thinking at the time.  This was a long time ago.
7        Q   Next paragraph down it says, Chan Kil Kim
8   continues to be a leading candidate for the position,
9   and it is very unclear to me and to many others as to
10  why he was not assigned to oversee the U.S. Open.
11       By that you mean why he wasn't picked to be the
12  interim referee chair?
13       A   No.  Why he was not assigned to oversee the
14  U.S. Open.
15       Q   Who was assigned to oversee the U.S. Open?
16       A   Barbara Wakefield.
17       Q   Then the next paragraph you say in the middle,
18  senior referee chair Chan Kil Kim was next in line for
19  that position, the position of chair of the referee
20  committee.
21       Do you see that?
22       A   Yes.

**Page 146**

1        A   I said not necessarily so.
2        Q   Can you read the next paragraph where it says
3   "An American referee chair will most certainly cause us
4   to lose the Korean-American referees."
5        A   As it has.  That was my opinion at that time.
6        Q   So you did express that view?
7        A   Apparently.
8        Q   And your view it is that having an American
9   referee chair is what caused those people to leave?
10       A   It has caused a great deal of people to leave,
11  not just Korean-Americans.
12       Q   Okay.  The next paragraph, I had asked you
13  whether anyone had been forced out of referee chair
14  position, and you said you had no knowledge of such
15  things.
16       A   I believe I said I didn't recall.
17       Q   You said you had no knowledge of such things.
18  I think the record will speak for itself.
19       It now says, Koang Woong Kim was forced out of
20  the referee chair position by Sang Lee and continues to
21  be an excellent candidate.  Since he was forced out of
22  office, it goes without saying that this man's integrity

**Page 148**

1        Q   That was your view that he was in line for that
2   position?
3        A   Senior referee denotes he's senior.
4        Q   Your view was people moved up through the ranks
5   and based on rank and seniority they were in line to get
6   the higher positions as those positions came open?
7        A   Tae kwon do is generally dealt with in rank and
8   seniority through thousands of years.  I don't believe
9   that has changed in the last year.
10       Q   That's fine.  Did you think that was right?
11       A   Martial arts, the word martial means military,
12  and it's the always been taught very much in the fashion
13  of the military that has rank.  That's what martial arts
14  is about.
15       Q   But the United States military, people often
16  are promoted above others if their merit exceeds the
17  people above them.  So --
18       A   But in proper sequence.  They don't go from
19  someone who is enlisted to general.
20       Q   But just because someone has got a higher rank
21  doesn't mean he is in line to get a promotion?
22       A   Is that a question?

1    Q    Isn't that correct?

2    A    No.

3    Q    So it was your view that it was traditional or

4    it was the way it had always been done in tae kwon do

5    that you moved up by rank and, therefore, the most

6    senior people should get positions when they became

7    open?

8    A    By rank, by seniority, those are the people

9    with the most experience period.

10    Q    But focusing on the USTU, through 2004 you said

11    with those people having those positions there had been

12    administrative problems, management problems and

13    operational problems at the USTU.  Isn't it possible

14    that the people with the rank and seniority didn't have

15    good administrative, management and operational skills?

16    A    Yes, that's possible, and probable and probably

17    is continuing to this day in the general -- in the

18    present organization.

19    Q    If you go three paragraphs down on the next

20    page, it talks about the U.S. Open and it says Mr. Kim

21    stood up, and in Korean, dressed down all those who

22    spoke Korean telling them they should support and

1    Wakefield had been picked as the acting referee chair?

2    A    I don't know what they were saying.  I don't

3    speak Korean.

4    Q    Well, you knew what he said to them?

5    A    No.  I heard people behind me describing.  I

6    didn't know because I don't speak Korean.

7    Q    You know that you were told that he spoke

8    Korean to tell them they should support and respect the

9    acting --

10    A    The body language is an indicator.  Everyone

11    dropped their head which means respect and listen to

12    whoever is speaking.

13    Q    But someone had to tell you what he said in

14    order for you to know that he was talking about the

15    acting referee chair?

16    A    I just said I heard the conversations from

17    people behind me.

18    Q    In English?

19    A    I don't speak Korean, exactly.

20    Q    So they told you that there was some sort of

21    problem with the referees not respecting the acting

22    referee chair and Mr. Kim stood up and told them that

1    respect the acting referee chair.

2        Do you see that?

3    A    Yes.

4    Q    You previously told me you didn't know anything

5    about any of these conversations that happened in

6    Korean?

7    A    I probably said I didn't recall it.

8    Q    Okay.  Why did he need to make those

9    statements?

10    A    You need to ask him.  I don't know why he did

11    it.

12    Q    Actually it says, next sentence, he did not

13    need to make that statement.

14        What were you referring to?

15    A    He stood up and dressed down those who spoke

16    Korean telling them they should not support --

17    Q    They should support?

18    A    That they should support and respect the acting

19    referee chair.

20    Q    So are you saying that the Korean-American

21    referees, because that's who he was speaking to in

22    Korean, were saying they were very angry that Barbara

1    they should?

2    A    Not necessarily did they say there was a

3    problem.  They said he was dressing them down.

4    Q    Why would he be dressing them down if there

5    wasn't a problem?

6    A    You need to ask him.

7    Q    But you were writing about this to

8    Mr. Gambardella?

9    A    Correct.

10    Q    The next -- you said you didn't know who

11    influenced Barbara Wakefield but --

12    A    Which paragraph are you on?

13    Q    Next sentence says while Barbara Wakefield is a

14    good referee, she has always been strongly influenced by

15    her personal instructors and others in position of

16    power.  This was confirmed when her instructor Mr. Park

17    from Minnesota remained at the referee area for the

18    entire tournament.  Ms. Wakefield had to consult with

19    him several times during breakfast, lunch and dinner

20    consultations.

21        What did that they discuss during breakfast,

22    lunch and dinner?

1    A    I wasn't there.

2    Q    How do you know she was consulting him and not

3    just having meals with him?

4    A    Because you don't necessarily talk to other

5    individuals when you're refereeing, not that are sitting

6    with the referee group, and he was sitting with the

7    referee group.

8    Q    So you thought it was inappropriate that she

9    had meals with her instructor?

10    A    During the tournament.  And he shouldn't have

11    been sitting there.  He's not a referee.

12    Q    Sitting in the --

13    A    With the referee area.

14    Q    I see.

15    A    He should not have been there.  She, had she

16    been following proper course, should have asked him to

17    leave.

18    Q    The next paragraph, you said you didn't know of

19    anything else about Ms. Wakefield and causing problems,

20    but, it says, in addition, Ms. Wakefield has been

21    involved in many other controversial and potentially

22    litigious situations in including one which ended up

153

---

1    costing USTU several thousands of dollars and a lengthy

2    court battle.  If Ms. Wakefield had responded other than

3    she did, litigation, time and wasted USTU moneys would

4    have been avoided.

5         What's that referring to?

6    A    Ms. Kim Davis.  We talked about that earlier.

7    Q    There was a lawsuit by Ms. Davis because she

8    wasn't allowed to referee?

9    A    Yes, there was.

10    Q    I see.  It says many other controversial

11    potential litigious situations.  You have mentioned Gene

12    Lopez's, you've mentioned Kim Davis, I guess the Las

13    Vegas issue about Mr. Choi.

14    A    You mentioned Las Vegas, you mentioned

15    Louisville, Kentucky.

16    Q    Those are in your letters.

17    A    Because you brought them up.

18    Q    I mentioned them because you referred to them

19    in prior letters.

20    A    But you mentioned them here.  So I mentioned

21    two, you mentioned two.

22    Q    What other -- is there any others that are the

154

---

1    many that you're referring to?

2    A    Four is quite a few when you're talking about

3    dollars spent.  And I'm sure that if I sit down I can

4    probably recall others, but off the top of my head at

5    this point in time I don't.

6    Q    But you view that you're right there were many

7    situations in which Ms. Wakefield did things that were

8    controversial and potentially litigious?

9    A    Well, I mentioned two, you mentioned two and as

10    I said I could probably recall others.

11    Q    Two paragraphs down, you say, to make matters

12    worse, the following year also at team trials

13    Ms. Wakefield was again assigned to center referee a

14    finals for a Lopez family competitor which once again

15    ended in a questionable outcome.  Integrity and common

16    sense indicated to all of us who watched that she should

17    have excused herself to avoid potential controversy or

18    the appearance of impropriety, but she didn't.

19         So it's your view that in light of the prior

20    problem with Gene Lopez, Ms. Wakefield shouldn't referee

21    any match involving a Lopez family competitor, is that

22    correct?

155

---

1    A    We previously discussed the Ford family, and

2    you asked if there had been some sort of decision made

3    with refereeing.  That situation because there was a

4    question with that individual's father and myself, I

5    would never step into the ring with that individual.

6    The same should have been held with her.  She should

7    have excused herself from refereeing someone with whom

8    she had had a dispute.

9         (Document marked as Exhibit 6)

10    Q    Let me show you what's been marked as Brunner

11    Exhibit No. 6 and ask you if you recognize that

12    document.

13    A    Yes.

14    Q    That's the lawsuit that was filed by Edward

15    Ford and his wife Rhonda Ford on behalf of their son?

16    A    There is the Amended Complaint.

17    Q    And attached to it is the complaint as well?

18    A    I don't remember as I stated to you before.

19    But you don't have the final.  Where is the final?

20    Q    Let's just deal with this one to start.

21    A    So even if it's incorrect, we're going to deal

22    with it?

156

1    Q    I don't think I have anything beyond the
2  Complaint and the Amended Complaint.
3    A    Because it was dismissed with prejudice which
4  meant it was frivolous.  All of this was made up.
5  That's why it was dismissed with prejudice.
6    Q    If you want to produce that document, I will be
7  happy to see it.
8    A    The USTU has it on file I'm sure.
9       As I stated before, the legal counsel for the
10  USTU did not entertain their complaint because he felt
11  it was frivolous, and told these people that they should
12  first file in civil court, and if, in fact, there was an
13  out come then he would accept the complaint at the USTU
14  level, none of which took place because the case was
15  dismissed as frivolous with prejudice.
16    Q    Focus on the Amended Complaint.  What Mr. Ford
17  and his wife --
18    A    Which page?
19    Q    -- on behalf of their son -- on page 4?
20    A    Of the first section?
21    Q    Yes.  The Amended Complaint was seeking, if you
22  look at paragraph 7B, that the respondent or anyone

1  important, it wouldn't be fair to the competitor that's
2  in the ring with him because if they file a complaint,
3  and that competitor that he was fighting legitimately
4  won, that could be overturned.  And that would be unfair
5  to the competitor that he was with, not to Luke.
6    Q    Luke was 11 years old?
7    A    I don't remember.  He was young.
8    Q    They first went to the USTU and then went to
9  court in order to try to get protection from their son
10  against you refereeing in his matches, is that correct?
11    A    No, sir.  They when to the USTU to complain
12  about having been kicked out of my school.
13    Q    Would you show me in this document that talks
14  about --
15    A    You need to talk to the USTU, sir.  Those
16  documents are within the USTU.  You need to talk to
17  legal counsel that dealt with them at that point in
18  time.  And he told them, I will not entertain your
19  complaint within the USTU until you have resolved this
20  civilly.  This is a civil situation.  When they went to
21  civil court it was dismissed with prejudice because all
22  of the statements they were making were equally as

1  under influence or direct control shall not be allowed
2  to referee, judge or technically assist in any ring.
3       So by the Amended Complaint it still hadn't
4  been determined that you wouldn't referee in his
5  matches?
6    A    Well, where is that on the Amended Complaint?
7    Q    Paragraph 7B.
8    A    Okay.  First of all, anyone that I would have
9  influence or affecting within the tae kwon do
10  environment would probably include all of the State of
11  Illinois, most of the State of Missouri, most of the
12  State of Wisconsin, the State of Indiana and any other
13  seminar at which I had participated in which would
14  involve about 80 percent of the referees in the United
15  States, and a good percentage of those internationally,
16  which means that nobody could have been able to
17  officiate at all because that's a ludicrous statement to
18  make one of the reasons why it was thrown out as
19  frivolous.  It's too nebulous.  Which is why I will
20  state again, I would not have ever stepped in the ring,
21  nor will I in the future as a referee where Luke is
22  competing.  It wouldn't be fair to him, but more

1  ludicrous as this number 7.
2    Q    Just for the record there's nothing in this
3  complaint whatsoever about him wanting to be in your
4  school and that he had been thrown out of your school.
5  It was that after he left your school you threatened him
6  and took actions adverse to him?  That's what they
7  allege.
8    A    Absolutely not.  Whatever they alleged it was
9  dismissed with prejudice, sir.  That means that it was a
10  frivolous complaint, that means that the information
11  that is in this document is made up, is incorrect which
12  is why they couldn't prove it up in court.  That's why
13  it was dismissed.  These allegations in this document
14  are incorrect, inaccurate.
15    Q    After the Fords filed complaints against you,
16  did you file with the Illinois Department of Children
17  and Family Services that they were guilty of child abuse
18  or neglect?
19    A    No, I did not.
20       (Document marked as Exhibit 7)
21    Q    Let me show you what's been marked as
22  Exhibit 7.  Have you seen that document before?

1    A    No, I have not.

2    Q    It refers to the fact that a report of

3    suspected child abuse or neglect was filed against

4    Mr. Ford with the Department of Children and Family

5    Services.

6         Are you saying it wasn't you who reported that?

7    A    Absolutely I'm saying it.

8    Q    Okay.

9    A    Did he say it was?

10   Q    I'm not here to answer questions.

11   A    By implication are you saying it?  Because it's

12   not true.

13   Q    Let's go back to Exhibit 6 -- 5.  The letter

14   you sent to Bob Gambardella or the memo, whatever, dated

15   February 26th.

16   A    Which page are we on?

17   Q    They're not numbered, but it's the third page.

18   Three paragraphs from the bottom you write, these two

19   examples alone clearly indicate that she, referring to

20   Ms. Wakefield, cannot be impartial and that

21   Ms. Wakefield is still bound to follow the direction

22   influence of other martial artists due to rank and

1    Q    So you thought Ms. Wakefield was an unethical

2    referee?

3    A    I told you that I thought the situations in

4    which she was involved were unethical.  The situations

5    were unethical.

6    Q    Based on those she shouldn't have been selected

7    to be the referee chair, among other things?

8    A    Those are two good reasons that anyone, not

9    just Ms. Wakefield, that had been involved in situations

10   that involve ethics regarding referees should not be

11   there, which is I will state again, have I occasion to

12   step in the ring where Luke Ford would be competing I

13   would not do so.  Not because of Luke Ford but because

14   of the competitor that is fighting him.  It wouldn't be

15   fair to the other person.

16   Q    Okay.  Now the purpose of this letter that you

17   were sending to Bob Gambardella was to set forth the

18   positive reasons why he should have picked Chang Kil

19   Kim?

20   A    It was just to state opinions or impressions.

21   Q    If you read the next paragraph it says, I can

22   provide side examples if you wish, but my purpose is to

1    personal affiliation with her personally and her own

2    allegiance to her instructor, Mr. Park.

3         So it was your view that --

4    A    Let me read the two previous paragraphs because

5    it had been so long since we went on this page that I

6    forgot what it was we were referring to when we left

7    that document.

8         The two examples to which you are referring are

9    in the previous -- are from the previous paragraphs,

10   and, that is, the Gene Lopez instance that apparently he

11   didn't file a lawsuit over but could have, and the

12   second Gene Lopez and Steven Lopez incident when she

13   should have excused herself from being in the ring as a

14   result of her having other altercations with the Lopezes

15   and didn't.  Those clearly are unethical decisions.

16   Q    Based on those you thought Ms. Wakefield

17   clearly could not be impartial and was bound to follow

18   the direction, influence of other martial artists?

19   A    It says that it indicates that she cannot be

20   impartial because she was told, I'm assuming, by others

21   to do what she did and did it.  Referees aren't supposed

22   to do that.

1    set forth the positive reasons as to why Mr. Chan Kil

2    Kim should have been considered.

3    A    Okay.

4    Q    Is that correct, that's what the purpose of the

5    letter was?

6    A    Part of impressions.  A lot of this is

7    impressions, sir.

8    Q    You said before that you weren't aware of and

9    didn't recall having been discriminated against by

10   Korean Americans?

11   A    Didn't recall.

12   Q    But it says in the next paragraph, as I told

13   you when we spoke, yes, it is true that many of us

14   have -- I think the word been is missing -- but it says

15   have discriminated against.  So I assume it means have

16   been discriminated against, is that correct?

17   A    We talked about discrimination Gambardella and

18   myself.

19   Q    Okay.  Let me read it again.  With the word

20   been should have been in there, is that correct?

21   A    I'm assuming so.

22   Q    Okay.  So you wrote to Mr. Gambardella, as I

**Page 165**

1  told you when we spoke, yes, it is true that many of us
2  have been discriminated against for many years by those
3  of Korean-American descent.
4        So even though you're writing to Bob
5  Gambardella one year ago that you and others have been
6  discriminated against for many years by those of
7  Korean-American descent, as you sat there just a few
8  minutes ago you couldn't recall any such incident?
9        A    You were asking me about the referee
10  environment.  You were asking me about officials in
11  tournament environment.  Koreans exist far beyond just
12  the tournament environment.  Korean-American instructors
13  exist all over the world.  They exist in great numbers
14  at state level and at regional level, many of whom who
15  are involved not involved all with the USTU and/or the
16  WTF and/or other organizations.  Discrimination could
17  occur at any level.  It can occur on the street or it
18  can occur at a restaurant, not necessarily in the
19  tournaments about which we have been speaking today.
20        Q    So this discrimination against you for many
21  years by those of Korean-American descent, did it have
22  something to do with tae kwon do or not?

**Page 167**

1  in that sport.  With that in mind we have approximately
2  40 to 50 percent of all competitors in tae kwon do
3  within the USTU structure being of Hispanic and Latino
4  background, approximately 20 percent of Korean
5  descendency, approximately 20 percent black.  These are
6  approximations.  I don't have any basis of fact, but
7  approximations.
8        The state level does not reflect those numbers
9  for almost any state that I am aware of, and neither do
10  the national organizations, either on the board previous
11  or currently.  Mr. Gambardella also hasn't reflected
12  those numbers, and in the referee channel most
13  especially.
14        Being the only Latin American female that I'm
15  aware of at this level of rank, we don't reflect 40
16  percent of the entire referee community being of Latin
17  origin or 20 percent being of black origin that I'm
18  aware of.  That's my idea in presenting this document
19  for discrimination.
20        Q    It says, I am not only female but also Hispanic
21  and I have personally felt discrimination firsthand all
22  my life.

**Page 166**

1        A    Could be, could not be.  That's --
2        Q    You were writing it --
3        A    That's why --
4        Q    What are you talking about in this sentence?
5        A    That's why I kept asking you to be more
6  specific in all the questions that you were asking.
7  They were so broad they encompassed everything in the
8  world, and I said that to you several times, that you
9  needed to be more specific.  Discrimination can occur
10  anywhere.
11        Q    Okay.  Why don't you tell me as you sit here
12  today what you recall about situations in which you were
13  discriminated against --
14        A    I don't recall any at this point.
15        Q    Even though as of one year ago you said it was
16  true that many of us, meaning you and many other people,
17  have been discriminated against for many years but those
18  Korean-American descent you can't recall any instances
19  as you sit here today?
20        A    Let me give you a nebulous answer.  By the
21  Sports Act, I believe that all of the positions within
22  the organization should reflect the competitors involved

**Page 168**

1        Is that correct?
2        A    Would you like me to explain that?
3        Q    If you'd like to.
4        A    I grew up in the State of Utah where there is
5  discrimination against religion and race and ethnicity.
6  So yes, I have been exposed to discrimination my entire
7  life.
8        Q    Let me turn back to your declaration.  By the
9  way -- the purpose of this letter you were saying to
10  Mr. Gambardella?
11        MR. JONES:  Excuse me, Counsel.  We've been going
12  over an hour this past one.
13        MR. LEVINSTEIN:  We can take a break.
14        THE VIDEOGRAPHER:  We're going off the record.  The
15  time is 12:21 p.m.
16        (Off the record)
17        THE VIDEOGRAPHER:  We're back on the record.  Time
18  is 1:05 p.m.
19        MR. LEVINSTEIN:  Q  In February of 2004 when you met
20  with Bob Gambardella, Ms. Wakefield had been appointed
21  interim referee chair, is that her title?
22        A    I guess if you say so.  I don't --

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    You don't recall?

2    A    I don't recall.

3    Q    You were still writing to Mr. Gambardella on

4    February 26th in the hope that he would select Koang

5    Woong Kim or Chan Kil Kim to replace her as the

6    permanent referee chair?

7    A    Interim to me did not mean permanent.

8    Q    You were writing to Mr. Gambardella to

9    recommend, in particular, Chan Kil Kim to the position?

10   A    Or someone with more stringent qualifications

11   like Koang Woong Kim.  Or someone with more stringent

12   qualifications, yes.

13   Q    Those were the only two people you mentioned --

14   A    By name.

15   Q    -- in your February 26 letter?

16   A    By name.  But as I stated before there were

17   countless others who have higher credentials, higher

18   ranks, higher seniority, et cetera, et cetera.

19   Q    Than Barbara Wakefield?

20   A    Yes.

21   Q    And you wrote this letter with the hopes that

22   Mr. Gambardella would consider it and select one of

169

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    issues over who had been selected interim chair.

2    Q    Well, it had to do with why he picked Barbara

3    Wakefield instead of somebody else, didn't it?

4    A    No, he had already told me he picked because

5    her because he saw her at a tournament.

6    Q    And nowhere in your letter dated February 26th

7    do you mention his statement about crooks?

8    A    There was no need to, crooks didn't have

9    anything to do with the interim chair position and the

10   issue that I had.  Was that a question?

11   Q    You didn't discuss with Bob Gambardella

12   anything about Olympic coach selection, did you?

13   A    I didn't never got involved with the coaching

14   process.  Wasn't my job function, didn't care about it,

15   don't care about it.

16   Q    You don't know what the Olympic coach selection

17   criteria were in 2003 or 2004?

18   A    Did not get involved with that end of

19   tournament functions, not my job, don't care about it,

20   didn't care about it.

21   Q    And don't know what the criteria?

22   A    Don't care about it, didn't care it, don't want

171

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    those people to replace Barbara Wakefield as the referee

2    chair?

3    A    My aim was to keep the referee group strong and

4    it didn't appear as that was happening.

5    Q    You took all the time to write this letter

6    because you were hopeful you could persuade

7    Mr. Gambardella to pick Mr. Kim?

8    A    I took the time to write the letter because I

9    had an opinion about an issue that had happened with the

10   changes in hierarchy.

11   Q    Okay.  Your declaration says in paragraph 6

12   that when you talked to Mr. Gambardella he said he

13   didn't want anymore Koreans involved at all, they are

14   crooks?

15   A    Yes.

16   Q    Yet on February 26th you thought he might

17   select a Korean-American to be the referee chair?

18   A    No.  I did not say that.  It was my hope that

19   someone with higher qualifications and a greater

20   following would be selected.  His statement to me that

21   he did not want anymore Koreans involved and stating

22   that they are all crooks had nothing to do with my

170

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

1    to know, never did know.

2    Q    And don't know whether Dae Sung Lee or anyone

3    else qualified under those criteria?

4    A    Don't care, don't know, don't want to know.

5    Q    In 2004 --

6    A    Which document are we on now?

7    Q    We are on no document.

8        In 2004 did various people complain about Bob

9    Gambardella about you?

10   A    I have no information about that.

11   Q    Did Mr. Ford approach Mr. Gambardella and talk

12   to him about what had happened in the Illinois court and

13   the dispute involving his son?

14   MR. JONES:  Calls for speculation.

15   THE WITNESS:  Exactly.  I have no firsthand

16   knowledge of it.  You need to ask the Fords.

17   MR. LEVINSTEIN:  Q  Did John -- who is John Seiber?

18   A    John Seiber?

19   Q    S-E-I-B-E-R.  I don't know how to pronounce it.

20   A    Yes.  He's the referee.

21   Q    Did he complain to you the USTU about you?

22   A    I have no knowledge of that.  Did you ask

172

Mr. Seiber?

1    Q   I have.

2      Do you know who Stewart Koch is, K-O-C-H?

3    A   Yes.

4    Q   Who is he?

5    A   He's an individual who is now teaching here in the State of Illinois.

6    Q   Did you ever have any dealings with Mr. Koch?

7    A   Koch.

8    Q   Koch?

9    A   Yes.

10      Was there a dispute between you and Mr. Koch?

11    A   Yes.  He stole money.

12    Q   In what context did he steal money?

13    A   He was supposed to be paying out at the 1994 Junior Olympics as a vendor, he never paid that, and he and I had a venture for equipment at that same tournament.  He stole all the money out of the account.  I believe it's called embezzlement.

14    Q   Were you aware that he alleges that you had done things that were improper?

15    A   So who ended up with the money?

*(lines numbered 1–22)*

---

1    Q   Was there an event at which -- have you ever been referring and there been a situation in which there were threats to call the police to come and escort you from --

2    A   Randy Chambliss just did that.

3    Q   Did you leave the event?

4    A   Absolutely not.  The event was over.

5    Q   But were you aware that police had been called and you left before they got there?

6    A   He did not call police.  He stood there right there with us, and the event was already over and he did it in front of 30 other people.

7    Q   You're aware though there had been complaints registered by people whether they have merit or not about you with the USTU?

8    A   No, I was not.

9    Q   ==Was there an event in 2004 that Bob Gambardella did not select you to referee?==

10    A   ==I believe there were several events in 2004.==

11    Q   ==What events were those?==

12    A   ==I don't remember.  I don't know what they call them anymore since he's changed everything.==

*(lines numbered 1–22)*

---

1    Q   I don't know.

2    A   He did.

3    Q   But are you -- did you ever sue Mr. Koch?

4    A   No.  Should have.

5    Q   But you're aware that he had a dispute with you?

6    A   He stole money from me and from KH Kim the tournament director.

7    Q   Are you aware that he contacted the USTU to complain about you?

8    A   No, I'm not aware.

9      Who is Dr. Randy Chambliss?

10    A   Randy Chambliss is a referee or a tae kwon doist out of California.

11    Q   Have you had disputes with Mr. Chambliss?

12    A   He wanted me to send my referee manual and I refused to do so.

13    Q   Is that the thing you testified about earlier about your being removed from your position with the USTU?

14    A   Yes.  That was my document and they had to have my permission to use it and I did not give it.

*(lines numbered 1–22)*

---

1    Q   ==Were they events that you wanted to referee?==

2    A   ==They are events at which I sent in an application to referee.  They acknowledged they had received my applications and did not select me to referee.==

3    Q   ==Did that anger you?==

4    A   ==Neither here nor there.==

5    Q   ==Did you send in your application because you wanted to referee those matches?==

6    A   ==That's normally why people send in applications.==

7    Q   ==You weren't selected by Mr. Gambardella?==

8    A   ==Bob Gambardella.==

9    Q   ==Did you inquire as to why you weren't selected?==

10    A   ==Actually, yes.  I inquired at a table of individuals at the San Jose regional, and the people that were present there were MC Kim, Chang Kil Kim, Jerome Reitenbach, Barbara Wakefield and Bruce Harris.  And Barbara Wakefield replied to me that the reason that she assumed that I had not been selected because I asked her --==

11    Q   ==I haven't asked you what she said.  You can --==

*(lines numbered 1–22)*

1     A    You did -- yes, you did.  I'd like to finish
2 the answer.  Was that there was a restraining order
3 issued by the Ford family and that that's the reason Bob
4 had not selected me.
5     Q    So you were told by Barbara Wakefield that the
6 restraining order issued by a court in the Ford family
7 case was the reason Bob Gambardella had not selected
8 you?
9     A    That's not what I said.  I said she told the
10 group of us that the reason I had not been selected by
11 Bob Gambardella was some issue over a restraining order
12 concerning the Ford family.  In fact, there was never
13 any such restraining order ever issued.
14     Q    But you said there was an agreement that might
15 have been filed about the court that restrained you from
16 refereeing his matches?
17     A    I don't know where it was filed.  The agreement
18 was, as I stated to you before, that I would not be
19 officiating at any event at which Luke -- at the match
20 in which he was competing.  But I would have done that
21 regardless.
22     Q    Subsequent to February of 2004, did you have

1 mentioned that to him at our previous meeting.  I
2 suppose two comments constitutes complaints in his mind.
3     Q    In 2005 have there been events you have applied
4 for you have not been selected to referee?
5     A    Yes.
6     Q    What other events?
7     A    Whatever events that are out there supported by
8 the USTU.
9     Q    Do you think that's unfair?
10     A    Yes.
11     Q    Do you think it's because you are Hispanic?
12     A    I don't know why it is, but it is unfair.  I
13 have higher credentials than a lot of the referees that
14 are there so that the people that are competing are not
15 getting the best officiating.  I personally wouldn't
16 want my kids to be competing at an Olympic level by a
17 first time referee, which is what's happening.
18     Which kind of goes back to what I said of
19 having lost 100 referees over attrition, that's
20 acceptable and common, but to then replace those people
21 with first time referees is not acceptable, and that's
22 what's happening.  And that hadn't been occurring prior

1 any conversations with Bob Gambardella, telephone
2 conversations, otherwise?
3     A    I believe I called him again to ask why I had
4 been uninvited, unselected to a Olympic qualifier.  I
5 received a request to officiate and the following week
6 was told I was unselected, whatever that meant.
7     Q    In the conversation with Mr. Gambardella, did
8 he tell you that if you were so unhappy or had so many
9 complaints that perhaps you should retire from
10 refereeing?
11     A    He did not say that to me.
12     Q    Did he satisfy your concerns in the call?
13     A    No.  Actually he said that decision was just
14 made, don't know why, didn't answer at all.  At least
15 didn't give me a reason.  He did answer, but didn't give
16 me a reason.
17     Q    Did you complain to Mr. Gambardella about other
18 relation issues related to the USTU?
19     A    I told him that I felt at that point he needed
20 to do some due diligence as to why certain people were
21 being selected and some weren't.  And he said he didn't
22 want to hear me complain about that anymore since I had

1 to Gambardella and this new regime taking over.
2     Q    But there had been a lot of attrition over the
3 prior two chairs?
4     A    We have thousands of registered referees,
5 that's going to happen as a matter of course.
6     Q    But you're also of the view because there was
7 an American referee chair that that was going to lead to
8 a lot of Korean-Americans --
9     A    It has lead to the fact we have had less
10 qualified referees, less credentialed referees, and I
11 don't know of very many referees seminars we have had by
12 comparison to previous years.  I believe just one at
13 each of the regionals as an instructional, but not as a
14 training seminar.
15     MR. LEVINSTEIN:  Subject to receiving documents and
16 cross-examination, I'm done.
17         EXAMINATION
18     By Mr. Jones:
19     Q    Okay.  Ms. Brunner, you're aware that the
20 testimony you give today could be used in lieu of live
21 evidence if you don't appear at trial in Hawaii when
22 this matter goes to trial?

1    A    Yes.

2    Q    What is your current occupation?

3    A    Well, I'm a martial arts instructor, but I'm

4    also involved in other business ventures.

5    Q    Do you have your own school?

6    A    Yes, I do.

7    Q    What is it called?

8    A    McHenry Tae Kwon Do Academy and Fitness, Inc.

9    Q    And roughly how many students do you have?

10    A    Several hundred.

11    Q    You've been refereeing since approximately 1979

12    I believe was your testimony?

13    A    Yes.

14    MR. LEVINSTEIN:  I think it was late '70s.

15    MR. JONES:  Q  Late '70s.

16    A    Approximately in late I'm assuming is pretty

17    much the same thing.

18    Q    What are the qualifications or requirements for

19    becoming a A-1 rated USTU rated referee?

20    A    There's a process, or at least there used to

21    be, I have not seen if there have been any changes since

22    Gambardella came on board, but it used to be there were

1    certain number of international events that you have

2    certified officially refereed in as an official before

3    you can be upgraded.  So the process is very long and

4    very involved.

5    Q    For those of us who have not much familiarity

6    with what a referee does, can you just tell us generally

7    what a referee does at a tae kwon do competition?

8    A    Once the tournament starts the control of the

9    tournament resides with the tournament committee and the

10    tournament committee chair and the referee committee and

11    the referee chair.  Those two groups then run the

12    tournament.

13    Specifically for officials or referees in the

14    ring, the principal purpose of the referees and judges

15    in a particular ring is for the safety of the

16    competitors, but also to implement that the rules are

17    being properly followed, observed by both competitors

18    and their coaches and that they are followed within and

19    properly administered by the referee in that ring.  That

20    happens when you have more experienced referees on the

21    floor as opposed to inexperienced ones.

22    So the likelihood then of having a fair

1    approximately 16 levels of certification and rank

2    promotion within the referee committee.

3    Q    And, generally speaking, what's required to

4    move from level to level?

5    A    Attending seminars, passing the criteria set by

6    the instructor that happened to be at that event at that

7    seminar, getting the appropriate upgrade which may or

8    may not have happened, upgrade certificate.  Basically

9    that was it.

10    Q    Same question for WTF ratings, what are the

11    requirements for that?

12    A    For the ratings?

13    Q    To move from level to level with the WTF.

14    A    That's more stringent.  In order to become an

15    international referee I believe the current requirements

16    are at least a fourth degree black belt, the proper

17    certification level for the country whom you are

18    representing, and the recommendation from the nation's

19    organizing group, in our case the USTU, and then once

20    you are through the initial seminar and training and

21    certification process then there is waiting periods of,

22    I believe, five and ten years to be upgraded with a

1    tournament really depends on the expertise of the

2    referees that are at the tournament.

3    Q    Does the referee -- as each match progresses

4    does a given referee's role change?  In other words, do

5    they move from one location to another and the roles

6    change?

7    A    The ring sometimes rotate position on the

8    floor, but within each ring, generally speaking, the

9    referees will rotate positions.  For example, the first

10    person starting out as center referee will rotate out

11    with the judge -- corner judge in position chair one.

12    When that position -- the corner judge 1 takes his place

13    as center referee, when he finishes one or two matches,

14    he will then rotate out with chair two, and chair two

15    acts as center and then he rotates out, or she, with

16    chair three and so on.  That's continuous throughout the

17    tournament.

18    Q    What do the referees do who sit in the chairs?

19    A    They actually score the points for the

20    competitors that are in that match, and should something

21    be missed by the center referee, they will call

22    attention to it.  However, they have no say in the

1   actual running of that particular match.  That's the job
2   of the center referee.
3       Q    So it would be fair then that the referees then
4   become judges when they're sitting in the chairs?
5       A    Yes.  Center referee is called the center
6   referee.  When you're sitting in the corner even though
7   you are a certified referee, you are acting in the
8   position of a judge.  Corner judge it is called.
9       Q    Now, turning to another area, that being the
10  United States Tae Kwon Do Union or what used to be
11  called the United States Tae Kwon Do Union, what we'll
12  call USTU for short, you mentioned that you have been a
13  member since its inception or thereabouts?
14      A    No.  I've been involved in and around the USTU
15  probably since its inception.  Only because the schools
16  I was associated with were, but I believe I didn't
17  become a member until I was active in the USTU referee
18  channel.
19      Q    Thank you.  Has the USTU undergone management
20  changes in the past 2 years, if you know?
21      MR. LEVINSTEIN:  Objection, lacks foundation.
22      THE WITNESS:  I'm assuming that the new regime that

1       A    It's considered I believe at this point in time
2   a prestigious event.  One that you would want to have a
3   competitor medal at.
4       Q    You were at the U.S. Open in 2004 for what
5   purpose?
6       A    As an official.
7       Q    How did you come to meet Mr. Gambardella?
8       A    I introduced myself to him and asked if he
9   could take some time to speak.  I believe I called him
10  ahead of that tournament and asked if I could speak to
11  with him, and I believe he suggested that we speak on
12  the floor at the tournament somewhere.  That's my
13  recollection.  I'm not 100 percent sure.  It's been a
14  while.
15      Q    You used the phrase the floor.  That's the area
16  where the competition is going on?
17      A    And all the encompassing area where we sit and
18  rest.  There's a place generally for the referees to
19  sit, there's a place generally for them to eat, to go to
20  the restroom, but generally it's the entire floor at
21  which the tournament is taking place.  But it
22  encompasses staging area, setup.  The tournament

1   Gambardella is now heading up is constitute a changing
2   in management and et cetera, along with the reformation
3   meeting that was held or whatever that was called
4   before.
5       MR. LEVINSTEIN:  Objection.  Move to strike based on
6   what she heard here and not her own knowledge.
7       MR. JONES:  Q  Again, for the record, who is
8   Mr. Gambardella or Robert Gambardella?
9       A    I don't know what his exact title is.  I'm
10  assuming he's in charge of the USTU.
11      Q    Roughly when did you first meet him?
12      A    I first met him at the tournament U.S. Open in
13  February of 2004.
14      Q    What kind of a competition is the U.S. Open?
15      A    It's an international event.  It was started by
16  Sang Chul Lee several years ago.  It was turned over to
17  management by the USTU several years ago.  It is
18  attended by teams from all over the world.  Generally 47
19  to 60 different countries attend that -- used to attend
20  that tournament.
21      Q    Is it an important competition for tae kwon do
22  competitors?

1   committee have their own area, referees of course have
2   their own, medical has its own area.  It is a big place.
3   It isn't just the tournament.
4       Q    Did he consent to speak with you?
5       A    Yes, he did.
6       Q    Before going into detail on the substance of
7   the discussion, what general topics were covered in that
8   hour to two-hour conversation?
9       A    We talked --
10      MR. LEVINSTEIN:  Objection to the hour, two hour.
11  You can continue.
12      THE WITNESS:  It was approximately a one-hour to
13  two-hour conversation that took place and we discussed
14  refereeing, discussed officials within the referee
15  committee, direction of the USTU, his perspective on
16  what he had planned to do.  How he planned to make
17  changes, what had happened in the past, what had
18  transpired in the past, almost every aspect that I could
19  think of to ask questions about.
20      MR. JONES:  Q  Focusing on the area of refereeing,
21  what in particular was covered with him?  What did you
22  say to him about refereeing?

1    A    I believe I asked why in particular he had
2    picked Barbara as an interim, and he responded that he
3    had met her at a tournament and she's the only one he
4    really knew.
5          I asked him if due diligence had taken place in
6    the selection process, he said no, he just knew her,
7    which was really not probably a good management decision
8    to make especially since he was new to that position.
9    It would seem to me that more due diligence would have
10   taken place rather than less because he was new and he
11   had no background in tae kwon do.  So I voiced those
12   opinions to him, and he said that's the reason he had
13   for selecting her.
14         Q    I'm sorry.  Barbara's last name?
15         A    Wakefield.
16         Q    She was selected in your understanding to what
17   position?
18         A    Interim referee chair.  When he spoke to the
19   referees I believe it was his statement that said that
20   she would be officiating or running -- managing the U.S.
21   Open and that he would then select someone later, but I
22   don't know if he really understood what he was saying to

1    us.
2          Q    What was -- was it your understanding then that
3    she was -- that the interim referee chair position was
4    appointed by Mr. Gambardella?
5          A    It was -- he was the one appointing, yes.
6          Q    And what was your understanding of the function
7    of the referee chairperson at USTU at that time?
8          A    Up until that time the referee chair was
9    responsible for processing and taking recommendations
10   for referee certification and upgrades and for selecting
11   referees that were at any given USTU event and/or the
12   U.S. Open and/or making recommendations to the WTF for
13   international tournaments and resided as the manager in
14   place over the tournaments that were sponsored by the
15   USTU.
16         Q    So the referee chair actually picked referees
17   at several USTU tournaments?
18         A    Up until that time, yes.
19         Q    What concerns, if any, did you voice with
20   Mr. Gambardella about selection of Wakefield as the
21   interim referee chair?
22         A    Her qualifications, her unbiased or biased

1    opinions and the fact that I had complained or written a
2    letter about the issues involving her situation with Kim
3    Davis and Lopez led me to believe that she probably
4    wouldn't be as positive about me.
5          Q    Focusing a moment on what you phrase as bias
6    being one of your concerns about Ms. Wakefield, what
7    bias were you -- did you voice to Mr. Gambardella?
8          A    I'm sorry.  Can you repeat the question
9          Q    You said you voiced concern about
10   Ms. Wakefield's selection because of bias.
11         A    Well, she had lacked in my opinion integrity in
12   the situation with the Lopezes and did not stand by a
13   referee when she could have, and those were really
14   contrary to what I had seen other referee chair people
15   do both of those.
16         Q    In your opinion did she have the support of all
17   of the various racial minorities within the referee
18   environment?
19         MR. LEVINSTEIN:  Objection.
20         THE WITNESS:  I do not believe so.
21         MR. JONES:  Q  Did you voice that to Mr. Gambardella
22   during that conversation?

1    A    I believe I expressed to him that her seniority
2    and rank were not of the level that would command as
3    much following and respect from the referee pool, et al.
4    as would have been with another individual.
5          Q    Exactly what races were mentioned, if any, to
6    Mr. Gambardella in that conversation with respect to
7    commanding respect?
8          MR. LEVINSTEIN:  Objection.
9          MR. JONES:  Q  Were there -- were there any races
10   mentioned that -- that in your opinion did not -- would
11   not support Ms. Wakefield?
12         MR. LEVINSTEIN:  Objection.
13         THE WITNESS:  The tae kwon do world operates on rank
14   and seniority.  It would be like a general in command of
15   an Army being contacted by the President of the United
16   States and said well, for the next war you follow the
17   direction of the enlistee that just started yesterday.
18   Because he didn't have the rank that soldier wouldn't
19   have the rank and/or the seniority or the experience it
20   would be less likely there would be a positive outcome
21   had the President of the United States requested of that
22   general why don't you talk to another general.

1  Rank and seniority mean a lot in the tae kwon
2  do world and there were many, many and are many, many
3  other people with higher rank and higher qualifications
4  that would command a higher following.
5      MR. JONES:  Q  Did you voice any concern that
6  Korean-Americans in particular would be less likely to
7  participate as referees when Ms. Wakefield was selected?
8      A  Well, I think I remember asking why there
9  weren't more Koreans on the floor since there were only
10  like four or five and that hadn't been the case in the
11  past.  And that's when he said to me he wanted to get
12  rid of them, he didn't want any of them, they were all
13  crooks, didn't want to have any participation at all,
14  wanted to clean house so to speak.
15      Q  This is important.  Can you use as best you can
16  the words he used to you with respect to his description
17  of why Korean-American refs weren't on the floor?
18      A  He said they're all crooks.  I want to get rid
19  of all of them.  I don't want to have them here anymore,
20  I don't want them involved with us anymore, USTU.
21  Something -- I'm paraphrasing.  I'm not quoting.
22      Q  What did you say in response to that, if

1  then.
2      Q  Your best estimate as to the number of
3  Korean-American refs -- referees that were on the floor
4  at the U.S. Open in Florida in 2004 when you were there.
5      A  I believe 4 to 6, something like that.  Not too
6  many.  About 10 percent.
7      Q  In your experience was that less than what you
8  would have expected?
9      A  I believe the previous year and the years in
10  the previous years -- the previous year and previous
11  years before that it was more like 40 percent as there
12  were more Latin referees in previous years.
13      Q  Did anyone witness this conversation -- witness
14  or to your knowledge overhear this conversation that
15  you've just described with Mr. Gambardella at the U.S.
16  Open on the floor there at the U.S. Open Championship?
17      A  There were two or three individuals that came
18  up and asked questions of him, somebody that was working
19  with him.  I don't know who they were.  Conversation was
20  paused while he and -- while he took care of whatever it
21  was they did, and I did not resume conversation until
22  they had left because I felt that was my business with

1  anything?
2      A  I said isn't that against the law, isn't that
3  called discrimination?  I said, I have been subject to
4  discrimination in the course of my lifetime as I said
5  probably you have with the last name of Gambardella.
6  And he said yes.  And I said it didn't feel good to me
7  then.  Did it feel good to you?  No.
8  I said, well, then that's the way it's going
9  feel to these other people also, myself included.  Just
10  because some people with any group, not just Korean, not
11  just Hispanic, but within any group, because some are
12  out of line or dishonest or are caught with whatever
13  situation doesn't mean that the whole group is bad, and,
14  therefore, that the whole group should not be castigated
15  as a result of that.
16      Q  What, if anything, did he say when you brought
17  up those points?
18      A  Don't care.  I don't want them here.
19      Q  You took the word them to mean whom?
20      A  Korean-American background referees, and I
21  don't know if he threw in Latins in there too.  I don't
22  know that, but I certainly haven't been selected since

1  him one-on-one.  No one else sat down with us nor was
2  witness to any of the conversation that I had with him.
3      Q  Did Ms. Wakefield come anywhere near the
4  conversation that you just described?
5      A  She might have been one of the individuals that
6  walked up to him, I don't recall, but she certainly was
7  not a witness to any of my conversation with him.  Only
8  because I would not want her to misconstrue anything
9  that I was saying.
10      Q  You were, in fact, talking about her?
11      A  Exactly.  So why would I invite her to sit
12  there?
13      Q  Based upon this verbal exchange, this
14  conversation you had with Mr. Gambardella on the floor
15  in February of 2004 at the U.S. Open, did you come away
16  with any impressions about how Mr. Gambardella felt
17  about Koreans or Korean-Americans?
18      MR. LEVINSTEIN:  Objection.
19      THE WITNESS:  My impression was that he didn't like
20  them, that he was a racist and that he was very open
21  about expressing his feelings about being a racist and
22  treating the Korean-Americans especially in a

1  discriminatory manner.

2      MR. JONES:  Q  As a result of your conversation with

3  Mr. Gambardella in February of 2004, did he, to your

4  knowledge, change his decision to select or appoint

5  Ms. Wakefield as interim chair referee?

6      A  I'm sorry.  Can you ask the question again?

7      Q  As a result of that conversation which you just

8  described, did Mr. Gambardella reconsider or change his

9  appointment of Ms. Wakefield?

10     A  I believe she is still interim referee chair.

11     Q  And earlier we went over a letter that you

12  wrote to Mr. Gambardella later in the month of February.

13     A  After the tournament, yes.

14     Q  Seeking reconsideration again?

15     A  He had asked me to put my suggestions down,

16  which is what I did.  That was why I wrote him.

17     Q  And even after that letter he did not --

18     A  In fact, he didn't even respond to my letter.

19  That I recall.  It's been a long time.  I don't think he

20  did.

21     Q  A few minutes ago you gave us some estimates of

22  what you'd expect to see as far as participation

1      MR. LEVINSTEIN:  Objection.

2      MR. JONES:  Q  I'm talking about in terms of

3  numerosity --

4      A  As a referee?

5      Q  Yes.  In terms of number of competitors who

6  have attended.

7      A  As a referee was probably be one of the Junior

8  Olympics, 2003 or 4, I don't remember the exact figures.

9  I'm assuming there were around 5,000.  But the largest

10  attendance was at the '94 Junior Olympics at which I was

11  the executive director at which there were over 5200

12  competitors.

13     Q  You were a referee and executive director?

14     A  No.  I was executive director and did not act

15  as referee at that tournament.

16     Q  And about how many participants did you say?

17     A  Over 5200 at that tournament.

18     Q  So how many referees participated in a

19  tournament of that size?

20     A  We invited approximately 200 referees to that

21  tournament.

22     Q  Your best estimate as to the percentage of

1  percentage-wise by Korean referees as a group at the

2  U.S. Open.  Let me ask you this.  Before the U.S. Open

3  in early 2004 at this more elite tournaments, the higher

4  level tournaments generally was it your impression that

5  the more elite referees would be selected?

6      MR. LEVINSTEIN:  Objection, vague and ambiguous.

7  Don't know what tournaments.

8      THE WITNESS:  They would have to be the more

9  qualified referees.  Most people vying for the Olympic

10  team and their coaches and representing organizations

11  would not want a beginning referee to be officiating.

12  The possibility of their competitor at a Steven Lopez

13  level to whether or not they would be a winner or not.

14  You'd want the most qualified, most experienced referees

15  on the floor.

16     MR. JONES:  Q  Over the past 10 or 15 years, what do

17  you think was the largest national tournament that you

18  have been to as a referee prior to February of 2004?

19     MR. LEVINSTEIN:  Objection.

20     THE WITNESS:  Been to as a referee?  I don't

21  understand the question.

22     MR. JONES:  Q  Participated in as a referee.

1  those 200 referees who were Korean-American?

2      MR. LEVINSTEIN:  Objection.

3      THE WITNESS:  The percentages were divided and I

4  tried to be very ethical in the way that we were

5  handling that tournament.  I tried to make sure that

6  ethnicities -- all ethnicities were represented.  I was

7  trying to follow the Sports Act.

8      So the -- one of the speeches I invited a black

9  to give one of the speeches.  I invited a Latino boy to

10  do the Pledge of Allegiance.  When we did some of the

11  demonstrations in opening ceremonies, I tried to make

12  sure that we had a representative ethnicity division

13  amongst the participants because I wanted no one to feel

14  left out.

15     As far as referees were concerned, I didn't

16  select those.  That was part of the referee chair.  But

17  I do believe that we had approximately 40 percent Korean

18  background or Korean born, Korean ethnicity;

19  approximately maybe 15 percent Latins.  We had about 15

20  percent blacks, maybe 20 percent blacks, and the rest

21  were mixed races and/or Caucasian, Vietnamese, blah,

22  blah, et cetera, et cetera.

1    THE VIDEOGRAPHER:  Five minutes on the tape.
2        MR. JONES:  Q  That was a national tournament you
3    were executive director of, is that right?
4        A    Yes.
5        Q    In your recollection what was the largest
6    international tournament in the United States that you
7    were either executive director of or referee at prior to
8    February of 2004 in terms of number of attendees?
9        A    Prior to it would be probably another U.S.
10   Open.  They were averaging around I'm guessing 2,000
11   competitors up until 2004 when the numbers dropped
12   dramatically.
13       Q  Can you give us a specific one that you recall
14   was the biggest?
15       A    2003, 2002 would probably be the two highest.
16       Q    And why -- again your best estimate of the
17   percentage of Korean-American referees who participated?
18       MR. LEVINSTEIN:  Objection.
19       THE WITNESS:  My guess would be pretty close to that
20   40 percent mark at both of those.
21       MR. JONES:  Q  Is that an estimate?
22       A    That's a best estimate because again I'm not --

1    part of the process, but generally we have a center
2    referee, three corners, and we may or may not have TA,
3    technical assistant, and you multiply that figure by the
4    number of rings that's generally the number of referees
5    you have on the floor.
6        Q    Have you observed any other tournaments in any
7    capacity where you were able to visually estimate the
8    number of -- estimate the number of Korean-American
9    referees present?
10       A    Any tournament you multiply five by the number
11   of rings you generally get a pretty good idea of the
12   number of referees that are on the floor.
13       Q    Have you attended any after the U.S. Open in
14   2004 where you were able to see and do that?
15       A    For the USTU?
16       Q    Yes.
17       A    No.  I wasn't invited anywhere.
18       Q    To what would you attribute the decrease in
19   percentage of Korean-American referees after February --
20   as of February 4th, 2004?
21       MR. LEVINSTEIN:  Objection.
22       THE WITNESS:  As I stated before referees for any

1    I wasn't on the referee committee.  I wasn't in the part
2    of anything to do with management, wasn't my job.  I
3    wasn't privy to all of that, but in looking around the
4    rings that would be my guess.
5        Q    Based on a visual estimate?
6        A    Yes.
7        MR. LEVINSTEIN:  Objection, move to strike.
8        MR. JONES:  Q  Now comparing that to what you
9    observed in February of 2004 during the U.S. Open in
10   Florida, your best estimate of the percentage of
11   Korean-American referees at that tournament in which you
12   participated in?
13       A    I believe there were about four or six on the
14   floor.  The number of participants was also dramatically
15   decreased.
16       Q    Your best estimate of the total number of
17   referees at that tournament.
18       A    Wasn't part of have process, but I believe we
19   were running four, six rings which would mean four to a
20   group, probably 24 people refereeing approximately.
21       Q    So 4 to 6 out of 24?
22       A    Yes, sir.  Again visual assumption.  I wasn't

1    given event are selected and invited by the person in
2    charge of that function.  In this case is Bob
3    Gambardella.  I can only assume that he has for some
4    reason decided not to select Koreans and/or Latins to
5    referee at his events.
6        MR. JONES:  Q  Just to acquaints us a little bit
7    with the referee selection process, how does that work?
8    Do referees who want to participate apply?
9        A    When a tournament is announced they
10   generally -- at least they used to -- they're not doing
11   that now, but they used to send out a tournament
12   information packet.  Included in that packet were
13   applications for the competitors and/or the coaches
14   and/or VIPs and instructors and/or masters.  And along
15   with that is an invitation or an application for
16   referees.  You fill out the application and you sent it
17   in.  That's been the normal procedure.
18       Q    What is on the application with respect to --
19   so is there any information on the application with
20   respect to individual tournament participation or are
21   tournaments listed on there that the respective referee
22   may want to participate in?

1    A    Currently -- they didn't used to be, but
2  currently the one that I had someone pull off the
3  Internet and give me showed the regional tournaments on
4  there and indicated which ones you wanted to or would be
5  available to assist in refereeing and the number of days
6  that you could participate at each particular
7  tournament.  And then you filled that out and then you
8  sent it back in along with your referee rank and other
9  personal information.
10   THE VIDEOGRAPHER:  Mr. Jones, we have to change the
11 videotape.
12   MR. JONES:  That's fine.
13   THE VIDEOGRAPHER:  This is the end of tape number 2
14 of the deposition of Mary M. Brunner.  The time is 1:52
15 p.m.
16      (Off the record)
17   THE VIDEOGRAPHER:  This is the beginning of tape
18 number 3 of the deposition of Mary M. Brunner.  The time
19 is 1:58 p.m.
20   MR. JONES:  Q  Ms. Brunner, before we broke we were
21 talking about the procedures for referee selection and
22 you explained to us your understanding of the content of

1    A    By Barbara and Bob.
2    Q    So what happens next, if you know?  As a given
3  tournament approaches do people get calls or letters or
4  what, if you know?
5    A    In the past I had been sent letters telling me
6  that I had been appointed, and in some cases also
7  received a phone call, and in some cases received a
8  phone call in lieu of a letter.
9    Q    Other than the impact of new management on the
10 percentage of attendance by Korean-American referees at
11 USTU sponsored tournaments, are you aware of any other
12 impacts that new management has had on the tournaments?
13   MR. LEVINSTEIN:  Objection.
14   THE WITNESS:  By observation the number of
15 participants at the national level of competitors has
16 decreased substantial by approximately half of the
17 juniors -- actually by approximately half at almost all
18 of the tournaments, which would subsequently lead to the
19 conclusion that the U.S. team membership has also
20 dropped significantly.  We have, of course, eliminated
21 50 state tournaments which reflects on the number of
22 competitors that have USTU tournaments availability to

1  the referee application.
2    A    Yes.
3    Q    And that the applicant has the ability to check
4  off what events they wish to participate in or are
5  available for, is that correct?
6    A    Yes.
7    Q    What happens, if you know, to those
8  applications?
9    MR. LEVINSTEIN:  Objection.
10   THE WITNESS:  It's my understanding they're sent to
11 the person that is then going to make the selection of
12 the referees for any particular tournament.  I don't
13 know who that is.  I'm assuming that it's Gambardella
14 since he's the one that uninvited me.
15   MR. JONES:  Q  And would -- if you know would
16 Ms. Wakefield have a role or function in that selection
17 process as well?
18   A    The documentation that is sent out on the
19 referee application that I saw said it was done as a
20 joint effort in writing on their applications.  It's on
21 the website.  It was on the website.
22   Q    Joint effort --

1  them, those that can't travel, that means that's gone
2  which, in turn, affects the number of referees and
3  coaching staff that is properly trained to go onto the
4  national level.
5    Doing away with the state presidents also
6  greatly affected the number of sanctioned tournament
7  fees that go to the USTU because they are no longer
8  required.
9    Is that what you meant?
10   Q    I think you've answered it.
11   So you mentioned several points.  One is
12 participation by athletes has dropped, is that correct,
13 at the tournaments?
14   A    Absolutely.
15   MR. LEVINSTEIN:  Objection.
16   THE WITNESS:  And, unfortunately, one of the views
17 -- the issues that I presented to Mr. Gambardella at
18 that meeting or meetings that I had with him in February
19 were that when we eliminate the state presidents and we
20 eliminate the state organizations, we are also
21 eliminating by attrition, by -- in the same hand the
22 grass roots efforts to develop competitors, the grass

1  roots efforts to develop referees and coaching staff.
2  So, in fact, his reply to me was, well we, still got
3  competitors.  Sure we do for now and for next year and
4  the next maybe.
5          But what happens in five years when we haven't
6  developed any new ones?  And it's happening with
7  referees.  We haven't developed any new ones.  So what's
8  happening is I was at the San Jose regional and almost
9  every -- well, maybe 90 percent of those referees were
10 first time referees.  What does that do to the caliber
11 of the tournament?  What does that do the caliber of the
12 competitors that we are now selecting because the -- it
13 logically follows we're not selecting the best of the
14 competitors because we have not the best of the
15 officials on the floor.
16     MR. LEVINSTEIN:  Objection.  Move to strike,
17 nonresponsive.
18     THE WITNESS:  The un -- unexperienced referees have
19 the greater likelihood of making errors in judgment,
20 errors in scoring and errors in applying the rules.
21     MR. JONES:  Q  So you're talking about the quality
22 of competition then when you talk about the quality of

1  like the U.S. Open were profitable for USTU?
2     MR. LEVINSTEIN:  Objection.
3     THE WITNESS:  I don't have direct knowledge of the
4  U.S. Open since I was not involved in that process.  But
5  I was executive director for the '94 Junior Olympics,
6  and for the PATU 1993 -- first PATU cup and I have
7  direct knowledge there.
8     Q  Were those two events profitable?
9     MR. LEVINSTEIN:  Objection.
10    THE WITNESS:  The 1994 Junior Olympics was not
11 profitable.  The PATU tournament I believe broke even.
12 I need to explain that at that time the tournaments
13 weren't run by the USTU.  The tournaments were run by
14 whoever bid on the tournament.  So I believe until about
15 4 years ago, maybe 5 years ago, I'm not sure when that
16 change happened, the tournaments were runs strictly by
17 individuals had nothing to do with the U.S.  They simply
18 paid a sanction fee to the USTU which, in effect, made
19 it profitable for the USTU because they got the sanction
20 fee free and clear.  They were not responsible for any
21 expenses.
22         In addition, because it was a USTU sanctioned

1  the referees or the officiating?
2     MR. LEVINSTEIN:  Objection.
3     THE WITNESS:  Not only the quality of the
4  competitions, it is also the quality of the people that
5  we select as competitors.  We may or may not get the
6  best, and more than likely we won't because there's --
7  the possibility with inexperienced officials is much
8  higher of us I say misapplying rules, not calling proper
9  penalties, et cetera, and missing points.
10    MR. JONES:  Q  Just understanding the relationship
11 between revenue and participation at these tournaments,
12 do participant athletes who are competing pay a fee?
13    A  The applicants pay a -- are required to pay an
14 application fee, and if they're late, they pay a late
15 fee.  And in order to participate they have to be a U.S.
16 team member.  If they are taking a parent with them to
17 sit in the back, especially if the juniors, those have
18 to pay a fee to become a parent coach/coach.  Coaches
19 going with them to help them at the tournament also pay
20 a fee, and any member of the family attending the
21 tournament must pay a fee to enter the tournament.
22    Q  In the past do you know if these tournaments

1  tournament, all the participants had to apply for USTU
2  membership, therefore, multiplying 5200 by USTU
3  membership, at that time was $28 in 1994, that would be
4  very profitable to USTU.
5     MR. JONES:  Q  Backing up a moment to your opinions
6  about the Korean-American referees.  In your opinion are
7  they better or more experienced referees than the ones
8  you've seen lately at USTU sponsored events?
9     MR. LEVINSTEIN:  Objection.
10    THE WITNESS:  That's a question that can't really be
11 answered objectively.  In every ethnicity you have
12 experienced people.  You have credentialed people.
13 Because you are Korean or because you are Latino does
14 not necessarily make you a more qualified referee.  What
15 makes you more qualified and more apt to be a
16 professional is how much experience you have had, how
17 much training you have had, and, more importantly, how
18 you apply the rules when you are in the ring.  Has
19 nothing to do with ethnicity.
20        What bothered me with Mr. Gambardella is that
21 he exclusively said, pointedly said, that they're all
22 crooks, meaning the Koreans, and, therefore, I don't

1  want them here.  That's not -- it's not ethical to me,
2  and I believe it's discriminatory.
3      MR. JONES:  Q  Let me --
4      MR. LEVINSTEIN:  Objection, move to strike,
5  nonresponsive.
6      THE WITNESS:  What does nonresponsive mean?
7      MR. JONES:  Q  Didn't answer the question.  Let me
8  rephrase the question.
9          Within the total group of Korean-American
10  referees out there, are there a significant number of
11  highly-qualified referees for international and national
12  competitions?
13      MR. LEVINSTEIN:  Objection.
14      THE WITNESS:  Yes.
15      MR. JONES:  Q  Why -- what makes them highly
16  qualified?
17      MR. LEVINSTEIN:  Objection.
18      THE WITNESS:  As I just stated the more experience
19  you have, the more training you receive, the more
20  training you seek will make you better at your
21  profession as in any profession.  A doctorate generally
22  has more training than a bachelor, Bachelor of Arts.

1      Q    Would you consider him a friend?
2      A    I would not have said -- I won't -- can't say
3  that he would be in my group of friends.
4      Q    Are you aware that prior to the 2004 Olympics
5  in Athens that he was appointed to be a coach of the
6  U.S. Olympic Team?
7      MR. LEVINSTEIN:  Objection.
8      THE WITNESS:  Ask the question again, please.
9      MR. JONES:  Q  Were you aware prior to the 2004
10  Olympics he was appointed to be the U.S. Olympic coach?
11      MR. LEVINSTEIN:  Objection, asked and answered.
12      THE WITNESS:  Excuse me.  I'm missing here.
13      MR. JONES:  Not been asked by me.
14      MR. LEVINSTEIN:  Asked and answered.
15      MR. JONES:  Q  Go ahead and answer the question.
16      A    I became aware that he had been appointed
17  approximately at the same time that I became aware that
18  he was not going.  Again referees and coaching
19  environment do not really have anything to do with each
20  other.  That's why I say I am acquainted with Dae Sung
21  Lee but not considered friend because once a tournament
22  starts, tournament committee is over there, they do

1      MR. JONES:  Q  Is it correct then within the
2  Korean-American community there are a number of referees
3  who have the highest certification, for example, A-1?
4      MR. LEVINSTEIN:  Objection.
5      THE WITNESS:  I don't know.  I'm not involved with
6  that process, but from my personal acquaintances there
7  are a higher number of Korean background or ethnic
8  referees with the higher ratings, and I believe the
9  highest ranking, highest two or three ranking referees
10  within the United States are all Korean.  One of them is
11  Koang Woong Kim.
12      MR. JONES:  Q  If one were to assume that the new
13  management at USTU wanted to remove all of the
14  Korean-Americans from their activities, would you say
15  that they have been successful?
16      MR. LEVINSTEIN:  Objection.
17      THE WITNESS:  The best way to eliminate a group of
18  people from the referee environment is to simply not
19  invite them, and I believe that's been done.
20      MR. JONES:  Q  Are you acquainted with the plaintiff
21  Dae Sung Lee?
22      A    Acquainted, yes.

1  their own thing, referee committee is over there, they
2  do their own thing, and they're really not together.
3  They're different functions within the tournament group,
4  within the tournament.
5      Q    When you became aware that he had been
6  appointed and then removed, what did you think of that?
7      MR. LEVINSTEIN:  Objection, lacks foundation, no
8  basis for her to answer that question.
9          Go ahead.
10      MR. JONES:  Q  What did you think?
11      A    What was my opinion?  They did it again.
12      Q    Meaning USTU?
13      MR. LEVINSTEIN:  Objection.
14      THE WITNESS:  Yes.
15      MR. JONES:  Thank you.  No further questions.
16      FURTHER EXAMINATION
17      by Mr. Levinstein:
18      Q    I've got a few.
19      But you don't know what the criteria were to be
20  the Olympic coach?
21      A    Didn't know, don't care, don't want to know,
22  not involved, not my job.

**Page 217**

```
 1     Q    Don't know whether he met the criteria or did
 2  not?
 3     A    Don't care, don't know, don't want to know.
 4  Not my job.
 5     Q    And since February of 2004 you don't know which
 6  referees have applied to be referees?
 7     A    That would be that I would be the referee chair
 8  and subject to receiving all documentation nationwide,
 9  which I don't believe Bob Gambardella has forwarded to
10  me.
11     Q    So you don't know if Korean -- Korean-Americans
12  have applied and not been accepted?
13     A    Yes, I do.  There are some that I have spoken
14  to that have applied and not been accepted.
15     Q    Based on them telling you?
16     A    Correct.
17     Q    You've never seen their application or any
18  documents saying they weren't selected?
19     A    As I said Mr. Gambardella has not forwarded me
20  -- forwarded to me that documentation.
21     Q    Do you know when Mr. Gambardella took his
22  position with the USTU?
```

**Page 219**

```
 1  don't recall exactly.
 2     Q    It's possible you never discussed elimination
 3  of state presidents and state organizations --
 4     A    Oh, I did discuss that with him.  It may or may
 5  not have been at this tournament, but I did discuss it
 6  with him, and I do remember discussing the grass roots.
 7  It may have been at a subsequent conversation, but I did
 8  have that conversation with him, he and I one-on-one.
 9     Q    Is it your understanding -- you were a referee
10  in the February of 2004 U.S. Open, correct?
11     A    Yes.
12     Q    When was your application accepted?
13     A    I have no idea.
14     Q    Would it have been a day before?
15     A    I have no idea.
16     Q    In general, for an event like that, how far in
17  advance do you know you're going to have to travel to be
18  a referee in an event?
19     A    There was no in general.  They were all
20  different.  I was uninvited to the Olympic qualifier
21  three or four days before the event.
22     Q    I understand.  But in order to have an event
```

**Page 218**

```
 1     A    I have no idea, not my job.
 2     Q    The event which you talked to him was in
 3  February of 2004, correct?
 4     A    Yes.
 5     Q    No indication, suggestion or discussion had
 6  even taken place as of then about the elimination of
 7  state presidents or state organizations, had it?
 8     A    I talked to him at great length about it during
 9  that conversation.
10     Q    That's your testimony, one week after he took
11  his job there had already been discussion about
12  eliminating state presidents --
13     A    I believe they had already been eliminated.  I
14  believe they had already contacted the state presidents.
15  We talked -- there had been several rumors going about
16  for many months prior to because of all the
17  machinations, et cetera.  I believe that we had talked
18  about state involvement, et cetera, et cetera, but I may
19  be wrong.  It was a long time ago, I didn't write it
20  down and I didn't record the conversation.
21     Q    So it's --
22     A    It could be incorrect, it may be correct.  I
```

**Page 220**

```
 1  like the U.S. Open, how far in advance does the event
 2  have to have referees lined up to referee the events?
 3     A    As I just said, they're all different.
 4     Q    But for an event that took place -- what does
 5  your declaration say -- February 4th you met with
 6  Mr. Gambardella?
 7     A    Yes.
 8     Q    How far in advance of that would invitations
 9  have to have been made or accepted?
10     A    There is no general timeframe, there is no set
11  timeframe.  It depends on the manager that's handling
12  that particular event, and the director I'm assuming at
13  this point it was Gambardella and how organized he is.
14  There is no set amount of time.
15     Q    What's the shortest time you can imagine that
16  you could accept applications and still have referees in
17  time for an event like that?
18     A    The morning of the event.
19     Q    The morning of the event you could select
20  people to travel to -- where was this event -- Orlando,
21  Florida and gets referees there between the morning and
22  the afternoon of the event?
```

1     A    There are several referees in Florida, several
2  in Orlando.
3     Q    But of the 24 people you said probably refereed
4  that event, were they coming from all around the
5  country?
6     A    I don't know.  You'd have to ask Bob
7  Gambardella that.  I know I came from Illinois.
8     Q    And when was your application accepted for that
9  event?
10    A    As I said before I don't know.
11    Q    Are you aware of any referee who applied for
12 the U.S. Open in February of 2004 who was not accepted?
13    A    Didn't care, didn't know, wasn't my job.
14    Q    You have no basis for saying that the USTU
15 turned down any Korean-American or Latin who applied in
16 the February, 2004 event?
17    A    Observation.  They weren't on the floor.
18    Q    But you don't know if they applied?
19    A    I have no idea of what and who, but I know
20 based on previous tournaments that that tournament was
21 highly attended by qualified, international referees.
22    Q    But didn't it affect the people's decision to

---

1     A    Can we reread back the question?
2     Q    She will never be able to find the question.
3     MR. JONES:  Objection, asked and answered.
4     THE WITNESS:  I believe I've already answered it.
5     MR. JONES:  Objection, asked and answered.
6     MR. LEVINSTEIN:  Q  You're under oath.  I'd like to
7  know why did you believe Barbara Wakefield would not be
8  positive.
9     A    It would be the same answer I gave before.
10    Q    This is a deposition.  I'm asking you a
11 question.  There's an objection.
12    A    I don't understand when before I answered it
13 you objected, now it's okay.
14    Q    That's not correct.  There was never such a
15 question.
16    A    Yes, there was.  I answered it before.
17    Q    Why were you concerned Barbara Wakefield would
18 not be positive about you?
19    A    I already stated that.  I had had issue and
20 stated the issues when she was caught having a petition
21 circulated without integrity at a tournament at which
22 she was officiating.  That's absolutely not ethical.

---

1  apply the fact that there was a new regime?
2     A    Is that hearsay?  You'd have to ask those
3  individuals.
4     Q    Well, you're the one who is telling me about
5  hearsay about why people didn't show up for the event.
6     A    No, I'm not.  You have to ask each individual
7  referee if they applied.
8     Q    But you have no knowledge of anyone who applied
9  and was turned down?
10    A    Well, why would I?  That wasn't my job.
11    Q    You have no idea whether Bob Gambardella turned
12 anyone down or didn't?
13    A    All I know is when he turned me down.
14    Q    Correct.  When you talked to Bob Gambardella,
15 you were concerned about Barbara Wakefield because you
16 were concerned that she wouldn't be positive about you,
17 isn't that correct?
18    A    That was one issue that I had.
19    Q    Why did you believe Barbara Wakefield would not
20 be positive about you?
21    A    I believe I've already answered that.
22    Q    I'd like to hear it again.

---

1     Q    Did you --
2     A    Would you let me finish?
3     Q    Sure.
4     A    And she was not standing behind the referees,
5  for example, Ms. Kim Davis, when it was clearly her job
6  as referee -- a position of referee chair, vice chair to
7  do so.
8     Q    And did your complaints about that get back to
9  her?
10    A    Did you see the letter that I wrote?
11    Q    It wasn't copied to her, was it?
12    A    She has a copy of it given to her by Bob
13 Gambardella.
14    Q    Which letter?
15    A    The letter that I wrote to Sang Chu Lee.
16    Q    But not as of February of 2004 she didn't?
17    A    Yes, she did.
18    Q    Given to her by Bob Gambardella?
19    A    Apparently he gave it to her because I saw it
20 in San Jose.  This year she showed it to me.  She told
21 me she had it.
22    Q    But you didn't send it to him until

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1  February 26th?

2    A    No, sir.  I sent the letter to Sang Chu Lee the

3  year before whenever that event happened with --

4    Q    In 2000.

5    A    Let me finish.  Whenever that event happened

6  involving her and the Lopezes.  Between then apparently

7  Bob Gambardella got a copy of it from somewhere because

8  when I met with Barbara Wakefield --

9    Q    Go ahead.  You attached it to your

10 February 26th letter to Bob Gambardella?

11   A    Yes.  And she had a copy on -- no, he works for

12 the USTU.  He has copies of everything that's there,

13 doesn't he?

14   Q    So you think he went back through the files and

15 found your June 22, 2000 letter?

16   A    If I attached it then he had it with that, but

17 she was given a copy by him.

18   Q    But you talked to him before you sent this

19 letter?

20   A    Yes.

21   Q    So you talked to him before February 26th?

22   A    Yes.

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1    A    To Sang Chu Lee concerning her involvement in

2  circulating a petition trying to sanction Gene Lopez

3  when, in fact, he was probably the most qualified coach

4  that we had.  And my issue with that instance was that

5  she did it during the middle of an Olympic qualifier --

6  an Olympic qualifying tournament, and it should have

7  been done either before or after, but not during the

8  tournament.  And I believe I have answered and stated in

9  the past.  That's my concern.  That isn't the ethical.

10 I would have objected had it been Barbara or anybody

11 else that did it.

12   Q    You objected directly to her?

13   A    Yes, and I objected to others.

14   Q    She knew you objected to others?

15   A    I don't know.  Didn't follow her around.

16   Q    You said you called Bob Gambardella head of the

17 tournament to arrange to meet with him?

18   MR. JONES:  Objection, misstates the testimony.

19   MR. LEVINSTEIN:  Q  In February.

20   A    I don't know what his title was is what I

21 believe I said.  And I called to ask if he could speak

22 with me.  He suggested we meet at the tournament.

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    And on the day you talked to him, you had

2  concern about Barbara Wakefield wouldn't be positive

3  about you?

4    A    Yes.

5    Q    And on that date you hadn't yet sent Bob

6  Gambardella your previous letter?

7    A    But I had discussed my issues.

8    Q    But on February 4th or 15th when you talked to

9  Bob Gambardella, there was no reason to believe that

10 Barbara Wakefield had seen your June 22 letter, 2000 to

11 Sang Chu Lee, correct?

12   A    Is that a question?

13   Q    Did you have any reason to believe she had seen

14 that letter?

15   MR. JONES:  Objection, calls for speculation.

16   THE WITNESS:  Why would I care?  I wouldn't ask.

17 Wasn't my issue.  I didn't care what she had done or

18 hadn't done.  My concerns were her being ethical in a

19 position that would influence me.

20   MR. LEVINSTEIN:  Q  You said you were concerned she

21 wouldn't be positive about you because you had sent the

22 letter.

6/28/2005 Brunner, Mary (Pltf desig = Yellow, Dfts' counters = Blue)

1    Q    You called him where?

2    A    I'm assuming at the USTU.

3    Q    Where did you get his name to call him?

4    A    I called the USTU and asked who was in charge

5  and they gave me to him.  I still didn't know his name.

6  He's got a very complicated last name.

7    Q    When did you call him?

8    A    I don't remember.  You could check the USTU

9  records I'm sure.  Incoming phone calls would have that

10 on record.

11   Q    And what was it that you wanted to talk to him

12 about?

13   A    Same as I stated before, hasn't changed.

14   Q    Did you want to talk to him about the

15 appointment of the interim referee chair?

16   A    At that time I just wanted to have a

17 conversation with him.  I didn't indicate to him the

18 topics that I wished to cover, nor the length of time of

19 each topic.

20   Q    Did you know when you called him ahead of the

21 tournament that Barbara Wakefield had been appointed the

22 interim referee chair?

1    A    I don't believe I did when I called him.

2    Q    And when you called did you identify who you

3    were and that you wanted to speak with him?

4    A    I gave him my name.

5    Q    Did you speak to him on the telephone?

6    A    He said he was busy, could we talk at the

7    tournament on the floor of the tournament.

8    Q    Were there Korean-American referees at the U.S.

9    Open?

10   A    I believe I've answered that at least ten

11   times.

12   Q    There were four to six?

13   A    It hasn't changed.

14   Q    Was there something about them that made them

15   different as to why they were allowed to referee and

16   others were not?

17   A    You'd have to ask the person who selected them.

18   Q    Were they unqualified?

19   A    I think I've already stated what the

20   qualifications are to become an international referee.

21   Q    So those four to six people who were there you

22   believe were qualified?

1    A    I believe I've already stated what the

2    qualifications are to become an international referee.

3    Q    I understand that.  That wasn't what I asked.

4    I asked you -- you said there were 24 people who

5    refereed the event?

6    A    Approximately.  I said multiply the number of

7    rings by the number of people required per ring and you

8    pretty well had a good idea of how many officials were

9    on the floor.

10   Q    Were some of those official not qualified to be

11   there?

12   A    If they were international referees they had

13   met the criteria required by the WTF, I would assume.

14   You'd have to check with the WTF.  I don't have access

15   to credentials or certification or documents that are

16   handled by the WTF.

17   Q    So you're not aware of anyone who was at that

18   U.S. Open who refereed who was not qualified to be a

19   referee?

20   A    I'm not aware of credentials of anybody that

21   was on that floor.

22   Q    And, as far as you know, all 24 people who

1    refereed at that event were qualified to referee the

2    U.S. Open in 2004?

3    A    At international tournaments you must be an

4    international referee to be selected to be there.  I

5    stated that before also.

6    Q    You mentioned when you ran an event you tried

7    to make sure that the ethnicity of the participants

8    matched certain percentages, is that correct?

9    A    Tried to be fair to all ethnic backgrounds that

10   were at our tournament, yes.

11   Q    You took into account ethnic backgrounds in

12   deciding which people to invite or to accept to

13   participate?

14   A    No.  I didn't say that.

15   Q    How could you make sure that all ethnicities

16   were represented?

17   A    In the open ceremony, sir, I believe I stated I

18   had a black give a speech as the MC, and I believe I had

19   a Latino little boy give the Pledge of Allegiance.  I

20   believe that's what I said.

21   Q    You specifically selected them because of their

22   ethnicity?

1    A    Yes -- no, not because of their ethnicity

2    because I wanted to have a percentage represented in the

3    opening ceremonies.

4    Q    But in the referee core you also wanted to

5    maintain certain percentages of ethnicity?

6    A    I had nothing to do with the referee selection

7    process.  I was the executive director.  Referees are

8    selected by the referee chair.  At that time that was

9    the case.  Now that person I believe is Mr. Gambardella.

10   I believe I stated before that that was done by Koang

11   Woong Kim because he was the acting referee chair.  As

12   the tournament executive director I had no input, no

13   say, nothing to do with the referees except to feed them

14   and to house them.  That's it.

15   Q    And you checked though to see what

16   percentage --

17   A    No, I did not.

18   Q    Then where did you get these numbers,

19   approximately 40 percent Korean born, 15 percent

20   Latinos, 15 to 20 percent blacks, and the rest a mixed

21   races or Caucasians?

22   A    Because I was the executive director of that

1  tournament and I have eyes.

2      Q    And you --

3      A    Can see --

4      Q    You went around and computed the percentages of

5  the various races?

6      A    We had rings running and I could look out from

7  one position and see the entire floor as could Mr. Dae

8  Sung Lee as I believe he was involved in the tournament

9  committee at that time, and at any given point in time

10 anyone involved in running the tournament could you do

11 exactly what I did, and, that is, observe.

12     Q    So with 200 referees, by observing from where

13 you were sitting you could see they were about 80 Korean

14 born, 30 Latinos, 30 to 40 black referees, and the rest

15 were mixed races or Caucasian?

16     A    Approximately, yes.  I'm not a stupid person.

17 MR. LEVINSTEIN:  That that's all I have.

18 MR. JONES:  One quick question.

19 MR. LEVINSTEIN:  Subject to cross.

20

21

22

---

1      Q    Would those 100 very good and qualified

2  referees being referees of all various races?

3      A    Probably be pretty much across the board.

4      Q    When counsel was asking you about examples of

5  persons that had sent in applications for tournaments

6  and then not gotten selected, that happened to you in

7  one instance, did it not in 2004?  Let me rephrase it

8  this way.

9           Was there a situation in 2004 where you

10 submitted an application, you got accepted then you got

11 deselected?

12     A    Yes.

13     Q    When was that?

14     A    It was an Olympic qualifier after the U.S. Open

15 that that happened.  I believe I also sent in

16 applications for the juniors and seniors that year and I

17 have sent in several applications for this year.

18     Q    And in all of those instances you have not been

19 selected?

20     A    No, I have not.  In fact, I asked for

21 confirmation of receipt of my applications.  I asked for

22 them to send them to me in writing, and they did on a

---

1           FURTHER EXAMINATION

2           By Mr. Jones:

3      Q    One quick question about Exhibit 5.

4      A    What's that?

5      Q    Your letter to Bob Gambardella dated

6  February 26th, 2004, last sentence on page 1.

7      A    Are these the ones that were being given to me,

8  this collection of documents here?

9  MR. LEVINSTEIN:  They're not being given to you.

10 They'll be attached to the transcript.

11 MR. JONES:  They're for the court reporter.

12 THE WITNESS:  So what's mine on here?

13 MR. LEVINSTEIN:  Just yours --

14 THE WITNESS:  This is mine.

15 MR. LEVINSTEIN:  If it doesn't have an exhibit

16 sticker on it.

17 THE WITNESS:  I brought that with me.  Okay.

18 MR. JONES:  Q  With respect to your statement on

19 February 26th of the USTU having lost approximately 100

20 very good and qualified referees during the tenure of

21 the last two referee chairs.

22     A    Yes.

---

1  few of the occasions, not all of them.

2      MR. JONES:  Thank you.  I don't think I have any

3  other questions.

4  MR. LEVINSTEIN:  That's it.

5  THE VIDEOGRAPHER:  This is the end of the deposition

6  of Mary M. Brunner.  The time is 2:33 p.m.

7      (Off the record)

8      - - - - - -

9

10           ACKNOWLEDGMENT OF DEPONENT

11

12     I, Mary M. Brunner, acknowledge that I have read

13 and examined the foregoing testimony, and the same is a

14 true, correct, and complete transcription of the

15 testimony given by me, and any corrections appear on the

16 attached errata sheet signed by me.

17

18

19 _____    _____

20    DATE                  SIGNATURE

21

22

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

```
1    STATE OF ILLINOIS  )
                        )  SS:
2    COUNTY OF C O O K  )

3

4         The within and foregoing deposition of the

5    aforementioned witness was taken before CAROL CONNOLLY,

6    CSR, CRR and Notary Public, at the place, date and time

7    aforementioned.

8         There were present during the taking of the

9    deposition the previously named counsel.

10        The said witness was first duly sworn and was

11   then examined upon oral interrogatories; the questions

12   and answers were taken down in shorthand by the

13   undersigned, acting as stenographer and Notary Public;

14   and the within and foregoing is a true, accurate and

15   complete record of all of the questions asked of and

16   answers made by the forementioned witness, at the time

17   and place hereinabove referred to.

18        The signature of the witness was not waived,

19   and the deposition was submitted, pursuant to Rule 30

20   (e) and 32 (d) 4 of the Rules of Civil Procedure for the

21   United States District Courts, to the deponent per copy

22   of the attached letter.
```

237

6/28/2005  Brunner, Mary  (Pltf desig = Yellow, Dfts' counters = Blue)

```
1         The undersigned is not interested in the within

2    case, nor of kin or counsel to any of the parties.

3         Witness my official signature and seal as

4    Notary Public in and for Cook County, Illinois on this

5    _____ day of _____, A.D. 2005.

6

7

                      _____

8                     CAROL CONNOLLY, CSR, CRR

                      CSR No. 084-003113
9                     Notary Public

10

11

12

13

14

15

16

17

18

19

20

21

22
```

238