6/22/2005 Loudat Deposition

0001

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                       DISTRICT OF HAWAII
 3      ----------------------------------------
 4      DAE SUNG LEE,
 5                Plaintiff,
 6           vs.                    CIVIL NO. 04-00461 SOM LEK
 7      UNITED STATES TAEKWONDO UNION, a Colorado nonprofit
 8      Corporation, UNITED STATES OLYMPIC COMMITTEE, a
 9      federally chartered nonprofit corporation;JOHN DOES
10      1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE
11      CORPORATIONS 1-10,
12                Defendants.
13      ----------------------------------------
14
15           VIDEOTAPED DEPOSITION OF THOMAS A. LOUDAT, PH.D.
16                            VOLUME I
17           Taken on behalf of the Defendants, at the
18      office of Roeca Louie & Hiraoka, Suite 900, Davies
19      Pacific Center, 841 Bishop Street, Honolulu, Hawaii
20      96813, commencing at 9:11 a.m., on June 22, 2005,
21      pursuant to Notice.
22
23
24      BEFORE:    DENNIS J. YANKEE, CSR NO. 285
25                 Certified Shorthand Reporter
```

EXHIBIT 2

1

6/22/2005 Loudat Deposition

1    five?
2        A.   Yes.
3        Q.   So, best estimate, three?
4        A.   Two or three.
5        Q.   After this October 13th telephone call,
6    first, how long did that last would you guess?
7        A.   Oh, no more than 15 minutes.
8        Q.   And at that point in time you were being
9    hired to assess damages, is that correct?
10       A.   Correct.
11       Q.   Were you retained at all to focus on
12   liability?
13       A.   No.
14       Q.   Were you retained to determine causation,
15   whether was any damage caused?
16       A.   No.  The only thing, what I'm doing is
17   looking at the margin, or the, what at the margin
18   impact the coaching experience could have had on this
19   business had Master Lee been the Olympic coach.  That
20   was my assignment.
21       Q.   But how were you to determine whether at
22   the margin, not being the head coach of the Olympic
23   team, was going to have any impact?  Is that based on
24   other people's work or were you to do work on the
25   fact of damage?

1    Q.    On January 27th had you already come to
2    the conclusion that Dae Sung Lee had suffered some
3    damage by not being continued as the Olympic coach?
4    A.    Well, concept -- or quan -- qualitatively,
5    that was my opinion, otherwise, I would have never
6    done any analysis.  Quantitatively, I wouldn't have
7    had a value at that point in time.
8    Q.    Well, how did you form the opinion that he
9    had been damaged?
10    A.    Well, the, just -- I have some empirical
11    information, but just the, the general concept or
12    general knowledge that a market-differentiating
13    characteristic such as an Olympics coaching
14    experience can be publicized and generally leads to
15    some income award or reward, which is typically the
16    case in this society.
17    Q.    And what analysis did you do or what
18    documents did you look at to come to that conclusion
19    about that being an Olympic coach would be
20    market-differentiating in this market?
21    A.    Generally, making professional and personal
22    observations of what occurs in this society, and I
23    would have had some documents of the statements of
24    Han Won Lee and, and Master Cheon, who provided
25    affidavits to the effect that it was their opinion

14

6/22/2005 Loudat Deposition

1   11 percent per year, consistent with what happened in
2   that one period. I did not increase it by any
3   hundred and six percent from one year to the next.
4        Q.   And all you know about Han Won Lee's
5   business is what's in his tax return?
6        A.   Well, and what I found out subsequent to,
7   and my conversations the other day with Master Lee.
8        Q.   Okay. But as of the date of your report,
9   all you knew about Han Won Lee's business was his
10  declaration and his tax return?
11       A.   That's right.
12       Q.   So you don't know -- all right. Have you
13  ever been to Mr. Dae Sung Lee's do'jang?
14       A.   No.
15       Q.   You've never been to Colorado Springs even?
16  Have you ever been to Colorado Springs?
17       A.   I think I've been through Colorado Springs.
18       Q.   On the way to where?
19       A.   Wyoming.
20       Q.   Okay. So you've driven through Colorado
21  Springs?
22       A.   Yes.
23       Q.   Ever stopped in Colorado Springs?
24       A.   No.
25       Q.   What do you know about Colorado Springs?

1  ambiguous.

2     A.  Yeah, I don't know what you're purporting

3  to say there.

4  BY MR. LEVINSTEIN:

5     Q.  So you don't know, focusing back on Han Won

6  Lee, you don't know anything about what competition

7  he faced in that marketplace?

8     A.  Han Won Lee in, in Colorado?

9     Q.  Yes.

10    A.  No.

11    Q.  Don't know how many competitors there are

12 who coach Taekwondo?

13    A.  No.  I mean, I'm looking at, like I said,

14 I'm looking at his business.  And there's an

15 assumption that's typically made when do you this

16 type of analysis by economists, it's called certeris

17 parabus:  All things the same but for this particular

18 event.

19         So I'm not aware of any significant change

20 in his marketplace or his competitive environment.

21 The most significant -- that that is dramatic enough

22 to cause a measurable impact.

23    Q.  Except that he was a three-year-old

24 business and still may have been on the increase from

25 that alone, right?

60

1    A.   I, that I don't know.  I mean, that's
2  possible, that's possible.
3    Q.   Okay.  And we don't know if athletes from
4  the National Training Center working at his school
5  helped his business?
6    A.   I don't know.
7    Q.   And we don't know about the quality of his
8  facility and how it compared to Dae Sung Lee's
9  facility?
10   A.   Yeah, I, I haven't observed either of the
11 facilities.  And I, I will state that it's very
12 atypical to do that.
13   Q.   Well, let's suppose we're going to take two
14 businesses and compare them in order to determine if
15 the experience of one is a good yardstick for the
16 experience of the other.  Are you familiar with that
17 analysis?
18   A.   Well, you're talking comparables for a
19 valuation estimate, or I assume that's what you, what
20 you would be using it for.
21   Q.   Yes.  And you're not an expert on that?
22   A.   I'm not doing a business valuation.
23   Q.   So you're not attempting to assess lost
24 profits based on a business valuation?
25   A.   No.  I'm measuring the consequence of an

```
 1   event on a business activity at the margin, what can
 2   reasonably be estimated to have happened --
 3        Q.   -- and don't you --
 4        A.   -- based on --
 5        Q.   -- understand --
 6        A.   -- based on, based on the best information
 7   I can bring to bear.
 8        Q.   And don't you understand that in order to
 9   make that assessment you need to know that the two
10   businesses you're comparing are comparable?
11        A.   The only reason that would come into play
12   is if there's a significant change in the operating
13   environment of one business relative to the other,
14   because we're talking an event at the margin, or an
15   incremental event that changes something.  Unless you
16   have some dynamic change in one versus the other,
17   then the comparable falls apart.
18        Q.   Let's suppose I have two businesses, one in
19   a mature market where there's lots of competition,
20   okay?  Where there's other people competing all the
21   time.  Other place you have a new business, all by
22   itself in a wide open market, okay?
23             Same event happens in two places.  This guy
24   gets a credential and that guy gets a credential and
25   they both go out to advertise it.  Are you telling me
```

```
 1   likely than not you would say no, that was your
 2   testimony --
 3       A.   Standing by, on its own, yeah, separate
 4   from the rest of the analysis, yeah, I would say
 5   that.
 6       Q.   Okay, and what would its probability be,
 7   would you say?
 8       A.   Oh, boy, I, I, you know, as --
 9       Q.   If you don't know and you haven't looked at
10   that, that's fine.  I just wanted to know if you
11   assigned it a probability.
12       A.   Well, I gave it an implicit probability of
13   50 percent in the analysis, given that I'm taking the
14   base case, which is the mid point of each.  So that,
15   that's essentially what I've, I've given it.
16       Q.   But is that your testimony that you think
17   that its probability is 50 percent?
18       A.   Yeah.  Implicit what I've done, that would
19   be my opinion.
20       Q.   But you testified before that you didn't
21   believe this probability was 50 percent.
22       A.   Well, I mean, what I said before, I, I have
23   three scenarios here.  I have a high, a base-case and
24   a low.  If, if I -- so those are three different
25   outcomes.  One is a real low-ball scenario, one is
```

```
 1       Q.   -- doesn't matter --
 2       A.   -- or, or you could --
 3       Q.   -- you could get all those --
 4            REPORTER:  Wait, wait, wait.  You're
 5  both saying at the same time.
 6  BY MR. LEVINSTEIN:
 7       Q.   Let me ask the question.  If you use zero,
 8  that this doesn't matter he's been Olympic coach
 9  twice, it really doesn't matter one iota, zero is the
10  low number.  Given that your high-loss scenario cut
11  in half is almost the same as the base-case, you'd
12  end up in about the same place?
13       A.   That's correct.  Yeah, that's correct.  You
14  could even take Candon's scenario wherein Dae Sung
15  Lee is worse off by virtue of, of, he would have been
16  worse off by virtue of having the, the Olympic
17  coaching experience than what's occurred, and, and
18  reduce it even further.  And it, it would still come
19  out to be about the same.
20       Q.   Right.  So the high-loss scenario is what
21  drives that base-case number?
22       A.   That's true.  That's true.
23       Q.   And it's the key analysis that leads to
24  both the high-loss and the base-case?
25       A.   That's right.
```

6/22/2005 Loudat Deposition

1    have to analyze how the competitors compare and
2    whether with his coaching experience he would be
3    better than those competitors?
4        A.   Yeah, well, we see what happened to, in
5    terms of the high scenario that I estimated, to Han
6    Won Lee, and that's what I'm using for a proxy as to
7    what could have occurred here.
8        Q.   Except Han Won Lee was the head coach at
9    the National Training Center and the Olympic coach,
10   and we don't know the quality of the competitors he
11   was facing, and he might have had an easy time
12   taking --
13       A.   -- right --
14       Q.   -- people from those competitors?
15       A.   And because of those unknowns, that's why I
16   didn't opine that the high scenario was what would
17   have occurred.
18       Q.   But shouldn't we investigate whether that's
19   the case before we start opining that his situation
20   is comparable?
21            MR. JONES:  Objection.  Argumentative.
22       A.   The, if you want to do it to that level of
23   analysis, you can.  I don't think it would make any
24   difference.
25   BY MR. LEVINSTEIN:

170