```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF HAWAII
 2              CIVIL ACTION NO. 04-00461-SOM-LEK

 3    _____

 4    DEPOSITION OF:  ROBERT GAMBARDELLA
      EXAMINATION DATE:  April 5, 2005
 5
      _____
 6    DAE SUNG LEE,

 7    Plaintiff,

 8    v.

 9    UNITED STATES TAEKWONDO UNION, a Colorado
      nonprofit Corporation, et al.,
10
      Defendants.
11    _____
              PURSUANT TO SUBPOENA, the deposition of
12    ROBERT GAMBARDELLA, was taken at 8:19 a.m. on
      April 5, 2005 at the Double Tree Hotel at 1775 E.
13    Cheyenne Mountain Boulevard, Colorado Springs,
      Colorado, before Susan L. Sims, Registered
14    Professional Reporter and Notary Public in and
      for the State of Colorado, said deposition being
15    taken pursuant to the Federal Rules of Civil
      Procedure.
16

17

18                       Susan L. Sims
                Registered Professional Reporter
19

20

21

22

23

24

25
```


EXHIBIT A

Case 1:04-cv-00461-SOM-LEK     Document 272-3     Filed 03/21/2006     Page 2 of 8

DEPOSITION OF ROBERT GAMBARDELLA                                    4/5/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 273

1  was the one that would have the direct interface
2  with the coach.
3      Q   Cecil Bleiker, you mean the
4  person who used to work for the USTU?
5      A   Yes.
6      Q   Did you see Dae Sung Lee at the
7  Olympic Taekwondo venue?
8      A   I did.
9      Q   Did you talk to him?
10     A   No.
11     Q   Why not?
12     A   We exchanged, you know, a little
13 hello, you know, just wave to each other and that
14 was it.
15     Q   Did you happen to see Dae Sung
16 Lee sitting with Chul Ho Kim?
17     A   I honestly don't remember. I
18 don't remember. But yeah, well, he was sitting
19 with John Holloway. I remember John Holloway at
20 one point, because I think I was sitting behind
21 him, yeah.
22     Q   So I take it you don't remember
23 any conversations relating to Chul Ho Kim sitting
24 with Dae Sung Lee?
25     A   No, I do remember John Holloway

Page 274

1  sitting with him.
2      Q   You don't remember telling Chul
3  Ho Kim that you were upset with him for sitting
4  with Dae Sung Lee?
5      A   No, I don't remember that.
6      Q   You don't remember --
7      A   No.
8      Q   -- telling Jean Lopez you were
9  upset with Chul Ho Kim because he sat with Dae
10 Sung Lee at the Olympic venue?
11     A   I don't remember that.
12     Q   Do you remember telling Herb
13 Perez that you were upset with Chul Ho Kim
14 because he was sitting with Dae Sung Lee at the
15 Olympic venue in Athens?
16     A   I don't remember saying that to
17 Herb Perez.
18     Q   Do you remember -- that's okay.
19 Then you came back from the Olympic Games and you
20 wrote this letter which we'll mark exhibit next
21 in order.
22         (Exhibit 65 was marked.)
23     Q   (BY MR. UESUGI) Do you remember
24 this letter?
25     A   Yes.

Page 275

1      Q   And it's addressed to all six of
2  the Olympic team participants?
3      A   Yes.
4      Q   It says here that, again, we
5  extend our congratulations, our thanks and best
6  wishes to you for the future. Did you mean that
7  for everyone listed on the letter or only certain
8  people?
9      A   Everyone. Everyone.
10     Q   When you came back to the OTC,
11 did you change the locks on Chul Ho Kim's office?
12     A   No, I didn't change the lock on
13 Chul Ho Kim's office. It was basically an office
14 that -- you know, he may say it's his, but what
15 happened was there was another person using that
16 office and they were asked to leave I think like
17 June 20th. So I wanted to make sure that there
18 were new locks on the door so that someone else
19 wouldn't have access.
20     Q   Who was that other person, Sammy
21 Pejo?
22     A   Sammy Pejo, yes.
23     Q   Why was Sammy Pejo asked to
24 leave?
25     A   Because the resident team program

Page 276

1  was suspended and there was no need for volunteer
2  services at that point.
3      Q   Why was -- or when was the OTC
4  resident athlete program for Taekwondo canceled
5  or suspended?
6      A   It was sometime in late June.
7      Q   Why?
8      A   Why?
9      Q   Why was the program suspended?
10     A   We were evaluating the entire
11 program.
12     Q   What does that mean?
13     A   That means you're looking at the
14 entire program and what type of features that you
15 want to put in in the future.
16     Q   Did you have -- when you first
17 started as the executive director in February,
18 did you watch any practices of the OTC athletes?
19     A   Yes.
20     Q   How many?
21     A   I really don't know. I can't
22 remember.
23     Q   More than ten?
24     A   I would say probably about ten,
25 maybe.

DEPOSITION OF ROBERT GAMBARDELLA  
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.  
4/5/2005

Page 277

1  Q   And all those practices were run
2  by Chul Ho Kim?
3  A   I don't remember that. I think
4  it was a combination of maybe Sammy and Chul Ho
5  Kim.
6  Q   Was Chul Ho Kim there all the
7  time that you -- whenever you visited the OTC
8  training?
9  A   I cannot remember every time that
10 I went there.
11 Q   Okay. Did Chul Ho Kim,
12 subsequent to finding out that the office that he
13 was using, the locks were changed, did he come
14 talk to you?
15 A   Yes.
16 Q   And what did he say during that
17 conversation?
18 A   I said I believe I sent him a
19 letter stating that his contract was not going to
20 be renewed as per the contract, the covenants in
21 the contract.
22 Q   Okay. Why was that?
23 A   There's no need for a coach when
24 there's no athletes training full time.
25 Q   And what did he say to you?

Page 278

1  A   I don't remember what he said to
2  me.
3  Q   Did he inform you that if he
4  doesn't have the position at OTC, that he would
5  lose his visa?
6  A   We did have that conversation,
7  yes.
8  Q   And what did you tell him?
9  A   I told him that we would write a
10 letter of support to help him.
11 Q   But the fact that if there was no
12 job, that he would -- one of the requirements for
13 his visa was that he be employed?
14 A   Well, basically, as I remember it
15 correctly when I wrote the letter, it was -- and
16 I can't remember when the date was, but it was
17 currently what he was getting paid and, you know,
18 that was it.
19 Q   Did he say that if he didn't have
20 the job at OTC as the resident coach that he
21 would have to go back to Korea?
22 A   He mentioned that, yes.
23 Q   What was your response?
24 A   My response -- he made it sound
25 like it was such a negative thing. And I said,

Page 279

1  Chul Ho, I was there in June and I think that
2  Korea's a really great place. I mean, what's
3  wrong, you know? And apparently he took it the
4  wrong way. And I was trying to be positive and
5  he just took it and turned it around in a
6  negative manner.
7  Q   So did you tell him that Korea's
8  a great place, why don't you go back to Korea?
9  Did you say that to him?
10 A   No, I said if you have to go back
11 to Korea, there's lots of opportunity, I would
12 think, for a person like yourself who has many
13 years of experience as a world champion athlete,
14 so on and so forth. So I was trying to make it a
15 positive type of thing in the fact that I'm not
16 just talking from -- you know, I've been there
17 and I've seen it and I've experienced the culture
18 and I thought it was a great place.
19 Q   So you never told him that maybe
20 he should go back to Korea?
21 A   No, not in that context.
22 Q   You never -- what did you say?
23 What context? Did you say that in another
24 context?
25 A   What I just said, was that I

Page 280

1  think that Korea's a great place and I think
2  there could be opportunity for him. But I did
3  not say that you can go back to Korea. It's been
4  taken out of context, I can tell you that.
5  Q   What has, the statement?
6  A   What he said to other people.
7  Q   Did you actually say that, why
8  don't you go back to Korea?
9  A   No, I didn't.
10 Q   Did you say something
11 substantially similar to that?
12 MR. LEVINSTEIN: He just told you what
13 the conversation was. You want to do it all over
14 again? Read it back.
15 A   I just said what I just said, is
16 that I think Korea's a great place and there
17 could be opportunities. But I did not say, why
18 don't you just go back? I wouldn't do that. I
19 wouldn't say that. I was trying to be positive
20 with him and try to help him.
21 Q   (BY MR. UESUGI) There was an
22 incident at the Titan games involving one of his
23 athletes, Jason Han. Do you know who Jason Han
24 is?
25 A   Yes, I do.

73 (Pages 277 to 280)

Page 281

1  Q  Do you remember sitting next to
2  Jason Han at the Titan games?
3  A  No.
4  Q  Apparently Jason Han was cheering
5  for one of the US players competing at the Titan
6  games, and you allegedly told him to sit down and
7  be quiet. Is that true?
8  A  I don't think that's exactly
9  true. I believe what was happening in the
10 situation was that the coach who was coaching,
11 and I think it was -- I'm almost positive it was
12 Kevin Padilla -- was trying to coach her and she
13 was actually just not listening to what he had to
14 say and it was causing a disruption.
15 Q  Who was the athlete in question?
16 A  I can't remember.
17 Q  It was a female athlete?
18 A  I believe it was.
19 Q  Was Kevin -- Jason Han a resident
20 athlete at the time?
21 A  When were the Titan games? I
22 don't know but probably, yes.
23 Q  Did you tell him to sit down and
24 be quiet?
25 A  I don't remember what I said.

Page 282

1  Q  But you do remember that?
2  A  Talking to him about it, yes.
3  Q  Talking to Jason Han?
4  A  Yeah.
5  Q  At the venue?
6  A  Yes, at that venue.
7  Q  But you don't remember the
8  specifics?
9  A  No.
10 Q  Jason Han is Asian?
11 MR. LEVINSTEIN: Is that a question?
12 Q  (BY MR. UESUGI) Yes. Is Jason
13 Han Asian?
14 A  I imagine he might be. His last
15 name is Han. He may be Asian.
16 Q  But you don't know?
17 A  No, I don't know. All I know is
18 that he's a graduate of University of
19 California-Berkeley and has done exceptionally
20 well. And that's what I know about him.
21 Q  Did you become aware of a letter
22 written by Chul Ho Kim to Jim Scherr in late
23 2004?
24 A  Yes.
25 Q  Do you remember what the letter

Page 283

1  said?
2  MR. LEVINSTEIN: Don't guess.
3  A  No.
4  Q  (BY MR. UESUGI) You don't
5  remember?
6  A  I don't remember it.
7  Q  Okay. Well, I'm going to show it
8  to you then.
9  A  Okay.
10 Q  Why don't we take this in order.
11 (Exhibits 66 and 67 were marked.)
12 Q  (BY MR. UESUGI) Do you recognize
13 this letter?
14 A  Yes, I do.
15 Q  It's a letter from Chul Ho Kim
16 dated June 24, 2004 requesting an update for his
17 status as a USTU staff member?
18 A  (Nodded.)
19 Q  Do you remember responding to
20 this letter?
21 A  Yes, I responded June 25th, 2004.
22 Q  That's this letter. Actually an
23 e-mail?
24 A  Yes, via e-mail, it says here in
25 black and white. We have someone out there. You

Page 284

1  may want to close the doors.
2  Q  Speak of the devil. In the first
3  paragraph, the last sentence, it says, In
4  addition, I am willing to help you with your
5  green card, so please do not worry about that?
6  A  Right.
7  Q  What did you mean by that
8  sentence?
9  A  That I would write him a letter,
10 that I would write a letter in his behalf.
11 Q  And on behalf of his family?
12 A  I can't remember that. I don't
13 know.
14 Q  And this help that you were going
15 to give him with his green card, did it come with
16 any conditions?
17 A  No. I just said I would help
18 write a letter for his green card. Maybe I
19 should have written it, but, hey, this is what we
20 have and my intention was to write him a letter,
21 a letter on his behalf.
22 Q  And in fact, you did write a
23 letter on July 19.
24 (Exhibit 68 was marked.)
25 Q  (BY MR. UESUGI) This letter is in

74 (Pages 281 to 284)

Case 1:04-cv-00461-SOM-LEK   Document 272-3   Filed 03/21/2006   Page 5 of 8

DEPOSITION OF ROBERT GAMBARDELLA                                    4/5/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 285

1  support of his wife and children?
2      A   Yes, that's what it seems, yes.
3      Q   And you wrote this letter without
4  conditions attached; is that correct?
5      A   I wrote this letter on his
6  behalf.
7      Q   Okay. And you subsequently wrote
8  this letter to him on September 8th, which we'll
9  mark as exhibit next in order.
10     (Exhibit 69 was marked.)
11     Q   (BY MR. UESUGI) Informing him,
12 Chul Ho Kim, that you were not going to renew his
13 employment agreement for the year 2005?
14     A   Right.
15     Q   Because the US Taekwondo will not
16 sponsor resident program in 2005; is that
17 correct?
18     A   I think what it says -- actually,
19 I received some help from -- legal help on this
20 one. And basically, I just -- it says what it
21 says. Pursuant to the employment agreement, I
22 must give a person notice and we were not
23 renewing his employment agreement.
24     Q   What is the plans for the
25 resident program for 2005?

Page 286

1      A   We're still working on that and
2  we would like to be able to incorporate the new
3  leadership once that gets in, just to kind of get
4  a project going with them so they feel that
5  there's some, you know, ownership as we move
6  forward.
7      Q   Are you aware of the fact that
8  the OTC resident athlete program is by far the
9  most successful Taekwondo athlete development
10 program that the USTU has ever promulgated?
11     A   That, I'm unaware of.
12     Q   That almost every single National
13 Team member or national coach presently competing
14 has either been a resident athlete or enjoyed the
15 benefits of a training under a coach who trained
16 at OTC as an athlete?
17     A   You said two things just then.
18     Q   Okay. Are you aware that the
19 vast majority of our National Team members have
20 at one point trained at OTC?
21     A   No, I'm not aware of that.
22     Q   Were you aware that in 2000 -- at
23 the time that you canceled the program,
24 50 percent of our National Team members were
25 resident athletes at OTC?

Page 287

1      MR. LEVINSTEIN: Objection, just made
2  reference to 2000 and canceling the program. And
3  I don't know that's what you meant.
4      Q   (BY MR. UESUGI) In 2004 when you
5  canceled the program or when you suspended the
6  program, were you aware of the fact that
7  50 percent of the athletes on the US National
8  Team were resident athletes at OTC?
9      A   Fifty percent of the National
10 Team athletes were resident. What class -- I
11 mean, you got to kind of give me a little bit
12 more on that one.
13     Q   National Team members, there were
14 eight National Team members at OTC when the
15 program was suspended. Were you aware of that?
16     A   What I was aware of was the fact
17 that we took a look and see who was qualified,
18 who would be qualified to go to the next Olympic
19 Games. And that's what we looked at. And we
20 felt that there was a point in time if we're
21 going to take -- if we're going to suspend a
22 program, that we do it after we got to a certain
23 point prior to the Olympics because a lot of
24 these athletes would not have been able to go to
25 the Olympic Games and qualify for whatever

Page 288

1  reasons they didn't qualify. So there was a
2  conscious decision at that point to suspend the
3  program.
4      Q   Because?
5      A   After a certain point, because
6  No. 1, there was not going to be anyone around to
7  coach these athletes. And we're looking at, you
8  know, developing -- we're looking at how -- what
9  we do going forward.
10     Q   Why wouldn't there be anyone to
11 coach the athletes at the OTC program? Wasn't
12 Chul Ho Kim here?
13     A   If you remember correctly, he was
14 on his way -- would be on his way going to Malta
15 and to the Olympic Games, so there would be no
16 one there coaching them.
17     Q   Han Won Lee was the OTC resident
18 athlete coach in 2000 and he participated at the
19 Olympic Games. The program wasn't shut down.
20 Were you aware of that?
21     A   No, I wasn't aware of that.
22     Q   Were you aware that Mr. Dae Sung
23 Lee was the resident athlete coach in 1992 and he
24 participated in the Olympic Games and the program
25 wasn't shut down?

Case 1:04-cv-00461-SOM-LEK   Document 272-3   Filed 03/21/2006   Page 6 of 8

DEPOSITION OF ROBERT GAMBARDELLA                                    4/5/2005
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.

Page 289

1     A   No, I was not aware of that.
2     Q   If you were aware of such
3 information, would that have affected your
4 decision to suspend the OTC program?
5     A   I don't think so.
6     Q   Why not?
7     A   Because there were other inherent
8 problems that were -- that existed.
9     Q   Such as?
10     A   Behavior types of things.
11     Q   Behavior of who?
12     A   Of some athletes.
13     Q   Was it -- how many athletes, who
14 are you specifically speaking of?
15     A   I was just giving you a general
16 overview of one of the conditions. That's all.
17     MR. LEVINSTEIN: You can just say he
18 shut down the program, but I don't know what it
19 has anything to do with this case. He made
20 business decision to shut down the resident
21 program.
22     Q   (BY MR. UESUGI) That's what we're
23 trying to find out. Was it a business decision?
24     A   Yes, it was.
25     Q   What was the business of? What

Page 290

1 was the business decision? Was it a financial
2 decision?
3     A   Yes, it was.
4     Q   How much does it cost to fund the
5 OTC resident athlete program per year?
6     A   I'd have to ask the USOC per
7 year.
8     Q   You don't know?
9     A   I imagine it's $60 per day per
10 athlete per room and board.
11     Q   Is that what the USTU has to pay?
12     A   If it's a resident program, they
13 don't have to pay. However, there are now in the
14 provisions that, again, programs have to have
15 impact. And if you've watched what's happened in
16 the past couple months, you can see that programs
17 have been moving off because of the fact that
18 they may not have the impact that the US Olympic
19 Committee has.
20     Q   Nia Abdallah, who made the US
21 Olympic team in 2004, she was a resident athlete;
22 isn't that correct?
23     A   Yes.
24     Q   Isn't that an impact?
25     A   Yeah, certain percentage of the

Page 291

1 athletes, small percentage.
2     Q   In spite of that, you closed the
3 program?
4     A   Yes. We as a group,
5 collectively, talked about it and then made a
6 decision to close the program.
7     Q   After she made the US Olympic
8 team?
9     A   It was -- basically the program
10 was shut, I want to say, was suspended like
11 June 20th just to give everyone an opportunity to
12 go to the qualification -- last qualification
13 tournament and then give them some time, rather
14 than just throwing them out on the street. We
15 didn't want to do that. So we gave them some
16 time to prepare to move on to different cities.
17     Q   When was this decision made?
18     A   I don't know the exact dates, but
19 it was early, early on.
20     Q   In February?
21     A   I can't remember, but it was
22 early.
23     Q   Was this a GMC committee
24 decision?
25     A   Yes, collectively it was a

Page 292

1 management committee decision.
2     Q   Okay. And that would have been
3 documented in the minutes?
4     A   I would think so.
5     Q   I don't remember seeing it. Was
6 it -- did you produce it?
7     A   I don't know.
8     Q   Okay. This is the letter to Jim
9 Scherr from Mr. Kim, which we will mark as the
10 exhibit next in order.
11     (Exhibit 70 was marked.)
12     Q   (BY MR. UESUGI) In the third
13 paragraph, it says, I strongly believe that sense
14 of mutual trust and respect is a crucial part of
15 any organization, especially in Taekwondo.
16 Unfortunately, when I attempted to access my
17 office after returning from Olympics, I was
18 shocked to find that my door locks has been
19 changed without prior notice. Certainly not the
20 type of welcome I had expected. Is that what
21 happened?
22     A   Well, whenever you have change in
23 personnel, I think it's a common practice that
24 you do change locks on doors. And I did offer
25 Mr. Kim the opportunity to come and work within

DEPOSITION OF ROBERT GAMBARDELLA
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/5/2005

Page 293

1  our office area. We did have an office area
2  within there, in that area. So again, it may be
3  just hearing half of the story.
4      Q   Next paragraph, when I visited
5  Mr. Bob Gambardella, the acting CEO of USTU for
6  an explanation, I was coldly told that my service
7  was no longer needed and was ask to leave the OTC
8  and US when my visa expires. Is that what
9  happened?
10     A   No, not at all.
11     Q   What did happen?
12     MR. LEVINSTEIN: He's already testified
13 to this.
14     A   Here, right here. This is the
15 letter. This is what happened. We had that
16 meeting and I talked to you about what
17 transpired.
18     Q   (BY MR. UESUGI) My youngest of
19 three children was born in the US in July 2003
20 and Mr. Gambardella had previously promised to
21 assist our family attain our visa to stay in the
22 US. Do you understand the significance of
23 Mr. Kim's son or child being born in the US?
24     A   No, I don't know exactly what you
25 mean, but maybe you might want to tell me.

Page 294

1      Q   If a child is born in the US from
2  Korean-born parents and if they move back to
3  Korea, like it has been alleged that you
4  suggested, that child would be ineligible for
5  such things as medical benefits, schooling, or
6  those kinds of things that are offered to
7  citizens that are born in Korea.
8      So the fact that Mr. Kim's youngest was
9  born in the US meant that he couldn't get many
10 benefits that other Korean-born children were
11 able to attain. Did he explain that to you?
12     A   No.
13     Q   There's a statement here, among
14 our mutual agreements he had also assured --
15     MR. LEVINSTEIN: Among other.
16     Q   (BY MR. UESUGI) Among other
17 mutual agreements, he had already assured me --
18     MR. LEVINSTEIN: Reassured.
19     Q   (BY MR. UESUGI) Reassured me,
20 sorry, the continued OTC coaching position
21 contingent upon winning an Olympic medal,
22 promises I kept. Was that your mutual agreement?
23     A   It's not an agreement that I came
24 up with.
25     Q   Did you have any agreement with

Page 295

1  Chul Ho Kim with respect to performance at the
2  Olympics?
3      A   No, nothing. I would never put
4  myself in a position like this.
5      Q   Whose agreement was that, do you
6  know? Do you know if anyone made this type of
7  agreement to Chul Ho Kim?
8      A   You'd have to ask Mr. Kim.
9      Q   Did Mr. Herb Perez approach you
10 about Chul Ho Kim's situation and talk to you
11 about whether he could stay if he -- contingent
12 upon him helping Nia Abdallah win a medal at the
13 Olympics?
14     A   No, we never had that
15 conversation.
16     Q   Did you have any conversations
17 with Herb Perez about Chul Ho Kim?
18     A   He asked me about him. And I
19 said I would take a look at it, you know,
20 afterwards. We want to focus on the Olympic
21 Games. And based on, you know, the contract, I
22 mean, we've got to make a decision when we get
23 back. And that's the conversation I had with
24 Herb Perez.
25     Q   When did you have this

Page 296

1  conversation with him?
2      A   I don't know. I don't remember.
3      Q   Was it in Athens?
4      A   I don't remember, no. I don't
5  think it was, but I don't remember.
6      Q   Because you stated when you got
7  back you had to make a decision?
8      A   Well, because of the contract.
9  If you look at the contract, I can't remember how
10 many days out that you have to provide a notice.
11 And so that's what I meant by getting -- when I
12 get back afterwards.
13     Q   Did you let Chul Ho Kim know
14 other than that letter?
15     A   This letter here?
16     Q   Right.
17     A   Yes.
18     Q   Was that the only form in which
19 you communicated to Mr. Kim about?
20     A   Yes, I was told that I should
21 write a letter stating, you know, what the future
22 is. I was advised, I should say.
23     Q   In your e-mail to Coach Kim on
24 the 6-25-2004, you blind carbon copy
25 Gold92@aol.com. Do you know who that is?

DEPOSITION OF ROBERT GAMBARDELLA
DAE SUNG LEE v. UNITED STATES TAEKWONDO UNION, et al.
4/5/2005

Page 297

1  A   That's Herb Perez.
2  Q   Why did you blind carbon copy
3  Herb Perez?
4  A   Because I know that they were
5  friends and he was helping him and supporting
6  him. So I just wanted to keep Herb in the loop
7  of what was going on.
8  Q   Why a blind carbon copy, why not
9  just a cc?
10 A   I don't remember.
11 Q   Did you subsequently receive a
12 copy of this letter?
13 A   Which letter?
14 Q   Exhibit 70, the letter from Chul
15 Ho Kim to Jim Scherr?
16 A   Yes.
17 Q   How did you get a copy of that
18 letter?
19 A   His secretary sent it to me.
20 Q   What was your response?
21 A   I just tried to answer it as best
22 as I could on my recollection of what had
23 happened.
24 Q   Did you subsequently write a
25 letter on his behalf to the immigration and

Page 298

1  naturalization service?
2  A   At one point I did. Yes, I did.
3  Q   Did you attach any conditions to
4  that letter?
5  A   I don't believe I did.
6  Q   Did you tell Mr. Kim that if he
7  signed the release, and only if he signed the
8  release, that you would sign -- write a letter
9  for him?
10 A   Oh, that is true.
11 Q   That you would only sign a letter
12 to INS if he had signed a release?
13 A   Yeah. We were getting complaints
14 and getting sued by so many people. We wanted to
15 try to eliminate, you know, just another lawsuit.
16 Q   If he didn't sign that release,
17 would you have signed his INS letter?
18 A   I don't know. I would have to
19 sit and think about it, because I did have
20 discussions with Mr. Hurley, his immigration
21 lawyer, we did talk. And he agreed to the fact
22 that this was -- the timing wasn't the greatest
23 in trying to help him. And I couldn't figure out
24 why he would, you know, sent this letter when he
25 did.

Page 299

1  Q   This is different from your
2  June 2004 e-mail in which you said, don't worry
3  about it, I'm going to help you with your green
4  card; is that correct?
5  A   Yes.
6  MR. LEVINSTEIN: Objection. It's a
7  different document you mean?
8  A   Right. It's when this came
9  forward.
10 Q   (BY MR. UESUGI) That changed
11 things?
12 A   It was a little bit
13 disheartening, to tell you the truth.
14 Q   In what way?
15 A   Just some of the things that he
16 alleged in that letter, which we've already gone
17 over.
18 Q   You felt hurt by the letter?
19 A   I don't know if I was hurt, but
20 it was a little bit of just a shock that, you
21 know, he, you know, says a couple of things in
22 this letter. I would never reassure anyone, you
23 know, based on an Olympic medal. You know, the
24 whole aspect of trust and respect, you know, I
25 was -- I'm just taken aback a little bit.

Page 300

1  Q   Okay. I want to show you an
2  exhibit that we're going to mark next in order.
3  It is an e-mail from a World Champion TKD.
4  (Exhibit 71 was marked.)
5  MR. UESUGI: What exhibit is this?
6  THE REPORTER: 71.
7  Q   (BY MR. UESUGI) Do you remember
8  receiving this e-mail?
9  A   I think you sent it to me.
10 Q   No, I didn't. Do you remember
11 receiving this letter from World Champion TKD?
12 A   Okay, yeah. As I read the line,
13 yes.
14 Q   That's your e-mail address,
15 bob.gambardella@usoc.org?
16 A   It sure is.
17 Q   What did you do when you received
18 this e-mail?
19 A   What I did was I read it and then
20 I just deleted it. Because I'm not going to get
21 in between you and John and anyone else's fights.
22 So I felt that it's ridiculous that your e-mails,
23 which would perpetuate somebody writing something
24 like this, would bring it to this level.
25 Q   So you didn't conduct --

78 (Pages 297 to 300)

VSM REPORTING, LLC
P.O. Box 186           Larkspur, CO 80118           vsmreporting.com
(303) 681-9939