**4/8/2005 Chalmers, Jill J. Esq.**

```
     0001
 1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF HAWAII
 2              CIVIL ACTION NO. 04-00461-SOM-LEK

 3    _____

      DEPOSITION OF JILL J. CHALMERS, ESQUIRE
 4    EXAMINATION DATE:  Friday, April 8, 2005
      _____
 5

      DAE SUNG LEE,
 6
      Plaintiff,
 7
      v.
 8
      UNITED STATES TAEKWONDO UNION,
 9    a Colorado nonprofit corporation, et al.,
10    Defendants.
      _____
11
12             PURSUANT TO SUBPOENA, the deposition of JILL
      J. CHALMERS, ESQUIRE, was taken at 8:11 a.m. on Friday,
13    April 8, 2005, at the Double Tree Hotel at 1775 E.
      Cheyenne Mountain Boulevard, Colorado Springs,
14    Colorado, before Valorie S. Mueller, Registered
      Professional Reporter and Notary Public in and for the
15    State of Colorado, said deposition being taken pursuant
      to the Federal Rules of Civil Procedure.
16
17
18
                          Valorie S. Mueller
19                  Registered Professional Reporter
20
21
22
23
24                          EXHIBIT 3
25
```

```
 1   expressed your feeling that the Membership and
 2   Credentials Committee was running amuck.  Did --
 3              MR. LEVINSTEIN:  Let's take them one at a
 4   time and separate them out because they present
 5   different issues.
 6       Q      (BY MR. JONES)  Did you hear Jeannie
 7   Picariello state that she felt USTU -- or refer to USTU
 8   as a Korea Mafia-run organization during any portion of
 9   the meeting in Denver?
10       A      No.
11       Q      Did you hear anyone on the USOC side use
12   language similar in reference to the USTU -- language
13   similar, I mean, "Korea Mafia" or words to that effect?
14       A      No one from the USOC Membership and
15   Credentials Committee or from the USOC.
16       Q      Who, if anyone, did you hear use that kind
17   of language?
18       A      Sammy Pejo.
19       Q      Your best memory of what Sammy Pejo said
20   at the Denver meeting?
21       A      I didn't hear Sammy use that term during
22   the Denver meeting.
23       Q      It was at a different time?
24       A      Yes.
25       Q      When, if you can say?
```

```
 1   plan where the leadership would be retained, although
 2   the Executive Director would resign.  And it was clear
 3   during the closed door meeting that members, and I
 4   can't remember individually which members, but certain
 5   members felt that the leaders of the organization
 6   should be held accountable for noncompliance with the
 7   USOC directives.
 8        Q    So did it sound to you like the committee
 9   had already made up its mind by the Denver meeting that
10   that's what they wanted to do?
11             MR. LEVINSTEIN:  Objection.
12        A    During the meeting, it was my belief that
13   certain members had made up their mind about
14   noncompliance and that the leadership and management of
15   the organization was insufficient.
16        Q    (BY MR. JONES)  Bruce Harris stated that
17   you told the USTU management after the meeting that you
18   thought the committee was running amuck.  Was that a
19   fair characterization of what was going on in there?
20             MR. LEVINSTEIN:  Objection.
21             MR. RYCHENER:  And I also object, I think
22   that does ask for attorney work product, thought
23   processes.  I mean, if you want to ask, did she say
24   that, I think that's where to start.
25        Q    (BY MR. JONES)  Did you say that?
```

4/8/2005  Chalmers, Jill J. Esq.

1      A      Those are not my words.

2      Q      Did the committee appear to be running

3  amuck --

4             MR. LEVINSTEIN:  Objection.

5      Q      (BY MR. JONES)  -- during the closed-door

6  session?

7             MR. LEVINSTEIN:  I think that's tied in

8  with legal advice and work product.  I don't even know

9  what it means.

10     A      And I'm not sure what running amuck means.

11 I can tell you that I thought that USTU, during the

12 open meeting, did not have proper opportunity to fully

13 explore the remediation plan that they were proposing

14 and to show the USOC the efforts they were taking to

15 try to comply with the requirements, because during the

16 meeting, much of the time was taken by members of the

17 USTU who spoke against the governance and management

18 during that meeting.

19            So from a time standpoint, it was very

20 difficult for us to represent and defend the USTU when

21 they were being questioned not only from the Membership

22 and Credentials Committee but from members and factions

23 of the organization itself.  And for that reason, it

24 did not seem to me that USTU had a fair opportunity to

25 be heard.

4/8/2005  Chalmers, Jill J. Esq.

```
 1          Q     (BY MR. JONES)  Just like a day after,
 2   right?
 3          A     That's correct.
 4          Q     Why did Holme and Roberts withdraw from
 5   representation on October 29, 2003, if you know?
 6                MR. LEVINSTEIN:  Objection; calls for
 7   attorney-client privileged communication.
 8                MR. RYCHENER:  Same objection.
 9                MR. JONES:  Instructing her not to
10   answer?
11                MR. RYCHENER:  That's correct, to the
12   extent it calls for attorney-client communications.  I
13   think the letter indicates, to some extent.  But beyond
14   the letter, I think I will instruct her not to answer.
15          Q     (BY MR. JONES)  Was Holme Roberts also
16   representing USOC in any matters during this period, if
17   you know?
18          A     I don't believe so, but I don't know for
19   certain.
20          Q     Do you know if it had in the past?
21          A     I believe it had in the past.
22          Q     It had represented USOC in the past?
23          A     I believe so, but I don't know for
24   certain.
25          Q     Going back to Exhibit 113, these
```