# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| DAE SUNG LEE, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES TAEKWONDO UNION, a Colorado nonprofit Corporation, UNITED STATES OLYMPIC COMMITTEE, a federally chartered nonprofit corporation; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10, <br><br> Defendants. | Civil No. 04—00461 SOM TEK <br><br> DECLARATION OF VIRGINIA WITTE; EXHIBITS A THROUGH C |

---

### DECLARATION OF VIRGINIA WITTE
### MANAGING DIRECTOR OF THE UNITED STATES OLYMPIC
### COMMITTEE AND GOVERNANCE AND MANAGEMENT COMMITTEE
### MEMBER, UNITED STATES TAEKWONDO UNION

1.     My name is Virginia Witte.  I am currently serving as a member of the Governance and Management Committee of the United States Taekwondo Union ("USTU").  I have held that position since February of 2004.

2.     I received a B.S. in Accounting from the University of Colorado at Colorado Springs in 1988.  I became a Certified Public Accountant ("CPA") in 1990 and a Certified Internal Auditor ("CIA") in 1991.  I am also a member of the American Institute of Certified Public Accountants, the Colorado Society of Certified Public Accountants, and the Institute of Internal Auditors.

EXHIBIT   "2"

3.      I worked at Texas A&M University from 1988-1992, where I originally served as an Internal Auditor, was promoted to Senior Auditor, and then promoted to Assistant Director of Internal Audit. I had a staff of 12 employees who audited the operating units of Texas A&M University for compliance with university policies and procedures. During my tenure at Texas A&M University, I also investigated the potential misappropriation and misuse of funds at the university. I was hired by the United States Olympic Committee ("USOC") on June 1, 1992, to serve as the Internal Auditor and essentially to develop the audit function for the USOC. I was promoted to be a Manager in 1994, to be a Director in 1996, and then to be the Managing Director starting in 2003.

4.      During my tenure with the USOC I created the audit function for the USOC to audit the USOC's National Governing Bodies ("NGBs") and Disabled Sports Organizations ("DSOs") that receive grant funding from the USOC. My staff and I perform audits of NGBs and DSOs and perform internal audits of the USOC and its organizational departments. We also serve as consultants on "best practices" for USOC organizations, while reviewing internal controls, accounting system designs, budget processes, and operating procedures of these organizations.

5.      Typically, the Audit Division conducts a biannual "grant compliance audit" of each NGB for their grant funding from the USOC. The amount of the grant funding is determined by the USOC's Sports Partnership division and is detailed in each NGB's Performance Partnership Agreement. This annual grant funding is typically paid to the NGBs on a quarterly basis in advance of their expenditures. The USOC and the Sports Partnership division require each NGB to spend the grant funding on certain approved grant projects and to file an annual grant report. These grant reports must account for all of the grant funding provided by the USOC the previous year. The grant reports must indicate the total expenditures by the NGB on each grant project, the total USOC funding allocated to the project, other sources of available revenue allocated to the project, and a narrative explaining the project's nature, participants, and any problems encountered. The auditor checks the NGB's general ledger to verify that the amount of expenditures listed in the general ledger matches the amount of the expenditures detailed in the grant report. The auditor also checks to verify that there is a "map" to show which general ledger accounts relate to which grant reports. Additionally, using a sample of expenditures made by the NGB, the auditor will examine backup documentation—such as invoices— for the expenditures to test or verify the expenditures. The auditor also studies and analyzes the accounting and administrative functions of the NGB based on USOC directives regarding grants and athlete assistance, provisions of USOC grant contracts, NGB internal operating

procedures, Generally Accepted Accounting Principles (GAAP), General Accepted Accounting Standards (GAAS), and other criteria to conform with the Institute of Internal Auditors' "Standards for the Professional Practice of Internal Auditing." Additionally, the auditor reviews the NGB's policy and procedures, internal controls, and segregation of duties. The auditor will then write up a report of his or her findings and recommendations.

6.    The general purpose for conducting an audit of an NGB is to make sure that the NGB is making appropriate use of the funds it receives to benefit the athletes it serves. Generally speaking, NGBs receive Base Funding and Performance Pool Funding each year from the USOC. This funding, and restrictions for spending the funding, are detailed in a Performance Partnership Agreement ("PPA") for each NGB. The general purpose of the audit is to determine how this funding is spent and accounted for. The auditor will also determine if prior audit recommendations have been implemented, ensure that the NGB is in compliance with the requirements agreed to and set forth in the PPA for the applicable period, ensure that the NGB maintains and has submitted accurate and complete financial reporting, and verify that the NGB has an adequate internal control process in place to ensure that USOC funds are protected and spent properly allocated by the NGB. I have audited every NGB at least once during my tenure with the USOC.

7.    I personally audited the USTU six times from 1992 to 2003. During those eleven years, with one exception, the USTU exhibited a pattern of severely insufficient financial reporting and controls. In fact, when I first audited the USTU in 1992, the near entirety of its financial records and reporting consisted of a bag filled with receipts. The USTU historically failed to properly account for the money that it spent, had poor or sometimes nonexistent records to support its expenditures, and failed to properly fulfill its role as an NGB. Part of these problems stemmed from the fact that the USTU failed to hire qualified individuals to perform financial services for its organization.

8.    Additionally, for many years, allegations of impropriety and mismanagement were made by USTU members, and repeated problems in USTU accounting for USOC grant funding were identified. I was witness to numerous examples of financial mismanagement and improper financial activity by the USTU, including instances where the USTU submitted forged financial receipts to the USOC.

9.    Based on my experience at the USOC, it is my opinion that the USTU has had the worst financial controls, the worst financial reporting, the worst spending

practices with respect to funding received from the USOC, and has exhibited the worst financial mismanagement of any NGB that I have ever seen, and there are about forty-five (45) NGBs for Olympic, Paralympic, and Pan American sports. The USTU has not been treated any differently than any other NGB, until the most recent issues of fiscal unreliability were identified during 2003. However, as I stated earlier, the USTU's problems that came to a head in 2003 were more severe than any others I have seen during my tenure with the USOC. Because of these significant problems, the USTU was audited 11 times by the USOC between 1992 and 2003, while most other NGB's were only audited 4 or 5 times during this period. Additionally, in 2003, the Audit Division spent more than 500 hours working with the USTU, attempting to identify and correct its various problems so that the USTU would be in compliance with the USOC requirements. The USOC audit division tried extremely hard to help the USTU and improve its financial controls, but, despite our help, the USTU's finances and financial management only deteriorated over time, eventually resulting in the January, 2004 hearing before the USOC Executive Committee.

10.    The USOC bent over backwards to help the USTU with its financial problems for the twelve years from 1992 to 2004. As I stated earlier, the Audit Division has audited the USTU eleven (11) times since 1992. After each of these audits, the Audit Division gave detailed written recommendations to the USTU that, if implemented by the USTU, were designed to improve the USTU's finances by improving its reporting procedures and accountability for USOC funds. Additionally, auditors within the Audit Division of the USOC spent considerable time with the leadership and financial staff of the USTU giving them detailed, hands-on instructions regarding ways to improve the USTU's finances.

11.    The USOC's Audit Division also audited the USTU's 2001 grant funding in 2002, following the typical procedures I described earlier. However, before we began the audit, an allegation had been made that USTU officers had been incurring extravagant entertainment expenses, unnecessary to the mission of the organization. Furthermore, during the audit, allegations were also made that USTU officers were receiving improper payments for services and that inappropriate charges were being made on the corporate credit cards. We therefore expanded our audit procedures to address each one of these allegations. Thus, in addition to the typical grant procedures, we reviewed the 2002 year-to-date general ledger and selected all expenses greater than $200 believed to be entertainment related. The supporting documentation was reviewed in an effort to determine the expense's relationship to the USTU's mission. We also reviewed disbursements to

USTU Officers and reviewed the corporate credit card statements and supporting documentation.

12.    As a result of the 2002 audit, the USTU was required to return $35,863. The audit process revealed, among other things, that the USTU had failed to use and thus had to return certain funds. Other amounts reported on the USTU grant report did not agree with the amounts in the general ledger, could not be reconciled by USTU, were determined to be unsupported, and were therefore disallowed. Other expenses were disallowed for not being acceptable under USOC grant funding. The grant audit also yielded eleven recommendationsfor USTU improvements in financial practices, four of which were repeated from the prior audit. Due to the subjectivity of the additional allegations that I discussed earlier and the lack of quality documentation, we were not able to determine the legitimacy of these allegations. Many invoices were missing and rarely were original copies available to support the credit card statements. Because of the weak documentation and subjectivity, we could not give any opinion on the allegations. A report was not issued regarding these allegations.

13.    The Audit Division audited the USTU three times in 2003. Typically, audits are performed for each NGB on a biannual basis, but the USTU has had so many financial and reporting problems that it was decided to conduct annual grant audits.

14.    The USTU's audit that culminated in its August 29, 2003 report was originally scheduled to begin on May 7, 2003, but per the USTU's request, the audit was postponed until June 16, 2003. The USTU requested another delay until August 2003, but this request was denied. When a member of the Audit Division arrived at the USTU's office on June 16, it became immediately clear that the USTU was not prepared for the audit. The documentation was so disorganized that we were unable to determine its relationship to the grant projects. We agreed to give the USTU approximately one month to reorganize the documentation and compile the appropriate grant-related information. However, at the direction of the USOC Membership and Credentials Committee, we performed additional procedures during the week of June 16, 2003 to ascertain USTU's managerial and financial capability and to determine its ability to meet its obligations as an NGB. These procedures involved a review of vendor files, the general ledger, and cancelled checks. It also included observations made while onsite and interviews of the Executive Director and staff.

15.    We returned to USTU on July 21, 2003 and spent three days on the audit. Generally speaking, we followed the typical audit procedures I described above.

As a result of this audit of the USTU, we made 19 recommendations. We found that the USTU had only properly implemented six of the eleven recommendations from the prior year's audit. We found that the USTU was not in compliance, as their USOC funding was not utilized or expended as agreed. Of the total funding the USTU received for 2002, the USTU left $116,749 unutilized and $15,710 of expenses were disallowed. The USTU was not in compliance with the requirements of its PPA because neither its budget nor its audited financial statements were submitted as required. We found that, as in the prior year, its final grant reports were incomplete, inaccurate, not supported by proper documentation, and fell short of the actual funding level. Once again they were also filed late. All of these problems continued despite the fact that the USOC gave the USTU substantial help and guidance over a period of several months concerning the USTU's grant report.

16.    We found that the USTU's control environment was completely inadequate and lacking safeguards to protect the organization's assets, USOC funds, or to provide reasonable assurances that the USTU will meet its stated objectives and obligations as an NGB. We found that the USTU did not have a current Policies and Procedures manual. There was a document called a Policies and Procedures manual formulated during 2001, but this manual was still in draft form throughout all of 2002, was never approved by the USTU Executive Committee, and was never implemented or enforced. Further, when asked, USTU management was not even aware of its existence.

17.    We found that there was a completely improper segregation of duties by the USTU. Segregation of duties, means, among other things, dividing the authorization, recording, and execution of transactions among different individuals so all functions of a transaction are not performed by one individual. Duties in the cash management functions of the USTU were not adequately segregated. The same individuals are posting transactions, making the deposits, and reconciling the bank accounts.

18.    We found that USTU had inadequate procedures for cash management at events. We found that the USTU was not prepared for the audit. The financial information we needed to conduct the audit was disorganized and not presented in a format to permit auditing. The USTU did not maintain its 2002 general ledger and the financial records were unreliable. When the audit procedures began, bank reconciliations had not been performed since November 2002 and receipts were not entered into the general ledger for the entire year of 2003. We found that the USTU did not complete and implement its 2003 budget until July 2003.

19.   We found that the USTU had grossly inadequate staffing in its finance department. At the time of the report, the USTU had not hired a permanent finance director and temporary employees were running the finance department. One accountant was fired by the Finance Director during the audit, and the Finance Director was in turned fired in July 2003. We found that the USTU had failed to implement processes to maintain control of its financial records. We found various other instances of financial mismanagement. For example, the President of the USTU owned and operated two taekwondo schools in Colorado Springs, and also maintains an office to support these schools. We discovered through admission by the prior Executive Director and through discussions with staff that the President's assistant worked at this office and performed duties for the President relating to his other businesses, while being paid as a full time employee of USTU, receiving 100% of her salary and benefits from USTU. USTU management was unaware of any work by the President's assistant for the benefit of the USTU.

20.   We also found that USTU volunteers micromanage the organization, which had resulted in a circumvention of internal controls. For example, there were many occurrences where the volunteers directly authorized disbursements outside of the normal process.

21.   We found that the USTU financial and managerial capability was not adequate to plan and execute its obligations as the NGB of Taekwondo in the United States.

22.   During the October 2003 audit, we found that the USTU had definitely failed to adequately implement seven of the nineteen recommendations from the prior audit and that six other recommendations required more time to determine whether the USTU's asserted implementation was adequate.

23.   Prior to the January 2004 USOC Executive Committee hearing concerning the USTU, we found that the USTU was insolvent, over one million dollars in debt, and had a net loss for 2003 of $216,839. In comparison to the December 5, 2002 report, we found that the USTU's financial situation had worsened.

24.   Waugh & Associates, P.C. was the USTU's outside auditing firm. Unfortunately, the inadequacies of USTU's accounting records resulted in Waugh being unable to form an opinion regarding the amounts recorded for revenue, expenses, assets, liabilities, and net assets. Finally, in October 2003, Waugh & Associates resigned as the USTU's independent auditor.

25.    After reviewing the audits of USTU in 2003, I concluded that the USTU's financial and managerial capability was inadequate for the USTU to plan and execute its obligations as the NGB of Taekwondo in the United States. Based on the USTU's pattern of non-compliance and almost complete failure to remedy any of its financial problems over the past several years, I did not believe the USTU had given any real indication that as an organization it had the ability or the present intention to remedy its shortcomings.

26.    While the Audit Division was conducting its audits of the USTU, the USOC Membership and Credentials Committee was conducting a compliance review of the USTU that began in 2001. The Membership and Credentials Committee is charged, under Chapter XXII of the USOC Bylaws, with the responsibility of reviewing and reporting on compliance of the United States National Governing Bodies ("NGB") with the requirements for membership as an Olympic Sport Organization and recognition as a sport's NGB. Pursuant to this compliance review of the USTU, the Membership and Credentials Committee held several meetings with the USTU, conducted a public forum for those interested in the sport of taekwondo, reviewed correspondence on compliance provided by the USTU, examined USTU's compliance with the anti-doping requirements for NGB membership, and analyzed the audit reports prepared by the USOC Audit Division.

27.    The Membership and Credentials Committee concluded that the USTU was not in compliance with the requirements for membership as an Olympic Sports Organization or for recognition as a NGB, as set forth in the USOC Constitution and Bylaws. The Committee therefore submitted a Resolution to the USOC Board of Directors requesting that it determine that the USTU was not in compliance and asked the USOC Board to direct the USOC Executive Committee to initiate action pursuant to the USOC Bylaws to revoke USTU's membership in the USOC and its recognition as an NGB. At the October 18, 2003 meeting of the USOC Board of Directors, the Board adopted the Membership and Credentials Committee's Resolution.

28.    While the decertification process for USTU proceeded, the USOC worked closely with the USTU to develop a Remediation Plan that would help solve its administrative and financial troubles. In addition, the USOC began to prepare for the USOC Executive Committee hearing on the USTU's possible decertification by compiling testimony regarding the USTU's problems and evidence of its noncompliance, such as the audit reports issued by the USOC Audit Division and certain correspondence. All of this testimony and evidence, in addition to the

- 8 -

complaint describing the USTU's noncompliance, was compiled into a report that was to be used at the arbitration hearing.

29.     At the USOC Executive Committee meeting and throughout the process conducted by the USOC Membership and Credentials Committee, the USTU was represented by counsel. After the direct testimony and exhibits were introduced and distributed to the Executive Committee members, the USTU and the USTU President reached a settlement agreement with the USOC. Pursuant to the settlement agreement, which is attached to this declaration as Exhibit A, the USOC agreed to halt the noncompliance proceedings in exchange for the USTU's agreement to enter into a Remediation Plan. As long as the USTU followed the remediation plan and took steps to come into compliance with its obligations as an NGB, the USOC would not take steps to decertify the USTU, but if the USTU failed to make progress toward compliance, the USOC could proceed based on the evidence already submitted at the hearing.

30.     The Remediation Plan agreed to by the USTU, among other things: 1) required that all officers and members of the USTU Executive Committee resign; 2) terminated all USTU state president and delegate appointments; and 3) established a five member Governance and Management Committee to monitor USTU compliance and assist in the reformation of the USTU with the goal of helping it succeed as an organization and fulfill its mission as a NGB. I have attached the Remediation Plan to this declaration as Exhibit B.

31.     The USTU Board approved the settlement agreement and the remediation plan, and the USTU officers and all other necessary USTU personnel took all steps necessary to ratify the settlement agreement and remediation plan

32.     In late January or early February 2004 I was selected to serve as one member to the USTU Governance and Management Committee. In that role, I am responsible for analyzing and reforming the USTU's governance structure, working with and overseeing the new Chief Executive Officer of the USTU, assisting with the development of sound financial policies, monitoring USTU compliance with the USOC Bylaws, and doing whatever else is necessary to ensure the success of the USTU as an NGB.

33.     As part of the new management of the USTU, we have been reforming the USTU by reinforcing and focusing on the primary mission of the USOC and its national governing bodies: supporting United States Olympic athletes to achieve

sustained competitive excellence, including winning Olympic medals. To achieve that goal we are transforming the USTU into a performance-based organization with the goal of success of elite competitors in major international competitions, with the primary focus on winning Olympic medals. In addition to having the most qualified athletes representing the United States at the Olympic Games, it is important that the USTU provide these athletes with the best facilities, equipment, administrators, trainers, and coaches to assist them in achieving peak performance.

34.    One component of the USTU process for ensuring that the USTU fulfills its mission was the development of new criteria for the selection of the USTU's Olympic coaches. The new USTU management believes strongly that coaching decisions should be based on who would best assist the athletes in winning medals. A taekwondo coach is with the Olympians during the weeks leading up to the games and sits next to the competition ring and is responsible for advising the competitors throughout each match. Therefore, it is the view of the USOC Sports Partnership Division and other USOC professionals with expertise concerning issues of maximizing sport performance that the coaches who worked on a daily basis with the athletes as they attained the skills necessary to qualify for the Olympic Games —and who are thus familiar with the athletes' strengths, abilities and weaknesses—would generally provide the greatest chance of victory. Furthermore, because the taekwondo athletes representing the United States are not chosen until two or three months prior to the Olympic Games, the replacement of the coaches who have been working with and training these athletes with someone unfamiliar with the athletes would be very disruptive to the training process. In fact, if we named outsiders as the Olympic coaches, the athletes would continue training with the coaches with whom they have been working, and the USTU would be paying expenses for Olympic coaches who would not be helping the athletes at all.

35.    The USTU's prior criteria for selecting Olympic coaches focused on the applicants' prior coaching experience in a wide array of international competitions, including the Olympic Games, the Pan-American Games, the World Championships, the World Cup, and the Pan-American Championships. Therefore, the coaches selected under these criteria did not necessarily have any familiarity with the individual taekwondo competitors who were going to be representing the United States in the Olympics. Being named the Olympic coach was more like receiving an award than being selected to help train United States Olympians. This approach yielded coaches who were named to a figurehead position. They traveled to events all over the world with their travel expenses paid for by the USTU and did little, if anything to help United States athletes achieve success. It was my

strongly-held view that it was not a proper use or expenditure of USTU or USOC funds to pay for someone to travel to Athens as a "coach" if that person was not going to coach our Olympians and was not going to increase the likelihood that our athletes would be successful, especially if there were other coaches who were likely to coach our athletes and help them secure medals.

36.    During the beginning of 2004, the USTU developed, with the assistance of the USOC Sport Partnerships Division, new coaching criteria designed to support the United States Olympians who would be competing in Athens. The new coaching criteria were specifically voted on and approved by the USTU Governance and Management Committee, of which I am one of the five (5) members. The new criteria were also approved by the USOC Sport Partnerships Division, the USOC Delegation Review Committee, and the USOC Executive Committee. Under the new coaching criteria, coaches are selected based on the following criteria, in priority order:

    (A)    Number of athletes the coach has placed on the 2004 Olympic Team

    (B)    Competition record (from June, 2003 to June, 2004) of the athletes placed on the 2004 Olympic Team. Priority consideration will be given to results from, in priority order:
        . 2003 World Championships
        . 2003 Pan American Games

The new coaching criteria are attached to this Declaration as Exhibit C.

37.    The USTU coach selection procedures require the USTU Chief Executive Officer to screen candidates to ensure that they meet the defined criteria and to forward the nominees to the USTU Governance and Management Committee, which must then vote on approval of the nominees.

38.    In selecting the 2004 United States Olympic taekwondo coaches, the USTU followed the exact procedures and criteria outlined above. The USTU CEO considered all the coaches who had expressed interest in the position and coaches like Mr. Lee who had previously held USTU international coaching positions. Applying the new selection criteria, the coaches who had placed Steven Lopez and Nia Abdallah on the Olympic Team-Jean Lopez and Chul Ho Kim-satisfied the first criterion. Jean Lopez scored higher on the second criterion because the athlete he coached, Olympic gold medalist Steven Lopez, possessed the better competition record in the most recent elite international competitions-the 2003 World Championships and the 2003 Pan-American Games. Therefore, the USTU CEO recommended that Jean Lopez be selected and he forwarded Jean Lopez's name to the USTU Governance and Management Committee. The Governance and

Aug-08-2004  10:53am  From-USOC A'                    7188884181            T-724  P.002/002  F-798

Management Committee, including myself, then voted to recommend Jean Lopez to serve as the coach for the 2004 Olympic Games, and this recommendation was approved by the USOC on June 22, 2004.

39.    Because of the importance to the USTU of its athletes doing well in the Olympics and because the USTU firmly believes that its athletes will be likely to perform better when assisted by coaches who consistently over time have worked with them, the USTU Governance and Management Committee voted unanimously on July 1, 2004, to allocate the necessary funds to also send Chul Ho Kim, Nia Abdallah's coach, to the Malta training camp and to Athens to coach Nia Abdallah. However, the USTU does not, at this time, have a second coaching credential for Coach Kim, who was Nia Abdallah's coach at the Pan-American Games and is also her coach at the Olympic Training Center in Colorado Springs. If we are unable to secure a second credential, Coach Kim will not be permitted to coach Nia Abdallah from ringside during the Olympics. However, the USTU is currently seeking another coaching credential that would permit Coach Kim to assist Nia Abdallah ringside. It is my understanding that one important factor in the consideration given to the USTU's request for another coaching credential is that the potential recipient actually be a coach working and training with one of the athletes, rather than a mere figurehead. We are hopeful that by the dates of the Olympic taekwondo competition, we may have a second coaching credential for Coach Kim, in order that he can coach Nia Abdallah at ringside.

40.    Throughout the 2003 process of addressing the USTU non-compliance of its responsibilities as an NGB, and throughout the coach selection process and the process by which the coach selection process and procedures were developed, the sex, race, or national origin of coaching candidates were never a consideration. All decisions were based on performance issues and an effort to select the coaches who would be most likely to help our United States Olympians win medals in Athens. It is my understanding that Coach Kim is a Korean-American, but again that played no role, one way or the other, in the decisions we made.

41.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  August 6, 2004

*Virginia Witte*
Virginia Witte

- 12 -

## AGREEMENT

The parties to this Agreement, dated January 27, 2004, are the United States Olympic Committee ("USOC"), the USOC Board of Directors, and the USOC Executive Committee, on the one hand, and the United States Taekwondo Union ("USTU") and USTU President Sang Lee on the other hand.

WHEREAS, on November 11, 2003, the USOC filed a Complaint against the USTU, pursuant to 36 U.S.C. § 220521(d) and Article IV of the USOC Constitution, as amended through April 12, 2003, which authorizes the USOC to take appropriate action to terminate membership in the USOC, to place conditions on continuing membership in the USOC, and, if necessary, to revoke the recognition of an amateur sports organization as a national governing body ("NGB") and a member of the USOC. The Complaint charges that the USTU has failed to meet its managerial and financial responsibilities as an Olympic Sports Organization and has violated certain other obligations the USTU has as an NGB, as required by, among other provisions, 36 U.S.C. § 220522(a) and Article IV, Section 4(C)(a)(2) of the USOC Constitution, and that the USTU has failed to meet its obligations to its members and to U.S. athletes and has failed to conduct itself in a manner that demonstrates that it is capable of fulfilling the responsibilities of an Olympic Sports Organization and as an NGB, as is required by 36 U.S.C. §§ 220522, 220523, 220524, and 220525 and by Article IV, Section 4(C) and Article VII of the USOC Constitution and by Chapter XXIV of the USOC Bylaws. The Complaint seeks the following remedies: that the USTU's membership in the USOC as an Olympic Sports Organization be terminated; that the USTU's recognition as the NGB for the sport of Taekwondo be revoked; that the USTU resign its membership in the World Taekwondo Federation; and that the USTU vacate the premises provided by the USOC at the United

EXHIBIT A

States Olympic Training Center, return all USOC property in its possession, and repay any monies owed to the USOC.

WHEREAS, on December 10, 2003, the USTU filed an Answer and Motion to Dismiss, denying certain material allegations of the Complaint, including, *inter alia*, that USTU is not in compliance with the requirements for membership as an Olympic Sport Organization or for recognition as an NGB under the USOC Constitution and Bylaws and the Ted Stevens Olympic and Amateur Sports Act, affirmatively stating that USTU had reached an agreement with representatives of the USOC on November 21, 2003 – ten (10) day after the Complaint was filed – to implement a Remediation Plan that would allow the decertification process to be stayed while the plan was implemented, and moving to dismiss the Complaint based on allegations of lack of jurisdiction by the USOC, discrimination against USTU, a failure to comply with due process of law, and a failure to provide the USTU with equal protection of the law.

WHEREAS, on December 14, 2003 Christo Lassiter, Esq. contending that he represents USTU, filed (a) a Motion to Strike the Answer and Motion to Dismiss that had previously been filed on December 10, 2003, and (b) an Answer and Request for Immediate Action. The Motion to Strike contended that the Motion to Dismiss was improvidently filed and was filed without proper authorization. The Answer and Request for Immediate Action asserts, among other things, that on November 22, 2003 the USTU Board of Governors adopted the Remediation Plan that was attached to the November 11, 2003 Complaint filed by the USOC.

WHEREAS, on December 19, 2003, the USTU was notified that a telephonic hearing before the USOC Executive Committee on the decertification of the USTU would take place on January 13, 2004, with an opportunity for the parties to cross-examine witnesses and to present legal

2

and factual claims, and that all direct testimony and exhibits on behalf of the USTU would be presented in writing, witness-by-witness, in question and answer form. The USTU was instructed to prepare and transmit its written testimony and exhibits by January 6, 2004, so that the material could be circulated to the USOC Executive Committee prior to the hearing.

WHEREAS, the USTU was notified that at the USTU's request the decertification hearing was postponed and would take place in person, before the Executive Committee, in Chicago, Illinois, on January 27, 2004, with an opportunity for the parties to present direct testimony in writing and to cross-examine witnesses and to present legal and factual claims. The USOC was instructed to prepare and transmit its written direct testimony and exhibits to be received by the USTU on or before January 21, 2003, and the USTU was instructed to prepare and transmit its written direct testimony and exhibits to be received by the USOC on or before Friday, January 23, 2004.

WHEREAS, the USOC caused its written direct testimony and exhibits to be transmitted and received by the USTU on January 21, 2004, and the USTU caused its written direct testimony and exhibits to be received by the USOC on Saturday, January 24, 2004.

WHEREAS, the USTU desires the USOC to enter into a remediation plan with the USTU.

NOW, THEREFORE, intending to be legally bound, and in consideration of the mutual promises and undertakings set forth herein, the parties agree to the terms and conditions of this Agreement, as follows:

1. Remediation Plan

The USTU hereby agrees to seek Board of Governors approval to enter into the attached Remediation Plan with the USOC in order to cause the USTU to come into compliance with all applicable rules and regulations under the Ted Stevens Olympic and Amateur Sports Act, and the

3

USOC Constitution and Bylaws. In addition, and as an additional term, all officers of the USTU, including but not limited to President Lee and the Treasurer of the USTU, shall resign or retire within 24 hours of the execution of this agreement or shall be removed from office. President Lee agrees not to seek or accept any position again with the USTU.

2. January 27, 2004 Hearing

The parties to this Agreement hereby agree that the USTU decertification hearing scheduled for January 27, 2004 shall be held, based solely on the written argument, written direct testimony and exhibits that have already been submitted by the parties to that proceeding and the USTU and President Lee and all other parties waive their right to conduct any cross-examination of witnesses or to present any additional argument, testimony, or exhibits at the hearing.

3. Future Hearings

(a) Waiver of Rights

The USTU and Sang Lee, on behalf of themselves and their past, current and future affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents, partners, members, managers, attorneys, shareholders, family members, estate and heirs, hereby waive their respective rights to any additional or future hearings regarding any of the claims made in the USOC's November 11, 2003 Complaint against the USOC, any of the claims in the USTU's December 10, 2003 Answer and Motion to Dismiss the Complaint, any claim that could have been made in connection with the subject matter of the Complaint and the Answer and Motion to Dismiss the Complaint, and any claim that is based on conduct, practices, circumstances or agreements similar in substance to the conduct, practices, circumstances or agreements challenged in the Answer and Motion to Dismiss the Complaint. These rights

4

include, but are not limited to, the rights to a hearing by the USOC Board of Directors and/or the USOC Executive Committee as detailed in Chapter IV, Section 5 of the USOC Bylaws, the rights to a public hearing, the opportunity to cross-examine witnesses, the opportunity to present oral or written evidence, and the right to present factual or legal claims as desired, as contained in Chapter VI, Section 1 of the USOC Bylaws, and any and all other applicable rights contained in the Ted Stevens Olympic and Amateur Sports Act and/or the USOC Constitution and Bylaws. This waiver shall also apply to any right to a hearing that the USTU might otherwise have before the USOC Board of Directors or any other body or panel or committee when the USOC Bylaws that were approved in October 2003 become effective.

        (b)  Rights of USOC Executive Committee and USOC Board of Directors

        The USTU and Sang Lee hereby acknowledge and agree, notwithstanding their waiver of hearing rights in Section 3(a) of this Agreement, that the USOC Executive Committee and the USOC Board of Directors may, pursuant to their respective rights under 36 U.S.C. § 220521(d), Article IV, Section 4(C)(a)(2) of the USOC Constitution, and Article VI, Section 3 of the current USOC Constitution, and under the provisions of the new USOC Bylaws that were approved by the USOC Board of Directors in October 2003 when they become effective, terminate the USTU's membership in the USOC as an Olympic Sports Organization, revoke the USTU's recognition as the NGB for the sport of Taekwondo, mandate that the USTU resign its membership in the World Taekwondo Federation, and cause the USTU to vacate the premises provided by the USOC at the U.S. Olympic Training Center and return all USOC property in its possession, and repay any monies owed to the USOC, based on any of the claims made in the USOC's November 11, 2003 Complaint against the USOC.

5

The USTU and Sang Lee hereby agree that any such actions, determinations, decisions, or conclusions made by the USOC Executive Committee and/or the USOC Board of Directors as described above may be made based on the written argument, written direct testimony and exhibits presented in connection with the January 27, 2004 decertification hearing. The USTU further acknowledges and agrees that consideration of the written argument, written direct testimony and exhibits presented in connection with the January 27, 2004 decertification hearing shall serve as a substitute for a full hearing as would otherwise have been provided under the USOC Constitution and Bylaws but for this Agreement.

(c) Final and Binding

The USTU and Sang Lee hereby agree that any action and/or determination made by the USOC Board of Directors pursuant to Section 3(b) of this Agreement shall be final and binding on the USTU and Sang Lee, on behalf of the USTU and Mr. Lee and their past, current and future affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents, partners, members, managers, attorneys, shareholders, family members, estate and heirs.

4.    Future Written Submissions. Notwithstanding the provisions of paragraph 3, above, in the event that the Remediation Plan is approved by the USTU Board of Governors and then the Remediation Plan is unsuccessful or for any other reason the USOC is considering or believes it may be considering decertifying the USTU, at that time, before the USOC Board can decertify the USTU, it must give public notice of the fact that it may be considering decertifying the USTU and disclosure of the reason that the issue of decertification may be considered. Then, after public notice is issued, the USOC Board of Directors shall provide a period of at least twenty-one (21) calendar days for written submission to the USOC Board by any USOC member

6

and/or through counsel, of any fact, evidence, or argument concerning the possible consideration

of decertification.

     5.    Releases.

     The USTU and Sang Lee, on behalf of themselves and their past, current and

future affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents,

partners, members, managers, attorneys, shareholders, family members, estate and heirs, hereby

remises, releases and forever discharges the USOC and each of its past, current and future

affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents, partners,

members, managers, attorneys, shareholders, family members, estate and heirs, from each of the

claims made in the USTU's December 10, 2003 Answer and Motion to Dismiss the Complaint,

any claim that could have been made in connection with the subject matter of the Complaint and

the Answer and Motion to Dismiss the Complaint, and any claim that is based on conduct,

practices, circumstances or agreements similar in substance to the conduct, practices,

circumstances or agreements challenged in the Answer and Motion to Dismiss the Complaint,

whether known or unknown at the date of this Agreement.

     6.    Covenants Not To Sue/No Solicitation.

     The USTU and Sang Lee shall not, and shall cause each their past, current and future

affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents, partners,

members, managers, attorneys, shareholders, family members, estate and heirs not to, (i) bring,

commence, institute, maintain or prosecute against the USOC and each of its past, current and

future affiliates, subsidiaries, predecessors, successors, directors, officers, employees, agents,

partners, members, managers, attorneys, shareholders, family members, estate and heirs, any

7

action at law, proceeding in equity, investigation or other legal, administrative or governmental

proceeding or claim of any kind whatsoever, based in whole or in part on any claim that, directly

or indirectly arises from or relates to the November 11, 2003 Complaint, USTU's December 10,

2003 Answer and Motion to Dismiss the Complaint, any claim that could have been made in

connection with the subject matter of the Complaint and the Answer and Motion to Dismiss the

Complaint, and any claim that is based on conduct, practices, circumstances or agreements

similar in substance to the conduct, practices, circumstances or agreements challenged in the

Answer and Motion to Dismiss the Complaint or (ii) solicit, assist or advise any other

prospective plaintiffs or other person or entity to bring, commence, institute, maintain or

prosecute against the USOC and each of its past, current and future affiliates, subsidiaries,

predecessors, successors, directors, officers, employees, agents, partners, members, managers,

attorneys, shareholders, family members, estate and heirs, any action at law, proceeding in equity,

investigation or other legal, administrative or governmental proceeding or claim of any kind

whatsoever, based in whole or in part on any claim that, directly or indirectly arises from or

relates to the November 11, 2003 Complaint, USTU's December 10, 2003 Answer and Motion to

Dismiss the Complaint, any claim that could have been made in connection with the subject

matter of the Complaint and the Answer and Motion to Dismiss the Complaint, and any claim

that is based on conduct, practices, circumstances or agreements similar in substance to the

conduct, practices, circumstances or agreements challenged in the Answer and Motion to

Dismiss the Complaint.

    7.    Breach/Indemnification.

It is understood and agreed that breach or threatened breach of the provisions of this Agreement by the USTU will immediately cause irreparable harm to the USOC and that any remedy at law for such breach will be inadequate. Accordingly, in addition to any other remedy the USOC may have, it shall be entitled to temporary, preliminary and permanent injunction or other equitable relief restraining any breach or threatened breach, without any bond or other security being required and without the necessity of showing actual damages.

8.    Representations and Warranties.

Each of the parties to this Agreement represents and warrants to the other parties that:

a.    it has the full right and capacity to enter into and perform this Agreement;

b.    the execution, delivery and performance of this agreement by that party have been duly authorized by all necessary action and will not violate or conflict with any agreement, instrument, commitment or arrangement to which that party is bound or any law, regulation, order, writ, judgment, injunction or decree applicable to that party;

c.    this agreement is a legal, valid and binding agreement of that party, enforceable against that party in accordance with its terms;

d.    in the event that the USTU Board of Governors fails to authorize the entry by the USTU into the Remediation Plan attached to this agreement, the rest of this Agreement shall remain binding and in effect, and the USOC Executive Committee can proceed to make any recommendation it sees fit to the USOC Board pursuant to the hearing conducted on January 27, 2004, without any requirement that the USOC Executive Committee receive any additional submissions from any person or party.

9

# USOC REMEDIATION PLAN FOR USTU
## January 27, 2004

1.     **Executive Director**. United States Taekwondo Union ("USTU") will accept an on-loan United States Olympic Committee ("USOC") employee to serve as the Executive Director of USTU. The person serving as the new Executive Director will be chosen by the USOC. This person will have operational control of the USTU with full authority to execute all day-to-day business and operations of the organization. This includes managing the staff and operations by making all personnel, financial and management decisions. The new Executive Director shall report to the Governance and Management Committee (as described below) and shall keep the Executive Committee and Board of Governors informed of his/her activities as appropriate.

The salary for the on-loan USOC employee shall be paid by the USOC and then immediately reimbursed by the USTU to the USOC or paid by the USTU to the USOC directly, at the sole discretion of the USOC, with the benefits being paid by the USOC. The USOC shall determine, at its sole discretion, the length of time that it will loan its employee to the USTU. It is anticipated that the on-loan USOC employee will continue until USTU has adopted both a governance and management structure that will allow USTU to carry out effectively and fairly its duties and obligations as an NGB. The possibility exists that USTU may want the on-loan USOC employee to remain beyond this term.

2.     **Chief Financial Officer**. USTU will hire a competent financial manager or outside contractor to serve as Chief Financial Officer. The person serving as the Chief Financial Officer will be chosen by the new Executive Director. The Chief Financial Officer shall report directly to the new Executive Director of USTU.

3.     **Governance and Management Committee**. USTU will establish a Governance and Management Committee comprised of five (5) persons. The USOC shall select all members of the Governance and Management Committee and shall designate the chair of the Governance and Management Committee, all of whom shall be recognized immediately by the USTU. Any member of the USTU may recommend in writing capable persons who are willing to serve on the Governance and Management Committee to fill the positions described in categories 1), 2), 3) and 4) below. These persons will be considered by the USOC, but the USOC shall not be obligated to select any person so recommended.

The Governance and Management Committee shall include the following individuals:

1)  One (1) Athlete Representative who meets the USOC definition;

2)  One (1) person from the USOC;

3)  One (1) person with experience in the governance of other National Governing Bodies.



EXHIBIT B

4) Two (2) other persons.

The Governance and Management Committee is charged with the following duties:

1) Governing USTU's affairs and commanding the general governance of USTU.

2) Analyzing, studying and proposing a new governance structure for USTU. In doing so the Governance and Management Committee should consider the following suggested changes: (i) ensure that the participation in the governance of USTU is effectively open to all interested parties; (ii) ensure that the election processes utilized to determine those persons in governance positions is fair; (iii) ensure that the governance structure of USTU fairly reflects all interests in the sport of taekwondo; (iv) reduce the size of the Board of Governors to a more manageable and effective level; (v) eliminate or greatly reduce the authority of the President to appoint individuals to positions within the governance structure; and (vi) establish a means for selection of state presidents in small-membership states that does not involve appointment by the President.

3) Overseeing and assisting the new Executive Director in his/her managerial capacity, ensuring that the new Executive Director can carry out his/her managerial responsibilities without unwarranted interference, and liaising with the Executive Committee and the Board of Directors regarding the new Executive Director's activities.

4) Assisting the new Executive Director and Chief Financial Officer in establishing a sound budget, identifying funding and implementing cost controls so that the budget can be adhered to, developing financial policies, implementing financial controls that comply with those policies and insuring that sound auditing practices are followed.

5) Overseeing the handling of all current and future complaints and grievances so that they are administered in a timely and fair manner.

6) Monitoring USTU to ensure that it properly complies with the USOC directives and mandates.

7) Doing whatever else is necessary to ensure that USTU succeeds as an organization and fulfills its mission regarding the sport of Taekwondo.

In order to provide the Governance and Management Committee with the authority to govern the activities of USTU, all members of the Board of Governors appointed by President Lee or the Executive Committee (under Article I, Section 5 of the USTU Bylaws) shall resign and the five members of the Governance and Management Committee to the Board of Governors will be appointed pursuant to Article I, Section 5. Under Article III, Section 4, the Board of Governors would then appoint the Governance

and Management Committee as a committee of USTU's Board of Governors and then delegate broad power and authority to the Governance and Management Committee to enable it to develop a new governance system and conduct the domestic affairs of the corporation and the general governance of USTU.

The Governance and Management Committee will remain in place for a sufficient period of time to ensure the proper governance of USTU to the satisfaction of the USOC and at least until USTU implements the new governance structure (which is scheduled to occur on or before the USTU annual meeting scheduled for November 2004). The decision to continue or not continue will remain exclusively within the discretion of the Governance and Management Committee and/or the USOC.

4.    Officers. Effective immediately, all officers of the USTU shall retire, resign or shall be removed. Once the officers resign, their positions will remain vacant until new elections occur under the new governance structure described in Section 3 above.

5.    Presidential Authority. All Presidential authority shall be delegated to the Governance and Management Committee pursuant to the form attached hereto as Exhibit A. The position of President of USTU will remain vacant until new elections occur under the new governance structure described in Section 3 above. During the time that the office of President is vacant, the Chair of the Governance and Management Committee shall assume the duties of President, although the Chair shall not hold the office nor assume the title of President. USTU agrees not to elect an Acting President or otherwise fill the vacant position during any of this time, nor shall the USTU permit any USTU Vice President to assume presidential functions.

6.    Treasurer and Secretary General Authority. The USOC person on the Governance and Management Committee shall assume the duties of Treasurer, although that person shall not hold the office nor assume the title of Treasurer. USTU agrees not to elect an Acting Treasurer or otherwise fill the vacant position. The Governance and Management Committee shall assume the duties and authority of Secretary General. USTU agrees not to elect an Acting Secretary General or otherwise fill the vacant position.

6.    Executive Committee. The members of the USTU Executive Committee agree to allow the Governance and Management Committee and the new Executive Director to handle the day-to-day domestic affairs and general governance of USTU.

7.    Term Limits/Re-election. USTU will recommend the reinstitution of term limits, which would disallow all officers from serving more than two full consecutive terms. Whether or not term limits are in place, Sang Lee and Ki Hong Kim agree that they will not stand for re-election during November, 2004, nor shall they be nominated, elected, and/or appointed to any USTU management or governance position, or any office, hereafter.

3

8.    **Termination of all Appointed Positions.** Upon appointment of the Governance and Management Committee all prior appointed state presidents and delegates at large shall be notified of the termination of their appointment. Such termination shall take effect fifteen (15) days from said notice.

9.    **Budget and Audit Committee and Finance Committee.** The USTU will seek and obtain immediate resignation from the five (5) members of its Budget and Audit Committee and the seven (7) members of its Finance Committee.

11.    **Public Statement.** Any public announcement or press release regarding this plan by USTU shall first be approved by the USOC. The USOC shall consult with USTU before making any public announcement or press release regarding this plan.

12.    **Adoption.** This Remediation Plan must be adopted by the USTU Executive Committee and ratified by the USTU Board of Governors.

4

DELEGATION OF AUTHORITY OF OFFICE OF PRESIDENT
UNITED STATES TAEKWONDO UNION
January 27, 2004

United States Taekwondo Union ("USTU") desires to conduct the office of President of the USTU as follows in furtherance of the United States Olympic Committee ("USOC") Remediation Plan for the USTU, dated January 27, 2004 ("the Remediation Plan"):

1. The USTU hereby delegates and assigns all authority the President of the USTU may hold to the Governance and Management Committee appointed by the USOC in accordance with the Remediation Plan. This delegation includes but is not limited to all powers of appointment and all executive decision making customarily exercised by the USTU President, as well as responsibilities for signature, execution, or disposition of financial instruments or accounts on behalf of or for the USTU.

2. President Lee agrees to retire or resign immediately, and he agrees to cooperate with and provide complete information to the Governance and Management Committee, or its designee(s), in its efforts to implement the Remediation Plan. Further, President Lee agrees to not interfere with the Governance and Management Committee and/or the implementation and operation of the Remediation Plan.

Sang Lee
President, United States Taekwondo Union

Dated    1 — 27 — 04

# Selection Procedures for Coaches

NGB: _____U.S. Taekwondo Union_____

DIRECTIONS: Procedures for selection of coaches for the Games must be approved at least 12 months prior to the start of the Games. Names of specific coaches must be submitted, with biographical information requested on forms attached, within seven (7) days after final trials.

1.  What are your NGB prerequisites for coaching positions?

Position of head coach will be selected based on the following criteria, in priority order:

  ➢ Number of athletes the coach has placed on the 2004 Olympic Team.
  ➢ Competition record (from June, 2003 to June, 2004) of the athletes placed on the 2004 Olympic Team. Priority consideration will be given to results from, in priority order:

      o  2003 World Championships
      o  2003 Pan American Games

2.  Describe the intended method of screening and selecting staff for coaching positions.

USTU CEO/Executive Director will screen candidates to ensure the candidate nominee meets the defined criteria, and will forward the nominee to the USTU Governance and Management Committee.

3.  What group or committee within your NGB will nominate the staff assigned to your sport?

The USTU Governance and Management Committee will vote on and approve the nominee for Head Coach.

SIGNED                    PRINTED                    DATE

_____   _____   _____
President or Executive Director

NGB: _____

USTU Olympic Selection Procedures – TL CH.       3
2-11-4 – Amend.


EXHIBIT  C