4/7/2005 Harris, Bruce C.F.K. VOLUME II

[lines 1–25 redacted]

204

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   A   That's correct. [redacted]
2   Q   [redacted] you signed this document, appointing
3   [redacted] on January 20th, 2003.
4   A   [redacted] Yes.
5       Q   But I think your testimony yesterday may
6   have been that these criteria were developed before you
7   came onboard? Maybe not. Let me ask it again. Let me
8   just start.
9       Can you tell us, did you play a role in
10  writing Exhibit 87, or was it something that you just
11  took the content from something someone previously had
12  done?
13      A   I did not personally have a hand in
14  writing Exhibit 87. This was a part of a larger
15  document, of the complete selection procedures for the
16  Olympic Games. And personally what I did was tweak the
17  athlete selection process, because that process, others
18  were asking that we relook at that.
19      As far as the selection for coaches, which is
20  this specific exhibit, this was there for me when I got
21  the document itself. So I didn't tweak that but signed
22  it as it was.
23  [redacted]
24  [redacted]
25  [redacted]

205

4/7/2005 Harris, Bruce C.F.K. VOLUME II

[lines 1–5 redacted]
6       Q   And were you aware that by February 28,
7   the USTU had already selected and approved Mr. Dae Sung
8   Lee as a coach?
9       A   February 28?
10          MR. JONES: Objection; calls for
11  speculation.
12      Q   (BY MR. LEVINSTEIN)  2002 (sic).
13      A   Of two thousand --
14      Q   I think so.
15      A   2002 you said?
16      Q   2003.
17      A   Oh, three.
18          MR. LEVINSTEIN: If that's wrong, someone
19  should feel free to tell me, because I'm not trying to
20  mislead him. Is that the date that Mr. Lee's
21  nomination was announced by the USTU, February 28,
22  2003?
23          MR. JONES: By the USTU?
24          MR. LEVINSTEIN: Yeah.
25      A   I'm not sure.

206

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1       Q   (BY MR. LEVINSTEIN)  Maybe I can find
2   that. I thought so. I don't mean to create -- I
3   thought that was the date, so if I'm wrong, please, I'm
4   not trying to mislead anyone.
5           MR. UESUGI: I know there was no World
6   Cup in 1976.
7           (Discussion off the record.)
8           MR. LEVINSTEIN: If you want me to
9   change -- I'll change the question to help you out on
10  that one, as long as you're going to raise that issue.
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]

207

[redacted]

Q Dae Sung Lee had been Mr. Sang Lee's student?

A Athlete as a coach, yes.

Q And in the world of Taekwondo, athlete coach, same thing as student instructor?

MR. JONES: Objection; vague.

A Not necessarily, but a similar type relationship.

Q (BY MR. LEVINSTEIN) Well, you talked about the values --

A Right.

Q -- of respect and loyalty. Were those

different in an athlete/coach versus a student/instructor?

A Somewhat, yes. For instance, I had Taekwondo schools. My students have a different relationship to me than the Army athletes that I coached for years. It's similar but different.

Q They were in the Army, so maybe they had a different relationship because they were employed.

A No. This was a coach thing.

Q All right.

A It's similar, but it's not like the instructor/student relationship.

Q Well, was your relationship with your athletes in the Armed Services different because of the overlay of the relationship between the officers and enlisted men?

A No. The point I'm trying to make that I'm not doing a very good job of is, for instance, my athletes that came to me with the Army team were someone else's student, but they were my athlete to coach. So that was a different relationship than their student/teacher relationship.

And I would think it would be the same with Mr. Dae Sung Lee and Mr. Sang Lee. Mr. Sang Lee was not Mr. Dae Sung Lee's instructor, but he was his coach

as an athlete.

[redacted]

[redacted]

[illegible] I think that's true in every organization, [illegible] possibly.

Q (BY MR. LEVINSTEIN) [illegible] organization you have been involved in is the USTU.

A Well, [illegible] this meeting [illegible] I have been in other organizations.

Q Have you been in any other organizations with a 120-member board?

A I don't think I have been in another organization with 127 members.

Q On the board?

A Members.

Q There you go. Did you understand when you came onboard as the Executive Director that there was an emphasis ongoing in the U.S. Olympic movement to emphasize supporting athletes to achieve sustained competitive excellence?

A Yes, as part of the mission statement.

Q Was that mission statement something the USTU was supposed to follow as a National Governing Body?

A Yes.

Q Were you aware of complaints by USTU

members, including athletes, that delegations of the USTU would go to events, and beyond the athletes and the coaches, there would be large numbers of staff or volunteers that the USTU paid to make those trips?

A I was aware of that allegation, yes.

Q And was that a problem that you worked on when you were the Executive Director?

A Yes, it was.

Q And you mentioned something about cutting $210,000 out of the budget. Was some of that involved in cutting down the extent to which the organization was paying for officers and others to engage in travel and attending events?

A I'm not sure that that was one of the specific areas [illegible]

[illegible]

[illegible]

[illegible] help of Kelly Skinner and the other Sports Partnership people, as to the number of people we would send for official delegations and [illegible] And again, [illegible] helped ensure that that happened.

[illegible] volunteers who were unnecessarily to the running of the event [illegible]

MR. JONES: Objection; [illegible] calls for speculation.

A I don't know if they were necessary. But we did have much larger delegations prior to my tenure.

Q (BY MR. LEVINSTEIN) And when you reduced the size of the delegations, was it your view that it wasn't going to hurt the athletes' performance at the events?

MR. JONES: Same objection.

A I didn't think it would hurt them, no.

Q (BY MR. LEVINSTEIN) So you didn't think they were necessary, did you?

MR. JONES: Objection; argumentative.

A In essence, no.

Q (BY MR. LEVINSTEIN) When the issue arose about term limits and eliminating the term limits [illegible]

A Yes.

Q [illegible] did you tell anyone that it would be a mistake for the USTU to eliminate the term limits?

A Yes, I did, in a conference with then President Lee.

Q And he didn't follow your advice?

A No. As I recall, there were four of us at the meeting, and he asked everyone's opinion on it before he recommended it as an agenda item.

Q And who else was in that meeting?

A Let me try to remember. I know that Mark Bryant was there. Sammy Pejo. I can't remember who the other person was. And myself.

And he asked each of us in turn what we thought of the idea, and I said I didn't think it was a good idea because the perception is that it eliminates hope. And others felt that if that's what you want to do, that's fine.

Q Was Sammy Pejo one of Mr. Sang Lee's students?

A I'm not certain whether he's Mr. Sang Lee's student. I know that he coached him, but I don't know if he is one of his initial students.

Q Did you ever have discussion with any USTU members that this concept of respect and loyalty to your senior interfered with younger people's willingness to speak out on issues counter to views expressed by people who were senior to them?

A Did I have discussions to that effect?

Q Yeah.

A I don't recall specifically that happening. I've had lots of discussions about junior/senior relationships, but I'm trying to think in the context of when I was Executive Director and it

4/7/2005 Harris, Bruce C.F.K. VOLUME II

interfering with things there.

Q Was that a concern expressed by USTU members?

A Not so much a concern, rather than part of our martial arts system, the junior/senior system. But not that it was problematic in doing anything.

Q What about concerns that committee chairmen would pick their students to be committee members?

MR. JONES: Objection; vague and ambiguous.

A I didn't have those discussions.

Q (BY MR. LEVINSTEIN) You said that there were budget cuts planned for 2004 that would save $210,000, and you referenced that they concerned allowances to officers. What did that refer to?

A At one point, the officers had operating expenses for their offices, like the secretary, the treasurer, the president. And part of that was cutting back on the allowance for those office expenses. And, again, that dovetails with eliminating a lot of phones and the payment of calls for those things.

Q So before this happened, the USTU was paying a lot of expenses for officers that involved running their own office and business expenses like

218

4/7/2005 Harris, Bruce C.F.K. VOLUME II

phones and faxes and things like that?

A Yes.

Q And they had no obligation at the time to document that these costs were limited to USTU business?

MR. JONES: Objection; calls for speculation.

A What they did was send us a copy of the bill. And if we had a question about a phone call -- for instance, there was a call to Africa that shows up. It's something we would circle and get clarification before the bills were paid, under my tenure. I don't know about before.

But, for instance, if there was a $12,000-a-year allowance for your office, and you sent us a $2,000 phone bill, well, you've eaten up one-sixth of your allowance, so it would draw inspection. And that wasn't something that happened, but I'm saying for instance.

Q What kind of allowance, dollar amounts, were these officers given?

A I think $12,000 was an operating expense for like the treasurer's office because they had to phone, fax, mail things, send reports, whatever; toner cartridges, blah, blah, blah.

217

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q So the volunteer treasurer was paid $12,000 a year towards his expenses?

A No.

MR. JONES: Objection; misstates the testimony.

A That wasn't. He had an allocation so that expenses -- say, for instance, his phone bill for the month of official calls was $150. That was sent in to the office. Once it was verified that these were official calls, that was paid. It was never paid directly to him to run his office.

Q (BY MR. LEVINSTEIN) It was reimbursed to him for costs he had expended?

A No. It was paid from the office with that amount being allocated to him.

Q Well, did that include expenses for travel and entertainment?

A No.

Q Did it include expenses for taking people to play golf?

A No.

Q What account did the amounts USTU paid for people to play golf come out of?

A Again, that was under the International Development or -- there were two budget items for that.

218

4/7/2005 Harris, Bruce C.F.K. VOLUME II

One was International Development. I forget the name of the other.

Q So the USTU reimbursed meals and golf fees and things like that, based on the representation of the officer that this was entertaining someone who had to do with international development of Taekwondo?

MR. JONES: Objection; calls for speculation. Also, lacks foundation.

A It's something that could be determined. For instance, if the president of WTF was coming to the Washington, D.C. area, and the secretary general wants to host him for a dinner and meet with him, that's something that we know is an international development item. They go play golf as part of the meetings. That's included in there.

If, on the other hand, the secretary met with a school owner, took him out to golf and eating and stuff, that's not international development. That wasn't something that was approved.

Q (BY MR. LEVINSTEIN) That was not something that should have been approved?

A Something that wasn't approved, because, again, I had the credit cards. So they had to submit for reimbursement.

Q Once the credit cards were eliminated?

219

A Yes.

[redacted]

Q (BY MR. LEVINSTEIN) Were you aware that at the end of 2003, the USTU was $900,000 in the red?

MR. JONES: Objection; lacks foundation,

misstates the testimony.

A No, I wasn't aware of that.

Q (BY MR. LEVINSTEIN) Were you aware -- a different subject. Were you aware that the advance given to the employee for the purchase of her house was never returned?

A No, I wasn't aware of that. I know that a payment schedule was set, and it was supposed to have been done directly with the finance department. I don't know that.

Q But you don't know of any payments having been made on that plan?

A Well, I didn't follow up on that.

[redacted]

[redacted]

[redacted]

[redacted]

Q (BY MR. LEVINSTEIN) And after you got that one complaint, did you make sure you addressed that issue with all of the athletes in the camp?

[redacted]

A Yes.

Q So you did view it was a problem that had to be dealt with?

A Yes. Once that was brought to my attention, that was something that was handled.

Q And the way it was brought to your attention was in part by the Membership and Credentials Committee?

A No. Actually, an athlete walked in the door and said we need to talk to you.

Q Was that during this compliance process?

A My whole tenure was during the process.

[redacted]

[redacted]

Q But when the whole document was submitted, you got a copy?

A No.

Q Did you ask for a copy?

A Yes.

Q And they were unwilling?

A I still have not received one.

MR. JONES: What was that?

A At the May meeting, one portion of the audience had prepared a bound document that had complaints and communications. It wasn't given to us. It was presented, I think, to the committee, and I asked for a copy, but we never received it.

Q (BY MR. LEVINSTEIN) But you understand your lawyers were given a copy, the USTU's lawyers?

A I don't know. I never saw it.

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   Q   Okay. And was it your understanding --
2   strike that.
3       When concerns were raised to the Membership
4   and Credentials Committee, was it your understanding
5   that it was their job to investigate and study those
6   issues?
7       MR. JONES: Objection; calls for
8   speculation.
9   A   That would be a reasonable expectation,
10  but I also found that most of the critiques and
11  critical things were things that the committee had
12  already brought up and that this group was speaking to
13  and elaborating on, with some exceptions.
14  Q   (BY MR. LEVINSTEIN) Well, let's talk
15  about those two letters, the August and September. You
16  don't have to pull them out, but the letters from
17  Mr. Satrom.
18  A   Okay.
19  Q   Had all of those things in those letters
20  already been raised by the committee in September of
21  2002?
22  A   Not in the September letter. But the
23  August letter I think had many of the same things that
24  were from the September of 2002, the first one, but not
25  the September '03 one. That was totally different.

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   And that was after the May meeting.
2   Q   Well, both the August and September
3   letters were after the May meeting?
4   A   But the August letter I'm saying --
5   Q   Is different?
6   A   -- paralleled the earlier one in September
7   of '02, whereas the September letter was completely
8   different.
9   Q   Okay. We'll get to those then.
10  A   To my recollection.
11  Q   We'll talk about what's different about
12  them. It's not a memory test, so we'll do that when
13  we're looking at them.
14  A   I'd fail that one.
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1-25 [redacted]

230

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1   [redacted] (BY MR. LEVINSTEIN) As of August 25th
2   or the date of that letter, no steps had been taken to
3   implement that committee --
4   [redacted] to implement the points of
5   agreement. Yes.
6   Q   A question about the master instructor's
7   licensing program.
8   A   Okay.
9       MR. UESUGI: Should we take a break?
10      MR. LEVINSTEIN: Fine. Anytime. It's
11  going to be awhile.
12      (Recess taken from 12:11 p.m. to 1:15
13      p.m.)
14      (Whereupon, the deposition proceedings
15      reconvened without the presence of
16      Mr. Uesugi.)
17  Q   (BY MR. LEVINSTEIN) Let's go back a
18  little bit to the process the Membership and
19  Credentials Committee was following. There was the May
20  open --
21  A   Forum.
22  Q   -- forum at which people came to express
23  their concerns, and you attended that meeting?
24  A   Yes.
25  Q   And did you speak at that meeting?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  A   I think I answered one question about
2  Kukkiwon, and that was it.
3  Q   Did someone else speak on behalf of the
4  organization at that meeting?
5  A   No. It was our information that there was
6  no requirement to respond unless direct questions were
7  asked to us.
8  Q   What had, if you know, led to the calling
9  of this meeting?
10 A   No idea.
11          (Whereupon, Mr. Uesugi rejoined the
12           deposition proceedings.)
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

232

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1-25 [redacted]

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  [redacted]
2-24 [redacted]
25 Q   And did you understand that part of the

234

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  purpose of the August 5th and September -- is that the
2  right date -- the August 5th and September 5th, or
3  August 4th and September --
4       MR. UESUGI: Close enough.
5-25 [redacted]

[redacted]

[redacted]

Q That's all. I'm not going to make you compare them. If you want to, you can, but I wasn't trying to keep you from doing it.

Do you see the first paragraph of the August 4 letter? At the end of the paragraph, it recites that "As part of the review process, the Committee reviewed the compliance form submitted by USTU, the Committee met with USTU on two occasions, the Committee made written inquiries of USTU to which USTU responded, the Committee held a public forum for individuals who were interested in the sport of Taekwondo to present their observations and comments on the governance of Taekwondo, and the Committee requested that the USOC Audit Division conduct an audit of USTU's financial records."

A Right.

Q Do you know which meetings with the USTU

236

4/7/2005 Harris, Bruce C.F.K. VOLUME II

on two occasions are being referred to? Do you know what dates those were or months?

A I know one was the September 2002 meeting. I don't know when the other second one was, other than the open forum in May, which wasn't really meeting with us.

Q Okay. So there may have been another meeting between September 2002 and the open forum, or you just don't remember?

A I don't remember.

Q And in your meetings with the Membership and Credentials Committee and in responding to these letters --

A Yes.

Q -- did you at times come of the view that the Membership and Credentials Committee simply didn't know enough about how Taekwondo worked?

A In some areas, yes.

Q And was it your impression that they were trying to get information so they could inform themselves?

MR. JONES: Objection; calls for speculation.

A Possibly.

Q (BY MR. LEVINSTEIN) Did you know any of

237

4/7/2005 Harris, Bruce C.F.K. VOLUME II

the members of the Membership and Credentials Committee?

A I knew one person prior to coming to the first meeting.

Q And who was that?

A Retired Colonel Jeannie Picarriello, formerly of Army Sports.

Q But from going to board meetings, did you know any of the other members -- oh, you're talking about September of 2002.

A Right. I didn't know anyone then.

Q Did you get to know anyone on the Membership and Credentials Committee during your time as Executive Director?

A Yes, I got to interact with several of them at USOC board meetings. I did speak with Mr. Satrom on several occasions. Let's see. Now I'm drawing a blank. A couple of others as well. I can't remember their names now.

Q Do you remember Steve Sobel?

A Yes. Yes.

Q And when you did meet with the Membership and Credentials Committee -- put aside the public forums where other people were there -- was it just USTU people and USOC staff, like the auditors and

238

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Sports Partnership, and the members of the committee?

A Other than the public forum?

Q Yes.

A Yes.

Q And was the tone of those meetings cooperative and friendly?

A The first one was very -- well, the first one sort of was. After that, it became more contentious.

Q But did they communicate to you that they were trying to find ways to bring the USTU into compliance?

A At the first meeting, very much so.

Q And you don't remember the second meeting?

A I don't remember that there was a second meeting, but -- unless there's a record of it.

Q That's fine.

A Now, I do recall meeting with Mr. Sobel once.

Q Okay. Could you tell me about that?

A I'm trying to remember where it was. I know we discussed some of the items that we had submitted in response to the letter from Mr. Satrom.

Q What sport did Mr. Sobel come from, if you know?

239

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A I don't remember.
Q But were you made aware that he was someone who had been involved with the Olympic movement for a long time?
A Yes. I think he was the vice chair of the committee as well.
Q You mean, where he had previously been the chair of the committee?
A Yes.
Q Was he meeting with you because he was someone experienced in helping NGBs comply with their obligations?
A I think it was a follow-up or a meeting that we had requested to talk about the responses and the questions, because I remember he was the only person that sat down with me and Mr. Sang Lee, I think it was. I still forget where it was, but he did discuss -- someone else from the committee was supposed to have shown up, but they didn't make it.
So we had a discussion about the compliance issues. That may be the second meeting that they were talking about. But it wasn't the committee itself.
Q Okay. Did you understand that there was someone within the committee assigned particular responsibility for Taekwondo?

240

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A No, I didn't.
Q What can you recall about the meeting with Mr. Sobel, if anything?
A I recall him asking me if I was clear on what was being asked by the committee, and if I had any questions that he could clarify. And that's when I first raised the issue of the allegiance to Korea, because I didn't understand what that meant. And he couldn't give a full explanation of what that meant. So all we did was theorize.
It was a very brief meeting. I remember that, because it was in a room sort of like this, but it was one table set up for maybe five people. And we waited for awhile because he expected the other person to show. I remember he and I had a soda by the thing (indicating).
We didn't talk very much except, are there any questions about what's being expected? Can I clarify anything? I went through the allegiance to Korea. The Kukkiwon, I said, well, no need to explain that to me. I said the explanation seems to be straightforward. And we didn't discuss anything else. He said, well, let's just call it quits.
Q Did you travel to attend that meeting?
A I don't remember.

241

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q You don't know if it was in Colorado Springs or some other city?
A I don't know.
Q Was it a positive meeting, or was it contentious?
A No, no. It was a positive meeting.
Q It was a positive meeting?
A Yeah.
Q Was it between the August 4th letter and the September 5th letter, do you think? If you don't know, it's okay.
A I don't know. I think it was more likely it was between the September '02 letter and whatever came next as far as correspondence.
Q Did you remember you already had a letter that mentioned allegiance to Korea?
A In some form or other, there was something about ties to Korea, because that came up at the September 2002 meeting as well, as I recall.
Q Okay. So you're not sure that you were specifically having Mr. Sobel go through the August 4th letter?
A No, I'm not certain.
Q There may have been some other list of issues?

242

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A Yes.
Q But you do recall going through some sort of list of issues of concerns of the committee?
A As I recall, I was asked if there was anything I didn't understand about what was being asked that we had to respond to, rather than going through, do you understand this, blah, blah, blah, blah.
Q Do you have some recollection that between August 4th and September 5th, the USTU asked the Membership and Credentials Committee to give a little more information about what was being referred to in the August 4th letter?
A Yes.
[redacted]

[redacted]

Case 1:04-cv-00461-SOM-LEK   Document 309-2   Filed 05/08/2006   Page 11 of 15
Case 1:04-cv-00461-SOM-LEK   Document 203   Filed 03/15/2006   Page 11 of 15

4/7/2005 Harris, Bruce C.F.K. VOLUME II

[lines 1-12 redacted]

13  Q    (BY MR. LEVINSTEIN)  Okay.  You talked
14  about the importance of the USTU's relationship with
15  the WTF?
16  A    Yes.
17  Q    Beyond that you have to comply with the
18  rules of the WTF, why is it important for the USTU to
19  be on good terms with the people running the WTF?
20       MR. JONES:  Objection; calls for
21  speculation.
22  A    It's not so much being on good terms, as
23  much as being in compliance, being a good member
24  nation.  Just as being a good NGB is applicable to the
25  USOC, it's the same importance.

244

1   And the difference is, even with the USOC, we
2   had a partnership that was monetary with Sports
3   Partnership and other things.  With WTF, that
4   partnership didn't exist.  With Kukkiwon, we had a
5   black belt program, but every member federation has
6   that.
7        So it wasn't that we were receiving anything
8   above and beyond what other member nations received
9   from the IF; it was just a matter of being a good
10  member nation.  It did result in appointments, which go
11  throughout the world, as far as the referee chair
12  currently is here in the United States, from
13  California.  Other committee positions, if you're in
14  good standing, you're liable to have appointments.
15  Q    (BY MR. LEVINSTEIN)  And those
16  appointments, you felt, were beneficial to the USTU?
17  A    Well, they're beneficial to whatever
18  country, yes.
19  Q    So you thought they were beneficial to the
20  sport of Taekwondo in the United States if those
21  appointments came to people in the United States?
22  A    Yes.  For instance, I was on the rules
23  committee prior to the Sydney Olympic Games, and I was
24  able to put some changes in that probably would not
25  have gone in.

245

1   I was able to dissent against the difference
2   in time limits for women and men and bring up the fact
3   that it's discriminatory, as viewed by the rest of the
4   world, things like that; whereas otherwise you don't
5   have that input.  You can't form the framework for
6   competitions and things.  So that's a benefit to
7   Taekwondo and to the country and to all our athletes.
8        MR. LEVINSTEIN:  Next exhibit number.
9        (Deposition Exhibit No. 88 was marked
10       for identification.)

[lines 11-25 redacted]

246

[page 247 - all lines redacted]

Case 1:04-cv-00461-SOM-LEK   Document 309-2   Filed 05/08/2006   Page 12 of 15
Case 1:04-cv-00461-SOM-LEK   Document 203   Filed 03/15/2006   Page 12 of 15

4/7/2005 Harris, Bruce C.F.K. VOLUME II

[Left column page 248 — text is redacted/blacked out and illegible]

1  Q  No, the first page, that paragraph I read.
2  A  Yes, yes.
3  Q  Do you find that to be a racially
4  insensitive thing to say, coming from a Korean-born
5  American citizen?
6       MR. JONES: Objection; calls for hearsay.
7  A  Yes.
8  Q  (BY MR. LEVINSTEIN)  But this was a
9  statement being made to the Membership and Credentials
10 Committee?
11 A  Yes.
12 Q  And given that Mr. Park was making
13 recommendations about what the Membership and
14 Credentials Committee should do and making statements
15 about his view of the sport in this country, the
16 information about the kind of allegations being made is
17 something you wanted the Membership and Credentials
18 Committee to tell you, correct?  If that's too long,
19 I'll start over.  I'll try again.
20 A  Please do.
21 [redacted] communicating the
22 information to the USOC
23 [redacted] Yes.
24 [redacted] the USOC
25 [redacted] Membership and Credentials

[Left column page 249 — mostly redacted]

22 Q  Now, Mr. Park, in this letter, makes
23 allegations about a Korean ethic minority dominating
24 the USTU.  Do you see those words?
25 A  Second page still?

[Right column page 251 top — partially redacted]

17 Q  When is the first time you heard the term
18 "Korean Mafia" used?
19 A  In a discussion with Holme Roberts and
20 Owen with Jill Chalmers.
21 Q  You weren't aware that communications had
22 been made, like the Park communication, that referred
23 to the leadership of the USTU as a Korean Mafia?
24 A  No.  And, again, I never saw the
25 communication from Dr. Park either.

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1    Q    Other than the communication involving
2  Jill Chalmers, have you ever heard anyone else refer to
3  the USTU, using the term Korean Mafia?
4    A    Not in those terms, no.
```
[lines 5–25 redacted]

252

4/7/2005 Harris, Bruce C.F.K. VOLUME II

[lines 1–25 redacted]

253

4/7/2005 Harris, Bruce C.F.K. VOLUME II

[lines 1–19 redacted]
```
20    Q    In the Ginny Lopez article --
21    A    Yes.
22    Q    -- do you consider the "Mafia-like
23  hierarchy" to be a racially insensitive comment?
24    A    Somewhat, yes.
25    Q    Now, the term racist or racially
```

254

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1   insensitive has been used before, but was it your
2   understanding that the primary concern was about the
3   individual's national origin?
4     A    When I think of things that are racially
5   insensitive, to me, I think of substituting any racial
6   name for the one that's there and thinking how that
7   would affect that person, whether it's black, white,
8   Italian, or whatever.
9           Anything that is derogatory about a group of
10  people because of their background, to me, is racially
11  insensitive.  And that's what I have been speaking to.
12  In this instance, it's Korean.  But it could very well
13  be black.
14    Q    But if it were, say, Italian American, it
15  would be the same thing?
16    A    Yes.
17    Q    And in those cases, the people from Italy
18  are not necessarily of the same race?
19    A    Right.
20          (Whereupon, Mr. Johansen rejoined the
21          deposition proceedings.)
22    Q    (BY MR. LEVINSTEIN)  So their country of
23  origin is, in your view, when you say racist, it may
24  mean discrimination against any kind of group like
25  that?
```

255

4/7/2005 Harris, Bruce C.F.K. VOLUME II

A Right. Can I ask a question off the record maybe?

(Discussion off the record.)

[redacted]

256

[redacted]

(Deposition Exhibit No. 91 was marked

257

4/7/2005 Harris, Bruce C.F.K. VOLUME II

for identification.)

Q (BY MR. LEVINSTEIN) Have you seen this document before?

A No, I haven't.

Q Let me just represent, it's Bates Stamp Nos. USOC00124 and 00125, and it appears to be an e-mail forwarded by Kay Burton of the USOC to certain other e-mail addresses.

A Okay.

Q I'll represent I think they're members of the Membership and Credentials Committee. I just ask that nobody now use those e-mail addresses to send them e-mails.

And it's forwarding them an e-mail that came to Kay Burton. Now, was Kay Burton the contact person for the Membership and Credentials Committee for the Taekwondo community to send information?

A I have no idea.

Q You don't recall whether they picked her as the staff person to receive information?

A No, I don't.

Q I don't either. I just see a lot of e-mails to Kay Burton, so I just was asking because you might know. And do you know who Diana Dunlap is?

A Yes.

258

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q And where is Dunlap's Taekwondo, if you know?

A Yes. Louisiana.

Q And did she speak at the May 2 open forum?

A I think she very well may have, yes.

Q This e-mail just suggests, we're rushing, but it just says, "This e-mail is in response to your request or information concerning my background and involvement in Taekwondo prior to the May 2 open forum." And I'm just -- did people sign up in advance to have a time slot to speak at the May 2 open forum?

A To my understanding, they just notified someone that they were coming and that they would like to be heard.

Q And then do you recall the people who did that were asked to give the committee some information about who they were so that when they got up, there would be some information about their background?

A That, I don't know.

Q And if you look at the bottom of the page, I won't ask you about these 16 issues that Ms. Dunlap says she would like to see addressed.

A Yes.

Q Those kinds of issues that were of concern to USTU members, are those things that you wanted the

259

USTU to -- sorry -- that you wanted the Membership and Credentials Committee to tell you about so that you could respond to them?

A Yes.

(Deposition Exhibit No. 92 was marked for identification.)

[redacted]

Q Does it have chat rooms or -- no.

MR. LEVINSTEIN: Somebody in the Internet world could give me a better term. What would you call these things? Glenn, you're the expert.

MR. UESUGI: It's a Web page.

MR. LEVINSTEIN: Okay. But there's a reference on the top to a thread. I forget what it's called when there are websites you go to and people can post messages.

MR. UESUGI: Bulletin board?

MR. LEVINSTEIN: A bulletin board. Okay. Thank you. I don't spend enough time on the Web.

[redacted]

[redacted]

Q Now, I don't know who sent this posting. It may have even been anonymous, so I'm having a hard time telling. But are a lot of the postings at this website, if you know, done by e-mail names that you

can't tell who the person is?

A I'm not sure. Some have screen names. Some use their real names, from my understanding.

Q And if they use a screen name, it might not tell you who they are.

A Right.

[redacted]

[redacted]