Q (BY MR. LEVINSTEIN) So didn't you view, to some extent, that the leadership, who were of a knowledge of the Korean language, used that knowledge in ways that were inappropriate in the USTU?

A I don't know how to respond to that. I know that in the past, we've had some leaders that aren't as conversant in English and of necessity had to communicate using Korean. Did I find that troubling that I didn't know what was being said? Somewhat. But, again, I have been in that situation in other countries as well.

Q But in other countries, you're in Spain, and they're speaking Spanish?

A But in Taekwondo for other countries, too.

Q But here weren't there situations in which everyone who was speaking in Korean, to your best understanding, could also understand English just fine?

MR. JONES: Lacking foundation.

A No. To my knowledge, that wasn't always the case.

Q (BY MR. LEVINSTEIN) But was it sometimes the case?

A Sometimes the case.

Q And wasn't it sometimes the case that -- well, strike that.

Did that happen ever at officers meetings?

MR. JONES: Objection; vague.

A During my tenure, no.

Q (BY MR. LEVINSTEIN) But a majority of the officers were of Korean national origin?

A Yes.

Q What about the majority of the Executive Committee?

A I would say so, but I'm not sure of the exact numbers.

Q When did you first learn that USTU officials gave gifts to WTF officials?

MR. JONES: Objection; lacks foundation.

Q (BY MR. LEVINSTEIN) Okay. Strike that.

MR. JONES: Objection; vague and

Case 1:04-cv-00461-SOM-LEK Document 206 Filed 03/15/2006 Page 3 of 7

ambiguous.

Q Do you know people in particular?

A No.

Q Did the USTU pay for a membership at the Broadmoor?

A That, I don't know. We didn't do that as part of my tenure, that I can recall.

Q You don't recall that President Sang Lee's membership at the Broadmoor was paid for?

A I knew that he had a membership at the Broadmoor.

Q You don't understand that it was paid for by the USTU?

A I don't know how the financial arrangements for that were made.

Q Do you recall that that was reimbursed as part of business expenses that he might incur in entertaining people?

A No, sir, I don't.

Q But you have no recollection of whether or not the USTU either paid for or reimbursed Mr. Sang Lee for his membership at the Broadmoor?

A Correct, I don't know how that worked.

[illegible]

Q Did the USTU pay for a full-time employee who worked for President Lee?

A No. There was a full-time employee that worked at President Lee's office.

Q And at President Lee's office, didn't she both work on USTU business and work at his school as well?

A I really have no firsthand knowledge if that's what she was doing during business hours. I know that during my time when we called, she responded to USTU business. When we had to do mailings or whatever, we had full access to her. I don't know what other business she conducted during those business hours. I don't know.

Q But she was part of the staff?

A She was part of the staff, USTU staff.

Q Yet she was outside of your supervision, because she worked at his office, and you had access to her, but when you didn't have a specific task for her, she worked on whatever Mr. Lee directed her to do?

A I know her title was assistant to the president, and that was her USTU job. And, additionally, we used her as we needed for other staff purposes.

Q So the USTU paid for a full-time assistant for the president?

MR. JONES: Objection; misstates the testimony, calls for speculation, lacks foundation.

A For instance -- let me answer it this way: I had an assistant to the Executive Director. She was a staff employee. She worked the same way the assistant to the president worked. If I needed something, my assistant worked on it for USTU business, and that's the assumption with the assistant to the president. But when the staff needed to work on group projects, for instance, my assistant worked on the group projects, as did the president's assistant.

Q (BY MR. LEVINSTEIN) But you didn't have any other business to ask her to work on other than USTU business?

A I could have.

Q You had another business?

A Well, no.

Q And it would have been inappropriate for you to ask her to work on another business if you did have another business?

A Yeah. She could have booked gigs. That was off the record.

Q But you would never ask her to do that?

A Right.

Q Because it would have been inappropriate.

MR. JONES: Objection; argumentative.

Q (BY MR. LEVINSTEIN) You talked earlier about how the bylaws were going to be changed in 2002. Sorry. Strike that. The question is wrong.

[illegible]

[illegible]

[illegible]

MR. LEVINSTEIN: I only have one copy of this, so I will -- for the record, I'll mark it as Exhibit 98. And it's USOC Bates Nos. 00001 and 0002.

(Deposition Exhibit No. 98 was marked for identification.)

Q (BY MR. LEVINSTEIN) Why don't you just let them look at it first for sort of efficiency here.

(Deposition Exhibit No. 99 was marked for identification.)

MR. LEVINSTEIN: Why don't you take -- if you don't mind, I'm going to stand behind because it's the only copy I have.

MR. JONES: That's fine.

MR. LEVINSTEIN: For the record, Exhibit 98 has USOC Bates Nos. 0001 and 0002. And it's a letter to Mr. Jim Scherr that I can't tell if it was mailed or sent by electronic communication, but it's dated April 12th, 2004, from Philip Acosta, it appears to be, and it's copied to Bob Gambardella, Gary Johansen, and Bill Martin, and it's re race discrimination.

Q (BY MR. LEVINSTEIN) I assume you have never seen that document before?

A Correct.

Q Okay. In it, it discusses an allegation

of racial discrimination, and as one aspect, it says that in a referee seminar in Illinois, the Caucasian referee coaches and parents were directed to one room of the referee school and all of the instructors of Korean descent were directed to another room. And it contends that none of the Korean attendees had ever refereed at any sanctioned U.S. tournament, and yet it's the understanding of the author that all of the Korean attendants were upgraded right away to the A-1 level.

Had you, during your term as Executive Director or in your involvement as a referee, heard allegations that people had been given preferential referee status based on their national origin?

MR. JONES: Objection; calls for hearsay and speculation.

A No, but I had heard of improper upgrades in general, not just race-based.

Q (BY MR. LEVINSTEIN) But improper upgrades based on favoritism?

A Of a sort, yes.

Q So it might have been race-based or national origin based?

MR. JONES: Objection; calls for speculation.

Q (BY MR. LEVINSTEIN) And it might have been a friend or some other motivation someone had to advance a person beyond what the rules permit?

MR. JONES: Same objection; calls for speculation.

A That would be a perception of that. I know in teaching referee seminars, like this in question, that there have been cases where people had taken seminars years before and for whatever reason didn't keep their participation certificate, et cetera; continued going to seminars, didn't get their upgrades. Finally, the paper trail caught up with them and they were upgraded. But the perception was they went from C to A at one seminar, things like that.

I have knowledge of many of those instances, which is different than what this is alleging. But that's why I say not just race-based, but other things as well.

[illegible]

Q Did Mr. Cain ever express to you his concern that individuals in the USTU were trying to control Sport Taekwondo?

A No, we didn't have that discussion at all.

316

4/7/2005 Harris, Bruce C.F.K. VOLUME II

Q. And again, in that group [illegible] the majority membership that were Korean-American?
A. Correct.
(Deposition Exhibit No. 100 was marked for identification.)
Q. (BY MR. LEVINSTEIN) I show you what's been marked as Exhibit 100, USOC00143 to 00146, and it's a letter that I don't know if it was sent electronically or by mail to Thomas Satrom from Kim Sol, the Montana state president of the USTU. And I assume you have not seen this document before?
A. Correct.
Q. Do you know Kim Sol?
A. Yes.
Q. Before we go on, you had talked about an opposition group which was the Pennsylvania and the Ohio associations?
A. Correct.
Q. But we have now seen the Montana state president, the Colorado state president, and a host of other people who wrote in [illegible] opposition to the USTU's conduct that was expressed to the Membership and Credentials Committee. It's broad-based, [illegible]
MR. JONES: Objection, argumentative, lacks foundation, calls for speculation, implies that

everybody is organized together as one opposition.
A. That could be a perception.
Q. (BY MR. LEVINSTEIN) Well, and I'm not suggesting they were organizing together with or without any of these people, but as far as you know, were they organized together?
A. No.
Q. In fact, people from all over the country spent their own money to fly to public hearings because they had grave concerns about the USTU. Correct?
A. Correct.
Q. Did it surprise you the extent to which people came from all over the United States to express support of severe remedial action against the USTU?
MR. JONES: Objection, calls for speculation.
A. I wasn't surprised.
Q. (BY MR. LEVINSTEIN) Because you were aware that there was widespread dissatisfaction all around the United States with the USTU?
MR. JONES: Objection, overbroad, vague.
A. Again, [illegible] members that I had spoken with, I understood that there was a lot of concern [illegible]

[illegible] organized [illegible]
Q. (BY MR. LEVINSTEIN) Were you aware of the paragraph that carries over from the first page to the second page of Exhibit 97, the reference to a news article of the previous year showing Sang Lee speaking at a press conference in Korea saying that the Korean NGB, the Korean Taekwondo Association, needed to get its act together to continue to be the head of Taekwondo development? Are you familiar with the news article referenced?
A. No, I'm not. I was informed of this by again members who called and asked what was going on. But I have no first-hand knowledge.
Q. Did you investigate?
A. No.
Q. Did you ask Mr. Lee about it?
A. No, I did not.
Q. Why not?
A. No reason at that time.
Q. It was a concern to members, wasn't it?
MR. JONES: Objection, calls for speculation.
A. Yes.
Q. (BY MR. LEVINSTEIN) And you just didn't feel it was your place to ask them, did you?

A. Also, [illegible] that may not have been the case. I mean, at this point in time, I don't know what was going on. [illegible] again, I did not [illegible] feel it was my position to question the president [illegible] didn't even know [illegible] had occurred.
Q. Were you aware [illegible] the Kukkiwon [illegible] on Page 2 [illegible] was hosting Korean team development [illegible]
A. No.
Q. [illegible] website [illegible] association [illegible] Korea [illegible] Korean [illegible] development [illegible]
A. [illegible] don't know [illegible]
Q. And [illegible] the USTU sent $300,000 to the Kukkiwon?
A. [illegible]
Q. [illegible] Kukkiwon organization?
MR. JONES: Objection, [illegible]