Case 1:04-cv-00461-SOM-LEK   Document 313-2   Filed 05/08/2006   Page 1 of 6
Case 1:04-cv-00461-SOM-LEK   Document 208   Filed 03/15/2006   Page 1 of 6

4/7/2005 Harris, Bruce C.F.K. VOLUME II

**Page 356**

1  persons who alleged impropriety by USTU during
2  different periods of time; isn't that true?
3      A    Yes.
4      Q    LadyTKD and people like that?
5           MR. LEVINSTEIN:  Objection; nothing from
6  LadyTKD.  Something from the website that she ran,
7  but . . .
8      Q    (BY MR. JONES)  However, those various
9  documents that you looked at today were not forwarded
10 to you during 2003, were they?
11     A    No, they weren't.
12     Q    In fact, none of them were?
13     A    No.  You're correct.  None of them were.
14     Q    And you asked for those communications,
15 didn't you?
16     A    From the May open forum, yes.  I don't
17 know if those communications all came after that or
18 whenever, but I did ask for --
19     Q    You asked for the communications?
20     A    Right, the book that was presented at the
21 May meeting.
22     Q    And instead of getting the actual
23 communications and the authors of those communications,
24 you were given these letters in August and September
25 from Mr. Satrom?

**Page 357**

1      A    Correct.
2      Q    And these letters took pieces from some of
3  these communications and stuck them together and put
4  them in the form of items that you had to respond to or
5  suffer decertification?
6           MR. LEVINSTEIN:  Objection.
7      A    That's -- I think that's a fair
8  assessment.
9      Q    (BY MR. JONES)  So when you got these
10 letters from Mr. Satrom, you were of the impression
11 that he was assuming those allegations to be true?
12          MR. LEVINSTEIN:  Objection.
13     Q    (BY MR. JONES)  And then the burden was on
14 you to respond to them?
15          MR. LEVINSTEIN:  Objection; compound
16 question.
17     A    Again, I think that's a fair assessment.
18     Q    (BY MR. JONES)  You were not given
19 opportunity to investigate and confront any of those
20 people who wrote in these e-mails and letters before
21 today?
22     A    Correct.
23     Q    You were put on the defensive?
24          MR. LEVINSTEIN:  Objection.
25     A    Yes.

**Page 358**

1      Q    (BY MR. JONES)  You were deprived of due
2  process?
3           MR. LEVINSTEIN:  Objection.
4      Q    (BY MR. JONES)  To the extent you
5  understand what due process means?
6           MR. LEVINSTEIN:  Objection.
7      A    I don't know how to answer that one.
8      Q    (BY MR. JONES)  A lot of time spent on
9  cross-examination regarding the Kukkiwon certification
10 system.
11     A    Yes.
12     Q    A lot of criticism apparently for the USTU
13 not putting into effect a USTU certification that would
14 draw in more of those dollars to the U.S. athletes
15 instead of part of it being shared with Korea.  Is that
16 true?
17     A    That's true.
18     Q    New management is in place at U.S.
19 Taekwondo as of February of 2004; is that true?
20     A    I'm not sure of the date, but yes.
21     Q    Something like that?
22     A    Right.
23     Q    So they've had a year or so to do what
24 they're going to do?
25          MR. LEVINSTEIN:  Objection.

**Page 359**

1      Q    (BY MR. JONES)  Is that fair?
2      A    They have been in place for more than a
3  year, yes.
4      Q    Have they done anything with regard to
5  putting in a U.S. certification program for black
6  belts?
7           MR. LEVINSTEIN:  Objection; lack of
8  foundation.
9      Q    (BY MR. JONES)  If you know.
10     A    Not that I know of.  I think that they're
11 still processing Kukkiwon applications, though to a
12 smaller degree.  But I haven't seen a U.S. black belt
13 program instituted.
14     Q    So we have, what, these five people that
15 have got U.S. certification, and that's it?
16     A    That was the last number I was aware of.
17     Q    So what happened to the big revenue
18 generating idea that USOC was apparently so interested
19 in?
20          MR. LEVINSTEIN:  Objection; lack of
21 foundation.
22     A    I can't speak to that.
23     Q    (BY MR. JONES)  Has it fallen by the
24 wayside?
25     A    I can't speak to that.

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  Q   You're still a USTU member, are you not?
2  A   A life member.
3  Q   So you still keep your -- you take some
4  interest in trying to follow what's going on with it?
5  A   Definitely.
6  Q   A couple of these people that wrote in
7  these complaints or e-mailed them in or sent them into
8  the USOC in September of 2003, you testified you
9  personally knew?
10 A   Yes.
11         (Whereupon, Mr. Johansen left the
12         deposition proceedings.)
13 Q   (BY MR. JONES) Did any of them have kids
14 that didn't get into the athletic programs at USOC
15 (sic), didn't make finals?
16     MR. LEVINSTEIN: Objection. I think you
17 misspoke.
18 A   Instead of USOC --
19 Q   (BY MR. JONES) Pardon me. USTU. I'm
20 sorry.
21     MR. LEVINSTEIN: Objection anyways. But
22 that in particular was completely wrong.
23         (Whereupon, Mr. Braunstein left the
24         deposition proceedings.)
25 A   In reviewing the members that I knew, or

360

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  know, there was Larry Cain, Voorhees, Guy Poos, oh,
2  Bob -- what was his last name -- from Colorado here
3  whose children are very active and had been trying to
4  make the team and didn't always make it. See, now
5  Gambardella is stuck in my head. But his name was
6  Gallagher.
7  Q   (BY MR. JONES) Okay.
8  A   Bob Gallagher. His children would be the
9  ones that I would think that fit that scenario where,
10 for years, they tried to make the team and didn't.
11 Q   Parents are particularly motivated to see
12 their children do well?
13 A   I would agree with that.
14     MR. LEVINSTEIN: Objection. Are you
15 testifying or asking a question?
16 A   I would agree with that. I'm a parent.
17 Q   (BY MR. JONES) And when your children
18 don't do well, isn't there a tendency to sometimes
19 blame?
20     MR. LEVINSTEIN: Objection.
21 A   I don't know about all parents, but I
22 think that's human nature to always see the best in
23 whatever your child does, and if it doesn't turn out
24 that way, look first for other reasons.
25 Q   (BY MR. JONES) Is it possible that -- let

361

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  me ask you, do you know -- you said you know Guy Poos?
2  A   Yes.
3  Q   Who is he?
4  A   He's from Oklahoma. He has Poos
5  Taekwondo. He was also on a couple of committees
6  within USTU. He holds an annual event. His children
7  are competitors with USTU, or have been. Now they're
8  on various positions, such as tournament committees,
9  coaching, et cetera.
10 Q   Did they try out for the U.S. Team?
11 A   Yes.
12 Q   Did they make it?
13 A   Not the national team. I think maybe some
14 other form of a team, but not the national team.
15 Q   Could Mr. Poos' criticisms of USTU be
16 motivated by sour grapes because his kids didn't make
17 it to the team as well?
18     MR. LEVINSTEIN: Objection.
19 A   Again, I can't speak to what motivated
20 him, but, I mean, that could be a possibility.
21 Q   (BY MR. JONES) And you can't see into the
22 minds of any of these people who wrote in these
23 letters; isn't that true? You are not a mind reader?
24 A   Not for pay anymore. No.
25 Q   And you don't know whether these

362

4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  criticisms are -- what the motivations of these
2  criticisms are that people write in?
3  A   I cannot speak to a certainty to anyone's
4  motivation, though some, by knowing them for years and
5  stances they've taken in the past, seem more
6  transparent than others, if that's a fair assessment.
7  Q   Do you know whether USOC did any
8  investigation into these e-mails and letters that came
9  in prior to incorporating it into the letter
10 threatening decertification of the USTU?
11     MR. LEVINSTEIN: Objection.
12 A   I have no way of knowing.
13 Q   (BY MR. JONES) Would the time frame
14 involved between the receipt of these letters and the
15 timing of the letters going out from Satrom to USTU
16 suggest that a very short time elapsed?
17     MR. LEVINSTEIN: Objection.
18 A   Yes. That's a fair assessment, I think.
19         (Whereupon, Mr. Braunstein rejoined the
20         deposition proceedings.)
21 Q   (BY MR. JONES) One of the complaints
22 brought to your attention was from Mr. Kim Sol?
23 A   Yes.
24 Q   Who was he again?
25 A   The state president of Montana, USTU state

363

Case 1:04-cv-00461-SOM-LEK    Document 313-2    Filed 05/08/2006    Page 3 of 6
Case 1:04-cv-00461-SOM-LEK    Document 208    Filed 03/15/2006    Page 3 of 6
4/7/2005 Harris, Bruce C.F.K. VOLUME II

1  president.
2     Q     Was he the chief architect of the U.S. Dan
3  program that you spoke of or described?
4     A     Yes, he was, as I mentioned yesterday I
5  think it was.
6     Q     When it became clear that the U.S. Dan
7  system was not proceeding by USTU management, could it
8  have been that he wrote in a complaint letter because
9  of disappointment that his Dan program was not in
10 place?
11          MR. LEVINSTEIN: Objection.
12    A     Again, I can't speak to his motivation,
13 but that's a possibility.
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22          (Whereupon, Mr. Braunstein left the
23          deposition proceedings.)
24    Q     (BY MR. JONES) Did you have any idea of
25 where that authority came from? Is it written in the

1  bylaws, for example?
2          MR. LEVINSTEIN: Objection.
3     A    Basically, yes, but bylaws are subject to
4  interpretation of course.
5     Q    (BY MR. JONES) There's been, through
6  questioning, a lot of criticism levied at the president
7  with respect to the scope of his power under those
8  bylaws today, hasn't there?
9     A    Yes.
10         (Whereupon, Mr. Johansen rejoined the
11         deposition proceedings.)
12    Q    (BY MR. JONES) But the bylaws say what
13 they say; is that true?
14    A    Correct.
15    Q    And isn't it also true that the USOC
16 approved those bylaws?
17    A    Correct.
18    Q    In fact, they have approved them over and
19 over through the years up until 2003?
20         MR. LEVINSTEIN: Objection.
21    A    Correct.
22         (Whereupon, Mr. Uesugi left the
23         deposition proceedings.)
24    Q    (BY MR. JONES) And, in fact, those bylaws
25 were reviewed at the time USTU became an Olympic-rated

1  NGB?
2     A    To my understanding, yes.
3     Q    And when was the first time that USOC made
4  sounds that they wanted to decrease the power of the
5  president in USTU, to your knowledge?
6     A    To my knowledge, once the USOC itself was
7  dealing with shrinking the size of its board, then
8  other NGBs became not a target so much as under that
9  same purview and scope.
10    Q    So you're telling us that the USOC had the
11 same problem?
12         MR. LEVINSTEIN: Objection.
13    Q    (BY MR. JONES) Same structural problems
14 that it was criticizing USTU for?
15         MR. LEVINSTEIN: Objection.
16    A    I can speak to the fact that the USOC's
17 structure was brought up as an issue that needed to be
18 addressed, just as the USTU's structure was brought up
19 by USOC as an issue to be addressed.
20    Q    (BY MR. JONES) Had USOC already shrunken
21 down its board to comply with some of these new federal
22 laws that counsel was throwing at you as of the time it
23 was bringing action against USTU, if you know?
24         (Whereupon, Mr. Uesugi rejoined the
25         deposition proceedings.)

1     A    To my recollection, it was in the process
2  of doing that. But the actual restructuring of the
3  board and seating the new board had just recently took
4  place, which was after our compliance issues were
5  raised.
6     Q    (BY MR. JONES) So that was a bit of the
7  pot calling the kettle black?
8          MR. LEVINSTEIN: Objection.
9     Q    (BY MR. JONES) They had the same problem,
10 but yet they're trying to force you -- cure the same
11 problem?
12         MR. LEVINSTEIN: Objection.
13    A    I can see the similarities, yes.
14    Q    (BY MR. JONES) And they hadn't even
15 cleaned their own house yet?
16         MR. LEVINSTEIN: Objection.
17    A    I can understand the similarity there.
18    Q    (BY MR. JONES) And worse, they were
19 limiting the time in which you had to comply?
20    A    I wasn't given a time limit, per se, but
21 with approximately a year on the job, it was determined
22 that that's long enough, you guys haven't complied.
23    Q    The time limit was determined by the date
24 of the decertification hearing, wasn't it?
25    A    I think our last -- the last letter that I

Case 1:04-cv-00461-SOM-LEK   Document 313-2   Filed 05/08/2006   Page 4 of 6
Case 1:04-cv-00461-SOM-LEK   Document 208   Filed 03/15/2006   Page 4 of 6
4/7/2005 Harris, Bruce C.F.K. VOLUME II

## Page 368

1  saw, the September letter stated that we had until
2  September 13th to respond, I think, finally.
3      Q    But once the decertification action was
4  filed, you had a clear deadline?
5      A    Yes.
6      Q    And when was that?
7      A    I think decertification was filed after I
8  had left. So the start of January '04, I think I
9  remember seeing.
10          MR. JONES: Can we just have a minute?
11          MR. LEVINSTEIN: Sure.
12          (Discussion off the record.)
13     Q    (BY MR. JONES) Just one final question.
14  Do you know if there was a rush by the USOC to
15  decertify USTU because of the Quadrennium ending in
16  early 2004?
17          MR. LEVINSTEIN: Objection.
18     A    I don't have a basis for knowing that that
19  was the cause for the perceived rush or not. I don't
20  know.
21     Q    (BY MR. JONES) You don't know if
22  Mr. Satrom would be losing his position?
23          MR. LEVINSTEIN: Objection.
24     A    I know that there was talk of all
25  committees being changed along with the new

## Page 369

1  restructuring of USOC, but I don't know if that
2  affected our situation or not. There was also a
3  discussion that even if the structure was drastically
4  changed, some committees would stay on to handle
5  existing matters, so I don't know.
6      Q    (BY MR. JONES) Thank you. I don't have
7  any further questions.
8           MR. LEVINSTEIN: A few quick ones.
9                 E X A M I N A T I O N
10  BY MR. LEVINSTEIN:
11     Q    Sang Lee hired you?
12     A    Indirectly. Again, I came on as Events
13  Director, which was under the hiring authority of the
14  Executive Director then, Jay Warwick.
15     Q    Were you aware that Mr. Sang Lee told
16  Mr. Warwick to hire you as the Events Director?
17     A    No, I was not aware of that.
18     Q    Were you aware that Sang Lee terminated
19  Mr. Warwick?
20     A    No.
21     Q    You didn't know that?
22     A    I didn't know how he was terminated. That
23  was a source of discussion at my very first meeting,
24  did I understand the procedures in which Mr. Warwick
25  was eliminated and I was replacing him. I don't.

## Page 370

1      Q    But that was discussed at your first
2  meeting?
3      A    By the Membership and Credentials
4  Committee.
5      Q    I see. I thought your first meeting at
6  the USTU.
7      A    No. That was one of the first questions
8  the committee asked me.
9      Q    You weren't aware that Mr. Warwick was
10  terminated as a result of a deal between the secretary
11  general and the president?
12     A    No, sir.
13     Q    [redacted]
14     [redacted]
15     [redacted]
16     [redacted]
17     [redacted]
18     [redacted]
19     [redacted]
20     [redacted]
21     [redacted]
22     [redacted]
23     Q    And the changes in the USOC's bylaws had
24  already been published in the summer of 2003?
25     A    I don't know what changes you're referring

## Page 371

1  to.
2      Q    Well, in October of 2003, are you aware
3  that at the USOC board meeting, all of the USOC bylaws
4  were completely changed to a completely new governance
5  structure?
6      A    Yes.
7      Q    That's the meeting you talked about --
8      A    Yes.
9      Q    -- that Mr. Sang Lee voted in favor of
10  that?
11     A    Yes.
12     Q    And as far as comparing the USOC situation
13  to the USTU's, there was never any suggestion that the
14  recordkeeping or financial situation of the USOC was
15  anything approaching that of the USTU, was there?
16     A    Correct. I understood his reference to be
17  the structure changes paralleling each other.
18     Q    Well, you understood it to be, I think,
19  simply that having a large board was a similar issue?
20     A    Right.
21     Q    And did you understand that if the USTU
22  wanted, they had the complete right to go to an
23  Executive Committee hearing and present their case that
24  they wanted more time and that they shouldn't be
25  decertified?

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1          MR. JONES: Objection; calls for
2  speculation, calls for a legal conclusion.
3      A   That wasn't my understanding, based on,
4  again, the letters that we had received that said if
5  you're not found in compliance by such and such a date,
6  this would happen. I wasn't aware of the executive
7  review possibility.
8      Q   (BY MR. LEVINSTEIN) You didn't understand
9  that the Membership and Credentials Committee had
10 absolutely no power to decertify you?
11     A   It was my understanding that once the
12 Membership and Credentials Committee came up with that
13 recommendation to decertify, the end was near.
14     Q   Well, did you understand -- did you ever
15 look at the USOC bylaws or have anyone explain to you
16 how the decertification process worked?
17     A   We did have an explanation of the
18 decertification process. I'm trying to remember who
19 did that for us.
20     Q   Didn't you know that the process was the
21 Membership and Credentials Committee recommended to the
22 USOC board, if the USOC board saw a problem they would
23 charter the Executive Committee to have a de novo
24 hearing on the issue, the issue would be presented to
25 the Executive Committee, the Executive Committee would
```

372

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1  then make a recommendation to the board, and unless the
2  Executive Committee recommended decertification and the
3  board approved it, the USTU would not be decertified?
4          MR. JONES: Objection; asked and
5  answered, calls for a legal conclusion, calls for
6  speculation.
7      A   What I do recall is that the way I
8  understood the process, once the Membership and
9  Credentials Committee came up with a recommendation to
10 decertify, that would go before a vote of USOC -- not
11 the Board of Governors, but whatever group would be the
12 group to approve that or say no, we don't agree with
13 it. That was my understanding.
14     Q   (BY MR. LEVINSTEIN) Okay. You identified
15 all the presidents of the USTU and its history that you
16 can remember?
17     A   I think I did. I might have left one out.
18     Q   You named all the ones you can remember?
19     A   Yes.
20     Q   And how many of those presidents were
21 Korean Americans?
22     A   All that I named.
23     Q   And was there a WTF rule -- strike that.
24         I'm done. No questions.
25         MR. JONES: Just, I think, one.
```

373

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1                EXAMINATION
2  BY MR. JONES:
3      Q   USOC approved USTU's bylaws in 1997?
4          MR. LEVINSTEIN: Objection; calls for a
5  legal conclusion.
6      A   I believe that to be true because it's on
7  the written document on the front.
8      Q   (BY MR. JONES) A stamp or a signature or
9  something?
10     A   Right, saying that it was approved then.
11     Q   And --
12         MR. LEVINSTEIN: The bylaws or --
13         THE DEPONENT: Our bylaws.
14         MR. LEVINSTEIN: -- the selection
15 criteria?
16         MR. JONES: Bylaws.
17         THE DEPONENT: Our bylaws.
18     Q   (BY MR. JONES) We were talking about all
19 this structuring business and pressure by USOC to
20 change the structure.
21         MR. LEVINSTEIN: Objection; move to
22 strike. Not a question.
23     Q   (BY MR. JONES) The USOC -- you just said
24 the USOC approved the USTU bylaws in 1997 because there
25 was something written on the bylaws; is that correct?
```

374

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
1      A   Right. There's a date on the cover page
2  of the bylaws that says the date they were approved and
3  reviewed.
4      Q   And were the bylaws that you were working
5  with for USTU in 2003 substantially similar to the '97
6  bylaws?
7      A   As far as I know, yes.
8      Q   Thank you.
9          MR. LEVINSTEIN: You're done.
10         (The deposition concluded at 5:11 p.m.)
```

375

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1                 A F F I D A V I T
 2    STATE OF COLORADO    )
                           ) ss.
 3    COUNTY OF            )
 4         I have read my deposition, and the same is
 5    true and accurate, save and except for changes and/or
 6    corrections, if any, as indicated by me on the
 7    amendment sheet(s) attached hereto as indicated.
 8
 9    Amendment sheet(s) attached [ ]
10    No changes; no amendment sheet attached [ ]
11
12
           _____
13            BRUCE C.K.W. HARRIS, VOLUME II
14
15         SUBSCRIBED AND SWORN TO before me on this
16    _____ day of _____, 2005.
17    My commission expires: _____
18
19         _____
                      NOTARY PUBLIC
20
           in and for the State of _____
21
22
23
24
25
```

4/7/2005 Harris, Bruce C.F.K. VOLUME II

```
 1              C E R T I F I C A T E
 2
      STATE OF COLORADO    )
 3                         ) ss.
      COUNTY OF DENVER     )
 4
 5
           I, VALORIE S. MUELLER, Registered
 6    Professional Reporter and Notary Public in and for the
      State of Colorado, duly appointed to take the
 7    deposition of BRUCE C.K.W. HARRIS, VOLUME II, certify
      that prior to the examination the deponent was duly
 8    sworn to testify to the truth in the matters in
      controversy between the parties herein; that the
 9    deposition was taken in shorthand by me at the time and
      place aforesaid and was thereafter reduced to
10    typewritten form by me and processed under my
      supervision, the same consisting of 312 pages, and that
11    the same is a full, true and complete transcription of
      my shorthand notes.  I further certify that I am not
12    related to, employed by, or counsel to any of the
      parties herein, or otherwise interested in the events
13    of the within cause.
14
           A transcript review of this deposition was
15    requested and is available to the deponent as notified
      by me.
16
17         IN WITNESS WHEREOF, I have affixed my notarial
      seal this 25th day of April, 2005.  My commission
18    expires December 11, 2006.
19
                    _____
20                       VALORIE S. MUELLER
                     Registered Professional Reporter
21
22
23
24
25
```